UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

JACK MONTAGUE,
    Plaintiff,

v.

YALE UNIVERSTIY, ANGELA GLEASON,    CIVIL ACTION
and JASON KILLHEFFER,    No.
    Defendants.

## COMPLAINT AND JURY DEMAND

### INTRODUCTION

1.    As of the fall of 2015, Jack Montague had a promising future. He was poised to graduate from Yale University in the spring of 2016 with a Bachelor of Arts in American Studies, and he was captain of Yale's basketball team, which was having its most successful season in 54 years.

2.    That all changed on November 30, 2015, however, when Montague received a letter from Yale's University Wide Committee on Sexual Misconduct informing him that he was the subject of a formal complaint based on a sexual encounter he had with another Yale student in the fall of 2014.

3.    This was not the first, or the second, or the third sexual encounter Montague had had with this same female student. Nor was it even the first time he and the student had engaged in sexual intercourse. But now, a year after the fact, the female student – who was affirmatively misled by the defendants into participating in a formal complaint process *initiated by Yale and not by the student herself* – claimed that just *part* of her encounter with Montague (the intercourse) was nonconsensual. And she made this claim despite calling Montague shortly after


the encounter, voluntarily rejoining him the same evening, flirting with him on the way back to his bedroom, and spending the remainder of the night in his bed with him.

4.      In the months that followed, Montague found himself thrust into the confusing, terrifying, and lonely process through which those accused of sexual misconduct are maneuvered, and into the midst of Yale's ongoing battle to establish itself as an institution that takes accusations of sexual misconduct seriously. Unfortunately for Montague, he was a prime candidate to serve as Yale's poster boy for tough enforcement of its *Sexual Misconduct Policies*: popular, well-liked and respected amongst his peers at Yale, and known throughout the country as one of Yale's most promising men's basketball stars. In short, imposing harsh discipline on Montague would surely make an impact.

5.      Less than three months after the complaint was lodged against him, Montague was expelled from Yale, kicked off his beloved basketball team, branded a sex offender, and widely castigated as a "rapist." Those who stuck by him were likewise criticized for condoning "rape," and were forced to publicly apologize for their support. His name appeared in local and national headlines alongside some of the most damning words that could be uttered about a young man: "sexual misconduct." His promising future crumbled into dust.

6.      The actions taken by the defendants resulted from a deeply flawed process during which the plaintiff was denied the most rudimentary elements of fairness promised to him by Yale in its *Procedures Governing the University Wide Committee on Sexual Misconduct.* As a result, Mr. Montague suffered, and continues to suffer, reputational, emotional, and financial damages of an enormous magnitude.

2

## JURISDICTION AND VENUE

7.      This action arises out of Yale University's breach of its contractual and other

obligations to the plaintiff, as well as its violations of Title IX of the Education Amendments of

1972 (20 U.S.C. § 1681) and 42 U.S.C. § 1981.

8.      The plaintiff is a resident of Tennessee, and Yale University and Defendants

Angela Gleason and Jason Killheffer are residents of Connecticut. The amount in controversy is

over $75,000.

9.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332.

10.      Venue is proper under 28 U.S.C. § 1391(b).

## PARTIES

11.      The plaintiff, Jack Montague ("plaintiff" or "Montague"), resides in Tennessee

and was formerly a full-time student at Yale. Mr. Montague was wrongfully and improperly

expelled in February of 2016, while in his senior year at the University. Montague enrolled at

Yale in the fall of 2012 after graduating from a public high school in Tennessee. He was

recruited to play basketball for the Yale men's basketball team, the Yale Bulldogs.

12.      The defendant Yale University ("Yale" or "the University") is a private liberal

arts college located in New Haven, Connecticut, with approximately 5,500 enrolled

undergraduates, and is the beneficiary of federal funds within the meaning of 20 U.S.C. §1681 *et*

*seq.* ("Title IX").

13.      The defendant Angela Gleason ("Gleason") was, at the time of the events at issue,

a Deputy Title IX Coordinator in the Office of the Provost at Yale University.

14.      The defendant Jason Killheffer ("Killheffer") was, at the time of the events at

issue, a Senior Deputy Title IX Coordinator in the Office of the Provost at Yale University.

3

## FACTS

### The Climate at Yale for Sexual Misconduct Discipline

15.     This case arose during a tumultuous period at Yale in which the University faced mounting criticism concerning its handling of allegations of sexual assault made by female students against male students. Specifically, Yale had been accused by students and alumni alike of not taking these allegations of sexual misconduct seriously enough and of shirking its duty to harshly punish perpetrators of sexual assault. Moreover, results from a survey of 27 colleges and universities around the country painted a damning picture of the campus climate: sexual assaults at Yale, according to the survey, were the third-highest of all the schools surveyed. As a consequence, the University had to show it was willing to take a hard line against male students accused of sexual assault in order to dispel the notion that Yale's campus was an unfriendly and unsafe environment for women.

16.     On April 4, 2011, the Office of Civil Rights ("OCR") of the U.S. Department of Education ("DOE") issued a guidance letter to colleges and universities in the United States, widely known as the "Dear Colleague" letter.  The letter advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq*. and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence, and address its effects."

17.     In the wake of the "Dear Colleague" letter, the DOE commenced numerous investigations against colleges and universities, with the underlying threat that those not in compliance stood to lose federal funding.

18.     Just one month before OCR issued the "Dear Colleague" letter, OCR received a complaint alleging that a sexually hostile environment existed at Yale and that Yale had not

4

responded in a prompt and adequate manner. The complaint stemmed in part from a well-publicized incident in October of 2010 in which fraternity pledges chanted sexually aggressive comments outside the Yale Women's Center.

19.     OCR assessed whether Yale had prompt and equitable grievance procedures to address complaints under Title IX, and whether Yale had allowed a sexually hostile environment to be created on campus by not sufficiently responding to complaints of sexual harassment.

20.     OCR concluded Yale was deficient in a number of areas.

21.     Consequently, in July of 2011, Yale created the University Wide Committee on Sexual Misconduct ("UWC"), a committee that provides both formal and informal ways to resolve grievances concerning alleged sexual misconduct. The UWC is charged with enforcing Yale's *Sexual Misconduct Policies*. A true and correct copy of Yale's *Sexual Misconduct Policies* is attached hereto as Exhibit 1.

22.     In connection with the creation of the UWC, Yale adopted *Procedures Governing the University Wide Committee on Sexual Misconduct* ("*UWC Procedures*"), which set out the rights and responsibilities of the University, an accuser, and an accused in the case of a complaint of sexual misconduct. A true and correct copy of the *UWC Procedures* is attached hereto as Exhibit 2.

23.     In addition, Yale established the Sexual Harassment and Assault Response and Education ("SHARE") Center, which serves as the initial place of referral for students seeking services and options as a result of alleged sexual misconduct.

24.     In the wake of the 2010 complaint to OCR, Yale also began tracking complaints of sexual misconduct and compiling the data in semi-annual reports (the "Spangler Reports")

5

named for Yale's Deputy Provost Stephanie Spangler, who supervises the activities of Yale's Title IX coordinators.

25.     On June 15, 2012, OCR resolved the Title IX complaint against Yale through a voluntary resolution agreement (the "Resolution Agreement"). Yale agreed to implement a new Title IX coordinator structure, and the Resolution Agreement itself provided for the monitoring of that implementation.

26.     Yale remained under the watchful eye of the OCR well into 2014, in part because it had agreed, pursuant to the Resolution Agreement, to report to the OCR on a periodic basis and to allow OCR to visit its campus "whenever necessary" to determine whether Yale was indeed fulfilling the terms of the Agreement and was in compliance with Title IX.

27.     OCR was not the only group watching Yale, however. The July 31, 2013, Spangler Report sparked outrage amongst alumni groups and student groups, such as "Students Against Sexual Violence at Yale" ("SASVY"), because the report revealed that students whom UWC had found responsible for "nonconsensual sex" were allowed to remain at Yale and in some cases were punished only with written reprimands.

28.     These groups not only took issue with what they viewed as inadequate discipline, they attacked Yale's use of the term "nonconsensual sex." That term, a group of 229 Yale alumni said in an August, 2013 "open letter" to Yale's president, Peter Salovey, and Provost Spangler, "reinforce[s] the rape myth that there are two tiers of sexual assault." The message from these 229 alumni was blunt: "Yale needs to be clear: Sex without consent is sexual assault."

29.     Around the same time the open letter was published, two Change.org petitions appeared online calling for tougher penalties for sexual assault.

30.     To answer these critics' concerns that the University was not automatically removing all "sexual assailants" from campus and was unfairly using "nonconsensual sex" as a euphemism for what the critics believed amounted to "rape" in all instances, Yale issued a series of hypothetical fact patterns, entitled "Sexual Misconduct Scenarios," to explain how it categorizes and punishes different types of sexual encounters. A true and correct copy of the *Sexual Misconduct Scenarios* is attached hereto as Exhibit 3.

31.     The "Sexual Misconduct Scenarios" describe various sexual situations along a spectrum – in some scenarios, consent is clear; in others, it is ambiguous; and in others there is a clear lack of consent. Each scenario is followed by the penalty or ranges of penalties likely in that particular, fact-specific circumstance (should a penalty be appropriate). (*See* Exhibit 3.)

32.     If the "Sexual Misconduct Scenarios" served to quell the tide of criticism against Yale, it was a short-lived calm. In September of 2015, a beleaguered Yale took yet another hit: the Association of American Universities ("AAU") released the results of a survey of 27 colleges around the country showing that rates of undergraduate sexual assaults at Yale were the third-highest among the schools surveyed. President Salovey called the results of the survey "profoundly troubling," and vowed to "redouble [Yale's] efforts" to combat sexual assault and misconduct.

33.     Meanwhile, Yale students seized on the results as another opportunity to criticize the University. For example, one student who was interviewed by the *New Haven Register* bemoaned the lack of "protocol o[r] repercussions for people who have done things on this campus," and another charged that the administration was not adequately performing its role in dealing with sexual misconduct on campus.

34.     As it turned out, Yale students had responded to this survey at a much higher rate than students at most of the 27 other colleges and universities: over half of Yale's entire student population participated in the survey.

35.     In short, Yale knew its students were paying close attention to the issue of sexual misconduct on campus, and that they had strong views on how Yale had responded, historically, to complaints of sexual assault.

36.     It was in this climate – permeated by deep mistrust and anger amongst Yale students and near-panic on the part of Yale administrators – that the defendants misled and pressured a female student, against her original wishes, to participate in a formal complaint process against Jack Montague, accusing him of sexual assault.

### Initiation of the Complaint Process

37.     The proceedings against Mr. Montague began in earnest on November 18, 2015, when Senior Deputy Title IX Coordinator Jason Killheffer filed a formal complaint alleging that Montague sexually assaulted Jane Roe[1] more than a year earlier, on the night of October 18-19, 2014.

38.     The allegations involved an incident in which Roe – with whom Montague had had sexual intercourse on at least one other occasion, and sexual encounters not involving intercourse on several other occasions – willingly accompanied Montague to his bedroom, removed her clothing as he removed his, got into his bed, and engaged in consensual sexual conduct. Roe was now claiming the intercourse that followed the consensual sexual foreplay was nonconsensual.

---

[1] Jane Roe is a pseudonym being used to protect this student's privacy. Except where the student has chosen to reveal his/her identity in the press, this complaint will identify other students through use of pseudonyms in order to protect their privacy.

8

39.     It was not Roe's idea to file the formal complaint against Montague, however.

40.     On September 21, 2015, one of Roe's suitemates, Rachel Rogers,[2] was speaking with Deputy Title IX Coordinator Angela Gleason about a different matter and took it upon herself to mention to Gleason that a friend of hers – Roe – had had a "bad experience."

41.     Rogers outlined the general details of Roe's "bad experience" and asked Gleason what she (Rogers) could do to help Roe. Rogers also revealed to Gleason that the person with whom Roe had the "bad experience" was Jack Montague, the popular captain of Yale's men's basketball team.

42.     Upon hearing the name of the alleged perpetrator, Gleason urged Rogers to convince Roe to come forward and report the incident.

43.     On October 15, 2015, Rogers talked to Roe about her conversation with Gleason, but Roe was hesitant to talk to Gleason. Roe asked Rogers to reach out to Gleason again and ask some additional questions so she could make a decision about whether to meet with Gleason or not.

44.     The following day, at Roe's request, Rogers met with Gleason again to discuss Roe's situation and, on information and belief, informed Gleason that Roe was reluctant to make a report.

45.     Trying a different tack to induce Roe to come forward, Gleason suggested to Rogers that she (Rogers) could inform Roe there were various formal and informal procedures available to deal with sexual misconduct, including the option of making an anonymous informal complaint.

---

[2] Rachel Rogers is a pseudonym being used to protect this student's privacy. Except where the student has chosen to reveal his/her identity in the press, this complaint will identify other students through use of pseudonyms in order to protect their privacy.

9

46.     Gleason described the anonymous informal complaint process to Rogers as a means through which Roe could speak to Gleason but request that her name be kept confidential; Gleason would then call Montague in for a conversation, inform him that a complaint was made against him, and suggest he participate in training about communication and sexual consent. Rogers said Gleason told her that the counseling would "help [Montague] avoid repeating his behavior with anyone else."

47.     According to Rogers, when she relayed this information to Roe, Roe liked the idea of the anonymous informal complaint process. Roe thought it would "fulfill her goal of making sure Mr. Montague understood [that] his behavior was wrong and hurtful and [would] stop him from doing it again to someone else," but it would also allow her to avoid the formal complaint process.

48.     Indeed, Roe was clear that she did not want to engage in the formal complaint process. She was "not interested in having Mr. Montague punished[.]"

49.     Based on the information that Gleason provided to Rogers, Roe finally met with Gleason on October 19, 2015.

50.     On November 6, 2015, Gleason contacted Roe and told her she would not be able to keep Roe's name confidential after all.

51.     There is nothing in Yale's *UWC Procedures* or its *Sexual Misconduct Policies* that prevents the University from keeping a complainant's name confidential, however. On the contrary, Yale's policy is to honor a complainant's request to keep her name confidential – and keep the process informal, if the complainant so chooses – unless there are "allegations of violence," in which case "the UWC may not be able to honor a request for confidentiality if doing so would endanger the safety or well-being of the complainant or other members of the

10

Yale community." (*See* <u>Exhibit 2</u>.) In fact, in a document entitled "Reporting Sexual Misconduct to a Title IX Coordinator," Yale explicitly states that "[e]xcept in cases of acute threat, coordinators *will not* take any action that could compromise a complainant's confidentiality without the complainant's agreement (emphasis added)." A true and correct copy of *Reporting Sexual Misconduct to a Title IX Coordinator* is attached hereto as <u>Exhibit 4</u>.

52.    This was not a case in which there was "acute threat" to anyone. It was therefore false and highly misleading for Gleason to tell Roe that the option to keep her name confidential was no longer available to her.

53.    Gleason also explained to Roe during the November 6 conversation that Montague had already been referred for SHARE training after a previous complaint against him and so the option of informal resolution and training was no longer available to him.

54.    In so informing Roe, Gleason either directly told Roe or clearly implied to Roe that the previous complaint against Montague was also a complaint of sexual assault.

55.    This information was affirmatively false, a breach of Yale's explicit confidentiality requirements, and contrary to Yale's *UWC Procedures*.

56.    Montague had never before been the subject of a complaint of sexual assault. As described in greater detail below, a female student accused him of rolling up a paper plate and shoving it down her shirt. There was nothing "sexual" about that encounter, and the SHARE training Yale imposed on Montague as a sanction for his conduct likewise had nothing to do with sex.

57.    Furthermore, the *UWC Procedures* and the *Provost's Statement on Confidentiality of UWC Proceedings* strictly prohibited Gleason from disclosing to Roe any information concerning the prior UWC proceedings against Montague or the outcome of those proceedings.

11

(*See* Exhibit 2; *see also Provost's Statement on Confidentiality of UWC Proceedings*, a true and correct copy of which is attached hereto as Exhibit 5.)

58.     Gleason blatantly violated the UWC's confidentiality requirements not only by telling Roe that there had been a prior UWC proceeding involving Montague, but worse, by falsely telling or implying to Roe that Montague was the subject of a previous complaint of *sexual assault*.

59.     Finally, contrary to what Gleason told Roe, there is nothing in Yale's *UWC Procedures* or its *Sexual Misconduct Policies* which bars Yale from conducting an informal process and recommending training when an accused has already received training after a previous complaint. That process was and should have remained available to Roe at the time she made her report to Gleason.

60.     After falsely informing Roe that the informal complaint process was foreclosed because of Montague's prior disciplinary history, Gleason expressed concern that the incident was serious and told Roe a Title IX Coordinator could file a formal complaint on Roe's behalf as long as Roe agreed to cooperate as a witness.

61.     Title IX Coordinators are permitted to bring formal actions on behalf of complainants only in "certain *unusual* circumstances" (emphasis added), however, "such as those involving risks to the safety of individuals and/or the community." (*See Report of Complaints of Sexual Misconduct*, a true and correct copy of which is attached hereto as Exhibit 6.)

62.     Montague posed no risk of safety either to Roe or to the Yale community, nor did Roe or Yale ever claim he posed such a risk.

63.     As a direct result of Gleason's misrepresentations and false statements to Roe,

Roe agreed to cooperate in the formal complaint process in order "to protect other women" from

Montague, whom she now believed had a history of sexual assault.

### Prior UWC Proceedings ("UWC I")

64.     In point of fact, the prior UWC complaint and resulting discipline against Mr.

Montague to which Gleason improperly referred is completely unrelated to "sexual assault," or

even to sexual misconduct.

65.     On the last day of Montague's freshman year, he and some fellow Yale students

congregated on the sidewalk outside a pizza parlor in New Haven. Some of the students,

including Montague, were intoxicated. Montague engaged in a discussion with the other

students, including Sally Smith[3] – a graduating senior – for approximately 10-15 minutes.

66.     According to Smith, Montague, who appeared to be annoyed by the end of the

conversation, rolled up a paper plate from the pizza parlor and put it down the front of Smith's

tank top. Smith did not allege that Montague made any statements of a sexual nature during the

interaction.

67.     It is undisputed that "[t]here was no . . . skin-to-skin contact" during the incident.

68.     Smith decided to file a formal Title IX complaint against Montague in the fall of

2013, after she graduated from Yale. Her allegation was that Montague had violated the

University's *Sexual Misconduct Policies* by engaging in "sexual harassment."

69.     The sexual harassment policy reads, in pertinent part:

Sexual harassment consists of nonconsensual . . . conduct of a sexual nature on or
off campus, when . . . such conduct has the purpose or effect of unreasonably

---

[3] Sally Smith is a pseudonym being used to protect this student's privacy. Except where the student has chosen to reveal his/her identity in the press, this complaint will identify other students through use of pseudonyms in order to protect their privacy.

13

interfering with an individual's work or academic performance or creating an intimidating or hostile academic or work environment. Sexual harassment may be found in a single episode, as well as in persistent behavior.

(*See* Exhibit 1.)

70.     Pursuant to the *UWC Procedures*, an independent fact-finder conducted an investigation into Smith's complaint. Montague told the fact-finder he remembered nothing of the incident, but conceded that it likely occurred as Smith described. Montague said he was "embarrassed and ashamed" by his behavior and "accept[ed] full responsibility for the incident . . . ."

71.     Smith's complaint proceeded to a UWC panel for fact-finding and, if necessary, a disciplinary recommendation. The UWC panel concluded Montague violated the University's *Sexual Misconduct Policies* by "sexually harassing" Smith. Specifically, the panel found that Montague "without provocation rolled up a used, paper pizza plate, shoved it down [Smith's] shirt between her breasts and then walked away from her."

72.     Consequently, the panel recommended Montague be placed on probation for four terms; that he not be permitted to hold a leadership position in any student activity, organization or sport; that he be required to enroll in sexual harassment and gender sensitivity training through Yale's SHARE Center; that he be required to meet with a member of the SHARE Center once each semester for the remainder of his time at Yale "to review and reflect on his interactions and relationships with female students at Yale"; and that he be required to receive training on the appropriate use of alcohol.

73.     Yale College Dean Mary Miller accepted the panel's findings of fact, conclusions and recommendations.

14

74.     Under Yale's own policies and definitions, however, Montague's conduct did not constitute "sexual harassment." Montague's conduct was not "conduct of a sexual nature," nor did the panel find any conduct that could reasonably be construed as "sexual." Moreover, Montague's conduct clearly did not "have the purpose or effect of unreasonably interfering with [Smith's] work or academic performance or creating an intimidating or hostile academic or work environment," nor did the panel find his conduct had that purpose or effect. In fact, it was undisputed that the conduct occurred on the last day of the 2012-2013 academic year and that Smith was a graduating senior who neither saw nor heard from Montague again after their minutes-long interaction at an off-campus pizza parlor.

75.     The outcome of the UWC I proceeding was therefore erroneous.

76.     Moreover, the matter was outside the jurisdiction of the UWC, which addresses *only* "[v]iolations of sexual misconduct." (*See* Exhibit 2.)

77.     This was an incident that should have been handled by Yale's Executive Committee, which has jurisdiction over all other disciplinary infractions committed by Yale undergraduate students.

78.     On information and belief, the only reason Yale chose to treat the matter as "sexual misconduct" and keep it with the UWC instead of transferring it to the Executive Committee was the fact that the alleged perpetrator was a man and the alleged victim was a woman.

79.     Montague complied with all of the disciplinary conditions imposed upon him as a result of UWC I.

80.     The training Montague received from the SHARE Center was wholly unrelated to sexual relationships or to sexual consent. Indeed, apparently recognizing that Smith's complaint

15

also had nothing to do with sexual harassment, the SHARE trainer did not even focus Montague's sessions on this topic.

## Jane Roe's Complaint ("UWC II" Proceedings)

81.     It was only as a result of the false light in which Gleason portrayed the UWC I proceedings and outcome to Roe that Roe agreed to cooperate in a formal complaint process against Montague.

82.     Indeed, as Roe later explained in her opening statement to the UWC panel, her conversation with Gleason "reframed the incident" for her: she "had always viewed [herself] as the victim of someone else's one-time mistake," but her "perspective broadened after [her] conversation with Angie [Gleason], as [she] began to think about the other people on this campus and how [her] choosing to remain silent on this matter could harm them." Having learned this information about Montague from Gleason, Roe felt her "hands were tied; [she] could not, in good conscience, say no to participating in the investigation."

83.     On November 18, 2015, Defendant Killheffer filed a formal complaint of sexual assault against Mr. Montague alleging that Montague sexually penetrated Roe without her consent on the night of Saturday, October 18, 2014, at his residence.

84.     Killheffer purported to bring this complaint pursuant to Section 1 of the *UWC Procedures*, which allows a Title IX Coordinator to bring a complaint "when there is evidence that the University's policies on sexual misconduct have been violated and the Coordinator's intervention is needed to ensure that the matter reaches the UWC." (*See* Exhibit 2.)

85.     As set forth above, however, Yale's policies contemplate that a Coordinator's intervention is "needed" only in "unusual circumstances . . . involving risks to the safety of

16

individuals and/or the community," in which case the informal complaint process is insufficient to address the severity of the situation. (*See* Exhibit 6.)

86.     No such circumstance existed here.

87.     On November 30, 2015, Aley Menon, UWC Secretary, notified Montague that he was the subject of a complaint alleging that he had "sexually assaulted a Yale College student on the night of October 18, 2014, at [his] residence[.]" The letter referred Montague to Killheffer's complaint; the only additional information contained in that letter was the name of Montague's accuser and the fact that she was alleging sexual penetration without consent.

88.     In the letter, Menon noted that in reviewing the facts during the formal complaint process, the UWC *may* consider other violations of the sexual misconduct policy "that relate to the complaint."

89.     Because of the nature of the UWC I proceedings, Montague had no reason to believe they "relate[d] to the complaint" of sexual assault in any way.

90.     Menon also informed Montague that he had only five days to provide a written response to the complaint and "encourage[d]" him to choose an advisor to "support [him] throughout this process," but warned that the advisor was not permitted to submit any documents or speak during Montague's fact-finding interview or the hearing.

91.     Montague later met with Defendant Gleason, who said that she was unable to provide him with any additional information about the complaint because it was confidential, and further, that he would not be able to get more information before or during his upcoming interview with the fact-finder.

17

92.     Montague submitted a written response denying the allegations against him and stating that all interactions between himself and Roe were consensual. This was all he could say at the time, as Yale gave him no notice of the specifics of Roe's complaint.

### The Investigation

93.     In accordance with the *UWC Procedures*, Yale appointed an impartial fact-finder to "gather documents and conduct interviews as necessary to reach a thorough understanding of the facts and circumstances surrounding the allegations of the complaint." (*See* <u>Exhibit 2</u>.)

94.     The undisputed facts are as follows:

   94a.   Roe and Montague first met at a party in early September, 2014, at which time they engaged in consensual sexual activity (but not intercourse). Roe joined Montague in his bed and spent the night with him.

   94b.   Roe and Montague continued to communicate with each other and, a week or two after their first encounter, they met again and had consensual sex (but not intercourse). Roe again spent the night with Montague.

   94c.   On September 24, 2014, Roe voluntarily accompanied Montague to his bedroom where "both parties undressed" and kissed in Montague's bed. Roe and Montague then had consensual sexual intercourse, and Roe spent the night with Montague.

   94d.   On October 18, 2014, Roe went to a party at Montague's house, where Roe and Montague engaged in consensual sexual contact (not including intercourse) outside the house in Montague's car.

   94e.   The two moved to Montague's bedroom, where they voluntarily removed all of their clothing and began engaging in consensual sexual activity.

18

94f.    Roe and Montague then had sexual intercourse – the subject of the UWC
        II complaint – and Roe ultimately spent the night at Montague's house.

94g.    Several days later Roe contacted Montague and the two met on October
        28, 2014, at which time Roe expressed regret about the sexual intercourse
        on October 18. Montague told her he was sorry she felt that way, and he
        agreed not to pursue her in the future.

95.     Roe provided the following additional details to the fact-finder:

95a.    During Roe's first two sexual encounters with Montague he inquired
        whether she wanted to have sexual intercourse, and she said "no."
        Montague "respected her decision and did not push her."

95b.    During Roe's third sexual encounter with Montague on September 24,
        2014, she affirmatively, verbally consented to sexual intercourse after both
        parties undressed and were in bed kissing.

95c.    Roe claimed that on the evening of October 18, 2014, while she and
        Montague were kissing each other outside his house and in his car, she
        told him she wanted to "hook up" but not "have sex."

95d.    Roe and Montague eventually got out of his car and went inside his house
        in order to go up to Montague's room. Roe led the way.

95e.    When they arrived in the bedroom, they both took off all of their clothes
        and got into bed, where they resumed kissing and touching.

95f.    Roe said that once they undressed and began engaging in consensual
        foreplay, "there was no further discussion about the boundaries of their
        sexual consent."

95g.   Montague kissed Roe and touched her genitals, and Roe had no objection. Indeed, Roe told the fact-finder she "indicated her consent by kissing [Montague,] touching his body . . . and by not tensing up."

95h.   Montague then got on top of Roe in order to engage in sexual intercourse.

95i.   Roe said that at that point she "put her hands up, pressed them against the front of Mr. Montague's shoulders and pushed him, *but not very forcefully*" (emphasis added).

95j.   According to Roe, she also said, "no, I said I wanted to hook up but not have sex." Roe explained to the fact-finder, however, that Montague looked "*as if he did not hear what she was saying*" (emphasis added).

95k.   Montague – having apparently not heard Roe's purported statement – penetrated Roe; Roe made no further attempts to stop the sexual intercourse.

95l.   Roe left Montague's house after the encounter, but later called him and met up with him again in the early morning hours of October 19.

95m.   Roe accompanied Montague back to his house, where she spent the rest of the night. Roe recalled that their conversation on the way back to Montague's house was "normal and flirty."

95n.   When they got back to Montague's room, Roe voluntarily got into bed with Montague. Roe told the fact-finder that Montague attempted to initiate sexual contact again, but Roe declined. Montague "did not object," and they both went to sleep.

20

96.     Mr. Montague's recollection of his relationship with Roe prior to October 18, 2014, was largely consistent with Roe's account. He provided the fact-finder with the following additional details:

96a.    As to the events of October 18, Montague told the fact-finder he had four to seven drinks of alcohol over a period of several hours that night. He recalled kissing Roe outside and then in his truck, and inviting her inside to go to his bedroom.

96b.    Montague's recollection was that Roe consented to all of their sexual activity that night.

96c.    Nothing about the encounter made Montague think Roe was hesitant or uncomfortable. Montague remembered changing positions during intercourse, and said Roe did not object. (Roe, for her part, did not deny the two changed positions – she simply did not remember.)

96d.    Roe then spent the night with him, as she had during their previous sexual encounters.

96e.    Montague told the fact-finder Roe never told him she wanted to "hook up but not have sex," nor did Roe put her hands on his shoulders and push him as they began to have intercourse.

96f.    The fact-finder asked Montague about Roe's account that she left the house after having intercourse with Montague and later returned; Montague did not deny this had occurred, but did not remember it.

97.     The fact-finder never asked Montague about the UWC I proceedings.

21

98.     The fact-finder also interviewed five of Roe's friends – Jessica Johnson, Nancy

Nelson, Carol Conrad, Kathleen Klein,[4] and Rachel Rogers – with whom Roe had discussed the

October 18 sexual encounter.

99.     Johnson, Nelson, Klein, and Rogers all told the fact-finder that Roe told

Montague, when the two were in his bedroom, that she did not want to "have sex."

100.    Roe did not tell her friends that she voluntarily removed all of her clothing, got in

bed with Montague, and consented to myriad sexual acts.

101.    Further, neither Johnson, Nelson, Klein, nor Rogers said that Roe told them she

had made any *previous* statements to Montague that night indicating she wanted to "hook up"

with Montague but did not want to "have sex."

102.    Roe had previously told Rogers that she had no romantic feelings for Montague,

however; their relationship was purely sexual.

103.    Conrad told a somewhat different story to the fact-finder than what was reported

by Roe's other friends. Conrad said Roe told Montague they could "hang out" but not have

intercourse, and that Montague "pushed her to agree to sex." According to Conrad, Roe said

"no" but Montague proceeded anyway.

104.    Conrad's account is not consistent with Roe's; Roe never said Montague "pushed

her to agree to have sex."

105.    The fact-finder interviewed Defendant Gleason as well. Gleason recalled that

when Roe first came to her, she told Roe that one option was to sit down with Montague, tell him

there was a complaint against him, and suggest he participate in training to make sure he

---

[4] These are pseudonyms being used to protect these students' privacy. Except where the student has chosen to reveal his/her identity in the press, this complaint will identify other students through use of pseudonyms in order to protect their privacy.

22

understood the University's consent policy. According to Gleason, she then told Roe she would "have to check to see if Mr. Montague was known to the Title IX Coordinators and would consult with other Coordinators in order to determine whether it was appropriate to address this incident with additional training."

106.    Gleason told the fact-finder that after consulting with the other Title IX Coordinators, she learned Montague had already participated in a semester of "sensitivity training" and so it "did not make sense to ask him to repeat that intervention."

107.    Gleason thereafter reported back to Roe and implied Montague had already received training on consent, and suggested the situation was serious enough to warrant a formal complaint.

108.    Gleason told Roe that a Title IX Coordinator could bring the complaint if Roe was willing to participate as a witness. Roe agreed to cooperate on that basis.

109.    The fact-finder prepared a report summarizing her interviews and submitted the report to the UWC hearing panel. The report did not include any factual findings about or references to the UWC I proceedings. None of the witnesses' interviews with the fact-finder were recorded by either audio or visual means.

110.    Per the *UWC Procedures*, on or about January 15, 2016, Montague received a final draft of the fact-finder's report. This was the first time he was informed of the details of Roe's claims.

### The UWC II Panel Hearing

111.    Mr. Montague's UWC II hearing was held on January 21, 2016.  The only assistance Montague had during the hearing came from Montague's adviser, Yale basketball coach James Jones.

23

112.    Roe participated in the hearing and was accompanied by an adviser from the SHARE Center. Roe prepared a lengthy written opening statement in advance of the hearing. On information and belief, Roe's SHARE Center adviser was aware of this practice and encouraged Roe to prepare the statement.

113.    Unlike Roe's adviser, Coach Jones was unaware of the practice of preparing opening statements for UWC hearings, and no one from Yale informed Montague that he should prepare an opening statement. Montague therefore did not prepare or read one at the hearing.

114.    As he had throughout the proceedings, Montague expressed to the panel his confusion about Roe's complaint; as he understood it, all of his interactions with Roe had been consensual.

115.    The panel hearing was not recorded by audio or visual means.

### The Panel's Report

116.    The panel issued its report on February 1, 2016.

117.    The panel confirmed in its report that Roe "agreed to participate in the UWC investigation *only* after she learned that Mr. Montague had already received training" (emphasis added).

118.    The panel accepted the undisputed facts in the fact-finder's report, and reviewed the evidence presented by the fact-finder in her report, as well as the evidence gathered at the hearing, to determine whether Montague engaged in nonconsensual sexual intercourse with Roe in violation of the University's *Sexual Misconduct Policies*.

119.    The panel's factual findings largely mirror the facts as set forth in the fact-finder's report. These findings, when construed consistently with the undisputed evidence, are inadequate

24

Case 3:16-cv-00885-AVC   Document 1   Filed 06/09/16   Page 25 of 101


to support a conclusion that Montague violated Yale's *Sexual Misconduct Policies* by engaging in nonconsensual sexual intercourse with Roe.

120.    Specifically, the panel's findings make clear that whatever Roe might have said to Montague about the limits of her consent prior to willingly accompanying him to his bedroom, and whatever she might have communicated about not wanting to "have sex," once she got to Montague's bedroom she clearly changed her mind.

121.    As the fact-finder was careful to ascertain, Roe affirmatively and unequivocally communicated to Montague, by her conduct, that she consented to "sex."

122.    To Montague, Roe's conduct on October 18 was not objectively different than it was during their previous sexual encounters, including the encounter on September 24 when Roe removed all of her clothing, voluntarily joined Montague in his bed, and voluntarily engaged in sexual foreplay and sexual intercourse.

123.    Roe had an absolute right to revoke her consent to sex at any time, but that revocation of consent had to be communicated to Mr. Montague.

124.    The revocation of consent – like the giving of consent – must be clear.

125.    The panel made no finding that Roe clearly revoked her consent to sex.

126.    For example, while the panel apparently credited Roe's account that when Montague got on top of her as if to penetrate her she put her hands up and pressed them against his shoulders, the uncontroverted evidence is that she did so in a manner that was "not very forceful[]."

127.    Putting one's hands on a sexual partner's shoulders and gently pressing on them during the course of a sexual act cannot reasonably be construed as conduct clearly indicating revocation of consent to sex.

25

128.    Montague's view that Roe "did not *push him away* immediately before intercourse" is thus consistent with a rational interpretation of Roe's actions in placing her hands on his shoulders and gently pressing on them as the two were about to have what he believed to be consensual intercourse.

129.    In addition, the panel did not find that Roe's purported verbal revocation of consent – "no, I said I wanted to hook up but not have sex" – was *audible*. In fact, Roe herself confirmed that she *did not think Montague heard her*.

130.    Montague's testimony that Roe did not tell him, during the course of the encounter, that she did not want to "have sex" is thus entirely consistent with Roe's account that Montague appeared not to "hear what she was saying."

131.    By all indications, then, Roe communicated to Montague, and Montague reasonably believed, that he had Roe's consent to engage in sex based on the fact that Roe led Montague to his bedroom, voluntarily removed all of her clothing and voluntarily engaged in sexual acts with him.

132.    Mr. Montague had no reason to believe Roe ever revoked that consent because he never heard Roe express that she did not wish to continue.

133.    In fact, by all accounts, Montague repeatedly demonstrated that when Roe said, and Montague *heard* and understood Roe to be saying, that she did not want to have sexual intercourse, he could – and *did* – comply with her wishes.

134.    Specifically, Roe told the fact-finder that in her earlier encounters with Montague, when Roe said she did not want to have sex, Montague "respected her decision and did not push her." Likewise, when Roe returned to Montague's room and got into bed with him in the early

26

morning hours of October 19 and rebuffed his attempts to re-initiate sexual contact, Montague again readily respected her wishes.

135.    The panel also made credibility determinations without properly considering the evidence presented.

136.    The panel explicitly credited Roe's account because Roe seemed able to remember the incident very clearly; indeed, the panel found, "there is no evidence [Roe] was intoxicated or otherwise impaired in any way that would have affected her recollection of the night."

137.    By contrast, the panel did not find Mr. Montague credible "because of his selective memory . . . and his shifting recollection of how he gauged consent."

138.    In so finding, the panel completely ignored the clear evidence that Montague *was* impaired to some degree, which would account for his failure to remember the events of October 18 with crystal clarity: Montague admitted to having four to seven alcoholic drinks in the space of just a few hours, although he said he was not intoxicated.

139.    Furthermore, it was not until just before the UWC hearing – when he received the fact-finder's report – that Montague finally understood the extent of Roe's claims. This also accounts for any differences in his memory between the time of his interview and the panel hearing.

140.    Yale's failure to give Montague proper notice of Roe's claims disadvantaged him at his interview with the fact-finder because he was asked to respond to those claims without knowing or being able to reflect upon any of the detailed allegations. Once he learned the details and was able to search his memory, however, he testified to a broader recollection of those events at the hearing.

4851-0117-1240, v. 2

141.    At the conclusion of its report, the panel stated that in accordance with Section 7.4 of the *UWC Procedures* it had taken "into account Mr. Montague's previous formal disciplinary history with the UWC for violating Yale's sexual misconduct policy . . . ." The panel may, consistent with Section 7.4 *and as part of the UWC hearing process*, choose to take account of prior UWC proceedings in assessing culpability. (*See* <u>Exhibit 2</u>.)

142.    On information and belief, the UWC Secretary made an *ex parte* submission to the panel detailing the UWC I proceedings.

143.    The panel never addressed the UWC I proceedings in Montague's presence. It did not ask Montague any questions about the UWC I proceedings, nor did allow him to explain what had occurred or to point out that what he did to Smith was not in any way "related to" nor probative of whether he committed the alleged sexual assault of Roe.

144.    Montague was entitled to be present during the presentation of all evidence the panel took into account on the issue of culpability, including the presentation of evidence related to the UWC I proceeding, and he was entitled to present relevant or countervailing evidence if he so chose.

145.    Montague was deprived of this opportunity. Had he been given the opportunity, he could have argued that the conclusion of the UWC I proceedings was erroneous, and further, that the UWC I proceedings bore no relationship to Roe's allegations, beyond the basic fact that both proceedings involved female complainants.

146.    The panel ultimately concluded, by a preponderance of evidence, that Mr. Montague sexually assaulted Roe in violation of *Yale's Sexual Misconduct Policies*.

147.   Per Yale's 2015 *UWC Procedures*, Montague was informed, on or about February 1, 2016, of the panel's findings of fact and conclusion, *but not of its recommended disciplinary action.* (*See* Exhibit 2.)

148.   This represented a substantial change in Yale's procedure. The prior version of the *UWC Procedures* – in effect from 2013 until they were revised in 2015 – provided that both parties would be notified of the panel's findings of fact, conclusions, *and* recommended penalty, and would be given the opportunity to submit a written response addressing the panel's report *in full*.

149.   Because of Yale's unilateral change in its procedure, Montague had no opportunity to respond to or challenge the panel's disciplinary recommendation.

150.   On February 2, 2016, Roe wrote to Yale College Dean Jonathan Holloway expressing her full support of the panel's conclusion. Roe reiterated that the motivation for the formal complaint was "to keep this campus safe," and urged Holloway to consider that Montague "has had additional opportunities to be trained on subjects related to consent and sensitivity."

151.   In reality, of course, Montague had received no training on "consent." On information and belief, Roe made this statement based on Defendant Gleason's false and misleading representations to her that Montague had been the subject of a prior sexual assault complaint and had already received training relevant to that complaint.

## The University Expels Mr. Montague, Ejects Him from the Campus, and Destroys His Reputation

152.   On February 10, 2016, Dean Holloway wrote to Mr. Montague and informed Montague that, as Dean, he accepted the panel's conclusion that Montague sexually assaulted

4851-0117-1240, v. 2

Roe and that he had determined "the appropriate penalty is expulsion, the penalty also recommended by the panel that heard this complaint."

153.    In making his decision, Holloway expressly considered the nature of the behavior in question; Montague's prior disciplinary history at the UWC; and "the extensive training" Montague "already received from the SHARE Center" – training that, according to Holloway, "did not have the hoped for impact on [Montague's] behavior." Holloway concluded that in light of Montague's "inability to learn from [his] past mistakes," "permanent separation from Yale is the only appropriate penalty."

154.    Montague's expulsion was contrary to Yale's own suggested sanction for similar (hypothetical) conduct.

155.    Yale's "Sexual Misconduct Scenarios," developed and disseminated in response to critics who charged that all nonconsensual sex is "sexual assault" and warrants expulsion in every instance, includes the following scenario:

> Morgan and Kai are friends who begin dancing and kissing at a party. They are both drunk, although not to the point of incapacitation. Together they decide to go to Kai's room. They undress each other and begin touching each other. Morgan moves as if to engage in oral sex and looks up at Kai questioningly. Kai nods in agreement and Morgan proceeds. Subsequently, without pausing to check for further agreement, Kai begins to perform oral sex on Morgan. Morgan lies still for a few minutes, then moves away, saying it is late and they should sleep.

(*See* Exhibit 3.)

156.    In this scenario, Yale said, "There was initial agreement, but the bounds of that agreement were not clear. Kai may have thought that Morgan had consented to reciprocal sex, but took no steps to obtain unambiguous agreement." Under these circumstances, "[t]he UWC penalty would likely be a reprimand."

30

157.    This scenario is comparable to the October 18 encounter between Roe and Montague, where it is undisputed that "[t]here was initial agreement" to engage in sexual acts, Montague thought Roe consented to sexual intercourse (though he took no steps to obtain additional consent), and Roe did not clearly and unambiguously revoke her initial consent. (In the present case, however, both Roe and Montague *mutually* consented to sexual activity; in Yale's hypothetical scenario, although Morgan obtained consent from Kai, Kai never obtained consent from Morgan.)

158.    Given that the penalty Yale itself recommended under very similar circumstances was a reprimand, the only rational explanation for Dean Holloway's decision to expel Montague is Dean Holloway's unwarranted reliance on the UWC I proceedings.

159.    As set forth above, however, the UWC I proceedings were contrary to Yale's *Sexual Misconduct Policies*. Had Montague had an opportunity to challenge the proposed sanction, he could have argued that in light of the fundamental differences between the UWC I and UWC II proceedings, it could not at all be said that "permanent separation from Yale is the only appropriate penalty."

160.    Additionally, on information and belief and consistent with Section 7.5 of the *UWC Procedures*, at the close of the panel hearing UWC Secretary Menon "inform[ed] the panel about the nature of previous penalties assessed for similar violations." (*See* Exhibit 2.)

161.    Yale's history of imposing penalties for nonconsensual sex demonstrates that *in almost all cases* the sanction for such conduct is something less than expulsion. Indeed, prior to Montague's expulsion, Yale had expelled only *three* other students between July 1, 2011, and June 30, 2015, for nonconsensual sexual conduct, demonstrating that it is an extreme sanction imposed in only the most serious circumstances.

31

162.    The following is a summary of the relevant UWC disciplinary actions during that time period:

- UWC found sufficient evidence that two male students engaged in <u>nonconsensual sex</u> with a female student; the respondents were given <u>written reprimands</u> and measures were taken to limit contact between the parties (January 1, 2012 through June 30, 2012);

- UWC found sufficient evidence that two male students engaged in <u>nonconsensual sex</u> with a female student; the respondents were given <u>written reprimands</u> and measures were taken to limit the contact of the parties (January 1, 2013 through June 30, 2013);

- UWC found sufficient evidence that a male student had <u>nonconsensual sex</u> with a female student; the respondent was given a <u>written reprimand</u> (January 1, 2013 through June 30, 2013);

- UWC found sufficient evidence that a male student, in the context of an intimate relationship, engaged in certain <u>nonconsensual acts</u> with a female student <u>during otherwise consensual sexual activity</u>; the respondent was given a <u>written reprimand</u>; restricted from contacting the complainant; required to attend gender sensitivity training; and encouraged to seek counseling (January 1, 2013 through June 30, 2013);

- UWC found sufficient evidence that a male student, in the context of an intimate relationship, engaged in certain <u>nonconsensual acts</u> with a female student <u>during otherwise consensual sexual activity</u>; the respondent was <u>placed on probation</u> for

32

the remainder of his time at Yale and a number of measures were taken to restrict him from contacting the complainant (January 1, 2013 through June 30, 2013);

- UWC found sufficient evidence that a male student had <u>nonconsensual sex</u> with a female student and violated the Yale College Code of General Conduct; the respondent was given a <u>two-semester suspension</u>; placed on <u>probation</u> for the remainder of his time at the university; restricted from contacting the complainant; and encouraged to continue counseling for alcohol abuse, appropriate sexual behavior, and the respectful treatment of others (January 1, 2013 through June 30, 2013);

- UWC found sufficient evidence that a male student engaged in <u>sexual intercourse</u> with a female student <u>without</u> her <u>consent</u>; the respondent was <u>expelled</u> (January 1, 2014 through June 30, 2014) (this expulsion occurred in the wake of the student and alumni protests spurred by the previous Spangler Report, in which the groups decried what they viewed as the University's weak penalties for sexual assault);

- After the complainant decided not to pursue formal action, a Title IX Coordinator brought a formal complaint to the UWC, and the UWC found sufficient evidence that a male student engaged in <u>sexual intercourse</u> with a female student <u>without</u> her <u>consent</u>; the respondent was <u>expelled</u> (January 1, 2014 through June 30, 2014) (this expulsion likewise occurred in the wake of the student and alumni protests spurred by the previous Spangler Report);

- UWC found sufficient evidence that a male student engaged in <u>certain acts</u> with a female student <u>without</u> her <u>consent during otherwise consensual sexual activity</u>;

the respondent was given a <u>written reprimand</u> and required to received sexual

consent training (January 1, 2014 through June 30, 2014);

- UWC found sufficient evidence that a male student engaged in <u>sexual intercourse</u>
  with a female student <u>without</u> her <u>consent</u>; the respondent was <u>suspended</u> through
  the summer of 2014; restricted from participating in certain campus activities; and
  his degree was withheld until May of 2015 (January 1, 2014 through June 30,
  2014);

- UWC found sufficient evidence that a male student engaged in <u>touching of a</u>
  <u>sexual nature and other sexual activities without</u> a female student's <u>consent</u>; the
  respondent was <u>suspended</u> through the summer of 2015; restricted from
  contacting the complainant; and required to receive training on sexual consent and
  alcohol consumption (January 1, 2014 through June 30, 2014);

- UWC found sufficient evidence that a male student engaged in <u>sexual intercourse</u>
  with a female student <u>without</u> her <u>consent</u>; the respondent was placed on
  <u>probation</u> for the remainder of his time at Yale (July 1, 2014 through December
  31, 2014);

- UWC found sufficient evidence that a male student engaged in <u>sexual intercourse</u>
  <u>and other sexual acts</u> with a female student <u>without</u> her <u>consent</u>; the respondent
  was <u>expelled</u> (July 1, 2014 through December 31, 2014)

- UWC found sufficient evidence that a student engaged in <u>sexual penetration</u> of
  another student <u>without consent</u>; the respondent was <u>suspended</u> for six months
  and referred for training on sexual consent (January 1, 2015 through June 30,

34

2015) (Yale stopped reporting the gender of complainants and respondents as of January 1, 2015);

- UWC found sufficient evidence that a student engaged in <u>sexual activity</u> with another student <u>without consent</u>; the respondent was <u>reprimanded</u>; restricted from participating in certain campus activities; and referred for training on sexual consent (January 1, 2015 through June 30, 2015);

- UWC found sufficient evidence that a student engaged in <u>sexual harassment and sexual penetration</u> of another student <u>without consent</u>; the respondent was placed on <u>probation</u> and received a written reprimand (January 1, 2015 through June 30, 2015).

163.    Based on the "previous penalties assessed for similar violations," then, the panel's decision to recommend expulsion in Montague's case was unsupported and unwarranted.

164.    On information and belief, Yale targeted and ultimately expelled Mr. Montague in order to make a public example of a prominent male figure on campus and demonstrate that, contrary to the opinions of Yale's internal and external critics, the University is indeed tough on men who "victimize" female students.

165.    Montague appealed the decision to the Provost, but his appeal was summarily denied.

166.    As a result of his expulsion, Montague was required to leave campus and abandon his beloved basketball team just as they were set to play in the first round of the NCAA Tournament, a feat the Yale men's team had not achieved since 1962.

35

167.    On February 26, 2016, Montague's teammates – in a gesture of support for their expelled captain – wore t-shirts sporting Montague's nickname and jersey number during warm-ups for a nationally-televised game.

168.    The backlash was vicious. Three days later, posters appeared on Yale's campus featuring photos of the team in their symbolic t-shirts and the words, "stop supporting a rapist."

169.    After those posters were removed, a new set of posters appeared just two days later, declaring: "Rape culture is standing by your teammate and silencing Yale's victims of sexual assault."

170.    The Yale Women's Center also posted a message on Facebook later that evening that a "high-profile member of a sports team in the midst of a pivotal moment in the season" left campus because of sexual misconduct. There was no mistaking who that "high profile member of a sports team" was, that Yale itself had publicly announced on February 24, after Montague had missed a series of games earlier that month, that he would not return to the team.

171.    The basketball team was forced to apologize publicly for "the hurt" the team caused to other students by supporting their former captain and teammate and to reiterate the team's commitment to a "healthy, safe and respectful campus climate where all students can flourish."

172.    Mr. Montague has been deeply and irreparably harmed by the defendants' actions. He was wrongfully deprived of the degree he worked so hard to obtain (while at the same time devoting hundreds of hours to training, practice and playing to support and lead Yale's men's varsity basketball team); indeed, he was just four months shy of receiving that degree when he was expelled. His expulsion from Yale on grounds of "sexual misconduct" will follow him throughout his life and will prevent him from obtaining a comparable college degree. The

defendants' wrongful actions also deprived Montague of his dream of playing in the NCAA tournament (a tournament for which the Yale team might not have qualified without his leadership and skill); it is an opportunity he will never have again. Finally, he was publicly vilified: his name and reputation will now forever be associated with the words "sexual assault." For these injuries, even monetary damages cannot make him whole.

<u>**Count I**</u>
<u>**Breach of Contract, UWC I (Lack of Jurisdiction)**</u>
<u>**(v. Yale University)**</u>

173.    Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

174.    Montague applied to and enrolled in the University and, with the assistance of defendant Yale University and his parents, paid associated fees and expenses. Montague did so in reliance on the understanding and with the reasonable expectation that the University would implement and enforce the provisions and policies set forth in its official publications, including the *UWC Procedures*, the *Sexual Misconduct Policies*, and the *Yale College Undergraduate Regulations*, as well as all supporting and explanatory documents produced, published, and/or disseminated by the University, whether cited in this complaint or not.

175.    An express contract or, alternatively, a contract implied in law or in fact was formed between Montague and the University.

176.    The contract contained an implied covenant of good faith and fair dealing. It implicitly guaranteed that any proceedings would be conducted with basic fairness.

177.    Pursuant to the *UWC Procedures* and the *Yale College Undergraduate Regulations*, the UWC has jurisdiction only over matters involving sexual misconduct.

178.    Because the incident involving Sally Smith was not, even on its face, a matter of sexual misconduct, the UWC lacked jurisdiction.

4851-0117-1240, v. 2

179.     The University's decision to pursue the matter through the UWC was a violation of its own procedures and policies, and a breach of the covenant of good faith and fair dealing.

180.     As a direct and foreseeable result of this breach, the plaintiff has suffered, and will continue to suffer, a multitude of injuries.  Without limitation, he was wrongly found and held responsible for "sexual harassment," and from this finding flowed extreme consequences, culminating in his expulsion from Yale. As a result, his academic and employment prospects – indeed, his entire future prospects – have been materially and drastically limited.

### Count II
### Breach of Contract, UWC I (Inadequate Evidence to Support Finding of Sexual Harassment) (v. Yale University)

181.     Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

182.     Under University policies, a student formally charged with sexual misconduct is entitled to a hearing before a panel of the UWC and may be found to have violated University policy only if the panel finds facts by a preponderance of the evidence presented at the hearing that the student committed an act or acts constituting an offense defined as sexual misconduct under said policies. The panel is not authorized to consider as evidence of culpability any matter that is not presented at the hearing in the presence of the parties, who would then have an opportunity to respond.

183.     The *Sexual Misconduct Policies* define sexual harassment as "nonconsensual . . . conduct of a sexual nature on or off campus, when . . . such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating or hostile academic or work environment. Sexual harassment may be found in a single episode, as well as in persistent behavior." (*See* Exhibit 1.)

38

184.    The UWC I panel did not find, and could not have found, that Montague's conduct towards Sally Smith was "conduct of a sexual nature," nor did it find the conduct had "the purpose or effect of unreasonably interfering with [Smith's] work or academic performance or creating an intimidating or hostile academic or work environment." (*See* Exhibit 1.)

185.    The panel's finding that plaintiff "sexually harassed" Smith was contrary to the plain language of the University's *Sexual Misconduct Policies*, and thus a breach the same, as well as a breach of the covenant of good faith and fair dealing.

186.    The finding should not have been made, recorded, or used in any way against Montague in making any subsequent disciplinary decisions affecting Montague during the remaining course of his college career at Yale.

187.    As a direct and foreseeable result of this breach, the plaintiff has suffered, and will continue to suffer, a multitude of injuries.  Without limitation, he was wrongly found and held responsible for "sexual harassment," and from that finding flowed extreme consequences, culminating in his expulsion from Yale. As a result, his academic and employment prospects – indeed, his entire future prospects – have been materially and drastically limited.

### Count III
### 20 U.S.C. § 1681 (Title IX), UWC I
### (v. Yale University)

188.    Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

189.    Title IX prohibits discrimination on the basis of sex in a school's "education program or activity," which includes all of the school's operations. 20 U.S.C. §§ 1681(a), 1687. The University receives federal funds and must comply with Title IX.

190.    A victim of discrimination based on his or her gender has, under Title IX, a private right of action against the offending school for monetary damages and equitable relief.

39

191.    As set forth above, the University engaged in a series of actions that ultimately resulted in the UWC I panel's erroneous finding that Montague violated Yale's *Sexual Misconduct Polices* in the form of "sexual harassment" of Sally Smith.

192.    These actions, and the panel's ultimate finding, were a product of disparate treatment of Montague based on his gender.

193.    As set forth above, the UWC lacked jurisdiction over matter because it did not involve "sexual misconduct," as Yale's own policies define it.

194.    For the same reason, the panel's finding of "sexual misconduct" in the form of "sexual harassment" was erroneous because, under Yale's own policies, the conduct was neither "conduct of a sexual nature" nor conduct that created a hostile environment for Smith.

195.    The University's decision to pursue the matter under the auspices of the UWC, and the panel's ultimate finding, were motivated by gender bias.

196.    On information and belief, had the perpetrator been a woman, Yale would not have considered the matter a UWC matter, nor would it have found "sexual harassment."

197.    Montague, based solely on his gender, suffered an erroneous outcome of the UWC I proceedings. This unlawful discrimination by the University in violation of Title IX proximately caused Montague to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future employment prospects.

<div align="center">

**Count IV**
**Breach of Contract, UWC II: Breach of Confidentiality**
**(v. Yale University)**

</div>

198.    Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

<div align="center">40</div>

199.   Both Yale's *UWC Procedures* and the *Provost's Statement on Confidentiality of UWC Proceedings* "impose strict and unequivocal confidentiality obligations regarding documents prepared by, prepared for, or received from the UWC in connection with a UWC proceeding." (*See* Exhibit 2; Exhibit 5.) These documents (and by necessary implication, their contents) may not be disclosed to anyone who was not a party to the UWC proceeding (other than the parties' advisers, family members, and attorneys).

200.   In direct contravention of this policy and in breach of the clear confidentiality requirements set forth in Yale's contract with Montague, as well as in breach of the covenant of good faith and fair dealing, Defendant Gleason, acting as a Deputy Title IX Coordinator on behalf of Yale, disclosed to Roe the fact and substance of the UWC I proceedings.

201.   As a direct and foreseeable result of the individual defendant's wrongful conduct, the plaintiff has suffered, and will continue to suffer, multiple forms of damage, as set forth above. Without limitation, the defendants' wrongful conduct was one of the primary reasons Roe agreed to participate in the formal complaint process against Montague. That process, and the resulting discipline, caused Montague to suffer substantial and irreparable injury, damages, and loss.

## Count V
## Defamation
## (v. Yale University and Gleason)

202.   Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

203.   On November 6, 2015, Defendant Gleason falsely informed Roe, either directly or by implication, that Montague had been the subject of a previous complaint of sexual assault; that he had been found responsible for sexual assault by the UWC; and that he had been required to participate in training concerning sexual relationships and sexual consent.

41

204.     These statements were false and defamatory *per se*, and caused Roe to believe she had to engage in the formal complaint process because this was not a "one-time mistake" on Montague's part, Roe consequently felt duty-bound "to protect other women" from him.

205.     These false and defamatory statements were, in fact, the genesis of the formal UWC II proceedings against Montague.

206.     Gleason made these statements to Roe negligently or in knowing or reckless disregard of the truth.

207.     As a direct and foreseeable result of these false and defamatory statements, the plaintiff has suffered, and will continue to suffer, grave reputational and economic injury, as set forth above.

<div align="center">

**Count VI**
**Invasion of Privacy (Violation of Confidentiality and False Light)**
**(v. Yale University and Gleason)**

</div>

208.     Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

209.     On November 6, 2015, Defendant Gleason falsely informed Roe, either directly or by implication, that Montague had been the subject of a previous complaint of sexual assault; that he had been found responsible for sexual assault by the UWC; and that he had been required to undergo training concerning sexual relationships and sexual consent.

210.     Gleason was prohibited by Yale's policies and procedures from disclosing this information to Roe, and her disclosure was a violation of Montague's right to privacy, *to wit*, his right to have the information kept confidential.

211.     Gleason's statements to Roe were also untrue. Montague had never before been the subject of a complaint of sexual assault, nor had he ever before been required to participate in training concerning sexual relationships or sexual consent.

42

4851-0117-1240, v. 2

212.    These statements were a major misrepresentation of Montague's character, history, and activities.

213.    The false light in which Gleason placed Montague would be highly offensive to a reasonable person.

214.    Gleason knew or acted in reckless disregard of the falsity of her statements to Roe and the false light in which they would place Montague.

215.    As a direct and foreseeable result of the false light in which Gleason placed Montague to Roe, Montague experienced, and continues to experience, emotional and mental suffering.

<div align="center">

**Count VII**
**Breach of Contract, UWC II: Breach of Procedure for Title IX**
**Coordinator-Initiated Complaints**
**(v. Yale University)**

</div>

216.    Plaintiff restates each of the foregoing as if fully restated herein.

217.    Yale's policies and procedures make it clear that Title IX Coordinators may initiate formal complaint proceedings only in "unusual circumstances . . . involving risks to the safety of individuals and/or the community." (*See* Exhibit 6.)

218.    The circumstances reported to Yale by Roe did not in any way involve a risk to Roe's safety or to the safety of the community.

219.    Defendant Killheffer, acting as a Senior Deputy Title IX Coordinator on behalf of Yale, lacked the authority under Yale's policies to bring a formal complaint against Montague. The decision to pursue the formal complaint, despite lacking such authority, was a breach of Yale's policies and procedures, and a breach of the covenant of good faith and fair dealing.

220.    As a direct and foreseeable result of defendants' wrongful conduct, Montague suffered, and will continue to suffer, a multitude of injuries and damages. Without limitation, he

<div align="center">43</div>

was subjected to a formal complaint process rather than the informal one Roe initially and affirmatively desired, and this formal complaint process culminated in his expulsion from Yale. As a result, his academic and employment prospects – indeed, his entire future prospects – have been drastically and materially limited, and he has suffered serious emotional and mental injury.

### Count VIII
### Tortious Interference With Contract
### (v. Gleason and Killheffer)

221.    Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

222.    Defendant Gleason, Defendant Killheffer, and others unknown were aware of the contractual relationship between plaintiff and Yale as set out above, which encompassed the obligations of each under Yale's *UWC Procedures*.

223.    Gleason, Killheffer, and others unknown intentionally and maliciously interfered with plaintiff's contractual relationship with Yale as set out above by taking steps to procure Montague's wrongful expulsion. These steps included, but are not limited to:

223a.    Violating the strict confidentiality requirements contained in Yale's policies;

223b.    Falsely informing Roe that her name could not be kept anonymous;

223c.    Falsely informing Roe that the informal complaint process was not available under the circumstances;

223d.    Falsely informing or implying to Roe that Montague was the subject of a previous complaint of sexual assault; and

223f.    Violating Yale's policy limiting the authority of Title IX Coordinators to bring formal complaints in situations where coordinator intervention is "needed" to protect "the safety or well-being of the complainant or other

44

members of the community," where in fact no such intervention was necessary.

224.     As a result of the conduct of these individual defendants, Roe was misled into cooperating in a formal complaint process against Montague despite her express wishes to keep the process informal and preserve her anonymity. The formal complaint process ultimately resulted in the University severing its relationship with plaintiff by expelling him from the University.

225.     Gleason, Killheffer, and others unknown acted through improper motive or means and with actual malice, including the illegitimate purpose of ensuring the pursuit of formal UWC proceedings against Montague, regardless of Roe's stated desire to keep the process anonymous and informal, in order to make an example of him and to prove that the University was tough on sexual assailants.

226.     As a direct and foreseeable result of the individual defendants' wrongful conduct, the plaintiff has suffered, and will continue to suffer, multiple forms of damage, as set forth above.

### Count IX
### Breach of Contract, UWC II: Failure to Make Findings
### Constituting a Violation
### (v. Yale University)

227.     Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

228.     As set forth above, under University policies, a student formally charged with sexual misconduct is entitled to a hearing before a panel of the UWC and may be found to have violated University policy only if the panel finds facts by a preponderance of the evidence presented at the hearing that the student committed an act or acts constituting an offense defined as "sexual misconduct" under said policies.

45

4851-0117-1240, v. 2

229.    A respondent cannot be found to have violated University policies in the absence of sufficient evidence. The evidence the panel may consider in determining sufficiency is confined to the fact-finder's report and the evidence elicited by the panel at the UWC hearing.

230.    According to Yale's *Sexual Misconduct Policies*, sexual assault is "any kind of nonconsensual sexual contact, including rape, groping, and any other nonconsensual sexual touching." (*See* <u>Exhibit 1</u>.) Furthermore, per the *Sexual Misconduct Policies*, "[s]exual activity requires consent, which is defined as positive, unambiguous, and voluntary agreement to engage in specific sexual activity throughout a sexual encounter." "Consent must be ongoing throughout a sexual encounter and can be revoked at any time." (*Id.*)

231.    The panel failed to make findings supporting the conclusion that Montague sexually assaulted Roe.

232.    It is undisputed that Roe affirmatively consented to sexual activity when she led Montague to his room, removed all of her clothing, got into bed with him, and voluntarily engaged in various forms of sex.

233.    The panel did not find, and could not have found, that Roe affirmatively, unambiguously, and audibly communicated to Montague her revocation of consent to sex. Rather, the uncontested facts were that Roe pushed lightly on Montague's shoulders as he positioned himself on top of her, an act that cannot under any reasonable interpretation be construed as a clear and unambiguous revocation of consent, and that Montague did not appear to hear Roe when she purportedly said "no."

234.    Consequently, the panel's conclusion that Montague sexually assaulted Roe in violation of the University's *Sexual Misconduct Policies* is a breach of the requirement that

sufficient evidence support the panel's findings, as well as a breach of the covenant of good faith and fair dealing.

235.    As a direct and foreseeable result of the defendant Yale's wrongful conduct, the plaintiff has suffered, and will continue to suffer, multiple forms of damage, as set forth above.

### Count X
### Breach of Contract, UWC II: Erroneous Reliance on UWC I Proceedings
### (v. Yale University)

236.    Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

237.    The *UWC Procedures* provide that "[i]n determining culpability, the panel may . . . take into account a respondent's previous formal discipline for *other acts of sexual misconduct* . . . (emphasis added)." (*See* Exhibit 2.)

238.    As set forth above, because the UWC I proceedings did not in fact involve any "acts of sexual misconduct," those proceedings could not and should not have been relied upon by the UWC II panel in assessing Montague's culpability.

239.    The panel's erroneous reliance on the UWC I proceedings was a breach of Section 7.4 of the *UWC Procedures*, and a breach of the covenant of good faith and fair dealing.

240.    As a direct and foreseeable result of the defendant's wrongful conduct, the plaintiff has suffered, and will continue to suffer, multiple forms of damage, as set forth above.

### Count XI
### Breach of Contract, UWC II: Consideration of Evidence
### Outside the Presence of the Respondent
### (v. Yale University)

241.    Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

242.    The *UWC Procedures* provide, *under the "Hearings" section* (7.4), that "[i]n determining culpability, the panel may . . . take into account a respondent's previous formal discipline for other acts of sexual misconduct . . . ." (*See* Exhibit 2.) The panel is not authorized

47

to consider as evidence of culpability any matter that is not presented at the hearing in the presence of the parties, who would then have an opportunity to respond; the evidence against a respondent consists of the fact-finder's report and the evidence and testimony gathered at the hearing.

243.   When it issued its findings, the panel explicitly stated that it relied on the UWC I proceedings in assessing Montague's culpability in the UWC II proceedings.

244.   Evidence of the UWC I proceedings was not contained in the fact-finder's report, however, nor was it discussed in Montague's presence at the UWC II hearing.

245.   Montague, as the respondent, had the right to be present at, or at least to meaningfully participate in, all portions of the hearing related to his culpability.

246.   Yale denied Montague the opportunity to be present at that portion of the hearing during which the panel considered the UWC I proceedings.

247.   As a result, Montague was deprived of the opportunity to explain to the panel the UWC I proceedings; to explain that his conduct did not in fact amount to "sexual harassment"; and to explain that his s training was not focused on, and indeed had no relationship to, sexual relationships or sexual consent.

248.   Had Montague been present during the panel's consideration of the UWC I proceedings, and had he been given an opportunity to explain to the panel the conduct which led to those proceedings, it would have been clear to the UWC II panel that the UWC I proceedings bore no relationship to, and had no probative value as to the issue of Montague's culpability in the UWC II proceedings.

48

249.   By denying Montague the opportunity to be present during the presentation of evidence against him, Yale breached its obligations under its own *UWC Procedures*, as well as the covenant of good faith and fair dealing.

250.   As a direct and foreseeable result of the defendant's wrongful conduct, the plaintiff has suffered, and will continue to suffer, multiple forms of damage, as set forth above.

<div align="center">

**Count XII**
**Breach of Contract/Common Law, UWC II (Denial of Basic Fairness/**
**Arbitrary and Capricious Decision Making)**
**(v. Yale University)**

</div>

251.   Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

252.   The University had a duty, either under an express or implied contract or as a matter of common law, to ensure that the UWC II proceedings were conducted with basic fairness.

253.   The University breached this duty of basic fairness by, without limitation:

253a.   Misleading Roe into cooperating with the formal complaint process;

253b.   Filing a formal complaint against Montague when there was no risk to Roe's safety or to the safety of the community;

253c.   Failing to provide Montague with adequate notice of the complaint against him, such that his version of events appeared inconsistent between the time he was interviewed by the fact-finder and when he testified at the UWC panel hearing;

253d.   Failing to find facts sufficient to support the conclusion that Montague violated the University's *Sexual Misconduct Policies*;

253e.   Taking the UWC I proceedings into account as to culpability in the UWC II proceedings when the UWC I proceedings were themselves a violation

<div align="center">49</div>

of Yale's own policies and procedures, and where the allegations in the UWC I proceedings were wholly unrelated to the UWC II proceedings in any event;

253f.   Failing to give Montague an opportunity to hear and respond to evidence of the UWC I proceedings;

253g.   Taking the UWC I proceedings into account to enhance Montague's punishment in the UWC II proceedings where the UWC I proceedings, and the resulting discipline, were themselves a violation of Yale's policies and procedures, and where the UWC I allegations and resulting discipline bore no relationship to the subject matter of the UWC II proceedings;

253h.   Failing to provide Montague an opportunity to respond to and challenge the panel's recommended sanction in advance of a final disciplinary decision against him;

253i.   Arbitrarily and capriciously expelling Montague when Yale's own recommended sanction for similar conduct is a reprimand; and

253j.   Arbitrarily and capriciously expelling Montague when – even if the UWC I proceedings were properly considered in relation to discipline – a more appropriate sanction would have been something less drastic than expulsion.

254.   The University's breach of its duty to ensure basic fairness proximately caused Montague to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

4851-0117-1240, v. 2

## Count XIII
## 20 U.S.C. § 1681 (Title IX), UWC II (Erroneous Outcome)
## (v. Yale University)

255.    Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

256.    As set forth above, the University engaged in a series of actions that ultimately resulted in the UWC II panel's erroneous finding that Montague violated Yale's *Sexual Misconduct Polices* sexually assaulting Jane Roe.

257.    These actions, and the panel's ultimate finding, were a product of disparate treatment of Montague based on his gender.

258.    Yale was under enormous pressure to show it took seriously female students' complaints of sexual assault and to counter the perception that it was inappropriately lenient in its discipline of male students accused of sexual misconduct.

259.    When Yale learned Roe's "bad experience" involved an encounter with Montague, it seized the opportunity to make an example of him because he was one of the most prominent *male* figures on campus. The University took steps to secure Montague's wrongful expulsion in order to prove to its critics that it could and would expel male students for responsible for sexual assault (despite its disciplinary history largely to the contrary).

260.    The University's decision to press Roe into cooperating in a formal complaint process and its ultimate decision to expel Montague were motivated by gender bias.

261.    Montague, because of his gender, suffered an erroneous outcome of the UWC II proceedings. This unlawful discrimination by the University in violation of Title IX proximately caused Montague to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss;

51

deprivations of due process; loss of educational opportunities; and loss of future employment prospects.

**WHEREFORE**, plaintiff Jack Montague respectfully requests that the Court grant him the following relief:

1.  Enjoin Yale University to reinstate the plaintiff as a fully matriculated, student in good standing at Yale University;

2.  Alternatively, enjoin Yale University to reopen the UWC proceedings;

3.  Enjoin Yale to expunge from plaintiff's transcript, disciplinary records, and all other records maintained by and/or under the control of Yale University all reference to sexual misconduct and the flawed UWC I and UWC II proceedings;

4.  After trial, enter judgment for the plaintiff on each Count of the complaint and award him damages in an amount to be determined at trial, including attorneys' fees, costs and interest;

5.  Award punitive damages to the plaintiff; and

6.  Grant such other relief as the Court deems just and equitable.

## <u>JURY DEMAND</u>

Plaintiff Jack Montague hereby demands a trial by jury on all claims so triable.

4851-0117-1240, v. 2

JACK MONTAGUE,

By his attorneys,

_____

William F.  Dow III (ct00161)
JACOBS & DOW, LLC
350 Orange Street
New Haven, CT 06511
wdow@jacobslaw.com
Telephone: (203)772-3100
Telefax: (203)772-1691


*Pro Hac Vice (Admission Pending)*:
Max D. Stern (BBO #479560)
mstern@toddweld.com
Alexandra H. Deal (BBO #660654)
adeal@toddweld.com
Hillary A. Lehmann (BBO #683657)
hlehmann@toddweld.com
TODD & WELD LLP
One Federal St., 27th Floor
Boston, MA 01880
Tel. (617) 720-2626
Fax (617) 227-5777

Dated: June 9, 2016

53

# EXHIBIT 1

Yale University

# Sexual Misconduct Response

# Yale Sexual Misconduct Policies and Related Definitions

## Sexual Misconduct Policies at Yale

Yale University is committed to maintaining and strengthening educational, working, and living environments founded on civility and mutual respect in which students, faculty, and staff are connected by strong bonds of intellectual dependence and trust. Sexual misconduct is antithetical to the standards and ideals of our community and will not be tolerated.

Yale aims to eradicate sexual misconduct through education, training, clear policies, and serious consequences for violations of these policies. The University's Title IX Coordinator has responsibility for ensuring compliance with Yale's policies regarding sexual misconduct. The University-Wide Committee on Sexual Misconduct (UWC) (http://provost.yale.edu/uwc) and the Title IX coordinators (http://provost.yale.edu/title-ix/coordinators) address allegations of sexual misconduct.

These policies apply to all members of the Yale community as well as to conduct by third parties (i.e., individuals who are neither students nor employees, including but not limited to guests and consultants) directed toward, University students, faculty, or staff members. Conduct that occurs in the process of application for admission to a program or selection for employment is covered by these policies.

Many forms of sexual misconduct are prohibited by Connecticut and federal law, including Title IX of the education amendments of 1972, and Connecticut statutes relating to sexual offenses, and could result in criminal prosecution or civil liability.

## Sexual Misconduct

Sexual misconduct incorporates a range of behaviors including sexual assault, sexual harassment, intimate partner violence, stalking, voyeurism, and any other conduct of a sexual nature that is nonconsensual, or has the purpose or effect of threatening, intimidating, or coercing a person.

Much sexual misconduct includes nonconsensual sexual contact, but this is not a necessary component. For example, threatening speech that is sufficiently severe or pervasive to constitute sexual harassment will constitute sexual misconduct. Making photographs, video, or other visual or auditory recordings of a sexual nature of another person without consent constitutes sexual misconduct, even if the activity documented was consensual. Similarly, sharing such recordings or other sexually harassing electronic communications without consent is a form of sexual misconduct. All members of our community are protected from sexual misconduct, and sexual misconduct is prohibited regardless of the sex of any party involved.

Violations of Yale's Policy on Teacher-Student Consensual Relations (http://www.yale.edu/equalopportunity/policies/index.html) and its policy on Relationships between Staff Members are a form of sexual misconduct.

## Sexual Harassment

Sexual harassment consists of nonconsensual sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature on or off campus, when: (1) submission to such conduct is made either explicitly or implicitly a condition of an individual's employment or academic standing; or (2) submission to or rejection of such conduct is used as the basis for employment decisions or for academic evaluation, grades, or advancement; or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating or hostile academic or work environment. Sexual harassment may be found in a single episode, as well as in persistent behavior. All members of our community are protected from sexual harassment, and sexual harassment is prohibited regardless of the sex of the harasser or the harassed.

## Sexual Assault

Sexual assault is any kind of nonconsensual sexual contact, including rape, groping, and any other nonconsensual sexual touching.

## Sexual Consent

Sexual activity requires consent, which is defined as positive, unambiguous, and voluntary agreement to engage in specific sexual activity throughout a sexual encounter. Consent cannot be inferred from the absence of a "no"; a clear "yes," verbal or otherwise, is necessary. Consent to some sexual acts does not constitute consent to others, nor does past consent to a given act constitute present or future consent. Consent must be ongoing throughout a sexual encounter and can be revoked at any time.

Consent cannot be obtained by threat, coercion, or force. Agreement under such circumstances does not constitute consent.

Consent cannot be obtained from someone who is asleep or otherwise mentally or physically incapacitated, whether due to alcohol, drugs, or some other condition. A person is mentally or physically incapacitated when that person lacks the ability to make or act on considered decisions to engage in sexual activity. Engaging in sexual activity with a person whom you know – or reasonably should know – to be incapacitated constitutes sexual misconduct.

## Guidance Regarding Sexual Consent

Consent can only be accurately gauged through direct communication about the decision to engage in sexual activity. Presumptions based upon contextual factors (such as clothing, alcohol consumption, or dancing) are unwarranted, and should not be considered as evidence for consent.

Although consent does not need to be verbal, verbal communication is the most reliable form of asking for and gauging consent. Talking with sexual partners about desires and limits may seem awkward, but serves as the basis for positive sexual experiences shaped by mutual willingness and respect.

## Intimate Partner Violence

Intimate partner violence (IPV) occurs when a current or former intimate partner uses or threatens physical or sexual violence. IPV also may take the form of a pattern of behavior that seeks to establish power and control by causing fear of physical or sexual violence. Stalking may also constitute IPV.

## Stalking

Stalking is repeated or obsessive unwanted attention directed toward an individual or group that is likely to cause alarm, fear, or substantial emotional distress. Stalking may take many forms, including following, lying in wait, monitoring, and pursuing contact. Stalking may occur in person or through a

medium of communication, such as letters, e-mail, text messages, or telephone calls. In some circumstances, two instances of such behavior may be sufficient to constitute stalking.

*Last updated May 10, 2016*

**In an emergency:**
If you are in immediate danger, call 911 or Yale Police (http://publicsafety.yale.edu/police)  at 203.432.4400

**Contact the SHARE Center** (http://sharecenter.yale.edu/) **:**
Call the hotline anytime at 203.432.2000 for information, advocacy and support

Click here (http://smr.yale.edu/sites/default/files/files/considering-seeking-help.pdf) for more information on who can help and how.

## Latest Updates

February 2016 Report of Complaints of Sexual Misconduct (http://provost.yale.edu/sites/default/files/files/February-2016-Report.pdf)

Yale Report on the AAU Campus Climate Survey (http://provost.yale.edu/title-ix/yale-report-aau-campus-climate-survey)

## Sexual misconduct scenarios

Scenarios have been developed to help illustrate Yale's definition of sexual consent. For comparison, the scenarios include examples of consensual sex. The scenarios also provide examples of penalties—ranging from expulsion to reprimand—that might be imposed as a result of a violation. view PDF (http://smr.yale.edu/sites/default/files/files/Sexual-Misconduct-Scenarios.pdf)

# Yale

Copyright © 2016 Yale University · All rights reserved ·

# EXHIBIT 2

# UWC Procedures

The procedures for the University Wide Committee on Sexual Misconduct can be found below.

## Introduction

Yale University is committed to maintaining and strengthening an educational, employment, and living environment founded on civility and mutual respect. Sexual misconduct is antithetical to the standards and ideals of our community, and it is a violation of Yale policy and the disciplinary regulations of Yale College and the Graduate and Professional Schools. Sexual misconduct will not be tolerated.

Sexual misconduct incorporates a range of behaviors including sexual assault (which includes rape, groping and any other non-consensual sexual contact), sexual harassment, intimate partner violence, stalking, and any other conduct of a sexual nature that is non-consensual, or has the purpose or effect of threatening or intimidating a person or persons. Sexual misconduct also includes a violation of Yale's Policy on Teacher-Student Consensual Relations. Yale aims to eradicate sexual misconduct through education, training, clear policies, and serious consequences for violations of these policies. In addition to being subject to University disciplinary action, sexual misconduct may lead to civil liability and criminal prosecution.

## 1. Authority of the UWC

The University-Wide Committee on Sexual Misconduct ("UWC") provides an accessible, representative, and trained body to answer informal inquiries and fairly and expeditiously address formal complaints of sexual misconduct. Any current or former Yale faculty member, [1] trainee, student, or managerial or professional employee ("staff member" [2]) who has experienced sexual misconduct may bring a complaint to the UWC, so long as two conditions are met: First, the person accused of sexual misconduct must be a Yale faculty member, trainee, student, or staff member at the time the complaint is filed.[3] Second, the alleged misconduct must have occurred at a time when all parties involved were Yale faculty members, trainees, students, or staff members. Please note: Only students and trainees may bring complaints to the UWC against staff members,[4] and the UWC is not empowered to hear complaints made by or against members of Yale's collective bargaining units or excluded clerical and technical employees.[5]

Any Title IX Coordinator at the University ("Coordinator") may bring a complaint to the UWC in three circumstances. First, a Coordinator may bring a complaint on behalf of a person who is not a current or former member of the Yale community, so long as (i) the respondent is a current Yale faculty member, trainee, student, or staff member; (ii) the respondent was at Yale in one of these roles at the time of the alleged misconduct; and (iii) the events complained of occurred on the Yale campus or

in connection with a Yale-sponsored event. Second, a Coordinator may bring a complaint to the UWC alleging a violation of Yale's Policy on Teacher-Student Consensual Relations.  Finally, a Coordinator may bring a complaint when there is evidence that the University's policies on sexual misconduct have been violated and the Coordinator's intervention is needed to ensure that the matter reaches the UWC.

Actions that are the source of complaints to the UWC may also violate criminal laws. The UWC will not delay its proceedings pending the outcome of a criminal investigation or other legal process. At the request of law enforcement authorities, the UWC may postpone fact-finding while the authorities are gathering evidence, but fact-finding will resume as soon as the authorities have finished that work.

Filing a complaint with the UWC is not a prerequisite to filing a complaint of discrimination with Connecticut's Commission on Human Rights and Opportunities, the federal Equal Employment Opportunity Commission, the U.S. Department of Education's Office for Civil Rights, or any other state or federal agency, and seeking assistance from the UWC in no way precludes filing a state or federal discrimination complaint.

Yale encourages individuals who have experienced sexual misconduct to contact the SHARE Center and the Yale or New Haven Police Departments in addition to seeking assistance from the UWC. The SHARE Center provides counseling and information to survivors of sexual violence and to those who have experienced other forms of sexual misconduct. SHARE counselors can also guide and support individuals bringing complaints to the UWC.

## 2. Service on the UWC

### 2.1. Composition

The UWC consists of about 30 members drawn from faculty throughout the schools of the University; managerial or professional employees; postdoctoral associates or fellows; and students from Yale College and the graduate and professional schools ("UWC Members"). The Chair of the UWC ("UWC Chair") is a tenured faculty member. The current UWC membership is posted on the UWC website.

The Secretary of the UWC organizes the UWC's activities; handles all official UWC correspondence; acts as a liaison with the complainant, the respondent, their advisors, and witnesses; and works with the UWC Chair and Title IX Coordinators to resolve informal complaints. In the case of a formal complaint, the Secretary attends the hearing, and may ask clarifying questions and participate in the deliberations, but does not vote.

### 2.2. Selection of Members

The provost appoints members to the UWC and accepts recommendations from the dean and the faculty of each school, who may nominate faculty members (of any rank) and managerial or professional employees for membership on the UWC. In the case of Yale College students, nominations by the Yale College Council will be submitted with appropriate supporting materials to the dean of Yale College, who will make recommendations to the provost. Similarly, the Graduate and Professional Student Senate will submit graduate and professional student nominations and supporting materials to the deans of the graduate and professional schools, who will make recommendations to the provost. The provost makes all final decisions regarding appointments.

**2.3. Terms**

Faculty members and managerial or professional employees are appointed to the UWC for terms of one year, which may be renewed. Student Members are appointed to one- or two-year terms, depending on their availability and anticipated graduatipon dates.  The UWC Chair is appointed to a three-year term.  All Members are eligible for reappointment.

**2.4. Training**

All UWC Members must participate in training. In addition, each year, returning UWC Members must receive refresher training. Training topics include discussion of University resources for redress of sexual misconduct; sexual misconduct and equal employment, educational, and professional opportunity; methods of informal resolution; the interaction between University disciplinary processes and criminal processes; responding to retaliation; and other topics suggested by experts from within and outside the University.

**3. Confidentiality and Honesty**

The UWC and all members of the Yale community who are involved in a matter before the UWC are expected to maintain the confidentiality of its proceedings and the information obtained for those proceedings.[6]  All documents prepared by, prepared for, or received from the UWC in connection with a UWC proceeding ("UWC Documents") must be held in strict confidence.  Parties may not disclose UWC Documents to anyone other than their advisers in the UWC proceeding, family members, and attorneys.  Parties must inform these recipients that the UWC Documents are strictly confidential and may not be further disclosed.  Disciplinary action may be taken against any member of the Yale community who discloses a UWC Document in violation of these procedures or who is responsible for the improper disclosure of such documents by others.  The Provost's Statement on the Confidentiality of UWC Proceedings elaborates on these confidentiality obligations.

An individual who makes an informal inquiry to the UWC Chair or Secretary may request that the UWC keep the matter confidential from the accused or other persons involved in the events. However, the UWC will not be able to hear a formal complaint unless the individual is willing to reveal the complaint (including the complainant's identity) to the respondent, the fact-finder, and the hearing panel (see Section 7, below). In some cases (for example, allegations of violence), the UWC may not be able to honor a request for confidentiality if doing so would endanger the safety or well-being of the complainant or other members of the Yale community. In addition, the University may not be able to preserve the complete confidentiality of UWC records in the event of litigation or a government investigation. Finally, an accused individual may have access to sexual misconduct allegations that become part of that individual's student record or personnel file, although in such cases the University will remove information identifying the complainant.

Parties and witnesses are expected to cooperate in the investigation of matters brought to the UWC. Parties and witnesses must provide truthful information in all phases of a UWC proceeding. Failure to provide truthful information or any attempt to impede the UWC process may result in a recommendation for a more severe penalty or a referral for discipline.

**4. Retaliation**

Yale policy strictly forbids retaliation against individuals who report sexual misconduct, file complaints of sexual misconduct, cooperate in the investigation of sexual misconduct, or hear formal or informal complaints of sexual misconduct. The UWC processes set out here are available to individuals who believe that they have suffered retaliation for any of these actions. The rules governing the UWC's authority as described in Sections 1 and 7 also apply to retaliation complaints.

## 5. Advisers

A party may be accompanied by an adviser at any stage of the UWC process. An adviser may be anyone of the party's choosing and offer personal and moral support, before, during, and after a hearing, and help the party prepare for meetings related to a complaint.  The adviser may not submit documents, either directly or indirectly, on a party's behalf at any stage of the process, nor speak for the party during an interview with a fact-finder or during a formal hearing.

A party must provide the adviser's name and contact information to the Secretary prior to meeting with the fact-finder.  A party must also inform the Secretary if a new adviser is selected.  The Secretary will send the adviser copies of UWC Documents unless the party requests otherwise. A party wishing to bring an attorney as an adviser must inform the Secretary at least four days in advance of any meeting that the adviser will attend.

## 6. Requests for Advice and the Resolution of Informal Complaints

An individual may ask questions about UWC procedures, request advice (including whether certain behavior constitutes sexual misconduct), or seek resolution of an informal complaint by contacting the UWC Chair or Secretary.[7] For the resolution of an informal complaint, the UWC Chair or Secretary will contact a Title IX Coordinator, who may offer an informal investigation, mediation, counseling, or other means of resolving the complaint (note that the University does not allow face-to-face mediation in cases alleging sexual violence). The Title IX Coordinator may also provide accommodations and interim measures that are responsive to the party's needs as appropriate and reasonably available.[8] In all cases, the UWC Chair or the Title IX Coordinator will inform the individual bringing the informal complaint that participation in an informal resolution is voluntary and that the individual may end the informal process at any time and choose to bring a formal complaint or choose not to further pursue the matter. In some cases (for example allegations of violence), the University may pursue an investigation of sexual misconduct, even if the complainant chooses not to pursue the matter further.

## 7. Formal Complaint Process

### 7.1. Filing of Complaint; Notice to the Respondent; Withdrawal

An individual may bring a formal complaint either without seeking an informal resolution or after attempting an informal resolution.  To initiate a formal complaint, an individual must submit a written statement to the UWC Chair[9] naming the respondent[10] and describing the events and circumstances underlying the complaint in sufficient detail to allow the UWC to determine jurisdiction and to provide general notice to the respondent.[11] The complaint may be supplemented by additional supporting documents or evidence. The UWC Chair, in consultation with the Secretary and one other UWC Member, will decide whether (i) the complainant and respondent meet the criteria set out in Section 1 above and (ii) the complaint, if substantiated, would constitute a violation of University policy concerning sexual misconduct.[12] The UWC will not hear formal complaints that do not meet these criteria. If a complaint is denied a hearing, the UWC Chair will explain the denial in writing to the individual who filed the complaint.

If, in the course of adjudicating a formal complaint, additional complaints or allegations are brought forward to the UWC that are associated with the circumstances of the original complaint, the UWC will incorporate the claims into the proceeding if feasible unless the UWC determines that a claim is retaliatory or without basis.  All such additional complaints must be raised before the fact-finding is concluded.  The UWC will not entertain a new complaint if it has already adjudicated a formal complaint based on the same set of circumstances.

Actions that are the source of complaints to the UWC may also violate criminal laws. The UWC will not delay its proceedings pending the outcome of a criminal investigation or other legal process. At the request of law enforcement authorities, the UWC may postpone fact-finding while the authorities are gathering evidence, but fact-finding will resume as soon as the authorities have finished that work.

If the complaint will be heard, the Secretary will inform the respondent in writing that a formal complaint has been filed and will be heard by the UWC.  The Secretary's letter will include the complaint, any documents accompanying the complaint, and references to the applicable Yale policy on sexual misconduct, these procedures, and any other relevant Yale procedures.  The letter will also set a deadline five days later by which the respondent may submit a written response to the Secretary. The response, like the complaint, may be supplemented by additional supporting documents or evidence. The Secretary will forward the response and any accompanying documents to the  complainant.[13]

The Secretary will inform the respondent's dean (in the case of a student, or trainee), the dean and the provost (in the case of a faculty member), or the supervisor (in the case of a staff member) and the cognizant Title IX Coordinator(s) that a formal complaint has been filed. The Title IX Coordinator(s) with responsibility for the parties will coordinate appropriate interim measures, including measures to protect and support the complainant and other individuals as appropriate. University officials are expected to cooperate in implementing those recommendations.[14]

The complainant may, at any time before the day scheduled for the hearing, request in writing to the Secretary that the complaint be withdrawn. The UWC Chair, in consultation with the Secretary and one other member, will consider whether the request is fully voluntary and whether the interests of the Yale community would be better served by hearing the complaint. If the UWC Chair decides to hear a complaint despite a request for withdrawal, the complainant will not be required to participate in the hearing. The UWC Chair's decision whether to approve or deny the request is final.

## 7.2. Appointment of Hearing Panel

The UWC Chair will appoint a hearing panel of five UWC Members and will appoint one of these Members as the panel chair. The hearing panel will not include any Member who has participated in the resolution of an informal complaint arising out of the same events. The panel members and the decision maker (as defined in Section 7.5) will receive a copy of the complaint and response and must withdraw from the proceedings if their relationship to the complainant or the respondent or other circumstances lead them to believe that they cannot judge the matter fairly.

The Secretary will send a notice to the complainant and the respondent, providing the names of the panel members and the decision maker and informing them of their right to object to the participation of a panel member or decision maker. The objection must be in writing to the Secretary and received within two days of the date of the notice, and it must state the party's grounds for believing the panel member or decision maker is incapable of fairly judging the matter. The UWC Chair will decide whether an objection is justified, and that decision is final. If a successful objection to the participation of a decision maker is raised, the UWC Chair will ask the dean of a different Yale school or the person who would normally hear an appeal under Section 7.7 to serve instead. Parties will have an opportunity to object to any panel member or decision maker selected as a replacement.

### 7.3. Fact-Finder; Witnesses

Within seven days of receiving the complaint, the UWC Chair will appoint an impartial fact-finder to assist in the investigation of the allegations. The Secretary will provide the fact-finder with the complaint, the response, and any other information provided by the parties. The fact-finder will gather documents and conduct interviews as necessary to reach a thorough understanding of the facts and circumstances surrounding the allegations of the complaint.[15] The fact-finder will not consider information that is provided solely to attest to a party's character.

Within 21 days of being appointed, the fact-finder will present a written report to the Secretary. The report will describe the relevant facts and circumstances and may address the credibility of witnesses but will not reach conclusions as to whether those facts and circumstances constitute a violation of University policy. After reviewing the report, the UWC Chair may request clarifications and additional investigation. The Secretary will send a copy of the completed report to the parties and inform them of with the date and location of the hearing.

The complaint and response, all documents relating to the complaint and response, and the fact-finder's report will be provided to the hearing panel and to the parties. The hearing panel will not accept from the parties any written response to the fact-finder's report or any additional documents, except as explained in Section 7.4 below. If a party believes the panel should interview witnesses, the party must submit to the Secretary the names of the witnesses and the subject of their testimony at least four days before the hearing. Normally, the panel will call a witness other than the parties only if the witness can offer potentially relevant information that was not conveyed to the fact-finder. Witnesses may not appear for the sole purpose of testifying about a party's character.

### 7.4. Hearing

The hearing will take place no sooner than five days after the parties' receipt of the fact-finder's final report. Unless both parties ask to appear jointly, the complainant and the respondent will not appear jointly before the panel at any stage of the hearing. The party who is not before the panel will be in a private room with audio access to the proceedings.

The hearing is intended primarily to allow the panel to interview the complainant and the respondent with respect to the fact-finder's report. The panel chair will begin the hearing by explaining the substance of the complaint and the specific University policy or policies allegedly violated. The complainant and then the respondent may make a brief statement of no longer than 10 minutes to the panel, and they may provide a written copy of their statements to the panel at the hearing. The panel will provide a copy of any written statement it receives to the other party. Following these statements, the panel will interview the complainant and then the respondent. At its sole discretion, the panel may request the testimony of additional witnesses.[16] The parties and any witnesses will be questioned by the panel only, but each party will be given an opportunity to submit questions for the panel to ask the other party or witnesses. The panel, at its sole discretion, may choose which, if any, questions to ask.

The panel may examine and take into account reports and evidence collected by law enforcement bodies or other investigators. In determining culpability, the panel may also take into account a respondent's previous formal discipline for other acts of sexual misconduct, including written reprimands, and the respondent's criminal conviction arising out of the events complained of. The panel may not take into account as evidence of culpability previous accusations of other acts of sexual misconduct that did not result in formal discipline or the fact that a criminal investigation or prosecution is pending in relation to the events complained of.

## 7.5. Findings, Conclusions, and Recommendations

Following the hearing, the panel will consider whether the respondent has violated University policy, giving an affirmative answer if it is satisfied that a violation has been shown by a preponderance of the evidence. Based on evidence presented in the fact finder's report or elicited at the hearing, the panel may find violations of Yale policy in addition to the violation(s) charged. The panel will reach its conclusions by a majority vote and by secret ballot, with no abstentions allowed. If a party is found to have violated University policy, the panel will recommend a penalty. The Secretary will inform the panel about the nature of previous penalties assessed for similar violations. The Secretary will also describe any formal Yale discipline previously imposed on the respondent, and the panel may consider this prior discipline in its recommendations regarding a penalty. The panel will again reach its recommendations by a majority vote and by secret ballot, with no abstentions allowed. The panel's recommendation may also include remedies other than or in addition to a penalty.[17]

Within 10 days of the final hearing session, the panel will complete a report, setting out its findings of fact, its conclusion as to whether or not those facts constitute a violation of University policy, and its recommended penalty, if any. The Secretary will forward the report to the relevant decision maker: (i) the provost if the respondent is a faculty member; (ii) the dean of the respondent's school if the respondent is a trainee or student; or (iii) the associate vice president for Human Resources if the respondent is a staff member.  The Secretary will furnish copies of the panel's findings of fact and conclusions to the complainant and the respondent. Each party may submit to the Secretary a single written response to the panel's findings of fact and conclusions within three days of receiving it.  The Secretary will forward the written response to the decision maker and to the other party.[18] On the basis of the decision maker's own concerns or concerns raised in a response from a party, the decision maker may ask the panel to re-examine or clarify findings of fact. If necessary, the panel may submit a revised report. The decision maker will then accept the panel's findings of fact, but may accept, reject, or modify the panel's conclusions or recommendations, in whole or in part. The final decision whether to impose a penalty, and what penalty or penalties to impose, belongs to the relevant decision maker.  The decision maker may consult with the chair of the panel regarding the panel's conclusions and recommendations.  In addition, if the decision maker contemplates materially modifying or rejecting the panel's conclusions or recommendations, the decision maker shall meet with a majority of the panel members to discuss the proposed decision. The decision maker will render his or her decision in writing within seven days of receiving the panel's report.  The decision will set out the decision maker's conclusions and the penalties imposed, if any.  The complainant is entitled to know any penalty imposed if that penalty would affect them directly (for example, if the respondent is not permitted to approach the complainant or the respondent is suspended from the University).

The Secretary will send written notice of the decision and the penalties imposed, if any, to the parties, the members of the panel, the UWC Chair, and the University's Title IX Coordinator.

## 7.6. Penalties

Persons found to have violated the sexual misconduct policies of the University may receive penalties up to and including expulsion from the University or termination of University employment, as discussed in applicable faculty, trainee, student, and staff policies and regulations.

## 7.7. Appeals

Any party may appeal the decision of the decision maker. An appeal from the provost's decision regarding a faculty member is made to the president; an appeal from a dean's decision regarding a trainee or student is made to the provost; and an appeal from the associate vice president for human resources' decision regarding a staff member is made to the vice president for human resources and administration. The appeal must be in writing and received by the Secretary within five days of the decision. The only grounds for appeal are (i) procedural error that prevented the hearing panel or the decision maker from judging the matter fairly, or (ii) the discovery of facts that were not reasonably available to the appealing party prior to the UWC hearing and that support or refute the allegation of sexual misconduct.

The Secretary will provide a copy of the appeal to the other party. If the other party wishes to respond, that party must do so in writing to the Secretary within five days after receiving the appeal. Within 14 days after receiving the appeal, the president, provost, or vice president will provide a written appeal decision to the parties.  If the appeal is granted, the matter will be returned to the hearing panel for reconsideration.  In the decision, the president, provost, or vice president may give the hearing panel instructions regarding the nature and extent of its reconsideration. The hearing panel will act promptly to reconsider the matter and will issue a revised report to the decision maker. The decision maker will promptly issue a new decision, which is not subject to appeal. The decision maker may consult with the chair of the panel regarding the panel's revised report.  In addition, if the decision maker contemplates modifying or rejecting some or all of the panel's conclusions or recommendations, the decision maker shall meet with a majority of the members of the panel and the individual that granted the appeal (president, provost, or vice president) to discuss the proposed decision.  The decision maker will promptly issue a new decision, which is final.

## 7.8. Time Periods

For ease of reference, the following time periods generally apply to the review of a formal complaint. The UWC Chair may extend a time period for good cause such as illness, holidays, the absence of witnesses from campus, the complexity of the allegations, or competing demands on UWC Members or decision makers. The parties will be informed by the Secretary or UWC Chair if a time period is extended, and the UWC Chair's decision regarding extensions will be final.

| | |
|---|---|
| Respondent submits a response to the complaint | Within five days after delivery of complaint to respondent |
| Parties may object to panel members | Within two days after notice of panel members' names |
| UWC Chair appoints fact-finder | Within seven days after receipt of complaint |
| Fact-finder's report due | Within 21 days after fact-finder's appointment |
| Hearing date | No sooner than five days after parties' receipt of fact-finder's report |

| Requests for hearing panel to interview witnesses | Received by Secretary at least four days before the hearing |
|---|---|
| Notice regarding bringing legal counsel as adviser | Received by Secretary at least four days in advance of the meeting that the adviser will attend. |
| Panel submits report | To Secretary within 10 days of the hearing |
| Response to panel's findings of fact and conclusions | Within three days after receipt of the findings of fact and conclusions |
| Decision maker renders decision | Within seven days after receipt of panel report and any responses by the parties |
| Appeal by either party | Within five days after decision rendered |
| Response to an appeal | Within five days after opposing party's receipt of appeal |
| Decision on appeal | Within 14 days after receipt of appeal |

**8. Recordkeeping**

The Secretary keeps and retains records of UWC proceedings, storing them in a secure place. The Secretary will retain records of (i) all complaints received by the UWC; (ii) all actions taken by the UWC in response to informal complaints; (iii) all supplementary documents and evidence received by the UWC in relation to a formal complaint; (iv) all fact-finder reports; (v) minutes from each UWC hearing session[19]; (vi) the report of the hearing panel; (vii) the written notice provided to the complainant and the written notice provided to the respondent of the decision maker's decision; and (viii) appeals and decisions regarding appeals.

The Secretary will summarize each formal complaint of sexual misconduct that the UWC receives and the resolution of those complaints, and they will submit the summaries to the University Title IX Coordinator as soon as possible after each complaint is resolved. The summaries will contain sufficient information to allow the University Title IX Coordinator to assess Yale's compliance with the requirements of Title IX. Semiannually, the University Title IX Coordinator will publish a statistical abstract of the handling of sexual misconduct complaints at Yale, including any disciplinary actions taken. These abstracts will include no information that would reveal the identities of the parties.

*Last Updated: October 26, 2015*

[1] In these procedures, the term "faculty member" should be understood to include persons teaching at Yale, even if they are not formally members of the faculty.

[2] The term "staff member," as used in these procedures, includes all Yale employees except faculty members, members of a Yale collective bargaining unit, clerical and technical employees excluded from the bargaining units, casual or temporary employees, or student employees.

[3] Yale faculty members, trainees, students, or staff members who have been harmed by the sexual misconduct of a person not affiliated with Yale (for example, a visitor to campus or the employee of a Yale contractor) may contact a Title IX Coordinator.

[4] Others who wish to file a complaint against a staff member may contact a Title IX Coordinator, a union representative, a Human Resources Generalist, or the Office for Equal Opportunity Programs.

Students who do not wish to use the UWC procedures may instead contact a Title IX Coordinator, a Human Resources Generalist, or the Office for Equal Opportunity Programs. Once the UWC or the department of Human Resources agrees to hear a student's formal complaint against a staff member, the student may not move the complaint to another forum.

[5] Complaints of sexual misconduct against members of the collective bargaining units or excluded staff may be brought to a Title IX Coordinator, a union representative, a Human Resources Generalist, or the Office for Equal Opportunity Programs.

[6] Under federal law, a complainant alleging certain types of sex offenses has a right to be informed of the outcome of disciplinary proceedings arising from his or her complaint, and Yale may not impose non-disclosure requirements on the complainant in regard to that information.

[7] The names and e-mail addresses of the UWC Members can be found on the UWC website.

[8] Some examples of accommodations and interim measures include providing an escort for the complainant; ensuring that the parties have no contact with one another; providing counseling or medical services; providing academic support, such as tutoring; and arranging for the complainant to re-take a course or withdraw from a class without penalty, including ensuring that any changes do not adversely affect the complainant's academic record.

[9] Should the UWC Chair be unable to address a complaint because of a relationship to a party or other circumstances, the provost will appoint another member of the UWC to assume the Chair's role.

[10] A single complaint may involve more than one complainant and/or more than one respondent. The singular is used throughout these procedures for convenience only.

[11] The UWC Chair will determine whether the complaint provides sufficient detail or must be supplemented.

[12] For the purposes of this determination, when a Title IX Coordinator brings a complaint, the Coordinator will be considered the complainant.

[13] Complex complaints may combine allegations of sexual misconduct and other offenses, and the UWC may not be the only University body with authority to hear a complaint. In such cases, the UWC will retain jurisdiction over all charges of sexual misconduct, and other charges will be heard according to the circumstances of each complaint. In some cases, for example, the UWC may hear all charges, and, in other cases, a different decision-making body may decide the charges that do not relate to sexual misconduct. In cases involving multiple types of allegations, the UWC Chair will consult with the official responsible for the other relevant body and together they will determine the appropriate forum and the applicable standards of proof. If there is disagreement about the appropriate forum or manner in which to hear a complaint, the provost will make the final decision.

[14] See footnote 8 for examples of interim measures that may be taken.

[15] In complaints involving sexual violence, if the fact-finder or panel chooses to consider medical or laboratory evidence, that consideration should include a trained forensic examiner's written opinion or testimony. Neither the fact-finder nor the panel may review documents or hear testimony covered by a legal privilege (for example, psychiatric patient records and attorney-client communications).

[16] If a Title IX Coordinator has brought a complaint on behalf of a person who is not a current or former member of the Yale community, the panel must hear that person's testimony, if that person wishes to appear.

[17] See footnote 8 for examples of non-disciplinary remedies.

[18] Except for this response, neither the parties nor their representatives may communicate with a decision maker about a pending case, and the decision makers will not consider documents sent to them by third parties on behalf of the complainant or respondent.

[19] The minutes of a UWC hearing consist of a protocol annotated to indicate the time at which each phase of the process started and ended. The minutes do not record statements, testimony, or questions.

# EXHIBIT 3

Sexual Misconduct Scenarios
September 9, 2013

Yale University is committed to creating and maintaining a campus that is safe and respectful—
where sexual misconduct of any kind has no place.  Accordingly, any alleged violation of Yale's
sexual misconduct policy that is brought to the attention of the University will be pursued to the
extent possible and, if substantiated, disciplined effectively and appropriately (policy at
http://smr.yale.edu/definitions-sexual-misconduct-consent-and-harassment).

In order to provide general information about sexual misconduct at Yale and to engage the
community in frank and open discussion, the University publishes semi-annual reports of
complaints of sexual misconduct brought to the attention of the Title IX Coordinators, the
University-wide Committee on Sexual Misconduct (UWC), and the Yale Police Department. The
most recent semi-annual report has generated a number of thoughtful questions and concerns.
While we cannot answer those questions in the context of actual cases, we have attempted to
address many of them through a statement and Frequently Asked Questions (posted at
http://provost.yale.edu/title-ix/reports). The scenarios in this document are intended to provide
additional information and to encourage further discussion.

The majority of recent questions and concerns relate to Yale's use of the term "nonconsensual
sex" and the disciplines imposed when the UWC finds that nonconsensual sex has occurred.
Yale's definition of consent requires positive, unambiguous, voluntary agreement at every point
during a sexual encounter – the presence of an unequivocal "yes" (verbal or otherwise), not just
the absence of a "no."  The category "nonconsensual sex" includes rape but is more expansive
than rape.  In disciplining the full range of nonconsensual sexual activity, not just those acts that
would meet a criminal standard, the UWC aims to uphold Yale's high community standards,
creating a campus that is safe for all.

The following scenarios have been developed to help illustrate a range of behaviors that Yale
and the UWC would characterize as "nonconsensual sex" – and thus, a violation of Yale's sexual
misconduct policy.  For comparison, the scenarios include examples of consensual sex. The
scenarios also provide examples of penalties–ranging from expulsion to reprimand–that might be
imposed as a result of a violation.

The scenarios are not drawn from actual cases heard by the UWC; the details of those cases are
held in the strictest confidence.  Rather, the scenarios draw upon the extensive research literature
on both consensual and nonconsensual sex on college campuses.  It is likely that these scenarios
reflect incidents on our campus too, but examples of this full range of circumstances have not yet
been heard in formal UWC cases.  The names chosen for the scenarios are gender neutral to
reflect the fact that sexual misconduct occurs in all gender configurations.

The scenarios are concise and do not capture the complexities that may emerge during the UWC
formal complaint process, which is designed to provide a fair and thorough review of each
complaint and thus includes independent fact finding, a formal hearing, and an appeal process
(procedures at http://provost.yale.edu/uwc).  Furthermore, the disciplinary outcomes described in
these scenarios presume that the UWC has determined that there is sufficient evidence (i.e., a

preponderance of the evidence) to conclude that the conduct occurred as presented in each scenario. The scenarios also presume that the UWC has determined each penalty based solely on the nature of the sexual misconduct found to have occurred. In an actual case, the penalty may be influenced by additional factors, such as the prior disciplinary record of the respondent and the wishes of the complainant.

Finally, the conduct described in some scenarios would be criminal and, as such, subject to criminal prosecution. The Title IX Coordinator reports all cases of possible sexual assault to the Yale Police Department (YPD), and the University fully supports all individuals who pursue their complaints with the YPD.

Yale is committed to addressing sexual violence and sexual misconduct, to increasing awareness of sexual misconduct on our campus, and to engaging the community in creating a culture of respect and responsibility. We hope these scenarios are informative, and that they generate productive discussion and suggestions.

*Note: the descriptions in some of the scenarios below may be disturbing to some readers.*

***The discipline imposed in each scenario presumes that the facts described below have been substantiated in the UWC fact finding and hearing processes.***

1. Ryo and Casey are dating. Casey is uncertain about whether they should have sex, but Ryo is persuasive and finally obtains Casey's voluntary agreement. As they engage in sex, Casey says "wait – stop – that hurts." Ryo nonetheless continues for several more minutes, restraining Casey. Afterwards, Casey is upset. Ryo apologizes, but says they were past the point of interruption.

   *While there was initial consent, that consent was withdrawn. The UWC penalty would be expulsion.*

2. Jessie and Vic have been flirting all semester, and agree to meet at a party. After dancing closely together for a while, Vic proposes going to one of their rooms and Jessie agrees. On the walk to Jessie's room, they send a few texts, letting Vic's friends know not to worry and asking Jessie's roommate to please sleep somewhere else. Once in the room, they begin touching. Each is interested in hearing what the other wants, and each is paying attention to the other's signals. They reach and sustain clear agreement upon mutually desired sexual activities.

   *This is consensual sex: Vic and Jessie reached positive, voluntary, unambiguous agreement to engage in sexual conduct together.*

3. Sidney and Harper are dating.  On several occasions they are physically intimate, but within limits set by Sidney, who is opposed to having sex at this stage of their relationship.  One night, when they are being intimate within their mutually agreed upon boundaries, Harper begins to cross them.  Sidney expresses concern, but Harper is encouraging, saying "it will be okay just this once."  Sidney replies "we shouldn't do this," but continues to touch Harper in an intimate way.  As Harper initiates sex, Sidney says "this is a bad idea" and begins to cry, but embraces Harper and the two proceed to have sex.

   *Initial consent was followed by ambiguity.  Sidney's acquiescence to sex was accompanied by too much dismay to constitute unambiguous agreement, especially given Sidney's longstanding prior refusal to engage in sex.  The UWC penalty would likely fall in the range of probation to suspension.*

4. Jamie and Cameron are at a party.  It is crowded on the dance floor and they are briefly pressed together.  Later, Jamie encounters Cameron in the hallway and smiles.  Cameron, who is now very drunk, follows Jamie into the bathroom and forces Jamie to have sex.

   *There was no consent to have sex.  The UWC penalty would be expulsion.*

5. Devin and Ansley are engaging in a consensual sexual encounter, which Devin begins to intensify.  Ansley responds by pulling away slightly, moving Devin's hands and saying "not so fast; I'm not sure."  Devin cooperates briefly but then intensifies the contact once more.  Ansley inches backwards and then becomes still.  Nonetheless, Devin has sex with Ansley.

   *While the initial sexual activity was consensual, that consent was not sustained.  The UWC penalty would likely range from multi-semester suspension to expulsion.*

6. Alexis and Riley are studying together in Riley's room.  During a break in their studying, they rub each other's shoulders.  Alexis then introduces some intimate touching.  Riley moves closer and says "Okay, but I don't want to go too far – we still have a lot of work to do."  Alexis continues to touch Riley in an intimate way.  Riley willingly agrees to some contact, but mostly sets boundaries.  Alexis jokes that they deserve to have sex as a reward for their hard work studying; Riley laughs.  After their studying is done, Alexis suggests again that they should have sex.  Riley responds they should probably get some sleep but continues to touch Alexis.  After a few more minutes, Alexis asks once more.  Riley pauses, then says okay and pulls Alexis closer.  They have sex.

   *This is consensual sex. Despite initial hesitation, the ultimate agreement to have sex was voluntary and unambiguous. There is no violation of the sexual misconduct policy. The UWC would likely counsel Alexis about the inappropriateness of sexual pressure, and recommend SHARE's sensitivity training program.*

7.  Morgan and Kai are friends who begin dancing and kissing at a party.  They are both drunk, although not to the point of incapacitation.  Together they decide to go to Kai's room.  They undress each other and begin touching each other.  Morgan moves as if to engage in oral sex and looks up at Kai questioningly.  Kai nods in agreement and Morgan proceeds.  Subsequently, without pausing to check for further agreement, Kai begins to perform oral sex on Morgan.  Morgan lies still for a few minutes, then moves away, saying it is late and they should sleep.

    *There was initial agreement, but the bounds of that agreement were not clear.  Kai may have thought that Morgan had consented to reciprocal oral sex, but took no steps to obtain unambiguous agreement.  The UWC penalty would likely be a reprimand.*

8.  Tyler and Jordan are both drinking heavily at an off-campus event.  Tyler becomes extremely drunk.  Jordan offers to take Tyler home.  On the way, Tyler has trouble walking, and makes several wrong turns.  Once in Tyler's room, Jordan initiates sexual activity.  Tyler looks confused and tries to go to sleep.  Jordan has sex with Tyler.

    *There was no consent to have sex. A person who is incapacitated—lacking the ability to make or act on considered decisions to engage in sexual activity—cannot give consent. The UWC penalty would be expulsion.*

4

# EXHIBIT 4

# Reporting Sexual Misconduct to a Title IX Coordinator

People are often curious about how a Title IX Coordinator can help someone who has experienced sexual misconduct. The specific actions and options vary from case to case, but the basic goals remain the same: coordinators seek to address any immediate concerns, connect complainants with appropriate resources, ensure that they are fully aware of the options available for further action, and help facilitate those actions. Except in rare cases involving an acute threat to community safety, coordinators defer to complainants' wishes. Information shared with coordinators is kept confidentially within the Title IX Office.[*]

### How do people reach a coordinator?

The names and contact information for all the Title IX Coordinators are posted online. Anyone can call or email any coordinator with concerns—no matter how big or small— about a specific incident or campus sexual climate in general. Sometimes, information comes to coordinators from friends, colleagues, or witnesses. In those cases, coordinators reach out to potential complainants, who can choose whether or not they want to engage in further discussion with the coordinator. Coordinators are also able to suggest resources to support and advise respondents.

### What happens during that first conversation?

Coordinators usually meet with people in person, but sometimes conversations happen by phone or email. Initially, coordinators focus on complainants' immediate concerns, especially safety, emotional well-being, and professional or academic requirements. Complainants do not need to describe their experiences in detail; they may choose to do so, but it is not necessary. Often, there are steps that can be taken—connecting someone with SHARE, shifting a class assignment, establishing a no-contact agreement, etc.— that can have immediate positive impact. Coordinators describe the full range of options and resources available for pursuing informal, formal, and criminal complaints, so that complainants can make a well-informed decision about next steps. Coordinators work closely with the SHARE Center, the University-Wide Committee on Sexual Misconduct (UWC), Human Resources, and the Yale Police Department, and can coordinate efforts among them to respond to complainants' needs and decisions.

### *What steps can coordinators take to address concerns?*

Coordinators can put various measures in place to address complainants' safety concerns, mitigate the impact of sexual misconduct, and address a potentially hostile climate. Many of these steps can be taken even if someone does not choose to pursue a complaint. For example, coordinators may be able to change on-campus housing or work locations, arrange for extra time to complete academic or work assignments, provide security escorts, or arrange for counseling as appropriate. Coordinators can also implement an order requiring the complainant and respondent to refrain from direct contact. Respondents may also agree to other steps, such as having their own housing, work, or class-room locations changed, avoiding specific areas of campus, etc. Alongside these individually-focused measures, other steps may be taken to address climate concerns such as sexual harassment training for departments or groups.

---

[*] The Title IX Office does share anonymized information with the community through our regular reports, taking care to protect individual confidentiality. In situations where there is an ongoing threat, identifying information may be shared with law enforcement, medical professionals, or other internal University colleagues in order to better protect individual and community safety.

**What happens if a complainant decides to pursue a complaint with a Title IX Coordinator?**

The Title IX Coordinator complaint process (often called "informal") is focused on remedies: finding ways to address complainants' concerns and, if necessary, potentially hostile climate issues to the extent possible without involving a formal hearing process. If a complainant wishes to move forward with the Title IX Coordinator complaint process, the coordinator may speak to the respondent and possibly other witnesses and review evidence. Except in cases of acute threat, coordinators will not take any action that could compromise a complainant's confidentiality without the complainant's agreement.

Complainants frequently ask a coordinator to talk to respondents about the behavior in question and its impacts. These conversations give a coordinator an opportunity to review University policy with a respondent, inform a respondent how their behavior has been perceived, and establish measures (as described above) to help complainants continue their professional and educational activities. A respondent may also be offered more intensive one-on-one training. The level of confidentiality requested by the complainant may limit options for remedies and therefore the effectiveness of the response.

A coordinator will not directly impose discipline but may work with supervisors or help to initiate formal processes that may produce disciplinary outcomes. Complainants are also free to file a formal complaint at any point, and coordinators can facilitate that process.

**How do coordinators help with formal complaints?**

While formal complaints of sexual misconduct are adjudicated by the UWC, the coordinators play supporting roles. For each formal complaint, the UWC will identify a coordinator to implement interim measures while the complaint process takes place and continuing measures as appropriate after the process concludes. In certain circumstances, coordinators can themselves bring a formal complaint to the UWC, e.g., on behalf of a person who is not a current or former member of the Yale community or to protect the safety of the community or individuals.

**What else do coordinators do?**

In addition to responding to and addressing specific complaints, coordinators track and monitor incidents to identify patterns or systemic issues, coordinate the available resources and support processes, deliver prevention and educational programming to the University community, and conduct periodic assessments of the campus climate and, when indicated, focused climate assessments of specific departments or units.

# EXHIBIT 5

Yale University

# Office of the Provost

# Statement on Confidentiality of UWC Proceedings

All members of the University community who are involved in a matter before the UWC should understand their obligations regarding the confidentiality of UWC proceedings and documents.

The UWC's procedures state that "all members of the Yale community who are involved in a matter before the UWC are expected to maintain the confidentiality of its proceedings and the information obtained for those proceedings."  The purpose of confidentiality is to encourage parties and witnesses to participate in UWC proceedings and share all the pertinent information they have to offer, which is essential to reaching a fair outcome.  If parties or witnesses fear that their participation or testimony in a UWC proceeding could be revealed, then concerns about reputation, social tension, or retaliation may cause them to keep silent.  Every member of the University community should recognize that breaches of confidentiality hurt the participants and have the potential to erode respect for the UWC process.

The UWC's procedures allow parties to select an adviser with whom they can discuss all aspects of the proceedings, and the University understands that parties will seek support and advice from their families. We expect, however, that parties will impress on their advisers and families the importance of maintaining strict confidentiality.  Of course, persons involved in a difficult situation will also seek support from friends, but participants in UWC proceedings are expected to do so without revealing details of the proceedings or information they have obtained as a result of the proceedings.

The UWC's procedures impose strict and unequivocal confidentiality obligations regarding documents prepared by, prepared for, or received from the UWC in connection with a UWC proceeding ("UWC Documents").  Parties may not disclose UWC Documents to anyone other than their UWC advisers, family members, and attorneys, and parties must inform these recipients that the UWC Documents are strictly confidential and may not be further disclosed.   The University may take disciplinary action against any member of the Yale community who discloses UWC Documents in violation of UWC

procedures or who is responsible for the improper disclosure of such documents by others. In addition, whether or not a UWC Document has been disclosed, disciplinary action may be taken against a member of the Yale community who breaches confidentiality in order to retaliate against a person for his or her participation in a UWC proceeding as a complainant, respondent, or witness.

Finally, breaching the expectation of confidentiality may have legal implications. The circumstances surrounding allegations of sexual misconduct are often sharply disputed and have the potential to affect the reputations of the persons involved. The University believes that statements made in good faith as part of UWC proceedings are legally protected. Statements made outside of UWC proceedings may lack that protection and could lead to a legal claim against the person who makes them.

If you have any questions regarding your responsibility to preserve the confidentiality of UWC proceedings, please contact UWC Chair David Post at david.post@yale.edu (mailto:david.post@yale.edu) or Secretary Aley Menon at aley.menon@yale.edu (mailto:aley.menon@yale.edu).

*Last updated: May 8, 2015*

## UWC Contact Info

**Aley Menon**
Secretary, University-Wide Committee on Sexual Misconduct
203-432-4441
aley.menon@yale.edu (mailto:aley.menon@yale.edu)

**Anita Sharif-Hyder**
Associate Secretary, University-Wide Committee on Sexual Misconduct
203-432-8798
anita.sharif-hyder@yale.edu (mailto:anita.sharif-hyder@yale.edu)

**Lani Danilowitz**
Project Coordinator, University-Wide Committee on Sexual Misconduct
203-432-4449
lani.danilowitz@yale.edu (mailto:lani.danilowitz@yale.edu)

# Yale

Copyright © 2016 Yale University · All rights reserved ·
Office of the Provost | P.O. Box 208333, New Haven, CT 06520-8365 | Contact Us

# EXHIBIT 6

# Yale University

*Report of Complaints of Sexual Misconduct*
*Brought forward from January 1, 2015 through June 30, 2015*

## Contents

Introduction ................................................................................................. 2

Guide to This Report ................................................................................... 3

Statistical Summary of Complaints ........................................................... 4

Descriptive Summaries of Complaints ...................................................... 6

    University-Wide Committee on Sexual Misconduct: Formal Complaints ................... 6

    University-Wide Committee on Sexual Misconduct: Informal Complaints ................ 8

    Title IX Coordinators .............................................................................. 9

    Yale Police Department ......................................................................... 13

Brief Definitions ........................................................................................ 15

Terminology Commonly Used in this Report ........................................... 16

# Introduction

Yale University is committed–above all else–to providing a safe, respectful, and supportive environment, where everyone can thrive and where sexual misconduct has no place. One of the many steps the University has taken to realize that commitment is the semi-annual publication of reports to inform the Yale community of complaints of sexual misconduct that have come to the University's attention and the actions that have been taken to address them.

This report– the eighth that we have published since 2012– presents summary information about 56 complaints of sexual misconduct that were brought to the University's attention between January 1, 2015 and June 30, 2015. It also provides updates on eight complaints that were first presented in previous reporting periods. The "Guide to This Report," which follows this introduction, contains additional information about the format and composition of the report, as well as links to general information about Yale's policies, definitions, and procedures relating to sexual misconduct.

Behind the summaries and statistics in this report lie the very real, and often very painful, experiences of members of our own community. We therefore make every effort to protect the privacy of those individuals. As a result, while we strive to make the report as informative as possible, it can offer only a limited view of the complex circumstances that underlie specific complaints and the multitude of factors that lead to decisions about discipline and other responsive actions.

Although necessarily constrained in the detail they provide, the semi-annual reports have been quite successful in generating broad discussion about Yale's programs and procedures to address sexual misconduct, including the reports themselves. Over the past months, for example, our Title IX student advisory boards, as well as faculty advisors, requested that we eliminate gender references in complaint summaries in order to strengthen confidentiality for the individuals involved. As you will see, the current report includes gender-neutral summaries and presents the gender of complainants and respondents only in aggregate, statistical form.

As I have noted in the past, the semi-annual reports capture information only about those incidents about which complaints have been brought forward; accordingly, these reports tell us very little about overall incidence rates. Last spring, Yale partnered with 26 peer institutions and the Association of American Universities to gather some of that missing information through the Campus Sexual Climate Survey, which was offered to all students. We look forward to sharing the Survey findings with the Yale community when they become available later this fall and hope that they will stimulate campus-wide discussion and lead to further improvements in our programs.

It is impossible to overstate the value of the community's input and engagement in shaping our initiatives to address and prevent sexual misconduct and assuring that Yale is a safe and respectful place to study, live and work. I hope that you will continue to share your observations, questions and suggestions about the report and any of our programs. You may contact me at titleix@yale.edu or schedule a call or meeting by contacting my office at 203-432-4446.

Stephanie S. Spangler

August 4, 2015

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

# Guide to This Report

This report includes both statistical and descriptive summaries of the complaints brought forward within this reporting period (January 1 – June 30, 2015) and are organized according to the office or committee that addressed the complaint most recently and/or definitively: the University-Wide Committee on Sexual Misconduct (UWC), the Title IX Coordinators, and the Yale Police Department (YPD).

The statistical summaries present the complaints by the category of the misconduct, then by complainant and respondent, and lastly by the venue through which the complaint was primarily addressed. Throughout the narrative portion of the report you will find cases that engaged more than one of these venues, evidence of the close coordination of the UWC, the Title IX Coordinators, and the YPD in working with complainants to find the venues that will best meet their needs.

While intended to be broadly informative, the report does have limitations. Because of privacy obligations, the report cannot fully convey the variety and complexity of circumstances associated with cases that may appear similar in the brief narrative descriptions. Likewise, the report assigns complaints to general categories such as "sexual assault" and "sexual harassment" that encompass broad ranges of behavior. We have embedded links to key definitions and terminology in the report (which also appear at the end of this report), so that readers can understand what behaviors may be included in any category. We also include links to Frequently Asked Questions and to hypothetical case scenarios, which illustrate Yale's definition of consent. Readers can find comprehensive information about Yale's policies, definitions and procedures in the guide "Preventing and Responding to Sexual Misconduct: Building a Climate of Safety and Respect at Yale."

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

*Report of Complaints of Sexual Misconduct, January 1, 2015 – June 30, 2015*

# Statistical Summary of Complaints[i]

The statistics below include all complaints of sexual misconduct brought forward within this reporting period (January 1 – June 30, 2015), regardless of when the alleged events occurred.  To avoid duplication, the tables below do not include complaints presented as updates in this report since these complaints were already included in the statistical summaries of previous reports.  The complaints of sexual misconduct are sorted in broad categories (e.g., sexual assault, intimate partner violence, sexual harassment) based on the complainant's allegations.  Complaints involving more than one allegation of sexual misconduct are listed only once.  The complainant is the person who reported having experienced misconduct, or (in the case of third-party complaints) the person who is reported to have experienced it.  The respondent is the person (or persons) alleged to have committed the misconduct.

Table 1. Sexual Misconduct Complaints by Complainant Affiliation

| | | Complainant Affiliation | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Undergrad | G&P | Staff | Postdoc | Faculty | Other Yale Affiliate | Non-Yale | Unknown | Total |
| Category of Sexual Misconduct Reported | Sexual Assault | 6 | 3 | 1 | 0 | 0 | 0 | 3 | 0 | 13 |
| | Intimate Partner Violence | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| | Sexual Harassment | 8 | 9 | 4 | 1 | 0 | 0 | 2 | 0 | 24 |
| | Stalking | 2 | 5 | 1 | 0 | 0 | 0 | 1 | 0 | 9 |
| | Other | 5 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| | Total | 22 | 20 | 7 | 1 | 0 | 0 | 6 | 0 | 56 |

Table 2. Sexual Misconduct Complaints by Respondent Affiliation

| | | Respondent Affiliation | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Undergrad | G&P | Staff | Postdoc | Faculty | Other Yale Affiliate | Non-Yale | Unknown | Total |
| Category of Sexual Misconduct Reported | Sexual Assault | 7 | 3 | 1 | 0 | 0 | 1 | 1 | 0 | 13 |
| | Intimate Partner Violence | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 |
| | Sexual Harassment | 4 | 3 | 5 | 0 | 3 | 2 | 3 | 4 | 24 |
| | Stalking | 2 | 3 | 0 | 0 | 0 | 0 | 2 | 2 | 9 |
| | Other | 2 | 2 | 0 | 0 | 1 | 0 | 2 | 1 | 8 |
| | Total | 15 | 11 | 6 | 0 | 4 | 3 | 10 | 7 | 56 |

---

[i] The sexual assault data in this report will not correspond to Yale's annual report required under the federal Clery Act because this report uses a more expansive definition of sexual assault and includes cases from a wider geographic jurisdiction than in the Clery report.

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

*Report of Complaints of Sexual Misconduct, January 1, 2015 – June 30, 2015*

Table 3. Sexual Misconduct Complaints by Gender Configuration

| | | Complainant Gender | | | | | |
|---|---|---|---|---|---|---|---|
| | | Female | Male | Other Gender Identity | Multiple Mixed Gender Complainants | Gender Not Known | **Total** |
| **Respondent Gender** | Female | 1 | 6 | 0 | 0 | 0 | **7** |
| | Male | 37 | 3 | 0 | 0 | 3 | **43** |
| | Other Gender Identity | 0 | 0 | 0 | 0 | 0 | **0** |
| | Multiple Mixed Gender Respondents | 0 | 0 | 0 | 0 | 0 | **0** |
| | Gender Not Known | 2 | 0 | 0 | 1 | 3 | **6** |
| | **Total** | **40** | **9** | **0** | **1** | **6** | **56** |

Table 4. Sexual Misconduct Complaints by Venue

| | | Venue (Office or Committee that Addressed the Complaint) | | | | |
|---|---|---|---|---|---|---|
| | | UWC - Formal | UWC - Informal | Title IX Coordinator | YPD | **Total** |
| **Category of Sexual Misconduct Reported** | Sexual Assault | 3 | 0 | 7 | 3 | **13** |
| | Intimate Partner Violence | 0 | 0 | 0 | 2 | **2** |
| | Sexual Harassment | 1 | 0 | 17 | 6 | **24** |
| | Stalking | 0 | 0 | 3 | 6 | **9** |
| | Other | 3 | 0 | 2 | 3 | **8** |
| | **Total** | **7** | **0** | **29** | **20** | **56** |

In providing a range of options—including informal options—for pursuing complaints, the University seeks to meet the varied needs of potential complainants. Given the violating nature of sexual misconduct, it is important that those who have experienced it retain as much control as possible over the actions taken in response. Accordingly, whenever possible, it is the potential complainant who decides whether or not to pursue a complaint, and in what venue. In certain unusual circumstances, such as those involving risks of the safety of individuals and/or the community, the University will bring matters to a formal hearing independently of the wishes of an individual complainant. The choice of an informal process does not imply the matter is less serious than those matters pursued through formal processes, nor does it preclude the complainant from choosing to bring a formal complaint at a later date.

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

5

*Report of Complaints of Sexual Misconduct, January 1, 2015 – June 30, 2015*

# Descriptive Summaries of Complaints

The descriptive summaries of complaints are organized in tables below according to the office or committee that reviewed and addressed the complaints, i.e., the University-Wide Committee on Sexual Misconduct (UWC), the Title IX Coordinators, and the Yale Police Department (YPD).

Although a complaint may be brought to multiple venues, each complaint is described only once in this report, based on where the majority of the actions taken occurred. The UWC, Title IX Coordinators and YPD routinely collaborate and coordinate their activities to ensure that complaints are resolved promptly and equitably. All reports of sexual misconduct brought to the YPD, for example, are reviewed by the University Title IX Coordinator; similarly, all reports of possible criminal activity brought to the Title IX Coordinators (including those reported via the UWC) are shared with the YPD.

## *University-Wide Committee on Sexual Misconduct: Formal Complaints*

The following complaints were pursued through formal resolution with the UWC. In every case, the complainant was provided information about all options for pursuing complaints – including formal, informal, and criminal complaints – as well as information about support resources such as the Sexual Harassment and Assault Response & Education Center (SHARE). See the UWC Procedures for more information.

| During this reporting period (January 1 – June 30, 2015), there were 7 new formal complaints brought forward to the UWC, which are reported in this table. In addition, below are updates to cases that were reported as pending in a previous report and have been completed. |||||
| --- | --- | --- | --- |
| **Complainant** | **Respondent** | **Category of Misconduct Reported** | **Description/Actions Taken** |
| Yale College Student | Yale College Student | Sexual assault | A YC student alleged that another YC student engaged in sexual harassment and sexual touching without consent. The complaint was withdrawn. |
| Yale College Student | Yale College Student | Other | A Title IX Coordinator alleged that a YC student engaged in voyeurism, and threatened and attempted to coerce a YC student to refrain from pursuing a complaint. The UWC found sufficient evidence to support the allegations of voyeurism and coercion. The respondent was expelled. |
| Yale College Student | Yale College Student | Other | Following adjudication of a complaint, the respondent alleged that the complainant made false claims in filing the complaint. The UWC found no factual basis for the respondent's complaint and therefore did not accept jurisdiction. |
| Yale College Student | Yale College Student | Sexual assault | A YC student alleged that another YC student engaged in sexual harassment and sexual penetration without consent. The UWC found sufficient evidence to support the allegation of nonconsensual sexual activity and sexual harassment. The respondent was placed on probation and received a written reprimand. |

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

*Report of Complaints of Sexual Misconduct, January 1, 2015 – June 30, 2015*

| Yale College Student | Yale College Student | Sexual assault | A Title IX Coordinator alleged that a YC student engaged in sexual penetration with another YC student without consent. The case is pending. No-contact restrictions were imposed as an interim measure. |
| Graduate & Professional Student | Graduate & Professional Student | Sexual harassment | A G&P student alleged that another G&P student sexually harassed and physically assaulted the complainant. The case is pending. No-contact restrictions were imposed as an interim measure. |
| Graduate & Professional Student | Graduate & Professional Student | Other | A G&P student alleged that another G&P student physically assaulted the complainant. The case is pending. No-contact restrictions were imposed as an interim measure. |

*Updates to previous complaints: The complaints below were reported as pending in a previous report as complaints brought to a Title IX Coordinator or the UWC. They were included in the statistical summaries in the previous report and are therefore not included in the statistical summaries at the beginning of this report.*

| Complainant | Respondent | Category of Misconduct Reported | Description/Actions Taken |
|---|---|---|---|
| Yale College Student | Yale College Student | Sexual assault | *Original summary:* A Title IX Coordinator brought a formal complaint alleging that a YC student engaged in sexual touching without consent.<br><br>*Update:* The UWC did not find sufficient evidence to support the allegation. No-contact restrictions, which were imposed as an interim measure during the proceedings, were continued. |
| Yale College Student | Yale College Student | Sexual assault | *Original summary:* A YC student reported that another YC student made unwanted advances. The Title IX Coordinator counseled the respondent on appropriate conduct and restricted the respondent from contacting the complainant.<br><br>*Update:* The YC student brought a formal complaint to the UWC alleging that the respondent engaged in sexual activity without consent, violated a voluntary no-contact arrangement and breached the expectation of confidentiality of UWC proceedings. The UWC found sufficient evidence to support the allegation of nonconsensual sexual activity. The respondent was reprimanded, was restricted from participating in certain campus activities, and was referred for training on sexual consent. No-contact restrictions were continued. |
| Yale College Student | Yale College Student | Sexual assault | *Original summary:* A YC student alleged that another YC student engaged in sexual activity without consent.<br><br>*Update:* This complaint was brought by the respondent following the adjudication of the original complaint. The UWC found no factual basis for the respondent's complaint and therefore did not accept jurisdiction. |

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

| Graduate & Professional Student | Graduate & Professional Student | Sexual assault | *Original summary:* A G&P student alleged that another G&P student engaged in sexual penetration without <u>consent</u>. The complainant is considering filing a complaint with the UWC.<br><br>*Update:* A Title IX Coordinator brought a formal complaint alleging that the respondent engaged in sexual penetration without <u>consent</u>. The UWC found <u>sufficient evidence</u> to support the allegation. The respondent was suspended for six months until January 1, 2016 and was referred for training on sexual consent. |
| Postdoctoral Trainee | Faculty | Sexual harassment | *Original summary:* A postdoctoral appointee reported that a faculty member threatened retaliation if the postdoctoral appointee brought a complaint forward.<br><br>*Update:* The complainant brought a formal complaint with additional allegations of a violation of the <u>Policy on Teacher-Student Consensual Relations</u> and sexual harassment. The UWC found sufficient evidence to support the allegation of a violation of the Policy on Teacher-Student Consensual Relations. The respondent was suspended from the faculty for one year, suspended from any leadership positions for five years and was required to complete counseling on mentoring and managing conflicts of interest. |

## *University-Wide Committee on Sexual Misconduct: Informal Complaints*

The following complaints were pursued through informal resolution with the UWC. In every case, the complainant was provided information about all options for pursuing complaints – including formal, informal, and criminal complaints – as well as information about support resources such as the Sexual Harassment and Assault Response & Education Center (<u>SHARE</u>). In cases where a complainant elects to pursue an informal resolution, the UWC may offer an informal investigation, counseling, or other means of resolving the complaint. The UWC may also recommend and assist in implementing interim measures and/or ongoing accommodations to support and protect the complainant. In resolving complaints, the UWC strives to comply with the complainant's wishes for resolution while ensuring that the University provides a safe and nondiscriminatory environment for all members of the Yale community. See the <u>UWC Procedures</u> for more information.

| *During this reporting period (January 1 – June 30, 2015), there were **0** informal resolutions pursued through the UWC.* | | | |
|---|---|---|---|
| **Complainant** | **Respondent** | **Category of Misconduct Reported** | **Description/Actions Taken** |

**Questions?** See the <u>Title IX FAQs</u> and <u>Sexual Misconduct Scenarios</u> for more information.

## *Title IX Coordinators*

The following are cases in which the complainant chose to pursue resolution with either the University Title IX Coordinator or a Deputy Title IX Coordinator (any of whom are referred to here as "Title IX Coordinator"). In every case, the complainant is provided information about all options for pursuing complaints – including formal, informal, and criminal complaints – as well as information about support resources such as the Sexual Harassment and Assault Response & Education Center (SHARE). The Title IX Coordinators do not conduct formal hearings. However, they investigate complaints to the degree possible and work with the complainant, the respondent, and, where appropriate, the respondent's supervisor to achieve a resolution of the complaint, which may include sanctions for the respondent and remedies and ongoing accommodations for the complainant. They may also put in place measures to support and protect the complainant. In making their determinations and recommendations, the Title IX Coordinators strive to comply with the complainant's wishes for resolution while ensuring that the University provides a safe and nondiscriminatory environment for all members of the Yale community. See the Title IX website for more information.

| | | | |
|---|---|---|---|
| *During this reporting period (January 1 – June 30, 2015), there were 29 cases pursued through the Title IX Coordinators. In addition, 3 complaints, which were reported as pending in a previous report, are included below as updates.* | | | |
| **Complainant** | **Respondent** | **Category of Misconduct Reported** | **Description/Actions Taken** |
| Yale College Student | Yale College Student | Stalking | A YC student reported that another YC student with whom the complainant previously had a relationship had accessed the complainant's electronic information on multiple occasions without consent. The complainant declined to pursue the complaint at this time. After consulting with the complainant, the Title IX Coordinator counseled the respondent on appropriate conduct and imposed no-contact restrictions. The complainant was provided with IT security assistance. |
| Yale College Student | Yale College Student | Sexual assault | A YC student reported that another YC student engaged in sexual touching without consent. The Title IX Coordinator could not substantiate the allegations. |
| Yale College Student | Yale College Students | Sexual harassment | A YC student reported that YC students whom the complainant did not identify made inappropriate comments to the complainant. The complainant declined to pursue the complaint at this time. The Title IX Coordinator did not have sufficient information to investigate. |
| Yale College Student | Yale College Student | Sexual assault | A YC student reported that several YC students, many of whom the complainant could not identify, engaged in sexual touching without consent. The complainant declined to pursue the complaint at this time. After consulting with the complainant, the Title IX Coordinator counseled the one identified respondent on appropriate conduct and referred the respondent for training on sexual consent. |
| Yale College Student | Yale College Student | Sexual harassment | A YC student reported that another YC student made unwanted advances. The complainant declined to pursue the complaint at this time. After consulting with the complainant, the Title IX Coordinator counseled the respondent on appropriate conduct and referred the respondent for training on sexual consent. |

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

*Report of Complaints of Sexual Misconduct, January 1, 2015 – June 30, 2015*

| Yale College Student | Yale College Student | Stalking | A YC student reported that another YC student with whom the complainant previously had a relationship followed the complainant and sent unwanted messages on a number of occasions. The Title IX Coordinator counseled the respondent on appropriate conduct and imposed no-contact restrictions. |
|---|---|---|---|
| Yale College Student | Yale College Student | Sexual harassment | An administrator informed a Title IX Coordinator that an unidentified YC student reported that an unidentified YC student made unwanted advances toward other YC students. The Title IX Coordinator did not have sufficient information to investigate. |
| Yale College Student | Graduate & Professional Student | Sexual harassment | A YC student reported that a G&P teaching assistant made inappropriate comments of a personal nature to YC students in the classroom. The Title IX Coordinator counseled the respondent on appropriate conduct. The respondent resigned the teaching position. |
| Yale College Student | Graduate & Professional Student | Sexual harassment | A YC student reported that a G&P student made unwanted advances. The complainant declined to pursue the complaint and asked that no further action be taken. |
| Yale College Student | Graduate & Professional Student | Other | An administrator informed a Title IX Coordinator about a rumor that a G&P student engaged in personal relationships with undergraduate students in violation of the Policy on Teacher-Student Consensual Relations. The Title IX Coordinator could not substantiate the allegations. The Title IX Coordinator counseled the respondent on the University's sexual misconduct policies and referred the matter to the respondent's supervisor for additional oversight. |
| Yale College Student | Staff | Sexual harassment | An administrator informed a Title IX Coordinator that a YC student whom the administrator would not identify received unwanted attention from a staff member. The Title IX Coordinator investigated and found sufficient evidence to support the allegations. The respondent received training on sexual harassment and appropriate workplace conduct. |
| Yale College Student | Unknown | Sexual harassment | An administrator informed a Title IX Coordinator that a G&P student reported that a YC student was sexually harassed at a study abroad program by an unknown individual. The Title IX Coordinator could not substantiate the allegations. The Title IX Coordinator provided additional training to the relevant staff. |
| Graduate & Professional Student | Graduate & Professional Student | Sexual assault | A G&P student reported that another G&P student engaged in sexual penetration without consent. The complainant declined to pursue a formal complaint at this time. After consulting with the complainant, the Title IX Coordinator counseled the respondent on appropriate conduct and imposed no-contact restrictions. |
| Graduate & Professional Student | Graduate & Professional Student | Stalking | A faculty member informed a Title IX Coordinator that a G&P student was stalked by another G&P student with whom the complainant previously had a relationship. After consulting with the complainant, the Title IX Coordinator counseled the respondent on appropriate conduct, referred the respondent for additional training, and imposed no-contact restrictions. |

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

*Report of Complaints of Sexual Misconduct, January 1, 2015 – June 30, 2015*

| Graduate & Professional Student | Graduate & Professional Student | Sexual assault | A G&P student reported that another G&P student engaged in sexual penetration without consent and appeared sexually aggressive toward others. The complainant declined to pursue a formal complaint at this time. After consulting with the complainant, the Title IX Coordinator counseled the respondent on appropriate conduct and referred the respondent for training on sexual consent. |
|---|---|---|---|
| Graduate & Professional Student | Graduate & Professional Student | Sexual assault | A student informed a Title IX Coordinator that a G&P student whom the third party would not identify was sexually assaulted by another G&P student. The Title IX Coordinator did not have sufficient information to investigate. |
| Graduate & Professional Student | Graduate & Professional Student | Sexual harassment | An administrator informed a Title IX Coordinator that a G&P student reported that another G&P student made a sexually inappropriate comment. The Title IX Coordinator could not substantiate the complaint. The respondent has left Yale. |
| Graduate & Professional Student | Staff | Sexual harassment | A G&P student reported that a staff member paid unwanted attention toward the complainant. The complainant declined to pursue the complaint. The Title IX Coordinator provided the complainant with additional security measures and will follow-up with the respondent's supervisor. |
| Graduate & Professional Student | Faculty | Sexual harassment | A G&P student reported that a faculty member whom the student would not identify made inappropriate comments in the classroom. The complainant declined to pursue the complaint and asked that no further action be taken. |
| Graduate & Professional Student | Faculty | Other | A faculty member informed a Title IX Coordinator that another faculty member is alleged to have engaged in personal relationships with G&P students in violation of the Policy on Teacher-Student Consensual Relations. The case is pending. |
| Graduate & Professional Student | Yale Affiliate | Sexual harassment | An administrator informed a Title IX Coordinator that the administrator received an anonymous report from a G&P student alleging that a Yale affiliate made inappropriate comments. The case is pending. |
| Graduate & Professional Student | Non-Yale | Sexual harassment | An administrator informed a Title IX Coordinator that the administrator received an anonymous report from a G&P student alleging that a non-Yale individual made sexually inappropriate comments. The case is pending. |
| Staff | Staff | Sexual assault | A staff member reported that another staff member engaged in sexual touching without consent and made inappropriate comments to the complainant on multiple occasions. The Title IX Coordinator investigated and found sufficient evidence to support the allegations. The respondent's employment was terminated. |
| Staff | Staff | Sexual harassment | A staff member reported that another staff member made unwanted advances and inappropriate comments. The Title IX Coordinator investigated and did not find sufficient evidence to support the allegations. The respondent was referred for training on sexual harassment. |

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

*Report of Complaints of Sexual Misconduct, January 1, 2015 – June 30, 2015*

| Staff | Staff | Sexual harassment | A staff member reported that another staff member made inappropriate comments about the complainant to other staff members. The Title IX Coordinator investigated and found sufficient evidence to support the allegations. The respondent will receive training on sexual harassment and appropriate workplace conduct. In addition, the department has planned a department-wide training program for supervisors. |
|---|---|---|---|
| Staff | Staff | Sexual harassment | An administrator informed a Title IX Coordinator that a staff member reported that another staff member paid unwanted attention to the complainant. The complainant declined to pursue the complaint. After consulting with the complainant, the Title IX Coordinator counseled the respondent on appropriate conduct. |
| Staff | Faculty | Sexual harassment | A staff member reported that a faculty member made unwanted advances and made unwanted physical contact. The case is pending. |
| Postdoctoral trainee | Faculty | Sexual harassment | A former faculty member informed a Title IX Coordinator that a postdoctoral trainee reported that a faculty member made unwanted advances. The case is pending. |
| Non-Yale | Yale affiliate | Sexual assault | A non-Yale individual reported that a former faculty member had engaged in sexual penetration without consent. The case is pending. |

| *Updates to previous complaints: The complaints below were reported as pending in a previous report and are not included in the statistical summaries at the beginning of this report.* | | | |
|---|---|---|---|
| **Complainant** | **Respondent** | **Category of Misconduct Reported** | **Description/Actions Taken** |
| Yale College Student | Graduate & Professional Student | Sexual harassment | *Original summary*: A YC student reported that a G&P teaching assistant made unwanted advances.<br><br>*Update:* The Title IX Coordinator counseled the respondent on appropriate conduct. The respondent resigned the teaching position. |
| Graduate & Professional Students | Faculty | Sexual harassment | *Original summary*: A G&P student reported that a faculty member made inappropriate comments about G&P students.<br><br>*Update:* The respondent's supervisor, in consultation with the Title IX Coordinator, counseled the respondent on appropriate conduct. |
| Staff | Staff | Sexual assault | *Original summary*: A staff member reported that another staff member engaged in sexual touching without consent.<br><br>*Update:* The Title IX Coordinator investigated and found sufficient evidence to support the allegations. The respondent received training on sexual harassment and appropriate workplace conduct. |

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

*Report of Complaints of Sexual Misconduct, January 1, 2015 – June 30, 2015*

## *Yale Police Department*

The following are cases in which the complainant chose to contact the Yale Police Department (YPD), which addressed each case according to its procedures (see the Yale Police website for more information).  All reports of possible sexual misconduct made to the YPD are reviewed by the University Title IX Coordinator.

> *During this reporting period (January 1 – June 30, 2015), there were 23 contacts with the YPD regarding possible sexual misconduct. 20 were handled primarily by the YPD and are described below.  The remaining were referred to the UWC or a Title IX Coordinator for further investigation and resolution and are thus described above.*

| Complainant | Respondent | Category of Misconduct Reported | Description/Actions Taken |
|---|---|---|---|
| Yale College Student | Non-Yale | Intimate partner violence | An administrator referred a YC student who reported that a non-Yale individual with whom the complainant was in a relationship physically assaulted and attempted to sexually assault the complainant. The YPD investigated and arrested the respondent.  The YPD provided the complainant with information on safety and victim services. |
| Yale College Students | Non-Yale | Other | YC students reported that a non-Yale individual engaged in indecent exposure.  The YPD investigated and arrested the respondent.  The YPD provided the complainant with information on safety and victim services. |
| Yale College Student | Non-Yale | Sexual assault | A YC student reported that a non-Yale individual engaged in sexual touching without consent.  The YPD investigated and arrested the respondent.  The YPD provided the complainant with information on safety and victim services. |
| Yale College Student | Unknown | Sexual harassment | A YC student reported receiving sexually explicit phone calls from an unknown caller.  The YPD investigation is ongoing.  The YPD provided the complainant with information on safety and victim services. |
| Yale College Student | Unknown | Other | A YC student reported that an unknown individual was looking into the complainant's suite bathroom from an adjacent building.  The YPD investigated and could not identify the respondent.  The YPD provided the complainant with information on safety and victim services. |
| Graduate & Professional Student | Graduate & Professional Student | Stalking | A G&P student reported that a G&P student with whom the complainant previously had a relationship sent unwanted messages on a number of occasions.  The YPD warned the respondent not to contact the complainant and provided the complainant with information on safety and victim services. |
| Graduate & Professional Student | Yale Affiliate | Sexual harassment | A G&P student reported that a Yale affiliate made unwanted advances. The YPD warned the respondent not to contact the complainant.  The YPD provided the complainant with information on safety and victim services. |
| Graduate & Professional Students | Non-Yale | Sexual harassment | G&P students reported that a non-Yale individual made threatening sexual gestures toward them.  The YPD investigated and arrested the respondent.  The YPD provided the complainant with information on safety and victim services. |

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

*Report of Complaints of Sexual Misconduct, January 1, 2015 – June 30, 2015*

| Graduate & Professional Student | Non-Yale | Stalking | A G&P student reported that a non-Yale individual with whom the complainant previously had a relationship followed her and sent unwanted messages on a number of occasions. The YPD investigation is ongoing. The YPD provided the complainant with information on safety and victim services. |
|---|---|---|---|
| Graduate & Professional Student | Non-Yale | Other | A G&P student reported that a non-Yale individual engaged in indecent exposure. The YPD investigated and arrested the respondent. The YPD provided the complainant with information on safety and victim services. |
| Graduate & Professional Students | Unknown | Stalking | G&P students reported receiving sexually explicit and threatening messages from an unknown source on multiple occasions. The YPD investigation is ongoing. The YPD provided the complainants with information on safety and victim services. |
| Graduate & Professional Student | Unknown | Sexual harassment | Multiple G&P students reported receiving sexually explicit phone calls from an unknown caller. The YPD investigation is ongoing. The YPD provided the complainants with information on safety and victim services. |
| Graduate & Professional Students | Unknown | Stalking | G&P students reported that an unknown individual followed them in a car repeatedly while they walked down the street. The YPD investigation is ongoing. The YPD provided the complainants with information on safety and victim services. |
| Staff | Non-Yale | Intimate partner violence | A staff member reported a physical assault by a non-Yale individual with whom the complainant previously had a relationship. The YPD investigated and arrested the respondent. The YPD provided the complainant with information on safety and victim services. |
| Staff | Non-Yale | Stalking | A staff member reported that a non-Yale individual with whom the complainant previously had a relationship waited for the complainant in the complainant's office building and sent unwanted and threatening messages on a number of occasions. The YPD investigation is ongoing. The YPD provided the complainant with information on safety and victim services. |
| Non-Yale | Yale College Student | Sexual assault | A non-Yale student reported that a YC student physically assaulted the complainant and engaged in sexual penetration without consent. The YPD investigated and also notified the Title IX Coordinator who reached out to the complainant. The complainant declined to participate in a formal complaint or criminal charges at this time. The YPD provided the complainant with information on safety and victim services. |
| Non-Yale | Yale College Student | Sexual assault | A non-Yale student reported that a YC student engaged in sexual penetration without consent. The YPD investigated and also notified the Title IX Coordinator who reached out to the complainant. The complainant declined to participate in a formal complaint or criminal charges at this time. The YPD provided the complainant with information on safety and victim services. |
| Non-Yale | Graduate & Professional Student | Stalking | A non-Yale individual reported receiving unwanted and disturbing emails from a G&P student on a number of occasions. The YPD investigation is ongoing. The YPD provided the complainant with information on safety and victim services. |

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

14

| Non-Yale Student | Non-Yale Student | Sexual harassment | An administrator referred a non-Yale student participating in a Yale program who reported that a non-Yale student made unwanted advances. The respondent was removed from the program. The YPD banned the respondent from the Yale campus and provided the complainant with information on safety and victim services. |
|---|---|---|---|
| Non-Yale Student | Unknown | Sexual harassment | An administrator referred a non-Yale student participating in a Yale program who reported that an unknown individual made unwanted advances. The YPD investigation is ongoing. The YPD provided the complainant with information on safety and victim services. |

# Brief Definitions

For more information on Yale's sexual misconduct policies and definitions, go to the Sexual Misconduct Response website.

The following are definitions for the specific terms Yale uses in this Report to categorize behaviors that make up the range of Sexual Misconduct.

***Sexual assault*** is any kind of nonconsensual sexual contact, including rape, groping, sexual penetration (which is the insertion of a penis, finger or object into another person's vagina or anus), or any other nonconsensual sexual touching. [ii]

Sexual activity requires ***consent***, which is defined as positive, unambiguous, and voluntary agreement to engage in specific sexual activity throughout a sexual encounter. Consent cannot be inferred from the absence of a "no"; a clear "yes," verbal or otherwise, is necessary. Consent to some sexual acts does not constitute consent to others, nor does past consent to a given act constitute present or future consent. Consent must be ongoing throughout a sexual encounter and can be revoked at any time.

Consent cannot be obtained by threat, coercion, or force. Agreement under such circumstances does not constitute consent.

Consent cannot be obtained from someone who is asleep or otherwise mentally or physically incapacitated, whether due to alcohol, drugs, or some other condition. A person is mentally or physically incapacitated when that person lacks the ability to make or act on considered decisions to engage in sexual activity. Engaging in sexual activity with a person whom you know -- or reasonably should know -- to be incapacitated constitutes sexual misconduct. For illustrations of Yale's consent definition, see the *Sexual Misconduct Scenarios* at http://smr.yale.edu/.

***Intimate partner violence (IPV)*** occurs when a current or former intimate partner uses or threatens physical or sexual violence. IPV also may take the form of a pattern of behavior that seeks to establish power and control by causing fear of physical or sexual violence. Stalking may also constitute IPV.

***Sexual harassment*** consists of nonconsensual sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature on or off campus, when: (1) submission to such conduct is made either explicitly or implicitly a condition of an individual's employment or academic standing; or (2) submission to or

---

[ii] The sexual assault data in this report will not correspond to Yale's annual report required under the federal Clery Act because this report uses a more expansive definition of sexual assault and includes cases from a wider geographic jurisdiction than in the Clery report.

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

*Report of Complaints of Sexual Misconduct, January 1, 2015 — June 30, 2015*

rejection of such conduct is used as the basis for employment decisions or for academic evaluation, grades, or advancement; or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating or hostile academic or work environment. Sexual harassment may be found in a single episode, as well as in persistent behavior. Both men and women are protected from sexual harassment, and sexual harassment is prohibited regardless of the sex of the harasser.

***Stalking*** is repeated or obsessive unwanted attention directed toward an individual or group that is likely to cause alarm, fear, or substantial emotional distress. Stalking may take many forms, including following, lying in wait, monitoring, and pursuing contact. Stalking may occur in person or through a medium of communication, such as letters, e-mail, text messages, or telephone calls. In some circumstances, two instances of such behavior may be sufficient to constitute stalking.

***Other*** includes a range of prohibited behaviors that do not fall into the categories above. Examples include voyeurism, audio-visual recording of sexual activity without consent, retaliation, and violations of the Policy on Teacher-Student Consensual Relations.

# Terminology Commonly Used in this Report

"UWC ***formal complaint***": Formal resolution of a complaint through the UWC involves an investigation by an external fact-finder, a hearing, adjudication, and possible disciplinary sanctions. See the UWC Procedures for more information.

"UWC ***informal complaint***": Informal resolution through the UWC does not include extensive investigation, a hearing, or a determination as to the validity of the allegations. The goal is to achieve a resolution that is desired by the complainant and acceptable to the respondent, and to counsel and educate the parties.[iii] See the UWC Procedures for more information.

"A Title IX Coordinator ***brought a formal complaint***…": Under certain circumstances, the Title IX Coordinator of the University or any Yale School may bring a complaint to the UWC. Generally, a Title IX Coordinator may file a complaint in situations on behalf of someone who experienced sexual misconduct but who cannot or will not themselves take the formal role of a complainant; this may be an issue of jurisdiction, safety, or preference. In certain circumstances involving a serious threat to the University community, a Title IX coordinator may bring a complaint to the UWC when there is evidence that the University's policy on sexual misconduct has been violated and the Title IX Coordinator's intervention is needed to ensure that the matter reaches the UWC. See the UWC procedures for more information.

"The Title IX Coordinator ***investigated***…": An investigation by a Title IX Coordinator generally includes, but is not limited to: interviewing the complaint and respondent, interviewing any witnesses or other parties with knowledge of the alleged conduct, and collecting documentation (including email or other communications) relevant to the complaint. Upon reviewing the evidence gathered, The Title IX Coordinator determines whether a violation of University policy occurred, whether any actions should be taken, and recommends disciplinary action, if warranted.

"***Sufficient evidence*** to support the allegations": The UWC and the Title IX Coordinators apply the "preponderance of the evidence" standard (i.e., it is more likely than not) to determine, based on the evidence

---

[iii] Note that the University does not allow face-to-face mediation in cases alleging sexual violence.

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

*Report of Complaints of Sexual Misconduct, January 1, 2015 – June 30, 2015*

gathered during the investigation, whether the alleged conduct occurred and, if so, whether it violates any University policies.

"The respondent was ***counseled on appropriate conduct***": In some cases, the Chair of the UWC, the Title IX Coordinator, or an administrator working in consultation with the Title IX Coordinator, will meet with the respondent to review the allegations and the university's definitions and policies, discuss and affirm expected behaviors, and warn the respondent about possible consequences for violations of the University sexual misconduct policies.

"***Imposed no-contact restrictions***": In most cases, the respondent is issued a warning to cease all forms of contact (including physical, verbal, and electronic) with the complainant. In some cases, contact restrictions may limit access to any or certain parts of campus.

"Provided the complainant with ***information on safety and victim services***": The YPD has a Sensitive Crimes & Support Coordinator who assists those affected by sexual misconduct and can help complainants make contact with SHARE or other University offices, coordinate interim safety measures, provide safety planning, and serve as a liaison with victims' assistance services. See the YPD website for more information.

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.