UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JACK MONTAGUE,<br>    Plaintiff,<br><br>v.<br><br>YALE UNIVERSTIY, ANGELA GLEASON,<br>JASON KILLHEFFER, and OTHERS<br>UNKNOWN,<br>    Defendants. | | CIVIL ACTION<br>No. 3:16-cv-00885 |

**AMENDED COMPLAINT AND JURY DEMAND**

**INTRODUCTION**

1.      As of the fall of 2015, Jack Montague had a promising future. He was poised to graduate from Yale University in the spring of 2016 with a Bachelor of Arts in American Studies, and he was captain of Yale's basketball team, which was having its most successful season in 54 years.

2.      That all changed on November 30, 2015, however, when Montague received a letter from Yale's University Wide Committee on Sexual Misconduct informing him that he was the subject of a formal complaint based on a sexual encounter he had with another Yale student in the fall of 2014.

3.      This was not the first, or the second, or the third sexual encounter Montague had had with this same female student. Nor was it even the first time he and the student had engaged in sexual intercourse. But now, a year after the fact, the female student – who was affirmatively misled by the defendants into participating in a formal complaint process *initiated by Yale and not by the student herself* – claimed that just *part* of her encounter with Montague (the

intercourse) was nonconsensual. And she made this claim despite calling Montague shortly after the encounter, voluntarily rejoining him the same evening, flirting with him on the way back to his bedroom, and spending the remainder of the night in his bed with him.

4.      In the months that followed, Montague found himself thrust into the confusing, terrifying, and lonely process through which those accused of sexual misconduct are maneuvered, and into the midst of Yale's ongoing battle to establish itself as an institution that takes accusations of sexual misconduct seriously. Unfortunately for Montague, he was a prime candidate to serve as Yale's poster boy for tough enforcement of its *Sexual Misconduct Policies*: popular, well-liked and respected amongst his peers at Yale, and known throughout the country as one of Yale's most promising men's basketball stars. In short, imposing harsh discipline on Montague would surely make an impact.

5.      Less than three months after the complaint was lodged against him, Montague was expelled from Yale, kicked off his beloved basketball team, branded a sex offender, and widely castigated as a "rapist." Those who stuck by him were likewise criticized for condoning "rape," and were forced to publicly apologize for their support. His name appeared in local and national headlines alongside some of the most damning words that could be uttered about a young man: "sexual misconduct." His promising future crumbled into dust.

6.      The actions taken by the defendants resulted from a deeply flawed process during which the plaintiff was denied the most rudimentary elements of fairness promised to him by Yale in its *Procedures Governing the University Wide Committee on Sexual Misconduct.* As a result, Mr. Montague suffered, and continues to suffer, reputational, emotional, and financial damages of an enormous magnitude.

2

## JURISDICTION AND VENUE

7.      This action arises out of Yale University's breach of its contractual and other

obligations to the plaintiff, as well as its violations of Title IX of the Education Amendments of

1972 (20 U.S.C. § 1681) and 42 U.S.C. § 1981.

8.      The plaintiff is a resident of Tennessee, and Yale University and Defendants

Angela Gleason and Jason Killheffer are residents of Connecticut. The amount in controversy is

over $75,000.

9.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332.

10.     Venue is proper under 28 U.S.C. § 1391(b).

## PARTIES

11.     The plaintiff, Jack Montague ("plaintiff" or "Montague"), resides in Tennessee

and was formerly a full-time student at Yale. Mr. Montague was wrongfully and improperly

expelled in February of 2016, while in his senior year at the University. Montague enrolled at

Yale in the fall of 2012 after graduating from a public high school in Tennessee. He was

recruited to play basketball for the Yale men's basketball team, the Yale Bulldogs.

12.     The defendant Yale University ("Yale" or "the University") is a private liberal

arts college located in New Haven, Connecticut, with approximately 5,500 enrolled

undergraduates, and is the beneficiary of federal funds within the meaning of 20 U.S.C. §1681 *et

seq*. ("Title IX").

13.     The defendant Angela Gleason ("Gleason") was, at the time of the events at issue,

a Deputy Title IX Coordinator in the Office of the Provost at Yale University.

14.     The defendant Jason Killheffer ("Killheffer") was, at the time of the events at

issue, a Senior Deputy Title IX Coordinator in the Office of the Provost at Yale University.

3

## FACTS

### The Climate at Yale for Sexual Misconduct Discipline

15.     This case arose during a tumultuous period at Yale in which the University faced mounting criticism concerning its handling of allegations of sexual assault made by female students against male students. Specifically, Yale had been accused by students and alumni alike of not taking these allegations of sexual misconduct seriously enough and of shirking its duty to harshly punish perpetrators of sexual assault. Moreover, results from a survey of 27 colleges and universities around the country painted a damning picture of the campus climate: sexual assaults at Yale, according to the survey, were the third-highest of all the schools surveyed. As a consequence, the University had to show it was willing to take a hard line against male students accused of sexual assault in order to dispel the notion that Yale's campus was an unfriendly and unsafe environment for women.

16.     On April 4, 2011, the Office of Civil Rights ("OCR") of the U.S. Department of Education ("DOE") issued a guidance letter to colleges and universities in the United States, widely known as the "Dear Colleague" letter.  The letter advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq*. and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence, and address its effects."

17.     In the wake of the "Dear Colleague" letter, the DOE commenced numerous investigations against colleges and universities, with the underlying threat that those not in compliance stood to lose federal funding.

18.     Just one month before OCR issued the "Dear Colleague" letter, OCR received a complaint alleging that a sexually hostile environment existed at Yale and that Yale had not

4

responded in a prompt and adequate manner. The complaint stemmed in part from a well-publicized incident in October of 2010 in which fraternity pledges chanted sexually aggressive comments outside the Yale Women's Center.

19.     OCR assessed whether Yale had prompt and equitable grievance procedures to address complaints under Title IX, and whether Yale had allowed a sexually hostile environment to be created on campus by not sufficiently responding to complaints of sexual harassment.

20.     OCR concluded Yale was deficient in a number of areas.

21.     Consequently, in July of 2011, Yale created the University Wide Committee on Sexual Misconduct ("UWC"), a committee that provides both formal and informal ways to resolve grievances concerning alleged sexual misconduct. The UWC is charged with enforcing Yale's *Sexual Misconduct Policies*. A true and correct copy of Yale's *Sexual Misconduct Policies* is attached hereto as Exhibit 1.

22.     In connection with the creation of the UWC, Yale adopted *Procedures Governing the University Wide Committee on Sexual Misconduct* ("*UWC Procedures*"), which set out the rights and responsibilities of the University, an accuser, and an accused in the case of a complaint of sexual misconduct. A true and correct copy of the *UWC Procedures* is attached hereto as Exhibit 2.

23.     In addition, Yale established the Sexual Harassment and Assault Response and Education ("SHARE") Center, which serves as the initial place of referral for students seeking services and options as a result of alleged sexual misconduct.

24.     In the wake of the 2010 complaint to OCR, Yale also began tracking complaints of sexual misconduct and compiling the data in semi-annual reports (the "Spangler Reports")

named for Yale's Deputy Provost Stephanie Spangler, who supervises the activities of Yale's Title IX coordinators.

25.     On June 15, 2012, OCR resolved the Title IX complaint against Yale through a voluntary resolution agreement (the "Resolution Agreement"). Yale agreed to implement a new Title IX coordinator structure, and the Resolution Agreement itself provided for the monitoring of that implementation.

26.     Yale remained under the watchful eye of the OCR well into 2014, in part because it had agreed, pursuant to the Resolution Agreement, to report to the OCR on a periodic basis and to allow OCR to visit its campus "whenever necessary" to determine whether Yale was indeed fulfilling the terms of the Agreement and was in compliance with Title IX.

27.     OCR was not the only group watching Yale, however. The July 31, 2013, Spangler Report sparked outrage amongst alumni groups and student groups, such as "Students Against Sexual Violence at Yale" ("SASVY"), because the report revealed that students whom UWC had found responsible for "nonconsensual sex" were allowed to remain at Yale and in some cases were punished only with written reprimands.

28.     These groups not only took issue with what they viewed as inadequate discipline, they attacked Yale's use of the term "nonconsensual sex." That term, a group of 229 Yale alumni said in an August, 2013 "open letter" to Yale's president, Peter Salovey, and Provost Spangler, "reinforce[s] the rape myth that there are two tiers of sexual assault." The message from these 229 alumni was blunt: "Yale needs to be clear: Sex without consent is sexual assault."

29.     Around the same time the open letter was published, two Change.org petitions appeared online calling for tougher penalties for sexual assault.

4851-0117-1240, v. 2

30.     To answer these critics' concerns that the University was not automatically removing all "sexual assailants" from campus and was unfairly using "nonconsensual sex" as a euphemism for what the critics believed amounted to "rape" in all instances, Yale issued a series of hypothetical fact patterns, entitled "Sexual Misconduct Scenarios," to explain how it categorizes and punishes different types of sexual encounters. A true and correct copy of the *Sexual Misconduct Scenarios* is attached hereto as Exhibit 3.

31.     The "Sexual Misconduct Scenarios" describe various sexual situations along a spectrum – in some scenarios, consent is clear; in others, it is ambiguous; and in others there is a clear lack of consent. Each scenario is followed by the penalty or ranges of penalties likely in that particular, fact-specific circumstance (should a penalty be appropriate). (*See* Exhibit 3.)

32.     If the "Sexual Misconduct Scenarios" served to quell the tide of criticism against Yale, it was a short-lived calm. In September of 2015, a beleaguered Yale took yet another hit: the Association of American Universities ("AAU") released the results of a survey of 27 colleges around the country showing that rates of undergraduate sexual assaults at Yale were the third-highest among the schools surveyed. President Salovey called the results of the survey "profoundly troubling," and vowed to "redouble [Yale's] efforts" to combat sexual assault and misconduct.

33.     Meanwhile, Yale students seized on the results as another opportunity to criticize the University. For example, one student who was interviewed by the *New Haven Register* bemoaned the lack of "protocol o[r] repercussions for people who have done things on this campus," and another charged that the administration was not adequately performing its role in dealing with sexual misconduct on campus.

34.     As it turned out, Yale students had responded to this survey at a much higher rate than students at most of the 27 other colleges and universities: over half of Yale's entire student population participated in the survey.

35.     In short, Yale knew its students were paying close attention to the issue of sexual misconduct on campus, and that they had strong views on how Yale had responded, historically, to complaints of sexual assault.

36.     It was in this climate – permeated by deep mistrust and anger amongst Yale students and near-panic on the part of Yale administrators – that the defendants misled and pressured a female student, against her original wishes, to participate in a formal complaint process against Jack Montague, accusing him of sexual assault.

### Initiation of the Complaint Process

37.     The proceedings against Mr. Montague began in earnest on November 18, 2015, when Senior Deputy Title IX Coordinator Jason Killheffer filed a formal complaint alleging that Montague sexually assaulted Jane Roe[1] more than a year earlier, on the night of October 18-19, 2014.

38.     The allegations involved an incident in which Roe – with whom Montague had had sexual intercourse on at least one other occasion, and sexual encounters not involving intercourse on several other occasions – willingly accompanied Montague to his bedroom, removed her clothing as he removed his, got into his bed, and engaged in consensual sexual conduct. Roe was now claiming the intercourse that followed the consensual sexual foreplay was nonconsensual.

---

[1] Jane Roe is a pseudonym being used to protect this student's privacy. Except where the student has chosen to reveal his/her identity in the press, this complaint will identify other students through use of pseudonyms in order to protect their privacy.

8

39.     It was not Roe's idea to file the formal complaint against Montague, however.

40.     On September 21, 2015, one of Roe's suitemates, Rachel Rogers,[2] was speaking with Deputy Title IX Coordinator Angela Gleason about a different matter and took it upon herself to mention to Gleason that a friend of hers – Roe – had had a "bad experience."

41.     Rogers outlined the general details of Roe's "bad experience" and asked Gleason what she (Rogers) could do to help Roe. Rogers also revealed to Gleason that the person with whom Roe had the "bad experience" was Jack Montague, the popular captain of Yale's men's basketball team.

42.     Upon hearing the name of the alleged perpetrator, Gleason urged Rogers to convince Roe to come forward and report the incident.

43.     On October 15, 2015, Rogers talked to Roe about her conversation with Gleason, but Roe was hesitant to talk to Gleason. Roe asked Rogers to reach out to Gleason again and ask some additional questions so she could make a decision about whether to meet with Gleason or not.

44.     The following day, at Roe's request, Rogers met with Gleason again to discuss Roe's situation and, on information and belief, informed Gleason that Roe was reluctant to make a report.

45.     Trying a different tack to induce Roe to come forward, Gleason suggested to Rogers that she (Rogers) could inform Roe there were various formal and informal procedures available to deal with sexual misconduct, including the option of making an anonymous informal complaint.

---

[2] Rachel Rogers is a pseudonym being used to protect this student's privacy. Except where the student has chosen to reveal his/her identity in the press, this complaint will identify other students through use of pseudonyms in order to protect their privacy.

46.     Gleason described the anonymous informal complaint process to Rogers as a means through which Roe could speak to Gleason but request that her name be kept confidential; Gleason would then call Montague in for a conversation, inform him that a complaint was made against him, and suggest he participate in training about communication and sexual consent. Rogers said Gleason told her that the counseling would "help [Montague] avoid repeating his behavior with anyone else."

47.     According to Rogers, when she relayed this information to Roe, Roe liked the idea of the anonymous informal complaint process. Roe thought it would "fulfill her goal of making sure Mr. Montague understood [that] his behavior was wrong and hurtful and [would] stop him from doing it again to someone else," but it would also allow her to avoid the formal complaint process.

48.     Indeed, Roe was clear that she did not want to engage in the formal complaint process. She was "not interested in having Mr. Montague punished[.]"

49.     Based on the information that Gleason provided to Rogers, Roe finally met with Gleason on October 19, 2015.

50.     On November 6, 2015, Gleason contacted Roe and told her she would not be able to keep Roe's name confidential after all.

51.     There is nothing in Yale's *UWC Procedures* or its *Sexual Misconduct Policies* that prevents the University from keeping a complainant's name confidential, however. On the contrary, Yale's policy is to honor a complainant's request to keep her name confidential – and keep the process informal, if the complainant so chooses – unless there are "allegations of violence," in which case "the UWC may not be able to honor a request for confidentiality if doing so would endanger the safety or well-being of the complainant or other members of the

10

Yale community." (*See* <u>Exhibit 2</u>.) In fact, in a document entitled "Reporting Sexual Misconduct to a Title IX Coordinator," Yale explicitly states that "[e]xcept in cases of acute threat, coordinators *will not* take any action that could compromise a complainant's confidentiality without the complainant's agreement (emphasis added)." A true and correct copy of *Reporting Sexual Misconduct to a Title IX Coordinator* is attached hereto as <u>Exhibit 4</u>.

52.     This was not a case in which there was "acute threat" to anyone. It was therefore false and highly misleading for Gleason to tell Roe that the option to keep her name confidential was no longer available to her.

53.     Gleason also explained to Roe during the November 6 conversation that Montague had already been referred for SHARE training after a previous complaint against him and so the option of informal resolution and training was no longer available to him.

54.     In so informing Roe, Gleason either directly told Roe or clearly implied to Roe that the previous complaint against Montague was also a complaint of sexual assault.

55.     This information was affirmatively false, a breach of Yale's explicit confidentiality requirements, and contrary to Yale's *UWC Procedures*.

56.     Montague had never before been the subject of a complaint of sexual assault. As described in greater detail below, a female student accused him of rolling up a paper plate and shoving it down her shirt. There was nothing "sexual" about that encounter, and Montague did not receive any relevant SHARE training after the incident.

57.     Furthermore, the *UWC Procedures* and the *Provost's Statement on Confidentiality of UWC Proceedings* strictly prohibited Gleason from disclosing to Roe any information concerning the prior UWC proceedings against Montague or the outcome of those proceedings.

11

(*See* Exhibit 2; *see also Provost's Statement on Confidentiality of UWC Proceedings*, a true and correct copy of which is attached hereto as Exhibit 5.)

58.     Gleason blatantly violated the UWC's confidentiality requirements not only by telling Roe that there had been a prior UWC proceeding involving Montague, but worse, by falsely telling or implying to Roe that Montague was the subject of a previous complaint of *sexual assault*.

59.     Finally, contrary to what Gleason told Roe, there is nothing in Yale's *UWC Procedures* or its *Sexual Misconduct Policies* which bars Yale from conducting an informal process and recommending training when an accused has already received training after a previous complaint. That process was and should have remained available to Roe at the time she made her report to Gleason.

60.     After falsely informing Roe that the informal complaint process was foreclosed because of Montague's prior disciplinary history, Gleason expressed concern that the incident was serious and told Roe a Title IX Coordinator could file a formal complaint on Roe's behalf as long as Roe agreed to cooperate as a witness.

61.     Title IX Coordinators are permitted to bring formal actions on behalf of complainants only in "certain *unusual* circumstances" (emphasis added), however, "such as those involving risks to the safety of individuals and/or the community." (*See Report of Complaints of Sexual Misconduct*, a true and correct copy of which is attached hereto as Exhibit 6.)

62.     Montague posed no risk of safety either to Roe or to the Yale community, nor did Roe or Yale ever claim he posed such a risk.

63.     As a direct result of Gleason's misrepresentations and false statements to Roe,

Roe agreed to cooperate in the formal complaint process in order "to protect other women" from

Montague, whom she now believed had a history of sexual assault.

### Prior UWC Proceedings ("UWC I")

64.     In point of fact, the prior UWC complaint and resulting discipline against Mr.

Montague to which Gleason improperly referred is completely unrelated to "sexual assault," or

even to sexual misconduct.

65.     On the last day of Montague's freshman year, he and some fellow Yale students

congregated on the sidewalk outside a pizza parlor in New Haven. Some of the students,

including Montague, were intoxicated. Montague engaged in a discussion with the other

students, including Sally Smith[3] – a graduating senior – for approximately 10-15 minutes.

66.     According to Smith, Montague, who appeared to be annoyed by the end of the

conversation, rolled up a paper plate from the pizza parlor and put it down the front of Smith's

tank top. Smith did not allege that Montague made any statements of a sexual nature during the

interaction.

67.     It is undisputed that "[t]here was no . . . skin-to-skin contact" during the incident.

68.     Smith decided to file a formal Title IX complaint against Montague in the fall of

2013, after she graduated from Yale. Her allegation was that Montague had violated the

University's *Sexual Misconduct Policies* by engaging in "sexual harassment."

69.     The sexual harassment policy reads, in pertinent part:

---

[3] Sally Smith is a pseudonym being used to protect this student's privacy. Except where the student has chosen to reveal his/her identity in the press, this complaint will identify other students through use of pseudonyms in order to protect their privacy.

4851-0117-1240, v. 2

> Sexual harassment consists of nonconsensual . . . conduct of a sexual nature on or off campus, when . . . such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating or hostile academic or work environment. Sexual harassment may be found in a single episode, as well as in persistent behavior.

(*See* Exhibit 1.)

70. Pursuant to the *UWC Procedures*, an independent fact-finder conducted an investigation into Smith's complaint. Montague told the fact-finder he remembered nothing of the incident, but conceded that it likely occurred as Smith described. Montague said he was "embarrassed and ashamed" by his behavior and "accept[ed] full responsibility for the incident . . . ."

71. Smith's complaint proceeded to a UWC panel for fact-finding and, if necessary, a disciplinary recommendation. The UWC panel concluded Montague violated the University's *Sexual Misconduct Policies* by "sexually harassing" Smith. Specifically, the panel found that Montague "without provocation rolled up a used, paper pizza plate, shoved it down [Smith's] shirt between her breasts and then walked away from her."

72. Consequently, the panel recommended Montague be placed on probation for four terms; that he not be permitted to hold a leadership position in any student activity, organization or sport; that he be required to enroll in sexual harassment and gender sensitivity training through Yale's SHARE Center; that he be required to meet with a member of the SHARE Center once each semester for the remainder of his time at Yale "to review and reflect on his interactions and relationships with female students at Yale"; and that he be required to receive training on the appropriate use of alcohol.

73. Yale College Dean Mary Miller accepted the panel's findings of fact, conclusions and recommendations.

14

74.     Under Yale's own policies and definitions, however, Montague's conduct did not constitute "sexual harassment." Montague's conduct was not "conduct of a sexual nature," nor did the panel find any conduct that could reasonably be construed as "sexual." Moreover, Montague's conduct clearly did not "have the purpose or effect of unreasonably interfering with [Smith's] work or academic performance or creating an intimidating or hostile academic or work environment," nor did the panel find his conduct had that purpose or effect. In fact, it was undisputed that the conduct occurred on the last day of the 2012-2013 academic year and that Smith was a graduating senior who neither saw nor heard from Montague again after what she described as their "peripheral" interaction at an off-campus pizza parlor.

75.     The outcome of the UWC I proceeding was therefore erroneous.

76.     Moreover, the matter was outside the jurisdiction of the UWC, which addresses *only* "[v]iolations of sexual misconduct." (*See* Exhibit 2.)

77.     This was an incident that should have been handled by Yale's Executive Committee, which has jurisdiction over all other disciplinary infractions committed by Yale undergraduate students.

78.     On information and belief, the only reason Yale chose to treat the matter as "sexual misconduct" and keep it with the UWC instead of transferring it to the Executive Committee was the fact that the alleged perpetrator was a man and the alleged victim was a woman.

79.     Montague complied with all of the disciplinary conditions imposed upon him as a result of UWC I. He attended training sessions on the appropriate use of alcohol, and he also periodically met with a SHARE staff member, as required.

80.     However, Montague was not trained by the SHARE Center, or any of its staff members, on sexual harassment, gender sensitivity, or any topic related to sexual relationships or sexual consent, nor did his sessions with the SHARE staff member focus on "review[ing] and reflect[ing] on [Montague's] interactions and relationships with female students at Yale."

### Jane Roe's Complaint ("UWC II" Proceedings)

81.     It was only as a result of the false light in which Gleason portrayed the UWC I proceedings and outcome to Roe that Roe agreed to cooperate in a formal complaint process against Montague.

82.     Indeed, as Roe later explained in her opening statement to the UWC panel, her conversation with Gleason "reframed the incident" for her: she "had always viewed [herself] as the victim of someone else's one-time mistake," but her "perspective broadened after [her] conversation with Angie [Gleason], as [she] began to think about the other people on this campus and how [her] choosing to remain silent on this matter could harm them." Having learned this information about Montague from Gleason, Roe felt her "hands were tied; [she] could not, in good conscience, say no to participating in the investigation."

83.     On November 18, 2015, Defendant Killheffer filed a formal complaint of sexual assault against Mr. Montague alleging that Montague sexually penetrated Roe without her consent on the night of Saturday, October 18, 2014, at his residence.

84.     Killheffer purported to bring this complaint pursuant to Section 1 of the *UWC Procedures*, which allows a Title IX Coordinator to bring a complaint "when there is evidence that the University's policies on sexual misconduct have been violated and the Coordinator's intervention is needed to ensure that the matter reaches the UWC." (*See* Exhibit 2.)

4851-0117-1240, v. 2

85.     As set forth above, however, Yale's policies contemplate that a Coordinator's intervention is "needed" only in "unusual circumstances . . . involving risks to the safety of individuals and/or the community," in which case the informal complaint process is insufficient to address the severity of the situation. (*See* Exhibit 6.)

86.     No such circumstance existed here.

87.     On November 30, 2015, Aley Menon, UWC Secretary, notified Montague that he was the subject of a complaint alleging that he had "sexually assaulted a Yale College student on the night of October 18, 2014, at [his] residence[.]" The letter referred Montague to Killheffer's complaint; the only additional information contained in that letter was the name of Montague's accuser and the fact that she was alleging sexual penetration without consent.

88.     In the letter, Menon noted that "the UWC in reviewing the facts during the formal complaint process may consider other violations of the sexual misconduct policy or the Yale College Undergraduate Regulations *that relate to the complaint* (emphasis added)."

89.     Because of the nature of the UWC I proceedings, Montague had no reason to believe they "relate[d] to the complaint" of sexual assault in any way.

90.     Likewise, Montague had no reason to believe that the only other policy violation he committed as a Yale student – an incident in which he tried to help an intoxicated male friend who was detained by the Yale University Police Department, and which resulted in a reprimand by Yale's Executive Committee for "Defiance of Authority" – "relate[d] to the complaint" of sexual assault against a female student. A true and correct copy of the Executive Committee's letter to Montague is attached hereto as Exhibit 7.

91.     Menon also informed Montague that he had only five days to provide a written response to the complaint and "encourage[d]" him to choose an advisor to "support [him]

17

throughout this process," but warned that the advisor was not permitted to submit any documents or speak during Montague's fact-finding interview or the hearing.

92.     Montague later met with Defendant Gleason, who said that she was unable to provide him with any additional information about the complaint because it was confidential, and further, that he would not be able to get more information before or during his upcoming interview with the fact-finder.

93.     Montague submitted a written response denying the allegations against him and stating that all interactions between himself and Roe were consensual. This was all he could say at the time, as Yale gave him no notice of the specifics of Roe's complaint.

### The Investigation

94.     In accordance with the *UWC Procedures*, Yale appointed an impartial fact-finder to "gather documents and conduct interviews as necessary to reach a thorough understanding of the facts and circumstances surrounding the allegations of the complaint." (*See* Exhibit 2.)

95.     The undisputed facts are as follows:

    95a.     Roe and Montague first met at a party in early September, 2014, at which time they engaged in consensual sexual activity (but not intercourse). Roe joined Montague in his bed and spent the night with him.

    95b.     Roe and Montague continued to communicate with each other and, a week or two after their first encounter, they met again and had consensual sex (but not intercourse). Roe again spent the night with Montague.

    95c.     On September 24, 2014, Roe voluntarily accompanied Montague to his bedroom where "both parties undressed" and kissed in Montague's bed.

18

Roe and Montague then had consensual sexual intercourse, and Roe spent the night with Montague.

95d.  On October 18, 2014, Roe went to a party at Montague's house, where Roe and Montague engaged in consensual sexual contact (not including intercourse) outside the house in Montague's car.

95e.  The two moved to Montague's bedroom, where they voluntarily removed all of their clothing and began engaging in consensual sexual activity.

95f.  Roe and Montague then had sexual intercourse – the subject of the UWC II complaint – and Roe ultimately spent the night at Montague's house.

95g.  Several days later Roe contacted Montague and the two met on October 28, 2014, at which time Roe expressed regret about the sexual intercourse on October 18. Montague told her he was sorry she felt that way, and he agreed not to pursue her in the future.

96.  Roe provided the following additional details to the fact-finder:

96a.  During Roe's first two sexual encounters with Montague he inquired whether she wanted to have sexual intercourse, and she said "no." Montague "respected her decision and did not push her."

96b.  During Roe's third sexual encounter with Montague on September 24, 2014, she affirmatively, verbally consented to sexual intercourse after both parties undressed and were in bed kissing.

96c.  Roe claimed that on the evening of October 18, 2014, while she and Montague were kissing each other outside his house and in his car, she told him she wanted to "hook up" but not "have sex."

19

96d.    Roe and Montague eventually got out of his car and went inside his house in order to go up to Montague's room. Roe led the way.

96e.    When they arrived in the bedroom, they both took off all of their clothes and got into bed, where they resumed kissing and touching.

96f.    Roe said that once they undressed and began engaging in consensual foreplay, "there was no further discussion about the boundaries of their sexual consent."

96g.    Montague kissed Roe and touched her genitals, and Roe had no objection. Indeed, Roe told the fact-finder she "indicated her consent by kissing [Montague,] touching his body . . . and by not tensing up."

96h.    Montague then got on top of Roe in order to engage in sexual intercourse.

96i.    Roe said that at that point she "put her hands up, pressed them against the front of Mr. Montague's shoulders and pushed him, *but not very forcefully*" (emphasis added).

96j.    According to Roe, she also said, "no, I said I wanted to hook up but not have sex." Roe explained to the fact-finder, however, that Montague looked "*as if he did not hear what she was saying*" (emphasis added).

96k.    Montague – having apparently not heard Roe's purported statement – penetrated Roe; Roe made no further attempts to stop the sexual intercourse.

96l.    Roe left Montague's house after the encounter, but later called him and met up with him again in the early morning hours of October 19.

20

96m.    Roe accompanied Montague back to his house, where she spent the rest of the night. Roe recalled that their conversation on the way back to Montague's house was "normal and flirty."

96n.    When they got back to Montague's room, Roe voluntarily got into bed with Montague. Roe told the fact-finder that Montague attempted to initiate sexual contact again, but Roe declined. Montague "did not object," and they both went to sleep.

97.    Mr. Montague's recollection of his relationship with Roe prior to October 18, 2014, was largely consistent with Roe's account. He provided the fact-finder with the following additional details:

97a.    As to the events of October 18, Montague told the fact-finder he had four to seven drinks of alcohol over a period of several hours that night. He recalled kissing Roe outside and then in his truck, and inviting her inside to go to his bedroom.

97b.    Montague's recollection was that Roe consented to all of their sexual activity that night.

97c.    Nothing about the encounter made Montague think Roe was hesitant or uncomfortable. Montague remembered changing positions during intercourse, and said Roe did not object. (Roe, for her part, did not deny the two changed positions – she simply did not remember.)

97d.    Roe then spent the night with him, as she had during their previous sexual encounters.

21

97e.    Montague told the fact-finder Roe never told him she wanted to "hook up but not have sex," nor did Roe put her hands on his shoulders and push him as they began to have intercourse.

97f.    The fact-finder asked Montague about Roe's account that she left the house after having intercourse with Montague and later returned; Montague did not deny this had occurred, but did not remember it.

98.    The fact-finder never asked Montague about the UWC I proceedings.

99.    The fact-finder also interviewed five of Roe's friends – Jessica Johnson, Nancy Nelson, Carol Conrad, Kathleen Klein,[4] and Rachel Rogers – with whom Roe had discussed the October 18 sexual encounter.

100.    Johnson, Nelson, Klein, and Rogers all told the fact-finder that Roe told Montague, when the two were in his bedroom, that she did not want to "have sex."

101.    Roe did not tell her friends that she voluntarily removed all of her clothing, got in bed with Montague, and consented to myriad sexual acts.

102.    Further, neither Johnson, Nelson, Klein, nor Rogers said that Roe told them she had made any *previous* statements to Montague that night indicating she wanted to "hook up" with Montague but did not want to "have sex."

103.    Roe had previously told Rogers that she had no romantic feelings for Montague, however; their relationship was purely sexual.

104.    Conrad told a somewhat different story to the fact-finder than what was reported by Roe's other friends. Conrad said Roe told Montague they could "hang out" but not have

---

[4] These are pseudonyms being used to protect these students' privacy. Except where the student has chosen to reveal his/her identity in the press, this complaint will identify other students through use of pseudonyms in order to protect their privacy.

22

intercourse, and that Montague "pushed her to agree to sex." According to Conrad, Roe said "no" but Montague proceeded anyway.

105.    Conrad's account is not consistent with Roe's; Roe never said Montague "pushed her to agree to have sex."

106.    The fact-finder interviewed Defendant Gleason as well. Gleason recalled that when Roe first came to her, she told Roe that one option was to sit down with Montague, tell him there was a complaint against him, and suggest he participate in training to make sure he understood the University's consent policy. According to Gleason, she then told Roe she would "have to check to see if Mr. Montague was known to the Title IX Coordinators and would consult with other Coordinators in order to determine whether it was appropriate to address this incident with additional training."

107.    Gleason told the fact-finder that after consulting with the other Title IX Coordinators, she learned Montague had already participated in a semester of "sensitivity training" and so it "did not make sense to ask him to repeat that intervention."

108.    Gleason thereafter reported back to Roe and implied Montague had already received training on consent, and suggested the situation was serious enough to warrant a formal complaint.

109.    Gleason told Roe that a Title IX Coordinator could bring the complaint if Roe was willing to participate as a witness. Roe agreed to cooperate on that basis.

110.    The fact-finder prepared a report summarizing her interviews and submitted the report to the UWC hearing panel. The report did not include any factual findings about or references to the UWC I proceedings. None of the witnesses' interviews with the fact-finder were recorded by either audio or visual means.

111.    Per the *UWC Procedures*, on or about January 15, 2016, Montague received a final draft of the fact-finder's report. This was the first time he was informed of the details of Roe's claims.

## The UWC II Panel Hearing

112.    Mr. Montague's UWC II hearing was held on January 21, 2016.  The only assistance Montague had during the hearing came from Montague's adviser, Yale basketball coach James Jones.

113.    Roe participated in the hearing and was accompanied by an adviser from the SHARE Center. Roe prepared a lengthy written opening statement in advance of the hearing. On information and belief, Roe's SHARE Center adviser was aware of this practice and encouraged Roe to prepare the statement.

114.    Unlike Roe's adviser, Coach Jones was unaware of the practice of preparing opening statements for UWC hearings, and no one from Yale informed Montague that he should prepare an opening statement. Montague therefore did not prepare or read one at the hearing.

115.    As he had throughout the proceedings, Montague expressed to the panel his confusion about Roe's complaint; as he understood it, all of his interactions with Roe had been consensual.

116.    The panel hearing was not recorded by audio or visual means.

## The Panel's Report

117.    The panel issued its report on February 1, 2016.

118.    The panel confirmed in its report that Roe "agreed to participate in the UWC investigation *only* after she learned that Mr. Montague had already received training" (emphasis added).

24

119.    The panel accepted the undisputed facts in the fact-finder's report, and reviewed the evidence presented by the fact-finder in her report, as well as the evidence gathered at the hearing, to determine whether Montague engaged in nonconsensual sexual intercourse with Roe in violation of the University's *Sexual Misconduct Policies*.

120.    The panel's factual findings largely mirror the facts as set forth in the fact-finder's report. These findings, when construed consistently with the undisputed evidence, are inadequate to support a conclusion that Montague violated Yale's *Sexual Misconduct Policies* by engaging in nonconsensual sexual intercourse with Roe.

121.    Specifically, the panel's findings make clear that whatever Roe might have said to Montague about the limits of her consent prior to willingly accompanying him to his bedroom, and whatever she might have communicated about not wanting to "have sex," once she got to Montague's bedroom she clearly changed her mind.

122.    As the fact-finder was careful to ascertain, Roe affirmatively and unequivocally communicated to Montague, by her conduct, that she consented to "sex."

123.    To Montague, Roe's conduct on October 18 was not objectively different than it was during their previous sexual encounters, including the encounter on September 24 when Roe removed all of her clothing, voluntarily joined Montague in his bed, and voluntarily engaged in sexual foreplay and sexual intercourse.

124.    Roe had an absolute right to revoke her consent to sex at any time, but that revocation of consent had to be communicated to Mr. Montague.

125.    The revocation of consent – like the giving of consent – must be clear.

126.    The panel made no finding that Roe clearly revoked her consent to sex.

25

127.    For example, while the panel apparently credited Roe's account that when Montague got on top of her as if to penetrate her she put her hands up and pressed them against his shoulders, the uncontroverted evidence is that she did so in a manner that was "not very forceful[]."

128.    Putting one's hands on a sexual partner's shoulders and gently pressing on them during the course of a sexual act cannot reasonably be construed as conduct clearly indicating revocation of consent to sex.

129.    Montague's view that Roe "did not *push him away* immediately before intercourse" is thus consistent with a rational interpretation of Roe's actions in placing her hands on his shoulders and gently pressing on them as the two were about to have what he believed to be consensual intercourse.

130.    In addition, the panel did not find that Roe's purported verbal revocation of consent – "no, I said I wanted to hook up but not have sex" – was *audible*. In fact, Roe herself confirmed that she *did not think Montague heard her*.

131.    Montague's testimony that Roe did not tell him, during the course of the encounter, that she did not want to "have sex" is thus entirely consistent with Roe's account that Montague appeared not to "hear what she was saying."

132.    By all indications, then, Roe communicated to Montague, and Montague reasonably believed, that he had Roe's consent to engage in sex based on the fact that Roe led Montague to his bedroom, voluntarily removed all of her clothing and voluntarily engaged in sexual acts with him.

133.    Mr. Montague had no reason to believe Roe ever revoked that consent because he never heard Roe express that she did not wish to continue.

134.   In fact, by all accounts, Montague repeatedly demonstrated that when Roe said, and Montague *heard* and understood Roe to be saying, that she did not want to have sexual intercourse, he could – and *did* – comply with her wishes.

135.   Specifically, Roe told the fact-finder that in her earlier encounters with Montague, when Roe said she did not want to have sex, Montague "respected her decision and did not push her." Likewise, when Roe returned to Montague's room and got into bed with him in the early morning hours of October 19 and rebuffed his attempts to re-initiate sexual contact, Montague again readily respected her wishes.

136.   The panel also made credibility determinations without properly considering the evidence presented.

137.   The panel explicitly credited Roe's account because Roe seemed able to remember the incident very clearly; indeed, the panel found, "there is no evidence [Roe] was intoxicated or otherwise impaired in any way that would have affected her recollection of the night."

138.   By contrast, the panel did not find Mr. Montague credible "because of his selective memory . . . and his shifting recollection of how he gauged consent."

139.   In so finding, the panel completely ignored the clear evidence that Montague *was* impaired to some degree, which would account for his failure to remember the events of October 18 with crystal clarity: Montague admitted to having four to seven alcoholic drinks in the space of just a few hours, although he said he was not intoxicated.

140.   Furthermore, it was not until just before the UWC hearing – when he received the fact-finder's report – that Montague finally understood the extent of Roe's claims. This also

27

accounts for any differences in his memory between the time of his interview and the panel hearing.

141.    Yale's failure to give Montague proper notice of Roe's claims disadvantaged him at his interview with the fact-finder because he was asked to respond to those claims without knowing or being able to reflect upon any of the detailed allegations. Once he learned the details and was able to search his memory, however, he testified to a broader recollection of those events at the hearing.

142.    At the conclusion of its report, the panel stated that in accordance with Section 7.4 of the *UWC Procedures* it had taken "into account Mr. Montague's previous formal disciplinary history with the UWC for violating Yale's sexual misconduct policy . . . ." The panel may, consistent with Section 7.4 *and as part of the UWC hearing process*, choose to take account of prior UWC proceedings in assessing culpability. (*See* Exhibit 2.)

143.    On information and belief, the UWC Secretary made an *ex parte* submission to the panel detailing the UWC I proceedings and resulting sanction.

144.    The panel never addressed the UWC I proceedings in Montague's presence. It did not ask Montague any questions about the UWC I proceedings, nor did allow him to explain what had occurred or to point out that what he did to Smith was not in any way "related to" nor probative of whether he committed the alleged sexual assault of Roe. The panel also did not confirm with Mr. Montague the topics or substance of his SHARE sessions.

145.    Montague was entitled to be present during the presentation of all evidence the panel took into account on the issue of culpability, including the presentation of evidence related to the UWC I proceeding, and he was entitled to present relevant or countervailing evidence if he so chose.

28

146.    Montague was deprived of this opportunity. Had he been given the opportunity, he could have argued that the conclusion of the UWC I proceedings was erroneous, and further, that the UWC I proceedings bore no relationship to Roe's allegations, beyond the basic fact that both proceedings involved female complainants. He could have also pointed out that, despite what the panel thought to be true, he had never received any SHARE training on sexual harassment or gender sensitivity, nor had he met with a SHARE trainer for the purpose of reviewing and reflecting on his interactions and relationships with female students at Yale.

147.    The panel ultimately concluded, by a preponderance of evidence, that Mr. Montague sexually assaulted Roe in violation of *Yale's Sexual Misconduct Policies*.

148.    On information and belief and consistent with Section 7.5 of the *UWC Procedures*, at the close of the panel hearing UWC Secretary Menon described to the panel two previous instances of discipline imposed upon Montague by Yale. (*See* Exhibit 2.) In so doing, she erroneously informed the panel that Mr. Montague "had received sexual harassment and gender sensitivity training" and had met at least three times with a member of the SHARE Center staff "to review and reflect on his interactions and relationships with female students at Yale." She also erroneously informed the panel that Mr. Montague had been formally disciplined by the Executive Committee, when in fact he had received a reprimand that was a matter of internal record only.

149.    Based at least in part upon this erroneous information, the panel recommended Montague be expelled.

150.    Per Yale's 2015 *UWC Procedures*, Montague was informed, on or about February 1, 2016, of the panel's findings of fact and conclusion, *but he was not informed that the panel*

29

*recommended expulsion, nor of the panel's reasoning for recommending this particular*

*sanction.* (*See* Exhibit 2.)

151.     This represented a substantial change in Yale's procedure. The prior version of

the *UWC Procedures* – in effect from 2013 until they were revised in 2015 – provided that both

parties would be notified of the panel's findings of fact, conclusions, *and* recommended penalty,

and would be given the opportunity to submit a written response addressing the panel's report *in*

*full*.

152.     Because of Yale's unilateral change in its procedure, Montague had no

opportunity to respond to or challenge the panel's disciplinary recommendation.

153.     In fact, unbeknownst to Montague, and as set forth above, the UWC II panel took

into account the UWC I proceedings and the purported SHARE training Montague had already

received – both of which it deemed "particularly relevant" – as well as the fact that "Mr.

Montague also received a written reprimand from the Yale College Executive Committee . . . for

violating Yale College *Undergraduate Regulations* for Defiance of Authority."

154.     Yet Montague had not, in fact, "received sexual harassment and gender sensitivity

training," nor had he "review[ed] and reflect[ed] on his interactions and relationships with

female students at Yale" during his meetings with the SHARE Center staff member. The UWC II

panel therefore relied on incorrect information in recommending the appropriate sanction, but

Montague was neither informed of this nor given an opportunity to make the facts known to the

panel.

155.     Furthermore, the reprimand issued by the Executive Committee was not "formal

discipline." Yale told Mr. Montague he was "free" to represent to others that he had *not* "been

subject to disciplinary sanctions by the University," and it also told Mr. Montague that the

30

reprimand would only be taken into account if the *Executive Committee* ever again found he had committed an infraction of the *Undergraduate Regulations*. (*See* Exhibit 7.) Yale never informed Montague that, when considering what penalty to recommend, the *UWC panel* could or would take into account the informal discipline imposed upon him by the Executive Committee.

156.    Just as Montague had no opportunity to explain the UWC I proceedings to the UWC II panel, he had no opportunity to address the Executive Committee's reprimand, or to rebut any notion that it was at all relevant to the UWC II proceedings.

157.    This procedure (or lack thereof) is in marked contrast to Executive Committee disciplinary proceedings at Yale, under which all complaints of alleged student misconduct, other than sexual misconduct, are adjudicated.

158.    When the Executive Committee considers what penalty to assign a student for an infraction under Yale's *Undergraduate Regulations*, a true and correct copy of which is attached hereto as Exhibit 8, the Committee "shall invite the student and the adviser to return to the room. The secretary will inform the committee of any previous infractions of the *Undergraduate Regulations* on the part of the student. *The Executive Committee shall permit the student and his or her adviser to present a statement of reasonable length relevant to the determination of the penalty and to furnish further information about his or her character*." (Exhibit 8, emphasis added.)

159.    Additionally, on information and belief and consistent with Section 7.5 of the *UWC Procedures*, at the close of the panel hearing UWC Secretary Menon "inform[ed] the panel about the nature of previous penalties assessed for similar violations." (*See* Exhibit 2.)

160.    Yale's history of imposing penalties for nonconsensual sex demonstrates that *in almost all cases* the sanction for such conduct is something less than expulsion. Indeed, prior to

31

Montague's expulsion, Yale had expelled only *three* other students between July 1, 2011, and June 30, 2015, for nonconsensual sexual conduct, demonstrating that it is an extreme sanction imposed in only the most serious circumstances.

161.    The following is a summary of the relevant UWC disciplinary actions during that time period:

- UWC found sufficient evidence that two male students engaged in <u>nonconsensual sex</u> with a female student; the respondents were given <u>written reprimands</u> and measures were taken to limit contact between the parties (January 1, 2012 through June 30, 2012);

- UWC found sufficient evidence that two male students engaged in <u>nonconsensual sex</u> with a female student; the respondents were given <u>written reprimands</u> and measures were taken to limit the contact of the parties (January 1, 2013 through June 30, 2013);

- UWC found sufficient evidence that a male student had <u>nonconsensual sex</u> with a female student; the respondent was given a <u>written reprimand</u> (January 1, 2013 through June 30, 2013);

- UWC found sufficient evidence that a male student, in the context of an intimate relationship, engaged in certain <u>nonconsensual acts</u> with a female student <u>during otherwise consensual sexual activity</u>; the respondent was given a <u>written reprimand</u>; restricted from contacting the complainant; required to attend gender sensitivity training; and encouraged to seek counseling (January 1, 2013 through June 30, 2013);

32

- UWC found sufficient evidence that a male student, in the context of an intimate relationship, engaged in certain <u>nonconsensual acts</u> with a female student <u>during otherwise consensual sexual activity</u>; the respondent was <u>placed on probation</u> for the remainder of his time at Yale and a number of measures were taken to restrict him from contacting the complainant (January 1, 2013 through June 30, 2013);

- UWC found sufficient evidence that a male student had <u>nonconsensual sex</u> with a female student and violated the Yale College Code of General Conduct; the respondent was given a <u>two-semester suspension</u>; placed on <u>probation</u> for the remainder of his time at the university; restricted from contacting the complainant; and encouraged to continue counseling for alcohol abuse, appropriate sexual behavior, and the respectful treatment of others (January 1, 2013 through June 30, 2013);

- UWC found sufficient evidence that a male student engaged in <u>sexual intercourse</u> with a female student <u>without</u> her <u>consent</u>; the respondent was <u>expelled</u> (January 1, 2014 through June 30, 2014) (this expulsion occurred in the wake of the student and alumni protests spurred by the previous Spangler Report, in which the groups decried what they viewed as the University's weak penalties for sexual assault);

- After the complainant decided not to pursue formal action, a Title IX Coordinator brought a formal complaint to the UWC, and the UWC found sufficient evidence that a male student engaged in <u>sexual intercourse</u> with a female student <u>without</u> her <u>consent</u>; the respondent was <u>expelled</u> (January 1, 2014 through June 30, 2014) (this expulsion likewise occurred in the wake of the student and alumni protests spurred by the previous Spangler Report);

33

- UWC found sufficient evidence that a male student engaged in <u>certain acts</u> with a female student <u>without</u> her <u>consent during otherwise consensual sexual activity</u>; the respondent was given a <u>written reprimand</u> and required to received sexual consent training (January 1, 2014 through June 30, 2014);

- UWC found sufficient evidence that a male student engaged in <u>sexual intercourse</u> with a female student <u>without</u> her <u>consent</u>; the respondent was <u>suspended</u> through the summer of 2014; restricted from participating in certain campus activities; and his degree was withheld until May of 2015 (January 1, 2014 through June 30, 2014);

- UWC found sufficient evidence that a male student engaged in <u>touching of a sexual nature and other sexual activities without</u> a female student's <u>consent</u>; the respondent was <u>suspended</u> through the summer of 2015; restricted from contacting the complainant; and required to receive training on sexual consent and alcohol consumption (January 1, 2014 through June 30, 2014);

- UWC found sufficient evidence that a male student engaged in <u>sexual intercourse</u> with a female student <u>without</u> her <u>consent</u>; the respondent was placed on <u>probation</u> for the remainder of his time at Yale (July 1, 2014 through December 31, 2014);

- UWC found sufficient evidence that a male student engaged in <u>sexual intercourse and other sexual acts</u> with a female student <u>without</u> her <u>consent</u>; the respondent was <u>expelled</u> (July 1, 2014 through December 31, 2014)

- UWC found sufficient evidence that a student engaged in <u>sexual penetration</u> of another student <u>without consent</u>; the respondent was <u>suspended</u> for six months

and referred for training on sexual consent (January 1, 2015 through June 30, 2015) (Yale stopped reporting the gender of complainants and respondents as of January 1, 2015);

- UWC found sufficient evidence that a student engaged in <u>sexual activity</u> with another student <u>without consent</u>; the respondent was <u>reprimanded</u>; restricted from participating in certain campus activities; and referred for training on sexual consent (January 1, 2015 through June 30, 2015);

- UWC found sufficient evidence that a student engaged in <u>sexual harassment and sexual penetration</u> of another student <u>without consent</u>; the respondent was placed on <u>probation</u> and received a written reprimand (January 1, 2015 through June 30, 2015).

162.    Based on the "previous penalties assessed for similar violations," then, the panel's decision to recommend expulsion in Montague's case was unsupported and unwarranted.

163.    On February 2, 2016, Roe wrote to Yale College Dean Jonathan Holloway expressing her full support of the panel's conclusion. Roe reiterated that the motivation for the formal complaint was "to keep this campus safe," and urged Holloway to consider that Montague "has had additional opportunities to be trained on subjects related to consent and sensitivity."

164.    In reality, of course, Montague had received no training on "consent and sensitivity." On information and belief, Roe made this statement based on Defendant Gleason's false and misleading representations to her that Montague had been the subject of a prior sexual assault complaint and had already received training relevant to that complaint.

**The University Expels Mr. Montague, Ejects Him from the Campus,
and Destroys His Reputation**

165.    On February 10, 2016, Dean Holloway wrote to Mr. Montague and informed

Montague that, as Dean, he accepted the panel's conclusion that Montague sexually assaulted

Roe and that he had determined "the appropriate penalty is expulsion, the penalty also

recommended by the panel that heard this complaint."

166.    In making his decision, Holloway, like the UWC II panel, expressly considered

the nature of the behavior in question; Montague's prior disciplinary history by the UWC and the

Executive Committee; and "the extensive training" Montague allegedly "already received from

the SHARE Center" – training that, according to Holloway, "did not have the hoped for impact

on [Montague's] behavior." Holloway concluded that in light of Montague's "inability to learn

from [his] past mistakes," "permanent separation from Yale is the only appropriate penalty."

167.    This was the first time Montague was ever informed that anyone at Yale had

considered the UWC I proceedings and the Executive Committee reprimand in determining his

sanction (although he was still unaware that the UWC II panel had considered both).

168.    Montague's expulsion was contrary to Yale's own suggested sanction for similar

(hypothetical) conduct.

169.    Yale's "Sexual Misconduct Scenarios," developed and disseminated in response

to critics who charged that all nonconsensual sex is "sexual assault" and warrants expulsion in

every instance, includes the following scenario:

> Morgan and Kai are friends who begin dancing and kissing at a party. They are
> both drunk, although not to the point of incapacitation. Together they decide to go
> to Kai's room. They undress each other and begin touching each other. Morgan
> moves as if to engage in oral sex and looks up at Kai questioningly. Kai nods in
> agreement and Morgan proceeds. Subsequently, without pausing to check for
> further agreement, Kai begins to perform oral sex on Morgan. Morgan lies still for
> a few minutes, then moves away, saying it is late and they should sleep.

(*See* Exhibit 3.)

170. In this scenario, Yale said, "There was initial agreement, but the bounds of that agreement were not clear. Kai may have thought that Morgan had consented to reciprocal sex, but took no steps to obtain unambiguous agreement." Under these circumstances, "[t]he UWC penalty would likely be a reprimand."

171. This scenario is comparable to the October 18 encounter between Roe and Montague, where it is undisputed that "[t]here was initial agreement" to engage in sexual acts, Montague thought Roe consented to sexual intercourse (though he took no steps to obtain additional consent), and Roe did not clearly and unambiguously revoke her initial consent. (In the present case, however, both Roe and Montague *mutually* consented to sexual activity; in Yale's hypothetical scenario, although Morgan obtained consent from Kai, Kai never obtained consent from Morgan.)

172. Given that the penalty Yale itself recommended under very similar circumstances was a reprimand, the only rational explanation for Yale's decision to expel Montague was its unwarranted reliance on the UWC I proceedings, Montague's purportedly "extensive" SHARE training, and the fact that he had previously been reprimanded by the Executive Committee

173. As set forth above, however, the UWC I proceedings were contrary to Yale's *Sexual Misconduct Policies*. Had Montague had an opportunity to challenge the proposed sanction, he could have argued that in light of the fundamental differences between the UWC I and UWC II proceedings, it could not at all be said that "permanent separation from Yale is the only appropriate penalty."

174. Montague could have also pointed out that, despite what the panel and the Dean apparently believed, he never in fact received any SHARE training – let alone "extensive"

training – on sexual harassment, gender sensitivity, or any topic related to sexual relationships or sexual consent.

175.   On information and belief, Yale targeted and ultimately expelled Mr. Montague in order to make a public example of a prominent male figure on campus and demonstrate that, contrary to the opinions of Yale's internal and external critics, the University is indeed tough on men who "victimize" female students.

176.   Montague appealed Yale's decision to expel him to the Provost. Finally aware, after receiving Dean Holloway's letter, that the UWC I proceedings and SHARE training had both weighed heavily in the decision to expel him, Montague took the first opportunity he had to explain the irrelevance of those particular factors and pointed out that "[u]nless a complete examination is done of my freshman year incident with UWC and my senior year fall meeting with the Executive Committee that resulted in a reprimand, the sanction of expulsion is unfair."

177.   Montague informed the Provost that the UWC I incident, while "wrong and incredibly immature," was simply a "disagreement with a senior, female student who was belittling [him]." He also explained that his meetings with the SHARE counselor "were not 'extensive training,' let alone training on sexual misconduct. Instead, these meetings were very casual and lasted no more than five minutes after explaining the incident on the first occurrence." Thus, he said, "[w]ithout proper examination" of this information, "the sanction imposed was extreme and unjustified."

178.   Apparently unfazed by the fact that the University was taking the most drastic disciplinary step it could against one of its students on the basis of complete misinformation, the Provost summarily denied Montague's appeal.

4851-0117-1240, v. 2

179.    As a result of his expulsion, Montague was required to leave campus and abandon his beloved basketball team just as they were set to play in the first round of the NCAA Tournament, a feat the Yale men's team had not achieved since 1962.

180.    On February 26, 2016, Montague's teammates – in a gesture of support for their expelled captain – wore t-shirts sporting Montague's nickname and jersey number during warm-ups for a nationally-televised game.

181.    The backlash was vicious. Three days later, posters appeared on Yale's campus featuring photos of the team in their symbolic t-shirts and the words, "stop supporting a rapist."

182.    After those posters were removed, a new set of posters appeared just two days later, declaring: "Rape culture is standing by your teammate and silencing Yale's victims of sexual assault."

183.    The Yale Women's Center also posted a message on Facebook later that evening that a "high-profile member of a sports team in the midst of a pivotal moment in the season" left campus because of sexual misconduct. There was no mistaking who that "high profile member of a sports team" was, that Yale itself had publicly announced on February 24, after Montague had missed a series of games earlier that month, that he would not return to the team.

184.    The basketball team was forced to apologize publicly for "the hurt" the team caused to other students by supporting their former captain and teammate and to reiterate the team's commitment to a "healthy, safe and respectful campus climate where all students can flourish."

185.    Mr. Montague has been deeply and irreparably harmed by the defendants' actions. He was wrongfully deprived of the degree he worked so hard to obtain (while at the same time devoting hundreds of hours to training, practice and playing to support and lead Yale's men's

39

varsity basketball team); indeed, he was just four months shy of receiving that degree when he was expelled. His expulsion from Yale on grounds of "sexual misconduct" will follow him throughout his life and will prevent him from obtaining a comparable college degree. The defendants' wrongful actions also deprived Montague of his dream of playing in the NCAA tournament (a tournament for which the Yale team might not have qualified without his leadership and skill); it is an opportunity he will never have again. Finally, he was publicly vilified: his name and reputation will now forever be associated with the words "sexual assault." For these injuries, even monetary damages cannot make him whole.

**Count I**
**Breach of Contract, UWC I (Lack of Jurisdiction)**
**(v. Yale University)**

186.    Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

187.    Montague applied to and enrolled in the University and, with the assistance of defendant Yale University and his parents, paid associated fees and expenses. Montague did so in reliance on the understanding and with the reasonable expectation that the University would implement and enforce the provisions and policies set forth in its official publications, including the *UWC Procedures*, the *Sexual Misconduct Policies*, and the *Yale College Undergraduate Regulations*, as well as all supporting and explanatory documents produced, published, and/or disseminated by the University, whether cited in this complaint or not.

188.    An express contract or, alternatively, a contract implied in law or in fact was formed between Montague and the University.

189.    The contract contained an implied covenant of good faith and fair dealing. It implicitly guaranteed that any proceedings would be conducted with basic fairness.

40

190.     Pursuant to the *UWC Procedures* and the *Yale College Undergraduate Regulations*, the UWC has jurisdiction only over matters involving sexual misconduct.

191.     Because the incident involving Sally Smith was not, even on its face, a matter of sexual misconduct, the UWC lacked jurisdiction.

192.     The University's decision to pursue the matter through the UWC was a violation of its own procedures and policies, and a breach of the covenant of good faith and fair dealing.

193.     As a direct and foreseeable result of this breach, the plaintiff has suffered, and will continue to suffer, a multitude of injuries.  Without limitation, he was wrongly found and held responsible for "sexual harassment," and from this finding flowed extreme consequences, culminating in his expulsion from Yale. As a result, his academic and employment prospects – indeed, his entire future prospects – have been materially and drastically limited.

### Count II
### Breach of Contract, UWC I (Inadequate Evidence to Support Finding of Sexual Harassment) (v. Yale University)

194.     Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

195.     Under University policies, a student formally charged with sexual misconduct is entitled to a hearing before a panel of the UWC and may be found to have violated University policy only if the panel finds facts by a preponderance of the evidence presented at the hearing that the student committed an act or acts constituting an offense defined as sexual misconduct under said policies. The panel is not authorized to consider as evidence of culpability any matter that is not presented at the hearing in the presence of the parties, who would then have an opportunity to respond.

196.     The *Sexual Misconduct Policies* define sexual harassment as "nonconsensual . . . conduct of a sexual nature on or off campus, when . . . such conduct has the purpose or effect of

41

unreasonably interfering with an individual's work or academic performance or creating an intimidating or hostile academic or work environment. Sexual harassment may be found in a single episode, as well as in persistent behavior." (*See* <u>Exhibit 1</u>.)

197.    The UWC I panel did not find, and could not have found, that Montague's conduct towards Sally Smith was "conduct of a sexual nature," nor did it find the conduct had "the purpose or effect of unreasonably interfering with [Smith's] work or academic performance or creating an intimidating or hostile academic or work environment." (*See* <u>Exhibit 1</u>.)

198.    The panel's finding that plaintiff "sexually harassed" Smith was contrary to the plain language of the University's *Sexual Misconduct Policies*, and thus a breach the same, as well as a breach of the covenant of good faith and fair dealing.

199.    The finding should not have been made, recorded, or used in any way against Montague in making any subsequent disciplinary decisions affecting Montague during the remaining course of his college career at Yale.

200.    As a direct and foreseeable result of this breach, the plaintiff has suffered, and will continue to suffer, a multitude of injuries.  Without limitation, he was wrongly found and held responsible for "sexual harassment," and from that finding flowed extreme consequences, culminating in his expulsion from Yale. As a result, his academic and employment prospects – indeed, his entire future prospects – have been materially and drastically limited.

**Count III**
**20 U.S.C. § 1681 (Title IX), UWC I**
**(v. Yale University)**

201.    Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

202.    Title IX prohibits discrimination on the basis of sex in a school's "education program or activity," which includes all of the school's operations. 20 U.S.C. §§ 1681(a), 1687. The University receives federal funds and must comply with Title IX.

203.    A victim of discrimination based on his or her gender has, under Title IX, a private right of action against the offending school for monetary damages and equitable relief.

204.    As set forth above, the University engaged in a series of actions that ultimately resulted in the UWC I panel's erroneous finding that Montague violated Yale's *Sexual Misconduct Polices* in the form of "sexual harassment" of Sally Smith.

205.    These actions, and the panel's ultimate finding, were a product of disparate treatment of Montague based on his gender.

206.    As set forth above, the UWC lacked jurisdiction over matter because it did not involve "sexual misconduct," as Yale's own policies define it.

207.    For the same reason, the panel's finding of "sexual misconduct" in the form of "sexual harassment" was erroneous because, under Yale's own policies, the conduct was neither "conduct of a sexual nature" nor conduct that created a hostile environment for Smith.

208.    The University's decision to pursue the matter under the auspices of the UWC, and the panel's ultimate finding, were motivated by gender bias.

209.    On information and belief, had the perpetrator been a woman, Yale would not have considered the matter a UWC matter, nor would it have found "sexual harassment."

210.    Montague, based solely on his gender, suffered an erroneous outcome of the UWC I proceedings. This unlawful discrimination by the University in violation of Title IX proximately caused Montague to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future

43

economic loss; deprivations of due process; loss of educational opportunities; and loss of future employment prospects.

**Count IV**
**Breach of Contract, UWC II: Breach of Confidentiality**
**(v. Yale University)**

211.    Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

212.    Both Yale's *UWC Procedures* and the *Provost's Statement on Confidentiality of UWC Proceedings* "impose strict and unequivocal confidentiality obligations regarding documents prepared by, prepared for, or received from the UWC in connection with a UWC proceeding." (*See* Exhibit 2; Exhibit 5.) These documents (and by necessary implication, their contents) may not be disclosed to anyone who was not a party to the UWC proceeding (other than the parties' advisers, family members, and attorneys).

213.    In direct contravention of this policy and in breach of the clear confidentiality requirements set forth in Yale's contract with Montague, as well as in breach of the covenant of good faith and fair dealing, Defendant Gleason, acting as a Deputy Title IX Coordinator on behalf of Yale, disclosed to Roe the fact and substance of the UWC I proceedings.

214.    As a direct and foreseeable result of the individual defendant's wrongful conduct, the plaintiff has suffered, and will continue to suffer, multiple forms of damage, as set forth above. Without limitation, the defendants' wrongful conduct was one of the primary reasons Roe agreed to participate in the formal complaint process against Montague. That process, and the resulting discipline, caused Montague to suffer substantial and irreparable injury, damages, and loss.

44

**Count V**
**Defamation**
**(v. Yale University and Gleason)**

215.    Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

216.    On November 6, 2015, Defendant Gleason falsely informed Roe, either directly or by implication, that Montague had been the subject of a previous complaint of sexual assault; that he had been found responsible for sexual assault by the UWC; and that he had been required to participate in training concerning sexual relationships and sexual consent.

217.    These statements were false and defamatory *per se*, and caused Roe to believe she had to engage in the formal complaint process because this was not a "one-time mistake" on Montague's part, Roe consequently felt duty-bound "to protect other women" from him.

218.    These false and defamatory statements were, in fact, the genesis of the formal UWC II proceedings against Montague.

219.    Gleason made these statements to Roe negligently or in knowing or reckless disregard of the truth.

220.    As a direct and foreseeable result of these false and defamatory statements, the plaintiff has suffered, and will continue to suffer, grave reputational and economic injury, as set forth above.

**Count VI**
**Invasion of Privacy (Violation of Confidentiality and False Light)**
**(v. Yale University and Gleason)**

221.    Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

222.    On November 6, 2015, Defendant Gleason falsely informed Roe, either directly or by implication, that Montague had been the subject of a previous complaint of sexual assault;

45

that he had been found responsible for sexual assault by the UWC; and that he had been required to undergo training concerning sexual relationships and sexual consent.

223.    Gleason was prohibited by Yale's policies and procedures from disclosing this information to Roe, and her disclosure was a violation of Montague's right to privacy, *to wit*, his right to have the information kept confidential.

224.    Gleason's statements to Roe were also untrue. Montague had never before been the subject of a complaint of sexual assault, nor had he ever before been required to participate in training concerning sexual relationships or sexual consent.

225.    These statements were a major misrepresentation of Montague's character, history, and activities.

226.    The false light in which Gleason placed Montague would be highly offensive to a reasonable person.

227.    Gleason knew or acted in reckless disregard of the falsity of her statements to Roe and the false light in which they would place Montague.

228.     As a direct and foreseeable result of the false light in which Gleason placed Montague to Roe, Montague experienced, and continues to experience, emotional and mental suffering.

**Count VII**
**Breach of Contract, UWC II: Breach of Procedure for Title IX**
**Coordinator-Initiated Complaints**
**(v. Yale University)**

229.    Plaintiff restates each of the foregoing as if fully restated herein.

230.    Yale's policies and procedures make it clear that Title IX Coordinators may initiate formal complaint proceedings only in "unusual circumstances . . . involving risks to the safety of individuals and/or the community." (*See* Exhibit 6.)

231.     The circumstances reported to Yale by Roe did not in any way involve a risk to Roe's safety or to the safety of the community.

232.     Defendant Killheffer, acting as a Senior Deputy Title IX Coordinator on behalf of Yale, lacked the authority under Yale's policies to bring a formal complaint against Montague. The decision to pursue the formal complaint, despite lacking such authority, was a breach of Yale's policies and procedures, and a breach of the covenant of good faith and fair dealing.

233.     As a direct and foreseeable result of defendants' wrongful conduct, Montague suffered, and will continue to suffer, a multitude of injuries and damages. Without limitation, he was subjected to a formal complaint process rather than the informal one Roe initially and affirmatively desired, and this formal complaint process culminated in his expulsion from Yale. As a result, his academic and employment prospects – indeed, his entire future prospects – have been drastically and materially limited, and he has suffered serious emotional and mental injury.

### Count VIII
### Tortious Interference With Contract
### (v. Gleason, Killheffer and Others Unknown)

234.     Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

235.     Defendant Gleason, Defendant Killheffer, and others unknown were aware of the contractual relationship between plaintiff and Yale as set out above, which encompassed the obligations of each under Yale's *UWC Procedures*.

236.     Gleason, Killheffer, and others unknown intentionally and maliciously interfered with plaintiff's contractual relationship with Yale as set out above by taking steps to procure Montague's wrongful expulsion. These steps included, but are not limited to:

236a.     Violating the strict confidentiality requirements contained in Yale's policies;

47

236b.    Falsely informing Roe that her name could not be kept anonymous;

236c.    Falsely informing Roe that the informal complaint process was not available under the circumstances;

236d.    Falsely informing or implying to Roe that Montague was the subject of a previous complaint of sexual assault; and

236f.    Violating Yale's policy limiting the authority of Title IX Coordinators to bring formal complaints in situations where coordinator intervention is "needed" to protect "the safety or well-being of the complainant or other members of the community," where in fact no such intervention was necessary.

237.    As a result of the conduct of these individual defendants, Roe was misled into cooperating in a formal complaint process against Montague despite her express wishes to keep the process informal and preserve her anonymity. The formal complaint process ultimately resulted in the University severing its relationship with plaintiff by expelling him from the University.

238.    Gleason, Killheffer, and others unknown acted through improper motive or means and with actual malice, including the illegitimate purpose of ensuring the pursuit of formal UWC proceedings against Montague, regardless of Roe's stated desire to keep the process anonymous and informal, in order to make an example of him and to prove that the University was tough on sexual assailants.

239.    As a direct and foreseeable result of the individual defendants' wrongful conduct, the plaintiff has suffered, and will continue to suffer, multiple forms of damage, as set forth above.

48

**Count IX**
**Breach of Contract, UWC II: Failure to Make Findings**
**Constituting a Violation**
**(v. Yale University)**

240.    Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

241.    As set forth above, under University policies, a student formally charged with sexual misconduct is entitled to a hearing before a panel of the UWC and may be found to have violated University policy only if the panel finds facts by a preponderance of the evidence presented at the hearing that the student committed an act or acts constituting an offense defined as "sexual misconduct" under said policies.

242.    A respondent cannot be found to have violated University policies in the absence of sufficient evidence. The evidence the panel may consider in determining sufficiency is confined to the fact-finder's report and the evidence elicited by the panel at the UWC hearing.

243.    According to Yale's *Sexual Misconduct Policies*, sexual assault is "any kind of nonconsensual sexual contact, including rape, groping, and any other nonconsensual sexual touching." (*See* Exhibit 1.) Furthermore, per the *Sexual Misconduct Policies*, "[s]exual activity requires consent, which is defined as positive, unambiguous, and voluntary agreement to engage in specific sexual activity throughout a sexual encounter." "Consent must be ongoing throughout a sexual encounter and can be revoked at any time." (*Id.*)

244.    The panel failed to make findings supporting the conclusion that Montague sexually assaulted Roe.

245.    It is undisputed that Roe affirmatively consented to sexual activity when she led Montague to his room, removed all of her clothing, got into bed with him, and voluntarily engaged in various forms of sex.

49

246.     The panel did not find, and could not have found, that Roe affirmatively, unambiguously, and audibly communicated to Montague her revocation of consent to sex. Rather, the uncontested facts were that Roe pushed lightly on Montague's shoulders as he positioned himself on top of her, an act that cannot under any reasonable interpretation be construed as a clear and unambiguous revocation of consent, and that Montague did not appear to hear Roe when she purportedly said "no."

247.     Consequently, the panel's conclusion that Montague sexually assaulted Roe in violation of the University's *Sexual Misconduct Policies* is a breach of the requirement that sufficient evidence support the panel's findings, as well as a breach of the covenant of good faith and fair dealing.

248.     As a direct and foreseeable result of the defendant Yale's wrongful conduct, the plaintiff has suffered, and will continue to suffer, multiple forms of damage, as set forth above.

**Count X**
**Breach of Contract, UWC II: Erroneous Reliance on UWC I Proceedings**
**(v. Yale University)**

249.     Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

250.     The *UWC Procedures* provide that "[i]n determining culpability, the panel may . . . take into account a respondent's previous formal discipline for *other acts of sexual misconduct* . . . (emphasis added)." (*See* Exhibit 2.)

251.     As set forth above, because the UWC I proceedings did not in fact involve any "acts of sexual misconduct," those proceedings could not and should not have been relied upon by the UWC II panel in assessing Montague's culpability.

252.     The panel's erroneous reliance on the UWC I proceedings was a breach of Section 7.4 of the *UWC Procedures*, and a breach of the covenant of good faith and fair dealing.

50

253.     As a direct and foreseeable result of the defendant's wrongful conduct, the plaintiff has suffered, and will continue to suffer, multiple forms of damage, as set forth above.

**Count XI**
**Breach of Contract, UWC II: Consideration of Evidence**
**Outside the Presence of the Respondent**
**(v. Yale University)**

254.     Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

255.     The *UWC Procedures* provide, *under the "Hearings" section* (7.4), that "[i]n determining culpability, the panel may . . . take into account a respondent's previous formal discipline for other acts of sexual misconduct . . . ." (*See* Exhibit 2.) The panel is not authorized to consider as evidence of culpability any matter that is not presented at the hearing in the presence of the parties, who would then have an opportunity to respond; the evidence against a respondent consists of the fact-finder's report and the evidence and testimony gathered at the hearing.

256.     When it issued its findings, the panel explicitly stated that it relied on the UWC I proceedings in assessing Montague's culpability in the UWC II proceedings.

257.     Evidence of the UWC I proceedings was not contained in the fact-finder's report, however, nor was it discussed in Montague's presence at the UWC II hearing.

258.     Montague, as the respondent, had the right to be present at, or at least to meaningfully participate in, all portions of the hearing related to his culpability.

259.     Yale denied Montague the opportunity to be present at that portion of the hearing during which the panel considered the UWC I proceedings.

260.     As a result, Montague was deprived of the opportunity to explain to the panel the UWC I proceedings; to explain that his conduct did not in fact amount to "sexual harassment";

51

and to explain that his training was not focused on, and indeed had no relationship to, sexual harassment, gender sensitivity, sexual relationships, or sexual consent.

261.    Had Montague been present during the panel's consideration of the UWC I proceedings, and had he been given an opportunity to explain to the panel the conduct which led to those proceedings, it would have been clear to the UWC II panel that the UWC I proceedings bore no relationship to, and had no probative value as to the issue of Montague's culpability in the UWC II proceedings.

262.    By denying Montague the opportunity to be present during the presentation of evidence against him, Yale breached its obligations under its own *UWC Procedures*, as well as the covenant of good faith and fair dealing.

263.    As a direct and foreseeable result of the defendant's wrongful conduct, the plaintiff has suffered, and will continue to suffer, multiple forms of damage, as set forth above.

### Count XII
### Breach of Contract, UWC II: Erroneous Reliance on Executive Committee Action
### (v. Yale University)

264.    Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

265.    The *UWC Procedures* provide, in Section 7.5 ("Findings, Conclusions, and Recommendations"), that "[t]he Secretary will . . . describe any formal Yale discipline previously imposed on the respondent, and the panel may consider this prior discipline in its recommendations regarding a penalty." (Exhibit 2.)

266.    The panel is not authorized by the *UWC Procedures* to consider *informal* discipline in making its recommendation regarding a penalty.

267.    Nor was the UWC II panel, in this specific instance, authorized to consider the Executive Committee's reprimand, where Yale promised Mr. Montague that the reprimand

4851-0117-1240, v. 2

would only be taken into account if he was subject to another disciplinary proceeding before the *Executive Committee*.

268.    The Executive Committee, "a standing committee of the Yale College Faculty by whose authorization it acts," is wholly distinct from the UWC, which is "is appointed and authorized to act by the provost." (Exhibit 8.)

269.    When the UWC II panel made its disciplinary recommendation to the Dean, it explicitly relied upon the fact that Mr. Montague had been reprimanded by the Executive Committee.

270.    This reprimand was not "formal discipline," however, nor would Montague have reasonably understood it to be formal discipline.

271.    Furthermore, Yale told Mr. Montague the reprimand would only be taken into consideration if the *Executive Committee* were to again discipline him for another infraction of the Undergraduate Regulations. (Exhibit 7.)

272.    Montague was never again disciplined by the Executive Committee for an infraction of the *Undergraduate Regulations*.

273.    The UWC had no authority to take into account the Executive Committee reprimand in recommending a penalty.

274.    The panel's erroneous reliance on the Executive Committee action was a breach of Section 7.5 of the *UWC Procedures*; a breach of its promise to Montague that the action would only be taken into account by the *Executive Committee* in any future disciplinary proceeding before that body; and a breach of the covenant of good faith and fair dealing.

275.    As a direct and foreseeable result of the defendant's wrongful conduct, the plaintiff has suffered, and will continue to suffer, multiple forms of damage, as set forth above.

**Count XIII**
**Breach of Contract/Common Law, UWC II (Denial of Basic Fairness/**
**Arbitrary and Capricious Decision Making)**
**(v. Yale University)**

276.    Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

277.    The University had a duty, either under an express or implied contract or as a matter of common law, to ensure that the UWC II proceedings were conducted with basic fairness.

278.    The University breached this duty of basic fairness by, without limitation:

278a.   Misleading Roe into cooperating with the formal complaint process;

278b.   Filing a formal complaint against Montague when there was no risk to Roe's safety or to the safety of the community;

278c.   Failing to provide Montague with adequate notice of the complaint against him, such that his version of events appeared inconsistent between the time he was interviewed by the fact-finder and when he testified at the UWC panel hearing;

278d.   Failing to find facts sufficient to support the conclusion that Montague violated the University's *Sexual Misconduct Policies*;

278e.   Taking the UWC I proceedings into account as to culpability in the UWC II proceedings when the UWC I proceedings were themselves a violation of Yale's own policies and procedures, and where the allegations in the UWC I proceedings were wholly unrelated to the UWC II proceedings in any event;

278f.   Failing to give Montague an opportunity to hear and respond to evidence of the UWC I proceedings;

54

278g.   Taking the UWC I proceedings into account to enhance Montague's punishment in the UWC II proceedings where the UWC I proceedings, and the resulting discipline, were themselves a violation of Yale's policies and procedures, where the UWC I allegations and resulting discipline bore no relationship to the subject matter of the UWC II proceedings; and where the UWC II panel had incorrect information about Montague's UWC I sanction;

278h.   Taking the Executive Committee reprimand into account to enhance Montague's punishment in the UWC II proceedings where the reprimand was not "formal discipline," and where Montague could not have reasonably expected Yale to take it into account in any proceeding in front of the UWC;

278i.   Failing to provide Montague an opportunity to respond to and challenge the panel's recommended sanction in advance of a final disciplinary decision against him;

278j.   Arbitrarily and capriciously expelling Montague when Yale's own recommended sanction for similar conduct is a reprimand; and

278k.   Arbitrarily and capriciously expelling Montague when – even if the UWC I proceedings were properly considered in relation to discipline – a more appropriate sanction would have been something less drastic than expulsion.

279.   The University's breach of its duty to ensure basic fairness proximately caused Montague to sustain substantial injury, damage, and loss, including, but not limited to: mental

55

anguish; severe emotional distress; injury to reputation; past and future economic loss;

deprivations of due process; loss of educational opportunities; and loss of future career prospects.

**Count XIV**
**20 U.S.C. § 1681 (Title IX), UWC II (Erroneous Outcome)**
**(v. Yale University)**

280.     Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

281.     As set forth above, the University engaged in a series of actions that ultimately

resulted in the UWC II panel's erroneous finding that Montague violated Yale's *Sexual*

*Misconduct Polices* sexually assaulting Jane Roe.

282.     These actions, and the panel's ultimate finding, were a product of disparate

treatment of Montague based on his gender.

283.     Yale was under enormous pressure to show it took seriously female students'

complaints of sexual assault and to counter the perception that it was inappropriately lenient in

its discipline of male students accused of sexual misconduct.

284.     When Yale learned Roe's "bad experience" involved an encounter with

Montague, it seized the opportunity to make an example of him because he was one of the most

prominent *male* figures on campus. The University took steps to secure Montague's wrongful

expulsion in order to prove to its critics that it could and would expel male students for

responsible for sexual assault (despite its disciplinary history largely to the contrary).

285.     The University's decision to press Roe into cooperating in a formal complaint

process and its ultimate decision to expel Montague were motivated by gender bias.

286.     Montague, because of his gender, suffered an erroneous outcome of the UWC II

proceedings. This unlawful discrimination by the University in violation of Title IX proximately

caused Montague to sustain substantial injury, damage, and loss, including, but not limited to:

mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future employment prospects.

**WHEREFORE**, plaintiff Jack Montague respectfully requests that the Court grant him the following relief:

1.  Enjoin Yale University to reinstate the plaintiff as a fully matriculated student in good standing at Yale University;

2.  Alternatively, enjoin Yale University to reinstate the plaintiff as a fully matriculated student in good standing at Yale University with leave to reopen the UWC proceedings;

3.  Alternatively, enjoin Yale University to reinstate the plaintiff as a fully matriculated student in good standing at Yale University with leave to reopen the UWC penalty phase;

4.  Enjoin Yale to expunge from plaintiff's transcript, disciplinary records, and all other records maintained by and/or under the control of Yale University all reference to sexual misconduct and the flawed UWC I and UWC II proceedings;

5.  After trial, enter judgment for the plaintiff on each Count of the complaint and award him damages in an amount to be determined at trial, including attorneys' fees, costs and interest;

6.  Award punitive damages to the plaintiff; and

7.  Grant such other relief as the Court deems just and equitable.

## <u>JURY DEMAND</u>

Plaintiff Jack Montague hereby demands a trial by jury on all claims so triable.

4851-0117-1240, v. 2

JACK MONTAGUE,

By his attorneys,


/s/   *Max D. Stern*
_____
Max D. Stern (BBO #479560) (*pro hac vice*)
mstern@toddweld.com
Alexandra H. Deal (BBO #660654) (*pro hac vice*)
adeal@toddweld.com
Hillary A. Lehmann (BBO #683657) (*pro hac vice*)
hlehmann@toddweld.com
TODD & WELD LLP
One Federal St., 27th Floor
Boston, MA 01880
Tel. (617) 720-2626
Fax (617) 227-5777


William F. Dow III (ct00161)
JACOBS & DOW, LLC
350 Orange Street
New Haven, CT 06511
wdow@jacobslaw.com
Tel. (203) 772-3100
Fax (203) 772-1691


Dated: October 31, 2016


## CERTIFICATE OF SERVICE


I, Max D. Stern, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on October 31, 2016.


/s/ *Max D. Stern*

4851-0117-1240, v. 2

# EXHIBIT 1

Yale University

# Sexual Misconduct Response

HOME  >  POLICIES & DEFINITIONS

# Yale Sexual Misconduct Policies and Related Definitions

## Sexual Misconduct Policies at Yale

Yale University is committed to maintaining and strengthening educational, working, and living environments founded on civility and mutual respect in which students, faculty, and staff are connected by strong bonds of intellectual dependence and trust. Sexual misconduct is antithetical to the standards and ideals of our community and will not be tolerated.

Yale aims to eradicate sexual misconduct through education, training, clear policies, and serious consequences for violations of these policies. The University's Title IX Coordinator has responsibility for ensuring compliance with Yale's policies regarding sexual misconduct. The University-Wide Committee on Sexual Misconduct (UWC) (http://provost.yale.edu/uwc) and the Title IX coordinators (http://provost.yale.edu/title-ix/coordinators) address allegations of sexual misconduct.

These policies apply to all members of the Yale community as well as to conduct by third parties (i.e., individuals who are neither students nor employees, including but not limited to guests and consultants) directed toward, University students, faculty, or staff members. Conduct that occurs in the process of application for admission to a program or selection for employment is covered by these policies.

Many forms of sexual misconduct are prohibited by Connecticut and federal law, including Title IX of the education amendments of 1972, and Connecticut statutes relating to sexual offenses, and could result in criminal prosecution or civil liability.

## Sexual Misconduct

Sexual misconduct incorporates a range of behaviors including sexual assault, sexual harassment, intimate partner violence, stalking, voyeurism, and any other conduct of a sexual nature that is nonconsensual, or has the purpose or effect of threatening, intimidating, or coercing a person.

Much sexual misconduct includes nonconsensual sexual contact, but this is not a necessary component. For example, threatening speech that is sufficiently severe or pervasive to constitute sexual harassment will constitute sexual misconduct. Making photographs, video, or other visual or auditory recordings of a sexual nature of another person without consent constitutes sexual misconduct, even if the activity documented was consensual. Similarly, sharing such recordings or other sexually harassing electronic communications without consent is a form of sexual misconduct. All members of our community are protected from sexual misconduct, and sexual misconduct is prohibited regardless of the sex of any party involved.

Violations of Yale's Policy on Teacher-Student Consensual Relations (http://www.yale.edu/equalopportunity/policies/index.html) and its policy on Relationships between Staff Members are a form of sexual misconduct.

## Sexual Harassment

Sexual harassment consists of nonconsensual sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature on or off campus, when: (1) submission to such conduct is made either explicitly or implicitly a condition of an individual's employment or academic standing; or (2) submission to or rejection of such conduct is used as the basis for employment decisions or for academic evaluation, grades, or advancement; or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating or hostile academic or work environment. Sexual harassment may be found in a single episode, as well as in persistent behavior. All members of our community are protected from sexual harassment, and sexual harassment is prohibited regardless of the sex of the harasser or the harassed.

## Sexual Assault

Sexual assault is any kind of nonconsensual sexual contact, including rape, groping, and any other nonconsensual sexual touching.

## Sexual Consent

Sexual activity requires consent, which is defined as positive, unambiguous, and voluntary agreement to engage in specific sexual activity throughout a sexual encounter. Consent cannot be inferred from the absence of a "no"; a clear "yes," verbal or otherwise, is necessary. Consent to some sexual acts does not constitute consent to others, nor does past consent to a given act constitute present or future consent. Consent must be ongoing throughout a sexual encounter and can be revoked at any time.

Consent cannot be obtained by threat, coercion, or force. Agreement under such circumstances does not constitute consent.

Consent cannot be obtained from someone who is asleep or otherwise mentally or physically incapacitated, whether due to alcohol, drugs, or some other condition. A person is mentally or physically incapacitated when that person lacks the ability to make or act on considered decisions to engage in sexual activity. Engaging in sexual activity with a person whom you know — or reasonably should know — to be incapacitated constitutes sexual misconduct.

## Guidance Regarding Sexual Consent

Consent can only be accurately gauged through direct communication about the decision to engage in sexual activity. Presumptions based upon contextual factors (such as clothing, alcohol consumption, or dancing) are unwarranted, and should not be considered as evidence for consent.

Although consent does not need to be verbal, verbal communication is the most reliable form of asking for and gauging consent. Talking with sexual partners about desires and limits may seem awkward, but serves as the basis for positive sexual experiences shaped by mutual willingness and respect.

## Intimate Partner Violence

Intimate partner violence (IPV) occurs when a current or former intimate partner uses or threatens physical or sexual violence. IPV also may take the form of a pattern of behavior that seeks to establish power and control by causing fear of physical or sexual violence. Stalking may also constitute IPV.

## Stalking

Stalking is repeated or obsessive unwanted attention directed toward an individual or group that is likely to cause alarm, fear, or substantial emotional distress. Stalking may take many forms, including following, lying in wait, monitoring, and pursuing contact. Stalking may occur in person or through a

medium of communication, such as letters, e-mail, text messages, or telephone calls. In some circumstances, two instances of such behavior may be sufficient to constitute stalking.

*Last updated May 10, 2016*

**In an emergency:**

If you are in immediate danger, call 911 or Yale Police (http://publicsafety.yale.edu/police) at 203.432.4400

**Contact the SHARE Center** (http://sharecenter.yale.edu/) :

Call the hotline anytime at 203.432.2000 for information, advocacy and support

Click here (http://smr.yale.edu/sites/default/files/files/considering-seeking-help.pdf) for more information on who can help and how.

## Latest Updates

February 2016 Report of Complaints of Sexual Misconduct (http://provost.yale.edu/sites/default/files/files/February-2016-Report.pdf)

Yale Report on the AAU Campus Climate Survey (http://provost.yale.edu/title-ix/yale-report-aau-campus-climate-survey)

## Sexual misconduct scenarios

Scenarios have been developed to help illustrate Yale's definition of sexual consent. For comparison, the scenarios include examples of consensual sex. The scenarios also provide examples of penalties—ranging from expulsion to reprimand—that might be imposed as a result of a violation. view PDF (http://smr.yale.edu/sites/default/files/files/Sexual-Misconduct-Scenarios.pdf)

# Yale

Copyright © 2016 Yale University · All rights reserved ·

# EXHIBIT 2

# UWC Procedures

The procedures for the University Wide Committee on Sexual Misconduct can be found below.

### Introduction

Yale University is committed to maintaining and strengthening an educational, employment, and living environment founded on civility and mutual respect. Sexual misconduct is antithetical to the standards and ideals of our community, and it is a violation of Yale policy and the disciplinary regulations of Yale College and the Graduate and Professional Schools. Sexual misconduct will not be tolerated.

Sexual misconduct incorporates a range of behaviors including sexual assault (which includes rape, groping and any other non-consensual sexual contact), sexual harassment, intimate partner violence, stalking, and any other conduct of a sexual nature that is non-consensual, or has the purpose or effect of threatening or intimidating a person or persons. Sexual misconduct also includes a violation of Yale's Policy on Teacher-Student Consensual Relations. Yale aims to eradicate sexual misconduct through education, training, clear policies, and serious consequences for violations of these policies. In addition to being subject to University disciplinary action, sexual misconduct may lead to civil liability and criminal prosecution.

### 1. Authority of the UWC

The University-Wide Committee on Sexual Misconduct ("UWC") provides an accessible, representative, and trained body to answer informal inquiries and fairly and expeditiously address formal complaints of sexual misconduct. Any current or former Yale faculty member, [1] trainee, student, or managerial or professional employee ("staff member" [2]) who has experienced sexual misconduct may bring a complaint to the UWC, so long as two conditions are met: First, the person accused of sexual misconduct must be a Yale faculty member, trainee, student, or staff member at the time the complaint is filed.[3] Second, the alleged misconduct must have occurred at a time when all parties involved were Yale faculty members, trainees, students, or staff members. Please note: Only students and trainees may bring complaints to the UWC against staff members,[4] and the UWC is not empowered to hear complaints made by or against members of Yale's collective bargaining units or excluded clerical and technical employees.[5]

Any Title IX Coordinator at the University ("Coordinator") may bring a complaint to the UWC in three circumstances. First, a Coordinator may bring a complaint on behalf of a person who is not a current or former member of the Yale community, so long as (i) the respondent is a current Yale faculty member, trainee, student, or staff member; (ii) the respondent was at Yale in one of these roles at the time of the alleged misconduct; and (iii) the events complained of occurred on the Yale campus or

in connection with a Yale-sponsored event. Second, a Coordinator may bring a complaint to the UWC alleging a violation of Yale's Policy on Teacher-Student Consensual Relations. Finally, a Coordinator may bring a complaint when there is evidence that the University's policies on sexual misconduct have been violated and the Coordinator's intervention is needed to ensure that the matter reaches the UWC.

Actions that are the source of complaints to the UWC may also violate criminal laws. The UWC will not delay its proceedings pending the outcome of a criminal investigation or other legal process. At the request of law enforcement authorities, the UWC may postpone fact-finding while the authorities are gathering evidence, but fact-finding will resume as soon as the authorities have finished that work.

Filing a complaint with the UWC is not a prerequisite to filing a complaint of discrimination with Connecticut's Commission on Human Rights and Opportunities, the federal Equal Employment Opportunity Commission, the U.S. Department of Education's Office for Civil Rights, or any other state or federal agency, and seeking assistance from the UWC in no way precludes filing a state or federal discrimination complaint.

Yale encourages individuals who have experienced sexual misconduct to contact the SHARE Center and the Yale or New Haven Police Departments in addition to seeking assistance from the UWC. The SHARE Center provides counseling and information to survivors of sexual violence and to those who have experienced other forms of sexual misconduct. SHARE counselors can also guide and support individuals bringing complaints to the UWC.

## 2. Service on the UWC

### 2.1. Composition

The UWC consists of about 30 members drawn from faculty throughout the schools of the University; managerial or professional employees; postdoctoral associates or fellows; and students from Yale College and the graduate and professional schools ("UWC Members"). The Chair of the UWC ("UWC Chair") is a tenured faculty member. The current UWC membership is posted on the UWC website.

The Secretary of the UWC organizes the UWC's activities; handles all official UWC correspondence; acts as a liaison with the complainant, the respondent, their advisors, and witnesses; and works with the UWC Chair and Title IX Coordinators to resolve informal complaints. In the case of a formal complaint, the Secretary attends the hearing, and may ask clarifying questions and participate in the deliberations, but does not vote.

### 2.2. Selection of Members

The provost appoints members to the UWC and accepts recommendations from the dean and the faculty of each school, who may nominate faculty members (of any rank) and managerial or professional employees for membership on the UWC. In the case of Yale College students, nominations by the Yale College Council will be submitted with appropriate supporting materials to the dean of Yale College, who will make recommendations to the provost. Similarly, the Graduate and Professional Student Senate will submit graduate and professional student nominations and supporting materials to the deans of the graduate and professional schools, who will make recommendations to the provost. The provost makes all final decisions regarding appointments.

## 2.3. Terms

Faculty members and managerial or professional employees are appointed to the UWC for terms of one year, which may be renewed. Student Members are appointed to one- or two-year terms, depending on their availability and anticipated graduatipon dates. The UWC Chair is appointed to a three-year term. All Members are eligible for reappointment.

## 2.4. Training

All UWC Members must participate in training. In addition, each year, returning UWC Members must receive refresher training. Training topics include discussion of University resources for redress of sexual misconduct; sexual misconduct and equal employment, educational, and professional opportunity; methods of informal resolution; the interaction between University disciplinary processes and criminal processes; responding to retaliation; and other topics suggested by experts from within and outside the University.

## 3. Confidentiality and Honesty

The UWC and all members of the Yale community who are involved in a matter before the UWC are expected to maintain the confidentiality of its proceedings and the information obtained for those proceedings.[6] All documents prepared by, prepared for, or received from the UWC in connection with a UWC proceeding ("UWC Documents") must be held in strict confidence. Parties may not disclose UWC Documents to anyone other than their advisers in the UWC proceeding, family members, and attorneys. Parties must inform these recipients that the UWC Documents are strictly confidential and may not be further disclosed. Disciplinary action may be taken against any member of the Yale community who discloses a UWC Document in violation of these procedures or who is responsible for the improper disclosure of such documents by others. The Provost's Statement on the Confidentiality of UWC Proceedings elaborates on these confidentiality obligations.

An individual who makes an informal inquiry to the UWC Chair or Secretary may request that the UWC keep the matter confidential from the accused or other persons involved in the events. However, the UWC will not be able to hear a formal complaint unless the individual is willing to reveal the complaint (including the complainant's identity) to the respondent, the fact-finder, and the hearing panel (see Section 7, below). In some cases (for example, allegations of violence), the UWC may not be able to honor a request for confidentiality if doing so would endanger the safety or well-being of the complainant or other members of the Yale community. In addition, the University may not be able to preserve the complete confidentiality of UWC records in the event of litigation or a government investigation. Finally, an accused individual may have access to sexual misconduct allegations that become part of that individual's student record or personnel file, although in such cases the University will remove information identifying the complainant.

Parties and witnesses are expected to cooperate in the investigation of matters brought to the UWC. Parties and witnesses must provide truthful information in all phases of a UWC proceeding. Failure to provide truthful information or any attempt to impede the UWC process may result in a recommendation for a more severe penalty or a referral for discipline.

## 4. Retaliation

Yale policy strictly forbids retaliation against individuals who report sexual misconduct, file complaints of sexual misconduct, cooperate in the investigation of sexual misconduct, or hear formal or informal complaints of sexual misconduct. The UWC processes set out here are available to individuals who believe that they have suffered retaliation for any of these actions. The rules governing the UWC's authority as described in Sections 1 and 7 also apply to retaliation complaints.

## 5. Advisers

A party may be accompanied by an adviser at any stage of the UWC process. An adviser may be anyone of the party's choosing and offer personal and moral support, before, during, and after a hearing, and help the party prepare for meetings related to a complaint.  The adviser may not submit documents, either directly or indirectly, on a party's behalf at any stage of the process, nor speak for the party during an interview with a fact-finder or during a formal hearing.

A party must provide the adviser's name and contact information to the Secretary prior to meeting with the fact-finder.  A party must also inform the Secretary if a new adviser is selected.  The Secretary will send the adviser copies of UWC Documents unless the party requests otherwise. A party wishing to bring an attorney as an adviser must inform the Secretary at least four days in advance of any meeting that the adviser will attend.

## 6. Requests for Advice and the Resolution of Informal Complaints

An individual may ask questions about UWC procedures, request advice (including whether certain behavior constitutes sexual misconduct), or seek resolution of an informal complaint by contacting the UWC Chair or Secretary.[7] For the resolution of an informal complaint, the UWC Chair or Secretary will contact a Title IX Coordinator, who may offer an informal investigation, mediation, counseling, or other means of resolving the complaint (note that the University does not allow face-to-face mediation in cases alleging sexual violence). The Title IX Coordinator may also provide accommodations and interim measures that are responsive to the party's needs as appropriate and reasonably available.[8] In all cases, the UWC Chair or the Title IX Coordinator will inform the individual bringing the informal complaint that participation in an informal resolution is voluntary and that the individual may end the informal process at any time and choose to bring a formal complaint or choose not to further pursue the matter. In some cases (for example allegations of violence), the University may pursue an investigation of sexual misconduct, even if the complainant chooses not to pursue the matter further.

## 7. Formal Complaint Process

### 7.1. Filing of Complaint; Notice to the Respondent; Withdrawal

An individual may bring a formal complaint either without seeking an informal resolution or after attempting an informal resolution.  To initiate a formal complaint, an individual must submit a written statement to the UWC Chair[9] naming the respondent[10] and describing the events and circumstances underlying the complaint in sufficient detail to allow the UWC to determine jurisdiction and to provide general notice to the respondent.[11] The complaint may be supplemented by additional supporting documents or evidence. The UWC Chair, in consultation with the Secretary and one other UWC Member, will decide whether (i) the complainant and respondent meet the criteria set out in Section 1 above and (ii) the complaint, if substantiated, would constitute a violation of University policy concerning sexual misconduct.[12] The UWC will not hear formal complaints that do not meet these criteria. If a complaint is denied a hearing, the UWC Chair will explain the denial in writing to the individual who filed the complaint.

If, in the course of adjudicating a formal complaint, additional complaints or allegations are brought forward to the UWC that are associated with the circumstances of the original complaint, the UWC will incorporate the claims into the proceeding if feasible unless the UWC determines that a claim is retaliatory or without basis.  All such additional complaints must be raised before the fact-finding is concluded.  The UWC will not entertain a new complaint if it has already adjudicated a formal complaint based on the same set of circumstances.

Actions that are the source of complaints to the UWC may also violate criminal laws. The UWC will not delay its proceedings pending the outcome of a criminal investigation or other legal process. At the request of law enforcement authorities, the UWC may postpone fact-finding while the authorities are gathering evidence, but fact-finding will resume as soon as the authorities have finished that work.

If the complaint will be heard, the Secretary will inform the respondent in writing that a formal complaint has been filed and will be heard by the UWC.  The Secretary's letter will include the complaint, any documents accompanying the complaint, and references to the applicable Yale policy on sexual misconduct, these procedures, and any other relevant Yale procedures.  The letter will also set a deadline five days later by which the respondent may submit a written response to the Secretary. The response, like the complaint, may be supplemented by additional supporting documents or evidence. The Secretary will forward the response and any accompanying documents to the complainant.[13]

The Secretary will inform the respondent's dean (in the case of a student, or trainee), the dean and the provost (in the case of a faculty member), or the supervisor (in the case of a staff member) and the cognizant Title IX Coordinator(s) that a formal complaint has been filed. The Title IX Coordinator(s) with responsibility for the parties will coordinate appropriate interim measures, including measures to protect and support the complainant and other individuals as appropriate. University officials are expected to cooperate in implementing those recommendations.[14]

The complainant may, at any time before the day scheduled for the hearing, request in writing to the Secretary that the complaint be withdrawn. The UWC Chair, in consultation with the Secretary and one other member, will consider whether the request is fully voluntary and whether the interests of the Yale community would be better served by hearing the complaint. If the UWC Chair decides to hear a complaint despite a request for withdrawal, the complainant will not be required to participate in the hearing. The UWC Chair's decision whether to approve or deny the request is final.

## 7.2. Appointment of Hearing Panel

The UWC Chair will appoint a hearing panel of five UWC Members and will appoint one of these Members as the panel chair. The hearing panel will not include any Member who has participated in the resolution of an informal complaint arising out of the same events. The panel members and the decision maker (as defined in Section 7.5) will receive a copy of the complaint and response and must withdraw from the proceedings if their relationship to the complainant or the respondent or other circumstances lead them to believe that they cannot judge the matter fairly.

The Secretary will send a notice to the complainant and the respondent, providing the names of the panel members and the decision maker and informing them of their right to object to the participation of a panel member or decision maker. The objection must be in writing to the Secretary and received within two days of the date of the notice, and it must state the party's grounds for believing the panel member or decision maker is incapable of fairly judging the matter. The UWC Chair will decide whether an objection is justified, and that decision is final. If a successful objection to the participation of a decision maker is raised, the UWC Chair will ask the dean of a different Yale school or the person who would normally hear an appeal under Section 7.7 to serve instead. Parties will have an opportunity to object to any panel member or decision maker selected as a replacement.

## 7.3. Fact-Finder; Witnesses

Within seven days of receiving the complaint, the UWC Chair will appoint an impartial fact-finder to assist in the investigation of the allegations. The Secretary will provide the fact-finder with the complaint, the response, and any other information provided by the parties. The fact-finder will gather documents and conduct interviews as necessary to reach a thorough understanding of the facts and circumstances surrounding the allegations of the complaint.[15] The fact-finder will not consider information that is provided solely to attest to a party's character.

Within 21 days of being appointed, the fact-finder will present a written report to the Secretary. The report will describe the relevant facts and circumstances and may address the credibility of witnesses but will not reach conclusions as to whether those facts and circumstances constitute a violation of University policy. After reviewing the report, the UWC Chair may request clarifications and additional investigation. The Secretary will send a copy of the completed report to the parties and inform them of with the date and location of the hearing.

The complaint and response, all documents relating to the complaint and response, and the fact-finder's report will be provided to the hearing panel and to the parties. The hearing panel will not accept from the parties any written response to the fact-finder's report or any additional documents, except as explained in Section 7.4 below. If a party believes the panel should interview witnesses, the party must submit to the Secretary the names of the witnesses and the subject of their testimony at least four days before the hearing. Normally, the panel will call a witness other than the parties only if the witness can offer potentially relevant information that was not conveyed to the fact-finder. Witnesses may not appear for the sole purpose of testifying about a party's character.

## 7.4. Hearing

The hearing will take place no sooner than five days after the parties' receipt of the fact-finder's final report. Unless both parties ask to appear jointly, the complainant and the respondent will not appear jointly before the panel at any stage of the hearing. The party who is not before the panel will be in a private room with audio access to the proceedings.

The hearing is intended primarily to allow the panel to interview the complainant and the respondent with respect to the fact-finder's report. The panel chair will begin the hearing by explaining the substance of the complaint and the specific University policy or policies allegedly violated. The complainant and then the respondent may make a brief statement of no longer than 10 minutes to the panel, and they may provide a written copy of their statements to the panel at the hearing. The panel will provide a copy of any written statement it receives to the other party. Following these statements, the panel will interview the complainant and then the respondent. At its sole discretion, the panel may request the testimony of additional witnesses.[16] The parties and any witnesses will be questioned by the panel only, but each party will be given an opportunity to submit questions for the panel to ask the other party or witnesses. The panel, at its sole discretion, may choose which, if any, questions to ask.

The panel may examine and take into account reports and evidence collected by law enforcement bodies or other investigators. In determining culpability, the panel may also take into account a respondent's previous formal discipline for other acts of sexual misconduct, including written reprimands, and the respondent's criminal conviction arising out of the events complained of. The panel may not take into account as evidence of culpability previous accusations of other acts of sexual misconduct that did not result in formal discipline or the fact that a criminal investigation or prosecution is pending in relation to the events complained of.

## 7.5. Findings, Conclusions, and Recommendations

Following the hearing, the panel will consider whether the respondent has violated University policy, giving an affirmative answer if it is satisfied that a violation has been shown by a preponderance of the evidence. Based on evidence presented in the fact finder's report or elicited at the hearing, the panel may find violations of Yale policy in addition to the violation(s) charged. The panel will reach its conclusions by a majority vote and by secret ballot, with no abstentions allowed. If a party is found

to have violated University policy, the panel will recommend a penalty. The Secretary will inform the panel about the nature of previous penalties assessed for similar violations. The Secretary will also describe any formal Yale discipline previously imposed on the respondent, and the panel may consider this prior discipline in its recommendations regarding a penalty. The panel will again reach its recommendations by a majority vote and by secret ballot, with no abstentions allowed. The panel's recommendation may also include remedies other than or in addition to a penalty.[17]

Within 10 days of the final hearing session, the panel will complete a report, setting out its findings of fact, its conclusion as to whether or not those facts constitute a violation of University policy, and its recommended penalty, if any. The Secretary will forward the report to the relevant decision maker: (i) the provost if the respondent is a faculty member; (ii) the dean of the respondent's school if the respondent is a trainee or student; or (iii) the associate vice president for Human Resources if the respondent is a staff member.  The Secretary will furnish copies of the panel's findings of fact and conclusions to the complainant and the respondent.  Each party may submit to the Secretary a single written response to the panel's findings of fact and conclusions within three days of receiving it.  The Secretary will forward the written response to the decision maker and to the other party.[18] On the basis of the decision maker's own concerns or concerns raised in a response from a party, the decision maker may ask the panel to re-examine or clarify findings of fact. If necessary, the panel may submit a revised report. The decision maker will then accept the panel's findings of fact, but may accept, reject, or modify the panel's conclusions or recommendations, in whole or in part. The final decision whether to impose a penalty, and what penalty or penalties to impose, belongs to the relevant decision maker.  The decision maker may consult with the chair of the panel regarding the panel's conclusions and recommendations.  In addition, if the decision maker contemplates materially modifying or rejecting the panel's conclusions or recommendations, the decision maker shall meet with a majority of the panel members to discuss the proposed decision. The decision maker will render his or her decision in writing within seven days of receiving the panel's report.  The decision will set out the decision maker's conclusions and the penalties imposed, if any.  The complainant is entitled to know any penalty imposed if that penalty would affect them directly (for example, if the respondent is not permitted to approach the complainant or the respondent is suspended from the University).

The Secretary will send written notice of the decision and the penalties imposed, if any, to the parties, the members of the panel, the UWC Chair, and the University's Title IX Coordinator.

## 7.6. Penalties

Persons found to have violated the sexual misconduct policies of the University may receive penalties up to and including expulsion from the University or termination of University employment, as discussed in applicable faculty, trainee, student, and staff policies and regulations.

## 7.7. Appeals

Any party may appeal the decision of the decision maker. An appeal from the provost's decision regarding a faculty member is made to the president; an appeal from a dean's decision regarding a trainee or student is made to the provost; and an appeal from the associate vice president for human resources' decision regarding a staff member is made to the vice president for human resources and administration. The appeal must be in writing and received by the Secretary within five days of the decision. The only grounds for appeal are (i) procedural error that prevented the hearing panel or the decision maker from judging the matter fairly, or (ii) the discovery of facts that were not reasonably available to the appealing party prior to the UWC hearing and that support or refute the allegation of sexual misconduct.

The Secretary will provide a copy of the appeal to the other party. If the other party wishes to respond, that party must do so in writing to the Secretary within five days after receiving the appeal. Within 14 days after receiving the appeal, the president, provost, or vice president will provide a written appeal decision to the parties.  If the appeal is granted, the matter will be returned to the hearing panel for reconsideration.  In the decision, the president, provost, or vice president may give the hearing panel instructions regarding the nature and extent of its reconsideration. The hearing panel will act promptly to reconsider the matter and will issue a revised report to the decision maker. The decision maker will promptly issue a new decision, which is not subject to appeal. The decision maker may consult with the chair of the panel regarding the panel's revised report.  In addition, if the decision maker contemplates modifying or rejecting some or all of the panel's conclusions or recommendations, the decision maker shall meet with a majority of the members of the panel and the individual that granted the appeal (president, provost, or vice president) to discuss the proposed decision.  The decision maker will promptly issue a new decision, which is final.

## 7.8. Time Periods

For ease of reference, the following time periods generally apply to the review of a formal complaint. The UWC Chair may extend a time period for good cause such as illness, holidays, the absence of witnesses from campus, the complexity of the allegations, or competing demands on UWC Members or decision makers. The parties will be informed by the Secretary or UWC Chair if a time period is extended, and the UWC Chair's decision regarding extensions will be final.

| | |
|---|---|
| Respondent submits a response to the complaint | Within five days after delivery of complaint to respondent |
| Parties may object to panel members | Within two days after notice of panel members' names |
| UWC Chair appoints fact-finder | Within seven days after receipt of complaint |
| Fact-finder's report due | Within 21 days after fact-finder's appointment |
| Hearing date | No sooner than five days after parties' receipt  of  fact-finder's report |

| Requests for hearing panel to interview witnesses | Received by Secretary at least four days before the hearing |
|---|---|
| Notice regarding bringing legal counsel as adviser | Received by Secretary at least four days in advance of the meeting that the adviser will attend. |
| Panel submits report | To Secretary within 10 days of the hearing |
| Response to panel's findings of fact and conclusions | Within three days after receipt of the findings of fact and conclusions |
| Decision maker renders decision | Within seven days after receipt of panel report and any responses by the parties |
| Appeal by either party | Within five days after decision rendered |
| Response to an appeal | Within five days after opposing party's receipt of appeal |
| Decision on appeal | Within 14 days after receipt of appeal |

## 8. Recordkeeping

The Secretary keeps and retains records of UWC proceedings, storing them in a secure place. The Secretary will retain records of (i) all complaints received by the UWC; (ii) all actions taken by the UWC in response to informal complaints; (iii) all supplementary documents and evidence received by the UWC in relation to a formal complaint; (iv) all fact-finder reports; (v) minutes from each UWC hearing session[19]; (vi) the report of the hearing panel; (vii) the written notice provided to the complainant and the written notice provided to the respondent of the decision maker's decision; and (viii) appeals and decisions regarding appeals.

The Secretary will summarize each formal complaint of sexual misconduct that the UWC receives and the resolution of those complaints, and they will submit the summaries to the University Title IX Coordinator as soon as possible after each complaint is resolved. The summaries will contain sufficient information to allow the University Title IX Coordinator to assess Yale's compliance with the requirements of Title IX. Semiannually, the University Title IX Coordinator will publish a statistical abstract of the handling of sexual misconduct complaints at Yale, including any disciplinary actions taken. These abstracts will include no information that would reveal the identities of the parties.

*Last Updated: October 26, 2015*

[1] In these procedures, the term "faculty member" should be understood to include persons teaching at Yale, even if they are not formally members of the faculty.

[2] The term "staff member," as used in these procedures, includes all Yale employees except faculty members, members of a Yale collective bargaining unit, clerical and technical employees excluded from the bargaining units, casual or temporary employees, or student employees.

[3] Yale faculty members, trainees, students, or staff members who have been harmed by the sexual misconduct of a person not affiliated with Yale (for example, a visitor to campus or the employee of a Yale contractor) may contact a Title IX Coordinator.

[4] Others who wish to file a complaint against a staff member may contact a Title IX Coordinator, a union representative, a Human Resources Generalist, or the Office for Equal Opportunity Programs.

Students who do not wish to use the UWC procedures may instead contact a Title IX Coordinator, a Human Resources Generalist, or the Office for Equal Opportunity Programs. Once the UWC or the department of Human Resources agrees to hear a student's formal complaint against a staff member, the student may not move the complaint to another forum.

[5] Complaints of sexual misconduct against members of the collective bargaining units or excluded staff may be brought to a Title IX Coordinator, a union representative, a Human Resources Generalist, or the Office for Equal Opportunity Programs.

[6] Under federal law, a complainant alleging certain types of sex offenses has a right to be informed of the outcome of disciplinary proceedings arising from his or her complaint, and Yale may not impose non-disclosure requirements on the complainant in regard to that information.

[7] The names and e-mail addresses of the UWC Members can be found on the UWC website.

[8] Some examples of accommodations and interim measures include providing an escort for the complainant; ensuring that the parties have no contact with one another; providing counseling or medical services; providing academic support, such as tutoring; and arranging for the complainant to re-take a course or withdraw from a class without penalty, including ensuring that any changes do not adversely affect the complainant's academic record.

[9] Should the UWC Chair be unable to address a complaint because of a relationship to a party or other circumstances, the provost will appoint another member of the UWC to assume the Chair's role.

[10] A single complaint may involve more than one complainant and/or more than one respondent. The singular is used throughout these procedures for convenience only.

[11] The UWC Chair will determine whether the complaint provides sufficient detail or must be supplemented.

[12] For the purposes of this determination, when a Title IX Coordinator brings a complaint, the Coordinator will be considered the complainant.

[13] Complex complaints may combine allegations of sexual misconduct and other offenses, and the UWC may not be the only University body with authority to hear a complaint. In such cases, the UWC will retain jurisdiction over all charges of sexual misconduct, and other charges will be heard according to the circumstances of each complaint. In some cases, for example, the UWC may hear all charges, and, in other cases, a different decision-making body may decide the charges that do not relate to sexual misconduct. In cases involving multiple types of allegations, the UWC Chair will consult with the official responsible for the other relevant body and together they will determine the appropriate forum and the applicable standards of proof. If there is disagreement about the appropriate forum or manner in which to hear a complaint, the provost will make the final decision.

[14] See footnote 8 for examples of interim measures that may be taken.

[15] In complaints involving sexual violence, if the fact-finder or panel chooses to consider medical or laboratory evidence, that consideration should include a trained forensic examiner's written opinion or testimony. Neither the fact-finder nor the panel may review documents or hear testimony covered by a legal privilege (for example, psychiatric patient records and attorney-client communications).

[16] If a Title IX Coordinator has brought a complaint on behalf of a person who is not a current or former member of the Yale community, the panel must hear that person's testimony, if that person wishes to appear.

[17] See footnote 8 for examples of non-disciplinary remedies.

[18] Except for this response, neither the parties nor their representatives may communicate with a decision maker about a pending case, and the decision makers will not consider documents sent to them by third parties on behalf of the complainant or respondent.

[19] The minutes of a UWC hearing consist of a protocol annotated to indicate the time at which each phase of the process started and ended. The minutes do not record statements, testimony, or questions.

# EXHIBIT 3

Sexual Misconduct Scenarios
September 9, 2013

Yale University is committed to creating and maintaining a campus that is safe and respectful—
where sexual misconduct of any kind has no place.  Accordingly, any alleged violation of Yale's
sexual misconduct policy that is brought to the attention of the University will be pursued to the
extent possible and, if substantiated, disciplined effectively and appropriately (policy at
http://smr.yale.edu/definitions-sexual-misconduct-consent-and-harassment).

In order to provide general information about sexual misconduct at Yale and to engage the
community in frank and open discussion, the University publishes semi-annual reports of
complaints of sexual misconduct brought to the attention of the Title IX Coordinators, the
University-wide Committee on Sexual Misconduct (UWC), and the Yale Police Department. The
most recent semi-annual report has generated a number of thoughtful questions and concerns.
While we cannot answer those questions in the context of actual cases, we have attempted to
address many of them through a statement and Frequently Asked Questions (posted at
http://provost.yale.edu/title-ix/reports). The scenarios in this document are intended to provide
additional information and to encourage further discussion.

The majority of recent questions and concerns relate to Yale's use of the term "nonconsensual
sex" and the disciplines imposed when the UWC finds that nonconsensual sex has occurred.
Yale's definition of consent requires positive, unambiguous, voluntary agreement at every point
during a sexual encounter – the presence of an unequivocal "yes" (verbal or otherwise), not just
the absence of a "no." The category "nonconsensual sex" includes rape but is more expansive
than rape.  In disciplining the full range of nonconsensual sexual activity, not just those acts that
would meet a criminal standard, the UWC aims to uphold Yale's high community standards,
creating a campus that is safe for all.

The following scenarios have been developed to help illustrate a range of behaviors that Yale
and the UWC would characterize as "nonconsensual sex" – and thus, a violation of Yale's sexual
misconduct policy.  For comparison, the scenarios include examples of consensual sex. The
scenarios also provide examples of penalties–ranging from expulsion to reprimand–that might be
imposed as a result of a violation.

The scenarios are not drawn from actual cases heard by the UWC; the details of those cases are
held in the strictest confidence.  Rather, the scenarios draw upon the extensive research literature
on both consensual and nonconsensual sex on college campuses.  It is likely that these scenarios
reflect incidents on our campus too, but examples of this full range of circumstances have not yet
been heard in formal UWC cases.  The names chosen for the scenarios are gender neutral to
reflect the fact that sexual misconduct occurs in all gender configurations.

The scenarios are concise and do not capture the complexities that may emerge during the UWC
formal complaint process, which is designed to provide a fair and thorough review of each
complaint and thus includes independent fact finding, a formal hearing, and an appeal process
(procedures at http://provost.yale.edu/uwc).  Furthermore, the disciplinary outcomes described in
these scenarios presume that the UWC has determined that there is sufficient evidence (i.e., a

preponderance of the evidence) to conclude that the conduct occurred as presented in each scenario. The scenarios also presume that the UWC has determined each penalty based solely on the nature of the sexual misconduct found to have occurred. In an actual case, the penalty may be influenced by additional factors, such as the prior disciplinary record of the respondent and the wishes of the complainant.

Finally, the conduct described in some scenarios would be criminal and, as such, subject to criminal prosecution. The Title IX Coordinator reports all cases of possible sexual assault to the Yale Police Department (YPD), and the University fully supports all individuals who pursue their complaints with the YPD.

Yale is committed to addressing sexual violence and sexual misconduct, to increasing awareness of sexual misconduct on our campus, and to engaging the community in creating a culture of respect and responsibility. We hope these scenarios are informative, and that they generate productive discussion and suggestions.

*Note: the descriptions in some of the scenarios below may be disturbing to some readers.*

**The discipline imposed in each scenario presumes that the facts described below have been substantiated in the UWC fact finding and hearing processes.**

1.  Ryo and Casey are dating. Casey is uncertain about whether they should have sex, but Ryo is persuasive and finally obtains Casey's voluntary agreement. As they engage in sex, Casey says "wait – stop – that hurts." Ryo nonetheless continues for several more minutes, restraining Casey. Afterwards, Casey is upset. Ryo apologizes, but says they were past the point of interruption.

    *While there was initial consent, that consent was withdrawn. The UWC penalty would be expulsion.*

2.  Jessie and Vic have been flirting all semester, and agree to meet at a party. After dancing closely together for a while, Vic proposes going to one of their rooms and Jessie agrees. On the walk to Jessie's room, they send a few texts, letting Vic's friends know not to worry and asking Jessie's roommate to please sleep somewhere else. Once in the room, they begin touching. Each is interested in hearing what the other wants, and each is paying attention to the other's signals. They reach and sustain clear agreement upon mutually desired sexual activities.

    *This is consensual sex: Vic and Jessie reached positive, voluntary, unambiguous agreement to engage in sexual conduct together.*

3.  Sidney and Harper are dating.  On several occasions they are physically intimate, but within limits set by Sidney, who is opposed to having sex at this stage of their relationship.  One night, when they are being intimate within their mutually agreed upon boundaries, Harper begins to cross them.  Sidney expresses concern, but Harper is encouraging, saying "it will be okay just this once."  Sidney replies "we shouldn't do this," but continues to touch Harper in an intimate way.  As Harper initiates sex, Sidney says "this is a bad idea" and begins to cry, but embraces Harper and the two proceed to have sex.

    *Initial consent was followed by ambiguity.  Sidney's acquiescence to sex was accompanied by too much dismay to constitute unambiguous agreement, especially given Sidney's longstanding prior refusal to engage in sex.  The UWC penalty would likely fall in the range of probation to suspension.*

4.  Jamie and Cameron are at a party.  It is crowded on the dance floor and they are briefly pressed together.  Later, Jamie encounters Cameron in the hallway and smiles.  Cameron, who is now very drunk, follows Jamie into the bathroom and forces Jamie to have sex.

    *There was no consent to have sex.  The UWC penalty would be expulsion.*

5.  Devin and Ansley are engaging in a consensual sexual encounter, which Devin begins to intensify.  Ansley responds by pulling away slightly, moving Devin's hands and saying "not so fast; I'm not sure."  Devin cooperates briefly but then intensifies the contact once more.  Ansley inches backwards and then becomes still.  Nonetheless, Devin has sex with Ansley.

    *While the initial sexual activity was consensual, that consent was not sustained.  The UWC penalty would likely range from multi-semester suspension to expulsion.*

6.  Alexis and Riley are studying together in Riley's room.  During a break in their studying, they rub each other's shoulders.  Alexis then introduces some intimate touching.  Riley moves closer and says "Okay, but I don't want to go too far – we still have a lot of work to do."  Alexis continues to touch Riley in an intimate way.  Riley willingly agrees to some contact, but mostly sets boundaries.  Alexis jokes that they deserve to have sex as a reward for their hard work studying; Riley laughs.  After their studying is done, Alexis suggests again that they should have sex.  Riley responds they should probably get some sleep but continues to touch Alexis.  After a few more minutes, Alexis asks once more.  Riley pauses, then says okay and pulls Alexis closer.  They have sex.

    *This is consensual sex. Despite initial hesitation, the ultimate agreement to have sex was voluntary and unambiguous. There is no violation of the sexual misconduct policy. The UWC would likely counsel Alexis about the inappropriateness of sexual pressure, and recommend SHARE's sensitivity training program.*

7. Morgan and Kai are friends who begin dancing and kissing at a party. They are both drunk, although not to the point of incapacitation. Together they decide to go to Kai's room. They undress each other and begin touching each other. Morgan moves as if to engage in oral sex and looks up at Kai questioningly. Kai nods in agreement and Morgan proceeds. Subsequently, without pausing to check for further agreement, Kai begins to perform oral sex on Morgan. Morgan lies still for a few minutes, then moves away, saying it is late and they should sleep.

   *There was initial agreement, but the bounds of that agreement were not clear. Kai may have thought that Morgan had consented to reciprocal oral sex, but took no steps to obtain unambiguous agreement. The UWC penalty would likely be a reprimand.*

8. Tyler and Jordan are both drinking heavily at an off-campus event. Tyler becomes extremely drunk. Jordan offers to take Tyler home. On the way, Tyler has trouble walking, and makes several wrong turns. Once in Tyler's room, Jordan initiates sexual activity. Tyler looks confused and tries to go to sleep. Jordan has sex with Tyler.

   *There was no consent to have sex. A person who is incapacitated—lacking the ability to make or act on considered decisions to engage in sexual activity—cannot give consent. The UWC penalty would be expulsion.*

4

# EXHIBIT 4

# Reporting Sexual Misconduct to a Title IX Coordinator

People are often curious about how a Title IX Coordinator can help someone who has experienced sexual misconduct. The specific actions and options vary from case to case, but the basic goals remain the same: coordinators seek to address any immediate concerns, connect complainants with appropriate resources, ensure that they are fully aware of the options available for further action, and help facilitate those actions. Except in rare cases involving an acute threat to community safety, coordinators defer to complainants' wishes. Information shared with coordinators is kept confidentially within the Title IX Office.[*]

### How do people reach a coordinator?

The names and contact information for all the Title IX Coordinators are posted online. Anyone can call or email any coordinator with concerns—no matter how big or small—about a specific incident or campus sexual climate in general. Sometimes, information comes to coordinators from friends, colleagues, or witnesses. In those cases, coordinators reach out to potential complainants, who can choose whether or not they want to engage in further discussion with the coordinator. Coordinators are also able to suggest resources to support and advise respondents.

### What happens during that first conversation?

Coordinators usually meet with people in person, but sometimes conversations happen by phone or email. Initially, coordinators focus on complainants' immediate concerns, especially safety, emotional well-being, and professional or academic requirements. Complainants do not need to describe their experiences in detail; they may choose to do so, but it is not necessary. Often, there are steps that can be taken—connecting someone with SHARE, shifting a class assignment, establishing a no-contact agreement, etc.— that can have immediate positive impact. Coordinators describe the full range of options and resources available for pursuing informal, formal, and criminal complaints, so that complainants can make a well-informed decision about next steps. Coordinators work closely with the SHARE Center, the University-Wide Committee on Sexual Misconduct (UWC), Human Resources, and the Yale Police Department, and can coordinate efforts among them to respond to complainants' needs and decisions.

### *What steps can coordinators take to address concerns?*

Coordinators can put various measures in place to address complainants' safety concerns, mitigate the impact of sexual misconduct, and address a potentially hostile climate. Many of these steps can be taken even if someone does not choose to pursue a complaint. For example, coordinators may be able to change on-campus housing or work locations, arrange for extra time to complete academic or work assignments, provide security escorts, or arrange for counseling as appropriate. Coordinators can also implement an order requiring the complainant and respondent to refrain from direct contact. Respondents may also agree to other steps, such as having their own housing, work, or class-room locations changed, avoiding specific areas of campus, etc. Alongside these individually-focused measures, other steps may be taken to address climate concerns such as sexual harassment training for departments or groups.

---

[*] The Title IX Office does share anonymized information with the community through our regular reports, taking care to protect individual confidentiality. In situations where there is an ongoing threat, identifying information may be shared with law enforcement, medical professionals, or other internal University colleagues in order to better protect individual and community safety.

**What happens if a complainant decides to pursue a complaint with a
Title IX Coordinator?**

The Title IX Coordinator complaint process (often called "informal") is focused on
remedies: finding ways to address complainants' concerns and, if necessary, poten-
tially hostile climate issues to the extent possible without involving a formal hearing
process. If a complainant wishes to move forward with the Title IX Coordinator
complaint process, the coordinator may speak to the respondent and possibly other
witnesses and review evidence. Except in cases of acute threat, coordinators will not
take any action that could compromise a complainant's confidentiality without the
complainant's agreement.

Complainants frequently ask a coordinator to talk to respondents about the behavior in
question and its impacts. These conversations give a coordinator an opportunity to review
University policy with a respondent, inform a respondent how their behavior has been
perceived, and establish measures (as described above) to help complainants continue their
professional and educational activities. A respondent may also be offered more intensive
one-on-one training. The level of confidentiality requested by the complainant may limit
options for remedies and therefore the effectiveness of the response.

A coordinator will not directly impose discipline but may work with supervisors or help
to initiate formal processes that may produce disciplinary outcomes. Complainants are
also free to file a formal complaint at any point, and coordinators can facilitate that process.

**How do coordinators help with formal complaints?**

While formal complaints of sexual misconduct are adjudicated by the UWC, the
coordinators play supporting roles. For each formal complaint, the UWC will identify
a coordinator to implement interim measures while the complaint process takes place
and continuing measures as appropriate after the process concludes. In certain circum-
stances, coordinators can themselves bring a formal complaint to the UWC, e.g., on
behalf of a person who is not a current or former member of the Yale community or to
protect the safety of the community or individuals.

**What else do coordinators do?**

In addition to responding to and addressing specific complaints, coordinators track
and monitor incidents to identify patterns or systemic issues, coordinate the available
resources and support processes, deliver prevention and educational programming to
the University community, and conduct periodic assessments of the campus climate
and, when indicated, focused climate assessments of specific departments or units.

# EXHIBIT 5

Yale University

# Office of the Provost

HOME  >  TITLE IX  >  UNIVERSITY-WIDE COMMITTEE ON SEXUAL MISCONDUCT  >  STATEMENT ON CONFIDENTIALITY OF UWC PROCEEDINGS

# Statement on Confidentiality of UWC Proceedings

All members of the University community who are involved in a matter before the UWC should understand their obligations regarding the confidentiality of UWC proceedings and documents.

The UWC's procedures state that "all members of the Yale community who are involved in a matter before the UWC are expected to maintain the confidentiality of its proceedings and the information obtained for those proceedings." The purpose of confidentiality is to encourage parties and witnesses to participate in UWC proceedings and share all the pertinent information they have to offer, which is essential to reaching a fair outcome. If parties or witnesses fear that their participation or testimony in a UWC proceeding could be revealed, then concerns about reputation, social tension, or retaliation may cause them to keep silent. Every member of the University community should recognize that breaches of confidentiality hurt the participants and have the potential to erode respect for the UWC process.

The UWC's procedures allow parties to select an adviser with whom they can discuss all aspects of the proceedings, and the University understands that parties will seek support and advice from their families. We expect, however, that parties will impress on their advisers and families the importance of maintaining strict confidentiality. Of course, persons involved in a difficult situation will also seek support from friends, but participants in UWC proceedings are expected to do so without revealing details of the proceedings or information they have obtained as a result of the proceedings.

The UWC's procedures impose strict and unequivocal confidentiality obligations regarding documents prepared by, prepared for, or received from the UWC in connection with a UWC proceeding ("UWC Documents"). Parties may not disclose UWC Documents to anyone other than their UWC advisers, family members, and attorneys, and parties must inform these recipients that the UWC Documents are strictly confidential and may not be further disclosed. The University may take disciplinary action against any member of the Yale community who discloses UWC Documents in violation of UWC

procedures or who is responsible for the improper disclosure of such documents by others. In addition, whether or not a UWC Document has been disclosed, disciplinary action may be taken against a member of the Yale community who breaches confidentiality in order to retaliate against a person for his or her participation in a UWC proceeding as a complainant, respondent, or witness.

Finally, breaching the expectation of confidentiality may have legal implications. The circumstances surrounding allegations of sexual misconduct are often sharply disputed and have the potential to affect the reputations of the persons involved. The University believes that statements made in good faith as part of UWC proceedings are legally protected. Statements made outside of UWC proceedings may lack that protection and could lead to a legal claim against the person who makes them.

If you have any questions regarding your responsibility to preserve the confidentiality of UWC proceedings, please contact UWC Chair David Post at david.post@yale.edu (mailto:david.post@yale.edu) or Secretary Aley Menon at aley.menon@yale.edu (mailto:aley.menon@yale.edu) .

*Last updated: May 8, 2015*

## UWC Contact Info

**Aley Menon**

Secretary, University-Wide Committee on Sexual Misconduct

203-432-4441

aley.menon@yale.edu (mailto:aley.menon@yale.edu)

**Anita Sharif-Hyder**

Associate Secretary, University-Wide Committee on Sexual Misconduct

203-432-8798

anita.sharif-hyder@yale.edu (mailto:anita.sharif-hyder@yale.edu)

**Lani Danilowitz**

Project Coordinator, University-Wide Committee on Sexual Misconduct

203-432-4449

lani.danilowitz@yale.edu (mailto:lani.danilowitz@yale.edu)

# Yale

Copyright © 2016 Yale University · All rights reserved ·
Office of the Provost | P.O. Box 208333, New Haven, CT 06520-8365 | Contact Us

# EXHIBIT 6

# Yale University

*Report of Complaints of Sexual Misconduct*
*Brought forward from January 1, 2015 through June 30, 2015*

## Contents

Introduction ............................................................................................................... 2

Guide to This Report ................................................................................................. 3

Statistical Summary of Complaints ........................................................................ 4

Descriptive Summaries of Complaints .................................................................. 6

    University-Wide Committee on Sexual Misconduct: Formal Complaints ................... 6

    University-Wide Committee on Sexual Misconduct: Informal Complaints ................ 8

    Title IX Coordinators ............................................................................................... 9

    Yale Police Department ............................................................................................ 13

Brief Definitions ....................................................................................................... 15

Terminology Commonly Used in this Report .................................................... 16

# Introduction

Yale University is committed–above all else–to providing a safe, respectful, and supportive environment, where everyone can thrive and where sexual misconduct has no place. One of the many steps the University has taken to realize that commitment is the semi-annual publication of reports to inform the Yale community of complaints of sexual misconduct that have come to the University's attention and the actions that have been taken to address them.

This report– the eighth that we have published since 2012– presents summary information about 56 complaints of sexual misconduct that were brought to the University's attention between January 1, 2015 and June 30, 2015. It also provides updates on eight complaints that were first presented in previous reporting periods. The "Guide to This Report," which follows this introduction, contains additional information about the format and composition of the report, as well as links to general information about Yale's policies, definitions, and procedures relating to sexual misconduct.

Behind the summaries and statistics in this report lie the very real, and often very painful, experiences of members of our own community. We therefore make every effort to protect the privacy of those individuals. As a result, while we strive to make the report as informative as possible, it can offer only a limited view of the complex circumstances that underlie specific complaints and the multitude of factors that lead to decisions about discipline and other responsive actions.

Although necessarily constrained in the detail they provide, the semi-annual reports have been quite successful in generating broad discussion about Yale's programs and procedures to address sexual misconduct, including the reports themselves. Over the past months, for example, our Title IX student advisory boards, as well as faculty advisors, requested that we eliminate gender references in complaint summaries in order to strengthen confidentiality for the individuals involved. As you will see, the current report includes gender-neutral summaries and presents the gender of complainants and respondents only in aggregate, statistical form.

As I have noted in the past, the semi-annual reports capture information only about those incidents about which complaints have been brought forward; accordingly, these reports tell us very little about overall incidence rates. Last spring, Yale partnered with 26 peer institutions and the Association of American Universities to gather some of that missing information through the Campus Sexual Climate Survey, which was offered to all students. We look forward to sharing the Survey findings with the Yale community when they become available later this fall and hope that they will stimulate campus-wide discussion and lead to further improvements in our programs.

It is impossible to overstate the value of the community's input and engagement in shaping our initiatives to address and prevent sexual misconduct and assuring that Yale is a safe and respectful place to study, live and work. I hope that you will continue to share your observations, questions and suggestions about the report and any of our programs. You may contact me at titleix@yale.edu or schedule a call or meeting by contacting my office at 203-432-4446.

Stephanie S. Spangler

August 4, 2015

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

# Guide to This Report

This report includes both statistical and descriptive summaries of the complaints brought forward within this reporting period (January 1 – June 30, 2015) and are organized according to the office or committee that addressed the complaint most recently and/or definitively: the University-Wide Committee on Sexual Misconduct (UWC), the Title IX Coordinators, and the Yale Police Department (YPD).

The statistical summaries present the complaints by the category of the misconduct, then by complainant and respondent, and lastly by the venue through which the complaint was primarily addressed. Throughout the narrative portion of the report you will find cases that engaged more than one of these venues, evidence of the close coordination of the UWC, the Title IX Coordinators, and the YPD in working with complainants to find the venues that will best meet their needs.

While intended to be broadly informative, the report does have limitations. Because of privacy obligations, the report cannot fully convey the variety and complexity of circumstances associated with cases that may appear similar in the brief narrative descriptions. Likewise, the report assigns complaints to general categories such as "sexual assault" and "sexual harassment" that encompass broad ranges of behavior. We have embedded links to key definitions and terminology in the report (which also appear at the end of this report), so that readers can understand what behaviors may be included in any category. We also include links to Frequently Asked Questions and to hypothetical case scenarios, which illustrate Yale's definition of consent. Readers can find comprehensive information about Yale's policies, definitions and procedures in the guide "Preventing and Responding to Sexual Misconduct: Building a Climate of Safety and Respect at Yale."

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

*Report of Complaints of Sexual Misconduct, January 1, 2015 – June 30, 2015*

# Statistical Summary of Complaints[i]

The statistics below include all complaints of sexual misconduct brought forward within this reporting period (January 1 – June 30, 2015), regardless of when the alleged events occurred.  To avoid duplication, the tables below do not include complaints presented as updates in this report since these complaints were already included in the statistical summaries of previous reports.  The complaints of sexual misconduct are sorted in broad categories (e.g., sexual assault, intimate partner violence, sexual harassment) based on the complainant's allegations.  Complaints involving more than one allegation of sexual misconduct are listed only once.  The complainant is the person who reported having experienced misconduct, or (in the case of third-party complaints) the person who is reported to have experienced it.  The respondent is the person (or persons) alleged to have committed the misconduct.

Table 1. Sexual Misconduct Complaints by Complainant Affiliation

| | | Complainant Affiliation | | | | | | | | Total |
| | | Undergrad | G&P | Staff | Postdoc | Faculty | Other Yale Affiliate | Non-Yale | Unknown | |
|---|---|---|---|---|---|---|---|---|---|---|
| Category of Sexual Misconduct Reported | Sexual Assault | 6 | 3 | 1 | 0 | 0 | 0 | 3 | 0 | 13 |
| | Intimate Partner Violence | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| | Sexual Harassment | 8 | 9 | 4 | 1 | 0 | 0 | 2 | 0 | 24 |
| | Stalking | 2 | 5 | 1 | 0 | 0 | 0 | 1 | 0 | 9 |
| | Other | 5 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| | Total | 22 | 20 | 7 | 1 | 0 | 0 | 6 | 0 | 56 |

Table 2. Sexual Misconduct Complaints by Respondent Affiliation

| | | Respondent Affiliation | | | | | | | | Total |
| | | Undergrad | G&P | Staff | Postdoc | Faculty | Other Yale Affiliate | Non-Yale | Unknown | |
|---|---|---|---|---|---|---|---|---|---|---|
| Category of Sexual Misconduct Reported | Sexual Assault | 7 | 3 | 1 | 0 | 0 | 1 | 1 | 0 | 13 |
| | Intimate Partner Violence | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 |
| | Sexual Harassment | 4 | 3 | 5 | 0 | 3 | 2 | 3 | 4 | 24 |
| | Stalking | 2 | 3 | 0 | 0 | 0 | 0 | 2 | 2 | 9 |
| | Other | 2 | 2 | 0 | 0 | 1 | 0 | 2 | 1 | 8 |
| | Total | 15 | 11 | 6 | 0 | 4 | 3 | 10 | 7 | 56 |

---

[i] The sexual assault data in this report will not correspond to Yale's annual report required under the federal Clery Act because this report uses a more expansive definition of sexual assault and includes cases from a wider geographic jurisdiction than in the Clery report.

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

Table 3. Sexual Misconduct Complaints by Gender Configuration

| | | Complainant Gender | | | | | Total |
|---|---|---|---|---|---|---|---|
| | | Female | Male | Other Gender Identity | Multiple Mixed Gender Complainants | Gender Not Known | |
| **Respondent Gender** | Female | 1 | 6 | 0 | 0 | 0 | **7** |
| | Male | 37 | 3 | 0 | 0 | 3 | **43** |
| | Other Gender Identity | 0 | 0 | 0 | 0 | 0 | **0** |
| | Multiple Mixed Gender Respondents | 0 | 0 | 0 | 0 | 0 | **0** |
| | Gender Not Known | 2 | 0 | 0 | 1 | 3 | **6** |
| | **Total** | **40** | **9** | **0** | **1** | **6** | **56** |

Table 4. Sexual Misconduct Complaints by Venue

| | | Venue (Office or Committee that Addressed the Complaint) | | | | Total |
|---|---|---|---|---|---|---|
| | | UWC - Formal | UWC - Informal | Title IX Coordinator | YPD | |
| **Category of Sexual Misconduct Reported** | Sexual Assault | 3 | 0 | 7 | 3 | **13** |
| | Intimate Partner Violence | 0 | 0 | 0 | 2 | **2** |
| | Sexual Harassment | 1 | 0 | 17 | 6 | **24** |
| | Stalking | 0 | 0 | 3 | 6 | **9** |
| | Other | 3 | 0 | 2 | 3 | **8** |
| | **Total** | **7** | **0** | **29** | **20** | **56** |

In providing a range of options—including informal options—for pursuing complaints, the University seeks to meet the varied needs of potential complainants.   Given the violating nature of sexual misconduct, it is important that those who have experienced it retain as much control as possible over the actions taken in response.  Accordingly, whenever possible, it is the potential complainant who decides whether or not to pursue a complaint, and in what venue.  In certain unusual circumstances, such as those involving risks of the safety of individuals and/or the community, the University will bring matters to a formal hearing independently of the wishes of an individual complainant.  The choice of an informal process does not imply the matter is less serious than those matters pursued through formal processes, nor does it preclude the complainant from choosing to bring a formal complaint at a later date.

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

*Report of Complaints of Sexual Misconduct, January 1, 2015 – June 30, 2015*

# Descriptive Summaries of Complaints

The descriptive summaries of complaints are organized in tables below according to the office or committee that reviewed and addressed the complaints, i.e., the University-Wide Committee on Sexual Misconduct  (UWC), the Title IX Coordinators, and the Yale Police Department (YPD).

Although a complaint may be brought to multiple venues, each complaint is described only once in this report, based on where the majority of the actions taken occurred.   The UWC, Title IX Coordinators and YPD routinely collaborate and coordinate their activities to ensure that complaints are resolved promptly and equitably.  All reports of sexual misconduct brought to the YPD, for example, are reviewed by the University Title IX Coordinator; similarly, all reports of possible criminal activity brought to the Title IX Coordinators (including those reported via the UWC) are shared with the YPD.

## *University-Wide Committee on Sexual Misconduct: Formal Complaints*

The following complaints were pursued through formal resolution with the UWC. In every case, the complainant was provided information about all options for pursuing complaints – including formal, informal, and criminal complaints – as well as information about support resources such as the Sexual Harassment and Assault Response & Education Center (SHARE).  See the UWC Procedures for more information.

| | | | |
|---|---|---|---|
| *During this reporting period (January 1 – June 30, 2015), there were 7 new formal complaints brought forward to the UWC, which are reported in this table.   In addition, below are updates to cases that were reported as pending in a previous report and have been completed.* | | | |
| **Complainant** | **Respondent** | **Category of Misconduct Reported** | **Description/Actions Taken** |
| Yale College Student | Yale College Student | Sexual assault | A YC student alleged that another YC student engaged in sexual harassment and sexual touching without consent.  The complaint was withdrawn. |
| Yale College Student | Yale College Student | Other | A Title IX Coordinator alleged that a YC student engaged in voyeurism, and threatened and attempted to coerce a YC student to refrain from pursuing a complaint.  The UWC found sufficient evidence to support the allegations of voyeurism and coercion.  The respondent was expelled. |
| Yale College Student | Yale College Student | Other | Following adjudication of a complaint, the respondent alleged that the complainant made false claims in filing the complaint. The UWC found no factual basis for the respondent's complaint and therefore did not accept jurisdiction. |
| Yale College Student | Yale College Student | Sexual assault | A YC student alleged that another YC student engaged in sexual harassment and sexual penetration without consent.  The UWC found sufficient evidence to support the allegation of nonconsensual sexual activity and sexual harassment.  The respondent was placed on probation and received a written reprimand. |

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

*Report of Complaints of Sexual Misconduct, January 1, 2015 – June 30, 2015*

| Yale College Student | Yale College Student | Sexual assault | A Title IX Coordinator alleged that a YC student engaged in sexual penetration with another YC student without consent. The case is pending. No-contact restrictions were imposed as an interim measure. |
| Graduate & Professional Student | Graduate & Professional Student | Sexual harassment | A G&P student alleged that another G&P student sexually harassed and physically assaulted the complainant. The case is pending. No-contact restrictions were imposed as an interim measure. |
| Graduate & Professional Student | Graduate & Professional Student | Other | A G&P student alleged that another G&P student physically assaulted the complainant. The case is pending. No-contact restrictions were imposed as an interim measure. |

*Updates to previous complaints: The complaints below were reported as pending in a previous report as complaints brought to a Title IX Coordinator or the UWC. They were included in the statistical summaries in the previous report and are therefore not included in the statistical summaries at the beginning of this report.*

| Complainant | Respondent | Category of Misconduct Reported | Description/Actions Taken |
| --- | --- | --- | --- |
| Yale College Student | Yale College Student | Sexual assault | *Original summary:* A Title IX Coordinator brought a formal complaint alleging that a YC student engaged in sexual touching without consent.<br><br>*Update:* The UWC did not find sufficient evidence to support the allegation. No-contact restrictions, which were imposed as an interim measure during the proceedings, were continued. |
| Yale College Student | Yale College Student | Sexual assault | *Original summary:* A YC student reported that another YC student made unwanted advances. The Title IX Coordinator counseled the respondent on appropriate conduct and restricted the respondent from contacting the complainant.<br><br>*Update:* The YC student brought a formal complaint to the UWC alleging that the respondent engaged in sexual activity without consent, violated a voluntary no-contact arrangement and breached the expectation of confidentiality of UWC proceedings. The UWC found sufficient evidence to support the allegation of nonconsensual sexual activity. The respondent was reprimanded, was restricted from participating in certain campus activities, and was referred for training on sexual consent. No-contact restrictions were continued. |
| Yale College Student | Yale College Student | Sexual assault | *Original summary:* A YC student alleged that another YC student engaged in sexual activity without consent.<br><br>*Update:* This complaint was brought by the respondent following the adjudication of the original complaint. The UWC found no factual basis for the respondent's complaint and therefore did not accept jurisdiction. |

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

| Graduate & Professional Student | Graduate & Professional Student | Sexual assault | *Original summary:* A G&P student alleged that another G&P student engaged in sexual penetration without consent. The complainant is considering filing a complaint with the UWC.

*Update:* A Title IX Coordinator brought a formal complaint alleging that the respondent engaged in sexual penetration without consent. The UWC found sufficient evidence to support the allegation. The respondent was suspended for six months until January 1, 2016 and was referred for training on sexual consent. |
|---|---|---|---|
| Postdoctoral Trainee | Faculty | Sexual harassment | *Original summary:* A postdoctoral appointee reported that a faculty member threatened retaliation if the postdoctoral appointee brought a complaint forward.

*Update:* The complainant brought a formal complaint with additional allegations of a violation of the Policy on Teacher-Student Consensual Relations and sexual harassment. The UWC found sufficient evidence to support the allegation of a violation of the Policy on Teacher-Student Consensual Relations. The respondent was suspended from the faculty for one year, suspended from any leadership positions for five years and was required to complete counseling on mentoring and managing conflicts of interest. |

## *University-Wide Committee on Sexual Misconduct: Informal Complaints*

The following complaints were pursued through informal resolution with the UWC. In every case, the complainant was provided information about all options for pursuing complaints – including formal, informal, and criminal complaints – as well as information about support resources such as the Sexual Harassment and Assault Response & Education Center (SHARE). In cases where a complainant elects to pursue an informal resolution, the UWC may offer an informal investigation, counseling, or other means of resolving the complaint. The UWC may also recommend and assist in implementing interim measures and/or ongoing accommodations to support and protect the complainant. In resolving complaints, the UWC strives to comply with the complainant's wishes for resolution while ensuring that the University provides a safe and nondiscriminatory environment for all members of the Yale community. See the UWC Procedures for more information.

| During this reporting period (January 1 – June 30, 2015), there were **0** informal resolutions pursued through the UWC. | | | |
|---|---|---|---|
| **Complainant** | **Respondent** | **Category of Misconduct Reported** | **Description/Actions Taken** |
| | | | |

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

8

*Report of Complaints of Sexual Misconduct, January 1, 2015 – June 30, 2015*

## Title IX Coordinators

The following are cases in which the complainant chose to pursue resolution with either the University Title IX Coordinator or a Deputy Title IX Coordinator (any of whom are referred to here as "Title IX Coordinator"). In every case, the complainant is provided information about all options for pursuing complaints – including formal, informal, and criminal complaints – as well as information about support resources such as the Sexual Harassment and Assault Response & Education Center (SHARE). The Title IX Coordinators do not conduct formal hearings. However, they investigate complaints to the degree possible and work with the complainant, the respondent, and, where appropriate, the respondent's supervisor to achieve a resolution of the complaint, which may include sanctions for the respondent and remedies and ongoing accommodations for the complainant. They may also put in place measures to support and protect the complainant. In making their determinations and recommendations, the Title IX Coordinators strive to comply with the complainant's wishes for resolution while ensuring that the University provides a safe and nondiscriminatory environment for all members of the Yale community. See the Title IX website for more information.

*During this reporting period (January 1 – June 30, 2015), there were 29 cases pursued through the Title IX Coordinators. In addition, 3 complaints, which reported as pending in a previous report, are included below as updates.*

| Complainant | Respondent | Category of Misconduct Reported | Description/Actions Taken |
|---|---|---|---|
| Yale College Student | Yale College Student | Stalking | A YC student reported that another YC student with whom the complainant previously had a relationship had accessed the complainant's electronic information on multiple occasions without consent. The complainant declined to pursue the complaint at this time. After consulting with the complainant, the Title IX Coordinator counseled the respondent on appropriate conduct and imposed no-contact restrictions. The complainant was provided with IT security assistance. |
| Yale College Student | Yale College Student | Sexual assault | A YC student reported that another YC student engaged in sexual touching without consent. The Title IX Coordinator could not substantiate the allegations. |
| Yale College Student | Yale College Students | Sexual harassment | A YC student reported that YC students whom the complainant did not identify made inappropriate comments to the complainant. The complainant declined to pursue the complaint at this time. The Title IX Coordinator did not have sufficient information to investigate. |
| Yale College Student | Yale College Student | Sexual assault | A YC student reported that several YC students, many of whom could not identify, engaged in sexual touching without consent. The complainant declined to pursue the complaint at this time. After consulting with the complainant, the Title IX Coordinator counseled the one identified respondent on appropriate conduct and referred the respondent for training on sexual consent. |
| Yale College Student | Yale College Student | Sexual harassment | A YC student reported that another YC student made unwanted advances. The complainant declined to pursue the complaint at this time. After consulting with the complainant, the Title IX Coordinator counseled the respondent on appropriate conduct and referred the respondent for training on sexual consent. |

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

*Report of Complaints of Sexual Misconduct, January 1, 2015 – June 30, 2015*

| | | | |
|---|---|---|---|
| Yale College Student | Yale College Student | Stalking | A YC student reported that another YC student with whom the complainant previously had a relationship followed the complainant and sent unwanted messages on a number of occasions. The Title IX Coordinator counseled the respondent on appropriate conduct and imposed no-contact restrictions. |
| Yale College Student | Yale College Student | Sexual harassment | An administrator informed a Title IX Coordinator that an unidentified YC student reported that an unidentified YC student made unwanted advances toward other YC students. The Title IX Coordinator did not have sufficient information to investigate. |
| Yale College Student | Graduate & Professional Student | Sexual harassment | A YC student reported that a G&P teaching assistant made inappropriate comments of a personal nature to YC students in the classroom. The Title IX Coordinator counseled the respondent on appropriate conduct. The respondent resigned the teaching position. |
| Yale College Student | Graduate & Professional Student | Sexual harassment | A YC student reported that a G&P student made unwanted advances. The complainant declined to pursue the complaint and asked that no further action be taken. |
| Yale College Student | Graduate & Professional Student | Other | An administrator informed a Title IX Coordinator about a rumor that a G&P student engaged in personal relationships with undergraduate students in violation of the Policy on Teacher-Student Consensual Relations. The Title IX Coordinator could not substantiate the allegations. The Title IX Coordinator counseled the respondent on the University's sexual misconduct policies and referred the matter to the respondent's supervisor for additional oversight. |
| Yale College Student | Staff | Sexual harassment | An administrator informed a Title IX Coordinator that a YC student whom the administrator would not identify received unwanted attention from a staff member. The Title IX Coordinator investigated and found sufficient evidence to support the allegations. The respondent received training on sexual harassment and appropriate workplace conduct. |
| Yale College Student | Unknown | Sexual harassment | An administrator informed a Title IX Coordinator that a G&P student reported that a YC student was sexually harassed at a study abroad program by an unknown individual. The Title IX Coordinator could not substantiate the allegations. The Title IX Coordinator provided additional training to the relevant staff. |
| Graduate & Professional Student | Graduate & Professional Student | Sexual assault | A G&P student reported that another G&P student engaged in sexual penetration without consent. The complainant declined to pursue a formal complaint at this time. After consulting with the complainant, the Title IX Coordinator counseled the respondent on appropriate conduct and imposed no-contact restrictions. |
| Graduate & Professional Student | Graduate & Professional Student | Stalking | A faculty member informed a Title IX Coordinator that a G&P student was stalked by another G&P student with whom the complainant previously had a relationship. After consulting with the complainant, the Title IX Coordinator counseled the respondent on appropriate conduct, referred the respondent for additional training, and imposed no-contact restrictions. |

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

*Report of Complaints of Sexual Misconduct, January 1, 2015 – June 30, 2015*

| Graduate & Professional Student | Graduate & Professional Student | Sexual assault | A G&P student reported that another G&P student engaged in sexual penetration without consent and appeared sexually aggressive toward others. The complainant declined to pursue a formal complaint at this time. After consulting with the complainant, the Title IX Coordinator counseled the respondent on appropriate conduct and referred the respondent for training on sexual consent. |
| --- | --- | --- | --- |
| Graduate & Professional Student | Graduate & Professional Student | Sexual assault | A student informed a Title IX Coordinator that a G&P student whom the third party would not identify was sexually assaulted by another G&P student. The Title IX Coordinator did not have sufficient information to investigate. |
| Graduate & Professional Student | Graduate & Professional Student | Sexual harassment | An administrator informed a Title IX Coordinator that a G&P student reported that another G&P student made a sexually inappropriate comment. The Title IX Coordinator could not substantiate the complaint. The respondent has left Yale. |
| Graduate & Professional Student | Staff | Sexual harassment | A G&P student reported that a staff member paid unwanted attention toward the complainant. The complainant declined to pursue the complaint. The Title IX Coordinator provided the complainant with additional security measures and will follow-up with the respondent's supervisor. |
| Graduate & Professional Student | Faculty | Sexual harassment | A G&P student reported that a faculty member whom the student would not identify made inappropriate comments in the classroom. The complainant declined to pursue the complaint and asked that no further action be taken. |
| Graduate & Professional Student | Faculty | Other | A faculty member informed a Title IX Coordinator that another faculty member is alleged to have engaged in personal relationships with G&P students in violation of the Policy on Teacher-Student Consensual Relations. The case is pending. |
| Graduate & Professional Student | Yale Affiliate | Sexual harassment | An administrator informed a Title IX Coordinator that the administrator received an anonymous report from a G&P student alleging that a Yale affiliate made inappropriate comments. The case is pending. |
| Graduate & Professional Student | Non-Yale | Sexual harassment | An administrator informed a Title IX Coordinator that the administrator received an anonymous report from a G&P student alleging that a non-Yale individual made sexually inappropriate comments. The case is pending. |
| Staff | Staff | Sexual assault | A staff member reported that another staff member engaged in sexual touching without consent and made inappropriate comments to the complainant on multiple occasions. The Title IX Coordinator investigated and found sufficient evidence to support the allegations. The respondent's employment was terminated. |
| Staff | Staff | Sexual harassment | A staff member reported that another staff member made unwanted advances and inappropriate comments. The Title IX Coordinator investigated and did not find sufficient evidence to support the allegations. The respondent was referred for training on sexual harassment. |

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

*Report of Complaints of Sexual Misconduct, January 1, 2015 – June 30, 2015*

| Staff | Staff | Sexual harassment | A staff member reported that another staff member made inappropriate comments about the complainant to other staff members. The Title IX Coordinator investigated and found sufficient evidence to support the allegations. The respondent will receive training on sexual harassment and appropriate workplace conduct. In addition, the department has planned a department-wide training program for supervisors. |
|---|---|---|---|
| Staff | Staff | Sexual harassment | An administrator informed a Title IX Coordinator that a staff member reported that another staff member paid unwanted attention to the complainant. The complainant declined to pursue the complaint. After consulting with the complainant, the Title IX Coordinator counseled the respondent on appropriate conduct. |
| Staff | Faculty | Sexual harassment | A staff member reported that a faculty member made unwanted advances and made unwanted physical contact. The case is pending. |
| Postdoctoral trainee | Faculty | Sexual harassment | A former faculty member informed a Title IX Coordinator that a postdoctoral trainee reported that a faculty member made unwanted advances. The case is pending. |
| Non-Yale | Yale affiliate | Sexual assault | A non-Yale individual reported that a former faculty member had engaged in sexual penetration without consent. The case is pending. |

| ***Updates to previous complaints:*** *The complaints below were reported as pending in a previous report and are not included in the statistical summaries at the beginning of this report.* | | | |
|---|---|---|---|
| **Complainant** | **Respondent** | **Category of Misconduct Reported** | **Description/Actions Taken** |
| Yale College Student | Graduate & Professional Student | Sexual harassment | *Original summary*: A YC student reported that a G&P teaching assistant made unwanted advances. <br><br> *Update:* The Title IX Coordinator counseled the respondent on appropriate conduct. The respondent resigned the teaching position. |
| Graduate & Professional Students | Faculty | Sexual harassment | *Original summary*: A G&P student reported that a faculty member made inappropriate comments about G&P students. <br><br> *Update:* The respondent's supervisor, in consultation with the Title IX Coordinator, counseled the respondent on appropriate conduct. |
| Staff | Staff | Sexual assault | *Original summary*: A staff member reported that another staff member engaged in sexual touching without consent. <br><br> *Update:* The Title IX Coordinator investigated and found sufficient evidence to support the allegations. The respondent received training on sexual harassment and appropriate workplace conduct. |

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

*Report of Complaints of Sexual Misconduct, January 1, 2015 – June 30, 2015*

## *Yale Police Department*

The following are cases in which the complainant chose to contact the Yale Police Department (YPD), which addressed each case according to its procedures (see the Yale Police website for more information). All reports of possible sexual misconduct made to the YPD are reviewed by the University Title IX Coordinator.

> *During this reporting period (January 1 – June 30, 2015), there were 23 contacts with the YPD regarding possible sexual misconduct. 20 were handled primarily by the YPD and are described below. The remaining were referred to the UWC or a Title IX Coordinator for further investigation and resolution and are thus described above.*

| Complainant | Respondent | Category of Misconduct Reported | Description/Actions Taken |
|---|---|---|---|
| Yale College Student | Non-Yale | Intimate partner violence | An administrator referred a YC student who reported that a non-Yale individual with whom the complainant was in a relationship physically assaulted and attempted to sexually assault the complainant. The YPD investigated and arrested the respondent. The YPD provided the complainant with information on safety and victim services. |
| Yale College Students | Non-Yale | Other | YC students reported that a non-Yale individual engaged in indecent exposure. The YPD investigated and arrested the respondent. The YPD provided the complainant with information on safety and victim services. |
| Yale College Student | Non-Yale | Sexual assault | A YC student reported that a non-Yale individual engaged in sexual touching without consent. The YPD investigated and arrested the respondent. The YPD provided the complainant with information on safety and victim services. |
| Yale College Student | Unknown | Sexual harassment | A YC student reported receiving sexually explicit phone calls from an unknown caller. The YPD investigation is ongoing. The YPD provided the complainant with information on safety and victim services. |
| Yale College Student | Unknown | Other | A YC student reported that an unknown individual was looking into the complainant's suite bathroom from an adjacent building. The YPD investigated and could not identify the respondent. The YPD provided the complainant with information on safety and victim services. |
| Graduate & Professional Student | Graduate & Professional Student | Stalking | A G&P student reported that a G&P student with whom the complainant previously had a relationship sent unwanted messages on a number of occasions. The YPD warned the respondent not to contact the complainant and provided the complainant with information on safety and victim services. |
| Graduate & Professional Student | Yale Affiliate | Sexual harassment | A G&P student reported that a Yale affiliate made unwanted advances. The YPD warned the respondent not to contact the complainant. The YPD provided the complainant with information on safety and victim services. |
| Graduate & Professional Students | Non-Yale | Sexual harassment | G&P students reported that a non-Yale individual made threatening sexual gestures toward them. The YPD investigated and arrested the respondent. The YPD provided the complainant with information on safety and victim services. |

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

*Report of Complaints of Sexual Misconduct, January 1, 2015 – June 30, 2015*

| Graduate & Professional Student | Non-Yale | Stalking | A G&P student reported that a non-Yale individual with whom the complainant previously had a relationship followed her and sent unwanted messages on a number of occasions. The YPD investigation is ongoing. The YPD provided the complainant with information on safety and victim services. |
|---|---|---|---|
| Graduate & Professional Student | Non-Yale | Other | A G&P student reported that a non-Yale individual engaged in indecent exposure. The YPD investigated and arrested the respondent. The YPD provided the complainant with information on safety and victim services. |
| Graduate & Professional Students | Unknown | Stalking | G&P students reported receiving sexually explicit and threatening messages from an unknown source on multiple occasions. The YPD investigation is ongoing. The YPD provided the complainants with information on safety and victim services. |
| Graduate & Professional Student | Unknown | Sexual harassment | Multiple G&P students reported receiving sexually explicit phone calls from an unknown caller. The YPD investigation is ongoing. The YPD provided the complainants with information on safety and victim services. |
| Graduate & Professional Students | Unknown | Stalking | G&P students reported that an unknown individual followed them in a car repeatedly while they walked down the street. The YPD investigation is ongoing. The YPD provided the complainants with information on safety and victim services. |
| Staff | Non-Yale | Intimate partner violence | A staff member reported a physical assault by a non-Yale individual with whom the complainant previously had a relationship. The YPD investigated and arrested the respondent. The YPD provided the complainant with information on safety and victim services. |
| Staff | Non-Yale | Stalking | A staff member reported that a non-Yale individual with whom the complainant previously had a relationship waited for the complainant in the complainant's office building and sent unwanted and threatening messages on a number of occasions. The YPD investigation is ongoing. The YPD provided the complainant with information on safety and victim services. |
| Non-Yale | Yale College Student | Sexual assault | A non-Yale student reported that a YC student physically assaulted the complainant and engaged in sexual penetration without consent. The YPD investigated and also notified the Title IX Coordinator who reached out to the complainant. The complainant declined to participate in a formal complaint or criminal charges at this time. The YPD provided the complainant with information on safety and victim services. |
| Non-Yale | Yale College Student | Sexual assault | A non-Yale student reported that a YC student engaged in sexual penetration without consent. The YPD investigated and also notified the Title IX Coordinator who reached out to the complainant. The complainant declined to participate in a formal complaint or criminal charges at this time. The YPD provided the complainant with information on safety and victim services. |
| Non-Yale | Graduate & Professional Student | Stalking | A non-Yale individual reported receiving unwanted and disturbing emails from a G&P student on a number of occasions. The YPD investigation is ongoing. The YPD provided the complainant with information on safety and victim services. |

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

14

*Report of Complaints of Sexual Misconduct, January 1, 2015 – June 30, 2015*

| Non-Yale Student | Non-Yale Student | Sexual harassment | An administrator referred a non-Yale student participating in a Yale program who reported that a non-Yale student made unwanted advances. The respondent was removed from the program.  The YPD banned the respondent from the Yale campus and provided the complainant with information on safety and victim services. |
|---|---|---|---|
| Non-Yale Student | Unknown | Sexual harassment | An administrator referred a non-Yale student participating in a Yale program who reported that an unknown individual made unwanted advances.  The YPD investigation is ongoing. The YPD provided the complainant with information on safety and victim services. |

# Brief Definitions

For more information on Yale's sexual misconduct policies and definitions, go to the Sexual Misconduct Response website.

The following are definitions for the specific terms Yale uses in this Report to categorize behaviors that make up the range of Sexual Misconduct.

***Sexual assault*** is any kind of nonconsensual sexual contact, including rape, groping, sexual penetration (which is the insertion of a penis, finger or object into another person's vagina or anus), or any other nonconsensual sexual touching. [ii]

Sexual activity requires ***consent***, which is defined as positive, unambiguous, and voluntary agreement to engage in specific sexual activity throughout a sexual encounter. Consent cannot be inferred from the absence of a "no"; a clear "yes," verbal or otherwise, is necessary.  Consent to some sexual acts does not constitute consent to others, nor does past consent to a given act constitute present or future consent. Consent must be ongoing throughout a sexual encounter and can be revoked at any time.

Consent cannot be obtained by threat, coercion, or force. Agreement under such circumstances does not constitute consent.

Consent cannot be obtained from someone who is asleep or otherwise mentally or physically incapacitated, whether due to alcohol, drugs, or some other condition. A person is mentally or physically incapacitated when that person lacks the ability to make or act on considered decisions to engage in sexual activity. Engaging in sexual activity with a person whom you know -- or reasonably should know -- to be incapacitated constitutes sexual misconduct.  For illustrations of Yale's consent definition, see the *Sexual Misconduct Scenarios* at http://smr.yale.edu/.

***Intimate partner violence (IPV)*** occurs when a current or former intimate partner uses or threatens physical or sexual violence.  IPV also may take the form of a pattern of behavior that seeks to establish power and control by causing fear of physical or sexual violence. Stalking may also constitute IPV.

***Sexual harassment*** consists of nonconsensual sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature on or off campus, when: (1) submission to such conduct is made either explicitly or implicitly a condition of an individual's employment or academic standing; or (2) submission to or

---

[ii] The sexual assault data in this report will not correspond to Yale's annual report required under the federal Clery Act because this report uses a more expansive definition of sexual assault and includes cases from a wider geographic jurisdiction than in the Clery report.

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

rejection of such conduct is used as the basis for employment decisions or for academic evaluation, grades, or advancement; or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating or hostile academic or work environment. Sexual harassment may be found in a single episode, as well as in persistent behavior. Both men and women are protected from sexual harassment, and sexual harassment is prohibited regardless of the sex of the harasser.

*Stalking* is repeated or obsessive unwanted attention directed toward an individual or group that is likely to cause alarm, fear, or substantial emotional distress. Stalking may take many forms, including following, lying in wait, monitoring, and pursuing contact. Stalking may occur in person or through a medium of communication, such as letters, e-mail, text messages, or telephone calls. In some circumstances, two instances of such behavior may be sufficient to constitute stalking.

*Other* includes a range of prohibited behaviors that do not fall into the categories above. Examples include voyeurism, audio-visual recording of sexual activity without consent, retaliation, and violations of the Policy on Teacher-Student Consensual Relations.

# Terminology Commonly Used in this Report

"UWC *formal complaint*": Formal resolution of a complaint through the UWC involves an investigation by an external fact-finder, a hearing, adjudication, and possible disciplinary sanctions. See the UWC Procedures for more information.

"UWC *informal complaint*": Informal resolution through the UWC does not include extensive investigation, a hearing, or a determination as to the validity of the allegations. The goal is to achieve a resolution that is desired by the complainant and acceptable to the respondent, and to counsel and educate the parties.[iii] See the UWC Procedures for more information.

"A Title IX Coordinator *brought a formal complaint*…": Under certain circumstances, the Title IX Coordinator of the University or any Yale School may bring a complaint to the UWC. Generally, a Title IX Coordinator may file a complaint in situations on behalf of someone who experienced sexual misconduct but who cannot or will not themselves take the formal role of a complainant; this may be an issue of jurisdiction, safety, or preference. In certain circumstances involving a serious threat to the University community, a Title IX coordinator may bring a complaint to the UWC when there is evidence that the University's policy on sexual misconduct has been violated and the Title IX Coordinator's intervention is needed to ensure that the matter reaches the UWC. See the UWC procedures for more information.

"The Title IX Coordinator *investigated*…": An investigation by a Title IX Coordinator generally includes, but is not limited to: interviewing the complaint and respondent, interviewing any witnesses or other parties with knowledge of the alleged conduct, and collecting documentation (including email or other communications) relevant to the complaint. Upon reviewing the evidence gathered, The Title IX Coordinator determines whether a violation of University policy occurred, whether any actions should be taken, and recommends disciplinary action, if warranted.

"*Sufficient evidence* to support the allegations": The UWC and the Title IX Coordinators apply the "preponderance of the evidence" standard (i.e., it is more likely than not) to determine, based on the evidence

---

[iii] Note that the University does not allow face-to-face mediation in cases alleging sexual violence.

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

*Report of Complaints of Sexual Misconduct, January 1, 2015 – June 30, 2015*

gathered during the investigation, whether the alleged conduct occurred and, if so, whether it violates any University policies.

"The respondent was ***counseled on appropriate conduct***": In some cases, the Chair of the UWC, the Title IX Coordinator, or an administrator working in consultation with the Title IX Coordinator, will meet with the respondent to review the allegations and the university's definitions and policies, discuss and affirm expected behaviors, and warn the respondent about possible consequences for violations of the University sexual misconduct policies.

"***Imposed no-contact restrictions***": In most cases, the respondent is issued a warning to cease all forms of contact (including physical, verbal, and electronic) with the complainant. In some cases, contact restrictions may limit access to any or certain parts of campus.

"Provided the complainant with ***information on safety and victim services***": The YPD has a Sensitive Crimes & Support Coordinator who assists those affected by sexual misconduct and can help complainants make contact with SHARE or other University offices, coordinate interim safety measures, provide safety planning, and serve as a liaison with victims' assistance services. See the YPD website for more information.

**Questions?** See the Title IX FAQs and Sexual Misconduct Scenarios for more information.

# Yale College

OFFICE OF THE DEAN

PO Box 208241
New Haven CT 06520-8241
T 203 432-2900
F 203 432-7369

*location*
1 Prospect Street
New Haven CT 06511

CONFIDENTIAL

September 24, 2015

Jack Montague TC '16
c/o Trumbull College Dean's Office

Dear Mr. Montague:

At its meeting on Wednesday, September 23, 2015, the Coordinating Group of the Yale College Executive Committee, acting on behalf of the entire Committee and in place of a formal hearing, held a disposition of the charge that on September 6, 2015 your actions were in violation of the following section of the *Undergraduate Regulations*: "Defiance of Authority" (Chapter General Conduct & Discipline, Section H).

The Coordinating Group voted to reprimand you for this infraction. This penalty is a matter of internal record only, and should you or the residential college dean ever be asked if you have been subject to disciplinary sanctions by the University, you are both free on this account to say that you have not been. On the other hand, the reprimand will be taken into consideration in determining a penalty if you should ever again be found by the Executive Committee to have committed an infraction of the *Undergraduate Regulations*.

Sincerely,

Pamela Y. George
Assistant Dean of Academic Affairs
Secretary, Yale College Executive Committee

cc:     Margaret Clark, Master
        Jasmina Besirevic Regan, Dean
        Jonathan Holloway, Dean of Yale College
        Mark Schenker, Dean of Academic Affairs
        Ronnell A. Higgins, Chief of Police
        Coordinating Group
        Executive Committee File

# Yale College Undergraduate Regulations

## 2016–2017



# TABLE OF CONTENTS

Yale College Undergraduate Regulations    2
  Introduction    3

  Policies    5
    Definitions of Plagiarism, Cheating, and Documentation of Sources    5
    Definitions of Sexual Misconduct, Sexual Consent, and Sexual Harassment    7
    Free Expression, Peaceful Dissent, and Demonstrations    9
    Parental Notification    11

  Regulations    13
    Alcoholic Beverages    13
    Campus Housing and University Facilities    15
    Dining Services    26
    Financial Aid    30
    Financial Services    33
    Health Services    39
    Library    42
    Motor Vehicles    43
    Social Functions    44
    Student Activities    48
    Other Services and Facilities    53
    Undergraduate Organizations    55

  Offenses    66
  Penalties    71

  Procedures    72
    The Disciplinary Procedures of the Executive Committee of Yale College    72
    Student Complaints    89
    The University Tribunal    90
    Emergency, Interim, and Administrative Suspension    91

  Index    93

# YALE COLLEGE UNDERGRADUATE REGULATIONS

Each student in Yale College is required as a condition of enrollment to comply with the *Undergraduate Regulations*. The University expects students to be familiar with the *Undergraduate Regulations* and to use this online version for reference during the course of the academic year. An assertion of ignorance of any of the rules published herein will not be accepted as an excuse for any violation of them. No student or group of students should expect to be individually warned to conform to any of the rules contained in the *Undergraduate Regulations*.

## AMENDMENT

The University reserves the right to amend or supplement these regulations at any time upon such notice to students as it deems suitable. The Yale College Dean's Office is responsible for the publication of the *Undergraduate Regulations*. Suggestions for amendments may be sent to the Editor, Undergraduate Regulations, Yale College Dean's Office, 102 SSS.

## CHANGES TO THE 2016–2017 UNDERGRADUATE REGULATIONS

Content has been reorganized to simplify navigation.

The sections "Sexual Misconduct" and "Sexual Harassment" (Policies, Sections B and C), replace previously gendered language with non-binary language.

The section "Postering and Publicity" (Regulations, Student Activities, Section K), now specifies that student organizations must include contact information on posters; it also removes language that previously restricted posters and publicity to announcing events, not positions or opinions.

The section "Student Productions" (Regulations, Student Activities, Section F) has been relocated, from "Regulations, Undergraduate Organizations."

The section "Acts of Violence or Physical Force" (Offenses, Section C) now states that implied or express consent of the person against whom violence or force is used will not be considered a defense.

The section "Suspension" (Penalties) now states that suspension shall be recorded on the academic transcript.

The section "Energy Conservation" (Regulations, Other Services and Facilities, Section F) has been removed; information about energy conservation can be found on the Sustainability website (http://sustainability.yale.edu).

# Introduction

Yale College is an academic community dedicated to the advancement of learning. Students freely associate themselves with the College and in doing so affirm their commitment to a philosophy of mutual tolerance and respect. All students admitted to Yale should understand the responsibility thus placed upon them. If any member of the community should interfere with its functions or show himself or herself unable or unwilling to assist in them, the community may find it necessary to protect itself by suspending or terminating his or her membership. Indeed, by formal vote the Yale College Faculty has affirmed:

- Its commitment to protect free expression and peaceful dissent and to preserve mutual respect and charitable relations among all members of the Yale community.

- Its belief that physical restriction, coercion, or intimidation of any member of that community is contrary to the basic principles of the University.

- Its expectation that such action will ordinarily result in temporary or permanent separation from Yale College.

The purpose of the regulations that follow is to spell out some of the actions that place the community in jeopardy and that may therefore result in suspension or expulsion from it. In general, these regulations are concerned with conduct on campus. While off-campus misconduct will not normally be the basis for disciplinary action by the University, it may result in disciplinary action under the circumstances specified below (See section W. Special provisions concerning student organizations (http://catalog.yale.edu/undergraduate-regulations/general-conduct-discipline/offenses/#special_provisions_concerning_student_organizations)), or if such conduct otherwise imperils the integrity and values of the University community. Off-campus infractions committed in the course of a Yale-sponsored program anywhere in the world, such as a Yale Summer Session abroad course, a Yale-sponsored internship or fellowship, a student organization's tour, or the like, could also be subject to disciplinary charges. Students must recognize that Yale College exists within a larger community that has its own laws and standards of behavior, and that membership in Yale College confers no exemption from those laws and standards. Unruly behavior or illegal or destructive acts that adversely affect the community surrounding the Yale campus will not be condoned. Students, whether on campus or off campus, are under the jurisdiction of the city, state, and national governments.

Authority for disciplinary matters proceeds from the Yale Corporation, which has empowered the Yale College Faculty to oversee disciplinary actions with respect to undergraduates. Penalties for misconduct by undergraduates are ordinarily imposed by the Yale College Executive Committee, a standing committee of the Yale College Faculty by whose authorization it acts.

The Executive Committee's jurisdiction includes offenses described in the *Undergraduate Regulations* as well as other actions on the part of students that may in the judgment of the committee warrant disciplinary action because they may imperil the integrity and values of the Yale community or the well-being of its members. The Executive Committee may assign penalties as provided in the *Undergraduate Regulations*,

though in some cases that authority resides in the president of the University, or is delegated to other University officials.

Violations of sexual misconduct will be addressed by the <u>University-Wide Committee on Sexual Misconduct</u> (http://provost.yale.edu/uwc) (UWC), which recommends penalties to the dean of Yale College.

The heads of the residential colleges, the University Librarian, the directors of the Yale computer facilities, and the Executive Director of Yale Dining may summarily impose certain penalties for violations of the dormitory regulations (p. 15), the library regulations (p. 42), the computer facility regulations (p. 53), and the dining services regulations (p. 26).

A member of the faculty finding evidence of academic dishonesty on a class assignment or examination is expected to bring the matter to the attention of the Executive Committee. Any member of the faculty, residential college head, residential college dean, or member of the University administration or staff may bring to the attention of the committee an alleged infraction of the *Undergraduate Regulations*.

An undergraduate student may bring a complaint of a nonacademic infraction to the attention of the Executive Committee only in conjunction with his or her residential college head, residential college dean, a member of the Yale College Dean's Office, a human relations counselor, the College or University's Title IX Coordinator, a member of the President's Committee on Racial and Ethnic Harassment, or the Yale Police Department. (See Disciplinary Procedures of the Executive Committee of Yale College (p. 72).)

Students may bring complaints regarding sexual misconduct directly to the University-Wide Committee on Sexual Misconduct (http://provost.yale.edu/uwc) (UWC). The UWC provides an accessible representative and trained body to answer internal inquiries and fairly and expeditiously address formal and informal complaints of sexual misconduct. It has sole disciplinary authority over Yale College students charged with sexual misconduct and recommends penalties to the dean of Yale College. The UWC is appointed and authorized to act by the provost.

# Policies

· Definitions of Plagiarism, Cheating, and Documentation of Sources (p. 5)
· Definitions of Sexual Misconduct, Sexual Consent, and Sexual Harassment (p. 7)
· Free Expression, Peaceful Dissent, and Demonstrations (p. 9)
· Parental Notification (p. 11)

# Definitions of Plagiarism, Cheating, and Documentation of Sources

By coming to Yale, students have implicitly asked the College to help them develop a broadly based, highly disciplined intelligence, not just to learn material, but also to be guided toward a deep and supple understanding of the subjects they study. Course readings, lectures, and discussions are all crucial elements of this learning. Less obvious, perhaps, is what students' own writing contributes to this process. It may sometimes seem that exams, lab reports, and papers are meant primarily to measure how much has been learned. But when students complete written course work, they are not demonstrating what they have learned, but are rather doing the very work of synthesis and reflection that constitutes advanced learning. Every writer has had the experience of making discoveries while writing an essay. To have this discovery is to make knowledge, and making knowledge is what joins all students to the project of the university.

Those students who cheat forfeit the opportunity to make such discoveries. Certainly there are other reasons not to cheat. One who borrows unacknowledged ideas or language from others is stealing their work, which denies them their due credit and also impedes that free exchange of ideas on which the university depends. Yale regards cheating as a serious offense, for which the standard penalty is two semesters of suspension. But the much more grievous wrong is to the cheating student. Writing is one of the most powerful sites of learning; students who turn in someone else's work, therefore, are giving away the very substance of their educations.

College course work frequently requires that students build on previous scholarship or collaborate with other students. The following definitions help clarify the proper procedures for conducting and documenting such collaborations and the expectations of Yale College. For a fuller discussion of these issues, see the Writing Center website (http://writing.yalecollege.yale.edu).

## A. MULTIPLE SUBMISSION

Students may not submit the same paper, or substantially the same paper, in more than one course. If topics for two courses coincide, a student must have written permission from both instructors before either combining work on two papers or revising an earlier paper for submission to a new course.

## B. CHEATING ON EXAMINATIONS

It is cheating to copy answers from other students or to refer without written permission to notes, books, laptop computers, cellular phones, or other programmable

electronic devices. Likewise, the use of cellular phones to discuss or obtain answers from another student, whether present in the classroom or not, is prohibited.

It is also cheating to change answers on a returned examination and then request regrading. It is the student's responsibility to submit the examination exactly as it was; any alteration is academic dishonesty.

For take-home examinations, and for examinations for which the questions are distributed in advance, instructors should make the rules clear, and students should obey them to the letter. If a student is in any doubt as to the meaning of the instructions governing such exercises, he or she should seek explicit clarification from the instructor. The ordinary expectation is that each student will prepare answers on his or her own; collaboration with others is acceptable only to the degree precisely and specifically described by the instructor. In all cases, the answer a student finally submits must represent his or her own understanding of the issues. If a student thinks that any answer or submission has been significantly influenced by consulting books or other people, he or she should say so, just as is required in a paper.

## C. PLAGIARISM

Plagiarism is the use of someone else's work, words, or ideas as if they were one's own. Thus most forms of cheating on examinations are plagiarism; but the term is usually used in reference to papers rather than examinations.

If one uses a source for a paper, one must acknowledge it. What counts as a source varies greatly depending on the assignment, but the list certainly includes readings, lectures, websites, conversations, interviews, and other students' papers. Every academic discipline has its own conventions for acknowledging sources. Instructors should make clear which conventions students must use. In all situations, students who are confused about the specific punctuation and formatting must nonetheless make clear in written work where they have borrowed from others—whether it be a matter of data, opinions, questions, ideas, or specific language. This obligation holds whether the sources are published or unpublished.

Submission of an entire paper prepared by someone else is an especially egregious form of plagiarism, and is grounds for the imposition of a particularly serious penalty, including expulsion from the University.

## D. PROBLEM SETS AND UNGRADED WRITTEN ASSIGNMENTS

Many instructors assign work that allows students to practice and develop skills in a low-stakes format, less formal than a paper and often ungraded. Collaboration with other students is common practice in many such courses, but students are expected to ask instructors for a written explanation of what kinds of collaboration are appropriate.

## E. LABORATORY EXERCISES

Many laboratory reports are constructed on some form of exercise in which observations are made and the results of these observations tabulated or processed in some manner. There are three violations of originality that can occur with this form of assignment:

1. Falsification of Data. The practice known as "dry-labbing," constructing observations out of one's head or borrowing the observations of others as if they were one's own genuine data, is an offense of such gravity that—in the professional world—it results in total excommunication from the community of scientists. In undergraduate work the comparable sanction is suspension.

2. Cooperation in Treatment of Data. Often a class is given a common set of data with an assignment to analyze the data and report the results. Sometimes when extensive routine analyses must be made, it is tempting for students to organize so that the total work load is divided among several students. The ordinary assumption must be that this type of cooperation, however sensible it may seem, is strictly forbidden unless explicitly permitted by the instructor. The best policy is to ask at the time the assignment is made.

3. Borrowing or Purchase of Material. Submission of material, such as a chemical product, that a student does not obtain from actually performing the assigned experiment is a flagrant act of cheating. Purchasing the product in the marketplace, "borrowing some product" from a classmate, or obtaining a sample surreptitiously from another laboratory all constitute serious offenses. In the preparation of products by synthesis, using "excess starting materials" to promote a better yield of products is also cheating.

Finally, it should be reiterated that the prohibition of cheating and plagiarism is not meant to restrict either the free discussion and exchange of ideas among students or the study of other scholars' works. Such activities are the very essence of education. Nor are the rules of citation meant to engender a dependent mentality. Students are at Yale to study the work of others in order to learn to think for themselves. Those who follow that principle will never cheat or plagiarize.

# Definitions of Sexual Misconduct, Sexual Consent, and Sexual Harassment

## A. SEXUAL MISCONDUCT POLICIES AT YALE

Yale University is committed to maintaining and strengthening educational, working, and living environments founded on civility and mutual respect in which students, faculty, and staff are connected by strong bonds of intellectual dependence and trust. Sexual misconduct is antithetical to the standards and ideals of our community and will not be tolerated.

Yale aims to eradicate sexual misconduct through education, training, clear policies, and serious consequences for violations of these policies. The University's Title IX Coordinator has responsibility for ensuring compliance with Yale's policies regarding sexual misconduct. The University-Wide Committee on Sexual Misconduct (UWC) (http://provost.yale.edu/uwc) and the Title IX coordinators  (http://provost.yale.edu/title-ix/coordinators)address allegations of sexual misconduct.

These policies apply to all members of the Yale community as well as to conduct by third parties (i.e., individuals who are neither students nor employees, including but not limited to guests and consultants) directed toward, University students, faculty,

or staff members. Conduct that occurs in the process of application for admission to a program or selection for employment is covered by these policies.

Many forms of sexual misconduct are prohibited by Connecticut and federal law, including Title IX of the education amendments of 1972, and Connecticut statutes relating to sexual offenses, and could result in criminal prosecution or civil liability.

## B. SEXUAL MISCONDUCT

Sexual misconduct incorporates a range of behaviors including sexual assault, sexual harassment, intimate partner violence, stalking, voyeurism, and any other conduct of a sexual nature that is nonconsensual, or has the purpose or effect of threatening, intimidating, or coercing a person.

Much sexual misconduct includes nonconsensual sexual contact, but this is not a necessary component. For example, threatening speech that is sufficiently severe or pervasive to constitute sexual harassment will constitute sexual misconduct. Making photographs, video, or other visual or auditory recordings of a sexual nature of another person without consent constitutes sexual misconduct, even if the activity documented was consensual. Similarly, sharing such recordings or other sexually harassing electronic communications without consent is a form of sexual misconduct. All members of our community are protected from sexual misconduct, and sexual misconduct is prohibited regardless of the sex of any party involved.

Violations of Yale's Policy on Teacher-Student Consensual Relations (http://www.yale.edu/equalopportunity/policies/#policy-teacher-student) and its policy on Relationships between Staff Members are a form of sexual misconduct.

## C. SEXUAL HARASSMENT

Sexual harassment consists of nonconsensual sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature on or off campus, when: (1) submission to such conduct is made either explicitly or implicitly a condition of an individual's employment or academic standing; or (2) submission to or rejection of such conduct is used as the basis for employment decisions or for academic evaluation, grades, or advancement; or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating or hostile academic or work environment. Sexual harassment may be found in a single episode, as well as in persistent behavior. All members of our community are protected from sexual harassment, and sexual harassment is prohibited regardless of the sex of the harasser or the harassed.

## D. SEXUAL ASSAULT

Sexual assault is any kind of nonconsensual sexual contact, including rape, groping, and any other nonconsensual sexual touching.

## E. SEXUAL CONSENT

Sexual activity requires consent, which is defined as positive, unambiguous, and voluntary agreement to engage in specific sexual activity throughout a sexual encounter. Consent cannot be inferred from the absence of a "no"; a clear "yes," verbal or otherwise, is necessary. Consent to some sexual acts does not constitute consent to others, nor does past consent to a given act constitute present or future consent.

Consent must be ongoing throughout a sexual encounter and can be revoked at any time.

Consent cannot be obtained by threat, coercion, or force. Agreement under such circumstances does not constitute consent.

Consent cannot be obtained from someone who is asleep or otherwise mentally or physically incapacitated, whether due to alcohol, drugs, or some other condition. A person is mentally or physically incapacitated when that person lacks the ability to make or act on considered decisions to engage in sexual activity. Engaging in sexual activity with a person whom you know – or reasonably should know – to be incapacitated constitutes sexual misconduct.

## F.  GUIDANCE REGARDING SEXUAL CONSENT

Consent can only be accurately gauged through direct communication about the decision to engage in sexual activity. Presumptions based upon contextual factors (such as clothing, alcohol consumption, or dancing) are unwarranted, and should not be considered as evidence for consent.

Although consent does not need to be verbal, verbal communication is the most reliable form of asking for and gauging consent. Talking with sexual partners about desires and limits may seem awkward, but serves as the basis for positive sexual experiences shaped by mutual willingness and respect.

## G. INTIMATE PARTNER VIOLENCE

Intimate partner violence (IPV) occurs when a current or former intimate partner uses or threatens physical or sexual violence. IPV also may take the form of a pattern of behavior that seeks to establish power and control by causing fear of physical or sexual violence. Stalking may also constitute IPV.

## H. STALKING

Stalking is repeated or obsessive unwanted attention directed toward an individual or group that is likely to cause alarm, fear, or substantial emotional distress. Stalking may take many forms, including following, lying in wait, monitoring, and pursuing contact. Stalking may occur in person or through a medium of communication, such as letters, e-mail, text messages, or telephone calls. In some circumstances, two instances of such behavior may be sufficient to constitute stalking.

# Free Expression, Peaceful Dissent, and Demonstrations

## A. FREE EXPRESSION

The Yale College Faculty has formally endorsed as an official policy of Yale College the following statement from the Report of the Committee on Freedom of Expression at Yale, published in January 1975.

*The primary function of a university is to discover and disseminate knowledge by means of research and teaching. To fulfill this function a free interchange of ideas is necessary not only within its walls but with the world beyond as well. It follows that the university must do everything possible to ensure within it the fullest degree of intellectual freedom. The history of*

intellectual growth and discovery clearly demonstrates the need for unfettered freedom, the right to think the unthinkable, discuss the unmentionable, and challenge the unchallengeable. To curtail free expression strikes twice at intellectual freedom, for whoever deprives another of the right to state unpopular views necessarily also deprives others of the right to listen to those views.

We take a chance, as the First Amendment takes a chance, when we commit ourselves to the idea that the results of free expression are to the general benefit in the long run, however unpleasant they may appear at the time. The validity of such a belief cannot be demonstrated conclusively. It is a belief of recent historical development, even within universities, one embodied in American constitutional doctrine but not widely shared outside the academic world, and denied in theory and in practice by much of the world most of the time.

Because few other institutions in our society have the same central function, few assign such high priority to freedom of expression. Few are expected to. Because no other kind of institution combines the discovery and dissemination of basic knowledge with teaching, none confronts quite the same problems as a university.

For if a university is a place for knowledge, it is also a special kind of small society. Yet it is not primarily a fellowship, a club, a circle of friends, a replica of the civil society outside it. Without sacrificing its central purpose, it cannot make its primary and dominant value the fostering of friendship, solidarity, harmony, civility, or mutual respect. To be sure, these are important values; other institutions may properly assign them the highest, and not merely a subordinate priority; and a good university will seek and may in some significant measure attain these ends. But it will never let these values, important as they are, override its central purpose. We value freedom of expression precisely because it provides a forum for the new, the provocative, the disturbing, and the unorthodox. Free speech is a barrier to the tyranny of authoritarian or even majority opinion as to the rightness or wrongness of particular doctrines or thoughts.

If the priority assigned to free expression by the nature of a university is to be maintained in practice, clearly the responsibility for maintaining that priority rests with its members. By voluntarily taking up membership in a university and thereby asserting a claim to its rights and privileges, members also acknowledge the existence of certain obligations upon themselves and their fellows. Above all, every member of the university has an obligation to permit free expression in the university. No member has a right to prevent such expression. Every official of the university, moreover, has a special obligation to foster free expression and to ensure that it is not obstructed.

The strength of these obligations, and the willingness to respect and comply with them, probably depend less on the expectation of punishment for violation than they do on the presence of a widely shared belief in the primacy of free expression. Nonetheless, we believe that the positive obligation to protect and respect free expression shared by all members of the university should be enforced by appropriate formal sanctions, because obstruction of such expression threatens the central function of the university. We further believe that such sanctions should be made explicit, so that potential violators will be aware of the consequences of their intended acts.

In addition to the university's primary obligation to protect free expression there are also ethical responsibilities assumed by each member of the university community, along with the right to enjoy free expression. Though these are much more difficult to state clearly, they are of great importance. If freedom of expression is to serve its purpose and thus the purpose of the university, it should seek to enhance understanding. Shock, hurt, and anger are not consequences to be weighed lightly. No member of the community with a decent respect for

*others should use, or encourage others to use, slurs and epithets intended to discredit another's race, ethnic group, religion, or sex. It may sometimes be necessary in a university for civility and mutual respect to be superseded by the need to guarantee free expression. The values superseded are nevertheless important, and every member of the university community should consider them in exercising the fundamental right to free expression.*

*We have considered the opposing argument that behavior which violates these social and ethical considerations should be made subject to formal sanctions, and the argument that such behavior entitles others to prevent speech they might regard as offensive. Our conviction that the central purpose of the university is to foster the free access of knowledge compels us to reject both of these arguments. They assert a right to prevent free expression. They rest upon the assumption that speech can be suppressed by anyone who deems it false or offensive. They deny what Justice Holmes termed "freedom for the thought that we hate." They make the majority, or any willful minority, the arbiters of truth for all. If expression may be prevented, censored or punished, because of its content or because of the motives attributed to those who promote it, then it is no longer free. It will be subordinated to other values that we believe to be of lower priority in a university.*

*The conclusions we draw, then, are these: even when some members of the university community fail to meet their social and ethical responsibilities, the paramount obligation of the university is to protect their right to free expression. This obligation can and should be enforced by appropriate formal sanctions. If the university's overriding commitment to free expression is to be sustained, secondary social and ethical responsibilities must be left to the informal processes of suasion, example, and argument.*

### B. PEACEFUL DISSENT, PROTESTS, AND DEMONSTRATIONS

In view of the obligation of Yale or of any university to promote the free expression of all views, the campus is open to any speaker whom students or members of the faculty have invited and for whom official arrangements to speak have been made with the University. The right of free expression in a university also includes the right to peaceful dissent, protests in peaceable assembly, and orderly demonstrations, which may include picketing and the distribution of leaflets. These are permitted on the Yale campus, subject to approval as to schedule and location by the appropriate University official, until or unless they disrupt regular or essential operations of the University or significantly infringe upon the rights of others, particularly the right to listen to a speech or lecture. It is a violation of University regulations for any member of the faculty, staff, or student body to prevent the orderly conduct of a University function or activity, such as a lecture, meeting, interview (including a job interview), ceremony, or other public event. It is similarly a violation of University regulations to block the legitimate activity of any person on the Yale campus or in any Yale building or facility. Demonstrations or protests which exceed these limits will subject the participants to temporary or permanent separation from the University.

# Parental Notification

Federal law protects the confidentiality of student records and specifies the limited situations in which information from educational records may be given out without a student's prior consent. Yale regards its students as responsible adults, capable of managing their own lives and seeking guidance when necessary. Thus Yale's policy

is that disclosure of information to parents except in extraordinary circumstances is limited to information concerning a student's enrollment at the University. See Yale's statement on "Student Education Records (FERPA) (http://www.yale.edu/sfas/registrar/#ferpa)".

Parents are therefore notified in the following situations:

1.  When a student withdraws from the University for any reason; and

2.  When a student has been placed on suspension or expelled from the University.

Cases in which Yale would, in extraordinary circumstances, notify parents or guardians cannot in the nature of things be completely enumerated or described; but it is, for example, the judgment of Yale College that a serious injury to a student, or a violent crime committed upon a student, are sufficiently grave occurrences as to constitute extraordinary circumstances. Yale College, therefore, as a matter of general policy, notifies parents of such events. In addition, the College may judge that parents should be notified concerning the existence of serious concerns or threats to a student's health, either physical or emotional. Although in most such instances students will be encouraged themselves to inform their parents, the University reserves the right to notify parents directly and/or to ensure that parents have been satisfactorily informed. Yale College recognizes, however, that special circumstances might cause a student to believe that notification of parents would be undesirable or inappropriate. In such a case, the residential college head and dean will discuss the matter carefully with the student, and as appropriate will consult the Yale College Dean's Office, Yale Health, or the Office of the General Counsel. In certain individual instances, Yale College may then conclude that it is not in the student's best interest that parental notification take place, and in that event an exception to the general policy will be made.

# Regulations

- Alcoholic Beverages (p. 13)
- Campus Housing and University Facilities (p. 15)
- Dining Services (p. 26)
- Financial Aid (p. 30)
- Financial Services (p. 33)
- Health Services (p. 39)
- Library (p. 42)
- Motor Vehicles (p. 43)
- Social Functions (p. 44)
- Student Activities and Extracurricular Activities (p. 48)
- Other Services and Facilities (p. 53)
- Undergraduate Organizations (p. 55)

# Alcoholic Beverages

The Yale College Dean's Office and the Council of Heads of College have issued points A through M below; anyone who disregards them risks legal prosecution by the State of Connecticut and may face disciplinary action, either by the head and dean of a residential college or by the Yale College Executive Committee.

## A. GENERAL RESPONSIBILITIES OF STUDENTS

Yale College recognizes its students to be responsible adults and believes that they should behave in a manner that does not endanger themselves or others and that is in compliance with state and local laws regarding the consumption, sale, and delivery of alcoholic beverages. Furthermore, students will be held fully responsible for their own behavior, even when acting under the influence of alcoholic beverages. Infractions of the alcohol regulations as well as any alcohol-related behavior that violates the *Undergraduate Regulations* will be subject to disciplinary action by the appropriate University officials. In such cases, the association of alcoholic beverages with problem behavior will not be seen as a mitigating factor and may be seen as an exacerbating factor.

Students are strongly encouraged to call for medical assistance for themselves or for any student who is dangerously intoxicated; such a call for emergency help does not in itself lead to disciplinary charges.

## B. COMPLIANCE WITH STATE STATUTES

The legal drinking age in Connecticut is twenty-one. The law provides that anyone who delivers or gives an alcoholic beverage to a person under the legal drinking age or to any person who is intoxicated is in violation of the law and subject to the imposition of penalties as designated by statute (CT General Statute, Section 30-86(b)). (http://search.cga.state.ct.us/dtsearch_pub_statutes.html) It is similarly a violation of the law for a person under the legal drinking age to possess alcohol or to misrepresent his or her age, through the use of a fraudulent identification card or otherwise, in order to

be served alcoholic beverages illegally (CT General Statute, Section 30-88a (http://search.cga.state.ct.us/dtsearch_pub_statutes.html)).

Connecticut statutes explicitly forbid the sale of alcoholic beverages unless the seller holds a state liquor license (CT General Statute, Section 30-74 (http://search.cga.state.ct.us/dtsearch_pub_statutes.html)). Yale University does not hold such a license for social functions on campus. No alcoholic beverages may be sold anywhere in the residential colleges or college annexes, Baker Hall ("Swing Space"), or anywhere on the Old Campus. Stratagems such as the sale of chits, potato chips, set-ups, or any article that may be redeemed for alcoholic beverages are the equivalent of paying money for alcoholic beverages and are prohibited. No admission may be charged or accepted for cocktail parties or other drinking parties no matter how named.

All undergraduate social functions, organized and private, must be in compliance with state and local laws. It is the responsibility of the host (or host organization) to ensure compliance with state and local laws and with appropriate University regulations. (See Social Functions (p. 44); for regulations pertaining to the service of alcohol, see section D (p. 14) below.)

## C. WHO MAY BE SERVED

The categories of persons listed below may be served alcoholic beverages. Verification must be made by a TIPS-certified bartender, including students trained in the certification course offered by the Yale College Dean's Office.

1. Members of the faculty, administrative staff, alumni, and parents.

2. Yale students of legal drinking age, whether undergraduate, graduate, or professional school students, as confirmed by the birthdate on their Yale University identification cards.

3. Guests, either individuals accompanied by Yale hosts or students visiting Yale from another college or university, who can establish that they may be legally served alcoholic beverages by means of two forms of identification, such as a college identification card, a driver's license, or a passport. At least one of the forms of identification must include a photograph.

## D. SERVICE OF ALCOHOLIC BEVERAGES

Under no circumstances may alcoholic beverages be served, directly or indirectly, to anyone under the legal drinking age or to anyone who is intoxicated. Alcoholic beverages are to be served from a well-illuminated bar physically separated from places where other refreshments are served. Service will be only by authorized bartenders assigned to the event from a pool to be administered by Yale Dining.

## E. PROVISION OF NON-ALCOHOLIC BEVERAGES AND FOOD

At any event at which alcoholic beverages are served, the host must also provide non-alcoholic beverages and food in adequate amounts. Service of alcoholic beverages must cease if the supply of non-alcoholic beverages is exhausted.

## F. PERMISSIBLE ALCOHOLIC BEVERAGES

Beer and wine may be served at organized social functions. Other alcoholic beverages, such as punch and mixed drinks, may be no more than 15% alcohol by volume. Grain alcohol is prohibited on campus.

## G. PRIVATELY OBTAINED ALCOHOLIC BEVERAGES

No privately obtained alcoholic beverages may be brought into an organized social function, including major campus events such as Spring Fling.

## H. ADVERTISING

There may be no advertising on the Web or elsewhere of alcoholic beverages at campus functions or at off-campus functions arranged by student organizations.

## I. CESSATION OF SERVICE

Service of alcoholic beverages must cease one hour prior to the scheduled end of an organized social function. (See Social Functions, section F, Hours (p. 46).)

## J. OLD CAMPUS AND FRESHMAN AREAS

Kegs of beer are strictly forbidden on the Old Campus and in freshman suites in Silliman and Timothy Dwight Colleges. In addition, no alcoholic beverages may be served at organized or private functions on the Old Campus, except at functions confined to upperclass rooms or to entryways occupied solely by upperclassmen or when authorized by the Yale College Dean's Office.

## K. MISUSE OF IDENTIFICATION CARDS

Misuse of the Yale identification card, as for example by allowing its use by someone else or by passing on alcoholic beverages obtained with its use to an underage person, is a violation of the *Undergraduate Regulations* and will lead to disciplinary action.

## L. ATTEMPTS TO BE SERVED ILLEGALLY

Any attempt by a student who is under the legal drinking age to be served alcoholic beverages illegally at an organized social function, for example by using false or fraudulent identification documents in order to misrepresent his or her age, is a violation of the *Undergraduate Regulations* and will subject the student to disciplinary action by the appropriate University officials.

## M. FAILURE TO COMPLY

Any individual or organization that fails to comply with these regulations will be subject to disciplinary action.

# Campus Housing and University Facilities

## A. RESIDENCE

Each residential college is a microcosm of the Yale undergraduate student body. Freshmen are assigned to colleges by a method that attempts to ensure that the population of each mirrors the diversity of backgrounds and interests found in the student body as a whole. The head of each residential college is in charge of all college affairs, including housing. Generally the responsibility for room assignments is

delegated to the dean; in some circumstances the head and dean may collaborate in making housing decisions.

Violation of the campus housing regulations may be subject to disciplinary action by the Yale College Executive Committee. In certain cases, the head of a residential college, in consultation with the residential college dean, will decide that the appropriate punishment for persistent or serious disregard for the regulations is to require the student in question to live off campus, either for a specified period or permanently. This penalty is called "rustication." Rusticated students may be denied access to the college itself and to its facilities. When a student is rusticated, no rebate of room rent will be granted for the time period of rustication. Violations of the penalty of rustication may also be referred to the Yale College Executive Committee.

Campus housing regulations are binding on all students in residence in Yale College housing and on their visitors, whether from Yale or elsewhere. The following regulations apply in the residential colleges, on the Old Campus, in Baker Hall ("Swing Space"), in Arnold Hall, and in any other annex spaces.

1. Occupancy. Students in their first four terms of enrollment must live on campus unless they are married or are at least twenty-one years of age on the first day of classes in the term in question. Freshmen and sophomores who are rusticated are required to live off campus during the time of their rustication.

   Students must live in the rooms to which they have been assigned. They may not move without the permission of the residential college dean or head. All resident students must take a meal contract. Empty beds in suites may be filled at the discretion of residential college deans or heads without prior notice to students.

   On-campus housing is guaranteed to freshmen and sophomores, for whom residence is required. Housing is generally available for all who request it, but availability is not guaranteed.

2. Off-Campus Housing. Juniors and seniors are ordinarily permitted to live off campus; however, the residential college head or dean may require a student to remain on campus in unusual circumstances. The University assumes that students have notified their parents or guardians of their housing plans.

   Any student living off campus may select a resident meal plan and is encouraged to take advantage of all the other resources of the college.

3. Mixed-Gender housing. Yale has adopted a mixed-gender suites option for and seniors with the following conditions:

   a. Each bedroom within a suite must be single-sex. A man and woman may not occupy a double bedroom, but they can elect to live in separate single bedrooms within a suite.

   b. No student will be assigned to a mixed-gender suite against his or her will.

   c. Mixed-gender housing groups will get no advantage or disadvantage in the housing selection process. If they are not able to select a suite that can accommodate them, they may need to break into different groups that may or may not be mixed-gender.

d. Students in intimate relationships are strongly discouraged from entering into a shared-suite arrangement.

4. Room Draw. An undergraduate who participates in the room draw of a residential college in the spring, and accepts a room as a result of the draw, has contracted for that room. If that student subsequently relinquishes the room, he or she normally will be subject to the charges outlined in Financial Services.

   Yale has limited wheelchair-accessible housing. Therefore, any student who selects and accepts a wheelchair-accessible room may later be required to relinquish it to a disabled student. If the room is needed, the original occupant will be provided with alternative housing.

5. Reinstatement. Students applying for reinstatement who wish to live on campus should notify the residential college dean early in their reinstatement process. On-campus housing is guaranteed to freshmen and sophomores, for whom residence is required. Housing is generally available for all who request it, but availability is not guaranteed. Housing will be determined upon completion of the reinstatement process: in early to mid-August, for the fall semester, and in early December, for the spring semester.

6. Transfer of College Affiliation. Students may request a transfer from their assigned residential college to another college. Such a request will be granted when a student has compelling reasons and there is space in the college to which he or she wishes to transfer. Instructions and the form to request a transfer may be obtained in the office of the head or dean of any residential college. A student must complete the form, which requires a brief written statement, and must also meet with the head and dean of each of the colleges involved before the application can be considered.

   Transfer requests must be submitted by Friday, February 10, 2017, for the following fall term. In unusual circumstances, students may ask to transfer affiliation at other times of the year; such requests will be considered on a case-by-case basis.

7. Occupying and Vacating Rooms. All residences, including the residential colleges, Old Campus dormitories, Baker Hall ("Swing Space"), and annex facilities, open for occupancy on stipulated dates before the beginning of classes each term. They are open for the entire fall and spring terms, but all are closed during the winter recess; the only exceptions are annex apartments, when they are in use. A residential college head may require students planning to stay on campus during the spring recess to notify the office before the start of recess.

All students must vacate their rooms by noon of the day following the end of the final examination period in the fall term. In the spring term, all students but seniors must vacate their rooms by noon of the day following the end of the final examination period; seniors may remain in their quarters until noon of the day following Commencement.

Failure to vacate rooms by these times will result in a fine of $100, which will be charged to a student's University account.

Students who are suspended must vacate the college and return keys and Yale identification to the residential college dean's office within the time period specified

by the Executive Committee. In no case may that period be greater than 72 hours after the imposition of the penalty. A suspended student may not return to campus during the period of suspension for any reason unless he or she receives express written permission in advance from his or her residential college dean or head, or the dean of student affairs, <u>Camille</u> Lizarríbar.

Only students currently enrolled in Yale College may live in undergraduate housing; students on leave of absence, students on a Year or Term Abroad, and withdrawn students may not occupy student housing. Students occupying dormitory rooms during the fall who will be leaving for the spring term must remove all of their possessions by noon of the day following the end of final examination period in the fall, so that the room can be prepared for the next occupant.

## B. CONDUCT IN THE DORMITORIES

Living and working in a community requires individuals to show each other mutual respect and consideration. Students need to be able to sleep and study in comfort, and they have a right to privacy. Persistent rooming disagreements should be discussed with the residential college head or dean.

1. Noise. Students should use sound systems, musical instruments, televisions, etc., with consideration for the rights of others. This is particularly important between 11 p.m. and 7 a.m. Sunday through Thursday and between 1 a.m. and 8 a.m. on Friday and Saturday. The residential college head has the authority to confiscate sound equipment and return it to the student at the end of the academic year if its use is inappropriate. Inconsiderate noise should be reported to the head and dean. Violation of the rules against noise may result in the penalty of rustication.

2. Firecrackers and Fireworks. Students may not store or use fireworks anywhere on campus. Violations will be prosecuted to the fullest extent of the law and referred to the Executive

3. Firearms and Weapons. Guns, ammunition, air rifles, paintball and pellet guns, BB guns, Tasers, knives, and other weapons are absolutely prohibited.

4. Pets. Students are not permitted to keep pets in their dormitory rooms. Off-campus students may not bring their pets onto campus. The Facilities Superintendent has the authority to remove and to send to the pound any animal found in University residences.

5. Service and Assistance Animals. In compliance with the Americans with Disabilities Act and other applicable state and federal law, Yale University generally allows students with disabilities to bring Service Animals to campus to perform work or tasks related to a disability. In some cases, Assistance Animals that do not qualify as Service Animals under the ADA may be permitted in University housing if shown to be necessary to afford a student with a documented disability an equal opportunity to use and enjoy University housing. http://policy.yale.edu/policy/4400-service-and-assistance-animals

   Students planning to bring a Service Animal to campus or seeking approval to bring an Assistance Animal to campus should contact The Resource Office on Disabilities as early as possible to begin the approval and registration process.

6. Thrown Objects. Throwing objects of any kind from windows is forbidden.

7. Guests. Students living in the dormitories may have guests for brief visits, but not for more than a few days. Roommates who feel inconvenienced by the presence of others' guests should discuss the matter with their residential college head or dean. No guest may be in residence if a host is not present. Students are responsible for the behavior of their guests at all times; guests may not use common areas of a college unless their hosts are present.

8. Trading and Soliciting. Students may not invite dealers or other tradespeople onto campus unless they receive permission from the head of their residential college. They also may not make contracts or agreements with such individuals that would require their presence in dormitories, except to remove or deliver goods to an individual student. Violations of this rule could result in the exclusion of such dealers and from University grounds and buildings, and might also subject the contracting student to disciplinary action.

9. Restricted Areas. Students may not trespass in areas that are locked, such as rooftops, towers, and tunnels.

10. Smoking Regulations. Smoking is forbidden in the colleges, on the Old Campus, in Baker Hall ("Swing Space"), in Arnold Hall, and in all other annex spaces.

11. Postings. Notices and postings may be put up on bulletin boards with permission of the residential college head. Students are prohibited from attaching notices or posters to doors, walls, etc.; such notices will be removed. See Student Activities and Extracurricular Activities, section K, Posters and publicity (http://catalog.yale.edu/undergraduate-regulations/rules-governing-student-activities/student-extracurricular-activities/#posters_publicity).

## C. DORMITORY FURNISHINGS

Each student in residence in a Yale College room will be supplied with a bed, mattress, bureau or wardrobe, desk, and chair. The University does not provide computer desks or tables. A blue recycling bin is allocated to each suite. In addition, some rooms or suites are furnished with bookcases, fire screens, curtains, window screens, or storm windows. At the beginning of each term, students will receive a Facilities Superintendent's dormitory room report listing the furniture that has been provided; the property listed becomes a student's responsibility. Students must inform the Facilities Superintendent within five days of occupancy if the report contains mistakes. Even when absent from their rooms, students are held responsible for any disorder or damage occurring there.

No University-issued furnishings may be removed from student rooms. If any furnishings are missing from rooms at the end of the year, students will be billed for replacement costs.

Students who damage furniture or furnishings will be charged for repairs. If it is unclear who damaged items, all of the occupants of the suite will be billed for a share of the repair or replacement. (See also section I, Maintenance of dormitory rooms and campus areas.)

## D. BAKER HALL ("SWING SPACE")

All the rooms in Baker Hall ("Swing Space"), including common rooms, are fully furnished; students may not remove any of the furniture. A summary of replacement and repair costs of furnishings and appliances will be distributed to students in Baker Hall along with their dormitory room reports when they move into their rooms. All other rules applying to other Yale College rooms apply also to Baker Hall. Students living in Baker Hall may add appliances such as toaster ovens, but these may be used only in kitchens. All such appliances must be listed for use in the United States and labeled as such by a testing/certifying agency such as Underwriters Laboratories (U.L.).

## E. STORAGE

At all times, storage is limited to the spaces each college designates for that purpose. No student may store possessions in the mechanical rooms of any college basement. The University reserves the right to dispose of improperly stored items without notice and without compensation. Absolutely no storage is allowed in stairwells or hallways per the Connecticut State Fire Safety Code.

Storage over the summer in the residential colleges is not a right but a privilege. The system is costly in terms of the time it requires of the residential college heads' offices and the custodial staff, and creates difficulties for the Summer Session and for those trying to clean and refresh the facilities. Summer storage is not permitted on the Old Campus, in Baker Hall, Arnold Hall, or in any other annex space. The residential college heads generally try to make the most space possible available but storage, even in the most spacious of colleges, is severely limited, and students should remember this in making their plans.

Storage in the summer may be divided into two categories: boxed storage of personal effects and furniture or other room furnishings. Students residing in the residential colleges may leave one couch per suite, and each student may leave one chair, one freestanding bookcase (no cinder-block or brick construction), and one standing lamp. Students must identify each item left in the room or suite with a tag obtained from the residential college head's office, and must securely attach and label each tag with the owner's name as well as fall and spring room numbers. Untagged or illegally tagged or excessive furniture, rugs, pictures, and other possessions left in rooms will be removed, and the student will be charged for the expense of the removal. Students must remove all other personal effects from their rooms at the end of the academic year and must either place their belongings in storage facilities provided by the college or remove them from the premises. Refrigerators may not be stored in student rooms or college storage spaces.

Students residing in rooms on the Old Campus, in Baker Hall, Arnold Hall, or in any other annex space must remove all personal effects and personal furniture when they vacate housing at the end of the spring term. Each college will designate one or more areas for boxed storage of personal effects of students assigned to the college (regardless of on-campus/off-campus status). The residential college head will determine the maximum number of boxes each student may store based on the available storage space in the college. Only boxed items will be accepted; no loose items or outsized items will be stored. Each box must be labeled on the sides in bold black lettering with the student's name and fall-term room number.

Yale takes no responsibility for the safety of items left on University property. Students are encouraged to provide their own storage for furniture and possessions and to provide insurance against loss or damage. In any college designated for occupancy during the summer, or for renovation or alteration, alternate storage arrangements may have to be made.

## F. INSURANCE FOR PERSONAL BELONGINGS

Yale is not responsible for loss of, or damage to, any personal belongings anywhere on or off campus, whether in a dormitory room, an off-campus apartment, or a storage area, regardless of the cause of the loss or damage. All students are encouraged to make their own arrangements to obtain insurance against loss or damage.

Yale's Office of Enterprise Risk Management provides access for students to a comprehensive insurance policy to protect student personal belongings. Details can be found at http://ogc.yale.edu/special-programs-0.

## G. FIRE SAFETY

It is crucial that all fires on campus, no matter how small, be reported to the residential college head's office and by calling 911. This includes fires extinguished without the assistance of the fire department or the Yale Police Department.

The University reserves the right to enter and to inspect any student room without prior notice. All dormitory rooms will be inspected twice a year. When the inspection is completed, occupants will be provided with a University fire and inspection report. They will be required to move any obstructions to fire doors or other dormitory exits. Any flammable or combustible material will be removed at the expense of the occupants. If the deficiencies are not corrected the students will be fined at least $100 and referred to the Executive Committee for disciplinary action.

1. Fire Alarms. All occupants are required to vacate the building in a timely manner when a fire alarm is activated, including when fire drills are being performed. Deliberately setting off a fire alarm when there is no fire is extremely dangerous and violates the laws of the State of Connecticut. A student who sets off a fire alarm will be fined at least $100 and prosecuted to the full extent of the law. Further disciplinary action will be taken by the residential college head or by the Yale College Executive Committee.

2. Fire Extinguishers. In the event of a fire, students should vacate the building, pull the fire alarm as they leave, and call 911. Students should use fire extinguishers only if they have been trained in their use and they can use them without presenting dangers to themselves or others. Students may not tamper with or remove fire extinguishers from their proper stations or discharge them except to put out fires. Students violating this rule will be fined at least $100 plus any cleanup costs that may be incurred. They may be subject to further disciplinary action by the residential college head or by the Yale College Executive Committee.

3. Smoke Detectors and Sprinkler Systems. The smoke detectors in each room must be in working order at all times. Students are required to press the test button on the front cover of their detectors monthly; if there is no sound, they must report the malfunction to the Facilities Superintendent. If it is found that students have damaged, removed, or deliberately made their smoke detectors inoperative,

occupants of the room or suite in which the detector is placed will be fined at least $200 each, and they will be subject to further disciplinary action by the residential college head or by the Yale College Executive Committee.

Students may not tamper with the automatic sprinkler systems in dormitory rooms. Sprinkler heads and pipes must not be used to hang clothing or other items because such use could lead to damage that could cause the system to activate, causing property damage. In order to ensure that they will function as designed in case of a fire, sprinkler heads must never be painted; painting can delay or prevent the sprinkler head from operating when needed. Students who cause the unnecessary discharge of a sprinkler will be fined $100 per person and charged for replacement of sprinkler heads, cleanup costs, and the repair or replacement of any damaged items. They may be subject to further disciplinary action by the residential college head or by the Yale College Executive Committee.

If, during a party, deliberate and unnecessary activation or discharge of fire alarms, sprinkler systems, or fire extinguishers, or tampering with fire alarms, smoke detectors, sprinkler systems, or door closures is discovered, the party will be stopped immediately and the person or persons hosting the party will be held responsible for all fines and cleanup costs and the students will be referred to the Executive Committee for disciplinary action.

4. Cooking Appliances. For reasons of fire safety, the following appliances are prohibited in dormitory rooms:

   Hot plates, toasters, toaster ovens, broilers, griddles, rice cookers, coffeepots, any appliances that are in poor condition, and any appliances deemed hazardous by Yale officials.

   The following items may be used in dormitory rooms:

   Microwaves, small electric teakettles, and Keurig-type beverage makers.

5. Other prohibited items.

   a. Halogen lamps.

   b. Space heaters, except when issued in emergencies by Physical Plant. Only liquid-filled space heaters issued by Physical Plant are allowed. Space heaters must be returned to Physical Plant immediately after the emergency is mitigated.

   c. Any electrical appliance with defective wiring or of an improper current rating.

   d. Kerosene lamps, camping cooking equipment, or other open-flame devices.

   e. Fabric or fishnet textiles hung from the ceiling or more than 20% of the walls in a room.

   f. Cork boards more than four square feet in size.

   g. Flammable fluids and gases such as kerosene, gasoline, and propane.

   h. Candles and incense.

    i. Live holiday trees and decorations.

    j. Residential-grade extension cords and power strips are prohibited. Only UL-approved commercial-grade extension cords and power strips are allowed.

6. Fireplaces. Fireplaces may not be used under any circumstances.

7. Fire Exit Doors. Access to fire exit doors must never be blocked; the automatic closure mechanisms must not be propped open. Occupants of any dormitory room in which any of these occurs will be fined $200 per occupant.

8. Obstructions of Fire Exits. No object of any sort may be placed or stored in entryways, corridors, exitways, or any other position where it might obstruct immediate access to a fire door or exit. This includes tripping hazards such as rugs or telephone cords.

9. Treatment of Material. Draperies, mattresses, mattress covers, carpets, or wall hangings over four square feet in size must be noncombustible or have been treated with a flame-retardant material.

10. Holiday Lights. Holiday lights will be limited to no more than three strings per room; these are prohibited from being plugged into each other to create a single string of lights, and must be listed and labeled by a product certification agency, such as Underwriters Laboratories (U.L.). No holiday lighting or decorations may be installed in stairwells or on the exterior of the building.

11. Special Events. Social gatherings or special events of more than 50 people must be approved by Fire Code Compliance Services (203-432-9923). The Yale Police Department and Yale Security must also be notified, via http://publicsafety.yale.edu/safety-services/request-police-or-security-services.

## H. CARE OF ROOMS

The University reserves the right to enter and to inspect any student room; inspections may be made without prior notice. Students are responsible for the care of their rooms and are expected to keep them in reasonable condition. If they do not do so, after appropriate warnings they will be charged a fine (assessed per student if more than one student occupies the room). Students who further disregard reasonable standards may be required to relinquish the room without rebate.

In entryway bathrooms, personal belongings are to be left only in the designated storage units or on installed shelves. Such belongings may not block the emergency exit doors connected to other rooms. Students living in suites with internal bathrooms are responsible for cleaning their own bathrooms and for requesting necessary repairs or other maintenance. Such bathrooms are furnished with cleaning supplies and cleaned twice each year by custodial services, during the winter recess and at the end of the spring term.

At the end of the academic year, each student must sign out of his or her room individually. Each student must complete a sign-out form upon leaving; students who fail to do so will be assessed a fine.  When rooms or suites are left in poor condition, a cleaning fee will be assessed, appropriately divided between suitemates or roommates.

## I. MAINTENANCE OF DORMITORY ROOMS AND CAMPUS AREAS

1. Damage to Rooms or Other University Property. Students responsible for damage to their rooms or to other University property will be charged for the cost of repairs. When students move into their rooms they will be provided with a student tenant manual that includes a fee schedule for damages. All damages must be reported to the Facilities Superintendent within five days of occupancy.

2. Alterations. Students may not make alterations to their rooms. No lofts or partitions of any kind may be constructed. Ceiling fans, outside TV antennae, air conditioners, and waterbeds are also prohibited. No furniture or equipment attached to the building itself may be removed. If alterations are made without permission, the University reserves the right to require restoration of the previous condition at the occupant's expense.

3. Painting. The painting or defacing of walls or woodwork in the bedrooms or common rooms of the student suites is prohibited. In addition, items may be attached to walls only with the materials provided by the Facilities Department; attaching items to walls by any other means is prohibited. Painting of entryways, hallways, entry doors to student rooms and suites, bathrooms, or any other part of a University residence building is prohibited. Fines for noncompliance or the actual cost of repair and repainting will be assessed by the Facilities Superintendent through Student Financial Services.

4. Trash. Fire regulations stipulate that rubbish containers may be placed only on the first floor of entryways on the Old Campus. In Baker Hall ("Swing Space") and the residential colleges, trash and recycling must be placed in the basement trash rooms. Under no circumstances may students leave trash in entryways, hallways, stairways, or landings; students who do so will be assessed a fine of $100 and will be charged for the removal of the trash.

5. Recyclables. Under city and state laws, students are required to recycle all newspapers, white office paper, corrugated cardboard, and glass and metal food and beverage containers in the designated recycling sites. A fine of $100 plus removal fees will be assessed if students leave their recyclables in entryways, hallways, stairways, or landings.

6. Items in Entryways and Stairwells. No items of any kind may be stored or chained in the entryways, hallways, or corridors of any dormitory. Bicycles, mopeds, or motorcycles left in entryways will be removed without notice and stored at the owner's expense. A fine will be assessed.

7. Bicycles. Bicycles must be stored in designated areas during the academic year; bicycles left at the end of the academic year may be removed and discarded.

8. Use of Public Spaces. Organized activities may only take place on the Old Campus with permission of the Yale College Dean's Office or on the Cross Campus with the permission of the President's Office. Activities or games that may harm lawns are not allowed in college courtyards, except with express permission of the individual

residential college heads. Activities involving oversized inflated balls (typically called Bladderball at Yale) are not permitted on University property.

9. Use of Grills. Grills may be used only by obtaining advance permission from Fire Code Compliance Services (203-432-9923), the appropriate residential college head, and, in the case of the Old Campus, the Yale College Dean's Office. Propane grills or tanks may not be stored inside buildings under any circumstances.

10. Hanging Items. No items may be hung on the exterior of dormitories or other University buildings, gates, fences, or structures. Exceptions may be made only by residential college heads or other University officials for facilities under their control.

11. Posters and Publicity. All advertising of events and activities must be in accordance with University regulations governing poster and chalk announcements. (See Student Activities, section K, Posters and Publicity (http://catalog.yale.edu/ undergraduate-regulations/rules-governing-student-activities/student-extracurricular-activities/#posters_publicity).)

## J. GENERAL SECURITY

While the safety of members of the community and the protection of University and personal property are a common concern of all members of the Yale community, each student is responsible for his or her own safety. Each student should obtain and carefully read the pamphlet entitled "Public Safety at Yale University (http:// your.yale.edu/sites/default/files/files/SAFETY_BROCHURE_2016.pdf )," published by the Yale Police Department and the University Security Department. Students are encouraged to read information on the Public Safety website (http://your.yale.edu/ community/public-safety).

The University particularly requests the cooperation of students in maintaining the security of the dormitories. Students should keep their own doors and entryways locked and their windows secured. They should report to the Yale Police Department (campus emergency number 911) any activity or the presence of any person that they think might constitute a threat to security. The Yale Police Department should be notified immediately in the event of a theft or of any other crime. Students are responsible for not compromising their own security or that of others. Among the actions which endanger the community and for which students may be subject to fines or disciplinary action by the Yale Police Department, the residential college head, or the Yale College Executive Committee are those concerning the following:

1. College Gates and College, Dormitory, or Building Doors. Students should never tamper with or prop open gates or doors and should obey security postings at all times, for their own safety and that of their fellow students.

2. Security Systems or Devices. Improper use of, tampering with, or vandalism of security systems or devices is forbidden.

3. University Identification/Proximity Cards or Keys. Students are not permitted to possess unauthorized identification/proximity cards or keys or to improperly give, lend, or duplicate these devices.

Students receive their identification/proximity cards and keys when they take occupancy of their rooms; in some cases they will also receive suite keys. In some cases a student will receive more than one room key. No keys will be issued except to the occupant of a given room, and that student is responsible for the return of all keys. Students living off campus will have identification/proximity cards giving them access to the residential college gates.

If keys to rooms, suites, or gates are lost, students will be charged a replacement fee of $25 per key. If a student finds the lost key or keys within thirty days and returns it or them to the residential college head's office, the replacement charge will be canceled. If keys are found after thirty days and returned, half the replacement charge will be returned to the student. Ordinarily the University does not change locks when keys are lost unless a form of identification has also been lost.

All students must return all keys to the residential college head's office at the end of each academic year or when they withdraw from Yale College, take leave of absence, or move off campus. Failure to return keys at such times will result in a $25 fine, half of which will be canceled if the keys are returned within thirty days of the student's departure. Subsequent return of keys will not reduce the amount of the fine. The identification/proximity card will be deactivated for all students at the end of each academic year, and it will be deactivated for departing students at the time of withdrawal or leave of absence.

When a student loses an identification/proximity card, he or she should immediately report the loss to the University Security Programs Department at 57 Lock St., 203-785-5555. Replacement cards are available from 9 a.m. to noon and 1 to 3 p.m., Monday through Friday, at the ID Card Center, 246 Church Street. The replacement fee is $20 for a lost or stolen card.

### K. LOSS OF PROPERTY

Lost and found items should be treated in the following ways:

1. Items of Value. All lost and found items of value, including wallets and cash, should be reported immediately to the Yale Police Department at 203-432-4400.

2. Personal Items. Personal items lost or found in Sterling Memorial Library and Bass Library should be reported immediately to 203-432-1830. Personal items lost or found in other libraries should be reported to the circulation desk in that library. In all other areas, contact the Lost and Found Department at the Yale Police Department, 203-432-4405 (weekdays between 9 a.m. and 5 p.m.) or 203-432-4400 (at other times).

# Dining Services

All resident students are required to have a meal contract. Freshmen are required to have the Full Meal Plan, but may upgrade to the optional Anytime Meal Plan. Upperclass residents may choose either the Anytime Meal Plan, the Full Meal Plan, or the Any-14 Meal Plan. Nonresident students may arrange on a term basis for the Off Campus Meal Plan, the Full Meal Plan, the Any-14 Meal Plan, or Eli Bucks for the purchase of individual meals. Follow the appropriate links to obtain more information about meal plans (http://hospitality.yale.edu/undergraduate-meal-plan-options), the

Yale Dining calendar and the operating schedule (http://hospitality.yale.edu/summer-operating-schedule-2016).

## A. CHARGES

Students who have a dining contract are required (except as provided in Financial Services (p. 33)) to pay the charge of the contract until the end of the term for which it was taken. Bills for additional charges, if incurred, will ordinarily be rendered monthly or before the end of each term. Board bills for nonresident students will ordinarily be rendered on a term basis in advance.

## B. REFUNDS

No refunds or rebates can be given for meals not taken during a term. In order to receive a refund due to a withdrawal or leave of absence, students are required to submit a written request to the Yale Dining Business Office (yale.dining@yale.edu). No board rebate can be given for any day before the day on which the student advises the Yale Dining Business Office of her or his status change, or the day on which notification is received by the Yale Dining Business Office.

For more information about Refunds, see Financial Services (p. 33).

## C. DINING HALL ACCESS

All undergraduates must present their University identification cards to access any Yale dining hall. Upon entering a dining hall, students present their University identification cards for electronic scanning. Students who do not present a valid Yale identification card may be denied access to a dining hall. The individual residential colleges reserve the right to limit access to their dining halls at specified times.

## D. MISUSE OR MISAPPROPRIATION OF DINING SERVICES PRIVILEGES

Dining privileges are not transferable and may not be given or sold to another person. If meals are improperly obtained in a dining hall or in a University retail location, the executive director of Yale Dining or the director's designee has the authority to impose fines and charges on the offending person or persons.

1. A student who gives, lends, or sells the use of a Yale identification card to a non-Yale person will be fined $100 and required to pay at the current guest rate for the meal or meals taken.

2. A student who gives, lends, or sells the use of a Yale identification card to another Yale student will be fined $100. The student who receives the card will also be fined $100 and will be required to pay at the current guest rate for the meal or meals taken.

3. A nonresident student without a dining contract who has not paid for a meal but who takes food available for self-service or who takes food from another person's tray will be fined $100 and required to pay for the meal at the current guest rate. (See also section F, "Nonresident students (p. 28).")

4. If a student brings a guest to a dining hall with no payment being made for a meal for the guest, and the guest takes food available for self-service or takes food from another person's tray, the student who is the host will be fined $100 and

required to pay for the meal at the current guest rate. (See also section G, "Guests (p. 29).")

Fines and charges will be billed to the student's account with Student Financial Services. When the executive director of Yale Dining or the director's designee imposes a fine on a student, he or she will so notify the student in writing, describing the evidentiary basis for his or her decision. The executive director will also send a copy of this notice to the student's residential college master and dean and to the chairman of the Yale College Executive Committee, and will, at his or her discretion, request that further disciplinary action be taken by the Yale College Executive Committee. The Executive Committee itself may also, at its discretion, assume disciplinary authority with regard to the offenses described in these paragraphs.

## E. TRANSFERS

An undergraduate with meal privileges may take meals in other residential colleges, Commons, or the Hall of Graduate Studies Dining Hall by exhibiting a Yale identification card.

Additionally, students with classes in the area (which make it difficult or impossible to return to a dining hall for lunch) are allowed to transfer their meal contracts on a cash equivalency basis to the following retail food services at lunch: the KBT Cafe, Thain Family Cafe, Durfee's, Cafe Med and the Divinity School Refectory. The value of the transfer for meals is limited to the cash equivalency for the meal taken. As there are time-period restrictions, students should check with these units before attempting to use their meal contract equivalency. (See section D, "Misuse or misappropriation of dining services privileges (p. 27).")

Off-campus students who purchase any meal plans (the Off Campus 5 Meal Plan, the Anytime Meal Plan, the Full Meal Plan, or the Any-14 Meal Plan) are entitled to transfer meals to the dining halls at the KBT Cafe, the Divinity School Refectory, the Hall of Graduate Studies and Cafe Med. As there are time-period restrictions to eating in those facilities, students should check with them before attempting to use their meal contract equivalency. Dining Points or Eli Bucks may be used at these facilities.

Transfers are not accepted during special events. Dining hall managers reserve the right to limit transfers at specified times, as directed by individual masters, or at any other time when transfer requests cannot be accommodated.

## F. NONRESIDENT STUDENTS

Off-campus students are encouraged to come frequently to the dining halls of their residential colleges. They may purchase the Off Campus 5 Meal Plan, the Anytime Meal Plan, the Full Meal Plan, the Any-14 Meal Plan, or the Eli Bucks Plan for the purchase of individual meals. Such a contract, when purchased, remains valid for the term and cannot be redeemed. Nonresident students may also charge meals to their Yale student accounts with Student Financial Services or pay for them cash by credit card (MasterCard, Visa, Discover ir AmEx) at the guest rate. (See section A, "Charges (p. 27).")

The service standard in the Yale College dining halls, which provides free access to the dining hall and unlimited second helpings, makes it inappropriate to charge by the item; payment for the full meal is consequently required. Off-campus students

who come to a dining hall must therefore pay for the meal being served or refrain from eating. (See section D, "Misuse or misappropriation of dining service privileges (p. 27).")

## G. GUESTS

Students are welcome to have guests in the dining halls. Payment at a guest rate may be made by credit card (MasterCard, Visa, Discover or AmEx) or may be charged to the student's Yale account with Student Financial Services. Dining Points or Eli Bucks may be used for guests' meals also. (See section A, "Charges (p. 27).") For reasons given above, payment for a full meal is required, and it is not possible to pay by the item. Hosts may not share food from their own trays with guests. (See section D, "Misuse or misappropriation of dining services privileges (p. 27).")

## H. REMOVAL OF FOOD

Meal contracts and guest payments entitle a diner to the food being served at a meal for consumption at that time. Food may not be taken from the dining hall to be consumed later. Only the following items are permitted to be eaten "on-the-go": a single beverage in a refillable mug no larger than 24 ounces; a sandwich, burger, or pizza slice; a cookie or brownie, an ice cream cone, or a single piece of fruit.

Students with meal contracts who cannot eat a lunch or a dinner in a dining hall may obtain a sack lunch or a late plate by filling out a form on line at http://hospitality.yale.edu/orders2go.

## I. MODIFIED DIETS AND FOOD ALLERGIES

A student with food allergies or other medical condition which requires dietary restrictions should fill out the Special Dietary Needs Self Identification Form (http://hospitality.yale.edu/special-dietary-needs-self-identification-form) and follow the instructions at http://hospitality.yale.edu/special-dietary-needs. Students with allergies or who need a modified diet are strongly encouraged to speak to the manager of his or her residential college dining hall. Arrangements will be made to accommodate reasonable dietary restrictions at no extra charge. Students may be asked to provide supporting medical documentation from the student's physician and/or Yale Health; this documentation is evaluated by and registered with the Resource Office on Disabilities. Additional information about dining accommodations can be found at http://hospitality.yale.edu/special-dietary-needs.

## J. CHINA, FLATWARE, AND GLASSWARE

Removing china, flatware, and glassware from the dining hall constitutes theft and is forbidden. Disciplinary action may be taken.

## K. USE OF THE DINING HALLS AFTER MEALS

Students or groups wishing to use a dining hall after meals for such events as dances or plays must first secure the permission of the head of the college and then coordinate the usage with the dining hall manager. Food purchased outside of Yale Dining is not allowed in any dining hall. There may be a charge for use of the dining hall. It is important to maintain the general condition of the dining facility after an event. Due to risk of injury and potential damages to furniture and facilities, students may not move dining room furnishings.  Any such movement must be arranged through the dining

hall manager and may require a fee for labor.  Any special cleaning or damages will be charged to the student account or to the student organization sponsoring the event.

## L. CONDUCT IN THE DINING HALLS

The dining halls are important social centers at Yale, and in the residential colleges especially they are the focus of much of the social life of the community. So that they may be places where everyone can eat and talk in comfort, certain activities must be regulated or entirely prohibited.

1. Annoyances. Loudness and offensive boisterousness are inconsiderate invasions of the rights of others and are not allowed. Food-throwing is absolutely forbidden.

2. Soliciting. Permission of the head of the college is required for solicitation in a residential college. (See Student Activities and Extracurricular Activities, section I, "Solicitation and sales in residential colleges and other buildings (p. 51)".) Table-to-table solicitations and sales are prohibited. Students wishing to solicit for any purpose must consult the dining hall manager; at most times in most of the residential colleges, tables and chairs can be provided for such students near the entrance to the dining hall. Public announcements, except with the approval of the dining hall manager and the head of the college, are not allowed during meals.

3. Photographing. In general, photographing during meals is not allowed because it interferes with the privacy of others. Written application for an exception to this rule must be made to the and the head of the college. Photographing a dining hall when meals are not being served can be arranged by contacting the dining hall manager who will obtain permission from the Director of Yale Dining.

4. Table Tents and Other Notices. Table tents and other notices are no longer permitted on tables in any of the dining halls. Students are encouraged to use electronic bulletin boards, websites, and social media to advertise their events.

5. Smoking Regulations. Smoking is not permitted in the public areas of University buildings.

## M. PENALTIES

For penalties for misuse of dining hall privileges, see section D, "Misuse or misappropriation of dining services privileges (p. 27)." The dining hall manager will refer other violations of the Dining Services Regulations to the head of the residential college or to the Yale College Executive Committee for disciplinary action. The head of the college has the right to forbid a student who violates the regulations to enter the dining hall, either permanently or for a specified period of time.

# Financial Aid

## A. GENERAL

The University adheres to a firm policy of providing assistance to meet the demonstrated financial need of all Yale College students for their four undergraduate years.

## B. AMOUNT AND TYPE OF AID

Most awards are made on a yearly basis. Where circumstances warrant, awards are made for one term even though a student is enrolled for the full academic year. The amount and the type of aid (i.e., job, loan, and gift) are determined individually after consideration of the financial situation of the student's family. The first portion of demonstrated financial need, however, is met through self-help (job and/or loan).

## C. ELIGIBILITY

A student who demonstrates financial need and who meets the requirements for promotion is eligible for gift aid and/or loans. No student, except certain reinstated students, will be eligible for assistance for more than eight terms. (See section J, "Reinstated students (p. 32).") The University will not aid any student who is in default on any federal or University loan, has borrowed in excess of loan limits, or owes a refund to the Department of Education, Yale, or any other institution for any Title IV financial aid. Further, if a student is found to be in default, has borrowed in excess of loan limits, or owes a refund after being offered financial aid, the University will withdraw all aid immediately while continuing to hold the student responsible for any charges incurred. Students who falsely attest to their status in this regard may be subject to disciplinary action as well.

## D. OFF-CAMPUS LIVING

Awards are granted on the assumption that a student's living expenses will not exceed the cost of room and board charged to resident students. Students will not receive additional gift aid in order to meet expenses for off-campus living that exceed the cost of living in University accommodations. Requests for additional self-help to meet such expenses, however, will be considered.

## E. MARRIED STUDENTS

A married student should not expect to receive more gift aid than he or she would receive as a single student.

## F. PARENTAL CONTRIBUTION

Yale College believes that parents have the primary responsibility of paying for their children's education. That principle extends to both parents, even when they are divorced or separated, and is fundamental to Yale College's financial aid policy. If a student is admitted to Yale as a dependent, and the student's parents discontinue support at a later time, the student cannot expect that the University will replace the expected parental contribution with Yale funds.

## G. DEPENDENTS

A student with dependents should plan to support them without assistance from the University.

## H. ADJUSTMENT OF AWARDS

A financial aid recipient is required to report to Student Financial Services any improvements or reversals in circumstances that alter the family's and/or student's financial situation, including receipt of gift or loan assistance other than that awarded

or processed by Student Financial Services. Awards may be adjusted as the result of such changes.

## I. APPLYING FOR FINANCIAL AID

Applications for financial aid for the academic year 2017-2018 must be completed by May 15, 2017. Applications for financial aid for spring term 2017 only must be completed by October 15, 2016. (Students applying for reinstatement should indicate that they are applying for financial aid on their applications for reinstatement. Student Financial Services will provide the application instructions to the student, who should complete and file them immediately.) To ensure that students benefit from the full range of available financial aid, Yale requires the completion of the Free Application for Federal Student Aid, which is used to determine eligibility for federal and state grants as well as the low-interest Federal Direct Loan program. Additional documents may be required for federal verification purposes. Institutional aid is a substantial component of the financial aid package for most Yale College students, and the CSS Profile, along with FAFSA, is required to determine eligibility for Yale scholarships. The CSS Profile provides an automatic fee waiver for applicants from low-income families with few assets. In addition, a copy of the student's and parents' latest federal income tax returns and W-2 forms, and a Yale College Application for Financial Aid are required from each applicant before a renewal of a financial aid award is made; other forms, such as a Noncustodial Parent Profile, a Business/Farm supplement, or an IRS tax transcript may also be required. Students not receiving financial aid whose circumstances change are encouraged at any time during the year to discuss with a staff member in Student Financial Services the possibility of applying for aid.

## J. REINSTATED STUDENTS

All financial aid recipients returning to Yale after a withdrawal must complete a financial aid application at least two weeks before the beginning of the term for which they have applied for reinstatement. (See section I, "Applying for financial aid (p. 32).") Students who withdrew for medical reasons will resume their eligibility for financial aid as before. Similarly, students who, after readmission, will be able to complete the requirements for graduation in a total of eight terms (the total including the semester in which they withdrew if withdrawal occurred after the first ten days of the term) will resume their eligibility for financial aid as before. Normally, students who attend for nine terms are not eligible for financial aid from Yale in their ninth term. However, a reinstated student who will require nine terms of enrollment may apply for financial aid for a ninth term.

## K. EXIT COUNSELING

At the end of senior year, or at the time of withdrawal from Yale College, students who have received a student loan from Yale or federal sources must complete exit counseling requirements. Student Financial Services will notify all graduating and withdrawn students of this obligation and provide instructions on completing the requirement. No student who has obtained a Yale or federal loan will be awarded a diploma or be able to secure a transcript until he or she has completed the exit counseling process.

## L. FURTHER INFORMATION

For a more detailed explanation of financial aid policy and procedures, including policies regarding Satisfactory Academic Progress requirements, students may contact Student Financial Services, located at 246 Church Street, first floor. The mailing address is Yale University, P.O. Box 208288, New Haven, CT 06520-8288; the telephone number is 203-432-2700; the website is http://finaid.yale.edu. The office may be contacted via the SFS "Contact Us" web page at http://finaid.yale.edu/contact.

# Financial Services

## A. INCLUSIVE FEE FOR THE FALL AND SPRING TERMS

The inclusive fee for resident undergraduates for the academic year 2016-2017 is $64,650. It includes tuition, room, board, library, laboratory, gymnasium, and (for seniors) graduation fees. The fee also covers network services, which include an Ethernet data connection at every desk and full wi-fi coverage; a telephone line in each suite; voicemail for each student; and "basic" cable television service (39 channels) in each suite. Students can, at additional cost, request private telephone lines and an expanded cable television service.

The yearly tuition fee for nonresident students is $49,480 ($24,740 for the fall term and $24,740 for the spring term). It includes all the items named above except room, board, and network services. The yearly room charge is $8,520 ($4,260 for the fall term and $4,260 for the spring term); the yearly board charge is $6,650 ($3,325 for the fall term and $3,325 for the spring term).

All students, whether resident or nonresident, will also be charged a yearly hospitalization and prescription coverage fee of $2,264 by Yale Health, unless it is waived upon presentation of evidence that a student has valid and sufficient alternative hospitalization/specialty care coverage. Coverage for the fall term only is $1,132; coverage for the spring term only is $1,132.  An online waiver (https://yhpstudentwaiver.yale.edu) indicating that a student wishes to waive this plan must be submitted to Yale Health Member Services Department by September 15, 2016, for the fall term and by January 31, 2017, for the spring term.

Additional charges will be made for such optional or incidental items as attendance at Yale Summer Session, individual instruction in the School of Music, special materials in art courses, special examinations, library fines, fines for a late course schedule and course schedule changes, damage to University property caused by the student, and the like.

## B. PAYMENT OF BILLS

The official means of communicating monthly financial account statements is through the University's Internet-based system for electronic billing and payment, Yale University eBill-ePay. Yale does not mail paper bills.

Student account statements are prepared and made available twelve times each year, at the beginning of each month. Payment is due in full by 4 p.m. Eastern time on the first business day of the following month. E-mail notifications that the account statement is available on the eBill-ePay website (http://student-accounts.yale.edu/ebep) are sent to all students at their official Yale e-mail addresses and to all student-designated

authorized payers. It is imperative that all students monitor their Yale e-mail accounts on an ongoing basis.

Yale University eBill-ePay is the preferred method of payment. Electronic payments are easy and convenient, and payments are immediately posted to student accounts. There is no charge for this service. Bank information is password-protected and secure, and there is a printable confirmation receipt. Payments can be made until 4 p.m. Eastern time on the due date to avoid late fees. Students have full control over access to their accounts, and up to three people per student can be authorized to make payments electronically from their own computers using Yale's system.

For those who choose to pay by check, a remittance advice with mailing instructions is available on the eBill-ePay website (p. 33).

A bill for one-half the inclusive fee will be available beginning the first week of July. Payment will be due by 4 p.m. Eastern time on August 1. A bill for the balance will be available beginning the first week of November; payment of the balance will be due by 4 p.m. Eastern time on December 1. The Yale Payment Plan (YPP), which is administered by the University's Office of Student Financial Services, enables students and families to pay all or a portion of the term bill in ten monthly installments beginning in May preceding the academic year. Families who elect to participate pay an enrollment fee of $100 per plan. Information about the plan is available on the Student Financial Services homepage at student-accounts.yale.edu within the Yale Payment Plan section or by calling Student Financial Services at 203-432-2700.

Information about supplemental loan plans may be obtained from the Student Financial Services Center at 246 Church Street. (See "Financial Aid (p. 30).")

A late charge will be assessed if any part of the inclusive fee is not paid when due. For payments due on August 1, but not received on or before that date, a late charge will be imposed as follows:

| If Payment in Full is Not Received | Late Charge |
| --- | --- |
| By August 1 at 4 p.m. | $125 |
| By September 1 at 4 p.m. | An additional $125 |
| By October 1 at 4 p.m. | An additional $125 |

**For payments due on December 1 but not received on or before that date, the late charge is as follows:**

| If Payment in Full is Not Received | Late Charge |
| --- | --- |
| By December 1 at 4 p.m. | $125 |
| By January 1 at 4 p.m. | An additional $125 |
| By February 1 at 4 p.m. | An additional $125 |

Students who have not paid or made arrangements for payment of their term bills by the due date will be placed on hold until these financial obligations have been settled. University regulations require that all financial obligations to the University be paid as a condition of enrollment.

Students who cancel a leave of absence or a Year or Term Abroad are subject to the deadlines outlined above. Those whose payments have not been received by Yale by

August 1 (for a fall term) or December 1 (for a spring term) are subject to the late charges as outlined above.

All payments must be made in U.S. currency and checks must be drawn on a U.S. bank.

A processing charge of $25 will be assessed for a payment returned for any reason by the bank on which it was drawn.

## C. PAYMENT OF BILLS, ACADEMIC TRANSCRIPTS, AND DIPLOMAS

No student will be able to secure an academic transcript unless all financial obligations to the University have been fulfilled. Similarly, no student will be awarded a diploma until all financial obligations have been fulfilled.

## D. REBATES OF UNDERGRADUATE CHARGES

1. Withdrawal on or before the Fifteenth Day of a Term. A student who withdraws for any reason on or before the fifteenth day of a term (September 14, 2016, in the fall term and January 31, 2017, in the spring term) will not be held responsible for the tuition, room, and board fees for that term. However, a resident student will be assessed a per diem housing charge for each day up to and including the day on which the student relinquishes the room. A student with a meal contract will be charged the guest rate per day for board through the date on which the student provides written notification of withdrawal to the Yale Dining Business Office, 246 Church Street. A nonresident student with the Dining Services Eli Bucks Plan will be charged only for meals actually taken.

2. Withdrawal after the First Fifteen Days but during the First Quarter of a Term. A student who withdraws for any reason after the fifteenth day of a term but on or before the last day of the first quarter of the term (September 24, 2016, in the fall term and February 10, 2017, in the spring term) will be given a rebate of one-half (50%) of the tuition, room, and board fees due or paid for that term. A resident student will be assessed a per diem housing charge for each day from the date of withdrawal up to and including the day on which the student relinquishes the room. A student with a meal contract will be charged the guest rate per meal for meals taken from the date of withdrawal through the date on which the student provides written notification of withdrawal to the Yale Dining Business Office, 246 Church Street. A nonresident student with the Dining Services Eli Bucks Plan will be charged only for meals actually taken.

3. Withdrawal after the First Quarter but on or before Midterm. A student who withdraws for any reason after the first quarter of a term but on or before the day of midterm (October 28, 2016, in the fall term and March 10, 2017, in the spring term) will be given a rebate of one-quarter (25%) of the tuition, room, and board fees due or paid for that term. A resident student will be assessed a per diem housing charge for each day from the date of withdrawal up to and including the day on which the student relinquishes the room. A student with a meal contract will be charged the per diem assessment for board taken from the date of withdrawal through the date on which the student provides written notification of withdrawal to the Yale Dining Business Office, 246 Church Street. A nonresident student with the Dining Services Eli Bucks Plan will be charged only for meals actually taken.

4. Withdrawal after Midterm. A student who withdraws for any reason after midterm (October 28, 2016, in the fall term and March 10, 2017, in the spring term) will not be given a rebate of any portion of the tuition, room, and board fees due or paid for that term.

5. Required Withdrawal for Academic or Disciplinary Reasons. A student who is required to withdraw during a term because of unsatisfactory academic performance or disciplinary reasons in the previous term will have his or her financial aid prorated based upon the number of days the student was enrolled in the current term. The student will not be charged the inclusive fee for the current term even if the withdrawal occurs after the fifteenth day of the term. The student will, however, be charged for room and board on the basis described in Section D.1., "Withdrawal on or before the Fifteenth Day of a Term (p. 35)."

6. Health Services. A student who withdraws from the University on or before the fifteenth day of the term will not be held responsible for the tuition fee for that term and as a result will not be eligible for any Yale Health benefits. Under such circumstances, the student will be refunded the premium fee(s) paid for Yale Health Hospitalization/Specialty Coverage and, if applicable, for Yale Health Prescription Plus Coverage. The student's Yale Health membership will be terminated retroactively to the start of the term and any services rendered and/or claims paid will be billed to the student on a fee-for-service basis.

    A student who withdraws from the University after the first fifteen days will be covered by Yale Health for 30 days following the date of withdrawal, or to the last day of the term, whichever comes first. A student who is hospitalized on the date of withdrawal or during the 30-day extension and has Yale Health Hospitalization/ Specialty Coverage and Yale Health Prescription Plus Coverage will have coverage until discharged from the hospital, up to the benefit limitation for that illness. In both these instances, Yale Health premiums are not refunded and will not be prorated. Students who withdraw are not eligible for Yale Health Affiliate Coverage.

7. The Tuition Refund Plan in the Event of Medical Withdrawal. The University makes available to students and parents an option to participate in the of A. W. G. Dewar, Inc. This plan provides protection from the loss of funds paid for tuition (and room and board, if applicable). Eight five percent of the funds paid by the student or the family to the University for tuition, room, and board, less any refund or credit due the student from the University, will be refunded provided the medical condition of the student is certified by a licensed physician and the condition necessitates complete withdrawal from all classes for the balance of the term. Benefit payment is made to Yale to be credited to the student's account. Benefits not required to settle the student's account with Yale will be refunded to the student through Yale. Benefits are coordinated with and reduced by credits issued by the University to the student's account as a result of withdrawal.

8. Death. In the event of a student's death on or before the fifteenth day of a term, the inclusive fee for that term will be canceled in full. Should death occur after the fifteenth day of a term, the Registrar's Office will adjust the inclusive fee on a pro rata basis as of the date of death.

9. Leave of Absence. The rules given in section D.1. above apply to a student who has been granted a leave of absence, except for Yale Health coverage (See Health Services, section C, "Eligibility changes (p. 42)") and rebate of room rent.

10. Rebate of Room Rent. A student who has contracted for a room by accepting a room in a residential college room draw and who subsequently relinquishes the room in order to live off campus or to take a leave of absence is subject to the following charges:

   a. A student who has contracted for a room but who notifies the college dean in writing on or before the first day of the term (August 31, 2016, in the fall term and January 17, 2017, in the spring term) of an intention to relinquish that room will be charged a nonrefundable deposit of one-quarter (25%) of the term room rent.

   b. A student who has contracted for a room but who notifies the college dean in writing on or before the fifteenth day of the term (September 14, 2016, in the fall term and January 31, 2017, in the spring term) of an intention to relinquish that room will be charged a nonrefundable deposit of one-quarter (25%) of the term room rent plus the per diem housing charge for each day up to and including the day on which the student relinquishes the room.

   c. A student who has contracted for a room but who notifies the college dean in writing after the fifteenth day of the term but on or before the last day of the first quarter of the term (September 24, 2016, in the fall term and February 10, 2017, in the spring term) of an intention to relinquish that room will be charged one-half (50%) of the term room rent.

   d. A student who has contracted for a room but who notifies the college dean in writing after the last day of the first quarter of the term but on or before midterm (October 28, 2016, in the fall term and March 10, 2017, in the spring term) of an intention to relinquish that room will be charged three-quarters (75%) of the term room rent.

   e. A student who has contracted for a room but who notifies the college dean in writing by November 30, 2016, of an intention to relinquish his or her room during the spring term will not be responsible for the spring-term room charge.

   Exceptions may normally be made only for medical reasons and require the approval of the dean of student affairs, Camille Lizarríbar.

11. Board Rebate. A student remaining in the University, but permitted by the dean of student affairs, Camille Lizarríbar, to cease taking meals in a dining hall, may have a board contract adjusted as of the date that this permission is presented at the Yale Dining Business Office, 246 Church Street. The student will receive a board rebate equal to one-half the daily rate for each board day remaining in the term on the day on which she or he cancels her or his dining hall contract at the Yale Dining Business Office, 246 Church Street.

No board rebate will be given to a student during a period of absence from the University if that absence is less than two weeks. After that, and if the absence is

approved by the residential college dean, the student will receive a board rebate equal to one-half the daily rate for each board day so approved.

Board rebates will not be given nor release granted to students observing religious beliefs, holidays, or fasts, students following specialized diets due to medical conditions, or students pursuing voluntary dietary restrictions based on various ethical, political, environmental, or health concerns.

12. Financial Aid Recipients. For purposes of determining the refund of Federal Student Aid funds, any student who withdraws from Yale College for any reason during the first 60% of any term will be subject to a pro rata schedule which determines the amount of Federal Student Aid funds a student has earned at the time of withdrawal. A student who withdraws after the 60% point has earned 100% of his or her Federal Student Aid funds for the term. In 2016-2017, the last days for the refund of Federal Student Aid funds will be November 2, 2016 in the fall term and March 31, 2017 in the spring term.

For purposes of determining the refund of institutional aid funds, any student who withdraws from Yale College for any reason on or before Midterm will be subject to a pro rata schedule which determines the amount of institutional aid funds a student has earned at the time of withdrawal. This schedule is based in part on the rebate of charges as previously indicated.

In all cases students are encouraged to contact Yale Student Financial Services to inquire about the consequences of withdrawal.

Recipients of Federal and/or institutional loans who graduate or withdraw are required to have an Exit Interview before leaving Yale. Students leaving Yale receive instructions on completing this process from Yale Student Financial Services.

13. Strikes, Work Stoppages, "Job Actions," and the Like. Except as provided herein, no rebates of tuition or any other fees will be given to a student, nor may any room contract be rescinded, on account of the interruption, as the result of a strike, work stoppage, "job action," etc., of any services customarily furnished by the University or of any activities customarily conducted by or at the University. In the event of the interruption of dining hall service on account of a strike, work stoppage, "job action," etc., the University will make arrangements for appropriate refunds, or provide an alternate service, on a temporary basis, to students who have contracted for meals.

14. Temporary Suspension of University Operations. In the unlikely event that public health or other significant safety or security concerns cause the University temporarily to suspend University programs and operations, the University will make arrangements for appropriate refunds, consistent with the principles enunciated in these Regulations, as may in its judgment be warranted in light of all the circumstances of the suspension and consistent with applicable law and regulations. The decision to suspend programs shall be made at the discretion and judgment of the University.

# Health Services

The Yale Health Center is located on campus at 55 Lock Street. The center is home to Yale Health, a not-for-profit, physician-led health coverage option that offers a wide variety of health care services for students and other members of the Yale community. Services include student health, gynecology, mental health, pediatrics, pharmacy, laboratory, diagnostic imaging, a seventeen-bed inpatient care department, a round-the-clock acute care clinic, and specialty services such as allergy, dermatology, orthopedics, and a travel clinic. Yale Health coordinates and provides payment for the services provided at the Yale Health Center, as well as for emergency treatment, off-site specialty services, inpatient hospital care, and other ancillary services. Yale Health's services are detailed in the Yale Health Student Handbook, available through the Yale Health Member Services Department, 203-432-0246, or online at yalehealth.yale.edu.

## A. ELIGIBILITY FOR SERVICES

All registered undergraduates (except those enrolled in the Nondegree Students program and those enrolled in the Eli Whitney Students program before September 2007) are enrolled automatically for Yale Health Basic Coverage. Basic Coverage is offered at no charge and includes preventive health, laboratory, and medical services in the departments of Student Health, Gynecology, and Mental Health & Counseling, Nutrition, and Inpatient Care. In addition, treatment for urgent medical problems can be obtained twenty-four hours a day through Acute Care. Students on leave of absence or on a Year or Term Abroad are not eligible for Basic Coverage but may enroll in Student Affiliate Coverage. Students enrolled in the Nondegree Students program are not eligible for Basic Coverage but may enroll in the Billed Associates Plan and pay a monthly premium. Students enrolled in the Eli Whitney Students program after September 2007 receive Yale Health Basic Coverage if they are enrolled at least half time; others in that program are eligible to elect the Student Affiliate Coverage. Associates must register for a minimum of one term within the first thirty days of affiliation with the University. Students not eligible for Basic Coverage may also use the services on a fee-for-service basis. Students who wish to be seen fee-for-service must register with the Member Services Department. Enrollment applications for the Student Affiliate Coverage, Billed Associates Plan, or Fee-for-Service Program are available from the Member Services Department. All students who purchase Yale Health Hospitalization/Specialty Coverage (yalehealth.yale.edu/understand-your-coverage) are welcome to use specialty and ancillary services at Yale Health Center. Upon referral, Yale Health will cover the cost of specialty and ancillary services for these students. Students with an alternate insurance plan should seek specialty services from a provider who accepts their alternate insurance.

1. Required immunizations and completion of Yale Health vaccination record

   All new students are required to provide a completed Yale Health Vaccination Record for Incoming Students by July 1, 2016. This Vaccination Record, which must be completed by a healthcare provider, addresses each of the following:

   a. Measles, mumps, rubella, and varicella (chicken pox) vaccinations: All full-time matriculated students who were born after January 1, 1957, are required to provide proof of immunization against measles, mumps, rubella, and varicella.

Connecticut State Department of Public Health (DPH) regulations require two doses of the following vaccines:

Measles vaccine. The first dose must have been given after the student's first birthday. The second dose must have been administered at least 28 days after the first measles vaccination. In lieu of vaccination, the student may submit laboratory confirmation of a positive titer result (blood test to determine immunity).

Mumps vaccine. The first dose must have been given after the student's first birthday. The second dose must have been administered at least 28 days after the first mumps vaccination. In lieu of vaccination, the student may submit laboratory confirmation of a positive titer result (blood test to determine immunity).

Rubella vaccine. The first dose must have been given after the student's first birthday. The second dose must have been administered at least 28 days after the first rubella vaccination. In lieu of vaccination, the student may submit laboratory confirmation of a positive titer result (blood test to determine immunity).

Varicella (chicken pox) vaccine. The first dose must have been given after the student's first birthday. The second dose must have been administered at least 28 days after the first varicella vaccination. In lieu of vaccination, the student may submit laboratory confirmation of a positive titer result (blood test to determine immunity), or documentation by a healthcare provider, of past varicella disease.

Students who are not compliant with this CT State DPH regulation will not be permitted to register for classes or move into the dormitories for the fall term, 2016. This regulation applies to all students unless they present (a) a certificate from a physician stating that such immunization is medically contraindicated, or (b) a letter from a member of the clergy certifying that such immunization would be contrary to the student's religious beliefs.

b.  Meningococcal (meningitis) vaccination: All students living in on-campus housing must be vaccinated against meningococcal disease. Students are required to provide documentation, by a clinician, of one quadrivalent meningitis vaccination administered within the last five years.

Students who are not compliant with this regulation will not be permitted to register for classes or move into the dormitories for the fall term, 2016. Please note that the State of Connecticut does not require this vaccine for students who intend to reside off campus.

This regulation applies to all students living on campus unless they present (a) a certificate from a physician stating that such immunization is medically contraindicated, or (b) a letter from a member of the clergy that such immunization would be contrary to the student's religious beliefs.

c. Tuberculosis (TB) screening. All full-time matriculated students are to provide documentation of a recent screening result and any other testing or treatment related to Tuberculosis.

## B. HEALTH COVERAGE ENROLLMENT

The University requires all students eligible for Basic Coverage to have adequate hospital insurance coverage as well. Students may choose Yale Health Hospitalization/ Specialty Coverage or elect to waive the plan if they have other hospitalization coverage, such as coverage through a spouse or parent. The waiver must be renewed annually, and it is the student's responsibility to confirm receipt of the waiver by the University's deadlines noted below.

1. Yale Health Hospitalization/Specialty Coverage. For a detailed explanation of this plan, which includes coverage for prescriptions, see the Yale Health Student Handbook (http://yalehealth.yale.edu/understand-your-coverage). Students are automatically enrolled and charged a fee each term on their Student Financial Services bill for Hospitalization/Specialty Coverage. Students with no break in coverage who are enrolled during both the fall and spring terms are billed each term and are covered from August 1 through July 31. For students entering Yale for the first time, readmitted students, and students returning from a leave of absence who have not been covered during their leave, Hospitalization/Specialty Coverage begins on the day the dormitories officially open. A student who is enrolled for the fall term only is covered for services through January 31; a student enrolled for the spring term only is covered for services through July 31.

   a. Waiving Yale Health Hospitalization/Specialty Coverage. Students are permitted to waive Hospitalization/Specialty Coverage by completing an online waiver form (http://www.yhpstudentwaiver.yale.edu). It is the student's responsibility to report any changes in alternate insurance coverage to the Member Services Department. Students are encouraged to review their present coverage and compare its benefits to those available under Yale Health. The waiver form must be filed annually and must be received by September 15 for the full year or fall term or by January 31 for the spring term only.

   b. Revoking the waiver. Students who waive Hospitalization/Specialty Coverage but later wish to be covered must complete and send a form voiding their waiver to the Member Services Department by September 15 for the full year or fall term or by January 31 for the spring term only. Students who wish to revoke their waiver during the term may do so, provided they show proof of loss of the alternate insurance plan and enroll within thirty days of the loss of this coverage. Yale Health fees will not be prorated.

2. Yale Health Student Two-Person and Family Plans. A student may enroll his or her lawfully married spouse or civil union partner and/or legally dependent children under the age of twenty-six in one of two student dependent plans: the Two-Person Plan or the Student Family Plan. These plans include services described in both Basic Coverage and Hospitalization/Specialty Coverage. Coverage is not automatic and enrollment is by application. Applications are available from the Member Services Department or can be downloaded from the Yale Health website (http://

yalehealth.yale.edu) and must be renewed annually. Applications must be received by September 15 for full-year or fall-term coverage, or by January 31 for spring-term coverage only.

3. Yale Health Student Affiliate Coverage. Students on leave of absence or extended study, students paying less than half tuition, or students enrolled in the Eli Whitney Program prior to September 2007 may enroll in Yale Health Student Affiliate Coverage, which includes services described in both Basic and Hospitalization/ Specialty Coverage. Applications are available from the Member Services Department or can be downloaded from the Yale Health website (http:// yalehealth.yale.edu) and must be received by September 15 for full-year or fall-term coverage, or by January 31 for spring-term coverage only.

## C. ELIGIBILITY CHANGES

1. Withdrawal. A student who withdraws from the University during the first fifteen days of the term will be refunded the fee paid for Hospitalization/Specialty Coverage. The student will not be eligible for any Yale Health benefits, and the student's Yale Health membership will be terminated retroactive to the beginning of the term. The medical record will be reviewed, and any services rendered and/or claims paid will be billed to the student on a fee-for-service basis. At all other times, a student who withdraws from the University will be covered by Yale Health for thirty days following the date of withdrawal. Fees will not be prorated or refunded. Students who withdraw are not eligible to enroll in Student Affiliate Coverage. Regardless of enrollment in Yale Health Hospitalization/Specialty Coverage, a student who withdraws from the University will have access to services available under Yale Health Basic Coverage (including Student Health, Athletic Medicine, Mental Health and Counseling, and Care Management) during these thirty days to the extent necessary for a coordinated transition of care.

2. Leave of absence. Students who are granted a leave of absence are eligible to purchase Student Affiliate Coverage during the term(s) of the leave. If the leave occurs during the term, Hospitalization/Specialty Coverage will end on the date the leave is granted and students may enroll in Student Affiliate Coverage. Students must enroll in Affiliate Coverage prior to the beginning of the term during which the leave is taken or within thirty days of the start of the leave. Fees paid for Hospitalization/Specialty Coverage will be applied toward the cost of Affiliate Coverage. Coverage is not automatic; enrollment forms are available at the Member Services Department or can be downloaded from the Yale Health website (http:// yalehealth.yale.edu). Fees will not be prorated or refunded.

# Library

The physical and digital collections of the Yale University Library, along with the library's numerous buildings and spaces for study and research, are among the University's greatest and most important academic assets. Students are encouraged to make full use of library collections and spaces, and to do so in a responsible manner that preserves them for future generations. Impairing library functions, failing to return library materials, removing or sequestering ("stashing") books without authorization, or damaging library materials diminishes the usefulness of the libraries and violates the

rights of others. Unauthorized access to library electronic records and databases is also a violation; this includes tampering with such files as online circulation records, falsifying identification to enter restricted databases, and downloading electronic content in a manner that violates the Library's license agreements.

Library access and privileges are provided to all registered undergraduates. The University identification card is required to enter most libraries either at all times the library is open or during specified hours. The identification card also must be shown whenever library materials are borrowed. Library privileges are personal and individual; they may not be transferred, or used on behalf of another person.

The loan periods and fine policies in the many units that constitute the University Library vary from library to library, depending on the nature of the collections and the needs of users. The staff in each library is prepared to give assistance in the use of that library, and to explain its rules and regulations. Information about loan policies and fines is located at http://www.library.yale.edu/circ/students.html.

A list of the Library's regulations and security polices is found at http://www.library.yale.edu/about/policies.

For violations of the library regulations, the University Librarian or his or her delegate may suspend library privileges and/or impose fines, including charges for replacement of library materials and repair to damages. Suspension of library privileges may be imposed for part of a term or for a full term or more. In the case of serious or repeated infractions of library regulations, the University Librarian or his or her delegate may refer the matter to the Yale College Executive Committee with a request that further disciplinary action be taken. In addition to University discipline, students may be subject to criminal prosecution and/or civil liability for violating provisions of applicable law.

# Motor Vehicles

The problem of parking in downtown New Haven is acute, and Yale is committed to active cooperation in its solution. For this reason the University hopes that students will not bring cars to New Haven. Not only is parking on city streets restricted and overnight parking prohibited, but the limited number of parking spaces in the inner city must be used for serving nearby businesses and cannot be employed for long-term student parking.

For those students who find a car to be a necessity, parking may be secured for a fee from the University in the Pierson-Sage parking garage at Whitney Avenue and Edwards Street. The garage is equipped with emergency telephones and other security features. Regulations governing student vehicles follow.

### A. PARKING

Yale students who live on campus and who have cars are expected to obtain a parking space in the Pierson-Sage facility. The Yale Shuttle Bus makes regular stops at the garage.

Case 3:16-cv-00885-AVC   Document 30-1   Filed 10/31/16   Page 152 of 202

## B. INSURANCE

Vehicle insurance must be in effect for at least the minimum requirements of the State of Connecticut. The University is not responsible for damage to students' vehicles.

## C. USE OF UNIVERSITY SURFACE PARKING LOTS

For the convenience of students who use their vehicles during the evening, any motor vehicle may be parked in any vacant space in most Yale Parking Service surface lots on Saturdays, Sundays, and employee holidays, and between 4 p.m. and 7:30 a.m. on any weekday. The following facilities are presently not available for such parking: Lots 21, 55, 81, and most Medical School lots. Occasionally other lots, when so posted, may not be available. A student's car illegally parked on a University lot during working hours, or a car parked at any time on a lot that is not available for student parking, may be towed without prior warning at the owner's expense. A towed vehicle may be located by contacting the Yale Parking Service at 203-432-9790 from 8 a.m. to 4 p.m. and the Yale Police Department at 203-432-4400 at other times. A driver's license must be presented to the towing company in order to reclaim a vehicle. Towing companies will release a vehicle only upon payment in cash.

## D. TWO-WHEELED MOTOR VEHICLES

Two-wheeled motor vehicles are subject to the same regulations that apply to automobiles. Motorcycles, motor scooters, mopeds, and motorbikes may not be parked in basements or within any University buildings.

## E. TEMPORARY PARKING OF TWO-WHEELED VEHICLES

Bicycles, motorcycles, or mopeds may not be stored, chained, or repaired in any exit of any University building; nor may bicycles be locked to gates, fences, or railings.

## F. ACCESS RAMPS

By order of the Resource Office on Disabilities, bicycles may not be secured to access ramps. Bicycles locked to ramps will be impounded. In order to retrieve such bicycles, owners will be required to identify themselves at the Yale Police Department, fill out a claim form, and pay the cost of the impounding.

## G. ENFORCEMENT

Recognition by students of the parking problems facing an urban area such as New Haven, and adherence both to the parking regulations of the University and to those of the City of New Haven, are essential if the University is to fulfill its legal obligations to the City of New Haven in parking matters. The University has provided parking facilities and developed regulations that make low-cost, convenient, and safe parking available to its students. Those who disregard the Undergraduate Regulations relating to motor vehicles will therefore be liable to appropriate disciplinary penalties imposed by the Yale College Executive Committee.

# Social Functions

Social functions, such as dances, parties, and receptions, are a valuable part of student life. To make a positive contribution, however, they must be conducted with consideration for others. This entails, in addition to the requirements set forth below,

keeping the sound level within reasonable limits and leaving the area used neat and clean. Violation of these regulations may result in disciplinary action by the head of a student's college or by the Yale College Executive Committee.

## A. ORGANIZED SOCIAL FUNCTIONS

Social functions shall be deemed organized if they are financed, even in part, by funds administered by the Undergraduate Organizations Committee (http://uoc.yalecollege.yale.edu) (UOC) or the University or if they are held in general access areas such as the common rooms, lounges, dining halls, courtyards, or entryways of residential colleges and the Old Campus, or other University buildings or common areas.

## B. ADVANCE APPROVAL

Approval of the head of college must be obtained no later than two days in advance of any organized social function anywhere in a college or in its annexes or in an affiliated entry on the Old Campus. If a college dining hall is to be used, permission must also be obtained in advance from the dining hall manager. Use of any other University premises for an organized social function requires advance approval of the appropriate authority including the Yale Police Department, the Fire Code Compliance Service, the Office of Environmental Health and Safety, and the Office of Risk Management. If alcoholic beverages will be served, approval must be obtained at least one week prior to the event.

Private social functions in students' rooms in the residential colleges, in the college annexes, in Baker Hall ("Swing Space"), and on the Old Campus at which more than twenty participants are expected require advance approval by the head of college. These private social functions may not make use of the general access areas listed in section A above and may not have more than fifty participants at any one time.

## C. RESPONSIBILITY OF HOSTS

For each organized or private social function in a residential college, in a college annex, in Baker Hall ("Swing Space"), or on the Old Campus that requires the approval of the head of college, a host or sponsoring organization must be designated to the head of college in advance. That individual or organization assumes responsibility for the orderly conduct and prompt conclusion of the event, as well as for cleaning the area used and returning furnishings to their proper places. In addition, the host or sponsoring organization will be liable for any expenses arising from damage to University premises or property or injuries to people. If alcoholic beverages are to be served, the host, who must be of legal drinking age, assumes responsibility for adherence to the state law that prohibits the service of alcoholic beverages to persons under the age of twenty-one or to anyone who is intoxicated (CT General Statute, Section 30-89a (http://search.cga.state.ct.us/dtsearch_pub_statutes.html)). If at a private function the number of participants unexpectedly exceeds fifty, the host must reduce the number of guests or end the function.

## D. PRESENCE OF POLICE

If fifty or more persons are expected to attend an organized social function on campus where alcoholic beverages are served, an off-duty campus police officer must be engaged by the sponsoring organization and must be present throughout the event.

The person or organization sponsoring such an organized social function must notify the Yale Police Department at least two weeks prior to the event. The chief of the Yale Police Department, or his or her designee, will determine whether police services are needed and the number of police appropriate for the event. The sponsor of the event will be financially responsible for police services. If the actual number of people attending an organized social function unexpectedly exceeds fifty, it is the obligation of the host to telephone the Yale Police Department at once. A head of college or the chief of the Yale Police Department or his or her designee may require that more than one police officer be present if attendance at a function is expected to be large or if the college's geography makes gate attendance and general surveillance difficult for a single officer. At the discretion of the head of college or the chief of the Yale Police Department, it may also be prudent and appropriate to engage an off-duty officer for events where there are no alcoholic beverages served.

## E. BARTENDERS

For organized events on campus at which alcoholic beverages are to be served, arrangements must be made at least a week in advance with Yale Dining for bartending service by off-duty dining services personnel. At the time these arrangements are made, the student hosts must reach agreement with the dining hall manager and the head of college regarding the procedures for checking identification cards, the number of bartenders needed, and other preparations. The number of bartenders needed will depend upon the expected attendance and the procedures to be used for checking identification cards. In all cases, bartenders must be provided with adequate student help for moving supplies and necessary tasks other than actual serving of alcoholic beverages.

## F. HOURS

All social functions, organized or private, that take place on University property must end no later than 11 p.m. on Sunday through Thursday nights and 1 a.m. on Friday and Saturday nights. With the head of college's approval, a college social committee may each term sponsor one organized function that extends until 2 a.m. on a Friday or Saturday night.

## G. ADMISSION CHARGES

Admission charges may be levied for organized social functions only in the event of substantial entertainment costs and never to cover the purchase of alcoholic beverages. No admission charge or any other fee may be levied for private social functions on or off campus.

## H. SERVICE OF ALCOHOLIC BEVERAGES

Any service of alcoholic beverages at a social function, whether organized or private, must be in full compliance with the laws of the State of Connecticut and the Yale College regulations on alcoholic beverages (p. 13). heads of college, deans, dining hall personnel, and the Yale Police Department are authorized to request a student's identification card in order to confirm that he or she has reached legal drinking age.

## I. NONALCOHOLIC BEVERAGES AND FOOD

At any event on or off campus at which alcoholic beverages are served, there must also be available nonalcoholic beverages and food in adequate amounts.

## J. ADVERTISEMENTS

Posters or other announcements of campus functions must be approved by the head of college or designated department or office representative before they are posted or circulated. They must comply with University policy on posters. (See Student Activities and Extracurricular Activities, section J, "Posters and Publicity (p. 52).") All notices of such events, including those on social media, may contain no advertising of the availability of alcoholic beverages.

## K. RECORD KEEPING

All student organizations that receive funds from the University must keep precise financial records of those funds. They must provide details of the amount expended for social functions within three weeks of the event, including the return of unused funds and a full account reconciliation. Those records must be accessible at all times to appropriate University officials.

## L. ABUSES

In the event of abuses, such as the passing of alcoholic beverages to persons other than those who receive them at the bar or verbal abuse of bartenders or police, the police will warn that service is being jeopardized. If that warning is not heeded, the police may close the bar. It is the responsibility of the host (or host organization) to monitor the behavior of students or other guests and to maintain the general decorum of the event.

## M. TAILGATING

Yale is committed to providing an environment that is both fun and safe at all athletic events. Rules governing tailgating may be found at http://www.yalebulldogs.com/information/tailgates/index.

## N. SOCIAL FUNCTIONS OFF CAMPUS

Social functions in off-campus locations hosted by Yale College students (or organizations in which the majority of members are Yale College students) must be registered with the Yale College Dean's Office (http://yalecollege.yale.edu/campus-event-registration-form) at least two days in advance of the event if fifty or more students are expected to attend. A host or sponsoring organization must be designated in advance. That individual or organization assumes responsibility for the orderly conduct of the event. If alcoholic beverages are to be served, the host, who must be of legal drinking age, assumes responsibility for adherence to the state law that prohibits the service of alcoholic beverages to persons under the age of twenty-one or to anyone who is intoxicated (CT General Statute, Section 30-89a (http://search.cga.state.ct.us/dtsearch_pub_statutes.html)). If the number of participants at an unregistered social event unexpectedly exceeds fifty, the host must reduce the number of guests or end the function.

# Student Activities and Extracurricular Activities

The regulations in this section apply to all Yale undergraduates. Additional regulations particularly relevant to registered undergraduate organizations appear in Undergraduate Organizations (p. 55). Other regulations pertaining to social functions, whether sponsored by registered undergraduate organizations or by other students or student organizations in Yale College, appear in Social Functions.

## A. REGISTRATION OF UNDERGRADUATE ACTIVITIES

Any undergraduate organization that conducts meetings periodically or sponsors activities on the campus of Yale University, that provides a service, or that raises funds within the University for charitable purposes must submit an online application (http://yalecollege.yale.edu/content/student-organizations) for registration or register with the Yale College Dean's Office each year. Registration is an annual requirement. Once approved, an organization's registration remains valid until September 15 in the following academic year. (For additional details, see Undergraduate Organizations, section D, "Registration of undergraduate organizations (p. 56).")

## B. USE OF THE YALE NAME AND TRADEMARKS

The Yale name and marks associated with the University are protected by trademark law. Any use by undergraduates of the Yale name or these trademarks in the title or caption of a publication or an organization or the like, on any promotional materials, or on any item or product to be manufactured, distributed, or sold by an individual or an organization, must be approved by the secretary of the University or the secretary's duly authorized agents, and under such restrictions and explanations as they may impose or require.

## C. USE OF UNIVERSITY FACILITIES

If an undergraduate individual, group, or organization wishes to use University space or property for a meeting, lecture, or other activity, the appropriate administrative office in charge of that facility or space must approve the request. (See Undergraduate Organizations, section J, Use of University facilities (p. 62). See also Social Functions (p. 44), Campus Housing and University Facilities, especially section I, Maintenance of dormitory rooms and campus areas (p. 24).)

Organizers of events and activities using theatrical elements (e.g., scenery, lighting, staging, seating risers, props, and costumes), whether on or off campus, must consult in advance with Undergraduate Production (http://up.yalecollege.yale.edu) and comply with regulations for such activities.

## D. OUTDOOR EVENTS ON CAMPUS

Students who wish to conduct an outdoor activity, performance, or event on Yale property must secure permission in advance from the Office of the President for an event on Cross Campus or Hewitt Quadrangle (Beinecke Plaza) or from the dean of student affairs, Camille Lizarribar, for an event on the Old Campus or other outdoor spaces. Any activity conducted in these spaces should reflect respect for University property and the rights of others. Application for the use of these spaces must be made

at least twenty-four hours in advance of a weekday event and forty-eight hours in advance of a weekend event.

## E. EVENTS IN THE RESIDENTIAL COLLEGES

The Council of Heads of College has issued the following guidelines concerning the use of general access areas in the residential colleges:

1. Events may take place in a general access area of a residential college only if advance permission has been granted by the head of college.

2. Permission may be granted at the discretion of the head of college for functions or activities sponsored by student organizations that are registered with the Yale College Dean's Office or by student groups that are associated with the particular college. Any out-of-pocket expenses, as for special janitorial or security services, shall be borne by the sponsoring group.

3. Permission to hold private functions in the residential colleges shall not be granted to individuals or groups not affiliated with Yale University.

4. All student events held in the residential colleges or college annexes where alcoholic beverages are served must comply fully with the policies set forth in Social Functions and Alcoholic Beverages.

## F. STUDENT PRODUCTIONS

All performance events produced by undergraduates on the Yale campus must abide by the Undergraduate Production Regulations (http://up.yalecollege.yale.edu/regulations). Performance events include undergraduate dramatic, musical, dance, operatic, and comedy productions as well as many other undergraduate presentations and events performed before an audience. Note that all University spaces fall under the jurisdiction of Yale Fire Code Compliance, Yale Environmental Health and Safety, and the department that owns or manages the space (e.g., head of college's office or Chaplain's Office). Individual venues may be covered by specific safety polices; in the event of conflicting policies, the most stringent will be assumed to apply.

Production elements not conforming to the Undergraduate Production Regulations (http://up.yalecollege.yale.edu/regulations) may be cut from a production. Failure to observe these regulations may be grounds for stopping an event. Serious or repeated violations of these regulations will be referred to the Yale College Dean's Office for possible disciplinary action.

All students involved in undergraduate production share responsibility for the safety of the production, crew, cast, audience, and performance space. All participants should be familiar with the relevant regulations and observe them during all phases of the production process; should direct any questions or concerns to the appropriate adviser, to the Undergraduate Production staff, and to other relevant University officials; and should consistently apply good judgment and common sense.

The use of drugs or alcohol in any theater by cast, crew, or audience is strictly forbidden and may be grounds for individual expulsion from the theater and/or immediate termination of the production's use of the theater.

No use of prop weapons or stage combat of any kind is allowed, in rehearsal or performance, without the express written permission of Undergraduate Production. Requests for the use of stage combat must be submitted to UP by the CPA deadline at the beginning of the semester in which the production will occur. Requests for the use of prop weapons must be made to the UP Technical Director of the specific production at least six weeks prior to the first performance date. Additional regulations may be found in the Prop Weapon and Stage Combat Policy (http://up.yalecollege.yale.edu/regulations/prop-weapon-and-stage-combat-policy).

## G. EVENTS OFF CAMPUS

Events sponsored by Yale students or Yale organizations (registered and unregistered) must comply with the *Undergraduate Regulations*. Events with an expected attendance of 50 or more people must be registered with the Yale College Dean's Office. See Social Functions, section N, Social functions off campus (p. 47).

## H. FRATERNITY AND SORORITY RUSH

Many organizations conduct special activities to introduce new members to their groups. Any initiation activities for new members must comply with hazing laws of the State of Connecticut. Fraternities and sororities may not hold rush activities for freshmen during the fall term. Freshmen may not attend rush events during their first term of enrollment at Yale. Fraternities and sororities may not extend a formal or informal offer of membership to freshmen during the fall term and a freshman may not make a formal request to join a fraternity or sorority during the fall term. Fraternities and sororities may not exert pressure on freshmen during the fall term to join a fraternity or sorority during the spring term.

Fraternities and sororities at Yale generally have the following characteristics: their primary purpose is social, they are single-sex, admission is selective, admission is not based on specific skills or talents (e.g., singing ability), they are typically affiliated with and pay dues to national organizations, they have a name with Greek letters, they own or rent space off campus for meetings and events, it is not permissible to be a member of more than one such organization, it is not permissible to switch membership from one such organization to another. This list is not exhaustive and not all of these characteristics apply to all fraternities and sororities. The Yale College Dean's Office reserves the right to determine whether a group qualifies as a fraternity or sorority.

Rush activities are defined as events hosted by fraternities and sororities (or representatives of those organizations) at which individuals are targeted for solicitation of membership. Rush activities occur during a period of time when events are held by fraternities and sororities for the express purpose of selecting new members, and they are exclusive to individuals who are both eligible for and interested in gaining membership to a fraternity or sorority. The following activities are not considered to be rush events, and freshmen may participate in them during the fall term: events that are not limited to freshmen and upperclass members of a single fraternity or sorority, events sponsored by non-Greek organizations or more than one Greek organization, and events that are primarily religious or philanthropic in nature.

## I. ACCOUNTING PROCEDURES

Each registered undergraduate organization is fully responsible for its own finances. These responsibilities include the submission of original receipts, invoices, purchase orders, other proofs of purchase, and account reconciliation. The balance of unused funds must be returned to the original award source within three weeks of the date of the event.

## J. SOLICITATION AND SALES IN RESIDENTIAL COLLEGES AND OTHER BUILDINGS

Solicitation and sales in University buildings is limited to two general areas: Commons Dining Hall and the residential college common rooms. Solicitation in the post office and other campus buildings is not allowed. Door-to-door solicitation and sales in the residences are not permitted.

Undergraduate organizations wishing to solicit or sell tickets and/or merchandise in the residential colleges must secure permission from the Office of the Council of Heads of College at least twenty-four hours in advance. Solicitation and sales for commercial purposes, except those by Associated Student Agencies, is prohibited.

Certain kinds of solicitation and sales in Commons Dining Hall and in residential college common rooms are permitted, among them the following:

1. to seek contributions for charitable or religious purposes;

2. to obtain signatures for petitions on matters of concern to Yale students;

3. to distribute questionnaires of a noncommercial nature;

4. to sell tickets of admission to benefit performances of plays or musicals held on University property;

5. to sell regularly issued student publications.

Registered student organizations may sell items and solicit funds in the rotunda outside Woolsey Hall, but they must remember that the hallways outside Commons and Woolsey Hall are a war memorial, and the area must be treated with respect. The following rules apply:

1. Sales and solicitations are allowed only in the round rotunda area, not in the halls leading to Commons Dining Hall or Hewitt Quadrangle ("Beinecke Plaza").

2. Nothing may be attached to any wall.

3. No live or recorded music of any sort is allowed at any time.

4. Groups may use one table that they provide.

5. No unattended tables are permitted.

6. Groups must clean up after themselves.

7. All money collected through sales and solicitations must be for nonprofit organizations.

8. Any merchandise featuring Yale marks must be approved by the Office of the Secretary.

9. No single group may sell or solicit for more than five days in any 30-day period.

10. Groups that violate any of these rules will not be allowed to use this space in the future for solicitation or sales.

No undergraduate may undertake to represent any commercial interest or to operate any business on the campus without securing prior permission from the assistant dean of student affairs, Hannah Peck.

Only student businesses operating in conjunction with the Associated Student Agencies will be considered for space on campus or charging privileges with Student Financial Services. The Agencies are formally recognized and sanctioned by the University officers and trustees. Control is maintained through the Associated Student Agencies Council, which consists of representatives of the faculty, administration, and student body.

All undergraduates interested in employment with existing Agencies or in organizing new enterprises are encouraged to contact the business manager of the Associated Student Agencies at 246 Church Street.

## K. POSTERS AND PUBLICITY

The University has made available appropriate space for postering and expects students to use this space and to respect the inviolability of other University property. Other forms of publicity, such as banners, may not be hung on college or University gates or on the exterior of University buildings. Posters may not exceed a size of 8.5 by 11 inches. Their use must be confined to regular bulletin boards, kiosks, and display cases provided for that purpose. Postering elsewhere is prohibited. Only one of each poster may be placed on the same bulletin board. Organizations advertising an event must provide contact information on their poster. Postings in the residential colleges must have the approval of the respective heads of colleges' offices. Posters must be removed after the event they announce has taken place, and they may not be posted for a period exceeding two weeks.

Students may use chalk on walkways to advertise events, but those markings must be on areas that are open to the sky and the weather. Walkways cannot be marked under roof overhangs, archways, or other covered areas. Chalk may not be applied to walls or other vertical surfaces. Chalk notices must be limited in size to 4 by 4 feet, and not more than one chalk announcement for a single event may be visible from any single point.

Staples and tape of any variety (e.g., Scotch tape, masking tape, duct tape) are damaging and may not be used on any Yale property. Thumbtacks or pushpins should be used on bulletin boards but may not be used on any interior or exterior woodwork.

Violation of these regulations may result in an organization's loss of official recognition and consequent loss of funding opportunities.

Students or organizations may also be charged for any necessary repairs to damaged University property resulting from improperly posted notices.

## L. INSURANCE

The University carries a general liability insurance policy covering most registered student organizations. See the Office of Enterprise Risk Management website (http://ogc.yale.edu/risk-management-student-activities) for more information. Registered undergraduate organizations not covered by this insurance may be required to maintain their liability insurance naming Yale University as additional insured. Detailed information about insurance coverage and requirements can be found in the "Undergraduate Organizations" section of this publication.

# Other Services and Facilities

## A. OFFICE OF CAREER STRATEGY

The Office of Career Strategy offers programs designed to enable students of Yale College to further their career goals. To provide services on an equitable basis, the Office of Career Strategy has established procedures and regulations. Violations of these standards, including reneging on an internship or post-graduate job offer, may cause revocation of the privilege to use OCS programs, resources, and facilities.

Infractions may be referred by the director of the Office of Career Strategy, at his or her discretion, to the Yale College Executive Committee with a request that disciplinary action be taken. Infractions include, but are not limited to, the following: altering in any manner a transcript, associated documents, or test scores; reneging on an accepted internship or full-time employment offer; signing up for an employment interview when not authorized to do so; purporting to be another person or utilizing a document of another person; and sequestering or removing materials without permission. Students are expected to keep appointments and to conform to norms of common courtesy.

## B. RESOURCE OFFICE ON DISABILITIES

The University is committed to developing and maintaining an environment that is supportive of students with disabilities. The Resource Office on Disabilities, 35 Broadway (rear entrance), room 222, facilitates individual accommodations for students with disabilities, and provides access to academic programs and activities, information on available services, and assistance with the use of those services. Students with disabilities are therefore encouraged to call or visit the Resource Office at their earliest opportunity to learn about the services available and to inform the office about their special needs. Written documentation of the disability is required for registration with the Resource Office.

## C. TECHNOLOGY FACILITIES

Yale's technology facilities (for example, the Yale network, work stations, computer labs, and other technologies) are a valuable educational and research resource, and students are expected to respect them and to use them responsibly. All students must conform to the University Information Technology Appropriate Use Policy (http://policy.yale.edu/policy/1607-information-technology-appropriate-use-policy). Misappropriation of the network, unauthorized copying of computer software, or unauthorized use of any Yale technology facility is forbidden.

Students using Yale's computer network are required to observe federal and state copyright laws, which regulate such activities as accessing, downloading, copying, uploading, and distributing copyrighted material. Copyrighted material commonly includes, among other works, books, songs, music, films, photographic images, and videos.

Yale receives "takedown" notices for violations of the Digital Millennium Copyright Act (DMCA). Yale receives these notices in its capacity as an Internet Service Provider (ISP) when a user on the Yale network is observed illegally sharing or downloading copyrighted material online. The University procedures for handling these notices includes forwarding the notice to the alleged infringers, contacting the student's residential college dean, or restricting or removing access to Yale network resources. If you receive a copyright infringement notice or other correspondence from the University in connection with alleged infringing activity, read the notice carefully and comply with University requests as soon as possible. In addition to any discipline imposed by Yale for these violations, illegal file sharing may result in legal action by the content owners.

Each technology facility has additional rules that govern its use. Copies of the relevant rules are available at the facilities. Students with authorized access to technology facilities are subject to the rules and should acquaint themselves with them. Violations may be punished by a suspension of the privilege of access to the facilities for a specified period of time or permanently. Such penalties may be summarily imposed by the director of the computer facilities in question or by the director's designee.

Once privileges are suspended, the director or the director's designee will so notify the student in writing, describing the evidentiary basis for the decision. A copy of this notice will also be sent to the student's residential college dean and to the chief information officer. A student who believes that he or she has been unjustly suspended from the use of technology facilities may appeal the director's decision to the Chief Information Officer.

In the case of serious or repeated infractions of the facility rules, the director of the facility or the director's designee may, at his or her discretion, refer the matter to the Yale College Executive Committee with a request that further disciplinary action be taken; infractions of the Undergraduate Regulations will be referred to the Yale College Executive Committee. In addition to University discipline, students may be subject to criminal prosecution and/or civil liability for violating provisions of applicable law.

## D. TELEPHONE FACILITIES

Telephone service at Yale, both local and long-distance, is provided by Yale Information Technology Services (ITS). The telephone facilities are wholly owned and managed by the University. Yale provides telephone service to each suite in the undergraduate residences and a voicemail box for each student who lives on campus.

All telephone services and the rules governing their use are explained in the ITS Telecommunications Student Handbook. Information regarding telephone and voicemail service is available at the department's service office located at 25 Science Park, by calling the ITS Help Desk at 203-432-9000, or on the ITS Telephone Services website.

Students who violate any of the rules governing use of telephone services or who use long-distance telephone facilities without authorization may be subject to disciplinary action by the Yale College Executive Committee and/or criminal prosecution.

## E. CABLE TELEVISION SERVICE

Yale University subscribes to cable television service supplied by Comcast for its educational and entertainment value. A basic set of broadcast, cable, and Yale-originated channels is included as part of the room charge. Further information can be obtained from the ITS-Telecommunications office at 203-432-9000 or on the ITS Telecommunications website.

Students who make alterations to the cable television equipment or use cable boxes not provided by Comcast are in violation of the Undergraduate Regulations. Violators will be reported to the residential college master and dean, who may also, at their discretion, request that disciplinary action be taken by the Yale College Executive Committee. In addition, such students may be subject to criminal prosecution and/or civil liability for violating provisions of applicable law, including the Federal Communications Act as amended (47 U.S.C. H553 and H605) and Connecticut General Statutes H53a-115 through -117a ("Criminal Mischief"), H53a-119 ("Larceny"), H53a-127c ("Theft of Utility or Community Antenna Television Service for Profit or Economic Gain"), and H52-564 ("Treble Damages for Thefts").

# Undergraduate Organizations

## A. INTRODUCTION

Yale recognizes that organizations under the leadership of undergraduates can and do enhance a student's education by providing additional opportunities beyond the curriculum for personal development and growth. Furthermore, the University and the community benefit from the variety of services and activities provided by undergraduate organizations. The University believes that students should be encouraged to participate in organizations that are open to all members of the community and whose activities do not interfere with the policies or programs of the University or with the rights of other members of the community. To that end the Yale College Dean's Office assists students in developing organizations and planning events, provides financial advice and assistance, clarifies University policies and procedures, and authorizes the use of University resources and facilities.

## B. TYPES OF STUDENT ORGANIZATIONS

Any group in which a majority of participants are undergraduates is considered to be an undergraduate organization. Such an organization that conducts meetings periodically or sponsors activities on the campus of Yale University, that primarily provides a service, or that raises funds within the University for charitable or other purposes must register with the Yale College Dean's Office. Groups with activities limited to, and affecting only, a single residential college (e.g., college councils, rooming committees) must register with the head of college's office of the appropriate residential college. Other groups within a residential college that sponsor extracurricular events open to the Yale community must register with the Yale College Dean's Office. Club sports or groups that compete athletically must register with the Office of Club Sports and Outdoor Education in the Department of Athletics. All religious organizations must

have the approval of Yale's Chaplain's Office before they can register with the Yale College Dean's Office as undergraduate organizations.

In order to qualify for registration as an undergraduate organization, the group must have five officers who are registered undergraduates and a majority of its members must be undergraduates. All administrative, policy, and managerial decisions must reside in the hands of currently enrolled undergraduates.

## C. RESPONSIBILITIES OF UNDERGRADUATE ORGANIZATIONS

Yale University requires that all student organizations—whether registered or unregistered, operating on or off campus—abide by the *Undergraduate Regulations*. Organizations and their officers and members assume responsibilities, including the responsibility to be aware of and abide by the *Undergraduate Regulations*, as set forth in this text and as they may be revised from time to time. A student who is believed to have violated University policy or state or federal law (including but not limited to hazing, sexual misconduct, or theft) in the course of working for or participating in the activities of an undergraduate organization may be brought before the Yale College Executive Committee or the University-Wide Committee on Sexual Misconduct (http://provost.yale.edu/uwc) (UWC), as appropriate, for possible disciplinary action, and/or referred to appropriate civil authorities.

At least one officer of each organization must attend training sponsored by the Yale College Dean's Office each year. This training focuses on hazing and sexual misconduct prevention and other topics that are particularly relevant to students and student organizations. If one officer of an organization do not attend this training the organization will lose its registered status and the privileges of registration.

Student organizations must operate in accordance with Yale policies on equal opportunity, which state, "Yale does not discriminate …against any individual on account of that individual's sex, race, color, religion, age, disability, or national or ethnic origin; nor does Yale discriminate on the basis of sexual orientation or gender identity or expression." As part of an undergraduate organization's obligation to abide by these policies, the organization is responsible for making reasonable accommodations to assist students with disabilities who indicate that they wish to participate in the organization's activities or attend one of its events. The University's Office for Equal Opportunity Programs, 221 Whitney Avenue, and the director of the Resource Office on Disabilities, 35 Broadway (rear entrance), room 222, are available to help organizations with these efforts.

Undergraduate organizations must operate on a non-profit basis. See section G, Finances (p. 59).

## D. REGISTRATION OF UNDERGRADUATE ORGANIZATIONS

Registration Requirement. The specific procedures for registration of undergraduate organizations are outlined in detail here and also on the Student Organizations website (http://studentorgs.yalecollege.yale.edu) in order to provide guidance to student officers. These registration requirements also protect the University's tax-exempt status and are designed to ensure that the purpose and activities of the organizations are consistent with the established purposes of the University. Registration is further

required because activities of student organizations frequently appear to involve identification with the University. However, registration does not imply official approval by the University of the activities of any undergraduate organization, nor does it indicate any responsibility for them.

Organizations that are established for the purpose of selling or renting items or paying students cannot be registered student organizations, but they may be able to operate as Associated Student Agencies. Students who wish to form such an agency should consult with the business manager of the Associated Student Agencies, 246 Church Street.

1. Procedure for Annual Registration. All undergraduate organizations, whether returning or new, are expected each academic year to submit an online application for registration on the Student Organizations website (http://studentorgs.yalecollege.yale.edu/register-student-organization), by September 15, to register in a fall term, or by February 2 in a spring term. Organizations that miss these deadlines must wait until the following semester to register. At least one officer of each organization is required to attend the fall orientation meeting sponsored by the Yale College Dean's Office for specific information about the online registration process and other issues discussed in this section.

   The online registration form requires, among other things, a description of the purposes of the organization, a constitution and set of bylaws, and the identification of officers or other leaders. Each named officer must accept responsibility for the organization before the group's registration undergoes formal review. A complete list of members is not required to be made public but may be requested by the assistant dean of student affairs, Hannah Peck, to verify information required for registration.

   Registration is ordinarily valid for one academic year; it remains valid until September 15 so that student groups may reserve University facilities or apply for funding at the beginning of the subsequent academic year. However, if a student organization wishes to change its activities from those outlined in the registration documents or alter aspects of the organization described in the registration agreements, then the organization must update its information on line for review and approval. Further online changes to group records are permitted only after the current set of changes has been reviewed. To ensure full access to group records for annual registration purposes and to ensure that online communications to the organization can be delivered promptly, officer term dates (begin/end) must remain valid. The online registration database will not grant access to any officer whose term of office has expired.

2. Registration Approval. A group's registration is confirmed by a formal communication of registration approval from the Yale College Dean's Office. The status of an organization may be verified on the Official List of Registered Undergraduate Organizations (http://studentorgs.yalecollege.yale.edu/directory).

3. Revocation or Suspension of Registration. The assistant dean of student affairs, Hannah Peck, may revoke or suspend the registration of any undergraduate organization that has not abided by the *Undergraduate Regulations* or by the organization's registration and related agreements. Failure by a student

organization or its officers or designated representatives to meet the financial obligations of the organization in a timely manner can also result in the suspension or revocation of registration. Any request for reinstatement should be addressed to the Yale College Dean's Office.

## E. PRIVILEGES OF REGISTRATION

Subject to availability and in some cases payment of rental fees, registration allows undergraduate organizations to:

1. Use classrooms and certain other University facilities or properties for programs, rehearsals, performances, and meetings, including conferences or other campus events;
2. Request funding from the Undergraduate Organizations Committee (UOC);
3. Request funding from the Dean's Discretionary Funds;
4. Request office space/storage space on campus;
5. Participate in the Bazaar of Registered Undergraduate Organizations at Freshman Orientation;
6. Petition for permission to use the Yale name;
7. Purchase some goods and services from the University;
8. Accept gifts from alumni and other donors for the current use of the undergraduate organization, when the solicitation for that donation was approved in the manner described in section H;
9. Request the use of theater and rehearsal spaces;
10. Be covered by Yale's liability insurance and automobile insurance when traveling on official group business;
11. Provide proof of insurance coverage for organizations meeting or performing beyond the Yale campus;
12. Receive contract review from the Procurement office and guidance from the Risk Management office;
13. Apply for a Yale website (www.yale.edu/web);
14. Use Yale electronic tools such as Message Lite and e-mail for communication.

## F. OFFICERS, MEMBERS, AND ADVISERS

1. Officers. Only currently registered students in good standing in Yale College can hold office or act officially on behalf of an organization in any way. Officers should be aware that they are financially and legally responsible for the organization during their terms of service, and can be held responsible by Yale for infractions committed by their organizations.

   A student on probation may not hold leadership or officer positions in any registered Yale College student organization, any varsity athletic team or club sport, or any other organization that receives University funds. Additional terms of probation may be enforced by the Executive Committee or the UWC in individual cases.

2. Members. All registered students, faculty, and staff of Yale University can be active (voting) members of an undergraduate organization as long as Yale College students constitute a majority of the membership. Withdrawn students, alumni,

and students on a leave of absence or a Year or Term Abroad are not considered registered students and may not participate in the activities of any undergraduate organization. For organizations in which special talents or skills are required, the standards used to select members must be related to the needs of the organization, and public announcements about auditions or competitions should be made to ensure that interested students are informed about the opportunities to be considered for membership in the organization.

Although the functioning of registered student organizations must be confined to and controlled by their active membership, organizations may invite others to attend or participate in events of general interest.

Exceptions to the restrictions on participation by alumni, withdrawn students, and other non-enrolled individuals must be approved by the Yale College Dean's Office. Requests for exceptions should be sent to assistant dean of student affairs, Hannah Peck, at hannah.peck@yale.edu.

3. Advisers. To assist in providing continuity from year to year, organizations are encouraged to have a Yale administrator or faculty member as an adviser or a committee composed primarily of Yale administrators and faculty members that is advisory (nonvoting) to the organization.

## G.  FINANCES

1. Financial Responsibility. Each undergraduate organization is fully responsible for its own finances. Officers should be aware that they are personally responsible for the payment of debts incurred during the period for which they are responsible for the organization. Any financial difficulties of an undergraduate organization should be discussed as early as possible with the dean of student affairs, Hannah Peck, who may be able to assist or advise the organization.

2. Financial Records and Reports. A record of all income and expenses and supporting documentation is to be maintained at all times. Each registered undergraduate organization is fully responsible for its own finances. These responsibilities include the maintenance of original receipts and account reconciliation. Financial records and reports may be audited by the University at any time. Heads of college may require similar or more extensive reporting for organizations operating essentially from a particular residential college. Incorporated student organizations are advised to consult with the Internal Revenue Service for specific information regarding tax obligations and responsibilities.

3. Nonprofit Status. All undergraduate organizations are to be operated exclusively on a nonprofit basis. If it becomes necessary for the organization to incorporate, this action is to be undertaken after consultation with the assistant dean of student affairs, Hannah Peck. Any undergraduate organization that incorporates must do so strictly on a nonprofit basis and in a manner that perpetuates its undergraduate status.

4. Profits and Wages. The overwhelming majority of students involved with undergraduate organizations receive no compensation for their contributions. While the Yale College Dean's Office and the Committee on Undergraduate Organizations applaud and prefer such volunteerism, permission for students to be paid for services they perform has occasionally been granted to a few organizations.

Organizations wishing to pay wages to any students must receive advance written approval to do so from the assistant dean of student affairs, Hannah Peck.

Students should understand that undergraduate organizations, as tax-exempt entities, are prohibited from being profit-making operations. Thus the "profits" or earnings of an undergraduate organization may not be paid to or divided among student members, officers, or other leaders. In that connection, wages or payments to students for their work with student organizations cannot be awarded in a way that would be a disguise for what is really a division of profits. Therefore, all students permitted to earn wages for their work with an undergraduate organization must be hired through the Yale College Dean's Office and paid according to the prevailing rates and regulations of the Student Employment Office.

## H. FUND-RAISING

1. Funding by the Undergraduate Organizations Committee (UOC): Funds have been provided to the UOC for disbursement to registered undergraduate organizations. Organizations should be aware that rarely is the entire budget funded and that the committee does not provide funding for off-campus travel. A copy of the committee's guidelines and forms for applying for funding are available online.

2. Funding from the Dean's Discretionary Fund. Registered undergraduate organizations may request funding from the Dean's Discretionary fund. Such funding is limited and it is not typically granted for routine, yearly activities. Applications may be found online (http://studentorgs.yalecollege.yale.edu/application-deans-discretionary-fund). Applications must include a budget showing all expected income and expenses, and if funding is granted, receipts must be submitted at the conclusion of the event to verify that the money was spent in a manner consistent with the application.

3. Raising Funds on Campus. While organizations are encouraged to hold fund-raising events to defray the organization's expenses, these events must be coordinated by Yale College for a variety of reasons, including avoiding multiple and competing events in one period of time and ensuring that certain University facilities are not monopolized by a few organizations. Thus permission to hold fund-raising events on campus must be requested in writing from the assistant dean of student affairs, Hannah Peck, at least two weeks before the event.

4. Raising Funds outside the University. Undergraduate organizations are encouraged to seek funds from a variety of sources, including reasonable membership dues; donations at concerts, speeches, or other events; and advertisements in publications. Fund-raising activities are permissible only to the extent that they are needed to support the activities of the organization, since each organization is operated on a nonprofit basis.

There must be limitations on fund-raising activities focused outside of Yale in order to coordinate such efforts with the University's alumni giving and development programs. Soliciting financial support from alumni and other outside sources (such as foundations and corporations) must be authorized by the assistant dean of student affairs, Hannah Peck, and the director of Development. To obtain such authorization, an organization must meet with the assistant dean of student affairs, and provide a statement describing the purpose of the solicitation and

the names and affiliations of prospective donors, as well as exact copies of all proposed solicitation materials. The assistant dean of student affairs will refer these documents to the director of Development for final approval. An organization may not contact prospective donors until it has received authorization in writing from the assistant dean of student affairs to do so.

5. Honoraria. Many distinguished visitors speak and perform at Yale without receiving compensation for their services. Occasionally it is necessary to pay an honorarium to certain speakers. The UOC does not provide funding for honoraria, but such funds may be obtained from other sources at Yale. If University funds are secured for an event, in no case may the total payment to a single speaker be greater than $3,500.

## I. USE OF THE YALE NAME AND REPRESENTATION OF THE UNIVERSITY

1. Use of the Yale name and its marks is governed by the Office of the Secretary. Any undergraduate organization wishing to incorporate the name of Yale into its title, domain name, and/or visual identity must secure permission to do so. (An online form for such a request is automatically generated at the time of a group's registration.) Following approval, the organization must secure written permission from the Office of the Secretary. Approval to use the Yale name is not final until the organization has received a memo from the Office of the Secretary confirming the privilege.

   In order to obtain approval by the Yale College Dean's Office, the organization should be certain (1) that the nature and purpose of the organization are clearly evident from its title, and (2) that its proposed name does not imply University endorsement of the activities, services, or products offered by the group. Therefore, the word "Undergraduate" must appear in the organization's title or subtitle, and must be prominently displayed whenever the Yale name is used in connection with the organization's identity. Examples of names that would avoid confusion are "The Yale Colloquium: An Undergraduate Publication" or the "Yale Undergraduate Backgammon Club."

   Permission to continue to use the Yale name is contingent upon maintaining these requirements and conforming to the regulations applicable to the organization. Permission is automatically revoked if an organization fails to register each year. Upon subsequent registration, the organization must reapply for permission to use the Yale name.

   In order to obtain approval by the Office of the Secretary, the organization should submit the proposed name, domain name, and, where applicable, visual identity of the organization, including any proposed subtitles. Submissions are to be made to Denise Castellano (denise.castellano@yale.edu).

   No student organization may reproduce a stylized version of the Yale name and/ or use any University marks in its literature, on a website, on its stationery, or in other media without prior written approval of the Office of the Secretary. The full name of the organization, including any subtitle, must be included on all materials, including but not limited to agreements, stationery, posters, websites, business

cards, and merchandise whenever the organization includes the Yale name to identify itself, with the exception of the group's outside bank account and bank checks which, for tax purposes, must not include the Yale name.

2. Representation of the University. No undergraduate organization shall purport to represent the views or opinions of Yale University or Yale College in the context of any publication, web page, radio, television, or Web broadcast or public forum.

3. Use of the Yale name and trademarks. The Yale name and marks associated with the University are protected by trademark law. Any use by undergraduates of the Yale name or these trademarks in the title or caption of a publication or an organization or the like, on any promotional materials, or on any item or product to be manufactured, distributed, or sold by an individual or an organization, must be approved by the secretary of the University or the secretary's duly authorized agents, and under such restrictions and explanations as they may impose or require. The use of Yale University logos such as the block letter "Y" and the bulldog image used by Yale athletic teams are expressly forbidden except in specific cases in which such permission is granted. Applications to use the Yale name or logos must be made to Denise Castellano.

## J. USE OF UNIVERSITY FACILITIES

1. Reserving University Space or Property for a Meeting or Activity. If an undergraduate organization wishes to use University space or property for a meeting, lecture, or other activity, that request must be approved by the appropriate administrative office in charge of that facility or space. Since there is a heavy demand on University facilities, requests should be submitted as soon as possible and, in any case, at least two weeks in advance of the event.

   The person or organization sponsoring an event or conference that includes guests from outside the Yale community must notify the Yale Police Department at least two weeks prior to the event. The chief of the Yale Police Department, or his or her designee, will determine whether police services are needed and the number of police officers appropriate for the event. The person or organization sponsoring the event will be financially responsible for police services.

   For the use of classrooms and certain auditoriums, undergraduate organizations will ordinarily not be charged a room fee when no admission charge is made, but there may be fees for specific services, e.g., public address system hookups, extra janitorial service, and the like. Reservation information is available on line through the Office of the University Registrar at www.yale.edu/sfas/registrar.

2. Assigning Office Space. Undergraduate organizations wishing to secure an office or storage space on campus must petition the assistant dean of student affairs, Hannah Peck, in writing. Space is extremely limited, and requests will be considered by the only when an organization presents strong evidence of the need for it. Organizations that have been in existence within the University for less than two full academic years will ordinarily not be considered eligible for the use of an office.

   The privilege to use an office is granted for only one academic year, but permission may be renewed from year to year by the assistant dean of student affairs, Hannah Peck.

## K. SOLICITATION AND SALES

All solicitation and sales regulations published in Student Activities and Extracurricular Activities are applicable to registered undergraduate organizations. (See Student Activities and Extracurricular Activities, section I, Solicitation and sales in residential colleges and other buildings (p. 51).)

## L. RISK MANAGEMENT AND INSURANCE

Most registered undergraduate organizations are covered by a general liability insurance policy purchased by the University for their events, providing there is full compliance with all rules and regulations governing undergraduate organizations. However, fraternities and sororities are not covered, and they, and affiliates of other national organizations, are expected to receive primary insurance coverage from their national organization. External vendors or private agents contracted for services as part of a conference or other major campus event are also expected to submit proof of liability insurance in the form of a certificate of insurance. This insurance must indicate that Yale University is named as an additional insured. Further details about insurance coverage or requirements can be obtained from the Office of Enterprise Risk Management, 2 Whitney Avenue, 6th floor.

Students driving University-owned vehicles, or rented vehicles paid for by University funds, and being driven for official registered organization activity, are covered by the University's automobile insurance policy, if the drivers have a clean driving record and have taken and passed the online training course offered by the Office of Enterprise Risk Management. There is no insurance provided for any driver who has not passed this class; students who have not passed it should not be driving any University-owned or rented vehicle. Details on Driver Safety Awareness can be found at http://ogc.yale.edu/training-courses. In the event of an accident, the registered organization will be expected to cover any applicable deductibles.

Students driving their own automobiles for group activities must have a clean driving record and be properly insured, and the vehicle must be properly maintained. The use of twelve- or fifteen-passenger vans is prohibited.

## M. OUTSIDE VENDORS AND CONTRACTS

Contracts between individual students or student organizations and outside vendors/contractors must be reviewed by Yale's Procurement office before the contracts are signed. All vendors hired by registered organizations (including, but not limited to, performers, caterers, and equipment rental companies) must provide proof of $2 million in liability insurance prior to performing any work or providing any service. Yale University must be named as an additional insured. The Office of Enterprise Risk Management can recommend a method of obtaining the proper insurance if an outside vendor does not carry it. Details can be found at ogc.yale.edu/insurancecertificates-insurance.

## N. ADDITIONAL REGULATIONS

Certain organizations have additional guidelines or legal requirements.

1. Musical Ensembles, Singing Groups, and Theater Groups. Undergraduate organizations using sheet music, scores, or scripts should be aware of federal copyright laws, including laws governing photocopying.

2. Publications. Each issue of every publication of an undergraduate organization must include a publication notice on the cover page or the page containing the table of contents stating that "This magazine"—or "periodical" or "newspaper," as the case may be—"is published by Yale College students, and Yale University is not responsible for its contents." For online publications, this notice must be prominently displayed on the organization's home page and on each discrete publication.

   In keeping with the requirement that administrative, policy, and managerial decisions are to be in the hands of undergraduates, decisions about the contents of each periodical, the editorial policy, and the business policies and practices are to be controlled by enrolled Yale College students.

3. Distinguished Visitors and Controversial Speakers. In order to ensure that appropriate courtesies are extended to distinguished visitors and in some cases to arrange other engagements or security for these visitors when they are on campus, an undergraduate organization that wishes to invite a head of state (past or present), cabinet member, ambassador, or other dignitary of similar rank to visit Yale must, at least a month in advance of the visitor's arrival, inform the secretary of the University and the assistant dean of student affairs, Hannah Peck, and apprise both of the visitor's proposed schedule while on campus. Similarly, the secretary of the University and the assistant dean of student affairs, Hannah Peck, must be notified when controversial speakers are invited to Yale. Such speakers include those who have engendered protests or public demonstrations in other venues. Undergraduates are responsible for paying for security that the University deems appropriate for such visitors, and as a result, groups are encouraged to seek funding from non-University sources to pay such expenses. The University reserves the right to cancel the invitation to any speaker if it deems that there is inadequate time to prepare for the event.

4. Travel Abroad. Members of undergraduate organizations planning to go abroad should consult the health and safety section of the Center for International and Professional Experience website (http://www.yale.edu/yalecollege/international/predeparture/healthsafety.html) and the Yale International Toolkit (http://worldtoolkit.yale.edu) for information about health and safety abroad, travel warnings issued by the U.S. Department of State for specific countries or regions, and steps to be taken prior to travel.

   Students who choose to travel to the site of a concert tour early, remain at the site after the planned activity is completed, or separate from the group do so at their own risk.

   Visa requirements for non-U.S. citizens traveling outside the U.S. may be different from those pertaining to U.S. citizens. Foreign students may be responsible for obtaining such visas on their own.

5. Events Involving Minors. Undergraduate organizations organizing or participating in activities that involve minors must comply with Yale's policies and procedures for Programs for Children and Youth (http://programs-minors.yale.edu/).

# Offenses

Among the offenses that are subject to disciplinary action are the following:

## A. ACADEMIC DISHONESTY

Cheating on examinations, plagiarism, improper acknowledgment of sources in essays, and the use of a single essay in more than one course except in academically appropriate circumstances and with the prior permission of the instructors. (See Definitions of Plagiarism, Cheating, and Documentation of Sources (p. 5).)

## B. FALSIFICATION OF DOCUMENTS

Forging, altering, misrepresenting, or otherwise falsifying any transcript, academic record, identification card, or other document or communication. (See also Office of Career Strategy (p. 53); Library (p. 42).)

## C. ACTS OF VIOLENCE OR PHYSICAL FORCE

Physical restriction, assault, or any other act of violence or use of physical force against any member of the community, or any act that threatens the use of violence or physical force. The implied or express consent of the person against whom such violence or force is used will not be considered a defense.

## D. SEXUAL MISCONDUCT, INCLUDING SEXUAL HARASSMENT

Any sexual activity for which positive, unambiguous, and voluntary consent has not been given in advance; any sexual activity with someone who is incapable of giving valid consent because, for example, she or he is sleeping or otherwise incapacitated due to alcohol or drugs; any act of sexual harassment, intimate partner violence, or stalking. Sexual misconduct includes nonphysical actions such as digital media stalking, cyberbullying, and nonconsensual recording of a sexual nature. Sexual harassment consists of nonconsensual sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature.

For a fuller description of sexual misconduct, sexual consent, and sexual harassment see the Definitions of Sexual Misconduct, Sexual Consent, and Sexual Harassment (p. 7). Sexual misconduct violations shall be addressed by the University-Wide Committee on Sexual Misconduct (http://provost.yale.edu/uwc) (UWC) and governed by its procedures.

## E. HARASSMENT, INTIMIDATION, OR COERCION

Acts of harassment, intimidation, or coercion, including harassment on the basis of race, ethnic origin, gender, or sexual orientation.

## F. INTERFERENCE WITH UNIVERSITY FUNCTIONS

Participation in any effort to prevent or disrupt a class or other University function, or to seize or occupy any University building or part thereof, or to violate the right of an audience to listen at a University function. (See Free Expression, Peaceful Dissent, and Demonstrations (p. 9).)

## G. RIOTS

Participation in or attendance at riots or mass disturbances on the city streets or on any area of the campus.

## H. DEFIANCE OF AUTHORITY

Defiance or belligerence toward or lying to a University police officer, faculty member, or other University official who, in the line of duty, issues an order or asks for identification or information. Students are expected to carry University identification cards at all times and must identify themselves to University officials upon request. It is understood that University officials or police officers will identify themselves before making such a request.

## I. MISCONDUCT AT A FORMAL HEARING

Deliberate and knowing misrepresentation or lying during a formal hearing conducted by University authorities.

## J. MISREPRESENTATION IN APPLYING FOR FINANCIAL AID

Knowingly and deliberately supplying false information in an application for financial aid from the University or processed by the University.

## K. WEAPONS AND EXPLOSIVES

The possession or use of explosives, incendiary materials, or weapons (weapons include, but are not limited to, guns, firearms, shotguns, rifles, air rifles, paintball and pellet guns, BB guns, Tasers, and knives) by any Yale student, which is absolutely prohibited on campus, in areas surrounding the campus, or in off-campus housing. Students participating in club sports or in any other recreational or sporting activities involving the use of firearms must adhere to this prohibition and to the protocols established by the University with respect to the possession, use, storage, and transportation of any firearms (see "Sporting Firearms (http://www.yale.edu/pistol/safety.htm)" in the Club Sports Handbook).

## L. ALCOHOL

The unlawful possession, use, purchase, or distribution of alcohol on University property or as part of any University activity.

## M. DRUGS

The unlawful possession, use, purchase, or distribution of illicit drugs or controlled substances (including stimulants, depressants, narcotics, or hallucinogenic drugs); the misuse of prescription drugs, including sharing, procuring, buying, or using in a manner different from the prescribed use, or by someone other than the person for whom they were prescribed.

## N. THEFT AND WILLFUL PROPERTY DAMAGE

Obtaining or exerting unauthorized control over the property of others, or the destruction of, or damage to, the property of others.

## O. TRESPASSING

Presence in University buildings, steam tunnels, or on University property at times or places where such presence is prohibited, as, for example, when a building, facility, or room is locked and permission to enter has not been given. (See also Campus Housing and University Facilities, section B, B. Conduct in the dormitories, number 9, Restricted Areas (p. 19).)

## P. OFFENSES COMPROMISING CAMPUS FIRE SAFETY

Deliberate and unnecessary activation of fire alarms; tampering with fire alarms or smoke detectors; deliberate and unnecessary discharge of fire extinguishers; deliberate or reckless starting of unauthorized fires; and other conduct creating a risk to persons or property from fire or smoke. (See Campus Housing and University Facilities, section G, G. Fire safety, number 2, Fire Extinguishers, and numbers 1-3, Fire Alarms, Fire Extinguishers, Smoke Detectors, and Sprinkler Systems (p. 21).)

## Q. OFFENSES COMPROMISING CAMPUS SECURITY

Improper use of, tampering with, or vandalism of security systems or devices; unauthorized possession or duplication of University identification/proximity cards or keys; unauthorized propping open of, or tampering with, doors or gates, or actions in disregard of security postings. (See also Campus Housing and University Facilities, section J, General security (p. 25).)

## R. UNAUTHORIZED USE OF SERVICES OR FACILITIES

Unauthorized, unlawful, or fraudulent use of services or facilities (such as computer services or the University's telephone or reprographic facilities). (See also Other Services and Facilities (p. 53).)

## S. LIBRARY OFFENSES

Unauthorized removal, stashing or sequestering, defacing, mutilating, or theft of library materials, or willful and repeated failure to respond to recall notices. (See also Library (p. 42).)

## T. OFFENSES COMPROMISING COURSE MATERIALS

Recording lectures without explicit permission of the lecturer, or selling or distributing for commercial purposes notes, transcriptions, or outlines of class lectures, or any course materials, in any course of instruction.

## U. VIOLATION OF THE REGULATIONS ON ALCOHOL OR SOCIAL FUNCTIONS

Violation of the regulations on social functions or the Yale College regulations on alcoholic beverages. (See Social Functions (p. 44) and Alcoholic Beverages (p. 13).)

## V. HAZING

Because it violates our community values and standards, Yale College prohibits all acts of hazing. Hazing includes any action that violates Connecticut hazing law (CT General Statute, Section 53-23a, Hazing (http://search.cga.state.ct.us/dtsearch_pub_statutes.html)) as well as additional violations spelled out in these regulations.

In addition to Connecticut law, Yale College defines hazing to include initiation or affiliation activities that intentionally or recklessly endanger physical or mental health; that intimidate, denigrate, or humiliate persons pledging or seeking membership, or seeking to retain membership, in a registered or unregistered student organization or on an athletic team; or that intimidate, denigrate, or humiliate third parties who are witness to or subject to such activities. Blindfolding or physically restraining another individual, with or without that person's consent, falls within the Yale College definition of hazing.

Hazing is an offense whether it occurs on or off campus. The Executive Committee will not consider the implied or express consent of the person being hazed as a defense; nor will it consider the use of alcohol or drugs as a mitigating factor. To the contrary, in the context of hazing, the use of alcohol or drugs by any participants may be considered an express attempt to impair judgment, likely contributing to reckless behavior. Because hazing is an organizational activity, the organization, its officers, and responsible members will be held accountable for hazing violations.

Where harm occurs or the potential for harm exists to any person or persons as a result of hazing by members of a student group, the hosts of the event as well as the individuals directly involved and the officers of the organization (or their equivalent) can be held personally responsible. With respect to possible disciplinary action against all such persons, the Executive Committee may consider as mitigating factors their efforts to prevent the harmful or potentially harmful situation, as well as their cooperation with the Executive Committee's investigation of the situation.

Student organizations include but are not limited to athletic clubs, varsity teams, fraternities, sororities, musical groups, junior and senior societies, drama groups, comedy groups, political groups, cultural houses, tour guides, student government organizations, and residential colleges.

## W. SPECIAL PROVISIONS CONCERNING STUDENT ORGANIZATIONS

1. Conduct Off Campus. Conduct occurring off campus is a violation of these regulations if the conduct, had it occurred on campus, would be a violation of section C, "Acts of violence or physical force," section D, "Sexual misconduct, including sexual harassment," section L, "Alcohol," or section M, "Drugs." In addition, as provided in General Conduct and Discipline, any conduct occurring off campus that imperils the integrity and values of the University community may result in disciplinary action.

2. Responsibility for Events. If any violations of sections L, "Alcohol," or M, "Drugs," occur at an event, or in connection with an event, where alcohol is served or permitted to be consumed, and which is held, sponsored, or supported by a fraternity or other registered or unregistered student organization (either on campus or off campus under the circumstances specified in subsection above), and the individual or individuals directly responsible for the violations are not identified, the host or hosts of the event or the organization responsible for the event will be held responsible for the violations. If the hosts are also not identified, the officers of the organization will be held personally responsible for the violations. The Executive Committee may consider the efforts made by the hosts or officers

to prevent such violations, and their cooperation with the investigation of the violations, as mitigating factors with respect to the penalty for the violations.

# Penalties

The following penalties are among those which may be imposed by the Yale College Executive Committee or recommended by the University-Wide Committee on Sexual Misconduct (http://provost.yale.edu/uwc):

## A. REPRIMAND

This is a matter of internal record only. Records of reprimands in college deans' offices will be destroyed when students graduate.

## B. RESTRICTION

Denial of the use of certain University facilities or of the right to participate in certain activities or to exercise certain privileges.

## C. PROBATION

The student is in official jeopardy. The commission of a serious offense while on probation will normally result in suspension or expulsion. A student on probation may not hold leadership or officer positions in any registered Yale College student organization, any varsity athletic team or club sport, or any other organization that receives University funds. Additional terms of probation may be enforced by the Executive Committee or the UWC in individual cases.

## D. SUSPENSION

Separation from the University for a stated period of time. A suspended student forfeits all privileges of enrollment, including residence, attendance at classes, participation in organized extracurricular activities, and use of University libraries as well as of athletic and other facilities. Suspension may require petition for reinstatement. A suspended student may not return to campus during the period of suspension for any reason unless he or she receives express written permission in advance from his or her residential college head or dean, or from the dean of student affairs, Camille Lizarríbar. Students on suspension during the spring and the subsequent fall term are not eligible to participate in the Yale Summer Session or any Yale-sponsored activities or programs over the summer. Suspension shall be recorded on the academic transcript.

## E. EXPULSION

Permanent separation from the University. Expulsion shall be recorded on the academic transcript.

## F. FINES

Yale reserves the right to impose fines as appropriate, in addition to requiring payment for costs resulting from or associated with the offenses.

———————————

In addition to imposing these penalties for offenses subject to disciplinary action, the University may refer students for prosecution.

# Procedures

- The Disciplinary Procedures of the Executive Committee of Yale College (p. 72)
- Student Complaints (p. 89)
- The University Tribunal (p. 90)
- Emergency, Interim, and Administrative Suspension (p. 91)

# The Disciplinary Procedures of the Executive Committee of Yale College

The Yale College Executive Committee is responsible for the fair, consistent, and uniform enforcement of the *Undergraduate Regulations*, the disciplinary rules governing students in Yale College. It receives complaints of alleged infractions of those regulations whether academic or nonacademic. Its jurisdiction also includes other actions on the part of undergraduates that may in the judgment of the committee warrant disciplinary action because these actions may imperil the integrity and values of the academic community or the safety of its members. The Executive Committee may assign penalties as provided in the *Undergraduate Regulations*, though in some cases authority is delegated to other University officials such as the heads of the residential colleges, the University Librarian, the directors of the Yale computer facilities, and the Executive Director of Yale Dining, who may summarily impose certain penalties for violations of dormitory, library, computer facility, and dining services regulations. Violations of sexual misconduct policies are addressed by the University-Wide Committee on Sexual Misconduct (http://provost.yale.edu/uwc) (UWC), which has authority to recommend penalties to the dean of Yale College.

As an institution, the Executive Committee is responsible to the Yale College Faculty and ultimately to the University. The committee is charged with protecting the Yale College community so as to ensure the integrity of academic instruction, the physical security of students, and the preservation of the property and educational resources of the University. The committee is bound at all times to consider the manner in which its actions and decisions may affect the persons and groups—faculty, student body, administration, and staff—whose activities carry and foster the intellectual and residential life of Yale College.

## A. COMPOSITION OF THE EXECUTIVE COMMITTEE

1. The Executive Committee of Yale College is appointed by the dean of Yale College. The committee shall have ten regular voting members: three tenured members of the Yale College faculty, three untenured members of the Yale College faculty, three undergraduates, and the dean of Yale College or the dean's designated representative. The presence of seven of these members shall constitute a quorum. A majority vote of those present shall be required for any decision. Should an occasion arise when, as a result of the conflict-of-interest provisions of these procedures or other unavailability of members, a quorum cannot be gathered from regular voting members, the dean of Yale College shall appoint a member or members from the faculty ad hoc to participate in the business then before the committee.

2. In addition to the regular voting members there shall be three officers of the Executive Committee who are also members: chair, secretary, and factfinder. They shall be appointed annually by the dean of Yale College and shall be charged with particular responsibilities.

   a. The chair shall be either a tenured member of the Yale College Faculty or an associate dean of Yale College. The chair shall coordinate all activities of the committee, shall preside at all meetings, shall organize the conduct of meetings, and shall be the person through whom faculty and students communicate to the committee. In full hearings, the chair shall vote only to break a tie, and shall not vote in any capacity when the committee considers an appeal from a complaint initially settled by disposition without formal hearing. (See section C.3.a. (p. 77))

   b. The secretary shall normally be an assistant or associate dean of Yale College. This person shall keep the records relating to committee business, handle official correspondence, assist the chair in the daily details of committee business, and ensure that all required procedural steps have been taken by the committee. The secretary shall be responsible for taking the minutes during the meetings and shall ensure that minutes are prepared in good time. In full hearings the secretary shall not vote in the Executive Committee.

   c. The factfinder ordinarily shall be a tenured member of the Yale College Faculty or an assistant or associate dean of Yale College, but may also be a tenured member of one of the other faculties or schools in the University. In situations where there is need to inquire into disputed matters of fact, to locate documents, or to gather relevant information that the committee cannot pursue collectively or that it would be improper or undesirable for a faculty member or other member of the University to seek individually, the factfinder shall be responsible for gathering the information in an impartial and thorough manner. The factfinder is not to be regarded as a prosecutor and is specifically charged to be alert to information that may exonerate a student. The factfinder shall have the responsibility to interview students, faculty, and other persons who he or she may reasonably believe have information relevant to the business of the committee. All members of the Yale community should recognize their responsibility to cooperate fully and truthfully with the factfinder. Throughout the factfinder's investigation, however, the student has the right to remain silent. The factfinder and the committee are not to draw a negative inference from the student's silence, but the student by that silence forfeits an opportunity to ensure that the factfinder obtains all relevant information. Normally, at the request of the chair, the factfinder will undertake an investigation. The student involved in the complaint may also request the factfinder to pursue particular information; the factfinder shall consider seriously any such request but the decision of how to proceed is the responsibility of the factfinder. The factfinder shall make a written report of the findings of his or her inquiry to the chair. In full hearings the factfinder shall not vote in the Executive Committee.

   d. The chair, secretary, factfinder, and one student member of the Executive Committee shall constitute the Coordinating Group of the Executive

Committee. The Coordinating Group shall prepare and organize all matters coming before the Executive Committee. A majority vote, if necessary, shall decide matters within the Coordinating Group. Should an occasion arise when an officer of the Coordinating Group is unavailable to participate in a hearing or other matter coming before the Coordinating Group, the dean of Yale College shall appoint a substitute officer ad hoc.

e. There shall be a Committee of Review which in circumstances described below (See section C.4 (p. 80).) may review decisions of the Executive Committee.

## B. SUBMISSION OF COMPLAINTS

Complaints of alleged infractions of the *Undergraduate Regulations*, academic or nonacademic, shall initially be referred to the chair of the Executive Committee or, in the chair's absence, to the secretary. The formal complaint must be made in writing and must describe in specific detail the complaint and the information upon which it is based.

1. Complaints of Academic Offenses

   a. A member of the faculty finding evidence of academic dishonesty on a class assignment or examination will bring the matter to the chair of the Executive Committee. The faculty member will be expected to provide copies of the examination or assignment, the paper or papers allegedly in violation of the regulations, and any alleged source materials. The faculty member must provide a written statement explaining the details of the alleged academic dishonesty.

   b. If a student becomes aware of academic dishonesty, he or she should report the matter to the instructor. If this procedure is not feasible, the student may report the matter to the chair of the department. The latter will then inform the instructor of the complaint (without identifying the complaining student) and seek the instructor's advice on the matter.

2. Complaints of Nonacademic Offenses

   a. Any member of the faculty, residential college head, residential college dean, or member of the University administration or staff may bring an alleged infraction to the attention of the chair of the Executive Committee.

   b. An undergraduate student may bring a complaint of a nonacademic infraction to the attention of the chair only in conjunction with his or her residential college head, residential college dean, a member of the Yale College Dean's Office, a human relations counselor, a member of the President's Committee on Racial and Ethnic Harassment, or the Yale Police Department.

   c. In addition, the Coordinating Group shall review weekly the reports of student misconduct lodged by the Yale Police Department. The Coordinating Group shall take note of those alleged infractions of the *Undergraduate Regulations* that appear to warrant action by the Executive Committee and shall refer them for action under section 3 immediately below.

3. Initial Disposition and Referral of Complaints. Each week the chair, factfinder, and secretary of the Coordinating Group shall review all complaints received by the chair and shall make one of the following judgments in regard to each complaint:

   a. Complaints for which sufficient information is available and which, if substantiated, would constitute a violation of the *Undergraduate Regulations* shall be submitted to the Executive Committee unless settled by disposition without a formal hearing (see section C.3.a. (p. 77)) or withdrawn, as provided below in section E.2 (p. 84).

   b. If there is need to locate documents, inquire further into matters of fact, or pursue additional information before an informed judgment may be made by the Coordinating Group, the chair shall request the factfinder to undertake the necessary investigation. In cases of alleged academic offenses, it remains the responsibility of the faculty member to furnish copies of any relevant source materials.

   c. If, after such investigation, the Coordinating Group determines that there is insufficient information or that the act does not amount to a violation of the Undergraduate Regulations, the Coordinating Group will close the matter.

   d. Complaints that should have been directed to an administrative official, such as infractions of library or dining services regulations, shall be referred to the proper authority.

   e. Complaints that appear to involve sexual misconduct shall be referred to the secretary of the University-Wide Committee on Sexual Misconduct (http://provost.yale.edu/uwc) (UWC). In complex cases that combine allegations of sexual misconduct and other offenses, the chair of the Executive Committee and the chair of the UWC shall consult pursuant to the provisions of the procedures of the UWC.

   f. See section E (p. 83) for complaints in regard to acts of violence or physical force, harassment, intimidation, or coercion.

   g. See section G (p. 85) for complaints in regard to computer misuse.

The Coordinating Group shall make timely reports summarizing statistically its decisions in regard to all complaints brought to its attention.

Throughout these and subsequent consultations the complaints shall not be discussed publicly. All complaints shall be part of the permanent record of the Executive Committee.

## C. PROCEDURES FOR CONSIDERATION OF A COMPLAINT BY THE EXECUTIVE COMMITTEE

1. Informing the Student. If the Coordinating Group decides that a complaint is to be referred to the Executive Committee or further investigated by the factfinder, the secretary shall, in writing, inform the student or students of this fact and specify the regulation that has been allegedly violated. The letter to the student shall include a list of the membership of the Executive Committee and a copy of these procedures, including a statement of the rights of students appearing before the committee.

(See section J (p. 87).) The secretary shall simultaneously inform the relevant residential college head(s) and residential college dean(s) of the complaint. The student should review information relevant to the proceedings in the residential college dean's office. The chair or secretary can familiarize the student and the student's adviser with practical as well as procedural aspects of the hearing process, so that the student can be as well prepared and comfortable as possible in meeting with the committee.

2. The Adviser to the Student. The student shall have the right to choose an adviser. The adviser is not an advocate, but rather a source of personal and moral support to the student. The adviser should aid the student in preparing to appear before the Executive Committee. The adviser should also accompany the student to the committee meeting and counsel him or her. During the meeting the adviser may unobtrusively suggest questions for the student to pose to witnesses or issues for the student to raise with the committee. The adviser may not participate directly in the proceedings except for making a brief concluding statement if the student so desires and except as provided in section E.1.b (p. 83).

    Normally, the adviser will be the student's residential college dean, but the adviser may also be the residential college head, a freshman or sophomore academic adviser, a Yale College faculty member, a Yale College administrator, a coach, or any other member of the University community who is not a member of the Executive Committee or the Office of the University General Counsel. Should a student find himself or herself unable to locate an adviser, the secretary of the Executive Committee shall furnish the student with a list of persons willing to aid students in these situations.

    In the case of a charge of physical assault or other possible infractions, a residential college head or dean shall not serve as adviser to a student in his or her college in a case involving a complaint made by another student in the same college.

    The student shall notify the secretary of the Executive Committee as soon as he or she has chosen an adviser.

    When a complaint is lodged involving alleged offenses against persons and/or property, the student may choose an attorney as a second adviser. The legal adviser may counsel the student but has no right to speak to the committee or otherwise participate directly in the proceeding. The legal adviser may unobtrusively suggest questions to be asked, and at the meeting may in writing request the chair to pursue a particular direction of questioning. It shall be the chair's decision whether such a question or line of questioning is followed.

    On all occasions when a student has requested the presence of an attorney in the meeting with the Executive Committee, the chair will as a matter of course request the presence of the University General Counsel or a representative of that office.

3. Consideration of the Complaint by the Committee. The chair shall prepare for the committee a written statement of the alleged infraction to which shall be attached any statement prepared by the factfinder and copies of all other relevant documents. These materials should be made available to the student no less than four working days prior to the committee meeting, except when the student requests that less

time be allowed to elapse prior to a scheduled meeting. The same materials will be made available to the adviser. The student shall have the right to submit, at least forty-eight hours in advance of the meeting, a written statement in response to these materials; the statement will also be circulated to the committee.

a. Disposition without a Formal Hearing. The student has the right to request in writing the disposition of the complaint by the Coordinating Group without a formal hearing before the entire committee. While the Coordinating Group will normally grant a request for disposition without a formal hearing, it is not required to do so. If the Coordinating Group does grant the request for disposition without a hearing, this request will be considered as the admission by the student of the validity of the complaint. That admission governs all further committee action in regard to the complaint.

The penalty imposed by the Coordinating Group is final and goes into effect immediately. If the student is dissatisfied with the penalty imposed by the Coordinating Group, the student may appeal to the Committee of Review (p. 80).

b. Complaints Involving Criminal Charges. See section D (p. 82) below for regulations governing complaints that come before the Executive Committee when criminal charges either are or may be pending before the courts.

c. Disposition before the Committee. Unless the student requests a Disposition without a Formal Hearing (or the complaint is withdrawn, provided in section E.2 (p. 84).), all complaints referred by the Coordinating Group will be reviewed by the Executive Committee.

　i Inspection of Records. The documents relating to the complaint, including the initial complaint, any report of the factfinder, the statement by the student, and any other materials deemed relevant by the Coordinating Group, shall be made available to the committee for inspection in the Yale College Dean's Office normally no less than twenty-four hours before the time of the meeting. These documents are confidential.

　　If within the three working days before the scheduled time of the committee meeting significant new information regarding the complaint becomes available, either the student or the chair may request a postponement of the consideration of the complaint until a subsequent meeting.

　ii Excuse for Conflicts of Interest. When the members of the committee have become familiar with the details of the complaint, the chair shall ascertain whether any members should be excused because of a conflict of interest (in accordance with section H (p. 85).)

　iii Procedures during the Student's Meeting with the Committee. The purpose of the meeting between the student and the committee is to vent fully all sides of the issue or issues raised by the complaint.

　　Students are expected to tell the truth in all their dealings with the Executive Committee. The members of the Executive Committee will

give such credence and weight to the student's statements as they believe appropriate.

Every student shall be put on notice that lying to the factfinder or to the Executive Committee will be taken into account in fixing the penalty and is a matter for an independent complaint as provided in the *Undergraduate Regulations*. (See General Conduct and Discipline, section I, "Misconduct at a formal hearing (http://catalog.yale.edu/undergraduate-regulations/general-conduct-discipline/offenses/#misconduct_formal_hearing).")

When the committee meets with the student, the chair shall explain the substance of the complaint and the specific undergraduate regulation allegedly violated or the other alleged action that in the committee's judgment may warrant disciplinary action. The student may make a statement of reasonable length to the committee. If the factfinder has conducted a review, the student or members of the committee may request the factfinder to explain his or her report.

The Coordinating Group may arrange for the appearance of witnesses. If it does so, their names shall be made available to the student no less than forty-eight hours before the meeting. If the complaint is one of academic dishonesty, the faculty member may request from the chair permission to make a brief explanatory statement to the committee in the presence of the student. The student may also present a reasonable number of witnesses, whose names shall likewise be submitted to the chair forty-eight hours before the meeting. Testimonies about the student's character may be submitted in writing, but shall not be presented in person at the hearing.

iv Deliberative Session of the Committee. Upon completion of the discussion of the complaint, the student, the factfinder, the adviser, and all other persons but the chair, the secretary, and the regular voting members of the committee shall withdraw. The committee shall then address the question of whether the student has violated the *Undergraduate Regulations*, and shall give an affirmative answer if it is satisfied that a violation has been shown by a clear preponderance of the evidence.

After a full consideration, the committee shall reach its decision, through a secret ballot, by majority vote. Should the initial ballot result in a tie, a second ballot shall be taken after further discussion. Should the result again be a tie, the chair shall cast the deciding vote. The actual vote shall not be indicated to the student and shall remain a part of the confidential record. The secretary shall not vote.

Should the meeting of the committee to consider the complaint extend beyond 10 p.m., the chair on his or her own responsibility, or a majority of the committee present, may postpone the remainder of the meeting for a period no longer than forty-eight hours. If the meeting is so adjourned, the same committee members must be present for the reconvened meeting at which the hearing or deliberations shall be resumed or the penalty assigned.

v Assignment of a Penalty. The Yale College Faculty believes it is proper for the Executive Committee to view a particular infraction of the Undergraduate Regulations in the context of the total personal and academic record of the student involved.

When the Executive Committee proceeds to consider assigning a penalty, it shall invite the student and the adviser to return to the room. The secretary will inform the committee of any previous infractions of the *Undergraduate Regulations* on the part of the student. The Executive Committee shall permit the student and his or her adviser to present a statement of reasonable length relevant to the determination of the penalty and to furnish further information about his or her character.

After the student and the adviser have again withdrawn, the secretary will inform the committee about the nature of previous penalties assessed for similar offenses. The committee will discuss what penalty it should impose. If the committee has found that the student purposely misled the committee during its deliberations, the committee may consider that factor as grounds for imposing a more severe penalty. The chair will propose a penalty upon which the regular voting members of the committee will vote by secret ballot. The committee shall continue to ballot secretly on proposed penalties until a decision has been reached by a majority of the members present. The chair shall vote on a penalty only if the regular voting members have reached tied votes on three proposed penalties. The secretary shall not vote.

Should the committee under extraordinary circumstances propose a penalty other than one of those specifically listed in the *Undergraduate Regulations* (e.g., some form of work service or repair of damaged property), the chair shall first ascertain that the persons upon whom would rest responsibility for overseeing enforcement of the penalty are willing to accept that responsibility.

The penalty of suspension must apply to periods when Yale College is in regular session. Students who are suspended must vacate the college and return keys and Yale identification to the residential college dean's office within the time period specified by the Executive Committee. In no case may that period be greater than 72 hours after the imposition of the penalty. A suspended student may not return to campus during the period of suspension for any reason unless he or she receives express written permission in advance from his or her residential college dean or head, or the dean of student affairs, Camille Lizarríbar.

When the committee has reached its decision about the penalty, the chair shall inform the student of the sanction and summarize the reasons that led the committee to assess it. The chair shall also inform the adviser and the student's residential college dean of the outlines of the committee's decision in as comprehensive and useful a manner as possible.

The secretary shall inform the relevant residential college head(s) and dean(s) of the decisions of the committee in regard to the penalty and action required to enforce it. The secretary shall inform the residential

college dean of the exact manner in which the infraction is to be indicated in the record and recommendations of the student. This communication should ordinarily take place in writing within two weeks of the disposition of the complaint. Copies of those letters shall form part of the permanent record of the Executive Committee.

The secretary shall also send written notice of the decisions of the committee to the person originally lodging the complaint, the charging person, and/or the person who is the alleged victim of any crime of violence or any sex offense.

The secretary may disclose to other universities and schools information concerning disciplinary action taken against a student for conduct that posed a significant risk to the safety or well-being of that student, other students, or members of the University community.

4. Appeals to the Committee of Review. Decisions of the Executive Committee or the Coordinating Group are final and take immediate effect, notwithstanding whether the student is applying to the Committee of Review for reconsideration of a decision as provided herein. They may be reopened by the Executive Committee itself only when substantial new evidence that may exonerate the student becomes available. The Executive Committee or the Coordinating Group may also be requested by the Committee of Review to reconsider a decision; see below.

   a. There shall be a Committee of Review, which may review and, when appropriate, request reconsideration of the decisions of the Executive Committee or the Coordinating Group. The Committee of Review will be composed of three persons, two of them members of the Yale College Faculty, appointed by the president for a term of five years, one of whom shall be designated by the president as chair of the committee. Each year, the faculty members of the Committee of Review, in consultation with the Yale College Council, will select a student member to serve on the committee.

   b. The Committee of Review will receive written complaints from (1) a student or students who have been assigned a penalty by the Executive Committee or the Coordinating Group (2) the dean of Yale College, where either the student(s) or the dean believes that a decision of the Executive Committee or the Coordinating Group, in matters of fact or the assignment of penalties, is inconsistent with precedent or otherwise in error. A complaint must be received by the Committee of Review no later than ten days after the decision of the Executive Committee or the Coordinating Group. In order to review such complaints, the Committee of Review will have access to all the written records of the Executive Committee or the Coordinating Group.

   c. In response to such a complaint, the Committee of Review will have the right (1) to decline to take action; (2) to request in writing a reconsideration by the Executive Committee; (3) to publish commentary on the case which, while maintaining the confidentiality of the Executive Committee hearings, seeks to clarify the principles involved in the case and to offer useful counsel for future decisions.

d.  It is anticipated that in the vast majority of cases, the Committee of Review will decline to take action. It will request reconsideration by the Executive Committee or the Coordinating Group only in cases where it believes that (1) some pertinent evidence was not taken into account; (2) long-standing precedents, in decisions of culpability and the assignment of penalties, were ignored; (3) errors in procedure may have substantially affected the decision; (4) certain key principles of the University were not sufficiently considered in the original decision.

e.  The Executive Committee or the Coordinating Group will have the authority to grant or deny a request for reconsideration. It is anticipated, however, that such requests will be rare, and that in most instances the Executive Committee or the Coordinating Group will give them the most serious consideration. In the case where the Executive Committee or the Coordinating Group has granted the request to reconsider, the chair of the Executive Committee and the Committee of Review will discuss appropriate procedures for the Executive Committee's or the Coordinating Group's reconsideration. At a reconsideration of a case by the Executive Committee or the Coordinating Group, the chair of the Committee of Review will appear before the Executive Committee or the Coordinating Group in order to make clear what motivated the call for reconsideration. The Executive Committee or the Coordinating Group will be free either to alter or to confirm its original decision. It may not, however, make a finding of culpability where it had previously exonerated a student, or assign a penalty more serious than that assigned originally.

f.  The Committee of Review will also be empowered to issue ad hoc reports on individual cases, and will publish an annual report in which it makes clear the principles and circumstances that led it to request reconsideration of certain cases, if in fact it has done so during the course of the year. In the annual report, it may also reflect on general principles and precedents guiding the administration of discipline in Yale College.

5.  Time Limit on Disposition of Complaints. The process of factfinding, Coordinating Group consideration, and Executive Committee action is to be completed by the end of the academic semester after the semester in which a complaint has been initiated. Otherwise the inquiry will be terminated without prejudice to the student at that time unless a majority of the committee formally authorizes the Coordinating Group to pursue the investigation beyond this time span.

Complaints made subject to the provisions of the administrative suspension shall be governed by the time limits provided for that procedure. (See section D.3 (p. 82).)

A student who withdraws from Yale College for personal reasons rather than face disciplinary charges that are pending against that student will not be eligible for Yale College reinstatement, re-enrollment or a Yale College degree, and a notation to this effect will be entered on the transcript. If a disciplinary case brought against a graduating senior is pending at the time of graduation, the Coordinating Group

will recommend to the dean of Yale College that the student's degree be withheld until the case is resolved.

## D. COMPLAINTS BEFORE THE EXECUTIVE COMMITTEE RESPECTING MATTERS BEFORE THE COURTS

When a complaint alleging an infraction of the *Undergraduate Regulations* relates to a case that either will be or is in process of adjudication by the courts, the Executive Committee may address the complaint by one of the following procedures:

1. If in the judgment of the Coordinating Group sufficient information is available to consider the complaint, the committee may consider it in the normal manner.

2. The Executive Committee may decide to defer its consideration of the complaint until after the matter has been adjudicated by the courts. When the Committee so defers consideration, it shall decide by a majority vote through secret ballot (so long as the student is in good academic standing) either to permit the student to continue in regular enrollment and residence in his or her residential college or to permit the student to enroll in classes but not to live in the residential college. Before the committee makes this decision, the chair shall request the written opinion of the student's residential college head. The student may also present a written statement in regard to his or her ongoing residence in the residential college.

3. The student may request in writing that the Executive Committee defer its consideration of the complaint and that he or she receive an administrative suspension. This provision is intended for use by the Executive Committee very rarely and only in situations in which the criminal charges are very serious and in which action by the Executive Committee might irreparably prejudice the student's cause before the courts.

An administrative suspension suspends the student from Yale College in the same manner as any suspension by the Executive Committee; however, the administrative suspension is without prejudice to the review of the complaint against the student. In effect, an administrative suspension means that the student facing a criminal hearing voluntarily withdraws from enrollment and residence in Yale College with the understanding that he or she may re-enroll, through the normal procedures for reinstatement or readmission, only after the standing complaint has been considered in the normal manner by the Executive Committee. The decision to provide an administrative suspension resides solely in the authority of the Executive Committee; even when a student requests an administrative suspension, the committee may decide to consider the complaint immediately.

The administrative suspension may remain in effect for no longer than one year, at the end of which time it must be reviewed by the Executive Committee. The student may then request in writing an extension of the administrative suspension for another period not to exceed one year. However, an extension of an administrative suspension may not remain in effect longer than one month past the date on which the matter has been adjudicated by the courts or settled otherwise, or normally longer than two weeks

beyond the opening of the academic term if determination by the courts has occurred when the College is not in session.

When the complaint comes for consideration by the Executive Committee after the period of administrative suspension, the committee will consider the complaint in the normal manner and without prejudice.

A decision favorable to the student in the courts will not necessarily exonerate him or her from having committed the alleged infraction of the Undergraduate Regulations.

## E. PROCEDURES FOR COMPLAINTS OF ACTS OF VIOLENCE OR PHYSICAL FORCE, HARASSMENT, INTIMIDATION, OR COERCION

1. In any case involving a charge of acts of violence or physical force, harassment, intimidation, or coercion (see General Conduct and Discipline, Offenses, section C (http://catalog.yale.edu/undergraduate-regulations/general-conduct-discipline/offenses/#acts_violence_physical_force) and section E (http://catalog.yale.edu/undergraduate-regulations/general-conduct-discipline/offenses/#harassment_intimidation_coercion)), the procedures for the disposition before the committee (see section C.3.c (p. 77).) are amended in the following ways:

   a. The person against whom one of the acts described above was allegedly committed (referred to here as the "charging person," whether or not he or she actually initiated the charge) shall receive copies of all documents already submitted relating to the complaint, including the initial complaint, any report of the factfinder, the statement by the student charged in the complaint, and any other materials deemed relevant by the Coordinating Group, no less than seventy-two hours before the time of the full committee's meeting to hear the charge (or the Coordinating Group's meeting if the complaint is to be disposed of without a hearing). All documents are strictly confidential and may not be shared, circulated, or posted except with the charging person's adviser or legal adviser, if any. All documents must be returned to the secretary of the Executive Committee at the conclusion of all proceedings.

   b. If the charging person appears as a witness before the committee, he or she may choose to be accompanied for moral support by an adult member of the Yale community who will not participate in the proceedings in any way. At the request of either the charging person or the student charged in the complaint, the testimony of the charging person may be given out of the presence of the student charged in the complaint. The charged student's adviser (and legal adviser, if permitted pursuant to section C.2 (p. 76).) may be present during the testimony, however. In addition, the committee will arrange for the student charged in the complaint to hear the testimony through audio transmission to a private room.

   During the testimony, the charged student's adviser may propose to the chair questions to be asked of the charging person. At the end of the testimony, the adviser may request a brief recess to consult with the student charged in the complaint, and after the recess the adviser may propose to the chair additional questions to be asked of the charging person. At the discretion of the chair, the

adviser (but not the legal adviser, if any) may be permitted to ask questions directly of the charging person rather than proposing them to the chair.

2. In any case involving a charge of acts of violence or physical force, harassment, intimidation, or coercion (see General Conduct and Discipline, Offenses, section C (http://catalog.yale.edu/undergraduate-regulations/general-conduct-discipline/offenses/#acts_violence_physical_force) and section E (http://catalog.yale.edu/undergraduate-regulations/general-conduct-discipline/offenses/#harassment_intimidation_coercion)), the charging person may, at any time before the day scheduled for the full Executive Committee's formal hearing, request in writing that the Coordinating Group withdraw the charge. The Coordinating Group will consider the request, and may inquire into the circumstances (including as appropriate consulting with the charging person's adviser or residential college dean) to determine whether the complaint has been resolved fairly and to the satisfaction of the parties, whether the charging person's request is fully voluntary, whether the interests of the Yale community would be better served by hearing the charge, and other relevant matters. The Coordinating Group will then decide to grant or deny the request, in its sole discretion. The decision of the Coordinating Group on the request will be final.

3. Each year the dean of Yale College shall appoint either a University Human Relations Counselor or a member of the President's Committee on Racial and Ethnic Harassment to serve as a consultant to the Coordinating Group and the Executive Committee on complaints relating to harassment on the basis of gender, sexual orientation, race, or ethnic origin. The chair of the Executive Committee shall invite one or both of these consultants to advise the Coordinating Group and the Executive Committee in appropriate cases.

4. It shall be the duty of the chair to explain to all parties involved in a complaint of harassment on the basis of gender, sexual orientation, race, or ethnic origin that the Executive Committee disposition of the complaint does not constitute the equivalent of action or redress at law. The chair shall also explain that the extent of the jurisdiction of the Yale College Executive Committee is limited to the enforcement of the *Undergraduate Regulations* by means of the penalties provided therein.

5. Should the complaint of harassment, intimidation, coercion, or assault be simultaneously pursued in the courts, the procedures in section D (p. 82) regulating such situations shall be in effect.

## F. COMPLAINTS OF GENDER DISCRIMINATION OTHER THAN SEXUAL MISCONDUCT

In proceedings involving charges of gender discrimination by students other than sexual misconduct the provisions of section E (p. 83) and the following provisions shall apply:

1. If the charged person is entitled to bring legal counsel to the hearing, the charging person shall also be allowed to bring legal counsel.

2. The charging person shall have the same rights as the charged student to bring an appeal to the Committee of Review as provided in section C.4 (p. 80).

3. The committee will determine a violation has occurred when it is proven by a preponderance of the evidence.

4. The committee shall complete the process of hearing the complaint within 60 days, unless illness, holidays, the absence of witnesses from campus, the complexity of the case, or similar circumstances require additional time.

5. Written notice of the outcome of the proceeding must be provided to the charging student.

## G. COMPLAINTS RELATED TO MISUSE OF COMPUTERS

Each year the dean of Yale College shall appoint one or more computer advisers to serve as consultants to the Coordinating Group and the Executive Committee on complaints, academic or nonacademic, relating to the misuse of computers.

The chair of the Executive Committee should in appropriate cases invite one of the computer advisers to be present at the meeting of the Coordinating Group and/or the Executive Committee during its hearing phase. In order to avoid conflicts of interest, the dean of Yale College may appoint one computer adviser from the Department of Computer Science who will consult on cases involving Information Technology Services (ITS), and one from Information Technology Services who will consult on cases involving the Department of Computer Science. If both the department and Information Technology Services are involved in bringing the complaint, the dean may appoint another computer adviser.

In general, academic dishonesty or any misconduct carried out through the use of or in conjunction with University or privately owned computer facilities differs neither in kind nor in gravity from other more familiar modes of academic dishonesty or misconduct. The Executive Committee should recognize this fact and should also regard any and all forms of damage to computer facilities, and/or damage to or invasion of the privacy of information stored within computers, as a serious offense against property and privacy. All computer facilities owned, leased, or sponsored by the University are educational and administrative resources, the security and the fair, private use of which must be vigorously protected in the same manner as laboratories, library resources, and traditional record-keeping and filing systems.

Penalties assigned in relation to computer offenses should take into account the actual cost of damage to equipment, the cost of replacement or retrieval of file information, and the value of legitimate use of an educational and research resource lost to authorized members of the Yale community.

## H. CONFLICT OF INTEREST

Members of the Executive Committee should be alert to potential conflicts of interest between themselves and the persons bringing complaints to the committee or the student against whom a complaint has been lodged.

1. Committee members having past or present ties of kinship, marriage, or other very close personal relationship to any of the parties involved in the complaint should

notify the chair that a conflict of interest exists and should be automatically excused from participation. The nature of the relationship need not be disclosed to the chair.

2. Committee members having some form of close professional relationship to one or more of the parties involved in the complaint (e.g., collaboration or cooperation in research, writing, or teaching with a colleague or service as an ongoing academic adviser or instructor to the student in a very small class) should notify the chair that a potential conflict of interest exists and may request to be excused from participation.

3. A committee member should inform the chair that he or she is in some manner involved in the specific details of the complaint and may request to be excused from participation.

4. A member of the committee should inform the chair that the nature of the complaint creates an occasion for a conflict of interest and may request to be excused from participation.

5. The student against whom a complaint has been lodged may request that a committee member be excused because of a proven conflict of interest as provided in the foregoing provisions.

6. Should one of the members of the Coordinating Group be excused for a conflict of interest, the tenured faculty member of the committee with the longest time of University service shall carry out the responsibilities of that member of the Coordinating Group in regard to the complaint under consideration. In the absence of an available tenured faculty member, the senior untenured faculty member of the committee shall carry out these responsibilities. In regard to the consideration of that particular complaint, this person shall have the voting rights of the member of the Coordinating Group for whom substitution has been made.

7. Should the chair deny a request to be excused, the member or the student may appeal the request to the full committee or quorum thereof. The vote of a majority, taken by secret ballot, will decide the matter. Although no member should be compelled to participate in considering a complaint when he or she anticipates deep personal discomfort, no member should be excused simply for the sake of convenience or to avoid consideration of complaints that are difficult or unpleasant.

8. All matters relating to conflict of interest should be raised and settled after the committee has received the written materials about the complaint and before the committee begins consideration of the complaint. Questions relating to conflict of interest may not be raised after the committee has reached decisions, nor may they be grounds for reconsideration of committee decisions.

9. The foregoing provisions are intended not to be inclusive of all possible situations of conflict of interest, but rather to provide guidance. It is the intention of these provisions to enable the committee to avoid both the appearance and the reality of conflict of interest, so that the community will have confidence in the fairness of the proceedings. In case of doubt, the chair and committee members should assume that a potential conflict of interest exists.

## I. RECORDS AND MINUTES OF THE EXECUTIVE COMMITTEE

The records of the Executive Committee are of four types. The first three (described in sections I.1-3.) are unavailable to the public unless subpoenaed by the court or other government agency and should be stored in a locked file in the Yale College Dean's Office. The fourth type of record (described in section I.4.) will be published twice per year, in September and January, and made available to students and other members of the Yale community. The Committee of Review will have access to all records of the Executive Committee.

1.  The secretary shall maintain a record of all complaints received by the Coordinating Group and forwarded to the full committee. This record shall include the original written complaint and a log of all Coordinating Group consultations or correspondence in regard to the complaint. This record should also include any forms or statements signed or submitted by the student and all materials submitted to the committee prior to the meeting, including the report of the factfinder.

2.  The secretary shall keep a comprehensive record of minutes from each meeting of the Executive Committee. These need not be a verbatim transcript, but they should reflect a full and faithful record of the statements of witnesses and substance of the discussions and decisions of the committee. Minutes shall not be kept of the private committee discussion prior to reaching a decision by vote on the substance of the complaint or the assessment of the penalty. A written record shall be kept of those committee members in attendance; the decision of the majority in determining whether a violation has occurred, including the penalty assessed if any; the witnesses appearing before the committee; and any written materials submitted to the committee.

3.  The secretary shall keep a careful, ongoing written record of the complaints sustained by the Executive Committee and the particular penalties assigned. The purpose of this record shall be to aid the committee in equitably addressing complaints of a similar character.

4.  The secretary shall prepare a brief narrative of each decision of the Executive Committee, describing the alleged act(s), the charge, the committee's finding, the mitigating or exacerbating circumstances, and the penalty, if any. The report should be written so as not to reveal, directly or indirectly, the identities of the individuals involved in the case. Because the reports are summaries, they do not contain all the relevant considerations in every case. For that reason, students should rely on them only for general guidance, not as binding precedent.

## J. STATEMENT OF RIGHTS OF STUDENTS MEETING WITH THE EXECUTIVE COMMITTEE

A statement of the following rights should be furnished to all students being informed that a complaint has been lodged against them. Students in Yale College requested to meet with the Executive Committee in regard to a complaint of their having violated one or more of the *Undergraduate Regulations*, or in regard to other actions that in the committee's judgment may warrant disciplinary action, should be aware of their following rights:

1. The student shall receive written notification of the complaint and of the specific alleged infraction of the *Undergraduate Regulations*. (See section C.1 (p. 75).)

2. The student will be furnished with a statement of the procedures, including the conflict-of-interest provisions and a list of the members of the Executive Committee. (See section H (p. 85).)

3. The student may choose an adult adviser from the Yale community as provided in the procedures. If the complaint involves an offense against persons and/or property, the student may also bring an attorney to the meeting of the Executive Committee as provided in the procedures. (See section C.2 (p. 76).)

4. The student may request in writing disposition of the complaint without formal hearing but should understand that such a request, if granted, shall be considered an admission of the validity of the complaint. The student will retain the right to appeal the penalty so assigned. Students choosing such disposition should carefully read the relevant portion of the procedures. (See section C.3.a. (p. 77))

5. Normally one week must elapse between notification of the student and the meeting of the committee at which the complaint is to be considered, but upon written request of the student a briefer interval may suffice.

6. The student may request the factfinder to make reasonable efforts to locate particular documents or to gather relevant information.

   Throughout the investigation of the factfinder, the student has the right to remain silent. The student should, however, understand that by doing so he or she forfeits the opportunity to ensure that the Executive Committee obtains all the relevant information. Every student should understand that lying to the factfinder or to the Executive Committee will be taken into account in fixing penalties and may be matter for an independent complaint. (See section A.2.c (p. 73) and section C.3.c.iii. (p. 77))

7. The student may see all written materials to be submitted to the committee, including the report of the factfinder, no less than four working days before the meeting. The student shall also be furnished with a list of all persons who have been requested to be witnesses at the meeting. (See section C.3 (p. 76). and section C.3.c.iii (p. 77).)

8. The student may ask persons to be witnesses on his or her behalf. (See section C.3.c.iii (p. 77).)

9. During the meeting of the committee the student has the right to remain silent. The committee is not to draw a negative inference from the student's silence, but the student should understand that by doing so he or she forfeits an opportunity to present orally his or her side of the matter. The student should also understand that the committee will base its decision on the information presented to it, and that while the members of the Executive Committee expect that students will tell them the truth, they will give such credence and weight to the student's statements as they believe appropriate. (See section C.3.c.iii (p. 77).)

10. The student shall have the option of making a statement of reasonable length relevant to the determination of the penalty and of furnishing further information

about his or her character prior to the penalty phase of the committee's meeting. (See section C.3.c.v (p. 79).)

11. In the circumstances outlined in section D of the procedures the student has the right to request an administrative suspension, but the granting of such a suspension is entirely at the discretion of the committee. (See section D.3 (p. 82).)

12. If, subsequently, substantial new information of an exonerating nature becomes available, the student has the right to request a reconsideration of the complaint. The student has the right to appeal to the Committee of Review no later than ten days after the decision of the Executive Committee only when he or she believes that it can be demonstrated that (1) pertinent evidence has not been taken into account in the Executive Committee's decision; (2) long-standing precedents, in decisions of culpability and the assignment of penalties, have been ignored; (3) errors in procedure may have substantially affected the decision; (4) certain key principles of the University have not been sufficiently considered. (See section C.4 (p. 80).)

13. The student should understand that the records of the Executive Committee may be subject to subpoena by the courts, but that in the absence of a court order or government inquiry the records of the committee will not be publicly disclosed (except as provided in section I (p. 87)).

This statement of student rights does not supplant other rights and protections of students within the procedures of the Executive Committee.

The Yale College Faculty or the Executive Committee may amend or modify this statement without necessarily making revisions in the procedures of the committee.

# Student Complaints

## A. THE DEAN'S PROCEDURE FOR STUDENT COMPLAINTS

The Dean's Procedure for Student Complaints may be used in any case in which a student has a complaint, including but not limited to a complaint of discrimination on the basis of race, gender, sexual orientation, color, religion, national or ethnic origin, or disability, against a member of the faculty or administration of Yale College. Teaching fellows and freshman counselors may be named in such a complaint. Complaints of sexual misconduct must be pursued in accordance with the Procedures Governing the University-Wide Committee on Sexual Misconduct (http://provost.yale.edu/uwc) (UWC) or with a Title IX Coordinator (http://provost.yale.edu/title-ix/coordinators).

The full text of the Dean's Procedure for Student Complaints may be found here (http://www.yale.edu/equalopportunity/complaint/dean-student.html).

## B. THE PROVOST'S PROCEDURE FOR STUDENT COMPLAINTS

The Provost's Procedure for Student Complaints is available in any case in which a student has a complaint, including but not limited to a complaint of discrimination on the basis of race, gender, sexual orientation, gender identity or expression, color, religion, national or ethnic origin, or disability, against a faculty member who is not a member of the Faculty of Arts and Sciences, or against an employee who is not an

administrator in Yale College or who is not subject to discipline by the dean of Yale College. A copy of the complete procedure is available from the Yale College Dean's Office, 102 SSS. Complaints of sexual misconduct must be pursued in accordance with the Procedures Governing the University-Wide Committee on Sexual Misconduct (http://provost.yale.edu/uwc) (UWC) or with a Title IX Coordinator.

The full text of the Provost's Procedure for Student Complaints may be found here (http://www.yale.edu/equalopportunity/complaint/provost-student.html).

## C. THE PRESIDENT'S PROCEDURE FOR COMPLAINTS OF RACIAL OR ETHNIC HARASSMENT

Any student in the University who believes that he or she has been harassed on account of race or ethnic origin by any member of the Yale community may bring a complaint through the President's Procedure for Addressing Student Complaints of Racial or Ethnic Harassment. For the purposes of this procedure, racial or ethnic harassment is considered to occur when any individual is subjected to arbitrary, capricious, or discriminatory treatment on the basis of race or ethnic origin. A student complaint of racial or ethnic harassment against another undergraduate may also be brought to the Yale College Executive Committee; such a complaint may be forwarded to the chair of the Executive Committee only in conjunction with the complainant's residential college head or dean, a member of the Yale College Dean's Office, a human relations counselor, or a member of the President's Committee on Racial and Ethnic Harassment. Copies of the President's Procedure for Addressing Student Complaints of Racial or Ethnic Harassment are available in the Yale College Dean's Office, 102 SSS. Complaints of sexual misconduct must be pursued in accordance with the Procedures Governing the University-Wide Committee on Sexual Misconduct (http://provost.yale.edu/uwc) (UWC) or with a Title IX Coordinator.

(See The Disciplinary Procedures of the Executive Committee of Yale College, section E, Procedures for complaints of acts of violence or physical force, harassment, intimidation, or coercion (p. 83).")

The full text of the President's Procedure for Complaints of racial or ethnic harassment may be found here (http://www.yale.edu/equalopportunity/complaint/president-student.html).

## D. COMPLAINTS OF SEXUAL MISCONDUCT

The University-Wide Committee on Sexual Misconduct (http://provost.yale.edu/uwc) (UWC) is available to hear all student complaints of sexual misconduct and includes provisions for formal and informal resolutions. The UWC provides an accessible representative and trained body to answer internal inquiries and fairly and expeditiously address formal and informal complaints of sexual misconduct. It has sole disciplinary authority over Yale College students charged with sexual misconduct and recommends penalties to the dean of Yale College. The UWC is appointed and authorized to act by the provost.

# The University Tribunal

The University Tribunal is a disciplinary body that has jurisdiction over students in all twelve schools of the University, including students in Yale College. It may

be convoked only by the president of the University (or the provost acting for the president). It exists to hear disciplinary cases deemed by the president to have institutional significance for the integrity and values of the University as a whole, cases the disposition of which the president believes would have some substantial impact within the University beyond a particular school of the University, or cases in which the president determines that the University Tribunal could best ensure a desired uniformity of disciplinary procedures and penalties among different schools of the University.

A hearing before the University Tribunal is in lieu of any proceeding before the disciplinary body of a student's own school. In Yale College, that body is the Yale College Executive Committee. Except for cases explicitly referred to the University Tribunal by the president, however, the responsibility for student discipline rests with the appropriate disciplinary bodies of the various schools of the University, and the University Tribunal does not hear appeals from the decisions of those disciplinary bodies. It is expected that the University Tribunal will be convoked infrequently and only in extraordinary circumstances.

Additional information concerning the University Tribunal, including information concerning its composition and procedures, is available at the Office of the Secretary of the University at Woodbridge Hall.

# Emergency, Interim, and Administrative Suspension

The president of the University, or an official of the University authorized by the president, may impose an emergency suspension from residence or academic status when, in the judgment of the president, such action appears necessary for reasons relating to a student's physical or emotional safety and well-being or the safety and well-being of a member of the University community or of University property, or may impose an immediate interim suspension when it appears necessary to deal with a continuing disturbance or a forcible interference by students with any University activity or with the free movement of any member of the University community. When an undergraduate in Yale College is suspended in this fashion, the matter may be referred either to the Yale College Executive Committee, to the University-Wide Committee on Sexual Misconduct (UWC), or to the University Tribunal, if the Tribunal is convoked. Interim suspension may remain in effect until the Executive Committee, the UWC, or the University Tribunal has taken action with regard to the student; however, interim suspension may be lifted earlier by action of the president or the president's authorized designee, or by action of the Executive Committee, the UWC, or University Tribunal panel after a preliminary review, which will be held at the earliest opportunity. (See The University Tribunal.)

An administrative suspension suspends the student from Yale College in the same manner as any suspension; however, the administrative suspension is without prejudice to the review of the complaint against the student. The student may request in writing that the adjudicating committee defer its consideration of the complaint and that he or she receive an administrative suspension. This provision is intended for use very rarely and only in situations in which the student faces serious criminal charges and in

which action by the committee might irreparably prejudice the student's cause before the courts.

In effect, an administrative suspension means that the student facing a criminal hearing voluntarily withdraws from enrollment and residence in Yale College with the understanding that he or she may re-enroll, through the normal procedures for reinstatement, only after the standing complaint has been considered in the normal manner. The decision to provide an administrative suspension resides solely in the authority of the relevant committee; even when a student requests an administrative suspension, the committee may decide to consider the complaint immediately.

The administrative suspension may remain in effect for no longer than one year, at the end of which time it must be reviewed by the adjudicating committee. The student may then request in writing an extension of the administrative suspension for another period not to exceed one year. However, an extension of an administrative suspension may not remain in effect longer than one month past the date on which the matter has been adjudicated by the courts or settled otherwise, or normally longer than two weeks beyond the opening of the academic term if determination by the courts has occurred when the College is not in session.

When the complaint comes for consideration by the adjudicating committee after the period of administrative suspension, the committee will consider the complaint in the normal manner and without prejudice.

A decision favorable to the student in the courts will not necessarily exonerate him or her from having committed the alleged infraction of the Undergraduate Regulations.

# INDEX

**A**

Alcoholic Beverages ................................................................................................................. 13

**C**

Campus Housing and University Facilities ............................................................................. 15

**D**

Definitions of Plagiarism, Cheating, and Documentation of Sources ........................................... 5

Definitions of Sexual Misconduct, Sexual Consent, and Sexual Harassment ................................ 7

Dining Services ...................................................................................................................... 26

**E**

Emergency, Interim, and Administrative Suspension ............................................................... 91

**F**

Financial Aid ......................................................................................................................... 30

Financial Services .................................................................................................................. 33

Free Expression, Peaceful Dissent, and Demonstrations ............................................................ 9

**H**

Health Services ...................................................................................................................... 39

**I**

Introduction ............................................................................................................................ 3

**L**

Library .................................................................................................................................. 42

**M**

Motor Vehicles ...................................................................................................................... 43

**O**

Offenses ................................................................................................................................ 66

Other Services and Facilities ................................................................................................... 53

**P**

Parental Notification .............................................................................................................. 11

Penalties ............................................................................................................................... 71

Policies ................................................................................................................................... 5

Procedures ............................................................................................................................ 72

**R**

Regulations ........................................................................................................................... 13

**S**

Social Functions .................................................................................................................... 44

Student Activities ........................................................................................................................ 48

Student Complaints ..................................................................................................................... 89

T

The Disciplinary Procedures of the Executive Committee of Yale College .................................... 72

The University Tribunal ................................................................................................................. 90

U

Undergraduate Organizations ....................................................................................................... 55

Y

Yale College Undergraduate Regulations ......................................................................................... 2