UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

JACK MONTAGUE,
      Plaintiff,

v.

YALE UNIVERSTIY, ANGELA GLEASON, and
JASON KILLHEFFER,
      Defendants.

CIVIL ACTION
No. 3:16-cv-00885

**Plaintiff's Motion for Preliminary Injunction and Memorandum of Law in Support Thereof, and Request for Hearing**

Max D. Stern (*pro hac vice*)
mstern@toddweld.com
Alexandra H. Deal (*pro hac vice*)
adeal@toddweld.com
Hillary A. Lehmann (*pro hac vice*)
hlehmann@toddweld.com
TODD & WELD LLP
One Federal St., 27th Floor
Boston, MA 01880
Tel. (617) 720-2626
Fax (617) 227-5777

William F. Dow III (ct00161)
JACOBS & DOW, LLC
350 Orange Street
New Haven, CT 06511
wdow@jacobslaw.com
Tel. (203) 772-3100
Fax (203) 772-1691

Dated: October 31, 2016

## **Table of Contents**

Introduction…………………………………………………………………………..1

Facts…………………………………………………………………………………..2

Background………………………………………………………………………….2

Events Preceding the 2015 Sexual Misconduct Complaint……………………………..4

*Interactions with Senior Title IX Coordinator Angela Gleason*………………………..4

*"UWC I" – The Prior Complaint of Sexual Harassment Against Montague*…………..5

"UWC II" – The 2015 Complaint Against Montague for Sexual Misconduct…………..7

*Fact-Finding Process*………………………………………………………………...8

*UWC II Hearing*……………………………………………………………………...9

*UWC II Penalty Proceedings*………………………………………………………10

*Imposition of Sanction*……………………………………………………………...12

*Appeal*…………………………………………………………………………13

Argument……………………………………………………………………………...15

I.      Plaintiff Has Suffered, and Will Continue to Suffer, Irreparable
       Harm Because of His Expulsion From Yale………………………………………16

II.     Plaintiff is Likely to Succeed on the Merits of His Case………………………..18

        A. Breach of Contract Claims………………………………………………….18

            1.   There Was No Evidence to Support a Finding of Sexual
                 Harassment in the UWC I Proceedings………………………………...19

                a.   No Conduct of a Sexual Nature……………………………………21

                b.   No Unreasonable Interference or Intimidating or
                     Hostile Environment……………………………………………..22

            2.   Yale, Through Title IX Coordinator Angela Gleason,
                 Breached Its Confidentiality Policy By Disclosing the
                 UWC I Proceedings to Jane Roe………………………………………24

3. Yale, Through Title IX Coordinator Jason Killheffer, Breached Its Policies and Procedures for Title IX Coordinator-Initiated Complaints, as Well as the Implied Covenant of Good Faith and Fair Dealing Therein........................25

    a. Breach of Contract.......................................................25

    b. Breach of the Implied Covenant of Good Faith and Fair Dealing.............................................................27

4. The UWC II Panel Erroneously Relied on the UWC I Proceedings, Failed to Consider the UWC I Proceedings in the Presence of Montague, and Breached the Implied Covenant of Good Faith and Fair Dealing in So Doing.....................29

    a. Erroneous Reliance on UWC I...........................................29

    b. Consideration of Evidence Outside of the Hearing, and Outside of the Presence of Montague....................................30

5. Yale Erroneously Considered the Executive Committee's Reprimand in Connection With Montague's UWC II Sanction, and Breached the Implied Covenant of Good Faith and Fair Dealing in So Doing.............................................................33

III. Balance of Hardships....................................................................34

  A. Appropriate Relief....................................................................34

  B. Relative Hardship on the Parties With Respect to Each Form of Relief....................................................................................35

    1. Hardship – Expulsion/Reinstatement.......................................35

    2. Hardship – Reinstatement/New Hearing..................................37

IV. Public Interest.............................................................................37

Conclusion.........................................................................................38

Request for Hearing............................................................................38

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

JACK MONTAGUE,
       Plaintiff,

v.

YALE UNIVERSTIY, ANGELA GLEASON,
and JASON KILLHEFFER,
       Defendants.

CIVIL ACTION
No. 3:16-cv-00885

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT THEREOF, AND REQUEST FOR HEARING

Plaintiff Jack Montague hereby moves, pursuant to Fed. R. Civ. P. 65(a), for a preliminary injunction enjoining Defendant Yale University from enforcing Montague's expulsion. Plaintiff requests an injunction that will allow him to resume his studies forthwith. As grounds for this motion, Plaintiff relies on the following Memorandum of Law.

## INTRODUCTION

In a complaint filed in this court on June 9, 2016 ("Complaint"), Jack Montague ("Montague" or "Plaintiff") set forth in detail how Defendant Yale University ("Yale" or "the University") and its employees repeatedly ignored, and directly contravened, the University's own policies and procedures in order to make an example out of a prominent male student athlete, thereby countering the damaging public perception that Yale was "soft" on men accused of sexual assault.[1] As set forth below, Montague meets the requirements for preliminary injunctive relief. He has already suffered, and continues to suffer, irreparable injury – his ability

---

[1] A true and accurate copy of the Amended Complaint, which Plaintiff incorporates in full in this memorandum, is attached hereto as **Exhibit 1** ("Ex. 1").

to complete his education and receive the degree he had all but earned prior to his expulsion hangs in the balance, and his employment prospects are dim. As in *Doe v. Brown University*, 1:16-cv-00017 (D. R.I.), the most recent case enjoining a private university to reinstate a student, only immediate relief in the form of full reinstatement as a student at Yale can rectify this damage and restore him to the position he was in prior to Yale's unlawful conduct. Montague is also likely to succeed on the merits. Although he is confident in the viability of all of his claims against Defendants, this motion will focus on those claims that can be easily evaluated on the basis of the undisputed or clearly established facts now known to all parties: 1) breach of contract with regard to UWC I; 2) breach of confidentiality; 3) breach of procedure for Title IX Coordinator-initiated complaints; 4) erroneous reliance on, and consideration of, the UWC I proceedings and sanction in the context of the UWC II proceedings; and 5) erroneous consideration of prior Executive Committee action in connection with the UWC II panel's recommended penalty. Moreover, on balance, the harm Plaintiff will suffer if injunctive relief is not granted far outweighs any harm to Yale, and an injunction is in the public interest. Consequently, the Court should grant Plaintiff immediate injunctive relief.

## FACTS

### Background

As set forth more fully in the Amended Complaint, Montague enrolled at Yale in the fall of 2012, having been recruited to play basketball for the men's basketball team, the Yale Bulldogs. (Ex. 1, ¶11.) He was an American Studies major concentrating in Politics and American Communities. (Montague Affidavit,[2] Ex. 2, ¶4.)

---

[2] A true and accurate copy of the Affidavit of Plaintiff Jack Montague is attached hereto as **Exhibit 2** ("Ex. 2.").

4851-0117-1240, v. 2

At the time of Montague's enrollment, Yale was in the midst of dealing with an ongoing problem related to its handling of sexual misconduct complaints. The Office of Civil Rights ("OCR") had cited Yale for its lack of prompt and equitable grievance procedures and its insufficient responses to complaints of sexual harassment, and as a consequence, Yale revamped its entire process for dealing with such complaints. (Ex. 1, ¶¶15-24.) In the summer of 2011, Yale created the University Wide Committee on Sexual Misconduct ("UWC"); it adopted *Procedures Governing the University Wide Committee on Sexual Misconduct* ("*UWC Procedures*")[3], which set out the rights and responsibilities of the University, an accuser, and an accused in the case of a complaint of sexual misconduct; and it established the Sexual Harassment and Assault Response and Education ("SHARE") Center, which serves as the initial place of referral for students seeking services and options as a result of alleged sexual misconduct. (Ex. 1, ¶¶21-23.) Even with these reforms, however, students and alumni continued to question what they perceived to be Yale's inadequate and, in some cases, offensive responses to complaints of sexual harassment, and these groups publicly chastised Yale for its shortcomings in this regard. (Ex. 1, ¶¶27-29.) Adding fuel to the fire was a September 2015 report released by the Association of American Universities ("AAU") showing that rates of alleged undergraduate sexual assaults at Yale were the third-highest among the 27 schools surveyed. (Ex. 1, ¶32.)

It was against this backdrop that Defendants misled and pressured a female Yale undergraduate, Jane Roe ("Roe") – against her original wishes – to participate in a formal complaint process against Mr. Montague accusing him of sexual assault. (Ex. 1, ¶36.)

---

[3] A true and accurate copy of the *UWC Procedures* is attached hereto as **Exhibit 3** ("Ex. 3").

4851-0117-1240, v. 2

**Events Preceding the 2015 Sexual Misconduct Complaint**

*Interactions with Senior Title IX Coordinator Angela Gleason*

In September of 2015, Roe's suitemate reported to Defendant Angela Gleason

("Gleason"), a Senior Title IX Coordinator at Yale, that Roe had previously had a "bad

experience" with Mr. Montague, someone whom Gleason clearly knew to be the captain of

Yale's basketball team. Roe's suitemate explained that Roe and Montague had sexual intercourse

in October of 2014, and Roe claimed the intercourse was nonconsensual. Gleason urged Roe's

suitemate to convince Roe to come forward and report the incident, but Roe was hesitant. Roe

asked her suitemate to follow up with Gleason so Roe could make a decision about whether to

meet with Gleason or not. Roe's suitemate therefore followed up at Roe's request, and Gleason

told her to pass along to Roe that she could make an informal, anonymous complaint if she

wished. Gleason explained that this would allow her (Gleason) to have a discussion with

Montague about the October 2014 incident and recommend SHARE training about

communication and sexual consent, and the matter would be resolved. Roe – who did not want to

engage in a formal complaint process – was satisfied with that course of action, and went to talk

with Gleason on October 19, 2015. (Ex. 1, ¶¶40-49.)

At that time, as Roe described it, Roe harbored no "sense of vengeance or a desire to

harm Jack's reputation or wellbeing." She "thought perhaps that he would benefit from

sensitivity training, and the informal complaint process seemed like the best way to achieve

that."[4] (Ex. 4.) A few weeks later, however, Gleason had a conversation with Roe that would, in

Roe's words, "reframe the incident" (Ex. 4), and ultimately lead to the initiation of the formal

---

[4] A true and accurate copy Roe's written statement is attached hereto as **Exhibit 4** ("Ex. 4").

4

complaint process against Montague. On November 6, 2015, Gleason contacted Roe and told her, incorrectly, that Roe's name could not be kept confidential, and further, that the option of an informal resolution was not available to Roe because Montague had already been the subject of a previous complaint of sexual misconduct and, as a result, had already received SHARE training "on subjects related to consent and sensitivity."[5] (Ex. 1, ¶¶50-54, 108.)

The *UWC Procedures* and the *Provost's Statement on Confidentiality of UWC Proceedings*[6] strictly prohibited Gleason from disclosing to Roe any information concerning the prior UWC proceedings against Montague or the outcome of those proceedings, of course. (Ex.1, ¶57.) Moreover, when Gleason told Roe about the prior complaint of "sexual misconduct" against Montague, she either said or implied that the complaint was of a similar character to Roe's allegations. Certainly, Gleason's revelation gave Roe the impression it was of a similar character (that is, that Mr. Montague had previously sexually assaulted a female student): before that conversation, Roe "had always viewed [herself] as a victim of someone else's one-time mistake," but that changed after she heard what Gleason had to say. (Ex. 4.)

### *"UWC I" – The Prior Complaint of Sexual Harassment Against Montague*

Yet the subject of Montague's prior UWC involvement (hereafter, "UWC I") bore no resemblance, and had no relationship, to Roe's allegations, nor was the SHARE training he received as a result of the UWC I process "related to consent and sensitivity." In fact, Montague had been accused by a graduating female student of taking a rolled up paper plate and, in a

---

[5] Roe explicitly said, in a letter to Dean Jonathan Holloway, that these were the subjects about which Montague received SHARE training. A true and accurate copy of Roe's letter is attached hereto as **Exhibit 5** ("Ex. 5").

[6] A true and accurate copy of the *Provost's Statement on Confidentiality of UWC Proceedings* is attached hereto as **Exhibit 6** ("Ex. 6").

moment of irritation with Smith, shoving it down the front of her shirt.[7] (Ex. 1, ¶¶ 56, 66; Ex. 7.) The incident occurred off-campus on or about the last day the female was a student at Yale. (Ex. 1, ¶65; Ex. 7.) Despite the fact that this student made it clear that Montague never actually touched her with his hands[8] or said anything inappropriate to her during the course of the incident, and despite the fact that the student graduated right after the incident occurred, a UWC panel found that Montague committed "sexual harassment," as that term is defined in the University's *Sexual Misconduct Policies*[9], and ordered him to enroll in sexual harassment and gender sensitivity training through Yale's SHARE Center. (Ex. 1, ¶¶66-67, 71-72.) Montague complied, but when he met with the SHARE Center staff member, he was not in fact trained on those subjects (nor on any other related subject). (Ex. 1, ¶¶56, 79-80, 164; Ex. 2, ¶3.)

Although the conduct at issue in UWC I was completely unrelated to Roe's experience with Montague, and although the training Montague received had absolutely nothing to do with "consent and sensitivity," Gleason's improper and inaccurate revelations to Roe about both the UWC I complaint and the resulting sanction suggested to Roe that, because of Montague's alleged history, Roe had an obligation to "protect other women" from him. (Ex. 1, ¶63; *see also* Ex. 1, ¶164; Ex. 4.) Indeed, Roe said her motivation for going along with the formal complaint was "to keep this campus safe." (Ex. 1, ¶163; Ex. 5.)

---

[7] A true and accurate copy of the UWC I fact-finder's report is attached hereto as **Exhibit 7** ("Ex. 7").

[8] A true and accurate copy of Smith's written complaint is attached hereto as **Exhibit 8** ("Ex. 8").

[9] A true and accurate copy of the *Sexual Misconduct Policies* is attached hereto as **Exhibit 9** ("Ex. 9").

4851-0117-1240, v. 2

**"UWC II" – The 2015 Complaint Against Montague for Sexual Misconduct**

As a direct result of Gleason's misrepresentations, Roe agreed to allow Yale's Title IX office to bring a formal complaint of sexual misconduct against Mr. Montague. (Ex. 1, ¶¶63, 82, 118; Ex. 4.) On November 18, 2015, Defendant Jason Killheffer, Yale's Senior Title IX Coordinator, filed a formal complaint of sexual assault against Montague.[10] (Ex. 1, ¶83.) Per Yale's own policies, however, this was not a situation in which the Title IX office had standing to intervene. The University's policies contemplate that when a complainant wants to proceed using the informal process, the Title IX coordinator should only step in under "unusual circumstances . . . involving risks to the safety of individuals and/or the community."[11] (Ex. 1, ¶85; Ex. 11, p. 5.) No such circumstances existed here: the events in question occurred in October of 2014, but Roe did not report them for a full year, nor did she report that she had any interactions with Montague during that one-year period that caused her alarm or concern. Thus, the Title IX office was bound to honor Roe's initial wishes to keep the process informal. Instead, Yale's Title IX coordinators, including the individual defendants in this action, improperly manipulated Roe into agreeing to cooperate with Yale's decision to file a formal complaint against Montague.

On November 30, 2015, UWC Secretary Aley Menon notified Montague that he was the subject of a complaint alleging that he had "sexually assaulted a Yale College student on the

---

[10] A true and accurate copy of Killheffer's complaint is attached hereto as **Exhibit 10** ("Ex. 10").

[11] Yale publishes a bi-annual bulletin called the *Spangler Report*, a true and accurate copy of which is attached hereto as **Exhibit 11** ("Ex. 11"). The bulletin summarizes campus sexual misconduct claims and adjudications, but also serves as an informational bulletin to students outlining and clarifying UWC policies and procedures.

7

night of October 18, 2014, at [his] residence" (hereafter, "UWC II").[12] The only additional information given to Montague was the name of his accuser, and the fact that she was alleging sexual penetration without consent. (Ex. 1, ¶87; Ex. 12.) Menon noted, in her letter, that in reviewing the facts during the formal complaint process, the UWC may consider "other violations of the sexual misconduct policy or the Yale College Undergraduate Regulations that relate to the complaint." (Ex. 1, ¶88; Ex. 12.) Because of the nature of the UWC I proceedings, Montague had no reason to believe they would "relate to the complaint" alleging nonconsensual sexual intercourse with Roe. (Ex. 1, ¶89.) Likewise, Montague had no reason to believe that the only other policy violation he committed as a Yale student – an incident in which he tried to help an intoxicated male friend who was detained by the Yale University Police Department, and which resulted in a reprimand by Yale's Executive Committee for "Defiance of Authority"[13] – "relate[d] to the complaint" of sexual assault against a female student. (Ex. 1, ¶90.)

Montague submitted a written response denying the allegations and stating that all interactions between himself and Roe were consensual. (Ex. 1, ¶93.)

### *Fact-Finding Process*

The UWC fact-finding process began shortly thereafter, and what emerged was hardly a clear-cut picture of nonconsensual sexual contact. Rather, the evidence gathered by the fact-finder showed that: 1) Montague and Roe had engaged in sexual contact on four occasions total, three of which Roe admitted were entirely consensual, including consensual sexual intercourse on one occasion immediately prior to the night in question; 2) on the night in question, Roe

---

[12] A true and accurate copy of Menon's letter to Montague is attached hereto as **Exhibit 12** ("Ex. 12").

[13] A true and accurate copy of the Executive Committee reprimand is attached hereto as **Exhibit 13** ("Ex. 13").

4851-0117-1240, v. 2

voluntarily accompanied Montague to his bedroom, voluntarily removed all of her clothing, and voluntarily engaged in sexual foreplay with Montague; 3) Roe herself believed that when she purportedly said "no" to Montague just before he penetrated her, Montague did not hear her; and 4) Roe initially left Montague's residence after the intercourse, but later returned and spent the remainder of the night with him (during which time she declined intercourse and Montague readily complied with her wishes, as he had on a previous occasion when Roe told him she did not want to have intercourse, and he heard her say so). (Ex. 1, ¶¶94-97.) The fact-finder, during the course of interviewing Montague, never asked Montague about the UWC I complaint or proceedings (Ex. 1, ¶98), and her report contained no mention of the UWC I complaint or proceedings (Ex. 1, ¶110).

### UWC II Hearing

The UWC II hearing was held on January 21, 2016. It was not recorded by audio or visual means. (Ex. 1, ¶¶112, 116.) The hearing panel issued its report on February 1, 2016, finding, by a preponderance of evidence, that Montague sexually assaulted Roe in violation of Yale's *Sexual Misconduct Policies*. (Ex. 1, ¶¶117, 147.) At the conclusion of its report, the panel stated that in accordance with Section 7.4 of the *UWC Procedures* it had taken "into account Mr. Montague's previous formal disciplinary history with the UWC for violating Yale's sexual misconduct policy . . . ." (Ex. 1, ¶¶142, 148.) The provision explicitly allows the panel to take this information into account on the issue of culpability. (Ex. 2, Section 7.4: *Hearings*.) The panel's consideration of this information came as a surprise to Montague, since he never had reason to believe the conduct or sanctions at issue in the UWC I proceedings "relate[d] to" the conduct at issue in the UWC II proceedings, and since the panel never addressed the UWC I proceedings in Montague's presence. It did not ask Montague any questions about the UWC I

9

proceedings, for example, nor did it indicate it considered the UWC I conduct or sanctions relevant or related to the UWC II complaint. (Ex. 1, ¶¶144, 146.)

Thus, Montague had no real opportunity to point out that the conduct at issue in the UWC I proceedings was not in fact "relate[d] to," nor probative of, whether he committed the alleged sexual assault of Roe. (Ex. 1, ¶¶144-146.) Had he been given that opportunity, he could have argued that the conclusion reached by the UWC I panel was erroneous, and further, that the UWC I proceedings bore no relationship to Roe's allegations, beyond the basic fact that both proceedings involved female complainants. (Ex. 1, ¶146.) He also could have explained that although he attended meetings with a SHARE staff member, he did not in fact receive any SHARE training on sexual harassment or gender sensitivity, nor on related subjects such as sexual relationships, communication, or consent. (Ex. 1, ¶146; Ex. 2, ¶3.)

### *UWC II Penalty Proceedings*

Under Yale's revised *UWC Procedures*, Montague was not informed of the UWC II panel's recommended penalty.[14] (Ex. 1, ¶150.) In fact, unbeknownst to Montague, the panel took into account two former instances of discipline imposed on Montague by Yale: the UWC I proceedings and sanction, as well as the reprimand Mr. Montague received from the Executive Committee for "Defiance of Authority" in connection with an incident in which he tried to help

---

[14] This procedure (or lack thereof) is in marked contrast to Executive Committee disciplinary proceedings at Yale, under which all complaints of alleged student misconduct, other than sexual misconduct, are adjudicated. When the Executive Committee considers what penalty to assign a student for an infraction under Yale's *Undergraduate Regulations*, a true and accurate copy of which is attached hereto as **Exhibit 14** ("Ex. 14"), the Committee "shall invite the student and the adviser to return to the room. The secretary will inform the committee of any previous infractions of the *Undergraduate Regulations* on the part of the student. *The Executive Committee shall permit the student and his or her adviser to present a statement of reasonable length relevant to the determination of the penalty and to furnish further information about his or her character.*" (Ex. 14, *Procedures*: *The Disciplinary Procedures of the Executive Committee of Yale College*.)

4851-0117-1240, v. 2

an intoxicated male friend who was detained by the Yale Police. (Ex. 1, ¶153; *see also* Ex. 13.) Yet in one case, the panel did not have inaccurate information, and in the other, it was without authority to consider the penalty.

As to the UWC I proceedings, the UWC II panel "found particularly relevant" the fact that Montague had already allegedly violated Yale's sexual misconduct policy, "had received sexual harassment and gender sensitivity training" before the incident with Roe took place, and had met three times with a SHARE Center staff member "to review and reflect on his interactions and relationships with female students at Yale." (Ex. 1, ¶¶153-154.) The problem is that none of this information was correct, and Montague had neither proper notice of, nor an opportunity to rebut, the information. In reality, Montague had not received sexual harassment and gender sensitivity training, and, while he did meet with a SHARE staff member at least three times, the SHARE staff member did not require Montague "to review and reflect on his interactions and relationships with female students at Yale" during the course of those meetings. (Ex. 1, ¶154; Ex. 2, ¶3.)

As to the Executive Committee's reprimand, the UWC II panel did not have the authority to consider it in recommending a penalty. When the Executive Committee had issued the reprimand, it told Mr. Montague the sanction was a matter of "internal record only" and that he was "free" to tell others he had not "been subject to disciplinary sanctions by the University." (Ex. 1, ¶155; Ex. 13.) The UWC Procedures specify that the UWC panel may only take into account "any *formal* Yale discipline previously imposed on the respondent" when considering its recommended penalty. (Ex. 3, Section 7.5: *Findings, Conclusions, and Recommendations* (emphasis added).) It is not reasonable to expect that a reprimand that is a matter of internal record only and that everyone is free to say does not exist, if asked, is "formal discipline." The

11

UWC II panel therefore lacked the authority to consider the Executive Committee action. Yale also told Mr. Montague that the reprimand would only be taken into account if the *Executive Committee* ever again found he had committed an infraction of the *Undergraduate Regulations*. (Ex. 13.) Importantly, Yale never said the *UWC* could or would take the reprimand into account in any of its proceedings, yet – in direct contravention of Yale's representations to Mr. Montague – the UWC II panel did just that.

Finally, in recommending the penalty of expulsion, the UWC II panel expressed its "deep[] concern" for the "pattern of behavior by Mr. Montague, and his failure to take responsibility for and learn from his actions that have caused considerable harm to others." According to the UWC II panel, Mr. Montague's representation that he was a good student and role model at Yale and "had never experienced anything like this before" was "in contrast to Mr. Montague's two previous violations of Yale regulations." Of course, those two previous violations were not, in fact, "like this" complaint of alleged sexual assault, and Mr. Montague would have no reason to consider them comparable or relevant (especially when he was never told the panel considered them comparable or relevant).

### *Imposition of Sanction*

On February 10, 2016, Montague received Dean Jonathan Holloway's decision: he was being expelled from Yale based upon the UWC II panel's finding that he "sexually assaulted" Roe. (Ex. 1, ¶165.) Dean Holloway told Montague he not only considered the nature of the behavior in question, but Montague's "prior disciplinary history by the UWC . . . and by the Executive Committee" and "the extensive training [Montague] . . . already received from the

12

SHARE center, training that did not have the hoped for impact on [Montague's] behavior."[15]

(Ex. 1, ¶166; Ex. 15.) According to Holloway, "on balance, considering the harm [Montague] caused and [his] inability to learn from [his] past mistakes, . . . permanent separation from Yale is the only appropriate penalty." (Ex. 1, ¶1166; Ex. 15.) This was, of course, the first Montague had heard that either the UWC I proceedings or the Executive Committee reprimand were taken into account in the course of the UWC II proceedings (although he still did not know that the UWC II panel itself had considered either one). (Ex. 1, ¶167.)

### *Appeal*

Montague then appealed his expulsion to the Provost, taking his first opportunity to point out that "[u]nless a complete examination is done of my freshman year incident UWC and my senior year fall meeting with the Executive Committee that resulted in a reprimand, the sanction of expulsion is unfair." (Ex. 1, ¶176.) Montague explained that the UWC I proceedings arose from "a disagreement with a senior, female student who was belittling [him]." (Ex. 1, ¶177.) Montague agreed that his response to the disagreement was "wrong and incredibly immature," and noted that Dean Holloway's perception of the SHARE training Montague received was inaccurate: the "meetings were not 'extensive training,' let alone training on sexual misconduct. Instead, these meetings were very casual and lasted no more than five minutes after explaining the incident to [the SHARE] staff member] on the first occurrence." (Ex. 1, ¶177.) Thus, he said, "[w]ithout proper examination" of this information, "the sanction imposed was extreme and unjustified." (Ex. 1, ¶177.) Apparently unfazed by the fact that the University was taking the

---

[15] A true and accurate copy of Dean Holloway's letter to Montague is attached hereto as **Exhibit 15** ("Ex. 15"). As set forth above, this training no relationship to any training from which Montague might have benefitted in connection with his interactions with Roe.

most drastic disciplinary step it could against one of its students on the basis of complete misinformation, the Provost summarily denied Montague's appeal. (Ex. 1, ¶178.)

Importantly, Yale made clear, in a bulletin published in 2013 containing various "sexual misconduct scenarios,"[16] that without a prior disciplinary record, Montague's conduct would at most have warranted a reprimand. (Ex. 1, ¶¶169-170; Ex. 16, p. 4.) Moreover, the penalty imposed on Montague was vastly out of line with the majority of sanctions Yale imposed on other students who were found responsible for nonconsensual sexual conduct in the five years prior to Montague's expulsion. (Ex. 1, ¶¶160-161.)

Montague was forced to leave campus and abandon his basketball team on the eve of the first round of the NCAA tournament (a tournament to which the Yale men's basketball team had not advanced since 1962). (Ex. 1, ¶179.) He has been deeply and irreparably harmed by the Defendants' actions. He was wrongfully deprived of the degree he worked so hard to obtain (while at the same time devoting hundreds of hours to training, practice and playing to support and lead Yale's men's varsity basketball team); indeed, he was just three months shy of receiving that degree when he was expelled. His expulsion from Yale on grounds of "sexual misconduct"

---

[16] A true and accurate copy . . . is attached hereto as **Exhibit 16** ("Ex. 16"). The analogous scenario is as follows:

> Morgan and Kai are friends who begin dancing and kissing at a party. They are both drunk, although not to the point of incapacitation. Together they decide to go to Kai's room. They undress each other and begin touching each other. Morgan moves as if to engage in oral sex and looks up at Kai questioningly. Kai nods in agreement and Morgan proceeds. Subsequently, without pausing to check for further agreement, Kai begins to perform oral sex on Morgan. Morgan lies still for a few minutes, then moves away, saying it is late and they should sleep.

In this scenario, Yale said, "There was initial agreement, but the bounds of that agreement were not clear. Kai may have thought that Morgan had consented to reciprocal sex, but took no steps to obtain unambiguous agreement." Under these circumstances, "[t]he UWC penalty would likely be a reprimand."

14

will follow him throughout his life, and has already hindered his ability to obtain employment. (Ex. 1, ¶185; Ex. 2, ¶¶10-11.) The Defendants' wrongful actions also deprived Montague of his dream of playing in the NCAA tournament (a tournament for which the Yale team might not have qualified without his leadership and skill); it is an opportunity he will never have again. Finally, he was publicly vilified: his name and reputation will now forever be associated with the words "sexual assault."  For these injuries, even monetary damages cannot make him whole. (Ex. 1, ¶185.)

## ARGUMENT

A party seeking a preliminary injunction must establish four elements: (1) a likelihood of irreparable harm; (2) either a likelihood of success on the merits or sufficiently serious questions as to the merits plus a balance of hardships that tips decidedly in the moving party's favor; (3) that the balance of hardships tips in the moving party's favor regardless of the likelihood of success; and (4) that an injunction is in the public interest. *General Mills, Inc. v. Chobani, LLC*, --- F. Supp. 3d ---, *5 (N.D. N.Y. 2016), citing *Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*, 75 F. Supp. 3d 592, 604 (S.D. N.Y. 2014); *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F. 3d 887, 895 (2nd Cir. 2015) (incorporating additional factors [set forth in *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7 (2008)]); *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 825 (2nd Cir. 2015) (same); *Doe v. Middlebury College*, 1:15-cv-00192, ECF No. 27 (D. Vt. Sep. 16, 2015) (same). A preliminary injunction, while considered an extraordinary remedy, should be issued when necessary to preserve the status quo pending final outcome of a case. *Reuters Ltd v. United Press International, Inc.*, 903 F.2d 904, 909 (2nd Cir. 1990). The "'status quo' does not mean the situation existing at the moment the law suit is filed, but the 'last peaceable uncontested status existing between the parties before the dispute developed.'" *General Mills*,

15

*supra*, at \*7, quoting *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004) (additional citations omitted). *See also LaRouche v. Kezer*, 20 F.3d 68, 74 n.7 (2nd Cir. 1994) (same); *Phillip v. Fairfield University*, 118 F.3d 131, 133-134 (2nd Cir. 1997); *Entegee, Inc. v. Korwek*, 2015 WL 5202902, \*3 (D. Conn. Sep. 4, 2015) ("[F]or purposes of a preliminary injunction, the status quo is 'the situation that existed between the parties immediately prior to the events that precipitated the dispute'" (quoting *ASA v. Pictometry Intern. Corp.*, 757 F. Supp. 2d 238, 243 (W.D. N.Y. 2010)).

## I.   Plaintiff Has Suffered, and Will Continue to Suffer, Irreparable Harm Because of His Expulsion From Yale

To make a showing of irreparable harm, the moving party must establish that he is subject to a continuing harm that cannot be adequately addressed by final relief on the merits and for which money damages are inadequate. *See LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 56 (2nd Cir. 2004); *Wisdom Import Sales Co., LLC v. Labatt Brewing Co., Ltd.*, 339 F.3d 101, 113-114 (2nd Cir. 2003).

Montague readily makes such a showing here. Montague was, as of the time of his expulsion, a senior at Yale and captain of Yale's men's basketball team. He was just three months shy of completing his degree when he was wrongfully expelled, and had completed 31 of the 36 credits required to graduate. (Ex. 2, ¶7.) His plan, upon graduation, was to pursue a post-graduate degree in business administration or law. (Ex. 2, ¶9.) Without injunctive relief, however, Montague will not graduate from college and he will not enter a post-graduate degree program, nor will he be able to secure the same types of employment opportunities he would have been able to secure with a degree from Yale and/or a post-graduate degree. Indeed, he has not even been able to obtain employment as a basketball player, despite diligent efforts, because his expulsion is a deterrent to scouts and agents. (Ex. 2, ¶10.)

16

For these losses, money damages cannot make him whole. *See, e.g., Doe v. Brown*, 1:16-cv-00017, ECF Nos. 15 (April 25, 2016) and 57 (Aug. 23, 2016); *Doe v. Middlebury*, *supra,* ECF No. 27, p. 5 (while plaintiff may recover money damages to compensate for lost wages, money damages cannot compensate him for loss of his senior year in college with his class, the delay in completing his degree, or the opportunity to begin his future career upon graduation); *King v. DePauw University*, 2:14-cv-70 (S.D. Ind. Aug. 22, 2014) (if plaintiff not permitted to complete studies, he will forever have either a gap or senior-year transfer on his record, which he will have to explain to future employers or graduate school admissions committees by revealing sexual misconduct finding, and money damages would not provide adequate remedy). *See also Phillip v. Nat'l Collegiate Athletic Ass'n*, 960 F. Supp. 552, 558 (D. Conn. 1997) (plaintiff demonstrated irreparable harm where, if preliminary injunction not granted, plaintiff's education would be interrupted and delayed, perhaps for years); *Coleman v. Newburgh Enlarged City School Dist.*, 319 F. Supp. 2d 446, 453 (S.D. N.Y. 2004) (continued suspension of student, and accompanying preclusion from extracurricular activities, "would result in imminent and irreparable harm by jeopardizing (a) the quantity and quality of the Plaintiff's education, (b) the Plaintiff's chance to graduate from high school, (c) the Plaintiff's chance for a college scholarship, and (d) the Plaintiff's opportunity to attend college"); *Maczaczyj v. State of N.Y.*, 956 F. Supp. 403, 408 (W.D. N.Y. 1997) (plaintiff showed irreparable harm where, in absence of injunction, he would not be able to participate in his masters program, or any other masters program at the college, which exclusion would most likely affect his ability to engage in future employment of his choice, and would have an unquantifiable effect on his mental health). *Cf. Doe v. NYU*, 666 F.2d 761, 773 (2nd Cir. 1981) (distinguishing delay in obtaining admission to school from "interruption or termination of attendance already in progress").

## II.   Plaintiff is Likely to Succeed on the Merits of His Case[17]

Plaintiff has alleged, in his Amended Complaint, violations of Title IX, breaches of contract, and various torts. Because the breach of contract claims can be most easily evaluated on the basis of the undisputed or clearly established facts *currently* known to all parties, however, it is upon those claims that Plaintiff focuses the instant motion for relief.

### A.  Breach of Contract Claims[18]

It is well settled that "'the basic legal relation between a student and a private university or college is contractual in nature.'" *Johnson v. Schmitz*, 119 F. Supp. 2d 90, 93 (D. Conn. 2000), quoting *Ross v. Creighton University*, 957 F.2d 410 (7th Cir. 1992) (additional citations omitted); *accord Burns v. Quinnipiac University*, 120 Conn. App. 311, 320 (2010) (same). Indeed, "'there seems to be "no dissent" from the proposition' that the 'catalogues, bulletins, circulars, and regulations of the institution' determine the contractual relationship between the student and the educational institution." *Johnson*, *supra*, quoting *Ross*, 957 F.2d at 416 (additional citations omitted). "'[A] court that is asked to enforce an asserted "contract" between a student and his university must examine the oral and written expressions of the parties in light of the policies and customs of the particular institution.'" *Id.*, quoting *Banerjee v. Roberts*, 641 F. Supp. 1093, 1106 (D. Conn. 1986).

Here, those expressions come in the form of the *UWC Procedures*, the *Sexual Misconduct Policies*, and other related printed and electronic materials Yale distributes to its

---

[17] Alternatively, for the same reasons set forth below, Plaintiff has, at a minimum, "demonstrated sufficiently serious questions going to the merits of his claims to make them fair ground for litigation." *See Doe v. Middlebury*, *supra*, ECF No. 27, p. 7.

[18] "The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." *Summerhill, LLC v. City of Meriden*, 162 Conn. App. 469, 474 (2016) (citation omitted).

community concerning sexual misconduct. Together, these materials constitute Yale's contract with Montague, and the standard for interpreting the contract is that of "reasonable expectation," *i.e.*, "what meaning the party making the manifestation, the university, should reasonably expect the other party to give it." *Doe v. Brandeis Univ.*, 2016 WL 1274533, *25 (D. Mass. Mar. 31, 2016), citing *Schaer v. Brandeis Univ.*, 432 Mass. 474, 478 (2000) (additional citations omitted); *Doe v. Brown Univ.*, 2016 WL 715794 (D. R.I. Feb. 22, 2016) (same). *See also Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 34 (1st Cir. 2007) (whether the "process [was] carried out in line with [the Plaintiff] student's reasonable expectations"); *Travelers Casualty & Surety Co. of America v. The Netherlands Ins. Co.*, 312 Conn. 714, 740 (2014) (any ambiguity in contract is construed in accordance with reasonable expectations of non-drafting party when that party entered into the contract).

Based upon the clear evidence and the undisputed facts currently known to the parties, Yale has breached its contractual obligations to Montague in myriad ways, such that he is likely to succeed on his breach of contract claims against Defendants.

### 1. There Was No Evidence To Support a Finding of Sexual Harassment in the UWC I Proceedings

Montague charges Yale, in Count II of his Amended Complaint, with breach of contract in connection with the UWC I proceedings. Specifically, he alleges that the evidence was clearly inadequate to support a finding that Montague sexually harassed Sally Smith, and as such, the UWC I panel's finding was contrary to the *Sexual Misconduct Policies and Related Definitions* and a breach of the same. (Ex. 1, ¶¶194-200.)

This erroneous finding, and the resulting sanction, ultimately proved key to Montague's eventual expulsion from Yale: first, Gleason told to Roe that Montague had already been accused of, and found responsible for, sexual misconduct, and she said or implied the conduct at issue

was similar in character to Roe's allegations, despite the fact that the two incidents were completely unrelated; then Roe – who initially sought resolution through Yale's informal complaint process – suddenly believed she was the victim of a serial sexual assailant rather than a "one-time mistake," and began to see things in a new light; and, accordingly, Roe agreed to cooperate in the formal complaint process against Montague. Further, it is undisputed – and dispositive – that in the course of the UWC II proceedings, the panel was informed of the UWC I proceedings and took them into account in determining Montague's culpability and recommended sanction, but did not seek any further explanation from Montague concerning the nature of the UWC I proceedings or the resulting sanctions, and Dean Holloway explicitly considered the UWC I proceedings and sanctions in deciding to expel Montague, explaining that, in his estimation, Montague had not "learned from [his] past mistakes." (Ex. 15.) Yet *none* of this would have occurred had UWC I been properly adjudicated.

Yale's *Sexual Misconduct Policies and Related Definitions* defines sexual harassment in the following manner:

> Sexual harassment consists of nonconsensual sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature on or off campus, when: (1) submission to such conduct is made either explicitly or implicitly a condition of an individual's employment or academic standing; or (2) submission to or rejection of such conduct is used as the basis for employment decisions or for academic evaluation, grades, or advancement; or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating or hostile academic or work environment. Sexual harassment may be found in a single episode, as well as in persistent behavior. All members of our community are protected from sexual harassment, and sexual harassment is prohibited regardless of the sex of the harasser or the harassed.

Under these criteria, in this case, the UWC I panel would have had to find "by a preponderance of evidence" (Ex. 3, Section 7.5: *Findings, Conclusions, and Recommendations*) that Mr. Montague 1) engaged in verbal or physical conduct of a sexual nature on or off campus, and 2)

that such conduct had the purpose or effect of unreasonably interfering with Smith's work or

academic performance or created an intimidating or hostile academic or work environment. It

could not have, and did not, make these findings.

### a. No Conduct of a Sexual Nature

First, it is black letter law that for conduct to be actionable as *sexual* harassment, "the

offensive behavior must be based on sex, rather than personal animus or other reasons." *Burwell*

*v. Pekin Community High School Dist.*, 303, 213 F. Supp. 2d 917, 930 (C.D. Ill. 2002), citing

*Frazier v. Fairhaven School Cmte.*, 276 F.3d 52, 66 (1st Cir. 2002). Yale's policy clearly

incorporates this concept by defining sexual harassment as "conduct of a sexual nature." While

"the conduct underlying a sexual harassment claim need not be *overtly* sexual in nature,"

*Williams v. General Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999) (emphasis added), it must at

a minimum be "motivated by discriminatory animus against women." *Id*. (citing cases).

"Innocuous statements or conduct, *or boorish ones that do not relate to the sex of the actor or*

*the offended party* . . . are not counted," *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th

Cir. 2000) (emphasis added), since sexual harassment law (and, by extension, sexual harassment

policies meant to comply with sexual harassment law) is not a "general civility code," *id*.,

quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998).

In the present case, by all appearances, Montague was merely drunk and irritated, and

acted on childish impulse. Specifically, Smith accused Montague of rolling up a paper plate and

putting it down the front of her shirt. According to Smith, Montague appeared annoyed just prior

to the incident. He did not say anything offensive (or otherwise) to her during the incident, and

there was no skin-to-skin contact whatsoever. (Ex. 1, ¶¶65-67; Exs. 7 and 8.) After the incident,

he walked away. (Ex. 1, ¶71.) Thus, while Montague's behavior may have been immature and

21

"boorish," it was not motivated in any way by Smith's gender. "Personal animosity is not the equivalent of sex discrimination[.]" *Succar v. Dade County School Bd.*, 60 F. Supp. 2d 1309, 1314 (S.D. Fla. 1999). Simply put, "[Smith]'s gender was not the impetus for [Montague's] conduct; rather, it was merely coincidental to that conduct." *Id.* at 1315 (citation omitted).

### b. No Unreasonable Interference or Intimidating or Hostile Environment

Furthermore, Montague's actions did not have the "purpose or effect of unreasonably interfering with [Smith's] work or academic performance or creating an intimidating or hostile academic or work environment." Indeed, Montague's actions *could not have* had that purpose or effect, since Smith's academic career at Yale was essentially over at the time of the incident, which itself occurred at an off-campus pizza parlor.[19] There was no evidence Montague's conduct prevented Smith from returning to campus or feeling safe on campus, for example. *See Johnson v. Galen Health Institutes, Inc.*, 267 F. Supp. 2d 679, 687 (W.D. Ky. 2003) (where student continued to go to class, she could not show that teacher's allegedly offensive comments and behavior interfered with her education). In fact, Smith neither saw nor heard from Montague again, and Montague left campus the following day. (Ex. 7.) And Smith herself described the interaction as merely "peripheral." (Ex. 8). Consequently, even assuming Montague's conduct was "sexual," it did not interfere with Smith's academic performance, nor did it create an intimidating or hostile academic environment for her.

For these reasons, Montague is likely to succeed on the merits of his claim that Yale breached its contract with him by erroneously holding him responsible for "sexual harassment"

---

[19] Smith alleged the incident took place on or about May 7, 2013. (Ex. 7.) Attached as **Exhibit 17** ("Ex. 17") is a true and accurate copy of the relevant portion(s) of Yale's 2012-2013 *Programs of Study*, which indicates the last day of exams that academic year was May 7, 2013. (Ex. 17, p. 14.)

4851-0117-1240, v. 2

when there was no evidence to support such a finding. If this Court agrees, then Montague is entitled either to an order granting immediate reinstatement, or at the very least, to a new UWC II hearing in which the UWC I proceedings are not disclosed or taken into account in any manner.

It is also worth noting here that Montague's conduct could have been taken up under Yale's *Undergraduate Regulations* (and indeed, that would have been the proper avenue for a complaint of simple assault like the one at issue here). (*See* Ex. 14, *Offenses* ("C," which covers simple assault).) Had that been done, Montague would have gone through an entirely different disciplinary process, and that process certainly would not have resulted in a finding of sexual misconduct. Furthermore, if the matter had proceeded to discipline in the appropriate forum, the result would not have been noteworthy to Gleason; Gleason would not have shared it with Roe; and Roe's view of the incident between herself and Montague would not have changed dramatically based on a false understanding that Montague had already engaged in similar behavior and received training on "consent." Finally, it could not have been considered in the UWC II proceedings on the question of Montague's culpability, since the UWC Procedures authorize the panel to consider *only* "a respondent's previous formal discipline for other acts of sexual misconduct[.]" (Ex. 3, Section 7.4: *Hearing*.) Montague would not have been expelled for his conduct with Roe, which was otherwise nearly identical to the conduct outlined in Yale's *Sexual Misconduct Scenarios* bulletin, and which is conduct that Yale itself has indicated would normally warrant a simple reprimand.[20] Thus, the fact that the matter was improperly taken up by the UWC in the first instance led, inexorably, to Montague's expulsion from the University. The

---

[20] And, relatedly, Dean Holloway would not have been swayed by Montague's "prior disciplinary history by the UWC" and the "extensive training [Montague] . . . already received from the SHARE center" (Ex. 15), because neither would have existed.

importance of these procedural and contractual failures cannot be overstated, given the devastating chain effect they caused.

### 2.   Yale, Through Title IX Coordinator Angela Gleason, Breached Its Confidentiality Policy By Disclosing the UWC I Proceedings to Jane Roe

Count IV of the Amended Complaint alleges that Yale, through Title IX Coordinator Angela Gleason, breached its contract with Montague when Gleason disclosed to Roe the fact and substance of the UWC I proceedings and resulting sanction, in direct contravention of Yale's policies and procedures concerning confidentiality. (Ex. 1, ¶¶211-214.)

The *UWC Procedures* provide, in Section 3 ("*Confidentiality and Honesty*"), that "[a]ll documents prepared by, prepared for, or received from the UWC in connection with a UWC proceeding ("UWC Documents") must be held in strict confidence," and refers to the *Provost's Statement on Confidentiality of UWC Proceedings* for additional support and clarification.[21] Despite this clear policy, Gleason, in the course of her conversations with Roe, disclosed to Roe: 1) that Montague already had, on his record, a formal complaint of sexual misconduct; 2) that Montague had already been found responsible for sexual misconduct; and 3) that Montague received, as part of his sanction for this alleged sexual misconduct, SHARE training. (Ex. 1, ¶¶53-58.)

All of these facts should have been "held in strict confidence," per Yale's clear confidentiality policies. It should be noted here that the fact that the policy refers only to "documents," and not the facts underlying the documents, is legally insignificant. "Mere protection of a disciplinary record only would be entirely pointless if administrators were free to

---

[21] That statement confirms the same restrictions on disclosure, and points out that "[t]he circumstances surrounding allegations of sexual misconduct are often sharply disputed and have the potential to affect the reputations of the persons involved." Thus, it warns, those who breach the expectation of confidentiality may be subject to legal claims. (Ex. 6.)

disclose the information the record contained. No reasonable student . . . would expect that [a university] would be free to broadcast his confidential information as long as the actual records themselves were not leaked." *Doe v. Brandeis University*, 2016 WL 1274533, *30 (D. Mass. Mar. 31, 2016). Gleason was therefore bound by the policy to keep confidential not just the UWC I documents themselves, but the information contained therein.

Furthermore, Yale explicitly recognizes that disclosure of such sensitive information to third parties – information that is "often sharply disputed" – has "the potential to affect the reputations of the persons involved," and that one who violates the confidentiality policy could therefore be subject to legal action. (Ex. 6.) And here, the harm Gleason caused by disclosing this information to Roe was far worse than reputational damage alone: Gleason's disclosure was the reason Roe agreed to allow Yale's Title IX Coordinator to file a formal complaint against Montague, because the disclosure caused Roe to believe (falsely) that Montague had previously sexually assaulted a female student at Yale, and had previously received training concerning sexual consent. (Ex. 1, ¶¶63, 81, 82, 108, 118, 163.)

For these reasons, Montague is likely to succeed on the merits of his claim for breach of confidentiality. If this Court agrees, then Montague is entitled to an order granting immediate reinstatement.

> ### 3. Yale, Through Title IX Coordinator Jason Killheffer, Breached Its Policies and Procedures for Title IX Coordinator-Initiated Complaints, as Well as the Implied Covenant of Good Faith and Fair Dealing Therein
>
> #### a. Breach of Contract

As set forth in Count VII the Amended Complaint, Montague also alleges that there was no proper basis under Yale's procedures and policies for the Title IX Coordinator to file a formal complaint against Mr. Montague, and that Yale's pursuit of the complaint via this avenue was a

25

breach of contract and a breach of the implied covenant of good faith and fair dealing therein. (Ex. 1, ¶¶229-233.)

Under Yale's policies, it is up to the complainant to "decide[] whether or not to pursue a complaint, and in what venue." (Ex. 11, p. 5.) The University has no standing to bring a complaint of sexual misconduct unless one of three exceptions applies. Two of these have no applicability here,[22] and the third – the exception under which Yale instituted the formal complaint against Montague (Ex. 10) – allows Title IX Coordinator-initiated complaints "when there is evidence that the University's policies on sexual misconduct have been violated and the Coordinator's intervention is needed to ensure that the matter reaches the UWC." (Ex. 3, Section 1: *Authority of the UWC*.) When that intervention is "needed" is spelled out in Yale's *Spangler Report* bulletins, which make very clear that such intervention is "needed" only "[i]n certain unusual circumstances, such as those involving risks of the safety of individuals and/or the community[.]" (Ex. 11, p. 5.)

In the present case, no "unusual circumstances" existed that would warrant intervention by the Title IX Coordinator. Roe made clear from the outset that she wanted to remain anonymous, and that she did not want to file a formal complaint against Montague. She was not even "interested in having Mr. Montague punished." (Ex. 1, ¶¶47, 48.) Had her safety been in jeopardy, her approach clearly would have been different. Moreover, the incident happened in October of 2014, but was not reported (and even then, was not reported by Roe herself) until September of 2015. (Ex. 1, ¶40.) In the interim, Montague took classes at Yale and participated

---

[22] "First, a Coordinator may bring a complaint on behalf of a person who is not a current or former member of the Yale Community . . . . Second, a Coordinator may bring a complaint to the UWC alleging a violation of Yale's Policy on Teacher-Student Consensual Relations." (Ex. 3, Section 1: *Authority of the UWC*.)

4851-0117-1240, v. 2

in Yale student life without incident: never once did Roe allege, nor did Yale express concern, that he posed a safety risk.

From these facts, it is clear that there was no valid basis upon which Yale's Title IX Coordinator could have initiated a complaint. In direct contravention of its policies, however, Yale – through Title IX Coordinator Jason Killheffer – improperly initiated a formal complaint process against Montague, thereby breaching its contract with Montague. If this Court agrees, then Montague is entitled to an order granting immediate reinstatement.

### b. Breach of the Implied Covenant of Good Faith and Fair Dealing

Additionally, Yale's decision to file a formal complaint against Montague breached the implied covenant of good faith and fair dealing inherent in the contract between Montague and Yale. "Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Gupta v. New Britain General Hosp.*, 239 Conn. 574, 598 (1996), quoting *Habetz v. Condon*, 224 Conn. 231, 238 (1992). The covenant "presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term . . . ." *Rafalko v. Univ. of New Haven*, 129 Conn. App. 44, 51 (2011) (citation omitted). "To constitute a breach [of the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he . . . reasonably expected to receive under the contract must have been taken in bad faith." Importantly, the doctrine has "particular application in situations where one party is invested with a discretionary power affecting the rights of another." *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*, 47 Cal. App. 4th 464, 482 (1996), cited with approval in *PSE Consulting, Inc. v. Frank Mercede and Sons, Inc.*, 267 Conn. 279, 301-302 (2004). In such a

27

situation, the "reasonable expectations of the parties" govern. *Portland v. George D. Ward & Assocs., Inc.*, 89 Or. App. 452, 457 (1998) (citation omitted), cited with approval in *PSE Consulting*, *supra*, at 302. Thus, "[w]hen one party to a contract is given discretion in the performance of some aspect of the contract, the parties ordinarily contemplate that that discretion will be exercised for particular purposes. If the discretion is exercised for purposes not contemplated by the parties, the party exercising discretion has performed in bad faith." *Id.*; *accord Centronics Corp. v. Genicom Corp.*, 132 N.H. 133, 143 (1989) (Souter, J.) ("under an agreement that appears by word or silence to invest one party with a degree of discretion in performance sufficient to deprive another party of a substantial proportion of the agreement's value, the parties' intent to be bound by an enforceable contract raises an implied obligation of good faith to observe the reasonable limits in exercising that discretion, consistent with the parties' purpose or purposes in contracting").

As set forth above, Yale's policies explicitly vest the Title IX coordinators with discretion to bring a formal complaint "when there is evidence that the University's policies on sexual misconduct have been violated and the Coordinator's intervention is needed to ensure that the matter reaches the UWC." However, according to Yale, such intervention is "needed" – and its discretion should be exercised – only "[i]n certain unusual circumstances, such as those involving risks of the safety of individuals and/or the community[.]" (Ex. 11, p. 5.) Thus, Mr. Montague could reasonably expect that he would not be the subject of a Title IX Coordinator-initiated complaint unless he posed a safety risk. Yet it is abundantly clear that he posed no such risk, and therefore, Yale exercised its discretion to file the complaint against him for a purpose not contemplated by the parties, and in so doing, clearly acted in bad faith. Consequently, he is likely to succeed on the merits of this claim. If this Court agrees, then Montague is entitled to an

28

order granting immediate reinstatement.

> **4. The UWC II Panel Erroneously Relied on the UWC I Proceedings, Failed to Consider the UWC I Proceedings in the Presence of Mr. Montague, and Breached the Implied Covenant of Good Faith and Fair Dealing in So Doing**

Montague alleges in Counts X and XI of his Amended Complaint that Yale breached its contract with him, along with the implied covenant of good faith and fair dealing therein, by erroneously relying upon the UWC I proceedings in determining culpability and sanctions in the UWC II proceedings, and by considering the UWC I evidence, as it related to culpability, outside of Montague's presence. (Ex. 1, ¶¶249-263.)

> **a. Erroneous Reliance on UWC I**

The *UWC Procedures* specify that "[i]n determining culpability, the panel may also take into account a respondent's previous formal discipline for other acts of sexual misconduct . . . ." The problem here, as illustrated above, is that the UWC I proceedings were themselves fundamentally flawed, their outcome entirely erroneous, and the resulting sanctions unwarranted. (*See* Section II(A)(1), *supra*.) Consequently, the UWC II panel should not have taken them into account because the "other act" at issue was not, in fact, an act of "sexual misconduct." Furthermore, the "discipline" the panel considered – Montague's purported SHARE training – was not factually correct: Montague was not formally trained by SHARE on sexual harassment and gender sensitivity, nor had he and the SHARE staff member with whom he met discussed his relationships with women. For the same reasons, Dean Holloway should not have taken the UWC I proceedings or sanction into account in considering what discipline to impose on Mr. Montague.

Moreover, the *UWC Procedures* say only that the panel "*may* . . . take into account a respondent's previous formal discipline for other acts of sexual misconduct." (Ex. 3, Section 7.4:

29

*Hearing*.) The procedures certainly do not *mandate* consideration of this evidence, and indeed, Yale represented to Montague that the UWC II panel would only consider those previous violations that "*relate to* the complaint." (Ex. 12, emphasis added.) Here, the allegations were not "relate[d]": at *worst*, that conduct for which he was found responsible in the UWC I proceedings proved he had, on one prior occasion, been disrespectful to another student who happened to be female. It certainly did not make it more or less likely that he might have committed a sexual assault.

Given the powerful and potentially poisonous nature of "character" evidence (for that is what this evidence really was), *see*, *e.g.*, *United States v. Scott*, 677 F.2d 72, 77 (2nd Cir. 2012), citing Fed. R. Evid. 404(b); *State v. Acosta*, 162 Conn. App. 774, 780 (2016) (citations omitted), it was imperative that Mr. Montague be informed the panel planned to consider it, and that he be given an opportunity to directly address the evidence and point out its utter irrelevancy to the UWC II proceedings.

### b. Consideration of Evidence Outside of the Hearing, and Outside of the Presence of Montague

Furthermore, it was reasonable for Mr. Montague to expect that if the UWC II panel were to exercise its discretion to consider the UWC I proceedings, it would do so *in his presence*. The *UWC Procedures* specify that consideration of a respondent's "previous formal discipline for other acts of sexual misconduct" is part of the "Hearing" phase of the proceedings. (Ex. 3, Section 7.4: *Hearing*.) The procedures also make clear that the parties have the right to be present for the hearing; the only limitation is that the complainant and respondent "will not appear jointly before the panel at any stage of the hearing" unless they ask to do so, but even so, "[t]he party who is not present before the panel will be in a private room with audio access to the

proceedings." (Ex. 3, Section 7.4: *Hearing*.) Nothing in the *UWC Procedures* indicates that any portion of the hearing will or may be conducted in the absence of the parties.

Indeed, no reasonable person would assume that a contractual provision granting a "hearing" would mean that some part of the hearing would be conducted outside of the presence of the parties, and without their knowledge. *See Giaimo v. City of New Haven*, 257 Conn. 481, 512-513 (2001) (even in informal hearing proceedings, "fundamental rules of natural justice" require that "the parties involved have a right to produce relevant evidence, and an opportunity to know the facts on which the [decision-maker] is asked to act, to cross-examine witnesses and to offer rebuttal evidence" (additional citation omitted)). *Cf. Catalano v. United States*, 383 F. Supp. 346, 352-353 (D. Conn. 1974) (when an inmate is to be reclassified, he must be given notice specifying the reason or reasons for the designation and a brief description of the underlying evidence relied on by prison authorities "sufficient to enable the inmate . . . to marshall [sic] the facts in his defense and to controvert the charges at the hearing"); *see also id*. at 353 ("The inmate should be fully informed of the nature of the evidence against him and be afforded suitable time to present his side of the case."). In shameful contravention of what is clearly a very basic right at any "hearing," Yale did not even tell Mr. Montague that it considered the UWC I proceedings relevant to the UWC II proceedings, let alone provide him with an opportunity to "present his side of the case" in this regard.

Importantly, the Office of Civil Rights ("OCR") of the U.S. Department of Education – which requires universities to have in place certain measures to address, investigate, and respond to complaints of sexual misconduct – has advised that Title IX mandates an "equitable" process. Because the *UWC Procedures* at issue here were drafted, at least in part, in light of the OCR investigation into Yale's Title IX practices, and where the procedures were also presumably

31

drafted to comply with Title IX, certainly these procedures must be "equitable," as Title IX, and

OCR, contemplate that term. In this vein, OCR recently shed light on what it considers an

"equitable" proceeding when it investigated Wesley College, a private institution in Delaware,

and concluded that the school was not in compliance with Title IX in a variety of areas. One such

area is of particular relevance here: Wesley did not provide an accused student with critical

materials regarding the College's anticipated evidence against him, and therefore, the student

was deprived of an opportunity to rebut the charges against him and challenge the evidence the

College relied upon in imposing the penalty of expulsion. *See* October 12, 2016 Letter from

OCR to Robert E. Clark, President of Wesley College:

http://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/03152329-a.pdf, at pp. 24-

25. OCR repudiated this inequitable and unfair practice and reminded the school that "[i]t is

critical, for purposes of satisfying the Title IX requirement that procedures be 'equitable,' that

the accused Student have a reasonable opportunity to present his version of events, particularly

in response to adverse 'findings' which the College relied upon in imposing the substantial

penalty meted out to the accused Student – expulsion." *Id*. at p. 25.

  The UWC II panel's decision to consider the UWC I proceedings outside of Montague's

presence therefore exceeded the reasonable limits of its discretion. *See Centronics*, *supra*. Thus,

Yale breached its contract with Montague, and the implied covenant of good faith and fair

dealing therein, and Montague is likely to succeed on the merits of these claims. If this Court

agrees, then Montague is entitled either to an order granting immediate reinstatement, or at the

very least, to a new UWC II hearing in which the UWC I proceedings are not disclosed or taken

into account in any manner.

**5.   Yale Erroneously Considered the Executive Committee's Reprimand in Connection With Montague's UWC II Sanction, and Breached the Implied Covenant of Good Faith and Fair Dealing in So Doing**

Finally, Count XII of the Complaint charges Yale with breach of contract and breach of the implied covenant of good faith and fair dealing because the UWC II panel improperly considered the Executive Committee action against Mr. Montague in connection with its recommended penalty in the UWC II proceedings. (Ex. 1, ¶¶264-275.)

The *UWC Procedures* make clear that the panel may only take into account "*formal* Yale discipline previously imposed on the respondent" in its recommendations regarding penalty. (Ex. 3, Section 7.5: *Findings, Conclusions, and Recommendations* (emphasis added).) When it issued its reprimand for "Defiance of Authority" after Mr. Montague attempted to help an intoxicated male friend who had been detained by Yale Police, the Executive Committee told Mr. Montague the reprimand was a matter of "internal record only," and further told him he was "free . . . to say" that he had not "been subject to disciplinary sanctions by the University[.]" (Ex. 13.) Based on this language, Mr. Montague could reasonably expect that the reprimand was not considered "formal discipline."

Furthermore, the Executive Committee told Mr. Montague the reprimand would be "taken into consideration in determining a penalty if you should ever again be found by the Executive Committee to have committed an infraction of the *Undergraduate Regulations*." (Ex. 13.) It did not say that the reprimand could or would be taken into account in any other disciplinary proceedings. Thus, Mr. Montague could reasonably expect that the reprimand would not be taken into account by the UWC.

The fact that the UWC II panel nevertheless considered the reprimand – in contravention of the UWC Procedures as well as the University's clear representations in the Executive

33

Committee's letter – was a breach of contract, as well as a breach of the covenant of good faith and fair dealing. Based on the language in the Executive Committee's letter, it was reasonable to expect that Yale would exercise its discretion to consider the reprimand *only* if Mr. Montague again found himself in front of the *Executive Committee*. The Executive Committee, "a standing committee of the Yale College Faculty by whose authorization it acts," is wholly distinct from the UWC, which is "is appointed and authorized to act by the provost." (Ex. 14, *Introduction*.) Yale could have – but did not – insert language in its letter to Mr. Montague indicating that the reprimand might also be considered in other disciplinary proceedings as well. *See Lefrak Org., Inc., v. Chubb Custom Ins. Co.*, 942 F. Supp. 949, 952 (S.D. N.Y. 1996) ("The cost of a failure to clarify is imposed on the drafting party, to encourage that party to clarify its language in the future. Put another way, if the insurance company had wanted to exclude certain claims, especially foreseeable claims, it could have and should have listed those exclusions in the policy and, if necessary, bargained for their adoption.") Thus, Yale's decision to take the reprimand into account in the UWC II proceedings was contrary to the reasonable expectations of the parties, and a decision made in bad faith. See *Portland v. George D. Ward & Assocs.*, *supra*; *Centronics Corp.*, *supra*. If this Court agrees, then Montague is entitled either to an order granting immediate reinstatement, or at the very least, to a new UWC II penalty phase in which the Executive Committee reprimand is not disclosed or taken into account in any manner.

### III. The Balance of Hardships Tips Decidedly in Montague's Favor

#### A. Appropriate Relief

If this Court determines that Montague is likely to succeed on any one of the following claims, then he would be entitled to <u>immediate reinstatement</u> as a student at Yale:

1. Breach of Contract, UWC I;

2. Breach of Confidentiality; and/or

34

3. Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing (Title IX Coordinator-Initiated Complaint).

If this Court determines that Montague is likely to succeed on his breach of contract claims with regard to UWC II (erroneous reliance on UWC I and/or failure to consider UWC I in Montague's presence), then he would be entitled to immediate reinstatement, but with leave to Yale to conduct a new UWC II hearing without consideration of UWC I (or, at a very minimum, a new UWC II hearing in which UWC I is considered in his presence and in which Montague is entitled to present evidence concerning UWC I). *See*, *e.g.*, *Doe v. Brown*, 1:16-cv-00017, ECF No. 62, p. 3 (Sep. 28, 2016) (student entitled to new hearing that remedies procedural infirmities). Finally, if this Court determines that Montague is likely to success on his breach of contract claim with regard to the Executive Committee, then he would at the least be entitled to reinstatement and a new UWC II penalty phase during which neither the Committee nor the Dean could take into account the Executive Committee reprimand.

**B. Relative Hardship on the Parties With Respect to Each Form of Relief**

**1. Hardship – Expulsion/Reinstatement**

If Plaintiff is not reinstated and allowed to complete his Yale degree, the grave hardships he has suffered and is now suffering will continue unabated. He has no college degree, despite working hard in his courses for almost four years whilst committing nearly all of his remaining time to the Yale basketball team; no real hope of ever graduating from college; and, as a result, an uncertain professional future. He has also been branded – unfairly and unjustifiably – a sexual predator. If an injunction is not granted, and Montague is not allowed to resume his studies at Yale until he prevails on his claims after a lengthy litigation, it will be exceedingly difficult for him to put his life on hold and return to school in his mid-20s.

35

Conversely, granting an injunction to reinstate Montague places no real hardship on Yale. Montague continued his studies, without issue, throughout the course of Yale's investigation. The only restriction Yale placed upon him was to prevent him from contacting Roe, either directly or indirectly. (Ex. 12.) Mr. Montague faithfully abided by this directive, also without issue. (Ex. 2, ¶4.) Consequently, his reinstatement would simply restore the status quo prior to his expulsion. Moreover, should it be in the parties' best interests, Mr. Montague is willing to complete the remainder of his courses remotely so as to minimize any distraction his presence might create on campus and any emotional distress it might cause Roe or her friends.[23] (Ex. 2, ¶8). *See also Doe v.*, *supra*, ECF No. 27, p. 8 (minimizing hardship to institution where "Plaintiff has indicated his willingness, as precaution, to refrain from entering on-campus residences and to report to an advisor").

Furthermore, "[w]hile Yale will suffer interference with its process and sanction if the Court grants the motion, if [Yale] prevails on the merits, it can refuse to award, or revoke, Plaintiff's diploma and maintain Plaintiff's disciplinary record in its files." *Id*. "The harm [Yale] will suffer is not as great as the harm Plaintiff will suffer if he is not permitted to return to campus but ultimately prevails in this case. *Id*., citing *King v. DePauw Univ.*, 2014 WL 4197507, *14 (finding the balance of harm in student's favor even though university has "interest in enforcing its own rules of conduct pursuant to its own procedures" and is harmed by having its actions second-guessed by a court because "the harm [university] will have suffered by [student's] court-ordered return to campus . . . , while real, will not be as great as the harm [student] will have suffered if he is not permitted to return to campus but ultimately wins").

---

[23] Mr. Montague must complete five (5) credits in order to graduate: four (4) courses plus his senior project. One of the courses must be in American Literature; the other three are electives. (Ex. 2, ¶7.)

4851-0117-1240, v. 2

Accordingly, the balance of hardships tips decidedly in favor of Plaintiff. *See*, *e.g.*, *Doe v. Brown*, 1:16-cv-00017, ECF No. 15, p. 2 (where "[t]he encounter at issue occurred approximately one and a half years ago" and "only one month remains of this academic year," the "University's proffered interest in immediately removing [the student] from campus . . . does not outweigh the potential damages [the student] stands to suffer").

### 2.   Hardship – Reinstatement/New Hearing

If the Court were to rule that Montague is entitled to reinstatement, but with leave to hold a new UWC II hearing, it is essential that such a hearing occur right away; if not, the hardship for Montague will be all but insurmountable. Witnesses will become unavailable and memories will fade. If Montague must wait for a new hearing until he prevails after a lengthy litigation, there is no hope that such a hearing could be fair. From Yale's perspective, however, holding a hearing now poses no real hardship, and indeed, an immediate hearing could even result in a scenario in which some of Montague's claims against Yale become moot.

### IV.   **Public Interest**

The public interest weighs heavily in favor of an injunction. Much has been said and written, in the wake of the "Dear Colleague letter," about how sexual misconduct claims are handled at universities and colleges across the country. It is a divisive issue, to be sure, but what is clear is that the public, as well as the parties involved in this lawsuit, have a shared interest in the fairness, reliability, and transparency of these proceedings. *See*, *e.g.*, Nancy Gertner, *Complicated Process*, 125 Yale L.J. Forum 442, 448-449 (2106) ("There is . . . 'a real contest about where the line between sex and sexual violence or harassment is, and as with all lines, there will be uncertainty over where some marginal cases fall.' An administrative framework – the 'sex bureaucracy' – policing these lines with few procedural protections, and less than transparently, raises . . . questions about fairness"); Stephen Henrick, *A Hostile Environment for*

37

*Student Defendants: Title IX and Sexual Assault on College Campuses*, 40 N. Ky. L. Rev. 49, 87

(2013) ("There is a difficult tension in sexual assault adjudication between avoiding the injustice

of a wrongful conviction and avoiding the injustice of a wrongful acquittal. Nevertheless, any

process designed to resolve such claims can only be legitimate if determining guilt or innocence

is the first priority"). Granting an injunction in this case will ensure the attainment of those goals.

## CONCLUSION

For the reasons set forth above, this Court should grant Mr. Montague the preliminary

injunctive relief he seeks.

## REQUEST FOR HEARING

**PLAINTIFF HEREBY REQUESTS AN EVIDENTIARY HEARING ON THIS MOTION.**

JACK MONTAGUE,

By his attorneys,

/s/ *Max D. Stern*

Max D. Stern (*pro hac vice*)
mstern@toddweld.com
Alexandra H. Deal (*pro hac vice*)
adeal@toddweld.com
Hillary A. Lehmann (*pro hac vice*)
hlehmann@toddweld.com
TODD & WELD LLP
One Federal St., 27th Floor
Boston, MA 01880
Tel. (617) 720-2626
Fax (617) 227-5777

4851-0117-1240, v. 2

William F. Dow III (ct00161)
JACOBS & DOW, LLC
350 Orange Street
New Haven, CT 06511
wdow@jacobslaw.com
Tel. (203) 772-3100
Fax (203) 772-1691

Dated: October 31, 2016

## CERTIFICATE OF SERVICE

I, Max D. Stern, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on October 31, 2016.

/s/ *Max D. Stern*

39