UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JACK MONTAGUE,<br>      Plaintiff,<br><br>v.<br><br>YALE UNIVERSTIY, ANGELA GLEASON,<br>JASON KILLHEFFER, and OTHERS<br>UNKNOWN,<br>      Defendants. | CIVIL ACTION<br>No. 3:16-cv-00885-AVC |

**PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTION TO BIFURCATE CONSIDERATION OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

**I.   Introduction**[1]

In his Motion for Preliminary Injunction, the Plaintiff, Jack Montague, has shown how Defendants flouted Yale's own rules and flagrantly disregarded his rights in myriad ways, culminating in his expulsion in February of 2016. In a most remarkable response, Defendants eschew any defense of what they did. Desperate to avoid confronting the merits of Plaintiffs' claims, they pitch their entire defense on the proposition that Montague was not irreparably harmed. First, they ask the Court to bifurcate consideration of Plaintiff's motion and thus to consider, in isolation, whether Mr. Montague has made an adequate showing of harm. This enables Defendants to pretend they might have a merits defense that they have not yet

---

[1] Plaintiff's Motion for Preliminary Injunction is cited herein as "Pl. Mot. at [page]"; Defendants' Motion to Bifurcate is cited herein as "Def. Mot. at [page]"; and Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction is cited herein as "Def. Opp. at [page]."

revealed. But then, not even waiting for a ruling on the request, they treat bifurcation as a *fait accompli*, submitting a 31-page tome on irreparable injury and purporting to "reserve the right" to address the merits at some later time. (Def. Opp. at 1.)

Defendants' proposed course of action turns a blind eye to the overwhelming weight of authority holding that no one factor in the preliminary injunction analysis can be considered in isolation: the factors are to be weighed *together*. Furthermore, this unfortunate litigation tactic saves no one time or expense, serves only to amplify the harm to Mr. Montague, and proves that Defendants indeed have nothing to say on the merits. Thus, if Defendants wish to "bet the farm" on the absence of irreparable harm, they must be held to their wager and not be permitted to submit any additional argument, having elected to forego it at their own peril. This Court should deny Defendants' request to bifurcate the proceedings and consider the motion for preliminary injunction as a whole, on the basis of the record as it now stands.[2]

Likewise, this Court should reject Defendants' argument that Mr. Montague has not shown the requisite likelihood of irreparable harm. The harm here consists of the inability of a young man with a once-promising future to move forward with his life in any meaningful way, such that he is virtually imprisoned by his own circumstances unless and until the stain on his reputation is lifted and he is permitted to continue his educational path with his peers. That this constitutes irreparable injury is "so clear as to be almost a truism." *Doe v. Rector and Visitors of George Mason University*, 149 F. Supp. 3d 602, 614 n.9 (E.D. Va. 2016) (citations omitted). Nor did Mr. Montague wait an unreasonably long time to seek relief, Defendants' protestations to the

---

[2] Plaintiff agrees with Defendants that the motion can be decided without an evidentiary hearing, but disagrees that the decision can properly rest on consideration of just one of the relevant factors.

contrary notwithstanding. Indeed, as Defendants are well aware, they refused to timely turn over documents that would have allowed Mr. Montague and his attorneys to promptly assess the scope and nature of all of his potential claims, and they engaged in negotiations with the Plaintiff, at Plaintiff's request, in order to determine whether the matter could be settled without the need to resort to litigation. Plaintiff then sought injunctive relief within four months of filing his complaint, a short delay that, under the circumstances explained below and in Mr. Montague's Supplemental Affidavit, was not at all unreasonable. Plaintiff has clearly shown a likelihood of irreparable harm.

## II.     Bifurcation is Not Appropriate

### A.  Bifurcation is an Exceptional Step, and Defendants Have Not Made the Requisite Showing

Pursuant to Fed. R. Civ. P. 42(b) (captioned "Separate Trials"), a district court "may order a separate trial of one or more separate issues, claims, crossclaims, or third-party claims" if doing so would be convenient; if it would avoid prejudice; or if it would expedite and economize the trial. "Because 'the general practice is to try all the issues in a case at one time,' *Miller v. Am. Bonding Co.*, 257 U.S. 304, 307 (1921), bifurcation is the exception and 'not the rule,' *Svege v. Mercedes-Benz Credit Corp.*, 329 F. Supp. 2d 283, 284 (D. Conn. 2004)." *Doe No. 1 v. Knights of Columbus*, 930 F. Supp. 2d 337, 378-379 (D. Conn. 2013) (additional citations omitted); *Tucker v. American Intern. Group, Inc.*, 2011 WL 6020851, *3 (D. Conn. Dec. 2, 2011) (same). Indeed, "[t]he inconveniences, inefficiencies and harms inherent in the[] probable consequences [of bifurcation] – to the parties and third parties, to the courts, and to the prompt administration of justice – weigh against separation of trials and suggest that, for those probable adverse effects to be overcome, <u>the circumstances justifying bifurcation should be particularly compelling and prevail only in exceptional cases</u>." *Kos Pharm., Inc. v. Barr Labs*, Inc., 118 F.R.D. 387, 391

(S.D. N.Y. 2003) (emphasis added); *see also U.S. v. 43.47 Acres of Land*, 45 F. Supp. 2d 187, 190 (D. Conn. 1999) ("Bifurcation . . . is a procedural device to be employed only in exceptional circumstances") (citation omitted). Thus, "[i]n establishing that bifurcation is warranted, the burden falls squarely on the party seeking bifurcation." *Doe No. 1*, *supra*, at 379 (citation omitted). "[T]he movant must justify bifurcation on the basis of the substantial benefits that it can be expected to produce.'" *Id.*, quoting *Svege*, *supra*. "Bifurcation is only appropriate where (1) separate trials would promote judicial economy and convenience; or (2) a single trial would prejudice the interests of a party." *U.S. v. 43.47 Acres of Land*, *supra*, at 190-191.

      Defendants argue that bifurcation will allow the court "an opportunity to rule on the question of whether the Plaintiff . . . has set forth a prima facie showing of irreparable harm on the papers before unnecessarily expending further resources of the Court and the parties on a multi-day hearing regarding each element of Plaintiff's Motion for Preliminary Injunction . . . ." (Def. Mot. at 1.) However, the Court can accomplish this same goal without bifurcating consideration of a motion that is not properly bifurcated in any case (*see* IIB, *infra*). As it stands, the Court can decide whether Plaintiff has made an adequate showing as to each necessary factor based on the record now before it, without a hearing. The legal claims Plaintiff raised in his Motion for Preliminary Injunction are all based on documents provided by Yale and are thus grounded in indisputable facts; no further testimony is necessary to decide the motion. Consequently, there would be no additional strain on judicial resources for the Court to immediately consider Plaintiff's Motion for Preliminary Injunction as a whole – as this Court ought to do in any event – rather than in the piecemeal fashion Defendants propose. In fact, piecemeal litigation is likely to be *less* economical and *less* convenient: if this Court ultimately determines that Plaintiff has in fact made a sufficient showing as to the likelihood of irreparable

harm in the absence of an injunction, it would be forced to then wait for Defendants to properly brief issues they should have already briefed, and perhaps wait for Plaintiff to reply, before rendering a decision (with or without an evidentiary hearing). This <u>lengthened</u> process would also deeply prejudice the Plaintiff. Conversely, Defendants will suffer no prejudice at all by having this Court consider the entirety of Plaintiff's Motion for Preliminary Injunction, on the papers, in one fell swoop. The factors weighing in favor of bifurcation are absent here.

### B. Bifurcation in the Context of a Preliminary Injunction Conflicts With the Established Legal Principle That the Elements of Preliminary Relief Are Balanced Against One Another

As an initial matter, Defendants have cited *one* (unreported) case (in which Defendant Yale was a party) where a court held a bifurcated proceeding on a motion for preliminary injunction. *See Bagley v. Yale Univ.*, 2014 WL 7370021 (D. Conn. Dec. 29, 2014).[3] After a diligent search, Plaintiff could find no other federal case reaching the same result.[4] There is good

---

[3] *Bagley* is entirely distinguishable from the instant matter, of course. In that case, the plaintiff sued Yale for non-renewal of her contract on the grounds that Yale discriminated against her based on her gender and retaliated against her. Her damages were thus easily compensable after trial by an award of back pay (and perhaps front pay). 2014 WL 7370021 at *5. Conversely, a student receives no salary that can be reduced to present value; accurate measurement of the future – and intangible – benefits of a college education is highly problematic. Bagley's remedies also included potential reinstatement, *id*., but reinstatement for a professor is a different matter than reinstatement for a student, who cannot simply pick up where he left off after two or more years of absence from college life and therefore be put in the position he would have been absent defendants' wrongful conduct. The two cases are simply not comparable.

[4] Defendants also cite *Upjohn Co. v. Medtron Labs, Inc.*, 1988 WL 18842 (S.D. N.Y. Feb. 22, 1988), as another alleged example of a court bifurcating a preliminary injunction proceeding, but that case is inapposite. The *Upjohn* court decided to consider defendants' laches defense before considering plaintiff's preliminary injunction motion; it did not bifurcate consideration of the <u>merits</u> of that motion, as Defendants here urge. *See id*. at *1. (And in fact, the *Upjohn* court went on to reject the defense of laches and to consider, and grant, the motion for preliminary injunction. *Upjohn Co. v. Medtron Labs, Inc.*, 1989 WL 146279 (S.D. N.Y. Nov. 17, 1989).) Moreover, Defendants here have not asserted a defense of laches, nor have they made any attempt to argue prejudice, a keystone to any laches defense. *See id*. at *1.

5

reason for the dearth of precedent: Rule 42(b) is clearly inappropriate in the context of a proceeding in which no one factor is *meant* to be severed from the others.

Indeed, it is well-established that the factors courts must consider in determining whether to grant a motion for preliminary injunction are to be weighed *together*, and if proof of one or more factor is particularly strong, the others need not be as strong in order for a plaintiff to obtain relief. *See*, *e.g.*, *In re World Trade Center Disaster Site Litig.*, 503 F.3d 167, 170 (2nd Cir. 2007) ("the degree to which a factor must be present varies with the strength of the other factors, meaning that more of one factor excuses less of the other"); *Mohammed v. Reno*, 309 F.3d 95, 101 (2nd Cir. 2002) ("The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff[ ] will suffer absent the [injunction]. Simply stated, more of one excuses less of the other", quoting *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991) (additional citation omitted)); *Triebwasser & Katz v. Am. Tel. & Tel. Co.*, 535 F.2d 1356, 1359 (2nd Cir. 1976) ("where the plaintiff establishes something less than probable success as to the merits, need for proof of the threat of irreparable damage is even more pronounced"); *Local 1303-362 of Council 4 v. KGI Bridgeport Co.*, 2014 WL 555355, *2-*7 (D. Conn. Feb. 10, 2014) (where factor of likelihood of irreparable harm did not "favor granting the motion for an injunction," court went on to consider all other factors, citing *World Trade Center Disaster Site Litig.*, *supra*, for proposition that factors must be weighed together). *See also Braintree Laboratories, Inc. v. Citigroup Global Markets, Inc.*, 622 F.3d 36, 42-43 (1st Cir. 2010); *Calvin Klein Cosmetics Corp. v. Lenox Labs, Inc.*, 815 F.2d 500, 503 (8th Cir. 1987); *North Carolina State Ports v. Dart Containerline*, 592 F.2d 749, 750 (4th Cir. 1979); *Citizens for Responsibility and Ethics in Washington v. Cheney*, 577 F. Supp. 2d 328, 334-335 (D. D.C. 2008); *Boehm v. Univ. of*

*Pennsylvania School of Veterinary Medicine*, 392 Pa. Super. 502, 522 (1990). This is not to say that a Plaintiff is excused from showing a likelihood of irreparable harm if he puts on an otherwise strong case on the other factors; he must always make a showing that irreparable harm is likely, but the strength of the showing can and does vary from case to case. Even a weak showing would not obviate the need to consider each factor in the analysis before rendering a decision, however.

It is also worth noting that in *Bagley*, *supra*, although Yale moved to bifurcate the proceedings, it still filed a complete opposition to the plaintiff's motion for preliminary injunction in which it fully addressed the likelihood of plaintiff's success on the merits, as well as the balance of hardships. *See* 3:13-cv-1890-CSH, ECF Doc. No. 87 (D. Conn. Dec. 3, 2014). It is thus clear that when Yale sees a defensible case, it mounts a defense. The obvious corollary to that is the situation presented here, in which Yale understands the strength of Plaintiff's claims and is using the Motion to Bifurcate as a means of avoiding confronting the weaknesses of its own defenses. In fact, the Defendants have not even asserted that they would suffer any harm if an injunction were granted, even though the Supreme Court has made clear that "[i]n each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Resources Defense Council, Inc.*, 557 U.S. 7, 24 (2008) (internal quotation marks and citation omitted). "Each case" necessarily includes <u>this</u> case. If bifurcation would eliminate a necessary element of the legal analysis, it is clearly inappropriate. That is precisely what it would do here.

Plaintiff has made a strong showing on *both* likelihood of irreparable harm and success on the merits. And even if there were any minor deficiencies in Plaintiff's proof (which there are not), the "degree" to which he has shown a likelihood of success on the merits is so strong as to

outweigh them. *See In re World Trade Center Disaster Site Litig.*, *supra*. Bifurcation is therefore entirely unwarranted in this context, and Defendants' motion should be denied.

### III. Mr. Montague Has Shown a Strong Likelihood of Irreparable Harm

#### A. Factual Points

Although Defendants have not addressed the merits of Plaintiff's claims, they have taken certain liberties with the facts that must be corrected. First, Defendants assert that "nowhere in his motion does the plaintiff challenge Ms. Roe's . . . account[] of the events giving rise to the discipline imposed upon him." (Def. Opp. at 6.) Defendants have apparently forgotten that Plaintiff has <u>always</u> maintained – from the day he first responded to the allegations until the present – that Roe's version of events is not accurate. (*See*, *e.g.*, Amended Complaint at ¶¶93, 97a-f, 102, 123, 132, 133, 240-248.) The ultimate question of which version is true is simply not relevant to the legal claims forming the basis for Plaintiff's Motion for Preliminary Injunction; to suggest that Montague does not challenge Roe's version, however, is absurd.

Second, in reciting Roe's version of events, Defendants claim that Roe said Montague "forced himself on her and then later apologized, and acknowledged that he was aware that she did not want to engage in intercourse but that he was unable to stop." (Def. Opp. at 3.) Defendants cite to nothing in support of this piece of fiction, nor could they. While Roe did claim that Montague apologized after the incident in question – a "fact" Montague disputes – she never claimed that he "forced himself on her" or that he said he was "unable to stop." Instead, as fully set forth in the Amended Complaint and supported by Defendants' own documents, Roe said the two were engaged in mutually consensual naked foreplay and that when Montague rolled on top of her, she pushed his shoulders, "but not very forcefully," and then said she did not

want to have sex – a statement Montague did not appear to hear. (*See* Amended Complaint at ¶¶96i, 96j, 96k, 127, 130.) Inventing a rape scenario, in a public filing, is simply inexcusable.

### B. Legal Analysis

#### 1. Reasonable Delay in Filing

Defendants' first line of attack is that Mr. Montague waited too long to file for a preliminary injunction and that the motion should be denied on that basis alone. (Def. Opp. at 12-18.) The simple fact of a delay is meaningless in isolation, however. While it is certainly true that unreasonable delay "*may* justify denial of a preliminary injunction" because it "*tends* to indicate at least a reduced need for such a drastic, speedy action," *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2nd Cir. 1985) (emphasis added) (citations omitted), the existence of a delay is not in itself dispositive. *Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025 (7th Cir. 1979), cert. denied, 447 U.S. 924 (1980) ("[D]elay is only one among several factors to be considered; [the] cases do not support a general rule that irreparable injury cannot exist if the plaintiff delays in filing its motion for a preliminary injunction"; seven-month delay in filing suit and eight-month delay thereafter in moving for preliminary injunction did not preclude relief); *Whistler Corp. v. Dynascan Corp.*, 1988 WL 142216, *2 (N.D. Ill. Dec. 28, 1988) ("a showing of delay does not preclude, as a matter of law, a determination of irreparable harm. A period of delay is but one circumstance that the district court must consider in the context of the totality of the circumstances"; delay of over one year did not preclude finding of irreparable harm).

Instead, "[i]f the individual seeking interim relief has waited an <u>inexplicable</u> amount of time before asking for . . . relief . . . after the occurrence of the facts giving rise

9

to his claimed distress, courts <u>may</u> draw the inference that the complainant's circumstances really are not or could have been that dire." *Bagley*, 2014 WL 7370021 at \*2. The real question, then, is whether the delay can be explained, or whether the delay rather evinces a lack of urgency on Plaintiff's part to confront the harm, thus permitting a court to draw the inference that Plaintiff's circumstances are not "dire." If the delay is "explainable," *Tough Traveler, Ltd. v. Outbound Products*, 60 F.3d 964 968 (2nd Cir. 1995) – as it is here – then it is not, as Defendants would have it, fatal to Plaintiff's request for relief.

Defendants make a series of sweeping allegations in support of the argument that Montague unreasonably delayed in filing his Motion for Preliminary Injunction, and they do so with a disingenuousness that is striking. First, Defendants claim that "[i]t cannot reasonably be disputed that, as of [the date of Plaintiff's expulsion from Yale], all of the materials he needed to file his complaint . . . had already been provided or were readily available to him. (Def. Opp. at 17.) As Defendants well know, many of the claims brought by Montague – and many of the claims upon which he now relies for his motion – arise out of matters *other* than the UWC II proceedings. Furthermore, as Defendants also know, shortly after his expulsion Plaintiff requested, from Yale, his <u>complete</u> educational record (including records of proceedings other than the UWC II), as well as a complete copy of the UWC II panel report (since he was not in fact provided with a complete version of that document prior to his expulsion from Yale).[5] (Affidavit of Max D. Stern, attached hereto as **Exhibit A** ("Ex. A"), at ¶3.) Instead of providing

---

[5] Plaintiff made these requests with an eye towards ensuring he made no baseless or frivolous claims against the Defendants. It is thus somewhat puzzling that Defendants criticize Plaintiff for a careful vetting process.

Plaintiff with copies of his own records, however, Yale took the position that it had 45 days to produce the records and insisted on an onerous Non-Disclosure Agreement that would have broadly prevented Montague from disclosing the records without prior written permission from Yale. (Ex. A at ¶¶4, 5, 8.) After negotiation, the parties came to an agreement concerning non-disclosure on or about April 20, 2016, and Yale finally provided Plaintiff the requested documents on April 26, 2016. (Ex. A at ¶¶9-11.)

Defendants have also conspicuously omitted mention of the fact that approximately two weeks after receiving the records from Yale, Plaintiff's attorneys requested a meeting with Yale's outside counsel in order to discuss the prospect of settlement without the need to resort to litigation. (Affidavit of Alexandra H. Deal, attached hereto as **Exhibit B** ("Ex. B"), at ¶3.) That meeting took place on May 20, 2016. Plaintiff received no response from Defendants' counsel until June 8, 2016, at which point counsel informed Plaintiff's attorneys that he had been unable to reach the appropriate decision-maker at Yale. (Ex. B at ¶¶4-7.) Plaintiff filed suit the next day. (Ex. B at ¶8.)

Defendants now attempt to revise history, claiming that "[b]y failing to act promptly, *the plaintiff deprived himself* of the opportunity to obtain preliminary relief during the semester in which was expelled." (Def. Opp. at 17 (emphasis added)). This is, as set forth above, simply false. Thus, there was nothing unreasonable about not filing for an injunction between the time Montague was expelled and the time he filed his complaint, when he was actively assessing the potential claims against the Defendants and attempting to settle the matter without filing suit. *See, e.g., King v. Innovation Books*, 976 F.2d 824, 831 (2nd Cir. 1992) (eight-month delay in filing did not rebut presumption of irreparable harm because author spent that period of time trying to trying to obtain copy of infringing screenplay and movie from defendant); *Clifford Ross*

11

*Co., Ltd. v. Nelvana, Ltd.*, 710 F. Supp. 517 (S.D. N.Y. 1989) (delay in filing was not unreasonable where plantiff's counsel engaged in "constructive, responsible and accommodating efforts . . . to resolve the matter without litigation").

Defendants' dubious claims notwithstanding, "[t]he only 'delay' in moving for interim relief fairly ascribable to Plaintiff is the period between" June 9, 2016, and October 31, 2016, which is more properly characterized as a single-semester delay (*i.e.*, seeking an injunction for the spring term rather than the fall term). *Bagley*, 2014 WL 7370021 at *3. Had Montague moved for a preliminary injunction at the same time he filed his complaint, the earliest he could have begun classes at Yale was the fall term of 2016, given the realities of motion practice and the fact that Yale's summer term was already underway when he filed suit. Montague was expelled during the spring of his senior year, however, and was taking classes that are only offered by Yale in the spring. (Supplemental Affidavit of Jack Montague, attached hereto as **Exhibit C** ("Ex. C"), at ¶¶3-9.) Thus, filing the motion in October of 2016 was not at all unreasonable, as the goal was to put Plaintiff in the same position (or as close as possible to the same position) he occupied when he was expelled: the spring term of his senior year.[6] (*See* Ex. C at ¶¶16-17.)

In addition, as set forth in Mr. Montague's Supplemental Affidavit, he spent the summer and early fall of 2016 attempting to mitigate the damage Defendants had already done to him. He was immediately aware that it would be fruitless for him to apply to another comparable school in order to obtain a degree – none of them would accept a student expelled on grounds of sexual

---

[6] As set forth in Mr. Montague's Supplemental Affidavit, three of the five courses he was taking when he was expelled are being offered again in the spring of 2017. None were offered in the fall of 2016. (Ex. C. at ¶¶5-10.)

misconduct. (Ex. C at ¶11.) *See also* James M. Picozi, Note, *University Disciplinary Process: What's Fair, What's New, and What You Don't Get*, 96 Yale L.J. 2132, 2138 (1987) ("The most significant alteration of an expelled student's status . . . is his inability to re-enroll at another university. A subsequent university to which a student may apply *always* knows of the reasons for his prior dismissal . . . . If he leaves without having earned his degree, the student must make an affirmative showing to any subsequent university to which he applies that he left the original university in 'good standing.'" (emphasis in original)). Because Montague knew he had no chance of getting into another school as a transfer student, and because it had always been his intention to try to play professional basketball after college before going on to graduate school, he decided to try to get a job playing basketball until he could get a request for preliminary injunction heard and be reinstated in order to finish the spring semester of his senior year. (Ex. C at ¶¶14-16.) He then filed the motion for preliminary injunction in October of 2016, asking to be readmitted to Yale in the spring of 2017 so that he could finish the classes he had already begun the previous spring term. (*See* Ex. C at ¶¶4, 17.)

Certainly, Montague cannot be faulted for diligently assessing the true nature of the harm wrought by Defendants' wrongful actions rather than rushing into court without having explored his options. *See, e.g.*, *Dudley v. HealthSource Chiropractic, Inc.*, 585 F. Supp. 2d 433, 448 (W.D. N.Y. 2008) (plaintiff's delay in filing until it became clear defendants' actions were causing third-party confusion did not constitute unreasonable delay). *See also Lego A/S v. Best-Lock Const. Toys, Inc.*, 874 F. Supp. 2d 75, 105-106 (D. Conn. 2012) (although Second Circuit has found delay of 10 weeks too long where it was unexplained, it has "found delays of five and six months not too long where the movant was actively dealing with the problem in the meantime" (citing cases)). Plaintiff has proffered a perfectly reasonable explanation for filing his

13

motion in October rather than June of 2016, thereby refuting any possible inference that he does not believe his situation is "dire." *See Bagley*, 2014 WL 7370021 at *2.

It is worth noting that Defendant Yale made this same argument (using nearly identical language and case cites) in *Bagley*, *supra* (*see* 3:13-cv-01890, ECF No. 87 (Dec. 3, 2014)). The judge flatly rejected Yale's argument, however, finding that the delay was explainable; that "Yale's present contention that Bagley indulged herself with an unexplained delay of a year before moving for a preliminary injunction misses the mark by a wide margin"; and that there was, in short, "no substance to Yale's argument [.]" 2014 WL 7370021 at *3. Just as in *Bagley*, Defendants' argument that Montague unreasonably delayed in moving for an injunction is nothing more than a red herring.

### 2. Likelihood of Irreparable Harm

Defendants also claim Mr. Montague has not made a legally sufficient showing of a likelihood of irreparable harm.[7] (Def. Opp. at 19-25.) Although Defendants have undoubtedly managed to amass a number of generic examples in which courts have denied motions for preliminary injunctions on the grounds that the complainants failed to demonstrate the requisite irreparable harm (Def. Opp. at 21-23, citing cases), the circumstances in these cases are not, as Defendants claim, "virtually identical to those presented here . . . ." (Def. Opp. at 22.)

---

[7] Defendants make a passing reference to the fact that "[w]here a plaintiff invokes the Second Circuit's modified 'serious questions going to the merits' test, *an even stronger showing of irreparable harm is required*." (Def. Opp. at 11 (emphasis in original), citing *Triebwasser & Katz*, 535 F.2d at 1359).) It is unclear whether Defendants are urging this Court to apply that standard here, since they have not bothered to address the merits of any of Plaintiff's legal claims, but it is plain in any event that Plaintiff has not "invoked" that test; rather, he has argued, and demonstrated, that he is *likely* to succeed on the merits. (*See* Pl. Mot. at 18-34.) He therefore has no heightened burden of showing irreparable harm.

14

The harm that flows from expulsion for sexual misconduct is unique, due in large part to the toxic combination of insurmountable hurdles those expelled students face as they try to move on with their lives. *See Doe v. Rector and Visitors of George Mason University*, 149 F. Supp. at 622. However, of the twenty-one cases Defendants cite, only <u>two</u> even involve expulsion for alleged non-consensual sexual behavior, and those two are readily distinguishable on the facts. *See Salau v. Denton*, 139 F. Supp. 3d 989, 1013 (W.D. Mo. 2015) (student expelled for sexual misconduct filed suit in federal court three years after expulsion, and after unsuccessfully suing school in state court; federal court dismissed all of student's claims and declined to grant preliminary injunction because student clearly could not succeed on the merits, and because student had not shown that, in intervening three years, he could not enroll in different school or be employed elsewhere); *Yu v. Vassar College*, 1:13-cv-4373, ECF Nos. 25, 29 (S.D. N.Y. Feb. 25, 2014) (student expelled for sexual misconduct sought injunction preventing defendant college from disclosing, to graduate schools, information about expulsion; where student had already successfully transferred to a new school, and where only harm court found was potential delay in obtaining admission to graduate school, court found student failed to adequately demonstrate irreparable injury or immediacy of need for relief). Two of the remaining cases Defendants cite involve what might be deemed gender-related misconduct – intimate partner violence (*Knoch v. Univ. of Pittsburgh*, 2016 WL 4570755 (W.D. Pa. Aug. 31, 2016)) and harassment of someone of the opposite sex (*Howe v. Pa. State Univ. Harrisburg*, 2016 WL 393717 (M.D. Pa. Feb. 2, 2016)) – and the rest have absolutely <u>no</u> relationship to sexual misconduct. The plaintiffs in those cases were thus on entirely different footing than Mr. Montague.

As one federal judge has aptly pointed out, and as noted above, cases like the instant one present unique challenges for the young men involved: "common sense suffices to understand that an adjudication of responsibility for sexual misconduct carries a much more powerful stigma than an adjudication of [other] run-of-the-mill [disciplinary violations]." *Doe v. Rector and Visitors of George Mason University*, 149 F. Supp. at 622. "[P]laintiff's lost opportunity to continue with his post-secondary education, coupled with the possibility that he may be unable to pursue meaningful educational opportunities elsewhere while his name remains associated with sexual misconduct, inevitably affects plaintiff's professional prospects" in a way more run-of-the-mill student discipline cases do not. *Id*. (emphasis added). For example, "if plaintiff seeks education or employment with institutions or organizations that require disclosure of [his disciplinary] records, plaintiff's only options are to forego opportunities with those institutions or organizations or to authorize dissemination of records that would likely foreclose plaintiff's ability to pursue such opportunities because of the allegedly defamatory nature of the records." *Id*. at 614 n.9.

Also instructive is the *Doe v. George Mason* court's order concerning an appropriate remedy (after Doe successfully argued that the disciplinary process in his case was constitutionally inadequate, *see Doe v. Rector and Visitors of George Mason Univ*., 132 F. Supp. 3d 312 (E.D. Va. 2015)). The plaintiff sought, among other things, an injunction for reinstatement, and the court said at that outset that there was "no doubt . . . plaintiff has suffered an irreparable injury and that he has no adequate remedy at law." 1:15-cv-00209, ECF No. 99, p. 5. "[D]efendants' unconstitutional conduct deprived plaintiff of three semesters of education at GMU, thereby delaying plaintiff's graduation from that institution. The clock cannot be turned

back . . . to allow plaintiff to resume his course of study on his preferred schedule. Instead, plaintiff will complete his education at GMU, if at all, several months or years behind the majority of his peers with whom he matriculated." *Id.*; *see also King v. DePauw Univ.*, 2014 WL 4197507, *13 (S.D. Ind. 2014) (where court understood that, even if plaintiff could transfer to another institution during his senior year, he would have to explain that transfer to future employers or graduate admissions committees, "which would require him to reveal that he was found guilty of sexual misconduct by [his school]. Successfully seeing this lawsuit to its conclusion could not erase . . . the transfer; the question will still be raised, and any explanation is unlikely to fully erase the stigma associated with such a finding. Money damages would not provide an adequate remedy at that point; [the school's] disciplinary finding – even if determined to have been arbitrary or made in bad faith – would continue to affect him in a very concrete way, likely for years to come"); Picozi, Note, *University Disciplinary Process: What's Fair, What's New, and What You Don't Get*, 96 Yale L.J. at 2138.

So too, here: neither money damages nor eventual reinstatement can turn back time, or erase the toxic stain of a finding of sexual misconduct. Immediate injunctive relief is the only remedy that can give Mr. Montague some chance of graduating with his contemporaries and taking advantage of the professional opportunities that will flow from that timely graduation. As outlined in Montague's attached Supplemental Affidavit, he has already lost an opportunity to play for one basketball team because the coach feared the fans and community might react negatively to Mr. Montague's presence on the team, given the circumstances around his expulsion. (Ex. C at ¶¶19-23; Affidavit of Dustin Simcox, attached hereto as **Exhibit D** ("Ex. D"), at ¶¶7-10.) He and his father also talked with at least three agents who said they did not

think they could place Mr. Montague because of those same circumstances. (Ex. C at ¶¶24, 25; *see also* Ex. D at ¶4.)

Moreover, despite Yale's suggestion that "[a]n attempt to gain admission after expulsion from Yale would not be futile" (Def. Opp. at 21 n.6), a survey of admissions requirements at eight colleges and universities of comparable stature to Yale, as well as Yale itself, suggests that such an attempt would be futile: all either require students to provide certification from their previous schools that they are in good standing; require disclosure of prior disciplinary action; or bar admission to any suspended or dismissed student. (*See* Admissions Requirements and Statistics Chart, attached hereto as **Exhibit E** ("Ex. E"); *see also* Picozi, Note, *University Disciplinary Process: What's Fair, What's New, and What You Don't Get*, 96 Yale L.J. at 2138.) Given that Montague was expelled from Yale for alleged sexual misconduct, Yale would not provide such a certification.[8] And in any case, colleges accept a very small percentage of transfer students: of the nine schools surveyed, most accept fewer than 10% of transfer applicants, and one (Princeton) does not accept any transfers. (*See* Ex. E.)

Additionally, even if Montague managed to get accepted, enrolling at another institution would likely mean he would have to extend his academic career by a year or more. Every school surveyed requires transfer students to earn a minimum number of credits at that institution (or be enrolled at that institution for a minimum amount of time) before graduating. Of those, most require at least one to two years' worth of credits and/or enrollment status at the institution before a transfer student may graduate. (*See* Ex. E.) This means that even transferring would deprive Mr. Montague of the opportunity to graduate with his contemporaries, and it would

---

[8] In fact, in all likelihood, Yale would not admit a student in Mr. Montague's position, since it, too, requires a certification that the would-be transfer student is in good standing with his prior institution. (*See* Ex. E.)

further delay his entry into the job market (which, at least for basketball, could be detrimental to his career prospects).[9] (Ex. C at ¶¶18, 26.) *See Portz v. St. Cloud State University*, --- F. Supp. 3d ---, 2016 WL 4005665, *6 (D. Minn. July 25, 2016) ("Student-athletes who transfer must 'break into new programs with new coaches and established rosters,' increasing the possibility that their athletic development will be 'stunt[ed]' just as they are on the precipice of the 'highest level of amateur competition.' And then there is the cost of transferring for all students, athletics aside: students who transfer must leave behind the professors, friends, and campuses they are familiar with to start all over again. While transferring in some instances may be the best decision for a particular student, the fact that very few students transfer and the vast majority do not proves the obvious fact that transferring is costly" (internal citation omitted)). In short, transferring to another school – an impossible feat in any event – would not adequately repair the harm done to Montague by his expulsion from Yale.

Consequently, Montague has made a more than sufficient showing that he is likely to suffer irreparable harm in the absence of injunctive relief.

## IV. Conclusion

For the reasons set forth above and in Plaintiff's Memorandum in Support of His Motion for Preliminary Injunction, this Court should deny Defendants' Motion to Bifurcate and, after reviewing the record as it now stands, grant Mr. Montague immediate injunctive relief.

---

[9] Relatedly, Defendants make the almost comical claim that because "[m]ost civil trials in this District are scheduled within 18 months of filing suit," Plaintiff could potentially be reinstated – if successful at trial – "in time for the January 2018 term." (Def. Opp. at 19.) Defendants have apparently forgotten that this Court scheduled trial in this matter for February 1, 2018. *See* ECF No. 26 (Sep. 13, 2016). Given the number of claims and potential witnesses, the trial will likely be a weeks-long affair. In reality, then, the earliest Plaintiff could obtain a judgment in his favor is approximately March of 2018, and the earliest he could attend classes at Yale would be the summer or fall of 2018.

JACK MONTAGUE,

By his attorneys,


/s/ *Max D. Stern*
Max D. Stern (BBO #479560) (*pro hac vice*)
mstern@toddweld.com
Alexandra H. Deal (BBO #660654) (*pro hac vice*)
adeal@toddweld.com
Hillary A. Lehmann (BBO #683657) (*pro hac vice*)
hlehmann@toddweld.com
TODD & WELD LLP
One Federal St., 27th Floor
Boston, MA 01880
Tel. (617) 720-2626
Fax (617) 227-5777

William F. Dow III (ct00161)
JACOBS & DOW, LLC
350 Orange Street
New Haven, CT 06511
wdow@jacobslaw.com
Tel. (203) 772-3100
Fax (203) 772-1691


Dated: December 9, 2016


## CERTIFICATE OF SERVICE

I, Max D. Stern, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on December 9, 2016.

/s/ *Max D. Stern*