UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

JACK MONTAGUE,
    Plaintiff,

v.

YALE UNIVERSTIY, ANGELA GLEASON,
and JASON KILLHEFFER,
    Defendants.

CIVIL ACTION
No. 3:16-cv-00885

## SUPPLEMENTAL AFFIDAVIT OF JACK MONTAGUE IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

I, Jack Montague, having been duly sworn, do hereby state as follows:

1. I am over eighteen (18) years of age and believe in the obligations of an oath.

2. I submit this Supplemental Affidavit in support of Plaintiff's Motion For Preliminary Injunction in the above-captioned matter.

3. The spring term of my senior year began in January of 2016. I was enrolled in the following courses: 1) Race, Gender, and American Literature; 2) Attractions and Relationships; 3) Urban Education and Inequality; 4) Spectacle of Disability; and 5) Religion and Politics.

4. I attended all classes and performed the required work up until the date of my expulsion.

5. Race, Gender, and American Literature was a course I was required to take to fulfill the obligations of my major, American Studies. This class has been offered every spring for at least five years; I have been informed that it is being offered again in the spring of 2017. It was not offered in the fall of 2016.

6. I was taking Attractions and Relationships because I was interested in the subject matter. This class has been offered every other spring for at least five years. It was not offered in the fall of 2016.

7. I was taking Urban Education and Inequality because I was interested in the subject matter. This class was first offered in the spring of 2016; I have been informed that it is being offered again in the spring of 2017. It was not offered in the fall of 2016.

8. I was taking Spectacle of Disability in order to fulfill my senior project requirement in American Studies. This course has been offered every other spring for at least five years. It was not offered in the fall of 2016.

9. I was taking Religion and Politics because I was interested in the subject matter. This class has been offered every spring for at least five years; I have been informed that it is being offered again in the spring of 2017. It was not offered in the fall of 2016.

10. Shortly after I was expelled, my attorneys attempted to negotiate a settlement with Yale so that we did not have to resort to litigation. I was hopeful the settlement would allow me to return to Yale. To my great disappointment, the settlement efforts were not successful.

11. I have not applied to any other colleges since my expulsion from Yale because I was aware at the time (and am still aware) that applying would likely be fruitless. I knew that any comparable school – and even schools that are less prestigious – would require me to provide certification that I was in good standing when I was expelled from Yale. I cannot provide that certification.

12. In addition, because of my parents' income and Yale's financial aid policies, I qualified to receive enough aid to cover my tuition, room and board. My parents cannot afford to pay out-

of-pocket for me to go to college. It would be pointless for me to apply to a school that does not offer the same financial aid package as Yale, because I could not go there even if I was accepted.

13. I have not applied to any post-graduate degree programs because I do not have a college degree, which is a prerequisite for admission to any of those programs.

14. Even though my expulsion from Yale was a clear bar to admission at any other college, I was still hopeful I could move on after the expulsion and that it would not negatively affect other areas of my life.

15. Before I was expelled from Yale, my goal was to try to play professional basketball for three to five years before returning to graduate school to pursue a post-secondary degree in either law or business administration.

16. Accordingly, faced with my inability to complete my education at this point, I decided to try to play professional basketball until I could gain re-entry to Yale through an order from this Court. My thought was that I could get a job playing basketball for the season beginning in September of 2016 and return to Yale in the spring of 2017 to complete my degree.

17. Even if I had gotten a job as a professional basketball player through these efforts, I still would have come back to school, at any point, if Yale had allowed me to do so. Graduating from college has always been my top priority.

18. My understanding is that, typically, professional coaches and agents recruit basketball players immediately upon graduation; most open spots are filled between May and August for the September season.

19. Since I was unable to finish the basketball season with my team, due to my expulsion, I went to the Eurobasket Summer League, an "exposure camp" in Virginia, in April of 2016. I did so in order to increase my prospects of being recruited to play professional basketball, since I

was no longer going to be drawn from the same pool as my peers who finished their college basketball careers and graduated. At that camp, I met an individual who was willing to serve as my agent, although we never signed a formal contract. His name is Dustin Simcox.

20. Mr. Simcox attempted to find a deal for me between April and August of 2016, but nearly all of the open slots had already filled by players who had just graduated college.

21. In or around September of 2016, it appeared there might be an opportunity for me to play on a team in Germany. I played in a 10-game tournament there in August and we won nine games in a row. I performed very well during the tournament, including scoring the last eight points in a very close game we ultimately won by two points.

22. In mid-September, Mr. Simcox and I had a call over Skype with the coach of a German league team. During that call, the coach said that he was interested in taking me on because he liked how I played, but he had concerns about my character and thought the fans and community might have issues with me being on the team, given my circumstances. He was also concerned about the pending lawsuit.

23. The coach for the German league team did not reach out to me or Mr. Simcox again after this call, and the deal ultimately fell through.

24. Because Mr. Simcox had not been able to secure a deal for me, my father and I reached out to several other agents to see whether they might have more luck. I spoke with at least one agent, Johnny Foster, who told me that it would be very difficult for me to find a job playing basketball, given my personal circumstances. Another did not even want to take me on as a client because of these circumstances.

25. Likewise, my father spoke with an agent, Mike Kneisley, who Googled me after his conversation with my father and subsequently told my father he did not think I could get a job playing basketball because of my expulsion from Yale.

26. I am still hopeful that I will be able to play professional basketball, but if I am not able to complete my degree until some time in 2018, I will be two years older than most of the players graduating at the same time, and two more years removed from my college basketball career. Although it is certainly possible to play basketball well into your 30s, the peak age – and the age coaches and scouts are most interested in recruiting – is immediately following college graduation (in your early 20s). The older I get, the more difficult it will be for me to get recruited.

27. I also still have friends who attend Yale, and if I were able to return in the spring of 2017, I would still have some sort of community, which is very important to me (and to most college students I know). If I have to wait until the lawsuit is over to return to Yale, most or all of my friends will have graduated. I certainly cannot put a value on their friendship and support, but I know that it would be extremely difficult for me to return to campus and build a new community for myself in one semester.

28. When I filed the instant lawsuit, friends set up a "fundly" account in order to help my family with the mounting legal expenses. Shortly after it was launched, someone hacked into the website and changed it to "fundly.com/rapist." I cannot escape this false label, which now follows me around in both the real and virtual (online) worlds.

I declare under penalty of perjury that the foregoing is true and correct.

Jack Montague     12/9/2016

Before me personally appeared Jack Montague, signer of the foregoing instrument, and he acknowledged the same to be his free act and deed, for the purposes contained herein.

Notary Public
My commission expires: 09/20/2020

6