# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JACK MONTAGUE,

          Plaintiff,

    v.

YALE UNIVERSITY, <u>et al.</u>,

          Defendants.

Case No.:  3:16-cv-00885 (AVC)

January 11, 2017

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

This memorandum is submitted in response to the plaintiff's motion for preliminary injunction and in reply to plaintiff's opposition to defendants' motion to bifurcate.

## I.    PRELIMINARY STATEMENT

It is indisputable that sexual assault on college campuses has attracted nationwide attention.  <u>See, e.g.</u>, <u>Yu v. Vassar Coll.</u>, 97 F. Supp. 3d 448, 461 (S.D.N.Y. 2015) (acknowledging existence of "the formidable problem of sexual assault on college campuses"); <u>Doe v. Trs. of Boston Coll.</u>, 2016 U.S. Dist. LEXIS 137777, at *89 (D. Mass. Oct. 4, 2016) ("sexual assault on campuses is a subject of increasing public attention and controversy").  The Connecticut legislature recognized the severity of the problem when it passed Conn. Gen. Stat. § 10a-55m, which requires institutions of higher education in the State of Connecticut to adopt procedures for addressing complaints of sexual misconduct.

To address sexual misconduct on its campus, Yale formed the University-Wide Committee on Sexual Misconduct (the "UWC") in 2011.  The UWC is governed by procedures which comply with Conn. Gen. Stat. § 10a-55m and with guidance issued by the U.S.

Department of Education's Office of Civil Rights.  Adjudication of formal complaints by the

UWC includes several stages:  an investigation by an impartial fact-finder; a hearing before a

five-member UWC panel; a report by the panel with findings and conclusions on culpability and,

if warranted, a recommended penalty; a decision by a designated official on culpability and, if

warranted, a penalty; and an opportunity to appeal the decision-maker's ruling.[1]  (See PX 3 § 7.)

Under the UWC Procedures, formal complaints may be filed either by the complainant (§

7.1) or by one of Yale's Title IX Coordinators (§ 1).  Section 1 of the UWC Procedures

delineates the circumstances in which a Title IX Coordinator may initiate a complaint, including

the following:  "[A] Coordinator may bring a complaint when there is evidence that the

University's policies on sexual misconduct have been violated and the Coordinator's

intervention is needed to ensure that the matter reaches the UWC."  (PX 3 § 1 (emphasis added).)

In addition, the Yale University Report of Complaints of Sexual Misconduct explains that "the

Title IX Coordinator may file a complaint in situations on behalf of someone who experienced

sexual misconduct but who cannot or *will not* themselves take the formal role of complainant;

this may be an issue of jurisdiction, safety or *preference*."[2]  (PX 11 at 16 (emphasis added).)[3]

---

[1]  The identity of the decision-maker and the individual hearing the appeal depends upon the school involved.  For cases involving Yale College, such as the present one, the decision-maker is the Dean of Yale College and the appeal is brought to the Provost.  A copy of the UWC Procedures is appended to the plaintiff's Motion for Preliminary Injunction dated October 31, 2015 (Doc. No. 31) as PX 3.  "PX" denotes a plaintiff's exhibit and "DX" denotes a defendants' exhibit.  DX A through F are appended to the defendants' initial Memorandum of Law in Opposition to Motion for Preliminary Injunction dated November 21, 2016 (Doc. No. 36).  DX G through Z are appended to this brief.

[2]  The Report also states that a Title IX Coordinator may file a formal complaint "independently of the wishes of an individual complainant" in other circumstances, "*such as* those involving risks of the safety of the individual and/or the community . . . ."  (PX 11 at 5 (emphasis added).)  In his papers, the plaintiff frequently refers to the Report as the "Spangler Report."  In the present case the complaint was not filed "independently of the wishes" of the complainant; she in fact explicitly agreed with the plan to have the complaint filed by the Title IX Coordinator, and stated in writing her willingness to be a witness.  However, even if Ms. Roe had not agreed to the filing of the complaint, the reporting of a rape would certainly justify the Title IX Coordinator in filing a complaint in order to protect the safety of the community.

[3]  Yale issues this Report twice yearly.  The version appended to the plaintiff's motion as PX 11 covers complaints of sexual misconduct brought forward from January 1, 2015 through June 30, 2015.  (PX 11 at 2.)

II.     <u>**STATEMENT OF FACTS**</u>

On the night of October 18, 2014, the plaintiff, Jack Montague, sexually assaulted Jane Roe by having non-consensual sexual intercourse with Ms. Roe.[4]  While outside the plaintiff's residence, the plaintiff and Ms. Roe began kissing.  Ms. Roe told Mr. Montague that, even though they had previously engaged in sexual intercourse, she did not want to have sexual intercourse that night.  Ms. Roe explicitly asked the plaintiff if it was acceptable to "hook up" but not "have sex."  The plaintiff agreed and they resumed kissing inside the plaintiff's car.  When the plaintiff expressed amusement at the notion that they would be "fucking in my car," Ms. Roe reminded him that she did not want to have intercourse and only wanted to "hook up."  The plaintiff once more indicated his assent.  He and Ms. Roe subsequently went to his room, removed their clothes, and resumed kissing and touching in the plaintiff's bed.  The plaintiff then got on top of Ms. Roe and leaned his pelvis into hers as if preparing to penetrate her.  Ms. Roe pressed her hands against the plaintiff's shoulders and pushed him.  She told him, "Jack, no, I said I wanted to hook up but not have sex," but he penetrated Ms. Roe over her objection.  When the plaintiff was finished, he said to Ms. Roe, "I'm really sorry.  I know you didn't want that." (DX G at 4-5.)

The plaintiff's sexual assault of Ms. Roe was not the first transgression by Mr. Montague to come to Yale's attention—it was the third.  In May 2013, at the end of his freshman year, the plaintiff was outside a pizza parlor in New Haven with four other students, including Sally Smith, a female senior.  After speaking with Ms. Smith for several minutes, the plaintiff rolled up a greasy, used paper pizza plate and shoved it down the front of Ms. Smith's tank top between her breasts.  Ms. Smith filed a complaint with the UWC regarding the incident.  (<u>See</u> PX 8.)

---

[4]  The facts set forth in this paragraph are derived from the Fact-Finder's Report dated January 15, 2016, which is annexed hereto as DX G.

Two other students who witnessed the event confirmed to the impartial fact-finder that the incident occurred as described by Ms. Smith.  Although the plaintiff claimed to have no memory of the incident due to his heavy drinking that night, he conceded that he most likely engaged in the conduct as described by Ms. Smith.  (PX 7 at 3-4.)  In his written response to the complaint, the plaintiff admitted that he was "probably drunk" and stated:  "I am completely ashamed of myself, and I take full responsibility for my actions that night."  (DX A.)  The plaintiff was found to have violated Yale's Sexual Misconduct Policy, and Yale College Dean Mary Miller placed him on probation for four semesters and required that he take sensitivity training and meet with a member of the Sexual Harassment and Assault Response & Education Center ("SHARE") once each semester until graduation.  He did not appeal Dean Miller's decision.

A second incident occurred in September 2015, the fall semester of the plaintiff's senior year, when he became belligerent with Yale police officers who had detained a male friend.  The officers detained the plaintiff's friend for interfering with their efforts to check on the wellbeing of a female student.  When the plaintiff arrived on the scene he was advised to back away until the police were finished with their investigation, but he refused to follow instructions and repeatedly attempted to engage the officers while they were speaking with the female student and with each other.  (DX H.)  Yale Chief of Police Ronnell Higgins submitted a complaint to the Yale College Executive Committee alleging that the plaintiff's conduct constituted a violation of the Undergraduate Regulations concerning Defiance of Authority.  The plaintiff apologized to the Executive Committee for his conduct and, once again, blamed his lapse of judgment on intoxication.  (DX I.)  The Executive Committee found a violation of the Undergraduate Regulations and issued a written reprimand.  (PX 15.)

Although Ms. Roe did not report the sexual assault of October 18, 2014 to the Title IX Office until the following year, she reported it to her friends and suitemates the following day, and she sought help from the SHARE Center a few days later.  (DX G at 6-7.)  On October 26, she asked to meet with the plaintiff, and he agreed to meet on October 28.  At the meeting, Ms. Roe told the plaintiff that she had made it clear to him that she did not want to have intercourse on October 18.  The plaintiff said that he was sorry that she felt that way and explained that he had been very drunk that night.  He also offered that if he ran into Ms. Roe at a party or elsewhere he would leave so as not to make her feel uncomfortable.  (Id. at 7.)

Thereafter, Ms. Roe began to have intrusive thoughts and nightmares about Mr. Montague.  In January 2015, she quit the cheerleading squad, explaining that she could no longer participate because of "a really serious issue with someone on the basketball team." (Id. at Ex. G.)  The intrusive thoughts continued into the fall of 2015, and Ms. Roe decided to meet with Angela Gleason, a Title IX Coordinator, on October 19, 2015 to discuss her options.  (Id. at 8.)  Initially, Ms. Roe expressed interest in an informal process that would be resolved by the plaintiff's agreement to take sensitivity training.  When Ms. Gleason later told Ms. Roe that the plaintiff had already taken sensitivity training, Ms. Roe decided to participate in a formal complaint brought by a Title IX Coordinator.  She expressed her willingness to have a formal complaint filed by a Title IX Coordinator and to serve as a witness in the proceedings in a meeting with Ms. Gleason on November 6 and again in an email to Ms. Gleason on November 9. (DX J.)

On November 18, 2015, pursuant to Section 1 of the UWC Procedures, Jason Killheffer filed a formal complaint of sexual assault with the UWC based upon Ms. Roe's reports that the plaintiff sexually penetrated Ms. Roe without her consent on October 18, 2014.  (PX 10.)  On

November 30, 2015, Aley Menon, the UWC Secretary, sent a letter to the plaintiff informing him of the complaint and enclosing copies of the complaint, the UWC Procedures, the Sexual Misconduct Policies, and the Statement on Confidentiality of UWC Proceedings.  Ms. Menon informed the plaintiff that he could submit a response to the complaint and encouraged him to choose an advisor to support him during the process.  (PX 12.)

Two days later, the plaintiff consulted with William Dow, a New Haven attorney who is familiar with the UWC process, having previously counseled students in connection with UWC proceedings.  The plaintiff told Ms. Menon that he intended to meet with Attorney Dow prior to his interview with the fact-finder.  (DX C.)  After meeting with Attorney Dow, the plaintiff selected his basketball coach, James Jones, to serve as his advisor.  On December 9, 2015, the plaintiff submitted his response to the complaint, in which he claimed that all intimate contact with Ms. Roe was consensual and stated that he was "sorry if she does not feel the same way." (DX K.)

Miriam Berkman, Esq. was appointed as the impartial fact-finder.  She interviewed nine witnesses, reviewed relevant documents, and issued her report on January 15, 2016.  (DX G.)  That day, Ms. Menon sent the plaintiff a letter, enclosing the report and exhibits.  (DX L.)  In that letter, Ms. Menon informed the plaintiff that a hearing would be held on January 21, 2016; provided him with the names of the panel members and the decision-maker; and advised him that he would have an opportunity to make an opening statement at the hearing and could provide the panel with a written copy of that statement.  (Id.)

The panel issued its report on February 1, 2016.  (DX M.)  The panel found Ms. Roe's account of the sexual encounter more credible because she had provided a full, detailed, and consistent description that was corroborated by several witnesses, contemporaneous text

messages, and building access records.  The panel did not find the plaintiff to be credible because

of his selective memory and his shifting recollection with respect to how he obtained consent.

Most significantly, the plaintiff told the fact-finder that Ms. Roe verbally agreed to have sex, but,

during the hearing before the UWC panel, he described only nonverbal cues when explaining

how he knew that Ms. Roe had consented to penetration.[5]  The plaintiff also initially denied that

Ms. Roe ever asked if it was okay to "hook up" but not "have sex," but later he said that Ms. Roe

may have made the statement and that he may have failed to understand her because the party

was loud.  The panel members unanimously concluded that the plaintiff had engaged in non-

consensual sexual intercourse in violation of Yale's Sexual Misconduct Policy.  (DX M.)

The plaintiff received a copy of the panel's findings of fact and conclusions on the day

they were issued and received a three-day extension to file his response.  (DX N.)  After

reviewing the plaintiff's response, Yale College Dean Jonathan Holloway accepted the UWC

panel's findings of fact and its conclusion that the plaintiff had sexually assaulted Ms. Roe.  (PX

13).  On February 10, 2016, Dean Holloway informed the plaintiff that he was expelled.  (Id.)

The plaintiff then submitted an appeal of Dean Holloway's decision to the Provost, who denied

the appeal on February 24, 2016.  (DX O.)

During the week following the denial of his appeal, the plaintiff's representatives began

their media campaign.  On March 4, 2016, the plaintiff's father, Jim Montague, told the New

Haven Register that the plaintiff had been expelled and had retained an attorney.  (DX P.)  On

March 14, 2016, the plaintiff's counsel Max Stern issued a press release revealing that the

---

[5]  In this regard, the Sexual Misconduct Policies provide that "[s]exual activity requires consent, which is defined as positive, unambiguous, and voluntary agreement to engage in specific sexual activity throughout a sexual encounter. Consent cannot be inferred from the absence of a 'no'; a clear 'yes,' verbal or otherwise, is necessary.  Consent to some sexual acts does nor constitute consent to others, nor does past consent to a given act constitute present or future consent.  Consent must be ongoing throughout a sexual encounter and can be revoked at any time."  (PX 9 at 2-3.)  The Undergraduate Regulations, of which the Sexual Misconduct Policies are a part, make clear that intoxication is not a defense to a charge of sexual misconduct.  (See PX 14 at 7 and 13.)

plaintiff had been expelled after the UWC panel found that he had non-consensual sex with a female student.  The release included a detailed account of the plaintiff's version of his sexual encounters with Ms. Roe.  Attorney Stern stated that the plaintiff "intends to sue Yale University to vindicate his rights."  (DX D at 2 and 5.)  Attorney Stern released a second statement on June 9, 2016, announcing that the plaintiff had initiated suit against Yale for wrongfully expelling him.  (DX Q.)  By contrast, none of the defendants has sought publicity in this matter.

Between July 1, 2011, when the UWC was created, and the plaintiff's expulsion, six other students were expelled from Yale for violations of the Sexual Misconduct Policy.  (DX R ¶ 4.)[6]  One of those students subsequently worked for an attorney on a significant civil rights case before matriculating at a university and currently enjoys full-time employment.  (Id. ¶ 5.)  Another worked as a research fellow and co-authored several publications on the Zika virus, and recently received his bachelor's degree from another university.  (Id. ¶ 6.)  A third student subsequently obtained employment as a special assistant to the mayor of a large metropolitan area and earns a salary in excess of $70,000 per year.  (Id. ¶ 7.)  A fourth student subsequently served for nearly a year in the armed forces of his home country and then became an assistant in the office of the prime minister of that nation.  (Id. ¶ 8.)  Each individual whom defense counsel has been able to track has continued his education and/or found full-time employment, despite expulsion for violating Yale's Sexual Misconduct Policy.

---

[6]  DX R is an affidavit from defense counsel detailing the information described in this paragraph.  Concurrently with the filing of this brief, the defendants have filed a motion for permission to file DX R under seal.  Defense counsel has been able to find any information relating to two of the six students who were expelled for violation of the Sexual Misconduct Policy.

III.   **LEGAL STANDARDS**

a.   **The "Extraordinary and Drastic Remedy" of Preliminary Injunctive Relief**

As discussed at length in the defendants' opening opposition memorandum, preliminary injunctive relief "is an 'extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion.'"  JBR, Inc. v. Keurig Green Mt., Inc., 618 Fed. App'x 31, 33 (2d Cir. 2015) (quoting Sussman v. Crawford, 488 F.3d 136, 139 (2d Cir. 2007)); Winter v. Nat'l Res. Defense Council, Inc., 555 U.S. 7, 24 (2008) (preliminary injunctive relief is an "extraordinary and drastic remedy never awarded as of right").  Courts in the Second Circuit award preliminary injunctive relief only where the movant has met his burden with respect to each of the following elements:

> (1)[a] a likelihood of success on the merits or . . . [b] sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction.

Benihana, Inc. v. Benihana of Tokyo, LLC, 784 F.3d 887, 895 (2d Cir. 2015) (quoting Salinger v. Colting, 607 F.3d 68, 79-80 (2d Cir. 2010)) (quotation marks omitted; emphasis added).  It is beyond cavil that "[t]he plaintiff has the burden of persuasion on each preliminary injunction element."  Blum v. Schlegel, 830 F. Supp. 712, 723 (W.D.N.Y. 1993) (citation omitted).

"The standard of proof to be applied in determining whether the moving party has satisfied the elements for a preliminary injunction depends on whether the party is seeking a mandatory or prohibitory injunction."  Vantico Holdings S.A. v. Apollo Mgmt., 247 F. Supp. 2d 437, 450 (S.D.N.Y. 2003).  The movant must "meet a higher standard where:  (i) an injunction will alter, rather than maintain, the status quo, *or* (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails

at a trial on the merits." Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 33-34 (2d Cir. 1995) (emphasis added).  In such cases, "the preliminary injunction should be granted only upon a *clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief*."  Vantico Holdings S.A., 247 F. Supp. 2d at 451 (emphasis added).  As observed in the defendants' opening opposition memorandum, the plaintiff here was permanently expelled from Yale in February 2016, and then waited nearly nine months before moving for a preliminary injunction seeking the affirmative relief of reinstatement.  (See Defs.' Mem. at 8-9.)  As such, it is indisputable that the injunctive relief he seeks is mandatory; he must therefore satisfy the higher burden.  See Vantico Holdings S.A., 247 F. Supp. 2d at 451.

### b.      Breach of Contract and the Covenant of Good Faith and Fair Dealing

The plaintiff has moved for a preliminary injunction solely with respect to the breach of contract and breach of the covenant of good faith and fair dealing claims asserted in Counts II, IV, VII, X, XI, and XII of his Amended Complaint dated October 31, 2016.  (See Pl.'s Mem. at 18 and 19-34.)  Under Connecticut law, the elements of a breach of contract claim are "[1] the formation of an agreement, [2] performance by one party, [3] breach of the agreement by the other party and [4] damages."  Midwest Media Group Inc. v. Benistar Employer SVC Trust Co., 2011 U.S. Dist. LEXIS 105356, at *18-19 (JCH) (D. Conn. Sept. 16, 2011) (quoting FCM Group, Inc. v. Miller, 300 Conn. 774, 798 (Conn. 2011).  It is well established that, in almost all circumstances, damages, not specific performance, are awarded for breach of contract.  See, e.g., Franklin Credit Mgmt. Corp. v. Nicholas, 1999 Conn. Super. LEXIS 1123, at *20 (Conn. Super. Ct. Apr. 26, 1999) ("Specific performance is a remedy only available in rare circumstances to enforce the terms of an agreement."); Ceruzzi Derby Redev., LLC v. City of Derby, 2009 Conn.

Super. LEXIS 1806, at *3 (Conn. Super. Ct. July 1, 2009) ("The court will not grant specific

performance if monetary damages will afford the Plaintiff an adequate remedy at law.  Specific

performance is also inappropriate if the court would thereby become involved in the supervision

of details of performance of the contract . . . ."); accord Lucente v. IBM, 310 F.3d 243, 262 (2d

Cir. 2002) (New York law) ("[B]efore the 'extraordinary' equitable remedy of specific

performance may be ordered, the party seeking relief must demonstrate that remedies at law are

incomplete and inadequate to accomplish substantial justice.") (citation omitted).  Thus, even

after a trial on the merits, injunctive relief is rarely granted for breach of contract.

With respect to the implied covenant of good faith and fair dealing, the Connecticut

Supreme Court has stated that

> every contract includes an implied duty requiring that neither party do anything
> that will injure the right of the other to receive the benefits of the agreement.  . . .
> To constitute a breach of [the implied covenant of good faith and fair dealing], the
> acts by which a defendant allegedly impedes the plaintiff's right to receive
> benefits that he or she reasonably expected to receive under the contract must
> have been taken in bad faith.

Renaissance Mgmt. Co. v. Conn. Hous. Fin. Auth., 281 Conn. 227, 240 (2007) (citation and

quotation marks omitted); De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn. 424,

433 (2004).  "Bad faith in general implies both actual or constructive fraud, or a design to

mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual

obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested

or sinister motive.  . . .  Bad faith means more than mere negligence; it involves a dishonest

purpose."  19 Perry Street, LLC v. Unionville Water Co., 294 Conn. 611, 637 (Conn. 2010);

Gupta v. New Britain General Hosp., 239 Conn. 574, 598 (Conn. 1996) (same).

c.    **Courts Must Exercise Deference and Restraint When Reviewing University Student Disciplinary Matters.**

Federal courts have repeatedly recognized that "an educational institution's academic decisions involve the exercise of professional judgment to which courts should defer." Stockstill v. Quinnipiac Univ., 2010 U.S. Dist. LEXIS 49481, at *22-23 (VLB) (D. Conn. May 19, 2010) (denying plaintiff's student's motion for reinstatement following university's rescission of admission based upon criminal probationary status) (citation omitted); Ruggiero v. Yale Univ., 2007 U.S. Dist. LEXIS 66290, at *2 (WWE) (D. Conn. Sept. 10, 2007) (same); Doe v. Trs. of Boston Coll., 2016 U.S. Dist. LEXIS 137777, at *60 (D. Mass. Oct. 4, 2016) ("the courts must recognize and respect the strong interest of a private university in managing its own affairs") (quoting Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 602 (D. Mass. 2016)).  "Thus, in order to maintain a breach of contract action against a university based upon an academic decision, the Plaintiff must show that the decision 'was made arbitrarily, capriciously, or in bad faith.'" Stockstill, 2010 U.S. Dist. LEXIS 49481, at *22 (quoting Daley v. Wesleyan Univ., 63 Conn. App. 119, 133-34 (Conn. App. Ct. 2001)).

In addition, "[a] college must have broad discretion in determining appropriate sanctions for violations of its policies." Schaer v. Brandeis Univ., 432 Mass. 474, 482 (Mass. 2000). See Morris v. Yale Univ., 2012 Conn. Super. LEXIS 1216, at *17-18 (Conn. Super. Ct. May 7, 2012) ("The discretion of universities to make academic decisions concerning its students without judicial interference is widely recognized and predicated on sound policy."); Keles v. New York Univ., 1994 U.S. Dist. LEXIS 4202, at *20 (S.D.N.Y. Apr. 6, 1994) ("judicial review of a university's academic decisions is limited to a determination of whether the university has acted arbitrarily, capriciously, irrationally, in bad faith or contrary to law") (New York law) (citations omitted); Coveney v. President & Trs. of Coll. of Holy Cross, 388 Mass. 16, 20 (Mass. 1983)

("A private university . . . may not arbitrarily or capriciously dismiss a student.  . . .  If school officials act in good faith and on reasonable grounds, however, their decision to suspend or expel a student will not be subject to successful challenge in the courts.") (citations omitted).

For example, in Schulman v. Franklin & Marshall Coll., 371 Pa. Super. 345 (Pa. Super. Ct. 1988), the plaintiff student was expelled after having been found responsible for committing various acts of sexual harassment against other students.  In upholding the trial court's denial of the plaintiff's motion for a preliminary injunction seeking reinstatement, the court stated:

> The courts have been very reluctant to interfere with college proceedings concerning internal discipline.  A college is a unique institution which, to the degree possible, must be self-governing and the courts should not become involved in that process unless the process has been found to be biased, prejudicial or lacking in due process . . . particularly with the necessary concern on college campuses as to student activities in the sexual area and with the widespread notoriety and publicity relating to date-rape and the opportunity for students to take advantage of one another, perhaps fostered by the proximity of students to each other in the mixed dorm communities, the need of the college to protect its students is manifested by actions such as taken here.  The trial court recognized the great discretion that reposes in the institution authorities to manage such conditions and the means employed to exercise such control, where reasonable, may not be subverted by the courts.

Id. at 351-52.  See Charest v. Pres. of Harvard Coll., 2016 U.S. Dist. LEXIS 18493, at *51 n.9 (D. Mass. Feb. 16, 2016) ("courts are chary about interfering with academic and disciplinary decisions made by private colleges and universities"); Doe, 2016 U.S. Dist. LEXIS 137777, at *60 (same); Berkowitz v. Pres. & Fellows of Harvard Coll., 58 Mass. App. Ct. 262, 269-70 (Mass. App. Ct. 2003) ("in the absence of a violation of a reasonable expectation created by the contract, or arbitrary and capricious conduct by the university, courts are not to intrude into university decision-making").  It would be ironic for the courts to not afford universities broad discretion when deciding disputes relating to claims of sexual assault on campus, given the fact

13

that both the federal government and the State of Connecticut have delegated to institutions of higher learning the responsibility for addressing campus sexual assault.[7]

IV.     **ARGUMENT**

  a.     **Bifurcation is Appropriate under the Circumstances Presented.**

    1.     **Bifurcation is within the Sound Discretion of this Court and Defendants have Made the Requisite Showing.**

  In his consolidated memorandum, the plaintiff cites a handful of cases for the general proposition that bifurcation is the exception and not the rule, and then claims that bifurcation is not necessary and would not streamline the Court's consideration of his motion.  (See Pl.'s Consol. Mem. at 3-5.)  The plaintiff is simply incorrect.

  Federal Rule 42(b) grants to the district court "broad discretion to try issues and claims separately to 'further convenience, avoid prejudice, or promote efficiency.'"  Doe No. I v. Knights of Columbus, 930 F. Supp. 2d 337, 378 (CSH) (D. Conn. 2013) (quoting Amato v. City of Saratoga Springs, 170 F.3d 311, 316 (2d Cir. 1999)).  Bifurcation is appropriate where "the litigation of the first issue might eliminate the need to litigate the second issue . . . ."  Id. (quoting Vichare v. AMBAC, Inc., 106 F.3d 457, 466 (2d Cir. 1996)).  Thus, "[i]f a single issue could be dispositive of the case . . . and resolution of it might make it unnecessary to try the other issues in the litigation, separate trial of that issue may be desirable to save the time of the court and reduce the expenses of the parties."  Doe No. I, 930 F. Supp. 2d at 378 (quoting 9A Wright & Miller, Federal Practice & Procedure § 2388 (3d ed. 2009)).  "It is thus incumbent on the Court, '[o]n a case-by-case basis . . . [to] examine, among other factors, whether bifurcation is needed to avoid or minimize prejudice, whether it will produce economies in the trial of the matter, and whether

---

[7]  It should be noted that a report issued in December 2014 by the U.S. Department of Justice, Bureau of Justice Statistics, concluded that non-students in the 18-24 year age range were more frequently the victims of rape and sexual assault than students.  (See DX S at 1.)  However, it is only colleges and universities that have been directed by both federal and state governments to address this issue.

bifurcation will lessen or eliminate the likelihood of juror confusion.'" Id. at 379 (quoting Svege v. Mercedes-Benz Credit Corp., 329 F. Supp. 2d 283, 284 (MRK) (D. Conn. 2004)).

As an initial matter, several of the cases the plaintiff cites were decided in connection with plenary jury trials or in other easily distinguishable contexts.  See, e.g., Miller v. Am. Bonding Co., 257 U.S. 304, 307-08 (1921) (denying subcontractor separate trial where right of action was creature of statute that required him to participate in a joint action for settlement of claims on contractor's bond); Svege, 329 F. Supp. 2d at 284 (denying motion to bifurcate routine personal injury trial); Tucker v. Am. Int'l Grp., Inc., 2011 U.S. Dist. LEXIS 139086, at *21-22 (CSH) (D. Conn. Dec. 2, 2011) (denying insurer's request to bifurcate discovery into coverage and bad faith); United States v. 43.47 Acres of Land in Litchfield, 45 F. Supp. 2d 187, 191 (PCD) (D. Conn. 1999) (denying motion to bifurcate tribe's trial on eminent domain proceedings where separate trial on issue of tribal status was premature because doctrine of primary jurisdiction required initial resolution of issue by agency).

The courts in the remainder of the cases the plaintiff cites actually granted the defendants' motions to bifurcate, for reasons similar to those proffered by the present defendants. See, e.g., Doe No. I, 930 F. Supp. 2d at 379-81 (CSH) (D. Conn. 2013) (granting motion to bifurcate jury trial because, inter alia: "preliminary adjudication of [one] issue . . . may entirely eliminate the need to litigate Plaintiff's negligence claim"); Kos Pharms., Inc. v. Barr Labs., Inc., 218 F.R.D. 387, 394 (S.D.N.Y. 2003) (bifurcating jury's consideration of disputed patents' validity and infringement from consideration of whether infringement was willful).

Perhaps more importantly, the plaintiff has abandoned his initial request for a hearing, and now explicitly agrees with the defendants that holding a hearing is unnecessary.  (See Pl.'s Consol. Mem. at 2 n.2 and 4.)  Judicial economy would be disserved not only by conducting a

lengthy and unnecessary evidentiary hearing, but also by having to research, thoughtfully consider, and issue a decision on a series of detailed legal claims and public-policy considerations only to reach the ultimate conclusion that another unrelated but dispositive element—irreparable harm—is lacking.  This is the reasoning underpinning the defendants' motion to bifurcate, and the reason why the Court should grant the defendants' motion.[8]

**2.    Second Circuit Courts Must Consider Irreparable Harm before the Remaining Elements of a Motion for a Preliminary Injunction.**

In support of his argument that bifurcation is inappropriate, the plaintiff cites a handful of cases that he claims stand for the proposition that "it is well-established that the factors courts must consider in determining whether to grant a motion for preliminary injunction are to be weighed *together*, and if proof of one or more factor is particularly strong, the others need not be as strong in order for a plaintiff to obtain relief."  (Pl.'s Consol. Mem. at 6)  There are two problems with this contention.  First, *none* of the cases the plaintiff cites, most of which were decided in other jurisdictions, actually stands for this proposition.  Second, as set forth in detail in the defendants' memorandum in support of its motion to bifurcate, courts in the Second Circuit *must* consider irreparable harm prior to addressing the remaining elements of a motion for a preliminary injunction.  See, e.g., Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1999).

As an initial matter, both Bagley v. Yale Univ., 2014 U.S. Dist. LEXIS 177611 (CSH) (D. Conn. Dec. 29, 2014), and Upjohn Co. v. Medtron Labs., Inc., 1988 U.S. Dist. LEXIS 1357 (S.D.N.Y. Feb. 22, 1988), support the defendants' position that bifurcation is appropriate in the context of a motion for a preliminary injunction.  Judge Haight in Bagley granted the defendants'

---

[8]  The plaintiff's remaining concern—that a decision by the Court that the plaintiff has adequately pleaded and proven irreparable harm would necessitate additional time to brief the remaining elements of his motion—is moot, because the defendants, at the plaintiff's repeated invitation, have elected to brief those issues below.  See infra Section IV(b).  In any case, it was the plaintiff's considered decision to wait nearly nine months after his expulsion, until October 31, 2016, to file his motion seeking reinstatement.

motion to bifurcate in the interest of judicial economy, because the absence of irreparable harm would be fatal to the plaintiff's application for preliminary injunctive relief.  Id. at *11-12.

Judge Haight observed:

> During oral argument . . . counsel for Plaintiff suggested that later decisions call into question the Second Circuit's holding in Rodriguez that the element of irreparable harm must always be demonstrated before all others.  Counsel's suggestion is questionable, since in subsequent cases the Second Circuit cites Rodriguez for the principle that on a motion for a preliminary injunction, the existence vel non of irreparable harm must be considered and decided first.

Id. at *13-14 (citing Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir. 2002)).  See JBR, Inc., 618 Fed. App'x at 33 (quoting Rodriguez, 175 F.3d at 234); Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 62-63 (2d Cir. 2007) (same); Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005) (same).

In Upjohn Co. v. Medtron Labs, Inc., 1988 U.S. Dist. LEXIS 1357 (S.D.N.Y. Feb. 22, 1998), the plaintiff moved for a preliminary injunction, and the district court bifurcated and tried first and separately the defendants' defense of laches.  Id. at *1.  The court reasoned that, since the defense, if sustained, would moot the motion, "it would serve the interest of judicial economy for it to consider defendants' laches defense before and separately from considering the merits of plaintiff's preliminary injunction motion."  Id.  While the court did not bifurcate its consideration of irreparable harm from the remaining elements of the plaintiff's motion, it did decide to consider the defendants' potentially dispositive laches defense before engaging in what might have been a lengthy but irrelevant analysis of the merits of the motion.  A lengthy but irrelevant analysis is precisely the outcome that the defendants here seek to avoid.[9]

---

[9]  The plaintiff argues that Upjohn is inapposite because the defendants "have not asserted a defense of laches . . . ." (Pl.'s Consol. Mem. at 5 n.4.)  In that regard, the defendants note that they have argued at length that the plaintiff's own unreasonable delay in filing his motion, in and of itself, defeats his claim of irreparable harm.  (See Defs.' Opp. Mem. at 12-18.)  See, e.g., Birnbaum v. Blum, 546 F. Supp. 1363, 1367-68 (S.D.N.Y. 1982) (four-month delay in seeking preliminary injunction is "tantamount to laches and grounds for denial of the relief sought").

The plaintiff cites four cases decided within the Second Circuit to support his proposition that "it is well-established" that all the factors relevant to a motion for a preliminary injunction must be decided together.  However, three of these cases were not even decided in the context of a motion for preliminary injunction, but rather interlocutory or post-judgment motions to stay pending an appeal.  As such, these cases arose in entirely different factual contexts, involved consideration of distinct legal factors, and are irrelevant to this Court's analysis in the present case.  See In re World Trade Ctr. Disaster Site Litig., 503 F.3d 167, 171 (2d Cir. 2007) (granting motion to vacate stay of district court proceedings in connection with interlocutory appeal of decisions denying motions for judgment on pleadings and summary judgment); Mohammed v. Reno, 309 F.3d 95, 100-03 (2d Cir. 2002) (granting government's motion to lift stay of removal proceedings against alien convicted of felony possession of stolen property and distinguishing elements of preliminary injunction from factors relevant to stay pending appeal); Local 1303-362 of Council 4 v. KGI Bridgeport Co., 2014 U.S. Dist. LEXIS 21644, at *20 (AWT) (D. Conn. Feb. 10, 2014) (denying plaintiff's motion to stay judgment pending appeal).[10]

---

[10]  The plaintiff also cites five cases from other circuits without any parenthetical indication as to their importance to his analysis.  Upon review, it appears that each of these cases supports the defendants' position, is distinguishable on its facts, or otherwise is non-controlling.  See Boehm v. Univ. of Pa. Sch. of Veterinary Med., 392 Pa. Super. 502, 524 (Pa. Super. Ct. 1990) (trial court abused discretion by issuing a preliminary injunction because suspended students could be compensated by money damages and thus would not suffer irreparable harm); Braintree Labs., Inc. v. Citigroup Global Mkts., Inc., 622 F.3d 36, 42-43 (1st Cir. 2010) (affirming denial of motion for preliminary injunction and holding that "[i]n this case, we need to focus our attention on only one of the four factors— irreparable harm, 'the essential prerequisite for equitable relief'—as Braintree's insufficient showing on it disposes of the claim") (citation omitted); Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc., 815 F.2d 500, 503 (8th Cir. 1987) (holding that district court improperly presumed existence of irreparable harm in trademark infringement action based on erroneous finding of probable success in proving likelihood of confusion); North Carolina State Ports v. Dart Containerline, 592 F.2d 749, 750 (4th Cir. 1979) (reversing district court order granting motion for preliminary injunction in part because port authority failed to establish that it would suffer irreparable harm if shipping company was not enjoined from making shipments pending resolution of tariff controversy); Citizens for Responsibility and Ethics in Washington v. Cheney, 577 F. Supp. 2d 328, 334-335 (D.D.C. 2008) (in action by public interest group against Office of Vice President concerning Office's statutory document retention obligations, in which parties agreed at court's suggestion to a "truncated preliminary injunction schedule . . . via a thorough briefing on the merits," court held that irreparable harm existed because, based on defendant's own representations, "unprotected documents could be transferred to other entities, destroyed, or not preserved, and if any of these events occur, the damage is inherently irreparable; once documentary material is gone, it cannot be retrieved").

With respect to the "likelihood of success on the merits" test, the Second Circuit has repeatedly held that "*the moving party must first demonstrate that irreparable harm would be 'likely'* in the absence of a preliminary injunction '*before the other requirements for the issuance of [a preliminary] injunction will be considered.*'" JBR, Inc., 618 Fed. App'x at 33 (2d Cir. 2015) (quoting Rodriguez, 175 F.3d at 234 (2d Cir. 1999) (emphasis added); Grand River, 481 F.3d at 62-63 (2d Cir. 2007) (same and holding that district court did not abuse discretion in finding plaintiff "failed to demonstrate sufficient likelihood of irreparable harm and, therefore, *on that basis alone*, affirm[ing] its denial") (emphasis supplied); Freedom Holdings, Inc., 408 F.3d at 114 (2d Cir. 2005) (same); Kamerling, 295 F.3d at 214 (2d Cir. 2002) (same).

The plaintiff here initially asserted in his opening memorandum, albeit in the alternative, that he had, "at a minimum, demonstrated sufficiently serious questions going to the merits of his claims to make them a fair ground for litigation."  (Pl.'s Mem. at 18 n.17 (citation and quotation marks omitted).)  In their opposition memorandum, the defendants observed that, "[w]here a plaintiff invokes the Second Circuit's modified 'serious questions going to the merits' test, *an even stronger showing of irreparable harm is required*."  (Defs.' Opp. Mem. at 11 (citing Triebwasser, 535 F.2d at 1359).)  Having the benefit of reviewing the defendants' arguments on the irreparable harm issue, the plaintiff now claims, in his consolidated memorandum, that he "has <u>not</u> 'invoked' that test; rather, he has argued, and [claims to have] demonstrated, that he is *likely* to succeed on the merits."  (Pl.'s Consol. Mem. at 14 n.7 (citation omitted; emphases in original).)  If that is the case, then this Court need not "weigh" any of the elements of the plaintiff's motion against one another, but rather should consider whether the plaintiff has adduced legally sufficient proof with respect to each independent element.  The logical place to begin, as the Second Circuit has repeatedly instructed, is the dispositive issue of irreparable

harm.  See, e.g., Rodriguez, 175 F.3d at 234.  Since that necessary element is lacking here, the Court should deny the plaintiff's motion.

      **b.**      **Plaintiff Is Not Entitled to the "Extraordinary and Drastic Remedy" of Preliminary Injunctive Relief.**

              **1.**      **Plaintiff Cannot, as a Matter of Law, Demonstrate Irreparable Harm.**

The defendants specifically incorporate by reference their arguments concerning the plaintiff's legally inadequate showing of irreparable harm as set forth in their initial brief dated November 21, 2016.  The defendants further reply to the arguments presented in the plaintiff's consolidated memorandum as follows.

         **A.**      Defendants have not taken "liberties" with the facts.

The plaintiff asserts in his consolidated memorandum that the defendants "have taken certain liberties with the facts that must be corrected."  (Pl.'s Consol. Mem. at 8.)  First, the plaintiff claims that for the defendants "to suggest that Montague does not challenge Roe's version [of events] . . . is absurd."  (Pl.'s Consol. Mem. at 8.)  This statement is confusing, because the defendants have not claimed that the plaintiff's Amended Complaint fails to challenge Ms. Roe's account of the events of October 18, 2014.  (See Pl.'s Consol. Mem. at 8.)  Rather, the defendants have correctly observed that "*nowhere in his motion* does the plaintiff challenge Ms. Roe's, Ms. Smith's, or Chief Higgins' accounts of the events giving rise of the discipline imposed upon him."  (Defs.' Mem. at 6 (emphasis added).)  The defendants further observed that "the plaintiff argues only that 'procedural and contractual failures' justify the immediate reversal of his expulsion . . . ."  (Defs.' Mem. at 6.)  The plaintiff apparently agrees, insofar as he acknowledges that "[t]he ultimate question of which version is true is simply not relevant to the legal claims forming the basis" of his motion.  (Pl.'s Consol. Mem. at 8.)

Second, the plaintiff takes issue with the defendants' statement that the plaintiff "forced himself on [Ms. Roe] and then later apologized, and acknowledged that he was aware that she did not want to engage in intercourse but that he was unable to stop." (Pl.'s Mem. at 8 (quoting Defs.' Mem. at 3).) The plaintiff claims that the defendants can "cite to nothing in support of this piece of fiction" and that "[i]nventing a rape scenario, in a public filing, is simply inexcusable." (Pl.'s Consol. Mem. at 8-9.) The defendants respectfully refer the Court to the UWC II Panel Report dated February 1, 2016, a copy of which was sent to the plaintiff on February 2, 2016, but which he chose not to attach to any of his moving papers:

> Mr. Montague got on top of Ms. [Roe] and leaned his pelvis into her as if he was preparing to penetrate her. Ms. [Roe] put her hands up and pressed them against his shoulder and pushed him away. Then she said "Jack, no, I said I wanted to hook up but not have sex," but he then penetrated her over her objection. Ms. [Roe] was surprised and frozen during intercourse. She did not attempt to push him away during intercourse but rather just waited for him to stop. Ms. [Roe] said Mr. Montague looked very drunk. After intercourse, Mr. Montague said "I'm really sorry. I know you didn't want that." After Mr. Montague stopped, Ms. [Roe] lay still in bed feeling defeated and confused.

(DX M at 3.) The panel specifically decided that Ms. Roe's version of events was the more credible one, and the defendants respectfully submit that they have "invented" nothing.

> B.     Plaintiff's admitted delay in seeking emergency injunctive relief is dispositive of his motion.

The plaintiff next argues that his admitted delay in filing his motion for a preliminary injunction "is not in itself dispositive" of his showing on the essential element of irreparable harm. (Pl.'s Consol. Mem. at 9 (citing Ideal Indus., Inc. v. Gardner Bender, Inc., 612 F.2d 1018, 1025 (7th Cir. 1979), and Whistler Corp. v. Dynascan Corp., 1988 U.S. Dist. LEXIS 14956, at *2 (N.D. Ill. Dec. 28, 1988).) The plaintiff's reliance on this extra-jurisdictional authority is misplaced where courts within this Circuit have repeatedly and explicitly held to the contrary. See, e.g., Tough Traveler, Ltd. v. Outbound Prods., 60 F.3d 964, 968 (2d Cir. 1995) ("Though

such delay may not warrant the denial of ultimate relief, it may, *standing alone*, preclude the granting of preliminary injunctive relief . . . .") (citation and internal alterations omitted; emphasis added); Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985) ("*delay alone* may justify denial of a preliminary injunction") (emphasis added); Richard A. Leslie Co., Inc. v. Birdie, LLC, 2007 U.S. Dist. LEXIS 88437, at *5 (S.D.N.Y. Nov. 26, 2007) (three-month delay was "sufficiently long, *in and of itself*, to warrant denial of preliminary relief") (emphasis added); Birnbaum, 546 F. Supp. at 1367-68 (four-month delay considered "tantamount to laches and grounds for denial of the [preliminary injunctive] relief").

In support of his irreparable harm argument, the plaintiff now relies almost exclusively on Doe v. Rector & Visitors of George Mason Univ., 149 F. Supp. 3d 602 (E.D. Va. Feb. 25, 2016). In that case, the plaintiff student was expelled for violating two of the university's policies, one pertaining to sexual misconduct and the other pertaining to threats. Id. at 608. His various claims against the defendant university all rested on violations of "various state and federal constitutional rights, state common law duties, and federal law." Id. The court's decision, however, addressed only two issues: (1) the parties' cross-motions for summary judgment on the plaintiff's due process and free speech claims; and (2) the court's prior decision denying the plaintiff's motion to reconsider its ruling granting the defendants' motion to dismiss certain of the plaintiff's claims. Id. at 608-09. Most importantly, the court was not called upon to consider a request for a preliminary injunction.[11]

The plaintiff claims that the defendants have made "a series of sweeping allegations in support of their argument that Montague unreasonably delayed in filing his Motion . . . with a

---

[11]   The plaintiff also cites to King v. DePauw, 2014 U.S. Dist. LEXIS 117075 (S.D. Ind. Aug. 22, 2014), which, as noted in the defendants' opposition memorandum, is readily distinguishable because the expelled plaintiff there filed suit and his motion for a preliminary injunction a mere *three days* after the university issued its final decision with respect to the plaintiff's expulsion. Id. at *39-40.

disingenuousness that is striking," and offers several excuses for the untimely filing of his

motion.  (Pl.'s Consol. Mem. at 10-14.)  To flesh out these excuses, the plaintiff submits four

affidavits:  two from his lawyers, Max Stern and Alexandra Deal; one from his unsigned sports

agent, Dustin Simcox; and one supplemental affidavit from the plaintiff in addition to the one he

submitted in connection with his initial moving papers.  (See PX A-D.)

The plaintiff first takes aim at the defendants' contention that all of the materials the

plaintiff needed to file his complaint were available to him as of the date of his expulsion.  (See

Pl.'s Consol. Mem. at 10 (citing Defs.' Mem at 17).)  He asserts that "many of the claims

brought by Montague—and many of the claims upon which he now relies for his motion—arise

out of matters *other* than the UWC II proceedings."  (Id.)  He then states that "shortly after his

expulsion Plaintiff requested, from Yale, his complete educational record (including records of

proceedings other than the UWC II), as well as a complete copy of the UWC II panel report

(since he was not provided with a complete version of that document prior to his expulsion from

Yale)."  (Id.)  Rather than acknowledge his own failure to retain any of the records provided to

him in connection with the UWC I, Executive Committee, and UWC II proceedings, the plaintiff

attempts to blame Yale for taking "the position that it had 45 days to produce the records" and

for insisting on "an onerous Non-Disclosure Agreement that would have broadly prevented

Montague from disclosing records without prior written permission from Yale."  (Id. at 10-11.)

The plaintiff ignores, however, that Yale is subject to the requirements of the Family

Educational Rights and Privacy Act of 1974 (FERPA), and more generally "has a responsibility

to all of its students and to the community at large, not just to the Plaintiff."  Stockstill, 2010

U.S. Dist. LEXIS 49481, at *35-36.  FERPA required Yale to carefully inspect the plaintiff's

"education records," which are broadly defined under FERPA to include any documents or other

materials that "contain information directly related to a student," and to redact any personally identifiable information of other students that appear in those records. See 20 U.S.C. § 1232g(a)-(b); 34 CFR §§ 99.30 and 99.31. Under the regulations, Yale had 45 days to assemble and review the relevant records, to make appropriate redactions, and then to make the plaintiff's records available. See 34 CFR § 99.10(b). Yale was also required to ensure that the records would not be further disseminated by the plaintiff without the prior consent of any affected students. See 34 CFR § 99.33(a)(1).

In any event, plaintiff's argument serves only to distract attention from the fact that the *only* materials the plaintiff needed to initiate this action and move for preliminary injunctive relief were (a) documents memorializing the results of his three disciplinary proceedings, which were provided to the plaintiff, and which he would have retained had he taken those matters seriously; (b) the policies and procedures he claims the defendants have violated, all of which were publicly available online; and (c) his own recollection of the events giving rise to his expulsion.

The plaintiff next attempts to excuse the untimeliness of his motion by arguing that, "approximately two weeks after receiving the records from Yale [on April 26, 2016], Plaintiff's attorneys requested a meeting with Yale's outside counsel in order to discuss the prospect of settlement without the need to resort to litigation." (Pl.'s Consol. Mem. at 11.) The discussions were short lived and unfruitful, and the plaintiff then filed his initial complaint on June 9, 2016. (See Pl.'s Consol. Mem. at 11.) Plaintiff's counsel fails to note that, during the very first discussion held between counsel, defense counsel informed plaintiff's counsel that Yale would under no circumstances voluntarily reverse the expulsion. That position was reiterated during each subsequent conversation when the question of reinstatement was revisited by plaintiff's

24

counsel.  Furthermore, even if the facts were otherwise, the plaintiff's purported attempts to settle would excuse less than one month of his nearly nine-month delay.

The plaintiff argues that "the only delay in moving for interim relief fairly ascribable to Plaintiff is the period between June 9, 2016 and October 31, 2016."  (Pl.'s Consol. Mem. at 12 (citation and quotation marks omitted).)  The plaintiff attempts to excuse this delay of nearly five months by claiming that he "was expelled during the <u>spring</u> of his senior year . . . and was taking classes that are only offered by Yale in the <u>spring</u>."  (Pl.'s Consol. Mem. at 12.)  The plaintiff concludes that "filing the motion [on the last day of] October of 2016 was not at all unreasonable, as the goal was to put Plaintiff in the same position (or as close as possible to the same position) he occupied when he was expelled:  <u>the spring term of his senior year</u>."  (Pl.'s Consol. Mem. at 12.)

This argument not only ignores the plethora of cases cited above and in the defendants' original brief, which hold that delays of far less than five months were deemed to demonstrate the absence of irreparable harm, but it is also factually incredible.  First, the plaintiff offers nothing to support these statements other than his own self-serving supplemental affidavit.  Second, he has disingenuously and inaccurately attempted to imply that all of the classes in which he was enrolled in the spring of 2016 were required for his graduation and that other classes could not be substituted for them.  To the contrary, in his initial affidavit, the plaintiff acknowledged that he needed to take "four courses and complete [his] senior project in American Studies," and that "[o]ne of the four courses must be an American Literature course to satisfy the requirements of [his] major; the other three courses are [his] choice."  (PX 2 ¶ 7.)  Obviously, there is a great deal of flexibility in the requirements for the plaintiff to graduate.  In fact, had the plaintiff filed his motion shortly after his expulsion, or even sometime relatively soon thereafter,

he could have had a decision on his motion in time to be reinstated for the fall semester of 2016, if his motion had any merit.  The plaintiff's contention that he intentionally elected to delay in filing his motion until such time as a court order granting it would "put Plaintiff in the same position . . . he occupied when he was expelled" is specious.

C.   Plaintiff has failed to mitigate his damages.

The plaintiff claims that he "spent the summer and early fall of 2016 attempting to mitigate the damage Defendants had already done to him," stating that "he was immediately aware that it would be fruitless for him to apply to another *comparable* school in order to obtain a degree" because "none of them would accept a student expelled on grounds of sexual misconduct."  (Pl.'s Consol. Mem. at 12-13 (emphasis supplied).)  The only support the plaintiff offers for this proposition is a law review note published in 1987 by a student who himself had been "a former defendant in a student disciplinary case" at the University of Michigan.  James M. Picozzi, Note, University Disciplinary Process:  What's Fair, What's New, and What You Don't Get, 96 Yale L.J. 2132 (1987).  Blindly assuming the truth of this proposition, the plaintiff then concludes:  "Because Montague knew he had no chance of getting into another school as a transfer student, and because it had always been his intention to try to play professional basketball after college before going on to graduate school, he decided to try to get a job playing basketball until he could get a request for preliminary injunction heard and be reinstated in order to finish the spring semester of his senior year."  (Pl.'s Consol. Mem. at 13.)  Contrary to the plaintiff's ill-advised assumption, however, his expulsion from Yale was not a bar from obtaining admission at another post-secondary institution or from obtaining employment.  As detailed above, at least four of the six other former Yale students expelled for sexual misconduct have been able to continue their educations and/or find employment.  Thus, the plaintiff's contention that it would be futile for him to seek college admission or employment is inaccurate.

"Any party claiming an injury is under a duty to mitigate its damages.  A movant for extraordinary relief cannot mask an ongoing failure on its part to mitigate its damages as an ongoing instance of irreparable harm.  . . .  Nor can it claim irreparable harm when its delay is itself the cause of whatever harm it alleges."  Lanvin, Inc. v. Colonia, Inc., 739 F. Supp. 182, 192-93 (S.D.N.Y. 1990) (citations omitted); see Air Transport Int'l Ltd. Liab. Co. v. Aerolease Fin. Grp., 993 F. Supp. 118, 123 (CFD) (D. Conn. 1998) (citing Lanvin, 739 F. Supp. at 192-93) ("Even if [the plaintiff] could demonstrate that it would be irreparably harmed, it must also show that it could not prevent such harm.").  The plaintiff here has offered no credible explanation for why he could not mitigate his damages by enrolling at another academic institution, nor has he offered any support for his claim that any such institution must be "comparable" to Yale.  He also has offered no credible explanation for why he has only sought employment as a basketball player.  The plaintiff "cannot mask [his] ongoing failure . . . to mitigate [his] damages as an ongoing instance of irreparable harm," nor can he "claim irreparable harm when [his own] delay is itself the cause," in large part, of the very harm he alleges.  Lanvin, 739 F. Supp. at 192-93.

Plaintiff cites two cases in an effort to excuse his failure to make any effort to mitigate his damages.  (Pl.'s Consol. Mem. at 13.)  Neither is apposite here.  In Dudley v. HealthSource Chiropractic, Inc., 585 F. Supp. 2d 433 (W.D.N.Y. 2008), the court held that the plaintiff's delay in filing his motion for a preliminary injunction was excusable because, at the time he first became aware of the existence of the defendants' allegedly infringing but inactive web address, he was "unaware of the extent to which defendants would infringe on his [trade]mark."  Id. at 447.  However, "[o]nce it became clear that defendants' actions were causing third-party

27

confusion, plaintiff applied for preliminary injunctive relief." Id. at 448.[12]  Likewise, in Lego
A/S v. Best-Lock Const. Toys, Inc., 874 F. Supp. 2d 75 (CSH) (D. Conn. 2012), Judge Haight
ruled that the defendant-copyright infringer's delay in filing its motion for a preliminary
injunction seeking to halt the plaintiff's seizures of the defendant's product was excusable
because the defendant, upon learning of the seizures, continuously communicated with the
plaintiff in an attempt to address the issue and filed its motion barely two weeks after it received
the plaintiff's final refusal to release the defendant's product. Id. at 105-06.[13]  The harm which
the present plaintiff has alleged was caused in large part by his own failure even to attempt to
mitigate his damages.

The plaintiff claims in his consolidated memorandum that he attempted but failed to
obtain employment as a professional basketball player. (See PX C and D.)  Both affidavits are
peppered with statements attributed by the affiants to other individuals both known and
unknown.  These individuals' statements plainly constitute inadmissible hearsay or hearsay
within hearsay, all without exception.  See Fed. R. Evid. 801-805.  Even if the contents of these
affidavits were admissible, the plaintiff has offered no explanation for why he has only sought

---

[12]  Nevertheless, the court denied the plaintiff's motion in part because of the plaintiff's insufficient showing on the
issue of irreparable harm.  Id. at 448 ("where the relief sought by the plaintiff will alter the status quo or will provide
'substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the
merits,' a higher standard applies") (quoting Tom Doherty Assocs., 60 F.3d at 34).

[13]  The plaintiff also observes in passing that Yale made a similar argument with respect to the plaintiff's delay in
Bagley, 2014 U.S. Dist. LEXIS 177611 (CSH) (D. Conn. Dec. 29, 2014), which was ultimately rejected.  However,
the plaintiff makes no effort to explain the circumstances that attended that ruling.  Central to the court's analysis on
the issue of delay was the fact that, in the 10 months that passed between the filing of the plaintiff's complaint and
the filing of her motion for a preliminary injunction, well over half of that time was spent heavily briefing the
defendants' motion to dismiss the entirety of the complaint.  Id. at *4-11.  The court also observed that "[t]he case is
complex, and it would seem that counsel for Yale were not in a position to file their motion to dismiss the complaint
as to all defendants and all claims until" three months after the commencement of suit.  Id. at *8.  The court further
specifically held "with perfect confidence" that, even if the plaintiff had moved for preliminary relief earlier in the
case, "this Court would have stayed proceedings on Bagley's motion against Yale for a preliminary injunction until
the Court decided Yale's motion to dismiss . . . ."  Id. at *8-9.  None of these circumstances is present here.
Nevertheless, Bagley remains highly instructive and consistent with the defendants' positions on the issues of
bifurcation and irreparable harm.

employment as a basketball player; he has not even attempted to explain why he has not sought alternative employment.  The plaintiff "cannot mask [his] ongoing failure . . . to mitigate [his] damages as an ongoing instance of irreparable harm."  Lanvin, 739 F. Supp. at 192-93.

The plaintiff argues that any attempt to enroll in a college or university elsewhere would be futile, citing nothing but the document titled "Admissions Requirements and Statistics Chart" attached to his consolidated memorandum.  (See Pl.'s Consol. Mem. at 18 and PX E.)  This document also is inadmissible because the plaintiff has failed to establish any foundation, such as who prepared the document, and how and from what sources the information contained within the document were obtained.  As such, this Court cannot consider it in connection with the plaintiff's motion.  Furthermore, even if the Court could consider the exhibit, it does not indicate under what circumstances a particular institution will refuse to admit a student, and the plaintiff's contention that applying for either college admission or employment would be futile is belied by the fact that all four of the other students expelled for violations of Yale's Sexual Misconduct Policy known to defense counsel have found either employment or college admission or both.  In any event, with one exception, all of the colleges and universities listed in the exhibit are either members of the Ivy League or of a comparable caliber, and the plaintiff has offered no support for his claim that he must be able to enroll at a "comparable" institution.  Since he has not even bothered to apply to any post-secondary institution, he cannot claim that his inability to enroll elsewhere is an "ongoing instance of irreparable harm."  Lanvin, 739 F. Supp. at 192-93.

For all of the foregoing reasons, in addition to those set forth in the defendants' opening opposition memorandum, the plaintiff has failed to establish that he will suffer irreparable harm in the absence of a preliminary injunction granting him the very same relief he will obtain if he succeeds at trial.

**2.      Plaintiff Cannot Demonstrate a Likelihood of Success on the Merits.**

The plaintiff has moved for preliminary injunctive relief solely with respect to the breach of contract and breach of the covenant of good faith and fair dealing claims asserted in Counts II, IV, VII, X, XI, and XII of his Amended Complaint dated October 31, 2016, and asserts that these "claims can be most easily evaluated on the basis of the undisputed or clearly established facts *currently* known to all parties." (Pl.'s Mem. at 18 and 19-34.)  Even if this Court determines that the plaintiff has made an adequate showing of irreparable harm, the plaintiff still cannot prevail because he cannot demonstrate a likelihood of success on the merits of these claims.

          A.      Plaintiff Cannot Prevail on Count II Because He Failed to Exhaust His Administrative Remedies in the UWC I Proceedings, and There Was Ample Evidence to Support the Panel's Findings.

                *i.      Plaintiff failed to exhaust his administrative remedies and cannot now complain about the UWC 1 proceedings.*

"It is well settled that the courts of the United States will not grant injunctive relief until administrative remedies have been exhausted." Byrd v. Gary, 184 F. Supp. 388, 390 (D.S.C. 1960).  "[E]xhaustion serves myriad purposes, including limiting judicial interference in agency affairs, conserving judicial resources, and preventing the frequent and deliberate flouting of administrative processes [that] could weaken the effectiveness of an agency." Bastek v. Fed. Crop Ins. Corp., 145 F.3d 90, 93-94 (2d Cir. 1998) (quoting McKart v. United States, 395 U.S. 185, 193-95 (1969)).

In Neiman v. Yale Univ., 270 Conn. 244 (Conn. 2004), the Connecticut Supreme Court considered whether a university professor was required to exhaust her administrative remedies before asserting claims for breach of contract, breach of implied covenant of good faith and fair dealing, and negligent misrepresentation arising out of the defendant's failure to offer her a tenured appointment to its faculty.  Id. at 246.  The Supreme Court affirmed the trial court's

dismissal of the action, concluding that the exhaustion of administrative remedies doctrine applies to the internal grievance processes provided by academic institutions:  "To allow a plaintiff to sidestep these procedures would undermine the internal grievance procedure that the parties had agreed to and encourage other litigants to ignore the available process as well."  Id. at 255.  The Supreme Court also explained that "academic institutions themselves are best suited to be the original forum for these types of disputes."

The principles enunciated in Neiman also apply to grievance procedures in a student handbook.  In the context of claims arising from disciplinary action taken by a university against a student, courts have stated that "[i]n order to inject the judiciary into what is essentially an intra-university dispute, plaintiff must first exhaust his available administrative remedies."  Hill v. Trs. of Ind. Univ., 537 F.2d 248, 256 (7th Cir. 1976).  Courts have routinely dismissed such cases for failure to exhaust the administrative remedies provided by an educational institution's policies and procedures.  See Durham v. SUNY Rockland Cmty. Coll., 2016 U.S. Dist. LEXIS 3713, at *19 (S.D.N.Y. Jan. 12, 2016) (action dismissed when plaintiff failed to exhaust administrative remedies following school suspension); Sierros v. Nova Southeastern Univ., Inc., 906 So.2d 1124, 1124-25 (Fla. Dist. App. Ct. 2005) (affirming summary judgment in favor of defendant because plaintiff, who was expelled, failed to exhaust his administrative remedies); Montalvo v. Univ. of Miami, 705 So. 2d 1042, 1043 (Fla. Dist. App. Ct. 1998) (affirming summary judgment against expelled plaintiff for failure to exhaust his administrative remedies); Gamma Phi Chapter of Sigma Chi Fraternity v. Univ. of Miami, 718 So. 2d 910, 910 (Fla. Dist. App. Ct.1998) (denying injunctive relief for failure to exhaust administrative remedies in University's Handbook); Hill, 537 F.2d at 256 (plaintiff's failure to exhaust administrative remedies foreclosed procedural due process claim).

Here, the UWC I panel found that the plaintiff sexually harassed Ms. Smith in violation of Yale's Sexual Misconduct Policies when he shoved a used paper pizza plate down the front of her tank top between her breasts.  Dean Miller accepted the panel's conclusion and its recommendation of training and probation.  The UWC Procedures permitted the plaintiff to appeal Dean Miller's decision to the Provost.  (PX 3 § 7.7.)  The plaintiff chose not to appeal, and thereby failed to exhaust his administrative remedies.  Since he did not exhaust his administrative remedies, this Court lacks subject matter jurisdiction over the plaintiff's breach of contract claims in Count II.

> ii.   *There was ample evidence to support a finding of sexual harassment in the UWC I proceedings.*

Even if the plaintiff's failure to appeal Dean Miller's decision were not dispositive of Count II, the UWC I panel appropriately concluded that the plaintiff engaged in "sexual harassment" as defined in the Sexual Misconduct Policies:

> Sexual harassment consists of . . . physical conduct of a sexual nature on or off campus, when . . . such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating or hostile academic or work environment.  Sexual harassment may be found in a single episode, as well as in persistent behavior.

(PX 9 at 2.)  The plaintiff, by his own admission, rolled up a greasy, used paper pizza plate and shoved it down the front of Ms. Smith's tank top between her breasts.  (PX 7 at 3-4; DX T at 2.) Placing an object between a woman's breasts is undeniably "physical conduct of a sexual nature."  That the plaintiff touched Ms. Smith's breasts with a paper plate rather than with his hands does not negate the sexual nature of his conduct.

Ms. Smith credibly described her reaction to the plaintiff's act as "shock, anger, and the feeling of being violated."  (DX T at 2.)  The panel concluded that the plaintiff "displayed an absolute disregard for [Ms. Smith] as a female student and as a fellow human being.  His conduct

was demeaning, humiliating and reprehensible." (Id.)  The panel also expressed concern that the plaintiff did not "have a clear understanding of or an appreciation for the significant implications of his misconduct for [Ms. Smith] or for the broader Yale community." (Id. at 2-3.)  The panel reasonably concluded that the plaintiff's conduct created an intimidating and hostile academic environment, not only for the complainant but also "*for the broader Yale community*." (Id. (emphasis added).)  Thus, the plaintiff's conduct constituted "sexual harassment" and, as such, Ms. Smith's complaint was properly heard and decided by the UWC.

> B.   Plaintiff Cannot Prevail on Count IV Because Ms. Gleason did not Breach the UWC Procedures or the Provost's Statement on Confidentiality of UWC Proceedings.

Contrary to the plaintiff's contention, Ms. Gleason did not disclose to Ms. Roe "the fact and substance of the UWC I proceedings and resulting sanction." (Pl.'s Mem. at 24.)  Indeed, Ms. Gleason specifically denies that she disclosed the existence or substance of the UWC I proceedings. (Gleason Answer ¶¶ 53-63.)  The relevant sequence of events is as follows.

On September 21, 2015, Ms. Roe's roommate, Rachel Rogers, met with Ms. Gleason on an unrelated matter and disclosed to Ms. Gleason that Ms. Roe had been "raped" by the plaintiff.[14]  Ms. Rogers also told Ms. Gleason that Ms. Rogers was aware of another incident in which the plaintiff engaged in non-consensual intercourse with a different Yale undergraduate. (DX U.)  On October 16, at Ms. Roe's request, Ms. Rogers met again with Ms. Gleason to inquire about options to support Ms. Roe.  Ms. Rogers believed that Ms. Roe might be interested in an informal process to address her concerns.  Ms. Gleason described the options available, including the possibility of offering the plaintiff gender sensitivity training at the SHARE Center. (Id.)  Later that day, after speaking with Ms. Rogers, Ms. Roe sent an email to Ms. Gleason

---

[14] "Rape" is the word used by Ms. Rogers.

stating that, based on her conversation with Ms. Rogers, she was "ready to proceed with an informal/anonymous complaint."  (DX V.)  On October 19, the two met and Ms. Roe recounted the events of the night in question, describing the plaintiff's conduct as "sexual penetration without consent."  (DX U.)  On October 26, Ms. Gleason sent an email to Ms. Roe asking whether she was comfortable with Ms. Gleason scheduling a meeting with the plaintiff to discuss the possibility of gender sensitivity training at the SHARE Center, as Ms. Gleason and Ms. Roe had previously discussed.  Ms. Gleason concluded her email as follows:  "Please don't feel pressured or rushed, and please let me know if you'd like to speak with me by email, phone or in person before any next steps.  I'll wait to hear from you."  Ms. Roe replied in the affirmative. (DX W.)  Shortly thereafter, Ms. Gleason learned for the first time that the plaintiff had previously received discipline from the UWC, which included gender sensitivity training.  In a discussion with other Title IX Coordinators, it was determined that a formal complaint was more appropriate than an informal process leading to gender sensitivity training, in light of the plaintiff's previous discipline and the serious nature of the current allegations.[15]

On Friday, November 6, Ms. Gleason and Ms. Roe met again and Ms. Gleason informed Ms. Roe that she had learned that the plaintiff had already received gender sensitivity training, and, therefore, a formal complaint would be more appropriate.  Ms. Gleason made no mention of the existence or substance of the UWC I proceeding.  Rather, she disclosed to Ms. Roe only what Ms. Roe needed to know:  that gender sensitivity training was not the best option since Mr. Montague had already participated in that training.  As an alternative, Ms. Gleason asked Ms. Roe whether she would be willing to participate as a witness in a formal UWC complaint brought by a Title IX Coordinator.  (See DX X.)  Since Ms. Gleason did not divulge any

---

[15]  This testimony was elicited during the deposition of Jason Killheffer, which took place on January 10, 2017.  The defendants will submit the relevant portions of the transcript of the deposition upon receipt from the court reporter.

information regarding the UWC I proceeding, or even the fact that it occurred, the plaintiff

cannot prevail on his breach of contract claim.

On Monday, November 9, Ms. Roe sent an email to Ms. Gleason and UWC Chair David

Post in which she stated:

> I have had time to think about the case and my role in it over the weekend, and I met with Amy [at the SHARE Center] this afternoon to talk about it more. I am comfortable with Title IX filing a formal complaint against Jack Montague, and I am willing to participate as a witness. I understand that this may include talking to a fact finder and eventually participating in a formal hearing. At this time I am comfortable with doing both of those things, but I will let you know if at any time I decide that I cannot participate in either.

(DX J.) Ms. Roe concluded her email with the following query: "Finally, and perhaps *most

importantly given some interactions from this past weekend*, is it possible for a no-contact policy

to be put in place between the two of us throughout the duration of this case?" (Id. (emphasis

added).)

On Tuesday, November 10, Ms. Roe met with Ms. Gleason and explained the nature of

the weekend interactions. Ms. Roe said that, on Saturday, November 7, the day after Ms.

Gleason asked Ms. Roe whether she would be interested in participating in a formal complaint,

Ms. Roe and one of her friends were at a party at which the plaintiff was also present. Ms. Roe's

friend approached the plaintiff, informed him that Ms. Roe was present, and asked him to leave.

Although on previous occasions the plaintiff had agreed to stay away from Ms. Roe, this time he

became belligerent and refused. (DX U.) It is evident that the plaintiff's callousness on

November 7 was a significant factor in Ms. Roe's November 9 decision to participate in a formal

proceeding. Thus, even if Ms. Gleason had, in fact, disclosed the existence of the UWC I

proceeding to Ms. Roe, the plaintiff cannot make out the critical element of causation on his

breach of contract claim.

Furthermore, even if there had been disclosure of the UWC I proceeding to Ms. Roe, the filing of the UWC II proceeding simply cannot be considered the "fruit of the poisonous tree" as the plaintiff essentially contends.  (See Pl.'s Mem. at 24-25.)  That concept is applicable only to criminal proceedings, not to a breach of contract claim.  The plaintiff does not allege that Ms. Roe's cooperation was obtained through intimidation or deceit.  Indeed, even assuming the truth of the allegations of plaintiff's complaint on this issue, the complaint alleges a truthful disclosure of the plaintiff's prior history with the UWC, which is not a breach of contract.

        C.     **Plaintiff Cannot Prevail on Count VII Because Mr. Killheffer**
              <u>**Properly Initiated the UWC II Complaint.**</u>

In Count VII, the plaintiff claims that "there was no proper basis under Yale's procedures and policies for the Title IX Coordinator to file a formal complaint against Mr. Montague . . . ." (Pl.'s Mem. at 25.)  Mr. Killheffer brought the UWC II complaint against Mr. Montague pursuant to the UWC Procedures, which provide that "a Coordinator may bring a complaint *when there is evidence that the University's policies on sexual misconduct have been violated and the Coordinator's intervention is needed to ensure that the matter reaches the UWC*."  (PX 3 § 1 (emphasis added).)  Ms. Roe's complaint that she had been raped constituted the "evidence"[16] that the University's policies on sexual misconduct had been violated, and the intervention of the Title IX Coordinator was needed because Ms. Roe was not willing to participate as a complainant, only as a witness.  Accordingly, this is exactly the type of situation specified in the UWC Procedures where the UWC Coordinator should file the complaint.

The plaintiff claims that the Report of Complaints of Sexual Misconduct defines when the Coordinator's intervention is "needed."  (Pl.'s Mem. at 26.)  The plaintiff argues that "such

---

[16]  Of course, the University's policy does not require "proof" that sexual misconduct has occurred, only some evidence, for a complaint to be filed.  The proof is elicited during the hearing.

intervention is 'needed' only '[i]n certain unusual circumstances, such as those involving risks to the safety of individuals and/or the community[.]'"  (Pl.'s Mem. at 26 (quoting PX 11 at 5).)  The plaintiff claims that no such intervention was "needed" here because no safety concerns existed. (Pl.'s Mem. at 26-27.)  In support of this conclusion, the plaintiff claims that nearly a year had passed between his sexual assault of Ms. Roe and her report to the Title IX Office, and that, in the interim, the plaintiff took classes and participated in student life "without incident:  never once did Roe allege, nor did Yale express concern, that he posed a safety risk."  (Id.)

There are several responses to the plaintiff's argument.  First, the Report acknowledges that "the Title IX Coordinator may file a complaint in situations on behalf of someone who experienced sexual misconduct but who cannot or *will not* themselves take the formal role of complainant; this may be an issue of jurisdiction, safety or *preference*."  (PX 11 at 16 (emphasis added).)  This is precisely what occurred.  Ms. Roe wanted to have a complaint filed, but did not wish to take the role of complainant, and Mr. Killheffer therefore filed the complaint.  Nothing in the Report suggests that in this circumstance the Title IX Coordinator is empowered to file a complaint only where there are "risks to the safety of individuals and/or the community."[17]

Since Yale complied with its procedures when it initiated the UWC II complaint against the plaintiff, he cannot prove that he would likely prevail on his breach of contract claim in Count VII.  Similarly, because there was no breach of contract, he cannot demonstrate that he

---

[17]  If Ms. Roe had not consented to the filing of the complaint, the Title IX Coordinators would then have considered whether the plaintiff's previous sexual misconduct violation, the assault of Ms. Roe, and the separate assault reported by Ms. Rogers were evidence of a safety risk sufficient to warrant the filing of formal a complaint without Ms. Roe's cooperation.  Indeed, under these circumstances, failing to file a complaint against the plaintiff could have exposed Yale to significant liability.  "Cases that hold a school responsible for pre-assault deliberate indifference involve actual knowledge of sexual assault(s) committed in a particular context or program or by a particular perpetrator or perpetrators."  See Zamora v. N. Salem Cent. Sch. Dist., 414 F. Supp. 2d 418, 424 (S.D.N.Y. 2006) (citation omitted); Williams v. Bd. of Regents of Univ. Sys. of Georgia, 477 F.3d 1282, 1294-96 (11th Cir. 2007) (Title IX liability for rape of student which occurred in basketball player's dorm room where university officials recruited player with knowledge of past sexual misconduct).

would likely prevail on his claim for breach of the covenant of good faith and fair dealing.  See, e.g., Capstone, 308 Conn. at 795.  In short, the plaintiff's argument that "Mr. Montague could reasonably expect that he would not be the subject of a Title IX Coordinator initiated complaint unless he posed a safety risk" is meritless.  (Pl.'s Mem. at 28.)

> D.  Plaintiff Cannot Prevail on Counts X and XI Because the UWC II Panel Appropriately Considered the UWC I Proceeding.

In Counts X and XI, the plaintiff asserts that Yale breached the UWC Procedures (1) by permitting the UWC II panel to take into account the UWC I proceeding in determining culpability and sanctions, and (2) by allowing that consideration to take place outside the presence of the plaintiff.  (See Pl.'s Mem. at 29-32.)  Each of these arguments is meritless.

The UWC Procedures specifically provide that, "[i]n determining culpability, the panel may . . . take into account a respondent's previous formal discipline for other acts of sexual misconduct, including written reprimands . . . ."  (PX 3 § 7.4.)  Accordingly, there simply is no basis for the claim that the UWC II panel could not take into account the UWC I findings.

The plaintiff received a copy of the UWC Procedures on November 30, 2015, when he received notice from Ms. Menon that a complaint had been filed against him.  (PX 12.)  Since the UWC Procedures provide that prior disciplinary proceedings are considered by the UWC panel, the plaintiff was on notice that his previous discipline would be taken into account when determining his culpability for sexually assaulting Ms. Roe; and he had the opportunity to explain that discipline during the hearing.  Moreover, nothing in the UWC Procedures mandates that the plaintiff be present when consideration of his disciplinary history takes place.  In fact, the UWC Procedures provide that the panel will consider this information "in determining culpability," indicating that the panel will receive disciplinary history from the UWC Secretary during its deliberations, which necessarily occur outside the parties' presence.  (See PX 3 § 7.5.)

Therefore, the consideration of UWC I outside the presence of the plaintiff did not violate the UWC Procedures.

In support of his claim that Yale's procedure for considering previous discipline was inequitable, the plaintiff cites to a letter from the Department of Education, Office of Civil Rights to the President of Wesley College dated October 12, 2016.  (Pl's Mem. at 32; DX Y.)  In that case, a student was expelled for the live streaming of a female student engaged in a sexual act, without the female student's knowledge.  The Office of Civil Rights determined that Wesley College failed to afford the accused student an equitable Title IX process, because it had not provided the student, prior to the hearing, a copy of the complaint and the investigative findings.  That case is completely inapposite to the present case.  Mr. Montague was provided with a copy of Mr. Killheffer's complaint and the fact-finder's report prior to the panel hearing.  (PX 12; DX L.)  The Wesley College case did not involve in any way the admissibility of prior discipline.

      E.     Plaintiff Cannot Prevail on Count XII Because the UWC II Panel Appropriately Considered the Executive Committee Proceeding.

In Count XII, the plaintiff asserts that the panel improperly considered the reprimand he received from the Executive Committee when recommending the penalty of expulsion.  The UWC Procedures specifically allow the panel to consider "any formal Yale discipline previously imposed on the respondent . . . in its recommendation regarding a penalty."  (PX 3 § 7.5 (emphasis supplied).)  In addition, when the plaintiff received the Executive Committee's reprimand, he was explicitly informed that "the reprimand will be taken into consideration in determining a penalty" if he was ever again found to have violated the Undergraduate Regulations, which include Yale's Sexual Misconduct Policies.  (PX 15.)  The panel therefore appropriately considered the prior reprimand when recommending that the plaintiff be expelled.  Furthermore, the plaintiff has pointed to no evidence to suggest that the recommended penalty

would have been different if the panel had been unaware of the Executive Committee reprimand. The plaintiff is unlikely to prevail on his claim in Count XII, both because it was appropriate for the UWC II Panel to consider the Executive Committee proceeding, and also because the plaintiff cannot establish the critical element of causation.

### 3. Plaintiff is Not Entitled to Preliminary Injunctive Relief Because the Balance of Hardships Tips Decidedly in Defendants' Favor.

Even if the plaintiff were to establish irreparable harm and a likelihood of success on the merits, courts considering the balance of hardships between a student who has been expelled or suspended and an educational institution routinely find in favor of the educational institution. The harm to the plaintiff should his motion be denied—which is anything but irreparable—is discussed in detail above and in the defendants' opposition memorandum, and it is clearly outweighed by the harm that would be suffered by the defendants should the plaintiff's motion be granted.

Stockstill, 2010 U.S. Dist. LEXIS 49481, at *1 (VLB) (D. Conn. May 19, 2010), is instructive. In that case, the plaintiff filed a complaint on February 23, 2010 asserting claims for breach of contract and promissory estoppel on the ground that Quinnipiac University rescinded his admission for enrollment for the Spring, 2010 semester without any legitimate reason. The plaintiff concurrently filed an emergency motion for a temporary restraining order and subsequent entry of a preliminary injunction requiring Quinnipiac to reinstate him so that he could continue to attend classes while his legal dispute with Quinnipiac was resolved. Id. Several months after being offered admission to Quinnipiac for fall 2009, Stockstill entered a guilty plea to a misdemeanor battery charge and was sentenced to one year of probation. The plaintiff's attorney informed Quinnipiac of the conviction, but failed to mention that the plaintiff would be considered a sexual predator under Florida law. Based on the plaintiff's attorney's

representations, Quinnipiac offered the plaintiff admission for the spring 2010 semester.  After

the plaintiff accepted the offer, his probation officer informed Quinnipiac that the plaintiff was

deemed a sexual predator under Florida law.  About two weeks later, Quinnipiac received a

notice from a different individual in the Florida Probation Office indicating that the plaintiff

would not be considered a sexual predator and that the previous notice had been sent in error.

Quinnipiac rescinded its offer of admission to the plaintiff, stating that it needed time to research

his status with the Florida Probation Office before permitting him to matriculate.  Id. at *7-14.

The plaintiff argued that the loss of one semester of classes would impede his future

educational and career opportunities, and that his inability to play lacrosse in the spring semester

would cause him to fall behind his peers in terms of his athletic skills and potentially impact his

athletic eligibility in subsequent semesters.  Judge Bryant found these arguments speculative.  Id.

at *35.  The hardship for Quinnipiac, on the other hand, was substantial:

> Quinnipiac has a responsibility to all of its students and to the community at large,
> not just to the Plaintiff.  There are thousands of students attending Quinnipiac.
> Permitting a student to matriculate when he may pose a danger to other students is
> a greater harm than the harm caused to the Plaintiff by rescinding his admission
> and causing him to miss one semester of classes.  Furthermore, even if the
> Plaintiff did not actually pose a danger to other students, Quinnipiac harbored
> legitimate concerns regarding his status as a sexual offender or sexual predator
> under Florida law and whether or not his probation file reflects that he is
> classified as a sexual predator.  If information regarding the Plaintiff's status as a
> sexual predator were to become public, it could substantially damage
> Quinnipiac's reputation and generate concern among the students who attend as
> well as their families.  In addition, allowing the Plaintiff to matriculate without
> conducting a thorough independent investigation of his background and status in
> light of the information to which it is now privy would subject Quinnipiac to
> significant potential legal liability and reputational liability and damage all to the
> detriment of the University, including its students, faculty, and alumni.

Id. at *35-36.  Judge Bryant concluded that the plaintiff had failed to establish that the balance of

hardships tipped decidedly in his favor.  Id. at 37.

Similarly, in <u>Doe v. Ohio State Univ.</u>, 136 F. Supp. 3d 854 (S.D. Ohio 2016), <u>adopted by</u>, 2016 U.S. Dist. LEXIS 52942 (S.D. Ohio April 20, 2016), a case arising from Ohio State's investigation of a claim for sexual harassment, the court held that the issuance of a preliminary injunction would not serve the public interest and would harm Ohio State:

> Granting Doe's motion is likely to cause harm to others . . . . Granting such a motion would cast doubt on OSU's power to regulate its student body, including investigating and disciplining its students for sexual misconduct.  And since guidance by the Office of Civil Rights on Title IX requires OSU to investigate allegations of off-campus sexual misconduct, not doing so could jeopardize its federal funding . . . .  The Court finds that issuing the injunction could cause harm to others, which weighs in favor of denying the injunction.

<u>Id.</u> at *871-872.

Similarly, in <u>Howe v. Pa. State Univ.</u>, 2016 U.S. Dist. LEXIS 11981 (M.D. Pa. Feb. 2, 2016), the court reasoned:

> The factors concerning whether the issuance of an injunction would cause greater harm to Penn State than the benefit which would be realized by the plaintiff if an injunction were issued and the public interest in this case go hand in hand.  Here, the court considers that Penn State not only has an obligation to the plaintiff, but also to the many other students of the Penn State community.  . . .  The court considers that Penn State has a significant interest in disciplining students who engage in misconduct and protecting the other students within its community.  The Third Circuit and the Supreme Court have both long recognized the need for maintaining order and discipline in our schools without prohibitive costs and in a manner that will contribute to, rather than disrupt, the educational process.  . . .  Were the court to grant injunctive relief in this case, that would put Penn State in a position of being second-guessed by the court every time it imposes a sanction upon a student for this type of behavior.  This is in the interest of neither Penn State nor the community.  *Unless there is a clear violation of rights*, which the court has not found for purposes of the instant motion, the courts should not be involved in the determination of disciplinary matters in the university setting.[18]

<u>Id.</u> at *21-23 (citation and internal quotation marks omitted; emphasis added).  <u>See</u> <u>LaFreniere v. Regents of the Univ. of Cal.</u>, 2006 U.S. Dist. LEXIS 47252, at *13 (N.D. Cal. July 6, 2006)

---

[18] The present plaintiff has not alleged a "clear violation of rights."  Rather, at best, he has alleged minor, non-material violations of contract.  None of the cases cited by the plaintiff in which a Court granted a motion for a preliminary injunction in connection with violation of a university's sexual misconduct policy rested on a claim of an inconsequential breach of contract.

(university's interest in protecting individuals from plaintiff's harmful actions outweighs

plaintiff's request for urgent relief, "especially in light of his lengthy delay in filing this action");

Bonnell v. Lorenzo, 241 F.3d 800, 822 (6th Cir. 2001) ("A college's or university's interest in

maintaining a hostile-free learning environment, particularly as it relates to its Title IX funding,

is well recognized"); Coleman v. Newburgh Enlarged City Sch. Dist., 319 F. Supp. 2d 446, 456-

57 (S.D.N.Y. 2004) (recognizing that the defendants have an interest in protecting the safety of

the students and staff and "it is not the province of this Court to instruct the Defendants on how

to accomplish that goal").

      The balancing of the hardships similarly tips in favor of the defendants in the present

case.  Courts have repeatedly held that college or graduate students will not suffer harm from a

gap in educational services or a delayed entrance into a profession.  See, e.g., Sohmer v.

Kinnard, 535 F. Supp. 50, 52 (D. Md. 1982) (finding that the plaintiff was not harmed by a delay

into his profession and in fact, would afford him the opportunity to "develop his professional

skills"); Yu v. Vassar Coll., 13-cv-4373 (Feb. 25, 2014) (holding that the plaintiff would not be

irreparably harmed by a one year gap in education).  Even if a delay in completing his degree

would, in fact, cause the plaintiff irreparable harm, the plaintiff has failed to provide any credible

reason why he cannot complete his remaining credits at another institution during the pendency

of this lawsuit.  See Phillips, 687 F.2d at 624 (Winter, J., concurring) ("[t]here are no lack of

colleges or universities which she might attend if all that is at stake is loss of instruction time");

Silman v. Utica Coll., 2015 U.S. Dist. LEXIS 8829, at *5 n.2 (N.D.N.Y. Jan. 27, 2015) (the

plaintiff will not suffer harm in the absence of injunctive relief because classes can be taken at

other accredited universities).  The present plaintiff has explicitly stated that, in the 11 months

that have passed since his expulsion, he has not applied to a single other university or sought any

form of employment other than professional basketball.  (See Pl.'s Consol. Mem. DX C ¶¶ 11 and 16.)  See, e.g., B.P.C. v. Temple Univ., 2014 U.S. Dist. LEXIS 130410, at *12-15 (E.D. Pa. Aug. 27, 2014) (denying injunctive relief where plaintiff failed to show that he was "potentially barred" from employment); Preston v. Bd. of Trs. of Chi. State Univ., 120 F. Supp. 3d 801, 805-06 (N.D. Ill. 2015) ("a student's ambitions in a particular future employment path" do not warrant entry of mandatory injunction); Ben-Yonatan v. Concordia Coll. Corp., 863 F. Supp. 983, 986 (D. Minn. 1994) (denying injunctive relief because plaintiff's argument that she may never be admitted to medical school because of one-year break in academic record was purely speculative).

Conversely, Yale would suffer great hardship if the plaintiff's motion were granted and it were forced to readmit a student who had been found responsible by three separate disciplinary panels for sexual assault, sexual harassment, and defiance of the Yale Police.  Just as Judge Bryant held with respect to Quinnipiac, "[Yale] has a responsibility to all of its students and to the community at large, not just to the Plaintiff."  Stockstill, 2010 U.S. Dist. LEXIS 49481, at *35-36.  Permitting the plaintiff to re-enroll for the January 2017 semester, when he may pose a danger to other students, is a far greater harm to the Yale community than any speculative harm the plaintiff may suffer by having to wait to re-enroll until the conclusion of this litigation.  See id. at *35-36.  It would also "substantially damage [Yale's] reputation and generate concern among the students who attend as well as their families."  Id.  The judicial undoing of his expulsion, in the context of a preliminary injunction issued before plaintiff has offered any evidentiary proof, would very likely have the effect of chilling other victims of sexual assault from coming forward, since it would convey to the Yale community that filing a complaint under Yale's Sexual Misconduct Policies has no real consequence except to expose sexual assault

44

victims to the risk of public scrutiny, which was precisely Ms. Roe's concern when she was considering her options.

Permitting the plaintiff to re-enroll over Yale's objection would also eviscerate Yale's legitimate interest in enforcing its own policies.  See, e.g., Ruggiero, 2007 U.S. Dist. LEXIS 66290, at *2 (WWE) (D. Conn. Sept. 10, 2007) ("an educational institution's academic decisions involve the exercise of professional judgment to which courts should defer"); Bhandari v. Trs. of Columbia Univ. in N.Y., 2000 U.S. Dist. LEXIS 3720, at *23 (S.D.N.Y. March 27, 2001) ("ordering [plaintiff's] return to classes would effectively prevent [the university] from ever suspending [the plaintiff] because, if allowed to return to his classes, he would likely complete his course work before this case is tried"); Schaer, 432 Mass. at 482 ("A college must have broad discretion in determining appropriate sanctions for violations of its policies.").

Finally, Mr. Montague's re-enrollment could also "subject [Yale] to significant potential legal liability and reputational liability and damage, all to the detriment of the University, including its students, faculty, and alumni."  Stockstill, 2010 U.S. Dist. LEXIS 49481, at *35-36.

Since the hardships do not tip in the plaintiff's favor, this Court should deny his motion, irrespective of what the Court might conclude on any other issue.

### 4.    Plaintiff is Not Entitled to Preliminary Injunctive Relief Because the Public Interest Weighs in Favor of Denying Plaintiff's Motion.

The public interest factor also weighs against granting the plaintiff's motion for preliminary injunction.  Both the state and federal governments have made it abundantly clear, through legislation and agency guidance, that the public has a strong interest in the enforcement of sexual misconduct policies by colleges and universities, see Conn. Gen. Stat. § 10a-55m and DX Z (U.S. Dep't of Educ. "Dear Colleague" Letter dated April 4, 2011), and courts have properly declined to interfere with university disciplinary decisions that promote that public

interest.  "[A]n educational institution's authority to make disciplinary decisions without having to resort to court intervention is a substantial public interest.  Requiring so would substantially weaken the institution's legitimate disciplinary authority among its students and be detrimental to the public interest, as educational institutions encourage their students to conduct themselves as model citizens in adhering to any applicable code of conduct."  Knoch v. Univ. of Pittsburgh, 2016 U.S. Dist. LEXIS 117081, at *30 (W.D. Pa. Aug. 31, 2016).  "[T]here is also a public interest in providing an educational environment that is free from harassment.  Colleges and universities are afforded great latitude in administering their rules and regulations as courts recognize that those institutions' primary responsibility is to provide an atmosphere conducive to study and learning for all students."  Pierre v. Univ. of Dayton, 143 F. Supp. 3d 703, 714 (S.D. Oh. Oct. 19, 2015).  "[U]niversities have an interest in disciplining students who have committed serious infractions of university rules and in protecting other students from the type of conduct alleged here [nonconsensual sex], and the public has a similar interest."  Doe v. Ohio State Univ., 2016 U.S. Dist. LEXIS 21064, at *36 (S.D. Oh. Feb. 22, 2016).

## V.    CONCLUSION

For all of the foregoing reasons, in addition to those set forth in their Motion to Bifurcate Consideration of Plaintiff's Motion for Preliminary Injunction and opening Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction, Defendants respectfully request that the Court deny the plaintiff's motion.

THE DEFENDANTS,
YALE UNIVERSITY, ANGELA GLEASON and
JASON KILLHEFFER


By:  _/s/  Patrick M. Noonan_____
        Patrick M. Noonan (ct00189)
        Colleen N. Davis (ct27773)
        James D. Flynn (ct29778)
        DONAHUE, DURHAM & NOONAN, P.C.
        741 Boston Post Road
        Guilford, Connecticut 06437
        Tel:  (203) 458-9168
        Fax:  (203) 458-4424
        Email: pnoonan@ddnctlaw.com
                cdavis@ddnctlaw.com
                jflynn@ddnctlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on January 11, 2017, a copy of foregoing Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


  /s/  James D. Flynn
James D. Flynn (ct29778)
DONAHUE, DURHAM & NOONAN, P.C.
741 Boston Post Road
Guilford, Connecticut 06437
Tel:  (203) 458-9168
Fax:  (203) 458-4424
Email:  jflynn@ddnctlaw.com