# EXHIBIT Y



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS

**REGION III**
DELAWARE
KENTUCKY
MARYLAND
PENNSYLVANIA
WEST VIRGINIA

THE WANAMAKER BUILDING, SUITE 515
100 PENN SQUARE EAST
PHILADELPHIA, PA 19107-3323

**October 12, 2016**

*IN RESPONSE, PLEASE REFER TO:  03-15-2329*

Robert E. Clark II
President
Wesley College
120 North State Street
Dover, DE 19901

Dear President Clark:

This letter is to inform you that the U.S. Department of Education (the Department), Office for Civil Rights (OCR), has completed its investigation of the above-referenced complaint filed against Wesley College (the College).  The Complainant alleged that the College discriminated against her son (the accused Student) on the basis of sex when it subjected him to an inequitable grievance and appeal process in April 2015.

OCR investigated this complaint under the authority of Title IX of the Education Amendments of 1972 (Title IX), and its implementing regulations, 34 C.F.R. §106, which prohibit discrimination on the basis of sex in education programs and activities that receive Federal financial assistance from the Department.  The College receives Federal financial assistance funds from the Department and, therefore, is subject to the requirements of Title IX and its implementing regulations.

The accused Student was a senior at the College during the 2014-2015 school year.  On March 31, 2015, the accused Student was accused of planning and implementing the live streaming of a female student engaged in a sexual act with another male student (Student 1) sometime over the weekend of March 20-22, 2015, without the female student's knowledge.  On April 1, 2015 the College notified the accused Student that he was charged with violating the College's Sexual Misconduct Policy.  Following the Judicial Board Hearing on April 7, 2015, the College expelled the accused Student.

The OCR complaint was filed on May 14, 2015, asserting that the accused Student did not participate in the planning or implementation of the live streaming, and that the College violated Title IX by failing to conduct an equitable investigation and resolution of the incident.

OCR investigated whether the College provided prompt and equitable responses to sexual harassment and sexual assault complaints, reports, and /or other incidents of which it had notice,

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness
by fostering educational excellence and ensuring equal access.*

www.ed.gov

including the incident involving the accused Student and three other accused male students (Students 1, 2, and 3) who were also alleged to have been involved in the incident.

During the investigation, OCR reviewed documentation provided by the Complainant and the College, including relevant College policies and procedures and case files related to reports of sexual harassment and sexual violence at the College from August 2013 through April 2015, interviewed the Complainant in June 2015, and conducted an on-site to the College and interviewed the accused Student, other students, and staff in November 2015.

**SUMMARY OF FINDINGS**

The College is required under Title IX to respond to allegations of sexual harassment or sexual violence when it knows, or reasonably should know, about possible sexual harassment or sexual violence. In undertaking this responsibility, the College must have an equitable process that ensures that the rights of survivors and those of the accused are protected.

OCR's role, after the College has responded to the allegations, is not to reinvestigate the underlying incident or substitute its judgement for that of the College. Rather, OCR's role in investigating Title IX sexual harassment and sexual violence allegations is to determine whether the College's grievance procedures for the resolution of complaints, such as those utilized for this complaint, are prompt and equitable and have been properly implemented.

For the reasons briefly stated below, and discussed further in the letter, OCR determined that the College failed to adopt and implement Title IX grievance policies and procedures that fully comply with the requirements of Title IX. Specifically, the College failed to implement several provisions of its Title IX policies and procedures during the processing of the complaint involving the accused Student, including when it suspended, and later expelled him for sexual misconduct. The College thereby denied the accused Student procedural protections to which he was entitled under Title IX, and under the College's own written procedures. OCR also had concerns regarding College's failure to maintain the recording of the hearing in the accused Student's case. OCR also determined that the College handled several other reports of sexual harassment and sexual violence from August 2013 through April 2015 in an inequitable manner.

OCR also found that the College's Notice of Non-Discrimination and its two (2) policies and procedures to address Title IX complaints that were in effect at the time of the incident, as well as the February and June 2016 revisions to them, did not fully comply with Title IX. Specifically, the Notice of Non-Discrimination did not identify the individual at the College responsible for investigating and resolving Title IX complaints and was not widely publicized. In addition, at all relevant time periods during OCR's investigation, the College's Title IX Policies and Procedures did not provide adequate notice to students and employees regarding where complaints may be filed and did not maintain designated and reasonably prompt timeframes for all stages of the grievance process. OCR also found that the College's designation and notice of the College's Title IX Coordinator does not comply with Title IX. Further, OCR's investigation identified concerns regarding whether the College has appropriately designated responsible employees obligated to report possible sexual violence to school officials, provided adequate training for the Title IX Coordinator, Title IX Team, and all other College staff and employees regarding the College's grievance procedures, as well as responsible employee designations and obligations to respond to requests for confidentiality.

Page 3 – President Robert E. Clark II

OCR also had concerns regarding the maintenance of hearing transcripts for sexual harassment and sexual violence allegations and complaints.

On September 30, 2016, the College voluntarily entered into a resolution agreement (Agreement), which was provided to OCR on October 6, 2016 and requires that the College take specific steps to address the identified violations and concerns.

This letter summarizes the applicable legal standards, the evidence gathered during the investigation, OCR's determinations, and the remedies the College has agreed to implement to ensure compliance with Title IX.

## LEGAL STANDARD

The regulation implementing Title IX, at 34 C.F.R. § 106.9, requires a recipient to implement specific and continuing steps to notify all applicants for admission and employment, students and parents, employees, sources of referral of applicants for admission and employment, and all unions or professional organizations holding collective bargaining or professional agreements with the recipient that it does not discriminate on the basis of sex in its education programs or activities, and that it is required by Title IX not to discriminate in such a manner. The Notice of Non-Discrimination must also state that questions regarding Title IX may be referred to the recipient's Title IX coordinator or to OCR.

The Title IX implementing regulation, at 34 C.F.R. § 106.8(a), requires that a recipient designate at least one employee to coordinate its responsibilities to comply with and carry out its responsibilities under that law. The Title IX Coordinator responsibilities include overseeing the school's response to Title IX reports and complaints, and identifying and addressing any patterns or systemic problems revealed by such reports and complaints; and therefore, the Title IX Coordinator must have knowledge of the requirements of Title IX, the school's own policies and procedures on sex discrimination, and of complaints raising Title IX issues throughout the school. The recipient is further required, by the Title IX implementing regulation at 34 C.F.R. § 106.8(a), to notify all students and employees of the name (or title), office address, and telephone number of the designated employee(s).

The Title IX regulation at 34 C.F.R. § 106.31 provides generally that, except as provided elsewhere in the regulation, no person shall on the basis of sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination in education programs or activities operated by recipients of Federal financial assistance. Sexual harassment that creates a hostile environment is a form of sex discrimination prohibited by Title IX. Sexual harassment is unwelcome conduct of a sexual nature. Sexual harassment can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature, such as sexual assault or acts of sexual violence. Sexual harassment of a student creates a hostile environment if the conduct is sufficiently serious that it interferes with or limits a student's ability to participate in or benefit from the recipient's program or activity.

OCR considers a variety of related factors to determine if a sexually hostile environment has been created and considers the conduct in question from both an objective and a subjective perspective. Factors examined include the degree to which the misconduct affected one or more students' education; the type, frequency, and duration of the misconduct; the identity of and relationship between the alleged harasser and the subject or subjects of the harassment; the

Page 4 – President Robert E. Clark II

number of individuals involved; the age and sex of the alleged harasser and the subject of the harassment, the size of the school, location of the incidents, and the context in which they occurred; and other incidents at the school. The more severe the conduct, the less the need to show a repetitive series of incidents; this is particularly true if the harassment is physical. A single or isolated incident of sexual harassment may, if sufficiently severe, create a hostile environment. For example, a single instance of rape is sufficiently severe to create a hostile environment.

Once a recipient knows or reasonably should know of possible sexual harassment, Title IX requires a recipient to take immediate and appropriate action to investigate or otherwise determine what occurred; and if the conduct occurred, whether it created a hostile environment for the harassed student(s) and for others. If an investigation reveals that sexual harassment created a hostile environment, a recipient must take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment, prevent the harassment from recurring and, as appropriate, remedy its effects. These duties are a recipient's responsibility, regardless of whether a student has complained, asked the recipient to take action, or identified the harassment as a form of discrimination. A recipient has notice of harassment if a responsible employee actually knew or, in the exercise of reasonable care, should have known about the harassment. If a recipient delays responding to allegations of sexual harassment or responds inappropriately, the recipient's own action may subject the student to a hostile environment. If it does, the recipient will be required to remedy the effects of both the initial sexual harassment and the effects of the recipient's failure to respond promptly and appropriately. A recipient's obligation to respond appropriately to sexual harassment complaints is the same irrespective of the sex or sexes of the parties involved.

A recipient is responsible under the Title IX regulations for the nondiscriminatory provision of aid, benefits, and services to students. Recipients generally provide aid, benefits, and services to students through the responsibilities they give to employees. If an employee who is acting (or who reasonably appears to be acting) in the context of carrying out the employee's responsibilities either conditions an educational decision or benefit on a student's submission to unwelcome sexual conduct, or engages in sexual harassment that is sufficiently serious to deny or limit a student's ability to participate in or benefit from the program on the basis of sex, the recipient is responsible for the discriminatory conduct and for remedying any effects of the harassment on the complainant, as well as for ending the harassment and preventing its recurrence. This is true whether or not the recipient has notice of the harassment.

The Title IX regulation, at 34 C.F.R. § 106.8(b), requires recipients to adopt and publish grievance procedures providing for the prompt and equitable resolution of complaints alleging action that would be prohibited by Title IX, including sexual harassment and sexual violence. OCR has identified a number of elements in the determining if grievance procedures are prompt and equitable for both parties, including whether the procedures provide for: (a) notice to students and employees of the procedures, including where complaints may be filed, that is easily understood, easily located, and widely distributed; (b) application of the procedures regarding complaints alleging discrimination and harassment carried out by employees, students, and third parties; (c) adequate, reliable, and impartial investigation, including an opportunity to present witnesses and evidence; (d) designated and reasonably prompt timeframes for major stages of the grievance process; (e) written notice to the parties of the outcome and any appeal; and (f) an assurance that the institution will take steps to further prevent harassment and to correct its discriminatory effects, if appropriate. Title IX does not require a recipient to provide

Page 5 – President Robert E. Clark II

separate grievance procedures for sexual harassment complaints, including sexual violence complaints.  A recipient may use student disciplinary or other separate procedures for these complaints; however, any procedures used to adjudicate complaints of sexual harassment or sexual assault, including disciplinary proceedings, must afford survivors and the accused a prompt and equitable resolution.

## BACKGROUND

Wesley College is a private college located in Dover, Delaware, and has one campus.  During the 2014-2015 academic year, the time period in which the incident at issue in the OCR complaint occurred, the College had a total enrollment of 1,615 students, of whom 1,528 were undergraduates.  Of the undergraduate students, 826 (54%) were female and 701 (46%) were male.[1]  During the 2015-2016 academic year, the College had a total enrollment of 1,571 undergraduate students, of whom 895 (57%) were female and 676 (43%) were male.

Pursuant to the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. § 1092 (Clery Act), the College reported zero (0) forcible sex offenses in 2011, two (2) forcible sex offenses in 2012, one (1) forcible sex offense in 2013, and one (1) rape in 2014.

## FACTS AND ANALYSIS

### 1.  Notice of Non-Discrimination[2]

The College's Notice of Non-Discrimination was published in the 2015-2016 undergraduate and graduate course catalogs, the College's employment weblink, 2015-2016 Student Nursing Guide, Nursing Graduate Program Student Handbook, and Staff Handbook (undated).  It did not appear in the 2014-2015 or 2015-2016 Student Handbook.  The Notice of Non-Discrimination does not identify the Title IX Coordinator or any individual at the College responsible for investigating and resolving Title IX complaints.  In addition, none of the publications in which the Notice of Non-Discrimination appears, except the Staff Handbook, states that complaints may be referred to OCR.  The reference to OCR in the Staff Handbook, however, provides the incorrect address for OCR.

OCR concludes that the College's Notice of Non-Discrimination does not comply with the requirements of Title IX, as it 1) does not identify the individual at the College responsible for investigating and resolving Title IX complaints, and 2) is not included in the Student Handbook and, therefore, is not widely distributed.

### 2.  Title IX Coordinator and Training of Title IX Team

In June 2013, the College hired the Dean of Students, and shortly thereafter she also took on the role of Title IX Campus Site Coordinator, acting as the College's Title IX Coordinator (hereafter the Dean of Students will be referred to as the Title IX Coordinator).  The Title IX Coordinator

---

[1] Source: National Center for Education Statistics-
http://nces.ed.gov/globallocator/index.asp?search=1&State=&city=&zipcode=&miles=&itemname=wesley+college&sortby=name&School=1&PrivSchool=1&College=1&CS=9A6F8015
[2] At all times relevant, the College utilized the same Notice of Non-Discrimination.

Page 6 – President Robert E. Clark II

reported that she immediately began the process of initiating, drafting, and implementing new Title IX policies and procedures and oversight over Title IX complaints, as well as designating specific responsibilities to members of the Title IX staff.  In January 2015, the College created a Title IX Team to assist with its efforts to carry out its duties under Title IX, and in February 2015, the College implemented the *Title IX Policy and Procedures*, which replaced the College's previous anti-harassment policy.

As of February 2015, prior to the date of the incident that is the subject of this complaint, the Title IX Team consisted of the Title IX Coordinator, the Central Coordinator for Anti-Harassment, the Central Coordinator for Student Conduct and Sexual Assault (the Student Conduct Coordinator), the Central Coordinator for Athletic Compliance, the Central Coordinator for Disability Support, and the Central Coordinator for Hostile Environment.  Although not designated or identified in the February 2015 *Title IX Policy and Procedures*, the Director of Security operated as a member of the Title IX Team.

Prior to October 2015, the Student Conduct Coordinator investigated all Title IX complaints involving students and also maintained all documentation regarding all Title IX complaints that were forwarded to her from the other Title IX Team members.  The Student Conduct Coordinator was responsible for submitting a spreadsheet summarizing all the Title IX incidents for the Title IX Coordinator's review.

In October 2015, the College hired an additional Central Coordinator for Student Conduct and Sexual Assault, who is referred to as the "Title IX Educator/Investigator," and in February 2016 the College changed several titles/roles of the Title IX Team Members.  Namely, the Director of Security was designated as a member of the Title IX Team, and the Title IX Educator/Investigator took over many of the roles that were previously held by the Student Conduct Coordinator, described above. The Title IX Educator/Investigator also serves as the investigator/advocate for survivors.  Another individual serves as the investigator/advocate for accused students. Although the Title IX Coordinator's title changed from the Title IX Central Coordinator to the "Coordinator/Gatekeeper," her responsibilities stayed the same.  Specifically, the Title IX Coordinator is responsible for reviewing all incidents to identify repeat offenders, problematic locations, and times of the year when the highest number of incidents occur, and is responsible for maintaining oversight over Title IX training and Title IX outreach efforts.  During OCR's onsite, College staff outside of the Title IX office told OCR that they were aware of the Title IX Coordinator, the Student Conduct Coordinator, and their duties.

The names, titles, and contact information for the members of the Title IX Team were published in the College's February 2015, February 2016 and June 2016 *Title IX Policy and Procedures,* in its *2015-2016 Student Handbook*, and on its *Title IX Information Page*.  The *Title IX Information Page*, however, has not yet been updated to include the Director of Security as a member of the Title IX Team.  In addition, at all times during OCR's investigation, the Title IX Team members detailed in the *Title IX Policy and Procedures* were not consistently detailed in the *Title IX Information Page*.

The College provided OCR with documentation demonstrating that the Title IX Coordinator and Student Conduct Coordinator attended Title IX training in May 2015, and in September 2015, the Central Coordinator for Disability Support, the Student Conduct Coordinator, the Title IX Educator/Investigator, and one of the hearing members attended a session on Title IX conduct boards.  The May 2015 training reviewed OCR resolution letters and agreements and various

Page 7 – President Robert E. Clark II

model Title IX investigative documents.  The September 2015 training reviewed the College's *Title IX Policy and Procedures* and *Student Code Procedures* set forth in the *Student Handbook*.  In addition, the College provided OCR with documentation demonstrating that in October 2015, the Assistant Director for Residence Life and Student Conduct Coordinator attended a Title IX session that reviewed the *Title IX Policy and Procedures* and the *Student Conduct Procedures* set forth in the *Student Handbook*.

While OCR did not find violations regarding the establishment of the role and responsibilities of the Title IX Coordinator and the Title IX Team from March 2015 through June 2016, for several reasons OCR has concerns regarding the adequacy of the training provided to Title IX Team members.  Specifically, as described more fully below, the Title IX Team members who investigated and resolved the complaint that was brought against the accused Student misapplied the College's *Title IX Policies and Procedures*, resulting in an inequitable process that did not meet the requirements of Title IX.  Moreover, also as discussed further below, OCR found several other instances of inequitable Title IX complaint investigations in the College's 2013 to 2015 case files.  Additionally, and as discussed below, the Title IX Team members provided conflicting information regarding the College's obligations in response to requests for confidentiality, and  hearing panel members, whose work is facilitated by certain Title IX Team members, lacked clarity about the preponderance of evidence standard which is provided for in the College's *Title IX Policies and Procedures*.  OCR also notes that the role of Central Coordinator for Anti-Harassment was not clear to the Title IX Team members.  Thus, OCR has concerns that the Title IX Coordinator and/or other Title IX Team members were inadequately trained to effectively fulfill their Title IX responsibilities.

## 3. Grievance Procedures

At the time the incident was reported to the College, the College utilized two policies to address complaints of sexual harassment, including sexual assault/violence: (1) *Title IX Policy and Procedures* that were adopted in February 2015 and (2) *Student Conduct Procedures* that were published in the 2014-2015 *Student Handbook*.  The College also maintained a *Title IX Information Page* that provided general information about Title IX and resources at the College.  The *Title IX Policy and Procedures* were revised in February and June 2016.

> *Title IX Policy and Procedures*

The *Title IX Policy and Procedures* apply to all complaints of sexual harassment and sexual assault involving students, employees, or third parties and specifically states that it is applicable regardless of the status of the parties involved, including members or non-members of the campus community, students, student organizations, faculty, administrators, and/or staff.  In addition, it provides the contact information for the Title IX Team.

The *Title IX Policy and Procedures* provides definitions for all forms of harassment, including sexual harassment and sexual misconduct/assault.  In addition, the *Title IX Policy and Procedures* states that the College considers non-consensual sexual intercourse violations to be the most serious, and therefore typically imposes the most severe sanctions, including suspension or expulsion for students and termination for employees.  It also explicitly states that acts of sexual misconduct may be committed by any person upon any other person, regardless of the sex, gender, sexual orientation, and/or gender identity of those involved.

Page 8 – President Robert E. Clark II

The *Title IX Policy and Procedures* also prohibits retaliation and states that the College will implement initial remedial and responsive and/or protective actions upon notice of alleged harassment, retaliation, and/or discrimination, and provides examples of interim and remedial actions offered by the College.

The *Title IX Policy and Procedures* describes in detail the process for investigating and resolving complaints of sexual harassment and/or sexual assault.  Specifically, any member of the community, guest, or visitor may file a complaint with any member of the Title IX Team, who will contact the Title IX Coordinator within 24 hours.  The *Title IX Policy and Procedures* state that within two business days of the receipt of a complaint, an initial determination is made whether a policy violation may have occurred and/or whether "conflict resolution," a mediation process, might be appropriate.  If the incident does not appear to allege a policy violation or if conflict resolution is desired and is appropriate, then the investigation does not proceed.  If an investigation does proceed, the *Title IX Policy and Procedures* states that the College aims to complete the investigation and resolution of the complaint within a 60 business day time period, which can be extended as necessary for appropriate cause by the Title IX Team, with notice to the parties.

If the complaining party wishes to pursue a formal investigation, or if the College decides to pursue a formal investigation based on the alleged policy violation, then the Title IX Coordinator appoints a Title IX Team member to conduct the investigation.  During interviews with OCR, two Title IX Team members stated that the Director of Security, although not identified as a Title IX Team member in the February 2015 *Title IX Policy and Procedures*, conducts all Title IX investigations.

According to the *Title IX Policy and Procedures*, investigations of incidents should be completed expeditiously, normally within 10 business days, unless initial interviews fail to provide direct first-hand information.  In addition, the *Title IX Policy and Procedures* states that the College may undertake a short delay (three (3) to ten (10) days) when criminal charges on the basis of the same behaviors that invoke the student conduct process are being investigated.  However, College action will not be altered or precluded on the grounds that civil or criminal charges involving the same incident have been filed, or that charges have been dismissed or reduced.

The *Title IX Policy and Procedures* permits the College to suspend a student, employee, or organization on an interim basis pending the completion of the investigation and provides procedures that are to govern the interim suspension process.  Specifically, the *Title IX Policy and Procedures* states that, in all cases in which an interim suspension is imposed, the accused will be given the opportunity to meet with the Title IX Coordinator prior to such interim suspension being imposed, or as soon thereafter as reasonably possible, to show why the interim suspension should not be implemented.  In addition, during an interim suspension, a student may be denied access to classes, but at the discretion of the appropriate administrative officer or the Title IX Team, alternative coursework options may be pursued to ensure as minimal an impact as possible on the accused student.

The *Title IX Policy and Procedures* states that all investigations will be thorough, reliable and impartial, and will entail interviews with all relevant parties and witnesses.  In addition, the *Title IX Policy and Procedures* states that during or upon the completion of the investigation, the investigators will meet with the Title IX Team and make a decision regarding whether there is reasonable cause to proceed.  If the Title IX Team decides that no policy violation occurred, or

Page 9 – President Robert E. Clark II

that the preponderance of the evidence did not support a finding of a policy violation, then the process will end. If there is reasonable cause, the Title IX Team will direct the investigation to continue, and if there is a preponderance of evidence of a violation, then the Title IX Team may recommend that the matter be resolved in one of three ways: (1) Conflict resolution, (2) Resolution without a hearing, or (3) the formal hearing processes.

- Conflict resolution is described as a mediation facilitated by the Title IX Coordinator that it is often used for behaviors that are inappropriate but less serious, and is encouraged as an alternative to the formal hearing process to resolve conflicts. The *Title IX Policy and Procedures* states that it is not necessary to pursue conflict resolution first in order to "make" a formal investigation, and anyone participating in conflict resolution can stop that process at any time and request a formal hearing. While the *Title IX Policy and Procedures* states that conflict resolution is not the primary resolution mechanism used to address grievances of sexual misconduct, it also states that it may be made available after the formal process is completed, should the parties and the Title IX Coordinator believe that it could be beneficial.
- Resolution without a hearing is described as a process in which the responding party may choose to admit responsibility for all or part of the alleged violations at any point in the process. The *Title IX Policy and Procedures* states that resolution without a hearing can be pursued for any behavior that falls within the policy, at any time during the process. This section of the *Title IX Policy and Procedures* states that the Title IX Coordinator will provide written notification of an investigation to any member of the College community who is accused of an offense of harassment, discrimination or retaliation. The Title IX Coordinator will meet with the responding individual to explain the finding(s) of the investigation, at which time, the responding party may choose to admit responsibility for all or part of the alleged policy violations. If so, the Title IX Coordinator will render a finding that the individual is in violation of College policy and the Title IX Team will recommend an appropriate sanction or responsive action.
- Formal hearings are applicable for grievances that are not appropriate for conflict resolution and which are not resolved without a hearing.

If the complaint proceeds to a formal hearing, the Title IX Coordinator will initiate the hearing and appoint a non-voting panel Chair and three hearing panel members, none of whom have been previously involved with the investigation. Hearing panels may include both faculty and non-faculty employees, with at least one faculty employee selected in an investigation involving a faculty member. Students do not serve on hearing panels, except in cases of lesser student-on-student investigations. OCR learned that a key Title IX Team member participates in Judicial Board Hearings as a non-voting member, and also as the individual who determines whether an appeal should be forwarded to the appeal panel for processing.

At least one week prior to the hearing, the Chair will send a letter to the parties detailing the alleged violation, applicable procedures and potential sanctions; time, date and location for the hearing; and offer of an advisor. Hearings will be convened usually within one to two weeks of the completion of the investigation. The *Title IX Policy and Procedures* states that the Chair will exchange the names of witnesses the College intends to call, all pertinent documentary evidence, and any written findings from the investigators "between the parties," at least two business days prior to the hearing. In addition, all parties are to have ample opportunity to present facts and arguments in full and question all witnesses during the hearing, though formal cross-examination is not used between the parties. Following the hearing, the hearing panel will deliberate in

Page 10 – President Robert E. Clark II

closed session and will base its determination on a preponderance of the evidence. If an individual is found responsible, the panel will recommend appropriate sanctions to the Title IX Coordinator. The *Title IX Policy and Procedures* allows both parties to appeal the findings and/or sanctions of the panel hearing. In February 2016, the College revised the *Title IX Policy and Procedures*. The revisions did not change the manner in which the College investigates and resolves Title IX complaints, but rather, provided clarifying information regarding the name and role of each Title IX Team member and designated the Director of Security as a member of the Title IX Team. In February 2016, the College also provided OCR with model documents to be utilized during the investigation and/or resolution of a sexual misconduct complaint, including an Investigative Report Template, sample of a Confirmation of Report-Rights and Support Letter, Declining Student Conduct Action Form, and an Educational Conference Acknowledgement Form.

In June 2016, the College made additional revisions to the *Title IX Policy and Procedures*. Once again, the revisions did not change the manner in which the College investigates and resolves Title IX complaints, but instead, revised the name of the Title IX Team to the "Title IX Advocate Team," and replaced the "Alcohol Education and Programming Coordinator" with a "Central Coordinator for Human Resources Advocate."[3]

> *Student Conduct Procedures*[4]

The *Student Conduct Procedures* are contained in the *Student Handbook,* which set forth the procedures the College will use in order to investigate and resolve alleged violations of the *Code of Conduct.* The *Student Conduct Procedures,* detailed in the 2014-15 *Student Handbook,* provide that, once an incident or violation of the *Code of Conduct* has been reported, the first step will be an educational conference, in which the accused student will be given the opportunity to explain his version of events. Educational conferences are held by trained Judicial Hearing Officers. Each accused student is assigned a conduct officer for their educational conference. During the educational conference, the accused student and the conduct officer meet to informally discuss the incident. If the conduct officer determines that a policy has not been violated, then the case and any related judicial charges may be dismissed. If the conduct officer maintains that the policy has been violated, the accused student is given the option of accepting responsibility and thus waiving the right to a formal Judicial Board Hearing and having the officer issue judicial sanctions. When this occurs, the case is considered resolved at the conclusion of the educational conference. Students who do not feel that they have violated the *Student Code of Conduct* have a second option, which is to request a formal Judicial Board Hearing. Students may request that witnesses be called to testify, and students may also invite a member of the faculty or staff to act as an advisor during the hearing. At the conclusion of the

---

[3] Because the February and June 2016 revisions to the *Title IX Policy and Procedures* did not change the manner in which the College investigates and resolves Title IX complaints, unless otherwise noted as the February or June 2016 *Title IX Policy and Procedures,* any general reference to the "*Title IX Policy and Procedures*" refers to information that consistently appears in each version of the *Title IX Policy and Procedures.*

[4] In the incident involving the accused Student, OCR's investigation found that the *Student Conduct Procedures* contained in the *Student Handbook* were provided to the accused Student to guide him through the investigative process. Thus, even though College staff informed OCR that the procedures set forth in the *Title IX Policy and Procedures* were to govern the processing of the complaint involving the accused Student, the accused Student believed that the *Student Conduct Procedures* in the *Student Handbook* governed the processing of the complaint. Accordingly, OCR also assessed the *Student Conduct Procedures* for compliance with the requirements of Title IX.

Page 11 – President Robert E. Clark II

hearing, the board members meet in closed session to determine its decision, and, in the event that the student is found responsible, the board will recommend appropriate sanctions. Both parties are permitted to appeal the outcome of an Administrative or Judicial Board Hearing.

The 2015-2016 *Student Handbook* included a disclaimer stating that all incidents of sexual misconduct are processed under the College's *Title IX Policy and Procedures*. The 2014-2015 *Student Handbook* that was in effect at the time of the incident in this complaint did not contain such a disclaimer, even though College staff members told OCR that, at the time of that incident, sexual misconduct complaints were being processed under the *Title IX Policy and Procedures.*

    *Title IX Information Page*

As of at least September 2015 through September 2016, the *Title IX Information Page* on the College's website provided general information regarding Title IX, definitions, the College's responsibilities under Title IX, contact information for the Title IX Team, an incident report to be utilized to report any incident of sexual harassment and/or sexual violence, a description of the College's reporting options, and a list of resources with contact information. The *Title IX Policy and Procedures* and *Title IX Information Page* appear together as links on the College's Title IX webpage.

OCR concludes that the *Title IX Policy and Procedures* adequately states that they apply to complaints alleging discrimination or harassment carried out by employees, students and third parties. Specifically, the *Title IX Policy and Procedures* appropriately states that any member of the community, guest, or visitor who believes that the Policy has been violated should contact a member of the Title IX Team. The *Title IX Policy and Procedures* also appropriately states that it applies to behaviors that take place on the campus, at college-sponsored events, and may also apply off-campus and to actions online, and that the College will take additional prompt remedial and/or disciplinary action with respect to any member of the community, guest or visitor who has been found to engage in harassing or discriminatory behavior or retaliation. In addition, the *Title IX Policy and Procedures* states that its procedures for conducting and resolving an investigation applies to students, staff, or faculty members, and redress and requests for responsive actions involving non-members of the community are also covered.

OCR also concludes that the *Title IX Policies and Procedures*, as written, provide for an adequate, reliable, and impartial investigation, including an opportunity to present witnesses and evidence. Specifically, the *Title IX Policy and Procedures* explicitly states that all investigations will be thorough, reliable, and impartial, and will entail interviews with all relevant parties and witnesses, obtaining available evidence and identifying sources of expert information, if necessary. However, as described more fully below, OCR's investigation revealed that the College failed to follow this stated practice in the incident involving the accused Student, and with regard to many of the other incidents of sexual harassment and/or sexual violence investigated by the College during the 2013-2014 and 2014-2015 academic years.

OCR also concludes that the *Title IX Policies and Procedures* adequately provides for written notice to the parties of the outcome and any appeal. Specifically, the *Title IX Policy and Procedures* states that the Title IX Coordinator will inform the accused individual and the party bringing an investigation of the final determination within two (2) to three (3) business days of the hearing. In addition, the *Title IX Policy and Procedures* states that the Title IX Coordinator will render a written decision on the appeal to all parties within two (2) to three (3) business days

Page 12 – President Robert E. Clark II

from the hearing of the appeal.  However, as described more fully below, OCR's investigation revealed that the College failed to provide written final determinations in several incidents of sexual harassment and/or sexual violence investigated by the College during the 2013-2014 and 2014-2015 academic years.

Last, OCR concludes that the *Title IX Policies and Procedures* adequately provides an assurance that the College will take steps to prevent further harassment and to correct its discriminatory effects on the complainant, if appropriate.  Specifically, the *Title IX Policy and Procedures* states that the College may provide interim remedies intended to address the short-term effects of harassment, discrimination, and/or retaliation to redress harm to the alleged survivor and the community and to prevent further violations.  In addition, the *Title IX Policy and Procedures* describe the various sources of remedial support for survivors, as well.

OCR's investigation also determined, however, that the *Title IX Policies and Procedures* are not fully complaint with Title IX.  Specifically, the College's policy providing for discontinuation of investigation if a student waived a right to a formal Judicial Board Hearing, when given that option, violates Title IX.  OCR also found that the College violated Title IX by failing to provide adequate notice to students, employees, and third parties of the procedures and by failing to provide designated and reasonably prompt timeframes for all stages of the grievance process, as described more fully below:

>        *a.   Notice*

At all relevant times, the *Title IX Policy and Procedures* and the *Title IX Information Page* included contact information for different Title IX Team members.  The June 2016 *Title IX Policy and Procedures* provides contact information for a Central Coordinator for Human Resources Advocate, but the current *Title IX Information Page* provides different contact information for an individual designated as the Title IX Coordinator for Hostile Environments. In addition, as noted above, the *Title IX Information Page* has not yet been updated to include the Director of Security as a member of the Title IX Team, even though he appears as a member of the Title IX Team in the June 2016 *Title IX Policy and Procedures*.

>        *b.   Designated and reasonably prompt timeframes*

The *Title IX Policy and Procedures* states that all employees receiving reports are expected to promptly contact the Title IX Coordinator within 24 hours.  In addition, the *Title IX Policy and Procedures* also states that the College aims to complete the investigation and resolution of complaints within a 60 business-day time period, which can be extended, as necessary, for appropriate cause and with notice to the parties.  Moreover, the *Title IX Policy and Procedures* states that investigations should be completed within ten (10) business days, and that hearings will be convened usually within one (1) to two (2) weeks of the completion of the investigation, and that the parties will be informed of the hearing determination within two (2) to three (3) days.

OCR has several concerns regarding the College's timeframes.  The *Title IX Policy and Procedures* do not provide any timeframes for the appeal panel to make a determination.  In addition, typically, a 60 calendar, not business, day period is considered an appropriate guidepost to investigate and reach resolution for a Title IX matter.  Also, OCR has concerns that the time period utilized to investigate and resolve some of the College's sexual harassment and sexual

Page 13 – President Robert E. Clark II

violence cases between 2013 and 2015, including the accused Student's case, may have been too short to allow for equitable investigations and resolutions. See discussion below.

### c. Other Concerns

OCR also identified the following concerns with regard to the *Title IX Policy and Procedures* and *Student Conduct Procedures*:

- The College's *Title IX Policy and Procedures* and *Student Conduct Procedures* do not explicitly bar conflict resolution in matters involving sexual harassment or sexual violence, even if only utilized after the formal process is completed.
- The *Title IX Policy and Procedures* state that within two business days of the receipt of a complaint an initial determination is made whether a policy violation may have occurred, which may not provide sufficient time for the College to meet its responsibility to investigate and determine whether steps are necessary to ensure student safety, both for students directly involved and for others who may experience a hostile environment.
- A key Title IX Team member participates in Judicial Board Hearings as a non-voting member, and also as the individual who determines whether an appeal should be forwarded to the appeal panel for processing. This may present a conflict of interest if the Title IX Team member has any oversight over the investigation of sexual misconduct complaints.
- The 2014-2015 *Student Handbook* that was in effect at the time of the incident involving the accused Student did not include a disclaimer directing individuals to the *Title IX Policy and Procedures*. Thus, prior to the 2015-2016 academic year, in which a disclaimer was inserted into the *Student Handbook*, individuals may have mistakenly believed that the *Student Conduct Procedures* set forth in the *Student Handbook* applied to incidents involving sexual misconduct.
- The *Title IX Policy and Procedures* and the 2014-15 *Student Conduct Procedures* that were in effect at the time of the incident involving the accused Student were contradictory, with each providing a different process for the resolution of the complaints of sexual harassment and/or sexual violence.

In addition, and as discussed below, to the extent the College's policies contain many of the required Title IX procedural requirements, the College did not implement many of those procedural requirements in the investigation and resolution of the incident involving the accused Student.

### 4. Responsible Employees

The *Title IX Policy and Procedures* and the *Student Conduct Procedures* contained in the *Student Handbook*, provide for three reporting categories: (1) confidential reporting, (2) formal reporting, and (3) quasi-confidential reporting:

The confidential reporting option provided for in the *Title IX Policy and Procedures* permits survivors to report an incident of sexual harassment or sexual violence to certain designated individuals who will maintain the survivor's confidentiality except in extreme cases of immediacy of threat or danger or abuse of a minor. On-campus confidential reporters include campus counselors, the employee assistance program, and on-campus clergy/chaplains. The *Title IX Policy and Procedures* further states that the on-campus resources cited above will

Page 14 – President Robert E. Clark II

submit anonymous statistical information for Clery Act purposes only, unless they believe it would be harmful to the reporting individual.

The *Title IX Policy and Procedures'* formal reporting option provides that formal reports may be made to the Title IX Team and that privacy is afforded to the reporter because only a small group of officials who need to know the information will be told.  The *Title IX Policy and Procedures* states that information will be shared as necessary with investigators, witnesses and the responding party, and that the circle of people with this knowledge will be kept as tight as possible to preserve the individual's rights and privacy.

Pursuant to the *Title IX Policy and Procedures,* most resources on campus fall in the middle of these two extremes, meaning that neither the College, nor the law, requires them to divulge private information that is shared with them, except in rare circumstances.

The *Student Conduct Procedures* set forth in the 2014-2015 *Student Handbook* provides information regarding this third reporting option, which is referred to as "quasi-confidential reporting," describing it as:

> *You can seek advice from certain resources who are not required to tell anyone else your private, personally identifiable information unless there is cause for fear for your safety, or the safety of others.  These resources include those without supervisory responsibility or remedial authority to address sexual misconduct, such as [Resident Advisors], faculty members, advisors to student organizations, career services staff, admissions officers, student activities personnel, Student Life staff members, and many others.  If you are unsure of someone's duties and ability to maintain your privacy, ask them before you talk to them.  They will be able to tell you, and help you make decisions about who can help you best.  Some of these resources, such as RAs, are instructed to share Incident Reports with the supervisors, but they do not share any personally identifiable information about your report unless you give permission, except in the rare event that the incident reveals a need to protect you or other members of the community.*

Eight (8) College staff members interviewed asserted that all members of the College faculty, staff, and administration, except for the chaplain and counseling, are required to notify the Title IX Team of all incidents of sexual misconduct, including all details of the incident that are shared with them by the survivor, and that this reporting requirement also applies to resident advisors.  Thus, none of these staff members were aware of a quasi-confidential reporting option, even though it was provided for in the *Student Conduct Procedures* set forth in the 2014-2015 *Student Handbook*.  Further, when asked to explain what is meant by the quasi-confidential reporting category detailed in the *Student Conduct Procedures*, two (2) Title IX Team members stated that they were unsure of the intent of this category given that their understanding was that all employees on campus were responsible employees except for the campus chaplain, nurse and counselor.

A responsible employee includes any employee: who has the authority to take action to redress sexual violence; who has been given the duty of reporting incidents of sexual violence or any other misconduct by students to the Title IX coordinator or other appropriate school designee; or

Page 15 – President Robert E. Clark II

whom a student could reasonably believe has the authority or duty.  OCR recognizes that any person with a professional license requiring confidentiality is not required to report, without the student's consent, incidents of sexual violence to the school in a way that identifies the student. OCR recognizes that some people who provide assistance to students who experience sexual violence are not professional or pastoral counselors, and thus, schools have the latitude not to require that these individuals report incidents of sexual violence in a way that identifies the student without the student's consent.  However, this category should be limited and typically applies to individuals who work or volunteer in an on-campus sexual assault center, survivor advocacy office, health center, or similar entity.  Thus, OCR has concerns that the quasi-confidential category detailed in the *Student Conduct Procedures* is overly inclusive; to the extent there are staff and persons who may receive confidential reports at the College, the number should be very limited.

OCR also has concerns that the College's policies and procedures provide conflicting information regarding staff reporting obligations and confidential reporting by students.  A school's Title IX policies and procedures should be easily understood, but the College's *Title IX Policy and Procedures* do not adequately describe the "quasi-confidential" reporting option. Last, OCR has concerns that the *Student Conduct Procedures* inappropriately places the burden on the student to determine the duties and ability of staff persons or persons affiliated with the College to maintain privacy.

In addition, given that none of the College staff members interviewed by OCR were aware of the quasi-confidential reporting category, OCR has concerns that College staff are not adequately trained regarding the College's policy regarding reporting obligations.  A school needs to ensure that responsible employees with the authority to address sexual harassment and sexual violence know how to respond appropriately, and know that they are obligated to report sexual harassment and sexual violence to appropriate school officials, and that all other employees understand how to respond to reports of sexual harassment and sexual violence.

### 5. Confidentiality

The *Title IX Policy and Procedures* states that every effort will be made to maintain the privacy of those initiating a report, and in all cases, the College will give consideration to the party bringing an investigation with respect to how the investigation is pursued, but reserves the right, when necessary to protect the community, to investigate and pursue a resolution when an alleged survivor chooses not to initiate or participate in a formal investigation.  By contrast, without noting the obligation to investigate to the degree possible, the *Title IX Information Page* contains a tab entitled "Why is Reporting Important?" in which it states that "*the College is unable to charge someone who has participated in an act of sexual misconduct or harassment without an actual survivor coming forward.*"

Additionally, one Title IX Team member told OCR that if a survivor wishes not to proceed with an investigation or adjudication, the College will cease its investigative activities.[5]  The Team member further stated that the College will only proceed with investigation or adjudication, against the survivor's wishes, if there is a risk to the community.  According to that Title IX

---

[5] In contrast, other Title IX Team members interviewed by OCR told OCR that the College has an obligation to investigate every reported Title IX incident, without consideration to the victim's wishes.

Page 16 – President Robert E. Clark II

Team member, the Title IX Coordinator is responsible for making the determination as to whether the College can honor the survivor's request, or has to proceed with an investigation.

Based on this information, OCR has concerns regarding the College's approach to confidentiality issues.  Specifically, the College's *Title IX Information Page* stating that the College is unable to proceed without an actual survivor is flawed, as written.  The College has an obligation to make reasonable efforts to investigate and address instances of sexual misconduct when it knows or should have known about such instances, even when a complainant chooses not to participate in an investigation.  As such, the information presented in the College's *Title IX Information Page* should be consistent with the information presented in its College's *Title IX Policy and Procedures,* where it states that the College will carry out its Title IX obligations to investigate to the extent possible even when information is provided in a confidential manner.  In addition, OCR has concerns that College staff are not adequately trained regarding the *Title IX Policy and Procedures* with respect to confidentiality, given the conflicting information provided by the Title IX team members during interviews.

### 6.  Handling of Criminal Complaints

The *Title IX Information Page* lists the various reporting options for survivors, including reporting to police for criminal charges, and provides the phone number for the Dover Police Department.  According to a Title IX Team member, when a student notifies the Campus Safety and Security Office of a sexual assault, Campus Safety and Security will respond to the location on campus, ensure that the student is safe, and provide the student with emergency medical assistance.  OCR observed that the College followed this practice in four (4) sexual misconduct incidents that occurred in 2014 and 2015.  The Director of Security told OCR that his office coordinates with local police and that he routinely advises survivors who come directly to his office to report an incident, of their right to file a complaint with local law enforcement.  He further informed OCR that, if an incident just took place, or is sufficiently egregious, his office will contact local law enforcement to secure the scene.  He stated, however, that the decision to involve local law enforcement depends on the facts of each case.

Based on a review of the College's case files related to reports of sexual harassment and sexual violence from August 2013 through April 2015, OCR does not have any concerns regarding the College's handling of criminal complaints.  Specifically, the documentation reviewed by OCR reflects that the College contacted local law enforcement, when appropriate, and, in accordance with Title IX, continued with its Title IX investigation notwithstanding of the law enforcement process.

### 7.  Training/Outreach[6]

The College conducted Title IX training for all employees in November 2015, which addressed: the definition of Title IX, including the various types of discrimination and harassment; the individuals protected by Title IX (students, staff, faculty and third parties); the College's obligation to address harassment that may occur off-campus; definitions of the various categories of employees; definitions of sex discrimination, harassment and assault; bystander intervention; confidentiality; retaliation; guidance on how to take a stand against and avoid engaging in sexual

---

[6] OCR reviewed and assessed the College's Title IX training activities that occurred during, or after the time period in which the incident that is the subject of this complaint occurred.

Page 17 – President Robert E. Clark II

harassment; information on various on and off campus resources, including the contact information for the Title IX Coordinator and other members of the Title IX Team; and case scenarios.  As noted above, even though the training addressed the definitions of the various employee reporting categories, OCR has concerns regarding the adequacy of the training provided to the College community given that College staff interviewed by OCR lacked sufficient understanding of the various employee reporting options and obligations regarding confidentiality.

The College also conducted Title IX training for all students in the fall 2015, in which 720 students who lived in residence halls, and 12 commuter students participated.  The College provided OCR with a copy of the PowerPoint slides that were utilized during the training, which reflects that the training:  provided an overview of Title IX, including its statutory language; explained that Title IX applies to all forms of sex based discrimination, including sexual harassment, sexual misconduct, sexual violence and gender-based harassment, and applies to students, staff and third parties; clarified that Title IX protects students in any educational program or activity, even at school-sponsored off-campus activities; provided a definition of notice, and further defined what is considered a responsible employee; provided an in-depth definition of sexual harassment, including sexual violence, and provided several examples; included a section on consent and retaliation, and bystander intervention; the duty to report; confidential reporting options; and a list of available resources, including the name and contact information for the Title IX Coordinator and the other Title IX Team members.  A key Title IX Team member told OCR that the training was mandatory and that they tracked attendance; however, it was acknowledged that there was no consequence for non-attendance.

A Title IX Team member stated that the College also conducted targeted Title IX training for resident advisors during the summer 2015, which addressed the reporting process, consent, bystander intervention, the influence of alcohol, etc.  In addition, as described more fully above, the documentation provided by the College demonstrates that it conducted several targeted training sessions for the Title IX Coordinator, other Title IX Team members and Assistant Director for Residence Life in 2015.  Additionally, the College provided OCR with copies of posters that are located throughout campus since the fall 2013, providing information regarding sexual assault.

During OCR onsite interviews with hearing panel members, OCR learned they received general training addressing sexual harassment in 2012 by the College's consulting attorney for student affairs issues.  However, the hearing panel members each lacked clarity regarding the College's preponderance of evidence standard.

As noted above, OCR has concerns that the training of the Title IX Team members who handled various aspects of the complaint against the accused Student was insufficient as several Title IX Team members either did not follow or misapplied the College's *Title IX Policies and Procedures*, resulting in an inequitable process that did not meet the requirements of Title IX.  In addition, as described more fully above, OCR has concerns that College staff are not adequately trained regarding the College's policy on requests for confidentiality and reporting obligations, and that hearing panel members were not trained since 2012.  Thus, staff did not have sufficient knowledge of the requirements of Title IX and the College's own policies and procedures on sex discrimination in order to effectively implement their role and responsibilities.

Page 18 – President Robert E. Clark II

### 8. Record Keeping Practices

The *Title IX Policy and Procedures* provides that records of all investigations, resolutions and hearing will be kept in the President's Office. The February and June 2016 *Title IX Policy and Procedures* modified this provision by designating that the materials would be maintained in the Student Affairs' Office. However, in November 2015, a key Title IX administrator informed OCR that the College's practice is to delete recordings of hearings 10 days after the conclusion of the hearing or appeal process, including the recording of the accused Student's hearing. The revised February and June 2016 *Title IX Policy and Procedures* state that "[a]ll recordings will be deleted 10 days after the conclusion of the hearing or the appeal process."

A Title IX Team member reported that information regarding incidents of sexual harassment or sexual violence is documented in a daily Blotter and Crime log, and Incident Reports are completed by each relevant Title IX Team member. The Team member further provided that the Safety and Security Administrative Assistant maintains documentation of complaints, investigative materials and findings regarding each incident.

The Title IX Coordinator told OCR that the Student Conduct Coordinator compiles all information regarding incidents of sexual harassment, which the Title IX Coordinator reviews on at least a monthly basis to identify patterns in repeat offenders, events of concern, and locations. The Title IX Educator/Investigator took over this role once she was hired in October 2015. The Central Coordinator for Hostile Environment maintains all documentation of incidents of sexual harassment involving employees.

OCR has concerns regarding the College's deletion within 10 days of the accused Student's hearing record. The College is required to meet its legal obligation to comply with the record-keeping provisions of the Department's regulation.[7] While Title IX does not require a recipient to make a recording of hearings, to the extent that such a recording is made, it constitutes a record and must be kept in order to be available to enable OCR to ascertain whether the College is carrying out its legal obligations under the Title IX regulations. Destroying hearing records after the hearing or appeal necessarily means that the College was undertaking steps that would result in relevant information not being available to OCR during its investigation and monitoring to assess whether the College is carrying out its legal obligations under the Title IX regulations. OCR is obligated to review pertinent practices and policies of the College, the circumstances in which the noncompliance occurred, and other factors relevant to a determination of whether the College has corrected its noncompliance with Title IX. Similarly, the document destruction prevents any external review, including pursuant to judicial proceedings, should a participating student wish to challenge the equity of the College's administrative process in court. Finally, destruction of the hearing records prevents the College itself, and specifically its Title IX Coordinator, from being able to review information to determine whether patterns of conduct exist, or whether further steps are necessary for the College to take to ensure student safety, or whether the College is satisfied with the fairness of its own administrative process as applied in particular cases.

---

[7] The regulation implementing Title VI, at 34 C.F.R. § 100.6(b) and (c), requires that a recipient of Federal financial assistance make available to OCR information that may be pertinent to reach a compliance determination. This requirement is incorporated by reference in the Title IX regulation at § 106.71.

Page 19 – President Robert E. Clark II

OCR also has concerns that the College's February and June 2016 *Title IX Policy and Procedures* have conflicting provisions regarding maintaining all materials regarding reports of sexual violence.  On the one hand, the February 2016 *Title IX Policy and Procedures* require that all documents are maintained by the College and, on the other, provide that hearing transcripts will be deleted within 10 days at the conclusion of the hearing or appeal process.

### 9.   Student Climate Information and Climate Assessment/Response

The College provided copies of an employee and student Title IX survey that was administered in early January 2016.  The College reported that it is using the results of the survey to develop a strategic plan for shifting the College climate regarding Title IX issues.

OCR reviewed a summary report of the survey results of the January 2016 survey, which reflects that 118 students (7.5%) completed the survey (79% female students; 21% male students).  OCR notes that only 5% of the responders who experienced or observed an incident of sexual harassment and/or misconduct indicated that they reported the incident formally to College staff or administrators; 15% of the responders indicated that they did not know to whom they should report the incident.  Twelve and one-half percent of the responders indicated they did not report the incident because they did not think College administration would do anything.  Half of the responders (50%) indicated that they understand the College process for addressing reports or unlawful discrimination and sexual misconduct.

One hundred fifty-three (153) employees completed the employee survey.  The summary report for the employee survey reflects that 11% of the responders indicated that they had observed sexual harassment on campus and 6% of the responders stated that they encountered sexual harassment that they did not report.  In addition, 18% of the responders stated that they feared retaliation for reporting sexual harassment.

The College's administration of the survey afforded the College information through which it can assess its Title IX obligations.  OCR does not have concerns generally regarding the College's administration of the climate survey and assessment, except that increased participation will potentially lead to more accurate data upon which the College could justifiably rely in developing its strategic plan for changing the College climate regarding Title IX issues.

### 10.   Handling of Complaints and Incidents of Sexual Assault/Violence

OCR investigated whether the College provided prompt and equitable responses to sexual harassment and/or sexual violence complaints, reports and/or other incidents of which it had notice (knew or should have known about) from August 2013 through April 2015, including the incident involving the accused Student.  OCR also investigated whether any failure by the College to promptly and equitably respond to complaints of sexual harassment/violence of which it had notice, resulted in individuals being subjected to continuing to be subjected to a sexually hostile environment.

*Incident Involving the accused Student and Students 1, 2 and 3*

On March 31, 2015, an Associate Professor (the reporting Professor) notified a Title IX Team member (Administrator 1) that she received a report by two female students of an incident of sexual misconduct involving several students at an off-campus residence.  The reporting

Page 20 – President Robert E. Clark II

Professor stated that the female students told her that a member of a fraternity, Student 1, had live streamed himself engaged in a sex act with a female student (Student 4) without her knowledge, and that other students had seen the live stream. She reported that the incident occurred sometime over the weekend of March 20-22, 2015. Administrator 1 reported to OCR that, later that same day, the two female students arrived at his office to make their own report, and at that time, they provided him with the name of another male student (Witness 1) who could provide additional information. On the afternoon of March 31, 2015, Administrator 1 interviewed Witness 1, who stated that, although he was not present at the time of the incident, he was aware that members of the fraternity provided Student 1 with a video camera to live stream the sexual encounter. Witness 1 identified the fraternity members who watched the live stream as the accused Student and Students 2 and 3. On April 1, 2015, Administrator 1 conducted an interview with Student 1, who conceded that a video camera was setup in his bedroom and live streamed downstairs, where the accused Student and Students 2 and 3 watched it.

Later on April 1, 2015, Administrator 1 and another Title IX Team member (Administrator 2) spoke with Student 4, who confirmed that she engaged in a consensual sex act with Student 1, but that she never consented to the live streaming and found out about it from another student days later. Student 4 told OCR that she informed Administrators 1 and 2 that she believed that the accused Student was not involved in the planning or execution of the live streaming. Student 4 told OCR that another Title IX Team member (Administrator 3) told her that the hearing would have to proceed because the accused Student was identified by witnesses as being involved in the planning and execution of the live streaming. Student 4 confirmed that, shortly thereafter, a College counselor called her, stated that she was aware of the incident, and offered counseling.

On the same day (April 1, 2015), the accused Student and Students 1, 2 and 3 were called to Administrator 3's office and notified that they were being charged with violations of the College's *Code of Conduct* (violations 13.0 (General Laws: Violation of Delaware Privacy Law) and 15.0 (Sexual Misconduct)) and that the College was imposing an interim suspension upon each student. Although the *Title IX Policy and Procedures* states that whenever an interim suspension is imposed, the student will be given the opportunity to show why the suspension should not be implemented, College staff conceded to OCR that neither the accused Student, Students 1, 2, or 3 were afforded this opportunity. Later on April 1, 2015, Administrator 3 provided each student with written notification of the charges, advising each student of the interim suspension that included a bar from campus and attendance in classes, and a no contact order with Student 4. The letter further advised that each student must contact Administrator 2 to obtain information about the student conduct process.

The April 1, 2015 letter that was sent to the accused Student and Students 1, 2 and 3 differed from the notices that were sent to accused students in every prior incident report that was provided to OCR from the 2013-2014 and 2014-2015 academic years. Specifically, all other notices provided to accused students stated:

> "*You do have the right to go through the college's student conduct process to respond to these charges. Please call or email [the designee] to arrange an **educational conference**. During this conference you and [the designee] will discuss what occurred and she will inform you of your options, which may be a formal Judicial Board Hearing, to resolve the matter.*"

Page 21 – President Robert E. Clark II

> By contrast, the notice sent to the accused Student and Students 1, 2 and 3 stated: "*You do have the right to go through the college's student conduct process to respond to these charges. Please call or email [Administrator 2]…to discuss the procedure. During this conversation you and [Administrator 2] will discuss the formal Judicial Board Hearing process. She will also convene the board and inform you of the date and time of your hearing.*"

According to the *Student Conduct Procedures* set forth in the 2014-2015 *Student Handbook* in effect at the time of the incident, that was also forwarded as a link to the accused Student and Students 1, 2 and 3 on April 2, 2015, the educational conference is where the accused student is provided with the opportunity to explain his/her version of events, and, where the accused student is given the option of accepting responsibility and thus waiving the right to a formal Judicial Board Hearing. The educational conference takes place between the College and the accused student; the student who makes the accusation does not participate.

Administrator 2 conceded that no educational conference was provided to the accused Student or Students 1, 2, and 3. Administrator 2 also confirmed that another resolution option detailed in the *Title IX Policy and Procedures* (Resolution without a hearing), was not provided to the accused Student or Students 1, 2 and 3. Thus, although the educational conference and Resolution without a hearing resolution options were detailed in the policies and procedures in effect at the time of the incident, neither the accused Student, nor Students 1, 2 and 3 were ever offered these resolution options. Administrator 2 also conceded that the *Title IX Policy and Procedures* and the *Student Conduct Procedures* provide for the options of the educational conference and Resolution without a hearing for all matters, including incidents of sexual violence. Thus, not only were these resolution options never made available to the accused Student or Students 1, 2 or 3; notice was never provided to the accused Student or Students 1, 2 or 3 that these means of resolution were not available for them. Moreover, because these options were not afforded to the accused Student or Students 1, 2 or 3, they were not provided with the opportunity to explain their version of events or the option of accepting responsibility and thus waiving the right to a formal Judicial Board Hearing. The accused Student asserts that as a result of his confusion regarding the student conduct process, he believed that the formal hearing was, in fact, an informal educational conference and/or Resolution without a hearing.

On April 1, 2015, Administrator 2 spoke with the accused Student regarding the student conduct process. Administrator 2 asserts that she informed the Student that the College could assist him with providing an excuse from classes for each witness he intended to call, which the Student adamantly denies. OCR notes that the Judicial Hearing Pointers sheet which was provided to the accused Student via email on April 2, 2015, stated that it was his responsibility to contact any witnesses to the alleged violation that he wanted to attend the Hearing.

On April 2, 2015, Administrator 2 emailed the accused Student to advise him of the date and time for his Judicial Board Hearing, and provided an attached Judicial Hearing Pointers sheet, as well as a link to the *Student Handbook* for further information regarding the student conduct process. Even though staff interviewed by OCR averred that the applicable policy at the time of the incident was the *Title IX Policy and Procedures*, this was not provided to the accused Student during the investigation and/or resolution of the complaint against him. The accused Student told OCR that it was his understanding that he should follow the *Student Conduct Procedures* set forth in the *Student Handbook* because Administrator 2 provided him with a link to it as further information and guidance. More specifically, because the *Student Conduct Procedures* set forth

Page 22 – President Robert E. Clark II

in the *Student Handbook* called for an educational conference as the first step in the student conduct process, he explained to OCR that he believed that the hearing scheduled for April 7, 2015 was either an informal hearing, the educational conference, and/or the Resolution without a hearing process detailed in the *Student Conduct Procedures*, and, therefore, he was not sufficiently prepared at the hearing.

The Judicial Board Hearing for the accused Student and Students 1, 2 and 3 was held on April 7, 2015. Although the *Title IX Policy and Procedures* states that all investigations will be thorough, reliable, and impartial, and will entail interviews with all relevant parties and witnesses, the College did not conduct any interviews with the accused Student or Students 2 and 3 prior to the hearing. Moreover, although the *Title IX Policy and Procedures* states that the Chair will exchange the names of witnesses the College intends to call, all pertinent documentary evidence, and any written findings from the investigators "between the parties," at least two business days prior to the hearing, neither the accused Student, nor Students 1, 2 or 3 were provided with a copy of the Incident Report or the investigative findings prior to the hearing. Thus, neither the accused Student nor Students 2 or 3 were provided with the information collected by Administrator 1 from the anonymous female students who reported the incident, Witness 1, and Student 1. The accused Student did not bring any witnesses to the hearing, but he provided a letter of support from two of his professors. As stated above, the accused Student stated that he did not bring witnesses to the hearing because he did not believe that the April 7, 2015 hearing was the final step in the process; rather, in accordance with the *Student Conduct Procedures* set forth in the *Student Handbook* that was sent to him as a link on April 2, 2015, he believed that the April 7, 2015 hearing was an educational conference and/or Resolution without a hearing.

The College stated that the reporting Professor and Student 4 were the only two witnesses called during the hearing. In addition to the hearing panel members, Administrator 1 and Administrator 2 were also present at the hearing. At the hearing, the accused Student and Students 1, 2 and 3 were present to hear the initial reading of the Incident Report by Administrator 1, and were each able to question Administrator 1 directly. The accused Student and Students 1, 2 and 3 were then brought to the hearing panel individually to give their statement and be questioned by the panel; none of the students were informed of each other's testimony. According to the hearing panel members, Student 1 stated during his individual testimony that the accused Student participated in the planning of the incident and watched the live stream on the date of the incident. Although the *Title IX Policy and Procedures* states that all parties are to have ample opportunity to question all witnesses during the hearing, the accused Student was not made aware of this testimony by Student 1 at any time during the hearing or thereafter, and was never provided with the opportunity to question Student 1 regarding his testimony. Each panel member also informed OCR that Student 4 expressed reluctance to participate as a witness because she disagreed with the College pursuing adjudication against the accused Student and Students 1, 2 and 3. Although the proceedings were recorded, a key Title IX administrator reported that recording was deleted within ten (10) days after the appeal was completed.

The College provided OCR with the Judicial Board Hearing Summary for all four accused students, which was dated April 8, 2015 and reflects that the Board found each responsible for violations 13.0 (General Laws) and 15.0 (Sexual Misconduct) and recommended an expulsion for each student. The accused Student and Students 1, 2 and 3 were provided with written notice of the outcome of the hearing and expulsion, which also stated that each student was prohibited indefinitely from taking classes, or being present on College owned or controlled property, and

Page 23 – President Robert E. Clark II

was subject to arrest for criminal trespass if he was found present on College property without permission from Administrator 2. Included with the letter was a summary of the appeal procedures. Student 4 told OCR that she received a copy of the letter advising her of the outcome of the Judicial Board Hearing via email.

The Complainant asserts that the College did not conduct an equitable investigation of the incident by failing to obtain other witness statements during the investigation, and by failing to assist the accused Student with excusing his witnesses from class to attend the Judicial Board Hearing. The Complainant also asserts that a key witness was Student 4, but the accused Student could not ask for Student 4 to provide a statement as a no contact order was implemented on April 1, 2015. Last, the Complainant cited the following statement in the College's *Title IX Policy and Procedures*: "*The College is unable to charge someone who has participated in an act of sexual misconduct or harassment without an actual victim coming forward.*" The Complainant asserts that the College failed to follow its policy by charging the accused Student when Student 4 did not come forward to report the incident.

The Complainant provided OCR with a copy of an April 9, 2015 email that Student 4 sent to Administrator 2 after the hearing, asking for a meeting, and stating that she learned that there was a video of Student 3 admitting to planting the camera in the room. She further stated that she wanted to discuss why the accused Student was expelled given that he had no involvement in the incident. Student 4 told OCR that, after the hearing, Students 1, 2 and 3 admitted to her their involvement in the incident, and conceded that the accused Student had no involvement in the planning or execution of the incident. She further asserts that she informed Administrator 2 of this information, who told her that the accused Student would have to appeal the hearing panel decision.

On April 16, 2015, the accused Student submitted an Intent to Appeal Form, based on new evidence that was not available at the time of the hearing, which, if introduced, he believed would significantly affect the outcome of the hearing. The accused Student stated in his appeal that new evidence that was not available at the time of the hearing was that Student 4 learned exactly who was responsible for the live streaming, and reported it to Administrator 2. In addition, the accused Student submitted letters of support. Administrator 2 notified the accused Student in writing that his appeal was denied because it failed to meet the College's criteria. The appeal requests for Students 1, 2, and 3 were also denied.

The accused Student was expelled from the College a few weeks before graduation and subsequently in February 2016 he entered into and completed a trade program at another school.

*Analysis of the Incident Involving the Accused Student and Students 1, 2, and 3*

   *The Accused Student*

OCR determined that the accused Student was entitled to procedural protections that the College did not afford him. In processing the complaint against the accused Student, the College did not satisfy Title IX, the College did not comply with its own procedures and, in fact, the College acted in direct contradiction of its procedures and as a result the resolution of the complaint was not equitable. The College's failure to interview the accused Student impacted the College's investigation and resolution of the accused Student's case. Without any information regarding the accused Student's responses to the allegations, the College was limited in its ability to obtain

Page 24 – President Robert E. Clark II

all potential relevant evidence, which, in turn, made the decisions it undertook potentially based on insufficient information.   Likewise, the College's failure to share information with the accused Student, as well as the College's provision of misinformation (the incorrect policy) to the accused Student, limited his ability to fully participate in the process.   Finally, the College's deviation from its own process, as well as from process that would be consistent with Title IX, in the conduct of the hearing itself prevented the accused Student from receiving equitable treatment as required by Title IX.

Specifically, OCR's investigation disclosed evidence that the resolution of the complaint was not equitable in several ways:

*The accused Student was not given an opportunity to share his version of events and to benefit from an investigation of the accuracy of that version of events.*  Because the College skipped the step in its policy providing for an educational conference at which accused students could be interviewed, the College could not have investigated – and did not investigate – facts the accused Student may have presented.   In addition, because this step in the process never took place (coupled with the failure, discussed below, to share the incident report with the accused Student), the accused Student did not benefit from notice, in advance of the hearing, of the scope of issues under investigation and the information he could rebut if he so chose.

*The accused Student was not provided with the opportunity to challenge evidence that the College relied upon in imposing his interim suspension.*   The College imposed an interim suspension on the accused Student on the same day as the incident was reported, without conducting an interview with the accused Student, or providing him with an opportunity to explain why the proposed interim suspension was not justified, as required by the College's *Title IX Policy and Procedures*.   While a school must assess whether the presence of an accused student threatens the safety of individuals within the school community, a sufficient level of inquiry – that is not here evident – must be undertaken in determining the appropriateness of interim suspensions.

*The accused Student was never afforded his resolution options.*   While the College's *Title IX Policy and Procedures* and/or *Student Conduct Procedures* provided opportunities for an educational conference and/or Resolution without a hearing, the accused Student was given no choice except the Hearing process.   Further, the specific information that the College provided the accused Student regarding his resolution options provides some support for the accused Student's position that he thought that he was attending an informal educational conference and/or Resolution without a hearing, not the Judicial Hearing.

*The Student was not provided an adequate opportunity to defend himself at the Hearing.*   The College's *Title IX Policy and Procedures* specifically states that the Chair would share all pertinent documentary evidence and any written findings from the investigators between the parties, at least two business days prior to the hearing and that all parties will have ample opportunity to present facts and arguments in full and question all present witnesses during the hearing.  However, the accused Student never received a copy of or information contained in the Incident Report or other critical materials regarding the College's anticipated evidence against him in advance of the Hearing, including Student 1's statement against him, and, therefore, had a

Page 25 – President Robert E. Clark II

very limited opportunity to rebut the charges made against him in the Judicial Board Hearing, and challenge the evidence that the College relied upon in imposing the penalty of expulsion.[8]

*The accused Student may not have been provided sufficient time to participate in the process.* The accused Student was notified of the charges on April 1, 2015 and was expelled following the Judicial Board Hearing on April 8, 2015. Yet, the College's own processes may have required more time than six business days to investigate and resolve the case if it had adhered to its own procedures and timelines. As previously discussed and according to the College's *Title IX Policy and Procedures* and/or *Student Conduct Procedures*, the following is required:

- Within two (2) business days of the receipt of a complaint, an initial determination is made whether a policy violation may have occurred.
- If the complaining party wishes to pursue a formal investigation, or if the College decides to pursue a formal investigation based on the alleged policy violation, then the Title IX Coordinator appoints a Title IX Team member to conduct the investigation.
- All investigations entail interviews with all relevant parties and witnesses.
- At least one week prior to the hearing, the Chair will send a letter to the parties detailing the alleged violation, applicable procedures and potential sanctions; time, date and location for the hearing; and offer of an advisor. Hearings will be convened usually within one to two weeks of the completion of the investigation.
- The Chair will exchange the names of witnesses the College intends to call, all pertinent documentary evidence, and any written findings from the investigators "between the parties," at least two business days prior to the hearing.

The College's *Title IX Policy and Procedures also* state that investigations of incidents should be completed expeditiously, normally within 10 business days, unless initial interviews fail to provide direct first-hand information. The *Title IX Policy and Procedures* also states that the College aims to complete the investigation and resolution of complaints within a 60 business-day time period, which can be extended, as necessary, for appropriate cause and with notice to the parties.[9] Thus, the College own procedures allowed it to take more time and it could have implemented its procedural steps to ensure an equitable and prompt investigation and resolution in the accused Student's case.

It is critical, for purposes of satisfying the Title IX requirement that procedures be "equitable," that the accused Student have a reasonable opportunity to present his version of the events, particularly in response to adverse "findings" which the College relied upon in imposing the substantial penalty meted out to the accused Student – expulsion. Thus, in conclusion, OCR determined that the College failed to provide an equitable investigation and resolution of the complaint involving the accused Student, including failures to follow many procedural elements set forth in its *Title IX Policies and Procedures.*

---

[8] The College's assertion that it would have provided assistance to the accused Student in excusing his witnesses from classes for the hearing is belied by the College own Judicial Pointers sheet. Moreover, whether or not the College would have helped the accused Student's witnesses attend the hearing does not address OCR's concern that the accused Student was provided the wrong policies which supports the accused Student's position that he believed that he was attending an educational conference rather than the Hearing.

[9] As discussed above, OCR has concerns regarding the College's 60 business, rather than calendar, day timeframe.

Page 26 – President Robert E. Clark II

*Students 1, 2 and 3*

For the same reasons as noted above regarding the procedures employed in the College's investigation and resolution of the incident involving the accused Student, OCR concludes that the College did not comply with the requirements of Title IX with regard to Students 2 and 3 by failing to provide them with the opportunity to present witnesses and evidence during the investigation; and by failing to provide Students 1, 2 and 3 notice regarding all possible means of resolution,  an opportunity to review the evidence prior to the hearing and fully participate in the hearing, and sufficient time to participate in the process.  OCR also concludes that the College did not comply with the requirements of Title IX by failing to assess the risk of threat to the school community and the rights of students, including the accused, by ensuring the sufficient level of inquiry in determining the appropriateness of an interim suspension imposed against Students 1, 2 and 3.

*Incidents Involving Other Students*

In its review of documentation for all student complaints or reports of sexual harassment or sexual violence from August 2013 through April 2015 provided by the College, OCR focused on assessing whether the College's processes provided prompt and equitable responses for both parties to the complaint.  OCR did not interview parties or witnesses involved in the cases.  In total there were twelve (12) complaints or reports made during that time period and OCR found several cases with deficiencies, which further support OCR's findings that the College failed to provide for adequate, reliable and impartial investigations and resolutions of complaints.[10] Specifically, OCR found that the College violated the requirements of Title IX by, in many cases, failing to offer the opportunity to accused students to provide witnesses and other evidence, failing to provide students who alleged sexual harassment including sexual assault with appropriate interim remedies including counseling and/or academic services, and by failing to provide the complainant with written notice of the outcome of the complaint.  OCR also has concerns that, in several incidents, the College imposed an immediate interim suspension without evidence demonstrating that the College engaged in a sufficient level of inquiry regarding the risk of threat to the community, and the rights of the students, including the accused.  In addition, the records the College provided reflect that it did not implement many of the Title IX procedural requirements contained in its grievance procedures in the investigation and resolution of incidents involving other students.

OCR concludes that the College responded promptly to reports of sexual harassment and/or sexual violence, as demonstrated by the conclusion of the College's investigative process in a matter of days in ten (10) of the twelve (12) incidents.  OCR has concerns, however, that the College's expedited investigation of complaints of sexual harassment and sexual violence may have compromised the equity of such investigations.

In addition, OCR notes that, in several incidents, interim suspensions were imposed on the same date that the incident was reported.  Specifically, in the interim suspensions imposed on students in six (6) incidents on the same date reported, it is not clear from the incident files whether there was an appropriate process to determine whether the interim suspension was warranted.  While

---

[10] In separate correspondence to the College, OCR identified the College's specific incident file numbers for each issue area referenced below.

Page 27 – President Robert E. Clark II

immediate suspensions may be warranted by the circumstances to protect individuals or the community, here the repetition of the swift imposition of interim suspension coupled with both the absence of effective recordkeeping and the lack of accused interviews, raises concerns. Specifically, OCR has concerns that the College may not be affording accused students their basic procedural protections by imposing immediate suspensions without conducting a sufficient assessment of the risk to the community, while also considering the rights of the parties, including the accused student.  The equitable principle in Title IX requires the College to consider a variety of factors in weighing whether an interim suspension is an appropriate interim remedy, given the potential educational impact of an interim suspension on the accused student. These factors include, for example, circumstances that suggest a risk to the greater College community, and the existence of risk that the accused student will commit additional acts of sexual harassment or sexual violence.  Other factors to consider are whether there have been other sexual harassment or sexual violence complaints against the same accused student, whether the accused student threatened further sexual harassment or sexual violence against the victim or others, and whether the sexual harassment or sexual violence was committed by multiple perpetrators.  It is not clear, however, from the documentation provided by the College that it reviewed or assessed any of these factors, or others, in any of the incidents in which an interim suspension was imposed.

In seven (7) of the twelve (12) incidents, no evidence was provided to demonstrate that the complainant was provided with counseling and/or academic services.  Title IX requires a school to take steps to ensure equal access to its education programs and activities, and to protect a survivor, as necessary, including taking interim measures before the final outcome of the investigation and to take steps to end the harassment and correct its effects, once a final determination is reached.  Imposing sanctions against the perpetrator, without more, likely will not eliminate the hostile environment, prevent its recurrence, and effectively remedy its effects.

OCR also found that, although Administrator 2 told OCR that the College always provides written or verbal notice to the complainant of the outcome of the hearing, no documentation was provided to substantiate this assertion for any of the incidents.  Title IX requires that a school adopt and publish grievance procedures providing for the prompt and equitable resolution of complaints of sexual harassment and sexual violence.  One element that is critical to achieving compliance with Title IX is providing notice to both parties of the outcome of the complaint.  As stated above, while the College's grievance procedures provided for many of the basic procedural protections to which students are entitled under Title IX, including providing notice to both parties of the outcome of the complaint, the College did not implement this procedural requirement in all cases.  By failing to provide written notice of the outcome to victims, the College denied such students basic procedural protections to which they are entitled under Title IX, and the opportunity to appeal the College's findings in accordance with the College's grievance procedures.

These issues outlined in the Resolution Agreement require the College to address the specific deficiencies that OCR has identified by case file, using its revised policies and procedures once they are approved by OCR.

## CONCLUSION

OCR determined that the College's policies and procedures and its Notice of Non-Discrimination are not compliant with the regulation implementing Title IX, at 34 C.F.R. §§ 106.8 and 106.9.  In

addition, OCR determined that the College failed to provide equitable responses to complaints of sexual harassment and sexual violence of which it had notice, including the complaint against the accused Student, and complaints involving other students, in violation of the regulation implementing Title IX, at 34 C.F.R. § 106.31.  In addition, OCR's investigation identified concerns regarding the College's designation and training of responsible employees, training for the Title IX Coordinator and Title IX Team, including training regarding the appropriate response to requests for confidentiality, and record keeping practices.

## RESOLUTION

The enclosed Resolution Agreement addresses the compliance concerns identified in OCR's investigation and, when fully implemented, will resolve the College's noncompliance with Title IX.

In accordance with the Agreement, the College agrees to:

- Determine whether it engaged in a sufficient level of inquiry and consideration of the rights of students, including the accused Student and Students 1, 2 and 3, and Student 4, and the risk of the threat to the school community prior to imposing interim suspensions upon the accused Student and Students 1, 2 and 3, and provide specific remedial actions if warranted, including, but not limited to, removal of each expulsion from all relevant educational records, as well as an offer to allow the accused Student and/or Students 1, 2 and 3 to complete their degrees at the College and reimburse them for documented costs incurred for enrollment at a different educational institution, and any other appropriate measure.
- Complete its investigation of the incident involving the accused Student and Students 1, 2 and 3, in compliance with Title IX.
- Address the specific investigative deficiencies OCR identified in the cases involving other students, including, but not limited to, failures to conduct adequate investigations, provide written notice of remedial services, and provide written notice of the outcome of the complaint investigation to the parties.
- Publish an anti-harassment statement, revise its Title IX grievance procedures, and confirm that it has properly designated a Title IX Coordinator.
- Make revisions to its Title IX grievance procedures to ensure consistency among its various Title IX policies and procedures so that students and employees receive clear notice of the applicable policies and procedures.
- Provide training to ensure that all members of the College community--particularly its Title IX staff and including students, faculty, administrators and other staff – are trained regularly on issues related to sexual harassment and on the requirements of Title IX.
- Review the complaints and reports of sexual harassment and/or sexual violence made from May 2015 through the date of the Agreement, to determine whether the College investigated each complaint or report promptly and equitably.
- Provide OCR with information concerning all incidents of alleged sexual harassment or sexual violence at the College for the next two academic years.
- Enhance its outreach to and feedback from students, including by conducting an annual climate check or series of climate checks with students on campus to assess the effectiveness of steps taken by the College towards providing a campus free of sexual misconduct.  In addition, the College will convene a committee, composed of staff,

Page 29 – President Robert E. Clark II

students, and community representatives, to develop a plan for educating students and employees about sexual harassment and violence.

OCR will monitor implementation of the Agreement.  If the College fails to implement the Agreement, OCR may initiate administrative enforcement or judicial proceedings to enforce the specific terms and obligations of the Agreement.  Before initiating administrative enforcement (34 C.F.R. §§ 100.9, 100.10), or judicial proceedings to enforce the Agreement, OCR shall give the College written notice of the alleged breach and sixty (60) calendar days to cure the alleged breach.

This concludes OCR's investigation of the complaint and should not be interpreted to address the College's compliance with any other regulatory provision or to address any issues other than those addressed in this letter.  This letter sets forth OCR's determination in an individual OCR case.  This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such.  OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public.  The complainant may have the right to file a private suit in federal court whether or not OCR finds a violation.

Please be advised that the College may not harass, coerce, intimidate, or discriminate against any individual because he or she has filed a complaint or participated in the complaint resolution process.  If this happens, the complainant may file another complaint alleging such treatment.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request.  In the event that OCR receives such a request, we will seek to protect, to the extent provided by law, personally identifiable information, which, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

We want to thank the College, including the Dean of Students, as well as Counsel for their cooperation during the investigation.

Should you have any questions, please contact Amy Niedzalkoski, Team Attorney at 215-656-8571 or Amy.Niedzalkoski@ed.gov, or myself at 215-656-6935 or Beth.Gellman-Beer@ed.gov.

Sincerely,

/s/

Beth Gellman-Beer
Supervisory Attorney
OCR Philadelphia

Enclosure

Cc:    Margaret DiBianca, Esq.
       Wanda Anderson