UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

JACK MONTAGUE,
      Plaintiff,

v.

YALE UNIVERSTIY, ANGELA GLEASON,
JASON KILLHEFFER, and OTHERS
UNKNOWN,
      Defendants.

CIVIL ACTION
No. 3:16-cv-00885

## AMENDED COMPLAINT AND JURY DEMAND

## INTRODUCTION

1.     As of the fall of 2015, Jack Montague had a promising future. He was poised to graduate from Yale University in the spring of 2016 with a Bachelor of Arts in American Studies, and he was captain of Yale's basketball team, which was having its most successful season in 54 years.

2.     That all changed on November 30, 2015, however, when Montague received a letter from Yale's University Wide Committee on Sexual Misconduct informing him that he was the subject of a formal complaint based on a sexual encounter he had with another Yale student in the fall of 2014.

3.     This was not the first, or the second, or the third sexual encounter Montague had had with this same female student. Nor was it even the first time he and the student had engaged in sexual intercourse. But now, a year after the fact, the female student – who was affirmatively misled by the defendants into participating in a formal complaint process *initiated by Yale and not by the student herself* – claimed that just *part* of her encounter with Montague (the

intercourse) was nonconsensual. And she made this claim despite calling Montague shortly after the encounter, voluntarily rejoining him the same evening, flirting with him on the way back to his bedroom, and spending the remainder of the night in his bed with him.

4.      In the months that followed, Montague found himself thrust into the confusing, terrifying, and lonely process through which those accused of sexual misconduct are maneuvered, and into the midst of Yale's ongoing battle to establish itself as an institution that takes accusations of sexual misconduct seriously. Unfortunately for Montague, he was a prime candidate to serve as Yale's poster boy for tough enforcement of its *Sexual Misconduct Policies*: popular, well-liked and respected amongst his peers at Yale, and known throughout the country as one of Yale's most promising men's basketball stars. In short, imposing harsh discipline on Montague would surely make an impact.

5.      Less than three months after the complaint was lodged against him, Montague was expelled from Yale, kicked off his beloved basketball team, branded a sex offender, and widely castigated as a "rapist." Those who stuck by him were likewise criticized for condoning "rape," and were forced to publicly apologize for their support. His name appeared in local and national headlines alongside some of the most damning words that could be uttered about a young man: "sexual misconduct." His promising future crumbled into dust.

6.      The actions taken by the defendants resulted from a deeply flawed process during which the plaintiff was denied the most rudimentary elements of fairness promised to him by Yale in its *Procedures Governing the University Wide Committee on Sexual Misconduct.* As a result, Mr. Montague suffered, and continues to suffer, reputational, emotional, and financial damages of an enormous magnitude.

## JURISDICTION AND VENUE

7.      This action arises out of Yale University's breach of its contractual and other obligations to the plaintiff, as well as its violations of Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681) and 42 U.S.C. § 1981.

8.      The plaintiff is a resident of Tennessee, and Yale University and Defendants Angela Gleason and Jason Killheffer are residents of Connecticut. The amount in controversy is over $75,000.

9.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332.

10.     Venue is proper under 28 U.S.C. § 1391(b).

## PARTIES

11.     The plaintiff, Jack Montague ("plaintiff" or "Montague"), resides in Tennessee and was formerly a full-time student at Yale. Mr. Montague was wrongfully and improperly expelled in February of 2016, while in his senior year at the University. Montague enrolled at Yale in the fall of 2012 after graduating from a public high school in Tennessee. He was recruited to play basketball for the Yale men's basketball team, the Yale Bulldogs.

12.     The defendant Yale University ("Yale" or "the University") is a private liberal arts college located in New Haven, Connecticut, with approximately 5,500 enrolled undergraduates, and is the beneficiary of federal funds within the meaning of 20 U.S.C. §1681 *et seq*. ("Title IX").

13.     The defendant Angela Gleason ("Gleason") was, at the time of the events at issue, a Deputy Title IX Coordinator in the Office of the Provost at Yale University.

14.     The defendant Jason Killheffer ("Killheffer") was, at the time of the events at issue, a Senior Deputy Title IX Coordinator in the Office of the Provost at Yale University.

## FACTS

### The Climate at Yale for Sexual Misconduct Discipline

15.     This case arose during a tumultuous period at Yale in which the University faced

mounting criticism concerning its handling of allegations of sexual assault made by female

students against male students. Specifically, Yale had been accused by students and alumni alike

of not taking these allegations of sexual misconduct seriously enough and of shirking its duty to

harshly punish perpetrators of sexual assault. Moreover, results from a survey of 27 colleges and

universities around the country painted a damning picture of the campus climate: sexual assaults

at Yale, according to the survey, were the third-highest of all the schools surveyed. As a

consequence, the University had to show it was willing to take a hard line against male students

accused of sexual assault in order to dispel the notion that Yale's campus was an unfriendly and

unsafe environment for women.

16.     On April 4, 2011, the Office of Civil Rights ("OCR") of the U.S. Department of

Education ("DOE") issued a guidance letter to colleges and universities in the United States,

widely known as the "Dear Colleague" letter.  The letter advised recipients that sexual violence

constitutes sexual harassment within the meaning of Title IX of the Education Amendments of

1972, 20 U.S.C. §1681 *et seq*. and its regulations, and directed schools to "take immediate action

to eliminate the harassment, prevent its recurrence, and address its effects."

17.     In the wake of the "Dear Colleague" letter, the DOE commenced numerous

investigations against colleges and universities, with the underlying threat that those not in

compliance stood to lose federal funding.

18.     Just one month before OCR issued the "Dear Colleague" letter, OCR received a

complaint alleging that a sexually hostile environment existed at Yale and that Yale had not

4

responded in a prompt and adequate manner. The complaint stemmed in part from a well-publicized incident in October of 2010 in which fraternity pledges chanted sexually aggressive comments outside the Yale Women's Center.

19.     OCR assessed whether Yale had prompt and equitable grievance procedures to address complaints under Title IX, and whether Yale had allowed a sexually hostile environment to be created on campus by not sufficiently responding to complaints of sexual harassment.

20.     OCR concluded Yale was deficient in a number of areas.

21.     Consequently, in July of 2011, Yale created the University Wide Committee on Sexual Misconduct ("UWC"), a committee that provides both formal and informal ways to resolve grievances concerning alleged sexual misconduct. The UWC is charged with enforcing Yale's *Sexual Misconduct Policies*. A true and correct copy of Yale's *Sexual Misconduct Policies* is attached hereto as Exhibit 1.

22.     In connection with the creation of the UWC, Yale adopted *Procedures Governing the University Wide Committee on Sexual Misconduct* ("*UWC Procedures*"), which set out the rights and responsibilities of the University, an accuser, and an accused in the case of a complaint of sexual misconduct. A true and correct copy of the *UWC Procedures* is attached hereto as Exhibit 2.

23.     In addition, Yale established the Sexual Harassment and Assault Response and Education ("SHARE") Center, which serves as the initial place of referral for students seeking services and options as a result of alleged sexual misconduct.

24.     In the wake of the 2010 complaint to OCR, Yale also began tracking complaints of sexual misconduct and compiling the data in semi-annual reports (the "Spangler Reports")

named for Yale's Deputy Provost Stephanie Spangler, who supervises the activities of Yale's Title IX coordinators.

25.     On June 15, 2012, OCR resolved the Title IX complaint against Yale through a voluntary resolution agreement (the "Resolution Agreement"). Yale agreed to implement a new Title IX coordinator structure, and the Resolution Agreement itself provided for the monitoring of that implementation.

26.     Yale remained under the watchful eye of the OCR well into 2014, in part because it had agreed, pursuant to the Resolution Agreement, to report to the OCR on a periodic basis and to allow OCR to visit its campus "whenever necessary" to determine whether Yale was indeed fulfilling the terms of the Agreement and was in compliance with Title IX.

27.     OCR was not the only group watching Yale, however. The July 31, 2013, Spangler Report sparked outrage amongst alumni groups and student groups, such as "Students Against Sexual Violence at Yale" ("SASVY"), because the report revealed that students whom UWC had found responsible for "nonconsensual sex" were allowed to remain at Yale and in some cases were punished only with written reprimands.

28.     These groups not only took issue with what they viewed as inadequate discipline, they attacked Yale's use of the term "nonconsensual sex." That term, a group of 229 Yale alumni said in an August, 2013 "open letter" to Yale's president, Peter Salovey, and Provost Spangler, "reinforce[s] the rape myth that there are two tiers of sexual assault." The message from these 229 alumni was blunt: "Yale needs to be clear: Sex without consent is sexual assault."

29.     Around the same time the open letter was published, two Change.org petitions appeared online calling for tougher penalties for sexual assault.

30.     To answer these critics' concerns that the University was not automatically removing all "sexual assailants" from campus and was unfairly using "nonconsensual sex" as a euphemism for what the critics believed amounted to "rape" in all instances, Yale issued a series of hypothetical fact patterns, entitled "Sexual Misconduct Scenarios," to explain how it categorizes and punishes different types of sexual encounters. A true and correct copy of the *Sexual Misconduct Scenarios* is attached hereto as Exhibit 3.

31.     The "Sexual Misconduct Scenarios" describe various sexual situations along a spectrum – in some scenarios, consent is clear; in others, it is ambiguous; and in others there is a clear lack of consent. Each scenario is followed by the penalty or ranges of penalties likely in that particular, fact-specific circumstance (should a penalty be appropriate). (*See* Exhibit 3.)

32.     If the "Sexual Misconduct Scenarios" served to quell the tide of criticism against Yale, it was a short-lived calm. In September of 2015, a beleaguered Yale took yet another hit: the Association of American Universities ("AAU") released the results of a survey of 27 colleges around the country showing that rates of undergraduate sexual assaults at Yale were the third-highest among the schools surveyed. President Salovey called the results of the survey "profoundly troubling," and vowed to "redouble [Yale's] efforts" to combat sexual assault and misconduct.

33.     Meanwhile, Yale students seized on the results as another opportunity to criticize the University. For example, one student who was interviewed by the *New Haven Register* bemoaned the lack of "protocol o[r] repercussions for people who have done things on this campus," and another charged that the administration was not adequately performing its role in dealing with sexual misconduct on campus.

34.     As it turned out, Yale students had responded to this survey at a much higher rate than students at most of the 27 other colleges and universities: over half of Yale's entire student population participated in the survey.

35.     In short, Yale knew its students were paying close attention to the issue of sexual misconduct on campus, and that they had strong views on how Yale had responded, historically, to complaints of sexual assault.

36.     It was in this climate – permeated by deep mistrust and anger amongst Yale students and near-panic on the part of Yale administrators – that the defendants misled and pressured a female student, against her original wishes, to participate in a formal complaint process against Jack Montague, accusing him of sexual assault.

### Initiation of the Complaint Process

37.     The proceedings against Mr. Montague began in earnest on November 18, 2015, when Senior Deputy Title IX Coordinator Jason Killheffer filed a formal complaint alleging that Montague sexually assaulted Jane Roe[1] more than a year earlier, on the night of October 18-19, 2014.

38.     The allegations involved an incident in which Roe – with whom Montague had had sexual intercourse on at least one other occasion, and sexual encounters not involving intercourse on several other occasions – willingly accompanied Montague to his bedroom, removed her clothing as he removed his, got into his bed, and engaged in consensual sexual conduct. Roe was now claiming the intercourse that followed the consensual sexual foreplay was nonconsensual.

---

[1] Jane Roe is a pseudonym being used to protect this student's privacy. Except where the student has chosen to reveal his/her identity in the press, this complaint will identify other students through use of pseudonyms in order to protect their privacy.

39.     It was not Roe's idea to file the formal complaint against Montague, however.

40.     On September 21, 2015, one of Roe's suitemates, Rachel Rogers,[2] was speaking with Deputy Title IX Coordinator Angela Gleason about a different matter and took it upon herself to mention to Gleason that a friend of hers – Roe – had had a "bad experience."

41.     Rogers outlined the general details of Roe's "bad experience" and asked Gleason what she (Rogers) could do to help Roe. Rogers also revealed to Gleason that the person with whom Roe had the "bad experience" was Jack Montague, the popular captain of Yale's men's basketball team.

42.     Upon hearing the name of the alleged perpetrator, Gleason urged Rogers to convince Roe to come forward and report the incident.

43.     On October 15, 2015, Rogers talked to Roe about her conversation with Gleason, but Roe was hesitant to talk to Gleason. Roe asked Rogers to reach out to Gleason again and ask some additional questions so she could make a decision about whether to meet with Gleason or not.

44.     The following day, at Roe's request, Rogers met with Gleason again to discuss Roe's situation and, on information and belief, informed Gleason that Roe was reluctant to make a report.

45.     Trying a different tack to induce Roe to come forward, Gleason suggested to Rogers that she (Rogers) could inform Roe there were various formal and informal procedures available to deal with sexual misconduct, including the option of making an anonymous informal complaint.

---

[2] Rachel Rogers is a pseudonym being used to protect this student's privacy. Except where the student has chosen to reveal his/her identity in the press, this complaint will identify other students through use of pseudonyms in order to protect their privacy.

46.     Gleason described the anonymous informal complaint process to Rogers as a means through which Roe could speak to Gleason about Montague but request that her name be kept confidential; Gleason would then call Montague in for a conversation, inform him that a complaint was made against him, and suggest he participate in training about communication and sexual consent. Rogers said Gleason told her that the counseling would "help [Montague] avoid repeating his behavior with anyone else."

47.     According to Rogers, when she relayed this information to Roe, Roe liked the idea of the anonymous informal complaint process. Roe thought it would "fulfill her goal of making sure Mr. Montague understood [that] his behavior was wrong and hurtful and [would] stop him from doing it again to someone else," but it would also allow her to avoid the formal complaint process.

48.     Indeed, Roe was clear that she did not want to engage in the formal complaint process. She was "not interested in having Mr. Montague punished[.]"

49.     Based on the information that Gleason provided to Rogers, Roe finally met with Gleason on October 19, 2015.

50.     As a result of that meeting, Gleason agreed that she would contact Mr. Montague, discuss with him the fact that "his behavior [had not] met [Yale's] expectations," and recommend sensitivity training sessions at SHARE. Gleason also promised, consistent with Roe's wishes, that Roe's "name and any potentially identifying information would not be mentioned."

51.     Roe retained a SHARE adviser, Amy Myers, LICSW, to guide her through the informal process.

10

52.     On November 4, 2015, Gleason learned, in a meeting with Defendant Killheffer, Stephanie Spangler, and an attorney from Yale's Office of the General Counsel ("OGC"), that Mr. Montague had been the subject of a prior UWC proceeding (hereafter "UWC I"). She also learned that the UWC I panel had ultimately recommended, as a sanction, that Mr. Montague participate in sexual harassment and gender sensitivity training. Per the University's policies on confidentiality, all of this information – the fact of the UWC I proceedings as well as the fact of the UWC I sanction – was confidential.

53.     As a result of learning about UWC I, Defendants determined there should be a formal complaint of sexual misconduct against Montague. Defendants further determined that if Roe remained unwilling to be the complainant, Yale should file the complaint against Mr. Montague through one of its Title IX Coordinators.

54.     Later in the day on November 4, Gleason met with Mr. Killheffer, the OGC attorney, UWC Chairman David Post, and UWC Secretary Aley Menon to discuss Mr. Montague. On information and belief, one topic discussed at this meeting was Defendants' belief that there should be a formal complaint of sexual misconduct filed against Montague, and their plan to file it through a University Title IX Coordinator if Roe remained unwilling to act as a complainant.

55.     Defendants were aware that Roe did not wish to file a formal complaint of sexual misconduct against Mr. Montague. Defendants were also aware that the University, through its Title IX Coordinators, may only bring formal complaints to the UWC "independently of the wishes of an individual complainant" in "unusual circumstances . . . such as those involving risks to the safety of individuals and/or the community." (*See Report of Complaints of Sexual Misconduct*, a true and correct copy of which is attached hereto as <u>Exhibit 4</u>.) Therefore, in order

11

for a formal complaint to be filed against Montague, defendants knew that Roe either had to assent to the filing of a formal complaint (whether or not she was the complainant), or there had to be a risk to the safety of individuals and/or the community. (*See* Exhibit 4.)

56.     Montague posed no safety risk either to Roe or to the Yale community, nor did Roe or Yale ever claim he posed such a risk. Consequently, Yale could not file a formal complaint against Montague unless Roe changed her mind and agreed to the formal complaint process. If she so agreed, Yale would then have the authority to file the formal complaint through one of its Title IX Coordinators, even in the absence of a safety risk.

57.     Thus, after discussing the matter with Spangler, Killheffer, University counsel, Professor Post, and Secretary Menon, Gleason contacted Roe to tell her about a "new development" in Roe's "case," and asked to meet with Roe in order to discuss it.

58.     Gleason also asked Professor Post to be on "standby" during her upcoming meeting with Roe. At that meeting, Gleason planned to try to convince Roe to abandon the informal complaint process she had already begun and to instead agree to participate in a formal complaint process against Montague. If Roe adhered to her decision not to be a complainant herself, defendants would endeavor to convince Roe to allow a Title IX Coordinator to file the complaint and to participate in the UWC process as a witness.

59.     Gleason thus invited Post to be on standby to answer Roe's questions and allay whatever fears Roe might have had about the formal UWC process in order to solidify her participation therein. Post was aware this was the reason he was being asked to participate.

60.     Gleason met with Roe on November 6, 2015. At that meeting, she told Roe that Mr. Montague had already been given a recommendation for training after a previous UWC complaint, so that option was no longer open to him.

61.     Gleason did not independently confirm whether Mr. Montague had ever received the aforementioned training. In fact, he did not. Thus, the information Gleason gave Roe in this regard was simply incorrect.

62.     Moreover, contrary to what Gleason told Roe, there is nothing in Yale's *UWC Procedures* or its *Sexual Misconduct Policies* which bars Yale from conducting an informal process and recommending training if an accused has already received training. That process was and should have remained available to Roe, particularly because Montague never actually received sexual harassment and gender sensitivity training.

63.     Furthermore, by informing Roe that Montague had received training after a previous UWC complaint, Gleason either directly told Roe or clearly implied to Roe that the previous complaint against Montague was also a complaint of sexual assault. This information was affirmatively false.

64.     Montague had never before been the subject of a complaint of sexual assault. As described in greater detail below, a female student accused him of rolling up a paper plate and shoving it down her shirt. There was nothing "sexual" about that encounter, and Montague did not receive any relevant SHARE training after the incident.

65.     Additionally, the *UWC Procedures* and the *Provost's Statement on Confidentiality of UWC Proceedings* strictly prohibited Gleason from disclosing to Roe any information concerning the prior UWC proceedings against Montague or the outcome of those proceedings, including the very fact that the proceedings took place, and the very fact that Mr. Montague was sanctioned. (*See* Exhibit 2; *see also Provost's Statement on Confidentiality of UWC Proceedings*, a true and correct copy of which is attached hereto as Exhibit 5.)

13

66.     Gleason blatantly violated the UWC's confidentiality requirements not only by telling Roe that there had been a prior UWC proceeding and disciplinary action involving Montague, but worse, by falsely telling or implying to Roe that Montague was the subject of a previous complaint of *sexual assault*.

67.     After falsely informing Roe that Montague had already completed training and falsely informing Roe that the informal complaint process was foreclosed because of Montague's prior disciplinary history, Gleason expressed concern that the incident between Roe and Montague was serious and told Roe a Title IX Coordinator could file a formal complaint on Roe's behalf if Roe – who had been explicit in her desire to keep the process informal – agreed to cooperate as a witness.

68.     As planned, Gleason then called Professor Post into the meeting for the purpose of discussing, with Roe, the specifics of a University-initiated formal complaint against Montague.

69.     Roe did not immediately agree to abandon the informal complaint process and allow Yale to move forward with a formal complaint against Montague. She took the weekend to think about it, met with her SHARE adviser, and then e-mailed Gleason and Post to inform them that she was comfortable allowing the Title IX Office to file a formal complaint against Montague and was willing to participate as a witness. Roe did not agree to act as the complainant.

70.     Roe's decision to truncate the informal complaint process and allow Yale to step in and file a formal complaint against Montague was a direct result of Roe's meeting with Gleason and Post.

71.     Because of Gleason's misrepresentations and false statements to Roe about Montague's prior UWC involvement and resulting sanction, Roe formed the belief that a formal complaint was necessary "to protect other women" from Montague, whom she now (incorrectly) believed had a history of sexual assault.

### Prior UWC Proceedings ("UWC I")

72.     In point of fact, the prior UWC complaint and resulting discipline against Mr. Montague to which Gleason improperly referred is completely unrelated to "sexual assault," or even to sexual misconduct.

73.     On the last day of Montague's freshman year, he and some fellow Yale students congregated on the sidewalk outside a pizza parlor in New Haven. Some of the students, including Montague, were intoxicated. Montague engaged in a discussion with the other students, including Sally Smith[3] – a graduating senior – for approximately 10-15 minutes.

74.     According to Smith, Montague, who appeared to be annoyed by the end of the conversation, rolled up a paper plate from the pizza parlor and put it down the front of Smith's tank top. Smith did not allege that Montague made any statements of a sexual nature during the interaction.

75.     It is undisputed that "[t]here was no . . . skin-to-skin contact" during the incident.

76.     Smith decided to file a formal Title IX complaint against Montague in the fall of 2013, after she graduated from Yale. Her allegation was that Montague had violated the University's *Sexual Misconduct Policies* by engaging in "sexual harassment."

77.     The sexual harassment policy reads, in pertinent part:

---

[3] Sally Smith is a pseudonym being used to protect this student's privacy. Except where the student has chosen to reveal his/her identity in the press, this complaint will identify other students through use of pseudonyms in order to protect their privacy.

Sexual harassment consists of nonconsensual . . . conduct of a sexual nature on or off campus, when . . . such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating or hostile academic or work environment. Sexual harassment may be found in a single episode, as well as in persistent behavior.

(*See* Exhibit 1.)

78.     Pursuant to the *UWC Procedures*, an independent fact-finder conducted an investigation into Smith's complaint. Montague told the fact-finder he remembered nothing of the incident, but conceded that it likely occurred as Smith described. Montague said he was "embarrassed and ashamed" by his behavior and "accept[ed] full responsibility for the incident . . . ."

79.     Smith's complaint proceeded to a UWC panel for fact-finding and, if necessary, a disciplinary recommendation. The UWC panel concluded Montague violated the University's *Sexual Misconduct Policies* by "sexually harassing" Smith. Specifically, the panel found that Montague "without provocation rolled up a used, paper pizza plate, shoved it down [Smith's] shirt between her breasts and then walked away from her."

80.     Consequently, the panel recommended Montague be placed on probation for four terms; that he not be permitted to hold a leadership position in any student activity, organization or sport; that he be required to enroll in sexual harassment and gender sensitivity training through Yale's SHARE Center; that he be required to meet with a member of the SHARE Center once each semester for the remainder of his time at Yale "to review and reflect on his interactions and relationships with female students at Yale"; and that he be required to receive training on the appropriate use of alcohol.

81.     Yale College Dean Mary Miller accepted the panel's findings of fact, conclusions and recommendations.

82.     Under Yale's own policies and definitions, however, Montague's conduct did not constitute "sexual harassment." Montague's conduct was not "conduct of a sexual nature," nor did the panel find any conduct that could reasonably be construed as "sexual." Moreover, Montague's conduct clearly did not "have the purpose or effect of unreasonably interfering with [Smith's] work or academic performance or creating an intimidating or hostile academic or work environment," nor did the panel find his conduct had that purpose or effect. In fact, it was undisputed that the conduct occurred on the last day of the 2012-2013 academic year and that Smith was a graduating senior who neither saw nor heard from Montague again after what she described as their "peripheral" interaction at an off-campus pizza parlor.

83.     The outcome of the UWC I proceeding was therefore erroneous.

84.     Moreover, the matter was outside the jurisdiction of the UWC, which addresses *only* "[v]iolations of sexual misconduct." (*See* Exhibit 2.)

85.     This was an incident that should have been handled by Yale's Executive Committee, which has jurisdiction over all other disciplinary infractions committed by Yale undergraduate students.

86.     On information and belief, the only reason Yale chose to treat the matter as "sexual misconduct" and keep it with the UWC instead of transferring it to the Executive Committee was the fact that the alleged perpetrator was a man and the alleged victim was a woman.

87.     Montague complied with all of the disciplinary conditions imposed upon him as a result of UWC I. He attended training sessions on the appropriate use of alcohol, and he also periodically met with a SHARE staff member, as required.

88.     However, as noted above, Montague was not trained by the SHARE Center, or any of its staff members, on sexual harassment, gender sensitivity, or any topic related to sexual relationships or sexual consent, nor did his sessions with the SHARE staff member focus on "review[ing] and reflect[ing] on [Montague's] interactions and relationships with female students at Yale."

### Jane Roe's Complaint ("UWC II" Proceedings)

89.     As a result of the false light in which Gleason portrayed the UWC I proceedings and outcome to Roe, Roe agreed to cooperate in a formal complaint process against Montague.

90.     Indeed, as Roe later explained in her opening statement to the UWC panel, her conversation with Gleason "reframed the incident" for her: she "had always viewed [herself] as the victim of someone else's one-time mistake," but her "perspective broadened after [her] conversation with Angie [Gleason], as [she] began to think about the other people on this campus and how [her] choosing to remain silent on this matter could harm them." Having learned this information about Montague from Gleason, Roe felt her "hands were tied; [she] could not, in good conscience, say no to participating in the investigation."

91.     On November 18, 2015, Defendant Killheffer filed a formal complaint of sexual assault against Mr. Montague alleging that Montague sexually penetrated Roe without her consent on the night of Saturday, October 18, 2014, at his residence.

92.     On November 30, 2015, UWC Secretary Menon notified Montague that he was the subject of a complaint alleging that he had "sexually assaulted a Yale College student on the night of October 18, 2014, at [his] residence[.]" The letter referred Montague to Killheffer's complaint; the only additional information contained in that letter was the name of Montague's accuser and the fact that she was alleging sexual penetration without consent.

93.     In the letter, Menon noted that "the UWC in reviewing the facts during the formal complaint process may consider other violations of the sexual misconduct policy or the Yale College Undergraduate Regulations *that relate to the complaint* (emphasis added)."

94.     Because of the nature of the UWC I proceedings, Montague had no reason to believe they "relate[d] to the complaint" of sexual assault in any way.

95.     Likewise, Montague had no reason to believe that the only other policy violation he committed as a Yale student – an incident in which he tried to help an intoxicated male friend who was detained by the Yale University Police Department, and which resulted in a reprimand by Yale's Executive Committee for "Defiance of Authority" – "relate[d] to the complaint" of sexual assault against a female student. A true and correct copy of the Executive Committee's letter to Montague is attached hereto as Exhibit 6.

96.     Menon also informed Montague that he had only five days to provide a written response to the complaint and "encourage[d]" him to choose an advisor to "support [him] throughout this process," but warned that the advisor was not permitted to submit any documents or speak during Montague's fact-finding interview or the hearing.

97.     Montague later met with Defendant Gleason, who said that she was unable to provide him with any additional information about the complaint because it was confidential, and further, that he would not be able to get more information before or during his upcoming interview with the fact-finder.

98.     Montague submitted a written response denying the allegations against him and stating that all interactions between himself and Roe were consensual. This was all he could say at the time, as Yale gave him no notice of the specifics of Roe's complaint.

99.     On information and belief and consistent with Section 7.2 of the *UWC Procedures*, the UWC Chairman, David Post, appointed a hearing panel of five UWC Members to hear and decide the formal complaint against Montague (the "UWC II Panel"). (*See* Exhibit 2.)

100.     Post appointed himself as Chair of the UWC II Panel. He did so in direct contravention of Section 7.2, which provides that "[t]he hearing panel will not include any Member who has participated in the resolution of an informal complaint arising out of the same events."

101.     Post met with Roe on November 6, 2015, and communicated with her over e-mail thereafter. Post knew that the purpose of the meeting, and the purpose of his involvement, was to convince Roe to abandon the informal complaint process she had already begun against Montague and agree to a formal complaint process instead. Thus, Post effectively participated in the resolution of Roe's informal complaint, and was therefore barred from serving on the UWC II Panel in any capacity.

102.     Secretary Menon thereafter sent a notice to Mr. Montague providing the names of the UWC II Panel members and the decision maker and informing him of his right to object to the participation of a panel member or decision maker. (*See* Exhibit 2.)

103.     Although this notice included Post's name, no one from Yale informed Mr. Montague that Post previously met with other members of Yale's administration for the specific purpose of discussing whether the University could or would initiate a formal complaint against Montague. Likewise, no one from Yale informed Mr. Montague that Post participated in a meeting with Roe whose specific purpose was to convince her to abandon the informal complaint process and participate in a formal UWC proceeding against Montague.

104.   Had these disclosures been made to Montague, he would have invoked his right to object to Post's presence on the UWC panel, given Post's direct involvement with the University's decision to pursue a formal complaint against Montague, as well as his direct involvement with Roe, the primary adverse witness against Montague.

105.   Furthermore, panel members are *required* to withdraw from the proceedings if their relationship to one of the parties, or other circumstances, lead them to believe they cannot judge the matter fairly. (Exhibit 2.)

106.   Despite the fact that Post participated in at least one meeting whose purpose was to steer the proceedings away from the informal complaint process Roe requested and towards a formal complaint process initiated by a Title IX Coordinator against Montague, and despite the fact that Post met with Roe to discuss the specifics of a formal complaint against Montague, Post failed to withdraw.

107.   Having thus stacked the decks against Montague from the very outset of the UWC II process, Yale continued to pursue its complaint against him, and continued to violated his rights at nearly every step thereafter.

108.   What is more, at the same time Montague – the male respondent – was being deprived of his clear contractual rights and denied basic fairness, Yale provided Roe – a female *witness* – with far greater rights than those to which she was entitled.

109.   The *UWC Procedures* make clear that "when a Title IX Coordinator brings a complaint, *the Coordinator will be considered the complainant*." (Exhibit 2 (emphasis added).) Despite this unambiguous language, Yale gave Roe the same status she would have had if she herself were the complainant, including, but not limited to: providing her with a copy of the fact-finder's report; allowing her to be in a private room during the UWC II hearing with audio

21

access to the proceedings; allowing her to make an opening statement to the Panel and to provide a written copy of the same; proving her with a copy of the Panel's findings of fact and conclusions; allowing her to submit a written response to the Panel's findings and conclusions; informing her of the decision and penalty imposed; and allowing her to respond to Montague's written appeal.

110.    In so doing, Yale improperly treated the complaint as if it had been brought by Roe herself, when in fact Roe never agreed to file a formal complaint, and never agreed to be the complainant – she only agreed, after being convinced by Gleason and Post, to participate in the process as a witness. In effect, Yale thus created a situation in which there were two complainants, such that the UWC II Panel could not fail to appreciate that this was not only a complaint by Roe individually, but a complaint that had the imprimatur and strong support of the University.

### The Investigation

111.    In accordance with the *UWC Procedures*, Yale appointed an impartial fact-finder to "gather documents and conduct interviews as necessary to reach a thorough understanding of the facts and circumstances surrounding the allegations of the complaint." (*See* Exhibit 2.)

112.    The undisputed facts are as follows:

112a.  Roe and Montague first met at a party in early September, 2014, at which time they engaged in consensual sexual activity (but not intercourse). Roe joined Montague in his bed and spent the night with him.

112b.  Roe and Montague continued to communicate with each other and, a week or two after their first encounter, they met again and had consensual sex (but not intercourse). Roe again spent the night with Montague.

22

112c.   On September 24, 2014, Roe voluntarily accompanied Montague to his bedroom where "both parties undressed" and kissed in Montague's bed. Roe and Montague then had consensual sexual intercourse, and Roe spent the night with Montague.

112d.   On October 18, 2014, Roe went to a party at Montague's house, where Roe and Montague engaged in consensual sexual contact (not including intercourse) outside the house in Montague's car.

112e.   The two moved to Montague's bedroom, where they voluntarily removed all of their clothing and began engaging in consensual sexual activity.

112f.   Roe and Montague then had sexual intercourse – the subject of the UWC II complaint – and Roe ultimately spent the night at Montague's house.

112g.   Several days later Roe contacted Montague and the two met on October 28, 2014, at which time Roe expressed regret about the sexual intercourse on October 18. Montague told her he was sorry she felt that way, and he agreed not to pursue her in the future.

113.   Roe provided the following additional details to the fact-finder:

113a.   During Roe's first two sexual encounters with Montague he inquired whether she wanted to have sexual intercourse, and she said "no." Montague "respected her decision and did not push her."

113b.   During Roe's third sexual encounter with Montague on September 24, 2014, she affirmatively, verbally consented to sexual intercourse after both parties undressed and were in bed kissing.

23

113c.   Roe claimed that on the evening of October 18, 2014, while she and Montague were kissing each other outside his house and in his car, she told him she wanted to "hook up" but not "have sex."

113d.   Roe and Montague eventually got out of his car and went inside his house in order to go up to Montague's room. Roe led the way.

113e.   When they arrived in the bedroom, they both took off all of their clothes and got into bed, where they resumed kissing and touching.

113f.   Roe said that once they undressed and began engaging in consensual foreplay, "there was no further discussion about the boundaries of their sexual consent."

113g.   Montague kissed Roe and touched her genitals, and Roe had no objection. Indeed, Roe told the fact-finder she "indicated her consent by kissing [Montague,] touching his body . . . and by not tensing up."

113h.   Montague then got on top of Roe in order to engage in sexual intercourse.

113i.   Roe said that at that point she "put her hands up, pressed them against the front of Mr. Montague's shoulders and pushed him, *but not very forcefully*" (emphasis added).

113j.   According to Roe, she also said, "no, I said I wanted to hook up but not have sex." Roe explained to the fact-finder, however, that Montague looked "*as if he did not hear what she was saying*" (emphasis added).

113k.   Montague – having apparently not heard Roe's purported statement – penetrated Roe; Roe made no further attempts to stop the sexual intercourse.

113l.   Roe left Montague's house after the encounter, but later called him and
met up with him again in the early morning hours of October 19.

113m.   Roe accompanied Montague back to his house, where she spent the rest of
the night. Roe recalled that their conversation on the way back to
Montague's house was "normal and flirty."

113n.   When they got back to Montague's room, Roe voluntarily got into bed
with Montague. Roe told the fact-finder that Montague attempted to
initiate sexual contact again, but Roe declined. Montague "did not object,"
and they both went to sleep.

114.    Mr. Montague's recollection of his relationship with Roe prior to October 18,
2014, was largely consistent with Roe's account. He provided the fact-finder with the following
additional details:

114a.   As to the events of October 18, Montague told the fact-finder he had four
to seven drinks of alcohol over a period of several hours that night. He
recalled kissing Roe outside and then in his truck, and inviting her inside
to go to his bedroom.

114b.   Montague's recollection was that Roe consented to all of their sexual
activity that night.

114c.   Nothing about the encounter made Montague think Roe was hesitant or
uncomfortable. Montague remembered changing positions during
intercourse, and said Roe did not object. (Roe, for her part, did not deny
the two changed positions – she simply did not remember.)

114d.   Roe then spent the night with him, as she had during their previous sexual encounters.

114e.   Montague told the fact-finder Roe never told him she wanted to "hook up but not have sex," nor did Roe put her hands on his shoulders and push him as they began to have intercourse.

114f.   The fact-finder asked Montague about Roe's account that she left the house after having intercourse with Montague and later returned; Montague did not deny this had occurred, but did not remember it.

115.   The fact-finder never asked Montague about the UWC I proceedings.

116.   The fact-finder also interviewed five of Roe's friends – Jessica Johnson, Nancy Nelson, Carol Conrad, Kathleen Klein,[4] and Rachel Rogers – with whom Roe had discussed the October 18 sexual encounter.

117.   Johnson, Nelson, Klein, and Rogers all told the fact-finder that Roe told Montague, when the two were in his bedroom, that she did not want to "have sex."

118.   Roe did not tell her friends that she voluntarily removed all of her clothing, got in bed with Montague, and consented to myriad sexual acts.

119.   Further, neither Johnson, Nelson, Klein, nor Rogers said that Roe told them she had made any *previous* statements to Montague that night indicating she wanted to "hook up" with Montague but did not want to "have sex."

120.   Roe had previously told Rogers that she had no romantic feelings for Montague, however; their relationship was purely sexual.

---

[4] These are pseudonyms being used to protect these students' privacy. Except where the student has chosen to reveal his/her identity in the press, this complaint will identify other students through use of pseudonyms in order to protect their privacy.

121.    Conrad told a somewhat different story to the fact-finder than what was reported by Roe's other friends. Conrad said Roe told Montague they could "hang out" but not have intercourse, and that Montague "pushed her to agree to sex." According to Conrad, Roe said "no" but Montague proceeded anyway.

122.    Conrad's account is not consistent with Roe's; Roe never said Montague "pushed her to agree to have sex."

123.    The fact-finder interviewed Defendant Gleason as well. Gleason recalled that when Roe first came to her, she told Roe that one option was to sit down with Montague, tell him there was a complaint against him, and suggest he participate in training to make sure he understood the University's consent policy. According to Gleason, she then told Roe she would "have to check to see if Mr. Montague was known to the Title IX Coordinators and would consult with other Coordinators in order to determine whether it was appropriate to address this incident with additional training."

124.    Gleason told the fact-finder that after consulting with the other Title IX Coordinators, she learned Montague had already participated in a semester of "sensitivity training" and so it "did not make sense to ask him to repeat that intervention."

125.    Gleason thereafter reported back to Roe and implied Montague had already received training on consent, and suggested the situation was serious enough to warrant a formal complaint.

126.    Gleason told Roe that a Title IX Coordinator could bring the complaint if Roe was willing to participate as a witness. Roe agreed to cooperate on that basis.

127.    The fact-finder prepared a report summarizing her interviews and submitted the report to the UWC hearing panel. The report did not include any factual findings about or

27

references to the UWC I proceedings. None of the witnesses' interviews with the fact-finder were recorded by either audio or visual means.

128.     Per the *UWC Procedures*, on or about January 15, 2016, Montague received a final draft of the fact-finder's report. This was the first time he was informed of the details of Roe's claims.

### The UWC II Panel Hearing

129.     Mr. Montague's UWC II hearing was held on January 21, 2016.  The only assistance Montague had during the hearing came from Montague's adviser, Yale basketball coach James Jones.

130.     As set forth above, and in direct contravention of the plain language of the *UWC Procedures*, Roe participated in the hearing *as the complainant*.

131.     Roe was accompanied by her SHARE Center adviser and was allowed to prepare and deliver a lengthy written opening statement. On information and belief, Roe's adviser was aware of this practice and encouraged Roe to prepare the statement.

132.     Unlike Roe's adviser, Coach Jones was unaware of the practice of preparing opening statements for UWC hearings, and no one from Yale informed Montague that he should prepare an opening statement. Montague therefore did not prepare or read one at the hearing.

133.     As he had throughout the proceedings, Montague expressed to the panel his confusion about Roe's complaint; as he understood it, all of his interactions with Roe had been consensual.

134.     The panel hearing was not recorded by audio or visual means.

### The Panel's Report

135.     The panel issued its report on February 1, 2016.

136.    The panel confirmed in its report that Roe "agreed to participate in the UWC investigation *only* after she learned that Mr. Montague had already received training" (emphasis added).

137.    The panel accepted the undisputed facts in the fact-finder's report, and reviewed the evidence presented by the fact-finder in her report, as well as the evidence gathered at the hearing, to determine whether Montague engaged in nonconsensual sexual intercourse with Roe in violation of the University's *Sexual Misconduct Policies*.

138.    The panel's factual findings largely mirror the facts as set forth in the fact-finder's report. These findings, when construed consistently with the undisputed evidence, are inadequate to support a conclusion that Montague violated Yale's *Sexual Misconduct Policies* by engaging in nonconsensual sexual intercourse with Roe.

139.    Specifically, the panel's findings make clear that whatever Roe might have said to Montague about the limits of her consent prior to willingly accompanying him to his bedroom, and whatever she might have communicated about not wanting to "have sex," once she got to Montague's bedroom she clearly changed her mind.

140.    As the fact-finder was careful to ascertain, Roe affirmatively and unequivocally communicated to Montague, by her conduct, that she consented to "sex."

141.    To Montague, Roe's conduct on October 18 was not objectively different than it was during their previous sexual encounters, including the encounter on September 24 when Roe removed all of her clothing, voluntarily joined Montague in his bed, and voluntarily engaged in sexual foreplay and sexual intercourse.

142.    Roe had an absolute right to revoke her consent to sex at any time, but that revocation of consent had to be communicated to Mr. Montague.

29

143.    The revocation of consent – like the giving of consent – must be clear.

144.    The panel made no finding that Roe clearly revoked her consent to sex.

145.    For example, while the panel apparently credited Roe's account that when Montague got on top of her as if to penetrate her she put her hands up and pressed them against his shoulders, the uncontroverted evidence is that she did so in a manner that was "not very forceful[]."

146.    Putting one's hands on a sexual partner's shoulders and gently pressing on them during the course of a sexual act cannot reasonably be construed as conduct clearly indicating revocation of consent to sex.

147.    Montague's view that Roe "did not *push him away* immediately before intercourse" is thus consistent with a rational interpretation of Roe's actions in placing her hands on his shoulders and gently pressing on them as the two were about to have what he believed to be consensual intercourse.

148.    In addition, the panel did not find that Roe's purported verbal revocation of consent – "no, I said I wanted to hook up but not have sex" – was *audible*. In fact, Roe herself confirmed that she *did not think Montague heard her*.

149.    Montague's testimony that Roe did not tell him, during the course of the encounter, that she did not want to "have sex" is thus entirely consistent with Roe's account that Montague appeared not to "hear what she was saying."

150.    By all indications, then, Roe communicated to Montague, and Montague reasonably believed, that he had Roe's consent to engage in sex based on the fact that Roe led Montague to his bedroom, voluntarily removed all of her clothing and voluntarily engaged in sexual acts with him.

151.    Mr. Montague had no reason to believe Roe ever revoked that consent because he never heard Roe express that she did not wish to continue.

152.    In fact, by all accounts, Montague repeatedly demonstrated that when Roe said, and Montague *heard* and understood Roe to be saying, that she did not want to have sexual intercourse, he could – and *did* – comply with her wishes.

153.    Specifically, Roe told the fact-finder that in her earlier encounters with Montague, when Roe said she did not want to have sex, Montague "respected her decision and did not push her." Likewise, when Roe returned to Montague's room and got into bed with him in the early morning hours of October 19 and rebuffed his attempts to re-initiate sexual contact, Montague again readily respected her wishes.

154.    The panel also made credibility determinations without properly considering the evidence presented.

155.    The panel explicitly credited Roe's account because Roe seemed able to remember the incident very clearly; indeed, the panel found, "there is no evidence [Roe] was intoxicated or otherwise impaired in any way that would have affected her recollection of the night."

156.    By contrast, the panel did not find Mr. Montague credible "because of his selective memory . . . and his shifting recollection of how he gauged consent."

157.    In so finding, the panel completely ignored the clear evidence that Montague *was* impaired to some degree, which would account for his failure to remember the events of October 18 with crystal clarity: Montague admitted to having four to seven alcoholic drinks in the space of just a few hours, although he said he was not intoxicated.

31

158.    Furthermore, it was not until just before the UWC hearing – when he received the fact-finder's report – that Montague finally understood the extent of Roe's claims. This also accounts for any differences in his memory between the time of his interview and the panel hearing.

159.    Yale's failure to give Montague proper notice of Roe's claims disadvantaged him at his interview with the fact-finder because he was asked to respond to those claims without knowing or being able to reflect upon any of the detailed allegations. Once he learned the details and was able to search his memory, however, he testified to a broader recollection of those events at the hearing.

160.    At the conclusion of its report, the panel stated that in accordance with Section 7.4 of the *UWC Procedures* it had taken "into account Mr. Montague's previous formal disciplinary history with the UWC for violating Yale's sexual misconduct policy . . . ." The panel may, consistent with Section 7.4 *and as part of the UWC hearing process*, choose to take account of prior UWC proceedings in assessing culpability. (*See* Exhibit 2.)

161.    On information and belief, the UWC Secretary made an *ex parte* submission to the panel detailing the UWC I proceedings and resulting sanction.

162.    The panel never addressed the UWC I proceedings in Montague's presence. It did not ask Montague any questions about the UWC I proceedings, nor did allow him to explain what had occurred or to point out that what he did to Smith was not in any way "related to" nor probative of whether he committed the alleged sexual assault of Roe. The panel also did not confirm with Mr. Montague the topics or substance of his SHARE sessions.

163.    Montague was entitled to be present during the presentation of all evidence the panel took into account on the issue of culpability, including the presentation of evidence related

to the UWC I proceeding, and he was entitled to present relevant or countervailing evidence if he so chose.

164.    Montague was deprived of this opportunity. Had he been given the opportunity, he could have argued that the conclusion of the UWC I proceedings was erroneous, and further, that the UWC I proceedings bore no relationship to Roe's allegations, beyond the basic fact that both proceedings involved female complainants. He could have also pointed out that, despite what the panel thought to be true, he had never received any SHARE training on sexual harassment or gender sensitivity, nor had he met with a SHARE trainer for the purpose of reviewing and reflecting on his interactions and relationships with female students at Yale.

165.    The panel ultimately concluded, by a preponderance of evidence, that Mr. Montague sexually assaulted Roe in violation of *Yale's Sexual Misconduct Policies*.

166.    On information and belief and consistent with Section 7.5 of the *UWC Procedures*, at the close of the panel hearing UWC Secretary Menon described to the panel two previous instances of discipline imposed upon Montague by Yale. (*See* Exhibit 2.) In so doing, she erroneously informed the panel that Mr. Montauge "had received sexual harassment and gender sensitivity training" and had met at least three times with a member of the SHARE Center staff "to review and reflect on his interactions and relationships with female students at Yale." She also erroneously informed the panel that Mr. Montague had been formally disciplined by the Executive Committee, when in fact he had received a reprimand that was a matter of internal record only.

167.    Based at least in part upon this erroneous information, the panel recommended Montague be expelled.

168.    Per Yale's 2015 *UWC Procedures*, Montague was informed, on or about February 1, 2016, of the panel's findings of fact and conclusion, *but he was not informed that the panel recommended expulsion, nor of the panel's reasoning for recommending this particular sanction*. (*See* Exhibit 2.)

169.    This represented a substantial change in Yale's procedure. The prior version of the *UWC Procedures* – in effect from 2013 until they were revised in 2015 – provided that both parties would be notified of the panel's findings of fact, conclusions, *and* recommended penalty, and would be given the opportunity to submit a written response addressing the panel's report *in full*.

170.    Because of Yale's unilateral change in its procedure, Montague had no opportunity to respond to or challenge the panel's disciplinary recommendation.

171.    In fact, unbeknownst to Montague, and as set forth above, the UWC II panel took into account the UWC I proceedings and the purported SHARE training Montague had already received – both of which it deemed "particularly relevant" – as well as the fact that "Mr. Montague also received a written reprimand from the Yale College Executive Committee . . . for violating Yale College *Undergraduate Regulations* for Defiance of Authority."

172.    Yet Montague had not, in fact, "received sexual harassment and gender sensitivity training," nor had he "review[ed] and reflect[ed] on his interactions and relationships with female students at Yale" during his meetings with the SHARE Center staff member. The UWC II panel therefore relied on incorrect information in recommending the appropriate sanction, but Montague was neither informed of this nor given an opportunity to make the facts known to the panel.

34

173.     Furthermore, the reprimand issued by the Executive Committee was not "formal discipline." Yale told Mr. Montague he was "free" to represent to others that he had *not* "been subject to disciplinary sanctions by the University," and it also told Mr. Montague that the reprimand would only be taken into account if the *Executive Committee* ever again found he had committed an infraction of the *Undergraduate Regulations*. (*See* Exhibit 6.) Yale never informed Montague that, when considering what penalty to recommend, the *UWC panel* could or would take into account the informal discipline imposed upon him by the Executive Committee.

174.     Just as Montague had no opportunity to explain the UWC I proceedings to the UWC II panel, he had no opportunity to address the Executive Committee's reprimand, or to rebut any notion that it was at all relevant to the UWC II proceedings.

175.     This procedure (or lack thereof) is in marked contrast to Executive Committee disciplinary proceedings at Yale, under which all complaints of alleged student misconduct, other than sexual misconduct, are adjudicated.

176.     When the Executive Committee considers what penalty to assign a student for an infraction under Yale's *Undergraduate Regulations*, a true and correct copy of which is attached hereto as Exhibit 7, the Committee "shall invite the student and the adviser to return to the room. The secretary will inform the committee of any previous infractions of the *Undergraduate Regulations* on the part of the student. *The Executive Committee shall permit the student and his or her adviser to present a statement of reasonable length relevant to the determination of the penalty and to furnish further information about his or her character*." (Exhibit 7, emphasis added.)

177.    Additionally, on information and belief and consistent with Section 7.5 of the *UWC Procedures*, at the close of the panel hearing UWC Secretary Menon "inform[ed] the panel about the nature of previous penalties assessed for similar violations." (*See* <u>Exhibit 2</u>.)

178.    Yale's history of imposing penalties for nonconsensual sex demonstrates that *in almost all cases* the sanction for such conduct is something less than expulsion. Indeed, prior to Montague's expulsion, Yale had expelled only *three* other students between July 1, 2011, and June 30, 2015, for nonconsensual sexual conduct, demonstrating that it is an extreme sanction imposed in only the most serious circumstances.

179.    The following is a summary of the relevant UWC disciplinary actions during that time period:

- UWC found sufficient evidence that two male students engaged in <u>nonconsensual sex</u> with a female student; the respondents were given <u>written reprimands</u> and measures were taken to limit contact between the parties (January 1, 2012 through June 30, 2012);

- UWC found sufficient evidence that two male students engaged in <u>nonconsensual sex</u> with a female student; the respondents were given <u>written reprimands</u> and measures were taken to limit the contact of the parties (January 1, 2013 through June 30, 2013);

- UWC found sufficient evidence that a male student had <u>nonconsensual sex</u> with a female student; the respondent was given a <u>written reprimand</u> (January 1, 2013 through June 30, 2013);

- UWC found sufficient evidence that a male student, in the context of an intimate relationship, engaged in certain <u>nonconsensual acts</u> with a female student <u>during</u>

36

otherwise consensual sexual activity; the respondent was given a written reprimand; restricted from contacting the complainant; required to attend gender sensitivity training; and encouraged to seek counseling (January 1, 2013 through June 30, 2013);

- UWC found sufficient evidence that a male student, in the context of an intimate relationship, engaged in certain nonconsensual acts with a female student during otherwise consensual sexual activity; the respondent was placed on probation for the remainder of his time at Yale and a number of measures were taken to restrict him from contacting the complainant (January 1, 2013 through June 30, 2013);

- UWC found sufficient evidence that a male student had nonconsensual sex with a female student and violated the Yale College Code of General Conduct; the respondent was given a two-semester suspension; placed on probation for the remainder of his time at the university; restricted from contacting the complainant; and encouraged to continue counseling for alcohol abuse, appropriate sexual behavior, and the respectful treatment of others (January 1, 2013 through June 30, 2013);

- UWC found sufficient evidence that a male student engaged in sexual intercourse with a female student without her consent; the respondent was expelled (January 1, 2014 through June 30, 2014) (this expulsion occurred in the wake of the student and alumni protests spurred by the previous Spangler Report, in which the groups decried what they viewed as the University's weak penalties for sexual assault);

- After the complainant decided not to pursue formal action, a Title IX Coordinator brought a formal complaint to the UWC, and the UWC found sufficient evidence

that a male student engaged in <u>sexual intercourse</u> with a female student <u>without</u>
her <u>consent</u>; the respondent was <u>expelled</u> (January 1, 2014 through June 30, 2014)
(this expulsion likewise occurred in the wake of the student and alumni protests
spurred by the previous Spangler Report);

- UWC found sufficient evidence that a male student engaged in <u>certain acts</u> with a
female student <u>without</u> her <u>consent during otherwise consensual sexual activity</u>;
the respondent was given a <u>written reprimand</u> and required to received sexual
consent training (January 1, 2014 through June 30, 2014);

- UWC found sufficient evidence that a male student engaged in <u>sexual intercourse</u>
with a female student <u>without</u> her <u>consent</u>; the respondent was <u>suspended</u> through
the summer of 2014; restricted from participating in certain campus activities; and
his degree was withheld until May of 2015 (January 1, 2014 through June 30,
2014);

- UWC found sufficient evidence that a male student engaged in <u>touching of a</u>
<u>sexual nature and other sexual activities without</u> a female student's <u>consent</u>; the
respondent was <u>suspended</u> through the summer of 2015; restricted from
contacting the complainant; and required to receive training on sexual consent and
alcohol consumption (January 1, 2014 through June 30, 2014);

- UWC found sufficient evidence that a male student engaged in <u>sexual intercourse</u>
with a female student <u>without</u> her <u>consent</u>; the respondent was placed on
<u>probation</u> for the remainder of his time at Yale (July 1, 2014 through December
31, 2014);

38

- UWC found sufficient evidence that a male student engaged in <u>sexual intercourse and other sexual acts</u> with a female student <u>without</u> her <u>consent</u>; the respondent was <u>expelled</u> (July 1, 2014 through December 31, 2014)

- UWC found sufficient evidence that a student engaged in <u>sexual penetration</u> of another student <u>without consent</u>; the respondent was <u>suspended</u> for six months and referred for training on sexual consent (January 1, 2015 through June 30, 2015) (Yale stopped reporting the gender of complainants and respondents as of January 1, 2015);

- UWC found sufficient evidence that a student engaged in <u>sexual activity</u> with another student <u>without consent</u>; the respondent was <u>reprimanded</u>; restricted from participating in certain campus activities; and referred for training on sexual consent (January 1, 2015 through June 30, 2015);

- UWC found sufficient evidence that a student engaged in <u>sexual harassment and sexual penetration</u> of another student <u>without consent</u>; the respondent was placed on <u>probation</u> and received a written reprimand (January 1, 2015 through June 30, 2015).

180.    Based on the "previous penalties assessed for similar violations," then, the panel's decision to recommend expulsion in Montague's case was unsupported and unwarranted.

181.    On February 2, 2016, Roe wrote to Yale College Dean Jonathan Holloway expressing her full support of the panel's conclusion. Roe reiterated that the motivation for the formal complaint was "to keep this campus safe," and urged Holloway to consider that Montague "has had additional opportunities to be trained on subjects related to consent and sensitivity."

182.    In reality, of course, Montague had received no training on "consent and sensitivity." On information and belief, Roe made this statement based on Defendant Gleason's false and misleading representations to her that Montague had been the subject of a prior sexual assault complaint and had already received training relevant to that complaint.

### The University Expels Mr. Montague, Ejects Him from the Campus, and Destroys His Reputation

183.    On February 10, 2016, Dean Holloway wrote to Mr. Montague and informed Montague that, as Dean, he accepted the panel's conclusion that Montague sexually assaulted Roe and that he had determined "the appropriate penalty is expulsion, the penalty also recommended by the panel that heard this complaint."

184.    In making his decision, Holloway, like the UWC II panel, expressly considered the nature of the behavior in question; Montague's prior disciplinary history by the UWC and the Executive Committee; and "the extensive training" Montague allegedly "already received from the SHARE Center" – training that, according to Holloway, "did not have the hoped for impact on [Montague's] behavior." Holloway concluded that in light of Montague's "inability to learn from [his] past mistakes," "permanent separation from Yale is the only appropriate penalty."

185.    This was the first time Montague was ever informed that anyone at Yale had considered the UWC I proceedings and the Executive Committee reprimand in determining his sanction (although he was still unaware that the UWC II panel had considered both).

186.    Montague's expulsion was contrary to Yale's own suggested sanction for similar (hypothetical) conduct.

187.    Yale's "Sexual Misconduct Scenarios," developed and disseminated in response to critics who charged that all nonconsensual sex is "sexual assault" and warrants expulsion in every instance, includes the following scenario:

40

> Morgan and Kai are friends who begin dancing and kissing at a party. They are both drunk, although not to the point of incapacitation. Together they decide to go to Kai's room. They undress each other and begin touching each other. Morgan moves as if to engage in oral sex and looks up at Kai questioningly. Kai nods in agreement and Morgan proceeds. Subsequently, without pausing to check for further agreement, Kai begins to perform oral sex on Morgan. Morgan lies still for a few minutes, then moves away, saying it is late and they should sleep.

(*See* Exhibit 3.)

188.    In this scenario, Yale said, "There was initial agreement, but the bounds of that agreement were not clear. Kai may have thought that Morgan had consented to reciprocal sex, but took no steps to obtain unambiguous agreement." Under these circumstances, "[t]he UWC penalty would likely be a reprimand."

189.    This scenario is comparable to the October 18 encounter between Roe and Montague, where it is undisputed that "[t]here was initial agreement" to engage in sexual acts, Montague thought Roe consented to sexual intercourse (though he took no steps to obtain additional consent), and Roe did not clearly and unambiguously revoke her initial consent. (In the present case, however, both Roe and Montague *mutually* consented to sexual activity; in Yale's hypothetical scenario, although Morgan obtained consent from Kai, Kai never obtained consent from Morgan.)

190.    Given that the penalty Yale itself recommended under very similar circumstances was a reprimand, the only rational explanation for Yale's decision to expel Montague was its unwarranted reliance on the UWC I proceedings, Montague's purportedly "extensive" SHARE training, and the fact that he had previously been reprimanded by the Executive Committee

191.    As set forth above, however, the UWC I proceedings were contrary to Yale's *Sexual Misconduct Policies*. Had Montague had an opportunity to challenge the proposed sanction, he could have argued that in light of the fundamental differences between the UWC I

41

and UWC II proceedings, it could not at all be said that "permanent separation from Yale is the only appropriate penalty."

192.    Montague could have also pointed out that, despite what the panel and the Dean apparently believed, he never in fact received any SHARE training – let alone "extensive" training – on sexual harassment, gender sensitivity, or any topic related to sexual relationships or sexual consent.

193.    On information and belief, Yale targeted and ultimately expelled Mr. Montague in order to make a public example of a prominent male figure on campus and demonstrate that, contrary to the opinions of Yale's internal and external critics, the University is indeed tough on men who "victimize" female students.

194.    Montague appealed Yale's decision to expel him to the Provost. Finally aware, after receiving Dean Holloway's letter, that the UWC I proceedings and SHARE training had both weighed heavily in the decision to expel him, Montague took the first opportunity he had to explain the irrelevance of those particular factors and pointed out that "[u]nless a complete examination is done of my freshman year incident with UWC and my senior year fall meeting with the Executive Committee that resulted in a reprimand, the sanction of expulsion is unfair."

195.    Montague informed the Provost that the UWC I incident, while "wrong and incredibly immature," was simply a "disagreement with a senior, female student who was belittling [him]." He also explained that his meetings with the SHARE counselor "were not 'extensive training,' let alone training on sexual misconduct. Instead, these meetings were very casual and lasted no more than five minutes after explaining the incident on the first occurrence." Thus, he said, "[w]ithout proper examination" of this information, "the sanction imposed was extreme and unjustified."

196.    Apparently unfazed by the fact that the University was taking the most drastic disciplinary step it could against one of its students on the basis of complete misinformation, the Provost summarily denied Montague's appeal.

197.    As a result of his expulsion, Montague was required to leave campus and abandon his beloved basketball team just as they were set to play in the first round of the NCAA Tournament, a feat the Yale men's team had not achieved since 1962.

198.    On February 26, 2016, Montague's teammates – in a gesture of support for their expelled captain – wore t-shirts sporting Montague's nickname and jersey number during warm-ups for a nationally-televised game.

199.    The backlash was vicious. Three days later, posters appeared on Yale's campus featuring photos of the team in their symbolic t-shirts and the words, "stop supporting a rapist."

200.    After those posters were removed, a new set of posters appeared just two days later, declaring: "Rape culture is standing by your teammate and silencing Yale's victims of sexual assault."

201.    The Yale Women's Center also posted a message on Facebook later that evening that a "high-profile member of a sports team in the midst of a pivotal moment in the season" left campus because of sexual misconduct. There was no mistaking who that "high profile member of a sports team" was, that Yale itself had publicly announced on February 24, after Montague had missed a series of games earlier that month, that he would not return to the team.

202.    The basketball team was forced to apologize publicly for "the hurt" the team caused to other students by supporting their former captain and teammate and to reiterate the team's commitment to a "healthy, safe and respectful campus climate where all students can flourish."

203.    Mr. Montague has been deeply and irreparably harmed by the defendants' actions. He was wrongfully deprived of the degree he worked so hard to obtain (while at the same time devoting hundreds of hours to training, practice and playing to support and lead Yale's men's varsity basketball team); indeed, he was just four months shy of receiving that degree when he was expelled. His expulsion from Yale on grounds of "sexual misconduct" will follow him throughout his life and will prevent him from obtaining a comparable college degree. The defendants' wrongful actions also deprived Montague of his dream of playing in the NCAA tournament (a tournament for which the Yale team might not have qualified without his leadership and skill); it is an opportunity he will never have again. Finally, he was publicly vilified: his name and reputation will now forever be associated with the words "sexual assault." For these injuries, even monetary damages cannot make him whole.

**Count I**
**Breach of Contract, UWC I: Lack of Jurisdiction**
**(v. Yale University)**

204.    Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

205.    Montague applied to and enrolled in the University and, with the assistance of defendant Yale University and his parents, paid associated fees and expenses. Montague did so in reliance on the understanding and with the reasonable expectation that the University would implement and enforce the provisions and policies set forth in its official publications, including the *UWC Procedures*, the *Sexual Misconduct Policies*, and the *Yale College Undergraduate Regulations*, as well as all supporting and explanatory documents produced, published, and/or disseminated by the University, whether cited in this complaint or not.

206.    An express contract or, alternatively, a contract implied in law or in fact was formed between Montague and the University. Defendant Yale University violated this contract in a number of ways.

207.    The contract contained an implied covenant of good faith and fair dealing. It implicitly guaranteed that any proceedings would be conducted with basic fairness.

208.    Pursuant to the *UWC Procedures* and the *Yale College Undergraduate Regulations*, the UWC has jurisdiction only over matters involving sexual misconduct.

209.    Because the incident involving Sally Smith was not, even on its face, a matter of sexual misconduct, the UWC lacked jurisdiction.

210.    The University's decision to pursue the matter through the UWC was a violation of its own procedures and policies, and a breach of the covenant of good faith and fair dealing.

211.    As a direct and foreseeable result of this breach, the plaintiff has suffered, and will continue to suffer, a multitude of injuries.  Without limitation, he was wrongly found and held responsible for "sexual harassment," and from this finding flowed extreme consequences, culminating in his expulsion from Yale. As a result, his academic and employment prospects – indeed, his entire future prospects – have been materially and drastically limited.

**Count II**
**Breach of Contract, UWC I: Inadequate Evidence to Support**
**Finding of Sexual Harassment**
**(v. Yale University)**

212.    Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

213.    Under University policies, a student formally charged with sexual misconduct is entitled to a hearing before a panel of the UWC and may be found to have violated University policy only if the panel finds facts by a preponderance of the evidence presented at the hearing that the student committed an act or acts constituting an offense defined as sexual misconduct

45

under said policies. The panel is not authorized to consider as evidence of culpability any matter that is not presented at the hearing in the presence of the parties, who would then have an opportunity to respond.

214.    The *Sexual Misconduct Policies* define sexual harassment as "nonconsensual . . . conduct of a sexual nature on or off campus, when . . . such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating or hostile academic or work environment. Sexual harassment may be found in a single episode, as well as in persistent behavior." (*See* Exhibit 1.)

215.    The UWC I panel did not find, and could not have found, that Montague's conduct towards Sally Smith was "conduct of a sexual nature," nor did it find the conduct had "the purpose or effect of unreasonably interfering with [Smith's] work or academic performance or creating an intimidating or hostile academic or work environment." (*See* Exhibit 1.)

216.    The panel's finding that plaintiff "sexually harassed" Smith was contrary to the plain language of the University's *Sexual Misconduct Policies*, and thus a breach the same, as well as a breach of the covenant of good faith and fair dealing.

217.    The finding should not have been made, recorded, or used in any way against Montague in making any subsequent disciplinary decisions affecting Montague during the remaining course of his college career at Yale.

218.    As a direct and foreseeable result of this breach, the plaintiff has suffered, and will continue to suffer, a multitude of injuries.  Without limitation, he was wrongly found and held responsible for "sexual harassment," and from that finding flowed extreme consequences, culminating in his expulsion from Yale. As a result, his academic and employment prospects – indeed, his entire future prospects – have been materially and drastically limited.

46

### Count III
### 20 U.S.C. § 1681 (Title IX), UWC I
### (v. Yale University)

219.    Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

220.    Title IX prohibits discrimination on the basis of sex in a school's "education program or activity," which includes all of the school's operations. 20 U.S.C. §§ 1681(a), 1687. The University receives federal funds and must comply with Title IX.

221.    A victim of discrimination based on his or her gender has, under Title IX, a private right of action against the offending school for monetary damages and equitable relief.

222.    As set forth above, the University engaged in a series of actions that ultimately resulted in the UWC I panel's erroneous finding that Montague violated Yale's *Sexual Misconduct Polices* in the form of "sexual harassment" of Sally Smith.

223.    These actions, and the panel's ultimate finding, were a product of disparate treatment of Montague based on his gender.

224.    As set forth above, the UWC lacked jurisdiction over matter because it did not involve "sexual misconduct," as Yale's own policies define it.

225.    For the same reason, the panel's finding of "sexual misconduct" in the form of "sexual harassment" was erroneous because, under Yale's own policies, the conduct was neither "conduct of a sexual nature" nor conduct that created a hostile environment for Smith.

226.    The University's decision to pursue the matter under the auspices of the UWC, and the panel's ultimate finding, were motivated by gender bias.

227.    On information and belief, had the perpetrator been a woman, Yale would not have considered the matter a UWC matter, nor would it have found "sexual harassment."

228.     Montague, based solely on his gender, suffered an erroneous outcome of the UWC I proceedings. This unlawful discrimination by the University in violation of Title IX proximately caused Montague to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future employment prospects.

**Count IV**
**Defamation**
**(v. Yale University and Gleason)**

229.     Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

230.     On November 6, 2015, Defendant Gleason falsely informed Roe, either directly or by implication, that Montague had been the subject of a previous complaint of sexual assault; that he had been found responsible for sexual assault by the UWC; and that he had been required to participate in training concerning sexual relationships and sexual consent.

231.     These statements were false and defamatory *per se*, and caused Roe to believe she had to engage in the formal complaint process because this was not a "one-time mistake" on Montague's part, Roe consequently felt duty-bound "to protect other women" from him.

232.     These false and defamatory statements were, in fact, the genesis of the formal UWC II proceedings against Montague.

233.     Gleason made these statements to Roe negligently or in knowing or reckless disregard of the truth.

234.     As a direct and foreseeable result of these false and defamatory statements, the plaintiff has suffered, and will continue to suffer, grave reputational and economic injury, as set forth above.

48

**Count V**
**Invasion of Privacy (Violation of Confidentiality and False Light)**
**(v. Yale University and Gleason)**

235.    Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

236.    On November 6, 2015, Defendant Gleason falsely informed Roe, either directly or by implication, that Montague had been the subject of a previous complaint of sexual assault; that he had been found responsible for sexual assault by the UWC; and that he had been required to undergo training concerning sexual relationships and sexual consent.

237.    Gleason was prohibited by Yale's policies and procedures from disclosing this information to Roe, and her disclosure was a violation of Montague's right to privacy, *to wit*, his right to have the information kept confidential.

238.    Gleason's statements to Roe were also untrue. Montague had never before been the subject of a complaint of sexual assault, nor had he ever before been required to participate in training concerning sexual relationships or sexual consent.

239.    These statements were a major misrepresentation of Montague's character, history, and activities.

240.    The false light in which Gleason placed Montague would be highly offensive to a reasonable person.

241.    Gleason knew or acted in reckless disregard of the falsity of her statements to Roe and the false light in which they would place Montague.

242.    As a direct and foreseeable result of the false light in which Gleason placed Montague to Roe, Montague experienced, and continues to experience, emotional and mental suffering.

## Count VI
## Tortious Interference With Contract
### (v. Gleason, Killheffer and Others Unknown)

243.    Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

244.    Defendant Gleason, Defendant Killheffer, and others unknown were aware of the contractual relationship between plaintiff and Yale as set out above, which encompassed the obligations of each under Yale's *UWC Procedures*.

245.    Gleason, Killheffer, and others unknown intentionally and maliciously interfered with plaintiff's contractual relationship with Yale as set out above by taking steps to procure Montague's wrongful expulsion. These steps included, but are not limited to:

      245a.    Violating the strict confidentiality requirements contained in Yale's policies;

      245b.    Falsely informing Roe that the informal complaint process was not available under the circumstances;

      245c.    Falsely informing or implying to Roe that Montague was the subject of a previous complaint of sexual assault; and

      245d.    Manipulating Roe into agreeing to participate in a formal complaint process against Montague.

246.    As a result of the conduct of these individual defendants, Roe was misled into cooperating in a formal complaint process against Montague despite her express wishes to keep the process informal and preserve her anonymity. The formal complaint process ultimately resulted in the University severing its relationship with plaintiff by expelling him from the University.

247.    Gleason, Killheffer, and others unknown acted through improper motive or means and with actual malice, including the illegitimate purpose of ensuring the pursuit of formal UWC proceedings against Montague, regardless of Roe's stated desire to keep the process anonymous and informal, in order to make an example of him and to prove that the University was tough on sexual assailants.

248.     As a direct and foreseeable result of the individual defendants' wrongful conduct, the plaintiff has suffered, and will continue to suffer, multiple forms of damage, as set forth above.

### Count VII
### Breach of Contract, UWC II

249.    Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

250.    Defendants breached their contract with Montague, and the covenant of good faith and fair dealing contained therein, in myriad ways, **including, but not limited to, the following**:

### Count VII(A): Breach of Confidentiality
### (v. Yale University)

251.    Both Yale's *UWC Procedures* and the *Provost's Statement on Confidentiality of UWC Proceedings* "impose strict and unequivocal confidentiality obligations regarding documents prepared by, prepared for, or received from the UWC in connection with a UWC proceeding." (*See* Exhibit 2; Exhibit 5.) These documents (and by necessary implication, their contents) may not be disclosed to anyone who was not a party to the UWC proceeding (other than the parties' advisers, family members, and attorneys).

252.    In direct contravention of this policy and in breach of the clear confidentiality requirements set forth in Yale's contract with Montague, as well as in breach of the covenant of

good faith and fair dealing, Defendant Gleason, acting as a Deputy Title IX Coordinator on behalf of Yale, disclosed to Roe the fact and substance of the UWC I proceedings.

253.    As a direct and foreseeable result of defendants' wrongful conduct, Montague suffered, and will continue to suffer, a multitude of injuries and damages. Without limitation, he was subjected to a formal complaint process rather than the informal one Roe initially and affirmatively desired, and this formal complaint process culminated in his expulsion from Yale. As a result, his academic and employment prospects – indeed, his entire future prospects – have been drastically and materially limited, and he has suffered serious emotional and mental injury.

### Count VII(B): Intentional Manipulation of Procedure for Title IX Coordinator-Initiated Complaints (v. All Defendants)

254.    Title IX Coordinators may only bring formal complaints to the UWC *independently of the wishes of an individual complainant* in "unusual circumstances . . . such as those involving risks to the safety of individuals and/or the community." (Exhibit 4.)

255.    The circumstances reported to Yale by Roe did not in any way involve a risk to Roe's safety or to the safety of the community. Yale therefore had no authority to bring a formal complaint against Montague independently of Roe's clear wish to proceed with the informal complaint process. Consequently, Yale had to convince Roe to abandon the informal complaint process and, at the least, to agree to allow a Title IX Coordinator to file a formal complaint against Montague with Roe as the primary witness.

256.    In order to accomplish that goal, defendants disclosed confidential information about UWC I to Roe; provided Roe with false information that Montague had already completed sensitivity training; misled Roe into believing that SHARE training was no longer an option for resolution of the matter and that a formal complaint was necessary; misled Roe into believing

that Montague had been found responsible in the past for sexual assault; and ultimately convinced Roe to agree to a Title IX Coordinator-initiated complaint process in which she would actively participate.

257.    Defendants' actions in pursuing the formal complaint against Montague, and securing Roe's cooperation in the endeavor, were a breach of Yale's policies and procedures and a breach of the covenant of good faith and fair dealing.

258.    As a direct and foreseeable result of the defendant Yale's wrongful conduct, the plaintiff has suffered, and will continue to suffer, multiple forms of damage, as set forth above.

### Count VII(C): Failure to Comply with *UWC Procedures* Concerning Status of Complainant
### (v. Yale University)

259.    According to the UWC Procedures, "when a Title IX Coordinator brings a complaint, the Coordinator will be considered the complainant." (Exhibit 2.)

260.    Defendant Killheffer filed the formal complaint against Montague and was therefore the "complainant" in this matter.

261.    Nevertheless, throughout the UWC II process, Yale allowed Roe to enjoy the status of a complainant, even though she affirmatively chose *not* to file a formal complaint against Montague and instead agreed *only* to participate as a witness in the formal complaint process initiated by Killheffer.

262.    Defendant's improper actions in this regard constituted a breach of contract and a breach of the covenant of good faith and fair dealing therein.

263.    As a direct and foreseeable result of the defendant Yale's wrongful conduct, the plaintiff has suffered, and will continue to suffer, multiple forms of damage, as set forth above.

### Count VII(D): Failure to Comply with Hearing Panel Appointment Procedures
### (v. Yale University)

264.    The *UWC Procedures* provide that a "hearing panel will not include any Member who has participated in the resolution of an informal complaint arising out of the same events." (Exhibit 2.)

265.    David Post, who appointed himself Chair of the UWC II Panel, directly participated in a meeting and subsequent e-mail exchange with Roe, the primary purpose of which was to convince Roe to truncate the informal complaint process she had already initiated against Montague and allow the University to file a formal complaint against him instead.

266.    Post's participation as Chair of the UWC II Panel was a breach of contract and a breach of the covenant of good faith and fair dealing therein.

267.    The *UWC Procedures* further provide that panel members "must withdraw from the proceedings if their relationship with the complainant or the respondent or other circumstances lead them to believe that they cannot judge the matter fairly." (Exhibit 2.)

268.    Because Post attended a meeting with Defendants Gleason and Killheffer and University counsel at which the primary topic of conversation was the possibility of a Title IX Coordinator-initiated complaint against Montague, and because Post subsequently met with Roe in order to persuade her to participate in this formal complaint process, Post should have withdrawn from the panel. His failure to do so constituted a breach of contract and a breach of the covenant of good faith and fair dealing therein.

269.    Additionally, the *UWC Procedures* provide that parties must be informed of the names of the panel members so the parties can decide whether to object to any of those members on the basis that they are "incapable of fairly judging the matter." (Exhibit 2.)

270.   Although Yale informed Montague of the names of the UWC II Panel members, it failed to inform Montague of Post's direct involvement in the events leading up to the formal complaint against him.

271.   By failing to provide Montague with this crucial information, Yale deprived Montague of the opportunity to object to Post serving on the UWC II Panel.

272.   Defendant's actions were a breach of Yale's policies and procedures and a breach of the covenant of good faith and fair dealing.

273.   As a direct and foreseeable result of the defendant Yale's wrongful conduct, the plaintiff has suffered, and will continue to suffer, multiple forms of damage, as set forth above.

### Count VII(E): Failure to Make Findings
### Constituting a Violation
### (v. Yale University)

274.   As set forth above, under University policies, a student formally charged with sexual misconduct is entitled to a hearing before a panel of the UWC and may be found to have violated University policy only if the panel finds facts by a preponderance of the evidence presented at the hearing that the student committed an act or acts constituting an offense defined as "sexual misconduct" under said policies.

275.   A respondent cannot be found to have violated University policies in the absence of sufficient evidence. The evidence the panel may consider in determining sufficiency is confined to the fact-finder's report and the evidence elicited by the panel at the UWC hearing.

276.   According to Yale's *Sexual Misconduct Policies*, sexual assault is "any kind of nonconsensual sexual contact, including rape, groping, and any other nonconsensual sexual touching." (*See* Exhibit 1.) Furthermore, per the *Sexual Misconduct Policies*, "[s]exual activity requires consent, which is defined as positive, unambiguous, and voluntary agreement to engage

55

in specific sexual activity throughout a sexual encounter." "Consent must be ongoing throughout a sexual encounter and can be revoked at any time." (*Id.*)

277. The panel failed to make findings supporting the conclusion that Montague sexually assaulted Roe.

278. It is undisputed that Roe affirmatively consented to sexual activity when she led Montague to his room, removed all of her clothing, got into bed with him, and voluntarily engaged in various forms of sex.

279. The panel did not find, and could not have found, that Roe affirmatively, unambiguously, and audibly communicated to Montague her revocation of consent to sex. Rather, the uncontested facts were that Roe pushed lightly on Montague's shoulders as he positioned himself on top of her, an act that cannot under any reasonable interpretation be construed as a clear and unambiguous revocation of consent, and that Montague did not appear to hear Roe when she purportedly said "no."

280. Consequently, the panel's conclusion that Montague sexually assaulted Roe in violation of the University's *Sexual Misconduct Policies* is a breach of the requirement that sufficient evidence support the panel's findings, as well as a breach of the covenant of good faith and fair dealing.

281. As a direct and foreseeable result of the defendant Yale's wrongful conduct, the plaintiff has suffered, and will continue to suffer, multiple forms of damage, as set forth above.

### Count VII(F): Erroneous Reliance on UWC I Proceedings
### (v. Yale University)

282. The *UWC Procedures* provide that "[i]n determining culpability, the panel may . . . take into account a respondent's previous formal discipline for *other acts of sexual misconduct* . . . (emphasis added)." (*See* Exhibit 2.)

283.    As set forth above, because the UWC I proceedings did not in fact involve any "acts of sexual misconduct," those proceedings could not and should not have been relied upon by the UWC II panel in assessing Montague's culpability.

284.    The panel's erroneous reliance on the UWC I proceedings was a breach of Section 7.4 of the *UWC Procedures*, and a breach of the covenant of good faith and fair dealing.

285.    As a direct and foreseeable result of the defendant's wrongful conduct, the plaintiff has suffered, and will continue to suffer, multiple forms of damage, as set forth above.

### Count VII(G): Consideration of Evidence
### Outside the Presence of the Respondent
### (v. Yale University)

286.    The *UWC Procedures* provide, *under the "Hearings" section* (7.4), that "[i]n determining culpability, the panel may . . . take into account a respondent's previous formal discipline for other acts of sexual misconduct . . . ." (*See* Exhibit 2.) The panel is not authorized to consider as evidence of culpability any matter that is not presented at the hearing in the presence of the parties, who would then have an opportunity to respond; the evidence against a respondent consists of the fact-finder's report and the evidence and testimony gathered at the hearing.

287.    When it issued its findings, the panel explicitly stated that it relied on the UWC I proceedings in assessing Montague's culpability in the UWC II proceedings.

288.    Evidence of the UWC I proceedings was not contained in the fact-finder's report, however, nor was it discussed in Montague's presence at the UWC II hearing.

289.    Montague, as the respondent, had the right to be present at, or at least to meaningfully participate in, all portions of the hearing related to his culpability.

290.    Yale denied Montague the opportunity to be present at that portion of the hearing during which the panel considered the UWC I proceedings.

291.    As a result, Montague was deprived of the opportunity to explain to the panel the UWC I proceedings; to explain that his conduct did not in fact amount to "sexual harassment"; and to explain that his training was not focused on, and indeed had no relationship to, sexual harassment, gender sensitivity, sexual relationships, or sexual consent.

292.    Had Montague been present during the panel's consideration of the UWC I proceedings, and had he been given an opportunity to explain to the panel the conduct which led to those proceedings, it would have been clear to the UWC II panel that the UWC I proceedings bore no relationship to, and had no probative value as to the issue of Montague's culpability in the UWC II proceedings.

293.    By denying Montague the opportunity to be present during the presentation of evidence against him, Yale breached its obligations under its own *UWC Procedures*, as well as the covenant of good faith and fair dealing.

294.    As a direct and foreseeable result of the defendant's wrongful conduct, the plaintiff has suffered, and will continue to suffer, multiple forms of damage, as set forth above.

### Count VII(H): Erroneous Reliance on Executive Committee Action
### (v. Yale University)

295.    The *UWC Procedures* provide, in Section 7.5 ("Findings, Conclusions, and Recommendations"), that "[t[he Secretary will . . . describe any formal Yale discipline previously imposed on the respondent, and the panel may consider this prior discipline in its recommendations regarding a penalty." (Exhibit 2.)

296.    The panel is not authorized by the *UWC Procedures* to consider *informal* discipline in making its recommendation regarding a penalty.

297.    Nor was the UWC II panel, in this specific instance, authorized to consider the Executive Committee's reprimand, where Yale promised Mr. Montague that the reprimand would only be taken into account if he was subject to another disciplinary proceeding before the *Executive Committee*.

298.    The Executive Committee, "a standing committee of the Yale College Faculty by whose authorization it acts," is wholly distinct from the UWC, which is "is appointed and authorized to act by the provost." (Exhibit 7.)

299.    When the UWC II panel made its disciplinary recommendation to the Dean, it explicitly relied upon the fact that Mr. Montague had been reprimanded by the Executive Committee.

300.    This reprimand was not "formal discipline," however, nor would Montague have reasonably understood it to be formal discipline.

301.    Furthermore, Yale told Mr. Montague the reprimand would only be taken into consideration if the *Executive Committee* were to again discipline him for another infraction of the Undergraduate Regulations. (Exhibit 6.)

302.    Montague was never again disciplined by the Executive Committee for an infraction of the *Undergraduate Regulations*.

303.    The UWC had no authority to take into account the Executive Committee reprimand in recommending a penalty.

304.    The panel's erroneous reliance on the Executive Committee action was a breach of Section 7.5 of the *UWC Procedures*; a breach of its promise to Montague that the action would only be taken into account by the *Executive Committee* in any future disciplinary proceeding before that body; and a breach of the covenant of good faith and fair dealing.

59

305.    As a direct and foreseeable result of the defendant's wrongful conduct, the

plaintiff has suffered, and will continue to suffer, multiple forms of damage, as set forth above.

### Count VIII
### Breach of Contract/Common Law, UWC II: Denial of Basic Fairness/
### Arbitrary and Capricious Decision Making
### (v. Yale University)

306.    Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

307.    The University had a duty, either under an express or implied contract or as a

matter of common law, to ensure that the UWC II proceedings were conducted with basic

fairness.

308.    The University breached this duty of basic fairness by, without limitation:

308a.   Misleading Roe into cooperating with the formal complaint process;

308b.   Affording Roe full status as a complainant in the UWC II process, and
allowing her all the benefits associated therewith;

308c.   Failing to provide Montague with adequate notice of the complaint against
him, such that his version of events appeared inconsistent between the
time he was interviewed by the fact-finder and when he testified at the
UWC panel hearing;

308d.   Failing to inform Montague that Post had an active role in formulating the
plan to bring a formal complaint against Montague and in convincing Roe
to do so;

308e.   Failing to find facts sufficient to support the conclusion that Montague
violated the University's *Sexual Misconduct Policies*;

308f.   Taking the UWC I proceedings into account as to culpability in the UWC
II proceedings when the UWC I proceedings were themselves a violation

of Yale's own policies and procedures, and where the allegations in the
UWC I proceedings were wholly unrelated to the UWC II proceedings in
any event;

308g.   Failing to give Montague an opportunity to hear and respond to evidence
of the UWC I proceedings;

308h.   Taking the UWC I proceedings into account to enhance Montague's
punishment in the UWC II proceedings where the UWC I proceedings,
and the resulting discipline, were themselves a violation of Yale's policies
and procedures, where the UWC I allegations and resulting discipline bore
no relationship to the subject matter of the UWC II proceedings; and
where the UWC II panel had incorrect information about Montague's
UWC I sanction;

308i.   Taking the Executive Committee reprimand into account to enhance
Montague's punishment in the UWC II proceedings where the reprimand
was not "formal discipline," and where Montague could not have
reasonably expected Yale to take it into account in any proceeding in front
of the UWC;

308j.   Failing to provide Montague an opportunity to respond to and challenge
the panel's recommended sanction in advance of a final disciplinary
decision against him;

308k.   Arbitrarily and capriciously expelling Montague when Yale's own
recommended sanction for similar conduct is a reprimand; and

308l.   Arbitrarily and capriciously expelling Montague when – even if the UWC I proceedings were properly considered in relation to discipline – a more appropriate sanction would have been something less drastic than expulsion.

309.   The University's breach of its duty to ensure basic fairness proximately caused Montague to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

**Count IX**
**20 U.S.C. § 1681 (Title IX), UWC II (Erroneous Outcome)**
**(v. Yale University)**

310.   Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

311.   As set forth above, the University engaged in a series of actions that ultimately resulted in the UWC II panel's erroneous finding that Montague violated Yale's *Sexual Misconduct Polices* sexually assaulting Jane Roe.

312.   These actions, and the panel's ultimate finding, were a product of disparate treatment of Montague based on his gender.

313.   Yale was under enormous pressure to show it took seriously female students' complaints of sexual assault and to counter the perception that it was inappropriately lenient in its discipline of male students accused of sexual misconduct.

314.   When Yale learned Roe's "bad experience" involved an encounter with Montague, it seized the opportunity to make an example of him because he was one of the most prominent *male* figures on campus. The University took steps to secure Montague's wrongful

expulsion in order to prove to its critics that it could and would expel male students for responsible for sexual assault (despite its disciplinary history largely to the contrary).

315.    The University's decision to press Roe into cooperating in a formal complaint process and its ultimate decision to expel Montague were motivated by gender bias.

316.    Montague, because of his gender, suffered an erroneous outcome of the UWC II proceedings. This unlawful discrimination by the University in violation of Title IX proximately caused Montague to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future employment prospects.

**WHEREFORE**, plaintiff Jack Montague respectfully requests that the Court grant him the following relief:

1.      Enjoin Yale University to reinstate the plaintiff as a fully matriculated student in good standing at Yale University;

2.      Alternatively, enjoin Yale University to reinstate the plaintiff as a fully matriculated student in good standing at Yale University with leave to reopen the UWC proceedings;

3.      Alternatively, enjoin Yale University to reinstate the plaintiff as a fully matriculated student in good standing at Yale University with leave to reopen the UWC penalty phase;

4.      Enjoin Yale to expunge from plaintiff's transcript, disciplinary records, and all other records maintained by and/or under the control of Yale University all reference to sexual misconduct and the flawed UWC I and UWC II proceedings;

5.      After trial, enter judgment for the plaintiff on each Count of the complaint and award him damages in an amount to be determined at trial, including attorneys' fees, costs and interest;

6.      Award punitive damages to the plaintiff; and

7.      Grant such other relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiff Jack Montague hereby demands a trial by jury on all claims so triable.

JACK MONTAGUE,

By his attorneys,


/s/   *Max D. Stern*
_____
Max D. Stern (BBO #479560) (*pro hac vice*)
mstern@toddweld.com
Alexandra H. Deal (BBO #660654) (*pro hac vice*)
adeal@toddweld.com
Hillary A. Lehmann (BBO #683657) (*pro hac vice*)
hlehmann@toddweld.com
TODD & WELD LLP
One Federal St., 27th Floor
Boston, MA 01880
Tel. (617) 720-2626
Fax (617) 227-5777

William F. Dow III (ct00161)
JACOBS & DOW, LLC
350 Orange Street
New Haven, CT 06511
wdow@jacobslaw.com
Tel. (203) 772-3100
Fax (203) 772-1691


Dated: January 9, 2017


## **CERTIFICATE OF SERVICE**


I, Max D. Stern, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on January 9, 2017.


/s/ *Max D. Stern*