UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

JACK MONTAGUE,
      Plaintiff,

v.

YALE UNIVERSTIY, ANGELA GLEASON,
JASON KILLHEFFER, and OTHERS
UNKNOWN,
      Defendants.

CIVIL ACTION
No. 3:16-cv-00885-AVC

## PLAINTIFF'S REPLY TO DEFENDANTS' SECOND "OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION"[1]

### I.    Introduction

Defendants, in their second Opposition to Plaintiff's Motion for Preliminary Injunction, begin their recitation of the "facts" with all the dramatic flair of a criminal prosecutor's opening statement: "On the night of October 18, 2014, the plaintiff, Jack Montague, sexually assaulted Jane Roe . . . ." (Def. Second Opp. at 3.) In reality, of course, a panel of five academics and administrators[2] with no training in evidentiary assessment or analysis determined that it was more likely than not that Mr. Montague violated Yale's sexual misconduct policies. This "finding" is factually meaningless beyond the academic context in which it was made. What is more, it is incorrect. (*See* Amended Complaint, ¶¶ 138-153, 274-281, 313-319.)

---

[1] Citations to the Second Opposition are in the form "Def. Second Opp. at [page]."

[2] The panel members were Sarah Demers, Associate Professor of Physics; Eileen Donahue, Director of Yale's Office of Development; Kimberly Harris, a Postdoctoral Fellow in Molecular, Cellular, and Developmental Biology; John Mayes, Associate Vice President and Chief Procurement Officer for Yale; and David Post, Professor of Ecology and Evolutionary Biology.

But Defendants have made crystal clear in their Second Opposition that they care very little about actual facts. For example, they manage to gloss over, in two sentences, what is perhaps the crux of this litigation. According to Defendants:

> Initially, Ms. Roe expressed interest in an informal process that would be resolved by the plaintiff's agreement to take sensitivity training. When Ms. Gleason later told Ms. Roe that the plaintiff had already taken sensitivity training, Ms. Roe decided to participate in a formal complaint brought by the Title IX Coordinator.

(Def. Second Opp. at 5.) In truth, Defendants: 1) were aware that Roe had no desire to file a formal complaint (Deposition of Angela Gleason, attached hereto as **Exhibit 18**, at 132, 148, 149-150); 2) formulated a plan to formally charge Montague with sexual misconduct, despite Roe's clearly expressed wishes to keep the process informal (Ex. 18 at 131, 147; Deposition of Jason Killheffer, attached hereto as **Exhibit 19**, at 111-114, 115-116, 119-120); 3) realized that since Roe refused to file a complaint on her own, they needed her consent and participation so that Yale could file the formal complaint (Ex. 19 at 52-53, 55-56); and then 4) convinced Roe to go along with their plan by disclosing confidential information to Roe (Ex. 18 at 134-135, 136, 140; DX M at 7-8) that gave Roe the false impression Montague had already been found responsible, in the past, for engaging in non-consensual sexual activity (PX 4[3] at 2). Roe was explicit in her description of how this influenced her, and made very clear that it was because of this calculated manipulation that she agreed to the formal UWC proceeding against Montague. (*Id.*). In fact, even the UWC II Panel affirmed, in a section of its report titled "[Roe's] motivation for bringing the complaint," that Roe "told the . . . hearing panel that she had not initially wanted to bring a complaint against Mr. Montague" but that she agreed to participate in the formal complaint process "only after she learned that Mr. Montague had already received training."

---

[3] Citations to exhibits attached to Plaintiff's Motion for Preliminary Injunction and Memorandum of Law in Support Thereof are in the form "PX [exhibit] at [page]".

(DX M at 7-8 (emphasis added).)  Simply put, had Defendants not flouted their own rules in order to carry out their master plan, this lawsuit would not exist.

Furthermore, although Defendants are quick to blame Mr. Montague, his family, and his attorneys for the media coverage of Montague's expulsion (Def. Second Opp. at 7), Defendants fail to mention that by the time Montague's father confirmed his expulsion to the press, Montague was already being publicly vilified – on Yale's own campus, as well as in the media – as a "rapist." (Amended Complaint, ¶¶ 199-201; *see also* representative print media coverage, attached hereto at **Exhibit 20**.) On February 29, 2016, he implored Yale to do something to quell the rising tide of vitriol rushing straight for him. (E-mail from Jack Montague titled "Serious Concern," attached hereto as **Exhibit 21**.) When Yale essentially did nothing in response – except to insinuate that Montague must have been talking about his own case, and to remind him that Yale could not control what Roe chose to say about her "experiences" (Correspondence from David Post to Jack Montague, attached hereto as **Exhibit 22**) – Montague had no choice but to defend himself and his reputation. It is also somewhat ironic that Yale continues to claim Montague has not suffered irreparable harm while simultaneously acknowledging the national press coverage of Montague's expulsion – press coverage he never asked for, and can never erase from public view – and while perpetuating, in its own public court filings, the toxic (and false) label of "sexual assailant."

This is precisely why Defendants' attempts to equate Plaintiff's circumstances with the circumstances of the six other Yale students expelled for alleged sexual misconduct (Def. Second Opp. at 8) is woefully misguided. In the first place, as far as can be told from the recitation of

facts in Defendants' memorandum about four of these individuals,[4] only <u>two</u> were able to

continue their educations at all, and there is nothing to suggest that they did so at schools

comparable to Yale. (*See* Def. Second Opp. at 8.) Moreover, unlike Mr. Montague, those

students were not captain of the basketball team; they were not the subjects of a vicious smear

campaign on campus; and their names were not broadcast to the nation alongside the word

"rapist." Consequently, their post-expulsion successes are irrelevant, since their ability to move

on with their lives is likely at least in part a product of the fact that they – unlike Mr. Montague –

were able to keep the reason for their departure from Yale a relatively private matter. Montague

never had that luxury.

## II.     Likelihood of Success on the Merits

### A.  Count II – Breach of Contract, UWC I: Inadequate Evidence to Support a Finding of Sexual Harassment

#### 1.  Exhaustion of Administrative Remedies – a Red Herring

Defendants claim that Plaintiff cannot prevail on Count II because he failed to exhaust his

administrative remedies. (Def. Second Opp. at 30-32.) As Defendants are no doubt aware, their

own procedures specify that "[t]he <u>only</u> grounds for appeal" of a UWC decision are (i)

procedural error that prevented the hearing panel or the decision maker from judging the matter

fairly, or (ii) the discovery of facts that were not reasonably available to the appealing party prior

to the UWC hearing and that support or refute the allegation of sexual misconduct. (PX 3,

Section 7.7: *Appeals* (emphasis added).) Thus, there was no "administrative remedy" available to

---

[4] Defendants cite to and rely upon a sealed affidavit concerning these students' respective paths since expulsion. Defendants have yet to provide Plaintiff with a copy of the affidavit, however, despite repeated requests from Plaintiff's counsel, so Plaintiff has no means of evaluating or addressing the assertions therein. Consequently, Plaintiff reserves the right to respond to the affidavit when Defendants provide it.

Mr. Montague for challenging the outcome of the UWC I process. Had he challenged the adequacy of the finding on appeal, Yale would have summarily denied it on the basis that there was no ground for lodging it in the first place. (*See id.*) Defendants' specious argument that Plaintiff failed to exhaust administrative remedies Yale never afforded him should be disregarded in its entirety.

### 2.   Inadequate Evidence to Support Finding

#### a. Conduct of a Sexual Nature

According to Defendants, "[p]lacing an object between a woman's breasts is <u>undeniably</u> 'physical conduct of a sexual nature.'" (Def. Second Opp. at 32 (emphasis added).) Not only do Defendants fail to cite a single case for this conclusory proposition, they fail to address the ample authority in Plaintiff's brief holding that conduct is only actionable as sexual harassment if it is actually <u>based on sex</u>, as opposed to personal animus or other reasons. (*See* ECF No. 31 at 21.) Even if conduct is "boorish," it must "relate to the sex of the actor or the offended party" to constitute <u>sexual</u> harassment. (*Id.*, citing *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000).)

What is more, at the same time Defendants blithely dismissed the idea that the conduct at issue might be anything other than "sexual," they were fully aware that the Chairman of the UWC, David Post, explicitly questioned the UWC's jurisdiction over the matter, noting that it may be better resolved by the Executive Committee because "<u>some [UWC] panel members will have a hard time seeing the sexual nature of the act</u>." (August 26, 2013 e-mail from David Post to UWC Secretary Aley Menon, attached hereto as **Exhibit 23** (emphasis added).) It is quite telling that Defendants filed their Second Opposition prior to revealing this information to

Plaintiff, and did not in fact reveal it until January 20, 2017, just five days before the instant reply was due.

As it turns out, Post's concerns were well founded. By all accounts, Mr. Montague was simply irritated by something Ms. Smith said and reacted immaturely – and "boorishly" – by shoving a paper plate down her shirt. His actions were wholly unrelated to the fact that he is male and Ms. Smith is female, and thus cannot – and do not – constitute conduct of a sexual nature. *See Succar v. Dade County School Board*, 60 F. Supp. 2d 1309, 1314 (S.D. Fla. 1999) ("Personal animosity is not the equivalent of sex discrimination").

### b. Hostile or Intimidating Environment

Defendants also claim the UWC I Panel "reasonably concluded that the plaintiff's conduct created an intimidating and hostile academic environment, not only for the complainant but also 'for the broader Yale community'." (Def. Second Opp. at 33, quoting DX T at 2-3.) The problem is, the panel made no such finding. Instead, it expressed "concern" that Mr. Montague did not "have a clear understanding of or an appreciation for the significant implications of his misconduct for [Smith] or for the broader Yale community." (DX T at 2-3.)

Furthermore, even if this somehow constituted a "finding" that Montague's conduct created an intimidating and hostile academic environment for Smith and the broader Yale community, such a finding would be clearly erroneous. *See*, *e.g.*, *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2nd Cir. 1998), *abrogated on other grounds*, *Cox v. Onondoga County Sheriff's Dept.*, 760 F.3d 139, 148 (2nd Cir. 2014) (where supervisor allegedly told employee she had been voted the 'sleekest ass' in the office and deliberately touched her breasts with papers he was holding in his hand, such "isolated and discrete" incidents – while "obviously offensive and inappropriate" – did not support a finding that employee "was subjected to abuse of sufficient

6

severity or pervasiveness as to 'alter the conditions of [her] employment'" (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). *Contrast Redd v. New York Div. of Parole*, 678 F.3d 166, 179 (2nd Cir. 2012) (where supervisor made sexual advances on plaintiff and touched her breasts on three occasions, such conduct was "severely intrusive" and not "incidental").

### B.  Breach of Confidentiality

Defendants argue that Plaintiff cannot prevail on Count IV because "Ms. Gleason did not breach the *UWC Procedures* or the *Provost's Statement on Confidentiality of UWC Proceedings*." (Def. Second Opp. at 33.) This assertion is belied by the clear facts on the record, however, and by the individual defendants' own admissions at their respective depositions. As Roe told the fact-finder, Gleason "explained to [Roe] that Mr. Montague had already been given a recommendation for training after a previous complaint and so that option was no longer open to him." (DX G at 8.) Roe also told the fact-finder that "[s]he was especially motivated to participate in the investigation and hearing process after she heard that Mr. Montague had already had another complaint against him . . . ." (*Id*.) The fact-finder to whom Roe made that statement confirmed – in a draft report she submitted to UWC Chair David Post and Secretary Aley Menon for their review and comment – that this was "an accurate description of what [Roe] told [the fact-finder] about her motivation and her decision-making about participating in the case." (Draft Fact-Finder's Report, attached hereto as **Exhibit 24**, at 8.)

At her deposition, and in an affidavit submitted with Defendants' Second Opposition, Gleason denied telling Roe that Mr. Montague had a "previous complaint." (Ex. 18 at 138-139.) She admitted to telling Roe that Montague had already received training, however (*id*. at 134-135, 136, 140), and noted that she learned about the training in the context of learning about Mr. Montague's prior involvement with the UWC (*id*. at 124-125, 128, 144, 145). She also agreed

that disclosing the mere <u>fact</u> of a UWC sanction would violate Yale's policies on confidentiality. (*Id*. at 34-35.) Similarly, Killheffer agreed, at his deposition, that "the fact that someone has received discipline previously is confidential" and is "covered by the confidentiality policy of Yale" (Ex. 19 at 116), as is "required training, which would only come out after disciplinary process" (*id*. at 118; *see also id*. ("Q: In fact, anything you learned as a result of the previous UWC process would be confidential, and should not be disclosed . . . , correct? [. . . ] A: I would say yes, if it was only learned through that process, absolutely"; 137-138, 143-144).

Even if Gleason's patently unbelievable and self-serving statements denying that she disclosed the existence or substance of the UWC I proceedings to Roe were true,[5] she does not deny telling Roe that Montague already received training. Thus, it is simply not true that Gleason "did not divulge any information regarding the UWC I proceeding" (Def. Second Opp. at 34-25) – she divulged the UWC I sanction, which is undeniably "information regarding the UWC I proceeding." (*See*, *e.g.*, Ex. 19 at 137-138: "the sanction that was given to him by the UWC, as a result of his first case, that would be confidential information.") This disclosure is itself a clear violation of Yale's confidentiality policies. (*See*, *e.g.*, *id*. at 133.)

Defendants also make a desperate attempt to attack causation by claiming that Montague's alleged "callousness" towards Roe on November 7, 2015, "was a significant factor in Ms. Roe's November 9 decision to participate in a formal proceeding." (Def. Second Opp. at 35.) This is a deliberate distortion of one of Roe's e-mails in which she mentions the interaction in the context of several follow-up questions to Gleason and Post – questions she posed <u>after</u> informing them that she was comfortable with Yale initiating a formal complaint and that she

---

[5] If Defendants are now suggesting that Roe is not credible in her account of what Gleason told her, then perhaps it should also reexamine its otherwise unwavering reliance on Roe's every word concerning the incident with Montague.

would participate as a witness. Thus, the only thing connecting Roe's November 7, 2015 interaction with Montague to the UWC II proceedings is the fact that the two things appear together in the same e-mail. (DX J at 4.) Beyond that, Roe's own words make very clear that the disclosure of the UWC I sanction (and the disclosure of the fact that there was a previous complaint against Montague, though Gleason continues, incredibly, to deny she made such a statement to Roe) was what led her to agree to participate in the formal complaint process against Montague. (DX G at 8; PX 4 at 2.) Indeed, the UWC II Panel report confirms as much: Roe "agreed to participate in the UWC investigation only after she learned that Mr. Montague had already received training." (DX M at p. 8.)

Finally, Defendants make two puzzling assertions without any legal support whatsoever: First, that "even if there had been a disclosure . . . , the filing of the UWC II proceeding simply cannot be considered the 'fruit of the poisonous tree' as the plaintiff essentially contends. That concept is applicable only to criminal proceedings, not to a breach of contract claim"; and Second, that "even assuming the truth of the allegations of plaintiff's complaint on this issue, the complaint alleges a truthful disclosure of the plaintiff's prior history with the UWC, which is not a breach of contract." (Def. Second Opp. at 36.) It is unclear what the first assertion even means, but what is clear is that the disclosure caused Roe to agree to participate in formal proceedings against Montague, and hence, it can be considered proof of causation. As to the second assertion, Yale appears to be arguing that it can disclose to anyone any fact about a student's UWC involvement, so long as that fact is true. This is obviously not allowed under the clear language of the relevant policies (as both Gleason and Killheffer confirmed at their depositions), and indeed, would be a serious breach of the same.

Amazingly, in conjunction with its decidedly weak legal arguments, Yale has now chosen to disclose, in a public filing, a piece of completely unsubstantiated **gossip** about Montague's alleged sexual history. (Def. Second Opp. at 33.) Yale fails to mention that **it was never able to verify this rumor** (Ex. 18 at 102: "Q: So that's a 'no,' you were not able to confirm [whether or not the allegation concerning Jane Doe was true]? A: Correct"), and has clearly included it in its memorandum for the sole purpose of further smearing Mr. Montague's name and reputation, as it has no bearing whatsoever on the instant litigation. Indeed, Yale insists that it did not rely on this rumor when devising the plan to ensure a formal complaint was filed against Montague. (Ex. 19 at 113.) Nevertheless, Yale also suggests, in this same filing, that it would have been perfectly happy to rely on the rumor as a reason to file a formal complaint against Montague if Defendants had been unsuccessful in manipulating Roe into cooperating in the formal complaint process. (Def. Second Opp. at 37 n.17.) This proposition is, quite simply, terrifying, particularly in an age where social media perpetuates the spreading of false information with alarming rapidity and viciousness.[6]

### C.  Title IX Coordinator-Initiated Process

After conducting additional discovery, Plaintiff has amended his complaint and has revised what was Count VII in his original complaint. (*See* ECF No. 67.) Plaintiff now alleges

---

[6] Equally unsettling is that Yale's Title IX Office maintains databases of complaints about students, and those databases include unsubstantiated third party complaints of sexual misconduct. (Ex. 19 at 27-28, 59, 184-185, 186-188.) Thus, one's name could appear in the databases based purely on rumor (or outright falsehood), and could later be used by Yale to show that a "previous complaint" had been made about that student. (*See id*. at 24, 188.) The records are not removed, even if the rumor is never substantiated. (*Id*. at 60.) As Killheffer put it, "any third party reports, even if I don't have a name or if we've never talked to the actual [alleged] victim, we would include a record in this database. [. . .] [A]nd this is the way I would go and check if there was a respondent who has been there before. [ . . . ] It's a tracking mechanism." (*Id*. at 187, 188.)

that Yale intentionally manipulated the procedures for Title IX Coordinator-initiated complaints in order to carry out their plan to file a formal complaint against Montague. Plaintiff acknowledges that a Title IX Coordinator has the authority, under the rather broad language of the UWC Procedures, to file a complaint – with the cooperation of the complaining witness – whenever "there is evidence that the University's polices on sexual misconduct have been violated and the Coordinator's intervention is needed to ensure that the matter reaches the UWC." (PX 3, Section 1: *Authority of the UWC*.) This may include situations in which the individual "who [allegedly] experienced sexual misconduct . . . cannot or will not themselves take the formal role of complaint[.]" (PX 11 at 16.)

However, in the present case, Yale did not initially have Roe's cooperation. Roe made very clear she did *not* want to file a formal complaint against Montague; she just wanted someone to counsel him about how his behavior "didn't meet [the University community's] expectations in terms of consent" (Ex. 18 at 110; October e-mail exchange between Gleason and Roe, attached hereto as **Exhibit 25**, at 2), and she did not want her name used in the context of that counseling (Ex. 18 at 111; Ex. 25 at 2-3). Thus, unless and until Yale got Roe's cooperation, the Title IX Coordinators did *not* have the authority to file the complaint against Roe's wishes absent a threat to the safety of the community. (*See*, *e.g.*, PX 11 at 16; Ex. 19 at 52-53, 55-56.)

Notwithstanding Defendants' representations in their Second Opposition that some nebulous threat existed simply by virtue of the nature of the complaint itself (a truly dubious argument, since that would mean every single report of alleged sexual assault would bestow upon the Title IX Coordinators the authority to file a complaint), Killheffer made clear in his deposition that the "primary factors" upon which Yale relied in order to pursue a formal complaint against Montague were the combination of the seriousness of Roe's allegations and

his prior involvement with the UWC. (Ex. 19 at 111, 112, 115.) Yale therefore had to convince

Roe to abandon the informal complaint process and, at the least, to agree to allow a Title IX

Coordinator to file a formal complaint against Montague with Roe as the primary witness. (*See*,

*e.g*, *id*. at 115-116.) Indeed, this was Defendants' plan (a plan they would not have needed to

formulate had they truly believed they could have filed the complaint absent Roe's participation

because of some perceived "threat" to her or to the community).

Consistent with that plan, Defendants then disclosed confidential information about

UWC I to Roe; provided Roe with false information that Montague had already completed

sensitivity training; misled Roe into believing that SHARE training was no longer an option for

resolution of the matter and that a formal complaint was necessary[7]; and misled Roe into

believing that Montague had been found responsible in the past for sexual assault. What is more,

they did these things in order to satisfy their own agenda, not to support Roe.

### D.  Consideration of the UWC I Proceeding

Defendants contend that because Mr. Montague "received a copy of the UWC Procedures

on November 30, 2015, when he received notice . . . that a complaint had been filed against

him," and because "the UWC Procedures provide that prior disciplinary proceedings are

considered by the UWC panel," Mr. Montague was "on notice that his previous discipline would

be taken into account when determining his culpability for sexually assaulting Ms. Roe[,] and he

had the opportunity to explain that disciple during the hearing." (Def. Second Opp. at 38.) In the

first place, the *UWC Procedures* did not put Mr. Montague "on notice that his previous

discipline <u>would</u> be taken into account" (*id*. (emphasis added)); they put him on notice that "the

---

[7] Both Gleason and Killheffer agreed in their depositions that nothing in Yale's policies prevents
or prohibits re-training an individual who has already received training. (Ex 18 at 125-126; Ex.
19 at 133-134.)

panel <u>may</u> take into account . . . previous formal discipline for other acts of sexual misconduct" (PX 3, Section 7.4.). Montague therefore had no way of knowing what the panel would and would not consider. In fact, Section 7.4 of the *UWC Procedures* states that the hearing "is intended primarily to allow the panel to interview the complainant and the respondent with respect to the fact-finder's report." The fact-finder's report contained no mention of the UWC I proceedings, so Montague had no reason to think the panel would (or should) "interview" him about those proceedings.

Moreover, in making this argument, Defendants appear to propose that the onus is on the <u>respondent</u> to volunteer any and all information he might think is relevant during the course of a UWC panel hearing. Yet it was Yale, the complainant, who had the burden of proof at these proceedings; the respondent had none. (*See* PX 3, Sections 7.4 and 7.5.) To suggest that a frightened college student who is facing a very serious accusation of sexual misconduct bears the burden of identifying and disclosing to the panel all relevant evidence in his favor is absurd. Consequently, it was not up to Montague "to explain [the UWC I proceedings] during the hearing." (Def. Second Opp. at 38.)

Defendants also argue that the respondent has no right, in any event, to hear or confront the evidence against him at that hearing. (Def. Second Opp. at 38: "nothing in the UWC Procedures mandates that the plaintiff be present when consideration of his disciplinary history takes place.") Not only does this fly in the face of traditional notions of basic fairness, it is inconsistent with Yale's own written procedures governing UWC panel hearings, and inconsistent with how any student would reasonably interpret those procedures. One need look no further than the *UWC Procedures* themselves to see that this argument is deeply flawed. Section 7.4 governs the "hearing" itself, which takes place in the presence of, and with the active

13

participation of, the parties. That section states that "in determining culpability, the panel may . .
. take into account a respondent's previous formal discipline for other acts of sexual
misconduct[.]" There is a separate section governing the panel's deliberations in the absence of
the parties – Section 7.5 (*Findings, Conclusions, and Recommendations*) – and it is this section
upon which Defendants rely for their surprising suggestion that a respondent has no right to hear
and respond to the evidence being used against him. The fact that the language concerning the
panel's consideration of previous formal discipline appears in the "hearing" section, and not in
the "findings, conclusions, and recommendations" section, makes clear that Yale intended such
consideration to occur at the "hearing," not during the closed-door deliberations of the panel.

　　　　Finally, although Defendants are correct that the factual circumstances in the Wesley
College matter were different than the factual circumstances here (Def. Second Opp. at 39), that
distinction is utterly irrelevant. The point is that OCR made very clear that Title IX procedures
are not "equitable" unless an accused student has "a reasonable opportunity to present his version
of events, particularly in response to adverse 'findings' which the College relied upon in
imposing the substantial penalty meted out to the accused Student – expulsion."
(http://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/03152329-a.pdf at p. 25.) To
suggest that this statement applies only in the specific factual circumstances of the Wesley
College matter is to ignore the forest in favor of the trees. Montague was entitled to a reasonable
opportunity to "provide his version of events" concerning the UWC I proceedings, particularly
because Defendants used those proceedings to 1) bring a formal complaint against him; and 2)
justify his expulsion. (PX 13.)

### III.    Balance of Hardships

Defendants have vastly overstated the hardship they would suffer if this Court were to grant Mr. Montague injunctive relief. In comparing Montague to a sexual predator (Def. Second Opp. at 40-41), Defendants actually reinforce the gravity of the hardship <u>Montague</u> faces in the absence of an injunction. Just as Yale did nothing when posters appeared on campus calling Montague a "rapist" – thereby allowing his name and reputation to become forever associated with that term on the grounds of Yale and beyond – it continues to label him a "sexual assailant" in its own public court filings, and it does so despite the fact that the only "finding" of "sexual assault" that has ever been made is the judgment of five laypeople that Roe's story was, more probably than not, true.

Moreover, an injunction would not "convey to the Yale community that filing a complaint under Yale's Sexual Misconduct Policies has no real consequence except to expose sexual assault victims to the risk of public scrutiny" (Def. Second Opp. at 44-45); rather, it would convey to the Yale community that Yale must follow its own policies, and would serve to reaffirm the OCR's directive that sexual misconduct proceedings – including those conducted under Yale's Sexual Misconduct Policies – be conducted in a fair and equitable manner.

### IV.    Public Interest

Defendants claim "the public has a strong interest in the enforcement of sexual misconduct policies by colleges and universities." (Def. Second Opp. at 45.) While certainly true, the public also has an interest in seeing those policies <u>properly</u> enforced. In accordance with the "legislation and agency guidance" Defendants reference, Yale has established a system that is – at least in theory – designed for a fair adjudication of claims of sexual misconduct. When Yale has blatantly disregarded the very rules it has adopted for this purpose, however, then it is in the

public's interest to enjoin Yale from enforcing a result that is the direct result of a deeply flawed, and decidedly unfair, process.

## Conclusion

For the reasons set forth below, as well as those in Plaintiff's Motion for Preliminary Injunction and his Consolidated Opposition to Defendants' Motion to Bifurcate and Reply to Defendants' Opposition, this Court should grant Plaintiff's Motion for Preliminary Injunction and immediately order appropriate relief.

JACK MONTAGUE,

By his attorneys,

/s/  *Max D. Stern*

Max D. Stern (BBO #479560) (*pro hac vice*)
mstern@toddweld.com
Alexandra H. Deal (BBO #660654) (*pro hac vice*)
adeal@toddweld.com
Hillary A. Lehmann (BBO #683657) (*pro hac vice*)
hlehmann@toddweld.com
TODD & WELD LLP
One Federal St., 27th Floor
Boston, MA 01880
Tel. (617) 720-2626
Fax (617) 227-5777
William F. Dow III (ct00161)
JACOBS & DOW, LLC
350 Orange Street
New Haven, CT 06511
wdow@jacobslaw.com
Tel. (203) 772-3100
Fax (203) 772-1691

Dated: January 25, 2017

## <u>CERTIFICATE OF SERVICE</u>

I, Max D. Stern, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on January 25, 2017.

/s/ *Max D. Stern*

17