# Exhibit 19

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 1

UNITED STATES DISTRICT COURT FOR THE

    DISTRICT OF CONNECTICUT

CIVIL ACTION No: 3:16 cv-00885-AVC

---------------------------------x

JACK MONTAGUE,                          :

    Plaintiff,                          :

        -v-                         :

YALE UNIVERSITY, ANGELA GLEASON,  :

And JASON KILLHEFFER,                   :

    Defendants.                         :

---------------------------------x


        Depositon of JASON KILLHEFFER, taken
pursuant to Notice, held at the Law Offices of Jacobs
& Dow, LLC, 350 Orange Street, New Haven, Connecticut,
before James A. Martone, LSR #248, and Notary Public,
in and for the State of Connecticut, on January 10,
2017, at 10:05 a.m.

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 2

```
 1   A P P E A R A N C E S:

 2

 3        For the Plaintiff:

 4   TODD & WELD, LLP

 5   One Federal Street-27th Floor

 6   Boston, MA  01880

 7   BY:  MAX D. STERN, ESQ.

 8   AND:  HILLARY A. LEHMANN, ESQ.

 9   mstern@toddweld.com

10

11        For the Defendants:

12   DONAHUE, DURHAM & NOONAN, PC

13   741 Boston Post Road

14   Guilford, Connecticut  06347

15   BY:  PATRICK NOONAN, ESQ.

16

17

18

19

20

21

22

23

24

25
```

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 3

```
 1              S T I P U L A T I O N S

 2

 3      IT IS HEREBY STIPULATED AND

 4    AGREED by and between counsel for the

 5    respective parties hereto that all

 6    technicalities as to proof of the official

 7    character before whom the deposition is to

 8    be taken are waived.

 9

10      IT IS FURTHER STIPULATED AND

11    AGREED by and between counsel for the

12    respective parties hereto that the

13    deposition may be signed before any Notary Public.

14

15      IT IS FURTHER STIPULATED AND

16    AGREED by and between counsel for the

17    respective parties hereto that all

18    objections, except as to form, are reserved

19    to the time of trial.

20

21

22                    *   *   *   *   *   *

23

24

25
```

Sanders, Gale & Russell
(203) 624-4157

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                     January 10, 2017

Page 4

```
 1                   WITNESS INDEX

 2

 3                                                PAGE

 4   Direct Examination by Mr. Stern                5

 5

 6                   EXHIBIT INDEX

 7   PLAINTIFF        DESCRIPTION                 PAGE

 8   20  Confidential Yale University Title IX

 9       Incident Summary Form                     22

10   21  August 19, 2013 letter                    76

11   22  Sexual Misconduct Scenerios document      80

12   23  E-mail chain                             159

13   24  3/12/16 E-mail                           162

14   25  February 23, 2016 E-mail exchange        163

15   26 February 23, 2016 E-mail                  166

16   27  February 24, 2016 E-mail                 167

17   28  3/17/2016 E-mail chain                   168

18   29  June 9, 2016 e-mail                      173

19   30  Document entitled Introduction to the

20       WESTAT-Yale report                       175

21   31  Document entitled Results of AAU Survey

22       On Sexual Assault and Misconduct         175

23   32  Document entitled confidential draft     184

24

25
```

Electronically signed by JAMES MARTONE (601-171-250-7767)                      31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 5

1    JASON KILLHEFFER,

2     called as a witness, having been first duly

3     sworn by James A. Martone, a Notary Public

4     in and for the State of Connecticut:

5    DIRECT EXAMINATION BY MR. STERN:

6         A.    Okay.  Please state your name.

7         A.    Jason Killheffer.

8         Q.    Spell it, please.

9         A.    J A S O N.  Last name, K I L L H E F F E R.

10                 MR. NOONAN:  We probably should state

11    for the record what we just stated off the record, and

12    that is that we're going to use real names in this

13    transcript, in this deposition, but if we need to file

14    the transcript or transmit it to anyone other than the

15    parties, the lawyers, we will redact the names.

16        A.    Okay.

17                 MR. STERN:  Right, and we have agreed

18    to the usual stipulations.

19                 MR. NOONAN:  Right.

20                 MR. STERN:  All objections and

21    motions to strike except as to form saved until the

22    time of trial.

23                 MR. NOONAN:  Right.

24                 MR. STERN:  Witness will read and

25    sign?

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 24

 1   us.  We control who has access to it and again, it's

 2   only limited to us and the specific Title IX

 3   Coordinator.

 4              So they would upload this to that

 5   site.  I would then be able to review it there.  I

 6   receive notifications through that site.  It's

 7   something that's been working for us.

 8        Q.   You said that you have that information.

 9   So you can search for trends so you will know if there

10   have been multiple complaints against someone?

11        A.   Those are two things that we look at, yes.

12        Q.   So under what circumstances will you look

13   to see if there are multiple complaints against

14   somebody?

15        A.   Under every circumstance.

16        Q.   So every time you get a new incident

17   report, you will look to see --

18        A.   I will look within the database to see if

19   we've had prior reports.

20              MR. NOONAN:  Just as a reminder, let

21   him finish the question.

22        A.   I understand.

23              MR. NOONAN:  You know where he's

24   going, but wait until he finishes.

25        A.   I understand.

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                          January 10, 2017

Page 27

1        A.   Right.  That's one scenario.

2        Q.   Well, what's another scenario?

3        A.   Another scenario is we, I would say often

4   at least at times, receive what we'll call a third

5   party complaint.  So the individual who has allegedly

6   experienced misconduct is not the one reporting it,

7   but it's another, either it's an administrator, a

8   friend, someone else in the community has reported to

9   a coordinator that an incident has occurred.  And so

10  sometimes that's how these will start.  So there --

11       Q.   Would you call that a complaint or do you

12  call that a report?  Or do you call it something else?

13       A.   I'll tell you, I call it a complaint.

14       Q.   Okay.

15       A.   In my view, we have the same

16  responsibilities regardless.  Whether we're hearing

17  directly from the victim or from someone else, where

18  we've been now put on notice or made aware of a

19  potential incident, and it's something that we have to

20  review.

21       Q.   All right.

22       A.   So I treat it as a complaint.

23       Q.   And then so that complaint which can be

24  based solely on the report of a third party also goes

25  to the central repository, is that right?

Electronically signed by JAMES MARTONE (601-171-250-7767)                31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 28

1       A.   Yes, it does.

2       Q.   And will you also routinely speak to the

3    Deputy Coordinator about that?

4       A.   Yes.

5       Q.   Now what is a Community Safety Alert?

6       A.   Community Safety Alert?

7       Q.   Yes.

8       A.   I'm not familiar with that term.

9            MR. STERN:  Did you bring your own

10   set of 1 through 19?

11           MR. NOONAN:  Yes.

12           MS. LEHMANN:  We have extras too.

13      Q.   I'd like to show the witness Exhibit 1.

14      A.   Okay.

15      Q.   Let me just stop.  What have you done to

16   prepare for this deposition?

17      A.   I've spoken to my attorney.

18      Q.   I'm not going to ask you what you spoke to

19   him about.  But have you done anything else?

20      A.   No.

21      Q.   Did you review any documents?

22      A.   None.

23      Q.   You have reviewed documents in this case,

24   right?

25           MR. NOONAN:  You mean when he was

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 52

1    control?

2         A.   Other than that, we take actions that are

3    consistent with complainant's wishes.

4         Q.   And if there is no safety issue, if the

5    complainant wants to do an informal resolution, that's

6    what it will be, correct?

7         A.   I want to make sure I'm understanding your

8    question.  You said -- can you repeat the question?

9    Just want to make sure I'm hering it.

10                   (Question read)

11        A.   I don't think that's accurate in terms of

12   how we, sort of how these things flow.

13        Q.   Tell me what's inaccurate about that.

14        A.   So our approach from the beginning is to

15   work with the complainant, to identify what their

16   needs are, what they're hoping will happen.  And we

17   talk about actions that, with the complainant that are

18   consistent with that.

19                   The determination about whether

20   there's a safety issue would really only come up in a

21   situation where the complainant doesn't want to do

22   something, doesn't want to pursue a complaint, and

23   we've evaluated it to determine that there may be a

24   safety concern.  So it's -- do you see what I'm

25   saying?  Your question reflected a different order.

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 53

1       Q.   I really don't understand the answer.

2       A.   Okay.  I'm trying to figure out how best to

3    explain this.  To the extent that we can, with a

4    complainant, find a course of action that is

5    consistent with their wishes, and that addresses the

6    behavior, that's a course of action that we will work

7    with them to implement.

8                    On a case-by-case basis we also look

9    at the nature of the allegations, the seriousness of

10   them.  Perhaps other factors, to determine whether

11   that course of action is really the most appropriate.

12   And we would discuss that with the complainant.

13                   At times the complainant is then in

14   agreement, and that moves forward.  It would only be

15   in a situation where there was an indication that

16   there was a safety risk to the complainant or the

17   community, and the complainant was not seeking to take

18   a course of action that we might feel that we had to,

19   as an institution.

20      Q.   All right.  So if a complainant says such

21   and such happened to me, but I do not wish to be a

22   complainant, a formal complainant --

23      A.   Uh-huh.

24      Q.   -- I only wish to have an informal

25   complaint.  What would you do?  What would Title IX

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 55

1    interested in a formal complaint, under what

2    circumstances could the university go forward on its

3    own?

4              MR. NOONAN:  Can I ask you for a

5    clarification.  Are you talking about sort of after

6    you've discussed all the options, and the Title IX

7    Coordinator has given all the advice, there's a final

8    decision on the part of the complainant, I don't want

9    to go forward?  Or are you talking about at the

10   outset?

11        Q.   The complainant says I do not wish a formal

12   complaint to be filed.

13        A.   Uh-huh.

14        Q.   Under what circumstances, after being

15   advised, under what circumstances could the university

16   go forward?

17        A.   Then we would have to evaluate the safety

18   concerns, and determine whether absent that

19   complainant's participation, would we go forward with

20   a formal complaint.

21        Q.   Now if the -- the option that you've

22   described to us a moment ago was you might say to the

23   complainant one way to do it is for us to file the

24   complaint, if you participate, right?

25        A.   Yes.

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 56

1       Q.   All right.  But that would still depend

2    upon the complainant's participation, correct?

3       A.   Well, that would be the question to the

4    complainant.

5       Q.   Right.

6       A.   Would you be willing to speak to a fact

7    finder, if the university brought a complaint on your

8    behalf.

9       Q.   Okay.  So if the complainant did not wish

10   to participate, then the only situation in which the

11   university would go forward would be if it determined

12   that there was a safety issue?

13      A.   If it determined there was a safety issue

14   and if it determined that it could go forward absent

15   that complainant's participation.  And that's gonna be

16   on a case by case basis.

17      Q.   But there would have to be a safety issue,

18   correct?

19      A.   Yes.

20      Q.   All right.

21      A.   And just to make that clear, the reason is

22   because in that situation, we would be essentially

23   overriding the complainant's stated wishes.  Going

24   against their stated wishes.

25      Q.   Now you've told us about the situation when

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 59

1      Q.   So when you receive that third party

2    report, one of these intake forms is filled out?

3      A.   Still generated.

4      Q.   Is still generated.  And does it -- whether

5    you generate such a report, does that depend upon

6    whether the third party herself or himself has

7    firsthand information, or could it be something that

8    that third party heard?  Not from the person who was

9    abused?

10     A.   Right.  I've seen both.

11     Q.   All right.

12     A.   I've seen situations where a third party

13   has either directly observed behavior, or has heard it

14   directly from the victim.  I've also seen reports that

15   have been made which included what I would call more

16   distant reports.

17     Q.   All right.

18     A.   And that's indicated on the form.  When the

19   coordinator submits it to me.

20     Q.   All right.  And that form will be kept in

21   the same way, in the same record with the Sharepoint

22   site as any other report?

23     A.   Yes.

24     Q.   And you have described the steps you will

25   then take to -- in an effort to make contact with the

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 60

1   victim, right?

2       A.   Right.

3       Q.   And if at the end of those steps, you are

4   unable to make contact with, or if the victim tells

5   you that she or he does not wish to proceed, do you

6   take any steps to remove that record from the

7   database?

8       A.   No.

9       Q.   It stays there?

10      A.   Yes.

11      Q.   Forever?  Right?  Is that right?

12      A.   I don't know about forever, but it stays

13  there for now.

14      Q.   I mean it's not -- I mean --

15      A.   We could not remove it from the database,

16  if that's what your question is.

17      Q.   I mean you don't say well, this person has

18  graduated, I should take it out now?

19      A.   No.  We haven't done that.

20      Q.   It's there, all right.  Now let's get back

21  to this situation where Title IX can go forward on its

22  own.  You said that, you've given us one scenario

23  where the complainant, where you determined there's a

24  safety issue, where you go forward, and there's

25  another scenario where you would discuss with a

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 111

1    Angie?

2         Q.    Yes.

3         A.    Yes, it did.

4         Q.    Okay.  And as a result of that meeting, was

5    some decision made?

6         A.    At that meeting, we reviewed the

7    allegations and the information that Angie had

8    gathered.  We reviewed the fact that Angie had

9    discussed with **Jane**   that **Jane**   was interested in

10   pursuing an informal resolution.

11                   We reviewed the fact that the

12   seriousness of the allegations in this matter and the

13   fact that Jack Montague had previously been through

14   the UWC complaint process, had previously been found

15   to have violated our sexual misconduct policies, and

16   most importantly, the seriousness of these allegations

17   made a formal complaint a more appropriate solution

18   than an informal complaint.  One of the reasons we

19   look as to why someone -- whether someone has been

20   through our process before is because should they go

21   through that process and be found in violation and

22   subsequent for that process, an allegation that they

23   violated it again, indicates that they may not have

24   learned from that earlier process, okay.  And so

25   that's an indicator.

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 112

1            So the nature of the allegations and

2    the fact that he had previously been through this

3    policy, or this process, and had previously been found

4    to have violated our policy.

5         Q.   All right.

6         A.   So we discussed,  Angie -- going back to

7    Jane    discussed going back to Jane   and discussing

8    with Jane   whether she would be willing to participate

9    in a formal complaint.  This gets back to what we

10   talked about earlier which is would she be a witness

11   and speak to a fact finder in a formal complaint.

12        Q.   What did you understand that Angie --

13   strike that.  You say you discussed the seriousness of

14   the allegation, the previous finding?

15        A.   The fact that he had had a previous finding

16   of a violation.

17        Q.   Right.  Anything else?

18        A.   Those are the two primary factors.

19        Q.   All right.  What about the fact that you

20   had been told by Angie that she had been told by Rachel

21   Rogers that Rachel Rogers had heard about, that there had

22   been another complaint of rape?

23        A.   The other complaint, that was knowledge,

24   but it wasn't -- we didn't have any details on it and

25   it wasn't anything, as far as we understood Angie did

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 113

1   not have any information, nor did she have in that

2   case someone who was willing to speak with her.

3              So there wasn't much we could glean

4   from that, but it certainly was knowledge.  But the

5   two things we do know is we had an allegation against

6   him that was quite serious.  We had a complainant who

7   was willing to talk about it.  And we had knowledge

8   that he had previously violated our policy.  And we

9   had a situation like that, a formal complaint,

10  bringing it to a formal complaint so the allegation

11  can be investigated and adjudicated is an appropriate

12  solution.

13       Q.   Did the knowledge from Rachel Rogers about the

14  issue of another rape complaint play any part in that

15  decision?

16       A.   Well, I can speak for myself, and the

17  answer is no.  For me, the nature of the allegations

18  and the fact that he had previously been through the

19  process and been found to have violated it.

20       Q.   Was there any discussion about that

21  previous allegation?

22       A.   Other than Angie relating to us what she

23  had heard which at that point was very little.

24       Q.   Did you discuss it in that meeting?

25       A.   Yes.  Angie detailed for Stephanie and for

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                        January 10, 2017

Page 114

1    Susan the information that she had gathered up until
2    that point.
3         Q.   What was the decision as to what Angie
4    should do next?
5         A.   My understanding was that Angie would go
6    back the **Jane**  and discuss with her whether she would
7    be willing to speak with a fact finder in a formal
8    complaint.
9         Q.   What else did you understand that Angie was
10   going to say to **Jane**
11        A.   I don't have any other understanding.  That
12   was the -- that was the question that she was going to
13   go back and ask **Jane**
14        Q.   Well, did you understand that she was going
15   to discuss with **Jane**  the pros and cons of
16   participating in a formal complaint as opposed to an
17   informal resolution?
18        A.   I don't know about that.  I imagine she
19   would have described for her what the process of
20   participating in a formal complaint involves.
21        Q.   Well, did you know that she was --
22        A.   But I'm not aware of pros and cons, I'm not
23   sure what -- what you mean by that.
24        Q.   Well, you had some reasons why you thought
25   a formal complaint was the appropriate way to go,

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 115

1    correct?

2          A.    That's correct.

3          Q.    And the other persons in that meeting

4    agreed with you, correct?

5          A.    I can't speak for them.

6          Q.    Well, that was the decision that was made,

7    correct?

8          A.    The plan was that Angie would go back and

9    speak with Jane

10         Q.    And the reasons why according to your -- in

11   your view that the formal complaint was the way to go

12   was because of the seriousness of this one and the

13   prior history of Jack Montague with UWC?

14         A.    Those were the primary factors.

15         Q.    Right.  Now did you understand that Angie

16   was going to relate those factors to Jane

17         A.    I did not.

18         Q.    Well, what did you think Angie was going to

19   say to Jane  about what were the reasons to go for a

20   formal complaint as opposed to an informal resolution?

21         A.    I understood Angie was intending to go back

22   to Jane  to discuss the fact that these allegations

23   against Mr. Montague were very serious.  And that the

24   university takes that behavior very seriously, and

25   feels the most appropriate course of action would be

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 116

1    to bring a formal complaint against him.  We

2    understood her desire to be anonymous, we talked about

3    the fact that you can't be anonymous in a formal

4    complaint so she would have to explain that to her.

5                But Title IX Coordinator could bring

6    the complaint if she would be willing to speak to a

7    fact finder.  But I can tell you I'm well aware in our

8    practices, and Angie is well aware, that we do not say

9    to complainants or to anyone the fact that someone has

10   received discipline previously.

11        Q.   And that fact, that someone has received

12   discipline previously is confidential, correct?

13        A.   We treat it as such, yes.

14        Q.   It's covered by the confidentiality policy

15   of Yale, correct?

16        A.   It is.

17        Q.   All right.  And the facts of that are

18   considered to be, of that prior discipline are

19   considered to be confidential, correct?

20        A.   Can you explain what you mean by the facts

21   of that?

22        Q.   The allegations?

23        A.   The allegations upon which the disciplinary

24   action is based?

25        Q.   Yes.

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 118

1   out after disciplinary process, would be something we

2   would not say to someone.

3        Q.   In fact, anything you learned as a result

4   of the previous UWC process would be confidential, and

5   should not be disclosed to Jane   Roe        in that

6   situation, correct?

7        A.   Just want to make sure I heard this

8   correctly.  You said anything that we learned through

9   the UWC process would be confidential, is that the

10  question?

11       Q.   Right.

12       A.   I would say yes, if it was only learned

13  through that process, absolutely.

14       Q.   Now as of this time, at the time of this

15  meeting --

16       A.   Which meeting just to be clear?

17       Q.   The meeting on -- well, let's look at this.

18  If you look at Exhibit 1.  It indicates on page 845,

19  the top, Stephanie, Susan, Jason, JMK, 11/4/15, 9:00

20  a.m.

21       A.   I see that.

22       Q.   And would you agree that at least as far as

23  this document indicates, that the meeting where this

24  discussion took place was on the morning of November

25  4th, 2015?

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 119

1        A.   That appears to be the case.

2        Q.   Okay.

3        A.   I see this is redacted, so it's not clear

4   to me what was here.  But if all you're asking me is

5   does it appear we had a meeting on that date at that

6   time, I'd say yes.

7        Q.   Right.

8               MR. NOONAN:  Just to be clear, he

9   can't confirm or deny that it occurred on that date.

10              MR. STERN:  I got it.

11              MR. NOONAN:  I mean there's no doubt

12   that Ms. Gleason testified about this and these are

13   her notes.

14              MR. STERN:  She's testified, yes,

15   right.

16              MR. NOONAN:  But I mean I think the

17   problem he's having with the dates is he just doesn't

18   remember.  He didn't keep them.

19              MR. STERN:  But she did.

20        Q.   I mean you don't dispute that the meeting

21   took place on November 4th, 2015, at 9:00 a.m., do

22   you?

23        A.   I don't.

24        Q.   Okay.  As of the end of this meeting, on

25   the morning of November 4th, is it fair to say that

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 120

1    the group had made the decision to bring a formal

2    complaint against Jack Montague if Jane   Roe      said

3    she would participate in it?

4         A.   I'd say yes.

5         Q.   Now as of this moment, you had never

6    interviewed, you never met Jane   Roe

7         A.   No.

8         Q.   And neither had Stephanie Spangler nor

9    Susan Sawyer met with her so far as you knew?

10        A.   No.  As far as I know.

11        Q.   And as of this point, Jane   had met with

12   her once, correct, so far as these documents are

13   concerned?

14        A.   I can't confirm that.

15        Q.   Now you know what it means to have a

16   thorough interview with a complainant, correct?

17        A.   Yes.  I --

18        Q.   In fact, you told us that what your

19   practice is in doing intake in the Title IX office is

20   not to press for details, but simply to get what the

21   person wants to tell you, is that right?

22        A.   Yes.

23        Q.   All right.  And so far as you know, is that

24   the practice that Angie followed when she had met with

25   Jane   prior to this meeting on November 4th, 2015?

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 133

1              MR. NOONAN:  This, meaning a formal
2      formal complaint or informal complaint?
3          Q.   Either way?
4          A.   Talking about any of the available options?
5          Q.   Right.
6          A.   Of course.  That would be untrue.  She
7      could just walk away then, and never pursue anything.
8          Q.   Put aside walking away.
9          A.   Even in the informal option, yes, her name
10     wouldn't have to be used but this doesn't make that
11     clear to me.  We're not clear the context of this
12     statement.
13         Q.   So did Angie ever tell you that she
14     explained that Mr. -- explained to Jane    that Mr.
15     Montague had already been given a recommendation for
16     training after a previous complaint?  Did she ever
17     tell you that she said that?
18         A.   No.
19         Q.   Was she authorized to say that to Jane
20         A.   No.
21         Q.   And that would have been a violation of the
22     confidentiality policy?
23         A.   To make that statement to another student,
24     would have both a violation of our confidentiality.
25         Q.   Right.

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 134

1       A.   I also want to point out that this is not

2   true.  There's never a situation that that option is

3   no longer open.  We do not have a policy that makes

4   that clear.

5       Q.   You're getting ahead.  And then did she

6   ever say to you that that recommendation for training

7   was an option that was no longer open to him?

8       A.   Did Angie ever say that to me?

9       Q.   That she said that?

10      A.   No.

11      Q.   And you're telling me that that is not

12  true, that it is not true that that option was not

13  open to him?

14      A.   We don't have a policy.

15      Q.   Okay.

16      A.   That says it's no longer available to

17  someone.  We can make a recommendation that that would

18  not be the appropriate way to go in a particular case,

19  and that a formal complaint would be the more

20  appropriate way to go.

21      Q.   Now let's go a little further.  Page 17.

22      A.   The same Exhibit?

23      Q.   Yes.  This is further into the fact

24  finder's report.

25      A.   Okay.

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 137

1   have already known that.  But this may be again a
2   situation of the dates and the discussions being
3   blurred after a year and a half.
4       Q.   Now of course whether someone was known to
5   Title IX Coordinators was itself a matter of
6   confidentiality, correct?
7       A.   Saying those words you mean, or whether or
8   not someone is actually known?
9       Q.   Whether or not someone is known to the
10  Title IX Coordinators is confidential, correct?
11      A.   If what she means by that is whether he's
12  previously had a complaint brought against him, then
13  yes, that would be something that you wouldn't be able
14  to share with an individual.
15      Q.   And then it states in the next paragraph
16  "After consultation with the other Title IX
17  Coordinators, Miss Gleason found out that Mr. Montague
18  had already participated in a full semester of
19  sensitivity training and so it did not make sense to
20  ask him to repeat that intervention."  You see that?
21      A.   I do.
22      Q.   The fact that she found out that he had
23  already participated in a full semester of sensitivity
24  training, that was confidential information, correct?
25      A.   If this is referring to the sanction that

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                     January 10, 2017

Page 138

1   was given to him by the UWC, as a result of his first

2   case, that would be confidential information.

3          Q.   I'm gonna show you another document.  Now

4   why don't you look at Exhibit 18.

5          Q.   This is the complaint that you filed?

6          A.   Looks like it, yes.

7          Q.   Now why was it that you were the one to

8   file this?

9          A.   Generally when a Title IX Coordinator has

10  had significant contact with the complainant, or other

11  witnesses, so in this case Miss Gleason wouldn't have

12  been appropriate to bring the complaint because she

13  had already met with **Jane   Roe**        as well as ^Rachel

14  **Rogers**  and we would want to preserve that

15  relationship.  So Angie wouldn't be the appropriate

16  Title IX Coordinator.

17              Me, being her supervisor, having had

18  no prior contact with the complainant or the

19  respondent, essentially I'm a neutral party at that

20  point, and I serve as the one who files the complaint.

21         Q.   Why would the contact with -- withdrawn.

22  Is that some sort of a conflict of interest?

23         A.   It is something that we view -- it's a

24  practice.  Given at this point Angie had already

25  developed a relationship with **Jane**   in the sense of

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 143

1    resolution.

2         Q.   And then it says, what Jane  says in her

3    statement, "She," meaning Angie, "explained that Jack

4    had previously gone through the sensitivity training

5    that my complaint suggested."  You see that?

6         A.   I do.

7         Q.   Now Angie never told you that she had told

8    that to Jane   correct?

9         A.   No.

10        Q.   And you'll agree with me that that was

11   confidential information, correct?

12              MR. NOONAN:  Objection.  It depends

13   on in what context.

14        A.   Yeah, and it depends on exactly what she

15   said to her.  So this is Jane    recollection of what

16   she heard.  I can't say what Angie said to her.

17        Q.   I'm not asking you that.  I'm asking you

18   whether Angie ever said to you that she told Jane

19   that Jack had previously gone through the sensitivity

20   training that my complaint suggested?

21        A.   No.

22        Q.   And if the way that Angie had found out

23   about sensitivity training for Jack had been from the

24   information that you gave her from the UWC proceeding

25   in 2013, that would be confidential information,

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 144

1    correct?

2        A.    Information about the required training

3    going out of the UWC case would be confidential

4    information.

5        Q.    All right.

6        A.    The fact that he was given that sanction or

7    that requirement from the UWC.

8        Q.    The fact that he was taking sensitivity

9    training, if she got that information from the

10   information that was held by Title IX as a result of

11   the UWC proceeding, right?

12       A.    Could you repeat that question?

13              (Question read)

14       A.    I don't know what the question is.  Why

15   don't ask you the question again.

16       A.    All right.  If you learned about that

17   somebody had had sensitivity training from your

18   participation in a Title IX or UWC matter, that

19   information would be confidential, correct?

20       A.    Yes.

21       Q.    And if Angie Gleason learned from you

22   information about sensitivity training that Jack had

23   had because of your participation and knowledge about

24   a UWC proceeding, that be would be confidential,

25   correct?

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 184

1   and still doing it.

2               MR. STERN:  Mark this.

3               (Plaintiff's Exhibit 32

4               Marked for identification)

5       Q.   Mr. Killheffer, this is an example of an

6   exhibit, we've been given multible exhibits, various

7   versions of this type of thing, with most of it

8   blacked out.  I would basically like to ask you, what

9   is it?

10      A.   This looks like -- I mean it's almost all

11  blacked out.  This looks like a database with records

12  of information regarding complaints.

13      Q.   This comes from the production made as a

14  result of our request for documents from you.

15      A.   Right.

16      Q.   So --

17      A.   This is something that's maintained in our

18  office.

19      Q.   Is this --

20      A.   By me.

21      Q.   Is this the Sharepoint?

22      A.   No.  This is literally just an excel file

23  that we use as a database.  It has a one-line record

24  for every complaint that has basic information.  Name,

25  affiliation.  What was the allegation.  What were the

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 185

1    dates of the incident, date it was reported.  That's

2    it.

3                 The Share point site is essentially a

4    document management system, that's where the incident

5    summary reports that we've looked at today are

6    uploaded to.  This is not that.

7         Q.   And so does this indicate -- what facts are

8    indicated or kept in this database?

9         A.   Names, name of complainant, name of

10   respondent.  We have all of the rows or columns

11   across.

12                MR. NOONAN:  In other words, this

13   would keep going across the page.

14        Q.   If you look at page 1 of --

15        A.   It has some of the headings.

16        Q.   It goes A through L.

17        A.   Yes.

18        Q.   And then if you go a few pages in, we don't

19   have all the pages here, but if you look at --

20        A.   It doesn't have the headings.

21        Q.   If you look at Yale 1690, you see M, N, O,

22   P.

23        A.   It doesn't have the headings.  It has some

24   data.  We're missing all the headings, or some of the

25   headings.

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                     January 10, 2017

Page 186

1              MR. NOONAN:  Not all.

2      A.    What this is is an excel spread sheet.  You

3  can see there are columns that represent certain

4  pieces of information.  Complainant name, respondent

5  name, school, year of graduation, residential college.

6  What was the allegation.

7              You'll note I track here CSA, that is

8  that Campus Security Authority, was a report sent to

9  the YPD so that we can make sure we're complying with

10  that requirement.  But there's no detail about a case

11  maintained in this document.

12     Q.    How long have you kept this database?

13     A.    Since 2011.  So this is five years worth of

14  information in this excel file.

15     Q.    And this is kept in the --

16     A.    In my office.

17     Q.    And who has access to this?

18     A.    Only me.

19     Q.    And what sorts of complaints are kept in

20  this?

21     A.    Anything that comes, is reported to my

22  office.  It could include anything that falls under

23  Title IX, so that would be sexual misconduct, but if

24  we receive a gender discrimination complaint, we

25  create a record on this file.  Just to have it.  It's

Electronically signed by JAMES MARTONE (601-171-250-7767)                     31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 187

1    a tracking system essentially.

2                    There's a case number assigned to

3    every case.  That's a tracking number that we use

4    throughout our system.

5        Q.   So the 2013 complaint against Jack Montague

6    would be in here somewhere, in this spread sheet?

7        A.   Looks like it is.  I see a record there,

8    yeah, on page 86.

9        Q.   And the 2015 to 2016 UWC case, would also

10   be in here?

11       A.   Should be in here also.  Yup.

12       Q.   All right.  Now would the report, the third

13   party report made by Rachel Rogers indicating that she

14   had been told that there was another person who had

15   complained of rape, would that be in here?

16       A.   I would expect it to be.  Because remember

17   we mentioned before, any third party reports, even if

18   I don't have a name or if we've never talked to the

19   actual victim, we would include a record in this

20   database.

21       Q.   And why is that kept?

22       A.   This here?

23       Q.   When you haven't actually talked to the

24   victim?

25       A.   This is to essentially taking any complaint

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                        January 10, 2017

Page 188

 1    that gets reported to our office.  Even if it's a

 2    third party complaint, and we never end up speaking to

 3    the victim or they choose not to speak with us.  Even

 4    if it's gender discrimination, which we don't report

 5    in our Spangler report, we still have a record of it

 6    and this is the way I would go and check if there was

 7    a respondent who has been there before.

 8                    It's very easy to go and do a control

 9    F, and say has this person ever had a complaint in

10    five years?  It's in here.  It's a tracking mechanism.

11        Q.   At some point was an effort made to

12    corroborate, to substantiate whether there was another

13    complaint made or --

14        A.   Are you talking about the third party

15    complaint that Rachel Rogers --

16        Q.   Yes.

17        A.   I believe it's in Angie's report.

18        Q.   And according to Angie, she did find out

19    the name of this person, correct?

20        A.   I believe so.  I think it's in -- it was

21    blacked out in the report we were looking at earlier.

22        Q.   And she was not able to substantiate that,

23    correct?

24        A.   I'd have to go back.  I don't remember.

25                    MR. NOONAN:  I'm going to object.  I

Electronically signed by JAMES MARTONE (601-171-250-7767)                        31a4d12d-81e0-45a5-b5d0-50b58814fcad