# Exhibit 24

CONFIDENTIAL

UNIVERSITY-WIDE COMMITTEE ON SEXUAL MISCONDUCT

FACT FINDER'S REPORT IN THE COMPLAINT
BROUGHT BY JASON KILLHEFFER ON BEHALF OF
Jane   Roe        AGAINST JACK MONTAGUE

January 4, 2016

Introduction and Background

This complaint was brought by Senior Deputy Title IX Coordinator Jason Killheffer against Jack Montague (TR '16). The complaint concerns a single episode of sexual intercourse between Mr. Montague and Jane Roe       (BR '17) that took place on the night of October 18-19, 2014. Ms. Roe       states she consented to other sexual activity but did not consent to intercourse. According to Mr. Montague, Ms. Roe       voluntarily consented throughout the encounter.

The current formal complaint was filed November 18, 2015 (Exhibit A). Mr. Montague was charged on November 30 (Exhibit B) and responded on December 9, 2015 (Exhibit C). The case was assigned to me for investigation on November 23, 2015. UWC Chair David Post granted an extension to the usual 21-day time limit for investigation due to the Yale College Thanksgiving and winter breaks, when the parties and witnesses were unavailable for interviews, and due to Mr. Montague's additional absence from campus for games with the varsity basketball team.

In conducting this investigation, I interviewed Ms. Roe       on November 30, December 2 and December 17, 2015 in the presence of Amy Myers, Sexual Assault Counselor at the SHARE Center. I interviewed Mr. Montague on December 16, 2015 and December 29, 2015, in the presence of his adviser, Coach James Jones.

I conducted additional interviews with the following witnesses:
Angela Gleason, Title IX Coordinator
           (BR 17), friend of Ms. Roe
       (YC 15), friend of Ms. Roe
            (BR 17), friend of Ms. Roe
         (BR 17), friend of Ms. Roe
Rachel Rogers(BR 17), friend of Ms. Roe
          (YC 15), friend of Mr. Montague

I also reviewed the following documents:
Summary of events on October 18-19, 2014, written on October 22, 2014 by Ms. Roe       (Exhibit D)
Text messages between Ms. Roe       and Mr. Montague (Exhibit E)
Text messages between Ms. Roe       and          (Exhibit F)
Text message from Ms. Roe      to           (                  ) (Exhibit G)

1

Yale security card activity record for Ms. Roe        October 19, 2014 (Exhibit H)

Undisputed Facts

The following facts are not in dispute: Mr. Montague and Ms. Roe      met at a party in early September 2014. At that time they engaged in consensual sexual activity, not including intercourse. They communicated with each other after that via Facebook and text message. On September 24, Mr. Montague and Ms. Roe encountered each other again at an event at Toad's Place. They left together and went to Mr. Montague's house at 43 Howe Street where they had sexual intercourse for the first time.[1] On October 18, Ms. Roe      went to another party at Mr. Montague's house. She and Mr. Montague engaged in consensual sexual contact not including intercourse outside the house and in Mr. Montague's car. They then went inside to Mr. Montague's bedroom, where they continued sexual contact, including intercourse. Ms. Roe      stayed the night with Mr. Montague and went home in the morning. A few days later Ms. Roe      contacted Mr. Montague and asked to meet for a discussion. The parties met on October 28, 2014. At that time Ms. Roe      told Mr. Montague that she had not wanted to have intercourse on October 18 and she felt very uncomfortable and upset about what had happened. He stated that he was sorry she felt that way and agreed to stay away from her in the future. The parties have not communicated with each other since that time.

> **Comment [DMP1]:** This appears to be in dispute below.
>
> I believe he agreed to stay away from her but did not agree to leave places where she might be.

Complainant's Version of Events

According to Ms. Roe      she first met Mr. Montague at a party early in September 2014. He was a member of the basketball team and she was a member of the cheerleading squad. They had some mutual friends and attended some of the same parties. He lived in an off-campus house at 43 Howe Street with other members of the basketball team. Mr. Montague's house often hosted parties, including the one where Ms. Roe      met Mr. Montague. The house was known as "the basketball house."

The night the parties first met, they talked and flirted and then began kissing. Mr. Montague invited Ms. Roe      to his room, where they continued kissing and sexual touching but did not have sexual intercourse. Ms. Roe      stayed the night, slept with Mr. Montague and went home to Branford College in the morning. All sexual contact that night was consensual. Ms. Roe      enjoyed Mr. Montague's company and felt comfortable with him. Ms. Roe      and Mr. Montague traded phone numbers and friended each other on Facebook. After their first encounter

---

[1] Both parties agree that Ms. Roe      consented verbally to this activity, however she states that she was highly intoxicated at the time and did not want to have sexual intercourse but went along because she was not thinking clearly. Mr. Montague is not charged with any wrongdoing in connection with the incident on September 24.

2

they had friendly communication over text and Facebook . According to Ms. Roe she met Mr. Montague a second time a week or two after the first meeting. This encounter was similar to the first. The parties went to Mr. Montague's room and had consensual sexual contact, not including intercourse. Ms. Roe slept over at Mr. Montague's house. She felt comfortable and enjoyed the encounter. She reported that on both of these occasions, Mr. Montague asked if she wanted to "have sex" (meaning intercourse) and she said "no." He respected her decision and did not push her.

Ms. Roe reported a third sexual encounter with Mr. Montague on September 24, 2014. Her sorority was hosting a charity event at Toad's Place. Ms. Roe drank a lot more alcohol at this event than she usually drinks and she became highly intoxicated. She could not remember precisely what she drank, but she told me she drank two or three shots with her friend           starting at about 9:30 pm, before they went to Toad's. She then had approximately five more drinks at Toad's.

At Toad's, Ms. Roe saw Mr. Montague. She spent some time with him there and left Toad's with him and some other people at approximately 12:30 am. They went to another bar that she cannot remember. She had one more drink there and then went home with Mr. Montague. Ms. Roe has blurry memories of that night. She remembers walking with Mr. Montague but does not remember their conversation that night. She stated that she did not need help walking or climbing the stairs in his house. She does not have specific memories of slurring her speech or other impaired motor skills, but she believes she must have been visibly intoxicated because friends have told her she was visibly drunk at other times when she drank a lot less than she drank that night. Ms. Roe stated that she went willingly to Mr. Montague's house, intending to have sexual contact with him, but not intending to have sexual intercourse. She felt comfortable going with him because on the previous occasions when he asked if she wanted sex and she said "no," he respected her decision and did not try to force or coerce her. This time, after both parties were undressed and in bed kissing, Mr. Montague asked Ms. Roe if she wanted to have sex and she said "yes," though in hindsight she does not believe she was capable of making a considered decision. Immediately after she said "yes," he penetrated her, without asking about whether she was using contraception and without using a condom.[2] Ms. Roe does not remember the experience of sexual intercourse after penetration; the next thing she remembers is waking up in Mr. Montague's bed the next morning. She asked him, "We had sex, right?" and he confirmed that they did. When she went home in the morning she still felt drunk. She was physically ill and also felt terrible that she had agreed to sexual intercourse. She blamed herself for agreeing and for drinking so much that she was unable to exercise her usual judgment.[3]

_____

[2] According to Ms. Roe she was upset that Mr. Montague did not use a condom and she later went to the Yale Health Center for a pregnancy test even though she was taking an oral contraceptive. The test was negative.

[3] Ms. Roe did not report this incident to the Title IX Coordinator and she does not claim this was a violation of Yale policies on sexual consent. When I asked about other witnesses who might have observed her level of impairment due to alcohol,

3

The next time Ms. Roe saw Mr. Montague was the night of October 18. That night Ms. Roe went with some friends to a birthday party at Sig Nu fraternity. She left for the party with her friend at about 9:15 pm and stayed until about 11:00 or 11:15 pm. While at the party, she played beer pong and had about two drinks of alcoholic beverages. After leaving the party, Ms. Roe walked back to Branford College to meet her suitemate Rachel Rogers. Ms. Rogers had friends from home visiting for the weekend and they were hanging out in the common room. Ms. Roe had two more drinks with Ms. Rogers and her friends. They all then left for a party at the basketball house, where Mr. Montague lived. When they arrived at the basketball house, Ms. Roe talked and socialized with friends. She did not drink any more alcoholic beverages. She encountered Mr. Montague leaning against a stone wall outside the house and he called out to her in a friendly way. He put his hands around her waist and made a flirty joke about how he knew she had broken ribs from a cheerleading accident and might only be able to have sex in the missionary position. He invited her outside in the back of the house where there was a parking lot for the residents' cars, and she went willingly. Ms. Roe and Mr. Montague leaned against his car and kissed. She stopped and told him that she knew they had sex last time when she was really drunk and that was OK, but she did not want to do that again this night. She asked if it was OK with him to "hook up" but not "have sex." Mr. Montague said that would be OK with him.

It got cold outside and Mr. Montague asked if Ms. Roe wanted to get inside his car. She agreed. While she was waiting for Mr. Montague to get his car keys, Ms. Roe got a text message from her friend Ms. Rogers asking where she was and telling her that Ms. Rogers and her friends were ready to leave this party and go to another party at Zeta Psi fraternity. Ms. Roe replied that she was with Mr. Montague, she was fine and she intended to stay at the basketball house. Ms. Roe reported to me that she felt comfortable with Mr. Montague and felt in control of the situation because she had been careful not to drink too much and because she had been so verbally clear and direct with him about not wanting to have intercourse. Mr. Montague returned with his keys and he and Ms. Roe continued to talk and kiss inside the car. At one point Mr. Montague commented, "Are we really doing this?" Ms. Roe asked, "Doing what?" and Mr. Montague replied, "Fucking in my car." Ms. Roe then reminded him that she did not want to "have sex" but only to "hook up" and Mr. Montague again said that was OK.

The party wound down and more people came into the back yard. Mr. Montague asked if Ms. Roe would like to come inside and she agreed. They went in the back door and up a flight of stairs to Mr. Montague's room. She knew the way and

---

she told me that she had asked friends about it but none of her friends remembered anything about that particular night. The one witness I interviewed who was present that night, did not remember anything about Ms. Roe level of intoxication. The incident is reported here in order to describe the context of the parties' previous interactions when they met on October 18.

4

went ahead of him. They both took off all of their clothes[4] and got into Mr. Montague's bed where they resumed kissing and touching. When they first got undressed there was no further verbal discussion of the boundaries of their sexual consent. Mr. Montague kissed Ms. Roe and touched her body, including her genitals, to which Ms. Roe had no objection. She stated to me that she indicated her consent by kissing him, touching his body (not his genitals) and by not tensing up. Then Mr. Montague got on top of her, lifted his chest and leaned his pelvis into her as if he was preparing to penetrate her. Ms. Roe put her hands up, pressed them against the front of Mr. Montague's shoulders and pushed him, but not very forcefully. She said, "Jack, no, I said I wanted to hook up but not have sex." He looked very drunk, as if he did not hear what she was saying. He then penetrated her over her objection. Ms. Roe stated that she was surprised and frozen. She did not move and did not attempt to push Mr. Montague off of her. She did not think she could push him off if she tried because he was bigger and heavier than she was. She just waited for him to stop. When he was done he got up and said, "I'm really sorry. I know you didn't want that." She lay still in the bed feeling defeated and confused.

> **Comment [SS2]:** Did she report here that the friends came up to the room?

Mr. Montague dressed and went downstairs, where some of his friends and housemates were gathered. He came back to the bedroom and told Ms. Roe he was going to Zeta Psi with his friends and she should stay in his bedroom and wait for him to come back. He gave her his laptop, which she took to be an offer of entertainment while she was waiting. She did not know what to do and had difficulty thinking. She thought she might leave and go home after he was gone to the party at Zeta. Then she heard people downstairs calling her name and telling her to come down. She felt frozen and passive and did what they said without making a real decision. Friends of Mr. Montague were complimenting her, saying she was beautiful and the hottest girl on campus. This confused her and made her wonder if Mr. Montague had asked them to be especially nice to her to placate her because she was upset with him. According to Ms. Roe Mr. Montague was planning to go to the party at Zeta Psi with some friends but he did not want her to go with him. Instead he asked a male friend of his, whom Ms. Roe did not know, to take her with him to Toad's Place. Mr. Montague said he would meet up with Ms. Roe later back at his house. She said nothing but went along passively because she couldn't think.

Ms. Roe went with Mr. Montague's friend to Toad's Place but she did not want to be there and didn't stay. She walked in and out and of Toad's without speaking to Mr. Montague's friend and walked home alone to Branford College. When she got inside the Branford courtyard she became confused and overwhelmed. It was after 1:00 am. She wanted to go to bed and sleep and not talk with anyone, but she realized that there would be lots of people in her suite and it would be impossible to go to bed without seeing anyone or being asked a lot of questions. Ms. Rogers had friends visiting and they were sleeping in the common room. Ms. Roe said that

---

[4] Ms. Roe did not remember precisely how they undressed but she believed that both she and Mr. Montague took off most of their own clothes and he unhooked her bra.

5

she lived in a suite with seven other people and there was always activity there and in the other large suites in the entry. She was overwhelmed at the prospect of having to talk or answer questions and she decided she couldn't go inside her suite. She didn't know what to do and couldn't think clearly. She decided to return to Mr. Montague's house since he was planning to have her return and would not question her about why she was there or what had happened earlier in the night. She thought he would let her go to sleep quietly. She called him by phone and asked where he was. She told him she was in Branford College and would meet him. He told her to meet him on Park Street near Davenport College and she did (Exhibits E, H).[5] They walked together back to his house. Ms. Roe does not remember the details of their conversation on the way back but she described it as normal and flirty. She told Mr. Montague she just wanted to go to sleep and he made a joke about being too drunk to be able to have sex. When Ms. Roe returned to Mr. Montague's bedroom she did not take off her clothes again and got in bed. Mr. Montague got on top of her again but she pushed him and said, "No. I don't sleep around." Mr. Montague said, "It's not sleeping around. This will be the third time." She said "No" again, said she just wanted to go to sleep and rolled away from Mr. Montague to the other side of the queen size bed. He did not object and they both went to sleep. In the morning, Ms. Roe woke up and asked Mr. Montague to let her out of the house, which required a key. They had no conversation about what had happened that night and Ms. Roe gave no indication that she was upset.

Ms. Roe walked home to Branford College as quickly as she could. She was upset and embarrassed that it was morning and she was dressed up in a skirt as if she were going to a party. She thought she would not talk to anyone and would push what had happened with Mr. Montague out of her mind until after fall break when she and her friends would be done with their exams. She got home at approximately 10:00 am on October 19.[6] There was no one in the common room and she sat down. Ms. Roe suitemate came in and asked Ms. Roe "How was your night?" Ms. Roe told her it was terrible. She reported what had happened and started to cry. A second suitemate also came out of her bedroom and she also listened to Ms. Roe account of what happened. Ms. and Ms. comforted Ms. Roe made some tea and told Ms. Roe to take a shower. Ms. Roe had been planning to go to New York that afternoon to see a ballet with several friends: Ms. Ms. Ms. Rogers and another suitemate, She went with her

---

[5] Exhibit H documents that Ms. Roe swiped her ID card at the Branford College gate at 1:34 am on October 19, 2014, did not swipe into any dormitory entry and then swiped her card at the Davenport College gate at 1:40 am. Exhibit E shows a text message from Mr. Montague to Ms. Roe at 1:30 am stating that he was at Davenport College.

[6] Exhibit H documents that Ms. Roe entered the Branford College gate at 9:57 am and entered entryway N at 9:58 am on October 19, 2014.

[7] I did not interview Ms. because she was not with Ms. Roe the night of October 18 and her testimony was likely to be repetitive of the other suitemates' reports.

6

friends as planned and hoped to get away from her thoughts about Mr. Montague. She cried for much of the ride on the train but got a lot of support from her friends.

Friends of Ms. Roe suggested that she talk with someone about what Mr. Montague had done to her but she did not want to make a complaint at that time. She did call the SHARE Center on October 21 or 22 and spoke with Jennifer Czincz, Ph.D., about her options. Ms. Roe decided that she wanted to talk with Mr. Montague herself, to make sure he understood that what he had done was wrong and so that he would not do it again to anyone else. She discussed with Dr. Czincz how she might effectively communicate with him. She also talked with a graduate student friend, who advised her to write down what had happened so that she would have it if she later decided that she did want to pursue an official complaint. Ms. Roe did make such a record on October 22; this undated document is attached as Exhibit D.

> **Comment [SS3]:** Should you confirm with this person that spoke to him/her and that the pseron told her to write down the incident?

On Sunday, October 26, 2014, the last day of fall break, Ms. Roe texted Mr. Montague asking him to meet with her (Exhibit E). She was irritated that he was not immediately responsive and seemed to be putting her off (Exhibit E) but he did agree to meet on October 28. They sat at a picnic table outside Davenport College and spoke briefly. Ms. Roe spoke and asked Mr. Montague to listen. She told him she had made it clear to him that she didn't want to have sex with him and she had not been feeling good about what happened on October 18. He said he was sorry that she felt that way. He said that he had been very drunk that night. She thought he was very careful with his words, trying to be nice but not to take responsibility for any misconduct. He stated that he thought she was a really nice person and "down to earth." He hoped they would be able to remain friends but he could understand if she didn't want to see him anymore. He offered that if he ran into her at a party or elsewhere he would leave so that she would not be uncomfortable. Ms. Roe felt that she had been able to communicate how she felt about the encounter on October 18 and she felt good about that even though Mr. Montague did not admit wrongdoing.

During the fall semester 2014, Ms. Roe had some intrusive thoughts and nightmares about Mr. Montague.

Later in the fall of 2014, Ms. Roe began dating a man who was very nice to her and helped her to put Mr. Montague out of her mind. She did not see Mr. Montague except occasionally in passing. She was mostly happy until the end of the spring semester when she saw Mr. Montague talking with a male friend of hers at Spring Fling. This surprised her and reawakened strong negative memories and feelings. She found it extremely upsetting that someone she liked and respected would be friendly with Mr. Montague, probably not knowing that he was someone who would force himself on a woman over her objection.

7

Ms. Roe was surprised to find that she continued to have strong memories and upsetting feelings about Mr. Montague when she returned to campus in the fall of 2015. She saw him around campus and New Haven more than she had in the spring, though he did not try to communicate with her or threaten her. She had expected to put the incident of the previous fall behind her but it was becoming harder rather than easier to avoid thinking about it. Ms. Roe talked with some of her friends, who again advised her to consider making a complaint or talking with a counselor. Ms. Roe suitemate Ms. Rogers happened to be speaking with Title IX Coordinator Angela Gleason about a completely unrelated matter and while she was there she mentioned a friend who had had a bad experience, provided an outline of what had happened between Ms. Roe and Mr. Montague and asked how she could help her friend. Ms. Rogers did not give Ms. Roe name at this point but merely requested information about her friend's options. Ms. Gleason talked about the various formal and informal procedures available to deal with sexual misconduct and encouraged Ms. Rogers to reach out to her friend. Ms. Rogers explained to Ms. Roe what she had learned from Ms. Gleason, including the option of making an anonymous informal complaint. This would allow Ms. Roe to tell her story to the Title IX Coordinator but request that her name be kept confidential. The Title IX Coordinator would then call Mr. Montague in for a conversation about the fact that a complaint had been made against him and would suggest that he participate in extra training about communication and sexual consent. Ms. Rogers liked this idea because it might fulfill her goal of making sure Mr. Montague understood that his behavior was wrong and hurtful and stop him from doing it again to someone else. She did not want to pursue a formal complaint because she did not want to engage in the lengthy and difficult process of telling the story repeatedly and being questioned in detail by strangers on the UWC. She stated to me that she was not interested in having Mr. Montague punished but in having him learn so that he would not hurt anyone else.

Based on what she had learned from Ms. Rogers Ms. Roe decided to talk with Ms. Gleason about Mr. Montague. She met with Ms. Gleason on October 19, 2015. On November 6, she heard back from Ms. Gleason that she would not be able to keep Ms. Roe name confidential. Ms. Gleason explained to Ms. Roe that Mr. Montague had already been given a recommendation for consent training after a previous complaint and so that option was no longer open to him. Ms. Gleason expressed concern that the incident Ms. Roe had reported to her was serious. She told Ms. Roe that she did not have to file a complaint herself and a Title IX Coordinator could do it. In the event that Ms. Roe elected not to bring a complaint, Ms. Gleason asked her to cooperate with the process as a witness. Ms. Roe was surprised and somewhat disappointed that she had been thrust into a process she had not sought out, but she agreed to cooperate with this investigation for the same reason she went to Ms. Gleason in the first place. She stated that she wants Mr. Montague to understand what he did was wrong and not repeat it. She was especially motivated to participate in the investigation and hearing process after she heard that Mr. Montague had already had another complaint against him, as she felt it was important to protect other women.

**Comment [SS4]:** Was the recommendation for "consent training," sensitivity training, or something else?

**Comment [AM5]:** There were two requirements: (i) that he receive sexual harassment and gender sensitivity training and (ii) that he meet with SHARE once each term for the remainder of his time at Yale to review and reflect on his interactions and relationships with female students at Yale. The requirements were imposed on October 21, 2013.

**Comment [MB6]:** This is an accurate description of what told me about her motivation and her decision-making about participating in this case. It is slightly different from what Angie Gleason, which is not relevant told me. I am concerned that it may be too much information about his prior record, which is not relevant to this investigation. I would be happy to take some of this out if you think it is too prejudicial. Please advise.

**Comment [DMP7]:** I am fine with this – the panel will hear about the previous violations before deciding on culpability anyway.

8

Respondent's Version of Events:

Mr. Montague's report of his first interactions with Ms. Roe matches her account. He stated to me that he met Ms. Roe at a party at his house early in September 2014. He was immediately attracted to her. The two parties spent the night together and had consensual sexual contact, including kissing and touching but not intercourse. Early in the morning, Ms. Roe asked if she could give Mr. Montague oral sex and he agreed. Mr. Montague enjoyed Ms. Roe company and wanted to see her again. They traded phone numbers and texted each other before meeting again.

Mr. Montague reported a second sexual encounter with Ms. Roe a few weeks later.[8] They met at a club or bar and walked back to Mr. Montague's house arm in arm, along with some of his teammates. According to Mr. Montague, this second sexual encounter was similar to the first in that Ms. Roe came willingly to his room and they engaged in consensual kissing and other sexual contact. This time they did have vaginal intercourse. Mr. Montague remembered few details about this encounter and stated that he did not recall whether he or Ms. Roe had been drinking a lot that night. He did not immediately remember that this incident took place after an event at Toad's Place but he accepted Ms. Roe report of that context. He did not recall Ms. Roe being impaired by alcohol in any way. She seemed to him to be having a good time and laughed as she walked home with him. She did not need help walking and participated actively in sexual activity with him. By Mr. Montague's account, there was no express verbal discussion of the boundaries of sexual consent until, just prior to intercourse, Mr. Montague asked Ms. Roe if she wanted to "have sex" and she said "yes." According to Mr. Montague, he had no reason to doubt that Ms. Roe was capable of sexual consent and he believed that her consent that night was voluntary.

Mr. Montague stated that his third sexual encounter with Ms. Roe occurred on October 18, 2014, after another party at his house. His description of this incident differs significantly from hers. According to Mr. Montague, he traded text messages with Ms. Roe prior to this party and he knew she was planning to be present.[9] He wanted to be able to have a good time with her and so he was careful not to drink too much before she arrived. He believes he drank between four and seven drinks of alcohol over a period of several hours. He was happy to see Ms. Roe at the party and they talked and socialized together. They went outside in the backyard of his house and kissed, first leaning against his truck and then inside the truck. After a

---

[8] Mr. Montague's description of what he remembers as his second sexual encounter with Ms. Roe closely matches her description of what she says was their third encounter. Mr. Montague does not remember getting together with Ms. Roe between the time he first met her at his house and the time they left Toad's together. He states that it is possible that there was another encounter before their meeting at Toad's but he does not remember it.

[9] Mr. Montague could not provide copies of these messages because he has changed phones and has lost access to text messages from that time. He was not able to obtain the messages from his cell phone carrier.

9

while, he invited her inside and they went to his bedroom. They both got completely undressed[10] and got into his bed. They resumed kissing and touching and then he asked if she wanted to have sex. She agreed and they did have intercourse. There was nothing about this encounter that made Mr. Montague think Ms. Roe had any hesitation or discomfort with having intercourse with him. He remembered changing positions during the course of sex from the missionary position to "doggy style" and Ms. Roe did not object. He denies that she ever told him that she wanted to "hook up but not have sex."[11] He denied making a comment about "fucking in [his] car." He denied that Ms. Roe told him to stop, put her hands up to his shoulders and pushed him. He also denied stating to her after intercourse that he was sorry because he knew she didn't want that.

**Comment [AM8]:** Did JM say how communicated her agreement to intercourse?

**Comment [SS9]:** Did you ask if their positions changed during intercourse?

**Comment [AM10]:** Does he recall his friends coming to his room?

When he described this encounter to me, Mr. Montague stated that Ms. Roe spent the night with him as she had the previous two times that they had been together. He did not report that they got dressed, left the house, went to other parties and met up again outside Davenport College as reported by Ms. Roe When I asked him about these details of Ms. Roe account, he seemed somewhat surprised but did not deny that this had occurred. When I interviewed Mr. Montague a second time he stated that he had tried hard to remember whether he and Ms. Roe had left the house and returned but he still did not have any memory of those events.

Mr. Montague stated that he believed his interaction with Ms. Roe on October 18, 2014 had gone well until he received a text from her on October 26 in which she asked to meet with him to discuss what had happened (Exhibit E). The tone of the message indicated to him that she was not happy and that she wanted to tell him something bad. He was worried about what she would say. The first things that came to his mind were that she was pregnant or that she had a sexually transmitted disease. He could not meet with her right away because of his basketball practice schedule but he agreed to meet a few days later. They met at a picnic table outside Davenport College just before he was going to a concert at Toad's with some friends. Ms. Roe told him that she had not wanted to have sex on the night of October 18 and she was not happy about what had happened. According to Mr. Montague, he interpreted what Ms. Roe said as stating that she was disappointed in what happened and regretted having sex. He denied that she told him that she had objected clearly and he had proceeded over her objection. He did not believe he had done anything wrong and he did not understand Ms. Roe to be accusing him of misconduct. He told Ms. Roe that he was sorry that she was feeling upset about the encounter. He said that he would "be there for her" if she wanted to talk more about this or anything else in the future. Ms. Roe responded immediately that she did not want to have anything more to do with him and he said

---

[10] Mr. Montague's memory was not clear as to how they got undressed. He believed they each took off their own clothes but he may have unhooked Ms. Roe bra. This is consistent with Ms. Roe account.

[11] Mr. Montague specifically denied her claims that she made this statement at least three times: just after beginning to kiss him, a second time while in the truck and a third time when he got on top of her in bed.

10

he would leave her alone. He denied Ms. Roe     report that he had volunteered that he would leave any venue where she was in order to make sure she was not uncomfortable around him. Despite the discomfort of the conversation Mr. Montague and Ms. Roe     parted amicably and hugged at the end of this conversation.[12]

Mr. Montague stated that he and Ms. Roe     never spoke with each other again. Occasionally he would see her around campus but she would ignore him. He was surprised that on one occasion during the spring semester of 2015 he was invited to a party at Ms. Roe     sorority but he was then asked not to attend because someone in the sorority did not want him there. He believed Ms. Roe     had "black-balled" him.[13] He knew he had said he would stay away from her after their last meeting on October 28, 2014, but he was surprised that she felt so strongly about not having him around that she would ask another member of her sorority to dis-invite him.

Mr. Montague was also surprised and confused this fall when he was at a party hosted by the Owl's Throne, a junior society that he belonged to, and a girl he did not know approached him and told him he had to leave the party right away. This girl explained that he could not be at the party because Ms. Roe     was there and he was supposed to stay away from Ms. Roe     because he had "raped" her. Mr. Montague was shocked to hear the allegation that he had "raped" Ms. Roe     when she had never made such an accusation herself and he continued to believe that he had done nothing wrong. He was also confused by the demand that he leave the party immediately to get away from Ms. Roe     From Mr. Montague's perspective, he had never agreed that it was his responsibility to get away from anyplace where Ms. Roe     was present and he had not even seen Ms. Roe     at this party before he was accosted by her friend. Shortly after this last interaction, Mr. Montague received the UWC complaint in the current case. Again, he was surprised and distressed. He discussed the matter with her former housemate and basketball captain,               who offered him support.

**Comment [SS11]:** Her housemate or his?

Mr. Montague explained to me that the allegation in this case is extremely distressing and anxiety provoking for him. He stated that he liked Ms. Roe     and never intended to hurt her. He emphasized that he considers himself a gentleman who would never force himself on a woman. Mr. Montague also emphasized the confusing nature of Ms. Roe     behavior after sexual intercourse on October 18 as evidence that her story is incredible. He argues that she did not look upset afterwards or tell him that he had done anything wrong. Although he does not remember her leaving his house late at night and then returning, he argues that if he had really committed a sexual assault against her, it makes no sense for Ms. Roe     to return voluntarily to his bed. He suggests that Ms. Roe     may have

---

[12] Ms. Roe     acknowledged hugging Mr. Montague at the end of the conversation on October 28. She explained that she wanted to be firm and clear with Mr. Montague but she did not want to be hostile or provoke a hostile response from him.
[13] Ms. Roe     agrees that this occurred.

11

felt regretful about having intercourse with him and then reinterpreted their encounter as nonconsensual.

Testimony of other witnesses:

            is a friend of Ms. Roe    They were freshman roommates and suitemates last year. She does not know Mr. Montague. Ms.        reported that on the night of October 18, 2014 she was not with Ms. Roe    Ms. Roe    went out with their suitemate ^Rachel RogersMs.        did not see Ms. Roe    until the following morning. Ms.        got up early on Sunday October 19 and went for a run. When she returned to the suite she found Ms. Roe    on the common room sofa crying. Ms.        hugged Ms. Roe    but Ms. Roe    continued sobbing and could not talk for about ten minutes. Eventually Ms. Roe    told Ms.        that she had had a terrible night with Mr. Montague. Ms. Roe    had previously told Ms.        about another encounter with Mr. Montague. On that occasion Ms. Roe    had been very drunk and had said yes to sex with Mr. Montague even though she didn't really want to. After that she was upset and very angry with herself. Ms. Roe    now told Ms.        that on the night of October 18, Ms. Roe    told Mr. Montague that she did not want what had happened before to happen again. She told him they could hang out but not have intercourse. He pushed her to agree to sex. She said "no" but he proceeded anyway. Later, he said he knew she didn't want that and he apologized. Ms. Roe    stayed the night with him because she was in shock and panicked.

Ms.        reported that there was a striking difference in Ms. Roe    demeanor between the day after her first sexual intercourse with Mr. Montague and the morning of October 19. On the earlier occasion, Ms. Roe    felt unhappy and angry with herself. She felt responsible for what happened because she was so drunk. She was upset but was not crying or falling apart. In contrast, on October 19, Ms. Roe    was sobbing uncontrollably as she told the story of what happened. That afternoon, Ms. Roe    went with Ms.        and several other suitemates to New York to see a ballet, but Ms. Roe    was upset and cried on and off the whole day.

      is a friend of Ms. Roe    They lived in the same suite last year and now live in the same entry in Branford College. Ms.        does not know Mr. Montague. Ms.        stated that she was not with Ms. Roe    on the night of October 18, 2014. Ms.        woke up the next morning at approximately 9:00 am. When she went out into the common room she found Ms. Roe    crying.        another suitemate, was attempting to comfort Ms. Roe    Ms. Roe    told Ms.        and Ms.        that she had been at the basketball house the previous night. She ran into Mr. Montague and went to his room with him. Ms. Roe    was not drunk. She and Mr. Montague were "hooking up" and Mr. Montague wanted to "have sex." Ms. Roe    said "no." She pushed on his chest but he was too heavy for her to push off. He went ahead and had intercourse with Ms. Roe    even after she said "no." Afterwards, Ms. Roe    stayed at Mr.

12

Confidential
YALE00008994

Montague's house overnight because it was very late and she did not want to walk home alone.

              is a friend and suitemate of Ms. Roe    They have been suitemates for two years. Ms.      knows who Mr. Montague is but does not consider him a friend. Ms.      reported that on the weekend of October 18, 2014 she was out of town for a              When she returned to campus on Sunday, October 19, Ms. Roe     was away in New York at the ballet. The next day, Ms. Roe     told Ms.      about her encounter with Mr. Montague on October 18. According to Ms.      Ms. Roe     told her that she went to a party at the basketball house on Saturday night October 18. She saw Mr. Montague and told him that she knew they had sex last time they were together but she did not want to do that again. She wanted to hook up but not have sex. He said that would be OK but then he ignored her. Ms. Roe     told Ms.      that she and Mr. Montague were hooking up in his room. He was on top of her. He was very drunk and she was relatively sober. She said she didn't want to have sex and he went ahead anyway. She resisted but he continued. He did not use a condom. After he was finished, he apologized and told Ms. Roe     that he knew she didn't want that.

Ms.      stated that she was concerned about Ms. Roe     reaction to the events with Mr. Montague, but she knows Ms. Roe     to be a person who presents herself as doing fine and who is able to compartmentalize bad experiences. Last spring                                                                              which was a big disruption in her life. According to Ms.      Ms. Roe     has seemed more stressed and unhappy this fall. Ms.      also reported an event in early November 2015 in which Ms. Roe     and Ms.      were at a party at the football house. Ms. Roe     told Ms.      that she noticed Mr. Montague was also there. Ms.      was aware that Mr. Montague had agreed to stay away from Ms. Roe and to leave anyplace that they ended up together. She asked Ms. Roe     if she wanted Ms.      to ask Mr. Montague to leave. At Ms. Roe     request, Ms.      approached Mr. Montague and told him that he needed to leave the party because Ms. Roe     was there. Mr. Montague responded that he was a senior and he was at this party with his friends. He stated that it had been a year since he had seen Ms. Roe     and if she wanted to talk to him she could do so herself. Ms.      told Mr. Montague he had to leave because "you raped her." The altercation ended when Ms.      boyfriend intervened. He told Mr. Montague he should leave. Mr. Montague did not leave but he did not approach Ms. Roe     for the remainder of the party.

> **Comment [SS12]:** I'm not sure I understand what you are trying to communicate in the first sentence and whether it rela to the point made in the second.

Rachel Rogers is a close friend and suitemate of Ms. Roe     Prior to October 2014, she knew who Mr. Montague was based on the fact that both were athletes and because they had some mutual friends. Ms. Rogers is not a friend of Mr. Montague. Ms. Rogers reported that she was with Ms. Roe     on Saturday, October 18, 2014. Ms. Rogers had two high school friends visiting her that weekend to attend the Yale football game. After the game, Ms. Rogers and her friends were hanging out in the suite and Ms. Roe     joined them sometime in the evening. At about 10:30 or 11:00 pm, Ms. Rogers Ms. Roe     and Ms. Rogers two friends went together to a party at the basketball house, where Mr. Montague lived. They saw Mr. Montague at the party and Ms. Roe     went to talk with him. Ms. Rogers and her friends were

13

socializing with other people. After an hour or more, they decided they were ready to leave and go to another party at Zeta Psi fraternity. Ms. Rogers did not want to go without Ms. Roe or at least without knowing where Ms. Roe was. Ms. Rogers texted, "Where are you? Come outside. We are going to leave."[14] Ms. Roe texted back, "I'm with Jack. I'm fine." Ms. Rogers knew that Ms. Roe had been with Mr. Montague before. She knew that Ms. Roe had no romantic feelings for him but she was sexually attracted to him. Ms. Rogers was not completely comfortable leaving the party without Ms. Roe but Ms. Roe text was clear and coherent, so Ms. Rogers felt that her friend was not too drunk and was making a conscious decision to remain at the party with Mr. Montague. Ms. Rogers left with her high school friends, spent some time at the Zeta party and then went back to the suite. When Ms. Rogers got home it was 1:00 or 1:30 am and Ms. Roe was not there.

Ms. Rogers and her friends woke up early, at 9:00 or 9:30 am, and went out to breakfast. Ms. Rogers did not see Ms. Roe before she left the suite but she did not know if Ms. Roe had come back late and was in her room or if she was still out. Ms. Rogers came back to the suite without her visiting friends at around 11:30 am or noon and found Ms. Roe in the common room crying with some of their other suitemates. Ms. Roe was very upset. She was saying things about her night with Mr. Montague, such as, "I told him I didn't want sex," "I told him no," "He was on top," and "I couldn't push him off." Later that day or the next day, Ms. Roe told Ms. Rogers more details about what had happened. She explained that after Ms. Rogers and her friends had left the basketball house, and before Ms. Roe went with Mr. Montague to his room, she told him specifically that she wanted to hook up and talk but she didn't want to have sex, but Mr. Montague didn't listen. Ms. Roe also told Ms. Rogers that after having sex, Mr. Montague got dressed and went downstairs where some of his friends were gathered. Ms. Roe followed him and did what he told her to do because she felt confused and out of control and didn't know what else to do. She went to Toad's with people she didn't know. She left Toad's and came back to Branford College but didn't want to come inside her suite so she called Mr. Montague and went back to his house with him. She then returned home to Branford College in the morning. According to Ms. Rogers this type of passive, confused behavior is not typical for Ms. Roe

Ms. Rogers also reported that after Ms. Roe encounter with Mr. Montague on October 18, Ms. Roe was highly reactive whenever she saw Mr. Montague on campus. She would become irritable and cranky, which was not like her.

Ms. Roe has been anxious about going out because she knows that Mr. Montague could pop up anywhere. Ms. Roe friends have been careful to watch for Mr. Montague and to stay close to Ms. Roe whenever they go places that he might be. They try to find alternative locations to go out so that they will not run into him.

---

[14] Neither Ms. Roe nor Ms. Rogers provided these text messages. Their description of the messages is similar and does not conflict with any statement of Mr. Montague.

14

In the fall of 2015, Ms. Roe told Ms. Rogers that she was thinking about how it had been nearly a year since her encounter with Mr. Montague and she was having nightmares again. At around the same time, Title IX Coordinator Angela Gleason asked to speak with Ms. Rogers about an unrelated incident. Ms. Rogers met with Ms. Gleason on September 21, 2015. At the end of their conversation, Ms. Gleason asked Ms. Rogers if she had any questions. Ms. Rogers told Ms. Gleason about what had happened to Ms. Roe and asked Ms. Gleason what to do to help her friend. Ms. Rogers told Ms. Gleason Mr. Montague's name but not Ms. Roe . Ms. Gleason urged Ms. Rogers to talk with her friend about coming forward and reporting the incident. Ms. Rogers waited a few weeks to talk with Ms. Roe because she wasn't sure what Ms. Roe reaction would be, but she did talk with Ms. Roe on October 15. Ms. Roe was nervous about talking to Ms. Gleason and asked Ms. Rogers to reach out again and ask some questions for her before she decided whether to meet with Ms. Gleason. On October 16, Ms. Rogers met again with Ms. Gleason to discuss the situation involving Ms. Roe but Ms. Rogers still did not reveal her name. Ms. Gleason suggested various options that Ms. Rogers could offer her friend, including the idea of making an anonymous complaint. This could result in a conversation between Ms. Gleason and Mr. Montague and a referral of Mr. Montague to sensitivity training, to help him avoid repeating his behavior with anyone else. Ms. Rogers told Ms. Roe about her conversation with Ms. Gleason and Ms. Roe liked the idea of having Mr. Montague referred to sensitivity training. Ms. Roe then went to talk with Ms. Gleason.

is a good friend of Ms. Roe She graduated from Yale in the spring of 2015. Ms. knows who Mr. Montague is but is not a friend of his. She knew Ms. Roe had several sexual encounters with Mr. Montague but Ms. never saw them together. Ms. was at the Pi Phi-sponsored event at Toad's Place on September 24, 2014. Ms. reported that she came to the event with Ms. Roe and they took pictures together at the beginning of the party but Ms. had no specific memories of Ms. Roe at the event later in the evening. Ms. did not see how much alcohol Ms. Roe drank or how her behavior may have been affected by alcohol. She did not see Ms. Roe with Mr. Montague.

Ms. was with Ms. Roe on the night of October 18, 2014. They went together to a birthday party for two friends, which took place at Sig Nu fraternity. It was not a big party and there was not a lot of alcohol served there. Ms. and Ms. Roe stayed at this party for about an hour or an hour and a half. After they left, Ms. went home and Ms. Roe went out with other friends. Ms. did not attend the party at Mr. Montague's house that night and did not see Ms. Roe after they left Sig Nu. The next day, Ms. texted Ms. Roe to ask how the rest of her night had been. Ms. Roe told her over text message that the night was terrible. She had told Mr. Montague she did not want to have sex but he went ahead anyway. She was not able to push him away. Afterwards he apologized and said he knew she had not wanted that. Ms. Roe said she had been feeling so upset she was physically ill all morning (Exhibit F). Ms. tried to be supportive

15

of her friend. Later, Ms. Roe     decided that she could not

> **Comment [AM13]:** It would be helpful to include here, if it's available, the date when

            is a close friend of Mr. Montague. He graduated from Yale College in 2015. Last year he was the Captain of the basketball team and a housemate of Mr. Montague. Mr.        was present at the basketball house on both occasions when Ms. Roe     attended parties there and stayed overnight with Mr. Montague. Mr.        stated that Mr. Montague had several encounters with Ms. Roe     in the fall of 2014, and he believed she stayed overnight at their house somewhere between two and five times. Mr.       knew that Mr. Montague was having a sexual relationship with Ms. Roe     but he did not personally observe much of their interaction. What interactions he did see seemed positive.

Mr.        described the basketball house as an active house that hosted a lot of large parties. When they hosted parties, the house was usually crowded and loud. They served a lot of alcoholic beverages. Mr.       had no specific memories of Mr. Montague and Ms. Roe     at the party on October 18, 2014. He did not see how they were touching or interacting and he had no personal knowledge of how Ms. Roe     came to stay overnight or the nature of her sexual contact with Mr. Montague.

Mr.       reported that a few days or a week after October 18, Mr. Montague came to him upset because something bad was going on with Ms. Roe     She had texted Mr. Montague and asked to meet for a conversation. Her tone was serious and different than she had been before. Mr. Montague was worried that she was upset with him about something and he didn't know what it was. Mr. Montague worried that perhaps she thought she was pregnant. Mr. Montague arranged to meet Ms. Roe     to discuss what was on her mind, and afterwards he came to Mr.        again and told him that Ms. Roe     had said she had not wanted to have sex that night and was disappointed that it had happened. Mr. Montague was shocked that she felt that way because it had been his impression that she was having a good time and wanted to do everything that they did sexually.

Early in November of 2015, Mr. Montague called Mr.        on the phone to tell him about another shocking allegation concerning Ms. Roe     This time Mr. Montague reported that he had been at a party and a girl he did not know came up to him and told him he had to leave right away because Jane was there. The girl yelled at him and said that he had raped Ms. Roe     Mr. Montague was completely taken aback because he had done no such thing. Moreover, Mr. Montague did not think Ms. Roe     herself, had accused him of raping her when they had met the previous fall and so he could not understand how this unknown girl could make such an accusation in a public place. A few days later, Mr. Montague received notice that a complaint had been filed with the UWC. Mr. Montague has been very upset about the accusation, which he believes is untrue and unfair, and potentially extremely harmful to him.

16

<u>Angela Gleason</u> is the Title IX Coordinator for Yale College. She first heard about the events involved in the current complaint when she met with Ms. Roe friend ^Rachel Rogers in connection with a completely unrelated incident. Ms. Rogers told her about Ms. Roe but did not reveal Ms. Roe name. Ms. Gleason encouraged Ms. Rogers to suggest that Ms. Roe come forward to talk with Ms. Gleason.

On October 19, 2014, Ms. Roe met with Ms. Gleason. Ms. Roe told Ms. Gleason that she told Mr. Montague she did not want to have intercourse but he continued anyway. Ms. Roe focused mainly on how she felt afterward. She told Ms. Gleason that on the night of this incident, after having nonconsensual sex with her, Mr. Montague had tried to manipulate her to make her feel differently by telling her how wonderful she was. Ms. Roe told Ms. Gleason that she had been seeing Mr. Montague around campus more this fall than last spring and that was difficult for her. Ms. Gleason listened to determine what Ms. Roe wanted from her and thought that it might be possible to arrange a no contact agreement without any formal complaint. Ms. Gleason told Ms. Roe that it is important for Mr. Montague to understand the University's consent policy and one option would be for Ms. Gleason to sit down with him, tell him there has been a complaint against him and suggest that he participate in training to make sure he does understand that policy. She told Ms. Roe that she would have to check to see if Mr. Montague was known to the Title IX Coordinators and would consult with other Coordinators in order to determine if it would be appropriate to address this incident with sensitivity training. She also agreed to report back to Ms. Roe about the results of any conversation with Mr. Montague.

After consultation with other Title IX Coordinators, Ms. Gleason found out that Mr. Montague had already participated in a full semester of sensitivity training and so it did not make sense to ask him to repeat that intervention. She met with Ms. Roe again on November 10, 2015 and informed her that Mr. Montague was aware of the University's policy on consent. Ms. Gleason told Ms. Roe that the incident she had reported was serious and could warrant a formal complaint. A Title IX Coordinator could bring the complaint if Ms. Roe was willing to participate as a witness. Ms. Roe agreed to cooperate on this basis.

<u>Discussion and Summary</u>

This case concerns a single episode of sexual intercourse that occurred after two or three prior casual sexual encounters between Ms. Roe and Mr. Montague. Ms. Roe claims that the incident in question took place over her express verbal objection and physical resistance. Mr. Montague claims that she consented to all of sexual activity that took place that night. The parties' descriptions of the events differ significantly. Ms. Roe reports at least three specific times that she told Mr. Montague that she did not want to "have sex," which he denies. She also reports that he apologized after having intercourse and said he knew she didn't want that; he also denies this statement. Ms. Roe reports many additional details about the night that Mr. Montague does not remember but does not deny, including that

17

they both left Mr. Montague's house after their sexual encounter, went to other places and then returned to Mr. Montague's house for the remainder of the night.

There are no direct witnesses to the sexual encounter between the parties on October 18-19, 2014. The central events occurred when the parties were alone outside Mr. Montague's house, in Mr. Montague's car and in his bedroom. No one else heard Ms. Roe tell Mr. Montague that she wanted to "hook up" but not "have sex." Ms. Roe friends' testimony does corroborate her statements in that all five friends I interviewed report that in the day or two after October 18, Ms. Roe told them that she had told Mr. Montague she did not want sex but he continued over her objection. Their testimony is consistent with her statements that she told him "no" many times, she tried to push him away physically and that he apologized afterwards. Ms. Roe written narrative (Exhibit D) is also consistent with her current statement, however the document is undated and cannot definitively be taken as a contemporaneous record. The text thread with Ms. (Exhibit F) also appears to be a contemporaneous written record but it is not date and time stamped and so cannot be confirmed as being written on October 19, 2014.

**Comment [SS14]:** Who provided this text thread?  Do each confirm that it is accurate and when it was written and received?

Both parties used the term "have sex" to describe having vaginal intercourse. Mr. Montague does not claim that he was confused by Ms. Roe use of the terms "hook up" in distinction to "have sex." Rather, he denies that she made any such stipulations about the activity she was consenting to. According to him, when she consented to intercourse on September 24 and October 18, 2014, she did so in response to his question whether she wanted to "have sex."

The parties also dispute the content and meaning of their discussion outside Davenport College on October 28, 2014. According to Ms. Roe she told Mr. Montague clearly that she had not wanted sexual intercourse on October 28 and he had ignored her. According to Mr. Montague she said only that she had not wanted to have sex and was disappointed in what happened, which he interpreted as a statement of her regret and not an accusation of wrongdoing. Mr. Montague's position is that Ms. Roe consented to intercourse on October 18 and that her behavior afterwards is inconsistent with her claim that she objected. He suggests that this panel should consider Ms. Roe return to Mr. Montague's house as evidence that she was not unhappy with what had happened earlier in the night.

It is for this panel to determine which party's version of the events of October 18-19, 2014 is more likely to be true.


Respectfully submitted,



Miriam Berkman, JD, LCSW
Impartial Fact-Finder


18

19

Confidential YALE00009001