UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

JACK MONTAGUE,
      Plaintiff,

v.

YALE UNIVERSTIY, ANGELA GLEASON,
JASON KILLHEFFER, and OTHERS
UNKNOWN,
      Defendants.

CIVIL ACTION
No. 3:16-cv-00885-AVC

## PLAINTIFF'S COMBINED MOTION AND MEMORANDUM IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF IMPROPERLY WITHHELD DOCUMENTS, AND REQUEST FOR HEARING

Now comes the Plaintiff in the above-captioned case and requests that this Court order Defendants to produce documents currently being withheld under the guise of the attorney-client privilege and/or the work product doctrine.[1]

Defendants are attempting to shield from disclosure documents that are critical to the claims in this case by improperly claiming attorney-client privilege and/or work product protection as to documents that fall into one or more of the following categories:

1) Documents whose privilege, if it ever existed, has been waived;

2) Documents for which there is no showing that the communications were made for the purpose of giving or receiving legal advice; and

3) Documents in which there is disclosure to third parties.

Defendants have failed to provide any justification for withholding these documents aside from bare-bones privilege logs that do no more than assert, in conclusory terms, that the

---

[1] The parties have conferred and have been unable to reach an agreement concerning disclosure.

documents logged therein are privileged because they represent the "advice" of one or more members of Defendant Yale University's Office of General Counsel ("OGC"), or that they constitute "work product."[2] For the reasons set forth below, Defendants have not and cannot meet their burden of proof as to either of these claims.

## FACTUAL AND PROCEDURAL BACKGROUND

This lawsuit was precipitated by Plaintiff Jack Montague's ("Montague") unlawful and improper expulsion from Yale University ("Yale" or the "University") on or around February 24, 2016, for alleged sexual misconduct. After trying unsuccessfully to resolve this dispute without resort to litigation, Montague filed the complaint in this case on June 9, 2016. The operative complaint, the Amended Complaint, was filed on January 25, 2017.

In brief, at the time of Montague's expulsion, Yale was in the midst of dealing with an ongoing problem related to its handling of sexual misconduct complaints. The Office of Civil Rights ("OCR") had cited Yale for its lack of prompt and equitable grievance procedures and its insufficient responses to complaints of sexual harassment. In response, Yale revamped its entire process for dealing with such complaints by creating the University Wide Committee on Sexual Misconduct ("UWC") and adopting *Procedures Governing the University Wide Committee on Sexual Misconduct* ("*UWC Procedures*"), which set out the rights and responsibilities of the University, accuser, and accused in the case of a complaint of sexual misconduct. Even with these reforms, however, students and alumni continued to question what they perceived to be Yale's inadequate and, in some cases, offensive responses to complaints of sexual harassment, and they publicly chastised Yale for its shortcomings in this regard.

---

[2] The privilege logs which reflect documents at issue in this motion are attached hereto at <u>Ex. A</u> (YALE004), <u>Ex. B</u> (YALE005), and <u>Ex. C</u> (YALE006).

2

It was against this backdrop that Defendants misled and pressured a female Yale undergraduate, Jane Roe ("Roe") – against her original wishes – to participate in a formal UWC complaint process against Montague accusing him of sexual assault. In September of 2015, Roe's suitemate reported to Defendant Angela Gleason ("Gleason"), a Senior Title IX Coordinator at Yale, that Roe and Montague had sexual intercourse in October of 2014 which Roe later claimed was nonconsensual. Gleason urged Roe's suitemate to convince Roe to come forward and report the incident. When Roe's suitemate told Gleason that Roe was still hesitant to come forward with her complaint, Gleason told her to pass along to Roe that Roe could make an informal, anonymous complaint if she wished. Gleason explained that this would allow her (Gleason) to have a discussion with Montague about the October 2014 incident and recommend training about communication and sexual consent, and the matter would be resolved.

Roe – who made clear that she did not want to engage in a formal UWC complaint process – was satisfied with that course of action. She went to talk with Gleason on October 19, 2015, and they discussed implementing this plan. Pursuant to the plan, Gleason would contact Montague, meet with him to discuss the fact that his behavior did not "meet [Yale's] expectations," and recommend sensitivity training sessions at SHARE. Roe confirmed, in a late October e-mail to Gleason, that she wished to move forward in this manner.

On or about November 2, however, Gleason spoke with Defendant Jason Killheffer, Yale's Senior Title IX Coordinator, about the proposed resolution to Roe's informal complaint against Montague. They decided that Gleason would wait to contact Montague until Gleason and Killheffer met with Susan Sawyer ("Sawyer"), Yale's Associate General Counsel, and Stephanie Spangler ("Spangler"), Yale's Deputy Provost who supervises the activities of Yale's Title IX coordinators.

This meeting occurred two days later, on November 4, 2015.[3] At the meeting, the group discussed the fact that Montague was involved in a prior UWC proceeding and had, as a result of that proceeding, been ordered to participate in SHARE training on "sexual harassment and gender sensitivity."[4] The group then collectively decided that a formal complaint of sexual misconduct should be filed against Montague and that they would urge Roe to abandon the agreed-upon informal resolution and instead participate in the formal process as the "primary witness." Indeed, they underlined needed Roe's agreement to participate in the formal process, because absent that agreement they would have been unable to move forward with a University-initiated complaint. Right after the meeting, Gleason wrote to Roe to tell her there was a "new development in the case" and she wanted to meet with Roe to discuss it.

Gleason and Roe met two days later, and Gleason revealed to Roe the "new development": Montague "had already been given a recommendation for training after a previous complaint."[5] Gleason then told Roe she would "not be doing her job if she did not take

---

[3] Gleason took notes at the meeting.

[4] The prior proceeding – "UWC I" – stemmed from an incident on the last day of Montague's freshman year in which he put a paper plate down the shirt of a graduating female student. He was intoxicated at the time and was, by all accounts, annoyed by something the student said to him and his friend. He did not make skin-to-skin contact with the student, and the student described her interaction with Montague as "peripheral."

[5] Roe now denies Gleason told her that Montague was the subject of a prior complaint, but the contemporaneous documents suggest Roe is changing her story in an effort to align her testimony with Defendants' revisionist version of events. The UWC II fact-finder, Miriam Berkman, wrote in her report that Roe told her Gleason revealed that Montague was the subject of a former complaint; she wrote, in a comment on her report, that her recitation of Roe's motivation for agreeing to participate in the formal complaint process – hearing about the prior complaint against Montague – was "accurate" (Draft Fact Finder's Report, Plaintiff's Deposition Exhibit No. 69, p. 8); and she wrote, in an e-mail to the UWC Chairman, the UWC Secretary, and one of Yale's attorneys, that "[Roe] didn't really know what [training] had been given before except that it was related to a previous incident and the fact that it had been given made it inappropriate to send him for more training now." (Plaintiff's Deposition Exhibit 73, p. 2.) It is

4

more serious action," and asked Roe whether she would participate in a formal complaint against Montague. At the end of Gleason's conversation with Roe, Gleason invited UWC Chair David Post ("Post") to join their conversation so that Post could explain to Roe the formal complaint process.

Yet in fact, contrary to what Gleason told Roe, Mr. Montague <u>never</u> received the SHARE training. Moreover, the *UWC Procedures* and the *Provost's Statement on Confidentiality of UWC Proceedings* strictly prohibited Gleason from disclosing to Roe any information concerning the prior UWC proceeding, including its existence, its outcome, or any discipline imposed as a result of that outcome (which, of course, was the "sensitivity training" that Gleason disclosed to Roe).

As a direct result of Gleason's disclosures and misrepresentations – which led Roe to believe this was not a "one-time mistake" on Montague's part – Roe agreed to allow Yale's Title IX office to bring a formal complaint of sexual misconduct against Montague, which initiated the UWC proceedings ("UWC II"). On November 18, 2015, Jason Killheffer filed a formal complaint of sexual assault against Montague and on November 30, 2015, UWC Secretary Aley Menon ("Menon") notified Montague that he was the subject of the complaint. Shortly thereafter, Post appointed Miriam Berkman as the impartial fact-finder and the fact-finding process began. Upon its conclusion, Post appointed himself as chairman of the hearing panel that

---

far more likely that this impartial fact-finder's contemporaneous writings concerning what Roe told her are more accurate and more credible than the calculated testimony of witnesses who have a personal stake in the outcome of this litigation.

would hear the evidence and make a report of its findings and recommendations of penalty to Dean Jonathan Holloway, the ultimate decision-maker.[6]

The UWC II hearing took place on January 21, 2016, and the panel issued its report and recommendations to Dean Holloway on February 1, 2016, finding, by a preponderance of the evidence, that Montague sexually assaulted Roe in violation of Yale's *Sexual Misconduct Policies*. On February 10, 2016, Dean Holloway issued his decision adopting the panel's findings that Montague had "sexually assaulted" Roe and expelling Montague from Yale. Montague appealed the expulsion to the Provost, but the Provost summarily denied his appeal on February 24, 2016.

Throughout the UWC II proceedings, Menon, Post, and Sawyer e-mailed amongst themselves regarding the UWC II process. Sawyer, although Associate General Counsel in title, played a largely administrative, non-legal role in this process. For instance, she helped review and revise drafts of the UWC II panel report, provided evidence to the fact-finder, and participated in other administrative decisions, including whether to extend deadlines. Sawyer also edited drafts of the fact-finder's report and corresponded with the fact-finder (who was not a Yale employee) about the UWC II process.

Yale has withheld a substantial number of documents and communications to and from attorneys at the OGC – as well as documents and communications on which members of the

---

[6] Post denied, at his deposition, that he had any knowledge of Roe's informal complaint against Montague, or any knowledge that there was a plan afoot to get Roe to drop the informal complaint and instead participate in a University-initiated formal complaint. However, Post took part in an e-mail chain on November 6, 2015 – the same day Gleason met with Roe – titled "update," in which the participants clearly discussed Gleason's meeting with Roe. This e-mail chain, if produced in unredacted form, will likely shed light on the breadth of Post's knowledge and his involvement in getting Roe to go along with Yale's plan to formally charge Montague..

OGC were copied – based on a purported attorney-client privilege. It is these documents that are the subject of the instant motion.

## **LEGAL STANDARDS**

*Attorney-Client Privilege*

"The attorney-client privilege protects communications between client and attorney when made in confidence for the purpose of seeking or giving legal advice." *Ullman v. State*, 23 Conn. 698, 711 (1994); *accord Standard Chartered Bank PLC v. Ayala Intern. Holdings (U.S.), Inc.*, 111 F.R.D. 76, 79 (S.D. N.Y. 1986), citing *Upjohn v. United States*, 449 U.S. 383, 391 (1981) (privilege "applies to communications made in confidence by a client to an attorney for the purpose of obtaining legal advice. It also applies to confidential communications made by the legal attorney to the client if such communications contain legal advice or reveal confidential information on which the client seeks legal advice").

"The party asserting the attorney-client privilege bears the burden of establishing all of the elements of the privilege." *Loftis v. Amica Mut. Ins. Co.*, 175 F.R.D. 5, 8 (D. Conn. 1997), citing *State v. Hanna*, 150 Conn. 457, 466 (1963); *accord United States v. Adlman*, 68 F.3d 1495, 1500 (2nd Cir. 1995). "This burden can only be met by an evidentiary showing based on competent evidence, and cannot be discharged by mere conclusory or ipse dixit assertions." *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 470 (S.D. N.Y. 1993) (internal quotation marks and citations and external citations omitted)).[7] "As for the substance of what

---

[7] Relatedly, if the party provides a privilege log, the standard for testing its adequacy is "whether, as to each document, it sets forth specific facts that, if credited, would suffice to establish each element of the privilege or immunity that is claimed. The focus is on the descriptive portion of the log, and not on the conclusory invocations of the privilege or work-product rule . . . ." *Bowne*, 150 F.R.D. at 474 (citations omitted).

must be proven," the court "look[s] to the elements of the privilege or immunity that is invoked." *Id*.

In Connecticut,[8] "[t]o invoke the attorney-client privilege, a communication must satisfy four criteria: (1) the attorney participating in the communication must be acting in a professional capacity as an attorney; (2) the communication must be between the attorney and the client; (3) the communication must be for the purpose of providing legal advice; and (4) the communication must be made in confidence." *Kent Literary Club v. Wesleyan University*, 2016 WL 2602274, *2 (Conn. Super. Apr. 12, 2016), citing *Lash v. Freedom of Information Comm'n*, 300 Conn. 511, 516 (2011) (additional citation omitted); *see also Brennan Ctr. For Justice at N.Y. Univ. Sch. of Law v. DOJ*, 697 F.3d 184, 207 (2nd Cir. 2012) (setting forth elements of claim of attorney-client privilege in Second Circuit). When applied in the corporate context, the criteria are similar: "(1) the attorney must be acting in a professional capacity for the [corporation]; (2) the [communication] must be made to the attorney by current employees or officials of the [corporation]; (3) the [communication] must relate to the legal advice sought by the [corporation] from the attorney; and (4) the [communication] must be made in confidence." *Shew v. Freedom of Information Com'n*, 245 Conn. 149, 159 (1998) (citation omitted). "Any ambiguities as to whether the[s]e essential elements have been met are construed against the party asserting the privilege." *Koumoulis v. Independent Financial Marketing Group, Inc.*, 295 F.R.D. 28, 38 (E.D. N.Y. 2013), citing *Scholtisek v. Eldre Corp.*, 441 F. Supp. 2d 459, 462 (W.D. N.Y. 2006 (listing cases) (additional citations omitted).

---

[8] "Connecticut law defines and governs the application of the attorney-client privilege in this diversity action." *Loftis*, 175 F.R.D. at 8, citing *Dixon v. 80 Pine St. Corp.*, 516 F.2d 1278, 1280 (2nd Cir. 1975); Rule 501, Fed. R. Evid.

It is important to recognize that "[n]ot every communication between an attorney and client falls with the [attorney-client] privilege." *Kent Literary Club*, 2016 WL 2602274 at *2, quoting *Olson v. Accessory Controls & Equip. Corp.*, 254 Conn. 145, 157 (2000) (additional citation omitted). "[T]he mere fact that a communication is made directly to an attorney, or an attorney is copied on a memorandum, does not mean that the communication is necessarily privileged." *U.S. Postal Service v. Phelps*, 852 F. Supp. at 160 (citations omitted). Similarly, "[a] communication from attorney to client solely regarding a matter of fact" is not regarded as privileged, absent some evidence that it is "inextricably linked to the giving of legal advice." *Ullman*, 230 Conn. at 713 (additional citation omitted).

Notably, "courts must be wary that the involvement of an attorney is not being used simply to shield corporate communications from disclosure." *In re Rivastigmine Patent Litig.*, 237 F.R.D. 69, 80 (S.D. N.Y. 2006). Although the attorney-client privilege is the "oldest of the privileges for confidential communications known to the common law," *Upjohn* at 389, it also "stands in derogation of the public's 'right to every man's evidence,' and as 'an obstacle to the investigation of truth[.]'" *Bowne*, 150 F.R.D. at 482 (citations omitted). Thus, "[b]ecause of its preclusive nature on discovery, the attorney-client privilege is to be narrowly construed to protect the communication of legal advice." *Kent Literary Club*, 2016 WL 2602274 at *2, citing *PSE Consulting, Inc. v. Frank Mercede & Sons, Inc.*, 267 Conn. 279, 330 (2004) (additional citation omitted); *accord Amica Mut. Ins. Co. v. Fasarella Pro Painting & Design*, LLC, 2011 WL 3671961, *2 (Conn. Super. July 2, 2011) ("since the rule tends to prevent a full disclosure of the truth in court, it should be strictly construed" (citation omitted)); *Valente v. Lincoln Nat. Corp.*, 2010 WL 3522495, *2 (D. Conn. 2010) ("because there is a countervailing public interest in ensuring materials relevant to legal disputes are discoverable, courts construe the attorney-

client privilege narrowly, and apply it 'only where *necessary* to achieve its purpose'" (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976)); *Bowne*, 150 F.R.D. at 473 ("enforcement of a claim of privilege acts in derogation of the overriding goals of liberal discovery and adjudication of cases on their merits. It is for this reason that privileges are disfavored and generally to be narrowly construed" (citing cases)); *NXIVM Corp. v. O'Hara*, 241 F.R.D. 109, 125-126 (N.D. N.Y. 2007) ("The attorney-client privilege is not given broad, unfettered latitude to every communication with a lawyer, but is to be narrowly construed to meet this narrowest of missions" (citing *Fisher*, 425 U.S. at 403 (additional citations omitted)).

In fact, this court has determined that **Connecticut law embraces the narrowest possible approach to the privilege**: "an attorney's communications with the client are not privileged unless they reveal client confidences." *Loftis*, 175 F.R.D. at 10; *accord Walsh v. Northrop Grumman Corp.*, 165 F.R.D. 16, 18 (E.D. N.Y. 1996) (Second Circuit "remains committed to the narrowest application of the privilege such that it protects only legal advice that discloses confidential information given to the lawyer by the client"); *accord Koumoulis*, 295 F.R.D. at 39, citing *Cuno, Inc.*, 121 F.R.D. at 200 (the attorney-client privilege "is confined within its narrowest possible limits").

### *Work Product Protection*

"Federal law governs the protection afforded under the work product doctrine in federal courts." *Loftis*, 175 F.R.D. at 11, quoting *EDO Corp. v. Newark Ins. Co.*, 145 F.R.D. 18, 21 (D. Conn. 1992). Accordingly, the court must "look to Fed. R. Civ. P. 26(b)(3) for guidance. The rule defines qualified immunity from discovery for documents 'prepared in anticipation of litigation or trial.'" *Bowne*, 150 F.R.D. at 471. "In interpreting Rule 26(b)(3), the courts have generally held that it 'applies only to documents prepared principally or exclusively to assist in

anticipated or ongoing litigation.'" *Id.* at 471 (citing cases); *accord Tudor Ins. Co. v. Stay Secure Const. Corp.*, 209 F.R.D. 37, 40 (S.D. N.Y. 2013) ("The party asserting the protection must show 'that the material it seeks to protect (1) was prepared in anticipation of litigation and (2) was prepared by or for a party, or by his representative'" (citations omitted)).

"The work-product doctrine," like the attorney-client privilege, "does not extend to every document generated by an attorney; it does not shield from disclosure everything a lawyer does." *NVIXM Corp.*, 241 F.R.D. at 127 (citation omitted). "Thus, if a party prepares a document in the ordinary course of business, it will not be protected even if the party is aware that the document may also be useful in the event of litigation." *Bowne*, 150 F.R.D. at 471 (internal quotation marks and citations omitted).

"When assessing whether a document was prepared in anticipation of litigation, courts consider 'if in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained *because of* the prospect of litigation.'" *Koumoulis*, 295 F.R.D. at 39 (emphasis in original), quoting *United States v. Adlman*, 134 F.3d 1194, 1202 (2nd Cir. 1998) (internal citation marks and additional citation omitted); *Tudor Ins. Co.*, 209 F.R.D. at 40 (same). Moreover, "the mere relation of documents to litigation does not automatically endow those documents with privileged status." *Id.* (citations omitted). "Even where the document 'might also help in preparation for litigation,' it will not be protected by the work-product doctrine if it was 'prepared in the ordinary course of business' or 'would have been created in essentially similar form irrespective of the litigation.'" *Id.*, quoting *Shinnecock Indian Nation*, 652 F. Supp. 2d at 362 (additional citation omitted); *accord Tudor Ins. Co.*, *supra* ("Whether work product protection applies turns on whether the material would have been prepared irrespective of the expected litigation" (internal quotation marks and citation

omitted). *See also id.* at 41 ("there is no reason to believe that [investigator's] reports would not have been prepared in the same form even if the [legal] actions had not been filed"); *OneBeacon Ins. Co.*, 2006 WL 3771010, *6 (insurance claim investigation documents were not protected because they were created in the ordinary course of business).[9]

"Because application of the work product doctrine tends to prevent a full disclosure of facts relevant to the truthful disposition of the case, and because the rule is an exception to the general rule permitting discovery of 'documents and tangible things,' the rule should be narrowly interpreted." *Carrier Corp.*, 1992 WL 139778 at *7 (internal citation omitted).

Just as with a claim of attorney-client privilege, the party invoking the doctrine bears "the burden of establishing that the documents at issue were prepared in anticipation of litigation." *Loftis*, 175 F.R.D. at 11, citing *Helt v. Metropolitan Dist. Comm'n*, 113 F.R.D. 7, 12 (D. Conn. 1986); *Koumoulis*, 295 F.R.D. at 39 ("As with the attorney-client privilege, the party asserting the work-product privilege 'bears the heavy burden of establishing its applicability'" (quoting *In re Grand Jury Subpoena Dated July 5, 2005*, 510 F.3d 180, 183 (2nd Cir. 2007)).

## ARGUMENT

### I.   *Waiver of Privilege*

Defendants have improperly redacted certain documents on the basis of attorney-client privilege when it is clear that if a privilege ever existed as to those documents (and it is not so clear it did), it has been waived by the detailed testimony of the individual Defendants.

---

[9] "In cases involving attorney-assisted investigations, the court must make a fact-specific inquiry to determine if and when an investigation changed from being within the ordinary course of business to being because of litigation." *Koumoulis*, 295 F.R.D. at 40 (internal quotation marks and citation omitted).

"The attorney-client privilege implicitly is waived when the holder of the privilege has placed the communication at issue[.]" *Kent Literary Club*, 2016 WL 2602274 at *4, quoting *Hutchinson v. Farm Family Casualty Inc., Co.*, 273 Conn. 33, 38 (2005). This exception is invoked

> when a party specifically pleads reliance on an attorney's advice as an element of a claim or defense, **voluntarily testifies regarding portions of the attorney-client communication**, or specifically places at issue, in some other manner, the attorney-client relationship. In those instances, the party has waived the right to confidentiality by placing the content of the attorney's advice directly at issue because the issue cannot be determined without an examination of that advice.

*Id*. (emphasis added); *accord Bowne*, 150 F.R.D. at 478 ("The attorney-client privilege is waived if the holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter or communication" (citations omitted)). Further, **voluntary partial disclosure of attorney advice waives the privilege with respect to the remainder of the advice**. *Kent Literary Club*, 2016 WL 2602274 at *8, citing *Beverly Hills Concepts v. Schatz, Schatz, Ribicoff & Kotkin*, No. CV 89-0369864-S, 1995 Conn. Super. LEXIS 3617 (Dec. 18, 1995); *Export-Import Bank of the U.S. v. Asia Pulp & Paper Co., Ltd*., 232 F.R.D. 103, 114 (S.D.N.Y. 2005) ("The client's offer of his own . . . testimony as to a specific communication to the attorney is . . . a waiver as to all other communications to the attorney on the same matter" (citations omitted)); *Bowne*, 150 F.R.D. at 485 ("disclosure in the context of litigation – whether by trial or deposition testimony or by production of documents – will result in an implied waiver broader than the original disclosure itself" (citing cases)). *See also* Fed. R. Civ. P. 502(a) (waiver extends to undisclosed communications where they ought in fairness to be considered with the disclosed communications).

In the present case, Defendants have redacted, as privileged, notes from a meeting that took place between the two named individual defendants (Angela Gleason and Jason Killheffer), their immediate supervisor (Spangler), and an attorney from the OGC (Sawyer). (*See* YALE00000845, attached hereto at Ex. D.) Defendants claim privilege on the basis that the meeting notes reveal a "communication between client and lawyer re UWC II proceeding." (*See* YALE005 Privilege Log, attached hereto at Ex. B, line 10.) Yet both Gleason and Killheffer already testified, in their depositions, to the substance of the communications during the meeting at issue – including the facts that were discussed and the decisions that were made, in concert with general counsel, at the meeting. Specifically, Gleason and Killheffer revealed that:

- The purpose of the meeting was to discuss "the Jack Montague case" (*See* Ex. E[10], Gleason Depo. at 119; *see also* Ex. F[11], Killheffer Depo. at 109: the purpose of the meeting was to "review the allegations with Stephanie and with Susan");

- That "whatever was discussed, everyone contributed to" (Ex. E, Gleason Depo. at 121);

- That the question was "what the right approach to this is" (Ex. F, Killheffer Depo. at 110);

- That the four people present at the meeting "reviewed the allegations and the information that Angie had gathered. We reviewed the fact that Angie had discussed with [Roe] that [Roe] was interested in pursuing an informal resolution. We reviewed the fact that the seriousness of the allegations in this matter and the fact that Jack Montague had previously been through the UWC complaint process, had previously been found to have violated our sexual misconduct policies, and most importantly, the seriousness of these allegations made a formal complaint a more appropriate solution than an informal complaint." (Ex. F, Killheffer Depo. at 111; *see also* Ex. E, Gleason Depo. at 125: "I believe it was also discussed that there had been not only sensitivity training, but a period of probation and the fact that there had been a finding in a previous UWC case, that it wouldn't be the plan going forward to recommend

---

[10] Pages of the deposition transcript of Defendant Angela Gleason cited herein are attached at Ex. E.

[11] Pages of the deposition transcript of Defendant Jason Killheffer cited herein are attached at Ex. F.

sensitivity training again, as a voluntary course of action, which is what I would have recommended in the case that [Roe] requested");

- The meeting attendees decided Defendant Gleason would "go[] back to [Roe] and discuss[] with [Roe] whether she would be willing to participate in a formal complaint" (Ex. F, Killheffer Depo. at 112; *see also*, *id.* at 114);

-  The meeting attendees "understood [Roe's] desire to be anonymous," and they "talked about the fact that you can't be anonymous in a formal complaint so she would have to explain that to her. But Title IX Coordinator could bring the complaint if she would be willing to speak to a fact finder" (Ex. F, Killheffer Depo. at pp. 115-116); and

- At the end of the meeting, the group had made a decision to bring a formal complaint against Jack Montague if Roe agreed to participate in it (Ex. F, Killheffer Depo. at 120).

Consequently, if the notes from this meeting were ever privileged – and it is not clear that they ever were, since Gleason could not recall whether the notes reflected legal advice (Ex. E, Gleason Depo. at 121), nor even what kind of legal advice they might have been seeking from the OGC (Ex. E, Gleason Depo. at 120) – that privilege has been waived by the detailed disclosure of the subject matters discussed at the meeting and the course of action that was formulated, in consultation with OGC, as a result. *Kent Literary Club*, 2016 WL 2602274 at *4.

Furthermore, by revealing these details about the meeting and the resulting plan, Defendants have also waived any claim of privilege with respect to all communications on the same subject matter. *Id.* at *8 (citation omitted); *Export-Import Bank of the U.S.,* 232 F.R.D. at 114; *Bowne*, 150 F.R.D. at 485 ("it [is] sufficient, for a waiver as to subjects discussed in the disclosed conversations, that the privilege holder has voluntarily revealed only some of the communications on the subject and has withheld others" (citations omitted)). These communications include the fact-finder's summary of her meeting with Defendant Gleason in which Gleason appears to have described the November 4, 2015 meeting to the fact-finder (*see* Ex. G at YALE00011984) and the e-mail chains between the meeting attendees on November 6,

2015 (*see* YALE00015947-00015948, YALE00015953-00015954 attached at Ex. H), which

occurred within hours of Gleason meeting with Roe to effectuate the plan upon which Gleason,

Killheffer, Spangler, and Sawyer agreed at the November 4 meeting (*i.e.*, to convince Roe to

abandon her informal complaint and participate in the formal complaint process as a primary

witness). These e-mails, which Defendants produced to Plaintiff in redacted form, quite clearly

pertain directly to the topics discussed at the November 4, 2016 meeting, and, as discussed

above, any privilege with regard to those topics has been waived by Defendants' own detailed

testimony.[12]

One final point bears noting here: these documents are central (indeed, potentially

crucial) to the litigation, and it appears Defendants are improperly using the attorney-client

privilege as a shield to prevent disclosure of what is obviously highly relevant information. As

set forth above, there is no dispute that Gleason, Killheffer, Spangler and Sawyer met on

November 4, 2015 to discuss Mr. Montague's prior disciplinary history; that, as a result of that

discussion, they jointly formed a plan to convince Roe to abandon her informal complaint and

participate as a witness in a University-initiated formal complaint against Montague; and that

---

[12] Indeed, counsel appears to have been merely *copied* on one of these e-mail chains (Ex. H at
YALE00015947-00015948); the two e-mail authors are Defendant Gleason and David Post.
"[T]he mere fact that a communication is made directly to an attorney, or an attorney is copied
on a memorandum, does not mean that the communication is necessarily privileged." *U.S. Postal
Service v. Phelps*, 852 F. Supp. at 160 (citations omitted); *In re Grand Jury Subpoena*, 599 F.2d
504, 511 (2nd Cir. 1979) ("Participation of the general counsel does not automatically cloak the
investigation with legal garb"). "The information-holder's motive for the communication, to the
extent it can be discerned from the document, . . . is an important consideration." *Id*. For
example, "[i]f the information-holder will communicate with the attorney even if the privilege
does not exist, or if a nonlegal objective is sufficient to stimulate communication with the
attorney, then there is no reason for the privilege to attach." *Id*. (internal quotation marks and
citation omitted). This is yet another reason the document has been improperly redacted: the
communication was clearly meant to "update" the recipients on the status of Gleason's meeting
with Roe – it was not meant to solicit legal advice.

Gleason subsequently met with Roe in an attempt to effectuate that plan. Exactly what Gleason said to Roe is a hotly contested issue, however (*see*, *e.g.*, note 5, *supra*), and it is entirely possible the contemporaneous e-mails and other documents Defendants are currently withholding will reveal the truth. While Defendants may have an interest in obfuscating that truth, Plaintiff's interest in uncovering it should ultimately prevail. *See Bowne*, 150 F.R.D. at 473, 482 (the attorney-client privilege often "stands in derogation of the public's 'right to every man's evidence,' and as 'an obstacle to the investigation of truth[]," and it is for these reasons that the privilege is "disfavored and generally to be narrowly construed" (citations omitted)); *Amica Mut. Ins. Co. v. Fasarella*, 2011 WL 3671961 at *2  ("since the rule tends to prevent a full disclosure of the truth in court, it should be strictly construed" (citation omitted)); *Valente*, 2010 WL 3522495 at *2 ("because there is a countervailing public interest in ensuring materials relevant to legal disputes are discoverable, courts construe the attorney-client privilege narrowly, and apply it 'only where *necessary* to achieve its purpose'" (quoting *Fisher*, 425 U.S. at 403).

On this basis, Plaintiff moves to compel redacted communications appearing at the following Bates numbers: YALE00011984 (Ex. G); YALE00000845 (Ex. D); YALE00015947-00015948 and YALE00015953-00015954 (Ex. H).

## II.      *Primary Purpose Not Predominantly Legal*

Defendants have also improperly redacted or withheld a number of documents on which general counsel either commented or was copied, but whose primary purpose is clearly not predominantly legal.

It is axiomatic that the attorney-client privilege "only applies when the lawyer is acting as a lawyer, *i.e.*, giving legal advice." *Standard Chartered Bank*, 111 F.R.D. at 80, citing *In Re Grand Jury Subpoena Duces Tecum Dated Sep. 15, 1983*, 731 F.2d 1032, 1037 (2nd Cir. 1984)

(additional citations omitted). "The privilege does not protect non-legal communications, including business and technical advice, unless the communications are intended to meet problems which can be characterized as predominantly legal." *Carrier Corp.,* 1992 WL 139778 at *3, citing *Cuno, Inc.*, 121 F.R.D. at 203-04; *In re Cnty. of Erie*, 473 F.3d 413, 421-422 (2nd Cir. 2007) ("When an attorney is consulted in a capacity other than as a lawyer, as (for example) a policy advisor, media expert, business consultant, banker, referee or friend, that consultation is not privileged" (citation omitted)); *Valente*, 2010 WL 3522495 at *2 (same); *U.S. Postal Service v. Phelps* at 160 (same); *Standard Chartered Bank*, 111 F.R.D. at 80 (same); *NXIVM Corp*., 241 F.R.D. at 126 (same).

"Defining the scope of the [attorney-client] privilege for in-house counsel is complicated by the fact that these attorneys frequently have multi-faceted duties that go beyond traditional tasks performed by lawyers. House counsel have increased participation in the day-to-day operations of large corporations." *U.S. Postal Service v.*, 852 F. Supp. at 160 (citation omitted). Because this "day-to-day involvement in their employer's affairs may blur the line between legal and non-legal communications," judges should "cautiously and narrowly apply the privilege . . . lest the mere participation of an attorney be used off seal off disclosure." *ABB Kent-Taylor, Inc. v. Stallings & Co., Inc.*, 172 F.R.D. 53, 55 (W.D. N.Y. 1996) (internal quotation marks and citations omitted); *see also First Chicago Intern. v. United Exchange Co. Ltd.*, 125 F.R.D. 55, 57 (S.D. N.Y. 1989) ("extending the privilege to corporations risks creating intolerably large zone of sanctuary since many corporations continuously consult attorneys. Any standard . . . must strike a balance between encouraging corporations to seek legal advice and preventing corporate attorneys from being used as shields to thwart discovery")*; Valente*, 2010 WL 3522495 at *3 (narrow construction of privilege is "necessary to protect against the possibility that corporate

clients could attempt to hide mountains of otherwise discoverable information behind a veil of

secrecy using in-house legal departments as conduits of otherwise unprivileged information"

(citations omitted)); *Carrier Corp. v. Home Ins. Co.*, 1992 WL 139778, *3 (Conn. Super. June

12, 1992) ("Legal departments are not citadels into which public, business, or technical

information may be placed to defeat discovery and thereby ensure confidentiality" (quoting *SCM*

*Corp. v. Xerox Corp.* at 515 (1976)).

  According to the Connecticut Supreme Court, the proper approach is "to apply the

[attorney-client] privilege where the communications at issue are inextricably linked to the

giving of legal advice." *Kent Literary Club*, 2016 WL 2602274, *3, quoting *Olson*, 254 Conn. at

164. That is, if the primary purpose of a document "is to solicit legal advice based on the

information supplied, the privilege applies." *Id*., citing *Olson*, *supra*, at 163 (additional citation

omitted). In other words, "a communication between a corporation's employee and counsel

should only be shielded if the communication would not have been made *but for the client's need*

*for legal advice or services*." *First Chicago Intern.,* 135 F.R.D. at 57 (emphasis added) (citation

omitted); accord *Valente*, 2010 WL 3522495 at *3 ("under the predominant purpose test, it is not

enough to show that a communication from corporate personal [sic] to in-house counsel

communicated factual information that might become relevant to the future rendering of legal

advice. Instead, the communication must also either explicitly or implicitly seek specific legal

advice about factual information"). In simple terms, "legal advice must be predominate for the

communications to be protected[.]" *Kent Literary Club*, 2016 WL 2602274, *3, quoting *North*

*Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1127 (N.D. Cal. 2003).

  Here, the vast majority of the UWC-related documents Defendants have either redacted

or withheld appear to involve counsel acting in a lay or business role as opposed to a legal role.

(Defendants have characterized counsel's role in the UWC process as that of "procedural advisor" and have claimed this involves providing "legal advice" on the case (*see* <u>Ex. I</u>[13], Post Depo. at 30-31; <u>Ex. J</u>[14] Menon Depo. at 182-183), but, as set forth below, the available documentary evidence concerning counsel's involvement in the process severely undercuts this claim.)

Because Defendants have produced certain of the same documents multiple times, and, puzzlingly, have redacted some of them but not others, Plaintiff has actually seen some of the so-called "legal advice" Defendants have redacted, and it is nothing more than ordinary editorial commentary. For example, Defendants redacted counsel's comments on one draft UWC II Panel Report (*see* <u>Ex. K</u>, YALE00012403-00012412), but neglected to redact them on another draft of the panel report (*see* <u>Ex. L</u>, YALE00008970-00008978). Counsel's comments – redacted in the former but appearing in full in the latter – are as follows:

- "Did he say he asked her and she consented verbally or that she indicated consent through behavior? Or through both. It he said he asked her it seems odd that the panel asked him how he had obtained affirmative consent." (<u>Ex. L</u> at YALE00008973);

- "Or was this one of the times she asked?" (<u>Ex. L</u> at YALE00008974);

- "This needs some clarifying in light of the way you report this testimony on consent." (<u>Ex. L</u> at YALE00008974);

- "This is the first time you introduce the previous instance of sexual intercourse. Perhaps this should be mentioned sooner?" (<u>Ex. L</u> at YALE00008975);

- "Ah, now I get this. Can you make the point that his testimony is contradictory earlier in the report?" (<u>Ex. L</u> at YALE00008977); and

- "Let's discuss this paragraph" (<u>Ex. L</u> at YALE00008977).

---

[13] Pages of the deposition transcript of David Post cited herein are attached at <u>Ex. I</u>.

[14] Pages of the deposition transcript of Aley Menon cited herein are attached at <u>Ex. J</u>.

These comments are not remotely legal in nature, let alone "inextricably linked to the giving of legal advice." *Kent Literary Club*, 2016 WL 2602274 at *3. Rather, it is clear that counsel's role was one that any member of the UWC/Title IX team could have performed (and, indeed, *did* perform, as evidenced by the fact that Menon, Post, and other panel members all similarly reviewed and edited the draft reports). *See id.* ("when an activity could be handled by a layperson as easily as a lawyer, the privilege will not apply" (citing *Bird v. Penn. Cent. Co.*, 61 F.R.D. 43, 47 n.3 (E.D. Pa. 1973) ("[i]t is unnecessary to reach the issue of whether some or all of these reports, correspondence, etc. prepared by counsel were not protected because counsel were acting as lay claim investigators at the time")). Counsel merely edited the factual information contained in the panel report, and as such, no attorney-client privilege exists. *See In re 3 Com Corp. Sec. Litig.*, No. 89 Civ. 20480(WAI)(PVT), 1992 WL 456813, *2 (N.D. Cal. Dec. 10, 1992) (where attorney's edits to draft document were "related to factual information, not legal advice," the drafts were not protected by the attorney-client privilege).

By way of similar example, Defendants produced counsel's comments, in full, on the draft fact-finder's reports (*see*, *e.g.*, Ex. M, YALE00008983-00009001), but redacted three of those same comments when the fact-finder copied them, and responded directly to them, in an e-mail to counsel and to the UWC Chairman and Secretary (*see* Ex. N, YALE00012942-00012943[15], where points 1, 2, 3 and 4 correspond with four comments made by counsel on the

---

[15] Defendants produced multiple drafts of this e-mail chain, some more heavily redacted than others (*see*, *e.g.*, Ex. O YALE00012313-00012314). The fact that the redacted text (visible in the less redacted version) is so clearly not legal advice further supports the general argument that Defendants are heavily over-redacting the documents they have produced. Additional examples of this same phenomenon – where the unredacted version Defendants produced belies any claim of privilege on the redacted (or withheld) version(s) – can be found here:

draft report). Just as with the UWC II panel report comments, these comments are nothing more than edits and/or questions related to factual information, and cannot properly be considered privileged. *In re 3 Com Corp. Sec. Litig.*, *supra*; *see also Koumoulis*, 295 F.R.D. at 37 ("investigatory reports and materials are not protected by the attorney-client privilege or the work-product doctrine merely because they are provided to, or prepared by, counsel" (citation omitted)); *Allied Banks v. Bank of Am., N.A.*, 240 F.R.D. 96, 104 (S.D. N.Y. 2007) (attorneys' draft reports for investigation into rogue trading scheme were not protected where the drafts were not created primarily to provide legal advice, but 'for the purpose of generating the Report, which indisputably did not provide legal advice").

Moreover, UWC Secretary Menon routinely copied general counsel in the course of preparing draft reports for the UWC without any indication that she was seeking legal advice. *See Koumoulis*, *supra*, at 47 (request for "review/edits" is not a request for legal advice in context of other communications); *Valente*, 2010 WL 3522495 at *3 ("it is not at all clear from the content of the emails or from the context of those emails that the purpose of the emails was to elicit specific legal advice. Instead, it appears [company] personnel simply made a habit of copying in-house counsel (along with many other individuals) on any email that included factual information that might become relevant to a possible claim"). Consequently, Plaintiff has good reason to believe that the remainder of the documents Defendants have either redacted or withheld contain similarly non-legal commentary from counsel, and are being withheld merely because counsel has either participated in the drafting of the document or because counsel was copied in the routine course of business. None of these is a proper reason for claiming privilege,

- <u>Ex. P</u>, at YALE00016688 (redacted) and at YALE00016816 (unredacted);
- <u>Ex. Q</u> at YALE00016892 (redacted) and at YALE00016902 (unredacted [appearing in YALE00016893-00016902]).

however.[16] *See, e.g., In re Rivastigmine Patent Litig.*, 237 F.R.D. at 80 ("courts must be wary that the involvement of an attorney is not being used simply to shield corporate communications from disclosure.")

And, in any event, by disclosing all of counsel's comments on the various draft fact-finder and panel reports, Defendants have waived whatever privilege existed as to counsel's role as a "procedural advisor" in the entirety of the UWC process.[17] *See Bowne*, 150 F.R.D. at 478 ("The attorney-client privilege is waived if the holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter or communication" (citations omitted)). Furthermore, as set forth above, partial disclosure of attorney advice waives the privilege with respect to the remainder of the advice. *Kent Literary Club*, 2016 WL 2602274 at *8 (emphasis added), citing *Beverly Hills Concepts v. Schatz, Schatz, Ribicoff & Kotkin*, No. CV 89-0369864-S, 1995 Conn. Super. LEXIS 3617 (Dec. 18, 1995); *Bowne*, 150 F.R.D. at 485

---

[16] Defendants have also attempted to claim "work product" on several UWC-related draft reports. *See* Log at Ex. A, lines 8, 260, 176, 274, and 288; Log at Ex. B, lines 136 and 152. Key to a work product claim is that the document was prepared in anticipation of litigation. *Bowne*, 150 F.R.D. at 471 (citing cases). There is no evidence anyone from Yale anticipated litigation in the fall of 2013, when the UWC I proceedings were taking place, and Yale's litigation counsel has taken the position that no one at Yale was anticipating litigation at the close of the UWC II process. (April 6, 2017 e-mail from Noonan to Deal.) As a consequence, none of these draft reports could be said to have been "prepared in anticipation of litigation." Furthermore, "if a party prepares a document in the ordinary course of business, it will not be protected even if the party is aware that the document may also be useful in the event of litigation." *Id.* (internal quotation marks and citations omitted); *see also Tudor* at 41 ("there is no reason to believe that [investigator's] reports would not have been prepared in the same form even if the [legal] actions had not been filed"); *OneBeacon Ins. Co.*, 2006 WL 3771010, *6 (insurance claim investigation documents were not protected because they were created in the ordinary course of business). These reports were unquestionably prepared "in the ordinary course of business," and would have been so prepared regardless of whether anyone at Yale anticipated litigation. As a result, there is simply no viable "work product" claim here.

[17] In the event the Court concludes that a waiver of privilege has occurred with regard to communications with counsel acting as "procedural advisor," Plaintiff respectfully requests the Court order Defendants to produce *all* such withheld communications, which are too numerous to list here.

("disclosure in the context of litigation – whether by trial or deposition testimony or by production of documents – will result in an implied waiver broader than the original disclosure itself" (citing cases)). *See also* Fed. R. Civ. P. 502(a) (waiver extends to undisclosed communications where they ought in fairness to be considered with the disclosed communications).

Accordingly, Plaintiff challenges Defendants' withholding of documents appearing at the following Bates numbers:

Redactions:

YALE00012942-00012943 (at Ex. N); YALE00013179-00013180, YALE00012287-00012289, and YALE000012290-00012292 (at Ex. R).

Withheld documents:

Log at Ex. A lines: 8, 43, 60, 100, 117, 119-120, 123, 125, 161-164, 176-177, 184-188, 241-242, 245-246, 259-264, 273-274, 287-288;

Log at Ex. B lines: 24, 51-84, 135-138, 147-152, 174-177;

Log at Ex. C lines: 7-10, 13-16.

There is one final category of documents, apart from the UWC-related documents, which Defendants have either redacted or withheld and in which counsel is apparently playing a non-legal role: documents pertaining to media requests and/or media responses. The law is clear that "[w]hen an attorney is consulted in a capacity other than as a lawyer, as (for example) a . . . media expert . . . , that consultation is not privileged." *In re Cnty. of Erie*, 473 F.3d 413, 421-422 (2nd Cir. 2007) (citation omitted)); *Valente*, 2010 WL 3522495 at *2 (same); *U.S. Postal Service v. Phelps*, 852 F. Supp. 156 at 160 (same); *Standard Chartered Bank*, 111 F.R.D. at 80 (same); *NXIVM Corp.*, 241 F.R.D. at 126 (same). Moreover, where, as here, information is given and it is agreed that it is to be transmitted to a third party (*i.e.*, the media), then not only the specific

information, but the more detailed circumstances relating to it, are subject to disclosure. *United States v. Tellier*, 255 F.2d 441, 448 (2nd Cir. 1958).

Accordingly, Plaintiff challenges Defendants' withholding of communications appearing at the following Bates numbers:

Redactions:

YALE00016686-00016689; YALE00012797-00012799; YALE00016867-00016869; YALE00012210; YALE00016008-00016011 attached hereto at Ex. S.

Withheld documents:

Log at Ex. A lines: 79-81, 143-146, 227-231;

Log at Ex. B lines: 18, 28-33, 93-100, 161-162.

### III.    *Disclosure To Third Party*

Defendants have also withheld, on the basis of a purported attorney-client privilege, communications between (or involving) the UWC II fact-finder, Miriam Berkman, and general counsel. Ms. Berkman is a third party, however, and has no client relationship with the Yale general counsel's office. It is well settled that statements made to a third party "are usually not privileged because there is then no reasonable expectation of confidentiality." *State v. Cascone*, 195 Conn. 183, 186 (1985). Even when the client is a corporate entity, such that multiple people (and, perhaps, multiple attorneys) might be involved in communications, certain basic criteria must be met before a communication can be considered privileged: (1) the attorney must be acting in a professional capacity for the corporation; (2) the communication must be made to the attorney by current employees or officials of the corporation; (3) the communication must relate to the legal advice sought by the corporation from the attorney; and (4) the communication must be made in confidence. *Segway v. Special Olympics Connecticut, Inc.*, 2015 WL 7421719, *6 (Conn. Super. Oct. 29, 2015) (citations omitted).

Ms. Berkman – a licensed social worker with her own private practice – was retained by Yale to do an "impartial" factual investigation of Ms. Roe's claim that Mr. Montague penetrated her without her consent. Ms. Berkman was not an "employee or official" of Yale, nor does she appear to have been seeking legal advice from the general counsel's office. *See Segway*, *supra*. Moreover, the purpose of Ms. Berkman's participation in the fact-finding process had nothing to do with "improv[ing] the comprehension of the communication between an attorney and client." *See NVIXM Corp.*, 241 F.R.D. at 141, quoting *United States v. Ackert*, 169 F.3d 136, 139 (2nd Cir. 1999). Instead, the purpose of her participation was to interview witnesses and compile an impartial factual report based upon those interviews. As such, she had no relationship – attorney-client or otherwise – with the general counsel's office. *See Raymond Road Associates LLC v. Taubman Centers, Inc.,* 2009 WL 4069251, *6 (Conn. Super. 2009) (where there has not been a showing of attorney-client relationship, no privilege attaches to communications (citation omitted)).

For this reason, Plaintiff moves to compel the following communications which have been disclosed to, or directly involve, a third party, Miriam Berkman:

Redactions:
YALE00012942-00012943 (Ex. N); YALE00011984 (Ex. G).

Withheld documents:
Log at Ex. A line 176;

Log at Ex. B lines: 52, 67-68, 70, 179, 181-189.

## CONCLUSION

For the reasons set forth above, this Court should order production of all requested documents or, alternatively, conduct an *in camera* review of the documents in order to ascertain whether their contents are in fact privileged.[18]

**Plaintiff hereby requests a hearing on this motion**.

JACK MONTAGUE,

By his attorneys,

/s/   *Max D. Stern*
Max D. Stern (BBO #479560) (*pro hac vice*)
mstern@toddweld.com
Alexandra H. Deal (BBO #660654) (*pro hac vice*)
adeal@toddweld.com
Hillary A. Lehmann (BBO #683657) (*pro hac vice*)
hlehmann@toddweld.com
TODD & WELD LLP
One Federal St., 27th Floor
Boston, MA 01880
Tel. (617) 720-2626
Fax (617) 227-5777

William F. Dow III (ct00161)
JACOBS & DOW, LLC
350 Orange Street
New Haven, CT 06511
wdow@jacobslaw.com
Tel. (203) 772-3100
Fax (203) 772-1691

Dated: May 12, 2017

---

[18] *See, e.g., Hartford Roman Catholic Diocesan Corp. v. Interstate Fire & Casualty Co.*, 2015 WL 164069, *3 (D. Conn. Jan. 13, 2015) ("Courts have broad discretion to conduct *in camera* review to make [the] initial determination" as to whether privilege applies, and such a review is a "highly appropriate and useful means of dealing with claims of . . . privilege" (internal quotation marks and citations omitted)).

## **CERTIFICATE OF SERVICE**

I, Max D. Stern, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on May 12, 2017.

/s/ *Max D. Stern*