UNITED STATES DISTRICT COURT FOR THE

    DISTRICT OF CONNECTICUT

CIVIL ACTION No: 3:16 cv-00885-AVC

----------------------------------x

JACK MONTAGUE,                    :

    Plaintiff,                    :

        -v-                       :

YALE UNIVERSITY, ANGELA GLEASON,  :

And JASON KILLHEFFER,             :

    Defendants.                   :

----------------------------------x

              Depositon of JASON KILLHEFFER, taken pursuant to Notice, held at the Law Offices of Jacobs & Dow, LLC, 350 Orange Street, New Haven, Connecticut, before James A. Martone, LSR #248, and Notary Public, in and for the State of Connecticut, on January 10, 2017, at 10:05 a.m.

Electronically signed by JAMES MARTONE (601-171-250-7767)    31a4d12d-81e0-45a5-b5d0-50b58814fcad

```
 1   A P P E A R A N C E S:
 2
 3        For the Plaintiff:
 4   TODD & WELD, LLP
 5   One Federal Street-27th Floor
 6   Boston, MA  01880
 7   BY:  MAX D. STERN, ESQ.
 8   AND:  HILLARY A. LEHMANN, ESQ.
 9   mstern@toddweld.com
10
11        For the Defendants:
12   DONAHUE, DURHAM & NOONAN, PC
13   741 Boston Post Road
14   Guilford, Connecticut  06347
15   BY:  PATRICK NOONAN, ESQ.
16
17
18
19
20
21
22
23
24
25
```

Electronically signed by JAMES MARTONE (601-171-250-7767)              31a4d12d-81e0-45a5-b5d0-50b58814fcad

1                S T I P U L A T I O N S

2

3      IT IS HEREBY STIPULATED AND
4    AGREED by and between counsel for the
5    respective parties hereto that all
6    technicalities as to proof of the official
7    character before whom the deposition is to
8    be taken are waived.
9
10     IT IS FURTHER STIPULATED AND
11   AGREED by and between counsel for the
12   respective parties hereto that the
13   deposition may be signed before any Notary Public.
14
15     IT IS FURTHER STIPULATED AND
16   AGREED by and between counsel for the
17   respective parties hereto that all
18   objections, except as to form, are reserved
19   to the time of trial.
20
21
22                       *   *   *   *   *   *
23
24
25

Electronically signed by JAMES MARTONE (601-171-250-7767)          31a4d12d-81e0-45a5-b5d0-50b58814fcad

1                    WITNESS INDEX

2

3                                                         PAGE

4    Direct Examination by Mr. Stern                      5

5

6                    EXHIBIT INDEX

7    PLAINTIFF      DESCRIPTION                           PAGE

8    20   Confidential Yale University Title IX

9         Incident Summary Form                           22

10   21   August 19, 2013 letter                          76

11   22   Sexual Misconduct Scenerios document            80

12   23   E-mail chain                                    159

13   24   3/12/16 E-mail                                  162

14   25   February 23, 2016 E-mail exchange               163

15   26   February 23, 2016 E-mail                        166

16   27   February 24, 2016 E-mail                        167

17   28   3/17/2016 E-mail chain                          168

18   29   June 9, 2016 e-mail                             173

19   30   Document entitled Introduction to the

20        WESTAT-Yale report                              175

21   31   Document entitled Results of AAU Survey

22        On Sexual Assault and Misconduct                175

23   32   Document entitled confidential draft            184

24

25

```
 1   JASON KILLHEFFER,
 2    called as a witness, having been first duly
 3    sworn by James A. Martone, a Notary Public
 4    in and for the State of Connecticut:
 5   DIRECT EXAMINATION BY MR. STERN:
 6        A.   Okay.  Please state your name.
 7        A.   Jason Killheffer.
 8        Q.   Spell it, please.
 9        A.   J A S O N.  Last name, K I L L H E F F E R.
10             MR. NOONAN:  We probably should state
11   for the record what we just stated off the record, and
12   that is that we're going to use real names in this
13   transcript, in this deposition, but if we need to file
14   the transcript or transmit it to anyone other than the
15   parties, the lawyers, we will redact the names.
16        A.   Okay.
17             MR. STERN:  Right, and we have agreed
18   to the usual stipulations.
19             MR. NOONAN:  Right.
20             MR. STERN:  All objections and
21   motions to strike except as to form saved until the
22   time of trial.
23             MR. NOONAN:  Right.
24             MR. STERN:  Witness will read and
25   sign?
```

```
 1   Montague until you could have a meeting with you,
 2   Stephanie Spangler and Susan Sawyer?
 3        A.   We discussed that so that we could discuss
 4   what the appropriate action would be in a case such as
 5   this.
 6        Q.   All right.  So prior --
 7        A.   Prior to what, this date?
 8        Q.   Prior to -- at some point you had a meeting
 9   with these various people, correct?
10        A.   Absolutely.
11        Q.   And prior to that time, you told Angie that
12   you wanted to schedule that meeting; is that correct?
13        A.   Yes, I did.
14        Q.   And you told Angie why you wanted to
15   schedule that meeting?
16        A.   I told Angie we should review the
17   allegations with Stephanie and with Susan.
18        Q.   All right.  And you knew at that time that
19   Angie was proceeding along a path of effectuating an
20   informal resolution, correct?
21        A.   I knew that she was in conversation with
22   **REDACTED**    , but not minute by minute, where
23   exactly they were in that process.
24        Q.   Well, you knew that they were planning
25   to --
```

1     A.   Let me -- an informal resolution does not
2  forego a formal complaint.  So she could continue to
3  work with **REDACTED** and talk with **REDACTED** about what her
4  wishes are, which could change, okay.  Knowing that we
5  were also going to have a meeting with Stephanie and
6  Susan.
7     Q.   All right.
8     A.   So if you're trying to draw -- I'm not sure
9  what conclusion you're trying to draw from that.
10    Q.   Did you tell Angie hold off on meeting with
11 Jack Montague until after we can have this meeting?
12    A.   We discussed her intention to contact Jack
13 Montague.  I believe at that point we must have
14 already had a meeting on the books, on our calendar
15 with Stephanie and Susan.
16              In fact, it looks like it's two days
17 later, on the 4th.  According to this exhibit.  So at
18 that point, if she's talking on Monday, I say we're
19 meeting on Wednesday, before you do anything, why
20 don't we talk about what the right approach to this
21 is.
22    Q.   All right.
23    A.   So that's it.
24    Q.   So now did this meeting take place?
25    A.   The meeting with Stephanie, Susan and

```
 1   Angie?
 2         Q.   Yes.
 3         A.   Yes, it did.
 4         Q.   Okay.  And as a result of that meeting, was
 5   some decision made?
 6         A.   At that meeting, we reviewed the
 7   allegations and the information that Angie had
 8   gathered.  We reviewed the fact that Angie had
 9   discussed with REDACTED that REDACTED was interested in
10   pursuing an informal resolution.
11                    We reviewed the fact that the
12   seriousness of the allegations in this matter and the
13   fact that Jack Montague had previously been through
14   the UWC complaint process, had previously been found
15   to have violated our sexual misconduct policies, and
16   most importantly, the seriousness of these allegations
17   made a formal complaint a more appropriate solution
18   than an informal complaint.  One of the reasons we
19   look as to why someone -- whether someone has been
20   through our process before is because should they go
21   through that process and be found in violation and
22   subsequent for that process, an allegation that they
23   violated it again, indicates that they may not have
24   learned from that earlier process, okay.  And so
25   that's an indicator.
```

```
 1                   So the nature of the allegations and
 2   the fact that he had previously been through this
 3   policy, or this process, and had previously been found
 4   to have violated our policy.
 5        Q.   All right.
 6        A.   So we discussed, Angie -- going back to
 7   REDACTED discussed going back to REDACTED and discussing
 8   with REDACTED whether she would be willing to participate
 9   in a formal complaint.  This gets back to what we
10   talked about earlier which is would she be a witness
11   and speak to a fact finder in a formal complaint.
12        Q.   What did you understand that Angie --
13   strike that.  You say you discussed the seriousness of
14   the allegation, the previous finding?
15        A.   The fact that he had had a previous finding
16   of a violation.
17        Q.   Right.  Anything else?
18        A.   Those are the two primary factors.
19        Q.   All right.  What about the fact that you
20   had been told by Angie that she had been told by REDACTED
21   REDACTED that REDACTED had heard about, that there had
22   been another complaint of rape?
23        A.   The other complaint, that was knowledge,
24   but it wasn't -- we didn't have any details on it and
25   it wasn't anything, as far as we understood Angie did
```

```
 1   Susan the information that she had gathered up until
 2   that point.
 3        Q.   What was the decision as to what Angie
 4   should do next?
 5        A.   My understanding was that Angie would go
 6   back the REDACTED and discuss with her whether she would
 7   be willing to speak with a fact finder in a formal
 8   complaint.
 9        Q.   What else did you understand that Angie was
10   going to say to REDACTED
11        A.   I don't have any other understanding.  That
12   was the -- that was the question that she was going to
13   go back and ask REDACTED
14        Q.   Well, did you understand that she was going
15   to discuss with REDACTED the pros and cons of
16   participating in a formal complaint as opposed to an
17   informal resolution?
18        A.   I don't know about that.  I imagine she
19   would have described for her what the process of
20   participating in a formal complaint involves.
21        Q.   Well, did you know that she was --
22        A.   But I'm not aware of pros and cons, I'm not
23   sure what -- what you mean by that.
24        Q.   Well, you had some reasons why you thought
25   a formal complaint was the appropriate way to go,
```

```
 1   correct?
 2       A.   That's correct.
 3       Q.   And the other persons in that meeting
 4   agreed with you, correct?
 5       A.   I can't speak for them.
 6       Q.   Well, that was the decision that was made,
 7   correct?
 8       A.   The plan was that Angie would go back and
 9   speak with REDACTED
10       Q.   And the reasons why according to your -- in
11   your view that the formal complaint was the way to go
12   was because of the seriousness of this one and the
13   prior history of Jack Montague with UWC?
14       A.   Those were the primary factors.
15       Q.   Right.  Now did you understand that Angie
16   was going to relate those factors to REDACTED
17       A.   I did not.
18       Q.   Well, what did you think Angie was going to
19   say to REDACTED about what were the reasons to go for a
20   formal complaint as opposed to an informal resolution?
21       A.   I understood Angie was intending to go back
22   to REDACTED to discuss the fact that these allegations
23   against Mr. Montague were very serious.  And that the
24   university takes that behavior very seriously, and
25   feels the most appropriate course of action would be
```

1   to bring a formal complaint against him.  We
2   understood her desire to be anonymous, we talked about
3   the fact that you can't be anonymous in a formal
4   complaint so she would have to explain that to her.
5                  But Title IX Coordinator could bring
6   the complaint if she would be willing to speak to a
7   fact finder.  But I can tell you I'm well aware in our
8   practices, and Angie is well aware, that we do not say
9   to complainants or to anyone the fact that someone has
10  received discipline previously.
11       Q.   And that fact, that someone has received
12  discipline previously is confidential, correct?
13       A.   We treat it as such, yes.
14       Q.   It's covered by the confidentiality policy
15  of Yale, correct?
16       A.   It is.
17       Q.   All right.  And the facts of that are
18  considered to be, of that prior discipline are
19  considered to be confidential, correct?
20       A.   Can you explain what you mean by the facts
21  of that?
22       Q.   The allegations?
23       A.   The allegations upon which the disciplinary
24  action is based?
25       Q.   Yes.

```
 1   the group had made the decision to bring a formal
 2   complaint against Jack Montague if **REDACTED**       said
 3   she would participate in it?
 4        A.   I'd say yes.
 5        Q.   Now as of this moment, you had never
 6   interviewed, you never met **REDACTED**
 7        A.   No.
 8        Q.   And neither had Stephanie Spangler nor
 9   Susan Sawyer met with her so far as you knew?
10        A.   No.  As far as I know.
11        Q.   And as of this point, **REDACTED** had met with
12   her once, correct, so far as these documents are
13   concerned?
14        A.   I can't confirm that.
15        Q.   Now you know what it means to have a
16   thorough interview with a complainant, correct?
17        A.   Yes.  I --
18        Q.   In fact, you told us that what your
19   practice is in doing intake in the Title IX office is
20   not to press for details, but simply to get what the
21   person wants to tell you, is that right?
22        A.   Yes.
23        Q.   All right.  And so far as you know, is that
24   the practice that Angie followed when she had met with
25   **REDACTED** prior to this meeting on November 4th, 2015?
```