CONFIDENTIAL

29 January 2016

UWC Panel Report to Dean Jonathan Holloway
Complainant: **REDACTED**
Respondent: Jack Montague (Trumbull '16)

**Introduction**

On 21 January 2016, the UWC held a hearing to address the complaint brought by Senior Deputy Title IX Coordinator Jason Killheffer against Jack Montague on 18 November 2015. The complaint alleges that Jack Montague (Trumbull '16) sexually assaulted **REDACTED** **REDACTED** on the night of Saturday, 18 October 2014 at his residence located at 43 Howe Street.

**REDACTED** participated in the hearing and was accompanied by her adviser **REDACTED** from the SHARE Center. Jack Montague participated in the hearing and was accompanied by his adviser Coach James Jones. The panel thanks the parties and their advisers for participating in the hearing.

During the hearing, the panel's questioning of the parties was informed by the detailed report prepared by UWC fact-finder Miriam Berkman.

**Findings of Fact**[1]

The panel accepts the undisputed facts in the fact-finder's report and summarizes here the relevant facts. **REDACTED** and Mr. Montague were friends and had three previous intimate interactions, including sexual intercourse on 24 September 2014. On 18 October 2014, **REDACTED** **REDACTED** went to a party at Mr. Montague's house. Both parties had been drinking but both said they were not incapacitated. They engaged in consensual sexual contact not including intercourse outside the house and in Mr. Montague's car. They then went inside to Mr. Montague's bedroom, where they continued sexual contact, including intercourse. **REDACTED** **REDACTED** stayed the night with Mr. Montague and went home in the morning. The panel accepts all of the above facts as undisputed.

The panel reviewed the evidence presented by the fact finder and at the hearing to understand whether, as alleged in the complaint, Mr. Montague engaged in nonconsensual sexual intercourse with **REDACTED** on 18 October 2014 in violation of the University's sexual misconduct policy.

**Relevant Yale Policy**

---

[1] The panel's findings of fact are underlined.

1

The relevant part of the University's definition of sexual misconduct reads:

*Sexual misconduct incorporates a range of behaviors including…sexual assault…and any other conduct of a sexual nature that is nonconsensual, or has the purpose or effect of threatening, intimidating or coercing a person.*

The University's definition of sexual assault in relevant part reads:

*Sexual assault is any kind of nonconsensual sexual contact including rape, groping, and any other nonconsensual touching.*

The relevant part of the University's definition of sexual consent reads:

*Sexual activity requires consent, which is defined as positive, unambiguous, and voluntary agreement to engage in specific sexual activity throughout a sexual encounter. Consent cannot be inferred from the absence of a "no"; a clear "yes," verbal or otherwise, is necessary. Consent to some sexual acts does not constitute consent to others, nor does past consent to a given act constitute present or future consent. Consent must be ongoing throughout a sexual encounter and can be revoked at any time.*

The University's guidance regarding sexual consent reads:

*Consent can only be accurately gauged through direct communication about the decision to engage in sexual activity. Presumptions based upon contextual factors (such as clothing, alcohol consumption, or dancing) are unwarranted, and should not be considered as evidence for consent.*

*Although consent does not need to be verbal, verbal communication is the most reliable form of asking for and gauging consent. Talking with sexual partners about desires and limits may seem awkward, but serves as the basis for positive sexual experiences shaped by mutual willingness and respect.*

**Finding and Explanation of the Panel:**

**REDACTED** and Mr. Montague provided substantially different accounts of the sexual encounter in Mr. Montague's room on the night of 18 October 2014 and of subsequent events and interactions.

**REDACTED** *account* - **REDACTED** alleges that Mr. Montague engaged in sexual intercourse over her express verbal objection and physical resistance. Before going inside to Mr. Montague's bedroom, **REDACTED** asked Mr. Montague twice if it was OK to "hook up" and not "have sex." Mr. Montague responded that it was OK with him. **REDACTED** said she

2

felt comfortable with Mr. Montague and in control of the situation because she had been careful to not drink too much and because she had been so verbally clear and direct with Mr. Montague about not wanting to have intercourse. [Did she also say she felt comfortable with him because he had respected her boundaries previously?] Once in Mr. Montague's room, they took off their clothing and kissed and touched. There was no further verbal discussion of the boundaries of their sexual interaction in the bedroom. **REDACTED** indicated her consent to kissing and touching by kissing Mr. Montague, touching his body (but not his genitals) and by not tensing up. Mr. Montague got on top of **REDACTED** and leaned his pelvis into her as if he was preparing to penetrate her. **REDACTED** put her hands up and pressed them against his shoulder and pushed him away. Then she said "Jack, no, I said I wanted to hook up but not have sex," but he then penetrated her over her objection. **REDACTED** said Mr. Montague looked very drunk. **REDACTED** was surprised and frozen during intercourse. She did not attempt to push him but rather just waited for him to stop. After intercourse, Mr. Montague said "I'm really sorry. I know you didn't want that." After Mr. Montague stopped, **REDACTED** lay still in bed feeling defeated and confused.

> **Comment [AM1]:** According to my notes, at the hearing she said, "I really trusted him. I had no reason not to." She also said she intentionally brought up the topic of not having sexual intercourse in the form of a question and that if he had said no, she would have considered things differently. In her opening statement, she said she had never before felt unsafe with Jack.

After intercourse, Mr. Montague got dressed and went downstairs, where some of his friends and housemates were gathered. He came back upstairs and told **REDACTED** that he was going to Zeta Psi and she should stay in his bedroom and wait for him to come back. **REDACTED** reported thinking she might leave and go home but then heard people downstairs calling her name and telling her to come down. **REDACTED** reported feeling confused but she went down stairs. Mr. Montague did not want her to go with him to Zeta Psi, so he asked a male friend of his, whom **REDACTED** did not know, to take her with him to Toad's Place. Mr. Montague said he would meet up with **REDACTED** later back at his house. **REDACTED** did not say anything and went along to Toad's passively with Mr. Montague's friend, whom she didn't know, because she couldn't think clearly. She told the panel that she felt like she was being passed along. She entered Toad's for a brief time and then left to go to her suite in **REDACTED**. She walked to **REDACTED** alone after 1:00 (swipe card data recorded her entering **REDACTED** 1:34 am) but once there, she became confused and overwhelmed. **REDACTED** said she just wanted to go to bed and not have to talk with anyone, but she realized that there would be lots of people in her suite (several suite mates and friends visiting) and it would be impossible to go to bed without seeing anyone or being asked a lot of questions. Because she was overwhelmed by the prospect of having to answer questions or talk if she returned to her suite, **REDACTED** decided to return to Mr. Montague's house, she said "the only place where I wouldn't have to explain myself." Since he was planning on having her return, he would not question her about the night, and she thought he would let her go to sleep quietly. **REDACTED** met Mr. Montague near Davenport College and returned to Mr. Montague's house. On the way, Mr. Montague was flirty and **REDACTED** told him she just wanted to go to sleep. Mr. Montague joked about being too drunk to have sex. **REDACTED** stayed the night at Mr. Montague's house, sleeping in Mr. Montague's bed, but remaining fully clothed. The next morning, **REDACTED** left Mr. Montague's house with no discussion of what happened the previous night.

3

REDACTED returned to her suite around 10 am (swipe card data indicates she entered REDACTED at 9:57am, and REDACTED – which connects through the basement to her suite in REDACTED – at 9:58am). In the common room of the suite, one of her suitemates, REDACTED REDACTED asked her how her night was. REDACTED replied "terrible," described what had happened, and started to cry. She then spoke with other suite mates about her experience, and her friends encouraged her to talk with someone about what Mr. Montague had done. She met with REDACTED from the SHARE center to learn her options, but decided she did not want to file a complaint. She also spoke with REDACTED a Divinity School student and friend, who encouraged her to write down what happened in case she wanted to file a complaint in the future. REDACTED wrote up her account by hand on 22 October (Exhibit D).

REDACTED decided to speak with Mr. Montague so he would understand that what he did was wrong and so that he would not do it again to anyone else. The parties met on 28 October. REDACTED told Mr. Montague that she had made it clear to him that she didn't want to have sex with him and that he proceeded anyway. She told Mr. Montague she did not want to see him again. Mr. Montague said that he was sorry that she felt that way and that he had been very drunk that night. He was very careful with his words, trying to be nice but not taking responsibility for any misconduct.

REDACTED reported a number of impacts on her educational and living experience at Yale. She had intrusive thoughts and nightmares about Mr. Montague in the fall of 2014 and on and off through the spring and early fall of 2015. REDACTED told the panel she abruptly ended relationships with high school friends because she did not think she could keep what happened from them and felt it even more difficult to tell them. She said would be overcome by emotion when she saw an article about Yale basketball, when the Yale Police sent an email about sexual assault, or when she saw Mr. Montague's name on the guest list REDACTED REDACTED made the difficult decision to resign from REDACTED because she could not imagine having to see and REDACTED Mr. Montague at basketball games (Exhibits F and G).

*Mr. Montague's account* – Mr. Montague asserts that REDACTED consented to all of the sexual activity that took place on the night of 18 October 2014. Mr. Montague told the fact finder that he had 4-7 drinks that night and that he had been careful to not drink too much because he was excited to see REDACTED Mr. Montague told the fact finder that REDACTED REDACTED agreed to go up to his room; that they each removed their clothing, although he may have unhooked her bra; they were kissing and touching; and he asked if she wanted to have sex and REDACTED said "OK." When the panel asked Mr. Montague how he understood that he had consent for sex, Mr. Montague said REDACTED agreed to come up stairs to his room, he did not use force, REDACTED took off all of her clothing, she did not say no, and that she was an active participant in sex, including verbalizing her pleasure, touching him, and switching positions during sex.

> **Comment [SS2]:** Did he say he asked her and she consented verbally or that she indicated consent through behavior? Or through both. If he said he asked her it seems odd that the panel asked him how he had obtained affirmative consent.

Mr. Montague said REDACTED never asked him if it was OK to "hook up but not have sex." He also denied that REDACTED told him she did not want to have sex or that she pushed him away while they were in his room. He further denied that he said after intercourse "that he

4

was sorry because he knew she didn't want that." Mr. Montague expressed confusion about the complaint and told the panel he was under the impression that all of their interactions had been consensual.

The accounts of **REDACTED** and Mr. Montague differ in several key respects, which are summarized here:

a) **REDACTED** said she asked Mr. Montague twice if it was OK that they "hook up" but not "have sex." **REDACTED** told the panel she asked him twice – that it was not a statement – and that Mr. Montague responded in the affirmative both times. REDACT **REDACTED** told the panel that she was proud she had been crystal clear about what she wanted that night. She said "I very clearly expressed myself." Mr. Montague denied that **REDACTED** ever said that she wanted to "hook up but not have sex." When pressed on this issue, Mr. Montague told the panel it was possible that **REDACTED** said this, but the party was loud and maybe he did not hear her or he may have heard something different.
b) **REDACTED** said she told Mr. Montague that she did not want to have sex when the two were in Mr. Montague's room. Mr. Montague denied this occurred.

   > **Comment [SS3]:** Or was this one of the times she asked?
   >
   > DMP – she asked him twice before, and then said this in his room.

c) **REDACTED** said Mr. Montague penetrated her against her express verbal objection and physical resistance. In stark contrast, Mr. Montague told the fact finder that REDACT **REDACTED** verbally agreed to have sex when they were in his room. When questioned about consent by the panel, Mr. Montague said **REDACTED** provided consent by taking her clothing off, by being a full participant in intercourse – including changing positions during sex – and by vocalizing her pleasure. Mr. Montague further said REDACT **REDACTED** did not push him away.

   > **Comment [SS4]:** This needs some clarifying in light of the way you report his testimony on consent.
   >
   > DMP – yes, that was a bit of a mess. I moved most of it down to C where it fits better.

d) Mr. Montague said they switched positions while having intercourse. **REDACTED** did not remember switching positions and recalls being frozen.

   > **Comment [SS5]:** Did he also say that he had asked and that she had verbally consented?
   >
   > DMP – I think this is clear now.

e) **REDACTED** said Mr. Montague looked very drunk, and that he joked about being too drunk for sex later in the evening, after she met him near Davenport College to return to his house. She told the panel that Mr. Montague seemed more intoxicated on 18 October 2014 than on the previous three nights when they had intimate interactions. Mr. Montague told the fact finder that he had four to seven drinks that night and that he had been careful to not drink too much because he was excited to see **REDACTED** He told the panel it was a typical party night for him and that he was not as intoxicated as he had been during previous encounters.

   > **Comment [AM6]:** With whom?

The panel deliberated at length about issues of credibility in evaluating the conflicting statements made by Mr. Montague and **REDACTED** The panel finds **REDACTED** account more credible for the following reasons:

1. **Full, detailed and consistent account. REDACTED** provided a full and detailed account of her relationship with Mr. Montague. **REDACTED** told the panel she remembered the incident and what happened very clearly. The panel finds there is no evidence that **REDACTED** was intoxicated or otherwise impaired in any way that

5

would have affected her recollection of the night. **REDACTED** testimony on the material facts at the hearing, in interviews with the fact-finder, in her contemporaneous text to her friend **REDACTED** (Exhibit F), and in her undated written account (Exhibit D) were all detailed and consistent. **REDACTED** also provided information that may have been viewed as damaging to her allegations, such as the fact that she returned to Mr. Montague's house. Her descriptions were detailed, clear and specific and where time frames and movements were concerned, her account was fully consistent with the time frames noted in the electronic gate readings. <u>The panel finds credible the account provided by</u> **REDACTED**

2. **Corroborative third-party witness accounts**. The fact finder interviewed **REDACTED** suitemates, **REDACTED** and friend **REDACTED** . In separate interviews with the fact finder, **REDACTED** **REDACTED** all recalled **REDACTED** taking with them about her sexual encounter with Mr. Montague the day after it occurred. **REDACTED** recalled speaking with **REDACTED** about her encounter with Mr. Montague a day later. All ᴿᴱᴰᴬᶜᵀᴱsuitemates said that ᴿᴱᴰᴬᶜᵀ **REDACTED** told Mr. Montague that she did not want to have sex and she resisted, but that he had ignored her and continued over her objections. **REDACTED** also recalled **REDACTED** said that after intercourse Mr. Montague apologized because he knew she had not wanted that. The nearly contemporaneous text message exchange between **REDACTED** on the morning of 19 October 2014 is also consistent with **REDACTED** testimony that she said no a number of times, she tried to push Mr. Montague away, and he apologized after intercourse (Exhibit F).

   **REDACTED** also spoke about the impacts of the sexual encounter on **REDACTED** said there was a striking difference between ᴿᴱᴰᴬᶜᵀ **REDACTED** reaction to her first sexual intercourse with Mr. Montague in September and her reaction on the morning of 19 October. On the earlier occasion, **REDACTED** felt unhappy and angry with herself, and she was upset but was not crying or falling apart. In contrast, on the morning of 19 October, **REDACTED** was sobbing uncontrollably as she told the story of what happened and **REDACTED** was upset and cried on and off the whole day. **REDACTED**said that **REDACTED** gave up **REDACTED** in order to stay away from Mr. Montague, which was a big disruption in her life, and **REDACTED** seemed more stressed and unhappy during the fall of 2015. **REDACTED** also discussed ᴿᴱᴰᴬᶜᵀ **REDACTED** leaving **REDACTED**

   > **Comment [SS7]:** This is the first time you introduce the previous instance of sexual intercourse. Perhaps this should be mentioned sooner?
   >
   > DMP – I thought about that but the description of her version of events was getting very long. Aley?

   <u>The panel finds persuasive the corroborative evidence provided by these third-party witnesses that **REDACTED** told Mr. Montague she did not want to have sex, that she tried to push him away, and that he apologized after intercourse. The panel also finds persuasive the evidence provided by ᴿᴱᴰᴬᶜᵀᴱᴰof the third-party witnesses that the sexual encounter had a strong negative impact on **REDACTED**</u>

3. **Independent evidence of that further supports REDACTED credibility.** The swipe card records (Exhibit H) support **REDACTED** description of her actions after leaving

6

Mr. Montague's house– swipe card data shows she entered **REDACTED** at 1:34am and then swiped into Davenport College, where she met Mr. Montague, just a few minutes later at 1:40am. This is consistent with **REDACTED** explanation that she returned to the **REDACTED** after around 1am but decided to return to Mr. Montague's house because she just wanted to go to sleep and she did not want to have to speak with her housemates about her experience at that time. Furthermore, **REDACTED** said she returned to **REDACTED** and her suite around 10am the next morning – swipe card data indicates she entered **REDACTED** at 9:57am and **REDACTED**, which connects to her suite in **REDACTED** at 9:58am. <u>The panel finds **REDACTED** explanation for why she did not return to her suite but rather returned to Mr. Montague's room and stayed the night reasonable, and her testimony consistent with the swipe card data and the testimony of her suite mates.</u> The swipe card data further supports the clarity and accuracy of **REDACTED** recollections of the evening.

4. **Narrowness of the claim.** **REDACTED** raised concerns about a single sexual act during an otherwise consensual encounter. **REDACTED** further contrasted her experience on 18 October 2014, when she alleges sexual intercourse was not consensual, with her experience on 24 September 2014 when she consented to sexual intercourse but felt unhappy in retrospect because she was intoxicated and had not exercised her normal good judgement. <u>The panel finds the narrow claim and contrasting response to the two experiences of sexual intercourse with Mr. Montague make **REDACTED** allegations more credible</u>.

5. **REDACTED** **motivation for the complaint.** **REDACTED** told the fact finder and the hearing panel that she had not initially intended to bring a complaint against Mr. Montague. In her conversation with Mr. Montague on 26 October 2014, and in her conversations with Angela Gleason, the Title IX coordinator for Yale College, in the fall of 2015, **REDACTED** wanted Mr. Montague to understand what he had done was wrong and to understand the University's policy on consent so he would not do it again to anyone else. **REDACTED** agreed to participate in the UWC investigation only after she heard that Mr. Montague had already received training. When asked by the panel what he thought might have motivated **REDACTED** to participate in this complaint, Mr. Montague said he did not understand her motivation, that it confused him, and that he thought they had both enjoyed their sexual activity on 18 October 2014. <u>The panel finds no credible evidence to suggest ▮▮▮▮▮▮ had any motivation to be dishonest with her friends, the fact finder, or this panel</u>.

6. **Actions after the alleged sexual assault.** After the alleged sexual assault, **REDACTED** sought support from her friends the next morning, called SHARE for support a couple days later, and confronted Mr. Montague the following week. In that meeting, **REDACTED** told Mr. Montague that she had made it clear she did not want to have sex with him that night, and she did not want to see him anymore. Later in that academic year, **REDACTED** resigned from the **REDACTED**. She told her friend on the **REDACTED** that she did not know if she could be okay **REDACTED** from Mr.

7

Montague at basketball games (Exhibit F), and told **REDACTED** on 8 January 2015 that she would not be able to **REDACTED** because she had "... a really serious issue with someone on the basketball team ..." (Exhibit G). <u>The panel finds **REDACTED** actions after 18 October 2014 to be consistent with her allegation of sexual assault</u>.

7. **Mr. Montague's credibility**. Mr. Montague did not remember many details of the night of 18 October 2014, including much of what happened immediately after sexual intercourse. The panel found Mr. Montague's vague memory of much of the night contradicted his very specific and clear memory that **REDACTED** had not asked him if it was OK to "hook up but not have sex," and that he never said "I'm really sorry. I know you didn't want that" or "I'm too drunk to have sex." Mr. Montague's account of how he gauged consent also shifted from his interviews with the fact finder, where he said **REDACTED** provided verbal consent, to his explanation to the panel, where he said **REDACTED** provided only non-verbal consent. Likewise, Mr. Montague told the fact finder that **REDACTED** did not tell him that she had objected clearly and he had proceeded over her objections when they met on 26 October, but he told the panel that **REDACTED** had told him at that meeting that she had told him that she did not want to have sex on the night of 18 October. <u>The panel finds Mr. Montague's account less credible because his memory of specific details was not consistent</u>.

> **Comment [SS8]:** Ah ha, now I get this. Can you make the point that his testimony is contradictory earlier in the report?
>
> DMP – I now hit on this up in pt C which should provide a better setup for this point.

The panel has considerable concerns about Mr. Montague's understanding of the University's consent policy. Mr. Montague stressed that he had sought verbal consent from **REDACTED** during previous intimate encounters, which was confirmed by **REDACTED** account of their relationship; however, on the night of 18 October 2015, Mr. Montague told the panel he gauged consent through non-verbal cues. He told the panel a couple times that that he did not use force and that **REDACTED** did not say "no" during intercourse. The panel notes that the absence of force and the absence of "no" are not sufficient to gauge consent under the University policy, which requires positive, unambiguous, and voluntary agreement to engage in specific sexual activity. Mr. Montague also asked **REDACTED**, through the panel, "I know that taking off all clothes doesn't entail sex, but if you really did not want to have sex that night, why did you feel comfortable taking off all of your clothes in my bed?" **REDACTED** responded with great shock and dismay. She said she trusted Mr. Montague and that she had been very clear with him earlier that she wanted to "hook up but not have sex." The panel finds that Mr. Montague did not demonstrate a solid understanding of Yale's policy on sexual consent.

> **Comment [SS9]:** Let's discuss this paragraph.

**Conclusion:**

<u>The panel concludes by a preponderance of evidence that Mr. Montague sexually assaulted</u> **REDACT** **REDACTED** <u>in violation of Yale's sexual misconduct policy</u>.

**Recommendations:**

8

In making its recommendation, the panel took into account not only the findings in this case, but information relating to two previous disciplinary findings against Mr. Montague. In particular, the panel found relevant a previous UWC finding that Mr. Montague violated Yale's sexual misconduct policy, in the form of sexual harassment, in the fall of 2013.

At the time of the incident with **REDACTED** in the fall of 2014, Mr. Montague was on probation, had received sexual harassment and gender sensitivity training, and education and counseling on the appropriate use of alcohol. Furthermore, starting in the Spring Term of 2014, Mr. Montague was meeting with a member of the SHARE Center staff each semester to review and reflect on his interactions and relationships with female students at Yale. Mr. Montague had four meetings with SHARE Center staff between the previous violation of UWC policy and his sexual assault of **REDACTED** Students on probation are warned that "the commission of a serious offense while on probation will normally result in suspension or expulsion."

> Comment [DMP10]: Need to check this
>
> Comment [DMP11]: Check this

Mr. Montague was also given a reprimand on ??? for defiance of authority in violation of the Yale College undergraduate regulations.

> Comment [DMP12]: Need to check this

The panel is deeply concerned by the pattern of behavior by Mr. Montague, and his failure to take responsibility for and learn from actions that have caused considerable harm to others. Mr. Montague told the panel that he was sorry if **REDACTED** felt disrespected or harmed, but then spoke at length about the harm this UWC complaint had on his academic and athletic performance. He also told the panel that he was an ideal student, a role model at Yale, and had never experienced anything like this before. These statements are in contrast to Mr. Montague's two previous violations of Yale regulations.

The panel recommends that Mr. Montague be expelled from Yale University.


Respectfully,[2]

Sarah Demers
Eileen Donahue
Kimberly Harris
John Mayes
David Post (Panel Chair)

---

[2] The panel notes that on page 17 of the fact-finder's report, in the section addressing the testimony of Angela Gleason, the sentence starting "On October 19, 2014 …" should read "On October 19, 2015 …"

9

Confidential          YALE00008978