UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JACK MONTAGUE | : | |
| | : | |
|     Plaintiff | : | CIVIL ACTION NO.: |
| | : | 3:16-CV-00885-AVC |
| vs. | : | |
| | : | |
| YALE UNIVERSITY, ET AL | : | |
| | : | |
|     Defendants | : | JUNE 2, 2017 |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S COMBINED MOTION AND MEMORANDUM IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF IMPROPERLY WITHHELD DOCUMENTS, AND REQUEST FOR HEARING**

The defendants hereby oppose the plaintiff's motion to compel documents.

**I.      Statement of Facts**

The plaintiff's moving papers provide a distorted recitation of the plaintiff's version of the underlying facts in this action. Since most of information contained in the five pages devoted to the plaintiff's "Statement of Facts" is immaterial to the present motion, defendants will not comment point by point. However, the following facts have been established through discovery, including the deposition of the plaintiff:

1. Both Jane Roe and Angela Gleason − the only parties to their conversations − have categorically denied plaintiff's contention that Ms. Roe was pressured and misled by Ms. Gleason's "misrepresentations" into filing a formal complaint against the plaintiff before the University Wide Committee on Sexual Misconduct. (Depo. Angela Gleason December 13, 2016, at pp. 154-155, 177; Depo. Jane Roe March 23, 2017, at

pp. 40-44.)[1]  Indeed, Ms. Roe not only agreed to have the formal complaint filed, she voluntarily agreed to testify at the hearing held to adjudicate that complaint, she prepared a lengthy opening statement which she delivered to the UWC panel, and she wrote a spirited defense of the UWC's findings and penalty when the plaintiff attempted his unsuccessful appeal of the decision expelling him.  She cannot be fairly described as a reluctant participant in the proceedings.

2. Both Ms. Roe and Ms. Gleason testified under oath at their depositions that Ms. Gleason <u>never</u> informed Ms. Roe that the plaintiff had been charged in a prior UWC proceeding and had, as a result of that proceeding, been ordered to participate in training on sexual harassment and gender sensitivity.  It bears noting once again that Ms. Roe and Ms. Gleason were the only participants in the discussions between them; there can be no contrary non-hearsay testimony.  Both of them have testified that Ms. Gleason informed Ms. Roe that providing more training to Mr. Montague through an informal complaint process was not the best option in light of the fact that he had already received training; however, Ms. Gleason never mentioned any prior complaint against the plaintiff and she never suggested that he had received that training as a punishment in a prior proceeding.  (Depo. Angela Gleason December 13, 2016, at pp. 133-136; Depo. Jane Roe March 23, 2017, at pp. 19-20, 23, 32-36, 41-42, 52.)  Several witnesses have testified, without contradiction, that sexual harassment training is <u>not</u> obtained only through a punishment imposed by the UWC.  There are several

---

[1] Copies of relevant portions of the deposition transcripts of Angela Gleason and Jane Roe are attached hereto as Exhibits 1 and 2, respectively.  The redactions are to protect the confidentiality of Jane Roe.

other vehicles, apart from a formal complaint, in which sexual harassment training is provided. Accordingly, revealing that Mr. Montague had prior training was not tantamount to revealing that he had received that training as a punishment in a prior UWC complaint.

3. Plaintiff's statement on page 2 of his brief that "Mr. Montague <u>never</u> received the SHARE training" is contradicted by the sworn testimony of the plaintiff himself. In fact, at his deposition the plaintiff testified that he met with John Criscuolo, the sexual harassment trainer, a total of eight to ten times in conjunction with the discipline imposed upon him as a result of his first violation of Yale's Sexual Misconduct Policy. (Depo. Jack Montague March 30, 2017, at pp. 52-54, 60.)[2] The plaintiff also testified that he understood, prior to receiving the training from Mr. Criscuolo, that he should not engage in intercourse with a woman without ensuring that she had consented. (Depo. Jack Montague March 30, 2017, at p. 60.)

4. The plaintiff also admitted in his deposition that the UWC II panel was required to make a decision as to which of the two individuals – the plaintiff or Ms. Roe – was more believable. (Depo. Jack Montague March 30, 2017, at p. 123, 149.) He also agreed that he gave two conflicting stories as to how he obtained consent. During his interview with the factfinder he claimed he had verbally asked Ms. Roe and she verbally agreed to intercourse. When he testified before the UWC panel a few weeks

---

[2] Copies of relevant portions of the plaintiff's deposition transcript are attached hereto as Exhibit 3. The redactions at lines 6 and 24 on page 52 are to protect the confidentiality of Sally Smith. The remaining redactions are to protect the confidentiality of Jane Roe.

3

later, he changed his story and claimed that he had consent to intercourse "by conduct." (Depo. Jack Montague March 10, 2017, at pp. 124-125, 138, 151.) He further agreed that if, as Ms. Roe has consistently stated, Ms. Roe had told him three times that she was willing to engage in some sexual contact, but not intercourse, then in that circumstance, proceeding to engage in intercourse against her will would violate Yale's Sexual Misconduct Policies. (Depo. Jack Montague March 30, 2017, at pp. 120-125, 148-149.) He also testified that he was well aware of the fact that sexually penetrating a female student against her will was subject to expulsion. (Depo. Jack Montague March 30, 2017, at pp. 96, 123.) Finally, he agreed that one factor which the UWC panel could legitimately consider in deciding which person to believe is which of them provided credible and consistent testimony as to the critical issue of consent. (Depo. Jack Montague March 30, 2017, at pp. 213-214.) Since the plaintiff acknowledged giving two inconsistent statements about the way he obtained consent and since Ms. Roe's statements were completely consistent throughout the proceedings, it is not surprising that the panel would credit her testimony over his.[3]

## II. Documents Relating to the Meeting Among Angela Gleason, Jason Killheffer, Stephanie Spangler, and Susan Sawyer

The plaintiff argues that documents relating to the meeting among Ms. Gleason, Mr. Killheffer, Dr. Spangler, and Attorney Sawyer are discoverable because the defendants waived

---

[3] There are other inaccuracies in plaintiff's purported Statement of Facts. Since they are not material to the present motion, the defendants will not address them here. However, the defendants' failure to address those additional misstatements should not be construed as an agreement with the plaintiff's characterization of the underlying facts in this case.

the attorney-client privilege when Ms. Gleason and Mr. Killheffer provided deposition testimony relating to that meeting. There are two responses to this argument. First, there was no waiver of the privilege because neither witness gave any testimony whatsoever in their depositions as to statements made or advice given by Attorney Sawyer. Second, even if answering questions regarding the conversations of the non-lawyers at the meeting could somehow be construed as a waiver of the privilege with respect to the advice offered by Attorney Sawyer, these witnesses were not authorized to waive the privilege. In this regard, it is axiomatic that the attorney-client privilege is owned by the corporation, not by a particular individual. There has been no showing that either Ms. Gleason or Mr. Killheffer had authority to waive the privilege.

"The administration of the attorney-client privilege in the case of corporations…presents special problems. As an inanimate entity, a corporation must act through agents. A corporation cannot speak directly to its lawyers. Similarly, it cannot directly waive the privilege when disclosure is in its best interest. Each of these actions must necessarily be undertaken by individuals empowered to act on behalf of the corporation." Commodity Futures Trading Com v. Weintraub, 471 U.S. 343, 348 (1985). "Because corporations may only act through representatives, 'any privilege that attaches to communications on corporate matters between corporate employees and corporate counsel belongs to the corporation, not to the individual employee[;] employees generally may not prevent a corporation from [asserting or] waiving the attorney-client privilege arising from such communications.'" *United States v. Int'l Bhd. of Teamsters*, 119 F.3d at 215. The power

to assert or waive a corporation's attorney-client privilege generally rests with the corporation's management and is exercised by its officers and directors. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. at 349." Mackenzie-Childs LLC v. Mackenzie-Childs, 262 F.R.D. 241, 248 (W.D.N.Y. 2009). See also, United States v. Ghavami, 882 F. Sup. 2d 532, 538, 544 (S.D.N.Y. 2012) ("Only the party that possesses the privilege may assert or waive it." "[A] corporate employee without authority cannot effect waiver of a privilege that belongs to the corporation."); Winans v. Starbucks Corp., 2010 U.S. Dist. LEXIS 134136, at *9 (S.D.N.Y. Dec. 15, 2010) ("Where a corporate entity seeks legal advice, the attorney-client privilege belongs to the corporation alone. See In re O.P.M. Leasing Services, Inc., 670 F.2d 383, 386 (2d Cir. 1982). It follows that the privilege may be waived only by corporate officers or directors with the authority to do so. See id.; Barcomb v. Sabo, No. 07-CV-877, 2009 U.S. Dist. LEXIS 120402, 2009 WL 5214878, at *4 (N.D.N.Y. Dec. 28, 2009"; Business Integration Services, Inc. v. AT & T Corp., 251 F.R.D. 121, 128 (S.D.N.Y. 2008).")

Neither Ms. Gleason nor Mr. Killheffer is a corporate officer or director of Yale University. Ms. Gleason is an Assistant Director of the Center for Language Study, Director of the Native American Language Project, and a Deputy Title IX Coordinator. (Depo. Angela Gleason December 13, 2016, at p. 12.) Mr. Killheffer is an Assistant Provost and the Senior Deputy Title IX Coordinator. (Depo. Jason Killheffer January 10, 2017, at p. 6.)[4] Since the attorney-client privilege belongs to Yale University, and Ms. Gleason and Mr. Killheffer are

---

[4] Copies of relevant portions of Mr. Killheffer's deposition transcript are attached hereto as Exhibit 4.

6

not officers or directors, they did not have the authority to waive the privilege on Yale University's behalf. Thus, any discussion by Ms. Gleason and Mr. Killheffer regarding the meeting among Ms. Gleason, Mr. Killheffer, Dr. Spangler, and Attorney Sawyer did not waive the attorney-client privilege.

More fundamentally, neither Ms. Gleason nor Mr. Killheffer revealed anything about the communications of Attorney Sawyer during their depositions. Defense counsel was careful to protect the attorney-client privilege, cautioning Ms. Gleason not to reveal the content of Attorney Sawyer's participation in the discussion:

> Q. Okay. And do you recall whether Ms. Sawyer gave legal advice to you during this meeting? Without revealing what the legal advice may have been?
>
> MR. NOONAN: Just answer that yes or no. Don't give any substance of what she said.

(Depo. Angela Gleason December 13, 2016, at p. 121.)

> Q. Okay. Do you remember the topics that were discussed at this meeting?
>
> MR. NOONAN: Again, at this point I don't have any objection to you talking about topics that others talked about, but don't mention anything Attorney Sawyer mentioned. So you can talk about what other people said, just not her.

(Depo. Angela Gleason December 13, 2016, at p. 121.)

> Q. Am I correct that this reflects a meeting that you had at 3:00 o'clock in the afternoon on that day, with Susan, Jason, Aley and David?
>
> A. Correct.
>
> Q. And this is Susan Sawyer, Jason Killheffer, Aley Menon, and David Post; is that right?

>       A.      Yes.
>
>       Q.      Do you remember what the purpose of that meeting was?
>
>               MR. NOONAN:     There's no redaction there, just so you know.
>
>               MS. DEAL:    I understand.  It's just a note that it happened.
>
>               MR. NOONAN:     Again, just don't repeat anything Susan said.

(Depo. Angela Gleason December 13, 2016, at pp. 122-23.)  Plaintiff's counsel never even asked Mr. Killheffer about any statements made or advice given by Attorney Sawyer during the meeting in question.  Thus, a cautionary instruction would not have been appropriate during his deposition.  Since Ms. Gleason and Mr. Killheffer did not provide testimony about Attorney Sawyer's advice, since they do not have the requisite authority to waive the attorney-client privilege, and since defense counsel took all appropriate steps to protect that privilege, the privilege has not been waived as to communications with Attorney Sawyer.

The plaintiff further argues that "these documents are central (indeed, potentially crucial) to the litigation" and "highly relevant," and therefore should be produced.  He then suggests that certain facts concerning the meeting among Ms. Gleason, Mr. Killheffer, Dr. Spangler, and Attorney Sawyer are not in dispute.  (Mot. to Compel, at pp. 16-17.)  The defendant does not agree these facts are not in dispute, and only agrees that a meeting occurred on or about November 4, 2015 among Ms. Gleason, Mr. Killheffer, Dr. Spangler, and Attorney Sawyer.  Even if the documents are central to the litigation and highly relevant, that is not sufficient to defeat the attorney-client privilege.  "The fact that an attorney-client communication is relevant to a material issue in a case does not overcome the attorney-client

privilege.  If it did, the privilege would be eviscerated."  Aiossa v. Bank of Am., N.A., 2011 U.S. Dist. LEXIS 102207 *12 (E.D.N.Y. Sep. 12, 2011), *aff'd*, 2011 U.S. Dist. LEXIS 142352 (E.D.N.Y. December 8, 2011).

The redacted portions in Ms. Gleason's November 6, 2015, 3:46 p.m. e-mail and Mr. Post's November 6, 2015, 7:23 p.m. e-mail are irrelevant to this action because they discuss a potential sexual misconduct complaint against a different student.  The communications in no way relate to the plaintiff, the complaint brought against him by Jane Roe, or the meeting among Ms. Gleason, Mr. Killheffer, Dr. Spangler, and Attorney Sawyer.  Requiring production of those materials would violate the privacy interests of persons who are not parties to this action without providing any information relevant to this action.

For the foregoing reasons, the plaintiff's motion to compel unredacted copies of the documents attached to the Motion to Compel as Exhibits D, G, and H should be denied.

### III. Documents Provided to Yale's Lawyers for Review and Comment, and Documents Regarding Media Inquiries

The plaintiff seeks a multitude of documents on the grounds that Yale's lawyers employed in Yale's Office of General Counsel were performing functions that any member of the UWC or Title IX team could have performed.  (Mot. to Compel, at pp. 19-21.)  The fact that both attorneys and lay individuals participated in drafting and editing the reports connected with the investigation of the UWC complaint against the plaintiff does not defeat the attorney-client privilege.

In Marsh v. Safir, 2000 U.S. Dist. LEXIS 5136 (S.D.N.Y. April 21, 2000), the district court explained that legal professionals assess documents from a different perspective than a

lay person, and therefore, undertake a different analysis. In Marsh, the plaintiff brought suit alleging that the defendants forced her out of her position as the head of the Police Department's Office of Equal Employment Opportunity ("OEEO") in retaliation for her approval of an investigative report by OEEO personnel that accused two senior police officials of misconduct. One issue in the discovery dispute concerned the defendants' refusal to produce several copies of internal OEEO reports that contained handwritten notations by the Police Department's Deputy Commissioner for Legal Affairs and another attorney employed by the Department. Id. at *1.

After conducting an investigation, the OEEO drafted eight reports addressing eight different complaints of sexual harassment and/or retaliation which had been filed with the OEEO; these reports were reviewed by the plaintiff and the Commanding Officer of the OEEO before they were issued. Id. at *2-5. The reports submitted by the OEEO were initially reviewed by the commanding officer in the Police Commissioner's office, who recommended consultation with the chief legal officer regarding his suggestion relating to the interrogation of an officer regarding her misconduct. After reviewing the reports, the Police Commissioner consulted the chief legal officer because he was concerned about whether charges should be brought against an officer who was an OEEO complainant. The chief legal officer and his deputy then reviewed the reports and made handwritten notes on them. Id. at *2-5.

Opposing the defendants' claim that the conversations in which the attorneys participated and the resulting documents were protected by the attorney-client privilege, the plaintiff argued that the reading and assessment of the OEEO reports were not a lawyer's

10

function. In support of that argument, she noted that non-lawyers performed the same reviews and assessments. Id. at *34. The district court disagreed, explaining:

> [A]n individual with legal training would be likely to review such documents from a somewhat different perspective. First, the attorney is more likely to be familiar with the law governing sexual harassment and retaliation claims, and would therefore be likely to assess the evidentiary presentation with an eye to whether the evidence meets relevant criteria. Moreover, given the attorney's training, he or she will probably be more attuned to the nuances of the text and to the potential legal pitfalls that such a report, and any decision based upon it, might encounter if the evidence is insufficient to justify whatever action the Commissioner might contemplate taking in reliance on the report.

Id. at *35-36. The district court concluded that: "Given the multi-faceted nature of the issues posed by the OEEO complaints and reports, it is entirely plausible that the Commissioner would have asked both lawyers and non-lawyers to read and assess the reports for somewhat different reasons, and that each group would have performed that task somewhat differently and from a somewhat different perspective." Accordingly, the district court ruled that the request to the attorneys to assess the OEEO reports and the attorneys' responses, including the handwritten notes on the reports, were protected by the attorney-client privilege. Id. at *37-38, 53.

As noted by the present plaintiff, David Post described Attorney Sawyer as the procedural advisor for the UWC who provided legal advice. (Mot. to Compel, at p. 20.) The fact that non-attorneys also participated in drafting reports does not overcome the attorney-client privilege. Therefore, both the questions posed to Attorney Sawyer seeking her advice, and her responses, are protected from disclosure. In a similar vein, the plaintiff seeks

11

production of e-mails and documents relating to an outline drafted by Attorney Harold Rose in the Office of the General Counsel and directed to the members of the Yale Corporation.[5] As explained above, the fact that lay individuals also commented and edited that document does not eviscerate the attorney-client privilege. The outline prepared by Attorney Rose is clearly protected by the attorney-client privilege.

The plaintiff further claims that by disclosing some of Attorney Sawyer's comments concerning the Fact-Finder's Report and the Panel Report, the defendants have waived the attorney-client privilege as to Attorney Sawyer's role in the entirety of the UWC process. Defense counsel appropriately made a good faith effort to disclose communications to and from Attorney Sawyer when it appeared that the communications did not appear to relate to legal advice. It would be difficult to conclude that this good faith attempt results in a blanket waiver of all communications to or from Attorney Sawyer. Even if they mistakenly failed to redact some of those comments which could be characterized as attorney-client material, that would constitute a waiver of the attorney-client privilege only with respect to those documents.[6]

The plaintiff requests production of an unredacted copy of the e-mails attached as Exhibit R to the motion to compel. In those e-mails, it is clear that Alice Menon was asking Attorney Sawyer for legal advice regarding questions posed to her by Dean Jonathan Holloway, and Attorney Sawyer provides a proposed response. Ms. Menon also requested

---

[5] Members of the Yale Corporation function similarly to a board of directors of a corporation.

[6] It should be noted that, because of the breadth of plaintiff's counsel's discovery requests, defense counsel has reviewed tens of thousands of pages of documents.

legal advice on answering the plaintiff's e-mail and Attorney Sawyer provides a response to that. Since Ms. Menon requested legal advice as to how she should respond to Dean Holloway and the plaintiff, the responses are clearly protected by the attorney-client privilege. Accordingly, the plaintiff's motion to compel production of these documents should be denied.

In the same vein, the plaintiff seeks to compel similar e-mails and documents which the defendants have withheld as privileged, in which Ms. Menon and John Criscuolo requested legal advice from Attorney Sawyer. Some of the requested advice concerns responses to e-mails from the plaintiff following his expulsion and retention of an attorney. Since these e-mails seek legal advice and legal advice was provided, they are clearly protected by the attorney-client privilege.

The plaintiff also requests disclosure of e-mails from Attorney Sawyer advising Yale employees on how to respond to media inquiries. (Mot. to Compel, at pp. 24-25.) The district court in Leber v. Citigroup 401(k) Plan Inv. Comm., 2015 U.S. Dist. LEXIS 144367 (S.D.N.Y. October 16, 2015), recognized that communications with counsel regarding media inquiries are protected by the attorney-client privilege. In that case, the plaintiffs sought production of documents relating to the planned response by the defendant to inquiries posed by a journalist researching financial institutions' use of proprietary funds in their 401(k) plans. Id. at *3. The district court concluded that the comments by counsel constituted legal advice:

> Fundamentally, legal advice involves the interpretation and application of legal principles to guide future conduct or assess past conduct and involve[s] the judgment of a lawyer in his capacity as a lawyer. Courts have recognized that attorneys who have advised their clients on public relations matters continued to render legal advice where [t]he legal ramifications and potential

13

> adverse use of such communications were material factors in the development of the communications.

(Internal quotations and citations omitted.) Id. at *8-9, citing, In re Grand Jury Subpoenas Dated Mar. 24, 2003, 265 F. Supp. 2d 321, 330 (S.D.N.Y. 2003) ("Questions such as whether the client should speak to the media at all, whether to do so directly or through representatives, whether and to what extent to comment on specific allegations, and a host of others can be decided without careful legal input only at the client's extreme peril."). Since the communications with Attorney Sawyer clearly contemplated the legal ramifications of the defendant's response to the journalist's inquiries and was conducted by and at the direction of counsel, in their capacity as attorneys, the district court concluded that the communications were privileged and denied the motion to compel those documents. Id. at *9-11. See also, Dongguk Univ. v. Yale Univ., 2011 U.S. Dist. LEXIS 53751 (D. Conn. May 19, 2011) (district court found communications between Yale's in-house counsel and employees of Yale concerning how to publicly respond to the news of an investigation before a lawsuit was filed were protected from disclosure by the attorney-client privilege). The same rationale applies in the present case.

The present defendants received media inquiries from the Yale Daily News, New York Times, Hartford Courant, Jezebel, and other media outlets posing specific questions regarding the plaintiff's expulsion in February, 2016 and the lawsuit he filed in June, 2016. The inquiries also requested information on the UWC procedures. Responding to those inquiries had legal ramifications, and were therefore discussed with attorneys in the Office of the General Counsel. The plaintiff himself had retained an attorney as early as March 3, 2016,

eight days after his internal appeal was denied. See, "Storm brews on Yale campus following departure of ex-basketball captain," New Haven Register, March 3, 2016, available at http://www.nhregister.com/sports/20160303/storm-brews-on-yale-campus-following-departure-of-ex-basketball-captain. Since the media inquiries requested information which clearly had legal ramifications, the communications between Yale employees and Yale's counsel are protected by the attorney-client privilege and the motion to compel those documents should be denied. See, Leber and Dongguk, supra.

For the foregoing reasons, the defendant should not be required to produce the documents requested in Section II of the plaintiff's motion to compel.

**IV.     Documents Disclosed to Miriam Berkman**

The plaintiff also seeks to obtain the communications with or disclosed to Ms. Berkman. (Mot. to Compel, at pp. 25-26.) Defendant Yale hired Ms. Berkman to conduct an investigation into Ms. Roe's complaint against the plaintiff. Ms. Berkman was working at the behest of Yale and as its agent. Therefore, the attorney-client privilege extends to communications with Ms. Berkman. In Morganti Nat'l, Inc. v. Greenwich Hosp. Ass'n, 2001 Conn. Super. LEXIS 1751 (June 27, 2001), the plaintiff sought production of all documents authored or received by certain employees and agents of Turner Construction Company, which had been retained by the Hospital to perform construction management services on the project which formed the basis of the litigation. The court observed: "Communications to third parties who are agents or employees of an attorney or a client and who are necessary to the consultation will not destroy the confidential nature of the communications." The court denied

15

the motion to compel. Id. at *1-2. In the present case, Ms. Berkman was necessary to the consultation because she was performing the investigation of the UWC complaint. Therefore, the attorney-client privilege was not destroyed by counsel communicating with Ms. Berkman.

The plaintiff also requests a number of e-mails from Attorney Rose instructing Ms. Berkman and employees of Yale University to preserve their documents and requesting information regarding their computers. These instructions were sent after plaintiff's counsel indicated that the plaintiff intended to bring suit. The vast majority of the federal courts have determined that instructions from counsel to preserve documents, often referred to as "litigation hold letters," are protected by the attorney-client privilege. See, EEOC v. Beauty Enters., 2008 U.S. Dist. LEXIS 60414 *14-15 (D. Conn. August 8, 2008) (Nevas, J.) (denying plaintiff's request for production of a letter from counsel to the defendants' supervisors advising them to implement a litigation hold on the ground that "the communication is privileged"); Buxbaum v. St. Vincent's Health Servs., 2013 U.S. Dist. LEXIS 2246 *17 (D. Conn. January 7, 2013) (Eginton, J.) (holding that emails between counsel and defendant's employee concerning a litigation hold "are protected by the attorney-client privilege as they are a confidential communication between client and counsel where legal advice is sought and provided"); Gordon v. City of N.Y., 2016 U.S. Dist. LEXIS 91035 *5 (S.D.N.Y. July 13, 2016) (holding that communications concerning the preservation and collection of documents "are work product, and need not be produced"); McDevitt v. Verizon Servs. Corp., 2016 U.S. Dist. LEXIS 34777 *2 (E.D. Pa. February 22, 2016) ("Generally, litigation hold letters exchanged between attorneys and their clients are privileged communications"); Muro v.

Target Corp., 250 F.R.D. 350, 360 (N.D. Ill. 2007) (holding that litigation hold notices are "communications of legal advice from corporate counsel to corporate employees regarding document preservation" and thus, privileged); Turner v. Resort Condos. Int'l, 2006 U.S. Dist. LEXIS 48561 *7-8 (S.D. Ind. July 13, 2006) (denying plaintiff's motion to compel production of litigation hold document because it was privileged); Estate of Carlock v. Williamson, 2011 U.S. Dist. LEXIS 7596, at *14 (C.D. Ill. January 26, 2011) (agreeing with the defendants that litigation hold spreadsheet was subject to a claim of privilege); Agne v. Papa John's Int'l, Inc., 2012 U.S. Dist. LEXIS 193375 *8 (W.D. Wash. February 6, 2012) (holding that litigation hold notices generally are not discoverable); Personal Web Techs., LLC v. Google Inc., 2014 U.S. Dist. LEXIS 116140 *11 (N.D. Cal. August 19, 2014) ("the litigation hold notice itself is protected as attorney-client communications and/or work product").  Therefore, the e-mails from Attorney Rose with instructions to preserve documents are protected by the attorney-client privilege.

**V.      Communications Between Ms. Roe and Her Therapist Should Not Be Disclosed.**

Even if the Court determines that the communications with Ms. Berkman are not all protected by the attorney-client privilege, the Court should still deny the plaintiff's motion to compel DOCID00017795, line 179 on Exhibit B.  That document is an e-mail from Jane Roe to Ms. Berkman simply forwarding a communication between Ms. Roe and a therapist she consulted at a rape crisis center.  The therapist is the Assistant Director of the rape crisis center and is a licensed clinical psychologist.  Ms. Roe consulted the therapist after the plaintiff had sexual intercourse with Ms. Roe over her objection.  The privilege log clearly indicates that

this communication is privileged because it is between a patient and a therapist. See, Exhibit B, line 179.

The communication is protected from disclosure by both Conn. Gen. Stat. §§ 52-146c and 52-146k. Conn. Gen. Stat. § 52-146c provides that communications between a person and a psychologist are privileged, and a psychologist is prohibited from disclosing that communication in the course of a civil action unless the person waives the privilege. Similarly, under Conn. Gen. Stat. § 52-146k, a sexual assault counselor is prohibited from disclosing any confidential communications made by a victim in any civil case unless the victim waives the privilege. Ms. Roe has not authorized the therapist to disclose her communications with Ms. Roe in this litigation. It appears that the plaintiff believes that Ms. Roe waived the privileges contained in Conn. Gen. Stat. §§ 52-146c and 52-146k when she forwarded the communication to Ms. Berkman. Ms. Roe forwarded the communication to Ms. Berkman in the course of the investigation into the sexual misconduct complaint against the plaintiff. By cooperating in the investigation, Ms. Roe did not knowingly and voluntarily waive the privilege protecting the communication from disclosure in this civil action, especially since she is not a party to this action. The defendant is not permitted to disclose the communication between Ms. Roe and the therapist without Ms. Roe's authorization. Since Ms. Roe has not provided that authorization, the plaintiff's motion to compel the communication between Ms. Roe and the therapist should be denied.

## **CONCLUSION**

For the foregoing reasons, the plaintiff's Motion to Compel should be denied.

                                        THE DEFENDANTS


BY:  /s/ Patrick M. Noonan (#ct00189)
      Patrick M. Noonan
      Colleen Noonan Davis (#ct27773)
      Donahue, Durham & Noonan, P.C.
      741 Boston Post Road
      Guilford, CT 06437
      (203) 458-9168


## CERTIFICATION

      I hereby certify that, on the above-written date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

                                        /s/
                              Patrick M. Noonan