UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF CONNECTICUT

CIVIL ACTION No: 3:16 cv-00885-AVC

------------------------------------x

JACK MONTAGUE,                      :

    Plaintiff,                      :

        -v-                         :

YALE UNIVERSITY, ANGELA GLEASON,    :

And JASON KILLHEFFER,               :

    Defendants.                     :

------------------------------------x

        Depositon of ANGELA GLEASON, taken pursuant to Notice, held at the Law Offices of Jacobs & Dow, LLC, 350 Orange Street, New Haven, Connecticut, before James A. Martone, LSR #248, and Notary Public, in and for the State of Connecticut, on December 13, 2016, at 10:30 a.m.

```
 1     Q.    So you were at Princeton until 2009?
 2     A.    That's correct.
 3     Q.    And what did you do in 2009?
 4     A.    Until December, I applied for jobs.  And I
 5  started at Yale in January of 2010.
 6     Q.    And in January of 2010, what was your
 7  position at Yale?
 8     A.    I was hired as Assistant Director of the
 9  Center for Language Study.
10     Q.    Is that still your position at Yale?
11     A.    It is.
12     Q.    Okay.  Other than being the Assistant
13  Director of the Center of Language Study, do you hold
14  any other positions at Yale?
15     A.    I do.
16     Q.    And what are those?
17     A.    Deputy Title 9 Coordinator for Yale
18  College.
19     Q.    And when did you start being a Deputy Title
20  9 Coordinator for Yale?
21     A.    July of 2014.
22     Q.    Was that your first position as a Title 9
23  Coordinator?
24     A.    Yes.
25     Q.    Okay.  And how did that come about?
```

1    Q.   Okay.  And do you recall whether Ms. Sawyer
2  gave legal advice to you during this meeting?  Without
3  revealing what the legal advice may have been?
4            MR. NOONAN:  Just answer that yes or
5  no.  Don't give any substance of what she said.
6    A.   I remember her speaking, yes.
7    Q.   Okay.  Would you characterize what she said
8  as legal advice?
9    A.   I believe so.
10   Q.   Okay.  Did your notes reflect things that
11 Ms. Sawyer said to you during that meeting?
12   A.   I can't see my notes.
13   Q.   Sitting here today, can you remember
14 whether these notes reflect what Ms. Sawyer said to
15 you during the meeting?
16   A.   I don't remember.
17   Q.   Okay.  Do you remember the topics that were
18 discussed at this meeting?
19            MR. NOONAN:  Again, at this point I
20 don't have any objection to you talking about topics
21 that others talked about, but don't mention anything
22 Attorney Sawyer mentioned.  So you can talk about what
23 other people said, just not her.
24   A.   I don't know how to separate them.  Because
25 I remember, I feel like largely, whatever was

1   discussed, everyone contributed to.
2       Q.   Did you have a particular concern going
3   into this meeting about what we're calling the "Jack M
4   case"?
5       A.   I didn't call it the Jack M case.
6            MR. NOONAN:  You mean more than what
7   she's talked about, that it was a sexual assault?
8       Q.   Did you have some particular concern you
9   needed to raise with Stephanie, Susan and Jason about
10  the Jack M case?
11      A.   I don't remember I did.  I didn't call the
12  meeting.
13      Q.   Okay.  Was it Jason who called the meeting?
14      A.   The e-mail seems to reflect that.
15      Q.   Okay.  Do you remember if he had a specific
16  concern?
17      A.   I don't remember.
18      Q.   And then there's a note further down on
19  that page, the same day, it says "Susan, Jason, Aley
20  and David."  Do you see that?
21      A.   Yes.
22      Q.   Am I correct that this reflects a meeting
23  that you had at 3:00 o'clock in the afternoon on that
24  day, with Susan, Jason, Aley and David?
25      A.   Correct.

```
 1      Q.   And this is Susan Sawyer, Jason Killheffer,
 2   Aley Menon, and David Post; is that right?
 3      A.   Yes.
 4      Q.   Do you remember what the purpose of that
 5   meeting was?
 6               MR. NOONAN:  There's no redaction
 7   there, just so you know.
 8               MS. DEAL:  I understand.  It's just a
 9   note that it happened.
10               MR. NOONAN:  Again, just don't repeat
11   anything Susan said.
12      A.   Okay.  I don't remember really anything
13   about that meeting.  And I actually don't remember
14   that it -- I actually don't remember that it happened.
15      Q.   Do you have any idea what that note means
16   then?
17      A.   I believe it had to do with someone from
18   the UWC being available if questions were asked about
19   the UWC process.
20      Q.   By whom?
21      A.   [redacted] I believe.
22      Q.   Okay, and why would [redacted] be asking
23   questions about the UWC process?
24      A.   If a formal complaint was made.
25      Q.   Okay.  Had your plan changed at this point?
```

1    Q.   And that's the same day that you met with
2  Jason Killheffer and Stephanie Spangler and Susan
3  Sawyer, right?
4    A.   I believe so.
5    Q.   And you discussed something about Jack
6  Montague's case?
7    A.   Correct.
8    Q.   Okay. And you say to ▒▒▒▒ "There's a new
9  development in the case we discussed." Do you see
10 where I'm reading?
11   A.   Yes.
12   Q.   What is that new development?
13   A.   In terms of the new development that I
14 would discuss with ▒▒▒▒ or the new development?
15   Q.   Well, you told her there was a new
16 development in the case.
17   A.   Correct.
18   Q.   What are you referencing there?
19   A.   The new development in the case that I
20 would discuss with ▒▒▒▒ is that Jack had received
21 sensitivity training, which is what she had
22 recommended that he receive.
23   Q.   Okay. But you hadn't actually confirmed at
24 this point that Jack had actually received sensitivity
25 training, is that right?

1     A.    I hadn't confirmed that.
2     Q.    Okay. And I believe you told me earlier
3  that your understanding of Yale's confidentiality
4  policy is that you may not reveal to another student
5  the fact that a student has been disciplined, as a
6  result of a UWC process; is that correct?
7     A.    That's correct.
8     Q.    Okay. So were you planning to tell ▮▮▮▮
9  that Jack had been disciplined as a result of the UWC
10 process?
11    A.    No.
12    Q.    Well, what were you planning to tell her at
13 this point?
14    A.    That he had already received sensitivity
15 training.
16    Q.    Okay. Was that not because he had been
17 sanctioned by the UWC?
18             MR. NOONAN: Are you asking her
19 whether she was going to tell ▮▮▮▮ that?
20    Q.    I'm asking you, isn't the sensitivity
21 training part of his sanction?
22    A.    It is, but that's not what I would tell
23 ▮▮▮▮.
24    Q.    Okay.
25    A.    That's not what I did tell ▮▮▮▮.

```
 1      Q.   What did you tell [REDACTED]?
 2      A.   That he had already received sensitivity
 3   training.
 4      Q.   Did you tell her why he had already
 5   received sensitivity training?
 6      A.   No.
 7      Q.   Did you tell her when he had received
 8   sensitivity training?
 9      A.   I don't believe so.  Because I don't
10   believe that I knew.
11      Q.   Okay.
12      A.   And in fact, it wouldn't have mattered.
13      Q.   Under what circumstances would a person
14   receive sensitivity training from the Share Center?
15      A.   I could recommend it, as a voluntary course
16   of action and often do.  I have no way of finding out
17   if someone does or not.
18      Q.   Okay.
19      A.   It could also be part of a decision, part
20   of a recommendation from a finding.  And generally I
21   just believe anyone, any member of the Yale community
22   can receive it if they want to.  You know, it could be
23   requested by any individual unit for an employee or,
24   you know, a student or a member of a group.
25      Q.   Okay.  Do you recall what you told [REDACTED]
```

```
 1   about Jack's sensitivity training?
 2        A.   I believe I said that he had already
 3   received sensitivity training.
 4             MS. DEAL:   Let's mark this.
 5             (Plaintiff's Exhibit 13
 6             Marked for identification)
 7        Q.   So I've marked as Exhibit 13, the Fact
 8   Finder's report in the complaint brought by Jason
 9   Killheffer on behalf of [REDACTED] against Jack
10   Montague.  Can you turn to page 8 of that report
11   please.
12        A.   Okay.
13        Q.   Just so we are clear, when there's a formal
14   UWC process, the UWC engages a fact finder to
15   interview the complainant, the respondent and
16   witnesses, is that right?
17        A.   I believe so.
18        Q.   Okay.  And then the fact finder records his
19   or her findings in a report; is that right?
20        A.   I believe so.
21        Q.   All right.
22        A.   I'm not entirely familiar.
23        Q.   So if you'd turn to page 8 of this report.
24   And if you look at the middle paragraph.  And this has
25   been redacted but I think we can all agree this is the
```

1    Q.   What does "It's okay for ▓▓▓ to be named
2   in the complaint" mean?
3    A.   I believe that means that if the university
4   filed a complaint, that ▓▓▓ could be named in that
5   complaint.  And what I mean by that is that she agreed
6   to be named, that it was okay for her to be named in
7   the complaint.
8    Q.   Okay.  Did you make any recommendation to
9   her, about what you thought the course of action
10  should be at this point?
11   A.   No.
12   Q.   Did you tell her that she still had
13  available to her an informal course of action?
14   A.   At this meeting?
15   Q.   Yeah.
16   A.   I don't recall.
17   Q.   Okay.  Did she still have available to her
18  an informal corse of action?
19   A.   There were accommodations that were always
20  available to her.
21   Q.   Was it necessary that a formal complaint be
22  filed?
23   A.   I don't know.
24   Q.   Did you feel it was necessary for a formal
25  complaint to be filed?

1    A.    Did I at that time?
2    Q.    Yes.
3    A.    I don't know.
4    Q.    Okay.  Did you give her your opinion at
5    all --
6    A.    No.
7    Q.    -- on what you thought the appropriate
8    course of action might be?
9    A.    I did not.
10   Q.    But you presented to her the option of the
11   university filing a Title 9 complaint on her behalf?
12   A.    Not on her behalf.
13   Q.    Filing a Title 9 complaint?
14   A.    Correct.
15   Q.    Okay.  And why did you present that option
16   to her?
17   A.    Because it was a possibility that the Title
18   9 office would file a complaint against Jack Montague.
19   Q.    So had you abandoned the plan all together
20   that you had previously formulated with ▓▓▓▓?
21   A.    Not that I know of.  I don't ever remember
22   discussing abandoning anything.
23   Q.    Did you tell her at that first meeting that
24   a formal complaint was an option for her?
25   A.    Which first meeting?

```
 1      A.   I don't believe so.
 2      Q.   Did you ask for her to participate in the
 3   case?
 4      A.   I don't believe I ever asked her to.  I
 5   believe I remember talking to her about the option
 6   that she could, if she wanted to participate in a
 7   formal complaint, as a witness.
 8      Q.   Okay.  But it's your testimony that you did
 9   not urge her to do so?
10      A.   No.
11      Q.   Okay.  And you did not urge her to
12   participate in the complaint process, the formal
13   complaint process?
14      A.   No.
15                  MS. DEAL:  Mark this.
16                  (Plaintiff's Exhibit 18
17                  Marked for identification)
18      Q.   If you can take a look at Exhibit 18
19   please.  Do you recognize this?
20      A.   No, I don't believe so.  And the reason I
21   say that is because I'm often copied on e-mails to
22   other people that have documents.  And I don't believe
23   I was copied on this.  But I don't know.
24      Q.   Okay.  Did you read drafts of the complaint
25   against Mr. Montague before it was actually filed?
```