UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

--------------------------------- x
JACK MONTAGUE,                    :
                                  :
        Plaintiffs,               :
                                  :
    -versus-                      : CIVIL ACTION
                                  : No. 3:16-cv-00885-AVC
YALE UNIVERSITY, ANGELA GLEASON   :
and JASON KILLHEFFER,             :
                                  :
        Defendants                x
---------------------------------

      Deposition of ███████████████, taken pursuant to Rule 30 of the Federal Rules of Civil Procedure, held at the law offices of Jacobs and Dow, LLC, 350 Orange Street, New Haven, Connecticut, before Rosanne LaBonia, LSR 249 and Notary Public in and for the State of Connecticut, on March 23, 2017, at 12:10 P.M.

```
 1      Q    Where did you meet?
 2      A    Dow Hall where the Center For Language
 3   Study is, which was our primary appointment.
 4      Q    Did anybody else attend the meeting aside
 5   from you and Ms. Gleason?
 6      A    David Post attended the meeting, but not at
 7   the beginning.
 8      Q    So at the beginning it was just you and
 9   Ms. Gleason?
10      A    Yes.
11      Q    I think you told me that she said she had
12   some new information for you?
13      A    She said a new development.
14      Q    A new development, sorry.  Did she tell you
15   at the meeting what that new development was?
16      A    Yes.
17      Q    What did she tell you about that new
18   development?
19      A    She told me that after I had filed my
20   informal complaint, that she learned or looked up that
21   Jack had already gone through the sensitivity training
22   that I had suggested that he go through.
23      Q    Did she tell you where she looked that up?
24      A    No.
25      Q    What did you understand her to be saying
```

MONTAGUE v. YALE UNIVERSITY                          March 23, 2017

Page 20

1   when she said she looked it up?
2       A    That the Title IX officers have some sort
3   of record of who goes through sensitivity training.
4       Q    Did you have a belief as to why Title IX
5   would have that record?
6       A    Because they're the one who offers the
7   sensitivity training.
8       Q    Did she explain to you any further what
9   training he had received?
10      A    She said sensitivity training.
11      Q    She didn't explain to you then anything
12  about the sensitivity training that he had received?
13      A    No.
14      Q    But your understanding was that she got
15  that information from some records that Title IX keeps,
16  the Title IX office keeps.
17      A    Yes.
18      Q    Your understanding was that the Title IX
19  office keeps those records of people who have been
20  referred to sensitivity training because of a complaint
21  of sexual misconduct, correct?
22              MR. NOONAN:  Objection.
23              Mischaracterization.  She said she assumed
24              that Angie got it from records, but nothing
25              was said about it.

Electronically signed by ROSANNE LABONIA (501-218-496-1146)          9090e572-c8fb-433c-bc39-648b103a2923

```
 1    is a way to resolve a complaint of sexual misconduct.
 2         A    Yes, I think so.
 3         Q    You know that from talking to Ms. Gleason,
 4    right?  I mean she told you that sensitivity training
 5    would be one option for resolving your complaint
 6    against Jack, right?
 7         A    Yes.
 8         Q    And so you understood that sensitivity
 9    training was a way to resolve a complaint of sexual
10    misconduct.
11         A    Yes.
12         Q    Ms. Gleason also told you that because Jack
13    had already received that training, it was no longer an
14    option for him, is that right?
15              MR. SCONZO:  Objection.
16         A    No.
17         Q    She didn't say that to you?
18         A    No.
19         Q    She also explained to you that he had been
20    given a recommendation for training after a previous
21    complaint, is that right?
22              MR. NOONAN:  Objection.
23         A    No.
24         Q    You met with -- we're jumping ahead a
25    little bit here, but you met with a fact finder in this
```

1      A     Yes.
2      Q     What does that mean?
3      A     I'm not sure how to clarify this.  Sorry, I
4   just think it's pretty clear.  Yeah, I had viewed the
5   incident as a mistake that he made, and that's why I
6   wanted him to go through sensitivity training because I
7   thought he made a mistake.
8      Q     Did your view of that change?
9      A     Yes.
10     Q     Why did your view of that change?
11     A     Because he had gone through sensitivity
12  training.
13     Q     So did that make you believe that it was
14  not a mistake?
15     A     Yes.
16     Q     And did that make you believe that it was
17  not a one-time mistake?
18     A     It made me believe it was not a mistake.
19     Q     You wrote here "one-time mistake," right?
20     A     Yeah.
21     Q     And that's what you believed after the
22  incident with Jack, that it was perhaps a one-time
23  mistake.
24     A     Yes.
25     Q     And then you learned that he had gotten

```
 1   sensitivity training, correct?
 2        A    Mm-hmm.
 3        Q    And you learned that from Ms. Gleason.
 4        A    Yes.
 5        Q    And after you learned that from Ms.
 6   Gleason, you no longer believed that it was a one-time
 7   mistake, is that right?
 8        A    Yeah.
 9        Q    I'd also like to direct your attention, if
10   you can just turn the page to page nine, the first
11   paragraph.
12        A    In the fact finder's report?
13        Q    Yes, I apologize, in the fact finder's
14   report.  So we're looking again at Exhibit 13, on page
15   nine, and if you look at the last sentence of that
16   paragraph it says, "She was especially motivated to
17   participate in the investigation and hearing process
18   after she heard that Mr. Montague had already had
19   another complaint against him, as she felt it was
20   important to protect other women."  Do you see that?
21        A    Mm-hmm, yes.
22        Q    Do you recall telling Ms. Berkman that you
23   were motivated to participate in the investigation and
24   hearing process because you heard that Mr. Montague had
25   already had another complaint against him?
```

```
 1      A    No, I didn't say that to Miriam.
 2      Q    So you say you did not say that to Ms.
 3   Berkman.
 4      A    No.
 5      Q    Sorry, we're just looking for something.
 6      A    Okay.
 7      Q    Again, you've reviewed the fact finder's
 8   report, right?
 9      A    Yes.
10      Q    And you reviewed it for accuracy, is that
11   right?
12                MR. NOONAN:  Objection.
13      A    Yes.
14      Q    You understood that if anything in it was
15   inaccurate you could correct that at the panel hearing,
16   right?
17      A    Yes, in my opening statement.
18      Q    So that was your understanding, is that if
19   anything was wrong in the fact finder's report, the
20   opening statement was your opportunity to correct that
21   inaccuracy.
22      A    Yes, because Miriam told me that she was
23   going to get stuff wrong, and that it's one person
24   compiling a report taking perspectives of so many
25   people and just -- I mean, I'm an anthropology major,
```

1    like I get this.  And that things are going to be
2    interpreted incorrectly by her, and that it was my
3    opportunity to set the record straight.
4         Q    The opening statement was your opportunity
5    to set the record straight.
6         A    Yes.
7         Q    But you didn't set the record straight with
8    regard to this, is that right?
9         A    No, I did.  What I said in my opening
10   statement is exactly what happened in my conversation
11   with Angie.
12        Q    But I mean you didn't say in your opening
13   statement that your motivation was not, in fact,
14   learning that he had another complaint against him, did
15   you?
16        A    No, but I did clarify my conversation with
17   Angie.  In my own words, what I said here is correct.
18        Q    You mean what you say in your opening
19   statement is a correct statement of your conversation
20   with Angie or a correct characterization of your
21   conversation with Angie.
22        A    Yes.  Like here, when it's in my own words,
23   my conversation with Angie about Jack going through the
24   sensitivity training is the only thing that's
25   mentioned.  I don't mention the complaint in my opening

1  statement because that's not what happened.
2       Q    But you didn't correct that in the opening
3  statement.  You didn't say in the opening statement, "I
4  was never told there was a former complaint against
5  him," right?
6            MR. NOONAN:  Objection.
7       A    I didn't say it explicitly, but my
8  conversation with Angie is described correctly in my
9  opening statement.
10      Q    And you said that Ms. Berkman said she gets
11 a lot of information and she might make mistakes,
12 right?
13      A    She said it's natural that mistakes will be
14 made.
15      Q    She's human.
16      A    Yes.
17      Q    I'd like to read to you Ms. Berkman's
18 comment on the sentence that I just read to you.
19 Ms. Berkman's comment is:  "This is an accurate
20 description of what ▇ told me about her motivation and
21 her decision making about participating in this case."
22           MR. SCONZO:  I'm going to object.  If
23              you're going to argue with her about what
24              ▇ told the fact finder, she's not going to
25              answer those questions.  We didn't come

1   and -- not because of anything that -- anyone
2   explicitly said to me, but just I was going through a
3   lot at the time.
4        Q    Had you heard anything about him other than
5   your interaction with him that made you not have the
6   best opinion of him?
7        A    Not at the time that I spoke to Miriam, no.
8        Q    At the time that you spoke to Miriam, is it
9   your recollection that you did talk to her about
10  assumptions that you may have made?
11       A    A few.
12       Q    Okay.
13       A    Some of them, yes.
14       Q    Did you talk to her about an assumption
15  that you made that he had already had another complaint
16  against him?
17       A    Not explicitly, but I wasn't being super
18  careful with my wording necessarily all the time.
19       Q    Did you talk to her about your motivation
20  for bringing -- for participating in the formal
21  complaint process against him?
22       A    She asked me about that explicitly, yes.
23       Q    What do you recall her asking?
24       A    She asked why I was motivated to
25  participate in the formal complaint process.

1    Q    Do you recall what your answer was?
2    A    I mentioned a lot of things. I mentioned
3 things about my own emotions, I mentioned conversations
4 that I had had with suite mates about their support, I
5 had mentioned my conversation with Angie about his
6 going through sensitivity training, I mentioned SHARE
7 counseling that I had received before this process.
8 There were a lot of things.
9    Q    Okay. Has anyone ever told you that it
10 might be harmful to either Yale or Ms. Gleason to say
11 that Ms. Gleason told you there was a prior complaint
12 against Jack?
13   A    No.
14   Q    Has anyone ever told you that it would be a
15 breach of Yale's confidentiality policy for Ms. Gleason
16 to have told you there was a prior complaint against
17 Jack?
18   A    No.
19   Q    All right. So let's go back to this
20 meeting with Ms. Gleason that I think you said happened
21 sometime in the first or second week of November, is
22 that right?
23   A    Yes.
24   Q    So your testimony is she told you that Jack
25 had already gone through sensitivity training. And was

1   that the new development that she was talking about?
2        A    I assume so.
3        Q    What else did she tell you?
4        A    She told me that she couldn't give me any
5   of the specifics because, I mean, I asked, I wanted to
6   know why he had gone through sensitivity training and
7   what happened, and she said she couldn't tell me,
8   which, I mean, I understood.  I figured that's her job.
9             And then she asked me if I would want to
10  hear more about the formal complaint process, and she
11  said that David Post was available right then and she
12  could give him a call and he could come to our meeting
13  and explain the steps and the process in more detail.
14       Q    Did she also tell you at that meeting that
15  she wouldn't be doing her job if she did not take more
16  serious action?
17       A    Yes.
18       Q    Okay.
19       A    If she didn't -- I think she wouldn't be
20  doing her job if she didn't give me the option of -- if
21  she didn't present these options to me again.
22       Q    What were her words to you, if you
23  remember?
24       A    The words that she said that stick out to
25  me a year and a half later are that she said he had

```
 1   already gone through sensitivity training, and she said
 2   she wanted me to be able to rethink my options, and
 3   that she did say that this is -- that she was doing her
 4   job by explaining these options to me again.
 5        Q    Did she explain to you why she wanted you
 6   to rethink your options?
 7        A    She told me because she thought that I
 8   would want to rethink my options knowing that he had
 9   gone through sensitivity training.
10        Q    So she suggested to you that you might want
11   to rethink your options at that point.
12        A    Yes.
13        Q    And she asked for your participation in a
14   formal complaint against him, right?
15        A    She presented that as an option.
16        Q    Well, let's look at your opening statement,
17   and that's what's been marked as Exhibit 17, on the
18   second page, the end of the second paragraph where you
19   say, "She told me she would not be doing her job if she
20   did not take more serious action and she asked for my
21   participation in the case."  Do you see that?
22        A    Yes.
23        Q    Is that an accurate description of what
24   Ms. Gleason said to you at the meeting?
25        A    I don't -- she presented me with a lot of
```

```
 1   options and asked me to consider participating, asked
 2   me to consider my options.
 3       Q    What were those options?
 4       A    As I understood it, she said that we could
 5   have him go -- we could offer him the sensitivity
 6   training again, Title IX could, or I could drop the
 7   informal complaint completely and let it go, or I could
 8   go through the formal complaint option acting either as
 9   the complainant or as a witness to the process.
10       Q    Did she explain to you what it would entail
11   if you were to act as the complainant?
12       A    David Post explained the process.
13       Q    Did Angie explain anything to you about the
14   UWC process?
15       A    No, she told me that she had contacted
16   David and he could come to the meeting because he's the
17   chair of the UWC, so he's the most knowledgeable about
18   those processes.
19       Q    And she told you that one of your options
20   was for Jack to be retrained in sensitivity, did you
21   say that?
22       A    I believe that was still an option, yes.
23       Q    Did you express an opinion on that one way
24   or the other at the meeting?
25       A    I was a disaster.  I told her that I would
```