```
 1     UNITED STATES DISTRICT COURT
       DISTRICT OF CONNECTICUT
 2    -------------------------------x
       JACK MONTAGUE,
 3
                    Plaintiff,
 4
       vs.              Civil Action No.: 3:16-CV-00885-AVC
 5                      Date:  March 30, 2017
       YALE UNIVERSITY, ET AL,
 6
                    Defendants.
 7    -------------------------------x

 8

 9              DEPOSITION OF JACK MONTAGUE

10

11        The deposition of Jack Montague was taken on

12   March 30, 2017, beginning at 9:08 a.m., at the office

13   of Jacobs, Grudberg, Belt, Dow & Katz, 350 Orange

14   Street, New Haven, Connecticut, before Susan

15   Wandzilak, Registered Professional Reporter and Notary

16   Public in the State of Connecticut.

17

18

19

20

21              Susan Wandzilak  License No. 377
            DEL VECCHIO REPORTING SERVICES, LLC
22          PROFESSIONAL SHORTHAND REPORTERS
                     117 RANDI DRIVE
23             MADISON, CONNECTICUT 06443
                     800-839-6867
24
     NEW HAVEN              STAMFORD          HARTFORD
25
```

1      Q.   You agreed with that assessment, didn't you?

2      A.   Yes.

3      Q.   And the panel also reached this conclusion,

4   and I'm quoting:  He does not yet have a clear

5   understanding or an appreciation for the significant

6   implications of his misconduct on ███████████ or the

7   broader Yale community.  The panel wishes to be clear

8   that Mr. Montague's behavior has no place at Yale or

9   in society.

10          Do you agree with that assessment?

11     A.   Yes.

12     Q.   Now, were you placed on probation for four

13  semesters as a result of that incident; is that right?

14     A.   Yes, sir.

15     Q.   And you were aware that any additional

16  violation of the university's rules while you were on

17  probation could lead to your dismissal, correct?

18     A.   Yes.

19     Q.   And the incident that you had with ████████

20  ████████████ occurred while you were on probation; isn't

21  that right?

22     A.   Yes.

23     Q.   Now, as a result of your conduct with

24  ████████████, you were required to immediately enroll in

25  sexual harassment and gender sensitivity training at

 1    the SHARE Center; is that right?

 2         A.    Yes.

 3         Q.    Did you do that?

 4         A.    Yes, I did.

 5         Q.    And do you recall whether -- who did you meet

 6    with for that training?

 7         A.    I met with John Criscuolo.

 8         Q.    All right, and did you -- do you recall that

 9    he had to e-mail you a number of times in order to get

10    you to come see him?

11         A.    Yes, it was -- it wasn't his full-time job so

12    he -- you know, he would usually only work after

13    hours.  And sometimes that kind of co-involved or was

14    the same time as my basketball practice so sometimes

15    it was difficult to schedule.  But, you know, we ended

16    up finding plenty of times to meet, especially the

17    first semester.

18         Q.    And so your recollection is that the delay in

19    getting to see Mr. Criscuolo when were you told to

20    immediately enroll in that training was a result of

21    him only working part-time?

22         A.    I wouldn't say it's a direct result, but I

23    think our complications with scheduling definitely led

24    to that.

25         Q.    Do you remember that he had to hunt you down

1    to get you to come to the first session?

2            MS. DEAL:  Objection.

3            THE WITNESS:  No.

4    BY MR. NOONAN:

5        Q.   You don't remember people getting ahold of

6    you and saying, this is serious, you really have to

7    contact him?

8        A.   No.

9        Q.   Okay.  And your recollection is that the

10   primary problem in getting to meet Mr. Criscuolo was

11   the fact he only worked part-time; is that right?

12       A.   From my memory, yes.

13       Q.   Okay.  And you did meet with Mr. Criscuolo;

14   is that right?

15       A.   Yes.

16       Q.   And how many times?

17       A.   I can't remember exactly how many times.  The

18   first semester I know we met more often than we did

19   near the end of my career here at Yale.  I think the

20   last couple of semesters I only had to meet with him

21   one time, but I think the first semester we met maybe

22   two, two to four times maybe that first semester.

23       Q.   And how long -- well, let me take them one at

24   a time.  How long was the first session you had with

25   Mr. Criscuolo?

1   longest.  And then they just continued to get shorter,

2   I guess.

3        Q.   All right.  And your not sure how many

4   sessions there were all told?

5        A.   I would say there was probably 8 to 10

6   sessions -- 8 sessions probably, somewhere around

7   there.

8        Q.   And you knew even before speaking to

9   Mr. Criscuolo that before you have intercourse with a

10  woman, it's important to make sure she has consented,

11  right?  That's something that was -- you probably knew

12  even before you got to college, right?

13       A.   Yes, sir.

14       Q.   And you went to training on that when you got

15  to college, didn't you?

16       A.   What do you mean by training?

17       Q.   Well, the training that they give all

18  freshmen and all sophomores.

19       A.   Yes.

20       Q.   You attended those sessions?

21       A.   I did attend those sessions.  It's mandatory.

22       Q.   Now, in addition to getting the training with

23  Mr. Criscuolo, the UWC panel required that you get

24  training on the use of alcohol.  Is that right?

25       A.   Yes.

```
 1    right?
 2         A.   Yes.
 3         Q.   And you know that people have gotten kicked
 4    out of Yale for that, correct?
 5         A.   I didn't know at that time.
 6         Q.   You sure know it now, right?
 7         A.   I sure know it now.
 8         Q.   But you had looked at the regulations on
 9    sexual misconduct, right?
10         A.   Yes.
11         Q.   During these various meetings that you
12    described before?
13         A.   Yes.
14         Q.   And did you know that expulsion was one of
15    the potential penalties for violation of Yale's sexual
16    misconduct policy?
17         A.   Yes.
18         Q.   And did you know that people could get kicked
19    out if they engaged in intercourse without consent?
20         A.   Yes.
21         Q.   And you knew all that even before you ever
22    met ███████████; is that right?
23         A.   Yes.
24         Q.   Now, I want to ask you just a couple of other
25    questions about UWC-I.
```

1      asking that question and you giving that answer?

2           A.   No.

3           Q.   If she had asked that question, is it okay to

4      hook up and not have sex and you answered okay, would

5      that be in your mind a clear and unambiguous consent

6      to intercourse?

7                MS. DEAL:  Objection.

8                THE WITNESS:  I believe okay would be

9           agreeing it shouldn't happen.  Okay saying that I

10          agree that I would not have sex with her that

11          night.  If she said do you not want to have sex

12          and I responded, okay, I agree that that okay

13          means that there should not have had sex that

14          night.

15     BY MR. NOONAN:

16          Q.   And the way both you and she were using the

17     terms have sex, that meant intercourse?

18          A.   Intercourse.

19          Q.   And hook up -- and I apologize because I'm an

20     old fogey as my kids are very fond of telling me --

21     but hook up means sort of anything else other than

22     intercourse?

23          A.   Anything else.  I mean, it could also include

24     intercourse as well.

25          Q.   That's kind of a generic term?

1     A.   Hook up is very generic.

2     Q.   But at least if she had said that to you,

3 meaning is it okay to hook up but not have sex, and

4 you said okay, that would mean to you that there is a

5 boundary there?

6     A.   Yes, a boundary.

7     Q.   There is some conduct that is okay, but

8 intercourse is not?

9     A.   Correct.

10     Q.   And you understood that -- I know you

11 disagree -- I'm sorry.  You don't recall that being

12 said that evening, correct?

13     A.   Yes, I do not recall that.

14     Q.   But as of that evening, you understood that

15 if that had -- if the conversation occurred the way

16 ██████████ said it did, that would mean that you

17 did not have consent for intercourse?

18     A.   Correct.

19     Q.   Okay.  Now, the factfinder's report also

20 indicates that ██████████ said that while you and

21 she were kissing inside your car, you said, Are we

22 really doing this?  And she said, doing what, to which

23 you responded, Fucking in my car.

24     She also told the factfinder that she

25 reminded you then that she did not want to have sex,

1    but only to hook up, and that you again said okay.  Do

2    you recall that from the factfinder's report?

3         A.   From the factfinder's report, yes, I do.

4         Q.   And do you remember that happening that

5    evening?

6         A.   No.

7         Q.   If it did happen the way ███████████████

8    describes it, would that mean that you did not have

9    consent for intercourse?

10        A.   Yes, that would mean I would not have

11   consent.

12        Q.   Right.  And if you had engaged in intercourse

13   with her that evening and she had said those things to

14   you, that would mean you violated Yale's sexual

15   misconduct policy, correct?

16              MS. DEAL:  Objection.

17              THE WITNESS:  Correct.

18   BY MR. NOONAN:

19        Q.   Now, ███████████████ or the factfinder's report

20   indicates that ██████████████ -- at the time you were

21   preparing to penetrate her, ██████████████ says that she

22   said, Jack, no, I said I wanted to hook up but not

23   have sex?

24              And then you penetrated her.  You don't

25   recall her saying that?

1        A.   No.

2        Q.   If she did say that, that would be another

3    indication that you didn't have consent, correct?

4        A.   Correct.

5        Q.   And would you agree that if all three of

6    those things were said as ███████████ has recounted

7    them and that you had intercourse anyway, you had

8    violated Yale's sexual misconduct policy?

9        A.   Correct.

10       Q.   And I think you said before you were aware

11   even before -- even during your freshman year that if

12   you violated Yale's sexual misconduct policy, one of

13   the potential penalties is expulsion?

14       A.   Yes.

15       Q.   Would you agree that the UWC panel had to

16   make a decision in this case as to which version of

17   the events they were to believe, that is, either ██████

18   ████████████ or yours?

19       A.   Yes.

20       Q.   And if they believed ████████████████, then

21   they would conclude that you had violated Yale's

22   sexual misconduct policy?

23       A.   Correct.

24       Q.   Now, the factfinder report indicates that

25   ████████████ recalls four different interactions with

1    you where there was some sexual contact, but she also

2    indicated that you only remember three incidents.  As

3    you sit here today, do you remember whether it was

4    three or four?

5         A.   I remember it was four.

6         Q.   But at the time of these events when you were

7    being asked questions about this, you thought it was

8    just three encounters with her; is that right?

9         A.   That's what I presumed, yeah.

10        Q.   And do you remember -- well, when you say you

11   remember it was four now, do you actually have a

12   memory of all four or you just believe it was four

13   because others have indicated that it was four?

14        A.   No, I remember it was four.

15        Q.   But at the time, your memory was such that

16   you just didn't remember the fourth one, correct?

17        A.   Correct, yeah.

18        Q.   Okay.  Now, you told the factfinder that when

19   you went upstairs and got into bed, you verbally asked

20   ██████████████ if she wanted to have sex and she said

21   okay.  Do you recall telling the factfinder that?

22        A.   Yes?

23        Q.   And is that the same way you remember it

24   today?

25        A.   No, it's not.

1   Q. Okay, so as of today -- well, strike that.

2     You did tell the factfinder that that's the

3 way you remembered it then?

4   A. That's what I told the factfinder.

5   Q. And as of today, you have a different

6 recollection?

7   A. Yes.

8   Q. Okay.  What is your recollection today?

9   A. Today is that it progressed with no verbal

10 anything.  It was basically just led by actions.

11   Q. Okay.  And those are two very different

12 things, right?

13   A. Yes.

14   Q. And you know from reviewing the Yale sexual

15 misconduct policies that there can be consent by

16 conduct or there can be actual verbal consent,

17 correct?

18   A. Correct.

19   Q. And those policies state that the best way to

20 get consent is by verbal consent to each particular

21 action; is that right?

22   A. Yes.

23   Q. And you knew that at the time of your

24 interactions with ██████████?

25   A. Yes.

1    Q.   She might have said it and you just don't

2    remember?

3    A.   I don't remember.

4    Q.   Do you remember her saying that it was

5    important for you to make any comments where you

6    believe she was wrong to the panel because she is

7    talking to a lot of people and she might make a

8    mistake?

9              MS. DEAL:  Objection.

10             THE WITNESS:  I don't remember that.

11   BY MR. NOONAN:

12   Q.   And do you remember being asked questions by

13   panel members?

14   A.   I remember being asked questions.  I don't

15   remember a specific question.

16   Q.   Can you remember any of them?

17   A.   I remember them asking me the question on if

18   I verbally asked ██████ for her consent right before

19   penetration.  And that's where I responded by saying

20   that no, I did not and it led to -- actions led to

21   intercourse.

22   Q.   And so you told the panel that you did not

23   ask for a consent?

24   A.   I told the panel I did not ask for consent on

25   the night in question.

1          You knew of that definition before these

2    disciplinary proceedings, correct?

3          A.   Yes.

4          Q.   That same guidance goes on as follows, and I

5    quote:

6          Although consent does not need to be verbal,

7    verbal communication is the most reliable form of

8    asking for engaging consent.  Talking with sexual

9    partners about desires and limits may seem awkward but

10   serves as a basis for positive sexual experiences

11   shaped by mutual willingness and respect.

12         Do you see that?

13         A.   Yes.

14         Q.   And there was a time when ███████████ agrees

15   that she gave consent for intercourse; is that right?

16         A.   Yes.

17         Q.   And that was a time when there was actual

18   verbal consent, correct?

19         A.   Correct.

20         Q.   You didn't have verbal consent for the night

21   of October 18, 2014, did you?

22         A.   No, I did not have.

23         Q.   Now, at the bottom of page 2, there appears

24   this sentence:  ███████████ and Mr. Montague provided

25   substantially different accounts of the sexual

1    encounter in Mr. Montague's room on the night of 18

2    October 2014 and of subsequent events and

3    interactions.

4              Is that true?

5        A.   Yeah.

6        Q.   You gave different accounts.  And the

7    committee's job was to look at all of the evidence,

8    hear from both sides, and then make a decision as to

9    whose account was more likely to be accurate, right?

10       A.   Correct.

11       Q.   And if they believed that her version was

12   likely to be more accurate than yours, then it would

13   be appropriate to conclude that you had violated

14   Yale's sexual misconduct policy, correct?

15             MS. DEAL:  Objection.

16             THE WITNESS:  Correct.

17   BY MR. NOONAN:

18       Q.   Now, on page 4, the committee report

19   summarizes some of what ███████████ said about the

20   impacts on her as follows, and I'm quoting from the

21   report:

22             ███████████ reported a number of impacts of

23   this incident on her educational and living experience

24   at Yale.  She had intrusive thoughts and nightmares

25   about Mr. Montague in the fall of 2014 and on and off

1    understood the impact on her was severe?

2         A.    I don't remember.

3         Q.    We will get to that.  Now, do you remember

4    telling the UWC committee and the factfinder that you

5    were careful not to drink too much on the evening of

6    October 18, 2014, because you knew you were going to

7    be seeing ███████████?

8         A.    Yes.

9         Q.    And, in fact, what you have told you us today

10   is you don't really know how much you drank except it

11   was probably your normal amount, correct?

12        A.    I mean, that's speculation.

13        Q.    But that's what you said.

14        A.    Yes.

15        Q.    The reason you have consistently said between

16   four and seven drinks, although you have no memory of

17   how much you drank, that was the norm, correct?

18        A.    Correct.

19        Q.    Now, at the bottom of page 4 of the

20   committee's report, the following sentence appears:

21             Mr. Montague's accounts of how he ascertained

22   consent differed in his accounts to the factfinder and

23   to the hearing panel.

24             That was true, correct?

25        A.    Yes.

1        A.    I remember getting this.

2        Q.    Okay.  And do you recall whether in fact you

3    took her up on that, sit down with her and review the

4    hearing process?

5        A.    That I do not remember.

6        Q.    You don't remember meeting with her other

7    than the first meeting where Dean B was present,

8    right?

9        A.    I believe I did, but it's not for sure.

10        Q.    But you did -- you certainly knew that

11    Ms. Menon was willing to meet with you and, in fact,

12    had encouraged to you meet with her so you could

13    understand the hearing process, right?

14        A.    Yes.

15        Q.    Okay.  Now, I have marked this one up so I

16    won't mark this as an exhibit, but there is an e-mail

17    which you sent to -- I guess it's -- it was between

18    you and Willie Dow.  And you say:  The panel sided

19    with the female, ██████████████, because they thought

20    her account and statement was more credible and

21    consistent.

22            And then you go on to say you wanted to get

23    his advice on how to respond.  Was that -- would that

24    be a good basis for the panel to decide with ██████

25    ██████████ if they found that she was more credible and

1    consistent?

2              MS. DEAL:  Objection.

3              THE WITNESS:  It's just what the panel's

4        response said.  That's what I e-mailed.

5    BY MR. NOONAN:

6        Q.    Right.  And you quoted they decided she was

7    more "credible and consistent."  My question to you

8    is, Is that a reasonable basis for the panel to decide

9    these allegations on, that is, that one party was more

10   credible and consistent than the other?

11             MS. DEAL:  Objection.

12             THE WITNESS:  Yes.

13   BY MR. NOONAN:

14       Q.    Now, there is a -- there was an e-mail from

15   Coach Jones on February 10th which included you.  And

16   it looks like it's all members of the team.  It's

17   February 10, 2016.  It says:  Team meeting tonight,

18   8:15, locker room.

19             Were you present at that meeting?

20       A.    I was not.

21       Q.    Now, did you talk with Dean B after the

22   UWC-II panel report was issued?

23       A.    I believe so.

24       Q.    And what, if anything, do you remember her

25   telling you about the report or the process or her

ERRATA SHEET — JACK MONTAGUE DEPOSITION TRANSCRIPT

Page 13, Line 2: strike "County"

Page 14, Line 18: "Making Moves" should be "Make-N-Moves"

Page 29, Line 15: "Giessen" should be "Essen"

Page 32, Line 3: "ELEVAT/8" should be "ELEV8"; note that the official name is "Versatility Basketball Academy"

Page 33, Line 14: strike "us"

Page 35, Line 5: "He is in" should say "He has a friend in"

Page 37, Line 6: "center" should be "sent"

Page 39, Line 11: "great" should be "grad"

Page 41, Line 18: "basketball pay" should be "basketball team"

Page 45, Line 7: My full answer is "Yes, sir, I admitted I engaged in the conduct." I did not understand the question at the time of my deposition. I was asked many questions during the course of the deposition that made me feel attacked and backed into a corner. I got very nervous, and felt unable to fully process, think about, or respond to many of the questions that were posed. Now that I see them in writing and have time to think and process, I understand them better and can explain myself better.

Page 47, Line 16: My full answer is "No, but I did not admit to a violation of the sexual misconduct policy." Even though I was being told to give a "yes" or "no" answer, it was not a "yes" or "no" question, because it implied that I admitted to something I did not.

Page 50, Lines 20-21: My full answer is "I would have questions surrounding it, but yes, I think — yeah, I would have questions."

Page 50, Line 25: My full answer is "Yes, you can't put your hands between a woman's breasts without consent." This is a two-part question and I was not fully processing or responding to both parts.

Page 51, Line 3: My full answer is "Yes, putting your hands between a woman's breasts without consent would violate Yale's sexual misconduct policy." This referred to the previous two-part question, and I only answered one part of that question.

Page 52, Line 11: My full answer is "Yes, I agree that my behavior had no place at Yale or in society." This question asked me to agree or disagree with a multi-part statement, and I wasn't able to fully process it at the time of my deposition.

Page 60, Line 25: My full answer is "Yes, the panel required me to get training on the use of alcohol."

Page 77, Line 18: My full answer is "Yes, according to the police report I read later."

Page 78, Line 11: My full answer is "I guess, but I don't know for sure."

Page 78, Lines 20-21: Should read "I don't have any idea what he intended to do."

Page 83, Line 20: My full answer is "Yes, I knew I could admit that I had engaged in the conduct or deny that I had engaged in the conduct." I did not really understand the use of the terms "guilty" or "not guilty" at the time of the deposition.

Page 83, Line 22: My full answer is, "Yes, at that time, I admitted I had engaged in the conduct."

Page 84, Line 2: My full answer is, "Yes, I knew I could either admit to engaging in the conduct or deny engaging in the conduct."

Page 84, Line 24: "Yes" should be "No". In reading over the deposition, I think my previous testimony was mischaracterized in this question.

Page 85, Line 16: My full answer is "No, that's not what I meant."

Page 89, Line 8: "Beseirivich" should be "Besirevic"

Page 95, Line 13: "Yes" should be "No, I sent a written response denying that our contact was non-consensual." I

forgot, at my deposition, that I had in fact written an email responding to the November 2015 complaint.

Page 106, Line 19: My full answer is "Sure, I understood that my conduct was completely inappropriate and wrong and I was willing to go through the counseling that had been ordered."

Page 107, Line 7: My full answer is "Sure, I felt my conduct was inappropriate and for that reason I was willing to accept the panel's counseling orders."

Page 109, Line 18: "Beseirivich" should be "Besirevic"

Page 112, Line 25: "what" should be "when"

Page 116, Lines 3-5: This makes no sense. I don't believe this is what I said, but I don't remember what I said.

Page 121, Line 18: My full answer is "Correct, at the time she said it, I would not have had consent at that time."

Page 122, Lines 10-11: My full answer is "Yes, that would mean I would not have consent at that time."

Page 122, Line 17: My full answer is "Correct, if she had not said or done anything else afterwards to indicate that she was giving consent."

Page 123, Line 9: My full answer is "Correct, if there was not any intervening indication of consent, and if I had heard her say no to penetration."

Page 123, Line 19: My full answer is "Yes, that was one of the things they had to decide. They also had to decide whether what they believed happened violated the sexual misconduct policy."

Page 123, Line 23: My full answer is "Correct, they did conclude that, but I don't agree with their conclusion."

Page 126, Line 19: "try" should be "trying"

Page 128, Line 1: My full answer is "No, I was confused as to which interaction we were talking about."

Page 129, Line 11: "untrue" should be "inaccurate"

Page 135, Lines 21 and 22: "would" should be "could" (in both lines)

Page 147, Line 8: My full answer is "No, it did not, but it still had an impact on how I interpreted her non-verbal cues."

Page 149, Line 10: My full answer is "Correct, that was one of their jobs."

Page 149, Line 16: My full answer is "Correct, I agree that's what they concluded, but I don't agree that that conclusion was correct, even if they believed her version was more accurate than mine."

Page 154, Line 22: My full answer is "Yes, that's one of the things they had to decide."

Page 158, Line 14: My full answer is "Yes, that was something that was part of my sanction, but I didn't actually receive any of that training."

Page 161, Line 3: My full answer is "Yes, but when I said that I didn't mean I'd never had a prior disciplinary experience. I meant I'd never been accused of rape before."

Page 164, Line 23: My full answer is "Yes, I believed I had consent."

Page 165, Line 10: My full answer is "Yes, if I had relied solely on the previous experience, then that would not mean I had consent, but the prior experience still informed my interpretation of her actions on that night."

Page 168, Line 2: My full answer is "Yes, I was given an opportunity to answer the questions they chose to ask me."

Page 169, Line 5: My full answer is "Yes, I was referring to the panel's recommendation that I get training with him, and to my meetings with him, which I attended. I did not receive any training at those meetings though."

Page 169, Line 21: My full answer is "Yes, and I also knew consent could be non-verbal."

Page 172, Line 9: My full answer is "It is true that it did not raise new information about the events of October 18, 2014." This question asked me about multiple statements and

I wasn't able to process and respond to all of them at the deposition.

Page 173, Line 6: "assistance" should be "assistant"

Page 181, Line 1: "another" should be "other"

Page 181, line 10: strike "not"

Page 182, Line 4: My full answer is "No, not me personally." I relied on my lawyers to draft the complaint." I didn't understand, at the time of my deposition, that I could say what my lawyers did.

Page 184, Line 12: My full answer is "I can't right now, no."

Page 185, Line 2: My full answer is "No, not me personally."

Page 193, Line 16: "leasing" should be "leagues"

Page 193, Line 18: both "league"s should be "ligue"

Page 194, Line 25: My full answer is "I would say still on hold, because I'm not able to apply to schools without my official Yale transcript."

Page 195, Line 23: My full answer is "Correct, it's on hold, but I don't think it's fair to say I'm leaving it on hold."

Page 201, Line 2: "nondenomination" should be "nondenominational"

Page 206, Line 13: "I'm drinking" should be "I've been drinking"

Page 214, Line 12: My full answer is "Yes, that's one factor for the panel to consider."

Page 215: Line 5: Change to: "I met with her at The Study for a drink with my dad." I misspoke at the time. I did not have brunch with her; I had brunch with Dean B, and I mixed up the two.

Page 233, Line 3: My full answer is "Yes, that's what the panel believed and what the panel found."

Page 234, Lines 15 and 16: "Rostigar" should be "Rastegar"

Page 254, Lines 13 and 14: "Efferidge" should be "Etheridge"

Page 261, Line 11: "LVO Felix" should be "El Amigo Felix"

Page 263, Line 13: "I" should be "She"