UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JACK MONTAGUE,<br>    Plaintiff,<br><br>v.<br><br>YALE UNIVERSITY, ANGELA GLEASON,<br>JASON KILLHEFFER, and OTHERS<br>UNKNOWN,<br>    Defendants. | CIVIL ACTION<br>No. 3:16-cv-00885-AVC |

**PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO MOTION TO COMPEL PRODUCTION OF IMPROPERLY WITHHELD DOCUMENTS, AND REQUEST FOR HEARING**

Plaintiff Jack Montague hereby submits this Reply in support of his Motion to Compel Production of Improperly Withheld Documents (ECF No. 86).  Defendants, in their Opposition (ECF No. 90), do not even attempt to satisfy their burden of demonstrating the applicability of the attorney-client privilege, and instead improperly attempt to shift that burden to Plaintiff to demonstrate inapplicability of the privilege.  While Defendants' claims of purported privilege are deficient in multiple respects, the most striking defect is Defendants' inability to articulate even in general terms the nature of the legal advice that was allegedly being sought and provided by the Office of General Counsel.  A clear example of this – which Plaintiff will focus on in this Reply – is Defendants' claim of privilege over the November 4, 2015 meeting, which was called for the non-legal purpose of deciding whether to proceed with a University-initiated formal complaint against Montague.  The mere inclusion of an in-house lawyer, Susan Sawyer, in this meeting, and on countless other communications – many of which go to the heart of this case – cannot, by itself, cloak those communications in the attorney-client privilege.  Further, even if a

privilege once attended that meeting, Defendants have waived it through subsequent disclosures, including at depositions in this case. Having utterly failed to meet their burden of demonstrating the applicability of the privilege, the Court should order Defendants to produce the improperly withheld documents and provide unredacted copies of documents previously provided in redacted form.

## BACKGROUND

Plaintiff in his opening brief provided the court with a summary of the facts of this case in order to contextualize the present dispute over Defendants' inappropriate and at best overbroad assertion of the attorney-client privilege. Defendants have predictably attempted to distort those facts in their Opposition. Here, Plaintiff clarifies the record only with respect to facts that relate to the present dispute over Defendants' improper withholding of critical, non-privileged documents in this case.

Contrary to Defendants' mischaracterization, the evidence shows that Jane Roe's decision to participate in a formal complaint against Montague was indeed made reluctantly, against her original wishes, as a result of manipulation by Deputy Title IX Coordinator Angela Gleason and in reliance upon inaccurate information that Gleason disclosed to Roe in breach of a confidentiality obligation. Initially hesitant even to talk to Gleason about her alleged encounter with Montague, Roe agreed to do so only after her suitemate relayed a message from Gleason that Roe could pursue an informal, anonymous complaint against Montague. Roe Dep. at 11-13, attached hereto as Ex. A. Roe "liked [the] idea" of pursuing this type of informal complaint "because it might fulfill her goal of making sure Mr. Montague understood that his behavior was wrong and hurtful and stop him from doing it again to someone else." UWC II Fact-Finder's Report, attached hereto as Ex. B, p. 8; *see* Ex. A, Roe Dep. at 12-13. Roe did not want to pursue

a formal complaint because she "was not interested in having Mr. Montague punished but in having him learn so that he would not hurt anyone else." Ex. B at p. 8; Ex. A, Roe Dep. at 12-13.  In response to this proposed course of action, Gleason "told [Ms. Roe] that she would have to check to see if Mr. Montague was known to the Title IX Coordinators and would consult with other Coordinators in order to determine if it would be appropriate to address this incident with additional training." Ex. B at p. 17.

Following her initial conversations with Roe in which Roe expressed a desire to proceed with an informal complaint, Gleason, on November 4, 2015, attended a meeting with Senior Deputy Title IX Coordinator Jason Killheffer, Deputy Provost Stephanie Spangler, and Deputy General Counsel Susan Sawyer.  Gleason Dep. 119-125, Motion Ex. E.[1]  This meeting was to decide a non-legal question:  whether the University itself should initiate a formal sexual misconduct complaint against Mr. Montague. *Id.*; Killheffer Dep. 109-120, Motion Ex. F.  At the meeting, Gleason and her colleagues decided to pursue a formal complaint against Montague, notwithstanding Roe's stated preference to resolve her complaint against Mr. Montague informally and without punishing him. *Id.*  Under Yale's rules however, Defendants needed Roe's agreement and participation as a witness in order to proceed with the formal complaint, as they had no basis for filing it against her express wishes.  Killheffer Dep. at 55-56, attached hereto as Ex. C.  Consequently, they decided to convince Roe to change her mind by telling her – or at the very least implying – that Montague had been the subject of a prior complaint for sexual misconduct.  According to the UWC II Fact-Finder's Report, Gleason thereafter "explained to [Roe] that Mr. Montague had already been given a recommendation for training after a previous complaint and so that option was no longer open to him." Ex. B at 8.  This

---

[1] "Motion Ex. __" refers to an exhibit to Plaintiff's opening brief, ECF No. 86.

"reframed the incident in [Roe's] mind," led her to believe what happened to her was not the product of a "one-time mistake," and caused her to participate in the formal complaint against Montague. Roe Opening Statement at 2, attached hereto as Ex. D.

In a remarkable example of "circling the wagons," defenders of Montague's expulsion now conveniently and uniformly deny that Gleason disclosed to Roe any confidential information, thereby allowing Yale to make the argument that because "Ms. Roe and Ms. Gleason were the only participants in the discussions between them[,] there can be no contrary non-hearsay testimony." Opp. at 2. They make this argument in the face of numerous examples in the contemporaneous records which demonstrate that Gleason violated confidentiality in her conversations with Roe, however. For example:

- The Fact-Finder, Miriam Berkman, wrote in her report that "***Ms. Gleason explained to [Roe] that Mr. Montague had already been given a recommendation for training after a previous complaint*** and so that option was no longer open to him," and that "[Roe] was especially motivated to participate in the investigation and hearing process after she heard that Mr. Montague had already had another complaint against him as she felt it was important to protect other women." Ex. B at 8-9.

- Concerned that inclusion of the previous statement about Roe's motivations in her report might be unduly prejudicial, Ms. Berkman in a draft of her report commented in the margin that ***"[t]his is an accurate statement of what [Roe] told me about her motivation and decision-making about participating in this case.*** It is slightly different from Angie Gleason, which is not relevant[,] told me." UWC Chair David Post replied to Ms. Berkman's comment and said "I'm fine with this – the panel will hear about the previous violations before deciding on culpability anyway." See January 4, 2016 draft of Fact Finder's report, attached hereto as Ex. E.

- In an email to UWC officials attaching another draft of her report, Berkman noted that Roe did not know the exact nature of the training Montague had previously received "***except that it was related to a previous incident*** . . . ." See YALE00012943, attached hereto as Ex. I.

- In response to Roe's stated preference to proceed with an informal complaint that would likely result in Montague receiving consent training, ***Gleason "told [Roe] that she would have to check to see if Mr. Montague was known to the Title IX***

4

> ***Coordinators*** and would consult with other Coordinators in order to determine if it would be appropriate to address this incident with additional training." Ex. B at 17. "After consultation with other Title IX Coordinators, Ms. Gleason found out that Mr. Montague had already participated in a full semester of sensitivity training and so it did not make sense to ask him to repeat that intervention." *Id.* Depending on whose contemporaneous version one believes, Gleason thereafter told Roe that Montague had been the subject of a prior complaint, or simply that Mr. Montague "had already received sensitivity training." *Compare* Ex. B p. 8 *with* Gleason Dep. at 135:1-3, attached hereto as Ex. F.

The contemporaneous records thus show that Gleason told or at least implied to Roe that Montague had been the subject of a prior complaint in order to procure Roe's participation in a formal complaint process against him. Defendants' attempt at revisionist history notwithstanding, it is undisputed that after telling Roe that she needed to consult with her Title IX colleagues to see if Mr. Montague was known to them and whether it would be appropriate to address Roe's complaint with training through the SHARE center, Ex. B at 17, Gleason learned from her Title IX colleagues that Mr. Montague had been the subject of a prior complaint, Ex. F, Gleason Dep. at 144:6-18, and thereafter at a minimum communicated to Roe that Montague "had already received sensitivity training," *Id.* at 135:1-3. Because the Title IX office would only be aware of a student's having received sensitivity training if it resulted from a formal or informal complaint of sexual misconduct, Ex. C, Killheffer Dep. at 45:17-47:16, and because Roe understood that the Title IX office only deals with complaints of sexual misconduct, Ex. A, Roe Dep. at 20:18-22:1. Gleason's disclosure to Roe – after "checking" with her Title IX colleagues to see if Montague was "known" to them – that Montague had already received training was tantamount to telling her that he had been the subject of a prior complaint of sexual misconduct. At a bare minimum, it is undisputed that Gleason violated confidentiality by telling

Roe that Montague had already received SHARE training, regardless of what implications that may or may not have carried. *See* Ex. C, Killheffer Dep. at 117:22-118:13.[2]

Obviously, the November 4, 2015 meeting – at which members of Yale's Title IX Office resolved to pursue formal discipline against Mr. Montague and convince Ms. Roe to participate despite her stated preference for an informal, anonymous resolution – was a critical event in that process. Recognizing the potential that evidence surrounding this meeting will damage their defense, Defendants attempt to cloak as much as they can of this meeting and surrounding communications in the attorney-client privilege, despite its clearly non-legal purpose at the time. Specifically, as Plaintiff will focus on in this Reply, Defendants assert the attorney-client privilege over Ms. Gleason's contemporaneous notes of this meeting (Motion Ex. D, ECF No. 89-4), and even more incredibly, over the fact-finder Ms. Berkman's notes of her interview with Gleason as it pertained to what was discussed at the November 4 meeting (Motion Ex. G, ECF No. 89-7). Neither claim of privilege is supportable, for the reasons explained below and in Plaintiff's opening brief.[3]

---

[2] Now faced with litigation over Montague's expulsion, Defendants wag their finger at Plaintiff, (erroneously) boasting that the substantial evidence demonstrating the serious breach of confidentiality by Ms. Gleason that set in motion the process that culminated in Mr. Montague's expulsion from Yale is all inadmissible hearsay. In fact, all such evidence fits comfortably within one or more exceptions to the rule against hearsay. Gleason is a Defendant in this action and an employee of Yale. Berkman was, by Defendants' own concession, "working at the behest of Yale and as its agent" with respect to the investigation into Roe's complaint against Montague. Opp. at 15. Their out-of-court statements are thus, by definition, "Statements That Are Not Hearsay," admissible under Fed. R. Evid. 801(d)(2)(A) & (D). In arriving at its finding, the UWC II Panel accepted all undisputed facts contained in the Fact-Finder's Report, and expressly credited the Fact-Finder's rehearsal of Roe's motivation in bringing the complaint. *See* UWC II Panel Report, attached hereto as Ex. G. The Fact-Finder's Report is thus independently admissible as an adoptive admission under Rule 801(d)(2)(B). The evidence of Gleason's breach of confidentiality is fully admissible.

[3] Plaintiff maintains his challenge to the privilege assertions over all documents referenced in his opening brief, except for the document listed on line 179 of the Privilege Log attached as Motion Ex. B. *See* Stipulation Re: Plaintiff's to Compel, ECF No. 96.

**ARGUMENT**

In their Opposition, Defendants make three main arguments with respect to the November 4 meeting. The first is that any materials reflecting Susan Sawyer's participation in the November 4 meeting are privileged because she is a lawyer and Plaintiff has not proven lack of privilege. Second, they argue that Gleason and Killheffer did not waive any privilege concerning that meeting through their deposition testimony because they are not corporate officers or directors of Yale and thus have no authority to waive the privilege. Finally, Defendants argue that what was discussed at the November 4 meeting is of no moment because Plaintiff has no admissible, non-hearsay evidence that Gleason disclosed confidential information to Roe. None of these arguments has merit.

**I.      Defendants Have Failed to Establish That November 4 Meeting Was Held for the Purposes of Seeking Legal Advice from Susan Sawyer**

It is black letter law that the attorney-client privilege "only applies when the lawyer is acting as a lawyer, *i.e.,* giving legal advice," *Standard Chartered Bank PLC v. Ayala Intern. Holdings (U.S.), Inc.*, 111 F.R.D. 76, 79 (S.D.N.Y. 1986), citing *In Re Grand Jury Subpoena Duces Tecum Dated Sep. 15, 1983*, 731 F.2d 1032, 1037 (2d Cir. 1984), and relatedly, that participation of an in-house lawyer "does not automatically cloak an investigation [or other matter] with legal garb." *In re Grand Jury Subpoena*, 599 F.2d 504, 511 (2d Cir. 1979). Rather, a party claiming privilege has the burden of showing that the communications at issue were: "(1) made by a client; (2) to his or her attorney; (3) for the purpose of obtaining legal advice; (4) with the intent that the communication be kept confidential." *Pagano v. Ippoliti*, 245 Conn. 640, 649 (1998). The burden of demonstrating applicability of the privilege is on the party asserting it. *See, e.g., United States v. International Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO*, 119 F.3d 210, 214 (2d Cir. 1997); *PSE Consulting, Inc. v. Frank*

7

*Mercede and Sons, Inc.*, 267 Conn. 279, 330 (2004).  "Any ambiguities as to whether th[e]se essential elements have been met are construed against the party asserting the privilege." *Koumoulis v. Independent Financial Marketing Group, Inc.*, 295 F.R.D. 28, 38 (E.D.N.Y. 2013).

Here, Yale actually concedes that Sawyer functioned in a non-attorney role, stating that defense counsel "made a good faith effort to disclose communications to and from Attorney Sawyer when it appeared that the communications did not appear to relate to legal advice."  Opp. at 12.  It is not at all clear, however, what Defendants consider as "appear[ing] to relate to legal advice."  As discussed at p. 20 of Plaintiff's opening brief, a review of Defendants' production calls into serious question the integrity of its privilege review, given that on numerous occasions, Defendants have produced multiple versions of the same document: one with text redacted on the basis of privilege, and another with the same text unredacted.  For example, in an email from Montague's residential dean, Jasmina Besirevic-Regan, to the head of Trumbull College, Margaret Clark, sent on February 11, 2016 – the day after Montague was notified that he had been expelled – Defendants redacted text in which Besirevic-Regan states that:

- Sawyer "suggested [to Besirevic-Regan] that [Besirevic-Regan and Clark] reach out to Jack's parent's as last night was very emotional and difficult for everybody involved";

- Sawyer "thought that [Clark] may want to reach out to them to listen to them and explain the process if they have any questions";

- Besirevic-Regan told Sawyer "that I am off to Boston this afternoon but I gave the parents my cell phone number to call at any time"; and

- Sawyer "hoped that [Clark] could call [Montague's parents] today (I believe that his father was going to drive up from Nashville last night)."

*Compare* YALE00019069 *with* YALE00019067-68, both of which are attached hereto as Ex. H.

Clearly, the redacted text in this example does not reflect the giving of legal advice and is

therefore not privileged.[4]  There are no doubt countless other inappropriate privilege redactions throughout Defendants' productions.[5]

Particularly against this backdrop, which calls into serious question the legitimacy of Defendants' approach to asserting the privilege, Defendants have not and cannot meet their burden of proving that Susan Sawyer's participation in the November 4 meeting – which was held to decide a non-legal question with respect to the discipline of Mr. Montague – cloaked any aspect of that meeting in the attorney-client privilege.  Despite bearing the burden on this issue, *United States v. International Broth. of Teamsters*, 119 F.3d at 214; *PSE Consulting, Inc.*, 267 Conn. at 330, Defendants have not bothered to submit any evidence in the form of affidavits or otherwise in support of their claim.  Defendants' indiscriminate and overbroad approach to asserting the privilege is reason enough to deny it.  *United States v. O'Neill*, 619 F.2d 222, 227 (3rd Cir. 1980) ("The indiscriminate claim of privilege may in itself be sufficient reason to deny it.").  Accordingly, Defendants have not met their burden of demonstrating the meeting was for the purpose of obtaining legal advice.

## II. Any Privilege Surrounding the November 4, 2015 Meeting Has Been Waived Where Defendants' Witnesses Testified Extensively About That Meeting

As demonstrated at pages 14-15 of Plaintiff's opening brief, Angela Gleason and Jason Killheffer testified extensively in their depositions about the November 4, 2015 meeting.  To the extent the attorney-client privilege ever attended that meeting – and Plaintiff contends it did not – Defendants have waived that privilege through this testimony.  It is irrelevant whether Gleason

---

[4] Plaintiff in his opening brief at pages 20-21 cited numerous other examples where Defendants have produced both redacted and unredacted versions of the same documents, allowing Plaintiff to readily determine that the redacted portions do not evidence the giving or seeking of legal advice.  *See* Motion Exs. K, L, M, N, O, P, & Q.

[5] To be clear, Plaintiff is not arguing that production of unredacted versions of otherwise genuinely privileged documents – *if inadvertent* – resulted in a waiver of the privilege.  Rather, Plaintiff is using the unredacted versions – which were not clawed back – to demonstrate the overbroad and indiscriminate approach Defendants have taken to redactions based on the attorney-client privilege.

or Killheffer would have been "authorized" to deliberately waive the privilege in a different context where, here, they disclosed what was discussed at the meeting without objection or intervention from Yale's counsel. Nor is it necessary for the witnesses to have recited verbatim statements made by Ms. Sawyer in order for a waiver to occur where they, and in particular Gleason, testified in substance about what was discussed at the meeting without distinguishing between speakers.[6]

Defendants in their opposition focus on the fact that Gleason and Killheffer are not corporate officers or directors of Yale University, and thus, they say, do not have authority to waive the privilege. This argument is misplaced. While there is no doubt authority, which Defendants cite, holding that "the power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors," this proposition concerns the ability of an employee to effect an express waiver of the corporation's privilege; for example, as part of an effort to cooperate with government investigators. *See, e.g., Commodity Futures Trading Com'n v. Weintraub*, 471 U.S. 343, 348 (1985) ("The managers of course, must exercise the privilege in a manner consistent with their fiduciary duty to act in the best interests of the corporation"); *Fitzpatrick v. American Intern. Group, Inc.*, 272 F.R.D. 100, 107 (S.D.N.Y. 2010) (a "corporate representative is properly viewed as acting in his corporate fiduciary capacity in undertaking [an attorney-client] communication or deciding whether to assert or waive the privilege").

---

[6] A client need not "quote from a particular communication in order to waive privilege with respect to it. A summary, paraphrase or clear reference to the substance of a communication can waive the confidentiality of that communication." *United States ex rel. Mayman v. Martin Marietta Corp.*, 886 F. Supp. 1243 (D. Md. 1995); *see, e.g., In re Kidder Peabody Securities Litigation*, 168 F.R.D. 459, 469–70 (S.D. N.Y. 1996); Rice et al., Attorney-Client Privilege in the U.S. § 9:30.

Where, in contrast, an employee discloses privileged material in a deposition <u>without objection from the corporation's attorney</u>, the privilege is waived regardless of whether that employee otherwise had authority over assertion or waiver of the privilege.  In *Kraemer v. Franklin & Marshall College*, 1995 WL 447634 (E.D. Pa. July 27, 1995), the court held that a former professor at the defendant college waived the privilege when he testified to the details of an interview conducted by the college's attorney as part of an internal investigation into claims of sex and age discrimination.  Rather than premising the waiver on any authority held by the professor to waive the privilege, the court attributed it to the failure of the college's counsel, who was present at the deposition, to make a contemporaneous objection.  *See id.* at *2.  Based on the waiver that resulted from the professor's testimony, the court allowed the plaintiff to depose the college's counsel concerning that interview and others.  *Id.*

There exists substantial authority for the proposition that an attorney may impliedly waive the attorney client privilege by failing to timely object to questioning or cut off deposition testimony that reveals privileged communications.  *See, e.g.*, *Diversified Group, Inc. v. Daugerdas*, 304 F. Supp. 2d 507, 515 (S.D.N.Y. 2003) (failure to object at a deposition waived the privilege protection); *Palazzetti Import/Export, Inc. v. Morson*, 2000 WL 1015921, *1 (S.D. N.Y. 2000) (counsel's permitting his client to answer deposition questions about privileged documents waived the privilege for those documents notwithstanding that their production had been inadvertent); *Village of Kiryas Joel Local Development Corp. v. Insurance Co. of North America*, 1992 WL 15044, *1 (S.D.N.Y. 1992) ("[T]he only significant point of Jack Kahan's testimony—which neither side refers to—is that he was permitted, without objection by plaintiff, whose counsel was present, to testify to the substance of the privileged conversation. In the absence of any effort by plaintiff's counsel to preclude that inquiry, plaintiff has waived the

11

privilege."); *Gramm v. Horsehead Industries, Inc.*, 1990 WL 142404, *3 (S.D.N.Y. 1990) (finding waiver through client's "disclosure of most or all of the documents in question [at a deposition] and their acquiescence in deposition testimony concerning the substance of those documents."); *see also Perrignon v. Bergen Brunswig Corp.*, 77 F.R.D. 455. 461 (N.D. Cal. 1978) (objection insufficient to preserve privilege where witness proceeded to testify to privileged matters following objection without further intervention by counsel).

Here, while cautioning Gleason not to testify verbatim to anything Sawyer said in the meeting, Defendants' counsel allowed her to testify to the substance of what was discussed at the meeting despite Gleason's acknowledgment that she could not remember who said what. *See* Motion Ex. E, Gleason Dep. at 121 ("whatever was discussed, everyone contributed to"). Killheffer similarly testified to the substance of the meeting without so much as a cautionary instruction from counsel regarding the privilege. *See* Motion Ex. F, Killheffer Dep. at 110-20. Accordingly, any privilege that might once have attended that meeting – as well as all subsequent communications concerning the subject matter of that meeting – has been waived.[7]

## CONCLUSION

For the reasons set forth above, Defendants should be order to produce unredacted copies of all documents identified in Plaintiff's Motion.

---

[7] *See, e.g., In re Grand Jury Subpoena (Zerendow)*, 925 F. Supp. 849, 855 (D. Mass. 1995), citing *In re Sealed Case*, 877 F.2d 976, 980–81 (D.C. Cir.1989) ("Waiver of the privilege in an attorney-client communication extends to all other communications relating to the same subject matter.")

JACK MONTAGUE,

By his attorneys,

/s/   *Max D. Stern*
Max D. Stern (BBO #479560) (*pro hac vice*)
mstern@toddweld.com
Alexandra H. Deal (BBO #660654) (*pro hac vice*)
adeal@toddweld.com
TODD & WELD LLP
One Federal St., 27th Floor
Boston, MA 01880
Tel. (617) 720-2626
Fax (617) 227-5777

William F. Dow III (ct00161)
JACOBS & DOW, LLC
350 Orange Street
New Haven, CT 06511
wdow@jacobslaw.com
Tel. (203) 772-3100
Fax (203) 772-1691

Dated: June 22, 2017

**CERTIFICATE OF SERVICE**

I, Max D. Stern, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on June 22, 2017.

/s/   *Max D. Stern*