MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

UNITED STATES DISTRICT COURT FOR THE

    DISTRICT OF CONNECTICUT

CIVIL ACTION No: 3:16 cv-00885-AVC

---------------------------------x

JACK MONTAGUE,                          :

    Plaintiff,                          :

        -v-                         :

YALE UNIVERSITY, ANGELA GLEASON,  :

And JASON KILLHEFFER,                   :

    Defendants.                         :

---------------------------------x


          Depositon of JASON KILLHEFFER, taken

pursuant to Notice, held at the Law Offices of Jacobs

& Dow, LLC, 350 Orange Street, New Haven, Connecticut,

before James A. Martone, LSR #248, and Notary Public,

in and for the State of Connecticut, on January 10,

2017, at 10:05 a.m.

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                          January 10, 2017

```
                                                          Page 2
 1   A P P E A R A N C E S :

 2

 3        For the Plaintiff:

 4   TODD & WELD, LLP

 5   One Federal Street-27th Floor

 6   Boston, MA  01880

 7   BY:  MAX D. STERN, ESQ.

 8   AND:  HILLARY A. LEHMANN, ESQ.

 9   mstern@toddweld.com

10

11        For the Defendants:

12   DONAHUE, DURHAM & NOONAN, PC

13   741 Boston Post Road

14   Guilford, Connecticut  06347

15   BY:  PATRICK NOONAN, ESQ.

16

17

18

19

20

21

22

23

24

25
```

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 3

1                    S T I P U L A T I O N S

2

3        IT IS HEREBY STIPULATED AND

4    AGREED by and between counsel for the

5    respective parties hereto that all

6    technicalities as to proof of the official

7    character before whom the deposition is to

8    be taken are waived.

9

10       IT IS FURTHER STIPULATED AND

11   AGREED by and between counsel for the

12   respective parties hereto that the

13   deposition may be signed before any Notary Public.

14

15       IT IS FURTHER STIPULATED AND

16   AGREED by and between counsel for the

17   respective parties hereto that all

18   objections, except as to form, are reserved

19   to the time of trial.

20

21

22                          *   *   *   *   *   *

23

24

25

Sanders, Gale & Russell
(203) 624-4157

Electronically signed by JAMES MARTONE (601-171-250-7767)          31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                          January 10, 2017

```
                                                    Page 4
  1                    WITNESS INDEX

  2

  3                                             PAGE

  4   Direct Examination by Mr. Stern             5

  5

  6                    EXHIBIT INDEX

  7   PLAINTIFF        DESCRIPTION               PAGE

  8   20  Confidential Yale University Title IX

  9       Incident Summary Form                  22

 10   21  August 19, 2013 letter                 76

 11   22  Sexual Misconduct Scenerios document   80

 12   23  E-mail chain                          159

 13   24  3/12/16 E-mail                        162

 14   25  February 23, 2016 E-mail exchange     163

 15   26 February 23, 2016 E-mail               166

 16   27  February 24, 2016 E-mail              167

 17   28  3/17/2016 E-mail chain                168

 18   29  June 9, 2016 e-mail                   173

 19   30  Document entitled Introduction to the

 20       WESTAT-Yale report                    175

 21   31  Document entitled Results of AAU Survey

 22       On Sexual Assault and Misconduct      175

 23   32  Document entitled confidential draft  184

 24

 25
```

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 5

1    JASON KILLHEFFER,

2     called as a witness, having been first duly

3     sworn by James A. Martone, a Notary Public

4     in and for the State of Connecticut:

5    DIRECT EXAMINATION BY MR. STERN:

6         A.    Okay.  Please state your name.

7         A.    Jason Killheffer.

8         Q.    Spell it, please.

9         A.    J A S O N.  Last name, K I L L H E F F E R.

10                  MR. NOONAN:  We probably should state

11   for the record what we just stated off the record, and

12   that is that we're going to use real names in this

13   transcript, in this deposition, but if we need to file

14   the transcript or transmit it to anyone other than the

15   parties, the lawyers, we will redact the names.

16        A.    Okay.

17                  MR. STERN:  Right, and we have agreed

18   to the usual stipulations.

19                  MR. NOONAN:  Right.

20                  MR. STERN:  All objections and

21   motions to strike except as to form saved until the

22   time of trial.

23                  MR. NOONAN:  Right.

24                  MR. STERN:  Witness will read and

25   sign?

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

 1    the UWC process, which the procedures for the UWC

 2    provide that any party in that process has the ability

 3    to select anyone they want, as an advisor.  The Share

 4    Center frequently serves as advisors for the

 5    complainants.  So that's another role that they

 6    fulfill.

 7                     So they don't, again, they have a

 8    dotted line reporting relationship to us.  As I said,

 9    we in our role as overseeing the Title IX program at

10    Yale, ensure that their work is effective, that they

11    have the resources that they need.  And we've actually

12    in the last five years increased their staffing.

13    We've increased their space that they've had allocated

14    in that building.

15                     So those are examples of the ways in

16    which we've helped them do their work.

17        Q.   If a person consults with the Share Center,

18    is that considered to be confidential?

19        A.   Yes.  The Share Center does not report to

20    our office.  As I mentioned to you before, we are the

21    repository for reports that go to Title IX

22    Coordinators, or other administrators.  But if an

23    individual goes to the Share Center, we do not know

24    about it.

25        Q.   That would be if a complainant goes to a

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                        January 10, 2017

Page 46

1    Share Center?

2         A.    That's right, or a respondent.

3         Q.    Anybody who --

4         A.    Anyone who goes to the Share Center, yes,

5    they are I believe shielded.  They're technically a

6    rape crisis center so they're shielded under whatever

7    laws exist to sort of shield those conversations, so

8    they do not report to us.

9         Q.    So if a person goes in and says I would

10   like counseling, the fact that that person is having

11   counseling at the Share Center would be considered to

12   being confidential?

13        A.    That's right.

14        Q.    And similarly, if the person is receiving

15   training, that would be confidential?

16        A.    Well, one exception there.  So as I

17   mentioned to you, if a Title IX Coordinator suggests

18   to a respondent that that individual go receive

19   training, we may not know whether or not they ever do

20   it, unless that individual confirms, says I went and I

21   participated in this training.  So they've self

22   disclosed, all right.

23              If an individual through the UWC who

24   has as a result of a disciplinary action, been

25   required to seek training, and that's different than

Electronically signed by JAMES MARTONE (601-171-250-7767)          31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 47

1   the Title IX Coordinator suggesting, but if the UWC

2   has required that individual to seek training, then I

3   do believe there's a record.

4        Q.   You would know that?

5        A.   I would not necessarily know that.  The UWC

6   would generally find out.  They track it.

7        Q.   The UWC would know that.

8        A.   Right.

9        Q.   And it would be in one of these summaries,

10  correct?

11       A.   Right.

12       Q.   But this would not, if I went to the Share

13  Center and wanted to know if Jason Killheffer has

14  received training, they will not tell me?

15       A.   They will never answer your question,

16  exactly.

17                 MR. NOONAN:  When you get to a

18  convenient spot, can we take a short break?

19                 MR. STERN:  This is a good spot.

20                 (Recess taken: 11:04-11:12 a.m.)

21       Q.   Back on the record.  So another informal

22  option, would that be mediation?

23       A.   Maybe you can just describe to me how you

24  view mediation, or what you mean by that term.

25       Q.   I think I saw it in something, some sort of

Electronically signed by JAMES MARTONE (601-171-250-7767)          31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                         January 10, 2017

 1   interested in a formal complaint, under what

 2   circumstances could the university go forward on its

 3   own?

 4                  MR. NOONAN:  Can I ask you for a

 5   clarification.  Are you talking about sort of after

 6   you've discussed all the options, and the Title IX

 7   Coordinator has given all the advice, there's a final

 8   decision on the part of the complainant, I don't want

 9   to go forward?  Or are you talking about at the

10   outset?

11        Q.   The complainant says I do not wish a formal

12   complaint to be filed.

13        A.   Uh-huh.

14        Q.   Under what circumstances, after being

15   advised, under what circumstances could the university

16   go forward?

17        A.   Then we would have to evaluate the safety

18   concerns, and determine whether absent that

19   complainant's participation, would we go forward with

20   a formal complaint.

21        Q.   Now if the -- the option that you've

22   described to us a moment ago was you might say to the

23   complainant one way to do it is for us to file the

24   complaint, if you participate, right?

25        A.   Yes.

                   Sanders, Gale & Russell
                        (203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 56

1        Q.   All right.  But that would still depend

2    upon the complainant's participation, correct?

3        A.   Well, that would be the question to the

4    complainant.

5        Q.   Right.

6        A.   Would you be willing to speak to a fact

7    finder, if the university brought a complaint on your

8    behalf.

9        Q.   Okay.  So if the complainant did not wish

10   to participate, then the only situation in which the

11   university would go forward would be if it determined

12   that there was a safety issue?

13       A.   If it determined there was a safety issue

14   and if it determined that it could go forward absent

15   that complainant's participation.  And that's gonna be

16   on a case by case basis.

17       Q.   But there would have to be a safety issue,

18   correct?

19       A.   Yes.

20       Q.   All right.

21       A.   And just to make that clear, the reason is

22   because in that situation, we would be essentially

23   overriding the complainant's stated wishes.  Going

24   against their stated wishes.

25       Q.   Now you've told us about the situation when

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 109

1    Montague until you could have a meeting with you,

2    Stephanie Spangler and Susan Sawyer?

3         A.   We discussed that so that we could discuss

4    what the appropriate action would be in a case such as

5    this.

6         Q.   All right.  So prior --

7         A.   Prior to what, this date?

8         Q.   Prior to -- at some point you had a meeting

9    with these various people, correct?

10        A.   Absolutely.

11        Q.   And prior to that time, you told Angie that

12   you wanted to schedule that meeting; is that correct?

13        A.   Yes, I did.

14        Q.   And you told Angie why you wanted to

15   schedule that meeting?

16        A.   I told Angie we should review the

17   allegations with Stephanie and with Susan.

18        Q.   All right.  And you knew at that time that

19   Angie was proceeding along a path of effectuating an

20   informal resolution, correct?

21        A.   I knew that she was in conversation with

22   **Jane Roe**        , but not minute by minute, where

23   exactly they were in that process.

24        Q.   Well, you knew that they were planning

25   to --

Sanders, Gale & Russell
(203) 624-4157

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

                                                        Page 110

 1      A.   Let me -- an informal resolution does not

 2  forego a formal complaint.  So she could continue to

 3  work with **Jane Roe**, and talk with **Jane Roe** about what her

 4  wishes are, which could change, okay.  Knowing that we

 5  were also going to have a meeting with Stephanie and

 6  Susan.

 7      Q.   All right.

 8      A.   So if you're trying to draw -- I'm not sure

 9  what conclusion you're trying to draw from that.

10      Q.   Did you tell Angie hold off on meeting with

11  Jack Montague until after we can have this meeting?

12      A.   We discussed her intention to contact Jack

13  Montague.  I believe at that point we must have

14  already had a meeting on the books, on our calendar

15  with Stephanie and Susan.

16           In fact, it looks like it's two days

17  later, on the 4th.  According to this exhibit.  So at

18  that point, if she's talking on Monday, I say we're

19  meeting on Wednesday, before you do anything, why

20  don't we talk about what the right approach to this

21  is.

22      Q.   All right.

23      A.   So that's it.

24      Q.   So now did this meeting take place?

25      A.   The meeting with Stephanie, Susan and

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 111

1   Angie?

2        Q.   Yes.

3        A.   Yes, it did.

4        Q.   Okay.  And as a result of that meeting, was

5   some decision made?

6        A.   At that meeting, we reviewed the

7   allegations and the information that Angie had

8   gathered.  We reviewed the fact that Angie had

9   discussed with **Jane Roe** that **Jane Roe** was interested in

10  pursuing an informal resolution.

11                We reviewed the fact that the

12  seriousness of the allegations in this matter and the

13  fact that Jack Montague had previously been through

14  the UWC complaint process, had previously been found

15  to have violated our sexual misconduct policies, and

16  most importantly, the seriousness of these allegations

17  made a formal complaint a more appropriate solution

18  than an informal complaint.  One of the reasons we

19  look as to why someone -- whether someone has been

20  through our process before is because should they go

21  through that process and be found in violation and

22  subsequent for that process, an allegation that they

23  violated it again, indicates that they may not have

24  learned from that earlier process, okay.  And so

25  that's an indicator.

Sanders, Gale & Russell
(203) 624-4157

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

1                    So the nature of the allegations and

2     the fact that he had previously been through this

3     policy, or this process, and had previously been found

4     to have violated our policy.

5          Q.   All right.

6          A.   So we discussed, Angie -- going back to

7     **Jane Roe** discussed going back to **Jane Roe** and discussing

8     with **Jane Roe** whether she would be willing to participate

9     in a formal complaint.  This gets back to what we

10    talked about earlier which is would she be a witness

11    and speak to a fact finder in a formal complaint.

12         Q.   What did you understand that Angie --

13    strike that.  You say you discussed the seriousness of

14    the allegation, the previous finding?

15         A.   The fact that he had had a previous finding

16    of a violation.

17         Q.   Right.  Anything else?

18         A.   Those are the two primary factors.

19         Q.   All right.  What about the fact that you

20    had been told by Angie that she had been told by **Rachel Rogers**

21         that **Rachel Rogers** had heard about, that there had

22    been another complaint of rape?

23         A.   The other complaint, that was knowledge,

24    but it wasn't -- we didn't have any details on it and

25    it wasn't anything, as far as we understood Angie did

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

```
 1   not have any information, nor did she have in that

 2   case someone who was willing to speak with her.

 3                  So there wasn't much we could glean

 4   from that, but it certainly was knowledge.  But the

 5   two things we do know is we had an allegation against

 6   him that was quite serious.  We had a complainant who

 7   was willing to talk about it.  And we had knowledge

 8   that he had previously violated our policy.  And we

 9   had a situation like that, a formal complaint,

10   bringing it to a formal complaint so the allegation

11   can be investigated and adjudicated is an appropriate

12   solution.

13       Q.   Did the knowledge from **Rachel Rogers** about the

14   issue of another rape complaint play any part in that

15   decision?

16       A.   Well, I can speak for myself, and the

17   answer is no.  For me, the nature of the allegations

18   and the fact that he had previously been through the

19   process and been found to have violated it.

20       Q.   Was there any discussion about that

21   previous allegation?

22       A.   Other than Angie relating to us what she

23   had heard which at that point was very little.

24       Q.   Did you discuss it in that meeting?

25       A.   Yes.  Angie detailed for Stephanie and for
```

Sanders, Gale & Russell
(203) 624-4157

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 114

1    Susan the information that she had gathered up until

2    that point.

3         Q.   What was the decision as to what Angie

4    should do next?

5         A.   My understanding was that Angie would go

6    back the **Jane Roe** and discuss with her whether she would

7    be willing to speak with a fact finder in a formal

8    complaint.

9         Q.   What else did you understand that Angie was

10   going to say to **Jane Roe**?

11        A.   I don't have any other understanding.  That

12   was the -- that was the question that she was going to

13   go back and ask **Jane Roe**.

14        Q.   Well, did you understand that she was going

15   to discuss with **Jane Roe** the pros and cons of

16   participating in a formal complaint as opposed to an

17   informal resolution?

18        A.   I don't know about that.  I imagine she

19   would have described for her what the process of

20   participating in a formal complaint involves.

21        Q.   Well, did you know that she was --

22        A.   But I'm not aware of pros and cons, I'm not

23   sure what -- what you mean by that.

24        Q.   Well, you had some reasons why you thought

25   a formal complaint was the appropriate way to go,

Sanders, Gale & Russell
(203) 624-4157

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

1    correct?

2        A.    That's correct.

3        Q.    And the other persons in that meeting

4    agreed with you, correct?

5        A.    I can't speak for them.

6        Q.    Well, that was the decision that was made,

7    correct?

8        A.    The plan was that Angie would go back and

9    speak with **Jane Roe**.

10       Q.    And the reasons why according to your -- in

11   your view that the formal complaint was the way to go

12   was because of the seriousness of this one and the

13   prior history of Jack Montague with UWC?

14       A.    Those were the primary factors.

15       Q.    Right.  Now did you understand that Angie

16   was going to relate those factors to **Jane Roe**?

17       A.    I did not.

18       Q.    Well, what did you think Angie was going to

19   say to **Jane Roe** about what were the reasons to go for a

20   formal complaint as opposed to an informal resolution?

21       A.    I understood Angie was intending to go back

22   to **Jane Roe** to discuss the fact that these allegations

23   against Mr. Montague were very serious.  And that the

24   university takes that behavior very seriously, and

25   feels the most appropriate course of action would be

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 116

1   to bring a formal complaint against him.  We

2   understood her desire to be anonymous, we talked about

3   the fact that you can't be anonymous in a formal

4   complaint so she would have to explain that to her.

5                    But Title IX Coordinator could bring

6   the complaint if she would be willing to speak to a

7   fact finder.  But I can tell you I'm well aware in our

8   practices, and Angie is well aware, that we do not say

9   to complainants or to anyone the fact that someone has

10  received discipline previously.

11       Q.   And that fact, that someone has received

12  discipline previously is confidential, correct?

13       A.   We treat it as such, yes.

14       Q.   It's covered by the confidentiality policy

15  of Yale, correct?

16       A.   It is.

17       Q.   All right.  And the facts of that are

18  considered to be, of that prior discipline are

19  considered to be confidential, correct?

20       A.   Can you explain what you mean by the facts

21  of that?

22       Q.   The allegations?

23       A.   The allegations upon which the disciplinary

24  action is based?

25       Q.   Yes.

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

1      A.   Is confidential?  Give me an example of

2  what you mean.  Would we share the fact that an

3  allegation had been made against someone?  Is that

4  what you're asking?

5      Q.   Well, let's ask that question.

6      A.   No.

7      Q.   That would be confidential?

8      A.   Absolutely.

9      Q.   And therefore, the specifics of the

10  allegation would be confidential, correct?

11      A.   The specifics of the allegation,

12  absolutely.  We would not share that information.

13      Q.   The fact that he had been found responsible

14  for that allegation would be confidential?

15      A.   That's correct.  We would not share that.

16      Q.   The fact that he was given a sanction, that

17  would be confidental, correct?

18      A.   Which sanction are we talking about?

19      Q.   Any sanction?

20      A.   You've disciplined, such as probation,

21  disciplinary action such as that would not be shared.

22      Q.   The fact that as a result of this, he was

23  required to go for training, that would be

24  confidential, correct?

25      A.   Required training, which would only come

Electronically signed by JAMES MARTONE (601-171-250-7767)          31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 118

```
 1   out after disciplinary process, would be something we
 2   would not say to someone.
 3        Q.   In fact, anything you learned as a result
 4   of the previous UWC process would be confidential, and
 5   should not be disclosed to Jane Roe           in that
 6   situation, correct?
 7        A.   Just want to make sure I heard this
 8   correctly.  You said anything that we learned through
 9   the UWC process would be confidential, is that the
10   question?
11        Q.   Right.
12        A.   I would say yes, if it was only learned
13   through that process, absolutely.
14        Q.   Now as of this time, at the time of this
15   meeting --
16        A.   Which meeting just to be clear?
17        Q.   The meeting on -- well, let's look at this.
18   If you look at Exhibit 1.  It indicates on page 845,
19   the top, Stephanie, Susan, Jason, JMK, 11/4/15, 9:00
20   a.m.
21        A.   I see that.
22        Q.   And would you agree that at least as far as
23   this document indicates, that the meeting where this
24   discussion took place was on the morning of November
25   4th, 2015?
```

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 119

1        A.    That appears to be the case.

2        Q.    Okay.

3        A.    I see this is redacted, so it's not clear

4   to me what was here.  But if all you're asking me is

5   does it appear we had a meeting on that date at that

6   time, I'd say yes.

7        Q.    Right.

8               MR. NOONAN:  Just to be clear, he

9   can't confirm or deny that it occurred on that date.

10              MR. STERN:  I got it.

11              MR. NOONAN:  I mean there's no doubt

12  that Ms. Gleason testified about this and these are

13  her notes.

14              MR. STERN:  She's testified, yes,

15  right.

16              MR. NOONAN:  But I mean I think the

17  problem he's having with the dates is he just doesn't

18  remember.  He didn't keep them.

19              MR. STERN:  But she did.

20       Q.    I mean you don't dispute that the meeting

21  took place on November 4th, 2015, at 9:00 a.m., do

22  you?

23       A.    I don't.

24       Q.    Okay.  As of the end of this meeting, on

25  the morning of November 4th, is it fair to say that

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 120

1    the group had made the decision to bring a formal

2    complaint against Jack Montague if **Jane Roe**              said

3    she would participate in it?

4         A.   I'd say yes.

5         Q.   Now as of this moment, you had never

6    interviewed, you never met **Jane Roe**         ?

7         A.   No.

8         Q.   And neither had Stephanie Spangler nor

9    Susan Sawyer met with her so far as you knew?

10        A.   No.  As far as I know.

11        Q.   And as of this point, **Jane Roe**had met with

12   her once, correct, so far as these documents are

13   concerned?

14        A.   I can't confirm that.

15        Q.   Now you know what it means to have a

16   thorough interview with a complainant, correct?

17        A.   Yes.  I --

18        Q.   In fact, you told us that what your

19   practice is in doing intake in the Title IX office is

20   not to press for details, but simply to get what the

21   person wants to tell you, is that right?

22        A.   Yes.

23        Q.   All right.  And so far as you know, is that

24   the practice that Angie followed when she had met with

25   **Jane Roe**prior to this meeting on November 4th, 2015?

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad