Page 1

UNITED STATES DISTRICT COURT FOR THE

    DISTRICT OF CONNECTICUT

CIVIL ACTION No: 3:16 cv-00885-AVC

----------------------------------x

JACK MONTAGUE,                     :

    Plaintiff,                     :

        -v-                        :

YALE UNIVERSITY, ANGELA GLEASON,   :

And JASON KILLHEFFER,              :

    Defendants.                    :

----------------------------------x


          Depositon of ANGELA GLEASON, taken pursuant to Notice, held at the Law Offices of Jacobs & Dow, LLC, 350 Orange Street, New Haven, Connecticut, before James A. Martone, LSR #248, and Notary Public, in and for the State of Connecticut, on December 13, 2016, at 10:30 a.m.


                     Sanders, Gale & Russell
                       (203) 624-4157

```
 1   A P P E A R A N C E S:
 2
 3          For the Plaintiff:
 4   TODD & WELD, LLP
 5   One Federal Street-27th Floor
 6   Boston, MA  01880
 7   BY:  ALEXANDRA H. DEAL, ESQ.
 8   adeal@toddweld.com
 9
10          For the Defendants:
11   DONAHUE, DURHAM & NOONAN, PC
12   741 Boston Post Road
13   Guilford, Connecticut  06347
14   BY:  PATRICK NOONAN, ESQ.
15
16   ALSO PRESENT:
17   Harold Rose, Esq.
18   General Counsel, Yale University
19
20
21
22
23
24
25
```

Electronically signed by JAMES MARTONE (601-171-250-7767)                    056999c1-7919-44a7-a21b-5d72e63e95c1

```
 1                S T I P U L A T I O N S
 2
 3         IT IS HEREBY STIPULATED AND
 4      AGREED by and between counsel for the
 5      respective parties hereto that all
 6      technicalities as to proof of the official
 7      character before whom the deposition is to
 8      be taken are waived.
 9
10         IT IS FURTHER STIPULATED AND
11      AGREED by and between counsel for the
12      respective parties hereto that the
13      deposition may be signed before any Notary Public.
14
15         IT IS FURTHER STIPULATED AND
16      AGREED by and between counsel for the
17      respective parties hereto that all
18      objections, except as to form, are reserved
19      to the time of trial.
20
21
22                       *  *  *  *  *  *
23
24
25
```

Electronically signed by JAMES MARTONE (601-171-250-7767)                        056999c1-7919-44a7-a21b-5d72e63e95c1

```
 1                       WITNESS INDEX
 2
 3
 4                                                          PAGE
 5   Direct Examination by Ms. Deal                            5
 6
 7                       EXHIBIT INDEX
 8   PLAINTIFF       DESCRIPTION                             PAGE
 9    1   Notebook                                              7
10    2   Sexual Misconduct Response                           26
11    3   Document entitled UWC Procedures                     30
12    4   Statement of Confidentiality of UWC Proceedings      35
13    5   Report of Complaints of Sexual Misconduct            39
14    6   September 23, 2015 e-mail exchange                   80
15    7   October 16, 2015 e-mail exchange                     90
16    8   Incident Summary Form                                95
17    9   October 16, 2015 e-mail exchange                    103
18   10   October 28, 2015 e-mail exchange                    109
19   11   October 29, 2015 e-mail                             112
20   12   November 4, 2015 e-mail exchange                    132
21   13   Fact Finder's report                                135
22   14   November 5, 2015 e-mail exchange                    140
23   15   November 9 2015 e-mail exchange                     159
24   16   November 10, 2015 e-mail chain                      160
25   17   January 21, 2016 opening statement                  175
```

Page 5

1                  -EXHIBITS CONTINUED-

2   18   November 18, 2015 letters                          177

3   19   November 20, 2015 e-mail                           179

4   _____

5   ANGELA GLEASON

6    called as a witness, having been first duly

7    sworn by James A. Martone, a Notary Public

8    in and for the State of Connecticut:

9                MR. NOONAN:  I should probably put on

10  the record our agreement that we're going to be using

11  real names of students whose names we ought not to

12  make public.  So we've agreed that the transcript will

13  be limited to parties and witnesses, and if the

14  transcript needs to be used elsewhere, for example, in

15  a court filing, we will redact the names.

16               MS. DEAL:  Yes.

17  DIRECT EXAMINATION BY MS. DEAL:

18       Q.   Good morning.

19       A.   Good morning.

20       Q.   Could you state your name please?

21       A.   Angela Gleason.

22       Q.   Ms. Gleason, have you ever been deposed

23  before?  Have you ever been to a deposition?

24       A.   I don't know what means.  Oh, yes I have.

25       Q.   Let me go over some of the ground rules,

Electronically signed by JAMES MARTONE (601-171-250-7767)                    056999c1-7919-44a7-a21b-5d72e63e95c1

Page 119

```
 1        Q.   And when we say contact Jack, we're talking
 2   about how your plan based on your discussion with
 3   Jane Roe       , was to talk to Jack about how his
 4   behavior didn't meet the community's expectations,
 5   recommend training and not mention Jane Roe by name; is
 6   that right?
 7        A.   I believe so.
 8        Q.   Okay.  Still looking at your notes, looks
 9   like on November 4th of 2015, you met with Stephanie,
10   Susan and Jason about the JM case; is that correct?
11        A.   Yes.
12        Q.   Okay.  What was the purpose of that
13   meeting?
14        A.   I believe to discuss the Jack Montague
15   case.
16        Q.   What about the Jack Montague case?
17        A.   I don't recall if I knew going into the
18   meeting.
19        Q.   Meaning you don't recall, when you went
20   into the meeting that morning, it looks like at 9:00
21   a.m. you're not sure if you knew going in, why you
22   were meeting with Stephanie, Susan and Jason, about
23   Jack Montague?
24        A.   Correct.
25        Q.   Okay.  Is it typical for you to meet with
```

1   these three individuals together, about a particular
2   case?
3        A.   Define typical.
4        Q.   Had you done it before?
5        A.   Yes.
6        Q.   How often had you done this before?
7        A.   I'm guessing three times, four times.
8        Q.   And that's since you became a Deputy Title
9   9 Coordinator in July of 2014?
10       A.   Correct.
11       Q.   Okay.  And if you recall, what was the
12  purpose of involving the General Counsel's office in
13  this meeting?
14       A.   What did I think going in?  Or --
15       Q.   No, what was the purpose of involving the
16  General Counsel's office in this meeting?
17       A.   Assumed for legal advice.
18       Q.   For legal advice with regard to what?
19       A.   This case.  Title 9.  I didn't know.
20       Q.   Do you know now?
21       A.   It's just -- again, it's not infrequent for
22  General Counsel, specifically Susan Sawyer, to join a
23  meeting of Title 9 concerns.
24       Q.   Okay.  Do you recall this meeting?
25       A.   I recall where it was.

```
 1       Q.   Okay.  And do you recall whether Ms. Sawyer
 2   gave legal advice to you during this meeting?  Without
 3   revealing what the legal advice may have been?
 4            MR. NOONAN:  Just answer that yes or
 5   no.  Don't give any substance of what she said.
 6       A.   I remember her speaking, yes.
 7       Q.   Okay.  Would you characterize what she said
 8   as legal advice?
 9       A.   I believe so.
10       Q.   Okay.  Did your notes reflect things that
11   Ms. Sawyer said to you during that meeting?
12       A.   I can't see my notes.
13       Q.   Sitting here today, can you remember
14   whether these notes reflect what Ms. Sawyer said to
15   you during the meeting?
16       A.   I don't remember.
17       Q.   Okay.  Do you remember the topics that were
18   discussed at this meeting?
19            MR. NOONAN:  Again, at this point I
20   don't have any objection to you talking about topics
21   that others talked about, but don't mention anything
22   Attorney Sawyer mentioned.  So you can talk about what
23   other people said, just not her.
24       A.   I don't know how to separate them.  Because
25   I remember, I feel like largely, whatever was
```

```
 1    discussed, everyone contributed to.
 2         Q.   Did you have a particular concern going
 3    into this meeting about what we're calling the "Jack M
 4    case"?
 5         A.   I didn't call it the Jack M case.
 6              MR. NOONAN:  You mean more than what
 7    she's talked about, that it was a sexual assault?
 8         Q.   Did you have some particular concern you
 9    needed to raise with Stephanie, Susan and Jason about
10    the Jack M case?
11         A.   I don't remember I did.  I didn't call the
12    meeting.
13         Q.   Okay.  Was it Jason who called the meeting?
14         A.   The e-mail seems to reflect that.
15         Q.   Okay.  Do you remember if he had a specific
16    concern?
17         A.   I don't remember.
18         Q.   And then there's a note further down on
19    that page, the same day, it says "Susan, Jason, Aley
20    and David."  Do you see that?
21         A.   Yes.
22         Q.   Am I correct that this reflects a meeting
23    that you had at 3:00 o'clock in the afternoon on that
24    day, with Susan, Jason, Aley and David?
25         A.   Correct.
```

Electronically signed by JAMES MARTONE (601-171-250-7767)					056999c1-7919-44a7-a21b-5d72e63e95c1

```
 1      Q.   And this is Susan Sawyer, Jason Killheffer,
 2   Aley Menon, and David Post; is that right?
 3      A.   Yes.
 4      Q.   Do you remember what the purpose of that
 5   meeting was?
 6              MR. NOONAN:   There's no redaction
 7   there, just so you know.
 8              MS. DEAL:   I understand.  It's just a
 9   note that it happened.
10              MR. NOONAN:   Again, just don't repeat
11   anything Susan said.
12      A.   Okay.  I don't remember really anything
13   about that meeting.  And I actually don't remember
14   that it -- I actually don't remember that it happened.
15      Q.   Do you have any idea what that note means
16   then?
17      A.   I believe it had to do with someone from
18   the UWC being available if questions were asked about
19   the UWC process.
20      Q.   By whom?
21      A.   **Jane Roe**           I believe.
22      Q.   Okay, and why would **Jane Roe** be asking
23   questions about the UWC process?
24      A.   If a formal complaint was made.
25      Q.   Okay.  Had your plan changed at this point?
```

Electronically signed by JAMES MARTONE (601-171-250-7767)                          056999c1-7919-44a7-a21b-5d72e63e95c1

 1      A.   I don't know if there was a plan.
 2      Q.   Well, let's go back to Exhibit 11 I think
 3   it is.  I'm sorry, 10.  As of October 28th, you were
 4   planning to contact Jack, is that right?
 5      A.   Correct.
 6      Q.   And you were planning to contact Jack for
 7   the purpose of discussing with him the fact that his
 8   behavior hadn't met the community's expectations; is
 9   that right?
10      A.   Correct.
11      Q.   Okay.  Did that plan change at some point?
12      A.   The plan to contact him as I described to
13   **Jane Roe**?
14      Q.   That's right.
15      A.   Yes.
16      Q.   Okay.  When did that plan change?
17      A.   I believe it changed in the meeting that is
18   redacted.
19      Q.   Okay.  Why did it change?
20      A.   I believe it was because of a new
21   development.
22      Q.   Whaat was the new development?
23      A.   That Jack Montague had already been through
24   a UWC case.
25      Q.   Okay.  And what relevance did that have to

```
 1   your plan?
 2        A.   To this plan here?
 3        Q.   Yes.
 4        A.   I believe a decision in the case
 5   recommended sensitivity training, or I believe
 6   mandated sensitivity training, and Jane Roe had requested
 7   that Jack receive sensitivity training.  And he had
 8   already received sensitivity training.
 9        Q.   Okay.  So why did that change the course of
10   action?
11        A.   I don't recalling the specifics of the
12   discussion.  But in concert with, I believe it was
13   also discussed that there had been not only the
14   mandate of the sensitivity training, but a period of
15   probation and the fact that there had been a finding
16   in a previous UWC case, that it wouldn't be the plan
17   going forward to recommend sensitivity training again,
18   as a voluntary course of action, which is what I would
19   have recommended in the case that Jane Roe requested.
20        Q.   Okay.  Does Yale have a policy that
21   prohibits a person from twice receiving sensitivity
22   training?
23        A.   I don't know.
24        Q.   You're not aware of any policy that Yale
25   has that prohibits someone from being trained again on
```

Electronically signed by JAMES MARTONE (601-171-250-7767)                056999c1-7919-44a7-a21b-5d72e63e95c1

```
 1       Q.   What did you tell Jane Roe?
 2       A.   That he had already received sensitivity
 3   training.
 4       Q.   Did you tell her why he had already
 5   received sensitivity training?
 6       A.   No.
 7       Q.   Did you tell her when he had received
 8   sensitivity training?
 9       A.   I don't believe so.  Because I don't
10   believe that I knew.
11       Q.   Okay.
12       A.   And in fact, it wouldn't have mattered.
13       Q.   Under what circumstances would a person
14   receive sensitivity training from the Share Center?
15       A.   I could recommend it, as a voluntary course
16   of action and often do.  I have no way of finding out
17   if someone does or not.
18       Q.   Okay.
19       A.   It could also be part of a decision, part
20   of a recommendation from a finding.  And generally I
21   just believe anyone, any member of the Yale community
22   can receive it if they want to.  You know, it could be
23   requested by any individual unit for an employee or,
24   you know, a student or a member of a group.
25       Q.   Okay.  Do you recall what you told Jane Roe
```

1    Q.   Check to see if Jack was known to the Title
2    9 Coordinators?
3    A.   Many times when I confer with Jason, that's
4    either the result of checking with Jason or something
5    that initiates that check.
6    Q.   Okay.  And do you recall whether you
7    learned at any point that Jack was or was not known to
8    the Title 9 Coordinators?
9    A.   I believe it was at the meeting that we've
10   discussed.
11   Q.   And that's the meeting with Stephanie,
12   Susan and Jason?
13   A.   Correct.
14   Q.   No.  It's at that meeting that you believe
15   you learned that Jack was at the very least, known to
16   the Title 9 Coordinators?
17   A.   My memory is that that's when I learned
18   that he had been in a UWC case.
19   Q.   And then in the next paragraph it says
20   "After consultation with other Title 9 Coordinators,
21   Ms. Gleason found out that Mr. Montague had already
22   participated in a full semester of sensitivity
23   training."  Do you see that?
24   A.   I do.
25   Q.   Okay.  You found out that that training had