CONFIDENTIAL

1 February 2016

UWC Panel Report to Dean Jonathan Holloway
Complainant: **Jane Roe**
Respondent:   Jack Montague (Trumbull '16)

**Introduction**

On 21 January 2016, the UWC held a hearing to address the complaint brought by Senior Deputy Title IX Coordinator Jason Killheffer against Jack Montague on 18 November 2015. The complaint alleges that Jack Montague (Trumbull '16) sexually assaulted **Jane Roe** on the night of Saturday, 18 October 2014 at his residence located at 43 Howe Street.

**Jane Roe** participated in the hearing and was accompanied by her adviser from the SHARE Center. Jack Montague participated in the hearing and was accompanied by his adviser Coach James Jones. The panel thanks the parties and their advisers for participating in the hearing.

During the hearing, the panel's questioning of the parties was informed by the detailed report prepared by UWC fact-finder Miriam Berkman.

**Findings of Fact[1]**

The panel accepts the undisputed facts in the fact-finder's report and summarizes here the relevant facts[2]. **Jane Roe** and Mr. Montague were friends and had three previous intimate interactions, including sexual intercourse on 24 September 2014. On 18 October 2014, **Jane Roe** went to a party at Mr. Montague's house. Both parties had been drinking but both said they were not incapacitated. They engaged in consensual sexual contact not including intercourse outside the house and in Mr. Montague's car. They then went inside to Mr. Montague's bedroom, where they continued sexual contact, including intercourse. **Jane Roe** stayed the night with Mr. Montague and went home in the morning. The panel accepts all of the above facts as undisputed.

The panel reviewed the evidence presented by the fact finder and at the hearing to understand whether, as alleged in the complaint, Mr. Montague engaged in nonconsensual sexual

---

[1] The panel's findings of fact are underlined.

[2] The panel notes that on page 17 of the fact-finder's report, in the section addressing the testimony of Angela Gleason, the sentence starting "On October 19, 2014 …" should read "On October 19, 2015 …" On page 18 of the fact-finder's report, in the final paragraph, the date in the sentence "… she had not wanted sexual intercourse on October 28 …" should be October 18.

1

intercourse with Jane Roe on 18 October 2014 in violation of the University's sexual misconduct policy.

**Relevant Yale Policy**

The relevant part of the University's definition of sexual misconduct reads:

> *Sexual misconduct incorporates a range of behaviors including...sexual assault...and any other conduct of a sexual nature that is nonconsensual, or has the purpose or effect of threatening, intimidating or coercing a person.*

The University's definition of sexual assault in relevant part reads:

> *Sexual assault is any kind of nonconsensual sexual contact including rape, groping, and any other nonconsensual touching.*

The relevant part of the University's definition of sexual consent reads:

> *Sexual activity requires consent, which is defined as positive, unambiguous, and voluntary agreement to engage in specific sexual activity throughout a sexual encounter. Consent cannot be inferred from the absence of a "no"; a clear "yes," verbal or otherwise, is necessary. Consent to some sexual acts does not constitute consent to others, nor does past consent to a given act constitute present or future consent. Consent must be ongoing throughout a sexual encounter and can be revoked at any time.*

The University's guidance regarding sexual consent reads:

> *Consent can only be accurately gauged through direct communication about the decision to engage in sexual activity. Presumptions based upon contextual factors (such as clothing, alcohol consumption, or dancing) are unwarranted, and should not be considered as evidence for consent.*

> *Although consent does not need to be verbal, verbal communication is the most reliable form of asking for and gauging consent. Talking with sexual partners about desires and limits may seem awkward, but serves as the basis for positive sexual experiences shaped by mutual willingness and respect.*

**Findings and Explanations of the Panel:**

Jane Roe and Mr. Montague provided substantially different accounts of the sexual encounter in Mr. Montague's room on the night of 18 October 2014 and of subsequent events and interactions.

2

Jane Roe *account* - Jane Roe alleges that Mr. Montague engaged in sexual intercourse over her express verbal objection and physical resistance. Before going in to Mr. Montague's bedroom, Jane Roe asked Mr. Montague twice if it was OK to "hook up" and not "have sex." Mr. Montague responded that it was OK with him. Jane Roe said she felt comfortable with Mr. Montague and in control of the situation because she had been careful to not drink too much and because she had been so verbally clear and direct with Mr. Montague about not wanting to have intercourse. Jane Roe told the panel "I really trusted him. I had no reason not to." She also told the panel that she had intentionally brought up the topic of not having sexual intercourse in the form of a question and if Mr. Montague had said no, she would have considered things differently.

Once in Mr. Montague's room, the parties took off their clothing and kissed and touched. Jane Roe indicated her consent to kissing and touching by kissing Mr. Montague, touching his body (but not his genitals), and by not tensing up. Mr. Montague got on top of Jane Roe and leaned his pelvis into her as if he was preparing to penetrate her. Jane Roe put her hands up and pressed them against his shoulder and pushed him away. Then she said "Jack, no, I said I wanted to hook up but not have sex," but he then penetrated her over her objection. Jane Roe was surprised and frozen during intercourse. She did not attempt to push him away during intercourse but rather just waited for him to stop. Jane Roe said Mr. Montague looked very drunk. After intercourse, Mr. Montague said "I'm really sorry. I know you didn't want that." After Mr. Montague stopped, Jane Roe lay still in bed feeling defeated and confused.

After intercourse, Mr. Montague got dressed and went downstairs, where some of his friends and housemates were gathered. He came back upstairs and told Jane Roe that he was going to Zeta Psi and she should stay in his bedroom and wait for him to come back. Jane Roe reported thinking she might leave and go home but then heard people downstairs calling her name and telling her to come down. Jane Roe reported feeling confused but she went down stairs. Mr. Montague did not want her to go with him to Zeta Psi, so he asked a male friend of his, whom Jane Roe did not know, to take her with him to Toad's Place. Mr. Montague said he would meet up with Jane Roe later back at his house. Jane Roe did not say anything and went along to Toad's passively with Mr. Montague's friend, whom she didn't know, because she couldn't think clearly. She told the panel that she felt like she was being passed along. She entered Toad's for a brief time and then left to go to her suite in

Jane Roe walked to alone after 1:00 a.m. (swipe card data recorded her entering at 1:34 a.m.) but once there, she became confused and overwhelmed. Jane Roe said she just wanted to go to bed and not have to talk with anyone, but she realized that there would be lots of people in her suite (several suitemates and friends visiting) and it would be impossible to go to bed without seeing anyone or being asked a lot of questions. Because she was overwhelmed by the prospect of having to answer questions or talk if she returned to her suite, Jane Roe decided to return to Mr. Montague's house. Jane Roe said it was "the only place where I wouldn't have to explain myself." Since Mr. Montague was

3

planning on having her return, Jane Roe thought he would not question her about the night and would let her go to sleep quietly. Jane Roe met Mr. Montague near            and returned to Mr. Montague's house. On the way, Mr. Montague was flirty and Ms. Jane Roe told him she just wanted to go to sleep. Mr. Montague joked about being too drunk to have sex. Jane Roe stayed the night at Mr. Montague's house, sleeping in Mr. Montague's bed, but remaining fully clothed. The next morning, Jane Roe left Mr. Montague's house with no discussion of what happened the previous night.

Jane Roe reported returning to her suite around 10 a.m. (swipe card data indicates she entered            at 9:57 a.m., and            – which connects through the basement to her suite in            – at 9:58 a.m.). In the common room of the suite, one of her suitemates,            , asked her how her night was. Jane Roe replied "terrible," described what had happened, and started to cry. She then spoke with other suitemates about her experience, and her friends encouraged her to talk with someone about what Mr. Montague had done. She met with            from the SHARE center to learn her options, but decided she did not want to file a complaint. She also spoke with            a Divinity School student and friend, who encouraged her to write down what happened in case she wanted to file a complaint in the future. Jane Roe wrote up her account by hand on 22 October (Exhibit D).

Jane Roe decided to speak with Mr. Montague so he would understand that what he had done was wrong and so that he would not do it to anyone else. The parties met on 28 October. Jane Roe told Mr. Montague that she had made it clear to him on 18 October that she did not want to have sex with him and that he proceeded anyway. She told Mr. Montague that she did not want to see him again. Mr. Montague said that he was sorry that she felt that way and that he had been very drunk that night. He was very careful with his words, trying to be nice but not taking responsibility for any misconduct.

Jane Roe reported a number of impacts of this incident on her educational and living experience at Yale. She had intrusive thoughts and nightmares about Mr. Montague in the fall of 2014 and on and off through the spring and early fall of 2015. Jane Roe told the panel she abruptly ended relationships with high school friends because she did not think she could keep what had happened from them and felt it even more difficult to tell them. She said she would be overcome by emotion when she saw an article about Yale basketball, when the Yale Police sent an email about sexual assault, or when she saw Mr. Montague's name on the guest list of her sorority's events. Jane Roe made the difficult decision to resign from the            because she could not imagine having to            Mr. Montague at basketball games (Exhibits F and G).

*Mr. Montague's account* – Mr. Montague asserts that Jane Roe consented to all of the sexual activity that took place on the night of 18 October 2014. Mr. Montague said he had four to seven drinks over three and a half hours and that he had been careful to not drink too much because he was excited to see Jane Roe. Mr. Montague's accounts of how he ascertained consent differed in his accounts to the fact finder and to the hearing panel. In his account to the

4

fact finder, Mr. Montague said he had obtained verbal consent. He told the fact finder that Jane Roe agreed to go up to his room; that they each removed their own clothing, although he may have unhooked her bra; they were kissing and touching each other; and he asked if she wanted to have sex and Jane Roe said "OK." At the hearing, when the panel asked Mr. Montague how he understood that he had consent for sex, Mr. Montague mentioned only non-verbal indicators of consent: Jane Roe agreed to come up stairs to his room, he did not use force, Jane Roe took off all of her clothing, she did not say no, and she was an active participant in sex, including verbalizing her pleasure, touching him, and switching positions during sex. He did not tell the panel that before engaging in sexual intercourse that he asked Jane Roe if she wanted to have sex and she said "OK."

Mr. Montague did not recall Jane Roe asking him if it was OK to "hook up but not have sex." He also denied that Jane Roe told him she did not want to have sex or that she pushed him away immediately before intercourse. He further denied saying to Jane Roe after intercourse "that he was sorry because he knew she didn't want that." Mr. Montague expressed confusion about the complaint and told the panel he was under the impression that all of his interactions with Jane Roe had been consensual.

The accounts of Jane Roe and Mr. Montague differ in several key respects, which are summarized here:

a) Jane Roe said she asked Mr. Montague twice if it was OK that they "hook up" but not "have sex" and Mr. Montague responded in the affirmative both times. Jane Roe told the panel that she was proud she had been crystal clear about what she wanted that night. She said "I very clearly expressed myself." Mr. Montague denied that Jane Roe ever asked if it was OK to "hook up but not have sex." When pressed on this issue, Mr. Montague told the panel it was possible that Jane Roe said this, but the party was loud and maybe he did not hear her or he may have heard something different.

b) Jane Roe said she told Mr. Montague that she did not want to have sex when the two were in Mr. Montague's room. Mr. Montague denied this occurred.

c) Jane Roe said Mr. Montague penetrated her against her express verbal objection and physical resistance. In stark contrast, Mr. Montague told the fact finder that Jane Roe verbally agreed to have sex when they were in his room. When questioned by the panel about how he knew he had consent that night, Mr. Montague described only nonverbal indications of consent. Mr. Montague also said Jane Roe did not push him away immediately before intercourse.

d) Mr. Montague said they switched positions while having intercourse. Jane Roe did not remember switching positions and recalls being frozen.

e) Jane Roe said Mr. Montague looked very drunk, and that he joked about being too drunk for sex later in the evening, after she met him near             to return to

5

his house. She told the panel that Mr. Montague seemed more intoxicated on 18 October 2014 than on the previous three nights when they had intimate interactions. Mr. Montague told the fact finder that he had four to seven drinks that night. He told the panel it was a typical party night for him and that he was not as intoxicated as he had been during previous intimate encounters with Jane Roe

The panel deliberated at length about issues of credibility in evaluating the conflicting statements made by Mr. Montague and Jane Roe. <u>The panel finds Jane Roe account more credible for the following reasons:</u>

1. **Full, detailed and consistent account.** Jane Roe provided a full and detailed account of her relationship with Mr. Montague. Jane Roe told the panel she remembered the incident and what happened very clearly. <u>The panel finds there is no evidence that Jane Roe was intoxicated or otherwise impaired in any way that would have affected her recollection of the night.</u> Jane Roe testimony on the material facts at the hearing, in interviews with the fact-finder, in her contemporaneous text to her friend (Exhibit F), and in her undated written account (Exhibit D) were all detailed and consistent. Jane Roe also provided information that may have been viewed as damaging to her allegations, such as the fact that she returned to Mr. Montague's house. Her descriptions were clear and specific, and where time frames and movements were concerned her account was fully consistent with the time frames noted in the electronic swipe card records. <u>The panel finds Jane Roe account credible.</u>

2. **Corroborative third-party witness accounts.** The fact finder interviewed Jane Roe suitemates, and friend . In separate interviews with the fact finder, all recalled Jane Roe talking with them about her sexual encounter with Mr. Montague the day after it occurred. recalled speaking with Jane Roe about her encounter with Mr. Montague a day later. All four suitemates said that Jane Roe told Mr. Montague that she did not want to have sex and she resisted, but that he had ignored her and continued over her objections.
also recalled that Jane Roe said that after intercourse, Mr. Montague apologized because he knew she had not wanted that. The nearly contemporaneous text message exchange between and Jane Roe on the morning of 19 October 2014 is also consistent with Jane Roe testimony that she said no a number of times, she tried to push Mr. Montague away, and he apologized after intercourse (Exhibit F).

also spoke about the impacts of the sexual encounter on Jane Roe said there was a striking difference between Jane Roe reaction to her first experience of sexual intercourse with Mr. Montague in September and her reaction on the morning of 19 October 2014. On the earlier occasion, Jane Roe felt unhappy and angry with herself because, although she consented, she felt she had too much to drink and was not using her usual good

6

judgment. On that occasion, she was upset with herself but was not crying or falling apart. In contrast, on the morning of 19 October 2014, Jane Roe was sobbing uncontrollably as she told the story of what happened and Jane Roe was upset and cried on and off the whole day.            said that Jane Roe gave up            in order to stay away from Mr. Montague, which was a big disruption in her life, and Jane Roe seemed more stressed and unhappy during the fall of 2015.            also discussed Jane Roe leaving the

<u>The panel finds persuasive the corroborative accounts provided by the third-party witnesses that Jane Roe told Mr. Montague she did not want to have sex, that she tried to push him away, and that he apologized after intercourse. The panel also finds persuasive the statements made by three of the third-party witnesses that the sexual encounter had a strong negative impact on Jane Roe</u>

3. **Independent evidence that further supports Jane Roe account.** The swipe card records (Exhibit H) support Jane Roe description of her actions after leaving Mr. Montague's house. The records show she entered            at 1:34 a.m. and then swiped into            where she met Mr. Montague, just a few minutes later at 1:40 a.m. This is consistent with Jane Roe explanation that she returned to the            after around 1 a.m. but decided to return to Mr. Montague's house because she just wanted to go to sleep and she did not want to have to speak with her housemates about her experience at that time. Furthermore, Jane Roe said she returned to            and her suite around 10 a.m. the next morning, which consistent with records indicating she entered            at 9:57 a.m. and            which connects to her suite in            , at 9:58 a.m. <u>The panel finds Jane Roe explanation for why she did not return to her suite but rather returned to Mr. Montague's room and stayed the night reasonable and understandable given her experience and the likely interactions in her suite that night. The panel also finds her statements consistent with the swipe card records and the accounts of her suitemates.</u> The swipe card data further supports the clarity and accuracy of Jane Roe recollections of the evening.

4. **Narrowness of the claim.** Jane Roe raised concerns about a single sexual act during an otherwise consensual encounter. Jane Roe further contrasted her experience on 18 October 2014, when she alleges sexual intercourse was not consensual, with her experience on 24 September 2014 when she consented to sexual intercourse but felt unhappy in retrospect because she was intoxicated and had not exercised her usual good judgement. <u>The panel finds the narrow claim and contrasting response to the two experiences of sexual intercourse with Mr. Montague contributed to Jane Roe credibility.</u>

5. **Jane Roe motivation for bringing the complaint.** Jane Roe told the fact finder and the hearing panel that she had not initially intended to bring a complaint against Mr. Montague. In her conversation with Mr. Montague on 26 October 2014, and

7

in her conversations with Angela Gleason, the Title IX Coordinator for Yale College, in the fall of 2015, Jane Roe said she wanted Mr. Montague to understand that what he had done was wrong and to understand the University's policy on consent so that he would not do it again to anyone else. Jane Roe agreed to participate in the UWC investigation only after she learned that Mr. Montague had already received training. When asked by the panel what he thought might have motivated Jane Roe to participate in this complaint, Mr. Montague said he did not understand her motivation, that it confused him, and that he thought they had both enjoyed their sexual activity on 18 October 2014. <u>The panel finds no credible evidence to suggest Jane Roe had any motivation to be dishonest with her friends, the fact finder, or this panel.</u>

6. Jane Roe **actions after the alleged sexual assault.** Jane Roe sought support from her friends the morning after the alleged sexual assault, she called SHARE for support a few days later, and she confronted Mr. Montague the following week. In that meeting, Jane Roe told Mr. Montague that she had made it clear she did not want to have sex with him on 18 October, and that she did not want to see him anymore. Later in that academic year, Jane Roe resigned from                     . She told her friend                     that she did not know if she would be okay                     Mr. Montague at basketball games (Exhibit F), and told                     on 8 January 2015 that she would not be able to                     games because she had "... a really serious issue with someone on the basketball team ..." (Exhibit G). <u>The panel finds Jane Roe actions after 18 October 2014 to be consistent with her experience of her encounter with Mr. Montague as sexual assault.</u>

7. **Mr. Montague's credibility.** <u>The panel does not find Mr. Montague as credible as Jane Roe because of his selective memory of the night of 18 October 2014 and his shifting recollection of how he gauged consent.</u>

   <u>The panel finds Mr. Montague remembered certain key details that were most helpful to him, but remembered few other details of the night of 18 October 2014.</u> For example, Mr. Montague said that Jane Roe did not ask him if it was OK to "hook up but not have sex," although when pressed by the panel he said he may not have heard her say this because the party was loud. Mr. Montague also said that he did not say "I'm really sorry. I know you didn't want that" or "I'm too drunk to have sex." In contrast, Mr. Montague did not recall speaking with his friends when he went downstairs after sexual intercourse with Jane Roe leaving the house to attend a party, arranging for Jane Roe to go to Toad's with a friend, or meeting Jane Roe at and walking together back to his residence.

   <u>In addition, the panel finds Mr. Montague's account of how he gauged consent shifted from his interviews with the fact finder to his discussion with the panel.</u> Mr. Montague told the fact finder that he asked Jane Roe if she wanted to have sex and Jane Roe said "OK," providing verbal consent. When asked by the panel, Mr. Montague did not mention obtaining verbal consent from Jane Roe , instead he remembered

8

Jane Roe providing non-verbal consent. In addition, when discussing consent with the panel, Mr. Montague said that that he did not use force and that Jane Roe did not say "no" during intercourse. The panel notes that the absence of force or the absence of "no" are not sufficient indicators of consent under the University policy, which requires positive, unambiguous, and voluntary agreement to engage in specific sexual activity.

## Conclusion:

In accordance with Section 7.4 of the UWC's Procedures, the panel takes into account Mr. Montague's previous formal disciplinary history with the UWC for violating Yale's sexual misconduct policy when reaching its conclusion.

<u>The panel concludes by a preponderance of evidence that Mr. Montague sexually assaulted Jane Roe in violation of Yale's sexual misconduct policy</u>.

## Recommendation:

In accordance with section 7.5 of the UWC's Procedures, the panel takes into account its conclusion in this case and the two previous formal disciplinary findings against Mr. Montague when making its recommendation.

The panel found particularly relevant a previous UWC finding that Mr. Montague violated Yale's sexual misconduct policy, in the form of sexual harassment, in the fall of 2013. At the time of the 18 October 2014 encounter with Jane Roe, for his violation of sexual misconduct policy, Mr. Montague was on probation, had received sexual harassment and gender sensitivity training, and education and counseling on the appropriate use of alcohol. Furthermore, starting in the spring term of 2014, Mr. Montague was required to meet with a member of the SHARE Center staff each semester to review and reflect on his interactions and relationships with female students at Yale. Mr. Montague had three meetings with SHARE Center staff between the previous violation of UWC policy and his sexual assault of Jane Roe. The panel notes that students on probation are warned that "the commission of a serious offense while on probation will normally result in suspension or expulsion."

Mr. Montague also received a written reprimand from the Yale College Executive Committee in September of 2015 for violating Yale College *Undergraduate Regulations* for Defiance of Authority.

The panel is deeply concerned by the pattern of behavior by Mr. Montague, and his failure to take responsibility for and learn from actions that have caused considerable harm to others. Mr. Montague told the panel that he was sorry if Jane Roe felt disrespected or harmed, but then spoke at length about the harm this UWC complaint had on his academic and athletic performance. He also told the panel that he was an ideal student, a role model at Yale, and had

9

never experienced anything like this before. These statements are in contrast to Mr. Montague's two previous violations of Yale regulations.

The panel recommends that Mr. Montague be expelled from Yale University.

**Respectfully,**

Sarah Demers
Eileen Donahue
Kimberly Harris
John Mayes
David Post (Panel Chair)