UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

JACK MONTAGUE,
     Plaintiff,

v.

YALE UNIVERSITY, ANGELA GLEASON,
JASON KILLHEFFER, and OTHERS
UNKNOWN,
     Defendants.

CIVIL ACTION
No. 3:16-cv-00885-AVC

## PLAINTIFF'S COMBINED MOTION AND MEMORANDUM IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND ANSWERS TO INTERROGATORIES

Now comes the Plaintiff in the above-captioned case and requests that this Court order Yale to provide certain discovery which Yale without legitimate basis refuses to provide, despite Plaintiff having substantially narrowed most of the challenged requests in a good faith effort to avoid unnecessary motion practice.  Specifically, Yale refuses to provide discovery concerning other Yale student disciplinary matters which establish precedents applicable to Plaintiff's case and are relevant to his claims in this litigation.  Second, despite taking the position that Plaintiff's expulsion from Yale has not irreparably harmed him, Yale refuses to provide highly relevant information in its possession concerning outcomes for other students whom Yale has expelled for sexual misconduct.   Third, Yale refuses to produce communications between Yale administrators and the Yale Women's Center principally concerning a social media post in which the Women's Center outed Plaintiff as a sexual assailant.  Fourth, Yale refuses to produce communications between its counsel and counsel for non-party witness Jane Roe surrounding her deposition testimony, dubiously asserting some form of common interest privilege over these

communications.  Finally, Yale refuses to produce materials presented at an annual training for members of the Yale community responsible for the investigation and adjudication of sexual assault complaints and Yale's compliance with Title IX.  All of the discovery Plaintiff seeks to compel through this motion is non-privileged, directly relevant to Plaintiff's claims, and proportional to the needs of the case, and this Court should order Yale to provide it.[1]

## RELEVANT BACKGROUND

Through this lawsuit, Plaintiff Jack Montague ("Montague") asserts claims for violations of Title IX, breaches of contract, and various torts stemming from Yale University's ("Yale" or the "University") unlawful and improper decision to expel him in February 2016 for alleged sexual misconduct that had occurred more than a year earlier.  Montague, who was captain of the Yale men's basketball team, was expelled during his senior spring, just one semester shy of graduating, and on the eve of Yale's first appearance in the NCAA basketball tournament since 1962.

At the time of Montague's expulsion, Yale was in the midst of dealing with an ongoing problem related to its handling of sexual misconduct complaints.  The Department of Education's Office of Civil Rights ("OCR") had cited Yale for its lack of prompt and equitable grievance procedures and its insufficient responses to complaints of sexual harassment.  In response, Yale revamped its entire process for dealing with such complaints by creating the University Wide Committee on Sexual Misconduct ("UWC") and adopting *Procedures Governing the University Wide Committee on Sexual Misconduct* ("*UWC Procedures*"), which set out the rights and responsibilities of the University, accuser, and accused in the case of a

---

[1] The Requests for Production and Interrogatories that are the subject of this the motion, and Yale's responses and objections thereto, are attached as Exs. A-E.  Correspondence initiated by Plaintiff in an attempt to narrow the disputes is attached as Ex. F.

complaint of sexual misconduct.  Even with these reforms, however, students and alumni continued to question what they perceived to be Yale's inadequate and, in some cases, offensive responses to complaints of sexual harassment, and they publicly chastised Yale for its shortcomings in this regard.

It was against this backdrop that Defendants misled and pressured a female Yale undergraduate, Jane Roe ("Roe") – against her original wishes – to participate in a formal complaint process against Montague accusing him of sexual assault.   After coaxing Ms. Roe to come forward by relaying a message through a friend that Roe could make an informal, anonymous complaint if she wished, Defendant Angela Gleason ("Gleason"), a Senior Title IX Coordinator at Yale, manipulated Roe into proceeding with a formal complaint by improperly (and misleadingly) disclosing to Roe that Montague had been the subject of a prior sexual misconduct complaint (hereafter, "UWC I") and telling her that she [Gleason] would "not be doing her job" if she did not proceed with a formal complaint.[2]  Following a deeply-flawed UWC adjudicatory process (hereafter "UWC II"), Yale expelled Montague.   This lawsuit followed.

## ARGUMENT

### I.    Yale Should Be Ordered to Provide Discovery Regarding Relevant Precedential University Disciplinary Matters

Under the Federal Rules of Civil Procedure, information is discoverable if it is "relevant to any party's claim or defense and is proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).  Even after the 2015 amendments, which added the proportionality requirement, "[r]elevance is still to be construed broadly to encompass any matter that bears on, or that

---

[2] Gleason's interactions with Roe which led to the filing of the formal complaint against Montague are described more fully in Plaintiff's Reply to Defendants' Opposition to Motion to Compel Production of Improperly Withheld Documents, and Request for Hearing (ECF No. 104) at pp. 2-6.

reasonably could lead to other matter that could bear on any party's claim or defense." *Bagley v. Yale Univ.,* 2015 WL 8750901, at *7 (D. Conn. 2015) (citing *State Farm Mutual Automobile Insurance Co. v. Fayda,* No. 14 Civ. 9792, 2015 WL 7871037, *2 (S.D.N.Y. Dec. 12, 2015)). In determining whether particular discovery is "proportional to the needs of the case", a court is to consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). A party resisting discovery "bears the burden of demonstrating specifically how, despite the broad and liberal construction afforded [by] the federal discovery rules, each request is not relevant or how each question is overly broad, unduly burdensome or oppressive." *Benavidez v. Greenwich Hotel Limited Partnership,* 2017 WL 1051184, at *2 (D. Conn. 2017) (internal citations omitted). Similarly, a party resisting production of electronically stored information "must show that the information is not reasonably accessible because of undue burden or cost," in which case a court may nonetheless order production if the requesting party demonstrates good cause. Fed. R. Civ. P. 26(b)(2)(B).

In both assessing Montague's level of culpability and, upon a finding of responsibility, imposing the sanction of expulsion, Yale placed significant weight on Montague's prior record of University discipline, and in particular, the UWC I matter. At the conclusion of its report, the UWC II panel stated that in accordance with Section 7.4 of the *UWC Procedures* it had taken "into account Mr. Montague's previous formal disciplinary history with the UWC for violating Yale's sexual misconduct policy" and "found particularly relevant" the fact that Montague has already allegedly violated Yale's sexual misconduct policy, "had received sexual harassment and gender sensitivity training" before the incident with Roe took place, and had met three times with

4

a SHARE Center staff member to "review and reflect on his interactions and relationships with female students at Yale."  UWC Panel Report, at 9, attached hereto as Ex. G. In recommending the penalty of expulsion, the UWC II panel expressed its "deep[] concern" for the "pattern of behavior by Mr. Montague, and his failure to take responsibility for and learn from his actions which have caused considerable harm to others."  *Id.*

Likewise, in imposing the sanction of expulsion, Dean Jonathan Holloway wrote that he not only considered the nature of the behavior in question, but Montague's "prior disciplinary history by the UWC . . . and by the Executive Committee" and "the extensive training [Montague] . . . already received from the SHARE center, training that did not have the hoped for impact on [Montague's] behavior."  February 10, 2016 Letter from Jonathan Holloway to Jack Montague, attached hereto as Ex. H.  According to Holloway, "on balance, considering the harm [Montague] caused and [his] inability to learn from [his] past mistakes, . . . permanent separation from Yale is the only appropriate penalty."  *Id.*

There is thus no doubt that the UWC I incident played a critical role both in the UWC II panel's determination of culpability and Yale's ultimate decision to expel Mr. Montague rather than impose some lesser sanction.   Indeed, Yale's own guidelines (in the form of hypothetical "Sexual Misconduct Scenarios", which it published in September 2013) indicate that in the absence of a disciplinary record, Montague's alleged conduct in the UWC II case would not have warranted expulsion.  *See* Ex. I.  The penalty of expulsion imposed on Montague was vastly out of line with the majority of sanctions Yale imposed on other students who were found responsible for nonconsensual sexual conduct in the five years prior to Montague's expulsion, as

5

reported in Yale's semi-annual Report of Complaints of Sexual Misconduct.  *See* Am. Compl. (ECF No. 67) at ¶ 179 (listing relevant cases).[3]

Accordingly, Plaintiff seeks, and Yale refuses to provide, relevant information concerning precedential UWC disciplinary matters.  Information about these cases is relevant to Plaintiff's claims, the scope of information sought is proportional to the needs of the case, and the information can be provided in such a way as to protect the privacy interests of the individuals involved.

a.   Yale Must Provide Documents Concerning the "Dollar Bills Case"

First, Plaintiff seeks documents relating to a UWC case known as the "dollar bills case".[4] As discussed above, Mr. Montague's record of prior discipline stemming from the UWC I matter played a substantial role in his ultimate expulsion from Yale.  The problem for Yale, and the basis of several of Plaintiff's claims in this case, is that the incident which gave rise to the UWC I proceeding was not sexual misconduct and thus should not have been considered in determining Mr. Montague's culpability in the UWC II matter.  Rather, it involved a nonsexual, albeit immature act from Montague's freshman year in which he stuffed a used pizza plate down the shirt of a female senior who was belittling him.  Montague did not make skin-to-skin contact or say anything inappropriate to the female student.  The student's complaint should never have been brought before the UWC – which handles only complaints of sexual misconduct – but should have been referred instead to the Executive Committee, which adjudicates all other student disciplinary matters.  Had the UWC I case been appropriately referred to the Executive

---

[3] Between July 1, 2011 – when Yale began publishing semi-annual reports containing the outcomes of UWC proceedings – and Montague's expulsion, Yale had expelled only three students for nonconsensual sexual conduct, demonstrating that it is an extreme sanction imposed in only the most serious circumstances.

[4] *See* Ex. A, Request No 3.

Committee, Mr. Montague likely would never have been expelled from Yale and this lawsuit

never filed.  Without the erroneous UWC I finding of sexual misconduct on Montague's record,

Gleason would not have manipulated Roe into filing a formal complaint in UWC II, and even if

the UWC II proceeding nevertheless went forward, the panel could not have considered the pizza

plate incident on the question of Montague's culpability, since the UWC procedures authorize

the panel to consider only "a respondent's previous formal discipline for other acts of sexual

misconduct."  *See UWC Procedures* at 7.4, attached hereto as <u>Ex. J</u>.  The pizza plate incident

would likewise have played a reduced role in the determination of the appropriate sanction,

given that it would not be cast as a prior instance of sexual misconduct, and would not have

resulted in Montague being ordered to receive consent training, which Holloway erroneously

perceived as having been ineffectual in reaching the decision to expel Montague.  The

consequences to Montague of the UWC's extrajurisdictional and erroneous adjudication of the

UWC I pizza plate incident thus cannot be overstated.

When the complaint in the UWC I case was filed, members of the UWC questioned

whether the incident was sufficiently sexual in nature so as to confer jurisdiction on the UWC, or

whether it was more appropriately referred to the Yale College Executive Committee, which

adjudicates all student disciplinary cases not involving sexual misconduct.  *See* August 27, 2013

emails among UWC members, attached hereto as <u>Ex. K</u>.  David Post, now chair and then a

member of the UWC, wrote to UWC Secretary Aley Menon that the complaint was "not an easy

complaint" and it "may be better served as a complaint to the executive committee because it is

on the edge and some panel members will have a hard time seeing the sexual nature of the act."

*Id.*  Menon forwarded Post's concerns to the UWC Chair at the time, Michael Della Rocca, who

responded by noting the similarity between the pizza plate incident and a UWC case he referred to as the "dollar bills case," which he suggested was another close call jurisdictionally. *Id.*

Plaintiff seeks discovery into the dollar bills case because such discovery is clearly relevant to his claims in this litigation relating to the UWC's lack of jurisdiction over and erroneous finding in the pizza plate incident. Having narrowed his original request in an effort to avoid unnecessary motion practice, Plaintiff now seeks only the following documents relating to the "dollar bills case":

- The UWC case file, comprising at least the complaint, fact-finder's report, panel report, decision, and any written appeal and decision on appeal;

- Any documents which the relevant decision makers relied upon or in which they discussed the jurisdiction of the UWC to hear the dollar bills case and/or the decision whether to proceed with a UWC or Executive Committee complaint.

Yale contends that even this narrowed request is far too broad and refuses to produce any documents concerning the dollar bills case. It speciously argues that responding to this request would involve an undertaking similar in magnitude to the collection and review of documents which it has undertaken to produce documents generated in connection with Mr. Montague's own University discipline. This is false. Plaintiff no longer seeks "all" documents concerning the dollar bills case, but has narrowed its request to the UWC case file, and other documents most likely to be relevant to the issue of jurisdiction. *See* Ex. F. The UWC case file is maintained by the UWC, is easily retrievable, and can be redacted to protect relevant privacy interests. Any other documents responsive to the narrowed request, namely, communications between the relevant decision makers concerning the initiation of the complaint and the determination that the UWC had jurisdiction, can be readily identified through consultation with

Mr. Della Rocca and any other relevant custodians.  There is no undue burden on Yale in producing these documents.[5]

      b.  <u>Yale Must Provide the UWC Case File for Each UWC Case Listed in Paragraph 179 of the Amended Complaint</u>

Plaintiff additionally seeks limited discovery into certain other UWC cases, the outcomes of which were published in Yale's semi-annual Report of Complaints of Sexual Misconduct, in which the respondent was found to have engaged in non-consensual sex but was not expelled, and a few rare cases like Plaintiff's where the respondent was expelled.  Despite substantially narrowing the relevant requests[6] concerning these relevant precedential matters to the UWC case files themselves, or information contained therein, for each of sixteen cases specifically identified in Plaintiff's Amended Complaint at ¶ 179, Yale nonetheless maintains that the requests are overbroad, unduly burdensome, and seek documents irrelevant to the Plaintiff's case.  *See* <u>Exs. A-F</u>.  To the contrary, the narrowed request is directed at information that Yale's own witnesses have testified is readily available through files required to be maintained by the UWC in the regular course of its business, and which is inarguably relevant to Plaintiff's claim that Yale's decision to expel him was arbitrary and capricious and deprived him of basic fairness.

Plaintiff seeks the UWC case files for sixteen cases identified in ¶ 179 of the Amended Complaint.  Plaintiff identified these cases through a review of Yale's Reports of Complaints of Sexual Misconduct, which are published on a semi-annual basis for purposes of informing the

---

[5] Even if Plaintiff pressed his request for "all" documents relating to the dollar bills case rather than substantially narrowing the request as he has done, the universe of documents relating to the dollar bills case would no doubt be many magnitudes smaller than the volume of documents collected and reviewed by Yale which relate in some way to Mr. Montague's UWC cases.  The large volume of documents produced to date in this case is largely the consequence of the public controversy that resulted from Mr. Montague's expulsion, which generated substantial discussion of Mr. Montague's case among members of the Yale administration in the weeks and months that followed.

[6] Request No. 4 and Interrogatory Nos. 7 and 10, *see* <u>Exs. A & B.</u>

Yale community regarding actions taken by the University in response to specific complaints of sexual conduct.  Case information is reported in summary fashion as in the following example:

> The complainant filed a formal complaint with the UWC alleging that the respondent, in the context of an intimate relationship, engaged in certain nonconsensual acts during otherwise consensual sexual activity.  The UWC found sufficient evidence to support the allegations.  The respondent was placed on probation for the remainder of his time at the University and a number of measures were taken to restrict him from contacting the complainant.

Yale University Report of Complaints of Sexual Misconduct Brought Forward from January 1, 2013 through June 30, 2013, attached hereto as Ex. L, at p. 3.  No detail is provided as to the specific nature of the allegations, nor any information regarding the respondent's disciplinary history.

Yale has objected to Plaintiff's requests, in part, on the basis of relevance, taking the position that information about other UWC cases could not possibly be relevant to the claims in this litigation.  To the contrary, information about these cases is relevant to Plaintiff's claims in at least two critical respects.   The first is that the majority are cases in which the respondent was not expelled from Yale despite being found to have engaged in non-consensual sex.  *See Am. Compl.* ¶ 179.  Plaintiff has alleged that Yale's decision to expel him was arbitrary and capricious and denied him of the basic fairness to which he is entitled under his contract with Yale.  Am. Compl. ¶¶ 309-312.  Particularly where the UWC is required under the *UWC Procedures* to consider "the nature of previous penalties assessed for similar violations" prior to recommending a disciplinary sanction, *see* Ex. J, records of cases in which respondents were given lesser sanctions despite being found responsible for sexual assault are plainly relevant to this claim.  For example, Plaintiff is entitled to know why the respondent in case summarized above was put on probation rather than expelled, where he, like Mr. Montague, was found to

have "engaged in certain nonconsensual acts during otherwise consensual activity"?  Second,

where Yale justified its decision to expel Plaintiff on the basis of his prior disciplinary record and

continues to defend that decision on this basis, Plaintiff is entitled to explore whether Yale has

been consistent in its treatment of respondents with disciplinary records.

      c.  <u>Yale's Burden and Proportionality Objections are Baseless and Have Repeatedly Been Rejected by this Court</u>

      In refusing to produce virtually any documents relating to these other relevant UWC

cases responsive Plaintiff's Third Set of Requests for Production, Yale essentially takes the

position that given its production of a large volume of documents in response to earlier requests

renders any further production of documents, regardless of their relevancy, is disproportionate to

the needs of the case.  *See* <u>Exs. A-F</u>.  This is a familiar refrain from Yale and its counsel, who

has unsuccessfully taken similar positions on Yale's behalf in other litigations.  In *Bagley v. Yale*

*University*, 307 F.R.D. 59 (D. Conn. 2015) (Haight, D.J.), the court denied Yale's motion for a

protective order which would have allowed it to cease document production after producing

documents from approximately half of the custodians from which the plaintiff requested

documents.  In support of its motion, Yale, in precisely the manner it has done here in objecting

to Plaintiff's requests:

> describe[d] in vivid, near-accusatory prose the considerable amount of time and treasure it has already expending responding to Bagley's ESI discovery requests: an exercise which, in Yale's non-objective and nonbinding evaluation, has unearthed no or very little information relevant to the lawsuit.  Yale's position is that given those circumstances, it should not be required to review any additional ESI with a view toward producing any additional information in discovery.  The contention is reminiscent of a beleaguered prizefighter's memorable utterance some years ago: 'No mas!'

*Id.* at 66.  The court rejected Yale's pleas, finding that the discovery sought by the plaintiff was

"reasonably" (if not "readily") accessible, and that the cost to Yale of conducting the discovery

was not "excessive or unwarranted." *Id.* at 65. The court in *Bagley* observed that the plaintiff had alleged Yale's decision to terminate her employment "was tainted by violations of federal anti-discrimination statutes, as well as principles of state and common law," and that "[s]uch violations are provable and often proved by circumstantial evidence, giving rise to a legitimate need for relatively wide-ranging and nuanced discovery." *Id.* at 66. Such is the case here. Yet, here, Yale similarly declares "no mas," in the face of requests that, unlike the requests at issue in *Bagley* which the court required Yale to respond to, do not envision broad ESI discovery from multiple custodians but are conventional discovery requests targeted at narrow categories of documents.

The court's decision in *Metcalf v. Yale University*, 2017 WL 627423 (D. Conn. 2015) (Bolden, D.J.), is even more directly on point. The plaintiff in *Metcalf,* who claimed age discrimination following his termination from Yale for sexual misconduct, sought the very types of documents that Yale has refused to produce in this case: case files maintained by Yale's Title IX and UWC offices. *Id.* at *1. The cases for which the plaintiff requested files were potentially relevant to his claims inasmuch as they concerned similarly situated employees who were treated differently in the face of alleged sexual misconduct. *Id.* at 3. There, as here, Yale argued that the plaintiff's requests (which originally sought "all documents" relating to cases involving similarly situated employees) were overbroad, directed at irrelevant evidence, imposed an undue burden on Yale, and thus lacked proportionality. *Id.* at *6. As a form of compromise, the court ordered production of case files maintained by the Yale Title IX office, which Yale represented to the court were "readily accessible", and imposed reasonable conditions designed to maintain the privacy of nonparties to the case. *Id.*

12

Like the courts in *Bagley* and *Metcalf,* this Court should reject Yale's burden objection and order Yale to produce the UWC/Title IX case files for the cases listed in ¶ 179 of the Amended Complaint.

## II.      Yale Should Be Ordered to Produce Information In Its Possession Concerning Outcomes Experienced by Students Expelled for Sexual Misconduct Since 2011

Yale refuses to answer Interrogatory No. 7, which asks Yale to provide information concerning cases between July 1, 2011 and the present in which Yale expelled students for sexual misconduct.   *See* Ex. B.  Specifically, for each such case, Plaintiff requests that Yale provide basic information about the nature of the complaint and the outcome for the student, including whether that student successfully completed his degree at another institution and if so, where.  *See id.*  Despite the obvious relevance of this information to Plaintiff's claims of irreparable harm and/or damages, and despite having previously having gathered most or all of the requested information in connection with preliminary injunction motion practice in this case, Yale objects to this request on the basis that the information is somehow not relevant, that compliance would violate the privacy of individuals who are not parties to this case, and that the court previously ruled that Plaintiff is not entitled to this information.  None of these arguments is persuasive.

First, it is inconceivable for Yale to dispute the relevance of this information.  There is perhaps no more probative evidence of the harm Yale has inflicted on Mr. Montague by expelling him for sexual misconduct than evidence concerning how other similarly situated students have fared since their expulsions.  Yale recognizes this.  It conducted an investigation into these students' outcomes and then attempted to use the information gathered to argue in opposition to Plaintiff's Motion for Preliminary Injunction – but without disclosing that information to Plaintiff – that Plaintiff's expulsion from Yale did not cause him irreparable harm.

13

*See* ECF No. 53 at 8.  Obviously, Plaintiff may take a different view of what the information shows, but its relevance is undeniable.  Yale cannot unilaterally declare or render the information irrelevant simply because it no longer seeks to rely on it in support of its defenses.

Yale is simply incorrect that the Court previously ruled on Plaintiff's entitlement to this information.  In opposing Plaintiff's motion for preliminary injunction, Yale submitted a Sealed Affidavit of Colleen Davis which purportedly contained the results of Yale's "investigation" into "the activities of students who [were] expelled from Yale University for violating the sexual misconduct policy."  When Plaintiff moved to compel production of that Sealed Affidavit (ECF No. 70), Yale moved to withdraw it (ECF No. 72).  The Court then simultaneously granted Yale's motion to withdraw (ECF No. 74) and denied Plaintiff's motion to compel (ECF No. 75).  Yale's withdrawal of the affidavit mooted Plaintiff's motion; the Court did not substantively rule on Plaintiff's entitlement to later obtain through discovery the information contained in that affidavit.

There is no burden to Yale in providing this information which it already gathered.  Finally, any privacy concerns implicated by disclosure of the information to Plaintiff's counsel can be addressed through an appropriate protective order.  The Court should order Yale to promptly answer Interrogatory No. 7.

### III.   Yale Should Be Ordered to Produce Communications Between Members of the Yale Administration and Representatives of the Yale Women's Center

Yale refuses to produce communications between members of the Yale administration and leadership at the Yale Women's Center in February or March of 2016 concerning Mr. Montague, and in particular, a Facebook post by the Women's Center on March 2, 2016.  That post reported on the expulsion of a "high-profile member of a sports team in the midst of a pivotal moment in the season on the basis of sexual violence."  Ex. M.  The next day, March 3,

14

2016, the Women's Center released an "edited public statement" which removed the implicit reference to Mr. Montague's having been expelled for sexual misconduct, but reiterated that despite Yale being prohibited from commenting on any specific incident, "Yale's actions speak much louder than its words" and "this is progress." Ex. N. Plaintiff is entitled to communications between Yale administrators and leadership at the Women's Center surrounding these events because they are relevant to determining, among other things, whether the original or edited statements – both of which clearly implied that Mr. Montague had been expelled for sexual assault – are attributable to Yale. Yale in this litigation has vigorously disputed that it played any role in revealing that Mr. Montague had been expelled for sexual misconduct, and has placed the blame for any resulting damage to his reputation squarely on his shoulders. The reality is that Mr. Montague only spoke publicly about the matter *after* his expulsion and the reason for it had been revealed. He is entitled to learn through discovery whether Yale played a role in outing him. Additionally, given the content of the Women's Center's original and edited statements – and in particular, the comment that the expulsion of a high profile male athlete represented "progress" – the requested discovery may reflect on Yale's motives for expelling Mr. Montague and whether those motives included unlawful gender discrimination.

As with Plaintiff's other requests, Yale objected to Plaintiff's original request for all communications between Yale and anyone affiliated with the Yale Women's Center concerning Jack Montague, the March 2 Facebook post, or the March 3 edited statement, by contending the breadth of this request and in particular the number of custodians potentially implicated, made it "literally impossible" for Yale to comply. Ex. A. Without crediting Yale's position but in the interest of compromise and avoiding motion practice, Plaintiff agreed to narrow the request to communications between Yale administrators and advisors, staff members and persons holding

leadership roles within the Yale Women's Center in February and March 2016, including but not limited to any person responsible for maintaining the Women's Center's Facebook page during that time period. Yale and its counsel no doubt can, after reasonable investigation, determine the handful of potentially relevant custodians and run targeted searches of their emails from February and March 2016 to locate responsive communications. Nonetheless, Yale persists in its baseless objection. Plaintiff thus requests this Court to order Yale to produce documents responsive to his narrowed request.

### IV.   Yale Should Be Ordered to Produce Communications Between Its Counsel and Counsel for Ms. Roe

Yale also improperly refuses to produce, as attorney-client privileged, communications between its counsel and counsel for non-party Ms. Roe surrounding Ms. Roe's deposition in this matter. Although Yale's legal basis for asserting attorney-client privilege over these communications has shifted over time, it appears that Yale now asserts some form common interest or joint defense privilege. This claim does not withstand scrutiny.

As discussed above, and at length in prior briefing, *see, e.g.,* ECF No. 104 at 2-6, one of Plaintiff's central contentions in this litigation is that, Yale, through its Deputy Title IX Coordinator Defendant Angela Gleason, disclosed to Ms. Roe – in violation of a contractual confidentiality obligation – that Mr. Montague had a prior complaint of sexual misconduct against him, in order to persuade Roe to pursue a formal complaint process which ultimately culminated in Mr. Montague's expulsion from Yale. Ms. Roe's contemporaneous statements – both to the UWC II fact-finder, and at the UWC II panel hearing – confirm that Ms. Gleason communicated to Roe that Mr. Montague had a prior complaint on his record. In her report, fact-finder Miriam Berkman wrote that Roe told her that Gleason ***"explained to [Roe] that Mr. Montague had already been given a recommendation for training after a previous complaint***

16

***and so that option was no longer open to him.''*** Fact-Finder's Report, attached hereto as Ex. O, at 8. Berkman, apparently concerned that inclusion of the previous statement about Roe's motivations in the report might be unduly prejudicial, commented in the margin of a draft of the report that "[t]his is an accurate statement of what [Roe] told me about her motivation and decision-making about participating in this case." *See* January 4, 2016 draft of Fact Finder's Report, attached hereto as Ex. P. Roe testified at the UWC II panel hearing that this revelation by Ms. Gleason "reframed the incident" for her, led her to believe what happened to her was not the product of a "one-time mistake," and caused her to participate in the formal complaint against Montague. Roe Opening Statement at 2, attached hereto as Ex. Q.

After Plaintiff subpoenaed Ms. Roe for a deposition, counsel for Ms. Roe, James Sconzo, emailed Plaintiff's counsel on February 10, 2017, inquiring about the scope of the deposition and threatening a motion to quash. *See* Ex. R. Plaintiff's counsel responded later that day, and thereafter repeatedly confirmed the primary focus of the deposition would be "the actions of the defendants," and in particular Ms. Roe's interactions with Angela Gleason that led to the filing of the formal complaint. *Id.* Plaintiff's counsel assured Mr. Sconzo that Plaintiff would not inquire about any of Ms. Roe's intimate encounters with Mr. Montague, and made clear that Plaintiff's goal in this litigation is to "remediate the damage that Yale – not [Ms. Roe] – has done to him." *See* Ex. S.

Despite Ms. Roe's statement as reported in the fact-finder's report – a statement whose accuracy Ms. Berkman expressly confirmed at the time – and Roe's opening statement to the hearing panel regarding the role Angela Gleason played in her decision to pursue a formal complaint, Roe in her March 23, 2017 deposition testified that she did not in fact tell Ms. Berkman that Ms. Gleason had informed her of Mr. Montague's prior complaint. *See* Ex. T,

Roe Dep. at 33:22-34:4.  Roe explained the discrepancy by offering that Ms. Berkman is "human" and "it's natural that mistakes will be made."  *Id.* at 36:13-16.[7]

Following Ms. Roe's deposition, in which she dramatically changed her version of events on a subject which does not concern her but is central to Yale's liability in this case, Plaintiff requested that Yale produce communications between Yale's counsel and Jane Roe (Request No. 6, Ex. A at 6) or between Yale's counsel at Donahue, Durham, & Noonan, P.C., and Ms. Roe's counsel, Mr. Sconzo (Request No. 7, Ex. A at 7), Yale objected and refused to make production on the grounds that Ms. Roe "was a prospective client of Donahue, Durham, & Noonan, P.C. because she inquired about legal representation and was a potential client," citing Rule 1.18 of the Rules of Professional Conduct.  Additionally, as to the request for communications between Yale's counsel and Mr. Sconzo, Yale asserted that "[a]ny communication with Attorney Sconzo is privileged because such communications were in furtherance of [her] request for legal representation" made to Donahue, Durham, & Noonan, P.C.  Ex. A at 7.  Yale in its objections did not assert any type of common interest privilege over its counsel's communications with Ms. Roe or her counsel, and indeed, previously, at another deposition in this matter, Yale's counsel indicated that "Yale is not claiming attorney/client privilege [over] communications with [Jane Roe]."  Ex. V, Killheffer Dep. at 175:8-11.

When pressed to produce a privilege log relative to this assertion of privilege, Yale responded by: a) withdrawing the claim of privilege over communications between Donahue, Durham, & Noonan, P.C. and Ms. Roe and producing these communications, *see* Ex. C (Yale's

---

[7] For her part, despite including this critical fact in her fact-finder's report, and even specifically confirming its accuracy in a comment to a draft of the report, Ms. Berkman claimed in her deposition that "I'm not a hundred percent sure that that is exactly what she told me" and "there really isn't anything in my notes about what [Ms. Roe] told me there and so it's – I just don't know what [Ms. Roe] told me, what her other friends told me, whether I got that right or whether I may have . . ."  Ex. U, Berkman Dep. at 58:9-11; 64:10-12.

supplemental responses); and b) providing a privilege log in which it lists 13 email chains

between its counsel and Mr. Sconzo or members of his office around the time of Ms. Roe's

deposition.  *See* <u>Ex. W</u>.[8]  The subject of each of the emails is identified as "Defense Strategy."

*Id.*  The log does not actually state the nature of the privilege asserted, but based on this

description, Plaintiff assumes Yale is now asserting a form of common interest privilege over

these communications.  Even assuming Yale did not waive any applicable common interest

privilege by failing to assert it in its objections to Plaintiff's request for productions, the more

fundamental flaw in Yale's belated assertion is that the common interest or joint defense

privilege does not apply to communications between Yale's counsel and counsel for Ms. Roe.

  The common interest or joint defense doctrine is an exception to the general rule that

disclosure of privileged information to a third party waives the attorney-client privilege.  Under

the doctrine, the exchange of otherwise attorney-client privileged communications between

separately represented parties or their counsel does not result in a waiver of the privilege if the

parties are engaged in a "common legal enterprise".  *Schaeffler v. United States*, 806 F.3d 34, 40-

41 (2d Cir. 2015).  Such disclosures remain privileged "where a joint defense effort or strategy

has been decided upon and undertaken by the parties and their respective counsel ... in the course

of an ongoing common enterprise ... [and] multiple clients share a common interest about a legal

matter." *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir.1989) (internal citations and

quotation marks omitted); *see also Supreme Forest Products, Inc. v. Kennedy*, 2017 WL 120644,

at *2 (D. Conn. 2017).  Critically, however, ***"a shared desire to see the same outcome in a legal***

***matter is insufficient to bring a communication between two parties within this exception.***"  *In*

---

[8] The email chains range in date from February 16, 2017 to June 9, 2017.  *See* <u>Ex. W</u>.  Plaintiff's counsel
first contacted Mr. Sconzo concerning the Ms. Roe's deposition on February 10, 2017, and the deposition
occurred on March 23, 2017. *See* <u>Exs. R, S, T</u>.

*re Pac. Pictures Corp.*, 679 F.3d 1121, 1129 (9th Cir. 2012) (emphasis added) (holding that crime victim did not have common legal interest with the government due to a "shared desire to see the same outcome in a legal matter"—i.e., a conviction).  "Instead, the parties must make the communication in pursuit of a joint strategy in accordance with some form of agreement— whether written or unwritten."  *Id.*  For the common interest doctrine to apply, the common interest between the parties must be of "sufficient legal character."  *Schaeffler*, 806 F.3d at 41. "Only those communications made in the course of an ongoing common enterprise and intended to further the enterprise are protected."  *Schwimmer*, 892 F.2d at 243.

Here, there was not, nor could there be, any "ongoing common enterprise" of "sufficient legal character" between Yale and Ms. Roe to cloak in privilege the communications between their respective counsel concerning Ms. Roe's deposition testimony.  Ms. Roe is neither a party nor prospective party to this litigation and has no legal stake in the outcome other than a desire to see Mr. Montague's expulsion upheld.  Accordingly, there was not (nor could there be) any "agreement" between Yale and Ms. Roe to pursue a "joint strategy" in this litigation.  Ms. Roe is akin to the crime victim in *In re Pacific Pictures Corp.*, whose claim of privilege over communications with the government the Ninth Circuit rejected.  679 F.3d at 1129.  Particularly given the timing of counsels' communications relative to the notice and taking of Ms. Roe's deposition, as demonstrated by the privilege log, Ex. W, there is strong reason to believe the only "strategy" being discussed was that of conforming Ms. Roe's testimony to Yale's litigation position regarding the extent of Ms. Gleason's disclosure to her of confidential information concerning Plaintiff's disciplinary history.  Yale's obvious desire to collude with Ms. Roe regarding her testimony on this topic notwithstanding, Yale's conjuring of a joint defense agreement with Ms. Roe, who has no legal stake in the outcome of this litigation, cannot shield

20

communications undertaken for this or any other purpose.   The purpose of the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).  "However, because there is a countervailing public interest in ensuring materials relevant to legal disputes are discoverable, courts construe the attorney-client privilege narrowly, and apply it only where necessary to achieve its purpose."  *Valente v. Lincoln Nat. Corp.*, 2010 WL 3522495, at *2 (D. Conn. 2010) (citing *Fisher v. United States*, 425 U.S. 391, 403 (1976) (internal quotation marks omitted)). Here, there is no legitimate purpose served by allowing Yale to collude with a non-party witness who has no legal stake in the outcome of this case and then conceal evidence of that collusion under the guise of attorney-client privilege.  Yale should be ordered to produce all communications between its counsel and counsel for Ms. Roe immediately.

## V.   Yale Should Be Ordered to Produce Documents Concerning the Fall 2015 Title IX/UWC Training

Finally, Yale refuses to produce documents concerning Yale's annual Title IX/UWC training held in the fall of 2015.  Specifically, Plaintiff has requested:

- Documents sufficient to show the date(s) of the annual Title IX/UWC training held in the fall of 2015;

- Documents reflecting the agenda, syllabus, and/or curriculum for the training;

- Attendance records for the training;

- Any materials presented or distributed in connection with the training; and

- Any recording of the training.

Ex. E, Yale's Responses and Objections to Plaintiff's Fourth Request for Production to Yale. Yale has objected to this request, arguing that the request is untimely and the documents sought are irrelevant to Plaintiff's claims. *Id.* Neither argument is persuasive.

As to relevance, it strains credulity for Yale to argue that the training it provided to the individuals in the Title IX office and members of the UWC who were responsible for the initiation, prosecution and adjudication of the sexual assault complaint against Plaintiff is somehow irrelevant to the issues in this case. The training that Yale provided to these individual is relevant to questions concerning, among other things, how Yale interpreted the various provisions of the *UWC Procedures* at issue in this litigation, and the direction it provided to Title IX officers, UWC panelists, fact-finders, and others regarding compliance with those procedures. The fall 2015 training at which this specific request is directed is particularly relevant for the additional reason that it occurred close in time to the publication of the results of a survey by the American Association of Universities concerning the incidence of sexual assault on the Yale campus – results which "deeply distressed" Yale President Salovey, and prompted him to promise that Yale would "redouble [its] efforts" in combating sexual assault. *See* Am. Compl. ¶ 32, ECF No. 67. Materials from the fall 2015 training presumptively shed light on the question how Yale planned to "redouble [its] efforts" following publication of the distressing AAU Survey results, whether that redoubling of efforts included an increased emphasis on the prosecution and expulsion of students accused of sexual assault, and if so, how this was to be achieved. *See, e.g., Doe v. Columbia University*, 831 F.3d 46, 58 (2d Cir. 2016) (acknowledging that pressure on school officials to increase sexual assault response can provide motive to unlawfully discriminate against male students accused of sexual assault). The fall 2015 annual training is plainly a proper target of discovery.

Regarding timeliness, Yale is correct that the specific request set forth above was served on September 8, 2017, after the June 30, 2017 deadline for fact discovery.  There is good reason for that, however.  The request was made in follow-up to the deposition of Yale Deputy Provost and Title IX Coordinator Stephanie Spangler, whose deposition occurred by agreement on August 31, 2017.  The request was not made earlier, prior to Dr. Spangler's deposition, because Plaintiff reasonably assumed that Dr. Spangler, who is in charge of Yale's Title IX compliance efforts and had significant responsibility for administering the fall 2015 training, would be able to testify to basic information like the approximate date of the training, and whether there was any discussion of the results of the AAU Survey or President Salovey's call for Yale to "redouble [its] efforts" in combating sexual assault.   Dr. Spangler could not recall even this basic information, so Plaintiff resorted to making a narrow, easily fulfilled request for documents which will provide the answers he is entitled to.   In any event, the documents sought are responsive to several earlier requests for production, including in particular a request served on September 13, 2016 which sought "[a]ll documents provided to any agents or employees of Yale or anyone appointed to serve on a UWC Hearing Panel concerning the operation, interpretations, or application or and/or training on UWC disciplinary proceedings from July 1, 2011, to the present." Ex. X.  *See also id.* at Request Nos. 11, 32 & 34.  Yale should be ordered to produce the documents requested.

## CONCLUSION

For the reasons set forth above, this Court should order Yale to:

23

a) for the "dollar bills case," produce the UWC case file (comprising at least the complaint, fact-finder's report, panel report, decision, and any written appeal and decision on appeal), and any documents which the relevant decision makers relied upon or in which they discussed the jurisdiction of the UWC to hear the dollar bills case and/or the decision whether to proceed with a UWC or Executive Committee complaint.

b) for the UWC cases listed in ¶ 179 of the Amended Complaint, produce the UWC/Title IX case file;

c) answer Interrogatory No. 6 concerning students expelled from Yale from sexual misconduct since July 1, 2011;

d) produce any communications dated in February or March 2016 between Yale administrators and advisors, staff members or persons holding leadership roles within the Yale Women's Center concerning Jack Montague, the Women's Center's March 2 Facebook post, or the March 3 edited statement;

e) produce the communications between Yale's counsel and Ms. Roe's counsel identified in the privilege log attached as Ex. W; and

f) produce documents relating to the Fall 2015 annual Title IX/UWC training as requested in Plaintiff's Fourth Set of Requests for production.

**Plaintiff hereby requests a hearing on this motion**.

JACK MONTAGUE,

By his attorneys,

/s/  *Christian G. Kiely*
Max D. Stern (BBO #479560) (*pro hac vice*)
mstern@toddweld.com
Alexandra H. Deal (BBO #660654) (*pro hac vice*)
adeal@toddweld.com
Christian G. Kiely (BBO #684308) (*pro hac vice*)
ckiely@toddweld.com
TODD & WELD LLP
One Federal St., 27th Floor
Boston, MA 01880
Tel. (617) 720-2626
Fax (617) 227-5777

William F. Dow III (ct00161)
JACOBS & DOW, LLC
350 Orange Street
New Haven, CT 06511
wdow@jacobslaw.com
Tel. (203) 772-3100
Fax (203) 772-1691

Dated: October 30, 2017

## LOCAL RULE 37(a) CERTIFICATION

I, Christian G. Kiely, hereby certify that Plaintiff has conferred in good faith with counsel for Defendants in an effort to narrow or resolve the issues raised in this motion and that the parties were unable to resolve these issues.

/s/  *Christian G. Kiely*

## CERTIFICATE OF SERVICE

I, Christian G. Kiely, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on October 30, 2017

/s/  *Christian G. Kiely*

25