```
UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
-----------------------------------x
JACK MONTAGUE,

                Plaintiff,

vs.                    Civil Action No.: 3:16-CV-00885-AVC
                       Date:  March 30, 2017
YALE UNIVERSITY, ET AL,

                Defendants.
-----------------------------------x
```

DEPOSITION OF JACK MONTAGUE

The deposition of Jack Montague was taken on March 30, 2017, beginning at 9:08 a.m., at the office of Jacobs, Grudberg, Belt, Dow & Katz, 350 Orange Street, New Haven, Connecticut, before Susan Wandzilak, Registered Professional Reporter and Notary Public in the State of Connecticut.

Susan Wandzilak   License No. 377
DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE
MADISON, CONNECTICUT 06443
800-839-6867

NEW HAVEN           STAMFORD           HARTFORD

1  more time goes on, the less likely things are to pop
2  up. But he said to always have your basketball resume
3  and film ready to go just in case someone contacts me
4  in need of a point guard or a guard. And he said he
5  would always, you know, give my name to people who
6  contacted him for players.
7      Q.   And when was the last time you talked with
8  Dustin Simcox?
9      A.   I'm guessing it was a month ago maybe.
10     Q.   And has he had anything to suggest to you
11 since you came back from Germany?
12     A.   He -- I mean, he is the one who suggested
13 that I speak to other countries so that's where I got
14 the idea of speaking to Australia.
15     Q.   And speaking to Australia, that was Kelvin?
16     A. Yes, sir.
17     Q.   The tour guide.
18     A. Yes, sir.
19     Q.   All right. Did Mr. Simcox suggest anything
20 else to you about basketball since you came back from
21 Germany other than that you talk to other countries
22 which you did by way of talking to your friend Kelvin?
23     A.   No. I mean, no, sir.
24     Q.   Now, do you have any plans to go back to
25 school?

```
 1      A. Yes, I mean, my ultimate goal is to definitely
 2  finish school.
 3      Q.   And what have you done to achieve that goal?
 4      A.   The first thing I did following my expulsion
 5  was reach out to a family friend.  He is in admissions
 6  at NYU.  And my family friend reached out for me.
 7           And basically they immediately contacted me
 8  back and said that no one like NYU or anywhere -- any
 9  school that is relatively as prestigious as NYU would
10  accept me because of how toxic my situation was in the
11  media and as well as in university schools around the
12  country.
13           So that was very disappointing as soon as I
14  heard that news.  But, I mean, I still wanted to
15  finish.  But I think me being only a semester away
16  from graduating from Yale, my, of course, ultimate
17  goal is to get a Yale education.  So, you know, my
18  plan is still to graduate from Yale if there is an
19  opportunity.
20           I definitely still tried to apply to other
21  universities.  And when I tried to apply to
22  Vanderbilt, they needed my official transcript, which
23  would not get transferred from Yale because there is
24  an outstanding bill that needs to be paid that has not
25  been paid.  So I haven't received my official
```

```
 1    transcript and therefore I was not able to finish my
 2    application to Vanderbilt as a transfer student.
 3         Q.   Okay.  When you say finish your application,
 4    did you actually complete any part of the application?
 5         A.   There was some small things that I definitely
 6    didn't finish.  It was kind of filling out my
 7    information.  And it was through a clearinghouse so
 8    it's what I did through high school so they still had
 9    some of my information.  But there was some parts
10    where they needed official documentation and I wasn't
11    able to kind of go past that.
12         Q.   Okay.  Did you talk with someone at
13    Vanderbilt?
14         A.   No, I did not.
15         Q.   And you said that you cannot get your
16    official transcript because your bill was outstanding
17    at Yale?
18         A.   Yeah, so basically I guess it was through
19    clearinghouse.  I tried to order my transcripts and
20    there was like some sort of fee that I was going to
21    have to pay.  And I went through filling out my Yale
22    information.  And I think a couple of days later I
23    received an e-mail saying that they were unable to,
24    you know, transfer the transcripts without -- with a
25    bill that was outstanding.
```

```
 1      Q.   And how much is the bill that is outstanding?
 2      A.   It's somewhere around $3,000.
 3      Q.   $3,000, what does that represent?
 4      A.   That represents the last semester that I
 5  didn't finish.  So as soon as I was expelled, they
 6  center me a bill for $3,000.
 7      Q.   And is it your understanding that this
 8  clearinghouse would be able to get the transcript if
 9  you were to pay the $3,000 bill you owe?
10      A.   That's what I would believe.
11      Q.   And have you considered doing that?
12      A.   I have considered doing that, but me and my
13  family don't believe that we should pay the $3,000
14  bill?
15      Q.   From what I read in the media, you have spent
16  a lot of money on legal fees; is that right?
17           MS. DEAL:  Objection.
18  BY MR. NOONAN:
19      Q.   You may answer.
20      A.   Yes, we have.
21      Q.   And many multiples of $3,000?
22      A.   I guess you could say that.
23      Q.   But you don't think it is worth paying the
24  $3,000 to be able to apply to Vanderbilt?
25      A.   Well, I think in addition to the $3,000, if I
```

1  were to apply and get accepted into Vanderbilt, then I
2  would also be looking at another year of school -- at
3  least another year of school, which would be way more
4  than $3,000 and probably somewhere around $60,000 or
5  $70,000.  And that's something that my parents cannot
6  afford.
7      Q.  All right, so you decided not to complete the
8  application at Vanderbilt; is that correct?
9      A.  I couldn't finish the application without the
10 transcript.
11     Q.  Unless you paid for the transcript?
12     A.  Exactly.
13     Q.  All right.  So you decided not to -- to fund
14 the lawsuit instead of getting the --
15     A.  Absolutely.
16         MS. DEAL:  Objection.
17 BY MR. NOONAN:
18     Q.  Have you made any other efforts to continue
19 your education other than to begin to think about
20 applying at Vanderbilt?
21     A.  I have not.
22     Q.  And why is that?
23     A.  Because I believe I deserve to finish at Yale
24 University.
25     Q.  And you are just going to wait until this

```
 1        Q.   Okay, and how long will you leave it on hold?
 2             MS. DEAL:  Objection.
 3             THE WITNESS:  I mean, until I -- there is
 4        resolution here in this lawsuit.
 5   BY MR. NOONAN:
 6        Q.   Okay.  So you are going to leave your life on
 7   hold until the lawsuit is over?
 8             MS. DEAL:  Objection.
 9             THE WITNESS:  I mean, putting it on hold is a
10        little out of context.  I mean, there is still
11        things that I'm striving to do.
12   BY MR. NOONAN:
13        Q.   Okay.
14        A.   But --
15        Q.   I have used the phrase only because it's in
16   the affidavit you filed in this case.  You filed an
17   affidavit on October 26, 2016, stating, My life is
18   effectively on hold.  And I think you just told me
19   that it is still on hold.  Is that true?
20        A.   Yes.
21        Q.   And how long will you leave it on hold?
22   Until the end of the lawsuit?
23        A.   Correct.
24        Q.   Now, your affidavit also talks about setting
25   up a -- and I don't know if this is a typo or not, but
```

```
 1    a fundly account, F-U-N-D-L-Y.  Is that what it's
 2    called, fundly?
 3         A.   Yes, sir.
 4         Q.   Okay, I though it was a Fund Me.  I have seen
 5    Fund-Me accounts, but his is fundly?
 6         A.   Um-uh.
 7         Q.   What was that about?
 8         A.   Well, my teammates had set up an account to
 9    raise funds for attorney fees.
10         Q.   And did those funds include money for the
11    publicist?
12         A.   What do you mean by publicist?
13         Q.   The public relations outfit, Karen
14    Schwartzman.
15         A.   I guess it was included, overall attorney's
16    fees and PR as well.
17         Q.   And how much has been raised through those
18    sources?
19         A.   I mean, the last time I checked, a few
20    thousand.
21         Q.   Do you have any idea when you say a few
22    thousand, are you talking about 3,000?
23         A.   Three or four.
24         Q.   And when was the last time you checked?
25         A.   It's been a few months.
```

```
 1         Q.   And are those all the funds that have raised
 2   outside of your family for legal fees?
 3         A.   No.
 4         Q.   Okay, and what other sources?
 5         A.   Alumni.
 6         Q.   Oh, the fundly account is not the --
 7         A.   It was, but it was hacked.  And basically we
 8   put it on hold and people didn't feel comfortable
 9   donating to that account.  So there has been outside
10   donations.
11         Q.   And what's the other account called?
12         A.   There is no other account.
13         Q.   I meant -- I guess I misunderstood.  I
14   thought you said the alumni was raising money.  Is
15   that part of the fund?
16         A.   No, it's not an account.
17         Q.   So how much has been raised through the
18   alumni?
19         A.   I think it's somewhere around -- it's
20   speculation, but I think it's upwards of 25,000 --
21   30,000, I think.
22         Q.   And how much have your legal fees been to
23   date?
24              MS. DEAL:  Objection.
25              THE WITNESS:  I'm not really sure, actually.
```

```
 1            I don't know the exact number.
 2      BY MR. NOONAN:
 3            Q.   What's the approximate number?
 4            A.   I don't really know.  I haven't looked at...
 5            Q.   You don't know?
 6            A.   Yeah, I don't know.
 7            Q.   Do you pay any of them?
 8            A.   Me personally?
 9            Q.   Yes.
10            A.   No.
11            Q.   And who is paying them?
12            A.   My parents.
13            Q.   And is it an hourly rate?
14            A.   Yes.
15            Q.   And do you pay the attorneys for the
16      publicist's firm?
17            A.   I believe we pay PR itself.
18            Q.   Oh, you pay them directly to the PR firm?
19            A.   Yes, I believe so.
20            Q.   Now, did you see this affidavit from Dustin
21      Simcox that was filed in connection with your
22      application for a temporary injunction?
23            A.   I did.
24            Q.   And it's dated December 5th, 2016.  He talks
25      about a Skype call with the pro A coach.  Is that the
```

1  I just mark these two as exhibits.
2  (Whereupon, Defendant's Exhibit Nos. B and C
3  were marked for identification.).
4  BY MR. NOONAN:
5  Q. I'm going to show you Exhibits B and C. And
6  they are -- at least I believe they are press releases
7  issued by your lawyer and I think by your PR firm.
8  And the only question I'm going to ask you
9  really is whether you authorized the distribution of
10 those press releases?
11 A. Yes.
12 Q. Okay. And just for the record, the date of
13 the first one is what?
14 A. March 14, 2016.
15 Q. So that was, what, a couple of weeks after
16 your final appeal was rejected?
17 A. Yes, sir.
18 Q. All right. And then the second one, Exhibit
19 C, is what date?
20 A. June 9, 2016.
21 Q. And that was at about the time that you filed
22 suit?
23 A. Yes, sir.
24 Q. Did you have any communications with anyone
25 who suggested that perhaps seeking publicity would not