UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JACK MONTAGUE,<br>        Plaintiff,<br><br>v.<br><br>YALE UNIVERSITY, ANGELA GLEASON,<br>JASON KILLHEFFER, and OTHERS<br>UNKNOWN,<br>        Defendants. | CIVIL ACTION<br>No. 3:16-cv-00885-AVC |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL RE: PUBLIC RELATIONS FIRM, FUNDRAISING FOR LEGAL FEES, AND MEDICAL RECORDS**

**I.        Introduction**

Plaintiff Jack Montague respectfully submits this opposition to Defendants' Motion to Compel re: Public Relations Firm, Fundraising for Legal Fees, and Medical Records.  The documents Defendants seek to compel concerning the public relations consultant engaged by Plaintiff's counsel are protected attorney work product under Fed. R. Civ. P. 26(b)(3) and established Second Circuit precedent.  The testimony Defendants seek to compel concerning Plaintiff's effort at fundraising for legal fees is totally irrelevant to the claims and defenses in this action, and under the circumstances, should additionally be protected from disclosure under the work product doctrine.[1]  Further, to the extent the Court deems that Defendants are entitled to any of the testimony they seek to compel from James Montague limited to this topic, this testimony can be provided by alternative means without convening a second deposition of Mr.

---

[1] Defendants' Motion additionally seeks to compel the production of certain of Plaintiff's medical records which, as Defendants' Motion notes, Plaintiff has always agreed to provide.  Plaintiff's counsel submitted a records request to Vanderbilt Medical Center on September 21, 2017, one week after the medical appointment for which Defendants sought records, but did not receive the records until December 7, 2017. They were re-produced to Defendants that same day.

Montague, a resident of Tennessee, at needless expense to Plaintiff.  Defendants' Motion should be denied.

## II.      Relevant Background

### A.  Engagement of Public Relations Consultant

Plaintiff was expelled from Yale on February 10, 2016, and the expulsion was upheld on appeal on February 24, 2016.  Word soon spread in the Yale community and beyond that Plaintiff, who was captain of the men's basketball team in the midst of an historic NCAA tournament run, had been expelled from Yale for sexual misconduct.  Plaintiff engaged the undersigned as counsel on or about March 2, 2016, and, in anticipation of filing a lawsuit against Yale, Plaintiff's counsel sent a litigation hold letter to Yale's Office of the General Counsel on March 18, 2016.  Around the same time, Plaintiff's counsel directly engaged the services of a public relations consultant, Karen Schwartzman of Polaris Public Relations, to manage the publicity expected to surround Plaintiff's anticipated lawsuit against Yale, with the primary goals of minimizing the prejudice that may result to Plaintiff's case from inaccurate media coverage and relieving Plaintiff's counsel of the burden of responding to continuous media inquiries.  *See* Affidavit of Karen Schwartzman, attached hereto as <u>Exhibit A</u>, at ¶6.  Plaintiff's counsel pays Ms. Schwartzman's fees directly, although as with all consultants and experts retained by Plaintiff's counsel, Plaintiff and his parents are ultimately responsible for payment.  *Id*. at ¶4.  On March 14, 2016, Plaintiff's counsel, through Schwartzman, issued a statement correcting the record with respect to rumors surrounding Plaintiff's expulsion and announced Plaintiff's intention to sue Yale in order to vindicate his rights.  *Id*. at ¶7.  Following unsuccessful efforts at resolving the dispute without filing suit, Plaintiff filed his lawsuit on June 9, 2016, and Plaintiff's counsel issued another statement through Ms. Schwartzman that same day.  *Id*. at ¶8.  Since

being engaged, Ms. Schwartzman has handled all media inquiries regarding Plaintiff's case, working in collaboration with Plaintiff's counsel to decide whether and how to respond to such inquiries.  *Id*. at ¶¶8-9.  Many members of the media are actively monitoring the docket and seek comment from Ms. Schwartzman in response to filings and other developments in the case.  *Id*. at ¶9.  All of Ms. Schwartzman's written communications with members of the media have previously been produced to Defendants in response to a subpoena served on Ms. Schwartzman in June 2017.[2]

### B.  Fundraising for Legal Fees

As Plaintiff testified both in his deposition and in an affidavit previously submitted to this Court, Plaintiff's friends set up a crowdfunding account through the website fundly.com in order to raise funds to assist Plaintiff with his legal fees.  This account had to be shut down after someone hacked into the website and changed the web address to fundly.com/rapist.  Since then, as Plaintiff testified at his deposition, Yale alumni supportive of his cause have contributed funds to help with Plaintiff's legal expenses.  Contrary to Defendants' assertion, Plaintiff did not testify that the raising of funds from alumni did not involve Plaintiff's counsel; in fact, since the shuttering of the fundly.com page, all fundraising has taken the form of direct contributions from alumni to Plaintiff's counsel.

---

[2] Consistent with the parties' practice in this case not to log communications between the parties and their trial counsel, Plaintiff had not previously included in his privilege log communications involving Ms. Schwartzman because all such communications include Plaintiff's trial counsel.  In connection with the instant Motion, Defendants requested that Plaintiff create a log of responsive, withheld communications involving Ms. Schwartzman.  In response to this request, and in accordance with L.R. 26(e), Plaintiff will provide Defendants with a log of responsive communications between Plaintiff's counsel and Ms. Schwartzman occurring between the date of her retention in mid-March 2016 and the date of the filing of the Complaint in this case, June 9, 2016.

### III.    Argument

#### A.  Communications Exchanged Between and Among Plaintiff, Plaintiff's Counsel, and Ms. Schwartzman Are Protected Attorney Work Product

Although there is concededly a split of authority in the Second Circuit regarding the extent to which the *attorney-client privilege* protects communications between and among lawyers, their clients, and public relations consultants, compare *In re Grand Jury Subpoenas*, 265 F. Supp. at 328-29 (attorney-client privilege applied to communications with public relations consultant); *In re Copper Mkt. Antitrust. Litig.*, 200 F.R.D. 213, 219-20 (S.D.N.Y. 2011) (attorney-client privilege available where public relations firm was functional equivalent of in-house department of client), *with Egiazaryan v. Zalmayev,* 290 F.R.D. 421, 433 (S.D.N.Y. 2013) (privilege unavailable); *Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53, 54-55 (S.D.N.Y. 2000) (same), most courts to have considered the issue have held that, provided the requisite conditions are met, the work product doctrine nevertheless protects such communications from disclosure.  *See, e.g., Haugh v. Schroder Investment Mgmt. North Am. Inc.*, 2003 WL 21998674 (S.D.N.Y. Aug. 25, 2003) (applying work product protection to communications between attorney and public relations consultant even where claim of attorney-client privilege failed); *Calvin Klein*, 198 F.R.D. at 55-56 (same).

The work-product doctrine, codified at Fed. R. Civ. P. 26(b)(3), provides qualified protection from discovery for "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative."  Fed. R. Civ. P. 26(b)(3).  Both distinct from and broader than the attorney-client privilege, the work product doctrine "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." *United States v. Adlman*, 134 F.3d 1194, 1996 (2d Cir. 1998) (quoting *Hickman v. Taylor*, 329

4

U.S. 495, 510-11 (1947)).  Although the Rule refers to "documents and tangible things," the protection it affords applies with equal force to deposition testimony concerning the substance of such work-product.  *See Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 471 (S.D.N.Y. 1993); *Gilhuly v. Johns-Manville Corp.*, 100 F.R.D. 752, 755 (D. Conn. 1983).  By the plain language of the Rule, the work product doctrine is not limited to material prepared by an attorney, but extends to work product prepared by non-attorney agents and/or "at the behest of counsel."  *In re Grand Jury Subpoenas*, 265 F. Supp. 2d 321, 332 (S.D.N.Y. 2003).

Critically, the Second Circuit extends work product protection to documents and other materials "prepared or obtained *because of* the prospect of litigation," expressly rejecting the standard applied in certain other jurisdictions that work product immunity protects only documents created or obtained "primarily to assist in litigation."  *United States v. Adlman*, 134 F.3d 1194, 1201 (2d Cir. 1998) (emphasis added).  In other words, the relevant inquiry in the Second Circuit concerns not the role that a particular document is designed to play in the litigation (if any), but instead asks simply whether the document "would not have been prepared in substantially similar form *but for* the prospect of that litigation . . . ." *Id.* at 1195 (emphasis added).  Under this more expansive formulation, "any document prepared 'because of' existing or expected litigation is sheltered under the protection of the work product privilege." *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc*., 229 F.R.D. 441, 447 (S.D.N.Y. 2004).

Several decisions of courts in the Second Circuit recognize that the work product doctrine applies to shield communications between litigation counsel and public relations consultants, even where a claim of attorney-client privilege over the same communications fails.  *Haugh v. Schroder Investment Mgmt. North Am. Inc.*, 2003 WL 21998674 (S.D.N.Y. Aug. 25, 2003), is instructive.  There, a discharged executive sued her former employer for age discrimination.

5

Prior to filing suit, the plaintiff's attorney retained a public relations consultant to assist with "media strategy as it impacted on [the] litigation and the consequent support and handling of media communications." *Id.* at *1. Although the court rejected the plaintiff's assertion of attorney-client privilege over communications between the attorney and the consultant on the grounds that such communications were not "necessary" to the attorney's provision of legal advice, *see United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961), the court nevertheless correctly held that all such communications were entitled to work product immunity because they were created "because of" anticipated (or already-filed) litigation. *Id.* at 5. In other words, because the communications between counsel and the consultant would not have occurred *but for* the litigation, they were entitled to work product protection.

The court in *In re Copper Mkt. Antitrust. Litig.*, 200 F.R.D. at 221, likewise held that communications and other documents exchanged between a law firm and a public relations firm were entitled to work product protection where the undisputed facts showed that the public relations firm's services "were provided initially because of the prospect of [a government] investigation and then because of the actual litigation which ensued thereafter." In another example, the court in *In re Grand Jury Subpoenas*, held that, in contrast to its conclusion, as to which reasonable minds could differ, that the attorney-client privilege protected communications between a public relations firm and attorneys representing a grand jury target, "[t]here is no serious question that . . . the documents withheld are work product, as the government does not dispute that they were prepared in anticipation of litigation." 265 F. Supp. 2d at 333. These decisions make clear that where an attorney's retention of a public relations consultant bears a sufficient nexus to actual or anticipated litigation, counsel should be entitled to communicate and

work collaboratively with that consultant without fear of intrusion into that relationship by a litigation adversary.

*McNamee v. Clemens,* 2013 WL 6572899 (E.D.N.Y. Sept. 18, 2013), cited by Defendants, in which the court denied work product protection to communications between an attorney and public relations consultant, is clearly distinguishable on its facts.   In *McNamee,* the party resisting disclosure, former major league baseball player Roger Clemens, had retained a public relations consultant to mount a public relations campaign in response to the release of the "Mitchell Report," which publicly identified Clemens as a steroid user.  *Id.* at *1.  Although Clemens ultimately filed a defamation suit against the person who made the accusation that was published in the Mitchell Report, Clemens failed to demonstrate that he had retained the public relations consultant because of that litigation.  *Id.* at *7-8.  Indeed, it seems apparent from the facts recited by the court in that case – in particular, Clemens' status as a public figure and the obvious harm to his reputation that resulted from the issuance of the Mitchell Report – that Clemens would have retained a public relations consultant irrespective of the decision to file the defamation suit.  In contrast, here, Plaintiff has not and would not have engaged in any public relations effort independent of the litigation against Yale, and Ms. Schwartzman's engagement is purely a result of that anticipated (and ultimately filed) litigation.

The only other case cited by Defendants in support of their argument, *Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53 (2000), actually supports Plaintiff's position.  While the court in that case took what Plaintiff respectfully contends is an overly narrow view of the scope of work product protection in the Second Circuit – and seems to have overlooked the

qualified protection afforded "fact" or "ordinary" work product[3] – it nonetheless reasoned that, at a minimum, materials which independently qualified as work product did not lose that protection because they were shared with a public relations consultant.  *See id.* at 55-56.  Also entitled to protection were documents prepared by the public relations consultant which "appear[ed] to implicitly reflect [the attorney's] work product."  *Id.* at 55.  As the court recognized, "the public relations firm needs to know the attorney's strategy in order to advise as to public relations, and the public relations impact bears, in turn, on the attorney's strategizing as to whether or not to take a contemplated step in the litigation itself and, if so, in what form."  *Id.* at 55.  While that rationale applies with equal force here, there is a simpler reason that sharing work product with the public relations firm did not waive work product protection:  unlike the attorney-client privilege, which can be waived through disclosure to any third party not properly within the privilege, work product protection is waived "only when the disclosure 'substantially increase[s] the opportunities for potential adversaries to obtain the information.'"  *United States v. Stewart*, 287 F. Supp. 2d 461, 468 (S.D.N.Y. 2003) (quoting 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2024 (1994)); *see In re Copper Market Antitrust Litig.*, 200 F.R.D. at 221 n.6.  Thus, sharing protected work product with a third party who has agreed to maintain confidentiality over that information does not render the work

---

[3] Documents need to not reveal an attorney's mental impressions in order to be entitled to protection as work product.  It is well established that "fact" or "ordinary" work product – documents generated because of litigation but which do not reveal counsel's mental impressions – are not discoverable absent a showing of "substantial need."  Fed. R. Civ. P. 26(b)(3); *see Adlman*, 134 F.3d at 1204 n.7.  To the extent the courts in both *McNamee* and *Calvin Klein* based their decisions on *in camera* reviews of the pertinent communications which revealed that most communications did not discuss litigation strategy per se, those courts overlooked the protection afforded ordinary work product.  While the policy underlying the work product doctrine is to provide a zone of privacy for strategizing about litigation, there is no requirement that individual documents reveal litigation strategy in order to be protectable as work product.  *See Golden Trade, S.r.L. v. Jordache*, 143 F.R.D. 508, 511 (S.D.N.Y. 1992) (observing that under Fed. R. Civ. P. 26(b), work product-protected material need not actually reflect an attorney's mental processes); *United States v. Stewart*, 287 F. Supp. 2d 461, 467 (S.D.N.Y. 2003) (stating that document's "purely factual content is no bar to protection" under work product doctrine).

product discoverable by a litigation adversary.  *See Stewart*, 287 F. Supp. 2d at 469.  Indeed,

Defendants expressly acknowledge and rely on this "critical distinction" between the work

product doctrine and attorney-client privilege in their own briefing in this case.  *See* ECF No.

128, at 16-17 (citing *Coastline Terminals of Connecticut, Inc. v. United States Steel Corp.*, 221

F.R.D. 14, 16-17 (D. Conn. 2003).

     Here, the facts and circumstances surrounding Plaintiff's counsel's retention of Ms.

Schwartzman compel the conclusion that all communications between and among Ms.

Schwartzman, Plaintiff's counsel, and the Montagues are protected work product.  The purpose

and timing of Ms. Schwartzman's retention in anticipation of Plaintiff's filing a lawsuit against

Yale render all such communications a byproduct of that litigation – *but for* that lawsuit,

Plaintiff's counsel would not have retained Ms. Schwartzman and the communications would not

have occurred.   While not all such communications necessarily pertain to litigation strategy or

reveal counsel's mental impressions, they need not do so in order to constitute protected work

product.  *See supra* n.3; *Golden Trade, S.r.L. v. Jordache*, 143 F.R.D. at 511; *United States v.*

*Stewart*, 287 F. Supp. 2d at 467.  Defendants do not argue that they have a "substantial need" to

obtain whatever subset of communications with Ms. Schwartzman might qualify only as

"ordinary" work product, nor could they make the necessary showing to obtain discovery into

those materials.  Accordingly, Defendants request for discovery into communications between

and among Ms. Schwartzman, Plaintiff's counsel, and the Montagues should be denied in its

entirety.

### B. Defendants Should Not Be Allowed to Re-Open the Deposition of James Montague to Engage in Irrelevant and Inappropriate Inquiry Concerning the Funding of Plaintiff's Lawsuit

Defendants additionally seek to re-open the deposition of Plaintiff's father, James Montague, at Plaintiff's expense, in order to question him on two narrow topics: namely, the amount of fees paid to Ms. Schwartzman, and the amount of funds that Yale alumni have contributed to assist Plaintiff with his mounting legal fees. The Court should deny Defendants' request because the information sought has no legitimate bearing on any of the claims or defenses in this litigation, and because, under the circumstances, Plaintiff should be entitled to maintain as attorney work product information concerning the funding of this litigation until such time as he prevails at trial and presses his claim for attorney's fees.

First, information concerning how Plaintiff is funding this litigation, including amounts contributed by alumni and paid to consultants like Ms. Schwartzman, is not discoverable because it is not relevant to any claim or defense in this litigation. Defendants in their Motion offer a single theory of relevance: that "[t]he amount of money which plaintiff has paid to his public relations firm and which has been raised for his legal fees . . . could have been used to pay the outstanding bill at Yale University and obtain his transcript, thereby enabling him to apply to other colleges and universities in a timely manner." ECF No. 123 at 6. Even if there were any merit to Defendants' spurious argument that Plaintiff somehow failed in a legal duty to mitigate his damages by funding his legal challenge against Yale while at the same time refusing to pay an outstanding bill to Yale which Plaintiff believed he did not rightfully owe, Defendants already have in their possession all the information they need to make this argument. The Yale bill was $3000 and Plaintiff testified at his deposition that his friends raised $3000 to $4000 through the fundly.com account before it was shut down, and that alumni had contributed another $25,000 to

10

$30,000.  *See* Jack Montague Tr. Vol. I at 196-97, ECF No. 123-3.  Plaintiff does not dispute that he had the funds available to pay the bill; what he does dispute is the propriety of Yale's conditioning the release of his transcript on the payment of that bill in circumstances where Plaintiff was suing Yale for wrongfully expelling him in violation of the very contractual relationship under which Yale sought payment.  Indeed, within days of the revelation at Plaintiff's deposition that Yale was impeding Plaintiff from applying to other schools, Yale released the transcript hold and waived the bill.  Defendants have not, and cannot, demonstrate the need for any further discovery on this topic.

Moreover, it bears noting that Yale in this litigation is waging a war of attrition.  Yale has virtually unlimited resources; Plaintiff's resources are finite and shrinking and depend in part on the generosity of sympathetic alumni.   Disclosure to Yale at this juncture of information concerning how Plaintiff is funding the litigation would further boost Yale's competitive advantage, threatening Plaintiff's ability to raise money and imposing a significant and undue burden on the Plaintiff which is totally disproportionate to whatever marginal legitimate value the information may have to Yale's defense.  Related concerns about unfair strategic advantage have led courts to hold that during the pendency of a litigation, the attorney work product doctrine can protect from disclosure information concerning amounts spent on attorney's fees. *See L.A. Cty. Bd. of Supervisors v. Super. Ct.*, 386 P.3d 773, 781 (Cal. 2016) ("When a legal matter remains pending and active, the privilege encompasses everything in an invoice, including the amount of aggregate fees. This is because, even though the amount of money paid for legal services is generally not privileged, an invoice that shows a sudden uptick in spending might very well reveal much of [a party's] investigative efforts and trial strategy."); *In re National Lloyds Insurance Company*, 2017 WL 2501107, at *7 (Tex. 2017) (requests for attorney billing

information in a pending litigation "invade the zone of work-product protection"). This Court

should reject Yale's pre-textual attempt to further tilt the scales in its favor.

**IV.     Conclusion**

For the reasons set forth above, the Court should DENY Defendants' Motion in its

entirety. To the extent the Court rules that Defendants are entitled to additional testimony from

James Montague regarding the payment of legal fees, the Court should order that testimony be

provided by way of interrogatory or telephonic deposition. *See, e.g., Calvin Klein,* 198 F.R.D. at

56 (following partial grant of motion to compel, ordering telephonic continuation of deposition

not to exceed twenty minutes).


JACK MONTAGUE,

By his attorneys,

/s/   *Christian G. Kiely*
Max D. Stern (BBO #479560) (*pro hac vice*)
mstern@toddweld.com
Alexandra H. Deal (BBO #660654) (*pro hac vice*)
adeal@toddweld.com
Christian G. Kiely (BBO #684308) (*pro hac vice*)
ckiely@toddweld.com
TODD & WELD LLP
One Federal St., 27th Floor
Boston, MA 01880
Tel. (617) 720-2626
Fax (617) 227-5777

William F. Dow III (ct00161)
JACOBS & DOW, LLC
350 Orange Street
New Haven, CT 06511
wdow@jacobslaw.com
Tel. (203) 772-3100
Fax (203) 772-1691

Dated: December 15, 2017

## **CERTIFICATE OF SERVICE**

I, Christian G. Kiely, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on December 15, 2017

/s/ *Christian G. Kiely*

13