UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JACK MONTAGUE | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO.: |
| | : | 3:16-CV-00885-AVC |
| vs. | : | |
| | : | |
| YALE UNIVERSITY, ET AL | : | |
| | : | |
| Defendants | : | MAY 17, 2018 |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The plaintiff brought this action two years ago, claiming that his expulsion was the result of discrimination against him because of his male gender. Since filing the action, the plaintiff has required the defendants to search the electronic data of 23 individuals, resulting in the production of literally tens of thousands of pages of documents. The plaintiff also took the depositions of nine different individuals and engaged two expert witnesses. What the plaintiff has failed to do is to unearth even a scintilla of evidence of any discriminatory motive on the part of any of the defendants' representatives.

The plaintiff was expelled by Yale University as a result of engaging in penetrative sexual intercourse without consent in violation of Yale's Sexual Misconduct Policies. Those policies, which even the plaintiff's expert witness testified comply with federal law and which are mandated by Connecticut state law, set forth a comprehensive process for adjudicating complaints of sexual misconduct. Once a complaint is filed, the University-Wide Committee on Sexual Misconduct ("UWC") appoints an impartial, experienced fact finder to assemble relevant documents and interview appropriate witnesses. Both the complainant and the respondent are interviewed by the fact finder, as well as individuals suggested by the parties. The fact finder

thereafter prepares a written report, which is transmitted to the parties and to the UWC hearing panel, a group of five members of the Yale community appointed to adjudicate the particular case. The UWC Panel then conducts a hearing at which both parties testify. At the conclusion of that hearing, the UWC Panel prepares a report consisting of factual findings, conclusions, and recommendations. The UWC Panel report is then transmitted to the decision maker, who in this case was Dean Jonathan Holloway. The decision maker is required to accept the Panel's findings of fact, but is free to alter the conclusions and recommended sanction. Thereafter, either party may file an appeal with the Provost.

In the present case, after a careful review of all the evidence, the five members of the UWC Panel, including the two male members, unanimously concluded that the plaintiff had violated the Sexual Misconduct Policies by engaging in penetrative sexual intercourse without consent. The UWC Panel unanimously recommended that the plaintiff be expelled because of the severity of the offense and because this was the plaintiff's third violation of Yale's disciplinary rules. As in the first two disciplinary infractions, the plaintiff's violation occurred in the context of his heavy consumption of alcohol. Furthermore, at the time of the sexual assault on Jane Roe, the plaintiff was on probation from a prior incident of sexual misconduct, for which he had been required to receive both alcohol counseling and sexual harassment and gender sensitivity training. Dean Holloway, a male, accepted the Panel's conclusion and recommended penalty. Provost Benjamin Polak, another male, thereafter denied the plaintiff's appeal.

Significantly, and as will be discussed in greater detail below, the plaintiff agreed to the following facts:

- The UWC Panel was charged with the responsibility of looking at all of the evidence and reaching a conclusion as to whether the account of the plaintiff or that of Ms. Roe was more accurate, credible, and consistent.

- The plaintiff had given inconsistent statements to the fact finder and to the UWC Panel, telling the former that he had obtained consent for intercourse verbally and telling the latter that the consent was obtained non-verbally through the conduct of Ms. Roe.

- The plaintiff initially testified at his deposition that he had provided "untrue" information to the fact finder and the UWC Panel, and he later amended this to state that some of the information was "inaccurate." He also acknowledged that he had "forgotten" many details of his interaction with Ms. Roe, ultimately being unable to remember much other than that he was certain he had somehow obtained consent.

- The plaintiff understood, even prior to the night in question, that he needed specific consent for each sexual act during a sexual encounter, and that consent obtained during a prior interaction would not imply consent for a subsequent interaction.

- If Ms. Roe had in fact, as she alleged, twice told the plaintiff prior to going to his bedroom, that she was willing to "hook up but not have sex," that would mean he did not have consent for intercourse on the night in question.

- Ms. Roe told the fact finder and the UWC Panel that immediately before intercourse she told the plaintiff "no," but despite her protest, he forced himself on her and then later apologized, acknowledging that he was aware that she had not wanted to engage in intercourse. The plaintiff admitted that if the UWC Panel found that Ms. Roe's version of the interaction was more accurate than his, then it would have been appropriate for the UWC Panel to conclude that the plaintiff had violated Yale's Sexual Misconduct Policies.

Plaintiff's expert witness offered the following testimony at her deposition:

- Yale's UWC process is entirely consistent with federal law.

- Both federal law and Yale's UWC Policies require that there be affirmative consent for each stage in a sexual interaction.

- In attempting to determine which of the two individuals was more credible, it was proper for the UWC Panel to consider whether one of the parties had made inconsistent statements about consent; whether one of the parties had changed his testimony with regard to how he obtained consent; whether one of the parties had completely forgotten parts of the evening in question, and whether one of the parties had consumed more alcohol than the other.

- If, as Ms. Roe testified, she had indicated twice before entering the plaintiff's bedroom that she was willing to "hook up but not have sex," and then, as the plaintiff began to penetrate her, she stated that she did not want intercourse,

and then immediately after intercourse the plaintiff apologized saying that he knew she did not want that, then the UWC Panel could logically conclude that the plaintiff did not have consent for intercourse, and that he engaged in intercourse despite knowing that he did not have consent.

- Dean Holloway appropriately declined the plaintiff's request that he be given a second hearing.

- Provost Polak properly denied the appeal since the plaintiff had not established any of the grounds upon which an appeal could be granted under Yale's Sexual Misconduct Policies.

In short, as both the plaintiff and his expert witness have testified, the UWC Panel was vested with the discretion to credit the testimony of Ms. Roe over that of the plaintiff, and there was more than ample reason for the UWC Panel to conclude as it did. Given those facts, and in the absence of any evidence of discrimination, summary judgment should enter in favor of the defendants.

## I.   <u>Factual Background</u>

This case arises out of the expulsion of the plaintiff after Yale's UWC Panel concluded that he had violated Yale's Sexual Misconduct Policies. The essence of the charge, filed with the UWC on November 18, 2015 by Senior Deputy Title IX Coordinator Jason Killheffer, was that the plaintiff had engaged in sexual intercourse with another student, Jane Roe, without her consent.[1] (Ex. A.) Ms. Roe stated that she had agreed to some sexual contact on the evening in question, but that she had specifically told the plaintiff three different times that she did not want to engage in intercourse, twice before entering his bedroom and again just before he penetrated her. She further stated that, despite her protests, he forced himself on her and then later apologized, and acknowledged that he was aware that she did not want to engage in intercourse. (Ex. B, p.4-5; Ex. C, p. 3.) It is undeniable that, if the events occurred as reported by Ms. Roe

---

[1] All exhibits referenced herein are attached to the Affidavit of Patrick M. Noonan.

and ultimately found by the UWC Panel, then the plaintiff violated Yale's Sexual Misconduct Policies and expulsion was an appropriate remedy.

While Ms. Roe at all times has acknowledged that she told the plaintiff on two separate occasions before entering the bedroom that she was "willing to hook up but not have sex," there can be no claim that Ms. Roe's agreement to engage in some sexual contact on the night in question meant that she had also consented to intercourse; nor can it be claimed that her consent to sexual intercourse on a previous date can be used in place of actual consent on October 18, 2014.  Yale's Sexual Misconduct Policies specifically preclude any such argument:  "Consent to some sexual acts does not constitute consent to others, nor does past consent to a given act constitute present or future consent."  (Ex. D, p. 3.)

The complaint was adjudicated pursuant to Yale's Procedures Governing the University-Wide Committee on Sexual Misconduct.  (Ex. E.)  The disciplinary process began with an investigation conducted by an impartial fact-finder who interviewed the plaintiff and Ms. Roe, as well as five other witnesses.  (Ex. B.)  The next step in the process was to convene a hearing on January 21, 2016 before a UWC Panel consisting of five members.  (Ex. C.)  At the conclusion of the hearing, the Panel unanimously determined that Ms. Roe had provided a full, detailed, and consistent account of the events of the night in question, which was supported by the testimony of several witnesses.  The Panel further unanimously found that the plaintiff's selective and shifting recollection of the events of that night and his conflicting statements as to how he obtained Ms. Roe's consent rendered his account not credible.  Specifically, the Panel noted that the plaintiff told the fact-finder that Ms. Roe had verbally agreed to intercourse, but he later contradicted that statement when he told the UWC Panel that the consent was non-verbal.  The Panel also noted that the plaintiff had consumed alcohol on the night in question, but that neither

he nor Ms. Roe suggested that Ms. Roe was intoxicated.[2]   The Panel specifically found that Ms. Roe's account of the interaction was more credible, both because she had provided consistent statements as to the events at issue and also because she was not intoxicated or otherwise impaired in any way that would have affected her recollection of those events.  (Ex. C, p. 6, 8-9.)

The Panel also noted that Ms. Roe's account was supported by five witnesses and contemporaneous text messages. The Panel observed that, in addition to providing conflicting reports at different times as to how he obtained consent, the plaintiff remembered almost nothing of the interaction with Ms. Roe, except that somehow he had obtained consent.  Ms. Roe, on the other hand, was able to provide a very detailed and consistent recollection of the entire evening. Remarkably, the plaintiff reported to the fact finder that he and Ms. Roe spent the entire night together in his bed; he forgot that he had left Ms. Roe by herself after the intercourse while he attended a party.   The Panel was shown evidence in the form of an electronic trail of card swiping which demonstrated that the two individuals separated for a substantial period of time following the intercourse.   (Ex. B, p.10; C, p. 6-9.)   Having determined that Ms. Roe was credible and that the plaintiff was not, the Panel unanimously concluded that the plaintiff had engaged in non-consensual sexual intercourse, which is a clear violation of Yale's Sexual Misconduct Policy.  The Panel then unanimously recommended to Dean Jonathan Holloway that the plaintiff be expelled.  (Ex. C, p. 9-10; Ex. G, H, I, J, ¶ 3; Ex. K, ¶ 11.)

There was nothing arbitrary or capricious about the Panel concluding that Ms. Roe was credible; indeed, the plaintiff himself attested to Ms. Roe's sincerity. In his response to the UWC Panel's report, the plaintiff wrote:  "There is no question that Ms. [Roe] honestly believes I took

---

[2] The Yale College Undergraduate Regulations provide that intoxication is not a defense to a charge of misconduct:  "[S]tudents will be held fully responsible for their own behavior, even when acting under the influence of alcoholic beverages.  Infractions of the alcohol regulations as well as any alcohol-related behavior that violates the Undergraduate Regulations will be subject to disciplinary action by the appropriate University officials.  In such cases, the association of alcoholic beverages with problem behavior will not be seen as a mitigating factor and may be seen as an exacerbating factor."  (Ex. F,  p. 52.)

advantage of her on October 18, 2014. I do not doubt the sincerity of her beliefs as of November, 2015, more than a year after the incident." (Ex. L, p. 1.) The plaintiff affirmed the truth of these statements at his deposition, and agreed that he believed that Ms. Roe "honestly believes that [I] took advantage of her and penetrated her without consent." (Ex. M, Depo. p. 163-164.) On February 10, 2016, Dean Holloway accepted the Panel's findings, conclusions, and recommended penalty of expulsion. (Ex. N.) The plaintiff appealed this decision, and his appeal was denied by Provost Polak on February 24, 2016. (Ex. O, P.)

The plaintiff's expulsion was the third time he had received discipline at Yale for misconduct. In May 2013, while standing outside a New Haven pizza parlor with several other students, including Sally Smith, he rolled up a used paper pizza plate and shoved it down the front of Ms. Smith's tank top between her breasts. Ms. Smith filed a complaint with the UWC, which investigated and held a hearing. (Ex. Q, R, S.) (Because it predated the case involving Ms. Roe, Ms. Smith's complaint is referred to in the Amended Complaint and here as "UWC I," and the complaint involving Ms. Roe is called "UWC II.") In his written response to the complaint, the plaintiff admitted that he was "probably drunk" at the time of the incident and stated, "I am completely ashamed of myself, and I take full responsibility for my actions that night." (Ex. T.) The UWC I Panel agreed with the plaintiff that he had violated Yale's Sexual Misconduct Policies and recommended that he be placed on probation for four semesters. He was also required to enroll in sexual harassment and gender sensitivity training at Yale's Sexual Harassment and Assault Response and Education Center ("SHARE") and alcohol counseling. (Ex. S, p. 3.) The plaintiff did not appeal the Dean's decision to accept the UWC Panel's findings, conclusions, and recommended penalty. (Ex. U.)

The second disciplinary matter involving the plaintiff occurred in September 2015, when he received a reprimand from the Yale College Executive Committee based on a complaint filed by Yale Chief of Police Ronnell Higgins alleging that the plaintiff had interfered with a police investigation. (Ex. V, W, X.) As in UWC I, the plaintiff acknowledged that he was very drunk at the time of the incident, and he did not contest the allegations against him. (Ex. Y.) It is significant that the plaintiff was under the influence of alcohol all three times that he was found to have violated Yale's policies, and he has acknowledged that Yale's policies stipulate that alcohol cannot be considered a mitigating factor, and in fact may be seen as an exacerbating factor. (Ex. M, Depo. p. 69-70; Ex. F, p. 52.)

## II.    Legal Standard

### A.    Summary Judgment

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of showing that no genuine factual dispute exists. Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000), *cert. denied*, 530 U.S. 1261 (2000). However, the Second Circuit has noted: "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on the plaintiff's part, and, at that point, plaintiff must designate specific facts showing that there is a genuine issue for trial." (Internal quotation marks and citations omitted.) Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001).

Once the moving party carries its initial burden, the nonmoving party must then go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Celotex Corp., 477 U.S. at 324; Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48. Whether a fact is "material" depends on the substantive law of the claim; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." Goins v. Bridgeport Hosp., 2013 U.S. Dist. LEXIS 41160 *8-9 (D.Conn. Mar. 25, 2013), *quoting*, Anderson, 477 U.S. at 248. Evidence that is "merely colorable" or is not "significantly probative" is insufficient to defeat a properly supported motion for summary judgment. Id., *quoting*, Anderson, 477 U.S. at 256. The "non-moving party may not rely on conclusory allegations or unsubstantiated speculation." (Internal quotations omitted.) Byrnie v. Town of Cromwell Board of Education, 243 F.3d 93, 101 (2d Cir. 2001).

**B.**     **Deference Owed to Disciplinary Decisions of Educational Institutions**

Both federal and state courts have repeatedly recognized that an educational institution's disciplinary decisions should be given deference by the courts. The United States Supreme Court has itself expressly enjoined that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 648 (1999). See also, Doe v. Trs. of Boston Coll., 2016 U.S. Dist. LEXIS 137777 *60 (D. Mass. Oct. 4, 2016) ("the courts must recognize and respect the strong interest of a private

university in managing its own affairs"), Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 572 (D. Mass. 2016) ("[I]t is not generally the role of the federal courts to tell a private university how to conduct its affairs."); Charest v. President of Harvard Coll., 2016 U.S. Dist. LEXIS 18493 *51 n.9 (D. Mass. Feb. 16, 2016) ("courts are chary about interfering with academic and disciplinary decisions made by private colleges and universities").

In Doe v. Brown University, 210 F. Supp. 3d 310, 331 (D.R.I. 2016), the district court explained:  "To be perfectly clear, a student is not entitled to a perfect disciplinary process, and it is not the Court's role to be an appeals court for [the university's] disciplinary decisions." See also, Ruggiero v. Yale Univ., 2007 U.S. Dist. LEXIS 66290 *2 (D. Conn. Sept. 10, 2007) (same); Gupta v. New Britain Gen. Hosp., 239 Conn. 574, 594 (1996) ("[W]e approach with caution, and with deference to academic decisionmaking, the plaintiff's challenge to the motivation of the hospital in terminating his residency."); Morris v. Yale Univ., 2012 Conn. Super. LEXIS 1216 *17-18 (Super. Ct. May 7, 2012) ("The discretion of universities to make academic decisions concerning its students without judicial interference is widely recognized and predicated on sound policy."); Burns v. Quinnipiac Univ., 2009 Conn. Super. LEXIS 237 *1 (Super. Ct. Jan. 22, 2009) ("The Connecticut courts have been reluctant to intervene" in decisions of colleges and universities on student issues.); Stockstill v. Quinnipiac Univ, 2010 U.S. Dist. LEXIS 49481 *22-23 (D. Conn. May 19, 2010) (an educational institution's decisions "involve the exercise of professional judgment to which courts should defer.").

A corollary to the principle that academic institutions are to be given substantial deference in disciplinary decisions is that the courts require only that an educational institution has "substantially complied" with its rules and regulations.  Thus, it has been held:  "Judicial review of the institution's actions is limited to whether the institution acted arbitrarily or whether

it substantially complied with its own rules and regulations." Jones v. Trs. of Union Coll., 937 N.Y.S.2d 475, 477 (App. Div. 2012). See also, Routh v. Univ. of Rochester, 981 F. Supp. 2d 184, 208 (W.D.N.Y. 2013); Faiaz v. Colgate Univ., 64 F. Supp. 3d 336, 358 (N.D.N.Y. 2014); Doe v. Colgate Univ., 2017 U.S. Dist. LEXIS 180267 *59  (N.D.N.Y. Oct. 31, 2017); Rolph v. Hobart & William Smith Colls., 271 F. Supp. 3d 386, 405 (W.D.N.Y. 2017); and Purcell v. New York Inst. of Technology-College of Osteopathic Med., 2017 U.S. Dist. LEXIS 124432 *25 (E.D.N.Y. Aug. 4, 2017).

The Second Circuit has also made clear that it is only in "rare education cases that it is appropriate for a court to intervene." Papelino v. Albany Coll. of Pharmacy of Union Univ., 633 F.3d 81, 94 (2d Cir. 2011).  "Thus, in order to maintain a breach of contract action against a [private] university based upon an academic decision, the Plaintiff must show that the decision 'was made *arbitrarily, capriciously, or in bad faith*.'" Stockstill, 2010 U.S. Dist. LEXIS at*22, *quoting*, Daley v. Wesleyan Univ., 63 Conn. App. 119, 133-34 (2001), *cert. denied*, 256 Conn. 930 (2001).  See also, Day v. Yale Univ. Sch. of Drama, 2003 Conn. Super. LEXIS 758 *5-6 (Super. Ct. Mar. 18, 2003) ("The plaintiff bears a heavy burden in proving that his dismissal resulted from arbitrary, capricious, or bad faith conduct on the part of the [educational institution].  To prevail, he must show that the [institution]'s decision had no discernable rational basis.")

It would be ironic if the courts failed to afford universities broad discretion when deciding disputes relating to claims of sexual misconduct on campus because the State of Connecticut has explicitly delegated responsibility for addressing this issue to institutions of higher learning. See, Conn. Gen. Stat. § 10a-55m. Similarly, the federal government mandated that, pursuant to Title IX, colleges and universities that receive federal funding must create a

disciplinary process for adjudicating claims of sexual misconduct.  See "Dear Colleague Letter" issued by the Department of Education in April, 2011.[3]  The courts have recognized that deference to an educational institution's decisions to discipline students who violate the institution's policies on sexual misconduct is in the public interest.  See, Knoch v. Univ. of Pittsburgh, 2016 U.S. Dist. LEXIS 117081 *30 (W.D. Pa. Aug. 31, 2016) ("[A]n educational institution's authority to make disciplinary decisions without having to resort to court intervention is a substantial public interest.  Requiring so would substantially weaken the institution's legitimate disciplinary authority among its students and be detrimental to the public interest, as educational institutions encourage their students to conduct themselves as model citizens in adhering to any applicable code of conduct."); Doe v. Ohio State Univ., 2016 U.S. Dist. LEXIS 21064 *36 (S.D. Ohio Feb. 22, 2016), adopted, 2016 U.S. Dist. LEXIS 52942 (S.D. Ohio Apr. 20, 2016)  ("[U]niversities have an interest in disciplining students who have committed serious infractions of university rules and in protecting other students from the type of conduct alleged here [nonconsensual sex], and the public has a similar interest."); Pierre v. Univ. of Dayton, 143 F. Supp. 3d 703, 714 (S.D. Ohio 2015) ("[T]here is also a public interest in providing an educational environment that is free from harassment.  Colleges and universities are afforded great latitude in administering their rules and regulations as courts recognize that those institutions' primary responsibility is to provide an atmosphere conducive to study and learning for all students.").

## III.    **Argument**

The defendants have moved for summary judgment on all counts of the plaintiff's January 25, 2017 Amended Complaint.  Counts I, II, and III should be dismissed in their entirety

---

[3] The plaintiff's expert witness, Attorney Susanna Murphy, stated that the "Dear Colleague Letter" sets forth the governing federal law at the time of the UWC Panel hearing for UWC II. (Ex. Z, Depo. p. 133, 192-193.)

because the plaintiff failed to exhaust his administrative remedies when he chose not to contest the charges against him in UWC I and then elected not to appeal.  The plaintiff cannot prevail on his breach of contract claims in Counts I, II, and VII for the additional reason that he cannot establish that defendant Yale University ("Yale") violated the policies governing the University-Wide Committee on Sexual Misconduct ("UWC").  Judgment should also enter in favor of Yale on the Title IX claims in Counts III and IX because the plaintiff has not produced any evidence that his gender was a motivating factor in his expulsion.

The plaintiff cannot prevail on his defamation and invasion of privacy claims in Counts IV and V because there is no evidence that the defendant Angela Gleason made the statement alleged by the plaintiff.  Additionally, the defamation claim fails because all statements made by Ms. Gleason were true, and the invasion of privacy claims are deficient because the statements were not given the requisite degree of publicity required under Connecticut law.  Summary judgment should enter in favor of the defendants Angela Gleason and Jason Killheffer on the tortious interference claims in Count VI, because the plaintiff cannot establish that either of the individual defendants engaged in any improper or tortious conduct.  The plaintiff cannot prevail on the breach of contract claim in Count VIII, alleging a denial of basic fairness and arbitrary and capricious decision making, because he cannot establish that Yale made an arbitrary and capricious decision.

### A.    Summary Judgment Should Enter on the Plaintiff's Title IX Discrimination Claims, Because there is no Evidence of Discrimination Based on Gender

In Counts III and IX, the plaintiff asserts disparate treatment claims of gender discrimination under Title IX.  In Count III, the plaintiff alleges that the decision to pursue the UWC I complaint and the Panel's finding were motivated by gender bias.  (Am. Compl., ¶¶ 222-225.)  He further asserts, "upon information and belief," that the defendant would not have

considered it a UWC matter nor found it sexual harassment if the "perpetrator" had been a woman.  (Am. Compl., ¶¶ 226-227.)  In Count IX, the plaintiff alleges that the decision to expel the plaintiff was motivated by gender bias.  (Am. Compl., ¶¶ 311-312, 315.)  Summary judgment should enter in favor of the defendants on the plaintiff's Title IX claims because the plaintiff has not produced any evidence demonstrating that the defendants intentionally discriminated against him based on his gender, a <u>sine qua non</u> of a gender discrimination action.

Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  The Second Circuit recently made clear that the burden-shifting framework for evaluating employment discrimination claims under Title VII established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), applies to "Title IX claims alleging discrimination on account of sex in education programs or activities that receive federal support."  <u>Doe v. Columbia Univ.</u>, 831 F.3d 46, 53-56 (2d Cir. 2016).  The Second Circuit there explained:

> [I]n the initial phase of the case, the plaintiff can establish a prima facie case without evidence sufficient to show discriminatory motivation….  If the plaintiff can show (1) that she is a member of a protected class; (2) that she was qualified for employment in the position; (3) that she suffered an adverse employment action; and, in addition, has (4) some minimal evidence suggesting an inference that the employer acted with discriminatory motivation, such a showing will raise a temporary 'presumption' of discriminatory motivation, shifting the burden of production to the employer and requiring the employer to come forward with its justification for the adverse employment action against the plaintiff.  However, once the employer presents evidence of its justification for the adverse action, joining issue on plaintiff's claim of discriminatory motivation, the presumption 'drops out of the picture' and the *McDonnell Douglas* framework 'is no longer relevant.'  At this point, in the second phase of the case, the plaintiff must demonstrate that the proffered reason was not the true reason (or in any event not the sole reason) for the employment decision, which merges with the plaintiff's ultimate burden of showing that the defendant intentionally discriminated against her.

14

Id. at 54.[4]   Even assuming that the plaintiff could establish a prima facie case of gender discrimination under Title IX, he cannot demonstrate that Yale's proffered reason for the plaintiff's expulsion – that he had violated the Sexual Misconduct Policies – was not the true reason for his expulsion and that Yale intentionally discriminated against him based on his gender.

The Second Circuit has observed that reverse Title IX cases generally fall into one of two categories, erroneous outcome and selective enforcement claims. Yusuf v. Vassar College, 35 F.3d 709 (2d Cir. 1994).  Irrespective of which type of claim is asserted, there can be no Title IX violation absent proof that the defendant was motivated by gender bias.  Id.  In light of the fact that the present plaintiff has no evidence of gender bias, summary judgment should enter in favor of the defense on the Title IX claims contained in Counts III and IX.

1.   The Plaintiff's Title IX Expert Witness Found No Evidence of Gender Discrimination

The plaintiff's Title IX expert witness, Susanna Murphy, Esq., acknowledged that at the time of the UWC proceedings against the plaintiff, the Department of Education Office of Civil Rights April, 2011 "Dear Colleague Letter" provided the standard for sexual misconduct procedures under Title IX. (Ex. Z, Depo. p. 132-133.)  Attorney Murphy testified that she had reviewed Yale's Sexual Misconduct Policies, and she agreed that they were consistent with federal law.  (Ex. Z, Depo. p. 192-193, 202-203, 206, 209; Ex. AA, Depo. p. 17-18, 31.)  Attorney Murphy further agreed that the federal government required educational institutions to allow a complainant to convert an informal process into a formal process, and that Yale was required to inform Ms. Roe of this right.  That is what occurred in this case when Ms. Roe

---

[4] While the Second Circuit in Doe v. Columbia, supra, reversed the district court decision to dismiss the complaint because of a failure to plead sufficient facts on the issue of discriminatory intent, the Second Circuit did not alter either the plaintiff's burden of proof at the summary judgment stage or the principle that decisions of educational institutions on disciplinary matters are entitled to great deference.

elected to file a formal complaint instead of continuing with an informal process.  Attorney

Murphy also acknowledged that the federal government required educational institutions to

evaluate claims of sexual misconduct under the preponderance of evidence standard, which Yale

did.  (Ex. Z, Depo. p. 207-209.)

Attorney Murphy acknowledged that the major issue presented in UWC II was whether

the plaintiff had obtained consent for intercourse.  She agreed that, in evaluating the issue of

consent, the UWC Panel was required to determine whether the plaintiff's or Ms. Roe's

recollection was more likely to be accurate, and that the UWC Panel could appropriately

consider evidence regarding credibility to make that determination.  (Ex. Z, Depo. p. 119-120;

Ex. AA, Depo. p. 19-21, 81.)  Attorney Murphy testified that it was proper for the UWC Panel to

consider the following factors:  (1) whether one of the parties had made inconsistent statements;

(2) whether one of the parties changed his testimony with regard to how he obtained consent; (3)

whether one of the parties had completely forgotten parts of the interaction;[5] and (4) whether one

of the parties consumed more alcohol than the other party.[6]  (Ex. Z, Depo. p. 126-128, 191-192;

Ex. AA, Depo. p.  21-22, 75-76.)

Attorney Murphy also agreed that it was appropriate for the Panel to consider the fact that

Ms. Roe did not register a complaint about a prior episode of intercourse with the plaintiff,

despite regretting it after the fact and despite her belief that her consent to intercourse on that

occasion was a result of her intoxication.  If Ms. Roe had been "out to get" the plaintiff, then she

could have claimed that the earlier incident was nonconsensual, on the ground that she was

_____

[5] In this regard, Attorney Murphy agreed that the plaintiff forgot some significant parts of the evening, including that
he left Ms. Roe with his friends after they had intercourse and told her to go to Toad's Place while he went to
another party.  He also forgot that they did not stay in bed together the entire night, but instead she left the house and
later returned.  (Ex. Z, Depo. p. 127.)

[6] The plaintiff admitted in his deposition that he had consumed more alcohol than Ms. Roe and that Ms. Roe did not
appear intoxicated.  (Ex. M, Depo. p. 133-134.)

incapacitated by alcohol.  (Ex. AA, Depo. p. 23-24.)  Attorney Murphy testified that if the UWC Panel believed that (1) Ms. Roe had twice indicated that she was willing to hook up but not have sex and then, (2) as the plaintiff began to penetrate her, she told the plaintiff that she did not want that, and (3) immediately after intercourse, the plaintiff apologized, saying that he knew she did not want that; then the UWC Panel could logically conclude that the plaintiff did not have consent for intercourse, and that he knew that he did not have consent.  (Ex. Z, Depo. p. 118-19.) The plaintiff himself agreed with this conclusion at his deposition:

> Q.    And if they believed that her version was likely to be more accurate than yours, then it would be appropriate to conclude that you had violated Yale's sexual misconduct policy, correct?
> MS. DEAL: Objection.
> A.    THE WITNESS: Correct.

(Ex. M, Depo. p. 149.)

Thus, the plaintiff's own Title IX expert testified that (1) Yale's Sexual Misconduct Policies comply with federal law, (2) Yale was required to inform Ms. Roe of the option to pursue a formal proceeding, and (3) the UWC Panel considered appropriate factors and made logical conclusions in determining that the plaintiff had not obtained consent from Ms. Roe for intercourse.  This testimony belies any suggestion that the defendants either discriminated against the plaintiff based on his gender or that they acted arbitrarily or capriciously.  As will be discussed immediately below, as a matter of law, the mere fact that the plaintiff is male does not, without more, support a conclusion that his gender was a motivating factor in the University's decision to expel him.  Indeed, Attorney Murphy testified that she has been involved in "hundreds" of investigations of sexual assault on behalf of the accused, and "at least 99 percent" of those individuals were male.  Attorney Murphy agreed that the criminal justice system was not

biased against males by virtue of the fact that 99 percent of the criminal defendants accused of sexual assault are male.  (Ex. AA, Depo. p. 84-85.)

2.      The Plaintiff Has No Evidence of Gender Discrimination

It is beyond cavil that a plaintiff's subjective belief that he was intentionally discriminated against is insufficient to withstand a motion for summary judgment.  The subjective belief must be objectively reasonable and supported by substantial evidence to prove that the defendant's proffered non-discriminatory justification is a mere pretext.  See, Saqib v. Stein Devisser & Mintz, PC, 2010 U.S. App. LEXIS 12188 *2 (2d Cir. June 15, 2010) (a plaintiff "may not rely on conclusory allegations or unsubstantiated speculation" to defeat a motion for summary judgment on a discrimination claim); Weber v. City of N.Y., 973 F. Supp. 2d 227, 254 (E.D.N.Y. 2013) ("a plaintiff's own subjective belief that he was discriminated against" held insufficient to sustain a discrimination claim); Boyar v. City of N.Y., 2010 U.S. Dist. LEXIS 115289 *4 (S.D.N.Y. Oct. 28, 2010) ( Plaintiff's "personal belief is insufficient to defeat defendants' summary judgment motion"); Sicular v. N.Y.C. Dep't of Homeless Servs., 2010 U.S. Dist. LEXIS 10089 *19 (S.D.N.Y. Feb. 4, 2010) adopted, 2010 U.S. Dist. LEXIS 53064 (S.D.N.Y. May 28, 2010), aff'd, 455 Fed. App'x 129 (2d Cir. 2012) (same).

In UWC I, as will be explained more fully below, the UWC had jurisdiction over Ms. Smith's complaint under the UWC Procedures, the plaintiff admitted to engaging in the alleged conduct, and his conduct towards Ms. Smith constituted sexual harassment under the Sexual Misconduct Policies.  The UWC Panel's conclusion was not erroneous or discriminatory.  The plaintiff has offered no evidentiary support for his conclusory allegation that the UWC I Panel was motivated by gender discrimination when it determined that the plaintiff committed sexual harassment.  The defendant, for its part, has submitted affidavits of the three individuals who

determined that the UWC had jurisdiction over the UWC I complaint, all of whom aver that the plaintiff's gender played no role in that determination.  (Ex. K, ¶ 6; Ex. BB, CC ¶ 5.)  The defendant has also submitted affidavits of three of the five panel members and the decision maker, all of whom deny that the plaintiff's gender played any role in their decisions regarding the plaintiff's violation of Yale's Sexual Misconduct Policies and the appropriate sanction.[7]  (Ex. DD, EE, FF, GG, ¶ 4-5.)  In light of the fact that the plaintiff actually admitted his responsibility for violating Yale's Sexual Misconduct Policies in UWC I, the plaintiff cannot make out a *prima facie* claim of discrimination as to those disciplinary infractions.  Moreover, even if he could, the fact that he admitted to those violations would provide more than ample justification to overcome any suggestion that the outcome of that proceeding was the result of discrimination.

When asked what evidence he had to support his belief that the Panel's finding in UWC II was a product of discrimination based on his gender, the plaintiff replied:  "I believe that I was put in a situation where it was hard to testify my innocence [sic] because I was a male."  (Ex. M, Depo. p. 190-191.)  When follow-up questions were asked, the plaintiff was unable to offer any other reason for claiming that he was the victim of gender discrimination.  (Ex. M, Depo. p. 191.)  The plaintiff has certainly not proffered any evidence to suggest that the defendants "made it hard to testify" as to his innocence; even if he had, he offered no evidence that any such conduct was motivated by gender bias.  Indeed, the plaintiff was given the opportunity to testify to his view of the facts and to make his claim of innocence to the fact-finder and to the UWC Panel.  He also articulated his reasons for believing he was innocent in his letters to Dean

---

[7] Defense counsel was unable to obtain an affidavit from the other two members of the UWC I Panel.  Francesca Coxe was a student who graduated in 2015 and defense counsel was unable to contact her.  Jonathan Wyrtzen is out of the country and unavailable until the end of July, 2018.

Holloway and Provost Polak during the appeal process.[8]  The plaintiff in his deposition agreed that he had not been prevented from offering evidence in opposition to the complaint filed against him.  (Ex. M, Depo. p. 191-192.)  What he objects to is that he was not believed.  The uniform case law has established that the plaintiff's subjective belief that he was discriminated against due to his gender and his conclusory allegations in the Amended Complaint are insufficient to sustain his claim under Title IX at the summary judgment stage.  The defendants have submitted affidavits from the five members of the UWC II Panel, the Dean, and the Provost, in which all of those individuals aver that the plaintiff's gender played no role in their decisions regarding the plaintiff's culpability in UWC II or the appropriate sanction.  (Ex. G, H, I, J, ¶ 4-5; K, ¶ 12-14; Ex. HH, ¶ 3-4; Ex. II, ¶ 3.).) Since the plaintiff has no evidence suggesting that the defendants were motivated by the plaintiff's gender when making their decisions, the defendants' motion for summary judgment should be granted as to the Title IX claims in Counts III and IX.

**B.**     **Summary Judgment Should Enter on the Plaintiff's Claims Regarding UWC I.**

1.     The Plaintiff Failed to Exhaust His Administrative Remedies

In Counts I, II, and III, the plaintiff asserts claims in connection with UWC I.  Since the plaintiff failed to exhaust his administrative remedies by choosing not to contest the UWC Panel Report or to appeal Dean Mary Miller's decision imposing discipline on him, he is barred  from asserting any claims in connection with UWC I.

In Neiman v. Yale Univ., 270 Conn. 244 (2004), the Connecticut Supreme Court considered whether a university professor was required to exhaust her internal administrative

---

[8] Attorney Murphy agreed that Dean Holloway appropriately denied the plaintiff's request for a second hearing before the UWC Panel under the UWC Procedures.  Similarly, she testified that the Provost properly concluded that there was no basis for an appeal under the UWC Procedures.  (Ex. AA, Depo. p. 36-40.)

remedies at Yale before asserting claims for breach of contract, breach of implied covenant of good faith and fair dealing, and negligent misrepresentation arising out of the defendant's failure to offer her a tenured appointment to its faculty.  <u>Id</u>. at 246.  The Supreme Court affirmed the trial court's dismissal of the action, concluding that the exhaustion of administrative remedies doctrine applies to the internal grievance processes provided by academic institutions, observing that "academic institutions themselves are best suited to be the original forum for these types of disputes."  <u>Id</u>. at 255.

The principles enunciated in <u>Neiman</u> also apply to grievance procedures in a student handbook.  In the context of claims arising from disciplinary action taken by a university against a student, courts have stated that "[i]n order to inject the judiciary into what is essentially an intra-university dispute, plaintiff must first exhaust his available administrative remedies."  <u>Hill v. Trs. of Ind. Univ.</u>, 537 F.2d 248, 256 (7th Cir. 1976) (Kunzig, J., concurring); <u>Stevenson v. Bd. of Ed.</u>, 426 F.2d 1154, 1157 (5th Cir. 1970), *cert. denied*, 400 U.S. 957 (1970) (federal courts should not intervene in school affairs "without requiring such prior reference to local institutional authority as may be necessary to assure that the action complained of is final within the institution in the sense that it is ripe for adjudication").  Courts have routinely dismissed such cases for failure to exhaust the internal remedies provided by an educational institution's policies and procedures.  <u>See</u>, <u>Durham v. SUNY Rockland Cmty. Coll.</u>, 2016 U.S. Dist. LEXIS 3713 *19 (S.D.N.Y. Jan. 12, 2016) (dismissing plaintiff student's action for failure to exhaust administrative remedies following school suspension); <u>Sierros v. Nova Se. Univ., Inc.</u>, 906 So. 2d 1124, 1124-25 (Fla. Dist. App. Ct. 2005) (affirming summary judgment in favor of defendant because expelled plaintiff failed to exhaust his administrative remedies).

The present plaintiff failed to exhaust his administrative remedies in connection with UWC I, and therefore is barred from asserting the claims alleged in Count I.  After conducting a hearing regarding the UWC I complaint, the UWC Panel submitted its report on October 16, 2013.  (Ex. S.)  On that same date, Aley Menon, the Secretary of the UWC, sent a letter to the plaintiff enclosing the Panel report and informing him that the report was being sent to the decision-maker, Dean Mary Miller, and that he was permitted to submit a written response to Dean Miller for her consideration.  (Ex. JJ.)  The plaintiff submitted nothing in response to the UWC I Panel report, because he "understood that [his] conduct was completely inappropriate and wrong and [he] was willing to go through the counseling that had been ordered."  (Ex. M, Depo. Errata, p. 3.)  On October 21, 2013, Ms. Menon wrote again to the plaintiff to inform him that Dean Miller had "accepted the findings of fact, the conclusion and the recommendations made by the panel." (Ex. U, p. 1.)  Ms. Menon notified the plaintiff of the discipline imposed and specifically informed him that he could appeal Dean Miller's decision under section 7.7 of the UWC Procedures.  Id.  The plaintiff chose not to appeal Dean Miller's decision because he "felt [his] conduct was inappropriate and for that reason [he] was willing to accept the panel's counseling orders." (Ex. M, Depo. Errata, p. 3.)

By failing to object to the UWC I Panel report and by failing to appeal Dean Miller's decision, the plaintiff failed to exhaust the administrative remedies available to him in connection with UWC I.  Accordingly, the plaintiff is barred as a matter of law from asserting any claims in connection with UWC I, and judgment should therefore enter in favor of the defendants on Counts I, II, and III for that reason alone.

2.      The Defendant Did Not Breach the UWC Procedures in UWC I

Even if the plaintiff had exhausted his administrative remedies, he would not be able to prevail on his breach of contract claims in Counts I and II because the defendant did not breach its procedures.  "The basic legal relation between a student and a private university or college is contractual in nature."  Burns v. Quinnipiac Univ., 120 Conn. App. 311, 320 (2010), *cert. denied*, 297 Conn. 906 (2010).

> By the act of matriculation, together with the payment of the required tuition fees, a contract between the student and the university is created containing two implied conditions:  (1) that no student shall be arbitrarily expelled therefrom; and (2) that the student will submit himself (sic) to reasonable rules and regulations for the breach of which, in a proper case, he (she) may be expelled, and that he (she) will not be guilty of such misconduct as will be subversive of the discipline of the university.

Okafor v. Yale Univ., 2004 Conn. Super. LEXIS 1657 *15 (Super. Ct. June 25, 2004).  "Under Connecticut law, the elements of a breach of contract claim are 'the formation of an agreement, performance by one party, breach of the agreement by the other party[,] and damages.'" Midwest Media Grp. Inc. v. Benistar Emp'r SVC Tr. Co., 2011 U.S. Dist. LEXIS 105356 *18-19 (D. Conn. Sept. 16, 2011), *quoting*, FCM Group, Inc. v. Miller, 300 Conn. 774, 798 (2011).

The plaintiff claims in Count I that the UWC lacked jurisdiction over Ms. Smith's complaint because it did not involve sexual misconduct.  He further alleges that Yale's decision to pursue the complaint through the UWC was a violation of its own procedures and policies and a breach of the covenant of good faith and fair dealing.[9]  (Am. Compl., ¶¶ 209-210.) The allegations of Count II are virtually indistinguishable from Count I.  The plaintiff claims that the UWC I Panel could not have found that the plaintiff's conduct was of a sexual nature or that it created an intimidating or hostile academic or work environment. (Am. Compl.,¶ 215.) Similar to

---

[9] It is clear that where there is no breach of contract, there can be no breach of the covenant of good faith and fair dealing.  Capstone Bldg. Corp. v. Am. Motorists Ins. Co., 308 Conn. 760, 795 (2013).  Since there was no breach of contract in this case, plaintiff's claims of a breach of the covenant of good faith and fair dealing also fail.  This is also true with respect to all of the plaintiff's claims for breach of the covenant of good faith and fair dealing asserted in Counts II and VII.

Count I, Count II alleges breach of contract as well as breach of the covenant of good faith and fair dealing. (Am. Complaint, ¶216.) The plain language of the UWC Procedures and the Sexual Misconduct Policies, the plaintiff's admission of violating the Sexual Misconduct Policies, and the plaintiff's own deposition testimony make clear that the UWC had jurisdiction over UWC I and that the plaintiff had violated the Sexual Misconduct Policies.

Under Yale's rules, the UWC Chair, the UWC Secretary, and another member of the UWC determine whether a complaint falls within the UWC's jurisdiction by considering whether the complaint, if substantiated, would constitute a violation of the Sexual Misconduct Policies.[10] (Ex. KK, p. 4.)  The Sexual Misconduct Policies define "sexual misconduct" as "a wide range of behaviors including sexual assault, sexual harassment, intimate partner violence, stalking, voyeurism, and any other conduct of a sexual nature that is nonconsensual, or has the purpose and effect of threatening, intimidating, or coercing a person."  (Ex. D, p. 2.)

Ms. Smith stated in her complaint that the plaintiff folded up his used pizza plate, and placed it down her tank top, between her breasts.  He then "turned around and walked away with his teammate, leaving the plate there as though my person was a garbage receptacle."  Ms. Smith was "shocked" and "continued to think about what happened for several days," and described the plaintiff's conduct as "offensive."  (Ex. Q.)  For jurisdictional purposes, Ms. Smith's complaint undeniably alleged "sexual misconduct" as defined in the Sexual Misconduct Policies and the UWC Procedures.  It was certainly *nonconsensual conduct* of a *sexual nature*, insofar as the plaintiff did not have Ms. Smith's consent to shove a used pizza plate between her breasts, and

---

[10] Both Ms. Menon and Professor Post testified that the inquiry is not whether the complained-of conduct would constitute a particular type of sexual misconduct, such as sexual harassment or sexual assault, but whether the complaint alleges conduct that, if true, could fall within the more general definition of "sexual misconduct."  (Ex. LL, Depo. p. 19-20; Ex. MM, Depo. p. 18-19.)  This is consistent with section 7.1 of the UWC Procedures.

his conduct had the effect of shocking and offending Ms. Smith, which was appropriately found by the UWC Panel to be *threatening* and *intimidating*.[11]

Ms. Menon testified at her deposition that "placing an object between a woman's breasts without her consent would be a violation of the sexual misconduct policy, if shown to be true," and that she "thought [the complaint] fell squarely within the jurisdiction of the UWC." (Ex. LL, Depo. p. 21, 32.)  On August 26, 2013, Ms. Menon sent an email to Professor David Post, the Chair of the UWC, to inquire whether he thought the UWC had jurisdiction.   (Ex. NN.) Professor Post replied that, although he thought "some panel members will have a hard time seeing the sexual nature of the act," he agreed that "the crux is he is alleged to have placed the plate down her shirt and between her breasts.  Therefore the act as described in the complaint could be viewed as an act of a sexual nature that was both non-consensual and has the effect of intimidating a person.  Therefore I think it falls within the jurisdiction of the UWC."[12]  Id.  Ms. Menon then forwarded Professor Post's reply to Professor Della Rocca, who confirmed his view that the UWC had jurisdiction and that the matter should not be handled by Yale's Executive Committee.  Id.  Thus, consistent with Yale's policies, the UWC Chair, the UWC Secretary, and another member of the UWC determined that the UWC had jurisdiction over Ms. Smith's complaint.  (Ex. K, ¶ 5; Ex. BB, CC, ¶ 4.)  These deliberations can hardly be described as

---

[11] Ms. Smith's complaint on its face also undeniably alleged "sexual harassment" under the Sexual Misconduct Policies.  It was certainly *physical conduct* of a *sexual nature*, which occurred *off campus*, and could easily be said to have had the effect of *creating a hostile academic environment* for Ms. Smith, the several eye witnesses to the incident, and the greater Yale community at large.  (Ex. D, p. 2.)  While it is not the UWC's responsibility to determine ab initio for jurisdictional purposes whether a specific type of violation of the Sexual Misconduct Policies, such as sexual harassment, has occurred, this is what the UWC I Panel and Dean Miller ultimately concluded.

[12] Professor Post confirmed this reasoning during his deposition:  "[T]he crux of the allegation was that in this case Mr. Montague placed a plate between the breasts of a woman, and I agreed that the UWC had jurisdiction over that." (Ex. MM, Depo. p. 15.)

"arbitrary and capricious," nor is there any evidence of "bad faith."  <u>Stockstill</u>, <u>supra</u>, 2010 U.S.

Dist. LEXIS at *22.

The plaintiff admitted that he acted inappropriately by shoving a used pizza plate

between Ms. Smith's breasts.  He testified that he was too drunk to remember the incident, but he

admitted the UWC I charge because two of his friends witnessed the incident and told him that

Ms. Smith's accusation was accurate.   The plaintiff told the fact-finder that he accepted full

responsibility for his actions toward Ms. Smith.  (Ex. M, Depo. p. 48-49.)  Significantly, the

plaintiff conceded that his conduct in UWC I constituted sexual contact in violation of the Sexual

Misconduct Policies:

> Q.     And you knew prior to the night of May 7, 2013, the night that this
>         occurred, that Yale's policies prohibited any form of sexual misconduct
>         including sexual harassment, correct?
> A.     Yes.
> Q.     Do you agree that putting something between a woman's breasts without
>         consent would represent sexual contact?
> A.     I would have questions surrounding it, but yes, I think – yeah.[13]
> Q.     And you can't put your hands or another object between a woman's
>         breasts without consent, right?
> A.     Yes.[14]
> Q.     And that would violate Yale's sexual misconduct policy, correct?
> A.     Yes.[15]
> Q.     And you knew that prior to May 7, 2013, right?
> A.     Yes.
> Q.     Can you appreciate how that behavior on your part could appear to be
>         hostile and intimidating to the victim of that conduct?
> A.     I guess.
> Q.     You guess.  In other words, it could be, right?
> A.     Yes.
> Q.     And you were aware as of May 7, 2013, that sexual misconduct was
>         prohibited whether it was on or off campus; isn't that right?

---

[13] In his errata sheet, the plaintiff amended his answer to "I would have questions surrounding it, but yes, I think –
yeah, I would have questions." (Ex. M, Depo. Errata, p. 1.)

[14] In his errata sheet, the plaintiff amended his answer to "Yes, you can't put your hands between a woman's breasts
without consent." (Ex. M, Depo. Errata, p. 1.)

[15] In his errata sheet, the plaintiff amended his answer to "Yes, putting your hands between a woman's breasts
without consent would violate Yale's sexual misconduct policy." (Ex. M, Depo. Errata, p. 2.)

A.    Yes.

Q.    Now, the UWC Panel concluded that your conduct in shoving this used pizza plate down Ms. [Smith's] shirt displayed absolute disregard for Ms. [Smith] as a female student and as a fellow human being.  This conduct was demeaning, humiliating, and reprehensible.  Do you recall that language in the UWC report?

A.    Yeah.

Q.    You agreed with that assessment, didn't you?

A.    Yes.

(Ex. M, Depo. p. 50-52.)

The Sexual Misconduct Policies define "sexual harassment" as "nonconsensual sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature on or off campus, when…such conduct has the purpose or effect of unreasonably interfering with an individual's…academic performance or creating a hostile academic…environment."  (Ex. D, p. 2.)  The plain language of the Sexual Misconduct Policies, the UWC I Panel Report, and the plaintiff's own deposition testimony show that there was ample evidence to support a finding of sexual harassment in UWC I.

As set forth in the UWC I Panel Report, the plaintiff, without provocation, rolled up a used, paper pizza plate and shoved it down Ms. Smith's shirt, between her breasts.  Two of the plaintiff's teammates witnessed and confirmed to the fact finder that the incident occurred as described by Ms. Smith.  (Ex. S, p. 2.)  In addition to her complaint, the UWC I Panel also considered Ms. Smith's written statement, in which she stated that the incident left her angry and made her feel violated.  (Ex. OO.)  Ms. Smith explained that the plaintiff's actions made her feel that the plaintiff perceived her character as that of a sexual object rather than a fellow human being.  Id.  She added that the plaintiff's conduct:

made me question what I was doing to invite him to approach me in such a way – whether I was at fault for my behavior or my clothing or my social skills.  The fact is that I shouldn't have had to question these things:  irrespective of them all, at no point did I invite or imply that Jack was in any way welcome to use my

> body as his personal trash can.  And, this is why I filed a complaint:  the disgust
> of having a used, greasy pizza plate stuffed between my breasts was not the only
> repercussion of this incident.

Id.  Citing the definition of sexual misconduct set forth in the Sexual Misconduct Policies, the

UWC Panel concluded, "on the basis of Mr. Montague's concession and based on the credible

statements of Ms. [Smith] and other witnesses, that Mr. Montague violated the University's

policy on sexual misconduct by sexually harassing Ms. [Smith.]"  (Ex. S, p. 2.)

It cannot reasonably be disputed that the plaintiff's behavior constituted "conduct of a

sexual nature."  That the plaintiff touched the area between Ms. Smith's breasts with a paper

plate rather than with his hands does not negate the sexual nature of his conduct.  The Panel also

specifically found that Ms. Smith's reaction – "shock, anger and the feeling of being violated" –

was reasonable.  (Ex. S, p. 2.)  The Panel concluded that the plaintiff's conduct created an

intimidating and hostile academic environment, not only for Ms. Smith, but also "for the broader

Yale community," and found that "Mr. Montague's behavior [was] a clear violation of

University policy…."  Id.

As noted above, the plaintiff reached these same conclusions during the first session of

his deposition.  (Ex. M, Depo. p. 50-51.)  At the second session of his deposition, the plaintiff

acknowledged that he was not allowed to put his hands between a woman's breasts without her

consent.  He further admitted that putting a pizza plate between a woman's breasts without

consent was "wrong, immature, and inappropriate" and he did not believe "that anything would

excuse his behavior." Although he initially testified at his second deposition that it would

"depend on the situation" as to whether he was allowed to put an object between a woman's

breasts without her consent, he later testified that he could not think of any circumstance where

that would be acceptable behavior.  (Ex. PP, Depo. p. 32, 34-35, 37-39, 99.)  There is simply no

evidence to suggest that the UWC I Panel's conclusion that the plaintiff had sexually harassed

28

Ms. Smith in violation of the Sexual Misconduct Policies by putting a used paper pizza plate between her breasts was "arbitrary and capricious," or in "bad faith." Stockstill, 2010 U.S. Dist. LEXIS at *22; Saliture v. Quinnipiac Univ., 2006 U.S. Dist. LEXIS 39326 *12 (D. Conn. June 6, 2006); Daley, 63 Conn. App. at 133-34.  Because the plain language of the Sexual Misconduct Policies, the reasoning of the UWC I Panel Report, and the plaintiff's own deposition testimony show that the UWC had jurisdiction over the complaint and that there was ample evidence to support a finding of sexual harassment, judgment should enter for the defendants on Counts I and II.

## C.   Summary Judgment Should Enter on the Plaintiff's State Law Claims Regarding UWC II

### 1.   The Defendants Are Not Liable for Defamation

In Count IV, the plaintiff asserts a claim for defamation per se against Yale and Ms. Gleason.  He claims that Ms. Gleason, a Title IX Coordinator, falsely informed Ms. Roe that he had been the subject of a previous complaint of sexual assault, that he had been found responsible for sexual assault by the UWC, and that he had been required to participate in training concerning sexual relationships and sexual consent.   (Am. Compl., ¶¶ 230, 236.) Because Ms. Gleason did not make any of these statements to Ms. Roe, the defendants' motion for summary judgment should be granted as to Count IV.

"To establish a prima facie case of defamation, the plaintiff must demonstrate that:  (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement."  Cweklinsky v. Mobil Chem. Co., 267 Conn. 210, 217 (2004). "A defamatory statement is defined as a communication

that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him….”  Id.

The defamation claim in this case is limited to statements allegedly made by Ms. Gleason to Ms. Roe.  There were no witnesses to this conversation.  The only participants in this conversation – Ms. Gleason and Ms. Roe – both categorically denied in their depositions that Ms. Gleason informed Ms. Roe that a previous UWC complaint had been filed against the plaintiff, that the plaintiff had been found responsible for sexual assault by the UWC, or that the plaintiff had been ordered to participate in training due to a finding of a violation of Yale’s Sexual Misconduct Policies.  Ms. Gleason testified that when she met with Ms. Roe for the first time on October 19, 2015, Ms. Gleason and Ms. Roe discussed the possibility of an informal process in which the plaintiff would be offered training.  (Ex. QQ, Depo. p. 106, 111.) Thereafter, Ms. Gleason learned that the plaintiff had already received the training that she had discussed with Ms. Roe as an informal resolution and informed Ms. Roe of this fact.  (Ex. QQ, Depo. p. 124-125; Ex. RR, ¶ 5.)  Although Ms. Gleason was aware that the plaintiff had received training in connection with a prior UWC complaint, Ms. Gleason did not tell Ms. Roe that there had been a previous UWC complaint filed against the plaintiff, nor did she report that the training had been mandated because of a prior UWC complaint.  (Ex. QQ, Depo. p. 133-136, 138-140; Ex. RR, ¶ 3-4, 6.)

Ms. Roe similarly testified that when she initially met with Ms. Gleason to discuss an informal complaint, there was discussion of offering the plaintiff training as a means of resolving an informal complaint.  Ms. Roe then met with Ms. Gleason in November, 2015 and Ms. Gleason informed Ms. Roe that the plaintiff had already had training.  Ms. Roe denied that Ms. Gleason informed her that the plaintiff had been ordered to submit to training after a previous

UWC complaint.  Ms. Roe also denied telling the fact-finder that she had heard that the plaintiff

had been the subject of a previous complaint.  (Ex. SS, Depo. p. 17-20, 23, 28-29, 33-34, 41-42,

52.)  Ms. Roe explained that she corrected the error in the fact-finder's report in her opening

statement to the hearing panel:

> Q.     You mean what you say in your opening statement is a correct statement
>        of your conversation with Angie or a correct characterization of your
>        conversation with Angie.
> A.     Yes.  Like here, when it's in my own words, my conversation with Angie
>        about Jack going through the sensitivity training is the only thing that's
>        mentioned.  I don't mention the [prior UWC] complaint in my opening
>        statement because that's not what happened.

(Ex. SS, Depo. p. 35-36.)

The plaintiff never spoke with Ms. Roe or Ms. Gleason regarding their discussion of the

training that the plaintiff had received.  (Ex. M, Depo. p. 180.)  The evidence from the only two

people who know what was said during the conversations between Ms. Gleason and Ms. Roe

demonstrates that Ms. Gleason did not make the statements alleged by the plaintiff.  For that

reason alone, the defendants are entitled to summary judgment on Count IV.

Even if there were admissible evidence to support the allegation that Ms. Gleason made

the statements attributed to her in the plaintiff's Amended Complaint, the plaintiff cannot make

out a claim of defamation per se.  Ms. Gleason's statement does not charge the plaintiff with

incompetence or dishonesty in office, general incompetence, or a crime involving moral

turpitude or to which an infamous penalty is attached, as required for a defamation per se claim.

See, Miles v. Perry, 11 Conn. App. 584, 602 (1987).  In this regard, "to determine whether a

communication is slander per se, the words must be stripped of all innuendo, colloquium, and

explanatory circumstances; the very definition of 'per se,' in and of itself, precludes the use of

innuendo.  Our Supreme Court has held that the context in which a statement is made is

relevant in determining whether it constitutes slander per se and that mere innuendo that a statement charges the plaintiff with a crime is insufficient."  (Internal quotations and citations omitted.)  Silano v. Cooney, 2015 Conn. Super. LEXIS 2177 *8-9 (Super. Ct. Aug. 17, 2015). Thus, whether or not Ms. Roe inferred or assumed from Ms. Gleason's statement that the plaintiff had a previous complaint filed against him is irrelevant to the determination of whether Ms. Gleason charged him with a crime of moral turpitude.  Since Ms. Gleason's statement that the plaintiff had received sensitivity training does not, in and of itself, charge the plaintiff with a crime of moral turpitude, the plaintiff cannot prevail on his defamation per se claim.

The defendants cannot be liable for defamation based on Ms. Gleason's statements to Ms. Roe for the additional reason that the alleged statements were true, even if Ms. Gleason had made them as alleged in the amended complaint. "[T]he rule in Connecticut is that the truth of an allegedly [slanderous] statement of fact provides an absolute defense….  Contrary to the common law rule that required the defendant to establish the literal truth of the precise statement made, the modern rule is that only substantial truth need be shown to constitute the justification….  It is not necessary for the defendant to prove the truth of every word of the [slander]."  Mercer v. Cosley, 110 Conn. App. 283, 304 (2008). There is no doubt that the statements attributed to Ms. Gleason in the Amended Complaint were in fact true.  The plaintiff had been the subject of a previous complaint before the UWC, he had been found responsible by the UWC, and he had been required to participate in training as a result of that prior UWC complaint. Part of the plaintiff's penalty from UWC I was a requirement that he immediately enroll in sexual harassment and gender sensitivity training through the SHARE Center.  (Ex. S, p. 3.)  The plaintiff testified at his deposition that he received sexual harassment and gender sensitivity training from John Criscuolo.  (Ex. M, Depo. 52-53, 158.)  Since the plaintiff had in

fact received sensitivity training, Ms. Gleason's statement to Ms. Roe was true.  Therefore, the plaintiff cannot prevail on his defamation claim.

The plaintiff also claims that Ms. Gleason's statements caused Ms. Roe to believe that she had to engage in the formal complaint process and that the statements were "the genesis of the formal complaint proceedings" against him.  (Am. Compl., ¶¶ 231-232.)  Contrary to these allegations, Ms. Roe testified that she did not tell the fact-finder that she was motivated to participate in the complaint because she had heard that the plaintiff was charged in a previous UWC complaint.  (Ex. SS, Depo. p. 33-34.)  Rather, Ms. Roe was motivated to participate in the formal complaint process because of her own emotions, conversations she had with her suitemates, and the fact that the plaintiff had already received the training that she had been considering as an informal resolution.  (Ex. SS, Depo. p. 40-41, 55-56.)  A subsequent interaction with the plaintiff also played a role in her decision.  The day after speaking with Ms. Gleason about the plaintiff having received sensitivity training, Ms. Roe was at a party where the plaintiff was also present.  Ms. Roe's friend approached the plaintiff and asked him to leave the party.  The plaintiff yelled at Ms. Roe's friend, saying:  "There's no reason why I should have to leave this party just because she's here.  Like this is ridiculous."  When Ms. Roe's friend said that the plaintiff had raped Ms. Roe, he replied:  "That was more than a year ago.  This is ridiculous."  The Monday after this interaction, Ms. Roe informed Ms. Gleason of her willingness to participate in the formal complaint process.  (Ex. SS, Depo. p. 84-87.)  The only person who is competent to testify as to the reason Ms. Roe elected to pursue a formal complaint against the plaintiff is Ms. Roe herself.  Since she categorically denied both that Ms. Gleason made the statements attributed to her and that Ms. Gleason's comments were "the genesis of the formal complaint proceedings," the plaintiff cannot establish either a breach of confidentiality or

a causal link between that alleged breach and the plaintiff's expulsion.  For all of the foregoing reasons, summary judgment should enter in favor of the defendants on the defamation claims.

2.     The Defendants are Not Liable for Invasion of Privacy

Count V purports to state causes of action for invasion of privacy. There are four distinct categories of "invasion of privacy" recognized in Connecticut:  "(a) unreasonable intrusion upon the seclusion of another; (b) appropriation of the other's name or likeness; (c) unreasonable publicity given to the other's private life; or (d) publicity that unreasonably places the other in a false light before the public."  Goodrich v. Waterbury Republican-American, Inc., 188 Conn. 107, 128 (1982).  The plaintiff appears to be asserting claims under the third and fourth categories.  Under either theory, he must prove that Ms. Gleason "gave publicity" to the private information, not just that she repeated the information to a small number of individuals.

In Blue v. Carbonaro, 2015 Conn. Super. LEXIS 1093 *23 (Super. Ct. May 11, 2015), the plaintiff brought claims for invasion of privacy due to unreasonable publicity relating to his private life and for casting the plaintiff in a false light.  The court explained that under either theory, the plaintiff would need to prove that publicity occurred, and each tort relies upon the same definition of publicity:  "Publication…includes any communication by the defendant to a third person. Publicity…means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.  The difference is not one of the means of communication… It is one of a communication that reaches, or is sure to reach, the public…  The distinction…is one between private and public communications…"  (Emphasis added; internal quotations omitted.)  Id. at *24, quoting, Carney v. Amendola, 2014 Conn. Super. LEXIS 1206 (Super. Ct. May 14, 2014).  The court observed that "it is not an invasion of privacy to communicate a fact

34

concerning the plaintiff's private life to a single person or even to a small group of persons." Id. at *24-25.  In fact, the Connecticut courts have repeatedly held that verbal communication to a small group of people does not constitute "publicity." Id. at *25.  See also, Doe v. Hartnett, 2002 Conn. Super. LEXIS 1673 *12 (Super. Ct. May 8, 2002) (stating that "publicity" requires that "the communication be published to more than a mere handful of individuals."); Bonito Mfg v. Criscuolo, 2012 Conn. Super LEXIS 2201 (Super. Ct. Aug. 27, 2012) (granting motion to strike invasion of privacy claim based on false light where the plaintiff alleged that the defendant disclosed information to two people); Cavallaro v. Rosado, 2006 Conn. Super. LEXIS 2919 (Super. Ct. Oct. 5, 2006) (granting motion to strike false light privacy claim where the plaintiff alleged that the defendant made a negative statement about him to one person); Olivas v. DeVivo Indus., 2001 Conn. Super. LEXIS 686 (Super. Ct. Feb. 28, 2001) (granting motion to strike false light privacy claim where defendant told three people of the alleged conduct of the plaintiff). Since the evidence in the present case is undisputed that Ms. Gleason told only Ms. Roe that the plaintiff had received sensitivity training, the plaintiff cannot establish the publicity requirement for the two invasion of privacy claims alleged in the amended complaint.

The plaintiff cannot prevail on the false light invasion of privacy claim for the additional reason that he cannot prove that Ms. Gleason's statement to Ms. Roe was false.  "The essence of a false light privacy claim is that the matter published concerning the plaintiff (1) is not true; and (2) is such a major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in his position."  (Internal quotations and citations omitted.) Goodrich, supra, 188 Conn. at 131.  As explained above, Ms. Gleason did not inform Ms. Roe that the plaintiff had been the subject of a previous UWC complaint, that he had been found responsible for sexual misconduct by the UWC, or that he had

been required to participate in training because of that violation.  However, even if Ms. Gleason had given Ms. Roe this information, those facts are not disputed by the plaintiff.

Because the statements alleged to have been made by Ms. Gleason were true and because the plaintiff cannot establish the publicity element of either of the invasion of privacy claims, the defendants' motion for summary judgment as to Count V should be granted in its entirety.

3.      The Defendants Did Not Tortiously Interfere with the Plaintiff's Contract

In Count VI, the plaintiff alleges that Ms. Gleason and Mr. Killheffer intentionally interfered with the plaintiff's contractual relationship with Yale by taking steps to procure his expulsion by:  (1) violating the confidentiality requirements contained in Yale's policies; (2) falsely informing Ms. Roe that the informal complaint process was not available under the circumstances; (3) falsely informing Ms. Roe that the plaintiff was the subject of a previous complaint of sexual assault; and (4) "manipulating" Ms. Roe into agreeing to participate in a formal complaint process against the plaintiff.[16]  (Am. Compl., ¶ 245.)

To make out a claim for intentional interference with contractual relations under Connecticut law, the plaintiff must establish:  "(1) the existence of a contractual or beneficial relationship; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to interfere with the relationship; (4) that the interference was tortious; and (5) a loss suffered by the plaintiff that was caused by the defendant's tortious conduct."  Rioux v. Barry, 283 Conn. 338, 351 (2007).  "[A]n action for intentional interference with business relations…requires the plaintiff to plead and prove at least some improper motive or improper means….  [A] claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself."  Weiss v. Wiederlight, 208 Conn. 525, 536 (1988).

---

[16]  Although the plaintiff also alleges that "others unknown" also tortiously interfered with his contractual relationship with Yale, he could not identify any other individuals at his deposition.  (Ex. M, Depo. p. 178-180.)

At his deposition, the plaintiff testified that Ms. Gleason interfered with his contractual relationship with Yale by providing Ms. Roe information "that was beyond her jurisdiction." (Ex. M, Depo. p. 180-181.)  As explained above in Section III(C)(1), Ms. Gleason and Ms. Roe both testified that Ms. Gleason did not inform Ms. Roe that the plaintiff had been the subject of a previous complaint, that he had been found responsible for violating the Sexual Misconduct Policies, or that he was required to participate in training because of that finding.  Ms. Roe's testimony also establishes that Ms. Gleason did not inform Ms. Roe that the informal complaint process was not available to her because the plaintiff had previously received training.  To the contrary, Ms. Gleason informed Ms. Roe that she still had the following options:  (1) offer the plaintiff sensitivity training again in an informal process; (2) abandon the informal complaint; or (3) proceed with a formal complaint, acting as either the complainant or a witness.  (Ex. SS, Depo. p. 41-44.)  Ms. Gleason also testified that she informed Ms. Roe that she still had the informal option available.  (Ex. QQ, Depo. p. 131; Ex. RR, ¶¶ 7-8.)  Ms. Gleason and Ms. Roe also both testified that Ms. Gleason did not pressure Ms. Roe to participate in a formal complaint.  Ms. Gleason denied urging Ms. Roe to participate in a formal complaint.  She simply presented Ms. Roe with her options, which included participating in a formal complaint as a witness.  (Ex. QQ, Depo. p. 177; Ex. RR, ¶ 8.)  Ms. Roe agreed that Ms. Gleason presented all of the above options, and did not recommend a course of action.  She chose the formal complaint option of her own volition. (Ex. SS, Depo. p. 43-44, 47.)  Since Ms. Gleason and Ms. Roe were the only witnesses to the conversations between them, there is no contrary evidence.

At the first session of his deposition, the plaintiff could not identify anything that Mr. Killheffer did to intentionally and maliciously interfere with the plaintiff's contractual relationship with the plaintiff.  (Ex. M, Depo. p. 181-182).  At the second session of his

deposition, the plaintiff claimed that Mr. Killheffer "coerced" Ms. Roe into filing a formal complaint and revealed confidential information to her.  He claimed to have learned this information through the "depositions," but could not cite to a specific deposition.  He then testified that he had read only parts of Ms. Gleason's deposition transcript and there was nothing specific in that transcript that caused him to believe that Mr. Killheffer interfered with his contractual relationship with Yale.  (Ex. PP, Depo. p. 80-83.)  Mr. Killheffer did not discuss the filing of a formal complaint with Ms. Roe.  In fact, Mr. Killheffer had never met or communicated with Ms. Roe until February 23, 2016, <u>after</u> Dean Holloway had already accepted the recommendation of the UWC II Panel to expel the plaintiff.  (Ex. TT, Depo. p. 165-166; Ex. UU, ¶¶ 3-4.)  Thus, he could not have provided her with any information or manipulated her into participating in a formal complaint.  Since the plaintiff has no evidence supporting his claim that either Ms. Gleason or Mr. Killheffer tortiously interfered with his contractual relationship with Yale, summary judgment should enter in favor of the defendants on Count VI.

4.     <u>The Defendants Fully Complied With the UWC Procedures in the UWC II Proceeding and There Was No Breach of Contract</u>

In Count VII, the plaintiff asserts eight breach of contract claims, each of which will be addressed in turn.

a.     <u>The Defendants Did Not Breach Yale's Policy on Confidentiality</u>

In Count VII(A), the plaintiff alleges that Ms. Gleason violated the UWC Procedures and the Provost's Statement of Confidentiality of UWC Proceedings by disclosing the "fact and substance of the UWC I proceedings to Ms. Roe."  (Am. Compl., ¶ 252.)  As explained above, Ms. Gleason did not reveal the fact or substance of the UWC complaint or proceedings.  She stated that the plaintiff had already received sensitivity training, but did not provide any further information.  It is significant that students can receive sensitivity training for a variety of reasons,

not only as a disciplinary measure after being found responsible for violating the Sexual Misconduct Policies.   John Criscuolo, a counselor at the SHARE Center, testified that he provides sensitivity and gender conduct training to students referred by the student's college Dean and to "self-referred" students, as well as students referred by the UWC.   Of the approximately 24 students he has counseled, at least half were either referred by their Deans or were self-referred. Those individuals did not receive training as a result of being found to have violated Yale's Sexual Misconduct Policies. (Ex. VV, Depo. p. 5, 8, 10-11.) [17] Thus, a statement that the plaintiff had received sensitivity training is not tantamount to a disclosure that he had been found responsible for violating the Sexual Misconduct Policies, and, therefore, the plaintiff cannot prevail on the breach of contract claim based on violation of confidentiality.

b.    <u>Yale's Policies Permitted a Title IX Coordinator to Bring the Complaint in UWC II</u>

In Count VII(B), the plaintiff alleges that Title IX Coordinators may only bring formal UWC complaints in "'unusual circumstances…such as those involving risks to the safety of individuals and/or the community.'"   Contrary to the plaintiff's allegation, the UWC Procedures do <u>not</u> limit a Title IX Coordinator to bringing a complaint only in unusual circumstances involving risks to the safety of individuals and/or the community.  In fact, that language does not appear anywhere in the UWC Procedures.   Rather, the UWC Procedures allow a Title IX Coordinator to bring a complaint in three different circumstances, including "when there is evidence that the University's policies on sexual misconduct have been violated and the Coordinator's intervention is needed to ensure that the matter reaches the UWC."  (Ex. E, p. 1-2.) The Yale University Report of Complaints of Sexual Misconduct explains that "the Title IX Coordinator may file a complaint in situations on behalf of someone who experienced sexual

---

[17] John Criscuolo is the same individual who provided training to the plaintiff as a result of his having been found responsible for a violation of Yale's Sexual Misconduct Policies in UWC I.

39

misconduct but who cannot or <u>will not</u> themselves take the formal role of complainant; this may be an issue of jurisdiction, safety or <u>preference</u>."[18]   (Emphasis added.)   (Ex. WW, p. 16.)   In UWC II, Ms. Roe would not bring the case herself and preferred that the Title IX coordinator bring the case on her behalf.  Ms. Roe provided Ms. Gleason with information that constituted evidence that the University's policies on sexual misconduct had been violated.  On November 9, 2015, Ms. Roe informed Ms. Gleason that, while she was comfortable participating in a formal complaint as a witness, she did not want to participate as the complainant:  "I have had time to think about the case and my role in it over the weekend….  I am comfortable with Title IX filing a formal complaint against Jack Montague, and I am willing to participate as a witness.  I understand that this may include talking to a fact finder and eventually participating in a formal hearing.  At this time I am comfortable doing both of those things, but I will let you know if at any time I decide that I cannot participate in either."  (Ex. XX; Ex. RR, ¶ 8.)[19]  Thus, UWC II was a case in which the UWC Procedures expressly allow the Title IX Coordinator to file a complaint; there was evidence from Ms. Roe that the Sexual Misconduct Policies had been violated, and the case would not have reached the UWC without the Title IX Coordinator's involvement because Ms. Roe decided not to file the complaint herself.  Accordingly, it was appropriate for Mr. Killheffer to bring the UWC complaint.

---

[18]  The Report also states that a Title IX Coordinator may file a formal complaint "independently of the wishes of an individual complainant" in other circumstances, "<u>such as</u> those involving risks of the safety of the individual and/or the community . . . ."  (Emphasis added.))  (Ex. WW, p. 5.)  In the present case the complaint was not filed "independently of the wishes" of the complainant; Ms. Roe explicitly agreed with the plan to have the complaint filed by the Title IX Coordinator, and stated in writing her willingness to be a witness.

[19]  As explained above, Ms. Gleason did not urge, or even recommend, that Ms. Roe pursue a formal complaint; she merely explained the options available.  Ms. Roe decided she wanted to pursue the formal complaint option, provided that a Title IX Coordinator was listed as the complainant.  (Ex. SS, Depo. p. 40-41, 55-56; Ex. RR, ¶ 8.)

c.       The Uniform Practice of the UWC is to Allow a Complaining
Witness to Participate in the UWC Process

In Count VII(C), the plaintiff alleges that the defendants breached the UWC Procedures because Ms. Roe was permitted to "enjoy the status of a complainant" despite not filing a formal complaint on her own behalf.  (Am. Compl., ¶ 261.)  Contrary to the plaintiff's allegations, the UWC Procedures do not prohibit a complaining witness in a case filed by a Title IX Coordinator from participating in the UWC process as if he or she had filed the formal complaint, *i.e.*, by receiving the fact-finder's report, submitting an opening statement, participating in the hearing, responding to the panel report, responding to the decision, and responding to an appeal.  Ms. Menon testified that, in circumstances where the complaining witness does not wish to be the formal complainant, it is the UWC practice to allow the witness to submit an opening statement and to participate fully in the process.  (Ex. LL, Depo. p. 142-44; Ex. BB, ¶ 6.)  Ms. Menon also testified as to the common sense reason for this practice, as applied in UWC II:  "Jason Killheffer has no knowledge of the incident, [Ms. Roe] does, which is why she is permitted to make an opening statement and be interviewed."  (Ex. LL, Depo. p. 143.)    Professor Post similarly testified that the UWC had a longstanding practice to allow the primary witness in a complaint brought by a Title IX Coordinator to participate fully in the hearing, because he or she is the person with firsthand knowledge of the alleged violation.  (Ex. MM, Depo. p. 27; Ex. K, ¶ 10.)   There was no evidence proffered by the plaintiff to contradict the testimony of the defendants on this issue. Since there is no provision in the UWC Procedures prohibiting Ms. Roe from participating in the UWC process as if she had filed the formal complaint on her own behalf, and the uniform practice has been to permit the complaining witness to do so, the plaintiff cannot prevail on the breach of contract claim in that regard.  In addition, the plaintiff cannot prove that he suffered any damages due to Ms. Roe's receiving the "status of a complainant."  At

both sessions of his deposition, the plaintiff was unable to explain how this procedure adversely impacted him.  (Ex. M, Depo. p. 182-184; Ex. PP, Depo. p. 83.)  Because the plaintiff cannot prove a violation of contract, causation, or damages, summary judgment should enter in favor of the defendant on the breach of contract claim based on the alleged "failure to comply with UWC Procedures concerning status of complainant" in Count VII(C).

d. <u>The UWC Procedures Did Not Require Professor Post to Withdraw from the UWC Panel</u>

In Count VII(D), the plaintiff alleges that Professor Post should not have appointed himself as Chair of the UWC II Panel and should have withdrawn from the panel because (i) he attended a meeting with Ms. Gleason, Mr. Killheffer, and counsel for Yale, at which the primary topic of conversation was the possibility of a Title IX Coordinator-initiated complaint against the plaintiff and (ii) participated in a meeting and e-mail exchange with Ms. Roe, allegedly to convince her to allow Yale to file a formal complaint against the plaintiff.  (Am. Compl., ¶¶ 265-268.)  The plaintiff further claims that Yale should have informed him of Professor Post's "direct involvement in the events leading up to the formal complaint against him," and the failure to do so deprived him of the opportunity to object to Professor Post as a member of the UWC Panel. (Am. Compl. ¶¶ 270-271.)

In support of his breach of contract claim, the plaintiff cites the provisions of the UWC Procedures that provide that a "hearing panel will not include any Member who has participated in the resolution of an informal complaint arising out of the same events" and a panel member "must withdraw from the proceedings if their relationship to the complainant or the respondent or other circumstances lead them to believe that they cannot judge the matter fairly." (Ex. E, p. 5.)  Neither of these provisions was breached because the undisputed evidence is that Professor Post did not participate in the resolution of an informal complaint by Ms. Roe against the

42

plaintiff.  He met with Ms. Roe solely to answer her questions regarding the UWC process, after she indicated she might be interested in a formal complaint.  After his meeting with Ms. Roe, Professor Post responded to Ms. Roe's e-mail that asked additional questions about the formal complaint process.  (Ex. MM, Depo. p. 20, 22-26; Ex. YY; Ex. K, ¶ 7-8.)  Both Ms. Gleason and Ms. Roe confirmed that Professor Post met with Ms. Roe only to answer her questions regarding the UWC process.  (Ex. QQ, Depo. p. 157-158; Ex. SS, Depo. p. 44-45, 47-49.)  As the Chair of the UWC, Professor Post was the most appropriate person to answer Ms. Roe's questions. Professor Post did not made any recommendations to Ms. Roe as to whether she should proceed with a formal complaint.  (Ex. MM, p. 25; Ex. SS, Depo. p. 49; Ex. K, ¶ 9.)  At no time prior to the UWC II hearing did Professor Post communicate with Ms. Roe, nor did she communicate with him, about the substance of her complaint against the plaintiff.  (Ex. K, ¶ 8.)  The plaintiff offered no evidence at his deposition in support his claim that Professor Post met with Ms. Roe to persuade her to participate in a formal complaint.  (Ex. M, Depo. p. 185.)  Since there is no evidence to support the plaintiff's claim in Count VII(D), summary judgment should enter.

e.      There Was Sufficient Evidence for the UWC Panel to Conclude
that the Plaintiff Violated the Sexual Misconduct Policies

In Count VII(E), the plaintiff alleges that the UWC II Panel lacked sufficient evidence to support its conclusion that the plaintiff sexually assaulted Ms. Roe in violation of the Sexual Misconduct Policies.  (Am. Compl., ¶¶ 274-280.)  He claims that "[i]t is undisputed that Roe affirmatively consented to sexual activity when she led Montague to his room, removed all of her clothing, got into bed with him, and voluntarily engaged in various forms of sex" and that the panel could not have found that Ms. Roe unambiguously and audibly communicated to the plaintiff her revocation of consent to sex.  (Am. Compl., ¶¶ 278-279.)  In fact, the UWC Panel

properly found that Ms. Roe told the plaintiff three times that she did not want to have sexual intercourse and that Ms. Roe never consented to intercourse, either by word or action.

The plaintiff acknowledged at his deposition that one of the duties of the UWC Panel was to look at all of the evidence and make a decision as to whether the account of the plaintiff or Ms. Roe was more accurate, credible, and consistent.  (Ex. M, Depo. p. 123, 154, 214.)  Attorney Murphy, the plaintiff's expert, testified that if the UWC Panel determined that the testimony of Ms. Roe was more credible than that of the plaintiff, then one reasonable conclusion would be that the plaintiff had violated Yale's Sexual Misconduct Policies.  (Ex. Z, Depo. p. 118-120; Ex. AA, Depo. p. 20-21.)  The UWC Panel deliberated at length about the issues of credibility and ultimately found Ms. Roe's account more credible.  The UWC Panel identified specific reasons that it credited Ms. Roe's version of the events over that of the plaintiff:  Ms. Roe provided a full and detailed account of her encounter with the plaintiff in her interviews with the fact-finder and the UWC Panel, and her contemporaneous text to her friend, her undated written account, and her testimony at the hearing were all detailed and consistent.  On the other hand, the plaintiff had a selective memory of the incident and a shifting recollection of how he gauged consent.  (Ex. C, p. 6, 8).  In fact, at his deposition, the plaintiff admitted that he made statements to the fact-finder that "turned out to be untrue."[20]  (Ex. M, Depo. p. 129.)  In this regard, the plaintiff testified:

> Q.  As of the time you talked to the factfinder, you were confused as to whether or not Ms. [Roe] had -- whether you had asked her whether she wanted to have sex and she said okay or whether, on the other hand, it was consent by conduct; is that right?
> MS. DEAL: Objection.
> THE WITNESS: I guess I was confused with the question and my responses.
> BY MR. NOONAN:
> Q.  Well, you weren't confused by the questions, were you?
> A.  No.

---

[20] In his errata sheet, the plaintiff amended his response to substitute "inaccurate" for "untrue."  (Ex. M, Depo. Errata p. 3.)

Q.      I mean, you just got it wrong?

A.      I just got it wrong.

Q.      Okay. And you got it wrong when you said it was three encounters [between the plaintiff and Ms. Roe] rather than four, right?

A.      Yes.

Q.      Okay. And that's just a failure of memory, right? You just didn't remember it at the time?

A.      Yes.

Q.      Okay.  Now, another thing you didn't remember that night -- about the night of October 18, 2014, when you were talking to the factfinder, is the fact that you had -- after having intercourse with Ms. [Roe], you had gotten up and gone out to another party at a different location.

A.      Correct.

Q.      You didn't remember that at the time?

A.      No, not the first time, no.

(Ex. M, Depo. p. 127-128.)

In fact, the plaintiff recalled almost nothing of his interaction with Ms. Roe on the night of the assault.  He testified that he did not remember speaking to his friends after having intercourse with Ms. Roe, leaving his house to attend a party, arranging for Ms. Roe to go elsewhere with his friends, or then meeting Ms. Roe later at Davenport College and walking with her back to his house.  He acknowledged that all of these events occurred, but he just did not remember them.  (Ex. M, Depo. p. 156.) At the second session of his deposition, the plaintiff tried to explain his inability to remember key events by testifying that he has had a very poor memory at least since high school, and that, based on a recommendation from his attorney, he planned to be evaluated for a medical condition that might be responsible for this very poor memory. (Ex. PP, Depo. p. 14-16.)[21]  In fact, the only aspects of his interaction with Ms. Roe that the plaintiff did seem to remember were those that supported his claims regarding consent.

---

[21] The plaintiff's claims about his memory problem evolved over time.  The plaintiff did not mention a poor memory at all during the first session of his deposition.  At the second session of his deposition he stated for the first time that he has had a very poor memory for many years (but had not mentioned this to his teachers or parents) and he planned to have a medical evaluation for that condition.  (Ex. PP, Depo. p. 14-19.)  Then in his errata sheet following the second session of his deposition he changed his answer to claim an "auditory processing disorder" instead of a poor memory.  (Ex. PP, Depo. Errata p. 2.)

Throughout the UWC II process, the plaintiff provided inconsistent accounts on the key question of how he obtained consent for sexual intercourse with Ms. Roe.  In his interview with the fact-finder, the plaintiff said that he obtained verbal consent from Ms. Roe, but, when he spoke to the UWC Panel, he said that Ms. Roe indicated consent by her conduct.  (Ex. B, p. 10; Ex. C, p. 5.)  In discussing with the Panel his reason for believing he had consent for intercourse, he said that he did not use force and that Ms. Roe did not say "no" during intercourse.  (Ex. C, p. 8.)   In his written response to the Panel's report, the plaintiff said that "given our prior experiences and conduct I believe it was reasonable for me to understand that our mutual sexual encounter was consensual." (Ex. L, p. 1).  The plaintiff now claims that Ms. Roe consented to sex "when she led [him] to his room, removed all of her clothing, got into bed with him, and voluntarily engaged in various forms of sex."  (Am. Compl., ¶ 278).

Under the Sexual Misconduct Policies, consent is defined as "positive, unambiguous, and voluntary agreement to engage in specific sexual activity throughout a sexual encounter."  The Policies further provide that "[c]onsent to some sexual acts does not constitute consent to others, nor does past consent to a given act constitute present or future consent.  Consent must be ongoing through a sexual encounter and can be revoked at any time."  (Ex. D, p. 2.)  The plaintiff's Title IX expert Attorney Murphy testified that Yale's definition of sexual consent was appropriate and consistent with the federal government's mandates.  She further acknowledged that each action in a sexual encounter requires positive, unambiguous and voluntary agreement and that it was the plaintiff's obligation to obtain positive, unambiguous, and voluntary consent to intercourse on the night of October 18, 2014.  (Ex. Z, Depo. p. 224-228; Ex. AA, Depo. p. 16-19.)  All of this was perfectly clear to the plaintiff on that night.  He admitted at his deposition that he understood that prior sexual activity did not provide consent for subsequent sexual

activity and that he needed specific consent for each sexual act during a sexual encounter.  (Ex. M, Depo. p. 146-147; Ex. PP, Depo. p. 67-69.)   The plaintiff further acknowledged at his deposition that the absence of force and the failure of Ms. Roe to say "no" would not imply consent.  (Ex. M, Depo. p. 156-157.)

Ms. Roe consistently stated that, on two separate occasions prior to entering the plaintiff's bedroom, she asked him if it was "okay to hookup, but not have sex," and he responded in the affirmative. She further stated that as the plaintiff was about to penetrate her, she told him to stop.  When he was finished, according to Ms. Roe, the plaintiff apologized saying he knew she did not want that.  (Ex. B, p. 4-5; Ex. C, p. 3; Ex. ZZ, p. 4.)  The plaintiff agreed that to "hook up, but not have sex" could mean any type of sexual contact with the exception of intercourse and admitted that all of the behavior that the two engaged in prior to penetration would fall within the definition of "hookup, but not have sex." (Ex. PP, Depo. p. 63-65, 102-103, 119-121.).   The plaintiff agreed at his deposition that if Ms. Roe had asked if it was okay to hook up but not have sex, then he would not have had consent for intercourse.[22]  (Ex. M, Depo. p. 120-122.)  He further admitted that if Ms. Roe had made all of the above referenced statements, then it would have been appropriate for the UWC Panel to conclude that the plaintiff had violated the Sexual Misconduct Policies.[23]  (Ex. M, Depo. p. 119-123, 148-149, 232-233.)

As discussed above, the plaintiff has admitted to having a very bad memory in general, and he has admitted that he made statements to the fact-finder that turned out to be untrue.  At the time of the UWC II process, he remembered almost nothing about the night of the assault except that he obtained consent, and his description of how he obtained consent shifted.  The

---

[22] In his errata sheet, the plaintiff amended his answers to indicate that he would not have had consent at the time Ms. Roe made those statements.  (Ex. M, Depo. Errata, p. 3.)

[23] In his errata sheet, the plaintiff also qualified this response.  (Ex. M, Depo. Errata, p. 3-5.)

UWC Panel, which was charged with finding the facts and assessing credibility, had excellent reason for concluding that Ms. Roe's recollection was accurate and the plaintiff's was not. Therefore, the plaintiff has no basis for asking this court to decide that the UWC II Panel lacked sufficient evidence to conclude that he assaulted Ms. Roe, and he cannot prevail on the breach of contract claim in Count VII(E).

> f.      The UWC Panel Properly Considered UWC I as a Previous Act of Sexual Misconduct

In Count VII(F), the plaintiff claims that the defendants should not have relied upon the UWC I proceedings when determining the plaintiff's culpability in UWC II, because UWC I did not involve an act of sexual misconduct.   The UWC Procedures provide: "In determining culpability, the panel may also take into account a respondent's previous formal discipline for other acts of sexual misconduct, including written reprimands, and the respondent's criminal conviction arising out of the events complained of."  (Ex. E, p. 6.) As already discussed above, the plaintiff waived his right to contest the decision in UWC I for the reason that he admitted to the violation and then failed to object to the penalty imposed or to pursue an appeal.  Even if the exhaustion doctrine did not apply, summary judgment should be entered in this count on the merits. As established in the discussion of Count I above, the plaintiff's conduct in UWC I -- stuffing a used pizza plate between a woman's breasts -- constituted sexual misconduct for which he received formal discipline in the form of probation, sensitivity training, and alcohol training. Since the plaintiff waived his right to challenge the findings in UWC I, and since in any event the plaintiff's conduct clearly involved "sexual misconduct," the plaintiff cannot prevail on the breach of contract claim in Count VII(F).

> g.      The UWC Panel Properly Considered UWC I During Deliberations on Culpability

In Count VII(G), the plaintiff alleges that the defendant breached the UWC Procedures because the UWC Panel relied upon the UWC I proceedings in assessing the plaintiff's culpability and discussed those proceedings outside the presence of the plaintiff. (Am. Compl., ¶¶ 286-292.)   The UWC Procedures explicitly state that the panel may take into account a respondent's previous formal discipline for other acts of sexual misconduct when considering culpability.   (Ex. E, p. 6; Ex. BB, ¶ 7.)      The plaintiff received and reviewed the UWC Procedures prior to the hearing, which informed him that the discipline he received as a result of UWC I could be considered when assessing his culpability in UWC II.   (Ex. M, Depo. p. 108-109.)   The UWC Procedures explicitly state that information regarding prior discipline is to be discussed only during the panel's deliberations on culpability, which necessarily occurs outside the presence of the complainant and respondent.   (Ex. E, p. 6.)   The plaintiff was not precluded from discussing UWC I during the UWC II hearing, and, in fact, he took the opportunity to address UWC I in both his response to the Panel report and his appeal from Dean Holloway's decision.   (Ex. L, O.)   Since the UWC Procedures do not require the respondent's presence while the Panel considers the respondent's previous discipline for sexual misconduct, the plaintiff cannot prevail on Count VII(G).

> h.   The UWC Panel Properly Considered the Discipline Imposed by the Executive Committee

In Count VII(H), the plaintiff alleges that Yale breached the UWC Procedures when the UWC II Panel considered the discipline imposed by the Executive Committee in making its recommendation for a penalty in UWC II.   (Am. Compl., 298-304.)   The UWC Procedures provide: "The Secretary will also describe any formal Yale discipline previously imposed on the respondent, and the panel may consider this prior discipline in its recommendations regarding a penalty."   (Emphasis added.) (Ex. E, p. 7; Ex. BB, ¶ 7.)   Ms. Menon testified that a written

reprimand from the Executive Committee constitutes formal discipline and that she was provided a copy of the written reprimand when she requested the record of the plaintiff's formal discipline.  (Ex. LL, Depo p. 169-171.)  The plaintiff has not offered any evidence indicating that it was improper for the UWC Panel to consider the written reprimand issued by the Executive Committee.  The plaintiff also argues that Yale "promised Mr. Montague that the reprimand would only be taken into account if he was subject to another disciplinary proceeding before the *Executive Committee.*"  (Am. Compl., ¶ 297.)  This is inaccurate.  The letter to the plaintiff explicitly stated that the reprimand "would be taken into consideration in determining a penalty if you should ever again be found by the Executive Committee to have committed an infraction of the *Undergraduate Regulations*."  (Ex. X.)  Contrary to the plaintiff's allegations, the letter does not state that <u>only</u> the Executive Committee would consider the reprimand if the plaintiff subsequently violated the Undergraduate Regulations.  Ms. Menon explained that the reprimand was a formal disciplinary matter and, therefore, could be considered by the UWC.  (Ex. LL, Depo. p. 169-171.)  Indeed, the plaintiff's Title IX expert testified that it was appropriate under Yale's Sexual Misconduct Policies and Title IX for the UWC Panel to consider the plaintiff's prior disciplinary history when considering a recommended penalty.  (Ex. AA, Depo. p. 87.)  The plaintiff has offered no evidence to dispute that conclusion.  Therefore, summary judgment should enter on Count VII (H).

### 5.    The Defendant Conducted the UWC II Proceedings with Basic Fairness

In Count VIII, the plaintiff claims that the defendants breached a duty to ensure that the UWC II proceedings were conducted "with basic fairness."  Most of the allegations under Count VIII are included in the breach of contract claims, and the defendants will not readdress those allegations here.  In addition to allegations included in other counts, the plaintiff claims that the

defendants failed to provide him with adequate notice of the complaint against him, failed to provide him an opportunity to respond to the Panel's recommended sanction in advance of a final disciplinary decision, and arbitrarily and capriciously expelled him when a reprimand would have been more appropriate.

While a "university must provide its students with some minimum level of fair play," a private university is not "bound by the requirements of the Sixth Amendment, such as an accused's right to be informed of the nature of the charges, the right to counsel, or the right to confront and cross-examine one's accuser." Doe v. Brandeis Univ., supra, 177 F. Supp. 3d at 572. The district court in Brandeis observed: "[A] private university is not a state or local government, and the courts must recognize and respect the strong interest of a private university in managing its own affairs."[24] Id. at 602. Quoting Doe v. Brown Univ., 166 F. Supp. 3d 177, 183 (D.R.I. 2016), the court noted that "'ensuring allegations of sexual assault on college campuses are taken seriously is of critical importance, and there is no doubt that universities have an exceedingly difficult task in handling these issues.'" Id.

With regard to the adequacy of the notice provided to the plaintiff, the November 18, 2015 UWC complaint informed the plaintiff that a formal complaint of sexual assault was being filed against him based on a report that he had sexually penetrated Ms. Roe without her consent on the night of Saturday, October 18, 2014, at the plaintiff's residence located at 43 Howe Street. (Ex. A.)   Thus, the plaintiff was apprised of the identity of the complaining witness, the date and location of the incident, and the conduct alleged. This is sufficient notice at the outset of the proceedings, particularly when the complaint involves a single incident.

The plaintiff further claims that the defendant failed to provide the plaintiff an opportunity to respond to and challenge the UWC II Panel's recommended sanction in advance

---

[24] The deference to be given to academic disciplinary decisions is fully briefed at pages 9 to 12 of this brief.

of a final disciplinary decision against him.  (Am. Compl., ¶ 308(j).)  The UWC Procedures provide that the complainant and respondent must be provided with the Panel's findings of fact and conclusions. (Ex. E, p. 7.) The UWC Procedures notably do <u>not</u> state that the parties will be provided with the Panel's recommendations.  Indeed, the plaintiff acknowledged in his response to the UWC II Panel Report that: "I understand that I will not know of the panel's recommendation; just of your ultimate decision."[25] (Ex. L, p. 2.) Since the plaintiff was not entitled under the UWC Procedures to learn of the Panel's recommendations, the failure to provide him with that information was not unfair.[26]

Finally, the plaintiff alleges that the defendants arbitrarily and capriciously expelled him when a lesser sanction was more appropriate.  (Am. Compl., ¶¶ 308k, 308l.)  The UWC II Panel Report indisputably demonstrates that the decision was not made arbitrarily or capriciously.  The UWC Panel listened to both the plaintiff and Ms. Roe and detailed the key respects in which their accounts of the incident differed.  (Ex. C, p. 3-6.)  The UWC Panel deliberated at length about issues of credibility and determined that Ms. Roe's account was more credible for a number of reasons, including the following:

- Ms. Roe provided a full, detailed, and consistent account of the incident which was consistent in her written account, her interviews with the fact-finder, and her testimony during the hearing.

- The swipe card records supported Ms. Roe's description of her actions after leaving the plaintiff's house.

- Ms. Roe limited her complaint to a single sexual act during an otherwise consensual encounter, rather than alleging that she was incapacitated by alcohol during her interaction with the plaintiff on September 24, 2014.

---

[25] The copy of the UWC II Panel Report provided to the plaintiff is identical to Exhibit C, with the exception that it does not include the section titled "Recommendation."

[26] As already discussed above, the plaintiff admitted in his deposition testimony that he could have addressed the UWC II Panel on the subject of UWC I if he had chosen to do so, and he in fact did address both Dean Holloway and Provost Polak on that issue when he wrote to them.

- Ms. Roe had no motivation to be dishonest with her friends, the fact-finder, or the panel.
- Ms. Roe sought support from her friends the morning after the incident, called the SHARE Center a few days later, and confronted the plaintiff the following week.

- The plaintiff selectively remembered only the details that were helpful to him.

- The plaintiff told the fact-finder that Ms. Roe gave verbal consent for intercourse, but he told the UWC Panel that she indicated consent through her conduct.

(Ex. C, p. 6-9.)

The plaintiff's expert Attorney Murphy testified that it was appropriate for the UWC Panel to consider all of the above factors in determining the parties' credibility. (Ex. Z, Depo. p. 126-128, 191-192; Ex. AA, Depo. p. 21-22, 75-76.) Attorney Murphy also stated that if the UWC Panel believed Ms. Roe when she said that she had told the plaintiff three times that she did not want intercourse, and then, immediately after the intercourse, the plaintiff said, "I'm sorry, I know you didn't want that," the UWC Panel could logically conclude both that Ms. Roe had not given consent and that the plaintiff was aware that she had not given consent. (Ex. Z, Depo. p.118-119.)

As for the recommended penalty, the UWC II Panel found relevant a previous finding that the plaintiff had violated the Sexual Misconduct Policies and that, at the time of his encounter with Ms. Roe on October 18, 2014, he was on probation. The Panel also took into account that the plaintiff had received sensitivity training and counseling on the appropriate use of alcohol. (Ex. C, p. 9.) The plaintiff admitted at his deposition that he was on probation at the time of the assault and that he had received sensitivity training and alcohol counseling. (Ex. M, Depo. p. 157-158.) In regard to the probation, the Yale Undergraduate Regulations provide: "The commission of a serious offense while on probation will normally result in suspension or

53

expulsion."  (Ex. F, p. 16.) The plaintiff acknowledged that sexual intercourse without consent was a "serious" violation of Yale's Sexual Misconduct Policies.  (Ex. M, Depo. p. 159.) Attorney Murphy, the plaintiff's expert, agreed that intercourse without consent is a "serious" offense under both Title IX and Yale's Sexual Misconduct Policies. She also agreed that since the plaintiff was on probation at the time of his encounter with Ms. Roe, suspension or expulsion were the most likely sanctions under Yale's policies.  (Ex. AA, Depo. p. 77-79.)

The plaintiff had also received a reprimand from the Executive Committee for defiance of authority in connection with the incident in which he interfered with a police investigation. The UWC II Panel was "deeply concerned by the pattern of behavior by Mr. Montague, and his failure to take responsibility for and learn from actions that have caused considerable harm to others."  Although the plaintiff stated that he was sorry if Ms. Roe felt disrespected or harmed, he then spoke at length about the harm the UWC II complaint had caused his academic and athletic performance.  He also told the UWC II Panel that he was an "ideal student, a role model at Yale, and had never experienced anything like this before," which was not consistent with his two previous violations of Yale regulations. (Ex. C, p. 9-10; Ex. M, Depo. p. 159.)  The UWC II Panel considered all of the foregoing when it recommended expulsion.  There was nothing arbitrary or capricious about its deliberations or its recommendation.

Given the foregoing, there is no evidence to suggest that the penalty in this case was inappropriate.  The sanction imposed for any violation of the Sexual Misconduct Policies depends on the circumstances of each case.  While the plaintiff claims that he should have been given a reprimand rather than a suspension or expulsion, he acknowledged in his deposition that he was unaware of a single case where the facts were similar to his and the respondent received only a reprimand. (Ex. M, Depo. p. 189-190.)   In particular, the plaintiff admitted that he was

unaware of any case in which the UWC ordered a reprimand in a case where it found that the respondent had penetrated the complainant despite three separate verbal requests that he not do so.  Id.  The plaintiff has also proffered no evidence to suggest that a reprimand had ever been recommended for a respondent who was already on probation for a prior disciplinary matter.  In short, given the strength of the evidence against him, the plaintiff's failure to accept responsibility for what he had done, the plaintiff's failure to reform his conduct following his previous disciplinary infractions, and the explicit statement of the Yale Undergraduate Regulations that the expected penalty would be suspension or expulsion, there was nothing unfair, capricious, or arbitrary about the expulsion of the plaintiff in this case.

As discussed above on pages 9 to 12 of this brief, courts have recognized the need to give a university broad discretion to decide student disciplinary sanctions and the jury in this case should not be allowed to substitute its judgment for that of the UWC Panel and the Dean of Yale College. An intervention in Yale's processes would be particularly inappropriate given the absence of any evidence to support the plaintiff's claim that, in similar cases, the penalty has been limited to a reprimand. Accordingly, the plaintiff cannot prevail on his claim that the UWC II proceedings were conducted "without basic fairness."

## IV.    Conclusion

For the reasons stated, the Motion for Summary Judgment should be granted.

**THE DEFENDANTS**


BY:___/s/ Patrick M. Noonan (#ct00189)__
     Patrick M. Noonan
     Colleen Noonan Davis (#ct27773)
     Donahue, Durham & Noonan, P.C.
     741 Boston Post Road
     Guilford, CT 06437
     (203) 458-9168


## <u>CERTIFICATION</u>

I hereby certify that, on the above-written date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.


_____/s/_____
            Patrick M. Noonan