UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JACK MONTAGUE | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO.: |
| | : | 3:16-CV-00885-AVC |
| vs. | : | |
| | : | |
| YALE UNIVERSITY, ET AL | : | |
| | : | |
| Defendants | : | MAY 17, 2018 |

## LOCAL RULE 56(a)(1) STATEMENT

1. The plaintiff matriculated at Yale University in the fall of 2012.  (Amended Complaint, at ¶ 11.)

2. Yale University has policies governing sexual misconduct titled "Sexual Misconduct Policies and Related Definitions."  (Ex. D.)

3. The Sexual Misconduct Policies and Related Definitions are consistent with federal law.  (Ex. Z, Depo. p. 192-193, 202-203, 206, 209; Ex. AA, Depo. p. 17-18, 31.)

4. Yale University's University-Wide Committee on Sexual Misconduct ("UWC") addresses formal complaints of sexual misconduct.  The UWC is governed by the "UWC Procedures."  (Ex. E, KK.)

5. On August 25, 2013, Sally Smith filed a complaint with the UWC alleging that the plaintiff folded up his used pizza plate and placed it down her tank top, between her breasts.  This complaint is referred to as UWC I.  (Ex. Q.)

6. Under the UWC Procedures, the UWC Chair, the UWC Secretary, and another member of the UWC must initially determine whether the complaint, if substantiated, would constitute a violation of the Sexual Misconduct Policies. (Ex. KK, p. 4.)

7. The Sexual Misconduct Policies define "sexual misconduct" as "a wide range of behaviors including sexual assault, sexual harassment, intimate partner violence, stalking, voyeurism, and any other conduct of a sexual nature that is nonconsensual, or has the purpose and effect of threatening, intimidating, or coercing a person." (Ex. D, p. 2.)

8. Aley Menon, as the Secretary of the UWC, Michael Della Rocca, as the Chair of the UWC, and David Post, as a member of the UWC, determined that the UWC had jurisdiction over the August 25, 2013 complaint based upon the conduct alleged. (Ex. K, ¶ 5; BB, CC, ¶ 4; NN.)

9. The plaintiff's gender played no role in the decision that the UWC had jurisdiction over the August 25, 2013 complaint. (Ex. K, ¶ 6; Ex. BB, CC, ¶ 5.)

10. Ms. Menon, Mr. Della Rocca, and Mr. Post did not discriminate against the plaintiff based on his gender. (Ex. K, ¶ 14; BB, ¶ 9; CC, ¶ 6.)

11. In response to Ms. Smith's complaint, the plaintiff admitted that he did not remember the incident and did not challenge Ms. Smith's account of the incident. (Ex. T.)

12. Attorney Timothy Pothin conducted an investigation of the UWC I complaint and submitted a Fact-Finder's Report dated September 25, 2013. (Ex. R.)

13. Two witnesses confirmed Ms. Smith's account and reported that they witnessed the plaintiff shove a pizza plate down Ms. Smith's tank top. (Ex. R, p. 3-4.)

14. The plaintiff told Attorney Pothin that he accepted full responsibility for his actions toward Ms. Smith. (Ex. R, p. 4; Ex. M, Depo. p. 48-49.)

15. The UWC I complaint was presented to a five member panel on October 9, 2013. (Ex. S, p. 1.)

16. The plaintiff did not contest the allegations of the UWC I complaint and the UWC I Panel unanimously concluded that he had violated Yale University's Sexual Misconduct Policies and unanimously recommended the imposition of a penalty. (Ex. G, H, I, J, ¶ 3; Ex. K, ¶ 11.)

17. The UWC I Panel concluded that the plaintiff had sexually harassed Ms. Smith when he, without provocation, rolled up a used, paper pizza plate and shoved it down Ms. Smith's shirt between her breasts. (Ex. S, p. 2.)

18. The plaintiff conceded at his deposition that his conduct constituted sexual contact in violation of the Sexual Misconduct Policies. (Ex. M, Depo. p. 50-52.)

19. The UWC I Panel recommended that the plaintiff be (1) placed on probation for four terms, beginning with the Fall Term of 2013 through the Spring Term of 2015; (2) prohibited from holding a leadership position in any student activity, organization or sport; (3) required to immediately enroll in sexual harassment and gender sensitivity training through the SHARE Center; (4) be required to meet with a member of the SHARE Center once each semester, beginning with the Spring Term of 2014, for the remainder of his time at Yale to review and reflect on his interactions and relationships with female students at Yale; and (5) required to receive training on the appropriate use of alcohol. (Ex. S, p. 3.)

20. The plaintiff's gender played no role in the UWC I Panel's conclusion that the plaintiff had violated Yale University's Sexual Misconduct Policies or in their recommendation on the appropriate penalty. (Ex. DD, EE, FF, ¶ 4-5.)

21. The plaintiff did not oppose the UWC I Panel report, because he "understood that [his] conduct was completely inappropriate and wrong and [he] was willing to go through the counseling that had been ordered." (Ex. M, Errata p. 3.)

22. The plaintiff was informed on October 21, 2013 that Dean Mary Miller had accepted the panel's findings of fact, the conclusion, and the recommendations made by the UWC I Panel. (Ex. U, p. 1.)

23. The plaintiff's gender played no role in Dean Miller's decision to accept the UWC I Panel's conclusion that the plaintiff had violated Yale University's Sexual Misconduct Policies or to accept the UWC I Panel's recommendation on the appropriate penalty. (Ex. GG, ¶ 4-5.)

24. The plaintiff chose not to appeal Dean Miller's decision because he "felt [his] conduct was inappropriate and for that reason [he] was willing to accept the panel's counseling orders." (Ex. M, Errata p. 3.)

25. The UWC I Panel members and Dean Miller did not discriminate against the plaintiff based on his gender. (Ex. DD, EE, FF, GG, ¶ 6.)

26. The plaintiff received the sexual harassment and gender sensitivity training and the training on the appropriate use of alcohol required after UWC I. (Ex. M, Depo. p. 52-53, 158.)

27. On September 18, 2015, the plaintiff was notified that Chief of Police Ronnell A. Higgins, had submitted a complaint to the Yale College Executive Committee alleging that the plaintiff's conduct violated that Undergraduate Regulations governing Defiance of Authority. (Ex. V, p. 1)

28. The complaint was based on an incident that occurred on September 6, 2015 when the plaintiff interfered with a police investigation of the well-being of a female student who appeared to be intoxicated and who was being followed by a male student. (Ex. W, p. 4.)

29. On September 24, 2015, the plaintiff was informed that the Coordinating Group of the Executive Committee held a disposition and concluded that the plaintiff's actions were in violation of the Undergraduate Regulations governing Defiance of Authority. The Coordinating Group voted to reprimand the plaintiff. (Ex. X.)

30. The September 24, 2015 letter informed the plaintiff that the reprimand "would be taken into consideration in determining a penalty if you should ever again be found by the Executive Committee to have committed an infraction of the *Undergraduate Regulations*." The letter does not state that only the Executive Committee would consider the reprimand if the plaintiff subsequently violated the Undergraduate Regulations. (Ex. X.)

31. The reprimand from the Executive Committee was a formal disciplinary matter which could be considered by the UWC. (Ex. LL, Depo. p. 169-171.)

32. At the time of the UWC II proceedings against the plaintiff, the Department of Education Office of Civil Rights April, 2011 "Dear Colleague Letter" provided the standard for sexual misconduct procedures under Title IX. (Ex. Z, Depo. p. 132-133.)

5

33. The federal government required educational institutions to allow a complainant to convert an informal process into a formal process, and Yale University was required to inform Ms. Roe of this right.  (Ex. Z, Depo. p. 207-209.)

34. The federal government required educational institutions to evaluate claims of sexual misconduct under the preponderance of evidence standard.  (Ex. Z, Depo. p. 209.)

35. Angela Gleason, a Title IX Coordinator, first met with Ms. Roe on October 19, 2015 and discussed the possibility of an informal process in which the plaintiff would be offered sensitivity training.  (Ex. QQ, Depo. p. 106, 111; Ex. SS, Depo. p. 17.)

36. After her initial meeting with Ms. Roe, Ms. Gleason learned that the plaintiff had already received the sensitivity training that she had discussed with Ms. Roe as an informal resolution and informed Ms. Roe of this fact.  (Ex. QQ, Depo. p. 124-125; Ex. SS, Depo. p. 18-20, 41-42; Ex. RR, ¶ 5.)

37. Ms. Gleason did not inform Ms. Roe that there had been a previous UWC complaint filed against the plaintiff.  (Ex. QQ, Depo. p. 135, 138-139; Ex. SS, Depo. p. 23, 28-29, 33-34, 41-42, 52; Ex. RR, ¶ 3.)

38. Ms. Gleason did not inform Ms. Roe that the sensitivity training the plaintiff received had been mandated because of a prior UWC complaint.  (Ex. QQ, Depo. p. 134-135, 140; Ex. SS, Depo. p. 23, 42; Ex. RR, ¶ 6.)

39. After Ms. Gleason informed Ms. Roe that the plaintiff had received sensitivity training, Ms. Gleason explained that Ms. Roe still had the following options:  (1) offer the plaintiff sensitivity training again in an informal process; (2) abandon the informal complaint;

6

or (3) proceed with a formal complaint, acting either as the complainant or a witness. (Ex. SS, Depo. p. 41-44; Ex. RR, ¶ 8.)

40. Ms. Gleason also informed Ms. Roe that she still had the informal option available. (Ex. QQ, Depo. p. 131; Ex. RR, ¶ 7.)

41. Ms. Gleason did not pressure Ms. Roe to participate in a formal complaint. Ms. Roe chose the formal complaint option of her own volition. (Ex. QQ, Depo. p. 177; Ex. SS, Depo. p. 43-44, 47; Ex. RR, ¶ 8.)

42. After Ms. Roe indicated that she might be interested in filing a formal complaint, Mr. Post met with Ms. Roe solely to answer questions regarding the UWC process. After his meeting with Ms. Roe, Mr. Post responded to Ms. Roe's e-mail that asked additional questions about the formal complaint process. (Ex. MM, Depo. p. 20, 22-26; Ex. QQ, Depo. p. 157-158; Ex SS, Depo. p. 44-45, 47-49; Ex. YY; Ex. K, ¶ 7-8.)

43. Mr. Post did not make any recommendations as to whether Ms. Roe should file a formal UWC complaint. (Ex. MM, p. 25; Ex. SS, Depo. p. 49; Ex. K, ¶ 9.)

44. At no time prior to the UWC II hearing did Mr. Post communicate with Ms. Roe, nor did she communicate with him, about the substance of her complaint against the plaintiff. (Ex. K, ¶ 8.)

45. Ms. Roe was motivated to participate in the formal complaint process because of her own emotions, conversations she had with her suitemates, and her conversation with Ms. Gleason regarding the plaintiff previously receiving sensitivity training. (Ex. SS, Depo. p. 40-41, 55-56.)

46. A subsequent interaction with the plaintiff also played a role in Ms. Roe's decision to participate in the formal complaint process. The day after speaking with Ms. Gleason about the plaintiff having received sensitivity training, Ms. Roe was at a party on a Saturday where the plaintiff was also present. Ms. Roe's friend approached the plaintiff and asked him to leave the party. The plaintiff yelled at Ms. Roe's friend, saying: "There's no reason why I should have to leave this party just because she's here. Like this is ridiculous." When Ms. Roe's friend said that the plaintiff had raped Ms. Roe, he replied: "That was more than a year ago. This is ridiculous." The Monday after this interaction, Ms. Roe informed Ms. Gleason of her willingness to participate in the formal complaint process. (Ex. SS, Depo. p. 84-87.)

47. Ms. Roe decided she wanted to pursue a formal complaint against the plaintiff, provided that a Title IX Coordinator was listed as the complainant. (Ex. SS, p. 40-41, 55-56; Ex. RR, ¶ 8.)

48. On November 18, 2015, Jason Killheffer, as Senior Deputy Title IX Coordinator, filed a complaint of sexual assault with the UWC based upon a report that the plaintiff sexually penetrated Jane Roe without her consent on October 18, 2014. This complaint is referred to as "UWC II." (Ex. A.)

49. The Sexual Misconduct Policies and Related Definitions define "consent" as "positive, unambiguous, and voluntary agreement to engage in specific sexual activity throughout a sexual encounter." The same document further explains that "[c]onsent to some sexual acts does not constitute consent to others, nor does past consent to a given act constitute

8

present or future consent. Consent must be ongoing through a sexual encounter and can be revoked at any time." (Ex. D, p. 2.)

50. Mr. Killheffer filed the complaint pursuant to Section 1 of the UWC Procedures that allows a Title IX Coordinator to bring a complaint to the UWC "when there is evidence that the University's policies on sexual misconduct have been violated and the Coordinator's intervention is needed to ensure that the matter reaches the UWC." (Ex. E, p. 1-2.)

51. Mr. Killheffer did not discuss the filing of a formal complaint with Ms. Roe. In fact, Mr. Killheffer never met or communicated with Ms. Roe until February 23, 2016, after Dean Jonathan Holloway had already accepted the recommendation of the UWC II Panel to expel the plaintiff. (Ex. TT, Depo. p. 165-166; Ex. UU, ¶¶ 3-4.)

52. The plaintiff's gender played no role in Mr. Killheffer's decision to bring a formal UWC complaint in UWC II. (Ex. UU, ¶ 6.)

53. Mr. Killheffer did not discriminate against the plaintiff based on his gender. (Ex. UU; ¶ 7.)

54. Mr. Killheffer did not intend to interfere with Jack Montague's contract with Yale University when he brought the formal complaint in UWC II. (Ex. UU, ¶ 5.)

55. Attorney Miriam Berkman conducted an investigation of the UWC II complaint and submitted a Fact-Finder's Report dated January 15, 2016. (Ex. B.)

56. The UWC II complaint was presented to a five member panel on January 21, 2016. (Ex. C, p. 1.)

57. When a UWC complaint is brought by a Title IX Coordinator, it is the uniform practice of the UWC to allow the complaining witness to submit an opening statement and otherwise participate in the process because he or she has firsthand knowledge of the alleged violation. (Ex. LL, Depo. p. 142-144; Ex. BB, ¶ 6; Ex. MM, Depo. p. 27; Ex. K, ¶ 10.)

58. Ms. Roe reported to both Attorney Berkman and the UWC II Panel that, on two occasions prior to entering the plaintiff's bedroom, she asked him if it was "okay to hookup, but not have sex." (Ex. B, p. 4; Ex. ZZ, p. 1; Ex. C, p. 3, 5.)

59. Ms. Roe also reported to both Attorney Berkman and the UWC II Panel that, as the plaintiff was preparing to penetrate her, she said, "Jack, no, I said I wanted to hook up but not have sex." (Ex. B, p. 5; Ex. C, p. 3, 5.)

60. Ms. Roe also stated to both Attorney Berkman and the UWC II Panel that, after intercourse, the plaintiff said, "I'm really sorry. I know you didn't want that." (Ex. B, p. 5; Ex. ZZ, p. 4; Ex. C, p. 3.)

61. The plaintiff did not doubt that Ms. Roe believed that he had had intercourse with her without her consent: "There is no question that Ms. [Roe] honestly believes I took advantage of her on October 18, 2014. I do not doubt the sincerity of her beliefs as of November, 2015, more than a year after the incident." (Ex. L, p. 1; Ex. M, Depo. p. 163-164.)

62. The plaintiff agreed that to "hook up, but not have sex" could mean any type of sexual contact with the exception of intercourse. He admitted that all of the behavior which the plaintiff and Ms. Roe engaged in prior to penetration would fall within the definition of "hookup, but not have sex." (Ex. PP, Depo. p. 63-65, 102-103, 119-121.)

63. The plaintiff also agreed that if Ms. Roe had asked if it was okay to hook up but not have sex, then he would not have had consent for intercourse. Ex. M, Depo. p. 120-122.)

64. The plaintiff admitted that he understood that prior sexual activity did not provide consent for subsequent sexual activity and that he needed specific consent for each sexual act during a sexual interaction. (Ex. M, Depo. p. 146-147; Ex. PP, Depo. p. 67-69.)

65. The plaintiff reported to Attorney Berkman that he had asked Ms. Roe if she wanted to have sex and that Ms. Roe responded, "okay." However, the plaintiff only mentioned non-verbal indicators of consent to the UWC II Panel. (Ex. B, p. 10; Ex. C, p. 5, 8-9.)

66. When speaking with Attorney Berkman, the plaintiff did not remember that he had had four sexual encounters with Ms. Roe, only recalling three such encounters. The plaintiff also did not remember going to a party at a different location after having intercourse with Ms. Roe. (Ex. M, Depo. p. 128.)

67. The plaintiff admitted that he made statements to Attorney Berkman that turned out to be untrue. (Ex. M, Depo. 129; Errata p. 3.)

68. The UWC II Panel deliberated at length about the issues of credibility and ultimately found Ms. Roe's account more credible. (Ex. C, p. 6.)

69. The UWC II Panel identified specific reasons that it credited Ms. Roe's version of the events over that of the plaintiff. Ms. Roe provided a full and detailed account of her encounter with the plaintiff in her interviews with the fact-finder and the UWC II Panel. Her contemporaneous text to her friend, her undated written account, and her testimony at the

11

hearing were all detailed and consistent. Ms. Roe raised concerns about a single sexual act during an otherwise consensual encounter, rather than alleging that she was incapacitated by alcohol during her interaction with the plaintiff on September 24, 2014. Ms. Roe had no motivation to be dishonest with her friends, the fact-finder, or the panel. Ms. Roe sought support from her friends the morning after the incident, called the SHARE Center a few days later, and confronted the plaintiff the following week. (Ex. C, p. 6-8.)

70. On the other hand, the plaintiff had a selective memory of the incident and a shifting recollection of how he gauged consent. The plaintiff remembered certain key details that were most helpful to him, but remembered few other details of the night. He told the fact-finder that he asked Ms. Roe if she wanted to have sex and Ms. Roe said "okay," providing verbal consent. However, when asked by the UWC II Panel, the plaintiff did not mention verbal consent, and instead remembered that Ms. Roe provided only non-verbal consent. (Ex. C, p. 8-9.)

71. In determining the issue of credibility, the UWC II Panel properly considered the factors listed in Paragraphs 69 and 70. (Ex. Z, Depo. p. 126-128, 191-192; Ex. AA, Depo. p. 21-22, 75-76.)

72. The UWC Procedures provide: "In determining culpability, the panel may also take into account a respondent's previous formal discipline for other acts of sexual misconduct, including written reprimands, and the respondent's criminal conviction arising out of the events complained of." (Ex. E, p. 6.)

73. The UWC Procedures provide: "The Secretary will also describe any formal Yale discipline previously imposed on the respondent, and the panel may consider this prior discipline in its recommendations regarding a penalty." (Ex. E, p. 7.)

74. In accordance with the UWC Procedures, Ms. Menon informed the UWC II Panel of Jack Montague's disciplinary history with the UWC and the Executive Committee. (Ex. LL, Depo. p. 169-171; Ex. BB, ¶ 7; Ex. AA, Depo. p. 87.)

75. When considering the appropriate penalty, the UWC II Panel found relevant a previous finding that the plaintiff had violated the Sexual Misconduct Policies and that, at the time of his encounter with Ms. Roe on October 18, 2014, he was on probation and had received sexual harassment and gender sensitivity training and education and counseling on the appropriate use of alcohol. The plaintiff admitted that the foregoing facts were true. (Ex. C, p. 9; Ex. M, Depo. p. 157-158.)

76. The Yale Undergraduate Regulations provide: "The commission of a serious offense while on probation will normally result in suspension or expulsion." (Ex. F.)

77. The plaintiff and his Title IX expert agreed that sexual intercourse without consent was a "serious" violation of Yale's Sexual Misconduct Policies. (Ex. M, Depo. p. 159; Ex. AA, Depo. p. 77-78.)

78. The Title IX expert also agreed that since the plaintiff was on probation at the time of his encounter with Ms. Roe, suspension or expulsion were the most likely sanctions under Yale's policies. (Ex. AA, Depo. p. 78-79.)

79. After considering all of the evidence, the UWC II Panel unanimously concluded that the testimony of Ms. Roe was more credible than that of the plaintiff. Accordingly, the UWC II Panel unanimously concluded that Jack Montague had violated Yale's Sexual Misconduct Policies. The UWC II Panel also unanimously decided to recommend expulsion. (Ex. C, p. 6-10; Ex. G, H, I, J, ¶ 3; Ex. K, ¶ 11.)

80. The plaintiff's gender played no role in the UWC II Panel's conclusion that the plaintiff had sexually assaulted Ms. Roe in violation of Yale University's Sexual Misconduct Policies or in their recommendation that Jack Montague be expelled from Yale University. (Ex. G, H, I, J, ¶ 4-5; K, ¶ 12-14.)

81. The plaintiff's Title IX expert testified that if the UWC II Panel concluded that the testimony of Ms. Roe was more credible than that of the plaintiff, then one reasonable conclusion would be that the plaintiff had violated Yale's Sexual Misconduct Policies. She also stated that if the UWC II Panel believed Ms. Roe when she stated that she had told the plaintiff three times before intercourse that she didn't want intercourse, and then immediately after the intercourse the plaintiff stated: "I'm sorry, I know you didn't want that," then the UWC II Panel could logically conclude that Ms. Roe had not given consent and the plaintiff was aware that she had not given consent. (Ex. Z, Depo. p. 118-120.)

82. The plaintiff agreed that if Ms. Roe had twice asked the plaintiff if it was okay with him to "hook up," but not "have sex," and then, immediately before the plaintiff penetrated her, Ms. Roe told him no and that she had said she wanted to hook up but not have

sex, then it would have been appropriate for the UWC II Panel to conclude that the plaintiff had violated the Sexual Misconduct Policies. (Ex. M, Depo. p. 119-123, 148-149, 232-233.)

83. The plaintiff and his Title IX expert agreed that if the UWC II Panel believed Ms. Roe's account of the incident underlying UWC II, then it would be appropriate for the UWC II Panel to conclude that the plaintiff had violated the Sexual Misconduct Policies. (Ex. M, Depo. 149; Ex. Z, Depo. p. 118-119.)

84. The UWC Procedures provide that the complainant and respondent must be provided with the Panel's findings of fact and conclusions, and the plaintiff understood that he would not be informed of the Panel's recommendations. (Ex. E, p. 7; Ex L, p. 2.)

85. On February 10, 2016, Dean Holloway accepted the UWC II Panel's findings of fact and the UWC II Panel's conclusion that the plaintiff had sexually assaulted Ms. Roe in violation of Yale's Sexual Misconduct Policies. He decided that the appropriate penalty was expulsion, the penalty that had been recommended by the UWC II Panel. (Ex. N.)

86. The plaintiff's gender played no role in Dean Holloway's decision to accept the panel's conclusion or that expulsion was the appropriate penalty. (Ex. HH, ¶ 3-4.)

87. The UWC II Panel members and Dean Holloway did not discriminate against the plaintiff based upon his gender. (Ex. G, H, I, J, ¶ 6; Ex. K, ¶ 14; HH, ¶ 5.)

88. The plaintiff filed an appeal from Dean Holloway's February 10, 2016 decision. (Ex. O.)

89. On February 24, 2018, Provost Benjamin Polak denied the plaintiff's appeal. (Ex. P.)

90.     The plaintiff's gender played no role in Provost Polak's decision to deny the plaintiff's appeal.  (Ex. II, ¶ 3.)

91.     Provost Polak did not discriminate against the plaintiff based upon his gender.  (Ex. II, ¶ 4.)

                        THE DEFENDANTS

BY:___/s/ Patrick M. Noonan (#ct00189)__
      Patrick M. Noonan
      Colleen Noonan Davis (#ct27773)
      Donahue, Durham & Noonan, P.C.
      741 Boston Post Road
      Guilford, CT 06437
      (203) 458-9168

**CERTIFICATION**

I hereby certify that, on the above-written date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

              _____/s/_____
                    Patrick M. Noonan