# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| JACK MONTAGUE, | ) Civil Action No. 3:16-cv-00885-AVC |
| Plaintiff, | ) |
| v. | ) |
| YALE UNIVERSITY, ANGELA GLEASON, and JASON KILLHEFFER, | ) ORAL ARGUMENT REQUESTED |
| Defendants. | ) |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Max D. Stern (*pro hac vice*)
mdstern@toddweld.com
Alexandra H. Deal (*pro hac vice*)
adeal@toddweld.com
Christian G. Kiely (*pro hac vice*)
ckiely@toddweld.com
TODD & WELD LLP
One Federal St., 27th Floor
Boston, MA 01880
Tel. (617) 720-2626
Fax (617) 227-5777

William F. Dow III (ct00161)
JACOBS & DOW, LLC
350 Orange Street
New Haven, CT 06511
wdow@jacobslaw.com
Tel. (203) 772-3100
Fax (203) 772-1691

Dated: July 18, 2018

**Table of Contents**

i.     **Introduction** ............................................................................................1

ii.    **Factual Background** ................................................................................2

      Montague's Sexual History with Roe ...........................................................2

      The Environment Concerning the Sexual Assault Issue at Yale ..........................4

      The Genesis of the Complaint Against Montague ............................................6

            *The Title IX Office Learns of an Accusation Against Montague* ...........................6

            *Roe Elects to File an Informal Complaint* .................................................8

            *Yale's Title IX Office Decides to Pursue a Formal Complaint Against Montague* ........8

            *Roe Is Manipulated into Authorizing a Formal Complaint Against Montague* ...........9

            *"UWC I" – The "Pizza Plate Incident" and Complaint of Sexual Harassment* ........10

      "UWC II" – The Formal Complaint Against Montague for Sexual Assault ..................11

            *The Fact-Finder's Investigation* .........................................................11

            *UWC II Panel Hearing* ...................................................................14

            *The Decision Against Montague* .........................................................14

            *Montague's Appeal is Denied* ...........................................................17

      Montague's Expulsion is Celebrated at Yale .................................................18

iii.   **Summary Judgment Standard** .................................................................19

iv.    **Argument** .............................................................................................20

   I.    Yale Breached Its Contract With Montague By Failing To Observe The *UWC Procedures*, Acting Arbitrarily, Capriciously, and in Bad Faith, and Denying Him Basic Fairness .........................................................................................21

A.  Yale Repeatedly Violated The *UWC Procedures*, Denied Montague
    Basic Fairness, and Breached the Implied Covenant of Good Faith
    and Fair Dealing In Its Handling of The UWC II Complaint ......................................23

    1.  Yale Violated Its Duty Of Impartiality By Inducing Roe To
        Authorize It To File A Formal Complaint .......................................................23

    2.  Yale Violated Its Obligation to Maintain Confidentiality by Improperly
        And Misleadingly Disclosing To Roe That Montague Was the Subject
        of a Prior Complaint and That He Had Already Received Training...............26

    3.  Yale Failed to Provide Montague With Adequate Notice Under The
        Circumstances Of The Charges Against Him ..................................................31

    4.  UWC Chairman David Post Violated The *UWC Procedures* by Appointing
        Himself to the UWC Panel After Having Helped to Convince Roe to
        Authorize a Formal Complaint ......................................................................32

    5.  The Collection, Consideration and Reporting of the Evidence by the
        Fact-Finder and the UWC Panel Was Incomplete, Flawed and Biased, In
        Violation of The Requirements of Montague's Contract With Yale ..............33

        a.  The Admitted Failure to Seek Exculpatory Evidence...............................34

        b.  The Double Standard as to Consistency ...................................................35

        c.  The Failure to Probe Roe's Apparent Motive...........................................36

        d.  The Transformation and Obliteration of Undisputed
            Evidence....................................................................................................38

        e.  The Flawed and Biased Collection, Consideration and Reporting of the
            Evidence by the Fact-Finder and the Panel Irreparably Tainted the
            Panel's Finding Against Montague...........................................................41

    6.  The UWC II Panel Violated the *UWC Procedures* and Offended Basic
        Fairness by Erroneously Relying On The UWC I Proceedings and
        Considering Them Outside Montague's Presence and Without Affording
        Him an Opportunity to Respond ....................................................................42

        a.  Erroneous Consideration of UWC I........................................................42

        b.  The *In Camera* Consideration of UWC I................................................42

7.   Yale Violated the *UWC Procedures* and Denied Montague Basic Fairness by Allowing Roe Full Participation In a Complaint Filed by the Title IX Office ................................................................44

8.   Considered As a Whole, Yale's Conduct With Respect to the UWC II Matter Deprived Montague of the Basic Fairness To Which He Was Entitled Under His Contract With Yale ................................................................44

B.   Yale Breached Its Contract With Montague in the UWC I Matter Because The Conduct At Issue Did Not Meet the Definition of Sexual Harassment Under Yale's Policies ................................................................46

1.   The Pizza Plate Incident Did Not Involve "Conduct Of A Sexual Nature" ................................................................47

2.   The Pizza Plate Incident Did Not Interfere With Sally Smith's Academic Performance Or Create An Intimidating Or Hostile Academic Environment ................................................................49

3.   Yale's "Exhaustion of Administrative Remedies" Defense Fails Because No Mechanism Existed For Montague to Challenge the Jurisdiction of the UWC to Hear the Pizza Plate Complaint ................................................................50

II.   The Evidence Supports Montague's Claim That His Expulsion Was Motivated At Least In Part By His Gender In Violation of 20 U.S.C. § 1681(a) ("Title IX") ................................................................51

A.   Montague Has Established A Prima Facie Case of Gender Discrimination ................................................................53

B.   The Evidence Supports The Proposition That Yale's Proffered Legitimate Nondiscriminatory Reason for Expelling Montague Is Not Entitled to Credence ................................................................56

III.   Montague's Claims for Tortious Interference Against Gleason and Killheffer Survive ................................................................57

v.   **Conclusion** ................................................................58

iv

## i. Introduction

Plaintiff Jack Montague ("Plaintiff" or "Montague") submits this Opposition to Defendants' Motion for Summary Judgment.  In this lawsuit, Montague asserts claims for breach of contract, tortious interference with contract, and gender discrimination in violation of Title IX, arising from Yale University's improper and bad faith conduct which culminated in Mr. Montague's expulsion from Yale in February 2016 for alleged sexual misconduct which had occurred more than a year earlier.  Montague, who was captain of the Yale men's basketball team, was expelled during his senior spring, just one semester shy of earning his degree, and on the eve of Yale's first appearance in the NCAA men's basketball tournament in over 50 years.

At the time of Montague's expulsion, Yale was at the epicenter of a national outcry over universities' handling of sexual misconduct complaints.  The Department of Education's Office of Civil Rights had cited Yale for its lack of prompt and equitable grievance procedures and its insufficient responses to complaints of sexual harassment.  Yale implemented reforms to its sexual misconduct adjudicatory process in response; however, students and alumni continued to publicly criticize what they perceived to be Yale's inadequate responses to complaints of sexual misconduct and, in particular, lenient penalties for sexual assault.

It was against this backdrop that Defendants misled and pressured a female Yale undergraduate, Jane Roe[1] ("Roe") to participate in a formal complaint process against Montague accusing him of sexual assault.  After receiving a third party report accusing Montague of sexually assaulting Roe over a year earlier, Defendant Angela Gleason ("Gleason"), the Deputy Title IX Coordinator for Yale College, coaxed Roe to come forward by relaying a message that Roe could make an informal, anonymous complaint that would result in Montague receiving a recommendation for consent training.  After Roe had expressed to Gleason a clear intention to

---

[1] A pseudonym.

seek only an informal resolution, Gleason then proceeded to manipulate Roe into abandoning that desired goal and authorizing the Title IX office to file a formal complaint which put Montague in jeopardy of expulsion.  With Roe's participation secured, Montague's fate was all but sealed.  In the UWC adjudicatory process that followed, both the procedure and the evidence against Montague were distorted at every turn and ultimately, a UWC panel found him responsible and Yale expelled him.  This lawsuit followed.

Defendants' Motion for Summary Judgment ignores the substantial evidence in the record of Defendants' multiple violations of the *UWC Procedures*, which, taken either individually or in combination, denied Montague the basic fairness to which he was entitled under his contract with Yale.  As to the Plaintiff's Title IX claim, there is sufficient evidence in the record to make out a jury question as to whether that same arbitrary, capricious, and bad faith conduct by the Defendants, which thoroughly undermined the outcome of his disciplinary proceeding, was motivated at least in part by Plaintiff's status as a high-profile varsity male athlete.  Defendants' Motion should be denied.

## ii. Factual Background

### Montague's Sexual History With Roe

This case, at its core, concerns whether Jack Montague was properly found responsible for (and properly punished for) sexually assaulting a fellow Yale student, Jane Roe, on October 18, 2014, following a party at Montague's off-campus house.  That night was the fourth encounter of a casual sexual relationship between Montague and Roe that took place over two months in the fall of 2014.  *See* Ex. B at YALE00011540.  The undisputed facts of that relationship, as they were presented to Yale's appointed fact-finder, are as follows:

- In early September 2014, Montague and Roe met at a party at Montague's off-campus house.  *Id.*  On that first occasion, Roe spent the night in Montague's bed, where the two engaged in "sexual touching".  *Id.* at -11540, 547.

- On the second occasion, approximately two weeks after the first, Roe again spent the night in Montague's bed, waking him up in the morning to perform oral sex. *Id.* at -11547.

- On the third occasion, Roe again joined Montague in his bed, took off all her clothes, and they engaged in consensual sexual contact, including intercourse, to which she verbally consented.  *Id.* at -11540.   Roe told her friends that she was sexually attracted to Montague but had no romantic interest in him, and that she regretted having had sex with him.  *Id.* at 11542, -552; Ex. 1[2] at 57-58.

- On the fourth occasion, Roe went to a party at Montague's house with her friends, and when her friends left, Roe stayed there with Montague over her friends' disapproval.  Ex. 1 at 9-12.  She once again joined him in his bed, again voluntarily removed all her clothing, and voluntarily engaged in sexual foreplay with Montague, including allowing him to digitally penetrate her.  Ex. B. at -11540; Ex. 2 at 31.  And, as on the previous occasion, the encounter culminated in sexual intercourse.  Roe and Montague then left his room and went their separate ways.  Ex. B at -11544.  Later that same night, she reached out to him to meet up again, then returned to his room voluntarily and spent the rest of the night in bed with him.  *Id.* Roe later told the fact-finder that she did not want to return home to her dorm that night because she did not want to face any questions from her suitemates.  *Id.*

    The next morning, Roe finally returned to her dormitory.  *Id.* at -11545.  Accounting for where she had been and what had happened, she related to her suitemates that she had been raped by Montague over what she said was her express verbal objection and physical resistance, without revealing to them that she had freely engaged in other sexual acts with Montague prior to the alleged assault.  *Id.* at 11550-54.  Despite this claim of alleged rape, Roe did not make any

---

[2] Plaintiff's exhibits have been assigned numbers in order to differentiate from exhibits submitted by Defendants, which were assigned letters.

complaint to the University – not even an informal one – until over a year later, after Yale

engaged in extraordinary efforts, discussed below, to induce her to prosecute Montague.

**The Environment Concerning the Sexual Assault Issue at Yale**

At the time of the events giving rise to this lawsuit, Yale had for years been at the

forefront of the national controversy over sexual misconduct on college campuses.  Shortly

before Montague enrolled at Yale in 2012, the Department of Education Office of Civil Rights

("OCR") cited Yale for its lack of prompt and equitable grievance procedures and its insufficient

responses to complaints of sexual harassment.  *See* Ex. 3; Ex. 4 at 44.  In response, Yale

completely overhauled its process for adjudicating complaints of sexual misconduct, by

establishing a dedicated campus sexual misconduct tribunal, the University Wide Committee on

Sexual Misconduct ("UWC"), and adopting the *Procedures Governing the University Wide*

*Committee on Sexual Misconduct* ("*UWC Procedures*"), which sets out the rights and

responsibilities of the University, accuser, and accused in the case of a complaint of sexual

misconduct.[3]  However, students and alumni continued to question what they perceived to be

Yale's inadequate, and in some cases, offensive responses to complaints of sexual misconduct

and publicly chastised Yale for its shortcomings.  *See, e.g.*, Ex. 6; Ex. 7; Ex. 8. [4]

In one prominent example, the release of the July 31, 2013 edition of Yale's semi-annual

report of sexual misconduct complaints, *see supra* n. 3, sparked outrage among students and

---

[3] *See* Ex. 5.  At the same time, Yale established the Sexual Harassment and Assault Response and Education ("SHARE") Center, which serves as the initial place of referral for students seeking services and options as a result of alleged sexual misconduct.  *Id.*  It also began publishing semi-annual reports containing statistical and other information concerning all complaints of sexual misconduct reported to Yale authorities in the preceding six month period.  *Id.* at 4.

[4] Indeed, the criticisms of Yale in this regard had spread beyond Yale, with Yale being held out as a national example of how not to handle sexual assault complaints.  A prominent campus activist at Columbia University, for example, was quoted as saying "[W]e want to make sure that what's happening at Yale isn't happening here at Columbia."  *Doe v. Columbia University*, 831 F.3d 46, 51 (2d Cir. 2016).

alumni and in the national media, who accused Yale of being too lenient in its punishment of students found responsible for sexual assault.[5]  This criticism was based on the report's revelation that five of six male Yale students found responsible for "nonconsensual sex" in the time period covered by the report received either a written reprimand, or in one case, probation.[6] Ex. 4 at 67-68.   In an open letter to Yale President Peter Salovey and Yale's Chief Title IX Coordinator, Deputy Provost Stephanie Spangler, some 229 Yale alumni and students complained that Yale was minimizing the seriousness and extent of the sexual assault problem on the Yale campus and called on Yale to "punish perpetrators of sexual assault in a way that recognizes the gravity of these crimes[.]"  Ex. 6.

The September 21, 2015 publication of the results of a survey conducted by the Association of American Universities ("AAU") on the incidence of sexual misconduct on college campuses roiled the Yale campus once again.  *See* Ex. 10.  The survey results revealed that rates of alleged undergraduate sexual assaults at Yale were the third-highest among 27 schools surveyed, and incredibly, estimated that more than one third of Yale senior women (34.6%) experienced an incident meeting the definition for criminal sexual assault during their four years at Yale. Ex. 11 at 3; Ex. 4 at 89.[7]  In a letter to the Yale community published that same day, President Salovey expressed that he was "deeply distressed" by the "extremely disturbing" results of the survey, and in particular, the incidence of sexual assaults committed against undergraduate women. Ex. 12.  "The survey results," he wrote, run "counter to our most

---

[5] Ex. 4 at 63-64, 72-74; Ex. 6; Ex.7, "Yale Officially Declares 'Nonconsensual Sex' Not That Big of a Deal," Jezebel, August 1, 2013; Ex. 8, "Yale Fails to Expel Students Guilty of Sexual Assault," Huffington Post, August 1, 2013.

[6] The sixth student was suspended but not expelled.  *See* Ex. 9.

[7] Using Yale's definition of sexual assault, it was estimated that almost half of all senior women (46.5%) would experience at least one sexual assault in their four years at Yale.  *See* Ex. 11 at 3.

fundamental values" and "make clear . . . that we must redouble our efforts." *Id.*[8]  The results of

the AAU survey caused much consternation on the Yale campus.  *See* Ex. 10.  Ultimately, the

administration held hundreds of meetings across campus to present the data and discuss Yale's

response, and the results were a topic of discussion at a subsequent training held for Title IX and

UWC personnel in the fall of 2015.  Ex. 2 at 90-92; Ex. 4 at 93-97.  All of the major players in

the Yale administration, including the Dean who would ultimately decide Montague's fate, were

at great pains to reassure the campus community that they were taking the results seriously and

committed to taking action.  *See* Ex. 10.

**The Genesis of the Complaint Against Montague**

*The Title IX Office Learns of an Accusation Against Montague*

*On the very same day that President Salovey called for a "redoubling of efforts" in*

*response to the results of the AAU survey*, Defendant Angela Gleason, the Deputy Title IX

Coordinator for Yale College, was informed by Roe's suitemate, Rachel Rogers[9], that the captain

of the men's basketball team, Montague, had "raped" a friend of hers, and what is more, that

Rogers heard (from a friend of a friend) that he had committed "another rape" as well.  Ex. 13;

Ex. 14; Ex. 15 at 76-77, 82-83; Ex. 1 at 52-53, 83.[10]  However, Rogers reported that her friend,

the alleged victim, was not interested in coming forward.  Ex. B at -11553-54.

This report set off alarm bells and left Yale's Title IX office with a troublesome

predicament.  Under Yale's policies and procedures, Yale could not initiate the type of "formal"

---

[8] Yale's Chief Title IX Officer, Deputy Provost Stephanie Spangler wrote in an introduction to the Yale-specific survey results that "Yale's relatively high response rate underscores the importance of the survey to our students and reflects a community that is both sensitized and engaged in the effort to combat campus sexual assault."  Ex. 11 at 2.

[9] A pseudonym.

[10] Although Rogers did not disclose Roe's name in her initial meeting with Gleason, Gleason asked Rogers to disclose Montague's name so that she could check the records of the Title IX office to determine whether he had prior complaints against him and she therefore needed to take action on behalf of the University.  Ex. 1 at 82-84.

proceeding against Montague needed to suspend or expel him unless it had Roe's agreement and participation.[11]  But, if it emerged that, faced with Rogers' incendiary report, Yale had done nothing, there could be little doubt the campus would erupt.[12]

The Yale administration resolved this dilemma by embarking on a campaign to coax Roe to file a formal complaint or to authorize the University to file one on her behalf.  The first step was to induce her to file an "informal" complaint which would have entailed anonymity for Roe, and counseling but no punishment for Montague.[13]  Once that was accomplished, Yale officials then set out to use every means at their disposal to persuade Roe to escalate to a "formal" complaint against Montague, which could lead to his expulsion.

Thus, over the weeks that followed their initial meeting, Gleason repeatedly emailed Rogers urging her to convince Roe – whose name Rogers had still yet to reveal – to come forward and report the incident.  Ex. 19; Ex. 1 at 28-31.  Roe, however, remained hesitant even to speak to Gleason, *id.*; Ex. 1 at 87, but finally agreed to do so only after Rogers relayed a message from Gleason that Roe could pursue an "informal," anonymous complaint, which would

---

[11] Under Yale's policies, the Title IX office can only proceed with a formal complaint absent the agreement and participation of the complainant if it is determined that the respondent poses a threat to the community.  Ex. 17 at 55-56; Ex. 4 at 30-31; Ex. 18 at 5.  There is no evidence that Yale considered Montague to pose a threat to the community. *See, e.g.*, Ex. 17 at 115 (stating that the reason the Title IX office decided to pursue a formal complaint was due to the "seriousness" of the allegation and Montague's "prior history" with the UWC).  Of course, if Yale determined that Montague posed such a threat, Roe's participation in the process would not have been necessary.

[12] That this news would have been met with outrage on campus can be seen in the equally intense reaction to the news of Montague's expulsion, *see infra* p. 18

[13] A member of the Yale community who reports a sexual assault to the University generally has three options for resolution available: 1) an informal complaint; 2) a formal complaint proceeding before the University Wide Committee on Sexual Misconduct ("UWC"); or 3) a referral to the Yale Police Department for a possible criminal complaint.  Ex. 17 at 38-40.  The UWC formal complaint process involves an investigation by a University-appointed fact-finder, a hearing before a five-member panel of the UWC, and possible disciplinary sanctions up to an including expulsion.  Ex. 9 at 2.  Informal resolution does not include an investigation or formal findings; rather, its goal is to achieve a resolution that is desired by the complainant and acceptable to the respondent, such as a referral to training on sexual consent.  Ex. 17 at 41-42.  In an informal resolution, the complainant's identity can be kept confidential; in a formal complaint proceeding, her name must be disclosed to the respondent and she must agree to be interviewed by a fact-finder.  Ex. 9 at 2; Ex. 17 at 131.  According to Yale's Title IX office, "[t]he choice of an informal process does not imply the matter is less serious than those matters pursued through formal processes[.]"  Ex. 9 at 2.

not result in any suspension or expulsion for Montague.  Ex. 20 at 11-13; Ex. 1 at 32, 87.

Gleason explained that she could have a discussion with Montague about the October 2014

incident and recommend training about communication and sexual consent, and the matter would

be resolved.  Ex. 1 at 87-89.  Roe was satisfied with this course of action.  Ex. 20 at 11-13.  On

this basis, she finally agreed to meet with Gleason on October 19, 2015 to discuss implementing

this plan.  *Id.* at 17-18; Ex. 21.

### Roe Elects to File an Informal Complaint

Roe testified in her deposition that upon the conclusion of her October 19, 2015 meeting

with Gleason, she believed she had made an informal complaint and "left understanding that

[Gleason] would . . . reach out to Jack and offer him the sensitivity training."  Ex. 20 at 17-18.

On October 28, 2015, Gleason confirmed to Roe that she planned to reach out to Montague on

the following Monday, November 2.  Ex. 22.

### Yale's Title IX Office Decides to Pursue a Formal Complaint Against Montague

Gleason did not end up contacting Montague on November 2, however.  Instead, she was

called to a meeting of the University's Title IX leadership – Chief Title IX Officer and Deputy

Provost Stephanie Spangler, Defendant Deputy Title IX Coordinator Jason Killheffer and Deputy

General Counsel Susan Sawyer – to "discuss the Jack M. case".  Ex. 23; Ex. 15 at 119-125.  At

the meeting on November 4, 2015, the attendees decided that the University would pursue a

*formal* complaint against Montague if Roe's participation could be obtained, notwithstanding

Roe's stated preference to resolve her complaint against Mr. Montague informally and without

punishing him, and notwithstanding their inability to confirm the unsubstantiated, third-hand

rumor Rogers relayed to Gleason concerning "another rape."  *Id.*, Ex.  17 at 109-120.  (Days

later, Gleason contacted the alleged victim of the other rape, who refused to confirm any incident

with Montague).  Ex. 15 at 102.   Therefore, to proceed, Roe would need to be convinced to abandon her informal complaint, give up her anonymity, and participate in a formal complaint process.

### *Roe Is Manipulated into Authorizing a Formal Complaint Against Montague*

Later that day, Gleason emailed Roe to inform her that there had been a "new development" in her case and that they needed to meet.  Ex. 24.  At the meeting, according to the report of the fact-finder's investigation that would follow, Gleason informed Roe that "she would not be able to keep [Roe's] name confidential" because "*Mr. Montague had already been given a recommendation for training after a previous complaint and so that option was no longer open to him*."  Ex. B at -11547 (emphasis added).  There was actually nothing "new" about this fact; it was not only contained in the records of the Title IX office, but Gleason's supervisor, Killheffer, told her about Montague's prior complaint before she ever met with Roe.  Ex. 17 at 93.  As Roe would later explain in her opening statement delivered to the UWC panel, Gleason told Roe that she now believed that she "wouldn't be doing her job if she did not take more serious action" and "asked for [Roe's] participation"  in a formal complaint process.  Ex. 25; Ex. 20 at 42-43.  Near the end of her meeting with Roe, Gleason brought in UWC Chairman David Post, whom she had asked to be on "standby."  Ex. 26; Ex. 15 at 156-58.  Post explained to Roe that she would have the option of serving as the complainant, or having the University Title IX office file the complaint in its own name on her behalf, which he presented as a "comfort" to her.  Ex. 20 at 48-49.[14]  At the conclusion of the meeting, Roe told Gleason that she would "take the weekend" to think things over.  *Id.* at 44-45.

---

[14] Post further explained that the two options were functionally the same in terms of Roe's participation in the process, except that with the latter option the complaint against Montague would effectively be brought in the name of the University.  Ex. 20 at 48-49; Ex. 27 at 25-27.

On Monday, November 9, 2015, Roe emailed Gleason to inform her that she had decided to allow the Title IX office to file a formal complaint against Montague on her behalf.  Ex. 28 at YALE0000433.  As she would later tell the UWC panel which would hear the case, Roe's November 6, 2015 meeting with Gleason "reframed the incident" for her, made her believe that her experience with Montague was not the product of a "one-time mistake" on Montague's part, and caused her to participate in the filing of a formal complaint against Montague.  Ex. 25. According to the fact-finder's report, "[Roe] was especially motivated to participate in the investigation and hearing process after she heard that Mr. Montague has already had another complaint against him as she felt it was important to protect other women."  Ex. B at -11547. Roe confirmed this motivation in her opening statement to the UWC panel:  "My perspective broadened after my conversation with Angie [Gleason], as I began to think about the other people on this campus and how my choosing to remain silent on this matter could harm them.  I did feel as though my hands were tied; I could not, in good conscience, say no to participating in the investigation."  Ex. 25 at 2.

### *"UWC I" – The "Pizza Plate Incident" and Complaint of Sexual Harassment*

Not only was Gleason's disclosure of the existence and outcome of the prior UWC proceedings against Montague strictly prohibited by the *UWC Procedures* and the *Provost's Statement on Confidentiality of UWC Proceedings*, as will be discussed below, it was also highly misleading.  The subject of Montague's prior UWC involvement (hereafter, "UWC I") bore no resemblance, and had no relationship, to Roe's allegations, and the training he received as a result of the UWC I process had nothing to do with sexual consent.  In reality, Montague had been accused by a graduating senior, Sally Smith,[15] of taking a rolled up paper plate and, in a

---

[15] A pseudonym.

moment of irritation with Smith for belittling him, shoving it down the front of her shirt.  Ex. R

at YALE00001856.  Smith made clear that Montague had not made skin-to-skin contact or said

anything offensive or inappropriate to her during the incident.  Ex. 29 at 23-24; Ex. R at

YALE0008157; Ex. OO.  Montague did not defend his conduct, but he did not admit that the

conduct constituted sexual misconduct.  Ex. 33 at 39.  Nevertheless, when Smith filed a

complaint with the UWC months later, after she had already graduated from Yale, Montague was

charged with and found responsible for sexual harassment and ordered to enroll in sexual

harassment and gender sensitivity training through Yale's SHARE Center.  Ex. S.  As SHARE

Center Director Carol Goldberg later wrote, the offense and training tailored to it concerned

Montague's "immature, inexcusable conduct as a drunk freshman"; it was "not about sexual

consent."  Ex. 30.

## "UWC II" – The Formal Complaint Against Montague for Sexual Assault

As a direct result of Gleason's efforts as described above, Roe agreed to allow Yale's

Title IX office to bring a formal complaint of sexual misconduct against Montague.  On

November 18, 2015, the University's Senior Deputy Title IX Coordinator, Defendant Killheffer,

filed a formal complaint of sexual assault against Montague, and on November 30, 2015,

Montague was notified in writing that he was the subject of a complaint alleging that he had

"*sexually assaulted a Yale College student on the night of October 18, 2014, at [his] residence*."

Ex. 32; Ex. A (emphasis added).  The only additional information given to Montague was the

name of his accuser, and the fact that she was alleging sexual penetration without consent.  *Id.*

### *The Fact-Finder's Investigation*

Under Section 7.3 of the *UWC Procedures*, the next step was the appointment of an

"impartial fact-finder," who was charged with investigating the allegations and "reach[ing] a

thorough understanding of the facts and circumstances surrounding the allegations of the complaint." Ex. E, *UWC Procedures* at 7.3. In Montague's case, Yale appointed Miriam Berkman, an attorney and social worker, as the impartial fact-finder. Ex. 29 at 95. Berkman conducted interviews of Roe and Montague, five of Roe's friends, one of Mr. Montague's friends, and Ms. Gleason. Ex. B at -11539. In addition, she reviewed a written narrative that Roe had allegedly prepared a few days after the October 18, 2014 encounter, certain text messages Roe "wanted [Berkman] to see," and records showing when Roe had used her Yale ID to gain entry to certain campus buildings. *Id.* at -11539-40; Ex. 2 at 24. She then prepared a report for submission to the UWC panel that was to hear Montague's case. Berkman shared draft versions of her report with UWC Chairman David Post, UWC Secretary Aley Menon, and Susan Sawyer of Yale's Office of the General Counsel, all of whom reviewed and made edits to the report prior to finalizing it. *Id.* at 58-59; Ex. 27 at 32-34.

As discussed above, it was undisputed that Roe and Montague had sexual contact including intercourse on prior occasions, and that, on the night in question, Roe had accompanied Montague to his room, removed all her clothing and engaged in consensual foreplay including digital penetration. The only question was whether the final act, penile penetration, was done without Roe's consent. Roe's claim was that she told Montague earlier in the evening, before they went to his room, that she wanted to "hook up" but not have "sex," and that this meant she did not want to have sexual intercourse. Ex. B at -11542-43. She also claimed that she told Montague "no" just prior to the intercourse, but that he appeared not to hear her, and that she put her hands on his "shoulders and pushed him, but not very forcefully." *Id.* at -11543. Confused about which of his prior sexual interactions with Roe was in question, Montague originally told the fact-finder that Roe verbally consented to intercourse on the night

in question.  After confirming which episode was at issue, however, Montague explained to the UWC panel during his hearing that Roe consented on the night in question through her continued active participation in their escalating sexual encounter.  Ex. 33 at 73-75.

The fact-finder questioned Roe's friends and suitemates regarding what Roe told them the morning after the encounter.  Ex. B at -11539, 11550-554.  Generally speaking, Roe reported to her friends a different version of events than she told the fact-finder: she told them that she told Mr. Montague that she wanted to "hook up" but not "have sex," and that he agreed, but then proceeded to force himself on her, over her protest, as she tried in vain to push him off her.  *Id.* She did not tell them that she had taken of all her clothes, gotten into bed with Montague, and consented to all of their mutual foreplay, including digital penetration.  Ex. 2 at 31-33.  Nor did Roe tell her friends that Montague had not heard Roe when she claimed to have said "no" just prior to the intercourse.  *Id.*; Ex. B at -11550-554.

At the conclusion of her report, under the heading "Discussion and Summary," the fact-finder made a series of conclusions about the evidence, including that "Ms. [Roe] claims that the incident in question took place over her express verbal objection and physical resistance[,]" and, in substance, that Roe's friends' statements were consistent with and corroborated Roe's own account that she "told  [Montague] 'no' many times, she tried to push him away physically and that he apologized afterwards."  Ex. B at -11556-57.  Notably, although Roe specifically told the fact-finder that she had allowed Montague to digitally penetrate her (for which she said she indicated consent through her conduct), the fact-finder in her report stated only that Roe had allowed Montague to "touch" her genitals, thereby omitting critical information concerning the consensual escalation of the sexual encounter between Roe and Montague.  Ex. 2 at 36-37; Ex. B at -11543.

### UWC II Panel Hearing

The UWC II hearing was held on January 21, 2016, before a five member panel, with David Post appointing himself as chair of the panel.[16]  Ex. 29 at 136.  The hearing consisted of opening statements from Roe and Montague, followed by interviews of Montague and Roe by the panel.  Ex. 34.  Contrary to the *UWC Procedures,* which permit only the complainant and respondent to make opening statements and mandate that non-party witnesses only be present while testifying, Roe was permitted to deliver an emotionally charged opening statement, Ex. 25, and be present for the entire hearing, although not the named complainant in the case.  Ex. 29 at 141-44.  The only other evidence the panel considered was the fact-finder's report.  Ex. C at 1. Following the conclusion of the interviews, Roe and Montague were excused and the panel conducted the remainder of the hearing in secret, including hearing evidence of Montague's prior involvement in the UWC I incident on the issue of culpability.  Ex. 29 at 159-60.  The panel then deliberated.  Ex. 34

### The Decision Against Montague

The hearing panel issued its report on February 1, 2016.[17]  Ex. C.  The panel found that Montague sexually assaulted Roe in violation of Yale's *Sexual Misconduct Policies and Related Definitions* and recommended that Montague be expelled from Yale.  *Id.*  In reaching its conclusions, the panel focused on Roe's purported lack of motive to lie, the alleged consistency of Roe's statements to her friends, the fact-finder, and the panel, and the supposed inconsistencies in Montague's accounts.  *Id.*

---

[16] The hearing was not recorded by audio or visual means.  Ex. 27 at 52.  The record of the hearing consists of the panel report, Ex. C, Roe's written opening statement, and a "hearing protocol", Ex. 34, which was prepared in advance and does not necessarily reflect what actually occurred at the hearing.  Ex. 29 at 55-56, 73-76.  Yale destroyed the UWC panel members' notes at the conclusion of the appeals process, pursuant to an unwritten but supposedly customary "practice."  *Id.* at 73-74.

[17] The report was drafted by Post, with input from the panel members and UWC Secretary Aley Menon.  Ex. 27 at 74-75.

14

In both assessing Montague's culpability and recommending his expulsion from Yale, the panel placed significant weight on Montague's disciplinary record from the UWC I matter.  At the conclusion of its report, the UWC II panel stated that in accordance with Section 7.4 of the *UWC Procedures*, it had taken "into account Mr. Montague's previous formal disciplinary history with the UWC for violating Yale's sexual misconduct policy" on the issue of culpability, and "found particularly relevant" the fact that Montague had already violated Yale's sexual misconduct policy, "had received sexual harassment and gender sensitivity training" before the incident with Roe took place, and had met three times with a SHARE Center staff member to "review and reflect on his interactions and relationships with female students at Yale."  Ex. C at 9.  In recommending the penalty of expulsion, the UWC II panel expressed its "deep[] concern for the pattern of behavior of Mr. Montague, and his failure to take responsibility for and learn from his actions which have caused considerable harm to others."  *Id.*

Despite the significance the panel placed on the UWC I incident, not only in imposing the sanction of expulsion but *in determining Montague's culpability for the charged conduct*, the panel's consideration of UWC I occurred outside Montague's presence, after he had been excused from the hearing. Ex. 34; Ex. 29 at 159-60.  Montague was thus given no opportunity to explain the significance of UWC I or rebut the panel's apparent misapprehension of both the nature of that incident and the training he allegedly received as a result.

Under the *UWC Procedures*, the report of a UWC panel is forwarded to a "decision-maker" (usually a dean), who is required to accept the panel's findings of fact but can reject or modify its conclusions and recommendations as to penalty.  Ex. E at 7.5.  Upon receiving a copy of the panel's report, Montague wrote to the decision-maker in his case, Dean Jonathan Holloway, urging him to contact Montague's SHARE trainer John Criscuolo, whom he believed

would place the incident and "training" in the proper context and who was indeed of the view that Montague's prior offense and training tailored to it *had nothing to do with sexual consent*. Ex. 30; Ex. 31 at 38-39. [18]  It is clear from the record that this information from the SHARE Center either never reached Holloway or if it did, that it was totally ignored.[19]  In affirming the panel's findings and accepting its recommendation that Montague be expelled, Dean Holloway wrote that he not only considered the behavior in question, but Montague's "prior disciplinary history by the UWC" and "the *extensive* training [he] . . . already received from the SHARE center, training that did not have the hoped for impact on [his] behavior."  Ex. N (emphasis added).  According to Holloway, "on balance, considering the harm [Montague] caused and [his] inability to learn from [his] mistakes, . . . permanent separation from Yale is the only appropriate penalty."[20]  *Id.*

---

[18] In his deposition, Criscuolo agreed that Jack did not receive "extensive training" on the issue of sexual consent.  Ex. 31 at 38-39.  Criscuolo testified that the extent of his conversation with Montague about consent was that "even the act of opening the female's blouse and shoving a paper plate down her front was not okay because it was not consented to."  *Id.* at 22-24.

[19] Menon spoke to Criscuolo around this time, as Criscuolo wrote in a February 16, 2016 email to his boss, SHARE Center director Dr. Carol Goldberg: "I spoke last week with Aly regarding the training and did explain we had not gone through the complete consent training as [the] situation at that time was not one of consent but rather conduct."  Ex. 30.  Menon has no memory of speaking to Criscuolo or relaying what he had to say to Dean Holloway before Holloway rendered his decision.  Ex. 29 at 186-187.

[20] After receiving notice of Dean Holloway's decision to expel him, and learning for the first time the extent to which the UWC II panel and Holloway were operating under a misunderstanding regarding the nature of the training he received following the UWC I incident, Montague contacted Criscuolo asking him to correct the record.  Ex. 30.  Criscuolo emailed Goldberg, asking whether it was okay to contact Aley Menon, expressing his concern that "if the UWC based part of their decision on the assumption that he received the full consent training I would like to speak to that piece."  *Id.*  In response, Goldberg told Criscuolo to contact Menon to explain that Criscuolo's "work with [Montague] was based on [his] immature conduct as a drunk freshman, not about sexual consent."  *Id.*  Criscuolo concedes that he likely did so.  Ex. 31 at 40-41.  Menon claims to have no memory of speaking with Criscuolo on this issue.  Ex. 29 at 193-94.  Although Menon sent a copy of the UWC I panel report and decision letter to Holloway, Ex. 35, there is no evidence in the record that Menon bothered to share with Holloway (or anyone else) that Montague did not actually receive training on issues of sexual consent.

### *Montague's Appeal is Denied*

Montague appealed his expulsion to the Provost, arguing that "[u]nless a complete examination is done of my freshman year incident with UWC and my senior year fall meeting with the Executive Committee that resulted in a reprimand, the sanction of expulsion is unfair."[21] Ex. O at 6.  Montague explained that the UWC I proceedings arose from "a disagreement with a senior, female student who was belittling [him]."  *Id.* at 7.  Montague agreed that his response to the disagreement was "wrong and incredibly immature," and pointed out that Dean Holloway's perception of the SHARE training Montague allegedly received was inaccurate:  the "meetings were not 'extensive training,' let alone training on sexual misconduct."  Ex. O at 7.  Of course, this view was shared by SHARE Director Carol Goldberg, who had described Montague's prior meetings with Criscuolo as being about his "immature, inexcusable conduct as a drunk freshman, not about sexual consent."  Ex. 30.  Thus, Montague said, "[w]ithout proper examination" of this information, "the sanction imposed was extreme and unjustified."  Ex. O at 7.  The Provost summarily denied Montague's appeal, stating, in essence, that Montague should have addressed his record from the UWC I incident earlier in the process.  Ex. P.[22]

---

[21] Montague's prior disciplinary history included a reprimand from the Executive Committee for "Defiance of Authority," which he received after attempting to help an intoxicated teammate who had been detained by the Yale Police.  Ex. V; Ex. W.  The reprimand was a "matter of internal record only" meaning he was free to deny its existence if ever asked if he had been subject to disciplinary sanctions at Yale.  Ex. X.

[22] Based on upon review of the semi-annual reports of sexual misconduct complaints published by Yale, it is evident that expulsion is an extreme sanction, rarely imposed even in cases where a student is found responsible for nonconsensual sex.  *See, e.g.*, Ex. 9; Ex. 18.  Yale justifies its decision to expel Montague in large part on the basis of his prior disciplinary record.  Despite this, Yale has refused to provide Plaintiff discovery into relevant precedential UWC matters which is necessary for Plaintiff to evaluate this claim, and Plaintiff has filed a motion to compel this discovery (ECF No. 119) which remains pending.  Although Plaintiff believes he has adduced more than enough evidence to withstand summary judgment on his claims relating to the penalty imposed, this outstanding discovery is the subject of a Rule 56(d) affidavit submitted with this Opposition.

**Montague's Expulsion Is Celebrated at Yale**

Given his high profile status as captain of the men's basketball team, which was at that time in the middle of an historic NCAA tournament run, Montague's expulsion caused a stir on campus.[23]  The campus was blanketed with posters labeling Montague a "rapist".   Ex. 15 at 188; Ex. 20 at 75.  Teammates who publicly showed support for Montague were condemned as rape apologists.  Ex. 4 at 115-16; Ex. 37.  On March 2 and 3, 2016, the Yale Women's Center issued a series of statements applauding Yale for expelling "a high-profile member of a sports team in the midst of a pivotal moment in the season on the basis of sexual violence," and remarking that while the University was prohibited from publicly commenting on Montague's expulsion, "Yale's actions speak much louder than its words.  While the campus can only speculate on what occurred, we can comfortably say, should all of this be true, this is progress."  *Id.*; Ex. 38. Demonstrations on campus decried men's athletic privilege and "rape culture" in sports.[24]

Montague, meanwhile, was forced to leave campus and abandon his basketball team on the eve of Yale's appearance in the NCAA tournament, a feat it achieved under his leadership for the first time in over 50 years.  Ex. 41.  Worse, he was publicly vilified as a "rapist", and wrongfully denied the degree that he had worked so hard to obtain and was just one semester shy of earning.  Ex. 15 at 188; Ex. 20 at 7; Ex. 42 at 35.  As a result of his expulsion for sexual misconduct, Montague was unable to obtain admission as a transfer student at any school even remotely comparable to Yale, and was denied opportunities to follow his dream of playing

---

[23] *See, e.g.*, Ex. 36, "Storm brews on Yale campus following departure of ex-basketball captain," New Haven Register, March 3, 2016.

[24] On March 9, 2016, campus women's groups organized a "chalk-in" where students wrote messages in chalk to "show their support for survivors of sexual violence on campus."  Ex. 39.  Spangler and Killheffer attended the chalk-in, with Spangler characterizing the messages as "very positive."  Ex. 4 at 117-18.  Those messages included ones targeting male athletes, such as: "Women >> basketball" ; "The only team I'm cheering for are survivors @ Yale – dismantle men's athletic privilege"; and "Imagine if Yale men cared as much about ending rape culture as they care about sports.  Be an ally."  Ex. 39.  Organizers prohibited the men's basketball team from attending, a decision which was backed by members of the Yale administration.  Ex. 39; Ex. 40.

professional basketball overseas.  Ex. 33 at 16-25; Ex. 42 at 34-36.  He is now finishing his

degree at a regional university near his home in Tennessee while working part time in real estate.

Ex. 33 at 22-24.  He brought this lawsuit seeking reinstatement in good standing to Yale and

money damages for the injuries caused by the Defendants' actions.

### iii. Summary Judgment Standard

Summary judgment may only be granted when "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

"The burden of showing that no genuine dispute of material fact exists rests of the party seeking

summary judgment."  *Id.  See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2009).   "An issue

of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the

nonmoving party.'  A fact is material if it 'might affect the outcome of the suit under the

governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"This standard dictates that courts must 'resolve all ambiguities, and credit all factual

inferences that could rationally be drawn, in favor of the party opposing summary judgment.'"

*Id.* (quoting *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001)).   "[A]t the summary

judgment stage the judge's function is not himself to weigh the evidence and determine the truth

of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. at 249.  In reviewing the evidence and the inferences that may reasonably

be drawn, the court "may not make credibility determinations or weigh the evidence ....

'Credibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge.'"  *Reeves v. Sanderson

Plumbing Products, Inc.*, 530 U.S. at 133, 150 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*,

477 U.S. at 255).  The court "must disregard all evidence favorable to [the moving party] that the

jury is not required to believe."  *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) (quoting

*Reeves*, 530 U.S. at 151).   Finally, as is applicable to Plaintiff's Title IX claim, "summary

judgment is ordinarily inappropriate where intent and state of mind are at issue."  *Montana v.*

*First Federal Sav. and Loan Ass'n of Rochester*, 869 F.2d 100, 103 (2d Cir. 1989); *accord*

*Wechsler v. Steinberg*, 733 F.2d 1054, 1058 (2d Cir. 1984).

### iv. Argument

Montague in his Amended Complaint asserts claims against Yale for breach of contract

(Counts I, II, VII, and VIII) and gender discrimination in violation of 20 U.S.C. § 1681(a) ("Title

IX") (Count IX), and claims against Gleason and Killheffer for tortious interference with

contract (Count VI).   The Defendants argue that summary judgment should be granted in their

favor as to all these claims, because, they contend, Montague was properly found to have

committed sexual assault in compliance with Yale's procedures, which fully comport with the

requirements of Title IX, and further, that all the decision-makers swear they did not discriminate

against Montague on the basis of his gender.  Yale's arguments fail.  As to the contract claims,

there is ample evidence of repeated violations of the *UWC Procedures*, including a concerted

effort to manipulate Roe into filing a complaint she otherwise would not have filed, in blatant

violation of the confidentiality and neutrality obligations set forth in the policies and procedures,

and a skewed fact-finding process virtually guaranteed to find responsibility.  As to the Title IX

claim, Montague has adduced sufficient evidence to make out a prima facie case of gender

discrimination under *Doe v. Columbia University*, 831 F.3d 46 (2d Cir. 2016), and there is ample

circumstantial evidence from which a jury could reject Yale's proffered nondiscriminatory

reasons for taking the actions it did, and find in Montague's favor on this claim.  Defendants'

Motion for Summary Judgment should be denied.[25]

I.      **Yale Breached Its Contract With Montague By Failing To Observe the UWC Procedures, Acting Arbitrarily, Capriciously, and in Bad Faith, and Denying Him Basic Fairness.**

It is undisputed that Montague had a contract with Yale consisting of the student

handbook (the *Yale College Undergraduate Regulations*) and various additional written policies

promulgated by the University, including the *UWC Procedures*, the *Sexual Misconduct Policies*

*and Related Definitions*, and the Provost's *Statement on Confidentiality of UWC Proceedings*,

among others.[26]   Under that contract, Montague was entitled to a degree from Yale if he met the

degree requirements and was a student in good standing upon the completion of those

requirements.  Montague could be expelled and denied his degree, or subjected to other

discipline, if found to have committed certain types of conduct prohibited by Yale according to

procedures and criteria prescribed by Yale's policies.  In that connection, Montague was entitled

to the specific procedural rights set forth in the applicable policies – including, above all, the

express promise in the *UWC Procedures* that any sexual misconduct complaint against him

would be adjudicated *fairly, based on an impartial and thorough investigation* – and he is

entitled to relief if those rights were not honored.[27]   *Doe v. Trustees of Boston College*, 892 F.3d

---

[25] Montague has elected not to press his claims for defamation (Count IV), invasion of privacy (Count V), or violation of Title IX relating to the UWC I matter (Count III).

[26] It is well settled that "'the basic legal relation between a student and a private university or college is contractual in nature.'"  *Johnson v. Schmitz*, 119 F. Supp. 2d 90, 93 (D. Conn. 2000) (quoting *Ross v. Creighton University*, 957 F.2d 410 (7th Cir. 1992)); *accord Burns v. Quinnipiac University*, 120 Conn. App. 311, 320 (2010).  Indeed, "there seems to be no dissent from the proposition that the catalogues, bulletins, circulars and regulations of the institution determine the contractual relationship between the student and the educational institution."  *Johnson*, 119 F. Supp. 2d at 93 (citations omitted).  "[A] court that is asked to enforce an asserted 'contract' between a student and his university must examine the oral and written expressions of the parties in light of the policies and customs of the particular institution."  *Banerjee v. Roberts*, 641 F. Supp. 1093, 1106 (D. Conn. 1986).

[27] The *UWC Procedures*, at section 1, provide that the purpose of the UWC is to "fairly and expeditiously address formal complaints of sexual misconduct."  Ex. E.  They further provide, at section 7.3, that an investigation

67, 80 (1st Cir. 2018) ("whenever a school expressly promises no less than basic fairness, which is the case here, the school's implied duty becomes superfluous and the court's analysis to ensure that the disciplinary proceedings were 'conducted with basic fairness,' focuses on assuring compliance with the express contractual promise." [internal citation omitted]); *Fellheimer v. Middlebury College*, 869 F. Supp. 238, 243 (D. Vt. 1994) (stating that college is "contractually bound to provide students with the procedural safeguards that it has promised").  Further, while a university is afforded a measure of discretion in reaching its ultimate decision, it must do so through a process that is impartial and thorough, provides basic fairness, and is not arbitrary, capricious or a product of bad faith.  *See id.*; *Doe v. Brandeis University*, 177 F. Supp. 3d 561, 600 (D. Mass. 2016); *Stockstill v. Quinnipiac University*, 2010 WL 2011152, at *8 (D. Conn. 2010).  *See also Jones v. Trustees of Union College*, 92 A.D.3d 997, 999 (N.Y. App. Div. 2012) (university must "substantially compl[y] with its own rules and regulations").[28]

---

will be conducted which is both "impartial" and "thorough". *Id.* These contractual provisions amount to an express promise of basic fairness. *Doe v. Trustees of Boston College*, 892 F.3d 67, 80 (1st Cir. 2018) (language in student handbook stating that the purpose of procedural rules is to "assure fundamental fairness to complainants and to students accused of any breach of the University Code" expressly guarantees basic fairness to students accused of misconduct).

[28] Although Plaintiff's claims are largely confined to express breaches of the *UWC Procedures*, the conduct at issue here also implicates the covenant of good faith and fair dealing inherent in all contracts. "Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Gupta v. New Britain General Hosp.*, 239 Conn. 574, 598 (1996). The covenant "presupposes that the terms and purpose of the contact are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term. . . ." *Rafalko v. University of New Haven*, 129 Conn. App. 44, 51 (2011) (citation omitted). Contrary to Defendants' contention (Def. Memo. at 23 n.9), while the implied covenant does not create new *rights* not contemplated by the terms of the contract itself, it is not required that there be an *express breach* in order to trigger what is, after all, an *implied* covenant. *See De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 437–38 (2004) ("Although the actual lease terms provide the most significant guidepost in determining the parties' reasonable expectations, it is also true, as the plaintiff asserts, that the defendant was prohibited, under the lease's implied covenant of good faith and fair dealing, from engaging in purposeful conduct that is inimical to the material terms of the lease."). *Capstone Bldg Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760 (2013), does not hold otherwise. Instead, it holds only that a cause of action against an insurer for a bad faith failure to investigate a claim will not lie where the underlying claim was not covered under the policy. *See id.* at 799 n.38 (holding "bad faith actions must be tethered to allegations of denial of benefits under the policy.").

The standard for interpreting a university contract is that of "reasonable expectation," *i.e.*, "what meaning the party making the manifestation, the university, should reasonably expect the other party[, the student,] to give it." *Doe v. Trustees of Boston College*, 892 F.3d at 80 (quoting *Schaer v. Brandeis Univ.*, 735 N.E.2d 373, 378 (Mass. 2000)); *see also Travelers Casualty & Surety Co. of America v. The Netherlands Ins. Co.*, 312 Conn. 714, 740 (2014) (any ambiguity in a contract is to be construed in accordance with the reasonable expectations of the non-drafting party at the time that party entered into the contract).  In the context of disciplinary hearings, the procedures employed must "fall within the range of reasonable expectations of one reading the relevant rules." *Doe v. Trustees of Boston College*, 892 F.3d at 80; *accord Lyons v. Salve Regina College*, 565 F.2d 200, 202 (1st Cir. 1977).

## A. Yale Repeatedly Violated the UWC Procedures, Denied Montague Basic Fairness, and Breached the Implied Covenant of Good Faith and Fair Dealing In Its Handling of the UWC II Complaint.

In its handling of the UWC II complaint, Yale employed a flawed and biased process which, through acts and omissions at every stage, was systematically slanted toward imposing and justifying a disciplinary action against Montague.  Considered on the whole, the complaint against Montague was not handled "fairly" as guaranteed by the *UWC Procedures*.  Moreover, even considered individually, a number of Yale's actions violated specific requirements of its disciplinary code, such that a jury could find it breached its contract with Montague.

### 1. *Yale Violated Its Duty of Impartiality By Inducing Roe To Authorize It To File A Formal Complaint.*

As outlined above, *see supra* n. 13, under Yale's policies, a person who reports sexual misconduct to the University is given the option to file an informal complaint or formal complaint (or do nothing at all).  An informal complaint typically entails an interaction by a Title IX coordinator with the respondent and can lead to an agreement for the respondent to seek

23

counseling or training.  In an informal complaint, the complainant's confidentiality is protected,

even as to the offending student (the "respondent").   The complainant can also choose to make a

formal complaint, resulting in a fact-finder's investigation, proceedings before the UWC, and

potential discipline, including suspension or expulsion.  A complainant cannot remain

anonymous in a formal complaint process.  According to Yale's Title IX office, "[t]he choice of

an informal process does not imply the matter is less serious than those matters pursued through

formal processes[.]"  Ex. 18 at 5

        Except where there is a threat to the community, the choice whether to pursue a formal or

informal complaint is left entirely to the discretion of the complainant.  Ex. 4 at 35-36.  If there

is no safety issue, and if the complainant does not request a Title IX complaint and agree to

participate, there can be no formal UWC proceeding.  Ex. 17 at 55-56; Ex 4 at 30-31; Ex. 18 at 5.

Here, Yale never made any determination that Montague posed a threat to safety.  Accordingly,

the matter could not have been prosecuted before the UWC without Roe's agreement.  *Id.*

        Under Yale's policies, which were written to comply with the requirements of Title IX

(as interpreted by the Department of Education Office of Civil Rights), Yale is required to

maintain impartiality throughout the disciplinary process.  Ex. 4 at 47; Ex. 43; Ex. 50.  This

means, according to Yale's chief Title IX Coordinator, Deputy Provost Stephanie Spangler, that

except where safety is an issue, Yale's Title IX officials "don't independently decide to file a

formal complaint.  [They] don't make the decision to pursue a formal complaint."  Ex. 4 at 32-

33.  Further, the Title IX office "doesn't recommend" to a complainant whether to file a formal

or informal complaint.  *Id.* at 34.  Instead, whether a case is more appropriate for formal versus

inform resolution depends solely on the complainant's goals and wishes.  *Id.* at 35-36.  "The

Title IX office does not have, does not create an independent view."  *Id.* at 36.[29]

However, in the face of yet another campus crisis over Yale's perceived mishandling of

sexual assault complaints, Yale's duty of impartiality fell by the wayside.  On the same day that

President Salovey promised to "redouble efforts" in response to the troubling results of the AAU

survey, Gleason and other members of Yale's Title IX leadership began a concerted effort – in

total violation of Yale's duty of neutrality – to bring about Montague's prosecution, despite

Roe's initial reluctance even to be involved in the Title IX process.

Despite Roe's resolution to proceed with her informal complaint, Yale's Title IX

leadership met and *decided*, independent of Roe and against her stated preference, and in direct

contravention of Yale's policy of neutrality, that the University should pursue a formal complaint

against Montague.  Gleason then summoned Roe to another meeting, to discuss a "new

development" in the case (which was not at all new to Gleason):  that Montague had a prior

complaint of sexual misconduct for which he received training and therefore was not eligible to

undergo training again.  Gleason further purposefully influenced Roe's decision by bringing in

UWC Chair David Post, who explained to Roe that she did not have to bring the complaint in her

---

[29] In a March 10, 2016 email to the director of Yale's Office of Public Affairs & Communications in response to a reporter's question "under what conditions would a Title IX coordinator/other University official ask a complainant to turn an informal complaint into a formal one," Spangler wrote that "[a] Title IX Coordinator would not try to influence the complainant's decision to pursue a formal or informal process, but would rather support and facilitate the complainant's decision."  Spangler emphasized that "this point is important in light of the mis-perception implied in [the reporter's] first questions—that a Title IX Coordinator would tell a complainant to pursue a formal complaint."  Ex. 44.

Notwithstanding Spangler's insistence to the contrary, in fact, some Yale students had reported in response to a question on the AAU Survey that they "felt pressured" by University Title IX coordinators or the UWC to file a complaint of sexual misconduct.  Ex. 11 at 10.  In her deposition, Spangler testified that this result was "concerning" because "we don't want students to feel pressured in either direction."  Ex. 4 at 93.  Spangler further testified that in response, the Title IX office "worked on clarifying [its] message, and one of the messages [it] clarified more expansively was that the complainant's wishes are what should determine how a complainant proceeds with a complaint."  *Id.* at 93-94.

own name so long as she was willing to cooperate – an option which he presented as a "comfort"

to her.  Even absent the gross breach of confidentiality, discussed below, this persuasion

campaign itself was a violation of Montague's contractual rights.  On the basis of this improper

influence, Roe decided to drop the informal complaint and allow the Title IX office to proceed

with the formal complaint that culminated in Montague's expulsion.[30]

> ## 2.  *Yale Violated Its Obligation To Maintain Confidentiality By Improperly And Misleadingly Disclosing To Roe That Montague Was The Subject Of A Prior Complaint And That He Had Already Received Training.*

The *UWC Procedures* provide, in Section 3 ("*Confidentiality and Honesty*"), that "[a]ll

documents prepared by, prepared for, or received from the UWC in connection with a UWC

proceeding ("UWC Documents") must be held in strict confidence," and refers to the *Provost's

Statement on Confidentiality of UWC Proceedings* for additional support and clarification.[31]  It is

undisputed that this policy prohibits the disclosure of the fact of prior UWC proceedings, as well

as the results of those proceedings and any discipline imposed.  Ex. 17 at 116-18; Ex. 27 at 61-

62.[32]

Notably, Yale does not contend in this case that there were any exceptions to the

confidentiality requirement that authorized Gleason to disclose Montague's prior disciplinary

---

[30] Yale asserts that Roe was motivated in part to pursue a formal complaint against Montague as a result of a happenstance interaction Roe had with Montague over the weekend after the "new development" meeting with Gleason, wherein Montague allegedly refused to leave a party even though his presence there made Roe feel uncomfortable.  Def. Memo. at 33, citing Ex. SS, at 84-87.  Roe never once mentioned this incident during the UWC II complaint process as a reason for her decision to participate in the formal complaint process.  To the contrary, she made clear that her conversation with Gleason about Montague's record was the primary motivator of her decision.  Ex. B at 8-9; Ex. 25 at 2.

[31] That statement confirms the same restrictions on disclosure, and points out that the "[t]he circumstances surrounding allegations of sexual misconduct are often sharply disputed and have the potential to affect the reputations of the persons involved."  Ex. 45.  Thus, it warns, those who breach the expectation of confidentiality may be subject to legal claims.  *Id.*

[32] Although the policy on its face refers to the confidentiality of "documents," Yale does not dispute that it applies with equal force to prohibit the oral disclosure of information contained in those documents.  *See Doe v. Brandeis University*, 177 F. Supp. 3d 561, 600 (D. Mass. 2016).

history to Roe.  Nor does it contend that if the disclosure of confidential information was used to persuade Roe to authorize a formal complaint, this did not invalidate the ensuing discipline. Instead, it simply argues that since both Gleason and Roe now both deny that there was any such disclosure, there is no evidence of it and thus no disputed issue of fact.  This is a flawed and cynical defense, given the overwhelming contemporaneous evidence that this is precisely how Roe was induced to proceed with a formal complaint.

In a remarkable example of "circling the wagons," defenders of Montague's expulsion now conveniently deny that Gleason disclosed to Roe any confidential information, thereby allowing Yale to make the argument that there is no admissible evidence of any breach of confidentiality because "[t]he only participants in this conversation – Ms. Gleason and Ms. Roe – both categorically denied in their depositions that Ms. Gleason informed Ms. Roe that a previous UWC complaint had been filed against the plaintiff . . . ."  (Def Memo. at 30). They make this argument in the face of extensive evidence in the contemporaneous records demonstrating that Gleason clearly violated confidentiality in her conversations with Roe, however.

Berkman, the fact-finder, wrote in her report that "***Ms. Gleason explained to [Roe] that Mr. Montague had already been given a recommendation for training after a previous complaint*** and so that option was no longer open to him," and that "[Roe] was especially motivated to participate in the investigation and hearing process after she heard that Mr. Montague had already had another complaint against him as she felt it was important to protect other women."   Ex. B at -11547.  In an initial draft of the report, Berkman also noted that Gleason denied telling Roe about Montague's prior complaint, but pointed out in a comment in the margin that although Gleason denied it, ***"[t]his is an accurate statement of what [Roe] told me about her motivation and decision-making about participating in this case.***" *See* Ex. 46 at

8, 16.  Then, in an email to UWC officials attaching another draft of her report, Berkman noted

that Roe did not know the exact nature of the training Montague had previously received "***except***

***that it was related to a previous incident*** . . . ." Ex. 47.  The issue of what exactly Gleason said

to Roe was the subject of specific attention and extensive discussion among Berkman, Post, and

Menon.  Ex. 46; Ex. 47; Ex. 48.  Ultimately, they decided to keep Roe's statement in the fact-

finder's report and to omit Gleason's denial.  *Id.*; Ex. 29 at 108-110.  Clearly, there was nothing

incidental or accidental about the finding in the fact-finder's report that Gleason had expressly

disclosed Montague's disciplinary history to Roe.

Moreover, even if there could be any question whether Montague's record was explicitly

disclosed, Gleason concedes that she told Roe that Montague had previous training, Ex. 15 at

135, and there is no question that she made it clear that her information came straight from the

records of the Title IX office.  After telling Roe that "***she would have to check to see if Mr.***

***Montague was known to the Title IX Coordinators*** and would consult with other Coordinators

in order to determine if it would be appropriate to address this incident with additional

training[,]" Ex. B at -11556, Gleason at a minimum told Roe that Montague "had already

received sensitivity training."  Ex. 15 at 135.  Because the Title IX office would only be aware of

a student's having received sensitivity training if it resulted from a formal or informal complaint

of sexual misconduct, Ex. 17 at 45-47, and because Roe understood that the Title IX office only

deals with complaints of sexual misconduct, Ex. 20 at 20-22, Gleason's disclosure to Roe that

Montague had already received training – after "checking" with her Title IX colleagues to see if

Montague was "known" to them – was tantamount to telling Roe that Montague had been the

subject of a prior complaint of sexual misconduct.[33]

---

[33] To this, Yale argues that "students receive sensitivity training for a variety of reasons," and "[t]hus, a
statement that the plaintiff had received sensitivity training is not tantamount to disclosure that he had been found

28

Now faced with litigation over Montague's expulsion, Defendants wag their finger at Plaintiff, boasting that this substantial evidence of Gleason's confidentiality breach consists only of inadmissible hearsay.  However, all of the evidence fits comfortably within one or more exceptions to the rule against hearsay.  Gleason is a Defendant in this action and an employee of Yale.  Berkman was, by Defendants' own concession and as this Court previously found, "working at the behest of Yale and as its agent" with respect to the investigation into Roe's complaint against Montague.  (ECF No. 137 at 9-10).  Their out-of-court statements are thus, by definition, "Statements That Are Not Hearsay," admissible under Fed. R. Evid. 801(d)(2)(A) & (D) as statements of a party or its agent.

As for Roe, her statements to the fact-finder and the panel concerning her conversations with Gleason are admissible under a related exception, for "adoptive admissions."  Under Rule 801(d)(2)(B), a statement offered for its truth is not hearsay when it "is offered against an opposing party and . . . is one the party manifested that it adopted or believed to be true."  Fed. R. Evid. 801(d)(2)(B).  Thus, in circumstances closely analogous to the present case, where a university president relied on an internal investigatory report in rendering discipline against a university employee over allegations of race discrimination, hearsay statements contained in the report were admissible against the university in a subsequent court action.  *Pilgrim v. Trustees of Tufts College*, 118 F.3d 864, 870 (1st Cir. 1997), *abrogated on other grounds by National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); *see Wright-Simmons v. City of*

responsible for violating the sexual misconduct policies, and therefore the plaintiff cannot prevail on the breach of contract claim based on violation of confidentiality."  (Def. Memo. at 38-39).  This is simply incorrect.  First, Gleason's superior, Killheffer, testified that even the disclosure of the fact that Montague received training, because that information was only known to Gleason through confidential Title IX office records, was a breach of confidentiality.  Ex. 17 at 117-18, 145.  Second, Yale's assertion is not only counterfactual but illogical, because Montague had in fact received the training as a result of a prior complaint, and that is precisely what Roe interpreted Gleason's disclosure to signify, since if she believed that Montague had voluntarily submitted to some unspecified form of SHARE training, that would hardly have "reframed the incident in [Roe's] mind" or caused her to believe that her experience with Montague was not the product of a "one-time mistake," Ex. 25, nor would it have instilled in her a sense of obligation to "protect other women."  Ex. B at -11547.

29

*Oklahoma City*, 155 F.3d 1264, 1268-69 (10th Cir. 1998) (hearsay statements contained in investigative report admissible against defendant municipality where municipality followed the recommendations of the report); *Talavera v. Municipality of San Sebastian*, 865 F. Supp. 2d 150, 155 (D.P.R. 2011) (same).

In arriving at its finding, the UWC II Panel "*accept[ed] the undisputed facts in the fact-finder's report[,]*" and expressly credited the fact-finder's rehearsal of Roe's motivation in bringing the complaint. Ex. C at 1, 7-8 (emphasis added). Roe's statements to both the Fact-Finder and the panel concerning the role Gleason played in convincing Roe to participate in a formal complaint, are thus independently admissible as adoptive admissions under Rule 801(d)(2)(B).[34] The ample evidence of Gleason's breach of confidentiality is therefore fully admissible.[35]

---

[34] Importantly, although here the UWC II Panel expressly credited Roe's statements to the fact-finder and the panel concerning her motivation in participating in a formal complaint, it is not necessary that a party believe every statement in a document in order for the document to be admissible under Rule 801(d)(2)(B). *See Wright-Simmons*, 155 F.3d at 1269 (noting that disputes in this regard go "to the weight of the evidence and not its admissibility"). *See also Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 238 (2d Cir. 1999) (noting that the Advisory Committee for the Federal Rules of Evidence recommends "generous treatment of this avenue to admissibility."); *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 262 F. Supp. 2d 251, 259 (S.D.N.Y. 2003) ("Ultimately any ambiguities and questions surrounding a party's actions and silences with regard to adoptive admissions should be for the jury to assess[.]")

[35] Because Roe's statements contained in the fact-finder's report and her opening statement concerning her motivation for filing a formal complaint are readily admissible as adoptive admissions, the Court need not consider the potential applicability of other exceptions to the rule against hearsay. However, were there any doubt in that regard, there is yet another basis for admissibility: the residual exception, Fed. R. Evid. 807. Rule 807 provides in relevant part:

> Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804: (1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests of justice.

Fed. R. Evid. 807(a). Roe's statements easily satisfy these criteria, and in particular the requirement of circumstantial guarantees of trustworthiness. There is, as described at length above, substantial contemporaneous evidence corroborating the true nature of Gleason's statements to Roe, including a written statement from Berkman herself that "*[t]his is an accurate statement of what [Roe] told me about her motivation and decision-making about*

30

     **3.**    *Yale Failed To Provide Montague With Adequate Notice Under The Circumstances Of The Charges Against Him.*

Yale's UWC Procedures specify that once a formal complaint is filed with the UWC and the UWC accepts jurisdiction over the complaint, the respondent must be provided with notice of the complaint against him, and given an opportunity to respond.  Ex. E at 7.1.  Whether that notice is adequate depends on the circumstances of the particular case, but as a general principle, adequate notice requires that a student be notified of "the specific factual conduct alleged to have given rise to the charge" so that the student can properly respond to the charges and defend himself.  *Doe v. Brandeis University*, 177 F. Supp. 3d at 603.  *See also Fellheimer v. Middlebury College*, 869 F. Supp. 238 (D. Vt. 1994).

Here, the notice sent to Montague, a year after the event in question, stated only that he was being accused of sexually penetrating Roe without consent "on the night of October 18, 2014, at [his] residence." Ex. A; Ex. 32.  It did not specify which of the four sexual encounters between them Roe was claiming was nonconsensual, or provide any other details which would have allowed Montague, over a year later, to pinpoint the particular encounter at issue.  Thus, when Montague first interviewed with the fact-finder, he confused his various encounters with Roe and explained that on the evening in question, Roe had verbally consented to sexual intercourse, when in fact, as he would later recall, she had given verbal consent on a prior occasion and had on the night in question consented by her conduct.  Ex. 33 at 73-75.  This apparent "inconsistency" in Montague's explanation for how he obtained consent became the principal peg on which the panel dismissed his credibility, and indeed, Yale continues to rely heavily on this fact in defense of Montague's lawsuit.  Ex. C at 8; *see infra* pp. 35-36.

---

*participating in this case.*"  Ex. 46.  While the residual exception is to be invoked sparingly, if there was ever a case to employ it, this is it.

4.    *UWC Chairman David Post Violated the UWC Procedures By Appointing Himself to the UWC Panel After Having Helped to Convince Roe to Authorize a Formal Complaint.*

An additional violation of the *UWC Procedures* occurred when David Post appointed himself to the UWC panel that was to hear Montague's case.  The *UWC Procedures* provide, in Section 7.2 ("*Appointment of the Hearing Panel*"), that "[t]he hearing panel will not include any Member who has participated in the resolution of an informal complaint arising out of the same events[,]" and that panel members "must withdraw from the proceedings if their relationship to the complainant or the respondent or other circumstances lead them to believe that they cannot judge the matter fairly."  Ex. E at 7.2.  Post's self-appointment to the UWC panel violated this rule because he "participated in the resolution of [Roe's] informal complaint".  *Id.* This alone breached Yale's contract with Montague.

Moreover, Montague had the right to question Post's impartiality given his role in joining the effort to convince Roe to authorize the filing of a formal complaint, by offering her "comfort" in the form of a complaint filed in the name of the Title IX office.  Post had, in essence, already aligned himself with the prosecution.  Post could hardly claim to be without any predisposition to accept Roe's testimony when he had directly participated in the effort to persuade her to come forward.[36]  But his pre-hearing *ex parte* role was not disclosed to Montague and thus Montague was deprived of the opportunity to request Post's recusal.  The failure to make this disclosure breached the covenant of good faith and fair dealing because it deprived Montage of his rights under Section 7.2 of the *UWC Procedures* to challenge the appointment of panel members who harbor potential biases.

---

[36] That Post well understood how the efforts to convince Roe could be perceived was shown by his careful construction of the panel's report to obscure the fact that Roe had been "push[ed] to participate" by Yale.  Ex. 16 at YALE00016747, -751.

> **5.** ***The Collection, Consideration and Reporting of the Evidence by the Fact-Finder and the UWC Panel Was Incomplete, Flawed and Biased, In Violation of The Requirements of Montague's Contract With Yale.***

The undisputed facts before the fact-finder revealed that within an approximately one month period in the Fall of 2014, Montague and Roe had four consensual sexual interactions in Montague's bed, and in three of those interactions they were both naked. On the third occasion they had consensual sexual intercourse. On the fourth occasion, they went up to Montague's room, took off their clothes, got into Montague's bed, and engaged in active, mutual, consensual sexual contact right up to an including digital penetration. The only issue to be decided by the UWC was whether the final act, penile penetration, was done without Roe's consent. Roe's testimony was that before she went to his room she told Montague that she wanted to "hook up" but not have "sex," meaning (to her) that she did not want sexual intercourse. She stated that she repeated this just as Montague was about to penetrate her; however, she conceded that he did not appear to have heard her then. Montague denied that she had set any limits at the outset, but the core of his defense was that, whatever Roe might have said at the beginning of the night, she consented to sexual intercourse through her actions leading up to that climax. It is undisputed that, even under Yale's definition of consent, consent can be communicated both verbally and by conduct. Ex. 49 at 3[37] ("consent does not need to be verbal"); Ex 31 at 24.

The UWC panel rejected Montague's defense and found him guilty of sexual assault. But Montague has produced sufficient evidence here to have a jury determine whether the investigation and determination of the facts leading to that finding were so flawed, incomplete and biased that it failed to comport with Yale's obligation under both the *UWC Procedures* and applicable Title IX guidance to provide a "fair", "thorough" and "impartial" process. Ex. E at 1,

---

[37] The version of the *Sexual Misconduct Policies and Related Definitions* submitted by Defendants as Ex. D appears to be missing pages. Plaintiff has submitted a complete version as Ex. 49.

7.3; Ex. 51 at 5.  Montague's claim in this regard is supported by a close analysis made by

Plaintiff's expert Susanna Murphy, an experienced sexual misconduct investigator in both the

university and criminal law realms.  *See* Ex. 50, Expert Report of Susanna B. Murphy.  Ms.

Murphy's critique is not a mere disagreement with the outcome of Yale's process, but a

systematic analysis of whether Yale applied investigative techniques designed to find truth in an

impartial way.  She concludes it did not.

In Ms. Murphy's professional opinion, the fact-finder's investigation was neither

"thorough" nor "impartial" but instead "demonstrated a one-sided approach to obtaining facts in

an effort to merely to support Ms. [Roe's] claims." Ex. 50 at 9.  As discussed below, the flaws in

the fact-finder's investigation were only repeated, and amplified, by the panel's treatment of the

facts.  This approach tainted the entire investigation and the ensuing decision by the UWC panel.

a.   The Admitted Failure to Seek Exculpatory Evidence

A most revealing illustration of the one-sided approach employed by the fact-finder was

her acknowledged preference for inculpatory evidence, as shown in her collection of electronic

communications from Roe.  Rather than seek all communications which potentially bore on the

incident in question or the relationship between Montague and Roe more generally, Berkman

asked only that Roe provide her with text messages that Roe "***wanted [her] to see*** in relation to

the investigation[,]" deeming all other text messages irrelevant.  Ex. 50 at 4-5; Ex. 2 at 24

(emphasis added).  Thus, as to an entire category of evidence – evidence which can contain "the

most honest and accurate perceptions of the event," Ex. 50 at 3 – Berkman concedes that she

sought only inculpatory evidence, and indeed defends her decision to do so.  Ex. 2 at 24.  Of

course, by hypothesis, we cannot know what was in communications that were never produced,

but the point here is that the fact-finder's approach to this evidence clearly exposes her lack of objectivity and the bias inhering in her investigative technique.

b.   The Double Standard as to Consistency

Both the fact-finder and the panel (in reliance on the fact-finder's report) focused on what they each characterized as Roe's "consistency" versus Montague's "inconsistency" in their various accounts of the evening in question.  In Ms. Murphy's opinion, this assessment of the evidence was based on inaccurate presentation by the fact-finder, rooted in a demonstrated bias towards believing Roe and disbelieving Montague.  Ex. 50 at 12.

Although Roe consistently told her friends and later the Title IX authorities that Montague had assaulted her, she did *not* consistently describe the experience.  Ex. 50 at 7-9, 11-12.  Most importantly, she did *not* tell her friends about the sexual activity with Montague in which she had had freely and voluntarily engaged as the interaction led to the ultimate act of sexual intercourse.  Instead, she just told her friends that she had forcefully resisted his advances, but lacked the strength to stop him.  All of this she contradicted when she was eventually interviewed by the fact-finder.  In the version of events Roe recounted to the fact-finder, she participated freely, including allowing digital penetration; Montague did not appear to hear her say "no"; and she did not physically resist except to "press" her hands into Montague's shoulders "but not very forcefully," Ex. B at -11543, an act entirely consistent with consensual sex.  This cannot be fairly characterized as "consistency" by Roe, Ex. 50 at 7-9, 11-12, but that is precisely how the fact-finder and the panel framed it.  Ex. B at -11557.

Demonstrating a clear double standard, at the same time as it cast Roe's inconsistencies as consistencies, the panel placed unfair weight on a supposed inconsistency in Montague's story:  that in his initial statement to the fact-finder he said that Roe's consent was express, while

35

he later told the panel that it was non-verbal.  Ex. C at 8.  One member of the panel went so far

as to describe the shift in Montague's explanation for how he obtained consent as "jarring",  Ex.

53 at YALE00009217, and the argument continues to be repeatedly emphasized by Yale.  This

was particularly unfair as the difference in recollection was the direct product of the inadequate

description of the charges against him at the outset, and whether or not that notice was so

deficient as to constitute an independent breach of contract, the fact remains that Montague was

understandably confused at the time of his first interview with the fact-finder.   Ex. 50 at 7.  Roe

did give verbal consent to sexual intercourse during their third interaction.  It is hardly surprising

that Montague would confuse the encounters, when over a year later he was suddenly confronted

with the lone accusation, unaccompanied by any factual context, that he had sexual intercourse

with Roe without her consent.  As Ms. Murphy opines, under the circumstances, "the Fact Finder

had an obligation to highlight the fact that, at the time Mr. Montague was first interviewed by

this Fact Finder, he had not been given any advance notice of which of the several intimate

encounters he and Ms. [Roe] participated in would be the subject of his interview."  Ex. 50 at 7.

c.  <u>The Failure To Probe Roe's Apparent Motive</u>

Neither the fact-finder nor the panel investigated whether Roe had a motive to falsely

characterize her interaction with Montague.  The panel simply dismissed the possibility of any

motive to lie based on the "narrowness" of her claim, *i.e.*, that she candidly disclosed that the rest

of her sexual relations with Montague were consensual.  Ex. C at 7.   But, as discussed above,

this is exactly what she did ***not*** do when, to her suitemates, she pictured the interaction as a

forcible rape, leaving out the fact of her enthusiastic participation in all the rest of their sexual

activity.

Obvious questions were raised by Roe's conduct.  Why did she give a misleading impression to her suitemates?  And, relatedly, why had she felt "overwhelmed" at the prospect of "being asked a lot of questions," by her roommates – which was the reason she gave the fact-finder for returning to Montague's room later that night rather than returning to her dormitory?  Ex. B at -11544.  What questions did she not wish to face?

The evidence suggested a plausible explanation for all of this.  Roe knew that her friends disapproved of her sexual relationship with Montague, which she had admitted to them was based purely on sex and which, she said, she regretted.  Ex. B at 11542, -552; Ex. 1 at 57-58.  And she also knew that they did not want her to go with Montague that very night.  Ex. 1 at 9-12.  If she did voluntarily surrender to her admitted sexual attraction to Montague again, she undoubtedly would be embarrassed at having to admit this to her friends upon returning to her dorm.  By presenting herself as a victim of assault, she insulated herself from their disapproval and criticism.  And if, indeed, her story was fashioned just to save her from the judgment of her suitemates, this would likewise explain her consistent reluctance to take any action against Montague, either at the time or over a year later – until pressured by Yale officials to do so.[38]

The point is not that Yale's triers of fact should have but did not conclude that such a motive existed – it is that they did not investigate or even consider it at all.  The fact-finder asked no questions to probe Roe's motive, Ex. 50 at 10, and the panel summarily dismissed the notion

---

[38] On this point, as Ms. Murphy opines, both the fact-finder and the panel "failed to adequately explore Ms. [Roe's] motivation in pursuing a formal complaint against Montague, and how that may have borne on her credibility."  Ex. 50 at 10.  Namely, "although the fact-fact finder's investigation revealed that Ms. [Roe's] decision to pursue a formal complaint was strongly influenced by what Ms. Gleason had communicated to her regarding Mr. Montage's past involvement with the Title IX apparatus, the fact-finder did not explore with Ms. [Roe] the possibility that her perception of what happened on October 18, 2014 was altered once she was led to believe that Mr. Montague had previously been disciplined for sexual misconduct."  *Id.* at 11.  It was equally possible that regardless of what she truly believed happened between her and Montague, Roe felt emboldened to pursue a formal complaint against Montague because she (falsely) believed that he had assaulted other women even if not her.  But neither the fact-finder nor the panel even considered this possibility.

37

because of its erroneous assumption that she had always truthfully admitted what part was consensual.  As Ms. Murphy points out, the failure even to consider this motive speaks volumes about Yale's resolve to avoid any evidence which might compromise Roe's credibility.  *See* Ex. 50 at 9-10.[39]

d.   The Transformation and Obliteration of Undisputed Evidence

Most striking in the reports of the fact-finder and the panel were their steady efforts to twist the undisputed evidence to remove facts which raised the most serious questions about whether Roe had indeed consented to the sex.  The fact-finder omitted from her report the fact that Roe told her that just prior to penile penetration, *she consented, non-verbally, to digital penetration*.  Instead, the fact-finder sanitized this part of the interaction by reporting that "[he] touched her body, including her genitals, to which Ms. [Roe] had no objection."  Ex. 2 at 36-37; Ex. B at-11543.  Then the panel went further to obscure the nature of the sexual episode, describing this part of the sexual activity no more than ***petting***, *i.e.*, that "the parties took off their clothes and kissed and touched."  Ex. C at 3.

Removing the fact of consensual digital penetration from what purported to be a detailed "blow by blow" account of the entire sexual episode changed the whole character of the

---

[39] As Ms. Murphy explains:

The fact that Ms. Berkman chose not to probe further regarding this interesting behavior demonstrates a level of partiality towards believing Ms. [Roe] without the necessary professional skepticism that should accompany the inquiry of any witness.  When Ms. [Roe] explained that she left the safety of her own dorm because she didn't want to answer a lot of questions, a fact-finder genuinely searching for a complete and unbiased view of the truth must inquire into what types of questions were so overwhelming to make Ms. [Roe] prefer to retreat to the bed of a man who she says assaulted her that very night.

. . . .

There are any number of possible explanations. However, the fact that Ms. Berkman failed to even inquire further demonstrates a premature willingness to simply accept as truth whatever Ms. [Roe] said and thus a concerning lack of impartiality."

Ex. 50 at 10.

interaction, as any trained sexual misconduct investigator could not fail to recognize, since digital penetration is, and is considered to be, as invasive and serious as penile vaginal intrusion.[40]  The elimination of this evidence was particularly significant since both the fact-finder and the panel acknowledged that all the unelaborated sexual activity prior to the claimed assault was consented to by Roe *through non-verbal conduct*, not simply through her prior statement that she wanted to "hook up."  *See* Ex. C at 3 (stating that Ms. Roe "indicated her consent to kissing and touching by kissing Mr. Montague, touching his body (but not his genitals), and by not tensing up."); Ex. B at -11543 (same).  According to Ms. Murphy:

> By omitting any mention of consensual penetration, Ms. Berkman took out of the equation altogether the possibility that Ms. [Roe] had changed her mind about how far she wanted the sexual encounter to go or that Mr. Montague could have had a reasonable belief that Ms. [Roe] had changed her mind and now was indicating consent to take things beyond what she had agreed to, previously.

Ex. 50 at 6.

Likewise, although the fact-finder correctly reported that Roe told her that Montague did not hear her say "no" and that her pushing against his shoulders was "not very forceful[];" she nevertheless reported in her concluding summary – without any qualification – that Roe claimed "the incident in question took place over her express verbal objection and physical resistance." Then the panel took this one step further – *it omitted entirely the fact that Montague did not hear the "no".*

Yale and its fact-finder have argued that this evidence was properly treated as "irrelevant" because Roe says she told Montague earlier that night that although she would

---

[40] In criminal law, unconsented-to digital penetration is uniformly considered the equivalent in degree and as punishable as penile penetration.  *See, e.g., Farley v. Lafler*, 193 Fed. Appx. 543, 548 (6th Cir. 2006); *State v. Escue*, 1988 WL 23016, at *1 (Tenn. Cr. App. 1988).  Under Connecticut law, non-consensual sexual penetration is defined as first or second degree sexual assault (a Class A, B, or C felony), while non-consensual sexual contact not including penetration is at most third degree sexual assault (a Class D felony).  *See* Conn. Gen. Stat. §§ 53a-65; 70-72a.  *See generally State v. Snook*, 555 A.2d 390, 405 (Conn. 1989).

"hook up," she did not want "sex," and thus set the limits of the sexual interaction.  Ex. 2 at 32-37.  The argument is fundamentally flawed.  In the first place, it must be remembered that Montague denied that any such restriction was expressed to him.  Thus, in no event could her testimony on this point relieve the triers of fact of the obligation to determine whether her later participation was consensual.  But even if it is accepted that Roe did lay down these rules at the outset, the argument ignores the possibility – a possibility later acknowledged by the fact-finder in her deposition – that Roe had a change of heart as their intense sexual interaction unfolded.  Ex. 2 at 40-41.[41]  This made both the consensual penetration and the unheard "no" particularly critical to Montague's defense and thus, as Ms. Murphy notes, the elimination of those facts "particularly prejudicial."  Ex. 50 at 6.

Moreover, contrary to Yale's insistence, there is no evidence that at the time Roe allegedly expressed verbal consent to "hook up," she defined what "hook up" meant, except that it *excluded* sexual intercourse.  "Hook up" is an ambiguous term that means different things at different times and to different people.[42]  There is no evidence in the record concerning what sexual conduct Roe considered to be within the definition of "hook up" when she claims that she told Montague she wanted to "hook up" but not "have sex".  Montague testified that the term "could" include varying degrees of foreplay, but not necessarily digital penetration.  Ex. 33 at 102-106.  Thus, even on Roe's testimony, when she did manifest through her non-verbal

---

[41] That the triers of fact never seriously considered the possibility that Roe had changed her mind and had in fact consented to sexual intercourse is further evidenced by their treatment of Montague's testimony to the fact-finder that he and Roe had changed positions during the intercourse.  If true, this would completely undermine Roe's claim that the intercourse was nonconsensual.  Roe told the fact-finder she did not *remember* changing positions, but did not deny that it happened.  Ex. B at -11548 n.13.  Rather than explore this issue further, the fact-finder relegated Roe's testimony on this key fact to a footnote in her report, and the panel utterly failed to address it.  Nor was Roe faulted for her lack of memory on this point, while Montague's lapses in memory were held against him at every turn.

[42] *See, e.g., England and Shafer, Hooking Up and Forming Romantic Relationships on Today's College Campuses*, The Gendered Society Reader 3, 531-93 (2008), *available at*: http://www.nyu.edu/classes/jackson/sex.and.gender/Readings/England%20-%20Hooking%20Up.pdf.

conduct, Ex. B at -11543, that she was ready to go further, Montague could well have interpreted her action to mean that she had dispensed with her previous restrictions and was willing to respond to him just as she had before.  Ex. 33 at 61-62.

Yale also argues that the consent to digital penetration was meaningless since its policy requires "positive, unambiguous, and voluntary agreement" to each sexual act.  Ex. 49 at 3. Although Yale's policy does require consent for each act, this does not mean that consent, once given, must be re-expressed verbally at each stage of a sexual encounter.  If consent can be expressed by conduct, as it can under Yale's policy, then a sexual partner must interpret what the scope of the consent is in light of how the partner behaves.  Yale's triers of fact did not ever find that Montague unreasonably interpreted the scope of Roe's consent when she allowed digital penetration.  They never made any assessment of what that should have meant to him.  Instead, it was simply ignored by the fact-finder and, then, not even acknowledged, much less discussed, in the panel's written report justifying its decision.

> e.  The Flawed and Biased Collection, Consideration and Reporting of the Evidence by the Fact-Finder and the Panel Irreparably Tainted the Panel's Finding Against Montague.

Yale contends that it was up to the fact-finder and UWC panel to weigh the evidence and determine culpability, and relies heavily on Ms. Murphy's acknowledgment that if the panel credited all of Roe's testimony as presented to it via the fact-finder's report, it could have found Montague responsible for violating Yale's sexual misconduct policy.  However, Yale ignores the most critical aspect of Ms. Murphy's opinion, which is that the panel's conclusion was no better than the investigation and consideration of the evidence upon which it was based. [43]  The point

---

[43] Addressing the effect of the fact-finder's flawed investigation, Ms. Murphy explained:

In conclusion, the failure to follow up on seeking various electronic communications of potential value, simply deferring to Ms. [Roe's] story as opposed to following up with probative questions,

here is that the panel's acceptance of Roe's credibility rested upon an incomplete and systematically biased method of collecting and reporting the facts. These flaws more than satisfy the customary standards for establishing prejudice by a tribunal, i.e., that they "cast articulable doubt on the accuracy of the outcome of the disciplinary proceeding" against Montague. *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994). Murphy's concession that Roe's story, if credited, could be sufficient to support the panel's finding, is beside the point.

> **6.** ***The UWC II Panel Violated the UWC Procedures and Offended Basic Fairness By Erroneously Relying On The UWC I Proceedings and Considering Them Outside Montague's Presence and Without Affording Him An Opportunity To Respond.***

### a. Erroneous Consideration of UWC I

Yale breached its contract with Montague by considering, on the issue of culpability, Montague's record in the UWC I Matter. The *UWC Procedures* specify that "[i]n determining culpability, the panel may also take into account a respondent's previous formal discipline for other acts of sexual misconduct[.]" Ex. E at 7.4. As will be explained below, the UWC I incident did not involve "sexual misconduct" and consequently, the UWC II panel had no authority to consider it on the issue of culpability.

### b. The *In Camera* Consideration of UWC I

Even if the UWC I incident was properly regarded as "sexual misconduct" – which for the reasons explained below (at pp. 46-49) it was not – Yale nonetheless breached its contract with Montague by considering this evidence after Montague had been excused from the hearing

---

glossing over the inconsistencies in Ms. [Roe's] stories, and downplaying evidence suggesting a change in consent amounted to an investigation that was neither thorough nor impartial. The process demonstrated a clear bias against Mr. Montague. The cumulative effect of these investigatory errors resulted in prejudice to Mr. Montague because it deprived the UWC Panel of relevant evidence which may have, if considered, led to a not responsible finding, or at a minimum a diminished degree of culpability as it pertained to the sanction imposed.

Ex. 50 at 12-13.

and without giving him any opportunity to respond.  The *UWC Procedures* specify that consideration of a respondent's "previous formal discipline for other acts of sexual misconduct" on the issue of culpability (as opposed to penalty) is part of the "Hearing" phase of the proceedings.  Ex. E at 7.4.  The *UWC Procedures* also make clear that the parties have the right to be present for the hearing; the only limitation is that the complainant and respondent "will not appear jointly before the panel at any stage in the proceeding of the hearing" unless they ask to do so, but even so, "[t]he party who is not present before the panel will be in a private room with audio access to the proceedings."  Ex. E at 7.4.  Nothing in the *UWC Procedures* indicates that any portion of the hearing will or may be conducted in the absence of the parties.  (The panel's *deliberations* are conducted in secret, but the *UWC Procedures* expressly state that the deliberations occur "*[f]ollowing the hearing[.]*"  *Id.* at 7.5 (emphasis added)).[44]  Indeed, no reasonable person would assume that a contractual provision granting a "hearing" would mean that some part of the hearing would be conducted outside of the presence of the parties, and without their knowledge.

The failure to present the evidence of UWC I in Montague's presence was made all the more prejudicial given that the presentation the panel did receive regarding UWC I was limited to a perfunctory "couple sentence description" of the prior case by the UWC Secretary, Menon, which was devoid of any context and omitted critical information favorable to Montague.  Ex. 27

---

[44] At her deposition, UWC Secretary Aley Menon could point to nothing in the *UWC Procedures* or any other written policy which would allow consideration of evidence on the issue of culpability in the absence of the respondent, Ex. 29 at 154-57; incredibly, her justification for addressing UWC I outside the presence of the parties was so that Roe (who was not even a party) would not hear of Montague's prior discipline.  *Id.* at 152-53.  This is nonsensical because Menon was aware that Gleason had already told Roe of Montague's prior discipline, and even if she had not, reference to the prior discipline was included in the fact-finder's report, which was provided to Roe in advance of the hearing.

at 60; Ex. 29 at 161-64.[45]  *See infra* pp. 46-49.  The panel was thus left to draw unwarranted

inferences about the significance of the UWC I incident, and this is precisely what it did, as the

panel report indicates.   Had Montague been given a proper opportunity to respond, he could

have made the points which he ultimately raised on appeal (and were rejected as untimely): that

his prior offense and the training tailored to it had nothing to do with sexual consent.

### 7. *Yale Violated the UWC Procedures and Denied Montague Basic Fairness By Allowing Roe Full Participation In a Complaint Filed by the Title IX Office.*

Yale's further placed its thumb on the scale by allowing Roe full participation in

Montague's UWC hearing even though the complaint was brought in the name of the University.

Roe, although not the named complainant, was allowed to deliver an emotional opening

statement about the incident and the effect it had on her, Ex. 25, attend the entire hearing, and

otherwise present herself as the complainant.  At the same time, Yale, with its Senior Deputy

Title IX Coordinator as the named complainant, put the full weight of its authority behind her,

implicitly vouching for her credibility.  Although Yale contends that it is the uniform practice of

the UWC to allow such participation by a complaining witness in a Title IX-initiated complaint,

Ex. 29 at 142-44, the plain language of the *UWC Procedures* provides for opening statements

only by the complainant and respondent, and does not allow for non-party witnesses to be

present other than while testifying.  Ex. E at 7.5; Ex. 29 at 141-42.  This double-barreled

prosecution against Montague deprived him of the basic fairness to which he was entitled under

his contract with Yale.

---

[45] Menon did not tell the panel that the respondent in UWC I, Sally Smith, had emphasized that her interaction had with Montague had been "peripheral," that there was no skin-to-skin contact, and that she herself believed it was likely just a "foolish mistake" on his part.  Ex. 29 at 161-64.  *See infra* pp. 46-49.

8. ***Considered as a Whole, Yale's Conduct With Respect to the UWC II Matter Deprived Montague of the Basic Fairness To Which He Was Entitled Under His Contract With Yale.***

Although any one of the contractual breaches set forth above is sufficient, standing alone, to invalidate Yale's expulsion of Montague, there can be little question that, when considered together, they amount to arbitrary and capricious conduct and a denial of the basic fairness which Montague is guaranteed under his contract with Yale.  Above all, Yale promises a sexual misconduct adjudicatory process which is fair, thorough, and impartial.  Ex. E at 1, 7.3.  This amounts to an express contractual promise of basic fairness throughout the proceeding.  *See Doe v. Trustees of Boston College*, 892 F.3d at 80 ("whenever a school expressly promises no less than basic fairness, which is the case here, the school's implied duty becomes superfluous and the court's analysis to ensure that the disciplinary proceedings were 'conducted with basic fairness,' focuses on assuring compliance with the express contractual promise." [internal citation omitted]).

Here, Yale breached that promise of basic fairness when it embarked on a mission to ensure Montague's expulsion by whatever means necessary, including by:  violating its duty of neutrality with respect to the intake of complaints; violating its duty of confidentiality; violating the rules governing the recusal of panel members; convincing Roe to allow the Title IX office to file a complaint in its own name, only to then allow her full participation in the hearing as if she were the complainant; relying on a flawed collection, consideration, and reporting of the facts which systematically suppressed all the evidence most favorable to Montague; and finally, in the coup de grâce, using a dubious prior finding of "sexual harassment"  both to assign culpability for a sexual assault and to justify the penalty of expulsion, without even giving Montague an opportunity to respond.   One cannot fairly consider the record in this case without reaching the

inescapable conclusion that from the moment Yale got wind of the allegation against the captain

of the basketball team, his fate was virtually guaranteed.  Yale's conduct in its handling of

Montague's case leaves little doubt on this score.

> **B.   Yale Breached Its Contract With Montague in the UWC I Matter Because
> The Conduct At Issue Did Not Meet the Definition of Sexual Harassment
> Under Yale's Policies.**

Although Montague's present legal challenge centers on his expulsion as a result of the

UWC II proceeding, because the UWC II panel and decision maker considered the UWC I

finding on issues of both culpability and disposition, *see supra* pp. 42-44, and because the UWC

I finding was itself erroneous, Montague challenges it here as well.  Yale does not dispute that if

the UWC I finding was not correct under its policies, and if Montague has not waived his right to

challenge the finding, then the UWC II finding and result are likewise invalid.  Under the facts, it

is clear that the UWC lacked jurisdiction over the pizza plate incident and for the same reason,

the evidence did not support a finding of sexual harassment against Montague.  Further, under

Yale's policies, there was no mechanism available to Montague to challenge the jurisdiction of

the UWC, so the exhaustion of remedies doctrine invoked by Yale does not apply as a matter of

law and summary judgment on this claim must be denied.

As is relevant here, Yale's *Sexual Misconduct Policies and Related Definitions* define

sexual harassment in the following manner:

> Sexual harassment consists of nonconsensual sexual advances, requests for sexual
> favors, or other verbal or physical conduct of a sexual nature on or off campus,
> when . . . such conduct has the purpose or effect of unreasonably interfering with
> an individual's work or academic performance or creating an intimidating or
> hostile academic or work environment.

Ex. 49 at 2.  Under these criteria, in this case, the UWC I panel would have had to find "by a preponderance of evidence"[46] that Montague: 1) engaged in verbal or physical conduct of a sexual nature on or off campus; and 2) that such conduct had the purpose or effect of unreasonably interfering with Sally Smith's work or academic performance or created an intimidating or hostile academic or work environment.  It could not have, and did not, make these findings.

## 1.   *The Pizza Plate Incident Did Not Involve "Conduct Of A Sexual Nature".*

Montague did not then and does not now dispute that his conduct in the pizza plate incident was offensive and unacceptable.   But not every instance of offensive and unacceptable behavior by a male towards a female constitutes sexual harassment.  It is axiomatic that, both under Yale's *Sexual Misconduct Policies and Related Definitions* and as a matter of common understanding, sexual harassment requires "conduct of a sexual nature."  Ex. 49 at 2; *see, e.g., Burwell v. Pekin Community High School Dist. 303*, 213 F. Supp. 2d 917, 930 (C.D. Ill. 2002) (to qualify as sexual harassment, "the offensive behavior must be based on sex, rather than personal animus or other reasons" ).   "Innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party . . . are not counted."  *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000).

While certain conduct can be considered inherently sexual in nature regardless of intent, the pizza plate incident was not such a case.[47]  Therefore, in order to find that Montague committed sexual harassment, there would have needed to be evidence sufficient to permit the

---

[46] *See* Ex. E at 7.5.

[47] Certainly, if Montague had shoved a pizza plate down a man's shirt, it would be similarly offensive and unacceptable, but indisputably *not* sexual harassment.

UWC I panel to conclude that Montague acted with some sort of sex-based motivation, and not just out of personal animus for Smith.  *See Gupta*, 212 F.3d at 583; *Burwell,* F. Supp. 2d at 930.

By all accounts, Montague was drunk and irritated by something Smith said and reacted immaturely – and "boorishly" – by shoving a paper plate down her shirt and walking away without saying a word to Smith.  Ex. R.  He made no skin-to-skin contact and said nothing offensive or sexually suggestive.  *Id.*  His actions were wholly unrelated to the fact that he is a male and Smith is female, and thus cannot – and do not – constitute conduct of sexual nature.[48] *See Succar v. Dade County School Board*, 60 F. Supp. 2d 1309, 1314 (S.D. Fla. 1999) ("Personal animosity is not the equivalent of sex discrimination").   Indeed, while Yale now takes the position that the conduct alleged was clearly sexual in nature, even UWC Chairman Post himself (then a member of the UWC), in deciding whether to accept jurisdiction, acknowledged that "*it may be better served as a complaint to the executive committee because it is on the edge and some panel members will have a hard time seeing the sexual nature of the act*."  Ex. NN.[49]

---

[48] Smith herself did not describe Montague's conduct as sexual in nature but instead characterized it in more general terms as an "invasion of my personal space and privacy (in addition to being thoroughly inappropriate)." Ex. R. at YALE00008155-56.  In both her initial written complaint and a statement she wrote in response to the fact-finder's report and which was read to the panel, Ex. 29 at 43-45, Smith went out of her way to emphasize that Montague had not actually made skin-to-skin contact (a fact she thought it was "important to be precise" about), and that, although she had made the decision to file a complaint because she felt like "sexual object rather than a fellow human being," she did not necessarily believe that Montague intended her to feel that way.  Ex. OO.  As Smith explained:

> [M]y complaint is not in regards to *whether or not* he viewed me as a sexual object.  My complaint is in regards to *what his actions implied to me and all around about my character and worth*. . . . I hope this helps Jack to understand that actions involving the invasion of another human's personal space have loaded meaning—always, no matter what the unspoken intent.  Inferences will be drawn, and they will not be favorable.

Ex. OO (emphasis in original).  As she further explained, "I have definitely been stupid and drunk before, too. People make mistakes."  *Id.*

[49] In response, then-UWC Chairman Michael Della Rocca drew a comparison to a case known as the "dollar bills case." Ex. NN.  Yale has refused to provide discovery into the "dollar bills case" and a motion to compel this discovery is pending (ECF No. 119).  Although Plaintiff believes he has adduced more than enough evidence to withstand summary judgment on his claim challenging the outcome of the UWC I matter, this outstanding discovery is the subject of a Rule 56(d) affidavit submitted with this Opposition.

Ultimately, the UWC I panel did not even make a finding that Montague's conduct was sexual in nature; instead, it merely recited the undisputed facts of what had occurred and then concluded in *ipse dixit* fashion that Montague had committed sexual harassment.  Ex. S at YALE00008117.  Based on the record it had before it, this finding was clearly erroneous.

> **2.    *The Pizza Plate Incident Did Not Interfere With Sally Smith's Academic Performance Or Create An Intimidating Or Hostile Academic Environment.***

Nor did Montague's actions have the "purpose or effect of unreasonably interfering with [Smith's] work or academic performance or creating an intimidating or hostile academic work environment."  Indeed, Montague's actions could not have had that purpose or effect, since at the time of the incident Smith had completed all of the academic requirements to earn her degree at Yale.  Ex. 29 at 25.  Yale's attempt to avoid the consequence of this fact by arguing that Montague's conduct in the pizza plate incident somehow created a hostile academic environment not just for Ms. Smith, but for "for the broader Yale community," finds no support in the record, and if adopted by this Court, would render that element of the offense meaningless.[50]  Further, to the extent Yale may argue that it has the authority or obligation as a general matter to adjudicate complaints of sexual misconduct even where the complainant will graduate before the resolution of the complaint, such an argument would miss the point.  Plaintiff does not dispute that Yale has the authority to adjudicate such complaints.  His challenge here is to the failure of his conduct to meet the *elements* of the offense with which he was charged.

---

[50] The panel did not find that Montague's isolated act of shoving a pizza plate down a person's shirt created a "hostile academic environment" for the Yale community at large.  It merely expressed "concern" that Montague did not "have a clear understanding of or an appreciation for the significant implications of his misconduct for [Smith] or for the broader Yale community."  Ex S. at YALE00008118.

49

### 3.    Yale's "Exhaustion of Administrative Remedies" Defense Fails Because No Mechanism Existed For Montague to Challenge the Jurisdiction of the UWC to Hear the Pizza Plate Complaint.

Faced with the obvious defects in the outcome of the UWC I proceeding, Yale principally argues that Montague has waived his right to challenge that outcome by failing to exhaust his administrative remedies.  The doctrine of exhaustion of administrative remedies only applies, however, where there is an available administrative remedy.  *See, e.g., Stepney, LLC v. Fairfield*, 263 Conn. 558, 565 (2003) (recognizing that doctrine of exhaustion of administrative remedies does not apply when "recourse to an administrative remedy would be futile or inadequate"); *Mendillo v. Board of Education*, 246 Conn. 456, 467 (1998) (holding an "administrative remedy is futile or inadequate if the agency is without authority to grant the requested relief").  Here, there was no such remedy available to Montague to challenge the outcome of the UWC I proceeding and thus Yale's defense fails.

Montague's challenge to the UWC I proceeding is fundamentally a challenge not just to the sufficiency of the evidence but to the very jurisdiction of the UWC to hear the complaint.  Under Yale's *Sexual Misconduct Policies*, sexual harassment, and sexual misconduct more generally, require "conduct of a sexual nature."  Ex. 49 at 2-3.  The UWC adjudicates only complaints involving sexual misconduct (with all other violations of the *Undergraduate Regulations* addressed to the Executive Committee), which means that the UWC only accepts jurisdiction over a complaint where it determines that the allegations, if substantiated, constitute "conduct of a sexual nature."  Ex. 29 at 12, 19-21.  That determination is final and not subject to appeal.  Ex. 4 at 28-29 ("If [the UWC] decide there's jurisdiction, then it has jurisdiction.")[51]

---

[51] Yale's procedures specify that "[t]he only grounds for appeal" of a UWC decision are (i) procedural error that prevented the hearing panel or the decision maker from judging the matter fairly, or (ii) the discovery of facts that were not reasonably available to the appealing party prior to the UWC hearing and that support or refute the allegation of sexual misconduct.  See Ex. E at 7.7.

Thus, in the circumstances of the pizza plate incident, where Montague admitted to the conduct underlying the complaint, the outcome was predetermined once the UWC erroneously determined the conduct alleged was of a sexual nature and accepted jurisdiction.  Indeed, the UWC I panel report makes no findings concerning the supposedly sexual nature of Montague's conduct, but instead premised its decision on Montague's "concession" to conduct which it had (erroneously) predetermined was sexual in nature.  Ex S. at YALE00008117.  Montague waived no rights by failing to challenge a determination he had no ability to challenge.

## II.   The Evidence Supports Montague's Claim That His Expulsion Was Motivated At Least In Part By His Gender In Violation of 20 U.S.C. § 1681(a) ("Title IX").

Title IX provides that "[n]o person in the United States shall, on the basis of sex . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  This provision is enforceable "through an implied private right of action."  *Gebser v. Lago Vista Indep. Sch. Dist*., 524 U.S. 274, 281 (1998) (citing *Cannon v. University of Chicago*, 441 U.S. 677, 717 (1979)).  "Because Title IX prohibits (under covered circumstances) subjecting a person to discrimination on account of sex, it is understood to 'bar[] the imposition of university discipline where gender is a motivating factor in the decision to discipline.'"  *Doe v. Columbia University*, 831 F.3d 46, 54 (2d Cir. 2016) (quoting *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994)).  While the Supreme Court has not adopted any formal classification of the various species of claims which may be asserted by students challenging university disciplinary proceedings as discriminatory under Title IX, courts in the Second Circuit and elsewhere recognize what is commonly referred to as an "erroneous outcome" claim.  *See Yusuf v. Vassar College*, 35 F.3d at 715; *Doe v. Trustees of Boston College*, 892 F.3d at 90; *Yu v. Vassar College*, 97 F. Supp. 3d 448, 461-62 (S.D.N.Y. 2015); *Scott v. WorldStarHipHop, Inc.*, 2011 WL 5082410, at *4 (S.D.N.Y. 2011).  A plaintiff prevails

on an erroneous outcome claim where the evidence "cast[s] articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and indicates that "gender bias was a motivating factor" in that outcome. *Yusuf,* 35 F.3d at 715.

As with other types of discrimination claims, which "are based principally on circumstantial evidence," *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 (2000), courts in the Second Circuit apply the familiar burden shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1968), to claims under Title IX alleging gender discrimination in university disciplinary proceedings. *Doe v. Columbia University,* 831 F.3d at 54. As applied to Title IX claims, the framework requires a plaintiff to establish a *prima facie* case by showing facts "supporting a minimum plausible inference of discriminatory intent." *Id.*[52] On a motion for summary judgment, once a plaintiff has established a prima facie case, the burden then shifts to the defendant to put forth evidence demonstrating a legitimate, nondiscriminatory reason for the disciplinary action being challenged. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *Meiri v. Dacon*, 759 F.2d 989, 996 (2d Cir. 1985). If the defendant sustains that burden, the burden shifts back to the plaintiff to show that the defendant's "proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. Critically, as to the third step in the *McDonnell Douglas* framework, "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the [defendant's] explanation." *Reeves,* 530 U.S. at 147. "Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the [defendant's] asserted justification is false, may permit the trier of fact to conclude that the [defendant] unlawfully discriminated." *Id.* at 148. In other

---

[52] Although *Doe v. Columbia* concerned a motion to dismiss and therefore the court applied the *McDonnell Douglas* framework as it relates to pleading standards, the *McDonnell Douglas* framework was originally developed as an evidentiary standard and similarly applies at summary judgment and trial. *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510 (2002); *Littlejohn v. City of New York*, 795 F.3d 297, 309-10 (2d Cir. 2015).

words, the plaintiff need not produce "additional, independent evidence of discrimination" where

he has satisfied the prima facie case and produced sufficient evidence from which a jury could

reject the defendant's proffered explanation for its conduct.  *Id.* at 149.  This rule is "consistent

with the general principle of evidence law that the factfinder is entitled to consider a party's

dishonesty about a material fact 'as affirmative evidence of guilt.'"  *Id.* at 147 (quoting *Wright v.

West*, 505 277, 296 (1992)).  *See also Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 846 (2d

Cir. 2013) ("A plaintiff may prove that retaliation was a but-for cause of an adverse employment

action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the

employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a

reasonable juror could conclude that the explanations were a pretext for a prohibited reason.").

### A.  Montague Has Established a Prima Facie Case of Gender Discrimination.

Yale does not seriously challenge that Montague has established a prima facie case of

gender discrimination under Title IX.  In *Doe v. Columbia*, the Second Circuit held the prima

facie case satisfied where the complaint alleged a flawed and biased disciplinary process, and

further alleged that:

> during the period preceding the disciplinary hearing, there was substantial
> criticism of the University, both in the student body and in the public media,
> accusing the University of not taking seriously complaints of female students
> alleging sexual assault by male students; [and that] the University's
> administration was cognizant of, and sensitive to, these criticisms, to the point
> that the President called a University-wide open meeting with the Dean to discuss
> the issue.

*Id.* at 57.  As the court explained, "[a]gainst this factual background, it is entirely plausible that

the University's decision-makers and its investigator were motivated to favor the accusing

female over the accused male, so as to protect themselves and the University from accusations

that they had failed to protect female students from sexual assault."  *Id.*  The court continued:

"There is nothing implausible about the Complaint's suggested inference that the panel adopted a

biased stance in favor of the accusing female and against the defending male varsity athlete in

order to avoid further fanning the criticisms that Columbia turned a blind eye to such assaults."

*Id.* at 58.

There can be no real question that Montague, for the reasons explained at length above,

has adduced sufficient evidence which "cast[s] articulable doubt on the accuracy of the outcome

of the disciplinary proceeding" against him.  *Yusuf,* 35 F.3d at 715.  As has been shown, that

disciplinary proceeding was laden with procedural violations and indeed defective from the very

root – the process having been commenced via a bait and switch manipulation of Roe, in direct

violation of the Title IX office's duty of neutrality and Montague's right to confidentiality.

While those procedural irregularities alone do not make out a Title IX claim, the evidence in the

present record would allow a jury to conclude that Yale, like Columbia was alleged to have done

in *Doe v. Columbia*, "adopted a biased stance in favor of the accusing female and against the

defending male varsity athlete in order to avoid further fanning the criticism that [Yale] turned a

blind eye to such assault."  *Doe v. Columbia*, 831 F.3d at 58.

And, like Columbia, Yale faced immense pressure to crack down on the perceived

epidemic of sexual misconduct of the Yale campus, and in particular, to "punish perpetrators of

sexual assault in a way that recognizes the gravity of these crimes[.]"[53]  Ex. 6.  Despite Yale's

prior efforts at reforms, the problem was not going away.   The release of the AAU survey results

marked a new low point for Yale administrators charged with combatting sexual assault on

campus and elicited a call from President Salovey for Yale to "redouble [its] efforts" on this

---

[53] In fact, as the court in *Doe v. Columbia* acknowledged, Yale was considered as a sort of poster child for having historically "given light punishments to male students found to have raped or assaulted female students." 831 F.3d at 51.

front.[54]  Then, on the very same day that President Salovey called for a redoubling of efforts,

Gleason and other members of Yale's Title IX leadership commenced a full court press, in total

derogation of their duties and the applicable rules, to convince Roe to come forward and

participate in a formal proceeding charging Montague with sexual assault.  These are precisely

the types of facts which, when combined with an allegation of erroneous outcome, the Second

Circuit held satisfied the prima facie case in *Doe v. Columbia*.

In this connection, two points bear emphasizing.  The first is that, as the Second Circuit

has explicitly recognized:

> A defendant is not excused from liability for discrimination because the
> discriminatory motivation does not result from a discriminatory heart, but rather
> from a desire to avoid practical disadvantages that might result from unbiased
> action. A covered university that adopts, even temporarily, a policy of bias
> favoring one sex over the other in a disciplinary dispute, doing so in order to
> avoid liability or bad publicity, has practiced sex discrimination, notwithstanding
> that the motive for the discrimination did not come from ingrained or permanent
> bias against that particular sex.

*Doe v. Columbia University*, 831 F.3d at 58 n.11.  Thus, biased action which is motivated by a

desire to quell the criticism that would result from unbiased action violates Title IX all the same

as action which is motivated by a discriminatory animus.   The second is that "a defendant

institution is not shielded from liability for discrimination practiced by an employee endowed by

the institution with supervisory authority or institutional influence in recommending and thus

influencing the adverse action by a non-biased decision-maker."  *Doe v. Columbia*, 831 F.3d at

58-59; *see Holcomb v. Iona College*, 521 F.3d 130, 143 (2d Cir. 2008) (holding in analogous

Title VII context that plaintiff is "entitled to succeed, even absent evidence of illegitimate bias on

---

[54] Yale has refused to provide discovery into a training held for all Title IX and UWC personnel following this announcement, and at which the results of the AAU survey were discussed.  Ex. 2 at 90-92. Plaintiff has moved to compel this discovery.  (ECF No. 119).  Although Plaintiff believes he has adduced more than enough evidence to withstand summary judgment on his Title IX claim, this outstanding discovery is the subject of a Rule 56(d) affidavit submitted with this Opposition.

the part of the ultimate decision maker," so long as a biased person endowed with institutional influence "played a meaningful role in the process").  *See also Staub v. Proctor Hospital*, 562 U.S. 411, 422 (2011) (act motivated by unlawful discriminatory animus which is intended to cause and proximately causes adverse employment action subjects employer to liability notwithstanding that biased actor did not make ultimate employment decision).  Therefore, even assuming (without conceding) that the ultimate decision-makers, the UWC panelists and Dean Holloway, did not personally act out of gender bias, that fact alone would not be dispositive of Montague's Title IX claim.[55]

> ### B.  The Evidence Supports The Proposition That Yale's Proffered Legitimate, Nondiscriminatory Reason for Expelling Montague Is Not Entitled to Credence.

Yale's proffered "legitimate, nondiscriminatory reason" for expelling Montague is that he was properly found to have committed sexual assault, in compliance with Yale's procedures adopted in compliance with Title IX guidance from the Department of Education, and he was therefore properly expelled.  Under the *McDonnell Douglas* burden- shifting framework, if a jury were to reject Yale's proffered justification for its actions, it would be entitled to find that Yale had discriminated against Montague on the basis of his gender.  *See Reeves,* 530 U.S. at 147; *Burdine*, 450 U.S. at 256.  A jury would be entitled to do so based on the present record, which would allow it to find Yale's "proffered explanation is unworthy of credence."  *Burdine*, 450 U.S. at 256.[56]

---

[55] Relatedly, at risk of stating the obvious, Defendants cannot obtain summary judgment by submitting self-serving affidavits from various parties swearing that they did not discriminate against Montague on the basis of his gender.  Discriminatory intent is rarely proved through direct evidence, *see, e.g., Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989), and it is hardly surprising that Defendants' witnesses would deny that they unlawfully discriminated against Montague.

[56] In evaluating whether the defendant's proffered "legitimate, nondiscriminatory" explanation is pretextual, the jury is entitled to rely on the same evidence which established the prima facie case.  *Reeves*, 530 at 143; *Burdine*, 450 U.S. at 255 n.10.

As set forth in detail above, there is substantial evidence from which a jury could find that Yale in fact did *not* comply with its own procedures and that its whole consideration of the matter was skewed against Montague from beginning to end, depriving him of the most basic elements of fairness guaranteed by his contract with the University.  The lengths they went to – to manipulate Roe, disclose confidential information about Montague, and then cover it up after the lawsuit was filed – can all be considered by a jury as evidence of gender discrimination.[57] Likewise, the record with respect to the investigation and adjudication of the UWC II case – including the systematic misstatement of evidence as to consistency and motive, suppression of evidence favoring Montague, and improper consideration of the UWC I finding and sanction – would permit a jury to conclude that there is "articulable doubt on the accuracy of the outcome of the disciplinary proceeding" against him.  *Yusuf,* 35 F.3d at 715.

### III.   Montague's Claims for Tortious Interference Against Gleason and Killheffer Survive.

Finally, there are Montague's claims for tortious interference with contract against the individual defendants, Gleason and Killheffer.  Under Connecticut law, "[a] claim for intentional interference with contractual relations requires the plaintiff to establish: (1) the existence of a contractual or beneficial relationship; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to interfere with the relationship; (4) that the interference was tortious; and (5) a loss suffered by the plaintiff that was cause by the defendant's tortious conduct."  *Rioux v. Barry*, 283 Conn. 338, 351 (2007).  Interference is tortious if it involves "improper motive or

---

[57] "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000) (quoting *Wright v. West*, 505 U.S. 277, 296 (1992)).

means," e.g., "fraud, misrepresentation, intimidation[,] molestation" or malice. *Robert S. Weiss and Associates, Inc. v. Wiederlight*, 208 Conn. 525, 536 (1988)

Montague's claim for tortious interference centers on Gleason's and Killheffer's roles in improperly influencing Roe's decision to authorize the filing of a formal complaint against Montague. As with the breach of contract claim stemming from this same conduct, Defendants' principal defense is that all the evidence of the interference conduct is hearsay. As it concerns Gleason's specific conduct of disclosing confidential information to Roe, that argument fails for the reasons explained above. *See supra* pp. 29-20. As to Killheffer's involvement in the manipulation of the process more generally, he has admitted to participating in the decision to pursue a formal complaint against Montague, contrary to the established policy of the Title IX office and despite Roe's clearly expressed wishes to the contrary. The record would allow a jury to conclude that Gleason and Killheffer possessed an improper motive (the prosecution of a formal complaint in circumstances in which the rules did not allow for one) and used improper means (the coercion and disclosure of confidential information to Roe). Gleason and Killheffer have not come close to demonstrating they are entitled to summary judgment on these claims.

## v. Conclusion

For the reasons stated herein, Plaintiff respectfully requests that the Court DENY Defendants' Motion for Summary Judgment. The Plaintiff respectfully requests that the Court hear oral argument on Defendants' Motion.

Respectfully submitted,

JACK MONTAGUE,

By his attorneys,

/s/  *Max D. Stern*

Max D. Stern (BBO #479560) (*pro hac vice*)
mstern@toddweld.com
Alexandra H. Deal (BBO #660654) (*pro hac vice*)
adeal@toddweld.com
Christian G. Kiely (BBO #684308) (*pro hac vice*)
ckiely@toddweld.com
TODD & WELD LLP
One Federal St., 27th Floor
Boston, MA 02110
Tel. (617) 720-2626
Fax (617) 227-5777

William F. Dow III (ct00161)
JACOBS & DOW, LLC
350 Orange Street
New Haven, CT 06511
wdow@jacobslaw.com
Tel. (203) 772-3100
Fax (203) 772-1691

Dated: July 18, 2018

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via the Court's electronic filing system, and served to all counsel of record on July 18, 2018.

/s/ *Christian G. Kiely*
Christian G. Kiely

59