Exhibit 2

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

---------------------------------x
JACK MONTAGUE,                   :
                                 :
        Plaintiffs,              :
                                 :
    -versus-                     : CIVIL ACTION
                                 : No.
YALE UNIVERSITY, ANGELA          : 3:16-cv-00885-AVC
GLEASON and JASON KILLHEFFER,    :
                                 :
        Defendants              x
---------------------------------

　　　　Deposition of MIRIAM BERKMAN, taken pursuant to Rule 30 of the Federal Rules of Civil Procedure, held at the law offices of Jacobs and Dow, LLC, 350 Orange Street, New Haven, Connecticut, before Rosanne LaBonia, LSR 249 and Notary Public in and for the State of Connecticut, on June 16, 2017, at 8:10 A.M.

Electronically signed by ROSANNE LABONIA (501-218-496-1146)          b769ef9c-2279-418b-908e-678fb5e3707a

```
 1      A     That's correct.
 2      Q     Now, in the course of this, you
 3   interviewed not only REDACTED   but a number of her
 4   friends.
 5      A     That's correct.
 6      Q     Five of them all together, is that right?
 7      A     Yes.
 8      Q     Did you ask her for text messages between
 9   her and her other friends after the event --
10      A     No.
11      Q     -- on the 19th or so forth?
12      A     No.
13      Q     Why not?
14      A     I asked her to provide me with any
15   documents or other material that she felt was --
16   that she wanted me to see in relation to the
17   investigation.  She had me -- she gave me the names
18   of people and she gave me these text messages.  I
19   didn't -- I didn't ask for other text messages
20   because I didn't think that they were relevant.
21      Q     Well, this was a text message that she
22   thought was consistent with the story that she was
23   telling you, is that right?
24      A     That's correct.
25      Q     You didn't think that if she had text
```

```
 1   off.
 2        Q      And then it says, "She took off shirt
 3   and"...
 4        A      "Skirt."
 5        Q      "Skirt.  And thinks he unhooked"...
 6        A      "Unhooked bra and took off underwear.
 7        Q      Then it says, "Five to ten min."
 8        A      Mm-hmm.
 9        Q      What?
10        A      That for five to ten minutes they were --
11   they were in bed, they were kissing, it says
12   fingering was consensual.
13        Q      What does fingering indicate?
14        A      That refers to Mr. Montague putting his
15   fingers inside her vagina.
16        Q      And you indicate that that was
17   consensual.
18        A      Yes.
19        Q      Then it says -- does it say "zero"?
20        A      No words.  Zero, the letter -- whatever
21   the greek letter for "No words."
22        Q      Then it says?
23        A      "Didn't tense up."
24        Q      So now having heard all these things from
25   Roe    you already told us you don't recall any of
```

```
 1    the five friends telling you that she told them that
 2    they got into bed and took off all their clothes
 3    voluntarily.  They didn't tell you that she told
 4    them that, correct?
 5                    MR. NOONAN:  Objection.  I think
 6            you've asked that and she said she
 7            doesn't recall it, but --
 8      A     I don't recall.
 9      Q     Them telling you that.
10      A     I don't recall them telling me that.
11      Q     Did any of them tell you that she told
12    them that they touched each other's bodies?
13      A     In those words -- I don't recall exactly.
14    What the other friends told me was that she had said
15    she wanted to hook up, that they were hooking up,
16    but she didn't want to have sex.
17      Q     Did anyone tell you that she had allowed
18    him to finger her?  Or should I put it this way, did
19    any of them tell you that she told them that she had
20    allowed him to finger her?
21      A     I don't recall.
22      Q     Now, that's a pretty significant fact,
23    wouldn't you agree with me?
24                    MR. NOONAN:  Objection.
25      A     In the context of her complaint, that
```

```
 1   what was nonconsensual was him putting his penis
 2   inside her.  The fact that she had let him put his
 3   fingers inside her is not relevant.
 4       Q    Not relevant at all?
 5       A    It describes the context of their
 6   interaction, but under the Yale definition of
 7   "consent," consent to one sexual act does not imply
 8   consent to any other sexual act.
 9       Q    It is true that one can consent
10   nonverbally, isn't that right?
11       A    Yes.
12       Q    And how does one consent nonverbally?
13       A    One can consent nonverbally by touching,
14   by being the person who is escalating the sexual
15   contact, by -- basically, by touching.
16       Q    By not tensing up?
17       A    That is -- by partici -- that -- yeah,
18   that can be part of a consent.
19       Q    In fact, you said that in your report, if
20   you look in the report, 543, the main paragraph
21   there, the one that starts, "The party wound down."
22       A    Correct, yes, I see.
23       Q    And then it says, "She stated to me that
24   he" -- this refers to Ms. Roe      "that he kissed
25   her, touched her body, including her genitals, to
```

```
 1    which Ms. Roe        had no objection," correct?
 2         A     Correct.
 3         Q     So that means she consented, is that
 4    right?
 5         A     Correct.
 6         Q     In fact, you say, "She stated to me that
 7    she indicated her consent by kissing him, touching
 8    his body, not his genitals, and by not tensing up."
 9    So those were indications of consent, right?
10         A     Yes.
11         Q     So fingering would also be an -- allowing
12    him to finger her would also be an indication of
13    consent, correct?
14               MR. NOONAN:  Objection.  Consent to
15         what?
16         Q     Just in the same sense that you have
17    written here, an indication of consent.
18         A     It's an indication of consent to sexual
19    contact.  It's not an indication of consent to
20    sexual intercourse.
21         Q     Are you saying that it would be
22    completely irrelevant to the question of whether she
23    is consenting to sexual --
24         A     Intercourse?
25         Q     Yes.
```

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                b769ef9c-2279-418b-908e-678fb5e3707a

1    A    In the context in which she -- she told
2  me that she told him three times all together, twice
3  before he was fingering her, that she did not want
4  to have sex.  And so in that context, I believe that
5  it was irrelevant to consent to intercourse to --
6  that she allowed and participated and was perfectly
7  agreeable to having him touch her genitals, put his
8  fingers inside her; I do not believe that that was
9  an indication of consent to sexual intercourse.
10   Q    You're a lawyer, you know the difference
11 between what is relevant or irrelevant and what is
12 the ultimate fact or not the ultimate fact, correct?
13   A    Yes.
14   Q    And so you say that the fact that she
15 might have allowed him to finger her does not mean
16 that she had consented to sexual intercourse, right?
17   A    Correct.
18   Q    But I'm asking you, was it your
19 conclusion that it was completely irrelevant to the
20 issue of whether she was giving nonverbal consent?
21        MR. NOONAN:  Objection.  Calls for
22        a legal conclusion.
23        THE WITNESS:  Do you want me to
24        answer?
25        MR. NOONAN:  Yes, go ahead.

```
 1                THE WITNESS:  I wasn't sure what I
 2           was supposed to do.
 3                MR. NOONAN:  Just for the future,
 4           you should -- do pause for the objection,
 5           but yes, you should answer.
 6                THE WITNESS:  Okay.  As I said, I
 7           haven't practiced law in a very long
 8           time.
 9       A    Perhaps not completely irrelevant, but
10  not -- not --
11       Q    Not determinative.
12       A    Not determinative, and not really very
13  significant.
14       Q    Is that why you left it out of your
15  report?
16       A    Left what out of my report?
17       Q    The fact that she had allowed him to
18  finger her?
19       A    I didn't leave it out of my report.
20       Q    Where does it say that?
21       A    I guess what it states is that he touched
22  her body, including her genitals.
23       Q    Well, touching someone's genitals is
24  different than penetrating her with his fingers,
25  would you not agree with me about that?  You'll
```

```
 1    agree with it, right?
 2         A     Yes, I'll agree with that.
 3         Q     So the fact that she allowed him to
 4    penetrate her with his fingers is not in your
 5    report.
 6         A     That is correct.
 7         Q     And was not mentioned to you by any of
 8    the friends when they reported to you what she had
 9    reported to them.
10         A     I don't recall.
11         Q     You don't recall that.
12         A     I don't recall that.
13         Q     And you're not saying that it may or may
14    not be in there; you're saying that -- is it
15    correct, as far as your best memory is concerned,
16    they did not tell you that?
17         A     I honestly don't recall.  I'm saying --
18    what I'm saying is sitting here today, I don't
19    recall them saying it, but I have not specifically
20    reviewed my notes to look for it, and I can't tell
21    you for sure that no one told me that.
22         Q     Okay.  If we take a break, I'm going to
23    ask you to look through your notes.
24         A     Okay.
25         Q     All right.  Now, turning to your notes
```

```
 1              you're communicating to the witness what
 2              you want her to say.
 3                   MR. NOONAN:  I'm stating a ground
 4              for the objection.
 5                   MR. STERN:  You do this all the
 6              time, and I don't want you to do it
 7              today.
 8                   MR. NOONAN:  I respectfully
 9              disagree with you.  I think I'm entitled
10              to state the ground of my objection.
11                   MR. STERN:  Not here.  Not in front
12              of the witness.
13     A     I'm sorry, can you ask me the question
14  again now?
15     Q     You've told us that one can consent
16  nonverbally, correct?
17     A     Yes.
18     Q     And the ways one consents nonverbally is
19  the way one conducts herself with respect to the
20  sexual activity that's going on, correct?
21     A     Correct.
22     Q     And when I asked you about whether
23  fingering can play a part in that, what you said was
24  not here because she had told him that she did not
25  wish to have sex.
```

```
 1       A     Correct.
 2       Q     Now, you'll agree with me that someone
 3   can say I don't want to do something, but then
 4   change their mind, correct?
 5       A     Yes.
 6       Q     So in this case, however, here, you did
 7   not think that her participation in sexual activity,
 8   including fingering, represented a change of mind.
 9       A     That's correct.
10       Q     That's right?
11       A     That's correct.
12       Q     And that's because she told him at the
13   same time, "No," right?
14       A     No, I don't believe that's what I said.
15   What I said was she had told him before, more than
16   once, that she did not want to have sex, and in that
17   context I think -- I don't know exactly what he was
18   thinking.  I can't tell you that.  But I don't think
19   it was a reasonable inference that because she
20   allowed fingering, that that was a change of her
21   mind, that that -- that it was -- because what -- I
22   believe what I told you about hooking up is that it
23   covers lots of things, and so she had previously
24   given verbal consent to hooking up, which then
25   covered the fingering, but she had taken sex,
```

1    and students of non-binary genders had been
2    especially a high number of people had had unwanted
3    unconsented sexual contact.
4        Q    And this got a fair amount of publicity
5    on the Yale campus?
6        A    Yes.
7        Q    Where the president was moved to write a
8    letter to the University community about that.
9        A    I don't remember that.  I'll believe you.
10       Q    I'll show you -- it's already marked as
11   Exhibit 31.  Does that refresh your memory?
12            MR. NOONAN:  Are you asking whether
13            she saw this at the time?
14       Q    Well, did you see it at the time?
15       A    I don't recall.  I don't know if I saw
16   it.
17       Q    Well, you were a vital part of the sexual
18   misconduct operation at Yale, correct?
19       A    Yes.
20       Q    How many fact finders are there?
21       A    I think there's five or six.
22       Q    And you've told us that there's a yearly
23   training meeting in the fall?
24       A    Yes.
25       Q    And this would have been discussed at the

```
 1   fall meeting?
 2        A    Yes.
 3        Q    Do you remember it being discussed?
 4        A    I remember it being discussed.  I
 5   remember it -- I don't recall the letter from Peter
 6   Salovey.  I'm not surprised that Peter Salovey wrote
 7   a letter.  I do recall it being discussed at the
 8   training --
 9             MR. NOONAN:  You're both saying
10             "it."  Can you tell me what you're
11             referring to, "it" being discussed.
12             THE WITNESS:  The survey.
13             MR. NOONAN:  Because we were
14             talking about the letter and survey.
15   BY MR. STERN:
16        Q    You see on page two of the survey, it
17   says -- I'm sorry, the letter from Peter Salovey,
18   "The survey results make clear, however, that we
19   must redouble our efforts."
20        A    Yes.
21        Q    So did someone refer to that at that
22   meeting in the fall?
23        A    Not that I recall.
24        Q    Well, did people talk about the need to
25   redouble efforts?
```

```
 1      A     Oh, yes, people talked about the need to
 2   work even harder to make sure that students were
 3   aware of what the consent policy was and to make
 4   sure that students were aware of what the
 5   University's mechanisms are to respond to violations
 6   of the policy and to make sure that the systems for
 7   responding to students were responding well.
 8      Q     Okay.  Give me a second.  I think I'm
 9   done.
10            I'm showing you Exhibit 82.  This was
11   previously marked.  This is an e-mail from Aley
12   Menon to you.
13      A     Yes.
14      Q     February 24th, 2016.
15      A     Yes.
16      Q     This is when --
17      A     So this answers the question of when I
18   received the panel report.
19      Q     Right.  Then she says, "Destroy or delete
20   any paperwork and electronic files you have relating
21   to this matter."
22      A     Yes.  I didn't do that.
23      Q     You didn't do that, right?
24      A     Right.
25      Q     Why didn't you do that?
```

Electronically signed by ROSANNE LABONIA (501-218-496-1146)          b769ef9c-2279-418b-908e-678fb5e3707a