# Exhibit 4

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

CIVIL ACTION NO. 3:16 cv 00885-AVC

--------------------------------x

JACK MONTAGUE,                         :

    Plaintiff,                         :

            -v-                     :

YALE UNIVERSITY, ANGELA GLEASON, :

And JASON KILLHEFFER,                  :

    Defendants.                        :

--------------------------------x


           Deposition of STEPHANIE SPANGLER,

taken pursuant to the Federal Rules of Civil

Procedure, at the Office of General Counsel, Yale

University, 2 Whitney Avenue, New Haven Connecticut,

before James A. Martone, LSR #248, and Notary Public,

in and for the State of Connecticut, on August 31,

2017, at 12:05 p.m.

Electronically signed by JAMES MARTONE (601-171-250-7767)                    2b94db3f-d12a-4a80-80b2-f233f9bcc17d

MONTAGUE v. YALE UNIVERSITY                    August 31, 2017

1    information would need to be shared with the

2    respondent to get that outcome.

3         Q.   But certainly if the complainant sought to

4    have the Deputy Title IX Coordinator or someone else

5    reach out to the respondent, to let him know that

6    someone had made a complaint, without revealing the

7    specifics of that complaint, that would be one option

8    that would be available?

9         A.   It's an option.

10        Q.   And what would the formal complaint

11   process entail?

12        A.   The formal complaint process is outlined

13   in the University-Wide Committee on Sexual Misconduct

14   procedures.

15        Q.   But generally speaking, what's involved in

16   bringing forward a formal complaint?

17        A.   Can you reframe that?  I'm not sure I

18   understand it.

19        Q.   Well, you just described a little bit

20   about what might happen with a complainant opted to

21   proceed with an informal resolution.

22        A.   Uh-huh.

23        Q.   So if a complainant opts to proceed with a

24   formal resolution, what is the sort of sequence of

25   events in bringing that complaint through the formal

Electronically signed by JAMES MARTONE (601-171-250-7767)                    2b94db3f-d12a-4a80-80b2-f233f9bcc17d

MONTAGUE v. YALE UNIVERSITY                    August 31, 2017

Page 29

1    resolution process?

2        A.   A complaint in writing is sent to the

3    University-Wide Committee.  The University-Wide

4    Committee decides about jurisdiction.  If they decide

5    there's jurisdiction, then it has jurisdiction.  They

6    will enact procedures as they're outlined in their

7    procedures, which are on line, which involve

8    fact-finding, a hearing process, and a number of

9    other steps that culminate in a finding and

10   recommendations.

11       Q.   Now for the formal complaint process, that

12   could proceed with the complainant, so the person who

13   has been the victim of some alleged sexual

14   misconduct, being the named complainant on the

15   Complaint, correct?

16       A.   Yes.

17       Q.   And it could also involve a Title IX

18   Coordinator being the named complainant on the

19   Complaint?

20       A.   Yes.

21       Q.   Now in the situation where the Title IX

22   Coordinator is the named complainant in the

23   Complaint, is it correct that the, what you'll call

24   the complainant, the person who experienced the

25   misconduct, that person, they don't need to be the

Electronically signed by JAMES MARTONE (601-171-250-7767)                    2b94db3f-d12a-4a80-80b2-f233f9bcc17d

MONTAGUE v. YALE UNIVERSITY                    August 31, 2017

1    named complainant, but they do need to participate in

2    the process, correct?

3         A.    Yes.

4         Q.    Okay.  And the only circumstance where you

5    could have a -- the university-wide bring a complaint

6    in its own name, where the complainant does not agree

7    to participate in the process is if there is evidence

8    to suggest that there is a danger to the community,

9    correct?

10        A.    Can you repeat that again?

11        Q.    So is there any situation where the

12   university can bring a formal complaint where the

13   Title IX Coordinator or someone else is the named

14   complainant, and the alleged victim of the misconduct

15   does not agree to participate in the process at all,

16   is there any circumstance under which the

17   university-wide can still proceed with a formal

18   complaint?

19        A.    If there's a risk to the safety of the

20   university community.

21        Q.    Okay.  So where a complainant is not --

22   and again sorry, where the person who is the alleged

23   victim of the sexual misconduct does not want to be

24   the named complainant, you either need that person's

25   participation in the process or you need some

Electronically signed by JAMES MARTONE (601-171-250-7767)                    2b94db3f-d12a-4a80-80b2-f233f9bcc17d

Page 31

1    evidence that the respondent poses a danger to the

2    community, is that accurate?

3         A.   Yes.

4                   MR. NOONAN:   Off the record.

5                   (Discussion off the record)

6         Q.   So back on the record.  And when we talk

7    about requiring the complaining witness's

8    participation in the process, what does that mean,

9    participation?

10        A.   Participation means in order for the UWC

11   to proceed with a formal process, they generally

12   except that the complaining witness will at least

13   speak to a fact finder.  Beyond that, there are no

14   requirements.  And in the course of explaining

15   options to a complainant, one of the conversations is

16   what limitations are placed on any process, be it

17   informal or formal, based on how much information the

18   complainant or complaining witness wants to share in

19   the process.

20        Q.   And in addition to speaking to a fact

21   finder, the complaining witness would not be able to

22   proceed anonymously, correct?

23        A.   Correct.

24        Q.   So the complaining witness' name would be

25   revealed to the respondent?

Electronically signed by JAMES MARTONE (601-171-250-7767)                    2b94db3f-d12a-4a80-80b2-f233f9bcc17d

MONTAGUE v. YALE UNIVERSITY                    August 31, 2017

Page 32

1         A.    In a formal process, the complaining
2    witness's name is revealed.
3         Q.    Sure.   Other than in the situation where
4    the respondent poses a danger to the community, or
5    the complainant, or the complaining witness, does the
6    Title IX officer take a position regarding whether a
7    formal complaint should be pursued?
8         A.    No.   The Title IX office and the Title IX
9    Coordinators work with complainants to try to
10   determine what outcomes they're aspiring to.
11        Q.    So there wouldn't be a case where the
12   Title IX office decides that this is a case that we
13   want to pursue, a formal complaint?
14        A.    Not without the complaining witness's
15   agreement that this is the direction to go.
16        Q.    So slightly rephrased, there are cases
17   where the Title IX office will decide we want to
18   pursue this as a formal complaint, if the complaining
19   witness agrees to participate?
20        A.    No.
21        Q.    So that --
22        A.    The Title IX office is interpreting the
23   complainant's wishes, for outcomes.   And so the Title
24   IX office may agree to file the Complaint, to meet
25   the complaining witness' wishes.   We don't

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    August 31, 2017

Page 33

1    independently decide to file a formal complaint.

2         Q.   Is there's never been a situation where

3    the Title IX office has decided that we think that

4    this case is appropriate to be resolved by a formal

5    complaint, provided that the complaining witness will

6    agree to participate in the process?

7         A.   We don't make the decision to pursue the

8    formal complaint.  The complaining witness or the

9    complainant decides to pursue a formal complaint.

10        Q.   But I'm asking a slightly different

11   question.  Which is does the Title IX office ever

12   decide that the Title IX office wants to pursue a

13   formal complaint provided that the complaining

14   witness will agree to participate in that process?

15        A.   That has not been my experience.

16        Q.   So if a complaining witness is willing to

17   participate in a formal -- strike.  If a complaining

18   witness does not want to be the named complainant,

19   but is willing to participate as a witness, speak to

20   the fact finder, are there cases where the Title IX

21   office decides that the case is an appropriate case

22   to pursue as a formal complaint process?

23              MR. NOONAN:  I'm sorry, are you

24   saying decides it was not appropriate or was

25   appropriate?

Electronically signed by JAMES MARTONE (601-171-250-7767)                    2b94db3f-d12a-4a80-80b2-f233f9bcc17d

MONTAGUE v. YALE UNIVERSITY                    August 31, 2017

Page 34

1               MR. KIELY:  I'll rephrase it.

2       Q.   Are there cases where provided that the

3    complaining witness agrees to participate in a formal

4    complaint process, the Title IX office -- strike

5    that.

6               Provided a complaining witness

7    agrees to participate in the process, but not be

8    named as a complainant, what are the reasons that it

9    would, that the Title IX office would recommend

10   pursuing a formal as opposed to informal Complaint?

11       A.   The Title IX office doesn't recommend.

12   The Title IX office would serve or Title IX

13   Coordinator would serve as the complainant in a case,

14   for jurisdictional reasons, for safety reasons, or

15   for complainant preference reasons.  But the goal is

16   to work to achieve the complainant or complaining

17   witness' goals.

18       Q.   So does the Title IX office never

19   privately forms a view as to the appropriateness of

20   formal versus informal Complaint in a particular

21   case?

22       A.   Depends how you define view.  What we

23   would determine is what options should be presented

24   to a complainant, and help the complainant decide

25   which of those options align with the complainant's

Electronically signed by JAMES MARTONE (601-171-250-7767)                    2b94db3f-d12a-4a80-80b2-f233f9bcc17d

MONTAGUE v. YALE UNIVERSITY                    August 31, 2017

1    goals.

2         Q.   Are there situations where a complainant

3    is not presented with both the formal and the

4    informal option?

5         A.   Not that I know of.

6         Q.   So the complaining witness is always

7    presented with the formal and the informal option,

8    correct?

9         A.   And the criminal option.

10        Q.   And the criminal option.  And would a

11   Title IX Coordinator ever express a view to a

12   complaining witness whether an informal versus a

13   formal resolution is more appropriate for that

14   particular case?

15        A.   The Title IX Coordinator would present

16   information about informal and formal resolution

17   processes.  So that the complainant can decide which

18   are better aligned based on the information the

19   complainant has with the complainant's goals.

20        Q.   You would agree with the general statement

21   that there are provided, whatever resolution is

22   ultimately sought is consistent with the

23   complainant's goals, that there are certain cases

24   that are more appropriate for formal resolution and

25   there are certain cases that are more appropriate for

Electronically signed by JAMES MARTONE (601-171-250-7767)                    2b94db3f-d12a-4a80-80b2-f233f9bcc17d

MONTAGUE v. YALE UNIVERSITY                    August 31, 2017

Page 36

1    informal resolution?

2              MR. NOONAN:   From whose point of

3    view?

4         Q.   From the point of view of the Title IX

5    office.

6         A.   Once again, the view is through the

7    complainant's goals.  And the complainant's wishes.

8    The Title IX office does not have, does not create an

9    independent view.  The Title IX office or Title IX

10   Coordinators work with complainants to determine

11   which option seems to best match the complainant's

12   goals, and the Title IX office provides the

13   complainant with the information that the complainant

14   needs to make that determination.

15        Q.   So let me step back.  So if an informal

16   process is pursued, that might result in some sort of

17   recommendation to the respondent to, for example, get

18   counseling, is that accurate?

19        A.   It could.

20        Q.   But an informal process would not result

21   in the respondent being -- having some sanction

22   imposed on him, correct?

23        A.   A student or faculty respondent would not

24   have a sanction imposed as a result of, or discipline

25   imposed as a result of an informal process.

Electronically signed by JAMES MARTONE (601-171-250-7767)          2b94db3f-d12a-4a80-80b2-f233f9bcc17d

MONTAGUE v. YALE UNIVERSITY                    August 31, 2017

Page 44

1                    (Recess taken: 1:08-1:19 p.m.)

2     CONTINUED BY MR. KIELY:

3          Q.   I'm now going to put in front of you

4     what's already been marked as Exhibit 64.  And my

5     first question is whether you recognize this

6     document?

7          A.   Again, I have -- I don't have time to

8     review the whole document, but it is titled Voluntary

9     Resolution Agreement for Yale University, Complaint

10    number 01112027.

11         Q.   Is it correct that in 2011, a group of

12    Yale students filed a Title IX Complaint against Yale

13    with the Department of Education?

14         A.   There was a Complaint filed against Yale

15    University in 2011.

16         Q.   And the Department of Education Office of

17    Civil Rights initiated an investigation of the

18    Complaint?

19         A.   Yes.

20         Q.   And this document that I've just placed in

21    front of you is an agreement resolving that

22    Complaint?

23         A.   It's called a Voluntary Resolution

24    Agreement.

25         Q.   And is it your understanding -- so if you

Electronically signed by JAMES MARTONE (601-171-250-7767)                    2b94db3f-d12a-4a80-80b2-f233f9bcc17d

MONTAGUE v. YALE UNIVERSITY                     August 31, 2017

```
 1        A.    Yes.
 2        Q.    Okay.  So if you'd turn to page 2, it says
 3   that the university -- at the very bottom, Grievance
 4   Procedures Addressing Sexual Misconduct, B2.  It says
 5   "If the university creates a new Title IX grievance
 6   process, the university will ensure it, as does the
 7   present UWC process affords the following."
 8        A.    Yes.
 9        Q.    And then it lists a number of -- there's a
10   number of items following that.  Item F, it says
11   "Adequate, prompt and impartial investigations of
12   allegations of sexual misconduct, including 1; Not
13   delaying the university's investigation of the
14   possible sexual misconduct under Title IX until
15   related criminal processes are concluded," and 2:
16   "Equitable information gathering from both the
17   complainants and the alleged perpetrators;" did I
18   read that correctly?
19        A.    Yes.
20        Q.    And does Yale's UWC process in fact comply
21   with what I've just read in letter F?
22        A.    I believe it does.
23        Q.    And if you'd turn down to C, on the same
24   page, here it describes, it says "The university has
25   conducted and will continue to hold annual training
```

MONTAGUE v. YALE UNIVERSITY                        August 31, 2017

Page 63

1    harms, have requested that the university provide

2    alternatives to the formal complaint option."

3          A.    Yes.

4          Q.    So is that an accurate statement?

5          A.    Yes.

6          Q.    And it goes on to say here "They,"

7    referring to many in our community, "have underscored

8    that choice of and control over the promises whenever

9    possible is an important element in helping those

10   affected regain their sense of well-being."  Is that

11   an accurate statement?

12         A.    Yes.

13         Q.    Do you recall that this particular edition

14   of the semiannual report caused some controversy?

15         A.    Yes.

16         Q.    Okay.  And describe for me what was the

17   nature of that controversy?

18         A.    The controversy -- the publication of this

19   report coincided with intensified action by certain

20   groups at the federal level with the Department of

21   Education about how they were addressing sexual

22   misconduct on campuses.  And we received after this

23   report, a number of communications with a variety of

24   concerns.

25                    The most intense concern was that

Electronically signed by JAMES MARTONE (601-171-250-7767)          2b94db3f-d12a-4a80-80b2-f233f9bcc17d

MONTAGUE v. YALE UNIVERSITY                    August 31, 2017

Page 64

1    they questioned why we were sanctioning

2    non-consensual sex with a variety of sanctions and

3    why non-consensual sex, which some of our

4    correspondence equated to a criminal offense, why

5    they were not all treated more severely.  That was

6    one.  The most prominent concern is that we were both

7    variable and mild in treating findings of

8    non-consensual sex.

9         Q.   So is it fair to say that one of the

10   criticisms was over the use of the term

11   "non-consensual sex?"

12        A.   Not necessarily.  That was -- no, that's

13   not necessarily the criticism.

14        Q.   Is it fair to say that one of the

15   criticisms was that Yale was not sanctioning students

16   found responsible for non-consensual sex severely

17   enough?

18        A.   That was one of the criticisms.

19        Q.   And, in fact, this controversy got some

20   coverage in the national media, correct?

21        A.   As I recall.

22        Q.   Okay.  And did you read any of the

23   articles that were published in various outlets about

24   this?

25        A.   Yes.

Electronically signed by JAMES MARTONE (601-171-250-7767)                    2b94db3f-d12a-4a80-80b2-f233f9bcc17d

MONTAGUE v. YALE UNIVERSITY                    August 31, 2017

Page 67

1        Q.   Are you familiar with her?

2        A.   Yes.

3        Q.   Why are you familiar with her?

4        A.   She is very prominent activist, created an

5   organization called "Know your IXs."  In addition,

6   she was the one petitioning the federal government

7   with thischange.org.

8        Q.   The other Yale student that purports to

9   quote is Hanna Slater.

10       A.   Uh-huh.

11       Q.   Are you familiar with Hanna Slater?

12       A.   I know who she is.  I'm not gonna go into

13   great detail about certain names you bring up to me

14   for reasons of privacy.

15            MR. NOONAN:  The question was does

16   she know who she is, the answer was yes.

17       Q.   But you're right, you should not reveal

18   confidential information about an individual.  But I

19   don't think he was asking for any private

20   information.

21            MR. KIELY:  I wasn't.

22       Q.   Do you know whether she's an activist or

23   not?

24       A.   I don't recall.

25       Q.   And again specifically -- well,

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    August 31, 2017

Page 68

1    specifically this article is referring to the fact

2    that in the July 31, 2013 edition of the semiannual

3    report, it reports that six students were found

4    responsible for non-consensual sex, and one was

5    suspended and the other five were given lesser

6    sanctions?

7            A.   Yes.  That's what it says.

8            Q.   And people were not happy about that?

9            A.   People in this article were not happy

10   about that.

11           Q.   And others in the Yale community were not

12   happy about that either?

13           A.   There were concerns about that.

14           Q.   Okay.  And you don't need to read it, but

15   the -- you can if you want, the Huffpost article,

16   103, you can read it, but my question to you is just

17   whether it's fair to say that a similar concern is

18   outlined in that article?

19           A.   Then I'll have to read it.

20           Q.   Okay.  Go ahead.

21                     (Pause in the Proceedings)

22           A.   Okay.

23           Q.   So again, that article, Exhibit 103, from

24   the Huffpost, the headline is just for the record,

25   "Yale fails to expel students guilty of sexual

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    August 31, 2017

Page 72

1      Q.   And this is dated August 5th, 2013?

2      A.   Yes.

3      Q.   And this is also something that's

4  available on Yale's website?

5      A.   Yes.

6      Q.   And now I'm going to show you what's

7  previously been marked as Exhibit 21.  Do you

8  recognize this?

9      A.   I see that it is a letter from Yale alumni

10  to me and President Salovey on the sexual misconduct

11  report.

12      Q.   Okay.  And you've seen this before today

13  certainly?

14      A.   I have seen this before today.

15      Q.   And it's signed by over 200 alumni?

16      A.   I haven't counted.  They count themselves.

17  There are 229 names on this.

18      Q.   And these people represent themselves as

19  being alumni?

20      A.   They include years of graduation.

21      Q.   And it also actually includes a few

22  current students at the time?  I will represent to

23  you that this --

24      A.   I see one so far.

25      Q.   I will represent that this list contains

Sanders, Gale & Russell
(203) 624-4157

Electronically signed by JAMES MARTONE (601-171-250-7767)                    2b94db3f-d12a-4a80-80b2-f233f9bcc17d

MONTAGUE v. YALE UNIVERSITY                    August 31, 2017

Page 73

1    the names of three persons based on their graduation

2    year, were current Yale students at the time that

3    this letter was written.

4         A.   Okay.

5         Q.   And is it fair the say that this letter

6    got a fair amount of publicity at the time?

7         A.   I don't know.

8         Q.   This was not something that was reported

9    on in the media?

10        A.   I don't know.  I don't recall.

11        Q.   And again, one of the concerns expressed

12   is the use of the term "non-consensual sex" to

13   describe sexual assault?

14        A.   Yes.

15        Q.   And another concern is that formal

16   complaints of non-consensual sex resulted in written

17   reprimands and sensitivity training?

18        A.   I have to read through the letter, if you

19   don't mind.

20                   (Pause in the Proceedings)

21        A.   Okay.

22        Q.   And so you've read the letter?

23        A.   Yes.

24        Q.   So one of the concerns expressed in this

25   letter is the use of the term "non-consensual" to

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    August 31, 2017

Page 74

1    describe sexual assault, correct?

2         A.   Yes.

3         Q.   And another concern is that formal

4    complaints of non-consensual, that resulted in a

5    finding of responsibility, the offenders were given

6    written reprimands and sensitivity training?

7         A.   Yes.

8         Q.   And if you look at the top of the second

9    page, it says "Our second concern is that Yale's

10   punishments for sexual assault further re-enforce the

11   myth that some sexual assaults are 'real' while

12   others merit only minor punishments"?

13        A.   Yes.

14        Q.   And the letter closes if you look at the

15   final paragraph, "We urge the university to replace

16   the term "non-consensual sex" in its reports with the

17   term "sexual assault," and to punish perpetrators of

18   sexual assault in a way that recognizes the gravity

19   of these crimes".  Is that correct?

20        A.   Yes.

21             MR. KIELY:  This is gonna to be 106.

22             (Plaintiff's Exhibit 106

23             Marked for identification)

24        Q.   Bates number MONT 000768 is Exhibit 106,

25   which I'm handing to you.  My question is, do you

Electronically signed by JAMES MARTONE (601-171-250-7767)          2b94db3f-d12a-4a80-80b2-f233f9bcc17d

MONTAGUE v. YALE UNIVERSITY                    August 31, 2017

Page 89

1          Q.   So what this shows is that it's estimated

2     that one in three Yale women is or will be the victim

3     of a criminal sexual assault since entering Yale?

4                    MR. NOONAN:  Objection.

5          A.   That's not correct.

6                    MR. NOONAN:  It clearly is not

7     correct.

8          Q.   Tell me why it's not correct.

9          A.   It's not correct.  It says that it is

10    estimated that roughly one in three Yale seniors,

11    okay, have experienced at least one episode of sexual

12    assault via force or incapacitation, meaning

13    touching, penetration or oral sex, via force or

14    incapacitation, while they're -- since entering

15    college.

16         Q.   And previously you equated that sexual

17    assault by force or incapacitation as a definition of

18    sexual assault that meets most criminal standards,

19    correct?

20         A.   I said that on page 2.

21         Q.   Okay.  And so that's a very troubling

22    statistic, correct?

23         A.   These results are disturbing, as I said

24    before.

25         Q.   I mean isn't that more than disturbing?

Electronically signed by JAMES MARTONE (601-171-250-7767)                    2b94db3f-d12a-4a80-80b2-f233f9bcc17d

MONTAGUE v. YALE UNIVERSITY                    August 31, 2017

Page 90

1                     MR. NOONAN:   Objection.

2          A.    That's -- I don't --

3          Q.    Would you characterize that as an

4    emergency?

5          A.    No.

6          Q.    Why not?

7          A.    I would characterize it as disturbing, and

8    it requires the attention of the whole community to

9    address.  It's not an emergency that can be repaired

10   in an extremely short period of time with only a few

11   people.

12                     And redoubling of the efforts was to

13   engage the community in reporting and providing more

14   information behind these members, and to work

15   together to prevent these behaviors.  So it is

16   certainly a call for the community to work together

17   on this issue.  They're disturbing numbers that

18   require community effort and a sense of importance

19   and seriousness.

20         Q.    Let's turn to page 10 of this document.

21   And actually turn to page 9, just so you can see that

22   this is a section of the report that refers to

23   reporting experiences.

24         A.    Uh-huh.

25         Q.    And so that's referring to experiences of

Electronically signed by JAMES MARTONE (601-171-250-7767)                    2b94db3f-d12a-4a80-80b2-f233f9bcc17d

Case 3:16-cv-00885-AVC   Document 157-4   Filed 07/18/18   Page 23 of 31

1    to file a complaint?

2         A.   It was a small number but that's

3    concerning.  We don't want students to feel pressured

4    in either direction.

5         Q.   And so after --

6         A.   It didn't say to file a complaint, may I

7    say.  It said to proceed.  And actually, if --

8              MR. NOONAN:  Can you let her finish?

9         A.   Go ahead.

10        Q.   Well, you --

11        A.   If you had the actual survey with you, we

12   should look at that in the survey.

13        Q.   First of all, I just want to see what it

14   says here, which is that the students were asked

15   whether they -- students who had experienced sexual

16   assault were asked whether they felt pressured by

17   officials at these university programs to file a

18   complaint.  And that some students felt pressured by

19   a Title IX Coordinator, the UWC or Yale Health to

20   proceed.  So it's equating proceeding with filing a

21   complaint, right?

22        A.   Right, could be informal.

23        Q.   Sure.  So in response to that, did you,

24   did the Title IX office take any response to this

25   report from students that some students were being

Electronically signed by JAMES MARTONE (601-171-250-7767)                    2b94db3f-d12a-4a80-80b2-f233f9bcc17d

MONTAGUE v. YALE UNIVERSITY                    August 31, 2017

Page 94

1    pressured to proceed with a complaint?

2         A.   We certainly took note of it and we

3    actually, again, worked on clarifying our message,

4    and one of the messages we clarified more expansively

5    was that the complainant's wishes are what should

6    determine how a complainant proceeds with a

7    complaint.

8              And so that's how we -- that was the

9    messaging plan we had in response to this, and also,

10   to our presumption that the reporting rates might be

11   lower because people were concerned about losing

12   control of the process.  We're very much committed to

13   the complainant retaining control of the process and

14   not feeling pressured to go in one direction or the

15   other.  So actually that's how we responded is by

16   really making that clear.

17        Q.   And how exactly did you make that clear?

18   How was that communicated to the relevant

19   individuals?

20        A.   We published, we worked with our student

21   advisory committees to ask how our messaging is clear

22   or unclear.  We produced the document about what

23   happens when you go to a Title IX Coordinator.  The

24   main way we messaged in the immediate -- so you asked

25   if we took this seriously and with some time

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    August 31, 2017

Page 95

1    pressure, in the immediate months after the AAU

2    survey, we went on campus, to various groups and

3    presented the data and also addressed some of these

4    issues in hundreds -- dozens, over a hundred, closer

5    to two hundred meetings.

6             And also worked with the Deans of

7    each of the graduate professional schools on what

8    their messaging was to students, to answer questions,

9    so we wanted to make sure campus leaders were fully

10   acquainted with what our approach was to people

11   coming forward.

12            And we were concerned, in

13   particular, that students who might need support and

14   safety measures, were not reporting to us.  And so we

15   wanted to clarify that when you bring a complaint, we

16   will not take any action or expose you without your

17   agreement unless there is a risk of safety to the

18   community, and that applies to anyone.

19            And I don't know what Yale Health

20   might have been doing, but we actually educated Yale

21   Health as well, that's their medical provider, so may

22   have also encouraged them to come to one of us.

23       Q.   So what you described there was your

24   message to the community, but my question is what was

25   your message to the Title IX Coordinators about

Electronically signed by JAMES MARTONE (601-171-250-7767)                    2b94db3f-d12a-4a80-80b2-f233f9bcc17d

MONTAGUE v. YALE UNIVERSITY                          August 31, 2017

Page 96

```
 1   whether or not it was appropriate to pressure a
 2   student to file a complaint?
 3        A.   We talked about it.  I don't think any --
 4   I think all of them, and as I said we don't just
 5   train once a year, we meet monthly, we work together
 6   on these messages to the community.  And, in fact,
 7   some of the Coordinators themselves went out and
 8   presented the data and the message to their own
 9   communities.
10              There was a lot of activity after
11   this report and a lot of it was to clarify what our
12   resources are, and what our procedures are.
13        Q.   So you mentioned that you hold in the fall
14   annual trainings for Title IX and UWC, correct?
15        A.   Yes.
16        Q.   And so do you recall when the fall of 2015
17   training was held?
18        A.   I don't recall the dates.
19        Q.   Do you recall if it was before or after
20   the results of the AAU survey were published?
21        A.   I don't recall.
22        Q.   Do you recall whether the AAU survey was
23   discussed at the training?
24        A.   I recall presenting AAU survey results at
25   a UWC training, I don't recall the date.  But the AAU
```

Electronically signed by JAMES MARTONE (601-171-250-7767)                    2b94db3f-d12a-4a80-80b2-f233f9bcc17d

MONTAGUE v. YALE UNIVERSITY                    August 31, 2017

Page 97

1    survey in its development, conduct and analysis, was

2    discussed continually with Title IX personnel, with

3    the Title IX Steering Committee and with the Title IX

4    Coordinators in their regular meeting.

5        Q.   You're talking about the results of the

6    survey?

7        A.   No.  We're talking about when we planned

8    to do it, how it was actually, the efforts of

9    students themselves on our advisory boards as well as

10   our Coordinators and the Steering Committee who

11   talked about what kind of survey to do, our own,

12   engaged with the AAU.  So it was, so the whole

13   process of the survey was discussed.

14       Q.   But once the survey results were released

15   which you previously agreed you found distressing --

16       A.   Yeah.

17       Q.   And that there was a need to take action.

18   Was that not discussed at the fall 2015, the annual

19   training?

20            MR. NOONAN:  Was what?

21       A.   I just don't know the date.  It was

22   certainly discussed with the members of -- that

23   training is not the only time those members get

24   together to discuss things.  Many of those members

25   are in Title IX Steering or our Title IX Deputy

Electronically signed by JAMES MARTONE (601-171-250-7767)                    2b94db3f-d12a-4a80-80b2-f233f9bcc17d

MONTAGUE v. YALE UNIVERSITY                    August 31, 2017

                                                        Page 115

1    what I recall of USAY as we call them.

2           Q.   And you don't have any formal affiliation

3    with USAY?

4           A.   No.

5           Q.   And what about the Yale Black Women's

6    Collation, have you attended any of their events?

7           A.   I don't believe.  Not that I recall.

8           Q.   Do you recall that in early March, 2016,

9    after Jack Montague had been expelled, the men's

10   basketball team wore jerseys with his jersey number

11   and nickname to a pre-game warm-up?

12          A.   Yes.

13          Q.   Is it fair to say that caused quite a

14   controversy on campus?

15          A.   Yes.

16          Q.   And why was that?

17                    MR. NOONAN:   Objection.

18   Speculation.

19          A.   I can't speculate.

20          Q.   What was the nature of the controversy?

21          A.   There were posters, as I recall, and

22   students voicing objections to that act by the

23   basketball team.

24          Q.   And what was the nature of the objections

25   that were being voiced?

Electronically signed by JAMES MARTONE (601-171-250-7767)                    2b94db3f-d12a-4a80-80b2-f233f9bcc17d

MONTAGUE v. YALE UNIVERSITY                          August 31, 2017

Page 116

1          A.   Well, the nature of some objections were

2     that the basketball team was supporting sexual

3     misconduct.

4          Q.   Do you recall around that time attending a

5     chalk-in event?

6          A.   Yes.

7          Q.   And what was the chalk-in event?

8          A.   I don't recall the specifics, but the

9     chalk-in event I attended was a chalk-in event to

10    express positive aspirations in chalk, in front of

11    the library, which is something the students do, as

12    opposed to -- in the wake of a lot of the negativity.

13         Q.   And do you recall, did Jason Killheffer

14    attend that event with you?

15         A.   I don't recall.

16                   MR. KIELY:  I'm going to mark 108.

17                   (Plaintiff's Exhibit 108

18                   Marked for identification)

19                   MR. KIELY:  Bates Yale 00017153.

20    3/9/16 e-mail.

21         Q.   I'll give you a minute to look through

22    this, and I'll ask you whether or not you recognize

23    this?

24                   (Pause in the proceedings)

25         A.   Okay.

Electronically signed by JAMES MARTONE (601-171-250-7767)                    2b94db3f-d12a-4a80-80b2-f233f9bcc17d

MONTAGUE v. YALE UNIVERSITY                    August 31, 2017

Page 117

1          Q.    So is it accurate that this is an e-mail
2    chain between you and various other individuals
3    discussing generally the chalk-in that we just talked
4    about?
5          A.    No, it's not.  I was only copied in the
6    very last message.  I was not on the chain.
7          Q.    So you say you dropped off, and --
8          A.    No.  I was never on it if you look
9    through.  That's why I'm reading it so carefully.
10                  MR. NOONAN:  I didn't see her
11   anywhere but the last one.
12         A.    Just the last one.
13         Q.    Okay.  But in any event, so there's an
14   e-mail chain among Melanie Boyd and Jonathan Holloway
15   and several others, discussing the chalk-in, and on
16   March 8th, Melanie Boyd forwards it to you and says
17   "I'm sorry, I thought you were in this chain?"
18         A.    Yes.
19         Q.    And then you respond or you reply to
20   everyone on the chain, on March 9th, and you say
21   "Just wanted you to know that Jason Killheffer and I
22   will be going to the chalk-in at noon."  So and you
23   did, in fact, attend the chalk-in?
24         A.    I recall, yes.
25         Q.    And you ask, "Is it correct that the

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    August 31, 2017

1  basketball team will not," in all caps, "BE

2  ATTENDING?"  And I guess my question is, why were you

3  concerned whether or not the basketball team would be

4  attending?

5      A.   I just wanted to know whether they were or

6  not.  The chain indicates that if they come, there

7  might be confrontation, and unrest.  So I had no

8  opinion whether they should come or not, it's just I

9  was emphasizing that I was asking if they were or

10  were not coming.

11           And I couldn't tell.  There are

12  various implications throughout the e-mail chain.

13      Q.   I think you said that the chalk-in was,

14  the purpose of the chalk-in is to write supportive

15  messages in chalk; is that correct?

16      A.   Yes.  It says it here, "Chalk-in on Cross

17  Campus Plaza supporting positive campus climate and

18  opposing sexual misconduct."  It was a very

19  positive -- they were positive messages.  It's in the

20  first message.

21      Q.   Sure.  And what was the -- if you recall,

22  what was the general tenor of the messages that

23  people wrote in chalk at the chalk-in?

24      A.   I can't recall the messages.  I recall the

25  tenor being calm and positive.  But I don't remember

Electronically signed by JAMES MARTONE (601-171-250-7767)                    2b94db3f-d12a-4a80-80b2-f233f9bcc17d