# Exhibit 15

```
UNITED STATES DISTRICT COURT FOR THE
    DISTRICT OF CONNECTICUT
CIVIL ACTION No: 3:16 cv-00885-AVC
-----------------------------------x
JACK MONTAGUE,                     :
    Plaintiff,                     :
         -v-                       :
YALE UNIVERSITY, ANGELA GLEASON,   :
And JASON KILLHEFFER,              :
    Defendants.                    :
-----------------------------------x
```

        Depositon of ANGELA GLEASON, taken pursuant to Notice, held at the Law Offices of Jacobs & Dow, LLC, 350 Orange Street, New Haven, Connecticut, before James A. Martone, LSR #248, and Notary Public, in and for the State of Connecticut, on December 13, 2016, at 10:30 a.m.

```
 1        A.    Correct.
 2        Q.    Okay.  But she did tell you who the
 3   respondent was; is that right?
 4        A.    Correct.
 5        Q.    And that respondent was Jack Montague?
 6        A.    Correct.
 7        Q.    Okay.  And it was September 21st of 2015,
 8   that you met with Ms. Rogers
 9        A.    Correct.
10        Q.    On September 21st of 2015, were you
11   familiar with Jack Montague?
12        A.    No.
13        Q.    Okay.  So you didn't know at all who Jack
14   Montague was?
15        A.    I don't believe so.
16        Q.    Okay.  And you have here in your notes
17   "Jack Montague 16, 'raped' undergraduate female
18   friend.  RR," I'm assuming RR is Rachel Rogers
19        A.    Yes.
20        Q.    'RR has heard of another 'rape' by JM."
21        A.    Correct.
22        Q.    Are these your notes reflecting what Rogers
23   is telling you?
24        A.    So my general practice is if something is
25   in quotations, it's a word that was used by the person
```

```
 1    who is reporting.
 2         Q.   Okay.  So based on that general practice,
 3    it's fair to assume that Rogers told you that Jack
 4    "raped" another undergraduate female friend of Rogers ?
 5         A.   Correct.
 6         Q.   And Rogers also told you that she had heard
 7    of another rape by Jack?  "JM," I'm assuming that
 8    means Jack Montague, is that right?
 9         A.   Correct.
10         Q.   Did you at that time inquire further into
11    the circumstances of either the alleged rape of Rogers
12    friend, or the alleged rape of another woman?
13         A.   Can you repeat the question?
14         Q.   Did you at that time, that is during the
15    course of this meeting, inquire further into the
16    specifics of this alleged rape of Rogers  female friend
17    and the alleged rape of another person?
18         A.   I believe I asked Rachel Rogers if she had any
19    more details.
20         Q.   And did she?
21         A.   I believe she did not.
22         Q.   Okay.
23         A.   Or she didn't share any.
24         Q.   And that's as to both her "female friend"
25    at this time, and the other person?
```

```
 1   Montague.
 2        Q.   Okay.  And that was on September 23rd, you
 3   did, in fact, ask coach Jones if he could switch Jack
 4   Montague; is that right?
 5        A.   Yes.
 6        Q.   You told him you couldn't say why.  You say
 7   "I can tell you it's not an issue yet, it may never
 8   be."  Do you see where I read that?
 9        A.   Yes.
10        Q.   What did you mean by that?
11        A.   I meant that I didn't have any certainty as
12   to whether or not it might be problematic.  And it may
13   never be problematic.
14        Q.   Okay.  And is that simply because you
15   didn't have enough information at the time to make
16   that judgment?
17        A.   Jack Montague had been named in a report to
18   me.  And that was for me potentially problematic, if
19   he were assigned to me in my role as Faculty Liaison.
20        Q.   So I believe you said that as of the date
21   that Rogers made the report, you didn't believe that you
22   knew who Jack Montague was.  At some point it appears
23   you made the connection, that Jack Montague was a
24   player on the men's basketball team, is that right?
25        A.   Correct.
```

```
 1        Q.   Okay.  When do you think you made that
 2   connection?
 3        A.   I believe in fact, in the meeting, Rogers
 4        may have mentioned that he was the captain of
 5   the basketball team when she mentioned his name.
 6        Q.   Okay.  Did that prompt you to take any
 7   action, for example, to look and see whether he was
 8   one of your assigned students?
 9        A.   The assigned students were sent to me after
10   that meeting.
11        Q.   Okay.  And that was on September 22nd?
12             MR. NOONAN:  Of which event?
13        Q.   When the assigned students were sent to
14   her.  The names of the assign students were sent.
15        A.   That's what it suggests by this e-mail.
16        Q.   Okay.  And at some point did you follow up
17   with Rogers about the allegations concerning Jack
18   Montague?
19        A.   I believe I did.  I believe I sent her a
20   follow-up e-mail.
21        Q.   Okay.  And what prompted you to send that
22   e-mail?
23        A.   The serious nature of the allegation and
24   hoping to support the person who may have experienced
25   the alleged behavior.
```

Electronically signed by JAMES MARTONE (601-171-250-7767)        056999c1-7919-44a7-a21b-5d72e63e95c1

```
 1        Q.   Why was there a discussion of Jack taking a
 2   year off?
 3        A.   I don't know.  Those are Rogers words.  I
 4   mean that's a paraphrase of what Rogers said to me.
 5        Q.   And you have no recollection as you sit
 6   here today, in what context this may have come up?
 7        A.   I don't have a recollection.
 8        Q.   Okay.  And the next bullet point says "Rogers
 9   and friends worried about fallout about national
10   attention."  Do you see that?
11        A.   I do.
12        Q.   This is Rogers again, telling that you she
13   and her friends are worried about the fallout about
14   national attention; fallout and national attention
15   based on what?
16        A.   What I do --
17        Q.   What do you recall her being worried about
18   fallout from or national attention from?
19             MR. NOONAN:  Objection.  Speculation.
20   Unless it's something she told you.
21        A.   I don't recall what she said specifically.
22        Q.   So is it fair to say that you felt that it
23   was important for you to -- strike that.  When did you
24   find out the name of Rogers friend, who was making
25   these allegations against Jack Montague?
```

Electronically signed by JAMES MARTONE (601-171-250-7767)        056999c1-7919-44a7-a21b-5d72e63e95c1

```
 1   remembering at least the substance of what she said to
 2   you?
 3       A.   It helps me remember the emotion.
 4       Q.   Okay.  Did she in the course of that
 5   conversation provide any details to you about any
 6   alleged interaction between her and Jack Montague?
 7       A.   Not in any details, no.
 8       Q.   Did she during that conversation either
 9   confirm or deny that she had had an unwanted sexual
10   experience with Mr. Montague?
11       A.   Not directly.
12       Q.   And to your knowledge, did she ever report
13   any sort of unwanted sexual experience between her and
14   Jack Montague to anybody?
15       A.   Not to my knowledge.
16       Q.   Okay.  So you were never able to confirm
17   whether or not the allegation concerning Jane Doe was
18   true?
19       A.   That was the sum total of my contact with
20   Jane Doe.
21       Q.   So that's a no, you were not able to
22   confirm that?
23       A.   Correct.
24       Q.   Okay.  Do you recall when you and Roe
25   first had contact with one another?  I believe you
```

1      Q.   And when we say contact Jack, we're talking
2   about how your plan based on your discussion with
3   Jane Roe            was to talk to Jack about how his
4   behavior didn't meet the community's expectations,
5   recommend training and not mention Roe   by name; is
6   that right?
7      A.   I believe so.
8      Q.   Okay.  Still looking at your notes, looks
9   like on November 4th of 2015, you met with Stephanie,
10  Susan and Jason about the JM case; is that correct?
11     A.   Yes.
12     Q.   Okay.  What was the purpose of that
13  meeting?
14     A.   I believe to discuss the Jack Montague
15  case.
16     Q.   What about the Jack Montague case?
17     A.   I don't recall if I knew going into the
18  meeting.
19     Q.   Meaning you don't recall, when you went
20  into the meeting that morning, it looks like at 9:00
21  a.m. you're not sure if you knew going in, why you
22  were meeting with Stephanie, Susan and Jason, about
23  Jack Montague?
24     A.   Correct.
25     Q.   Okay.  Is it typical for you to meet with

MONTAGUE v. YALE UNIVERSITY						December 13, 2016

Page 120

```
 1   these three individuals together, about a particular
 2   case?
 3        A.    Define typical.
 4        Q.    Had you done it before?
 5        A.    Yes.
 6        Q.    How often had you done this before?
 7        A.    I'm guessing three times, four times.
 8        Q.    And that's since you became a Deputy Title
 9   9 Coordinator in July of 2014?
10        A.    Correct.
11        Q.    Okay.  And if you recall, what was the
12   purpose of involving the General Counsel's office in
13   this meeting?
14        A.    What did I think going in?  Or --
15        Q.    No, what was the purpose of involving the
16   General Counsel's office in this meeting?
17        A.    Assumed for legal advice.
18        Q.    For legal advice with regard to what?
19        A.    This case.  Title 9.  I didn't know.
20        Q.    Do you know now?
21        A.    It's just -- again, it's not infrequent for
22   General Counsel, specifically Susan Sawyer, to join a
23   meeting of Title 9 concerns.
24        Q.    Okay.  Do you recall this meeting?
25        A.    I recall where it was.
```

Sanders, Gale & Russell
(203) 624-4157

Electronically signed by JAMES MARTONE (601-171-250-7767)                    056999c1-7919-44a7-a21b-5d72e63e95c1

1      Q.   Okay.  And do you recall whether Ms. Sawyer
2   gave legal advice to you during this meeting?  Without
3   revealing what the legal advice may have been?
4           MR. NOONAN:  Just answer that yes or
5   no.  Don't give any substance of what she said.
6      A.   I remember her speaking, yes.
7      Q.   Okay.  Would you characterize what she said
8   as legal advice?
9      A.   I believe so.
10     Q.   Okay.  Did your notes reflect things that
11  Ms. Sawyer said to you during that meeting?
12     A.   I can't see my notes.
13     Q.   Sitting here today, can you remember
14  whether these notes reflect what Ms. Sawyer said to
15  you during the meeting?
16     A.   I don't remember.
17     Q.   Okay.  Do you remember the topics that were
18  discussed at this meeting?
19          MR. NOONAN:  Again, at this point I
20  don't have any objection to you talking about topics
21  that others talked about, but don't mention anything
22  Attorney Sawyer mentioned.  So you can talk about what
23  other people said, just not her.
24     A.   I don't know how to separate them.  Because
25  I remember, I feel like largely, whatever was

MONTAGUE v. YALE UNIVERSITY                                December 13, 2016

Page 122

```
 1    discussed, everyone contributed to.
 2        Q.   Did you have a particular concern going
 3    into this meeting about what we're calling the "Jack M
 4    case"?
 5        A.   I didn't call it the Jack M case.
 6             MR. NOONAN:  You mean more than what
 7    she's talked about, that it was a sexual assault?
 8        Q.   Did you have some particular concern you
 9    needed to raise with Stephanie, Susan and Jason about
10    the Jack M case?
11        A.   I don't remember I did.  I didn't call the
12    meeting.
13        Q.   Okay.  Was it Jason who called the meeting?
14        A.   The e-mail seems to reflect that.
15        Q.   Okay.  Do you remember if he had a specific
16    concern?
17        A.   I don't remember.
18        Q.   And then there's a note further down on
19    that page, the same day, it says "Susan, Jason, Aley
20    and David."  Do you see that?
21        A.   Yes.
22        Q.   Am I correct that this reflects a meeting
23    that you had at 3:00 o'clock in the afternoon on that
24    day, with Susan, Jason, Aley and David?
25        A.   Correct.
```

Sanders, Gale & Russell
(203) 624-4157

```
 1      Q.   And this is Susan Sawyer, Jason Killheffer,
 2   Aley Menon, and David Post; is that right?
 3      A.   Yes.
 4      Q.   Do you remember what the purpose of that
 5   meeting was?
 6              MR. NOONAN:  There's no redaction
 7   there, just so you know.
 8              MS. DEAL:  I understand.  It's just a
 9   note that it happened.
10              MR. NOONAN:  Again, just don't repeat
11   anything Susan said.
12      A.   Okay.  I don't remember really anything
13   about that meeting.  And I actually don't remember
14   that it -- I actually don't remember that it happened.
15      Q.   Do you have any idea what that note means
16   then?
17      A.   I believe it had to do with someone from
18   the UWC being available if questions were asked about
19   the UWC process.
20      Q.   By whom?
21      A.   Jane Roe          I believe.
22      Q.   Okay, and why would Roe    be asking
23   questions about the UWC process?
24      A.   If a formal complaint was made.
25      Q.   Okay.  Had your plan changed at this point?
```

```
 1        A.    I don't know if there was a plan.
 2        Q.    Well, let's go back to Exhibit 11 I think
 3   it is.  I'm sorry, 10.  As of October 28th, you were
 4   planning to contact Jack, is that right?
 5        A.    Correct.
 6        Q.    And you were planning to contact Jack for
 7   the purpose of discussing with him the fact that his
 8   behavior hadn't met the community's expectations; is
 9   that right?
10        A.    Correct.
11        Q.    Okay.  Did that plan change at some point?
12        A.    The plan to contact him as I described to
13   Roe
14        Q.    That's right.
15        A.    Yes.
16        Q.    Okay.  When did that plan change?
17        A.    I believe it changed in the meeting that is
18   redacted.
19        Q.    Okay.  Why did it change?
20        A.    I believe it was because of a new
21   development.
22        Q.    Whaat was the new development?
23        A.    That Jack Montague had already been through
24   a UWC case.
25        Q.    Okay.  And what relevance did that have to
```

```
 1    your plan?
 2         A.    To this plan here?
 3         Q.    Yes.
 4         A.    I believe a decision in the case
 5    recommended sensitivity training, or I believe
 6    mandated sensitivity training, and Roe had requested
 7    that Jack receive sensitivity training.  And he had
 8    already received sensitivity training.
 9         Q.    Okay.  So why did that change the course of
10    action?
11         A.    I don't recalling the specifics of the
12    discussion.  But in concert with, I believe it was
13    also discussed that there had been not only the
14    mandate of the sensitivity training, but a period of
15    probation and the fact that there had been a finding
16    in a previous UWC case, that it wouldn't be the plan
17    going forward to recommend sensitivity training again,
18    as a voluntary course of action, which is what I would
19    have recommended in the case that Roe requested.
20         Q.    Okay.  Does Yale have a policy that
21    prohibits a person from twice receiving sensitivity
22    training?
23         A.    I don't know.
24         Q.    You're not aware of any policy that Yale
25    has that prohibits someone from being trained again on
```

MONTAGUE v. YALE UNIVERSITY                          December 13, 2016

Page 135

```
 1       Q.    What did you tell Roe
 2       A.    That he had already received sensitivity
 3   training.
 4       Q.    Did you tell her why he had already
 5   received sensitivity training?
 6       A.    No.
 7       Q.    Did you tell her when he had received
 8   sensitivity training?
 9       A.    I don't believe so.  Because I don't
10   believe that I knew.
11       Q.    Okay.
12       A.    And in fact, it wouldn't have mattered.
13       Q.    Under what circumstances would a person
14   receive sensitivity training from the Share Center?
15       A.    I could recommend it, as a voluntary course
16   of action and often do.  I have no way of finding out
17   if someone does or not.
18       Q.    Okay.
19       A.    It could also be part of a decision, part
20   of a recommendation from a finding.  And generally I
21   just believe anyone, any member of the Yale community
22   can receive it if they want to.  You know, it could be
23   requested by any individual unit for an employee or,
24   you know, a student or a member of a group.
25       Q.    Okay.  Do you recall what you told Roe
```

```
 1      Q.   The one where you discussed that she wanted
 2   to take this informal/anonymous approach?
 3      A.   I believe so, because that's something that
 4   I always present as an option.
 5      Q.   Okay.  But at that time, that wasn't the
 6   option that she wanted to move forward with?
 7      A.   I don't know if that was the option she
 8   wanted to move forward with.  That's not what we
 9   discussed.
10      Q.   Okay.  If you can take a look now at what
11   has been marked as Exhibit 14.  It's an e-mail chain
12   between you and David Post.  And also Aley Menon is
13   copied on it.  Do you see that?
14      A.   I do.
15      Q.   On November 4th?
16      A.   Yes.
17      Q.   And you indicate in this e-mail chain that
18   you're meeting with -- what does that mean?
19      A.   That means that I was -- I had scheduled a
20   meeting with Roe   and would David be available if
21   Roe   had questions that I couldn't answer concerning
22   UWC.
23      Q.   And that was because you had planned to
24   talk to Roe    through the UWC?
25      A.   Yes.  Including other things, I did plan
```

Electronically signed by JAMES MARTONE (601-171-250-7767)    056999c1-7919-44a7-a21b-5d72e63e95c1

1   to.
2       Q.   What else did you plan to talk to her
3   about?
4       A.   I wanted to check in with her, how she was
5   doing, to see if there were any accommodations that we
6   could support her.
7       Q.   Did she mention any accommodations that she
8   wanted or needed at that time?
9       A.   I think she expressed some concerns about
10  feelings that she had, but I don't remember any
11  requests for specific accommodations.
12      Q.   Okay.  Did she have any questions for David
13  Post as a result of your meeting with her on the 10th?
14      A.   She did.
15      Q.   She did?
16      A.   Sorry, on which date?
17      Q.   He was on standby.
18      A.   So are you talking Friday?
19      Q.   No.  You asked him to be on standy at your
20  next meeting with Roe    correct?
21      A.   Correct.
22      Q.   Okay.  And was he on standy at that
23  meeting, Mr. Post?
24      A.   He was.
25      Q.   And did he ever end up participating at

Electronically signed by JAMES MARTONE (601-171-250-7767)         056999c1-7919-44a7-a21b-5d72e63e95c1

```
 1   that meeting?
 2        A.   He did.
 3        Q.   Okay.  At what point did he participate in
 4   the meeting?
 5        A.   I would say probably two-thirds of the way
 6   through the meeting.  Maybe halfway through the
 7   meeting.
 8        Q.   Okay.  And what did he say?
 9        A.   I don't remember what he said specifically.
10   He answered questions that she had.
11        Q.   Were those questions about the UWC process?
12        A.   Yes, I believe so.
13        Q.   Okay.  Have you involved Mr. Post in
14   meetings on prior occasions with any other
15   complainants?
16        A.   No.
17        Q.   So this is the first time that you asked
18   Mr. Post to be on standy for a meeting that you were
19   having with a complainant?
20        A.   Correct.
21        Q.   Okay.  Had you ever prior to this incident,
22   encountered a situation in which you developed a plan
23   with a complainant to take some course of action, and
24   which you didn't take that course of action
25   ultimately?
```

MONTAGUE v. YALE UNIVERSITY                         December 13, 2016

Page 188

1   me, I'm a Faculty Liaison, you know, and I think I
2   said, we were talking about the other players I think,
3   not by name but just his teammates, and I said it
4   seemed important to me that his teammates continue to
5   support him, and be friends with him, because that's
6   what teammates do.
7               And part of that conversation was
8   continued later, and I decided this year at least, I
9   don't know what will happen next year, but this year
10  not to be a Faculty Liaison, but I do remember that
11  that kind of thread started at that lunch.
12      Q.  Okay.  And teammates, his teammates did
13  support him, right?
14      A.  I assume they did.
15      Q.  Well, are you aware that there were some
16  posters put up on campus after Jack was expelled,
17  directed at the men's basketball team?
18      A.  I'm aware that posters were put up.
19      Q.  And do you remember what those posters
20  said?
21      A.  I know that "rapist" was on those posters.
22      Q.  Okay.  Did you give Roe  instructions with
23  regard to the confidentiality of the UWC proceedings?
24      A.  Did I give them to her?
25      Q.  Yes.

Sanders, Gale & Russell
(203) 624-4157