# Exhibit 17

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 1

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF CONNECTICUT

CIVIL ACTION No: 3:16 cv-00885-AVC

----------------------------------x

JACK MONTAGUE,                       :

        Plaintiff,                   :

                -v-                  :

YALE UNIVERSITY, ANGELA GLEASON,     :

And JASON KILLHEFFER,                :

        Defendants.                  :

----------------------------------x


                Depositon of JASON KILLHEFFER, taken

pursuant to Notice, held at the Law Offices of Jacobs

& Dow, LLC, 350 Orange Street, New Haven, Connecticut,

before James A. Martone, LSR #248, and Notary Public,

in and for the State of Connecticut, on January 10,

2017, at 10:05 a.m.

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 38

1      Q.   So that could be in the first --

2      A.   It could be in the first meeting.

3      Q.   First meeting or it could be in a

4  subsequent meeting.

5      A.   Could be in a subsequent meeting.  Our

6  priority would be support options in the beginning, so

7  what of the support resources; Share, Yale police,

8  coordinator, what can we do to make accommodations in

9  the short-term.

10          If the individual is ready to talk

11  about other options, ready to talk about a formal

12  complaint or informal resolution options, we will

13  discuss that with them as well.

14     Q.   All right.

15     A.   If they're not ready to talk about it in

16  detail, we'll at least make sure they're aware that

17  those options exist and that we can talk to them about

18  them when they're ready.

19     Q.   So at some point when they're ready, you

20  talk to them about it?

21     A.   Yes.

22     Q.   And what are those options?

23     A.   So I'll separate them into support

24  resources which we just talked about, Share being the

25  primarily.  Title IX Coordinator, being the support

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

1    accommodations we can provide, which are available

2    across the board, no matter what other course you

3    take.  So we try to make sure they're aware of that.

4                     As far as complaint options, we tell

5    them about an informal resolution process, which I can

6    tell you more about.  The formal complaint process,

7    which is a complaint to the university-wide committee.

8                     And then we talk to them about the

9    criminal complaint process if it's -- if the behavior

10   alleged is something that might be criminal in nature.

11   And so we will review all three of those with them.

12       Q.    And I take it another option would be to do

13   nothing, right?

14       A.    That's correct.

15       Q.    And you'd review that with them, with the

16   person as well?

17       A.    That's correct.

18       Q.    All right.  Now if there is -- what do you

19   tell them about these various options?

20       A.    I'll start with the police.  We tell them

21   that first of all the, police have a Sensitive Crimes

22   Coordinator, who we can connect them with someone who

23   can simply talk to them.  It's not a police report,

24   you're not filing a complaint.  But it's someone who

25   can talk to you about what that process is like, and

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

1   they can do so in greater detail, and with more

2   experience than we can.

3                So we make sure they know that person

4   is available, just to chat.  That person is also

5   available if the individual has any sort of immediate

6   safety concerns, and we will make sure we connect them

7   with that police contact.

8                We will make sure they're aware that

9   they can pursue any and all of these options, for

10  instance, you can pursue an informal complaint and

11  then ultimately choose to pursue a form am complaint

12  later.  That one option doesn't foreclose the other.

13                We will also make sure they're aware

14  they can pursue a criminal complaint while also

15  pursuing a complaint through the university.  So we

16  discuss that with them.

17                In the case of the formal complaint,

18  we can discuss what the procedure is like, and what

19  it's like to participate in a process like that.  But

20  since Title IX Coordinators don't participate in that

21  process directly, we will also offer to facilitate a

22  conversation or connect them with someone at the UWC,

23  usually the Chair of the UCC, David Post, who could

24  answer more specifically and with more detail their

25  questions about what that process is like.  So that's

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

1    something we'll do.
2                On the informal, we will talk about
3    the range of options.  Now oftentimes they're already
4    clear about what they want, or they have something
5    very specific that they want.  Sometimes not so much.
6    But we will talk to them about the accommodations,
7    we'll talk to them about things like, you know,
8    contact orders, which we can work to facilitate.  We
9    will talk about residential changes that they may be
10   interested in.  And again, we sort of bundle those all
11   under the what we call informal.
12        Q.    Are there any other?
13        A.    So there's a range of things.  No contact
14   being probably the most common.  Academic and
15   residential accommodations.  Training options.  At
16   times complainants want someone to simply have a
17   conversation with the respondent, and just deliver
18   some information about their experience and the
19   impact.  So that's another sort of informal resolution
20   that people often ask for.
21        Q.    What do you mean by training options?
22        A.    So there's a range of training.  I mean we
23   have one in particular that often is either mandated
24   by the UWC as a result of a case or a disciplinary
25   action or we can refer people over as a Title IX

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                     January 10, 2017

 1    Coordinator, although it's a voluntary referral, we

 2    have no way to require someone to go to training.

 3         Q.   What is it?

 4         A.   We call this training conduct awareness

 5    training.  It's -- I've not participated in it myself.

 6    It's conducted by an individual at the Share Center.

 7    His name is John Criscuolo.  And --

 8         Q.   Can you spell that?

 9         A.   C R I S C U O L O.

10         Q.   All right.

11         A.   I have, however, reviewed the materials

12    that are shared in that training, and it's essentially

13    from my view, a training that discusses behaviors, how

14    people experience those behaviors, what the impact of

15    behaviors are.  It stresses things like self

16    awareness, being more aware of what you're doing.

17    Then also being empathetic and being aware of how what

18    you're doing impacts other people.

19              So it's a -- some people call it

20    sensitivity training, but we're sort of settled on the

21    term "conduct awareness."  Just because it's a much

22    broader term and it really reflects the focus of that

23    training.

24         Q.   All right.

25         A.   So that is a training that we will refer

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 45

1   the UWC process, which the procedures for the UWC

2   provide that any party in that process has the ability

3   to select anyone they want, as an advisor.   The Share

4   Center frequently serves as advisors for the

5   complainants.   So that's another role that they

6   fulfill.

7                    So they don't, again, they have a

8   dotted line reporting relationship to us.   As I said,

9   we in our role as overseeing the Title IX program at

10  Yale, ensure that their work is effective, that they

11  have the resources that they need.   And we've actually

12  in the last five years increased their staffing.

13  We've increased their space that they've had allocated

14  in that building.

15                   So those are examples of the ways in

16  which we've helped them do their work.

17       Q.   If a person consults with the Share Center,

18  is that considered to be confidential?

19       A.   Yes.   The Share Center does not report to

20  our office.   As I mentioned to you before, we are the

21  repository for reports that go to Title IX

22  Coordinators, or other administrators.   But if an

23  individual goes to the Share Center, we do not know

24  about it.

25       Q.   That would be if a complainant goes to a

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

1    Share Center?

2         A.    That's right, or a respondent.

3         Q.    Anybody who --

4         A.    Anyone who goes to the Share Center, yes,

5    they are I believe shielded.  They're technically a

6    rape crisis center so they're shielded under whatever

7    laws exist to sort of shield those conversations, so

8    they do not report to us.

9         Q.    So if a person goes in and says I would

10   like counseling, the fact that that person is having

11   counseling at the Share Center would be considered to

12   being confidential?

13        A.    That's right.

14        Q.    And similarly, if the person is receiving

15   training, that would be confidential?

16        A.    Well, one exception there.  So as I

17   mentioned to you, if a Title IX Coordinator suggests

18   to a respondent that that individual go receive

19   training, we may not know whether or not they ever do

20   it, unless that individual confirms, says I went and I

21   participated in this training.  So they've self

22   disclosed, all right.

23              If an individual through the UWC who

24   has as a result of a disciplinary action, been

25   required to seek training, and that's different than

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                        January 10, 2017

1    the Title IX Coordinator suggesting, but if the UWC

2    has required that individual to seek training, then I

3    do believe there's a record.

4         Q.    You would know that?

5         A.    I would not necessarily know that.  The UWC

6    would generally find out.  They track it.

7         Q.    The UWC would know that.

8         A.    Right.

9         Q.    And it would be in one of these summaries,

10   correct?

11        A.    Right.

12        Q.    But this would not, if I went to the Share

13   Center and wanted to know if Jason Killheffer has

14   received training, they will not tell me?

15        A.    They will never answer your question,

16   exactly.

17               MR. NOONAN:  When you get to a

18   convenient spot, can we take a short break?

19               MR. STERN:  This is a good spot.

20               (Recess taken: 11:04-11:12 a.m.)

21        Q.    Back on the record.  So another informal

22   option, would that be mediation?

23        A.    Maybe you can just describe to me how you

24   view mediation, or what you mean by that term.

25        Q.    I think I saw it in something, some sort of

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

1    interested in a formal complaint, under what

2    circumstances could the university go forward on its

3    own?

4                    MR. NOONAN:  Can I ask you for a

5    clarification.  Are you talking about sort of after

6    you've discussed all the options, and the Title IX

7    Coordinator has given all the advice, there's a final

8    decision on the part of the complainant, I don't want

9    to go forward?  Or are you talking about at the

10   outset?

11       Q.   The complainant says I do not wish a formal

12   complaint to be filed.

13       A.   Uh-huh.

14       Q.   Under what circumstances, after being

15   advised, under what circumstances could the university

16   go forward?

17       A.   Then we would have to evaluate the safety

18   concerns, and determine whether absent that

19   complainant's participation, would we go forward with

20   a formal complaint.

21       Q.   Now if the -- the option that you've

22   described to us a moment ago was you might say to the

23   complainant one way to do it is for us to file the

24   complaint, if you participate, right?

25       A.   Yes.

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                          January 10, 2017

1      Q.   All right.  But that would still depend
2   upon the complainant's participation, correct?
3      A.   Well, that would be the question to the
4   complainant.
5      Q.   Right.
6      A.   Would you be willing to speak to a fact
7   finder, if the university brought a complaint on your
8   behalf.
9      Q.   Okay.  So if the complainant did not wish
10  to participate, then the only situation in which the
11  university would go forward would be if it determined
12  that there was a safety issue?
13     A.   If it determined there was a safety issue
14  and if it determined that it could go forward absent
15  that complainant's participation.  And that's gonna be
16  on a case by case basis.
17     Q.   But there would have to be a safety issue,
18  correct?
19     A.   Yes.
20     Q.   All right.
21     A.   And just to make that clear, the reason is
22  because in that situation, we would be essentially
23  overriding the complainant's stated wishes.  Going
24  against their stated wishes.
25     Q.   Now you've told us about the situation when

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 93

```
 1        Q.    In deciding essentially what you're going
 2   to do or what you're going to recommend, right?
 3        A.    Right.
 4        Q.    What did you tell Angie Gleason about that,
 5   when she first told you that she had received that
 6   report?
 7        A.    I informed her that Jack Montague had had a
 8   prior complaint that had gone through the UWC, and he
 9   had been found in violation.
10        Q.    All right.
11        A.    That that would be something we would have
12   to take into consideration.
13        Q.    And you told her that in the very first
14   conversation that you had with her about the
15   information she got from Rachel Rogers right?
16        A.    I believe I did.
17        Q.    And that was before she had actually made
18   contact with Jane Roe
19        A.    That's correct.  Well, actually I don't
20   know.  What she told me was she had not spoken to
21   Jane Roe        yet.  So that I can say.
22        Q.    What is the next thing you recall about
23   the --
24        A.    Subsequent to that conversation with Miss
25   Gleason?
```

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                        January 10, 2017

1    Montague until you could have a meeting with you,

2    Stephanie Spangler and Susan Sawyer?

3         A.    We discussed that so that we could discuss

4    what the appropriate action would be in a case such as

5    this.

6         Q.    All right.  So prior --

7         A.    Prior to what, this date?

8         Q.    Prior to -- at some point you had a meeting

9    with these various people, correct?

10        A.    Absolutely.

11        Q.    And prior to that time, you told Angie that

12   you wanted to schedule that meeting; is that correct?

13        A.    Yes, I did.

14        Q.    And you told Angie why you wanted to

15   schedule that meeting?

16        A.    I told Angie we should review the

17   allegations with Stephanie and with Susan.

18        Q.    All right.  And you knew at that time that

19   Angie was proceeding along a path of effectuating an

20   informal resolution, correct?

21        A.    I knew that she was in conversation with

22   Jane Roe          but not minute by minute, where

23   exactly they were in that process.

24        Q.    Well, you knew that they were planning

25   to --

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                      January 10, 2017

```
 1        A.    Let me -- an informal resolution does not

 2   forego a formal complaint.  So she could continue to

 3   work with Roe    and talk with Roe    about what her

 4   wishes are, which could change, okay.  Knowing that we

 5   were also going to have a meeting with Stephanie and

 6   Susan.

 7        Q.    All right.

 8        A.    So if you're trying to draw -- I'm not sure

 9   what conclusion you're trying to draw from that.

10        Q.    Did you tell Angie hold off on meeting with

11   Jack Montague until after we can have this meeting?

12        A.    We discussed her intention to contact Jack

13   Montague.  I believe at that point we must have

14   already had a meeting on the books, on our calendar

15   with Stephanie and Susan.

16                    In fact, it looks like it's two days

17   later, on the 4th.  According to this exhibit.  So at

18   that point, if she's talking on Monday, I say we're

19   meeting on Wednesday, before you do anything, why

20   don't we talk about what the right approach to this

21   is.

22        Q.    All right.

23        A.    So that's it.

24        Q.    So now did this meeting take place?

25        A.    The meeting with Stephanie, Susan and
```

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 111

1    Angie?

2         Q.   Yes.

3         A.   Yes, it did.

4         Q.   Okay.  And as a result of that meeting, was

5    some decision made?

6         A.   At that meeting, we reviewed the

7    allegations and the information that Angie had

8    gathered.  We reviewed the fact that Angie had

9    discussed with Roe   that Roe   was interested in

10   pursuing an informal resolution.

11                  We reviewed the fact that the

12   seriousness of the allegations in this matter and the

13   fact that Jack Montague had previously been through

14   the UWC complaint process, had previously been found

15   to have violated our sexual misconduct policies, and

16   most importantly, the seriousness of these allegations

17   made a formal complaint a more appropriate solution

18   than an informal complaint.  One of the reasons we

19   look as to why someone -- whether someone has been

20   through our process before is because should they go

21   through that process and be found in violation and

22   subsequent for that process, an allegation that they

23   violated it again, indicates that they may not have

24   learned from that earlier process, okay.  And so

25   that's an indicator.

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

1              So the nature of the allegations and

2    the fact that he had previously been through this

3    policy, or this process, and had previously been found

4    to have violated our policy.

5         Q.   All right.

6         A.   So we discussed, Angie -- going back to

7    Roe    discussed going back to Roe    and discussing

8    with Roe    whether she would be willing to participate

9    in a formal complaint.  This gets back to what we

10   talked about earlier which is would she be a witness

11   and speak to a fact finder in a formal complaint.

12        Q.   What did you understand that Angie --

13   strike that.  You say you discussed the seriousness of

14   the allegation, the previous finding?

15        A.   The fact that he had had a previous finding

16   of a violation.

17        Q.   Right.  Anything else?

18        A.   Those are the two primary factors.

19        Q.   All right.  What about the fact that you

20   had been told by Angie that she had been told by Rogers

21        that Rachel Rogers had heard about, that there had

22   been another complaint of rape?

23        A.   The other complaint, that was knowledge,

24   but it wasn't -- we didn't have any details on it and

25   it wasn't anything, as far as we understood Angie did

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 113

1    not have any information, nor did she have in that

2    case someone who was willing to speak with her.

3                    So there wasn't much we could glean

4    from that, but it certainly was knowledge.  But the

5    two things we do know is we had an allegation against

6    him that was quite serious.  We had a complainant who

7    was willing to talk about it.  And we had knowledge

8    that he had previously violated our policy.  And we

9    had a situation like that, a formal complaint,

10   bringing it to a formal complaint so the allegation

11   can be investigated and adjudicated is an appropriate

12   solution.

13        Q.    Did the knowledge from Rachel Rogers about the

14   issue of another rape complaint play any part in that

15   decision?

16        A.    Well, I can speak for myself, and the

17   answer is no.  For me, the nature of the allegations

18   and the fact that he had previously been through the

19   process and been found to have violated it.

20        Q.    Was there any discussion about that

21   previous allegation?

22        A.    Other than Angie relating to us what she

23   had heard which at that point was very little.

24        Q.    Did you discuss it in that meeting?

25        A.    Yes.  Angie detailed for Stephanie and for

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 114

```
 1    Susan the information that she had gathered up until
 2    that point.
 3         Q.    What was the decision as to what Angie
 4    should do next?
 5         A.    My understanding was that Angie would go
 6    back the Roe   and discuss with her whether she would
 7    be willing to speak with a fact finder in a formal
 8    complaint.
 9         Q.    What else did you understand that Angie was
10    going to say to Roe
11         A.    I don't have any other understanding.  That
12    was the -- that was the question that she was going to
13    go back and ask Roe
14         Q.    Well, did you understand that she was going
15    to discuss with Roe   the pros and cons of
16    participating in a formal complaint as opposed to an
17    informal resolution?
18         A.    I don't know about that.  I imagine she
19    would have described for her what the process of
20    participating in a formal complaint involves.
21         Q.    Well, did you know that she was --
22         A.    But I'm not aware of pros and cons, I'm not
23    sure what -- what you mean by that.
24         Q.    Well, you had some reasons why you thought
25    a formal complaint was the appropriate way to go,
```

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                        January 10, 2017

Page 115

1   correct?

2        A.   That's correct.

3        Q.   And the other persons in that meeting

4   agreed with you, correct?

5        A.   I can't speak for them.

6        Q.   Well, that was the decision that was made,

7   correct?

8        A.   The plan was that Angie would go back and

9   speak with Roe

10       Q.   And the reasons why according to your -- in

11  your view that the formal complaint was the way to go

12  was because of the seriousness of this one and the

13  prior history of Jack Montague with UWC?

14       A.   Those were the primary factors.

15       Q.   Right.  Now did you understand that Angie

16  was going to relate those factors to Roe

17       A.   I did not.

18       Q.   Well, what did you think Angie was going to

19  say to Roe   about what were the reasons to go for a

20  formal complaint as opposed to an informal resolution?

21       A.   I understood Angie was intending to go back

22  to Roe   to discuss the fact that these allegations

23  against Mr. Montague were very serious.  And that the

24  university takes that behavior very seriously, and

25  feels the most appropriate course of action would be

Sanders, Gale & Russell
(203) 624-4157

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                      January 10, 2017

Page 116

1    to bring a formal complaint against him.  We

2    understood her desire to be anonymous, we talked about

3    the fact that you can't be anonymous in a formal

4    complaint so she would have to explain that to her.

5                   But Title IX Coordinator could bring

6    the complaint if she would be willing to speak to a

7    fact finder.  But I can tell you I'm well aware in our

8    practices, and Angie is well aware, that we do not say

9    to complainants or to anyone the fact that someone has

10   received discipline previously.

11       Q.   And that fact, that someone has received

12   discipline previously is confidential, correct?

13       A.   We treat it as such, yes.

14       Q.   It's covered by the confidentiality policy

15   of Yale, correct?

16       A.   It is.

17       Q.   All right.  And the facts of that are

18   considered to be, of that prior discipline are

19   considered to be confidential, correct?

20       A.   Can you explain what you mean by the facts

21   of that?

22       Q.   The allegations?

23       A.   The allegations upon which the disciplinary

24   action is based?

25       Q.   Yes.

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 117

1          A.    Is confidential?  Give me an example of

2    what you mean.  Would we share the fact that an

3    allegation had been made against someone?  Is that

4    what you're asking?

5          Q.    Well, let's ask that question.

6          A.    No.

7          Q.    That would be confidential?

8          A.    Absolutely.

9          Q.    And therefore, the specifics of the

10   allegation would be confidential, correct?

11         A.    The specifics of the allegation,

12   absolutely.  We would not share that information.

13         Q.    The fact that he had been found responsible

14   for that allegation would be confidential?

15         A.    That's correct.  We would not share that.

16         Q.    The fact that he was given a sanction, that

17   would be confidental, correct?

18         A.    Which sanction are we talking about?

19         Q.    Any sanction?

20         A.    You've disciplined, such as probation,

21   disciplinary action such as that would not be shared.

22         Q.    The fact that as a result of this, he was

23   required to go for training, that would be

24   confidential, correct?

25         A.    Required training, which would only come

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

 1    out after disciplinary process, would be something we

 2    would not say to someone.

 3         Q.   In fact, anything you learned as a result

 4    of the previous UWC process would be confidential, and

 5    should not be disclosed to Jane Roe          in that

 6    situation, correct?

 7         A.   Just want to make sure I heard this

 8    correctly.  You said anything that we learned through

 9    the UWC process would be confidential, is that the

10    question?

11         Q.   Right.

12         A.   I would say yes, if it was only learned

13    through that process, absolutely.

14         Q.   Now as of this time, at the time of this

15    meeting --

16         A.   Which meeting just to be clear?

17         Q.   The meeting on -- well, let's look at this.

18    If you look at Exhibit 1.  It indicates on page 845,

19    the top, Stephanie, Susan, Jason, JMK, 11/4/15, 9:00

20    a.m.

21         A.   I see that.

22         Q.   And would you agree that at least as far as

23    this document indicates, that the meeting where this

24    discussion took place was on the morning of November

25    4th, 2015?

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 119

1        A.    That appears to be the case.

2        Q.    Okay.

3        A.    I see this is redacted, so it's not clear

4    to me what was here.  But if all you're asking me is

5    does it appear we had a meeting on that date at that

6    time, I'd say yes.

7        Q.    Right.

8              MR. NOONAN:  Just to be clear, he

9    can't confirm or deny that it occurred on that date.

10             MR. STERN:  I got it.

11             MR. NOONAN:  I mean there's no doubt

12   that Ms. Gleason testified about this and these are

13   her notes.

14             MR. STERN:  She's testified, yes,

15   right.

16             MR. NOONAN:  But I mean I think the

17   problem he's having with the dates is he just doesn't

18   remember.  He didn't keep them.

19             MR. STERN:  But she did.

20       Q.    I mean you don't dispute that the meeting

21   took place on November 4th, 2015, at 9:00 a.m., do

22   you?

23       A.    I don't.

24       Q.    Okay.  As of the end of this meeting, on

25   the morning of November 4th, is it fair to say that

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 120

```
 1    the group had made the decision to bring a formal

 2    complaint against Jack Montague if Jane Roe        said

 3    she would participate in it?

 4         A.   I'd say yes.

 5         Q.   Now as of this moment, you had never

 6    interviewed, you never met Jane Roe

 7         A.   No.

 8         Q.   And neither had Stephanie Spangler nor

 9    Susan Sawyer met with her so far as you knew?

10         A.   No.  As far as I know.

11         Q.   And as of this point, Roe    had met with

12    her once, correct, so far as these documents are

13    concerned?

14         A.   I can't confirm that.

15         Q.   Now you know what it means to have a

16    thorough interview with a complainant, correct?

17         A.   Yes.  I --

18         Q.   In fact, you told us that what your

19    practice is in doing intake in the Title IX office is

20    not to press for details, but simply to get what the

21    person wants to tell you, is that right?

22         A.   Yes.

23         Q.   All right.  And so far as you know, is that

24    the practice that Angie followed when she had met with

25    Roe    prior to this meeting on November 4th, 2015?
```

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 116

1    to bring a formal complaint against him.  We

2    understood her desire to be anonymous, we talked about

3    the fact that you can't be anonymous in a formal

4    complaint so she would have to explain that to her.

5              But Title IX Coordinator could bring

6    the complaint if she would be willing to speak to a

7    fact finder.  But I can tell you I'm well aware in our

8    practices, and Angie is well aware, that we do not say

9    to complainants or to anyone the fact that someone has

10   received discipline previously.

11        Q.   And that fact, that someone has received

12   discipline previously is confidential, correct?

13        A.   We treat it as such, yes.

14        Q.   It's covered by the confidentiality policy

15   of Yale, correct?

16        A.   It is.

17        Q.   All right.  And the facts of that are

18   considered to be, of that prior discipline are

19   considered to be confidential, correct?

20        A.   Can you explain what you mean by the facts

21   of that?

22        Q.   The allegations?

23        A.   The allegations upon which the disciplinary

24   action is based?

25        Q.   Yes.

Electronically signed by JAMES MARTONE (601-171-250-7767)          31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 117

1       A.   Is confidential?  Give me an example of
2   what you mean.  Would we share the fact that an
3   allegation had been made against someone?  Is that
4   what you're asking?
5       Q.   Well, let's ask that question.
6       A.   No.
7       Q.   That would be confidential?
8       A.   Absolutely.
9       Q.   And therefore, the specifics of the
10  allegation would be confidential, correct?
11      A.   The specifics of the allegation,
12  absolutely.  We would not share that information.
13      Q.   The fact that he had been found responsible
14  for that allegation would be confidential?
15      A.   That's correct.  We would not share that.
16      Q.   The fact that he was given a sanction, that
17  would be confidental, correct?
18      A.   Which sanction are we talking about?
19      Q.   Any sanction?
20      A.   You've disciplined, such as probation,
21  disciplinary action such as that would not be shared.
22      Q.   The fact that as a result of this, he was
23  required to go for training, that would be
24  confidential, correct?
25      A.   Required training, which would only come

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                           January 10, 2017

Page 118

1    out after disciplinary process, would be something we

2    would not say to someone.

3         Q.   In fact, anything you learned as a result

4    of the previous UWC process would be confidential, and

5    should not be disclosed to Jane Roe          in that

6    situation, correct?

7         A.   Just want to make sure I heard this

8    correctly.  You said anything that we learned through

9    the UWC process would be confidential, is that the

10   question?

11        Q.   Right.

12        A.   I would say yes, if it was only learned

13   through that process, absolutely.

14        Q.   Now as of this time, at the time of this

15   meeting --

16        A.   Which meeting just to be clear?

17        Q.   The meeting on -- well, let's look at this.

18   If you look at Exhibit 1.  It indicates on page 845,

19   the top, Stephanie, Susan, Jason, JMK, 11/4/15, 9:00

20   a.m.

21        A.   I see that.

22        Q.   And would you agree that at least as far as

23   this document indicates, that the meeting where this

24   discussion took place was on the morning of November

25   4th, 2015?

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 131

1        Q.   I'm asking you if Angie told you at any
2    point that she said that she would not be able to keep
3    Roe      name confidential?
4        A.   So I'm reading this one sentence completely
5    out of context.  As I said to you a moment ago in the
6    process of having, serving as a witness in a formal
7    complaint and speaking to a fact finder, you can't be
8    confidential, or anonymous.  People use those words
9    interchangeably.
10                  If you are going to testify to or
11   provide testimony to the fact finder, your name will
12   be included in the report.  I don't know if that's
13   what this refers to or not.  But -- because it's one
14   sentence completely out of context.
15       Q.   I'm not asking you to interpret this, Mr.
16   Killheffer.
17       A.   Right.
18       Q.   I'm asking you a question which is, did she
19   ever tell you that she would --
20                  MR. NOONAN:  She meaning who?
21       Q.   Did Angie ever tell you that she told Roe
22   that she would not be able to keep her name
23   confidential?
24       A.   That was part of what we discussed about
25   the formal complaint process.  And she told me that

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad

MONTAGUE v. YALE UNIVERSITY                    January 10, 2017

Page 145

1        A.    There's a lot of ifs here.  Didn't
2    participate in any UWC proceeding.  But if Angie
3    learned from me that Jack Montague was required to
4    take sensitivity training, that information was
5    confidential.
6        Q.    Let's take out the words "was required."  I
7    want to be very clear.  If she learned that he had
8    taken sensitivity training, and that information came
9    only from information held by the Title IX office
10   because of the UWC proceeding, that would be
11   confidential, correct?
12       A.    That's correct.
13       Q.    Now going further in this paragraph, it
14   says "She," this is again Roe     statement.  "She,
15   referring to Angie, "told me that she would not be
16   doing her job if she did not take more serious action,
17   and she asked for my participation in the case."  You
18   see that?
19       A.    I do see that.
20       Q.    Now was she authorized to say that she
21   would not be doing her job if she did not take more
22   serious action?
23       A.    Did she request my permission to say that?
24       Q.    Is that an appropriate thing for a Title IX
25   Coordinator to say?

Electronically signed by JAMES MARTONE (601-171-250-7767)                    31a4d12d-81e0-45a5-b5d0-50b58814fcad