# Exhibit 20

Page 1

UNITED STATES DISTRICT COURT


DISTRICT OF CONNECTICUT




------------------------------- x
JACK MONTAGUE,                   :
                                 :
        Plaintiffs,              :
                                 :
    -versus-                     : CIVIL ACTION
                                 : No. 3:16-cv-00885-AVC
YALE UNIVERSITY, ANGELA GLEASON  :
and JASON KILLHEFFER,            :
                                 :
        Defendants               x
------------------------------- 



        Deposition of Jane Roe          taken pursuant

    to Rule 30 of the Federal Rules of Civil Procedure,

    held at the law offices of Jacobs and Dow, LLC,

    350 Orange Street, New Haven, Connecticut, before

    Rosanne LaBonia, LSR 249 and Notary Public in and

    for the State of Connecticut, on March 23, 2017, at

    12:10 P.M.

MONTAGUE v. YALE UNIVERSITY                          March 23, 2017

```
 1        A    Yes.

 2        Q    So your understanding was that Rogers would

 3   go to Ms. Gleason and find out what your options might

 4   be.

 5        A    Yes.

 6        Q    Do you know when she met with Ms. Gleason?

 7        A    It should have been October, around the

 8   15th.  It was that Friday, whatever it was.

 9        Q    When Rogers met with Ms. Gleason.

10        A    When Rogers met with her.

11        Q    Did Rogers report back to you about that

12   meeting?

13        A    Yes.

14        Q    What did she tell you about that meeting?

15        A    She explained that Angie had told her that

16   the two main options through Title IX are the informal

17   complaint, which may involve something like sensitivity

18   training, and the formal complaint which is the hearing

19   process.

20        Q    What did you understand at that time before

21   you yourself had spoken with Ms. Gleason, what did you

22   understand the informal complaint process to be?

23        A    I understood, from what Rogers told me, that

24   my name wouldn't necessarily be attached to it, that I

25   could file it anonymously, and that they would reach
```

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                    9090e572-c8fb-433c-bc39-648b103a2923

MONTAGUE v. YALE UNIVERSITY                    March 23, 2017

1    out to him and offer this additional sensitivity

2    training.

3          Q    At that time, again, prior to when you had

4    spoken to Ms. Gleason, did you have any understanding

5    of what that sensitivity training would entail?

6          A    No.

7          Q    Did you at that time make a decision to go

8    and speak to Ms. Gleason yourself?

9          A    Yes.

10         Q    What did you want to talk to Ms. Gleason

11   about?

12         A    I had decided that I wanted to file an

13   informal complaint against Jack.

14         Q    And again, you understood that to mean

15   something along the lines of training, something that

16   would be provided to him, but your name would not

17   necessarily be attached to the complaint, is that

18   right?

19         A    Yes.

20         Q    Why was it that you wanted to proceed in

21   that fashion?

22         A    Because my main concern at that point

23   was -- I was concerned about Jack's potential behavior

24   to other women on campus, and I thought that that was

25   sort of a low stakes way to sort of affect change and

Electronically signed by ROSANNE LABONIA (501-218-496-1146)          9090e572-c8fb-433c-bc39-648b103a2923

MONTAGUE v. YALE UNIVERSITY                          March 23, 2017

Page 13

1    hopefully prevent any further like incidents or

2    anything like that.

3         Q    When you say "low stakes," can you explain

4    what you mean by that?

5         A    My understanding was that after I filed the

6    informal complaint, I wouldn't have to do anything

7    else.

8         Q    Okay.  So low stakes for you?

9         A    Low stakes for me, yes.

10        Q    Am I correct in understanding that you

11   weren't at that point out to get Jack expelled or

12   anything along those lines?

13        A    Correct.

14        Q    So you went to talk to Ms. Gleason about

15   filing an informal complaint.

16        A    Yes.

17        Q    Do you remember when it was that you went

18   to speak to her about that?

19        A    It was October 19th.

20        Q    What did the two of you talk about at that

21   meeting aside from any details you may have given her

22   about your experience with Mr. Montague?

23        A    She explained the informal and formal

24   complaint processes to me again.  Basically,

25   reiterating what Rogers had said.

Electronically signed by ROSANNE LABONIA (501-218-496-1146)          9090e572-c8fb-433c-bc39-648b103a2923

MONTAGUE v. YALE UNIVERSITY                                    March 23, 2017

1          A      Yes.

2          Q      Consent was an important piece of it to

3    you.

4          A      Yes.

5          Q      And you believed that the sensitivity

6    training would address consent with Mr. Montague,

7    correct?

8          A      Yes.

9          Q      At that meeting with Ms. Gleason, did you

10   formulate a plan as to how you would, in fact, move

11   forward with your complaint against Mr. Montague?

12         A      Yes.

13         Q      What was the plan?

14         A      I filed the informal complaint with her and

15   I left understanding that she would -- that she would

16   reach out to Jack or -- I don't know if it was her

17   specifically, but I thought someone in Title IX would

18   reach out to Jack and offer him the sensitivity

19   training.

20         Q      At that point, were you satisfied with that

21   plan?

22         A      Yes.

23         Q      I'm sorry, you said you filed an informal

24   complaint with Ms. Gleason.  Did you have to fill out

25   any paperwork, or was it just the act of going to her

Electronically signed by ROSANNE LABONIA (501-218-496-1146)            9090e572-c8fb-433c-bc39-648b103a2923

MONTAGUE v. YALE UNIVERSITY                           March 23, 2017

1    and discussing the incident that was the filing of the

2    complaint?

3         A    As far as I understand it, yes, the second

4    one, the latter.

5         Q    That it was just the act of going there.

6         A    Yes.

7         Q    So you didn't fill out any paperwork with

8    regard to the complaint.

9         A    Correct.

10        Q    Did you and Ms. Gleason communicate after

11   that about this plan to reach out to Mr. Montague and

12   offer him sensitivity training?

13        A    Yes, she reached out to me several weeks

14   later.

15        Q    Do you remember what she said?

16        A    She said that a new -- that there had been

17   a new development in the case that I had discussed with

18   her and that she wanted to meet with me.

19        Q    Did you meet with her?

20        A    Yes.

21        Q    Do you remember when you met with her?

22        A    It was the first or second week of November

23   on a Friday.

24        Q    You met in person?

25        A    Yes.

Electronically signed by ROSANNE LABONIA (501-218-496-1146)          9090e572-c8fb-433c-bc39-648b103a2923

MONTAGUE v. YALE UNIVERSITY                    March 23, 2017

```
1    when she said she looked it up?

2         A     That the Title IX officers have some sort

3    of record of who goes through sensitivity training.

4         Q     Did you have a belief as to why Title IX

5    would have that record?

6         A     Because they're the one who offers the

7    sensitivity training.

8         Q     Did she explain to you any further what

9    training he had received?

10        A     She said sensitivity training.

11        Q     She didn't explain to you then anything

12   about the sensitivity training that he had received?

13        A     No.

14        Q     But your understanding was that she got

15   that information from some records that Title IX keeps,

16   the Title IX office keeps.

17        A     Yes.

18        Q     Your understanding was that the Title IX

19   office keeps those records of people who have been

20   referred to sensitivity training because of a complaint

21   of sexual misconduct, correct?

22              MR. NOONAN:   Objection.

23              Mischaracterization.  She said she assumed

24              that Angie got it from records, but nothing

25              was said about it.
```

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                      March 23, 2017

Page 21

```
 1        A    Angie didn't mention a database or

 2   anything.

 3        Q    I'm not asking what Angie said.  I'm asking

 4   what you understood that to mean.  And I believe that

 5   you told me that you understood that Title IX keeps

 6   records of people who go through sensitivity training,

 7   is that right?

 8                    MR. NOONAN:  I have the same

 9             objection.  I don't think she said she

10             understood it; she said she assumed it.

11        Q    Correct, you assumed that Title IX kept

12   records of people who go through sensitive training.

13        A    I assumed that, yes.

14        Q    And you know that the Title IX office at

15   Yale is established to deal with complaints of sexual

16   misconduct, is that correct?

17                    MR. NOONAN:  Objection.  Lack of

18             foundation.

19                    Perhaps we should mention, if someone

20             objects, you still get to answer.

21                    THE WITNESS:  Okay.  Sorry, can I take

22             a break?

23                    MR. SCONZO:  We can take a break.

24             (R E C E S S)

25             (THE REPORTER READ THE RECORD.)
```

Electronically signed by ROSANNE LABONIA (501-218-496-1146)          9090e572-c8fb-433c-bc39-648b103a2923

MONTAGUE v. YALE UNIVERSITY                    March 23, 2017

```
 1        A     Yes.
 2        Q     So did you make any assumptions at that
 3   point about the reason that Jack had already gone
 4   through sensitivity training?
 5        A     Not really.
 6        Q     Did you know that sensitivity training was
 7   one of the options for addressing a complaint of sexual
 8   misconduct?
 9        A     Yes.
10        Q     Did you assume that Jack had been trained
11   in sensitivity because of a prior incident of sexual
12   misconduct?
13        A     I think part of me assumed that.
14        Q     Did you make any specific assumptions about
15   that, as in did you assume that it was a prior incident
16   that was, for example, similar to yours?
17              MR. SCONZO:   Objection.
18        A     No.
19        Q     Do you know what other reasons there might
20   be for somebody going through sensitivity training?
21        A     Not really.
22        Q     Do you know if there are other mechanisms
23   by which a Yale student would get sensitivity training?
24        A     Not really.
25        Q     But you do know that sensitivity training
```

Electronically signed by ROSANNE LABONIA (501-218-496-1146)          9090e572-c8fb-433c-bc39-648b103a2923

MONTAGUE v. YALE UNIVERSITY                        March 23, 2017

Page 42

1    that the new development that she was talking about?

2         A    I assume so.

3         Q    What else did she tell you?

4         A    She told me that she couldn't give me any

5    of the specifics because, I mean, I asked, I wanted to

6    know why he had gone through sensitivity training and

7    what happened, and she said she couldn't tell me,

8    which, I mean, I understood.  I figured that's her job.

9              And then she asked me if I would want to

10   hear more about the formal complaint process, and she

11   said that David Post was available right then and she

12   could give him a call and he could come to our meeting

13   and explain the steps and the process in more detail.

14        Q    Did she also tell you at that meeting that

15   she wouldn't be doing her job if she did not take more

16   serious action?

17        A    Yes.

18        Q    Okay.

19        A    If she didn't -- I think she wouldn't be

20   doing her job if she didn't give me the option of -- if

21   she didn't present these options to me again.

22        Q    What were her words to you, if you

23   remember?

24        A    The words that she said that stick out to

25   me a year and a half later are that she said he had

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                    9090e572-c8fb-433c-bc39-648b103a2923

MONTAGUE v. YALE UNIVERSITY                           March 23, 2017

Page 43

1    already gone through sensitivity training, and she said

2    she wanted me to be able to rethink my options, and

3    that she did say that this is -- that she was doing her

4    job by explaining these options to me again.

5         Q    Did she explain to you why she wanted you

6    to rethink your options?

7         A    She told me because she thought that I

8    would want to rethink my options knowing that he had

9    gone through sensitivity training.

10        Q    So she suggested to you that you might want

11   to rethink your options at that point.

12        A    Yes.

13        Q    And she asked for your participation in a

14   formal complaint against him, right?

15        A    She presented that as an option.

16        Q    Well, let's look at your opening statement,

17   and that's what's been marked as Exhibit 17, on the

18   second page, the end of the second paragraph where you

19   say, "She told me she would not be doing her job if she

20   did not take more serious action and she asked for my

21   participation in the case."  Do you see that?

22        A    Yes.

23        Q    Is that an accurate description of what

24   Ms. Gleason said to you at the meeting?

25        A    I don't -- she presented me with a lot of

Electronically signed by ROSANNE LABONIA (501-218-496-1146)          9090e572-c8fb-433c-bc39-648b103a2923

MONTAGUE v. YALE UNIVERSITY                         March 23, 2017

Page 44

1    options and asked me to consider participating, asked

2    me to consider my options.

3         Q    What were those options?

4         A    As I understood it, she said that we could

5    have him go -- we could offer him the sensitivity

6    training again, Title IX could, or I could drop the

7    informal complaint completely and let it go, or I could

8    go through the formal complaint option acting either as

9    the complainant or as a witness to the process.

10        Q    Did she explain to you what it would entail

11   if you were to act as the complainant?

12        A    David Post explained the process.

13        Q    Did Angie explain anything to you about the

14   UWC process?

15        A    No, she told me that she had contacted

16   David and he could come to the meeting because he's the

17   chair of the UWC, so he's the most knowledgeable about

18   those processes.

19        Q    And she told you that one of your options

20   was for Jack to be retrained in sensitivity, did you

21   say that?

22        A    I believe that was still an option, yes.

23        Q    Did you express an opinion on that one way

24   or the other at the meeting?

25        A    I was a disaster.  I told her that I would

Electronically signed by ROSANNE LABONIA (501-218-496-1146)          9090e572-c8fb-433c-bc39-648b103a2923

MONTAGUE v. YALE UNIVERSITY                              March 23, 2017

Page 45

1    take the weekend to think about it.

2          Q     When you say you were a disaster, do you

3    mean you were just having difficulty talking to her

4    about --

5          A     I was very emotional.

6          Q     So did she do most of the talking?

7          A     I guess.  I was talking too.  I don't know

8    how it broke up.

9          Q     I'm just trying to understand whether

10   you -- if Ms. Gleason said to you that training Jack in

11   sensitivity is still an option, if you had a response

12   to that at all.

13         A     I don't think I had a response.  I asked

14   questions about the formal complaint process.

15         Q     Did you ask those questions to Angie or to

16   David Post?

17         A     To both, they were both in the room, yeah.

18         Q     Did she tell you about the sensitivity

19   training that Jack had already received while David

20   Post was in the room?

21         A     Before David got there.

22         Q     I believe you said that she told you that

23   another option was to simply drop your informal

24   complaint, is that right?

25         A     Yes, I thought that was still an option,

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                    9090e572-c8fb-433c-bc39-648b103a2923

MONTAGUE v. YALE UNIVERSITY                          March 23, 2017

Page 48

1    process?

2        A    He explained -- he told me a little bit

3    about the length of the process, that I would have an

4    advisor throughout the process, meet with an impartial

5    fact finder, it culminates in a hearing, told me who

6    was on the UWC, that it's faculty, and then he told me

7    that Dean Holloway usually makes the ultimate decision.

8        Q    Did he explain to you the difference

9    between serving as the complainant and serving as a

10   witness?

11       A    Yeah, a little bit.  He said that I didn't

12   have to be the one who brought the complaint, but that

13   functionally as the primary witness it's pretty much

14   the same thing as bringing forward the complaint.

15       Q    So did he explain why one would choose one

16   over the other if they're functionally the same?

17       A    I don't really remember what he said the

18   difference was.  I think it was presented as a comfort

19   thing.

20       Q    Can you explain that a little bit more?

21       A    That it may be more comfortable for certain

22   victims to not be the complainant because of just

23   general anxiety about bringing a complaint forward.

24       Q    Okay.  But ultimately, functionally, you

25   would be complainant.

Electronically signed by ROSANNE LABONIA (501-218-496-1146)          9090e572-c8fb-433c-bc39-648b103a2923

MONTAGUE v. YALE UNIVERSITY                    March 23, 2017

Page 49

1     A    I think in my case, functionally I was the

2    complainant.  I think now I don't see a whole lot of

3    difference between them, but at the time it seemed like

4    a major source of comfort to not be officially a

5    complainant.

6     Q    Do you think that he explained to you at

7    the time that functionally it might be the same as

8    being the complainant?

9     A    I think I had that clarified for me at a

10   later time.

11    Q    Did Mr. Post discuss with you the fact that

12   Jack had already received sensitivity training?

13    A    No.

14    Q    While Mr. Post was in the room, did you

15   discuss the fact that Jack had already received

16   sensitivity training?

17    A    No.

18    Q    Did Mr. Post make any recommendations to

19   you about what the best course of action might be?

20    A    No.

21    Q    I believe you said you didn't decide at

22   that meeting what you wanted to do, is that right?

23    A    Correct.

24    Q    Why didn't you make a decision right then?

25    A    It's a pretty big decision to make for like

Electronically signed by ROSANNE LABONIA (501-218-496-1146)            9090e572-c8fb-433c-bc39-648b103a2923

MONTAGUE v. YALE UNIVERSITY                    March 23, 2017

1               fairness to you, this was a journal.

2               That's why you have it.

3                    MS. DEAL:  That's fine.

4        Q    How was campus tumultuous?

5        A    There was just -- I mean the basketball

6   team all wore his number, which prompted an onslaught

7   of posters being distributed in lecture halls and

8   posted on different bulletin boards.  I was being

9   contacted by reporters from national papers as well as

10  the school paper.

11       Q    When you say posters, are you talking about

12  the posters that said, "Stop Supporting a Rapist"?

13       A    Yes, the fliers, things like that.  I think

14  campus felt very divided.

15       Q    Do you know why you were being contacted?

16       A    Well, I think they knew that I -- people

17  were aware to a certain extent, some people were aware

18  that I was the person who brought the complaint, not

19  officially, you know what I mean.  And yeah, people

20  were -- felt like that was something that they could

21  share with reporters.  So yeah.

22       Q    Do you have any idea who shared that with

23  the reporters?

24       A    No.  No one that knows me at all.

25       Q    So if you'll turn to the second page, which

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                              March 23, 2017

1     about.  It relates to what we already marked as Exhibit

2     16, which is basically an e-mail chain, as I understand

3     it, between you and Angie Gleason, is that right?

4          A     Yes.

5          Q     So if you go to the second page of the

6     exhibit, the bottom of the second page, there's an

7     e-mail that starts -- it's dated 11/9/2015, 4:41 p.m.,

8     and it's from you to Angie.  Am I correct that this is

9     the e-mail in which you expressed your willingness to

10    have a formal complaint filed and you would serve as

11    the witness?

12         A     Yes.

13         Q     You describe in there some of your -- some

14    of the things that you were thinking about and also

15    asked some questions, which I think were then answered

16    for you within the body of the e-mail, is that right?

17         A     Yes.

18         Q     The major thing I want to ask about was at

19    the bottom of the third page of Exhibit 16, there's a

20    paragraph that -- I'll just read it because it's

21    relatively brief.  "Finally, and perhaps most

22    importantly, given some interactions from this past

23    weekend, is it possible for a no contact policy to be

24    put in place between the two of us throughout the

25    duration of this case.  Again, please let me know if

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                    9090e572-c8fb-433c-bc39-648b103a2923

MONTAGUE v. YALE UNIVERSITY                          March 23, 2017

Page 85

1    you need any more information."

2            So why was it most importantly because of

3    interactions over the weekend that you were asking

4    about a no contact policy?

5        A    Right.  So I met with Angie on that Friday.

6        Q    The Friday previous to this e-mail.

7        A    Yes, the Friday previous to this e-mail.

8    And then that weekend, I believe it was a Saturday, it

9    could have possibly been that Friday night, but I

10   believe it was Saturday, I was with Rogers and REDACTED my

11   two suite mates.  It was a party in a back yard of some

12   house.  They call it the dog house.  It's a house.  And

13   I was there and Jack was also there and Rogers and REDACTED

14   at this point were privy to what was going on and sort

15   of what I was dealing with.  And they asked me if I

16   wanted to leave, and I was like, "I don't really want

17   to leave.  Like I just want to be able to be here right

18   now."

19           So my friend REDACTED is a little more -- I

20   don't want to say aggressive, but proactive than I am,

21   and she ended up going up to Jack and telling him

22   that -- she told him, "Roe   is here.  I think you

23   should leave and just -- it will make things easier for

24   everyone if you guys aren't in the same place."

25           And he -- I think he was drunk and he, from

Electronically signed by ROSANNE LABONIA (501-218-496-1146)          9090e572-c8fb-433c-bc39-648b103a2923

MONTAGUE v. YALE UNIVERSITY                    March 23, 2017

Page 86

1    how she told me the story -- I wasn't present for this

2    conversation, but as she reported it back to me, he

3    basically yelled at her and was saying that, "There's

4    no reason why I should have to leave this party just

5    because she's here.  Like this is ridiculous."

6              And then REDACTEDsaid, "You raped her."

7              And he said, "That was more than a year

8    ago.  This is ridiculous," like -- basically that this

9    is his space and not mine.  I don't know that he had

10   any connection to the space, he may have been, I'm not

11   sure.

12        Q    The space meaning the house?

13        A    The house, yes.  I don't think he lived

14   there.  And then -- so REDACTEDtold me that, and that was

15   really upsetting for me.  So after a few minutes, we

16   ended up going home because I was like, "This is not

17   worth it."

18              So I think that interaction made me really

19   worried about just further interactions between me and

20   him potentially or between him and my friends, so I was

21   interested in the no contact order and, yeah, also

22   played a role in my ultimate decision to file this

23   formal complaint.

24        Q    And why is that?  Why did this interaction

25   have some role in your decision to file the -- or to

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                    9090e572-c8fb-433c-bc39-648b103a2923

MONTAGUE v. YALE UNIVERSITY                        March 23, 2017

Page 87

1    participate in the formal complaint as a prime witness?

2         A    Yeah, I think it was just such a negative

3    and aggressive reaction on his part that -- and just

4    sort of cemented in my mind that he really -- all of my

5    concerns about him not understanding respect and to a

6    certain extent like consent because consenting to be in

7    an area with someone who you have like a severe issue

8    with, I think, yeah, it cemented in my mind all of

9    those concerns, and I think -- I don't really know what

10   would have -- if my decision would have been

11   differently if he had been like, "Oh, yeah, you're

12   right.  I'll head out of here in twenty minutes or so,

13   like we're leaving anyway."  I can't say that my

14   decision would have been different, but I think it

15   definitely had something to do with it.

16        Q    Was this behavior where he was not willing

17   to leave a place where you went, was that different

18   from how he had acted in the past?

19        A    Yeah.  When I met with him immediately

20   after the incident, I had expressed that I wouldn't

21   want to be in the same place as him in a going out

22   setting or otherwise, and for about a year, I don't

23   know if it was just like coincidence or happenstance

24   that we just hadn't run into each other, but I hadn't

25   had any issues with him.

Electronically signed by ROSANNE LABONIA (501-218-496-1146)          9090e572-c8fb-433c-bc39-648b103a2923