# Exhibit 29

Page 1

UNITED STATES DISTRICT COURT


DISTRICT OF CONNECTICUT




------------------------------x
JACK MONTAGUE,                    :
                                  :
          Plaintiffs,             :
                                  :
     -versus-                     : CIVIL ACTION
                                  : No.
YALE UNIVERSITY, ANGELA           : 3:16-cv-00885-AVC
GLEASON and JASON KILLHEFFER,     :
                                  :
          Defendants              x
------------------------------



          Deposition of ALEY MENON, taken pursuant to

     Rule 30 of the Federal Rules of Civil Procedure,

     held at the law offices of Jacobs and Dow, LLC,

     350 Orange Street, New Haven, Connecticut,

     before Rosanne LaBonia, LSR 249 and Notary

     Public in and for the State of Connecticut, on

     April 13, 2017, at 11:44 A.M.

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                    95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 12

1       Q       And then what did you do then?

2       A       I joined -- I became a secretary for the

3    University-Wide Committee.

4       Q       So you've done that continuously since

5    2001?

6       A       2011.

7       Q       2011.  Excuse me.

8       A       Yes.

9       Q       What are your responsibilities as the

10   secretary of the University-Wide Committee?

11      A       I'm a liaison to the parties and the

12   community, the Yale community.  I handle official

13   correspondence for the Committee.  I oversee, you

14   know, activities of the UWC.

15      Q       Do you advise persons as to the contents

16   of UWC policies?

17      A       Yes.

18      Q       Do you advise as to whether or not the

19   UWC has jurisdiction?

20      A       Yes.

21      Q       Whether the UWC has jurisdiction would

22   depend at least in part on whether the charged

23   conduct would constitute an offense under the

24   University policies, is that right?

25      A       University sexual misconduct policies,

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 19

1      to decide when there's an investigation of the

2      matter, and then for the hearing panel to consider.

3            Q      Now, as a result of her communication, a

4      decision had to be made whether this complaint by

5      Ms. Smith  was within the jurisdiction of the UWC, is

6      that right?

7            A      That's correct.

8            Q      And that had to do with whether her

9      complaint on its face stated something that would be

10     considered to be an offense under Yale's sexual

11     misconduct policy, right?

12           A      That's correct.

13           Q      And the offense in this case would be

14     sexual harassment, is that right?

15           A      The allegation that she made was of the

16     pizza plate being placed down the front of her shirt

17     between her breasts.

18           Q      But the issue, the jurisdictional issue

19     was whether this was -- this alleged the offense of

20     sexual harassment, is that right?

21           A      No.

22           Q      That was not the issue?

23           A      No.

24           Q      Was there something -- was there an

25     issue?

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                    95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 20

1      A      Yes.

2      Q      What was the issue?

3      A      The issue was whether that the allegation

4   was a violation of the sexual misconduct policy.

5      Q      All right.  And what part of the sexual

6   misconduct policy?

7      A      At the jurisdictional stage, you don't

8   have to identify specifically which aspect of it.

9   The question is a broader question of whether there

10   would be a violation of the sexual misconduct

11   policy.

12      Q      In order to take jurisdiction, you needed

13   to have three persons agree, correct?

14      A      Mm-hmm.

15      Q      And Professor Della Rocca said that he

16   thought there was jurisdiction, right?

17      A      That's correct.

18      Q      And you said that you thought the UWC had

19   jurisdiction, right?

20      A      Yes.

21      Q      And why did you think the UWC had

22   jurisdiction?

23      A      The allegation was one of a student

24   rolling up a pizza plate, an object, and placing it

25   between the breasts of another student, and so I

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                    95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                          April 13, 2017

Page 21

1    believed that that was -- would fall within the

2    sexual misconduct policy.

3         Q      In what respect did you believe it would

4    fall within the sexual misconduct policy?

5         A      I think placing an object between a

6    women's breasts without her consent would be a

7    violation of the sexual misconduct policy, if shown

8    to be true.

9         Q      Ultimately, Mr. Montague was found

10   responsible for the offense of sexual harassment, is

11   that right?

12        A      Yes, that's correct.

13        Q      What were the elements of sexual

14   harassment at that time?

15        A      I would have to look at the policy at the

16   time.

17        Q      Well, just from your best memory.

18        A      I prefer to look at the policy.

19        Q      Well, I don't have the exact policy, but

20   I can give you the 2016 policy if you think there's

21   a difference.

22        A      Okay.

23        Q      I give you now what is the replacement

24   for Exhibit 2.

25        A      Thank you.

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 22

1              MR. NOONAN:  I think you had

2              another copy of that, right?  Do you

3              still have an extra one?

4              MR. STERN:  Yes, this must be it.

5              MR. NOONAN:  Thank you.

6      A     Could you repeat the question one more

7   time?

8      Q     What were the relevant elements of sexual

9   harassment in the policy?

10     A     So the relevant aspects would be -- and

11  this is also in the protocol for the hearing.  That

12  would be the most accurate probably statement of it,

13  but I believe it was sexual harassment consists

14  of --

15             MR. NOONAN:  For the record you're

16             looking at Exhibit 2 page two.  The

17             second page of Exhibit 2.

18             THE WITNESS:  That's correct.

19     Q     Would you like to look at the protocol

20  for the hearing?  Would that be helpful?

21     A     It may be.  I think we usually place in

22  the protocol the relevant sections of the policy.

23             (PLAINTIFF'S EXHIBIT 58 FOR

24             IDENTIFICATION Received and Marked.)

25     Q     I'm giving you Exhibit 58.

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                          April 13, 2017

```
 1      A      Thank you.

 2      Q      Can you tell me what that is?

 3      A      Sure.

 4      Q      That's the protocol for the hearing.

 5      A      Yes, yes.

 6      Q      We'll get into that a little more later.

 7      A      October 9, 2013, on page two is the

 8  relevant part of the sexual harassment definition

 9  which reads, "Sexual harassment consists of

10  nonconsensual conduct of a sexual nature on or off

11  campus when such conduct has the purpose or effect

12  of unreasonably interfering with an individual's

13  work or academic performance or creating an

14  intimidating or hostile academic or work

15  environment.  Sexual harassment may be found in a

16  single episode, as well as in persistent behavior."

17      Q      What about this allegation made you think

18  that this was conduct of a sexual nature?

19      A      The object was placed between a woman's

20  breasts under her shirt.

21      Q      Did you understand that Ms. Smith  was

22  saying that there was no skin on skin contact?  Did

23  you understand that?

24      A      Yes.

25      Q      So what made it of a sexual nature?
```

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 24

1      A      Because of the object being placed, as I
2  mentioned, under the woman's shirt between her
3  breasts.
4      Q      Was it significant to you that a man was
5  doing that or would it have made no difference if it
6  was a man or a woman?
7      A      I guess it depends on if she experienced
8  it as hostility whether it was a man or a woman, if
9  it created a hostile environment for her.
10     Q      Well, in what --
11     A      And it was conduct of a sexual nature
12 that the object was placed between her breasts.
13     Q      What made it a sexual -- she didn't say
14 that it touched either breast, right?  She said it
15 was between her breasts, right?
16     A      Yes.
17     Q      And that it was -- and that there was no
18 skin on skin contact, correct?
19     A      Correct.
20     Q      Did you understand this to be that Mr.
21 Montague, according to her allegation, was making a
22 sexual advance to her?
23     A      I don't believe she alleged that.
24     Q      So it was a matter that it was hostility
25 expressed by Mr. Montague to her, is that the point?

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 43

1        Q        Now, before the hearing, Ms. Smith  sent

2    you an e-mail with a statement or with some -- with

3    a statement or some statements that she wished you

4    to pass on to the committee.

5        A        Yes, that's correct.

6                        (PLAINTIFF'S EXHIBIT 61 FOR

7                        IDENTIFICATION Received and Marked.)

8        Q        Now, if you look at this, you will

9    recognize this as what we call an e-mail chain, do

10   you not?  You go from the bottom up, the back

11   forward, right?

12       A        Yes.

13       Q        So at the back is the first one where

14   you're sending an e-mail to Ms. Smith  and then she

15   responds on October 8th which is the day before the

16   scheduled date for the hearing.  If you look at the

17   second page of this exhibit.

18       A        Yes, I see she wrote to me on October

19   8th.

20       Q        It says, "I have a few things to add

21   which maybe you might be willing to present at

22   tomorrow's hearing," right?

23       A        Yes.

24       Q        You did then present it, right?

25       A        Yes.

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                    95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 44

```
 1                    (PLAINTIFF'S EXHIBIT 62 FOR

 2                    IDENTIFICATION Received and Marked.)

 3          Q     So this is now Exhibit 62, and is this

 4     what you prepared to give to the committee as Ms.

 5     Smith    statement?

 6                    MR. NOONAN:  I missed the question.

 7                    Could you read it?

 8                    (THE REPORTER READ THE RECORD.)

 9                    MR. NOONAN:  I'll object to the

10                    form.

11          A     I don't recall if I --

12                    MR. NOONAN:  The question is did

13                    you prepare this?  You mean as opposed to

14                    Ms. Smith  for the hearing.

15          A     Ms. Smith  prepared the content.

16          Q     Right?

17          A     Yes.

18          Q     So all of the language that's in Exhibit

19     62 is taken from Ms. Smith     e-mail to you of the

20     day before the hearing, correct?

21          A     Correct.

22          Q     And then you took that and you put it

23     into this document, which says at the bottom,

24     "Submitted by Sally Smith        October 9, 2013,"

25     right?
```

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 45

```
 1      A      I don't remember.
 2      Q      Well, if you look back at Exhibit 61.
 3   That's the day after the hearing, you wrote to Ms.
 4   Smith  and you told her about the hearing.
 5      A      Yes.
 6      Q      And you told her, "I read your statement
 7   to all the participants just before Jack made his
 8   opening statement."
 9      A      Yes, correct.
10      Q      So that would be what is found in Exhibit
11   62, that's what you read, right?
12      A      I just don't know if I read from -- I
13   just don't recall preparing this document, that's
14   all.
15      Q      In any event, let's just look at what is
16   on the second page of Exhibit 61.
17      A      Okay.
18      Q      She said in that, "I just want to
19   emphasize that although the pizza plate obviously
20   literally touched me, Jack's hand never made skin to
21   skin contact."  Do you see that?
22      A      Yes.
23      Q      Did you have any conversation with Ms.
24   Smith
25      A      No.
```

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

1    satisfies that provision requiring the keeping of

2    minutes?

3         A    That's our practice.

4         Q    And you think that complies with the

5    requirement.

6         A    I don't know.

7         Q    You don't know?

8         A    Which requirement?

9         Q    The requirement that you keep minutes.

10        A    Yes, yes.

11        Q    So why do you think that something that

12   is written before, that doesn't record a single

13   thing that actually happens in the hearing,

14   satisfies the requirement that you keep minutes?

15        A    It does walk through the steps that

16   happen during the hearing.

17        Q    It walks through the steps --

18        A    It describes each step that happens.

19        Q    Well, it doesn't say anything about what

20   was decided, does it?

21        A    That's not required that that be in the

22   minutes.

23        Q    Who says that?

24        A    It's not required in the procedures that

25   the minutes state what the decision is, and there's

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                    95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 73

1        Q        And there's no reference to the finding

2    in the fact finder's report that Ms. Smith  saw this

3    as impulsive rather than premeditated.

4        A        I don't recall that in the report.

5        Q        And there's also no reference in the

6    report to Ms. Smith    comment that people make

7    mistakes, isn't that right?

8        A        That's true.

9        Q        So would you agree that the panel's

10   report seems to be a good deal more harsh than the

11   attitude taken by Ms. Smith  herself?

12       A        No.

13       Q        Did you reserve any notes from this

14   hearing?

15       A        No.

16       Q        If you had any notes, did you destroy

17   them?

18       A        Our practice is to destroy them after the

19   final decision is reached in the case.

20       Q        Is there some written policy that

21   requires you to destroy the notes?

22       A        No.  It's a practice.

23       Q        Who is the author of this practice?

24       A        I don't know that there was an author,

25   but it's a practice that's been in place and it's --

Electronically signed by ROSANNE LABONIA (501-218-496-1146)            95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 74

1    yes, it's been in place.

2         Q     What is the purpose of this practice?

3         A     I think the panel's report is the -- is

4    the statement of what occurred at the hearing from

5    the panel's perspective, and so this speaks to that,

6    coupled with the protocol.  Those are the two

7    documents that reflect what happened at the hearing,

8    plus the hearing statements that the students make

9    if they provide a written copy.  So those are the

10   various pieces of -- you know, the documents that

11   reflect what happened at the hearing, not notes that

12   I may or may not have taken.  I step out of the

13   room, I come back in and, you know, there's no

14   transcription of the hearing, there's no recording

15   of it or anything like that.

16        Q     As the secretary of the committee and as

17   a lawyer, you are aware that sometimes these matters

18   can proceed to litigation, right?  There can be

19   litigation about these hearings, correct?

20        A     Yes.

21        Q     This is a good example, correct?

22        A     Yes.

23        Q     It's not the first one, is it?

24             MR. NOONAN:  I don't know if --

25             this could be the first one.  She's

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                    95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                April 13, 2017

1                 looking at me.  I don't know.

2        Q       This is the first lawsuit about

3    discipline for sexual misconduct at Yale?

4        A       I don't know the order.  There are very

5    few.

6        Q       Did it ever occur to you --

7        A       I don't know if any of this is

8    confidential.

9        Q       You know that persons sue over being

10   expelled from universities for sexual misconduct

11   from time to time, correct?

12       A       Yes.

13       Q       And did it occur to you that documents

14   made and notes made concerning what occurs at these

15   proceedings might be relevant to such a lawsuit in

16   the future?

17                 MR. NOONAN:  Are you asking if it

18                 occurred at the time of this proceeding

19                 in 2013?

20       Q       Well, in executing this policy of

21   destroying all the notes, has it ever occurred to

22   you that they might be relevant to some --

23       A       No.

24       Q       No?

25       A       No.

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 76

```
 1        Q       Did you ever have as working at the
 2   University of Miami with the General Counsel's
 3   Office, did it ever come to your attention that
 4   people were suing concerning disciplinary action
 5   that had been taken against them?
 6        A       Yes.
 7        Q       All right.  So you knew then that what
 8   happens at a disciplinary proceeding might be
 9   relevant to a lawsuit, correct?
10        A       Yes, that's possible.
11        Q       And despite that, you followed a policy
12   of destroying everything other than those specific
13   documents that you told us about.
14                MR. NOONAN:  Well, objection.  She
15                didn't say she had a policy of
16                destroying.  What she said is she doesn't
17                keep her notes and other documents.
18        Q       You said you kept the protocol.
19        A       Yes.
20        Q       The panel report, the decision by the
21   decision maker.
22        A       The procedures specify what I should
23   keep, what the records are that the secretary needs
24   to maintain, and I maintain those records.
25        Q       And the procedures specify minutes?
```

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 95

1    look to others.

2         Q       At some point, a fact finder was

3    appointed.

4         A       Yes.

5         Q       Who was the fact finder in this case?

6         A       Miriam Berkman.

7         Q       Who is Miriam Berkman?

8         A       She has a private social work -- like a

9    clinical social work practice, and she's a fact

10   finder for the UWC.

11        Q       So she's a licensed social worker?

12        A       I believe so.

13        Q       Have you used her before?

14        A       We have.

15        Q       How many times have you used her before

16   this?

17        A       I don't know.

18        Q       Did you consider her to be experienced?

19        A       Yes.

20        Q       And capable?

21        A       Yes.

22        Q       You had confidence in her work?

23        A       Yes.

24        Q       At some point -- and she went about

25   interviewing persons and conducting her

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                                    95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 108

1    Yale 11547 version.

2        Q      Now, you know from the report that Ms.

3    Gleason denied telling Ms. Roe      about -- denied

4    telling Ms. Roe      about Jack Montague's prior

5    complaint.

6        A      Which version of the report?  In the

7    final version?

8        Q      Why don't we look in the draft version.

9        A      The draft version.

10       Q      Which is --

11              MR. NOONAN:   70.  That's one draft

12              version anyway.

13       A      Yes, Exhibit 70.

14       Q      Do you have that section?

15       A      Which section?

16       Q      The section where Ms. Gleason describes

17   what happened in her interaction with --

18       A      Page 17?  You mean Miriam Berkman with

19   Angela Gleason?

20       Q      Right.

21       A      Yes, I have it in the draft version.

22       Q      And that says -- you see in the draft

23   version something that is blued out, a blue

24   strike-out?

25       A      Yes.

Electronically signed by ROSANNE LABONIA (501-218-496-1146)          95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 109

1        Q      And that says she did not tell Ms.

2    Roe       about the previous complaint against Mr.

3    Montague, but she did tell her that Mr. Montague was

4    aware of the University's policy on consent.

5        A      I see that that has a strike-out through

6    it.

7        Q      The first part was struck out.

8        A      Yes, I see that.

9        Q      And that was you who struck that out,

10   right?

11       A      I don't recall that.

12                      (PLAINTIFF'S EXHIBIT 72 FOR

13                      IDENTIFICATION Received and Marked.)

14       Q      If you turn to the -- this I will

15   represent to you has been turned over to us by Yale

16   as the information that is contained by the

17   so-called Native Word program which shows who made

18   what revision.  And if you turn to page three,

19   you'll notice towards the bottom a deletion, "She

20   did not tell Ms. Roe       about the previous

21   complaint against Mr. Montague."

22       A      Yes, I see that.

23       Q      And it indicates that that deletion was

24   made by you.

25       A      Yes, it does say that.

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                    95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 110

1      Q      So why did you delete that denial by
2   Angela Gleason?
3      A      Do you mind if I read it?
4      Q      Sure, go ahead.
5      A      I don't remember that, I'm sorry.
6      Q      So if I have this correctly, the person
7   who reviewed Ms. Berkman's draft did not take out or
8   did not suggest that she take out the statement that
9   Gleason told Jane Roe        about Jack's prior
10  complaint, but did take out Gleason's denial of
11  having told that to Jane Roe
12     A      I'm not sure what this is.  I see that
13  this sentence is struck out and that the paragraphs
14  that you mentioned are the way that you -- that we
15  discussed.
16     Q      What reason could there have been to
17  leave in the statement that Gleason told Roe    that,
18  but not Gleason's denial that she told her that?
19     A      I don't remember.
20     Q      And then, again, if you turn to the same
21  page where those comments were on Exhibit 70, there
22  was also some question about the word "consent
23  training."  Do you see that?
24     A      Yes.
25     Q      According to Ms. Berkman's initial draft,

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                      April 13, 2017

Page 115

1    according to Miriam Berkman, right?

2         A    I see what she wrote here.

3         Q    And she's referred to it three times,

4    correct?

5                    MR. NOONAN:  I think it's twice.

6         A    It's twice.

7         Q    Once, and then she called specific

8    attention to it, and then she refers to it again in

9    her e-mail, correct?

10        A    I see the three comments that you're

11   referring to.

12        Q    Now, you certainly saw these three

13   statements by Miriam Berkman at the time.

14        A    Yes.

15        Q    And these statements record that

16   according to what she was told by Jane Roe

17   there was a breach of Yale's confidentiality policy,

18   correct?

19        A    I don't know if there was a breach.

20        Q    She says that Roe   told her about a

21   breach, right?

22                    MR. NOONAN:  Objection, she doesn't

23             say that.  She doesn't say -- she doesn't

24             say Roe   told her about a breach.

25        A    There is no mention of a breach in this

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                 95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 116

1    report, in any of these communications.

2         Q       Then I'll just ask you this.  Was Angela

3    Gleason allowed to tell Jane Roe        about Jack's

4    prior UWC-1 complaint --

5         A       No.

6         Q       -- under the confidentiality policy?

7         A       No.

8         Q       And so if Angela Gleason told her that,

9    that would be a violation of Yale's confidentiality

10   policy.

11        A       Yes.

12        Q       Now having read the report by Miriam

13   Berkman, a reliable reporter according to you, that

14   Roe   told her that, what did you do about the

15   violation or the alleged violation of the

16   confidentiality policy?

17        A       There was no allegation of a violation of

18   the policy at the time.

19        Q       There's an allegation -- or there's a

20   statement that Angela Gleason did something which

21   you told us just now would have been a violation of

22   the confidentiality policy.

23        A       I don't know that Angela Gleason violated

24   the confidentiality policy.

25        Q       I know you don't know if she did, but you

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                    95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

1    do know that Miriam Berkman reported that Angela --

2    that Jane Roe        told her that Angela Gleason did

3    it, right?

4         A    No.

5         Q    Okay.  This is really too much.  I

6    just -- I just have to put that on the record.

7                   MR. NOONAN:  And I'm going to put

8                   on the record that that is inappropriate,

9                   and you know it, Max.  Come on.

10                  MR. STERN:  There is such a

11                  thing --

12                  MR. NOONAN:  Max.

13                  MR. STERN:  It's being evasive.

14                  MR. NOONAN:  What we're going to do

15                  is take a break.  Aley and I are going to

16                  have some lunch because it's three

17                  o'clock.  We're going to come back.  I

18                  want you to compose yourself and ask

19                  questions, don't make comments for the

20                  witness.

21                  MR. STERN:  But I'm going to ask

22                  you to talk to your client about not

23                  giving me --

24                  MR. NOONAN:  No, I'm not going to

25                  take advice from you on how to practice

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                    95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

                                                      Page 118

1                 law.  She's not given a single evasive

2                 answer.  You've done nothing but insult

3                 her.  Off the record.

4                      (DISCUSSION HELD OFF THE RECORD.)

5                      (R E C E S S) 3:00 - 3:44

6     BY MR. STERN:

7          Q      As the secretary of the UWC, if you had

8     been told that someone has or may have breached

9     confidentiality, what obligation do you have?

10         A      My responsibility is to take in

11    complaints and process those complaints.  So if

12    there was a complaint about it, we would look at it,

13    if there was a complaint brought forward.

14         Q      So if you learn -- if you get information

15    that a member of the Title IX staff has breached

16    confidentiality or that someone has said a Title IX

17    staff member has breached confidentiality, you don't

18    have any obligation to do anything about it unless

19    someone actually makes a formal complaint?

20         A      Yes.

21         Q      No obligation.

22         A      That's correct.

23         Q      Is confidentiality taken seriously by the

24    UWC?

25         A      Yes.

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                    95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 119

1       Q       Indeed, is there -- it's not only dealt

2    with in the UWC policies, but there's a separate

3    Statement of Confidentiality by the Provost,

4    correct?

5       A       That's correct.

6       Q       Indeed, the Provost says the University

7    may take disciplinary action against any member of

8    the Yale community who discloses UWC documents in

9    violation of UWC procedures or who is responsible

10   for the improper disclosure of such documents by

11   others.

12      A       That's correct.

13      Q       The Title IX staff are responsible, among

14   others, for enforcing the confidentiality policy of

15   Yale, isn't that correct?

16      A       I'm sorry, could you state that question

17   again?

18      Q       The Title IX staff are responsible for

19   enforcing the confidentiality policy of Yale

20   University in respect to sexual misconduct matters.

21              MR. NOONAN:  Object to the form.

22      A       May I look at the confidentiality

23   statement, please?

24              Thank you.  Your question again, please.

25      Q       "Isn't that correct" is the question.

Electronically signed by ROSANNE LABONIA (501-218-496-1146)          95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

     1               (THE REPORTER READ THE RECORD.)

     2       Q      Who is responsible for enforcing the

     3   confidentiality policies of Yale in respect to

     4   sexual misconduct?

     5       A      What do you mean by "enforcement"?

     6       Q      Taking steps to make sure that the

     7   confidentiality policy is complied with.

     8       A      Again, the UWC takes in complaints, so I

     9   guess we would -- we've not had this issue come up.

    10   We would have to take a look at it, if a complaint

    11   was brought forward, if there was a violation of the

    12   statement of confidentiality.  Again, it's of UWC

    13   proceedings.

    14       Q      So if you find out that in the very

    15   matter in which you are conducting a UWC proceeding

    16   that an official of Yale University has violated the

    17   confidentiality policy, your testimony is that you

    18   have no obligation to do anything about it

    19   whatsoever unless someone makes a formal complaint.

    20       A      No, that's not what I said.

    21       Q      Okay.  So that's not true?

    22       A      My responsibility -- I'm explaining what

    23   my responsibility is, is to take in complaints that

    24   are brought to the UWC and to determine jurisdiction

    25   and then go through the UWC process if we determine

Electronically signed by ROSANNE LABONIA (501-218-496-1146)              95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                        April 13, 2017

Page 121

1    there is jurisdiction.  That's my responsibility as

2    the UWC secretary.

3        Q      I hear that.  You would have jurisdiction

4    over a complaint that the confidentiality policy was

5    violated in the sexual misconduct matter, correct?

6        A      This hasn't come up and I think it's

7    something we would have to look at.

8        Q      Well, I'm asking you specifically, do you

9    have the responsibility to do anything if it comes

10   to your attention that an official of Yale

11   University with official responsibilities concerning

12   a matter which is before the UWC has breached

13   confidentiality?  Do you have responsibility to do

14   anything at all?

15               MR. NOONAN:  You're talking about

16               in the absence of a complaint.

17       Q      In the absence of a formal complaint.

18       A      No.

19       Q      And it's perfectly -- as far as you

20   understand your responsibilities, you can just

21   ignore it, is that right?

22       A      No, I said -- that's not my -- my

23   responsibility is to process the complaints that are

24   brought forward to the UWC as the secretary.  That's

25   my responsibility.

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 122

1      Q      What about your understanding of the
2   responsibilities of the other members of the
3   committee, and including the Chair of the committee,
4   would any of those persons have any responsibility
5   to do anything if it came to their attention that a
6   Title IX staff member had breached confidentiality
7   in respect to a matter before the UWC?
8      A      The statement says the University may
9   take disciplinary action.  So, you know, we haven't
10  had this issue come up.  I can tell you what my
11  obligations are and that's, as I said, to make sure
12  that the process is followed if a complaint is
13  brought forward.
14     Q      I don't think you've answered my
15  question.
16     A      I'm sorry.
17     Q      I'm asking you whether anyone else on the
18  committee such as the Chair of the committee would
19  have any responsibility to do anything.
20            MR. NOONAN:  You're talking about
21            in the absence of a complaint.
22     Q      In the absence of a formal complaint.
23     A      No.
24     Q      No responsibility.
25     A      Not that I can think of at the moment.

Sanders, Gale & Russell
(203) 624-4157

Electronically signed by ROSANNE LABONIA (501-218-496-1146)              95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 123

1    It's not been an issue.  It's kind of speculative

2    because we have not had this issue come up before.

3         Q    Well, you had Miriam Berkman telling you

4    that she had been told that there had been a

5    disclosure to a victim or witness in a sexual

6    misconduct matter of a prior complaint against the

7    person.

8         A    I don't know that a breach of

9    confidentiality has taken place.

10        Q    But you were told by your investigator

11   that she had been told that, right?

12        A    I know what she wrote in her report.

13        Q    And --

14        A    I know what she wrote in her report.

15        Q    And that's what she wrote in her report,

16   right?

17        A    I don't -- again, I don't know if there's

18   been a breach of confidentiality.

19        Q    I know you don't know if there's a breach

20   of confidentiality.  I'm asking you once having been

21   told that someone told that to your investigator,

22   was there any obligation to do anything?

23        A    Not at the time, no.

24        Q    You didn't have to commence an

25   investigation of that particular issue?

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 124

```
 1      A      No.

 2      Q      Is that right?

 3      A      That's correct.

 4      Q      You didn't have to report it to the

 5   Provost?

 6      A      No.

 7      Q      And you're under the aegis of the

 8   Provost's office.

 9      A      That's correct.

10      Q      As is the Title IX office?

11      A      Yes.

12      Q      And the Provost has the special policy in

13   confidentiality is that right?

14      A      There is a statement on confidentiality

15   in the proceedings.

16      Q      I take it as far as you know, nobody ever

17   reported it to the Provost.

18      A      I'm not aware of it.

19      Q      Or anybody in the Provost's office.

20      A      Reported what?

21      Q      An allegation that there had been a

22   violation of confidentiality.

23      A      I'm not aware of that.

24      Q      And nobody has the responsibility that

25   you are aware of to report such a violation if they
```

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 125

1    hear one?

2         A      I didn't say that.

3         Q      Is there anybody -- let me put it this

4    way.  Other than in this case, Jack Montague

5    himself, is there anybody who has the responsibility

6    to do anything if they find out about a breach of

7    confidentiality?

8         A      It would depend I guess on the nature of

9    the breach and what was being breached.  There would

10   be a lot of additional information that was needed

11   to think about that.

12        Q      If the breach was by an official of Yale

13   University of the fact that Jack Montague had

14   previously been complained of in a UWC matter.

15        A      I'm sorry, say that again.  Or she can

16   repeat it back to me.

17        Q      You said it would depend -- I asked you

18   if there is anybody who would be responsible for

19   doing anything --

20        A      If there was a breach.

21        Q      And you said it would depend.

22        A      Yes.

23        Q      And I said if it were a disclosure of a

24   previous complaint against Mr. Montague --

25        A      Mm-hmm.

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                    95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                April 13, 2017

Page 126

1      Q      -- by a Yale official to someone who is
2    not entitled to know about it.
3      A      It would depend.  I don't have enough
4    information.
5      Q      What would it depend on?
6      A      Many factors.  Is there a complaint
7    coming forward, you know, I think that would be one
8    of the basic questions.
9      Q      Well, in the facts that you have here
10   according to what Miriam Berkman was told, is there
11   anybody who would have had a responsibility to do
12   anything once being told that information?
13     A      I think I've answered it.  I think I've
14   answered your question.
15     Q      You said you wouldn't have the
16   responsibility.
17     A      Right.
18     Q      You said Professor Post wouldn't have the
19   responsibility.  You said that nobody else on the
20   committee would have the responsibility.  I'm asking
21   you if there is anybody that would have had that
22   responsibility?
23     A      In the absence of a formal complaint?
24     Q      In the absence of a formal complaint by
25   Jack Montague.

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 127

1      A      Without any confirmation that there was

2   an actual breach.

3      Q      Just that someone said there was.

4      A      The allegation, but there's not even a

5   complaint of the allegation.  I mean --

6      Q      No one has made a formal complaint.

7      A      Mm-hmm.

8      Q      But it has come to your attention that

9   Jane Roe         told Miriam Berkman that this

10  disclosure was made to her.

11     A      Is there anybody -- I'm sorry, I'm

12  getting confused.

13     Q      Is there anybody that would have the

14  responsibility to do anything about that?

15              MR. NOONAN:  I think you're saying

16              someone outside the UWC.

17              MR. STERN:  I'm saying anybody

18              outside of the people she's already said

19              have no responsibility.

20     A      I don't know, I don't know.

21     Q      Yourself, Dr. Post, you're not aware of

22  anybody.

23     A      I don't know.

24     Q      There's no one else that could know about

25  it, right?

Sanders, Gale & Russell
(203) 624-4157

Electronically signed by ROSANNE LABONIA (501-218-496-1146)          95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 136

1        Q       All right.  Do you think that was a

2   balanced panel that had no undergraduate student on

3   it?

4        A       I think there were five qualified trained

5   UWC members who served on that panel.

6        Q       And the only one who was anything close

7   to a student was a post-doc fellow?

8        A       Correct.

9        Q       You wouldn't call that person a student,

10  would you?

11       A       The person is a trainee.

12       Q       David Post put himself on the panel as

13  Chair of the panel, is that right?

14       A       Yes, he was the Chair of the panel.

15       Q       Why did he do that?

16               MR. NOONAN:  Objection.

17               Speculation.

18       A       I don't know why he did that.

19       Q       You've told us you've been on

20  approximately 70 -- involved in approximately 70 UWC

21  hearings?

22       A       I think I said 60.  I --

23       Q       How many of those --

24               MR. NOONAN:  You're talking over

25               one other.

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 141

1    procedure is on the matter of culpability, correct?

2        A       Correct.

3        Q       And then Section 7.5 says that following

4    the hearing, then that's when the panel retires to

5    deliberate, correct?

6        A       Yes, that's what it says.

7        Q       And it determines -- it makes its

8    findings and its conclusions and its recommendations

9    for penalty if there has been a finding of

10   responsibility, right?

11       A       Yes, yes.

12       Q       The penalty section is 7.6.

13       A       Yes.

14       Q       Now, who has the right to appear at the

15   hearing?  Who has the right to be present at the

16   hearing?

17       A       For interviews, it's typically the

18   parties and any witnesses, any other witnesses.

19       Q       And are the witnesses entitled to be

20   present for the entire hearing or just when they

21   testify?

22       A       For the interview portion, when the panel

23   is interviewing witnesses, the parties are allowed

24   to be present.

25       Q       The parties.

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                    95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 142

```
 1      A      Yes.  In private rooms.

 2      Q      But are witnesses entitled to be

 3  present -- other witnesses entitled to be present if

 4  there are other witnesses?

 5      A      During the interview?  No.

 6      Q      I'm trying to get a fix on who is

 7  entitled to be present at that hearing whether in

 8  another room or not.

 9      A      Well, it depends on -- for the

10  interviews, the parties are permitted to be there.

11  Once the interviews are concluded, the parties leave

12  and the panel goes about its process of

13  deliberation.  So the hearing goes all the way until

14  the deliberations are concluded.

15      Q      Now, who was the complainant in this

16  case?

17      A      Jason Killheffer was the official

18  complainant.

19      Q      Now, despite the fact that Mr. Killheffer

20  was the complainant, Jane Roe        was allowed to

21  make an opening statement, is that right?

22      A      Yes, that's correct.

23      Q      She was not the complainant, correct?

24      A      She did not file the complaint, that's

25  right.
```

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                    95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                        April 13, 2017

1      Q      So is there some -- where in these

2   procedures does it say that someone who is not the

3   complainant has the right to make an opening

4   statement?

5      A      That's our practice.

6      Q      But I'm asking you where does it say that

7   in the procedures?

8      A      It doesn't say that in the procedures.

9      Q      Now, do you agree with me that your

10  practice must conform to what you put in writing in

11  your procedures?

12     A      I think it does conform.

13     Q      But you were unable to show me anywhere

14  in here where it says the complainant -- someone

15  other than the complainant has the right to make an

16  opening statement.

17     A      Jason Killheffer has no direct knowledge

18  of the incident, Jane Roe        does, which is why

19  she is permitted to make an opening statement and be

20  interviewed --

21     Q      She can be interviewed, but what it says

22  here is the complainant and then the respondent may

23  make a brief statement of no longer than ten minutes

24  to the panel and they may provide a written copy of

25  their statements to the panel.

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                    95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 144

1       A       Mm-hmm.

2       Q       But she is neither the complainant nor

3   the respondent.

4       A       We view the primary witness as the person

5   who can make the opening statement.

6       Q       Is there some written policy that sort of

7   modifies what it says in writing, that incorporates

8   this practice that you said?

9       A       No.

10      Q       Now, during this -- while these

11  interviews were taking place, you asked a number of

12  questions, isn't that right?

13      A       I don't recall.

14      Q       No memory of asking any questions?

15      A       I believe I asked questions, but I don't

16  recall how many.  I think you said -- what was your

17  question?

18      Q       I said "a number of questions."

19      A       I don't recall.

20      Q       Well, what do you recall?

21              MR. NOONAN:  About whether she

22              asked questions?

23      Q       What do you recall about the questions

24  that you asked?

25      A       I just -- I mean, I -- I don't recall

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 152

1      Q     So now you went into the 7.5 section of

2  the hearing.

3      A     Yes.

4      Q     It starts out in the procedure saying,

5  "Following the hearing," right?

6      A     It does, yes.

7      Q     So this follows the opening section.

8      A     The interviews, yes, yes.

9      Q     So now let's -- at some point you brought

10  to the committee's attention the UWC-1 findings, is

11  that right?

12     A     Yes.

13     Q     Now, this was not in the 7.4 section of

14  the hearing, that's not when you brought it up,

15  right?

16     A     I don't know -- I brought it up in the

17  order that you see it in the protocol.

18     Q     I'm looking at the -- I'm not asking you

19  about the protocol right now.  I'm asking you about

20  what the procedures were supposed to be.

21     A     Well, the protocol aligns with the

22  procedures.

23     Q     Well --

24     A     But this is how we move through the

25  process.  We don't go back in the form that it's in

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                    95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 153

1    in the procedures.

2        Q     Because the form in the procedures, the

3    ability to take account of a prior complaint takes

4    place in the 7.4 hearing section of the procedures,

5    right?

6        A     It's listed in the 7.4 section of the

7    hearing procedures, yes.

8        Q     But you didn't take it up at that -- and

9    if you had taken it up at that point in the

10   proceeding, Jack Montague would have heard what you

11   had to say, right?

12       A     And Jane Roe          would have heard what

13   I had to say, correct.

14       Q     And she already knew there had been a

15   prior complaint, right?

16                    MR. NOONAN:   Objection.

17       A     I don't know that.

18       Q     Well, it was listed -- it was referred to

19   in the fact finder's report, correct?

20       A     There was a -- we can go back through it

21   again.  I think I discussed what I understood.

22       Q     But there was a reference in the fact

23   finder's report to a prior complaint.

24       A     Yes.

25       Q     Correct?

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                    95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 154

1        A    Yes.

2        Q    And in fact, Miriam Berkman wondered

3    whether she should take it out and David Post says

4    she doesn't have to, correct?  Do you remember that?

5        A    That particular sentence that we

6    discussed.

7        Q    And that report was shared with Roe

8             , correct?

9        A    The report was shared, the final version

10   of the report was shared.

11       Q    So, one way or the other, she had by this

12   time notice of a prior complaint.

13       A    I don't know that.

14       Q    Well, she had the report and the report

15   referred to the prior complaint, right?

16       A    That was not the UWC confirming that

17   there was a prior complaint.

18       Q    But there was a reference to it, correct?

19       A    Yes.  May I look at it one more time?

20   Could you remind me of the page number in the fact

21   finder's report.

22       Q    Well, it was page eight of the draft.

23            MR. NOONAN:  You're talking about

24            11547.

25       Q    It's Exhibit 71.

Sanders, Gale & Russell
(203) 624-4157

Electronically signed by ROSANNE LABONIA (501-218-496-1146)          95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 155

```
 1       A      71?  Oh, yes.

 2       Q      And it's the paragraph beginning, "Based

 3   on," and it's the last sentence.

 4       A      Yes, that's the sentence that you're

 5   referring to, I see it.

 6       Q      So it refers to the fact that Mr.

 7   Montague had already had another complaint against

 8   him.

 9              MR. NOONAN:  Well, objection.  It

10              refers to the fact that Jane Roe

11              told the fact finder that she had been

12              told something.

13              MR. STERN:  Yes.

14       A      And it was accurately reported -- I --

15       Q      There's a reference to it?

16       A      There is a reference to it, to another

17   complaint.

18       Q      And that's -- and she got this report,

19   right?

20       A      She did receive this report, yes.

21       Q      So getting back to the procedures, you

22   did not take up the examination of the UWC-1 finding

23   in the 7.4 hearing section of the proceeding.

24       A      We don't -- I can't answer your question

25   because that's not the way that the hearing is -- I
```

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 156

1    can tell you based on the protocol where it was

2    reported.

3         Q    That's what I'm asking you, you didn't

4    take it up during the part that was described in the

5    procedures under 7.4, you didn't take it up at that

6    time.

7         A    This is a time -- this last paragraph,

8    for example, it doesn't say when this will take

9    place, it simply says it will take place during the

10   hearing, and so the hearing --

11        Q    If you look at the next sentence, it

12   says, "Following the hearing."

13        A    Yes.

14        Q    So the hearing is what comes before this,

15   right?

16        A    That's not the way we've interpreted it.

17        Q    But it's the way it says it in the

18   procedures, right?

19        A    It does say, "Following the hearing."

20        Q    So now it comes up when Jack is not

21   there.

22        A    And Roe  is not there.

23        Q    But Roe   is not the complainant, right?

24        A    Jack and Roe   are not there when I

25   discuss --

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 157

1      Q      Jack is a party, he's the respondent,

2   right?

3      A      Yes.

4      Q      But Roe   is not a party, correct?

5      A      Roe   is not the complainant.

6      Q      And there's no provision in here for a

7   person being a party who is not a complainant, is

8   there?

9      A      Our practice is to allow the primary

10   witness to attend.

11             MR. NOONAN:  You have really gone

12             over this at some point.  I know you're

13             doing your best to finish.

14      Q      So if she wasn't a party, she would be

15   the same as any other witness, right?

16      A      No.

17      Q      Well, any witness can be excluded,

18   correct?  Any witness who is not a party can be

19   excluded, correct?

20      A      Can be excluded from what?

21      Q      Excluded from the hearing except when the

22   witness testifies, right?

23      A      No, that's not true.  The primary witness

24   is permitted to be there to give an opening

25   statement, to be fully interviewed and to hear the

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                    95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 158

1    other party's interview.

2        Q    It doesn't say primary witness, it says

3    the complainant.

4        A    I understand, I understand, and I've

5    explained our practice.

6        Q    Your practice differs from what's

7    written, correct?

8               MR. NOONAN:  Objection.  It's a

9               mischaracterization.  What's written

10              doesn't address this.

11              MR. STERN:  I don't need your

12              testimony, Pat, I don't.  Let me ask the

13              question.

14              MR. NOONAN:  You have and you've

15              asked her numerous times.  Why are we

16              going over it again now?

17              MR. STERN:  It's comes up in a

18              different context right now.

19              MR. NOONAN:  It's the exact same

20              thing you asked her before.

21              MR. STERN:  If you want to extend

22              it, you can extend this, but I want to

23              ask my questions.

24              MR. NOONAN:  I'm telling you, if

25              you want to take another day at this, I'm

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 159

1              not going to let you ask her repetitive

2              questions.  Ask whatever question you

3              want now, but the second time around --

4                    MR. STERN:  I'm asking the

5              questions.  I need to get my answers.

6                    MR. NOONAN:  Do what you need to

7              do.

8                    MR. STERN:  You don't want me to

9              make any comment about the witness being

10             evasive, so I am just going to ask the

11             questions, and sometimes I have to ask

12             multiple times to get my answer.

13                   MR. NOONAN:  Okay.

14                   MR. STERN:  Because I've gotten a

15             lot of unresponsive answers.

16                   MR. NOONAN:  You actually haven't

17             had an unresponsive answer.

18                   MR. STERN:  We can differ about

19             that?

20                   MR. NOONAN:  Next time out, we're

21             going to stop if you ask repetitive

22             questions.

23     BY MR. STERN:

24         Q    So what you did is once Mr. Montague and

25     Ms. Roe      were excused from the proceedings, you

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 160

1    then read portions of documents and summarized the

2    UWC-1 proceeding, correct?

3         A     I'm just looking at -- could you ask your

4    question again?

5         Q     Once Jack Montague and Jane Roe

6    were excused, who was left?

7         A     The five panel members.

8         Q     Anybody else?

9         A     No.

10        Q     What about Susan Sawyer, was she there?

11        A     No.

12        Q     And you then read and summarized some

13   documents concerning the UWC-1 proceeding?

14        A     Yes, that's correct.

15        Q     And specifically, what you gave them was

16   the panel's report and the decision letter, correct?

17        A     No.

18        Q     What did you give them?

19        A     I didn't give them anything.  I didn't

20   give them any documents.

21        Q     Okay.

22        A     I don't believe I gave them documents.

23        Q     Let's look at Exhibit 45.

24        A     Sure.  Thank you.

25        Q     What I've given you is an e-mail exchange

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 161

1    with Jonathan Holloway after this was over, right?

2         A    Yes.

3         Q    He was the decision maker.

4         A    Yes, that's correct.

5         Q    And he wanted to know the extent to which

6    the committee considered Montague's disciplinary

7    history, correct?

8         A    Yes.

9         Q    And you reported to him that, "The most

10   relevant documents from the previous UWC case are

11   the panel report and the decision letter which I am

12   attaching here for your consideration."

13        A    That was for the decision maker, that's

14   correct.

15        Q    But that's what you told him, that you

16   said, "I read portions and summarized parts of this

17   document."

18        A    Yes.

19        Q    So the portions that you -- you didn't

20   actually give any documents, you just summarized

21   them or you read from them.

22        A    Yes.

23        Q    All right.  And those are the only

24   documents that you read from or summarized, is that

25   right?

MONTAGUE v. YALE UNIVERSITY                         April 13, 2017

```
                                                        Page 162
 1       A      At which point?
 2       Q      Well, we're now in the section of the
 3   proceeding in which you brought to the committee's
 4   attention the UWC-1 proceeding.
 5       A      Yes.
 6       Q      Correct?
 7       A      Yes.
 8       Q      And what you did was you read from or you
 9   summarized two documents, the panel report and the
10   decision letter.
11       A      That's correct, yes.
12       Q      You did not give them any of the
13   statements made by Sally Smith         correct?
14       A      No, I did not.
15       Q      And so therefore, you did not tell them
16   that Smith    said that it might have been a foolish
17   mistake, correct?
18       A      Correct.
19       Q      Or that she considered it to be
20   peripheral, correct?
21       A      Yes.
22       Q      Or that she wanted to emphasize that
23   there was no skin to skin contact, correct?
24       A      Yes.
25       Q      Or that the fact finder reported that she
```

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 163

1    said it was impulsive and not premeditated.

2              MR. NOONAN:  Objection.

3              Mischaracterization.

4        A    I don't believe that's what the fact

5    finder said.

6        Q    I'm saying that's what the fact finder

7    reported that Sally Smith        said.

8              MR. NOONAN:  Objection.  If you're

9              going to quote something, Max, quote it.

10             MR. STERN:  We went over it

11             already.

12             MR. NOONAN:  Why do it again?

13             MR. STERN:  Exactly.

14             MR. NOONAN:  Right.

15             MR. STERN:  That's what I'm trying

16             to avoid.

17             MR. NOONAN:  You're doing it again.

18             MR. STERN:  I'm trying to bring

19             it -- the fact that she did it bring it

20             to the board's attention.

21             MR. NOONAN:  She told you what she

22             brought to the board's attention, but

23             you're mischaracterizing what the fact

24             finder said.

25             THE WITNESS:  I would need to look

Sanders, Gale & Russell
(203) 624-4157

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                    95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 164

1            at the fact finder's report.

2                 MR. NOONAN:  It says what it says.

3                 MR. STERN:  Well, we're going to

4            get it now since you can't concede to it.

5                 MR. NOONAN:  You are once again

6            quoting two words from a document that

7            has much other relevant information.

8                 MR. STERN:  I'm going to read to

9            you what it says.

10                MR. NOONAN:  Tell us what exhibit

11           you're on.

12    BY MR. STERN:

13      Q    Exhibit 60.  The last line of the fact

14    finder report is that, "She believes that Mr.

15    Montague" -- page five, he reports that "Smith

16        believes that Mr. Montague should be held

17    accountable for his behavior, but at the same time

18    she feels it was an impulsive rather than a

19    premeditated act."  Did I quote that accurately?

20      A    Yes, yes.

21      Q    Is that different than what I said

22    before?

23                MR. NOONAN:  Yes.

24      A    Yes.

25                MR. STERN:  No, it wasn't.

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 186

1      Q      So you knew that Jack wanted the Dean to

2   contact John Criscuolo, right?  That's what he was

3   asking?

4      A      Yes.

5      Q      And also, before the Dean made his

6   decision, you spoke with John Criscuolo, correct?

7      A      I don't remember.

8                  (PLAINTIFF'S EXHIBIT 78 FOR

9                  IDENTIFICATION Received and Marked.)

10     Q      This is an exchange between John

11  Criscuolo and Carole Goldberg, and you've told us

12  before Carole Goldberg is the head of the SHARE

13  Center.

14     A      Yes.

15     Q      John Criscuolo is the one that does the

16  gender sensitivity training, correct?

17     A      Yes.

18     Q      In this e-mail to John Criscuolo, he says

19  on February 16th that he spoke last week with you.

20     A      I'm sorry?

21     Q      Regarding the training.

22     A      May I read the e-mail?

23     Q      Yes.

24     A      Okay.  I've read it.

25     Q      All right.  So the week before February

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                    95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                     April 13, 2017

Page 187

1    16th, you had a call with John Criscuolo, correct?

2        A    I don't remember it.

3        Q    Is it fair to say that having seen the

4    response by Jack to the panel report in which Jack

5    asked Dean Holloway to call or to contact John

6    Criscuolo, that that is something that you would

7    have done, doing a conscientious job as the

8    secretary of the UWC?

9        A    No, because the request is not that I

10   contact John Criscuolo, it's that the Dean contact

11   John Criscuolo, and I wouldn't have -- I don't think

12   I did that on the Dean's behalf.

13       Q    Well --

14       A    Maybe I --

15       Q    Well, did you have a conversation with

16   John Criscuolo in which he told you that they had

17   not gone through complete consent training?

18       A    I don't remember.  I don't know.

19       Q    And that his situation at that time was

20   not one of consent, but rather conduct?

21            MR. NOONAN:  I don't see anything

22            to that effect.

23            MR. STERN:  Well, he says --

24            MR. NOONAN:  This e-mail is not

25            between these two folks.

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                     95aaa0a2-0622-43c3-8626-0f32aa2e79db

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 193

1        Q      And if you look at page seven, he refers
2    to these meetings with John Criscuolo, correct?
3        A      Yes.
4        Q      And he says, "These meetings were not
5    extensive training, let alone training on sexual
6    misconduct.  Instead, these meetings were very
7    casual and lasted no more than five minutes after
8    explaining the incident on the first occurrence."
9    So now at this -- you did read that at the time,
10   right?
11       A      Yes.
12       Q      So you now know at this stage that,
13   again, Jack Montague is raising the question of how
14   extensive the training was that he received.
15       A      Yes, I see that he's raising it here,
16   yes.
17       Q      And you say you don't remember having a
18   conversation before Dean Holloway's decision, but
19   you must have had a conversation with John Criscuolo
20   after the decision when he made an appeal, right?
21       A      No.
22       Q      Well, here, if you look back at the
23   exchange between John Criscuolo and Carole Goldberg,
24   he's saying that after he talked to you once, Jack
25   calls him and he wants -- he wants to essentially

Sanders, Gale & Russell
(203) 624-4157

MONTAGUE v. YALE UNIVERSITY                    April 13, 2017

Page 194

1    correct the record about this point.

2         A    What's the question?

3         Q    He says he spoke to you once and Jack now

4    wants him to speak to you again about this, that's

5    what he tells Carole Goldberg, and Carole Goldberg

6    says, "Yes, contact Aley.  Your work with him was

7    based on his immature, inexcusable conduct as a

8    drunk freshman, not about sexual consent."

9         A    I'm sorry, I don't understand your

10   question.

11        Q    Did you ever have this conversation with

12   John Criscuolo?

13        A    I don't remember.

14        Q    Not even after Dean Holloway's

15   decision --

16        A    No, I don't remember.

17        Q    -- after his appeal was denied, correct?

18        A    Yes.

19        Q    And then you had made notes during the

20   course of this?

21        A    When?

22        Q    During the course of this whole UWC

23   process, during your involvement.

24        A    I may have taken notes at the hearing.

25        Q    What did you do with your notes of the

Electronically signed by ROSANNE LABONIA (501-218-496-1146)                    95aaa0a2-0622-43c3-8626-0f32aa2e79db