# Exhibit 50




# CAMPUS INVESTIGATIONS, LLC

PO BOX 688, HINGHAM, MA, 02043 - (617) 320-8068
SUSANNAMURPHY@CAMPUSINVESTIGATIONS.COM
WWW.CAMPUSINVESTIGATIONS.COM

SUSANNA BLAKE MURPHY, ESQ. LICENSED PRIVATE DETECTIVE

## I. Qualifications & Experience

I, Susanna B. Murphy, am a sexual assault investigator, advisor and educator with Campus Investigations, LLC and an attorney licensed in Massachusetts and Maryland. I worked for over twenty years with the Massachusetts Committee for Public Counsel Services (CPCS), Massachusetts's public defender agency, handling cases including sexual assaults as an attorney and an investigator. I was the first Chief Investigator for CPCS in which role I created training programs for new investigators, as well as provided continuing education for the staff of over fifty investigators and supervised and reviewed that staff.

I left CPCS in 2014 and became a licensed private detective in Massachusetts. The vast majority of my caseload involved investigating sexual assault cases. In 2015, I formed Campus Investigations, LLC, a firm specializing in handling allegations of violations of Title IX on academic campuses. With Campus Investigations, LLC, I am hired as an advisor to students going through the Title IX process at their respective schools. I have been hired to advise both Complainants making allegations of sexual misconduct by another student as well as Respondents who are alleged to have violated Title IX through some sort of sexual misconduct. I have been hired by universities to act as an independent, impartial fact-finder on behalf of the institution and written reports and testified at hearings on my findings. In these roles I have requested and reviewed documentary evidence and visited locations where sexual assaults are alleged to have occurred on campuses. I also have

continued to investigate allegations of sexual assault on behalf of individuals charged in the criminal justice system with committing sexual assault.

I have attended numerous trainings and webinars on the topics of The Clery Act and Title IX and have spoken and presented at various MCLE seminars on investigating sexual assault cases and I have trained at fraternities, sororities and high schools on how to navigate Title IX and avoid instances and allegations of sexual assault. In my years of working in this field, I have interviewed literally hundreds if not thousands of witnesses somehow related to allegations of sexual misconduct. I have interviewed dozens and dozens of students, faculty members, administrative employees and family members of students at various colleges and universities around the country.

## II. Assignment & Materials Considered

I have been hired by the firm of Todd & Weld, LLP to review all discovery documents in the matter of Jack Montague v. Yale University and to offer my expert opinion regarding the quality and completeness of the investigation conducted on behalf of Yale University. For these services I have been compensated at a rate of $150 per hour.

In order to form my conclusions regarding the investigation in question, I requested, was provided, and have reviewed the materials listed in Appendix A.

## III. Standards Applicable to Title IX Investigations

Title IX is an evolving area of the law as it relates to investigations of allegations of sexual misconduct on academic campuses. Guidance has been given to educational institutions through a series of mandates from the federal government. While there is not a set procedure that each school must follow and, in fact, each school's

approach is unique, there are minimum expectations for how these cases are to be handled. One of the most explicit sets of standards for such investigations came in 2011, from the U.S. Department of Education Office for Civil Rights in the form of what is now known as the "Dear Colleague Letter". This letter sets out in no uncertain terms that investigations must be "prompt, thorough, and impartial". Furthermore, Yale University's own "UWC Procedures" sets forth the requirement that the fact-finder be "impartial" and conduct a "thorough" investigation. (UWC Procedures, at 7.3.)

IV. Opinions

It is my opinion, based on my education, training and experience, and my review of the documents provided, that this investigation was neither thorough, nor impartial. The investigation was not thorough in a number of respects. First, it failed the most basic standard of thoroughness in that that it did not include an examination of a whole host of potential electronic communications. The independent "Fact Finder" retained by Yale University, Ms. Miriam Berkman, should have, but failed to, inquire of each and every witness whether they had read, seen or heard of any electronic communications or social media posts regarding the alleged incident or the relationship between Ms. Roe and Mr. Montague. Had she asked this of each witness and received any affirmative or uncertain response, the independent fact-finder should have requested that those witnesses search their phones, computers and other devices and request that they turn over anything that referenced the relationship between Ms. Roe and Mr. Montague or the night in question. Posts and communications of this sort, that might be contemporaneous with, or at least made shortly following the alleged event, often reveal the most honest and accurate perceptions of the event and often are written without being tainted by input from friends or other events that take place in the aftermath of the encounter or created in anticipation of building a case against the other party.

In the investigation of any alleged incident of any kind, it is imperative to learn of, and carefully examine, any and all statements of any sort made by any of the parties involved, including conversations amongst friends of the parties directly involved. In the 21st century, an integral part of discovering and examining potentially relevant statements is the search for electronic communications and social media posts. Ms. Berkman does not appear to have requested of any of the friends of either party any text messages or electronic posts regarding the relationship between the parties or the alleged incident. She relied upon Ms. Roe to turn over only her own text messages to a single friend and did not take the initiative to search further.

The entire investigative process also failed to be impartial. A bias towards simply taking Ms. Roe story at face value dictated further actions on the part of the fact-finder and, as a result, Ms. Berkman failed to pursue important lines of inquiry, thereby ensuring an even less thorough investigation. Throughout her inquiry, Ms. Berkman appears to have failed to take an objective approach, by gathering all possible information that could shed light on what actually happened, and what each party perceived was happening and being communicated at the time of the incident. Instead, she appears to have read the complaint and sought only information to support the allegations made in the complaint.

In order to assess the credibility of both parties, as well as each student's perspective on, and role in, the relationship, and to assess if there was any sort of pre-existing power dynamic, it is important for an investigator to examine the relationship and interactions between the parties involved before, during, and after the alleged incident. Ms. Berkman failed to examine thoroughly the pre-existing relationship, in part by failing to examine communications between the parties prior to October 18, 2014.

For example, Ms. Berkman stated in her deposition that she did not examine any text messages between Ms. Roe and Mr. Montague prior to the alleged

incident. Ms. Berkman knew that there was a pre-existing intimate relationship between the two parties yet, without even looking at messages that pre-dated the alleged events, did not request that Ms. Roe turn over prior messages "because I didn't think that there was anything relevant in those messages". (Berkman Tr. at 23, l.13-14.) A thorough investigation would include at least an attempt to review of any and all messages between the parties during the less than two month period that they had been involved.

Similarly, Ms. Berkman did not request of all parties that they turn over any and all communications (including text messages, emails, or social media posts) that they had sent, received, observed or heard about. Instead, she relied exclusively on what Ms. Roe chose to turn over in support of her allegations. Ms. Berkman only asked Ms. Roe to provide the text messages "that she felt was—that she wanted me to see in relation to the investigation....I didn't ask for other text messages because I didn't think they were relevant". (Deposition, p. 24, l.15-20.) Ms. Berkman should have requested that Ms. Roe turn over *all* communications she had with *anyone* regarding the relationship with Mr. Montague and the night in question, not just those that Ms. Roe "wanted [her] to see". (Deposition, at p. 24.)

It also appears that Ms. Berkman was not impartial in her approach as evidenced by her discussion of the facts before her. Again, Ms. Berkman concludes in her report (Fact Finder's Report, Exhibit 13) that Ms. Roe accounts of the night in question remain consistent, thereby lending her credibility. However, in drawing such a conclusion, Ms. Berkman sets aside facts to the contrary and actually excludes some of those facts from her report. That report lays out discussions between Ms. Roe and Mr. Montague before entering the basketball house, about whether or not, at that point in time, the parties wanted to have vaginal sexual intercourse. It then explains that inside Mr. Montague's room Mr. Montague kissed Ms. Roe and "touched her body including her genitals, to which she had no objection". (Exhibit 13, at page 5.) However, the report is completely devoid of any

mention of the digital penetration to which Ms. Roe eventually admits she consented. It also does not point out that she never told her friends that she consented to digital penetration.

By omitting any mention of consensual penetration, Ms. Berkman took out of the equation altogether the possibility that Ms. Roe had changed her mind about how far she wanted the sexual encounter to go or that Mr. Montague could have had a reasonable belief that Ms. Roe had changed her mind and now was indicating consent to take things beyond to what she had agreed to, previously. Given that, by Ms. Roe own account, she did not believe that Mr. Montague heard her say "no" just prior to the alleged assault,[1] and the fact that she downplayed the significance of her pushing his shoulders (which she said she did "not very forcefully"), Berkman's failure to place adequate emphasis on the ways in which Ms. Roe may have nonverbally consented to sexual intercourse was particularly prejudicial. Consent is something that is communicated. Here, the fact-finder failed to properly present for consideration by the UWC Panel significant evidence that, whatever Ms. Roe had earlier told Mr. Montague about the limits of their encounter, she subsequently through her actions communicated nonverbal consent to sexual intercourse. Any later revocation of that consent would have had to have been communicated to Mr. Montague. The fact that Ms. Roe claims to have said, "'No'" at this point, but that Mr. Montague looked "as if he did not hear what she was saying", (Exhibit 13, at pg 5) and the fact that Ms. Roe claims to have "pushed him but not very forcefully" (Exhibit 13, at pg 5), does not provide support for the claim that she was revoking the consent that was given through her non-verbal actions and participation in the sexual activities at this point, as described above. The UWC Panel may still have found against Mr. Montague, but Ms.

---

[1] In her deposition, Ms. Berkman confirmed that her contemporaneous notes reflect that Ms. Roe told Berkman that when she said "no" just prior to the alleged assault, Mr. Montague "didn't seem to hear." However, in the fact-finder's report, Ms. Berkman curiously concluded that Mr. Montague's lack of hearing was a result of intoxication, writing he "looked very drunk, as if he did not hear what she was saying." There is no evidence that Ms. Roe said anything about Mr. Montague appearing drunk, yet, in drawing this conclusion, Ms. Berkman effectively eliminated the possibility that Ms. Roe "no" was inaudible.

Berkman's report simply did not present a complete and impartial recitation of the facts, as she heard them.

The Fact Finder also failed to give a full picture of factors that may have shed some light on Mr. Montague's credibility. Ms. Berkman chose to emphasize in her report where Mr. Montague's memory of the second and third encounters between himself and Ms. Roe differed from that of Ms. Roe and was blurry on some details and clear on some others. However, the Fact Finder had an obligation to highlight the fact that, at the time that Mr. Montague was first interviewed by this Fact Finder, he had not been given any advance notice of which of the several intimate encounters he and Ms. Roe participated in would be the subject of his interview. It is incumbent upon the Fact Finder to share the context in which answers were given. The fact that over a year had passed since the series of encounters and the fact that Mr. Montague did not have any advance warning as to which night they would be discussing which might have allowed him to reflect and clarify, to the extent possible after the passage of so much time, undeniably gives context to the answers given. In order to provide a thorough and impartial report to the UWC, it was incumbent upon the Fact Finder to describe fully the circumstances under which the parties were interviewed. The Fact Finder failed to do so here.

The Fact Finder's Report also failed to highlight the variations in the versions of the story that Ms. Roe told. Ms. Berkman had quite a few friends of Ms. Roe whom she could interview to gather information and to assist her in assessing the credibility of Ms. Roe By comparing the various stories that a witness has told, one can gauge the consistency and therefore credibility of that witness to a certain degree. Ms. Berkman did, indeed, interview these five witnesses. However, not only did she fail to solicit potentially insightful evidence in any requests for electronic communications from these witnesses, she also glossed over aspects of Ms. Roe story that were not included in the versions of the story that she told her friends. So, while the fact finder focused on the parts of Ms. Roe story

that were consistent when she told her friends, she failed to mention in her report, and perhaps to consider in drawing her conclusions, the holes that Ms. Roe left blank in her stories to others. There is no evidence that Ms. Roe ever told any of these five friends that, after stating to Mr. Montague that she wanted to "'hook up' but not 'have sex'" (Exhibit 13, at page 3), she then went into his bedroom, voluntarily took off her clothes, got into Montague's bed with him after he had taken off his clothes, and kissed and touched him while he kissed and touched and digitally penetrated her. It is notable that Ms. Roe gave various versions of her story to different parties and it potentially sheds light on her credibility and therefore should have been included in the report. The fact-finder in this case should have considered the question of whether Ms. Roe did not tell her roommates this information because she thought it might look to them like she had changed her mind and consented to having sex with Mr. Montague by this point, or because she was ashamed, given her prior regrets over having had sexual intercourse with Mr. Montague, that she had, in fact, changed her mind and decided to have sexual intercourse with him again, or because she realized that perhaps Mr. Montague might have thought she had changed her mind, or for some other reason, altogether. No matter what, if any, conclusion had been drawn, it is quite notable that Ms. Roe chose not to share this information with any of the five roommates. The fact that Ms. Berkman chose to ignore and omit the significant variations in accounts of the events given by Ms. Roe shows a concerning lack of impartiality on the part of the fact-finder.

Similarly, the fact-finder failed to highlight the fact that Ms. Roe gave her friends and the fact finder different descriptions of the actions she claims to have taken to express that she did to not want to have vaginal sexual intercourse. Ms. Roe told the fact-finder that, when she thought Mr. Montague was going to engage in vaginal sexual intercourse "she pushed him, but not very forcefully" (Exhibit 13, at pg. 5), and then after the intercourse began she did not attempt to push him off, explaining, "she did not think she could push him off if she tried because he was bigger and heavier than she was". (Exhibit 13, at pg. 5.) Ms.

Roe friend, Rachel Rogers told the fact-finder that Ms. Roe had told her, "'I couldn't push him off'" (Exhibit 13, at pg. 15), Ms. Roe never told her friend, REDACTED that she pushed Mr. Montague, at all, and she told REDACTED "'he was too heavy for her to push off'". (Exhibit 13, at pg. 15).The fact finder's report should have at least pointed out the variations in this story rather than categorized these various statements as consistent.

In her "Discussion and Summary", Ms. Berkman concluded, "Ms. Roe friends' testimony does corroborate her statements (Exhibit 13, at pg. 18), and she adds, "The text thread with REDACTED... appears to be a contemporaneous written record of Ms. Roe experience...." (Exhibit 13, at pg. 18). Thus, she concluded that Ms. Roe was credible because the evidence she provided corroborated her statements. However, this is an incomplete inquiry. Ms. Berkman never sought any text messages from those friends that potentially were inconsistent with Ms. Roe story. It seems that once Ms. Berkman had received from Ms. Roe seemingly corroborative electronic communications with one friend, she was satisfied and halted further inquiry.

The fact-finder also demonstrated a one-sided approach to obtaining facts in an effort merely to support Ms. Roe claims when she failed to follow-up on a line of questioning regarding a curious series of events. Ms. Roe reported that, following her alleged sexual assault, she left the bedroom of her perpetrator, left his dorm, walked to Toad's Place, left Toad's Place, walked to her dorm, went inside her dorm, then called her assailant on the phone, made a plan to meet up with him, walked back to his dorm together with him, climbed into his bed with him and slept in bed with him until they woke the next morning. Ms. Roe described her walk back to Mr. Montague's dorm as "normal and flirty". (Exhibit 13, at pg. 6) Ms. Roe explained that she left the safety of her dorm, to go back to the bed of her perpetrator, because she didn't want to be "asked a lot of questions" from various people in her suite (Exhibit 13, at pg. 6). While the actions of any victim of a sexual assault are determined by a whole host of factors and understandably can vary

widely from individual to individual, Ms. Roe actions could reasonably raise some questions as to whether they are consistent with two individuals in the aftermath of a sexual assault between them. Those actions, of course, while not in and of themselves enough to call into question the credibility of the allegations, do require deeper questioning to determine what, in fact, led to those actions being taken. The fact that Ms. Berkman chose not to probe further regarding this interesting behavior demonstrates a level of partiality towards believing Ms. Roe without the necessary professional skepticism that should accompany the inquiry of any witness. When Ms. Roe explained that she left the safety of her own dorm because she didn't want to answer a lot of questions, a fact-finder genuinely searching for a complete and unbiased view of the truth must inquire into what types of questions were so overwhelming to make Ms. Roe prefer to retreat to the bed of the man whom she says assaulted her that very night. The lack of a follow-up line of questioning by Ms. Berkman suggests that she wasn't really seeking to get to the bottom of the dynamic between the parties at that time. Perhaps Ms. Roe was confused as to what had happened that night, which in turn could shed some light on whether Mr. Montague, as well, could justifiably have been confused at the time. Perhaps she was embarrassed to admit to her roommates that she had had sex with Mr. Montague again after previously complaining that she had given in to having sex with him and regretting it. Or, perhaps any one of these friends and roommates would have reacted dramatically to what Ms. Roe says happened to her and it was more than what she could handle emotionally at that time. There are any number of possible explanations. However, the fact that Ms. Berkman failed to even inquire further demonstrates a premature willingness to simply accept as truth whatever Ms. Roe said and thus a concerning lack of impartiality.

The fact-finder also failed to adequately explore Ms. Roe motivation in pursuing a formal complaint against Mr. Montague, and how that may have borne on her credibility. Ms. Roe told the fact-finder that when she first agreed to speak to Title IX Coordinator, Angela Gleason, that she "was not interested in having Mr.

Montague punished" and "did not want to engage in the lengthy and difficult process of telling the story repeatedly and being questioned in detail by strangers on the UWC." However, Ms. Roe testified at Mr. Montague's UWC hearing that her conversations with Ms. Gleason "reframed the incident" for her and convinced her to pursue a formal complaint. Although the fact-finder's investigation revealed that Ms. Roe decision to pursue a formal complaint was strongly influenced by what Ms. Gleason had communicated to her regarding Mr. Montague's past involvement with the Title IX apparatus, the fact-finder did not explore with Ms. Roe the possibility that her perception of what had happened on October 18, 2014 was altered once she was led to believe that Mr. Montague previously had been disciplined for sexual misconduct. The fact that the school breached confidentiality in sharing any information regarding Mr. Montague's record at Yale, and permitted Ms. Roe to proceed under a misunderstanding of what that record reflected was a hugely significant fact that should have been further explored and highlighted in the fact finder's report.

The shortcomings of the fact-finder's report resulted in an investigation by Yale University that was one-sided in favor of the Ms. Roe possibly by virtue of the fact that she was the female making the complaint. Mr. Montague was not afforded the same benefit of the doubt approach that was constantly afforded Ms. Roe and Ms. Roe was only ever asked to provide support for her claims. Her credibility did not appear to be scrutinized in the way that Mr. Montague's was throughout the investigation and in a way that any professional investigator should scrutinize statements by any party in any sort of investigation. Several potential pieces of objective evidence that could have shed further light on Ms. Roe memory or credibility was never sought. The variations in Ms. Roe story were never presented to the UWC and therefore never were considered. As a result, the entire disciplinary proceeding against Mr. Montague was one-sided.

Although the Fact Finder's Report lays out some of the versions of events that Ms. Roe told the Ms. Berkman, and, in other parts of the reports lays out versions Ms. Roe told her friends, by summarizing them as consistent, rather than pointing out the changes, were summarily accepted as consistent by the Panel Report. This is made clear by the fact that the UWC Panel Report ignores the same inconsistencies and seems to take the Fact Finder's Report at face value. For example, the UWC Panel Report, just like the Fact Finder's Report, makes no mention of the fact that Ms. Roe never told any of her friends that she consented to digital vaginal penetration, nor does the UWC Panel Report make note of the fact that Ms. Roe descriptions of how she showed a lack of consent (in terms of her pushing against Mr. Montague's chest) varies from friend to friend to Fact Finder. Both reports simply conclude that, based on *some* similarities in descriptions, that the descriptions then are "consistent". The UWC also makes no effort to illuminate the rationale behind Ms. Roe decision to return to the bed of Mr. Montague within an hour of allegedly being sexually assaulted by him, nor to engage in "normal and flirty" conversation on the walk back to his room. There appear to be no further lines of inquiry regarding the decisions that were made at that time. Again, these decisions, alone, do not amount to Ms. Roe being inherently not credible, but they certainly indicate a process that was neither complete nor impartial. The lack of impartiality and therefore incomplete investigation began with the fact-finder's work and was perpetuated in the UWC's inquiry and final report.

In conclusion, the failure to follow up on seeking various electronic communications of potential value, simply deferring to Ms. Roe story as opposed to following up with probative questions, glossing over the inconsistencies in Ms. Roe stories, and downplaying evidence suggesting a change in consent amounted to an investigation that was neither thorough nor impartial. The process demonstrated a clear bias against Mr. Montague. The cumulative effect of these investigatory errors resulted in prejudice to Mr. Montague because it deprived the UWC Panel of relevant evidence which may have, if considered, led to a not responsible finding, or at a

minimum diminished the degree of culpability as it pertained to the sanction imposed.

Susanna B. Murphy

8/17/17

Date

## Appendix A – Materials Considered

| Deposition Exhibit No. | Bates Range or Description of Document |
|---|---|
| 1 | YALE00000841-00000847 |
| 2 | Yale Sexual Misconduct Policies and Related Definitions |
| 3 | UWC Procedures |
| 4 | Statement on Confidentiality of UWC Proceedings |
| 5 | Reports of Complaints of Sexual Misconduct |
| 6 | YALE00000362-00000363 |
| 7 | YALE00000519-00000525 |
| 8 | YALE00000004-00000006 |
| 9 | YALE00000206-00000207 |
| 10 | YALE00000372-00000375 |
| 11 | YALE00000455 |
| 12 | YALE00000767-00000768 |
| 13 | Fact Finder's Report dated January 15, 2016 |
| 14 | YALE00000449-00000450 |
| 15 | YALE00000443-00000444 |
| 16 | YALE00000432-00000436 |
| 17 | Opening Statement of Jane Roe dated January 21, 2016 |
| 18 | Letter |
| 19 | YALE00000409 |
| 20 | YALE00007711-00007714 |
| 21 | Yale Alumni Open Letter on Sexual Misconduct Report |
| 22 | Sexual Misconduct Scenarios |
| 23 | YALE00001008-00001013 |
| 24 | YALE00000961 |
| 25 | YALE00000996-00000998 |
| 26 | YALE00000865 |
| 27 | YALE00000995 |
| 28 | YALE00000956-00000960 |
| 29 | YALE00000887 |
| 30 | Yale University 2015 AAU Campus Climate Survey on Sexual Misconduct |
| 31 | Results of AAU Survey on Sexual Assault and Misconduct |
| 32 | YALE00001619-00001831 (Excerpts from a 236 page document) |
| 33 | HR000120-000122 |
| 34 | HR000068 |
| 35 | HR000167 |
| 36 | David Post CV |
| 37 | YALE00008460-00008461 |
| 38 | YALE00016120-00016138 |
| 39 | YALE00010847 |

| Deposition Exhibit No. | Bates Range or Description of Document |
|---|---|
| 40 | MONT000794-000802 |
| 41 | YALE00008562 |
| 42 | YALE00009228 |
| 43 | UWC Report to Dean Jonathan Holloway dated February 1, 2016 |
| 44 | YALE00008552 |
| 45 | YALE00008846-00008850 |
| 46 | YALE00011244-00011245 |
| 47 | YALE00016747-00016757 |
| 48 | YALE00016743 |
| 49 | YALE00016744-00016745 |
| 50 | YALE00011250 |
| 51 | YALE00011182 |
| 52 | YALE00011258 |
| 53 | YALE00011277-00011278 |
| 54 | YALE00016834 |
| 55 | YALE00016627 |
| 56 | YALE00016735-00016736 |
| 57 | YALE000012118-00012126 |
| 58 | YALE00012012-00012014 |
| 59 | YALE00012132-00012133 |
| 60 | YALE00008151-00008157 |
| 61 | YALE00008250-00008252 |
| 62 | YALE00012034 |
| 63 | YALE00012066 |
| 64 | Voluntary Resolution Agreement |
| 65 | YALE00008116-00008118 |
| 66 | YALE00008172-00008174 |
| 67 | YALE00012015-00012016 |
| 68 | YALE00008521-00008522 |
| 69 | YALE00011904-00011950 |
| 70 | Fact Finder's Report dated January 4, 2016 |
| 71 | YALE00011539-00011580 |
| 72 | Revisions Analysis Report |
| 73 | YALE00012942-00012943 |
| 74 | UWC Hearing Protocol dated January 21, 2016 |
| 75 | YALE00008630 |
| 76 | YALE00010663 |
| 77 | YALE00001012-00001013 |
| 78 | YALE00016921 |
| 79 | YALE00008828 |
| 80 | YALE00009153-00009155 |
| 81 | YALE00008833-00008841 |
| 82 | YALE00008818 |

| Deposition Exhibit No. | Bates Range or Description of Document |
|---|---|
| 83 | YALE00009147-00009149 |
| 84 | YALE00011966-00012004 |
| 85 | Letter |
| 86 | YALE00011498-00011499 |
| 87 | YALE00017031 |
| 88 | YALE00008144-00008145 |
| 89 | YALE00016968 |
| 90 | YALE00016988-00016990 |
| 91 | YALE00021968 |
| 92 | YALE00017705-00017706 |
| 93 | YALE00017708 |
| 94 | YALE00016992-00016993 |
| 95 | YALE00016919 |
| 96 | YALE00016936-00016937 |
| 97 | MONT000176 – 000178 |
| | |
| Def. A | Letter |
| Def. B | Statement of Max Stern, Counsel for Jack Montague dated March 14, 2016 |
| Def. C | Statement re: Jack Montague v. Yale University dated June 9, 2016 |
| Def. D | MONT000781-000782 |
| Def. E | MONT000776 |
| Def. F | MONT000381 |
| Def. G | YALE00009089 |
| Def. H | YALE00009077-00009078 |
| Def. I | MONT000811 |
| Def. J | MONT000685-000687 |
| | |
| | Amended Complaint and Jury Demand filed 01-25-2017 |
| | Transcript of the deposition of Miriam Berkman dated -06-16-2017 |
| | Transcript of the deposition of John Criscuolo dated -06-16-2017 |
| | YALE00011387-11389 |
| | YALE00011390-11402 |
| | YALE00011459 |
| | YALE00011509-11510 |
| | YALE00011520-11523 |