**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| _____ )<br>JACK MONTAGUE, )<br> )<br> Plaintiff, )<br> )<br> v. )<br> )<br>YALE UNIVERSITY, ANGELA )<br>GLEASON, and JASON KILLHEFFER, )<br> )<br> )<br> Defendants. )<br>_____) | Civil Action No. 3:16-cv-00885-AVC |

**PLAINTIFF'S LOCAL RULE 56(a)(2) STATEMENT OF FACTS**
**IN OPPOSITION TO SUMMARY JUDGMENT**

Pursuant to Local Rules 56(a)(2) and (3), Plaintiff hereby submits this Statement of Facts in Opposition to Summary Judgment.   All admissions and denials are made solely for the purposes of Defendants' Motion for Summary Judgment, unless otherwise specified.

1.      The plaintiff matriculated at Yale University in the fall of 2012.  (Amended Complaint, at ¶ 11.)

**Plaintiff's Response**:

Admitted.

2.      Yale University has policies governing sexual misconduct titled "Sexual Misconduct Policies and Related Definitions." (Ex. D).

**Plaintiff's Response:**

Admitted, except that the version of the Sexual Misconduct Policies and Related Definitions submitted by Defendants as Ex. D appears to be missing pages.  Plaintiff has submitted a complete copy as Ex. 49 to his Opposition.

3.     The Sexual Misconduct Policies and Related Definitions are consistent with federal law. (Ex. Z, Depo. p. 192-193, 202-203, 206, 209; Ex. AA, Depo. p. 17-18, 31.)

**Plaintiff's Response:**

Admitted that Plaintiff's expert sexual misconduct investigator, Susanna Murphy, when asked whether, upon her review of Yale's Sexual Misconduct Policies and Related Definitions, she saw "anything that [she] believed to violate the federal government's requirements," she answered "No", and further testified that in her opinion, other discrete aspects of Yale's procedures complied with federal law.   Plaintiff takes no position on whether as written, every aspect of Yale's Sexual Misconduct Policies and Related Definitions is consistent with federal law, as this is both a legal conclusion and immaterial to the instant Motion.  Plaintiff has designated Ms. Murphy as an expert in sexual misconduct investigation, including investigations conducted in the university setting pursuant to Title IX.  *See* Ex. 50.  She is not being offered as a legal expert on all facets of university compliance with Title IX.

4.     Yale University's University-Wide Committee on Sexual Misconduct ("UWC") addresses formal complaints of sexual misconduct. The UWC is governed by the "UWC Procedures." (Ex. E, KK.)

**Plaintiff's Response:**

Admitted.

5.      On August 25, 2013, Sally Smith filed a complaint with the UWC alleging that the plaintiff folded up his used pizza plate and placed it down her tank top, between her breasts. This complaint is referred to as UWC I. (Ex. Q.)

**Plaintiff's Response:**

 Admitted.  Further responding, Sally Smith explained that "[t]here was no physical (skin-to-skin) contact" and described her interaction with Montague as "peripheral".  Ex. Q.  Nor did Montague say anything offensive or inappropriate to her during the incident.  Ex 29, Deposition of Aley Menon, at 23-24; Ex. R at YALE0008157; Ex. OO.

6.      Under the UWC Procedures, the UWC Chair, the UWC Secretary, and another member of the UWC must initially determine whether the complaint, if substantiated, would constitute a violation of the Sexual Misconduct Policies. (Ex. KK, p. 4.)

**Plaintiff's Response:**

 Admitted.

7.      The Sexual Misconduct Policies define "sexual misconduct" as "a wide range of behaviors including sexual assault, sexual harassment, intimate partner violence, stalking, voyeurism, and any other conduct of a sexual nature that is nonconsensual, or has the purpose and effect of threatening, intimidating, or coercing a person." (Ex. D, p. 2.)

**Plaintiff's Response:**

 Admitted.

8.      Aley Menon, as the Secretary of the UWC, Michael Della Rocca, as the Chair of the UWC, and David Post, as a member of the UWC, determined that the UWC had jurisdiction over the August 25, 2013 complaint based upon the conduct alleged. (Ex. K, ¶ 5; BB, CC, ¶ 4; NN.)

**Plaintiff's Response:**

Admitted.  Further responding, while he ultimately concurred in the decision to accept jurisdiction, Post questioned whether the complaint "may be better served as a complaint to the executive committee because it is on the edge and some panel members will have a hard time seeing the sexual nature of the act."  Ex. NN.  Smith herself did not describe Montague's conduct as sexual in nature but instead characterized it in more general terms as an "invasion of my personal space and privacy (in addition to being thoroughly inappropriate)."  Ex. R. at YALE00008155-56.  In both her initial written complaint and a statement she wrote in response to the fact-finder's report and which was read to the panel, Ex. 29, Menon Tr. 43-45, Smith went out of her way to emphasize that Montague had not actually made skin to skin contact (a fact she thought it was "important to be precise" about), and that, although she had made the decision to file a complaint because she felt like "sexual object rather than a fellow human being," she did not necessarily believe that Montague intended her to feel that way.  Ex. OO.  As she further explained, "I have definitely been stupid and drunk before, too.  People make mistakes."  *Id.*

9.      The plaintiff's gender played no role in the decision that the UWC had jurisdiction over the August 25, 2013 complaint. (Ex. K, ¶ 6; Ex. BB, CC, ¶ 5.)

**Plaintiff's Response:**

Disputed.  Common sense dictates that, if Montague had been a female, or had placed a pizza plate down a man's shirt, it certainly would be not considered an act of sexual misconduct and therefore the UWC could not have accepted jurisdiction over the matter.

10.      Ms. Menon, Mr. Della Rocca, and Mr. Post did not discriminate against the plaintiff based on his gender. (Ex. K, ¶ 14; BB, ¶ 9; CC, ¶ 6.)

**Plaintiff's Response:**

For the purposes of the instant Motion, Plaintiff does not contest paragraph 10. However, common sense dictates that, if Montague had been a female, or had placed a pizza plate down a man's shirt, it would be not considered an act of sexual misconduct.

11.     In response to Ms. Smith's complaint, the plaintiff admitted that he did not remember the incident and did not challenge Ms. Smith's account of the incident. (Ex. T.)

**Plaintiff's Response:**

Admitted that Plaintiff did not remember the incident and stated that he took "full responsibility for his actions" but that he "never meant to hurt or sexually harass" Ms. Smith. Ex. T.

12.     Attorney Timothy Pothin conducted an investigation of the UWC I complaint and submitted a Fact-Finder's Report dated September 25, 2013. (Ex. R.)

**Plaintiff's Response:**

Admitted.

13.     Two witnesses confirmed Ms. Smith's account and reported that they witnessed the plaintiff shove a pizza plate down Ms. Smith's tank top. (Ex. R, p. 3-4.)

**Plaintiff's Response:**

Admitted.

14.     The plaintiff told Attorney Pothin that he accepted full responsibility for his actions toward Ms. Smith. (Ex. R, p. 4; Ex. M, Depo. p. 48-49.)

**Plaintiff's Response:**

Admitted.  Further responding, Plaintiff also told Mr. Pothin that he "never meant to hurt or sexually harass" Ms. Smith.  Ex. T.

15.    The UWC I complaint was presented to a five member panel on October 9, 2013. (Ex. S, p. 1.)

**Plaintiff's Response:**

Admitted.

16.    The plaintiff did not contest the allegations of the UWC I complaint and the UWC I Panel unanimously concluded that he had violated Yale University's Sexual Misconduct Policies and unanimously recommended the imposition of a penalty. (Ex. G, H, I, J, ¶ 3; Ex. K, ¶ 11.)

**Plaintiff's Response:**

Disputed in part.  Admitted that Plaintiff did not contest the factual allegations of the UWC I complaint, i.e., he admitted to placing a pizza plate down Ms. Smith's shirt.  Disputed to the extent this paragraph suggests that Plaintiff admitted his actions constituted a violation of the Sexual Misconduct Policies.  He did not make such an admission.  *See* Ex. 33, Montague Tr. Vol II at 39.

17.    The UWC I Panel concluded that the plaintiff had sexually harassed Ms. Smith when he, without provocation, rolled up a used, paper pizza plate and shoved it down Ms. Smith's shirt between her breasts. (Ex. S, p. 2.)

**Plaintiff's Response:**

Admitted.

18.    The plaintiff conceded at his deposition that his conduct constituted sexual contact in violation of the Sexual Misconduct Policies. (Ex. M, Depo. p. 50-52.)

**Plaintiff's Response:**

Disputed as misleading and incomplete.  Plaintiff initially testified at his deposition that "putting your hands or another object between a woman's breasts without consent" would violate Yale's Sexual Misconduct Policies, but later clarified his response through an errata sheet.  His full answer was: "Yes, putting your hands between a woman's breasts without consent would violate Yale's sexual misconduct policy."  Ex. M, Errata p. 2.  As Ms. Smith herself made clear, Plaintiff did *not* place his hands between her breasts.  Ex. OO

19.    The UWC I Panel recommended that the plaintiff be (1) placed on probation for four terms, beginning with the Fall Term of 2013 through the Spring Term of 2015; (2) prohibited from holding a leadership position in any student activity, organization or sport; (3) required to immediately enroll in sexual harassment and gender sensitivity training through the SHARE Center; (4) be required to meet with a member of the SHARE Center once each semester, beginning with the Spring Term of 2014, for the remainder of his time at Yale to review and reflect on his interactions and relationships with female students at Yale; and (5) required to receive training on the appropriate use of alcohol. (Ex. S, p. 3.)

**Plaintiff's Response:**

Admitted.

20.    The plaintiff's gender played no role in the UWC I Panel's conclusion that the plaintiff had violated Yale University's Sexual Misconduct Policies or in their recommendation on the appropriate penalty. (Ex. DD, EE, FF, ¶ 4-5.)

**Plaintiff's Response:**

Disputed.  Common sense dictates that, if Montague had been a female, or had placed a used pizza plate down a man's shirt, it would be not considered an act of sexual misconduct.

21.     The plaintiff did not oppose the UWC I Panel report, because he "understood that [his] conduct was completely inappropriate and wrong and [he] was willing to go through the counseling that had been ordered." (Ex. M, Errata p. 3.)

**Plaintiff's Response:**

Disputed as misleading and incomplete.  Admitted that this paragraph accurately quotes Plaintiff's testimony.  Disputed to the extent this paragraph suggests that Plaintiff admitted his actions constituted a violation of the Sexual Misconduct Policies.  He did not make such an admission.  *See* Ex. 33, Montague Tr. Vol II at 39.

22.     The plaintiff was informed on October 21, 2013 that Dean Mary Miller had accepted the panel's findings of fact, the conclusion, and the recommendations made by the UWC I Panel. (Ex. U, p. 1.)

**Plaintiff's Response:**

Admitted.

23.     The plaintiff's gender played no role in Dean Miller's decision to accept the UWC I Panel's conclusion that the plaintiff had violated Yale University's Sexual Misconduct Policies or to accept the UWC I Panel's recommendation on the appropriate penalty. (Ex. GG, ¶ 4-5.)

**Plaintiff's Response:**

Disputed.  Common sense dictates that, if Montague had been a female, or had placed a used pizza plate down a man's shirt, it would be not considered an act of sexual misconduct.

24.     The plaintiff chose not to appeal Dean Miller's decision because he "felt [his] conduct was inappropriate and for that reason [he] was willing to accept the panel's counseling orders." (Ex. M, Errata p. 3.)

**Plaintiff's Response:**

Disputed in part as misleading and incomplete.  Plaintiff further testified that he did not appeal Dean Miller's decision because he admitted to the conduct, and did not understand there to be any procedural mechanism available for him to admit to the conduct but challenge whether that conduct constituted sexual misconduct.  *See* Ex. 33, Montague Tr. Vol II at 39.

25.    The UWC I Panel members and Dean Miller did not discriminate against the plaintiff based on his gender. (Ex. DD, EE, FF, GG, ¶ 6.)

**Plaintiff's Response:**

Admitted.

26.    The plaintiff received the sexual harassment and gender sensitivity training and the training on the appropriate use of alcohol required after UWC I. (Ex. M, Depo. p. 52-53, 158.)

**Plaintiff's Response:**

Admitted.

27.    On September 18, 2015, the plaintiff was notified that Chief of Police Ronnell A. Higgins, had submitted a complaint to the Yale College Executive Committee alleging that the plaintiff's conduct violated that Undergraduate Regulations governing Defiance of Authority. (Ex. V, p. 1)

**Plaintiff's Response:**

Admitted.

28.    The complaint was based on an incident that occurred on September 6, 2015 when the plaintiff interfered with a police investigation of the well-being of a female student who appeared to be intoxicated and who was being followed by a male student. (Ex. W, p. 4.)

**Plaintiff's Response:**

Admitted that the complaint was a result of Plaintiff's attempting to help a friend who had been detained by the Yale Police.  Ex. V; Ex. W.  Ex. 42, Montague Tr. Vol. I, at 74-76. Montague recorded the incident on video.  In response their request, Montague told police the name of his friend and ultimately they released his friend from custody as a result.  Ex. 42, Montague Tr. Vol. I, at 74-76.

29.     On September 24, 2015, the plaintiff was informed that the Coordinating Group of the Executive Committee held a disposition and concluded that the plaintiff's actions were in violation of the Undergraduate Regulations governing Defiance of Authority. The Coordinating Group voted to reprimand the plaintiff. (Ex. X.)

**Plaintiff's Response:**

Admitted.  The reprimand was a "matter of internal record only" meaning Montague was free to deny its existence if ever asked if he had been subject to disciplinary sanctions at Yale. Ex. X.

30.     The September 24, 2015 letter informed the plaintiff that the reprimand "would be taken into consideration in determining a penalty if you should ever again be found by the Executive Committee to have committed an infraction of the Undergraduate Regulations." The letter does not state that only the Executive Committee would consider the reprimand if the plaintiff subsequently violated the Undergraduate Regulations. (Ex. X.)

**Plaintiff's Response:**

Disputed.  The letter speaks for itself.  It says "the reprimand will be taken into consideration in determining a penalty if you should ever again be found by the _Executive Committee_ to have committed an infraction of the Undergraduate Regulations."  Ex. X (emphasis

added).  The letter does not indicate that the UWC could or would take the reprimand into consideration in adjudicating a complaint alleging a violation of the *Sexual Misconduct Policies*.

31.     The reprimand from the Executive Committee was a formal disciplinary matter which could be considered by the UWC. (Ex. LL, Depo. p. 169-171.)

**Plaintiff's Response:**

Admitted.

32.     At the time of the UWC II proceedings against the plaintiff, the Department of Education Office of Civil Rights April, 2011 "Dear Colleague Letter" provided the standard for sexual misconduct procedures under Title IX. (Ex. Z, Depo. p. 132-133.)

**Plaintiff's Response:**

Admitted.

33.     The federal government required educational institutions to allow a complainant to convert an informal process into a formal process, and Yale University was required to inform Ms. Roe of this right. (Ex. Z, Depo. p. 207-209.)

**Plaintiff's Response:**

Admitted.

34.     The federal government required educational institutions to evaluate claims of sexual misconduct under the preponderance of evidence standard. (Ex. Z, Depo. p. 209.)

**Plaintiff's Response:**

Admitted that the federal government, through the Dear Colleague Letter, required educational institutions to evaluate claims of sexual misconduct under a preponderance of evidence standard, on the basis of evidence gathered in a "thorough" and "impartial" investigation.  Ex. 51, "Dear Colleague Letter", at 5

35.     Angela Gleason, a Title IX Coordinator, first met with Ms. Roe on October 19, 2015 and discussed the possibility of an informal process in which the plaintiff would be offered sensitivity training. (Ex. QQ, Depo. p. 106, 111; Ex. SS, Depo. p. 17.)

**Plaintiff's Response:**

Admitted.

36.     After her initial meeting with Ms. Roe, Ms. Gleason learned that the plaintiff had already received the sensitivity training that she had discussed with Ms. Roe as an informal resolution and informed Ms. Roe of this fact. (Ex. QQ, Depo. p. 124-125; Ex. SS, Depo. p. 18-20, 41-42; Ex. RR, ¶ 5.)

**Plaintiff's Response:**

Disputed.  First, Ms. Gleason knew of Mr. Montague's prior complaint and training before her initial meeting with Roe.  Ex. 17, Killheffer Tr. at 93; Ex. 1, Rogers Tr. at 82-84. Second, that training had nothing to do with sexual consent because it was tailored to his prior offense which had nothing to do with sexual consent; therefore it is not correct that Montague had already received the type of training he would have received, i.e., training on sexual consent, if Roe had been allowed to proceed with her desired informal resolution.  Ex. 30; Ex. 31, Deposition of John Criscuolo, at 38-39.

37.     Ms. Gleason did not inform Ms. Roe that there had been a previous UWC complaint filed against the plaintiff. (Ex. QQ, Depo. p. 135, 138-139; Ex. SS, Depo. p. 23, 28¬29, 33-34, 41-42, 52; Ex. RR, ¶ 3.)

**Plaintiff's Response:**

Disputed.  Extensive evidence demonstrates that Gleason informed Roe that "Mr. Montague had already been given a recommendation for training after a previous complaint[.]" Ex. B at 8-9; Ex. 25; Ex. 46 at 8, 16; Ex. 47.

38.     Ms. Gleason did not inform Ms. Roe that the sensitivity training the plaintiff received had been mandated because of a prior UWC complaint. (Ex. QQ, Depo. p. 134-135, 140; Ex. SS, Depo. p. 23, 42; Ex. RR, ¶ 6.)

**Plaintiff's Response:**

Disputed.  Extensive evidence demonstrates that Gleason informed Roe that "Mr. Montague had already been given a recommendation for training after a previous complaint[.]" Ex. B at 8-9; Ex. 25; Ex. 46 at 8, 16; Ex. 47.

39.     After Ms. Gleason informed Ms. Roe that the plaintiff had received sensitivity training, Ms. Gleason explained that Ms. Roe still had the following options: (1) offer the plaintiff sensitivity training again in an informal process; (2) abandon the informal complaint; or (3) proceed with a formal complaint, acting either as the complainant or a witness. (Ex. SS, Depo. p. 41-44; Ex. RR, ¶ 8.)

**Plaintiff's Response:**

Disputed.  In fact, Ms. Gleason informed Ms. Roe that because Montague had already received sensitivity training in connection with a prior complaint, he was ineligible to receive training again.  Ex. B at 8-9.  Gleason further told Roe that she (Gleason) "wouldn't be doing her job if she did not take more serious action" and "asked for [Roe's] participation" in a formal complaint process.  Ex. 25; Ex. 20, Roe Tr. at 42-43.

40.     Ms. Gleason also informed Ms. Roe that she still had the informal option available. (Ex. QQ, Depo. p. 131; Ex. RR, ¶ 7.)

**Plaintiff's Response:**

Disputed as misleading and incomplete.  Gleason implied to Roe that a formal complaint, rather than informal one, was the necessary and appropriate course of action.  Ex. 25; Ex. 20, Roe Tr. at 42-43.

41.     Ms. Gleason did not pressure Ms. Roe to participate in a formal complaint. Ms. Roe chose the formal complaint option of her own volition. (Ex. QQ, Depo. p. 177; Ex. SS, Depo. p. 43-44, 47; Ex. RR, ¶ 8.)

**Plaintiff's Response:**

Disputed.  Gleason did mislead, manipulate, improperly influence, and/or pressure Roe into participating in a formal complaint.  She told Roe that "she [Gleason] would not be able to keep [Roe's] name confidential" because Montague had already received training after a prior complaint and was therefore ineligible to receive the training her informal complaint implicated, and that she (Gleason) "wouldn't be doing her job if she did not take more serious action" and "asked for [Roe's] participation" in a formal complaint process.  Ex. B at 11547, -546; Ex. 25; Ex. 20, Roe Tr. at 42-43.  After her meeting with Gleason, which "reframed the incident" for her, Roe felt obliged to participate in a formal complaint in order to protect other women on campus. Ex. B at -11556; Ex. 25.

42.     After Ms. Roe indicated that she might be interested in filing a formal complaint, Mr. Post met with Ms. Roe solely to answer questions regarding the UWC process. After his meeting with Ms. Roe, Mr. Post responded to Ms. Roe's e-mail that asked additional questions about the formal complaint process. (Ex. MM, Depo. p. 20, 22-26; Ex. QQ, Depo. p. 157-158; Ex SS, Depo. p. 44-45, 47-49; Ex. YY; Ex. K, ¶ 7-8.)

**Plaintiff's Response:**

Disputed as misleading and incomplete.  Post encouraged Ms. Roe to participate in a formal complaint by offering her the option of having the Title IX office file the complaint on her behalf, which he presented as a "comfort" to her.  Ex. 20, Roe Tr. at 48-49.

43.     Mr. Post did not make any recommendations as to whether Ms. Roe should file a formal UWC complaint. (Ex. MM, p. 25; Ex. SS, Depo. p. 49; Ex. K, ¶ 9.)

**Plaintiff's Response:**

Disputed as misleading and incomplete.  Post encouraged Ms. Roe to participate in a formal complaint by offering her the option of having the Title IX office file the complaint on her behalf, which he presented as a "comfort" to her.  Ex. 20, Roe Tr. at 48-49.

44.     At no time prior to the UWC II hearing did Mr. Post communicate with Ms. Roe, nor did she communicate with him, about the substance of her complaint against the plaintiff. (Ex. K, ¶ 8.)

**Plaintiff's Response:**

Admitted.

45.     Ms. Roe was motivated to participate in the formal complaint process because of her own emotions, conversations she had with her suitemates, and her conversation with Ms. Gleason regarding the plaintiff previously receiving sensitivity training. (Ex. SS, Depo. p. 40-41, 55-56.)

**Plaintiff's Response:**

Dispute as misleading and incomplete, inasmuch as Gleason's disclosure to Roe was not limited to the fact that Montague received sensitivity training.  Ex. B at 8-9; Ex. 47.  "[Roe] was especially motivated to participate in the investigation and hearing process after she heard that

Mr. Montague has already had another complaint against him as she felt it was important to protect other women." Ex. B at -11547.

46.     A subsequent interaction with the plaintiff also played a role in Ms. Roe's decision to participate in the formal complaint process. The day after speaking with Ms. Gleason about the plaintiff having received sensitivity training, Ms. Roe was at a party on a Saturday where the plaintiff was also present. Ms. Roe's friend approached the plaintiff and asked him to leave the party. The plaintiff yelled at Ms. Roe's friend, saying: "There's no reason why I should have to leave this party just because she's here. Like this is ridiculous." When Ms. Roe's friend said that the plaintiff had raped Ms. Roe, he replied: "That was more than a year ago. This is ridiculous." The Monday after this interaction, Ms. Roe informed Ms. Gleason of her willingness to participate in the formal complaint process. (Ex. SS, Depo. p. 84-87.)

**Plaintiff's Response:**

Disputed as misleading and incomplete.  First, Plaintiff denies making those statements. Ex. 42, Montague Tr. Vol. I at 261-63.  Second, and in any event, Roe told the fact-finder that her primary motivation in participating in the formal complaint was Gleason's disclosure to her of Montague's prior complaint, which instilled in her a sense of obligation to protect other women.  Ex. B at -11547.

47.     Ms. Roe decided she wanted to pursue a formal complaint against the plaintiff, provided that a Title IX Coordinator was listed as the complainant. (Ex. SS, p. 40-41, 55-56; Ex. RR, ¶ 8.)

**Plaintiff's Response:**

Admitted.  Further responding, UWC Chairman Post presented this option as a "comfort" to her.  Ex. 20, Roe Tr. at 48-49.

48.     On November 18, 2015, Jason Killheffer, as Senior Deputy Title IX Coordinator, filed a complaint of sexual assault with the UWC based upon a report that the plaintiff sexually penetrated Jane Roe without her consent on October 18, 2014. This complaint is referred to as "UWC II." (Ex. A.)

**Plaintiff's Response:**

Admitted.

49.     The Sexual Misconduct Policies and Related Definitions define "consent" as "positive, unambiguous, and voluntary agreement to engage in specific sexual activity throughout a sexual encounter." The same document further explains that "[c]onsent to some sexual acts does not constitute consent to others, nor does past consent to a given act constitute present or future consent. Consent must be ongoing through a sexual encounter and can be revoked at any time." (Ex. D, p. 2.)

**Plaintiff's Response:**

Admitted.  Further responding, although Yale's policy does require consent for each act, this does not mean that consent, once granted, must be re-expressed verbally at each stage, or that a separate consent be obtained for each act.  Ex. 52, Deposition of Susanna Murphy, Vol. II, at 16-19; 43.  Also, the Sexual Misconduct Policies state that "consent does not need to be verbal."  Ex. 49 at 3; *see also* Ex 31, Criscuolo Tr. at 24.  Revocation of consent must be communicated.  Ex. 50 at 6.

50.     Mr. Killheffer filed the complaint pursuant to Section 1 of the UWC Procedures that allows a Title IX Coordinator to bring a complaint to the UWC "when there is evidence that the University's policies on sexual misconduct have been violated and the Coordinator's intervention is needed to ensure that the matter reaches the UWC." (Ex. E, p. 1-2.)

**Plaintiff's Response:**

Admitted.  Further responding, it is Yale's policy that except where there is a threat to the community, the choice whether to pursue a formal complaint is left entirely to the discretion of the complaining witness.   Ex. 4, Spangler Tr. at 35-36.  If there is no safety issue, and if the complaining witness does not request a Title IX-filed complaint and agree to participate, there can be no formal UWC proceeding.  Ex. 17, Killheffer Tr. at 55-56; Ex 4, Spangler Tr. at 30-31; Ex. 18 at 5.

51.      Mr. Killheffer did not discuss the filing of a formal complaint with Ms. Roe. In fact, Mr. Killheffer never met or communicated with Ms. Roe until February 23, 2016, after Dean Jonathan Holloway had already accepted the recommendation of the UWC II Panel to expel the plaintiff. (Ex. TT, Depo. p. 165-166; Ex. UU, ¶¶ 3-4.)

**Plaintiff's Response:**

Admitted that Killheffer did not discuss the filing of a formal complaint with Roe. Further responding, Mr. Killheffer discussed the filing of a formal complaint not with Roe, but with Gleason, Spangler, and Susan Sawyer, who decided that the Title IX office would file a formal complaint if Roe's participation could be obtained.  Ex.  17, Killheffer Tr. at 109-120; Ex. 23; Ex. 15, Gleason Tr. at 119-125.

52.      The plaintiff's gender played no role in Mr. Killheffer's decision to bring a formal UWC complaint in UWC II. (Ex. UU, ¶ 6.)

**Plaintiff's Response:**

Disputed.  As discussed at length in Plaintiff's Opposition to Defendants' Motion for Summary Judgment, the record evidence supports Plaintiff's claim that the University's conduct

with respect to the UWC II complaint was motivated at least in part by Plaintiff's status as a varsity male athlete.  *See* Opposition Brief at 51-56.

     53.     Mr. Killheffer did not discriminate against the plaintiff based on his gender. (Ex. UU; ¶ 7.)

     **Plaintiff's Response:**

Disputed.  As discussed at length in Plaintiff's Opposition to Defendants' Motion for Summary Judgment, the record evidence supports Plaintiff's claim that the University's conduct with respect to the UWC II complaint was motivated at least in part by Plaintiff's status as a varsity male athlete.  *See* Opposition Brief at 51-56.

     54.     Mr. Killheffer did not intend to interfere with Jack Montague's contract with Yale University when he brought the formal complaint in UWC II. (Ex. UU, ¶ 5.)

     **Plaintiff's Response:**

Disputed.  Mr. Killheffer participated in an institutional decision, along with Gleason, Spangler, and Sawyer, to convince Roe to abandon her informal complaint and to either file a formal complaint against Montague or allow the Title IX office to file one on her behalf.  Ex. 17, Killheffer Tr. at 109-120; Ex. 23; Ex. 15, Gleason Tr. at 119-125.  Whether Mr. Killheffer's actions constituted tortious interference with Mr. Montague's contract for Yale is a legal conclusion as to which no response is required.

     55.     Attorney Miriam Berkman conducted an investigation of the UWC II complaint and submitted a Fact-Finder's Report dated January 15, 2016. (Ex. B.)

     **Plaintiff's Response:**

 Admitted.

56.     The UWC II complaint was presented to a five member panel on January 21, 2016. (Ex. C, p. 1.)

   **Plaintiff's Response:**

Admitted.

57.     When a UWC complaint is brought by a Title IX Coordinator, it is the uniform practice of the UWC to allow the complaining witness to submit an opening statement and otherwise participate in the process because he or she has firsthand knowledge of the alleged violation. (Ex. LL, Depo. p. 142-144; Ex. BB, ¶ 6; Ex. MM, Depo. p. 27; Ex. K, ¶ 10.)

   **Plaintiff's Response:**

Admitted that Yale's witnesses testified to the existence of such a "practice."  Further responding, neither the *UWC Procedures* nor any other written procedures published by Yale provide for a non-party to a UWC complaint to make an opening statement and otherwise participate as if she were a party to the complaint.  Ex. E; Ex. 29, Menon at 141-44.  Instead, a non-party would not be allowed to be present for the hearing except to testify.  *Id.*

58.     Ms. Roe reported to both Attorney Berkman and the UWC II Panel that, on two occasions prior to entering the plaintiff's bedroom, she asked him if it was "okay to hookup, but not have sex." (Ex. B, p. 4; Ex. ZZ, p. 1; Ex. C, p. 3, 5.)

   **Plaintiff's Response:**

Admitted.

59.     Ms. Roe also reported to both Attorney Berkman and the UWC II Panel that, as the plaintiff was preparing to penetrate her, she said, "Jack, no, I said I wanted to hook up but not have sex." (Ex. B, p. 5; Ex. C, p. 3, 5.)

   **Plaintiff's Response:**

Disputed as misleading and incomplete.  Roe further told the fact-finder, Ms. Berkman, that Mr. Montague did not appear to hear her make this statement.  Ex. B at -11543.

60.     Ms. Roe also stated to both Attorney Berkman and the UWC II Panel that, after intercourse, the plaintiff said, "I'm really sorry. I know you didn't want that." (Ex. B, p. 5; Ex. ZZ, p. 4; Ex. C, p. 3.)

   **Plaintiff's Response:**

Disputed as misleading and incomplete.  Montague denies having made that statement to Roe.  Ex. 42, Montague Tr. Vol. I at 132.  Admitted that Roe claimed Montague made this statement.

61.     The plaintiff did not doubt that Ms. Roe believed that he had had intercourse with her without her consent: "There is no question that Ms. [Roe] honestly believes I took advantage of her on October 18, 2014. I do not doubt the sincerity of her beliefs as of November, 2015, more than a year after the incident." (Ex. L, p. 1; Ex. M, Depo. p. 163-164.)

   **Plaintiff's Response:**

Admitted that Plaintiff wrote this in response to the UWC II Panel Report, as part of a plea that the decision-maker reexamine the facts of his case.

62.     The plaintiff agreed that to "hook up, but not have sex" could mean any type of sexual contact with the exception of intercourse. He admitted that all of the behavior which the plaintiff and Ms. Roe engaged in prior to penetration would fall within the definition of "hookup, but not have sex." (Ex. PP, Depo. p. 63-65, 102-103, 119-121.)

   **Plaintiff's Response:**

Disputed as misleading and incomplete.  Plaintiff testified that Roe's alleged statement that she wanted to "hook up, but not have sex" *could* but did not necessarily confer consent for

all the activity Montague and Roe engaged in prior to intercourse.  Ex. 33, Montague Tr. Vol. II

at 102-106.  There is no evidence in the record concerning how Roe was defining "hook up"

except that it did not include sexual intercourse.  Roe told the fact-finder and the panel that she

indicated her consent to the pre-intercourse sexual activity, not verbally, but through her conduct.

*See* Ex. C at 3 (stating that Ms. Roe "indicated her consent to kissing and touching by kissing

Mr. Montague, touching his body (but not his genitals), and by not tensing up."); Ex. B at

YALE000011543 (same).  Thus, even on Roe's testimony, when she did manifest through her

non-verbal conduct, Ex. B at -11543, that she was ready to go further, Montague could well have

interpreted her action to mean that she had dispensed with her previous restrictions and was

willing to respond to him just as she had before.  Ex. 33, Montague Tr. Vol II, at 61-62.  Further

responding, "hook up" is an ambiguous term that means different things at different times and to

different people.  *See, e.g.*, England and Shafer, *Hooking Up and Forming Romantic*

*Relationships on Today's College Campuses*, The Gendered Society Reader 3, 531-93 (2008),

*available at*: http://www.nyu.edu/classes/jackson/sex.and.gender/Readings/England%20-

%20Hooking%20Up.pdf.

      63.     The plaintiff also agreed that if Ms. Roe had asked if it was okay to hook up but

not have sex, then he would not have had consent for intercourse. Ex. M, Depo. p. 120-122.)

      **Plaintiff's Response:**

     Admitted that Plaintiff's testimony is that if Ms. Roe had said she wanted to hook up but

not have sex, he would not have had consent for intercourse at the time she made that statement.

Ex. M at Errata p. 3.

64.     The plaintiff admitted that he understood that prior sexual activity did not provide

consent for subsequent sexual activity and that he needed specific consent for each sexual act

during a sexual interaction. (Ex. M, Depo. p. 146-147; Ex. PP, Depo. p. 67-69.)

**Plaintiff's Response:**

Admitted.  Further responding, Plaintiff's testimony is that notwithstanding that prior

sexual activity does not provide consent for future sexual activity, his sexual history with Ms.

Roe appropriately had an impact on how he interpreted her non-verbal cues.  Ex. M at Errata p.

4.  Further responding, although Yale's policy does require consent for each act, this does not

mean that consent, once granted, must be re-expressed verbally at each stage, or that a separate

consent be obtained for each act.  Ex. 52, Deposition of Susanna Murphy, Vol. II, at 16-19; 43.

65.     The plaintiff reported to Attorney Berkman that he had asked Ms. Roe if she

wanted to have sex and that Ms. Roe responded, "okay." However, the plaintiff only mentioned

non-verbal indicators of consent to the UWC II Panel. (Ex. B, p. 10; Ex. C, p. 5, 8-9.)

**Plaintiff's Response:**

Admitted.  Further responding, Plaintiff testified that, when, over a year after his

relationship with Roe ended, he was confronted with the lone accusation that he had sex with

Roe without her consent, unaccompanied by any factual context which would allow him to

pinpoint which of his several sexual encounters with Roe was at issue, he was understandably

confused and initially told the fact-finder that Roe had provided verbal consent, as she had on a

separate occasion.  Ex. 33, Deposition of Jack Montague, Volume II, at 73-75.

66.     When speaking with Attorney Berkman, the plaintiff did not remember that he

had had four sexual encounters with Ms. Roe, only recalling three such encounters. The plaintiff

also did not remember going to a party at a different location after having intercourse with Ms. Roe. (Ex. M, Depo. p. 128.)

**Plaintiff's Response:**

Admitted that by the time he was interviewed by the fact-finder over a year after the events in question, Plaintiff's memory of certain details of his encounters with Roe had faded.

67.     The plaintiff admitted that he made statements to Attorney Berkman that turned out to be untrue. (Ex. M, Depo. 129; Errata p. 3.)

**Plaintiff's Response:**

Disputed.  Plaintiff admitted that he made statements to Berkman , based on his best memory at the time he was being interviewed over a year after the events in question, that ultimately turned out to be inaccurate.  Ex. 33, Montague Tr. Vol. II at 71-75.

68.     The UWC II Panel deliberated at length about the issues of credibility and ultimately found Ms. Roe's account more credible. (Ex. C, p. 6.)

**Plaintiff's Response:**

Disputed in part.  Admitted that the UWC II Panel found Ms. Roe's account more credible.  The UWC II Panel's deliberations were not transcribed and so the extent to which they deliberated issues of credibility is not known.  The UWC II Panel Report, Ex. C, speaks for itself.

69.     The UWC II Panel identified specific reasons that it credited Ms. Roe's version of the events over that of the plaintiff. Ms. Roe provided a full and detailed account of her encounter with the plaintiff in her interviews with the fact-finder and the UWC II Panel. Her contemporaneous text to her friend, her undated written account, and her testimony at the hearing were all detailed and consistent. Ms. Roe raised concerns about a single sexual act during an

otherwise consensual encounter, rather than alleging that she was incapacitated by alcohol during her interaction with the plaintiff on September 24, 2014. Ms. Roe had no motivation to be dishonest with her friends, the fact-finder, or the panel. Ms. Roe sought support from her friends the morning after the incident, called the SHARE Center a few days later, and confronted the plaintiff the following week. (Ex. C, p. 6-8.)

**Plaintiff's Response:**

Admitted that the UWC II Panel identified that it found Ms. Roe's account more credible based on the reasons set forth at pp. 6-8 of its report.  Further responding, Plaintiff's expert sexual misconduct investigator, Susanna Murphy, has opined that the UWC II panel's assessment of Ms. Roe's credibility was tainted because it was based on a flawed and biased collection, consideration and reporting of the evidence.  *See* Ex. 50.  Although Roe consistently told her friends and later the Title IX authorities that Montague had assaulted her, she did *not* consistently describe the experience.  Ex. 50 at 7-9, 11-12.  Most importantly, she did *not* tell her friends about the sexual activity with Montague in which she had had freely and voluntarily engaged as the interaction led to the ultimate act of sexual intercourse.  Ex. B at 11550-554. Instead, she just told her friends that she had forcefully resisted his advances, but lacked the strength to stop him.   *Id.*  All of this she contradicted when she was eventually interviewed by the fact-finder.  Further, the panel simply dismissed the possibility that Roe had any motive to lie based on the "narrowness" of her claim, *i.e.*, that she candidly disclosed that the rest of her sexual relations with Montague were consensual, Ex. C at 7, and neither the fact-finder nor the panel even *considered* the possibility that Roe *did* have a motivation to be dishonest with her friends.  *Id.*  The evidence suggested a plausible motive to lie:  Roe knew that her friends disapproved of her sexual relationship with Montague, which she had admitted to them was

based purely on sex and which, she said, she regretted.  Ex. B at 11542, -552; Ex. 1 at 57-58.

And she also knew that they did not want her to go with Montague that very night.  Ex. 1 at 9-12.

If she did voluntarily surrender to her admitted sexual attraction to Montague again, she

undoubtedly would be embarrassed at having to admit this to her friends upon returning to her

dorm.

70.     On the other hand, the plaintiff had a selective memory of the incident and a

shifting recollection of how he gauged consent. The plaintiff remembered certain key details that

were most helpful to him, but remembered few other details of the night. He told the fact-finder

that he asked Ms. Roe if she wanted to have sex and Ms. Roe said "okay," providing verbal

consent. However, when asked by the UWC II Panel, the plaintiff did not mention verbal

consent, and instead remembered that Ms. Roe provided only non-verbal consent. (Ex. C, p. 8-9.)

**Plaintiff's Response:**

Disputed as misleading and incomplete.  Plaintiff testified that, when, over a year after

his relationship with Roe ended, he was confronted with the lone accusation, unaccompanied by

any factual context, that he had sexual intercourse with Roe without her consent, he was

understandably confused and initially told the fact-finder that Roe had provided verbal consent,

as she had on a separate occasion.  Ex. 33, Deposition of Jack Montague, Volume II, at 73-75.

Once he was provided a copy of the fact-finder's report containing details of Roe's allegations,

he was able to separate the third and fourth sexual encounters and recalled that on the night in

question, Roe had consented through her conduct.  *Id.*

71.     In determining the issue of credibility, the UWC II Panel properly considered the

factors listed in Paragraphs 69 and 70. (Ex. Z, Depo. p. 126-128, 191-192; Ex. AA, Depo. p. 21-

22, 75-76.)

**Plaintiff's Response:**

Disputed as misleading and incomplete.  Ms. Murphy testified that, as a general matter, it is appropriate for a trier of fact like the UWC panel to consider whether a party has made inconsistent statements or forgotten details when assessing that party's credibility.  Ms. Murphy qualified her testimony in this respect by explaining that because the UWC II panel's assessment of credibility was based on a flawed and biased collection, consideration and reporting of the evidence, its finding cannot stand.   Ex. 50 at 11-13; Murphy Tr. Vol. I at 120-124.

72.     The UWC Procedures provide: "In determining culpability, the panel may also take into account a respondent's previous formal discipline for other acts of sexual misconduct, including written reprimands, and the respondent's criminal conviction arising out of the events complained of." (Ex. E, p. 6.)

**Plaintiff's Response:**

Admitted.  Further responding, the UWC Procedures require that the presentation of this evidence on the issue of culpability occurs during the "Hearing."  Ex. E. at 7.4.

73.     The UWC Procedures provide: "The Secretary will also describe any formal Yale discipline previously imposed on the respondent, and the panel may consider this prior discipline in its recommendations regarding a penalty." (Ex. E, p. 7.)

**Plaintiff's Response:**

Admitted.

74.     In accordance with the UWC Procedures, Ms. Menon informed the UWC II Panel of Jack Montague's disciplinary history with the UWC and the Executive Committee. (Ex. LL, Depo. p. 169-171; Ex. BB, ¶ 7; Ex. AA, Depo. p. 87.)

**Plaintiff's Response:**

Disputed as misleading and incomplete.  The *UWC Procedures* specify that consideration of a respondent's "previous formal discipline for other acts of sexual misconduct" on the issue of culpability (as opposed to penalty) is part of the "Hearing" phase of the proceedings.  Ex. E, *UWC Procedures*, at 7.4.  Yale violated the *UWC Procedures* by presenting evidence of Montague's disciplinary history with the UWC, which the panel considered on the issue of culpability, after Montague had already been excused from the hearing.

75.     When considering the appropriate penalty, the UWC II Panel found relevant a previous finding that the plaintiff had violated the Sexual Misconduct Policies and that, at the time of his encounter with Ms. Roe on October 18, 2014, he was on probation and had received sexual harassment and gender sensitivity training and education and counseling on the appropriate use of alcohol. The plaintiff admitted that the foregoing facts were true. (Ex. C, p. 9; Ex. M, Depo. p. 157-158.)

   **Plaintiff's Response:**

Admitted.  Further responding: Plaintiff was not given an adequate opportunity to speak to the relevance (or rather, irrelevance) of that previous finding; that previous finding was erroneous; and the training he received as a result had nothing to do with the main issue in UWC II, which was sexual consent.  *See supra* ¶¶ 5, 8, 36*; infra* ¶¶ 127, 130, 134.

76.     The Yale Undergraduate Regulations provide: "The commission of a serious offense while on probation will normally result in suspension or expulsion." (Ex. F.)

   **Plaintiff's Response:**

Admitted.

77.     The plaintiff and his Title IX expert agreed that sexual intercourse without consent was a "serious" violation of Yale's Sexual Misconduct Policies. (Ex. M, Depo. p. 159; Ex. AA, Depo. p. 77-78.)

**Plaintiff's Response:**

Disputed in part.  Admitted that Ms. Murphy testified as such.  Disputed that Ms. Murphy is being offered as a "Title IX expert".  Ms. Murphy is offered as an expert in sexual misconduct investigation (including in the university setting where Title IX applies).  Her expert opinion in this case is limited to topics related to the fact-finder's investigation and presentation of the evidence to the UWC II panel.  Ex. 50 at 2.

78.     The Title IX expert also agreed that since the plaintiff was on probation at the time of his encounter with Ms. Roe, suspension or expulsion were the most likely sanctions under Yale's policies. (Ex. AA, Depo. p. 78-79.)

**Plaintiff's Response:**

Disputed in part.  Admitted that Ms. Murphy testified as such.  Disputed that Ms. Murphy is being offered as a "Title IX expert".  Ms. Murphy is offered as an expert in sexual misconduct investigation (including in the university setting where Title IX applies).  Her expert opinion in this case is limited to topics related to the fact-finder's investigation and presentation of the evidence to the UWC II panel.  Ex. 50 at 2.

79.     After considering all of the evidence, the UWC II Panel unanimously concluded that the testimony of Ms. Roe was more credible than that of the plaintiff. Accordingly, the UWC II Panel unanimously concluded that Jack Montague had violated Yale's Sexual Misconduct Policies. The UWC II Panel also unanimously decided to recommend expulsion. (Ex. C, p. 6-10; Ex. G, H, I, J, ¶ 3; Ex. K, ¶ 11.)

**Plaintiff's Response:**

Disputed as misleading and incomplete.  Admitted that the UWC II Panel unanimously found Roe's account more credible than Montague's, concluded that Montague had violated the Sexual Misconduct Policies, and decided to recommend expulsion.  Disputed inasmuch as the UWC II panel did not consider "all the evidence" as a result of the biased and inaccurate presentation of the evidence in the fact-finder's report.  *See* Ex. 50.  *See supra* ¶¶ 69-70; *infra* ¶¶ 81 & 121.

80.    The plaintiff's gender played no role in the UWC II Panel's conclusion that the plaintiff had sexually assaulted Ms. Roe in violation of Yale University's Sexual Misconduct Policies or in their recommendation that Jack Montague be expelled from Yale University. (Ex. G, H, I, J, ¶ 4-5; K, ¶ 12-14.)

**Plaintiff's Response:**

Disputed.  As discussed at length in Plaintiff's Opposition to Defendants' Motion for Summary Judgment, the record evidence supports Plaintiff's claim that the University's conduct with respect to the UWC II complaint was motivated at least in part by Plaintiff's status as a varsity male athlete.  *See* Opposition Brief at 51-56.

81.    The plaintiff's Title IX expert testified that if the UWC II Panel concluded that the testimony of Ms. Roe was more credible than that of the plaintiff, then one reasonable conclusion would be that the plaintiff had violated Yale's Sexual Misconduct Policies. She also stated that if the UWC II Panel believed Ms. Roe when she stated that she had told the plaintiff three times before intercourse that she didn't want intercourse, and then immediately after the intercourse the plaintiff stated: "I'm sorry, I know you didn't want that," then the UWC II Panel

could logically conclude that Ms. Roe had not given consent and the plaintiff was aware that she had not given consent. (Ex. Z, Depo. p. 118-120.)

     **Plaintiff's Response:**

Disputed as misleading and incomplete.  Ms. Murphy opined in her report and testified in her deposition that because the panel based its assessment of Roe's credibility on the facts as they were reported by the fact-finder – who presented consistencies as inconsistencies, sought out only inculpatory evidence, and actively suppressed exculpatory evidence – its finding cannot stand.  Ex. 50 at 11-13; Murphy Tr. Vol. I at 120-124.  In Murphy's opinion, the fact-finder effectively deprived the panel of evidence from which it might reasonably have concluded that, whatever she had said earlier in the evening, Roe later communicated consent to sexual intercourse through her active participation in an escalating sexual encounter, and that, even if she had intended to revoke that consent by saying "no" just prior to the intercourse, Montague had not heard her and thus reasonably assumed he did have consent.  Ex. 50 at 6.  Murphy's testimony that when viewed in isolation, Roe's testimony was sufficient to support the panel's finding is thus meaningless.  As to the allegation that Montague stated after the intercourse "I'm sorry, I know you didn't want that," Ms. Murphy testified that the UWC II panel's consideration of this statement was likewise tainted by the biased presentation of evidence in the fact-finder's report, and that even if Montague actually made this statement, it is not necessarily an admission to sexual assault.  Ex. Z at 119; Ex. 52, Murphy Tr. Vol. II at 64-65.  Further, disputed that Ms. Murphy is being offered as a "Title IX expert".  Ex. 50 at 2.

82.    The plaintiff agreed that if Ms. Roe had twice asked the plaintiff if it was okay with him to "hook up," but not "have sex," and then, immediately before the plaintiff penetrated her, Ms. Roe told him no and that she had said she wanted to hook up but not have sex, then it

would have been appropriate for the UWC II Panel to conclude that the plaintiff had violated the Sexual Misconduct Policies. (Ex. M, Depo. p. 119-123, 148-149, 232-233.)

    **Plaintiff's Response:**

Disputed as misleading and incomplete.  Plaintiff's testimony is that if Roe had said she wanted to "hook up" but not "have sex", and had not subsequently done anything to indicate consent to sexual intercourse, he would not have had consent for sexual intercourse.  Ex. M at Errata p. 3.

83.    The plaintiff and his Title IX expert agreed that if the UWC II Panel believed Ms. Roe's account of the incident underlying UWC II, then it would be appropriate for the UWC II Panel to conclude that the plaintiff had violated the Sexual Misconduct Policies. (Ex. M, Depo. 149; Ex. Z, Depo. p. 118-119.)

    **Plaintiff's Response:**

Disputed.  Plaintiff's testimony is that he does not believe the UWC II Panel's conclusion was correct.  Ex. M, Errata at 4.  As for Ms. Murphy, her opinion is that the UWC II Panel could not properly assess Roe's credibility or make a valid finding against Montague on the basis of the flawed and biased fact-finder's report.  *See supra* ¶ 81.  Further, disputed that Ms. Murphy is being offered as a "Title IX expert". Ex. 50 at 2.

84.    The UWC Procedures provide that the complainant and respondent must be provided with the Panel's findings of fact and conclusions, and the plaintiff understood that he would not be informed of the Panel's recommendations. (Ex. E, p. 7; Ex L, p. 2.)

    **Plaintiff's Response:**

Admitted.

85.     On February 10, 2016, Dean Holloway accepted the UWC II Panel's findings of fact and the UWC II Panel's conclusion that the plaintiff had sexually assaulted Ms. Roe in violation of Yale's Sexual Misconduct Policies. He decided that the appropriate penalty was expulsion, the penalty that had been recommended by the UWC II Panel. (Ex. N.)

**Plaintiff's Response:**

Admitted.

86.     The plaintiff's gender played no role in Dean Holloway's decision to accept the panel's conclusion or that expulsion was the appropriate penalty. (Ex. HH, ¶ 3-4.)

**Plaintiff's Response:**

Disputed.  As discussed at length in Plaintiff's Opposition to Defendants' Motion for Summary Judgment, the record evidence supports Plaintiff's claim that the University's conduct with respect to the UWC II complaint was motivated at least in part by Plaintiff's status as a varsity male athlete.  *See* Opposition Brief at 51-56.  As explained in Plaintiff's Opposition, even assuming (without conceding) that the ultimate decision-makers, the UWC panelists and Dean Holloway, did not personally act out of gender bias, that fact alone would not be dispositive of Montague's Title IX claim.

87.     The UWC II Panel members and Dean Holloway did not discriminate against the plaintiff based upon his gender. (Ex. G, H, I, J, ¶ 6; Ex. K, ¶ 14; HH, ¶ 5.)

**Plaintiff's Response:**

Disputed.  As discussed at length in Plaintiff's Opposition to Defendants' Motion for Summary Judgment, the record evidence supports Plaintiff's claim that the University's conduct with respect to the UWC II complaint was motivated at least in part by Plaintiff's status as a varsity male athlete.  *See* Opposition Brief at 51-56. As explained in Plaintiff's Opposition, even

assuming (without conceding) that the ultimate decision-makers did not personally act out of gender bias, that fact alone would not be dispositive of Montague's Title IX claim.

88.     The plaintiff filed an appeal from Dean Holloway's February 10, 2016 decision. (Ex. O.)

**Plaintiff's Response:**

Admitted.

89.     On February 24, 2018, Provost Benjamin Polak denied the plaintiff's appeal. (Ex. P.)

**Plaintiff's Response:**

Admitted.

90.     The plaintiff's gender played no role in Provost Polak's decision to deny the plaintiff's appeal. (Ex. II, ¶ 3.)

**Plaintiff's Response:**

Disputed.  As discussed at length in Plaintiff's Opposition to Defendants' Motion for Summary Judgment, the record evidence supports Plaintiff's claim that the University's conduct with respect to the UWC II complaint was motivated at least in part by Plaintiff's status as a varsity male athlete.  *See* Opposition Brief at 51-56.  As explained in Plaintiff's Opposition, even assuming (without conceding) that the ultimate decision-makers did not personally act out of gender bias, that fact alone would not be dispositive of Montague's Title IX claim.

91.     Provost Polak did not discriminate against the plaintiff based upon his gender. (Ex. II, ¶ 4.)

**Plaintiff's Response:**

Disputed.  As discussed at length in Plaintiff's Opposition to Defendants' Motion for Summary Judgment, the record evidence supports Plaintiff's claim that the University's conduct with respect to the UWC II complaint was motivated at least in part by Plaintiff's status as a varsity male athlete.  *See* Opposition Brief at 51-56.  As explained in Plaintiff's Opposition at, even assuming (without conceding) that the ultimate decision-makers did not personally act out of gender bias, that fact alone would not be dispositive of Montague's Title IX claim.

## ADDITIONAL STATEMENT OF MATERIAL FACTS

**Montague's Sexual History With Roe**

92.     In early September 2014, Montague and Roe met at a party at Montague's off-campus house. Ex. B, UWC II Fact-Finder's Report, at YALE00011540.  On that first occasion, Roe spent the night in Montague's bed, where the two engaged in "sexual touching".  *Id.* at -11540, 547.

93.     On the second occasion, approximately two weeks after the first, Roe again spent the night in Montague's bed, waking him up in the morning to perform oral sex.  *Id.* at -11547.

94.     On the third occasion, Roe again joined Montague in his bed, took off all her clothes, and they engaged in consensual sexual contact, including intercourse, to which she verbally consented. Id. at -11540.   Roe told her friends that she was sexually attracted to Montague but had no romantic interest in him, and that she regretted having had sex with him. Id. at 11542, -552; Ex. 1, Deposition of Rachel Rogers, at 57-58.

95.     On the fourth occasion, Roe went to a party at Montague's house with her friends, and when her friends left, Roe stayed there with Montague over her friends' disapproval. Ex. 1,

Rogers Tr. at 9-12.  She once again joined him in his bed, again voluntarily removed all her clothing, and voluntarily engaged in sexual foreplay with Montague, including allowing him to digitally penetrate her.  *Id.* at -11540; Ex. 2, Deposition of Miriam Berkman, at 31.  And, as on the previous occasion, the encounter culminated in sexual intercourse.  Roe and Montague then left his room and went their separate ways.  Ex. B at -11544.  Later that same night, she reached out to him to meet up again, then returned to his room voluntarily and spent the rest of the night in bed with him.  *Id.* Roe later told the fact-finder that she did not want to return home to her dorm that night because she did not want to face any questions from her suitemates.  *Id.*

96.    The next morning, Roe finally returned to her dormitory.  *Id.* at -11545.  Accounting for where she had been and what had happened, she related to her suitemates that she had been raped by Montague over what she said was her express verbal objection and physical resistance, without revealing to them that she had freely engaged in other sexual acts with Montague prior to the alleged assault.  *Id*. at 11550-54.

**The Environment Concerning the Sexual Assault Issue at Yale**

97.    At the time of the events giving rise to this lawsuit, Yale had for years been at the forefront of the national controversy over sexual misconduct on college campuses.  Shortly before Montague enrolled at Yale in 2012, the Department of Education Office of Civil Rights ("OCR") cited Yale for its lack of prompt and equitable grievance procedures and its insufficient responses to complaints of sexual harassment.  See Ex. 3, June 11, 2012 Voluntary Resolution Agreement; Ex. 4, Deposition of Stephanie Spangler, at 44.

98.    In response, Yale completely overhauled its process for adjudicating complaints of sexual misconduct, by establishing a dedicated campus sexual misconduct tribunal, the University Wide Committee on Sexual Misconduct ("UWC"), and adopting the Procedures

Governing the University Wide Committee on Sexual Misconduct ("UWC Procedures"), which sets out the rights and responsibilities of the University, accuser, and accused in the case of a complaint of sexual misconduct. *See* Ex. 5, President's Response to the Report of the Advisory Committee on Campus Climate. At the same time, Yale established the Sexual Harassment and Assault Response and Education ("SHARE") Center, which serves as the initial place of referral for students seeking services and options as a result of alleged sexual misconduct. *Id.* It also began publishing semi-annual reports containing statistical and other information concerning all complaints of sexual misconduct reported to Yale authorities in the preceding six month period. *Id.* at 4. However, students and alumni continued to question what they perceived to be Yale's inadequate, and in some cases, offensive responses to complaints of sexual misconduct and publicly chastised Yale for its shortcomings. *See, e.g.*, Ex. 6; Ex. 7; Ex. 8.

99.     In one prominent example, the release of the July 31, 2013 edition of Yale's semi-annual report of sexual misconduct complaints, sparked outrage among students and alumni and in the national media, who accused Yale of being too lenient in its punishment of students found responsible for sexual assault. *See* Ex. 4, Spangler Tr. at 63-64; 72-74; Ex.7, "Yale Officially Declares 'Nonconsensual Sex' Not That Big of a Deal," Jezebel, August 1, 2013; Ex. 8, "Yale Fails to Expel Students Guilty of Sexual Assault," Huffington Post, August 1, 2013; Ex. 6, August 19, 2013 Letter to President Salovey from Alumni. This criticism was based on the report's revelation that five of six male Yale students found responsible for "nonconsensual sex" in the time period covered by the report received either a written reprimand, or in one case, probation. Id. (The sixth student was suspended but not expelled. See Ex. 9, July 31, 2013 Report of Complaints of Sexual Misconduct).

100.    In an open letter to Yale President Peter Salovey and Yale's Chief Title IX

Coordinator, Deputy Provost Stephanie Spangler, some 229 Yale alumni and students

complained that Yale was minimizing the seriousness and extent of the sexual assault problem

on the Yale campus and called on Yale to "punish perpetrators of sexual assault in a way that

recognizes the gravity of these crimes[.]"  Ex. 6.

101.    The September 21, 2015 publication of the results of a survey conducted by the

Association of American Universities ("AAU") on the incidence of sexual misconduct on college

campuses roiled the Yale campus once again.  *See* Ex. 10.  The survey results revealed that rates

of alleged undergraduate sexual assaults at Yale were the third-highest among 27 schools

surveyed, and incredibly, estimated that more than one third of Yale senior women (34.6%)

experienced an incident meeting the definition for criminal sexual assault during their four years

at Yale.  Ex. 11 at 3; Ex. 4, Spangler Tr. at 89.  Using Yale's definition of sexual assault, it was

estimated that almost half of all senior women (46.5%) would experience at least one sexual

assault in their four years at Yale.  *See* Ex. 11 at 3.

102.    In a letter to the Yale community published that same day, President Salovey

expressed that he was "deeply distressed" by the "extremely disturbing" results of the survey,

and in particular, the incidence of sexual assaults committed against undergraduate women.  Ex.

12.  "The survey results," he wrote, run "counter to our most fundamental values" and "make

clear . . . that we must redouble our efforts."  *Id.*  Yale's Chief Title IX Officer, Deputy Provost

Stephanie Spangler wrote in an introduction to the Yale-specific survey results that "Yale's

relatively high response rate underscores the importance of the survey to our students and

reflects a community that is both sensitized and engaged in the effort to combat campus sexual

assault."  Ex. 11 at 2.

103.    The results of the AAU survey caused much consternation on the Yale campus.

*See* Ex. 10.  Ultimately, the administration held hundreds of meetings across campus to present

the data and discuss Yale's response, and the results were a topic of discussion at a subsequent

training held for Title IX and UWC personnel in the fall of 2015.  Ex. 2, Berkman Tr. at 90-92;

Ex. 4, Spangler Tr. at 93-97.  All of the major players in the Yale administration, including the

Dean who would ultimately decide Montague's fate, were at great pains to reassure the campus

community that they were taking the results seriously and committed to taking action.  *See* Ex.

10.

## The Genesis of the Complaint Against Montague

### *The Title IX Office Learns of an Accusation Against Montague*

104.    On the very same day that President Salovey called for a "redoubling of efforts" in

response to the results of the AAU survey, Defendant Angela Gleason, the Deputy Title IX

Coordinator for Yale College, was informed by Roe's suitemate, Rachel Rogers, that the captain

of the men's basketball team, Montague, had "raped" a friend of hers, and what is more, that

Rogers heard (from a friend of a friend) that he had committed "another rape" as well.  Ex. 13,

Title IX Incident Summary Form; Ex. 14, Handwritten Notes of Angela Gleason; Ex. 15,

Deposition of Angela Gleason at 76-77, 82-83; Ex. 1 at 52-53, 83.  However, Rogers reported

that her friend, the alleged victim, was not interested in coming forward.  Ex. B at

YALE00011553.   Although Rogers did not disclose Roe's name in her initial meeting with

Gleason, Gleason asked Rogers to disclose Montague's name so that she could check the records

of the Title IX office to determine whether he had prior complaints against him and she therefore

needed to take action on behalf of the University.  Ex. 1, Rogers Tr. at 82-84.

105.    Under Yale's policies and procedures, Yale could not initiate the type of "formal" proceeding against Montague needed to suspend or expel him unless it had Roe's agreement and participation.  Under Yale's policies, the Title IX office can only proceed with a formal complaint absent the agreement and participation of the complainant if it is determined that the respondent poses a threat to the community.  Ex. 17, Killheffer Tr. at 55-56; Ex. 4, Spangler Tr. at 30-31; Ex. 18 at 5.  There is no evidence that Yale considered Montague to pose a threat to the community.  *See, e.g.,* Ex. 17, Killheffer Tr. 115 (stating that the reason the Title IX office decided to pursue a formal complaint was due to the "seriousness" of the allegation and Montague's "prior history" with the UWC).

106.    A member of the Yale community who reports a sexual assault to the University generally has three options for resolution available: 1) an informal complaint; 2) a formal complaint proceeding before the University Wide Committee on Sexual Misconduct ("UWC") ; or 3) a referral to the Yale Police Department for a possible criminal complaint.  Ex. 17, Killheffer Tr. at 38-40.  The UWC formal complaint process involves an investigation by a University-appointed fact-finder, a hearing before a five-member panel of the UWC, and possible disciplinary sanctions up to an including expulsion.   Ex. 9 at 2.  Informal resolution does not include an investigation or formal findings; rather, its goal is to achieve a resolution that is desired by the complainant and acceptable to the respondent, such as a referral to training on sexual consent. Ex. 17, Killheffer Tr. at 41-42.  In an informal resolution, the complainant's identity can be kept confidential; in a formal complaint proceeding, her name must be disclosed to the respondent and she must agree to be interviewed by a fact-finder. Ex. 9 at 2; Ex. 17, Killheffer Tr. at 131.  According to Yale's Title IX office, "[t]he choice of an informal process

does not imply the matter is less serious than those matters pursued through formal processes[.]" Ex. 9 at 2.

107.    Under Yale's policies, which were written to comply with the requirements of Title IX (as interpreted by the Department of Education Office of Civil Rights), Yale is required to maintain impartiality throughout the disciplinary process.  Ex. 4, Spangler Tr. at 47; Ex. 43; Ex. 50, Expert Report of Susanna B. Murphy.  This means, according to Yale's chief Title IX Coordinator, Deputy Provost Stephanie Spangler, that except where safety is an issue, Yale's Title IX officials "don't independently decide to file a formal complaint.  [They] don't make the decision to pursue a formal complaint."  Ex. 4, Spangler Tr. at 32-33.  Further, the Title IX office "doesn't recommend" to a complainant whether to file a formal or informal complaint.  *Id.* at 34. Instead, whether a case is more appropriate for formal versus inform resolution depends solely on the complainant's goals and wishes.  *Id.* at 35-36.  "The Title IX office does not have, does not create an independent view."  *Id.* at 36.  *See also* Ex. 44 (March 10, 2016 email from Spangler stating: "[a] Title IX Coordinator would not try to influence the complainant's decision to pursue a formal or informal process.")

108.    Notwithstanding Spangler's insistence to the contrary, in fact, some Yale students had reported in response to a question on the AAU Survey that they "felt pressured" by University Title IX coordinators or the UWC to file a complaint of sexual misconduct.  Ex. 11 at 10.  In her deposition, Spangler testified that this result was "concerning" because "we don't want students to feel pressured in either direction."  Ex. 4, Spangler Tr. at 93.  Spangler further testified that in response, the Title IX office "worked on clarifying [its] message, and one of the messages [it] clarified more expansively was that the complainant's wishes are what should determine how a complainant proceeds with a complaint."  *Id.* at 93-94.

109.    Over the weeks that followed their initial meeting, Gleason repeatedly emailed

Rogers urging her to convince Roe – whose name Rogers had still yet to reveal – to come

forward and report the incident.  Ex. 19, Email chain between Gleason and Rogers; Ex. 1, Rogers

Tr. at 28-31.  Roe, however, remained hesitant even to speak to Gleason, id.; Ex. 1, Rogers Tr. at

87, but finally agreed to do so only after Rogers relayed a message from Gleason that Roe could

pursue an "informal," anonymous complaint, which would not result in any suspension or

expulsion for Montague.  Ex. 20, Deposition of Jane Roe at 11-13; Ex. 1, Rogers Tr. at 32, 87.

Gleason explained that she could have a discussion with Montague about the October 2014

incident and recommend training about communication and sexual consent, and the matter would

be resolved.  Ex. 1, Rogers Tr. at 87-89.  Roe was satisfied with this course of action.  Ex. 20,

Roe Tr. at 11-13.  On this basis, she finally agreed to meet with Gleason on October 19, 2015 to

discuss implementing this plan.   Id. at 17-18; Ex. 21, Emails between Gleason and Roe.

### *Roe Elects to File an Informal Complaint*

110.    Roe testified in her deposition that upon the conclusion of her October 19, 2015

meeting with Gleason, she believed she had made an informal complaint and "left understanding

that [Gleason] would . . . reach out to Jack and offer him the sensitivity training."  Ex. 20, Roe

Tr. at 17-18.  On October 28, 2015, Gleason confirmed to Roe that she planned to reach out to

Montague on the following Monday, November 2.  Ex. 22, Email chain between Gleason and

Roe.

### *Yale's Title IX Office Decides to Pursue a Formal Complaint Against Montague*

111.    Gleason did not end up contacting Montague on November 2, however.  Instead,

she was called to a meeting of the University's Title IX leadership – Chief Title IX Officer and

Deputy Provost Stephanie Spangler, Defendant Deputy Title IX Coordinator Jason Killheffer and

42

Deputy General Counsel Susan Sawyer – to "discuss the Jack M. case".  Ex. 23; Ex. 15, Gleason

Tr. at 119-125.  At the meeting on November 4, 2015, the attendees decided that the University

would pursue a formal complaint against Montague if Roe's participation could be obtained,

notwithstanding Roe's stated preference to resolve her complaint against Mr. Montague

informally and without punishing him, and notwithstanding their inability to confirm the

unsubstantiated, third-hand rumor Rogers relayed to Gleason concerning "another rape."  *Id.*, Ex.

17, Killheffer Tr. at 109-120.  (Days later, Gleason contacted the alleged victim of the other rape,

who refused to confirm any incident with Montague.  Ex. 15, Gleason Tr. at 102.)

### Roe is Manipulated into Authorizing a Formal Complaint Against Montague

112.    Later that day, Gleason emailed Roe to inform her that there had been a "new

development" in her case and that they needed to meet.  Ex. 24.  At the meeting, according to the

report of the fact-finder's investigation that would follow, Gleason informed Roe that "she would

not be able to keep [Roe's] name confidential" because "*Mr. Montague had already been given a*

*recommendation for training after a previous complaint and so that option was no longer open*

*to him*."  Ex. B at 8 (emphasis added).  There was actually nothing "new" about this fact; it was

not only contained in the records of the Title IX office, but Gleason's supervisor, Killheffer, told

her about Montague's prior complaint before she ever met with Roe.  Ex. 17, Killheffer Tr. at 93.

As Roe would later explain in her opening statement delivered to the UWC panel, Gleason told

Roe that she now believed that she "wouldn't be doing her job if she did not take more serious

action" and "asked for [Roe's] participation"  in a formal complaint process.  Ex. 25; Ex. 20, Roe

Tr. at 42-43.

113.    The *UWC Procedures* provide, in Section 3 ("*Confidentiality and Honesty*"), that

"[a]ll documents prepared by, prepared for, or received from the UWC in connection with a

UWC proceeding ("UWC Documents") must be held in strict confidence," and refers to the *Provost's Statement on Confidentiality of UWC Proceedings* for additional support and clarification.  That statement confirms the same restrictions on disclosure, and points out that the "[t]he circumstances surrounding allegations of sexual misconduct are often sharply disputed and have the potential to affect the reputations of the persons involved."  Ex. 45.  Thus, it warns, those who breach the expectation of confidentiality may be subject to legal claims.  *Id.*  It is undisputed that this policy prohibits the disclosure of the fact of prior UWC proceedings, as well as the results of those proceedings and any discipline imposed.  Ex. 17, Killheffer Tr. 116-18; Ex. 27, Post Tr. at 61-62.

114.    In an initial draft of the fact-finder's report, Berkman noted that Gleason denied telling Roe about Montague's prior complaint, but pointed out in a comment in the margin that although Gleason denied it, ***"[t]his is an accurate statement of what [Roe] told me about her motivation and decision-making about participating in this case.***"  *See* Ex. 46 at 8, 16.  Then, in an email to UWC officials attaching another draft of her report, Berkman noted that Roe did not know the exact nature of the training Montague had previously received "***except that it was related to a previous incident*** . . . ."  Ex. 47.  The issue of what exactly Gleason said to Roe was the subject of specific attention and extensive discussion among Berkman, Post, and Menon.  Ex. 46; Ex. 47; Ex. 48.  Ultimately, they decided to keep Roe's statement in the fact-finder's report and to omit Gleason's denial.  *Id.*; Ex. 29, Menon Tr. at 108-110.

115.    Near the end of her meeting with Roe, Gleason brought in UWC Chairman David Post, whom she had asked to be on "standby."  Ex. 26; Ex. 15, Gleason Tr. at 156-58.  Post explained to Roe that she would have the option of serving as the complainant, or having the University Title IX office file the complaint in its own name on her behalf, which he presented as

a "comfort" to her.  Ex. 20, Roe Tr. at 48-49.  Post further explained that the two options were

functionally the same in terms of Roe's participation in the process, except that with the latter

option the complaint against Montague would effectively be brought in the name of the

University.  Ex. 20, Roe Tr. at 48-49; Ex. 27, Deposition of David Post at 25-27.  At the

conclusion of the meeting, Roe told Gleason that she would "take the weekend" to think things

over.  *Id.* at 44-45.

116.    Gleason concedes that she told Roe that Montague "had already received

sensitivity training."  Ex. 15, Gleason Tr. at 135.  This was after she told Roe that ***"she would

have to check to see if Mr. Montague was known to the Title IX Coordinators*** and would

consult with other Coordinators in order to determine if it would be appropriate to address this

incident with additional training."  Ex. B at 17.  Because the Title IX office would only be aware

of a student's having received sensitivity training if it resulted from a formal or informal

complaint of sexual misconduct, Ex. 17, Killheffer Tr. at 45-47, and because Roe understood that

the Title IX office only deals with complaints of sexual misconduct, Ex. 20, Roe Tr. at 20-22,

Gleason's disclosure to Roe that Montague had already received training – after "checking" with

her Title IX colleagues to see if Montague was "known" to them – was tantamount to telling Roe

that Montague had been the subject of a prior complaint of sexual misconduct.  Gleason's

superior, Killheffer, testified that even the disclosure of the fact that Montague received training,

because that information was only known to Gleason through confidential Title IX office

records, was a breach of confidentiality.  Ex. 17, Killheffer Tr. at 117-18, 145.

117.    On Monday, November 9, 2015, Roe emailed Gleason to inform her that she had

decided to allow the Title IX office to file a formal complaint against Montague on her behalf.

Ex. 28 at YALE0000433.  As she would later tell the UWC panel which would hear the case,

Roe's November 6, 2015 meeting with Gleason "reframed the incident" for her, made her believe that her experience with Montague was not the product of a "one-time mistake" on Montague's part, and caused her to participate in the filing of a formal complaint against Montague. Ex. 25.  According to the fact-finder's report, "[Roe] was especially motivated to participate in the investigation and hearing process after she heard that Mr. Montague has already had another complaint against him as she felt it was important to protect other women." Ex. B at 8-9.  Roe confirmed this motivation in her opening statement to the UWC panel:  "My perspective broadened after my conversation with Angie [Gleason], as I began to think about the other people on this campus and how my choosing to remain silent on this matter could harm them.  I did feel as though my hands were tied; I could not, in good conscience, say no to participating in the investigation."  Ex. 25 at 2.

### "UWC II" – The Formal Complaint Against Montague for Sexual Assault

118.   As a direct result of Gleason's efforts as described above, Roe agreed to allow Yale's Title IX office to bring a formal complaint of sexual misconduct against Montague.  On November 18, 2015, the University's Senior Deputy Title IX Coordinator, Defendant Killheffer, filed a formal complaint of sexual assault against Montague, and on November 30, 2015, Montague was notified in writing that he was the subject of a complaint alleging that he had "*sexually assaulted a Yale College student on the night of October 18, 2014, at [his] residence*." Ex. 32; Ex. A (emphasis added).  The only additional information given to Montague was the name of his accuser, and the fact that she was alleging sexual penetration without consent.  *Id.*

#### *The Fact-Finder's Investigation*

119.   Under Section 7.3 of the UWC Procedures, the next step was the appointment of an "impartial fact-finder," who was charged with investigating the allegations and "reach[ing] a

thorough understanding of the facts and circumstances surrounding the allegations of the complaint." Ex. E, UWC Procedures at 7.3.  In Montague's case, Yale appointed Miriam Berkman, an attorney and social worker, as the impartial fact-finder.  Ex. 29, Menon Tr. at 95. Berkman conducted interviews of Roe and Montague, five of Roe's friends, one of Mr. Montague's friends, and Ms. Gleason.  Ex. B.  In addition, she reviewed a written narrative that Roe had allegedly prepared a few days after the October 18, 2014 encounter, certain text messages Roe "wanted [Berkman] to see," and records showing when Roe had used her Yale ID to gain entry to certain campus buildings. *Id.* at -11539-40; Ex. 2, Berkman Tr. at 24.  She then prepared a report for submission to the UWC panel that was to hear Montague's case.  Berkman shared draft versions of her report with UWC Chairman David Post, UWC Secretary Aley Menon, and Susan Sawyer of Yale's Office of the General Counsel, all of whom reviewed and made edits to the report prior to finalizing it. *Id.* at 58-59; Ex. 27, Post Tr. at 32-34.

120.    Confused about which of his prior sexual interactions with Roe was in question, Montague originally told the fact-finder that Roe verbally consented to intercourse on the night in question.  After confirming which episode was at issue, however, Montague explained to the UWC panel during his hearing that Roe consented on the night in question through her continued active participation in their escalating sexual encounter.  Ex. 33, Deposition of Jack Montague, Volume II, at 73-75.

121.    The fact-finder questioned Roe's friends and suitemates regarding what Roe told them the morning after the encounter.  Ex. B at -11539, 11550-554.  Generally speaking, Roe reported to her friends a different version of events than she told the fact-finder: she said that she told Mr. Montague that she wanted to "hook up" but not "have sex," and that he agreed, but then proceeded to force himself on her, over her protest, as she tried in vain to push him off her. *Id.*

She did not tell them that she had taken of all her clothes, gotten into bed with Montague, and consented to all of their mutual foreplay, including digital penetration.  Ex. 2, Berkman Tr. at 31-33.  Nor did Roe tell her friends that Montague had not heard Roe when she claimed to have said "no" just prior to the intercourse.  *Id.*; Ex. B at -11550-554.

122.    At the conclusion of her report, under the heading "Discussion and Summary," the fact-finder made a series of conclusions about the evidence, including that "Ms. [Roe] claims that the incident in question took place over her express verbal objection and physical resistance[,]" and, in substance, that Roe's friends' statements were consistent with and corroborated Roe's own account that she "told  [Montague] 'no' many times, she tried to push him away physically and that he apologized afterwards."  Ex. B at -11556-57.  Notably, although Roe specifically told the fact-finder that she had allowed Montague to digitally penetrate her (for which she said she indicated consent through her conduct), the fact-finder in her report stated only that Roe had allowed Montague to "touch" her genitals, thereby omitting critical information concerning the consensual escalation of the sexual encounter between Roe and Montague.  Ex. 2, Berkman Tr. at 36-37; Ex. B at 11543.  (The panel further obscured the nature of the sexual episode, describing this part of the sexual activity no more than ***petting***, *i.e.*, that "the parties took off their clothes and kissed and touched."  Ex. C at 3.)

### *UWC II Panel Hearing*

123.    The UWC II hearing was held on January 21, 2016, before a five member panel, with David Post appointing himself as chair of the panel. Ex. 29, Menon Tr. at 136.  The hearing consisted of opening statements from Roe and Montague, followed by interviews of Montague and Roe by the panel.  Ex. 34.  Contrary to the *UWC Procedures*, which permit only the complainant and respondent to make opening statements and mandate that non-party witnesses

only be present while testifying, Roe was permitted to deliver an emotionally charged opening statement, Ex. 25, and be present for the entire hearing, although not the named complainant in the case. Ex. 29, Menon at 141-44. The only other evidence the panel considered was the fact-finder's report. Ex. B. Following the conclusion of the interviews, Roe and Montague were excused and the panel conducted the remainder of the hearing in secret, including hearing evidence of Montague's prior involvement in the UWC I incident on the issue of culpability. The panel then deliberated. Ex. 34.

124.    The hearing was not recorded by audio or visual means. Ex. 27, Post Tr. at 52. The record of the hearing consists of the panel report, Ex. C, Roe's written opening statement, and a "hearing protocol", Ex. 34, which was prepared in advance and does not necessarily reflect what actually occurred at the hearing. Ex. 29, Menon Tr. at 55-56, 73-76. Yale destroyed the UWC panel members' notes at the conclusion of the appeals process, pursuant to an unwritten but supposedly customary "practice." Id. at 73-74.

### The Decision Against Montague

125.    The hearing panel issued its report on February 1, 2016. The report was drafted by Post, with input from the panel members and UWC Secretary Aley Menon. Ex. 27, Post Tr. at 74-75. The panel found that Montague sexually assaulted Roe in violation of Yale's Sexual Misconduct Policies and Related Definitions and recommended that Montague be expelled from Yale. Id. In reaching its conclusions, the panel focused on Roe's purported lack of motive to lie, the alleged consistency of Roe's statements to her friends, the fact-finder, and the panel, and the supposed inconsistencies in Montague's accounts. Id. One member of the panel went so far as to describe the shift in Montague's explanation for how he obtained consent as "jarring". Ex. 53 at YALE00009217. The panel dismissed the possibility of any motive to lie based on the

"narrowness" of her claim, *i.e.*, that she candidly disclosed that the rest of her sexual relations with Montague were consensual.  Ex. C at 7.   In arriving at its finding, the UWC II Panel "accept[ed] the undisputed facts in the fact-finder's report[,]" and expressly credited the fact-finder's rehearsal of Roe's motivation in bringing the complaint.  Ex. C at 1, 7-8.

126.    In both assessing Montague's culpability and recommending his expulsion from Yale, the panel placed significant weight on Montague's disciplinary record from the UWC I matter.  At the conclusion of its report, the UWC II panel stated that in accordance with Section 7.4 of the *UWC Procedures*, it had taken "into account Mr. Montague's previous formal disciplinary history with the UWC for violating Yale's sexual misconduct policy" on the issue of culpability, and "found particularly relevant" the fact that Montague had already violated Yale's sexual misconduct policy, "had received sexual harassment and gender sensitivity training" before the incident with Roe took place, and had met three times with a SHARE Center staff member to "review and reflect on his interactions and relationships with female students at Yale."  Ex. C at 9.  In recommending the penalty of expulsion, the UWC II panel expressed its "deep[] concern for the pattern of behavior of Mr. Montague, and his failure to take responsibility for and learn from his actions which have caused considerable harm to others."  *Id.*

127.    Despite the significance the panel placed on the UWC I incident, not only in imposing the sanction of expulsion but in determining Montague's culpability for the charged conduct, the panel's consideration of UWC I occurred outside Montague's presence, after he had been excused from the hearing.  Ex. 34; Ex. 29, Menon Tr. 159-60.  Montague was thus given no opportunity to explain the significance of UWC I or rebut the panel's apparent misapprehension of both the nature of that incident and the training he allegedly received as a result.  *Id.*

128.    The presentation the panel did receive regarding UWC I was limited to a

perfunctory "couple sentence description" of the prior case by the UWC Secretary, Menon,

which was devoid of any context and omitted critical information favorable to Montague.  Ex.

27, Post Tr. at 60; Ex. 29, Menon Tr. at 161-64.   Menon did not tell the panel that the

respondent in UWC I, Sally Smith, had emphasized that her interaction had with Montague had

been "peripheral," that there was no skin-to-skin contact, and that she herself believed it was

likely just a "foolish mistake" on his part.  Ex. 29, Menon Tr. at 161-64.  *See supra ¶¶* 5, 8, 36,

127; *infra ¶¶* 128, 130, 134.

129.    At her deposition, UWC Secretary Aley Menon could point to nothing in the UWC

Procedures or any other written policy which would allow consideration of evidence on the issue

of culpability in the absence of the respondent, Ex. 29, Menon Tr. at 154-57; incredibly, her

justification for addressing UWC I outside the presence of the parties was so that Roe (who was

not even a party) would not hear of Montague's prior discipline.  *Id.* at 152-53.

130.    Upon receiving a copy of the panel's report, Montague wrote to the decision-

maker, Dean Jonathan Holloway, urging him to contact Montague's SHARE trainer John

Criscuolo, whom he believed would place the incident and "training" in the proper context and

who was indeed of the view that Montague's prior offense and training tailored to it *had nothing*

*to do with sexual consent*.  Ex. 30; Ex. 31, Deposition of John Criscuolo, at 38-39.  Under the

UWC Procedures, as decision maker, Holloway was required to accept the panel's findings of

fact but could reject or modify its conclusions and recommendations.  Ex. E, *UWC Procedures* at

7.5.

131.    It is clear from the record that this information from the SHARE Center either

never reached Holloway or if it did, that it was totally ignored.  Menon spoke to Criscuolo

around this time, as Criscuolo wrote in a February 16, 2016 email to his boss, SHARE Center director Dr. Carol Goldberg: "I spoke last week with Aly regarding the training and did explain we had not gone through the complete consent training as [the] situation at that time was not one of consent but rather conduct."  Ex. 30.  Menon has no memory of speaking to Criscuolo or relaying what he had to say to Dean Holloway before Holloway rendered his decision.  Ex. 29, Menon Tr. at 186-187.

132.    In affirming the panel's findings and accepting its recommendation that Montague be expelled, Dean Holloway wrote that he not only considered the behavior in question, but Montague's "prior disciplinary history by the UWC" and "the *extensive* training [he] . . . already received from the SHARE center, training that did not have the hoped for impact on [his] behavior."  Ex. N (emphasis added).  According to Holloway, "on balance, considering the harm [Montague] caused and [his] inability to learn from [his] mistakes, . . . permanent separation from Yale is the only appropriate penalty."  *Id.*

133.    Expulsion is an extreme sanction, rarely imposed even in cases where a student is found responsible for nonconsensual sex.  *See, e.g.*, Ex. 9; Ex. 18.

134.    After receiving notice of Dean Holloway's decision to expel him, and learning for the first time the extent to which the UWC II panel and Holloway were operating under a misunderstanding regarding the nature of the training he received following the UWC I incident, Montague contacted Criscuolo asking him to correct the record.  Ex. 30.  Criscuolo emailed Goldberg, asking whether it was okay to contact Aley Menon, expressing his concern that "if the UWC based part of their decision on the assumption that he received the full consent training I would like to speak to that piece."  *Id.*  In response, Goldberg told Criscuolo to contact Menon to explain that Criscuolo's "work with [Montague] was based on [his] immature conduct as a drunk

freshman, not about sexual consent." *Id.*  Criscuolo concedes that he likely did so.  Ex. 31, Criscuolo Tr. at 40-41.  Menon claims to have no memory of speaking with Criscuolo on this issue.  Ex. 29, Menon Tr. at 193-94.  Although Menon sent a copy of the UWC I panel report and decision letter to Holloway, Ex. 35, there is no evidence in the record that Menon bothered to share with Holloway (or anyone else) that Montague did not actually receive training on issues of sexual consent.

### *Montague's Appeal is Denied*

135.   Montague appealed his expulsion to the Provost, arguing that "[u]nless a complete examination is done of my freshman year incident with UWC and my senior year fall meeting with the Executive Committee that resulted in a reprimand, the sanction of expulsion is unfair." Ex. O at 6.  Montague explained that the UWC I proceedings arose from "a disagreement with a senior, female student who was belittling [him]." *Id.* at 7.  Montague agreed that his response to the disagreement was "wrong and incredibly immature," and pointed out that Dean Holloway's perception of the SHARE training Montague allegedly received was inaccurate:  the "meetings were not 'extensive training,' let alone training on sexual misconduct."  Ex. O at 7.  Of course, this view was shared by SHARE Director Carol Goldberg, who had described Montague's prior meetings with Criscuolo as being about his "immature, inexcusable conduct as a drunk freshman, not about sexual consent."  Ex. 30.  Thus, Montague said, "[w]ithout proper examination" of this information, "the sanction imposed was extreme and unjustified."  Ex. O at 7.  The Provost summarily denied Montague's appeal, stating, in essence, that Montague should have addressed his record from the UWC I incident earlier in the process.  Ex. P.

**Montague's Expulsion Is Celebrated at Yale**

136.   Given his high profile status as captain of the men's basketball team, which was at that time in the middle of an historic NCAA tournament run, Montague's expulsion caused a stir on campus.  *See, e.g.*, Ex. 36, "Storm brews on Yale campus following departure of ex-basketball captain," New Haven Register, March 3, 2016.  The campus was blanketed with posters labeling Montague a "rapist".   Ex. 15, Gleason Tr. at 188; Ex. 20, Roe Tr. at 75. Teammates who publicly showed support for Montague were condemned as rape apologists.  Ex. 4, Spangler Tr. at 115-116; Ex. 37.  On March 2 and 3, 2016, the Yale Women's Center issued a series of statements applauding Yale for expelling "a high-profile member of a sports team in the midst of a pivotal moment in the season on the basis of sexual violence," and remarking that while the University was prohibited from publicly commenting on Montague's expulsion, "Yale's actions speak much louder than its words.  While the campus can only speculate on what occurred, we can comfortably say, should all of this be true, this is progress."  *Id.*; Ex. 38. Demonstrations on campus decried men's athletic privilege and "rape culture" in sports.

137.   On March 9, 2016, campus women's groups organized a "chalk-in" where students wrote messages in chalk to "show their support for survivors of sexual violence on campus."  Ex. 39.  Spangler and Killheffer attended the chalk-in, with Spangler characterizing the messages as "very positive."  Ex. 4, Spangler Tr. at 117-18.  Those messages included ones targeting male athletes, such as: "Women >> basketball" ; "The only team I'm cheering for are survivors @ Yale – dismantle men's athletic privilege"; and "Imagine if Yale men cared as much about ending rape culture as they care about sports.  Be an ally." Ex. 39.  Organizers prohibited the men's basketball team from attending, a decision which was backed by members of the Yale administration.  Ex. 39; Ex. 40.

Respectfully submitted,

JACK MONTAGUE,

By his attorneys,

/s/ *Max D. Stern*
Max D. Stern (BBO #479560) (*pro hac vice*)
mstern@toddweld.com
Alexandra H. Deal (BBO #660654) (*pro hac vice*)
adeal@toddweld.com
Christian G. Kiely (BBO #684308) (*pro hac vice*)
ckiely@toddweld.com
TODD & WELD LLP
One Federal St., 27th Floor
Boston, MA 01880
Tel. (617) 720-2626
Fax (617) 227-5777

William F. Dow III (ct00161)
JACOBS & DOW, LLC
350 Orange Street
New Haven, CT 06511
wdow@jacobslaw.com
Tel. (203) 772-3100
Fax (203) 772-1691

Dated: July 18, 2018

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via the Court's electronic filing system, and served to all counsel of record on July 18, 2018.

/s/ *Christian G. Kiely*
Christian G. Kiely