UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JACK MONTAGUE | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO.: |
| | : | 3:16-CV-00885-AVC |
| vs. | : | |
| | : | |
| YALE UNIVERSITY, ET AL | : | |
| | : | |
| Defendants | : | AUGUST 22, 2018 |

## REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The defendants submit this brief in response to the plaintiff's opposition to the defendants' motion for summary judgment. At the outset, the defendants observe that the plaintiff has not challenged their motion for summary judgment as to Counts III, IV, and V. (Pl.'s Opp., n. 25.) Therefore, summary judgment should enter in favor of the defendants on those counts.[1]

The plaintiff's opposition to the defendants' motion for summary judgment is in large part supported by nothing more than plaintiff's counsel's statements, without any support in the record. This is not permitted, and the Court may not rely on such bald assertions when ruling on a Motion for Summary Judgment. The Second Circuit has long recognized that a party who opposes summary judgment "'cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.'" Powell v. Donahoe, 519 Fed. App'x. 21, 22 (2d Cir. 2013), quoting Gottlieb v. Cnty. of Orange, 84 F.3d 511, 518 (2d Cir. 1996).

---

[1] Although the plaintiff does not identify the counts to which each argument applies, the defendants have organized their reply to address the counts to which the arguments appear to apply. The defendants have recounted the relevant facts in their Memorandum of Law in Support of Motion for Summary Judgment, and will not address the plaintiff's recitation of the facts in this reply, except where necessary for argument. (Pl's Opp., n.3.)

The principle enunciated in <u>Powell</u> has been confirmed regularly by the judges of this District.  <u>See</u> <u>also</u>, <u>Perez v. Arnone</u>, 2018 U.S. Dist. LEXIS 125424 *16 (D.Conn. July 26, 2018) (Bryant, J.); <u>Rodriquez-Coss v. Sessions</u>, 2018 U.S. Dist. LEXIS 109531 *18 (D.Conn. June 29, 2018) (Bryant, J.) ("[A] party opposing summary judgment must come forth with evidence sufficient to allow a reasonable jury to find in its favor.  The evidence, such as affidavits offered in opposition to a motion for summary judgment, must be both admissible and must be sufficient to raise a genuine issue of material fact."); <u>Sweet v. City of Hartford</u>, 2018 U.S. Dist. LEXIS 87221 *3 (D. Conn. May 24, 2018) (Haight, J.) ("[W]hen the moving party has carried its burden under Rule 56, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.  The nonmoving party must present specific evidence demonstrating a genuine dispute."); <u>Brown v. Connecticut</u>, 2018 U.S. Dist. LEXIS 54241 *7-8 (D. Conn. Mar. 30, 2018) (Martinez, J.) ("The party opposing summary judgment may not rely merely on allegations or denials."); <u>PA Realty Grp., LLC v. Hornbeck</u>, 2017 U.S. Dist. LEXIS 152264 *13 (D.Conn. Sep. 19, 2017) (Bryant, J.); <u>Reaes v. City of Bridgeport</u>, 2017 U.S. Dist. LEXIS 19029 *6 (D. Conn. Feb. 10, 2017) (Martinez, J.); <u>Brayboy v. City of Bridgeport</u>, 2014 U.S. Dist. LEXIS 69557 *4 (D.Conn. May 21, 2014) (Garfinkel, J.); *aff'd*, 633 Fed.Appx. 557 (2016) ("When the opposing party fails to appropriately deny material facts set forth in the moving party's Local Rule 56(a)(1) Statement, and where those facts are supported by evidence in the record, those facts are deemed to be admitted.")

Accordingly, the Court must ignore all statements of counsel that lack support in the record. Once that is done, it is clear that summary judgment should enter in favor of the defendants.

**I.** **Count I and II (Breach of Contract, UWC I; Lack of Jurisdiction and Inadequate Evidence to Support Finding of Sexual Harassment)**

In response to the defendants' argument that the plaintiff failed to exhaust his administrative remedies as to UWC I, the plaintiff asserts that there was no mechanism through which he could challenge the jurisdiction of the UWC. (Pl.'s Opp., pp. 46, 50.) This is false; the UWC Procedures in effect in 2013 specifically permitted the plaintiff to submit a response to the Panel report and to file an appeal on the basis of a "procedural error that prevented the hearing panel or the decision maker from judging the matter fairly." (Ex. KK, p. 8.) An improper determination that the UWC had jurisdiction would qualify as a procedural error. While the plaintiff could have raised the issue of jurisdiction in response to the UWC I Panel Report or in an appeal of Dean Mary Miller's decision, he chose not to do either. He has therefore failed to exhaust his administrative remedies as to UWC I.

In an attempt to support his claim that a finding of jurisdiction is not appealable, the plaintiff provides a short excerpt from the deposition testimony of Dr. Spangler. (Pl.'s Opp., p. 50.) Explaining the process followed when a complainant opts to proceed with a formal complaint, Dr. Spangler testified: "A complaint in writing is sent to the University-Wide Committee. The University-Wide Committee decides about jurisdiction. If they decide there's jurisdiction, then it has jurisdiction. They will enact procedures as they're outlined in their procedures, which are on line, which involve fact-finding, a hearing process, and a number of other steps that culminate in a finding and recommendations." (Pl. Ex. 4, Depo. p. 28-29.) Dr. Spangler was simply summarizing the UWC process when a formal complaint is filed. She did not testify that a finding of jurisdiction "is final and not subject to appeal," as falsely represented by the plaintiff. In fact, she was never asked whether the finding of jurisdiction could be appealed. A plain reading of the

UWC Procedures makes it clear that the plaintiff could have raised the jurisdictional issue; he just decided not to do so.  That is the essence of waiver.

The plaintiff does not dispute that the determination that the UWC had jurisdiction over UWC I was made in accordance with the UWC Procedures, *i.e.*, the UWC Chair, the UWC Secretary, and another member of the UWC considered whether the complaint, if substantiated, would constitute a violation of the Sexual Misconduct Policies, and therefore the UWC had jurisdiction.  (Ex. KK, p. 4; Defs.' Memo, p. 24-25.)  The plaintiff also does not deny that he testified at his deposition that his conduct in UWC I violated Yale's sexual misconduct policy. (Ex. M, Depo. p. 50-52; Defs.' Memo., p. 26-27.)  With this testimony, the plaintiff acknowledged that his conduct in UWC I constituted sexual misconduct.  Since the decision that the UWC had jurisdiction over UWC I was made in accordance with the UWC Procedures and since the plaintiff admitted at his deposition that his conduct violated the Sexual Misconduct Policies, the plaintiff cannot prevail on his claim that the UWC lacked jurisdiction over UWC I, even if he had not waived his right to raise this issue now.

Despite his deposition testimony, the plaintiff continues to argue that his conduct in UWC I was not conduct of a sexual nature.  In support of his argument that UWC I did not involve conduct of a sexual nature, the plaintiff asserts: "Certainly, if Montague had shoved a pizza plate down a man's shirt, it would be similarly offensive and unacceptable, but indisputably *not* sexual harassment."  (Pl.'s Opp., n. 47.)  Of course, a man's chest is not considered a private, sexual part of the body, as are a woman's breasts.  This is exactly the reason that the plaintiff's conduct in touching Ms. Smith's breasts with a used paper pizza plate constituted sexual misconduct. Professor Post did not waiver when considering whether the alleged conduct constituted sexual misconduct: "I think the crux is he is alleged to have placed the plate down her shirt and between

her breasts.  Therefore the act described in the complaint could be viewed an act of a sexual nature that was both non-consensual and has the effect of intimidating a person.  Therefore I think it falls within the jurisdiction of the UWC."  (Ex. NN., p. 1.)  Although Professor Post acknowledged some UWC panel members may have felt differently, he observed that that was a determination for the UWC Panel to consider in its deliberations.  (Ex. NN, p. 1.)  The members of the UWC Panel clearly found that the plaintiff's conduct was of a sexual nature when they concluded that he had sexually harassed Ms. Smith.  Furthermore, they concluded that the harassment was based upon her gender, as the plaintiff had "displayed an absolute disregard for Ms. [Smith] as a female student…."  (Ex. S, p. 2.)

As to the plaintiff's argument that his conduct could not have created a hostile academic environment because Ms. Smith had completed all of the academic requirements to earn her degree at Yale, Ms. Menon explained: "The academic environment is the learning environment that the students are in from the time they begin their relationship with the University until they graduate, and that would include their interactions with other students."  (Ex. AAA, Depo. p. 29.)[2]  Thus, the fact that Ms. Smith had completed all of her academic requirements for graduation is irrelevant to the question of whether the plaintiff's conduct violated the Sexual Misconduct Policies

The plaintiff does not dispute that both the plaintiff and Ms. Smith were students at the time the plaintiff shoved a used paper pizza plate down her tank top between her breasts.  In its report, the UWC I panel noted that Ms. Smith's reaction to the plaintiff's conduct was shock, anger, and the feeling of being violated.  The panel concluded that the plaintiff displayed an absolute disregard for Ms. Smith as a female student and fellow human being, and that his conduct was demeaning, humiliating, and reprehensible.  (Ex. S, p. 2.)  In her response to the panel report,

---

[2] Additional exhibits are attached to the Affidavit of Patrick M. Noonan filed contemporaneously herewith.

Ms. Smith explained that the plaintiff's conduct made her feel violated and that the plaintiff perceived her as a sexual object, rather than a fellow human being. (Ex. OO.) The facts found by the panel clearly support a conclusion that the plaintiff's conduct created an intimidating and hostile academic environment for Ms. Smith.

In short, even if the plaintiff had not waived his right to challenge the jurisdictional issue in this case, summary judgment should enter in favor of the defendants on Counts I and II because the record shows that the UWC had jurisdiction over UWC I and the UWC Panel properly concluded that the plaintiff had sexually harassed Ms. Smith.

## II.   __Count VI (Tortious Interference with Contract)__

In support of his Opposition to the Motion for Summary Judgment as to the claims for tortious interference with contract, the plaintiff asserts that Ms. Gleason and Mr. Killheffer improperly influenced "Ms. Roe's decision to authorize the filing of a formal complaint." (Pl.'s Opp., p. 58.) The claim against Ms. Gleason focuses on the alleged disclosure of confidential information to Ms. Roe. Both Ms. Gleason and Ms. Roe deny that Ms. Gleason informed Ms. Roe that a previous UWC complaint had been filed against the plaintiff, that the plaintiff had been found responsible for sexual assault by the UWC, or that the plaintiff had been ordered to participate in training due to a finding of a violation of Yale's Sexual Misconduct Policies. (Ex. QQ, Depo. p. 106, 111, 124-125, 133-136, 138-140; Ex. RR ¶ 3-6; Ex. SS, Depo. p. 17-20, 23, 28-29, 33-36, 41-42, 52.) Since the only two parties to the conversation in question both deny any discussion of confidential information—which is the linchpin of the tortious interference claims—the plaintiff cannot demonstrate that Ms. Gleason tortiously interfered with the plaintiff's contract with Yale by providing Ms. Roe with confidential information.

The plaintiff argues that Ms. Gleason "purposefully influenced Roe's decision by bringing in UWC Chair David Post, who explained that she did not have to bring the complaint in her own name so long as she was willing to cooperate…." (Pl.'s Opp., p. 25-26.) The plaintiff does not contest the fact that Ms. Gleason informed Ms. Roe that she had several options in November, 2014: (1) offer the plaintiff sensitivity training again in an informal process; (2) abandon the informal complaint; or (3) proceed with a formal complaint, acting as either the complainant or a witness. The plaintiff also does not dispute that Professor Post was consulted in his position as the Chair of the UWC solely to answer Ms. Roe's questions regarding the UWC process, after she indicated she might be interested in a formal complaint. Finally, the plaintiff has offered no evidence demonstrating that either Ms. Gleason or Professor Post pressured Ms. Roe into participating in the formal complaint. (Ex. K, ¶ 9; Ex. MM, p. 25; Ex. QQ, Depo. p. 131, 177; Ex. RR, ¶¶ 7-8; Ex. SS, Depo. p. 41-44, 47, 49.) Ms. Gleason and Professor Post did nothing more than explain the options available to Ms. Roe under Yale's procedures, which was appropriate given their respective positions as Title IX Coordinator and Chair of the UWC. This cannot be considered impermissible influence or coercion. Since the evidence demonstrates that Ms. Gleason did not divulge confidential information to Ms. Roe and did not improperly influence her decision to participate in the formal complaint process, summary judgment should enter as to Ms. Gleason on Count VI.

As to Mr. Killheffer, the plaintiff claims that he "admitted to participating in the decision to pursue a formal complaint against Montague, contrary to the established policy of the Title IX office and despite Roe's clearly expressed wishes to the contrary." (Pl.'s Opp. P. 58.) The plaintiff offers no evidence to support this statement. Mr. Killheffer never stated that the decision to pursue a formal complaint was contrary to any policies or against Ms. Roe's wishes. In fact, he believed

that it was appropriate for Ms. Gleason to consider all alternatives, including a formal complaint. (Ex. BBB, Depo. p. 150-151.)  When Ms. Roe decided to participate in the formal complaint, she specified that she was reserving the right to withdraw from the process.  (Ex. XX.)  Thus, far from demonstrating that Ms. Roe was "coerced" into agreement, the evidence establishes that Ms. Roe elected to participate in the formal complaint process only after considering all of her options; and even then she reserved the right to change her mind later.  There is simply no evidence supporting the plaintiff's assertion that Mr. Killheffer participated in any impropriety.  Indeed, Mr. Killheffer's sole involvement in this matter was to file the formal complaint in his capacity as Title IX Coordinator.  (Ex. BBB, Depo. p. 151.)

The plaintiff does not dispute the defendants' evidence which establishes that Mr. Killheffer never discussed the filing of a formal complaint with Ms. Roe in any fashion and did not meet or communicate with Ms. Roe until February 23, 2016, after Dean Holloway had already accepted the recommendation of the UWC II Panel to expel the plaintiff on February 16, 2016. See, Defs.' Memo., p. 38.  Given that Mr. Killheffer never communicated with Ms. Roe prior to filing the complaint, he could not have coerced her into participating in the formal process, nor could he have revealed confidential information to her, as alleged by the plaintiff in his deposition. (Ex. PP, Depo. p. 80-83.)

Ms. Roe testified that she met with Ms. Gleason, who presented her with three different options for proceeding. She went on to say that she chose the formal complaint option of her own volition.  (Ex. SS, Depo. p. 43-44, 47.)  Since the plaintiff has offered no evidence to counter the testimony of Ms. Roe that she willingly agreed to participate in a formal complaint brought by Mr. Killheffer as the Title IX Coordinator, and since that procedure is permitted by the UWC

Procedures (Ex. E, p. 1-2), summary judgment should enter in favor of all defendants as to Count VI.

## III.   Count VII (Breach of Contract, UWC II)

### A.   Count VII(A) (Breach of Confidentiality)

In Count VII(A) the plaintiff alleges that Ms. Gleason disclosed the "fact and substance of the UWC I proceedings to Ms. Roe." (Am. Compl., ¶ 252.) There is absolutely no evidence that Ms. Gleason divulged to Ms. Roe the "facts" or "substance" of UWC I, *i.e.*, that the plaintiff shoved a used paper pizza plate down Ms. Smith's tank top. Both Ms. Gleason and Ms. Roe deny that Ms. Gleason informed Ms. Roe that a previous UWC complaint had been filed against the plaintiff, that the plaintiff had been found responsible for sexual assault by the UWC, or that the plaintiff had been ordered to participate in training due to a finding of a violation of Yale's Sexual Misconduct Policies. (Ex. QQ, Depo. p. 133-136, 138-140; Ex. RR, ¶ 3-4, 6; Ex. SS, Depo. p. 17-20, 23, 28-29, 33-34, 41-42, 52.) Ms. Gleason only informed Ms. Roe that the plaintiff had already received the training that she had previously discussed with Ms. Roe as a potential informal resolution for Ms. Roe's complaint. (Ex. QQ, Depo. p. 124-125; Ex. RR, ¶ 5.) John Criscuolo, a counselor at the SHARE Center, testified that he provides sexual harassment and gender sensitivity training to students. Of the approximately 24 students he has counseled, at least half were not referred following a finding of sexual misconduct. They were self-referred or referred by their college Deans, and did not receive training as a result of having been found to have violated Yale's Sexual Misconduct Policies. (Ex. VV, Depo. p. 5, 8, 10-11.) Thus, the disclosure by Ms. Gleason that the plaintiff had received sensitivity training was not tantamount to a disclosure of the "fact and substance" of UWC I. Accordingly, summary judgment should be rendered in favor of the defendants on Count VII(A).

**B.**     **Count VII(B) (Intentional Manipulation of Procedure for Title IX Coordinator-Initiated Complaints)**

The plaintiff does not dispute that the UWC Procedures permit a Title IX Coordinator to bring a formal complaint "when there is evidence that the University's policies on sexual misconduct have been violated and the Coordinator's intervention is needed to ensure that the matter reaches the UWC." (Ex. E, p. 1-2.)

While it is true that Ms. Gleason, Mr. Killheffer, Dr. Spangler, and Attorney Sawyer met to discuss the allegations against the plaintiff and concurred that the seriousness of the allegations merited a formal complaint, the plaintiff has not pointed to any evidence suggesting that any of those individuals pressured or coerced Ms. Roe into participating in a formal complaint brought by a Title IX Coordinator.  The evidence establishes that Ms. Gleason and Mr. Post, the only two individuals who spoke with Ms. Roe prior to the filing of the formal complaint, simply presented Ms. Roe with the different options, which included pursuing a formal complaint or proceeding with an informal process. (Ex. K, ¶ 9; Ex. MM, p. 25; Ex. QQ, Depo. p. 131, 177; Ex. RR, ¶¶ 7-8; Ex. SS, Depo. p. 41-44, 47, 49.)  After considering those options, Ms. Roe informed Ms. Gleason, in writing, that she was comfortable participating in a formal complaint as a witness, but she did not want to be listed as the complainant.  She also retained the right to withdraw from the formal process.  (Ex. XX; Ex. RR, ¶ 8.)  The plaintiff agrees that a formal complaint could have been properly brought with Ms. Roe's agreement.  (Pl.'s Opp., p. 24.)  Since Ms. Roe agreed to participate in a formal complaint against the plaintiff, and because there is no evidence that she was pressured or coerced into doing so, the plaintiff cannot prevail on his breach of contract claim in Count VII(B).

C.     **Count VII(C) (Failure to Comply with *UWC Procedures* Concerning Status of Complainant)**

The plaintiff claims that he was deprived of basic fairness because Ms. Roe was permitted to offer an opening statement, listened to the plaintiff's testimony, and communicated with Dean Holloway and Provost Polak during the course of the proceedings, despite the fact that she was not the complainant. The UWC Procedures do not prohibit this practice. (Pl.'s Opp., p. 44.) Significantly, the plaintiff does not dispute the uncontradicted testimony that the UWC had a uniform practice to allow the primary witness to fully participate in the hearing of a complaint initiated by the Title IX Coordinator. (Ex. K, ¶ 10; Ex. LL, Depo. p. 142-44; Ex. BB, ¶ 6; Ex. MM, Depo. p. 27.) As explained by Ms. Menon and Professor Post, this practice is logical because the complaining witness has firsthand knowledge of the incident at issue, while the Title IX Coordinator does not. (Ex. LL, Depo. p. 143; Ex. MM, Depo. p. 27; Ex. K, ¶ 10.) The plaintiff has not quarreled with this logic. Thus, compliance with this long-standing practice did not violate the UWC Procedures, nor did it deprive the plaintiff of "basic fairness."

Without any evidentiary support, the plaintiff claims that Yale put the "full weight of its authority" behind Ms. Roe when Mr. Killheffer initiated the complaint in his role as the Senior Deputy Title IX Coordinator, thereby "implicitly vouching for her credibility." (Pl.'s Opp., p.44.) As with many of the statements in his brief, the plaintiff has offered no evidence supporting this assertion. The UWC panel members are all employees and/or students of Yale who are familiar with and understand the UWC Procedures. (Ex. E, p. 2-3.) There is no evidence suggesting that the fact that the complaint was initiated by Mr. Killheffer influenced any of the UWC II Panel members' deliberations or decision making. In fact, since Mr. Killheffer had no involvement in UWC II after filing the complaint, and Ms. Roe fully participated as if she were the complainant, it defies logic to assert that Mr. Killheffer's technical status as the complainant would have affected

the UWC Panel's deliberations or decision making. Certainly, the plaintiff has pointed to no evidence to support the argument that allowing Ms. Roe to participate in the process as if she had filed the complaint had any adverse impact on the plaintiff. The plaintiff offers only the unsubstantiated argument by his counsel that he was "deprived of basic fairness" when Ms. Roe was permitted to provide an opening statement and participate in the hearing. Since that is not sufficient to overcome a Motion for Summary Judgment, judgment should enter in favor of the defendants on Count VII (C).

### D.    Count VII(D) (Failure to Comply with Hearing Panel Appointment Procedures)

UWC Procedures provide that no member of the UWC who has previously participated in the resolution of an informal complaint arising out of the same events may serve on a hearing panel for a formal complaint. The plaintiff claims that David Post's decision to put himself on the UWC Panel violated this rule because he "participated in the resolution of [Roe's] informal complaint." (Pl.'s Opp., p. 32.) As is so often the case in the Opposition Brief, the plaintiff makes this statement without offering evidence to support it. (Pl.'s Opp., p. 32.) The plaintiff does not dispute that Professor Post was consulted in his position as the Chair of the UWC solely to answer Ms. Roe's questions regarding the UWC process, after she indicated she might be interested in a formal complaint. In fact, the plaintiff agrees that Professor Post met with Ms. Roe immediately after her meeting with Ms. Gleason and explained that if she wanted to pursue a formal complaint, she had the option of serving as the complainant or having the University Title IX office file the complaint. (Pl.'s Opp., p. 9.) The plaintiff has offered no evidentiary support for the proposition that providing information about the process of filing a formal complaint constitutes "participation in the resolution of an informal complaint."

The plaintiff also does not dispute the defendants' observation that Professor Post made no recommendations to Ms. Roe as to whether she should proceed with a formal complaint.  Since Professor Post did not participate in any resolution of the informal complaint and did not recommend that Ms. Roe participate in a formal complaint, there was no reason for Professor Post to recuse himself from the UWC panel.  The plaintiff, once again without any support, claims that Professor Post "already aligned himself with the prosecution" by providing Ms. Roe with information regarding the UWC procedures.  (Pl.'s Opp., p. 32.)  (Of course, the UWC is a neutral adjudicatory body, not a criminal tribunal, and Yale does not "prosecute" anyone.)   Without evidence that Professor Post participated in the resolution of the informal complaint, Count VII(D) must be dismissed.

### E.       Count VII(E) (Failure to Make Findings Constituting a Violation)

The plaintiff argues that the UWC Panel "placed an unfair weight" on his inconsistent descriptions of how he decided he had consent.  (Pl.'s Opp., p. 35-36.) The plaintiff now claims that his inconsistent memory of whether Ms. Roe consented verbally or through conduct was due to his confusion about which incident was the subject of the complaint. There were four sexual encounters between the plaintiff and Ms. Roe; there was intercourse only at two of those encounters.  The plaintiff's theory that he gave the wrong information to the fact finder about how he obtained consent on the evening in question would be viable only if the plaintiff had previously believed that he obtained consent verbally on one occasion and by conduct on the other. In fact, the plaintiff told the fact finder that Ms. Roe verbally consented to <u>both</u> incidents of intercourse. (Ex. B, p. 10, 19.) Since the plaintiff reported to the fact finder that Ms. Roe verbally consented to intercourse on both occasions and never indicated that she consented by conduct, his theory that he confused the two occasions in terms of how consent was given simply does not withstand

scrutiny.  To put it bluntly, prior to the UWC hearing, the plaintiff at all times claimed that he had

obtained consent verbally on both occasions he had intercourse with the plaintiff; once he got to

the hearing, he changed his mind, and claimed that the consent he obtained the second time he had

intercourse with Ms. Roe was by conduct.  The UWC Panel was correct in pointing out that this

was a very stark contrast with the plaintiff's previous statements to the fact finder.

The plaintiff claims that the fact finder and the UWC Panel made "efforts to twist the

undisputed evidence to remove facts which raised the most serious questions about whether Roe

had indeed consented to the sex." [3]  (Pl.'s Opp., p. 38.)  The plaintiff focuses on the fact that the

fact finder did not explicitly state that Ms. Roe consented to digital penetration[4] prior to sex and

that the UWC Panel did not explicitly state that Ms. Roe allowed the plaintiff to touch her genitals.

He claims that the fact that Ms. Roe consented to digital penetration may be evidence that Ms. Roe

"changed her mind."  (Pl.'s Opp., p. 38-39.)  However, such an inference is precluded by the

evidence demonstrating that Ms. Roe told the plaintiff "no" immediately prior to intercourse and

tried to push him away.  (Ex. B, p. 5; Ex. C, p. 3.)  The plaintiff also admitted that when Ms. Roe

stated that she wanted to "hook up and not have sex," that meant that she did not want intercourse,

but anything short of intercourse was acceptable.  (Ex. M, Depo. p. 120-121; Ex. PP, Depo. p. 63-

65.)  In short, the plaintiff has offered nothing more than an unsupported assertion, not evidence,

---

[3] This statement also seems to be in reference to the Title IX claim.  The UWC Panel reviewed the fact finder's report, considered the information therein, and followed up with questions of the plaintiff and Ms. Roe at the hearing.  (Ex. C, p. 1.)  The fact that the UWC Panel summarized the facts presented in the fact finder's report is not surprising or unfair.  The decision maker, Dean Jonathan Holloway, received both the fact finder's report and the panel report.  (Ex. N., p. 1.)  Thus, there was no need for the UWC Panel to repeat all of the facts from the fact finder's report.  Moreover, the plaintiff has not offered any evidence demonstrating that the fact finder and UWC Panel omitted facts because of the plaintiff's gender.

[4] Citing criminal law, the plaintiff argues that "digital penetration is, and is considered to be, as invasive and serious as penile vaginal intrusion."  (Pl.'s Opp., p. 39.)  The theory behind criminal law has no relevance to Ms. Roe's consent to sexual activity.

to support his theory that Ms. Roe's consent to digital penetration could have been an indication that she had changed her mind about wanting intercourse.

### F.   Count VII(F) (Erroneous Reliance on UWC I Proceedings)

As discussed above in Section I, the plaintiff's conduct in UWC I constituted sexual misconduct and was therefore properly considered in determining the plaintiff's culpability in UWC II. Therefore, summary judgment should enter in favor of the defendants on Count VII(F).

### G.   Count VII(G) (Consideration of Evidence Outside the Presence of the Respondent)

The plaintiff argues that the UWC Panel was required to discuss the plaintiff's previous discipline for sexual misconduct in his presence because the provision of the UWC Procedures permitting the UWC Panel to take into account previous formal discipline for sexual misconduct when determining culpability is included in the section of the Procedures entitled "Hearing." The UWC Panel's discussion and determination of culpability always occurs outside the presence of both the complainant and the respondent. (Pl's Ex. 29, Menon Depo. p. 155-156.) Having received a copy of the UWC Procedures, the plaintiff should have been aware that his prior discipline would be considered, and he could have addressed that issue during the hearing if he so chose. In fact, he did address his prior discipline in his response to the Panel report and in his appeal from Dean Holloway's decision. (Ex. L, O.)

The plaintiff then complains that Ms. Menon did not provide the Panel with enough information concerning his prior discipline. (Pl.'s Opp., p. 43-44.) The response to this contention is twofold. First, the UWC Procedures do not prescribe a particular level of detail which must be provided when informing the Panel of a respondent's prior discipline. Professor Post explained that the practice of the UWC Secretary is to provide a short description of the prior complaint that resulted in formal discipline. That description informs the Panel of the conduct at issue and the

finding.  From Ms. Menon's summary, the Panel understood the behavior exhibited by the plaintiff and that he had been found responsible for sexual harassment.  (Pl. Ex. 27, p. 60-61.)  Second, any alleged prejudice suffered by the plaintiff was alleviated when Ms. Menon provided the decision-maker, Dean Jonathan Holloway, with copies of the Panel Report and the decision letter from UWC I.  Since he was given those materials, Dean Holloway was fully informed of the findings of fact and conclusions reached in UWC I before he reached his decision.  (Pl. Ex. 29. P. 161.) The UWC Procedures do not require the respondent's presence while the UWC Panel considers the respondent's previous discipline for sexual misconduct and any alleged prejudice was subsequently remedied.  Accordingly, the plaintiff cannot prevail on Count VII(G).

###    H.    Count VII(H) (Erroneous Reliance on Executive Committee Action)

The plaintiff does not counter any of the arguments that the defendants presented in support of their motion for summary judgment as to Count VII(H).  Therefore, summary judgment should enter in favor of the defendants on that count.

## IV.    Count VIII (Breach of Contract/Common Law, UWC II:    Denial of Basic Fairness/Arbitrary and Capricious Decision Making

In support of his claim that the defendants did not provide him with adequate notice of the complaint against him, the plaintiff asserts that the complaint "did not specify which of the four sexual encounters between them Roe was claiming was nonconsensual, or provide any other details which would have allowed Montague, over a year later, to pinpoint the particular encounter at issue."  (Pl.'s Opp., p. 31.)  The plaintiff was informed that a formal complaint of sexual assault had been lodged against him based on a report that he had sexually penetrated Ms. Roe without her consent on the night of Saturday, October 18, 2014, at the plaintiff's residence located at 43 Howe Street.  (Ex. A.)   The plaintiff therefore was apprised of the identity of the complaining witness, the date and location of the incident, and the conduct alleged.  Significantly, the plaintiff

does not specify what further information should have been provided to him at the initial stage of the complaint.  Since the plaintiff and Ms. Roe only engaged in intercourse on two occasions and Ms. Roe confronted the plaintiff shortly after the encounter that occurred on October 18, 2014, the plaintiff had additional information indicating that the complaint concerned the second occasion on which they had sexual intercourse.  The plaintiff's claim that he was not provided with adequate notice, and therefore, the proceedings were not conducted with basic fairness, is without merit.[5] As noted above, the issue in this case was consent to intercourse; and the plaintiff claimed at all times prior to the UWC hearing that he obtained verbal consent for intercourse on the only two occasions he had sexual intercourse with the plaintiff. Under these circumstances, there was no further detail needed to provide the plaintiff with reasonable notice of the allegations against him, nor was the plaintiff prejudiced by any alleged failure to disclose all details of the encounter. Therefore, summary judgment should enter in favor of the defendants on Count X.

## V.     Count IX (Title IX, Gender Discrimination)

The plaintiff largely rests his argument in support of his Title IX claim on the expert testimony of Susanna Murphy that the fact finder's investigation was "a one-sided approach to obtaining facts in an effort to merely support Ms. [Roe's] claim."[6]  (Pl.'s Opp., p. 34.)

### A.     The Fact Finder Requested Relevant Evidence

Contrary to the plaintiff's assertion, the fact finder did not concede that she sought only inculpatory evidence from Ms. Roe.  Rather, she asked Ms. Roe to provide documents or other material that was relevant to the investigation.  Ms. Roe then provided names of witnesses and

---

[5] The plaintiff also argues in support of his claim in Count VIII that the claimed contractual breaches, when considered together, "amount to arbitrary and capricious conduct and a denial of the basic fairness which Montague is guaranteed under his contract with Yale."  (Pl.'s Opp., p. 45.)  Thus, the arguments made in support of the motion for summary judgment on the remaining breach of contract claims also apply to Count VIII.

[6] The arguments contained in this section are also applicable to Count VIII.

relevant text messages.  The fact finder did not ask for any further text messages, because she did not think that they were relevant.  (Pl.'s Ex. 2, p. 24.)  Notably, the plaintiff has not pointed to any communications that would have shed any further light on the incident or altered the investigation, hearing, or determination.  Moreover, the plaintiff does not allege that the fact finder required him to produce documentation that was not required of Ms. Roe.  In other words, he has not shown that the fact finder took a different approach to gathering information based upon his gender.  The fact that the fact finder requested only documentation that was relevant to her investigation of the incident at issue does not suggest either gender bias or unfairness.

### B.      Ms. Roe's Statements Were Not Inconsistent or Contradictory

Contrary to the plaintiff's contention, Ms. Roe's accounts to her friends and later to the fact finder were not inconsistent.[7]  The fact finder's report reveals that Ms. Roe told at least two of her friends that she had been hooking up with the plaintiff on the night of the incident.  (Ex. B, p. 13-14.)  The fact that, on the morning after the encounter, Ms. Roe did not share with her friends all of the minute details of the sexual encounter that occurred prior to intercourse does not create an inconsistency in regard to the more detailed information that she shared with the fact finder a year later.  Ms. Roe told both her friends and the fact finder that she told the plaintiff "no" and physically resisted him.  Moreover, the fact that Ms. Roe engaged in consensual sexual activity up until the time of intercourse is not inconsistent with her claim that intercourse was not consensual. The Sexual Misconduct Policies specifically state: "Consent to some sexual acts does not constitute consent to others, nor does past consent to a given act constitute present or future

---

[7]  The plaintiff also claims that the UWC Panel demonstrated a double standard when it cast Ms. Roe's alleged inconsistencies as consistencies and then placed unfair weight on the inconsistencies in the plaintiff's account of how he gauged consent. (Pl's Opp., p. 35-36.)  The defendants have already addressed the substance of this argument in their opening brief.  In terms of the Title IX claim, it is significant that the plaintiff has not demonstrated any gender bias as the basis for the alleged double standard.

consent.  Consent must be ongoing through a sexual encounter and can be revoked at any time."
(Ex. 49, p. 3.)  Ms. Roe had told the plaintiff multiple times that she was willing to "hook up, but
not have sex."  Accordingly, engaging in sexual activity short of intercourse did not constitute
consent for intercourse.

### C.      The Fact Finder Addressed and the UWC Panel Considered Ms. Roe's Motive in Returning to the Plaintiff's Room

Contrary to the plaintiff's contention, the fact finder addressed, and the UWC panel
considered, Ms. Roe's decision not to go to her suite after the incident, and instead to return to the
plaintiff's room.  Ms. Roe also thoroughly addressed this issue in her hearing statement.  (Ex. ZZ,
p. 3.)  Without any evidence, the plaintiff theorizes that Ms. Roe had a motive to conceal from her
friends that she had consensual intercourse with the plaintiff. (Pl.'s Opp., p. 37.)  The plaintiff has
offered no evidence suggesting that Ms. Roe's friends would have disapproved of, or criticized, a
decision on her part to have intercourse with the plaintiff.  The plaintiff also inaccurately suggests
that Ms. Roe's friends did not want her to go out with the plaintiff that night.  (Pl.'s Opp., p. 37.)
The evidence establishes that Ms. Roe's friend was concerned because another student told her
that a mutual friend had had a "bad experience" with the plaintiff and gave the impression that the
plaintiff was "a jerk".  Ms. Roe's friend then checked in with Ms. Roe prior to leaving the party.
(Ex. CCC, Depo. p. 10-11.)  There is no suggestion that Ms. Roe's friend asked her to leave the
plaintiff's company that night.   In an effort to suggest that Ms. Roe's motives were not
investigated, the plaintiff completely fabricates an ulterior motive for Ms. Roe.  This is insufficient
for the plaintiff to prevail at the summary judgment stage.  Therefore, summary judgment should
enter in favor of the defendants on Count IX.

### D.    The Plaintiff Has Not Demonstrated that His Expulsion was Motivated by Gender Bias

The plaintiff relies on Doe v. Columbia Univ., 831 F.3d 46 (2d Cir. 2016), in his argument that he has produced sufficient evidence to support his gender discrimination claim under Title IX. It is essential to note that the Doe v. Columbia case did not involve a Motion for Summary Judgment; rather, that case reached the Second Circuit only after the district judge had granted a Motion to Dismiss.  Accordingly, the Second Circuit there had no occasion to address the standard of proof required for defeating a motion for summary judgment.  Instead, the Court's discussion was limited to the specificity of pleading necessary to survive a motion to dismiss and concluded: "[A]t the 12(b)(6) stage of a Title VII suit, allegation of facts supporting a minimal plausible inference of discriminatory intent suffices as to this element of the claim because this entitles the plaintiff to the temporary presumption of *McDonnell Douglas* until the defendant furnishes its asserted reasons for its action against the plaintiff."  Id. at 55. (Emphasis supplied.) The Second Circuit took pains to observe that the role of the court at the Rule 12(b)(6) stage "was not in any way to evaluate the truth as to what really happened, but merely to determine whether the plaintiff's factual allegations are sufficient to allow the case to proceed."  Id. at 59.  The plaintiff's burden at the summary judgment stage is significantly higher.  He must "'demonstrate a genuine issue of material fact, not merely allegations of a plausible inference of gender bias.'"  Doe v. Colgate Univ., 2017 U.S. Dist. LEXIS 180267 *37 (N.Y.N.D. October 31, 2017), quoting Doe v. Trs. of Boston Coll., 2016 U.S. Dist. LEXIS 13777 n. 7 (D.Mass. October 4, 2016).

The plaintiff claims that "Yale faced immense pressure to crack down on the perceived epidemic of sexual misconduct" on the Yale campus, and in particular, to "punish perpetrators of

sexual assault in a way that recognizes the gravity of these crimes[.]"[8]  (Pl.'s Opp., p. 54.)  In support of this argument, he submits various media articles and publications.  None of this material demonstrates that the defendants were under pressure to target male students in an effort to address the issue of sexual misconduct on campus.   More importantly, without evidence that Yale in fact handled the present case in a manner that evidenced bias against the plaintiff because of his gender, the plaintiff cannot prevail on his Title IX claim.

Like the present plaintiff, the plaintiff in Doe v. Colgate argued that Colgate University's "sexual climate" during the 2014-2015 academic year was evidence of outside pressure on the defendants, which caused the plaintiff's proceeding to be tainted by gender bias.  The district court noted that the Second Circuit in Doe v. Columbia found that allegations that Columbia University faced external pressure, both from students and the press, to favor female complainants over male respondents were sufficient to survive a motion to dismiss.   However, unlike in Doe v. Columbia, the parties in Doe v. Colgate had reached the summary judgment stage, and the plaintiff was required to "demonstrate a genuine issue of material fact, not merely allegations of plausible inference of gender bias." Doe v. Colgate Univ., 2017 U.S. Dist. LEXIS 180267 *36-37 (N.Y.N.D. October 31, 2017).  In response to the plaintiff's argument that student activism centered around survivor support was evidence of a gender-biased climate, the district court held: "[R]aising awareness of sexual assault, without drawing gendered assumptions about males, does not raise an inference of anti-male bias." Id. at *39.  The district court also concluded that Colgate University's effort to comply with the Obama Administration's Dear Colleague Letter was not evidence of

---

[8] The plaintiff claims that the district court in Doe v. Columbia acknowledged that "Yale was considered as a sort of poster child for having historically 'given light punishments to male students found to have raped or assaulted female students.' 831 F.3d at 51." (Pl.'s Opp., n. 53.)  The district court made no such acknowledgement.  Rather, the district court explained that the Membership Director of the Columbia University Democrats had written opinion articles and had referred to reports that Yale University had given light punishments to male students found to have raped or assaulted female students, saying, "[W]e want to make sure that what's happening at Yale isn't happening here at Columbia."

gender bias.  The plaintiff also pointed to a university publication authored by the former President of Colgate.  Since the portion excerpted by the plaintiff acknowledged that both men and women can be victims of sexual assault, and made no reference to men as aggressors or women as victims, the district court found that document to be insufficient to demonstrate gender bias.  Id. at *41-42, citing Doe v. Salisbury Univ., 123 F.Supp.3d 748, 766-67 (D.Md. 2015) (finding that public notices or newsletters informing the student body at large of the risk of sexual assault on college campuses that were presented in a gender-neutral tone, addressed to all students, and published to improve campus safety for both men and women did not support an inference of gender bias.)

Like the articles and publications submitted in Doe v. Colgate Univ. and Doe v. Salisbury Univ., the materials presented by the present plaintiff are written in a gender-neutral manner and urge action to remedy the problem of sexual assault on campus.  The AAU survey cited in the plaintiff's brief discussed the genders of the victims, which included men, women, and those who did not identify with gender binaries.  The gender of the respondents was not a topic of that survey. (Pl. Ex. 11.)  Since the materials cited by the plaintiff do not draw gendered assumptions about male students or suggest that Yale should punish only male students who engage in sexual misconduct, rather than all perpetrators of sexual misconduct, the articles fail to constitute evidence of gender bias on the part of the defendants.  Similarly, President Salovey's letter pledging to redouble efforts to free Yale of sexual misconduct contains no assumptions regarding the gender of the respondents.  (Pl. Ex. 12.)  Thus, while the articles and publications submitted by the plaintiff may demonstrate that students and alumni challenged Yale to adopt procedures to stop sexual misconduct on campus, there is no evidence of a gender bias against male students in either the calls for action or the pledged response.

The plaintiff claims that Yale did not comply with its own procedures, and, therefore, a jury could find that Yale's reason for expelling the plaintiff – violation of university Sexual Misconduct Policies – was merely a cover for gender discrimination.  Since the plaintiff has not pointed to any evidence of gender discrimination, and he has not proffered evidence to demonstrate that the defendants' reason for expelling the plaintiff was false, summary judgment should enter in favor of the defendants on Count IX.

## CONCLUSION

For the foregoing reasons, and for those stated in the initial Memorandum of Law in Support of Defendants' Motion for Summary Judgment, the defendants' motion for summary judgment should be granted.

THE DEFENDANTS

BY:          /s/ Patrick M. Noonan (#ct00189)
     Patrick M. Noonan
     Colleen Noonan Davis (#ct27773)
     Donahue, Durham & Noonan, P.C.
     741 Boston Post Road
     Guilford, CT 06437
     (203) 458-9168

## **CERTIFICATION**

     I hereby certify that, on the above-written date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.


                                            /s/
                                  Patrick M. Noonan