## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JACK MONTAGUE, | ) | Civil Action No. 3:16-cv-00885-AVC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| YALE UNIVERSITY, ANGELA | ) | LEAVE TO FILE GRANTED |
| GLEASON, and JASON KILLHEFFER, | ) | AUGUST 29, 2018 |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S SUR-REPLY IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants' Reply consistently ignores Plaintiff's arguments, or misstates them, setting up straw men which they then can knock down.[1]  What is most significant about Defendants' Reply is not what it says but what it does *not* say:  Defendants in their Reply do not dispute any of the principal legal underpinnings of Plaintiff's arguments in his Opposition: that Montague was contractually entitled not to have his record of prior discipline disclosed to Roe; that Yale was prohibited from influencing or manipulating Roe's decision to bring a formal complaint; or that he was entitled to an adjudication that was the product of a thorough and impartial investigation and which comported with principles of basic fairness.  Nor, with respect to Plaintiff's Title IX claim, do Defendants challenge Plaintiff's application of the *McDonnell Douglas* burden-shifting framework, except to cite to a single district court case which did not

---

[1] Plaintiff submits this Sur-Reply in order to respond to Defendants' Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment (ECF No. 166) and to supplement the record with additional evidence which Defendants produced pursuant to the Court's Order (ECF No. 161) after Plaintiff's Opposition had already been filed.  This brief is not intended to be a comprehensive response to Defendants' much lengthier Reply. Plaintiff refers the Court to his Opposition (ECF No. 157) for his full position on all issues, including those addressed in this brief.

apply that framework, and which ignored established Supreme Court precedent holding a plaintiff need not adduce direct evidence of discriminatory intent in order to prevail on a claim on unlawful discrimination.  As to the facts, while Defendants incorrectly accuse Plaintiff of making arguments which are unsubstantiated by the record, it is in fact Defendants who have outright ignored the substantial record evidence of their misconduct, most notably, the breach of confidentiality and manipulation of Roe, for which they double down and continue to insist there is "no evidence".  And, in any event, factual disputes are not the stuff of summary judgment. Defendants' Motion for Summary Judgment should be denied in its entirety.

## Argument

I.      **Defendants Continue to Ignore the Substantial Admissible Evidence Demonstrating that Defendant Gleason Breached Confidentiality and Manipulated Roe into Proceeding with a Formal Complaint.**

As set forth at considerable length in Plaintiff's Opposition at pp. 6-10 and pp. 23-30, there is substantial evidence, primarily in the form of Roe's contemporaneous statements to the fact-finder and the UWC panel, that Defendant Gleason informed Roe of the prior finding of sexual misconduct against Montague and through this disclosure and other inappropriate tactics, strongly influenced Roe's decision to abandon her informal complaint and participate in a formal complaint against Montague that put him in jeopardy of expulsion.  This evidence is extensive and Plaintiff will not repeat it all here; among other things, Roe told Yale's fact-finder that Gleason informed her that "she [Gleason] would not be able to keep [Roe's] name confidential" because "Mr. Montague had already been given a recommendation for training after a previous complaint and so that option was no longer open to him", and that "[she] was especially motivated to participate in the investigation and hearing process after she heard that Mr. Montague had already had another complaint against him as she felt it was important to protect

2

other women." Ex. B at -11547.   Roe further explained in her opening statement to the UWC

panel that Gleason told Roe that Gleason believed that she [Gleason] "wouldn't be doing her job

if she did not take more serious action" and "asked for [Roe's] participation" in a formal

complaint process.  Ex. 25; Ex. 20 at 42-43.

Remarkably, as they have in various pleadings throughout this litigation, Defendants in

their Reply continue to pretend as if the above evidence, and other similar evidence of the breach

of confidentiality and manipulation of Roe, simply does not exist.  They then put forth factual

defenses to Plaintiff's breach of contract and tortious interference claims based on Gleason's

conduct in her conversations with Roe which presume (and indeed depend on) the absence of

this evidence from the record.  *See, e.g.*, Reply at p. 7 ("Since the evidence demonstrates that Ms.

Gleason did not divulge confidential information to Ms. Roe and did not improperly influence

her decision to participate in the formal complaint process, summary judgment should enter as to

Ms. Gleason on Count VI.").  Defendants obviously cannot avoid a trial on the grounds that their

witnesses now deny malfeasance by Gleason which is well documented in the contemporaneous

record.

Nor do Defendants make any effort whatsoever to challenge the admissibility of this

damning evidence against them.  Defendants insinuated in their opening brief that because Roe

and Gleason were the only two parties to their conversations, and because they now both

conveniently deny that Gleason ever made any of these problematic statements, Plaintiff is

unable to put forth any admissible evidence supporting his breach of contract and tortious

interference claims based on Gleason's conduct in her conversations with Roe.  To the extent

Defendants were arguing that Plaintiff's evidence is hearsay, Plaintiff amply demonstrated in his

Opposition that Roe's statements to the fact-finder are admissible as "adoptive admissions"

3

pursuant to Fed. R. Evid. 801(d)(2)(B) and a substantial body of case law holding admissible

under this exception statements made by witnesses in the course of administrative investigations.

*See* Opp. at pp. 29-30.  Defendants fail even to *mention* much less respond to this argument in

their Reply, and therefore have not contested the admissibility of this evidence.  Accordingly,

Defendants' arguments for summary judgment on the claims relating to Gleason's conduct all

fail, and these claims must proceed to trial.

II.     **Roe's Eventual Voluntary Agreement to Authorize a Formal**
        **Complaint Process Does Not Absolve Defendants of Liability.**

        Beyond ignoring the substantial evidence of the manipulation as discussed above

(including, among other things, Gleason falsely suggesting to Roe that Montague was ineligible

for the informal resolution she desired given his prior involvement with the UWC), Defendants

also appear to argue that the fact that Roe ultimately made a voluntary decision to participate in a

formal complaint, and was therefore not "coerced," absolves them from any liability for

manipulating the process.  Not so.  Plaintiff's argument does not depend upon a showing of

"coercion."  Plaintiff does not dispute that the decision to authorize the filing of a formal

complaint was ultimately a voluntary act on Roe's part.  Rather, the crux of Plaintiff's claim is

that Yale's Title IX Office, contrary to Roe's expressed preference to pursue an informal

complaint, independently decided to pursue a formal complaint, and thereafter manipulated and

persuaded her to provide the authorization necessary for them to prosecute the complaint.

        As with the breach of confidentiality, Defendants simply pretend that the substantial

evidence of this manipulation does not exist.  The record reflects, however, that Gleason made

various statements to Roe (discussed above and in Plaintiff's Opposition) to the effect that Mr.

Montague was ineligible for an informal resolution, that the Title IX Office had already made the

decision to pursue a formal complaint, and that she should seriously considering participating in

4

that formal complaint "to protect other women."   Ex. B at -11547.  This conduct is directly at

odds with the contractual duty of impartiality imposed on Yale's Title IX Office requiring it to

avoid influencing a complainant's decision whether to file a formal or informal complaint,

which, according to Dr. Spangler, means the Title IX Office does not "make the decision to

pursue a formal complaint" and does not even recommend to a complainant whether to file a

formal versus informal complaint.  Ex. 4 at 32-36.  There is therefore more than sufficient

evidence from which a jury could conclude that the Defendants' conduct with respect to

influencing Roe towards filing a formal complaint violated Yale's contract with Montague.[2]

### III.   UWC Chairman Post Participated in the "Resolution" of Roe's Informal Complaint by Joining in the Effort to Convince Her to Abandon that Informal Complaint In Favor of a Formal One.

The evidence shows that, following the decision of Yale's Title IX leadership to pursue a

formal complaint against Montague, UWC Chairman David Post joined a meeting between

Defendant Gleason and Roe in which Gleason urged Roe to abandon her informal complaint and

file a formal complaint.  Post helped overcome Roe's reluctance to file a formal complaint by

offering her "comfort" in the form of a complaint filed in the name of the Title IX office.  Ex. 20

at 48-49.  After that meeting, which occurred on a Friday, Roe "[took] the weekend" to think

things over and on the following Monday, informed Gleason that she would allow the Title IX

office to file a formal complaint against Montague on her behalf.  Ex. 28 at YALE0000433.

Yale does not dispute that the *UWC Procedures* prohibit "any Member who has participated in

the resolution of an informal complaint arising out of the same events" from sitting on a UWC

---

[2] Defendant Killheffer is not absolved of liability for tortious interference simply because he did not have any direct communications with Roe in the relevant time period.  He joined in the decision, made at the November 4, 2015 meeting of Yale's Title IX Leadership, that the Title IX Office would independently pursue a formal complaint against Montague (including by convincing Roe to participate in that complaint) in deliberate violation of the contractual obligation of impartiality.  A jury could properly hold him liable for tortious interference with contract on the basis of this evidence.

hearing panel.  Ex. E at 7.2.  On these facts, a jury could readily conclude that Post's

participation in a meeting where Roe was persuaded to abandon her informal complaint

constitutes participation in the "resolution," *viz.*, abandonment, of that complaint.  Yale is not

entitled to summary judgment on this claim.

### IV.    The Panel's Receipt of Evidence Concerning the UWC I Violation Outside of Montague's Presence Was a Violation of the *UWC Procedures*.

With respect to the UWC II Panel's consideration of the UWC I offense, Yale again

erects a straw man and knocks it down.  Yale argues that the panel's receipt of evidence

concerning the UWC I offense properly occurred outside of Montague's presence because,

according to the testimony of UWC Secretary Aley Menon, "[t]he UWC Panel's discussion and

determination of culpability always occurs outside the presence of both the complainant and

respondent."  Reply at p. 15.  This misses the point.  Plaintiff is not arguing that he was entitled

to be present for the panel's deliberations.  He was entitled – as the *UWC Procedures* make clear

in the section governing the "Hearing" – to hear and to have an opportunity to respond to all

evidence against him considered by the panel in determining his culpability.   Thus, under the

*UWC Procedures*, the Secretary was required to make her presentation regarding UWC I in Mr.

Montague's presence.   Had he been given the opportunity to hear that presentation, he could

have made the very response that was later articulated by SHARE Director Carol Goldberg, that

the UWC I offense and the training tailored to it was "not about sexual consent," but rather

concerned Montague's "immature, inexcusable conduct as a drunk freshman."  Ex. 30.[3]  As it

was, after Montague learned that the panel had considered the UWC I offense in determining his

---

[3] Yale's stated rationale for allowing consideration of prior sexual misconduct offenses on the issue of culpability is that "research indicates that a significant proportion of perpetrators of sexual misconduct are repeat offenders."  Ex. 54, Disc 3/File 4 at 9:15.  That being the case, surely the UWC Panel would want to know that the experts at the SHARE Center believed the UWC I and UWC II incidents were entirely different in character.

culpability, he made a feverish but unsuccessful effort to get the decision-maker to secure this information from the SHARE Center. *See* Opposition at pp. 15-16.

Yale's attempt to place the impetus on Mr. Montague to proactively raise the issue of UWC I defies logic. The *UWC Procedures* state that prior sexual misconduct offenses "may" be considered in determining culpability, not they necessarily will be considered. The suggestion that Yale's procedures required Montague effectively to rebut evidence of prior misconduct before it had even been presented, and without knowing if it would be presented at all or what would be said about it, is utter nonsense.

V.      **The Record Demonstrates a Genuine Issue of Material Fact Concerning Whether the Investigation and Consideration of the Evidence Complied with Yale's Contractual Obligation of Impartiality and Thoroughness and <u>Comported with Basic Fairness.</u>**

In another mischaracterization of Plaintiff's arguments, Yale says that Plaintiff takes the position that the UWC panel was obliged to find in his favor. What Plaintiff is actually arguing, with the support of the opinion of expert sexual assault investigator Susanna Murphy, is that Yale failed to properly test the accuser's account, and in doing so violated its contractual guarantees of impartiality and thoroughness and fell short of the common law requirement of basic fairness which Yale acknowledges it must heed.[4] A central feature of any type of investigation is the ability to probe inconsistencies and ask questions raised by a party's account. The customary means of accomplishing this in the American system of justice is to allow parties to formulate questions to ask of the other side. Yale's policies do not allow for this, but instead

---

[4] At the Fall 2015 Training for all Title IX and UWC Personnel, representatives from Yale's Office of the General Counsel acknowledged that Connecticut common law recognizes a due process right of basic or "substantial" fairness which even private schools must observe. Ex. 54, Disc 3/File 2 at 3:50.

leave to the fact-finder and the panel itself the responsibility to properly develop the evidence.[5]
This is, according to Plaintiff's expert, precisely what they did not do here.

**VI.      Plaintiff Has Adduced Sufficient Evidence Under the *McDonnell-Douglas* Burden-Shifting Framework as Applied to Title IX Cases.**

Yale's response to Plaintiff's Title IX claim is twofold: first, that there was no erroneous outcome because there was sufficient evidence for the panel to find against Montague; and second, that in any event, there is no evidence that any of the flaws in the investigation and consideration of the evidence were motivated by Plaintiff's male gender.  As with Plaintiff's contract claims discussed in the preceding section, the first point relies on a mischaracterization of Plaintiff's argument: the question is not whether the evidence *required* a finding for Montague, but rather whether defects in the investigation and consideration of the evidence "cast articulable doubt on the accuracy of the outcome of the disciplinary proceeding," *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994).  They do, for all the reasons set forth at length in Plaintiff's Opposition.  As to the second point, as discussed below, it wholly ignores the import of the burden-shifting framework which Defendants concede applies to Plaintiff's claim.

**A.  The Law Does Not Require Direct Evidence of Gender Bias.**

As Plaintiff explained in his Opposition and Defendants do not meaningfully rebut, substantial precedent, including from the Supreme Court, holds that a plaintiff need not produce direct evidence of discriminatory intent in order to prevail on a claim of unlawful discrimination. *Doe v. Colgate University*, 2017 WL 4990629 (N.D.N.Y. 2017), cited by Defendants, does not even mention much less properly apply the *McDonnell Douglas* framework; inasmuch as it supports the proposition that direct evidence of discriminatory intent is required to prevail on a

---

[5] As recently reported, the Department of Education is in the process of issuing new regulations which will reportedly require that schools afford complainants and respondents the right to cross-examine one another.  *See* https://www.nytimes.com/2018/08/29/us/politics/devos-campus-sexual-assault.html.

discrimination claim, it runs contrary to decades of Supreme Court precedent.[6]  The *McDonnell Douglas* burden-shifting framework, which the Second Circuit expressly adopted for Title IX claims in *Doe v. Columbia University*, 831 F.3d 46, 54 (2d Cir. 2016), was borne out of a recognition that direct evidence of discriminatory intent will rarely be available to a plaintiff claiming discrimination.  As such, "the *McDonnell Douglas* formula does not require direct proof of discrimination[.]"  *International Broth. of Teamsters v. United States*, 431 U.S. 324, 358 n.44 (1977).  Once a plaintiff has established a prima facie case of discrimination, "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the [defendant's] explanation" for the adverse action.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000).  "Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the [defendant's] asserted justification is false, may permit the trier of fact to conclude that the [defendant] unlawfully discriminated."  *Id.* at 148.

     In order to establish a prima facie case of unlawful discrimination, a "plaintiff needs to present only minimal evidence supporting an inference of discrimination."  *Columbia*, 831 F.3d at 54.  To be sure, at the summary judgment stage, the plaintiff may no longer rely on the allegations of a complaint but must put forth actual evidence making out the prima facie case.  The *McDonnell Douglas* framework originated as an evidentiary standard, however, and the analysis of the sufficiency of the proof of the prima facie case – whether in the form of allegations in a complaint or evidence developed during discovery – is not fundamentally altered

---

[6] Defendants' reliance on *Doe v. Salisbury University*, 123 F. Supp. 3d 748, 754 (D. Md. 2015), is also misplaced.  Not only does that case pre-date the Second Circuit's decision in *Doe v. Columbia*, it actually supports Plaintiff's position.  The court there *denied* the defendant university's motion to dismiss a Title IX claim, in part on the basis of allegations in the complaint concerning university publications which identified sexual assault as a predominantly male phenomenon.  *See id.* at 767-69.

at the summary judgment stage.[7]  Therefore, the teachings of *Doe v. Columbia* cannot be so quickly cast aside by virtue of the fact that that case was decided at the motion to dismiss and not the summary judgment stage.  They key holding of *Columbia* is that the *McDonnell Douglas* framework applies in the Second Circuit to claims challenging university discipline under Title IX, which, of course, Defendants do not dispute.

      **B.  The Prima Facie Case is Established by Record Evidence Demonstrating that Yale Was Under Extreme Pressure to Prosecute and Expel Male Students For Sexual Assault.**

      Here, Montague has adduced more than adequate evidence to make out a claim that the outcome of the disciplinary action against him was motivated at least in part by his male gender. In addition to the evidence regarding the campus climate which Plaintiff marshaled in his Opposition and which the Second Circuit in *Doe v. Columbia* held sufficient to make out a prima facie case under *McDonnell Douglas*, Plaintiff now has the benefit of additional evidence in the form of video recordings of Yale's Fall 2015 training for all Title IX and UWC personnel, which Yale unsuccessfully fought to withhold from the Plaintiff.[8]  The content of that training is eye-opening, and it provides further evidence of the crisis environment that existed at Yale with respect to sexual assault, which, Yale administrators acknowledged in these closed-door sessions, is uniquely a male versus female problem.

      As have many other colleges and universities, Yale essentially takes the position in this litigation that because it is careful to use gender-neutral pronouns when discussing the issue of

---

   [7] The real distinction is that by the time of summary judgment, the defendant has typically put forth its proffered legitimate, nondiscriminatory reason for the adverse action being challenged, thus shifting the burden back to the plaintiff to show that the defendant's "proffered explanation is unworthy of credence."  *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

   [8] Plaintiff has submitted to the Clerk's office (with a copy to chambers) a thumb drive containing several video files which comprise the complete record of the Fall 2015 training.  These files have collectively been designated as Exhibit 54 to Plaintiff's Opposition.

sexual assault on its campus, any bias which infects its adjudication of sexual misconduct allegations is, at worst, a bias against "accused students," not all of whom are male. Not only does this argument defy common sense, but it is belied by the actual evidence in this case which shows that the "problem" Yale was called upon to solve was overwhelmingly a problem of sexual assaults committed by males against females.

Perhaps confident in the assumption that the training would remain confidential,[9] presenters from Yale's Title IX and UWC leadership were uncharacteristically candid at the Fall 2015 training.[10] Yale's efforts in this litigation to downplay the significance of the release of the AAU Survey results is belied by the intense emphasis placed on those survey results at the training. The first day of the training, on October 2, 2015, occurred exactly one week after the release of the survey results and President Salovey's concomitant call to "redouble efforts" (coincidentally, issued on very same day Rachel Rogers met with Defendant Gleason to report that Jack Montague had raped her friend). At one point, UWC Chairman David Post apologized for all the "droopy eyelids" in the room, which he attributed to participation in a "road show" to discuss the results of the survey, consisting of more than 35 events held around campus in the week between the release of the results and the first day of training. Ex. 54, Disc 1/File 1 at 15:30. Reflecting on the survey results, Provost Spangler stated bluntly: "We don't have enough complainants." *Id.* at 14:18.

More to the point, Yale's presenters dropped their façade, and acknowledged that, indeed, sexual assault on college campuses overwhelmingly involves claims of assault by women against

---

[9] Participants were instructed at the outset that the content of the training and any discussions occurring during the training should be kept strictly confidential. Ex. 54, Disc 1/File 1 at 5:08.

[10] For example, Senior Associate General Counsel Susan Sawyer openly admitted that Yale deliberately adopted a policy not to transcribe or even take minutes of UWC panel hearings specifically out of fear those records could be discovered in litigation. Ex. 54, Disc 3/File 4 at 20:32.

men.  Assistant Dean Melanie Boyd, Director of Yale's Communication and Consent Educators

Program, acknowledged that "[a]lmost always, [there is] a presumption of female victims, male

perpetrators," Ex. 54, Disc 1/File 2 at 0:34, and explained how AAU survey responses for

students who did not identify their gender were assigned a gender based on whether their

answers "looked like a male set answers" or a "female set of answers."  Ex. 54, Disc 1/File 2 at

12:43.  She also cited "lots of cultural support" for the notion that it is "often taken as a

normative element of male sexuality" that men pressure women "to engage in unwanted sexual

activity," Ex. 54, Disc 1/File 4 at 15:59, invoking the type of "archaic assumptions" and

"chauvinistic view of the sexes" which courts have recognized can give rise to gender

discrimination claims.  *See Mallory v. Ohio University*, 76 Fed. Appx. 634, 638 (6th Cir. 2003);

*Pederson v. Louisiana State University*, 213 F.3d 858, 881 (5th Cir. 2000); *Bleiler v. College of*

*Holy Cross*, 2013 WL 4714340, at *5 (D. Mass. 2013).  And, after presenting on several research

studies concerning perpetration of sexual assault by college males, Ms. Boyd added: "We know

that women commit acts of sexual violence – it turns up a little bit on our survey as well – but

nobody has done any significant research on that so I don't have much of anything to present on

that."  Ex. 54, Disc 1/File 3 at 2:20.  Further playing into traditional stereotypes about male

athletes, one of Ms. Boyd's Consent Educators remarked how she was "pleasantly surprised"

how well her workshop with the football team went.  Ex. 54, Disc 2/File 2 at 6:50.[11]

---

[11] Although perhaps not directly relevant to the analysis of Plaintiff's Title IX claim, other aspects of the training demonstrate just how stacked the deck was against Montague.  Assistant Dean Melanie Boyd, for example, presented on the topic of "Unwanted Consensual Sex" and its corollary, wanted nonconsensual sex.  Despite the fact that Yale's policy on consent expressly recognizes that consent can be nonverbal, Ms. Boyd advanced the notion that because "people frequently set limits for themselves that they are trying to stay within . . . [,] looking for cues, for well, did they want it, is in some ways irrelevant to whether there was consent . . . ."  Ex. 54, Disc 1/File 4 at 19:00.  In essence, the UWC fact-finders and panelists who would ultimately decide Montague's case were being instructed to disregard nonverbal cues of consent which contradict a prior verbal expression of lack of consent.  For her part, Miriam Berkman, the fact-finder in Montague's case, instructed that lapses in memory and shifts in a complainant's narrative are presumed to be a result of trauma. Ex. 54, Disc 2/File 4.

Whether gender discrimination has occurred is an extremely fact bound exercise.

Plaintiff has presented enough facts for a properly instructed jury to make this determination.[12]

### iii. Conclusion

For the reasons stated in this brief and in Plaintiff's Opposition (ECF No. 157), Plaintiff

respectfully requests that the Court DENY Defendants' Motion for Summary Judgment.  The

Plaintiff respectfully requests that the Court hear oral argument on Defendants' Motion.

Respectfully submitted,

JACK MONTAGUE,

By his attorneys,

/s/  Max D. Stern
Max D. Stern (BBO #479560) (*pro hac vice*)
mstern@toddweld.com
Alexandra H. Deal (BBO #660654) (*pro hac vice*)
adeal@toddweld.com
Christian G. Kiely (BBO #684308) (*pro hac vice*)
ckiely@toddweld.com
TODD & WELD LLP
One Federal St., 27th Floor

---

[12] Even if it were a close call, the Court could exercise its discretion to postpone the determination of the sufficiency of the evidence until there has been a full presentation of all the facts at trial. It is within the discretion of the district court to deny summary judgment "where there is reason to believe that the better course would be to proceed to a full trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  This includes "[w]here a case involves complex issues of fact or unsettled questions of law[,]"*Flores v. Kelley*, 61 F.R.D. 442, 445-47 (N.D. Ind. 1973), or where issues which are ripe for summary judgment are intertwined with issues which must proceed to trial. *Toyoshima Corp. of California v. General Footwear, Inc.*, 88 F.R.D. 559, 560 (S.D.N.Y. 1980).  *See also In re Franklin Nat. Bank Securities Litigation*, 478 F. Supp. 210, 213 (E.D.N.Y. 1979).  Here, assuming summary judgment is denied as to Plaintiff's contract claims, there is good reason to hold a trial on all of Plaintiff's claims, both because there is a substantial overlap in the evidence between Plaintiff's contract claims and the Title IX claim, and because the legal standards surrounding Title IX claims arising from university discipline are still emerging and unsettled.  Obviously, at trial, the Court could consider the sufficiency of the evidence supporting Plaintiff's Title IX claim on a Rule 50 motion for a judgment of a matter of law.

Boston, MA 02110
Tel. (617) 720-2626
Fax (617) 227-5777

William F. Dow III (ct00161)
JACOBS & DOW, LLC
350 Orange Street
New Haven, CT 06511
wdow@jacobslaw.com
Tel. (203) 772-3100
Fax (203) 772-1691

Dated: September 7, 2018

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via the Court's electronic filing system, and served to all counsel of record on September 7, 2018.

/s/ *Christian G. Kiely*
Christian G. Kiely