# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JACK MONTAGUE, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 3:16-CV-00885 (AVC) |
| | : | |
| YALE UNIVERSITY, et al. | : | |
| Defendants. | : | |

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This is an action for damages and equitable relief, in which the plaintiff, Jack Montague, alleges that the defendant, Yale University, et al. ("Yale"), unlawfully and improperly expelled him for alleged sexual misconduct. It is brought pursuant to Title IX of the Education Amendment of 1972 ("Title IX")[1] and common law tenets including breach of contract, defamation, violation of confidentiality and false light, and tortious interference with a contractual relationship. The court has jurisdiction pursuant to 28 U.S.C. § 1331[2] and 28 U.S.C. § 1332.[3]

---

[1] 20 U.S.C. § 1681 et seq. and 42 U.S.C. § 1981.

[2] 28 U.S.C. § 1331 provides that the "district court shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

[3] 28 U.S.C. § 1332 states in relevant part that the "district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between (1) citizens of different states. . . ."

The defendants have filed a motion for summary judgment on all counts pursuant to rule 56 of the Federal Rules of Civil Procedure, arguing that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. For the following reasons, the defendants' motion for summary judgment (docket no. 142) is GRANTED in part and DENIED in part.

## FACTS

Examination of the complaint, pleadings, local rule 56 statements, the exhibits accompanying the motion for summary judgment, and the responses thereto, disclose the following undisputed material facts:

At all times relevant herein, the plaintiff, Jack Montague, was a student and athlete at Yale University, where he played on Yale's basketball team and became captain of the team.

The defendant, Yale University, is in New Haven, Connecticut, with approximately 5,500 enrolled undergraduates and is the beneficiary of federal funds within the meaning of Title IX.

On or about March 2011, the Office of Civil Rights ("OCR") of the United States Department of Education ("DOE") "received a complaint alleging that a sexually hostile environment existed

at Yale and that Yale had not responded in a prompt and adequate manner."[4]

On April 4, 2011, the OCR issued a letter to Yale and other universities receiving federal money, known as the "Dear Colleague" letter.  The letter discusses "Title IX's requirements related to student-on-student sexual harassment, including sexual violence, and explains schools' responsibility to take immediate and effective steps to end sexual harassment and sexual violence," supplements the OCR's <u>Revised Sexual Harassment Guidance</u> issued in 2001, and discusses "the proactive efforts schools can take to prevent sexual harassment. . . ."

The OCR assessed whether Yale had prompt and equitable grievance procedures to address complaints under Title IX, and whether Yale allowed a sexually hostile environment on campus by failing to sufficiently respond to complaints of sexual harassment.

On June 11, 2012, Yale entered into a voluntary resolution agreement with the OCR in response to the 2011 complaint.[5]

---

[4] "The complaint stemmed in part from a well-publicized incident in October of 2010 in which fraternity pledges chanted sexually aggressive comments outside the Yale Women's Center."  The court notes that the complainant is unidentified.

[5] The court notes that the OCR did not make a finding of noncompliance.  The voluntary resolution agreement indicated that Yale voluntarily agreed "to assure that it has an environment and culture in which all students feel safe and well supported, and that it responds promptly and effectively to incidents of sexual harassment and violence (hereinafter referred to as sexual misconduct), in a manner designed to remedy the effects of such

Subsequently, Yale published a semi-annual report to the Yale community about actions taken by Yale University in response to specific complaints of sexual misconduct.[6]

At all times relevant herein, Yale had in place policies governing sexual misconduct titled "Sexual Misconduct Policies and Related Definitions."  These policies define sexual misconduct as "a wide range of behaviors including sexual assault, sexual harassment, intimate partner violence, stalking, voyeurism, and any other conduct of a sexual nature that is nonconsensual, or has the purpose or effect of threatening, intimidating, or coercing a person."  Attorney Susanna Murphy, Montague's sexual misconduct expert, testified in her deposition that Yale's sexual misconduct policies and definitions are consistent with federal law.[7]

The "University Wide Committee on Sexual Misconduct" ("UWC") addresses formal complaints of sexual misconduct and is

---

misconduct if should occur, and prevent recurrence, consistent with the requirements of Title IX" by complying with specified requirements.

[6] The first report included complaints of sexual misconduct brought between July 1, 2011 and December 31, 2011.

[7]  While Montague admits that Murphy testified that she did not see anything that violates federal law, Montague takes no position on whether every aspect of the policies is consistent with federal law in that this is a legal conclusion and immaterial to the instant motion.  He also responds that Murphy is being offered as an expert in sexual misconduct investigation and is not being offered as a legal expert on all facets of university compliance with Title IX.

governed by the UWC procedures.[8]  Under the UWC procedures, the UWC chair, the UWC secretary, and another member of the UWC must initially determine whether the complaint, if substantiated, would constitute a violation of Yale's sexual misconduct policies.

In the Fall of 2012, Montague matriculated at Yale University as a first-year student.

In August 2013, Yale alumni wrote an open letter to Peter Salovey, the president of Yale University, and Stephanie Spangler, Yale's deputy provost for health affairs and academic integrity and Title IX coordinator, questioning Yale's use of the term "'nonconsensual sex' to describe sexual assault."  The open letter also expressed concern over the fact that many of the complaints of "nonconsensual sex" resulted in "written reprimands or sensitivity training," sending a message that sexual assault is a minor infraction.

On September 9, 2013, in response to the January 1, 2013 through June 30, 2013 semi-annual report, Yale issued "Sexual Misconduct Scenarios" to address questions and concerns regarding the report.  The scenarios were "developed to help illustrate a range of behaviors that Yale and the UWC would characterize as 'nonconsensual sex' - and thus, a violation of

---

[8] The UWC provides both a formal and an informal means of resolving allegations of sexual misconduct.

Yale's sexual misconduct policy." These "scenarios also provide examples of penalties-ranging from expulsion to reprimand. . . ."

On August 25, 2013, one Sally Smith[9] filed a complaint with the UWC (hereinafter referred to as "UWC I") alleging that Montague folded up his used pizza plate and placed it down her tank top, between her breasts.[10] Aley Menon, the UWC secretary, Michael Della Rocca, the UWC chair, and David Post, a UWC member,[11] determined that the UWC had jurisdiction over the August 25, 2013 complaint, based on Montague's alleged conduct.[12,13] In response to Smith's complaint, Montague stated that he "took full responsibility for his actions."[14]

Attorney Timothy Pothin investigated the UWC I complaint and submitted a "Fact-Finder's Report" dated September 25, 2013.

---

[9] Sally Smith is a pseudonym used to protect the privacy of this Yale student.

[10] Montague admits this fact and further responds that Smith also indicated in her UWC I complaint that there "was no physical (skin-to-skin) contact," and that she described her interaction as "peripheral." The court notes that Smith indicated in her UWC I complaint that she "had never met [Montague] until this encounter."

[11] Post later became the chair of the UWC.

[12] However, Montague disputes whether the UWC's determination that they had jurisdiction over the UWC I complaint was proper. In support, he cites Post's e-mail comments and Smith's comments.

[13] For purposes of this motion, Montague does not contest that Menon, Della Rocca, and Post "did not discriminate against Montague based on his gender."

[14] Montague further asserted that he "never meant to hurt or sexually harass" Smith. He also indicated that he "assume[s] that [he] was under the influence of alcohol that night, as [he] do[es] not recall this incident."

Two witnesses confirmed Smith's account and reported that they witnessed Montague shove a pizza plate down Smith's tank top. Montague also told Pothin that he accepted full responsibility for his action toward Smith.[15]

On October 9, 2013, a five-member panel reviewed the UWC I complaint.  Montague did not contest the allegations of the UWC I complaint and/or the UWC I panel concluded that he sexually harassed Smith when he, without provocation, rolled up a used paper pizza plate and shoved it down Smith's shirt between her breasts.[16]  The UWC I panel unanimously concluded that Montague violated Yale's sexual misconduct policies and unanimously recommended that Montague be: 1) placed on probation for four terms;[17] 2) prohibited from holding a leadership position in any student activity, organization, or sport; 3) required to enroll in sexual harassment and gender sensitivity training through the

---

[15] Montague again asserts that he told Mr. Pothin that he "never meant to hurt or sexually harass" Smith.

[16] Montague admits that he did not contest the factual allegations, that he placed a pizza plate down Smith's shirt, however, he disputes that this is an admission that his actions constituted a violation of Yale's sexual misconduct policies.  Yale notes, however, that Montague conceded, at his deposition, that his conduct constituted sexual contact in violation of Yale's sexual misconduct policies.  Montague admits that he initially testified at his deposition that putting your hands **or another object** between a woman's breasts without consent would violate Yale's sexual misconduct policy.  However, he later clarified his response through an errata sheet to say that "[y]es, putting your hands between a woman's breasts without consent would violate Yale's sexual misconduct policy."

[17] The four terms began with the Fall term of 2013 and continued through the end of the Spring term of 2015.

Sexual Harassment and Assault Response and Education ("SHARE") Center; 4) required to meet with a member of the SHARE Center once each semester, beginning with the Spring term of 2014, for the remainder of his time at Yale, to review and reflect on his interactions and relationships with female students at Yale; and 5) required to receive training on the appropriate use of alcohol.

On October 21, 2013, Menon, the UWC secretary, informed Montague that Dean Mary Miller had accepted the UWC I panel's findings of fact, conclusions, and recommendations.  Montague did not oppose the UWC I panel report or appeal Dean Miller's decision.[18]  Montague admits that the UWC I panel members and Dean Miller did not discriminate against him based on gender. He received the sexual harassment and gender sensitivity training, and the training on the appropriate use of alcohol, as required, following the UWC I proceedings.

In early September 2014, Montague and one Jane Roe[19] met at a party at his house, where he lived with other Yale basketball

---

[18] Montague admitted that he testified that he did not oppose the UWC I panel report or appeal because he "understood that [his] conduct was completely inappropriate and wrong and [he] was willing to go through the counseling that had been ordered."  Montague disputes, however, that this statement is an admission that he violated Yale's sexual misconduct policies.  Although he testified that he admitted the conduct, he argues that he did not understand that there was a procedural mechanism to admit the conduct, but challenge whether the behavior was sexual misconduct.

[19] Jane Roe is a pseudonym used to protect the privacy of this Yale student. The court assumes that Jane Roe was of the age of consent.

players.  They engaged in "sexual touching," but not sexual intercourse.

Several weeks later, Montague and Roe again engaged in consensual sexual contact, not including sexual intercourse.

On September 24, 2014, Montague and Roe saw each other at an event at Toad's Place.  They left together and went to Montague's house, where they engaged in consensual sexual intercourse.[20]

On October 18, 2014, Montague and Roe met again at a party, at his house.  Montague and Roe engaged in consensual sexual contact, not including intercourse, outside of the house and in Montague's car.  They then went into Montague's bedroom where they continued sexual contact, including sexual intercourse. Roe claims that Montague engaged in sexual intercourse with her, without her consent and over her objection.  Montague claims that Roe voluntarily consented throughout the encounter.

In the Fall of 2015, Montague was a full-time student in his senior year of college.  On September 18, 2015, the Secretary of the Yale College Executive Committee (hereinafter the "Executive Committee") notified Montague that Chief of Police Ronnell A. Higgins submitted a complaint to the Executive

---

[20] Roe does not dispute that she verbally consented to sexual intercourse. She indicated that, in hindsight, she does not believe that she was capable of making a considered decision because she was highly intoxicated and was not thinking clearly.  However, she does not claim that Montague engaged in sexual misconduct on this date.

9

Committee, alleging that Montague's conduct on September 6, 2015, violated Yale's undergraduate regulations governing "Defiance of Authority."  The complaint alleged that Montague interfered with a police investigation into the well-being of a female student who appeared to be intoxicated and was being followed by a male student, who was a friend of Montague.[21]

On September 24, 2015, the secretary of the Executive Committee informed Montague that his actions were in violation of Yale's undergraduate regulations governing "Defiance of Authority" and the committee voted to reprimand him.[22]  The September 24, 2015 letter stated that "the reprimand will be taken into consideration in determining a penalty if you should ever again be found by the Executive Committee to have committed an infraction of the [u]ndergraduate [r]egulations."  The

---

[21] Officer Higgin's complaint alleges that Montague's friend "continually screamed at [him] and the other officers to leave [the female student] alone so they could go back to his house" and "had his cellphone near [the officer's] face the entire time."  The complaint further alleges that, while he was escorting Montague's friend to the police vehicle to detain him, Montague arrived on the scene inquiring about his friend.  When he was told that his friend was being detained and he needed to back away, "Montague did not listen and became argumentative with [the officers]," began recording on his cell phone, and got all the officers' names and badge numbers.  He "continued to encroach on the officers. . . ."  The complaint further alleges that Montague and his friend refused to "give any information about who they were[.]" However, the officers knew their names.  Montague does not admit to interfering with the police investigation and admits only to helping his friend, who had been detained by the Yale Police, and to recording the incident on video.

[22] Montague adds that the letter further states that the reprimand was a "matter of internal record only" and that Montague was free to deny its existence if ever asked if he had been subject to disciplinary sanctions at Yale.

Executive Committee's reprimand was a formal disciplinary matter which could be considered by the UWC.[23]

In September 2015, the Association of American Universities ("AAU") issued the "Report on the AAU Campus Climate Survey on Sexual Assault and Sexual Misconduct" (hereinafter the "Campus Climate Report").  In Stephanie Spangler's September 21, 2015 introduction to the report of Yale-specific findings, she indicated that "[w]hile some students felt pressured by a Title IX Coordinator, the University-Wide Committee, or Yale Health to proceed [in filing a complaint], no students reported being pressured by any official to drop or abandon a complaint."

On September 21, 2015, President Salovey issued a statement regarding the results of the report.  In his statement, Salovey expressed concern that "[o]ver half of all students reported that they had experienced sexual harassment," and that the "survey results make clear . . . that we must redouble our efforts."

---

[23] The parties, however, dispute the significance of this language.  Montague argues that the letter specifically refers to an infraction under the undergraduate regulations found by the "Executive Committee" and does not indicate that the UWC could or would take the reprimand into consideration in adjudicating a complaint alleging a violation of Yale's sexual misconduct policies. Yale argues that the letter does not state that only the executive committee would consider the reprimand if Montague subsequently violated the undergraduate regulations.  Ultimately, Montague admitted that the reprimand from the Executive Committee was a formal disciplinary matter which could be considered by the UWC.

Also on September 21, 2015, one Rachel Rogers,[24] a suitemate of Roe, spoke to Angela Gleason, deputy Title IX coordinator. Rogers described Roe's experience with Montague on October 18, 2014 and asked for advice on how to help Roe.

On or about October 16, 2015, Gleason met with Rogers and discussed the options available to Roe.  On October 19, 2015, Gleason met with Roe and discussed the possibility of an informal process where Montague would be offered sensitivity training with SHARE and where it might be possible to keep Roe's name and identifying information confidential.

On or about November 6, 2015, Gleason contacted Roe to request a meeting to discuss a new development.[25]  Gleason asked Post to be on standby, during her meeting with Roe, to answer any questions Roe might have about the UWC process.  At the meeting, Gleason expressed concern to Roe about the seriousness of the incident and informed her that a Title IX coordinator could file a formal complaint if Roe agreed to cooperate as a witness.[26]  Gleason asked Post to join the meeting to address

---

[24] Rachel Rogers is a pseudonym used to protect the privacy of this Yale student.

[25] Gleason learned that Montague had been found to have violated Yale's sexual misconduct policies in UWC I and had already received sensitivity training. The parties dispute when Gleason first learned of this and the extent of the sensitivity training.  The parties also dispute what Gleason disclosed to Roe about this incident.

[26] Montague argues that the purpose of the meeting was to try to convince Roe to abandon the informal complaint and to agree to participate in a formal complaint against Montague.

questions Roe had about the UWC process.  Roe did not immediately agree to participate in a formal complaint.

On or about November 9, 2015, Roe decided that she wanted to pursue a formal complaint against Montague provided that a Title IX coordinator was listed as the complainant.[27]

At no time prior to the formal hearing did Post communicate with Roe nor did she communicate with him, about the substance of her complaint against Montague.

On November 18, 2015, Jason Killheffer, senior deputy Title IX coordinator, filed a complaint with the UWC (hereinafter "UWC II") alleging sexual assault by Montague based on a report that, on October 18, 2014, he had sexual intercourse with Roe without her consent.[28]  The Sexual Misconduct Policies and Related

---

[27] Montague responds that UWC Chairman Post presented this option as a "comfort" to Roe. The OCR's "Dear Colleague" letter provided the standard for sexual misconduct procedures at this time.  The federal government required educational institutions to evaluate claims of sexual misconduct under the preponderance of evidence standard.  The federal government also required educational institutions to allow a complainant to convert an informal process into a formal process.  Yale was required to inform Roe of this right.

[28] Killheffer filed the complaint pursuant to Section 1 of the UWC procedures, which allows a Title IX coordinator to bring a complaint to the UWC "when there is evidence that the University's policies on sexual misconduct have been violated and the Coordinator's intervention is needed to ensure that the matter reaches the UWC."  Montague states that, in a situation where the alleged victim of the misconduct does not agree to participate in the formal process by at least speaking to a fact finder, the Title IX coordinator can only proceed with a formal complaint if there is a risk to the safety of the university community.  Killheffer did not discuss the filing of a formal complaint with Roe.  Montague states that Killheffer did discuss the filing of a formal complaint with Gleason, Spangler, and Sawyer "who decided that the Title IX office would file a formal complaint if Roe's participation could be obtained."

13

Definitions define "consent" as "positive, unambiguous, and voluntary agreement to engage in specific sexual activity throughout a sexual encounter."  The same document explains that "[c]onsent to some sexual acts does not constitute consent to others, nor does past consent to a given act constitute present or future consent.  Consent must be ongoing throughout a sexual encounter and can be revoked at any time."[29]

On November 30, 2015, Menon notified Montague that Killheffer filed a formal complaint against him with the UWC. On December 9, 2015, Montague responded in writing.  He denied the allegations in the UWC II complaint and indicated that all intimate interactions with Roe were consensual.  Yale appointed attorney Miriam Berkman as the fact-finder to investigate Roe's allegations.  Berkman investigated the UWC II complaint and issued a fact-finder's report dated January 15, 2016.

On January 21, 2016, a five-member panel held a hearing and reviewed the UWC II complaint.  Roe submitted an opening statement and testified at the hearing.[30]  Roe admitted consenting to other sexual activity, but denied consenting to intercourse.  Roe reported to Berkman and the UWC II panel that,

---

[29] Montague disputes the meaning of this language.

[30] Although Yale's witnesses testified that it is their uniform practice to allow the complaining witness to submit an opening statement and participate in the process, Montague responds that there is no authority for this practice.

on the evening of the alleged incident, she asked Montague if it was "ok to hookup, but not have sex," twice prior to entering Montague's bedroom.[31]

Montague reported to Berkman that he asked Roe if she wanted to have sex and Roe responded "okay," but Montague reported to the UWC II panel that he had "non-verbal" indicators of consent.[32]  Montague admitted that he made statements to Berkman that ultimately turned out to be inaccurate.[33]  In his deposition, Montague testified that if Roe had said that she wanted to hook up but not have sex, he would not have had consent for intercourse.[34]  In his deposition, Montague admitted that he understood that prior sexual activity did not provide consent for subsequent sexual activity and that he needed

---

[31] Roe also reported to Berkman and the UWC II panel that, when Montague was preparing to engage in sexual intercourse with her, she put her hands up, pressed them against the front of Montague's shoulders and pushed him, but not very forcefully.  She also reported that she said, "Jack, no, I said I wanted to hookup but not have sex."  Montague, however, disputes this and further notes that Roe also told the fact-finder that Montague did not appear to hear her because he looked very drunk.  Montague admits that Roe told the fact-finder that, after intercourse, Montague said, "I'm really sorry.  I know you didn't want that."  However, Montague denies making this statement.

[32] Montague further responds that, since he had several sexual encounters with Roe, he was confused when he spoke with the fact-finder.

[33] Montague points out that, when being interviewed by Berkman over a year after the alleged events in question, he recalled only three sexual encounters with Roe, instead of four, and did not remember going to a party at a different location after having intercourse with Roe.

[34] Montague corrected his testimony in an errata sheet to state that, if Roe had said that she wanted to hook up but not have sex, he "would not have had consent for intercourse *at the time*." (emphasis added).

15

specific consent for each sexual act during a sexual interaction.[35]

Menon informed the UWC II panel of Jack Montague's disciplinary history with the UWC and the Executive Committee.[36] When considering the appropriate penalty, the UWC II panel found relevant the UWC I finding that Montague had violated the sexual misconduct policies.  At the time of his alleged encounter with Roe, Montague was on probation and had received sexual harassment, gender sensitivity training and education, and counseling on the appropriate use of alcohol, as a penalty from the UWC I proceeding.[37]  Yale's undergraduate regulations provided that "[t]he commission of a serious offense while on probation will normally result in suspension or expulsion."  Montague and Murphy, Montague's expert witness, both testified that sexual intercourse without consent was a serious violation.  Murphy also testified that, since Montague was on probation at

---

[35] Montague further states that his sexual history with Roe had an impact on how he interpreted her non-verbal cues.  He further responds that consent, once granted, need not be re-expressed verbally at each stage, or that a separate consent be obtained for each act.

[36] Montague disputes that Menon's disclosure was in accordance with the UWC Procedures.  He argues that "previous formal discipline for other acts of sexual misconduct" on the issues of culpability, rather than penalty, is part of the hearing phase of the proceedings.  He further argues that the UWC panel considered this information following the hearing, after Montague had already been excused.

[37] Montague admits these facts.  However, he argues that he was not given the opportunity to speak regarding the irrelevance and erroneousness of the UWC I findings and the fact that the training had nothing to do with sexual consent.

the time of the encounter with Roe, suspension or expulsion were the most likely sanctions under Yale's policies. [38]

After deliberation, the UWC II panel unanimously concluded that Roe's testimony was more credible than Montague's testimony and that Montague violated Yale's sexual misconduct policies.[39] They recommended expulsion.  Montague states that the UWC II panel did not consider all of the evidence because of the biased and inaccurate presentation of the evidence in the fact-finder's report.

On February 1, 2016, the panel issued its report.[40] Montague wrote a response to the UWC II panel report, requesting that Dean Holloway reopen his case for further review and that the matter be referred back to the panel so that they could conduct a more expansive review.

---

[38] Montague admits this fact.  However, he argues that his expert is not a Title IX expert and indicates that Murphy is only offered as an expert in sexual misconduct investigation, in the university setting, where Title IX applies.  Therefore, her expert opinion is limited to topics related to the fact-finder's investigation and presentation of the evidence to the UWC II panel.

[39] Montague disputes the extent to which the panel deliberated since the deliberations are not transcribed.  The UWC II panel identified specific reasons for their credibility determination.  However, Montague's investigator, Murphy, opined that the credibility determination was tainted because it was based on a flawed and biased collection, consideration, and reporting of the evidence.

[40] The UWC procedures provide that the complainant and respondent must be provided with the panel's findings of fact and conclusion, and Montague understood that he would not be informed of the panel's recommendations.

On February 10, 2016, Dean Holloway accepted the UWC II panel's findings of fact and conclusion that Montague had sexually assaulted Roe, in violation of Yale's sexual misconduct policies.  Holloway also decided that the appropriate penalty was expulsion, as recommended by the UWC II panel.  Montague filed an appeal from Dean Holloway's February 10, 2016 decision with Provost Benjamin Polak.

On February 24, 2016, Provost Polak denied Montague's appeal.  Due to Montague's expulsion, he was removed from Yale's basketball team, where he was the captain.[41]  There were articles in the press reporting that Montague was expelled from Yale and removed from the basketball team.

### STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A dispute regarding a material fact is genuine 'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

---

[41] The team ultimately qualified for the NCAA Tournament, which it had not accomplished since 1962.

The court must view all inferences and ambiguities "in a light most favorable to the nonmoving party." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991), cert. denied, 502 U.S. 849 (1991). "'Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper.'" Id. at 523 (quoting Bryant, 923 F.2d at 982).

## DISCUSSION

### I.   Deference

As a threshold matter, Yale argues that this court owes Yale deference in its disciplinary decisions. Specifically, Yale argues that courts "require only that an educational institution has 'substantially complied' with its rules and regulations" and that judicial review of its actions is limited to whether the institution acted arbitrarily, capriciously, or in bad faith. While the cases cited by Yale demonstrate that courts refrain from interfering with discipline arising out of academic related issues and decisions which involve professional judgment, they do not provide authority on cases involving discipline arising from sexual misconduct.

Indeed, the second circuit recognizes that "[w]hen reviewing the substance of a *genuinely academic decision*, courts should accord the faculty's professional judgment great deference." Powell v. National Bd. Of Med. Examiners, 364 F.3d 79, 88 (2d Cir. 2004) (citing Regents of Univ. of Michigan v.

Ewing, 474 U.S. 214, 225 (1985))(emphasis added).  However,

"[e]ducational discretion is. . . not limitless." Gupta v. New

Britain General Hospital, 239, Conn. 574, 595 (1996).  "[I]n

exercising its professional judgment, an educational institution

does not have license to act arbitrarily, capriciously, or in

bad faith." Id.  When an expulsion is "not grounded in

academic, but disciplinary reasons . . . the court need not

confer . . . the type of deference that is appropriate within

the context of an academic, rather than a contractual dispute,

which falls squarely within the court's competency." McCarty v.

Yale University, CV 166063796S, 2017 WL 4508771 at 4 (Sup. CT

Aug. 29, 2017).  Because Montague's expulsion was based on

sexual misconduct, and not "a genuinely academic decision," this

court need not confer deference to Yale on the breach of

contract claims.[42]

## II.  Breach of Contract Claims

In his complaint, Montague alleges two related breach of

contract claims arising out of UWC I, and a myriad of breach of

contract claims arising out of UWC II.

---

[42] Although Yale further asserts that this court should apply an arbitrary and
capricious standard of review, it fails to provide sufficient support for
application of such limited review.  The court notes that, even if the court
were to confer deference to Yale on the breach of contract claims, Montague
has demonstrated an issue of fact for the jury with respect to whether Yale's
actions were arbitrary and capricious, given the evidence presented.

In Connecticut, "[t]he elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." Meyers v. Livingston, Adler, Pulda, Meiklejohn and Kelly, P.C., 311 Conn. 282, 291 (2014). "Every contract carries with it a covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. Maloney v. Connecticut Orthopedics, P.C., 47 F. Supp. 2d 244, 249 (D. Conn. Mar. 22, 1999)(citing Habetz v. Condon, 224 Conn. 231, 238 (1992)). "A party's neglect or refusal to fulfill a contractual obligation constitutes bad faith only if prompted by some interested or sinister motive." Id. (citation omitted). "Bad faith means more than mere negligence; it involves a dishonest purpose." Feinberg v. Berglewicz, 32 Conn. App. 857, 862 (1993). In this case, the parties do not dispute that the relationship between a student and a private university is contractual. Instead, the parties dispute whether Yale breached the agreement.

(a)  Breach of Contract Arising from UWC I – Exhaustion of Administrative Remedies

Yale first argues that Montague's claims for breach of contract in counts I and II, based on the UWC I proceedings, must fail because Montague failed to exhaust his administrative remedies. Specifically, Yale argues that Montague could have

21

raised lack of jurisdiction in response to the UWC I panel report and/or in an appeal of Dean Mary Miller's decision, but Montague chose not to contest either decision. Therefore, according to Yale, he failed to exhaust his administrative remedies and is barred from asserting any claims based on UWC I. In support of its argument, Yale cites to Neiman v. Yale University, 270 Conn. 244, 255-56 (2004), in which the court held that the exhaustion of remedies doctrine applies to an academic institution's grievance procedures, contained in a faculty handbook, in an employment case involving tenure.

Montague responds that exhaustion of administrative remedies applies only if there is an administrative remedy and, in this case, there was no mechanism to challenge jurisdiction.[43] Specifically, Montague responds that, since the UWC panel

---

[43] The relevant sections of the UWC procedures in effect at the time of the UWC I proceedings indicate:

7.5 Recommendation
[T]he panel will complete a report, setting out its findings of fact, its conclusion as to whether or not those facts constitute a violation of University policy, and its recommended penalty, if any. The secretary will forward the report to the parties . . . . The parties may submit to the decision maker a written response to the panel's report within three days of receiving it. . . .
7.7. Appeals
Any party may appeal the decision of the decision maker. . . .  An appeal from the provost's decision regarding a . . . student is made to the provost. . . .  The only grounds for appeal are (i) procedural error that prevented the hearing panel or the decision maker from judging the matter fairly, or (ii) the discovery of facts that were not reasonably available to the appealing party prior to the UWC hearing and that support or refute the allegation of sexual misconduct.

decides jurisdiction, their decision is final and not subject to appeal.

Yale responds that "an improper determination that the UWC had jurisdiction would qualify as a procedural error" under the UWC procedures.

The court concludes that the defendants have failed to provide a basis for judgment based upon Montague's failure to exhaust the administrative remedies.  The Neiman case is specific to employment disputes regarding tenure, as demonstrated by that court's enumerated reasons for the exhaustion requirement.  Yale has not provided, nor has this court found, authority to support application of the exhaustion of remedies doctrine on the facts of this case.  Therefore, Yale's motion for summary judgment on this basis is denied.

    (b)  Breach of Contract Arising from UWC I

    (i)  Count I

Yale argues that it is entitled to summary judgment with respect to Montague's claim that the UWC lacked jurisdiction. Specifically, Yale argues that Smith's complaint "undeniably alleged" sexual misconduct as defined by the sexual misconduct policies and the UWC procedures.  Yale states that, since the UWC chair, the UWC secretary, and another UWC member determined that the UWC had jurisdiction over Smith's complaint, the

decision to accept jurisdiction is "consistent with Yale's policies."

Montague responds that because the incident involving Sally Smith was not a matter of sexual misconduct, the UWC lacked jurisdiction. Specifically, he argues that the complaint does not allege sexual misconduct based on the plain language of Yale's sexual misconduct policies. Montague cites to an e-mail between Post and Menon to support his allegation that the "decision to pursue the matter through the UWC was a violation of its own procedures and policies, and a breach of covenant of good faith and fair dealing."

Section 7.1 of the UWC procedures provides, in relevant part, that "[t]he [UWC] chair, in consultation with the secretary and one other [UWC] member, will decide whether . . . the complaint, if substantiated, would constitute a violation of University policy concerning sexual misconduct. . . . The UWC will not hear formal complaints that do not meet these criteria. . . ." The introduction to the UWC procedures indicates that "[s]exual misconduct incorporates a range of behaviors including rape, sexual assault (which includes any kind of non-consensual sexual contact), sexual harassment, intimate partner violence, stalking, and any other conduct of a sexual nature that is non-consensual, or has the purpose or effect of threatening or intimidating a person or persons."

Menon, the UWC secretary, Post, a UWC member, and Della Rocca, the UWC chair, determined that the UWC had jurisdiction over the August 25, 2013 complaint, based on Montague's alleged conduct.  On August 26, 2013, in considering jurisdiction, Menon sent an e-mail to Post asking his opinion regarding jurisdiction.  Post replied that "I think the crux is he is alleged to have placed the plate down her shirt and between her breasts.  Therefore[,] the act described in the complaint could be viewed [as] an act of a sexual nature that was both non-consensual and has the effect of intimidating a person.  Therefore[,] I think it falls within the jurisdiction of the UWC[.]"  Montague cites to Post's subsequent remark that "it may be better served as a complaint to the executive committee because it is on the edge and some panel members will have a hard time seeing the sexual nature of the act."

On August 27, 2013 Menon forwarded Post's e-mail to Della Rocca.  Della Rocca, as the chair of the UWC, confirmed jurisdiction[44] and stated "I don't think that this case would be better sent to [the Executive Committee]" because of "precedent of a somewhat similar case . . . that we handled in the UWC. . . ."  Menon testified at her deposition that she "thought the UWC had jurisdiction" because "placing an object between a wom[a]n's

---

[44] Della Rocca wrote that "I regard David as agreeing that we have jurisdiction here."

breasts without her consent would be a violation of the sexual misconduct policy, if shown to be true." She further testified that she felt that the complaint "fell squarely within the jurisdiction of the UWC."

The fact that Post speculated that the case is on the "edge" and other members might "have a hard time seeing the sexual nature of the act," does not create a dispute as to jurisdiction. In satisfaction of the UWC procedures, the chair, the secretary, and another member of the UWC found that jurisdiction existed.[45]

A five-member panel concluded that Montague violated Yale's policy on sexual misconduct by sexually harassing Smith. Montague did not submit a response to the panel report.[46] Dean Miller accepted the findings of fact, the conclusion, and the recommendations made by the panel. Montague accepted full responsibility, did not appeal, and did not challenge the UWC's jurisdiction until over two years later, when he filed the within complaint. Montague has failed to provide sufficient evidence demonstrating a genuine issue of material fact in dispute that the UWC lacked jurisdiction. Therefore, the defendants' motion for summary judgment with respect to count I is granted.

---

[45] Della Rocca further wrote that "if a UWC panel feels that the case is non-sexual, it is open to them to consider whether it would fall under some other non-sexual-misconduct policy."

[46] The five-member panel found that Montague's unprovoked behavior "displayed an absolute disregard for Smith as a female student" and walking away was "demeaning, humiliating and reprehensible."

(ii) <u>Count II</u>

Yale argues that it is entitled to summary judgment on Montague's claim that the UWC I panel's finding was contrary to Yale's sexual misconduct policies.  Specifically, Yale argues that the plain language of the UWC procedures, the sexual misconduct policies, Montague's admission that he violated the sexual misconduct policies, and his deposition testimony "make clear . . . that [Montague] violated the sexual misconduct policies."  Yale states that there was adequate evidence to support a finding of sexual harassment because Montague's behavior displayed an absolute disregard for Smith as a female student.

Montague responds that the UWC I panel's finding of sexual harassment was contrary to the plain language of Yale's sexual misconduct policies because it was not "nonconsensual conduct of a sexual nature" which had the "purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating or hostile academic or work environment."  Therefore, he argues that Yale's conduct amounted to a breach of contract and a breach of the covenant of good faith and fair dealing.

Yale's sexual misconduct policies define sexual harassment, in relevant part, as "nonconsensual sexual advances, request for sexual favors, or other verbal or physical conduct of a sexual

nature on or off campus, when . . . such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating or hostile academic or work environment.  Sexual harassment may be found in a single episode . . . and sexual harassment is prohibited regardless of the sex of the harasser or the harassed."

On August 25, 2013, Sally Smith filed a complaint with the UWC alleging that Montague folded up his used pizza plate and placed it down her tank top, between her breasts.  In her complaint, Smith indicated that she "had never met [Montague] until this encounter."  The fact-finder's report indicates that Montague had no recollection of the incident or any events of the night.  Montague indicated in his response to the complaint that he "assume[s] that [he] was under the influence of alcohol that night, as [he] do[es] not recall this incident."[47]  Two of Montague's friends confirmed his behavior to the fact-finder. Montague admitted that the incident must have occurred as alleged and stated that he "accepts full responsibility for the incident although he does not remember it" and indicated that he "never meant to hurt or sexually harass" Smith.  The fact-

---

[47] Yale College undergraduate regulations provide that "students will be held fully responsible for their own behavior, even when acting under the influence of alcoholic beverages. . . .  [T]he association of alcoholic beverages with problem behavior will not be seen as a mitigating factor and may be seen as an exacerbating factor."

finder's report also indicates that Smith stated that Montague's "inappropriate conduct" caused her to "second-guess herself, questioning whether she did anything to prompt or invite" his behavior.[48]

Montague attempts to show a dispute by arguing that Smith also indicated that there "was no physical (skin-to-skin) contact," and that she described her interaction as "peripheral."[49]  However, the sexual misconduct polices do not require skin-to skin contact.  Montague also cites Smith's statement that his action was an impulsive rather than a pre-meditated act.  Montague provided no evidence, however, that the UWC procedures require pre-meditation for a finding of sexual misconduct.  Therefore, Montague has failed to show that these

---

[48] Smith further reported that she "did not act because [she] was so shocked," she "continued to think about what had happened for several days," and wanted Montague to "understand that his behavior was offensive and unacceptable." The panel found that Smith's reaction of shock, anger, and the feeling of being violated was reasonable.

[49] Although Montague testified that putting your hands **or another object** between a woman's breasts without consent violates Yale's sexual misconduct policy, he points out that he later clarified his testimony in an errata sheet, by deleting his reference to "another object." "Rule 30(e) allows deponents to make 'changes in form or substance' to their testimony. . . ." Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 103 (2d Cir. 1997) (citing Fed. R. Civ. P. 30(e)). However, the deponent is "'not entitled to have his answers take the place of the original ones,' and . . . his 'changed answers bec[o]me [simply a] part of the record generated during discovery.'" Id. (quoting Podell v. Citicorp Diners Club, Inc., 914 F. Supp. 1025, 1027 (S.D.N.Y.1996)). In this case, Montague accepted responsibility during the proceedings and during his deposition and attempts to correct his testimony via an errata sheet.  His "effort to retrieve the situation by scratching out and recanting his original testimony does not weigh enough in the balance to create an issue of fact for the jury." Id.

statements created a genuine issue of material fact for the
jury.[50]

As such, the defendants' motion for summary judgment with
respect to count II is granted.

(c)  Breach of Contract Claims Arising from UWC II - Counts
     VII (A) through (H)

The defendants argue that since they fully complied with
the UWC procedures in the UWC II proceeding, there was no breach
of contract and summary judgment is warranted.

Montague responds that the defendants "employed a flawed
and biased process . . . slanted toward imposing and justifying
a disciplinary action against Montague" and violated specific
UWC procedures, resulting in a breach of contract and a breach
of the covenant of good faith and fair dealing.

---

[50] While Montague offers other extraneous arguments that his conduct did not
amount to sexual harassment, these arguments are also conclusory, immaterial,
and insufficient to create an issue of fact for the jury.  For example,
Montague argues that his behavior was not inherently sexual in nature because
if he shoved a pizza plate down a man's shirt, it would be similarly
offensive and unacceptable, but indisputably not sexual harassment.  This
argument, however, does not create a genuine issue of material fact for the
jury.  A dispute concerning a material fact is not created by a mere
allegation in the pleadings, or by surmise or conjecture.  D'Amico v. City of
N.Y., 132 F.3d 145, 149 (2d Cir. 1998); see also Stuart & Sons, L.P. v.
Curtis Pub. Co., Inc., 456 F. Supp. 2d 336, 342 (D. Conn. 2006) (citing
Applegate v. Top Assoc., Inc., 425 F.2d 92, 96 (2d Cir. 1970); Quinn v.
Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980)).
Montague provided no evidence or case law to support his argument.  "Factual
disputes that are irrelevant or unnecessary will not be counted." Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Summary judgment cannot be
avoided by [alleging] immaterial factual disputes."  Howard v. Gleason Corp.,
901 F.2d 1154, 1159 (2d Cir. 1990).

(i)  <u>Obligation to Maintain Confidentiality – Count VII(A)</u>

Yale argues that there are no issues of fact with respect to Montague's claim that it breached its confidentiality obligations, either under the UWC procedures or the "Provost's Statement on Confidentiality."  Specifically, Yale argues that Gleason only stated that Montague already received sensitivity training but did not reveal the fact or substance of the UWC I proceedings to Roe.  Yale states that John Criscuolo, a SHARE Center counselor, testified that "he provides sensitivity and gender conduct training to students referred by the student's college Dean and to 'self-referred' students, as well as students referred by the UWC. . . .  Thus, a statement that the plaintiff had received sensitivity training is not tantamount to a disclosure that he had been found responsible for violating the Sexual Misconduct Policies. . . ."

Montague responds that Gleason disclosed to Roe confidential information regarding the UWC I proceedings in order to persuade Roe to pursue a formal complaint.  He notes that Berkman, the fact-finder in the UWC II proceedings, wrote in her report that "Gleason explained to [Roe] that [Montague] had already been given a recommendation for training after a previous complaint and so that option was no longer open to him."  Montague also cites Berkman's statement that Roe "was especially motivated to participate in the investigation and

31

hearing process after she heard that [Montague] had already had another complaint against him, as she felt it was important to protect other women."  Montague points out that, in a draft report, Berkman commented that "[t]his is an accurate description of what Roe told me . . . ."  Finally, in a January 7, 2016 email response to the suggested edits, Berkman wrote that "Roe didn't really know what had been given before except that it was related to a previous incident and the fact that it had been given made it inappropriate to send him for more training now."

Yale argues in its reply that Gleason and Roe deny that Gleason informed Roe that a previous UWC complaint had been filed against Montague, that he had been found responsible for sexual misconduct, or that the training was due to a finding of a violation of the sexual misconduct policies.

The applicable UWC procedures[51] provide, in relevant part, that "[t]he UWC and all members of the Yale community who are involved in a matter before the UWC are expected to maintain the confidentiality of its proceedings and the information obtained for those proceedings. . . .  All documents prepared by, prepared for, or received from the UWC in connection with a UWC

---

[51] New UWC procedures came into effect on October 26, 2015, shortly after Gleason met with Roe.

proceeding ("UWC Documents") must be held in strict confidence."[52]

In viewing all inferences and ambiguities "in a light most favorable to the nonmoving party," Fed. R. Civ. P. 56(c), the court concludes that Montague has provided sufficient evidence to establish a dispute over whether Gleason's disclosures to Roe were a breach of the confidentiality provisions of Yale's UWC procedures or motivated Roe to file a formal complaint.[53]

Therefore, Yale's motion for summary judgment is denied with respect to count VII(A).

(ii) <u>Intentional Manipulation of Procedure – Count VII(B)</u>

Yale argues that it is entitled to judgment with respect to the claim that it intentionally manipulated the UWC procedures. Specifically, Yale argues that the UWC procedures allow a Title IX coordinator to file a complaint "when there is evidence that the University's policies on sexual misconduct have been violated and the [c]oordinator's intervention is needed to ensure that the matter reaches the UWC."  Yale states that Roe

---

[52] The provost's statement on confidentiality states in relevant part: "The UWC's procedures impose strict and unequivocal confidentiality obligations regarding documents prepared by, prepared for, or received from the UWC in connection with a UWC proceeding ("UWC Documents")."

[53] Montague claims that admission of the evidence on this claim would fall under an exception to the rule against hearsay.  The court notes that any arguments regarding hearsay will be addressed at the time of trial.

agreed to file a formal complaint and participate as a witness
by talking to the fact-finder and participating in a hearing.

Montague responds that, "except when there is a threat to
the community, the choice of whether to pursue a formal or
informal complaint is left entirely to the discretion of the
complainant."  Therefore, Yale could not have brought a formal
complaint without agreement from Roe.  Montague further responds
that Yale's Title IX leadership violated the duty of
impartiality, when they met and decided that they should pursue
a formal complaint and by inducing Roe to file a formal
complaint against him.

Yale responds that, while Gleason, Killheffer, Spangler,
and Sawyer met to discuss the allegations, Montague has not
shown any evidence of pressure or coercion.

Section 1 of the UWC procedures provides that "a
coordinator may bring a complaint when there is evidence that
the University's policies on sexual misconduct have been
violated and the Coordinator's intervention is needed to ensure
that the matter reaches the UWC."

The parties do not dispute that Roe ultimately agreed to
participate in a formal complaint as a witness with the UWC
coordinator as the complainant.  Montague has not provided any
evidence that Yale breached section 1 of the UWC procedures, by
bringing the complaint on Roe's behalf.  However, Montague has

34

provided sufficient evidence in his other breach of contract counts, to create an issue of fact regarding whether Yale pressured or coerced Roe into filing a formal complaint.

Therefore, in viewing all inferences and ambiguities "in a light most favorable to the nonmoving party," Fed. R. Civ. P. 56(c), the court concludes that Montague has provided sufficient evidence to establish a dispute over whether the defendants intentionally manipulated the UWC procedures in order to motivate Roe to file a formal complaint.  The defendants' motion for summary judgment is denied with regard to count VII(B).

(iii) <u>Full Participation in Hearing by Roe - Count VII(C)</u>

Yale argues that it is entitled to summary judgment with respect to Montague's claim that it violated UWC procedures by allowing Roe to fully participate, even though she was not the complainant.  Specifically, Yale argues that "since there is no provision in the UWC procedures prohibiting [Roe] from participating in the UWC process as if she had filed the formal complaint on her own behalf, and the uniform practice has been to permit the complaining witness to do so, [Montague] cannot prevail" on this claim.  Yale argues that Montague has not proffered any evidence to contradict the testimony of Menon and Post that the uniform practice is to allow the primary witness to participate fully in a complaint brought by a Title IX

35

coordinator, because of firsthand knowledge.  Yale also states that Montague failed to articulate how the procedure adversely affected him.

Montague argues in opposition that Roe was allowed to give "an emotional opening statement about the incident and the effect it had on her, attend the entire hearing, and otherwise present herself as the complainant."  Specifically, he responds that the UWC procedures "provide for opening statements only by the complainant and respondent and does not allow for non-party witnesses to be present other than while testifying."

The relevant provision governing the hearing process is section 7.4, which provides, in relevant part, that "the complainant and the respondent will not appear jointly before the panel at any stage of the hearing. . . .  Following these statements, the panel will interview the complainant and then the respondent.  At its sole discretion, the panel may request the testimony of additional witnesses."

Montague has not provided any evidence disputing Menon and Post's testimony that the UWC has a practice of allowing the primary witness to fully participate in the hearing of a complaint initiated by the Title IX coordinator.  However, Section 7.4 allows only the complainant and the respondent to make a brief statement.  While the panel may request the testimony of additional witnesses, at their sole discretion,

section 7.3 provides that "[n]ormally, the panel will call a witness other than the parties only if the witness can offer potentially relevant information that was not conveyed to the fact-finder." Section 7.4 also provides that "unless both parties ask to appear jointly, the complainant and the respondent will not appear jointly before the panel at any stage of the hearing."

In viewing all inferences and ambiguities "in a light most favorable to the nonmoving party," Fed. R. Civ. P. 56(c), the court concludes that there are issues of material fact with regard to whether Yale violated their own procedures by allowing Roe full participation in the hearing, even though she was not the complainant.[54] Therefore, the defendants' motion for summary judgment is denied with respect to count VII(C).

(iv) <u>Hearing Panel Appointment Procedures – Count VII(D)</u>

Yale argues it is entitled to summary judgment with respect to Montague's claim that Post, as UWC chair, improperly appointed himself as panel chair in UWC II, even though he participated in a meeting with Roe. Specifically, Yale argues that Post did not participate in the resolution of an informal

---

[54] Montague also argues that by allowing Roe to participate fully and by having Killheffer as the complainant, Yale put the "full weight of its authority" behind Roe, thereby "implicitly vouching for her credibility." Yale argues that Montague provided no evidence that these circumstances "influenced any of the UWC II panel members' deliberations or decision making."

complaint because he met with Roe "solely to answer her
questions regarding the UWC process, after she indicated that
she might be interested in a formal complaint."  Yale relies on
Gleason and Roe's testimony confirming that Post met with Roe to
answer questions regarding the UWC process.

Montague responds that Post's self-appointment to the UWC
panel violated section 7.2 of the UWC procedures because he
participated in the resolution of Roe's informal complaint.
Montague also responds that he had the right to question Post's
impartiality because Post "join[ed] the effort to convince Roe
to authorize the filing of a formal complaint, by offering her
'comfort' in the form of a complaint filed in the name of the
Title IX office."  Montague states that this "pre-hearing *ex
parte* role was not disclosed to him" and deprived him of the
opportunity to request Post's recusal as allowed under UWC
procedures.

Section 7.2 of the UWC procedures provides that "[t]he
hearing panel will not include any member who has participated
in the resolution of an informal complaint arising out of the
same events.  The panel members . . . will receive a copy of the
complaint and response and must withdraw from the proceedings if
their relationship to the complainant or the respondent or other
circumstances lead them to believe that they cannot judge the
matter fairly."

The parties appear to dispute what "the resolution of an informal complaint" means in the UWC procedures.  Section 6 of the UWC procedures indicates that "[for] the resolution of an informal complaint, the UWC Chair or Secretary will contact a Title IX Coordinator, who may offer an informal investigation, mediation, counseling, or other means of resolving the complaint."  Montague provided evidence that on November 4, 2015, Gleason, deputy Title IX coordinator, attended a meeting with Stephanie Spangler, deputy provost for health affairs and academic integrity and Title IX coordinator, Susan Sawyer, general counsel, and Jason Killheffer, senior deputy Title IX coordinator, regarding Montague.  Gleason also attended an additional meeting with Sawyer, Killheffer, Menon, UWC secretary, and Post, UWC chair.  On or about November 6, 2015, Gleason contacted Roe to request a meeting to discuss a new development.  Gleason asked Post to be on standby during the meeting between she and Roe so that Post could answer any questions Roe might have about the UWC process.  Gleason testified that Roe did have questions about the UWC procedures.  Gleason testified that Post joined the meeting either "halfway" or "two-thirds" of the way through the meeting.  Gleason further testified that this was "the first time that [she] asked [Post] to be on standby. . . ." and she had never "involved [Post] in

meetings on prior occasions with any other complainants."[55]
While Yale points out that Roe was already considering filing a
formal complaint before Post spoke with Roe, Roe did not agree
to participate in a formal complaint on that day.  On or about
November 9, 2015, Roe agreed to participate as a witness in a
formal complaint, filed by the UWC coordinator.

In viewing all inferences and ambiguities "in a light most
favorable to the nonmoving party," Fed. R. Civ. P. 56(c), the
court concludes that, based on these facts, there is a genuine
issue of material fact as to whether there was a "resolution of
an informal complaint," and whether Post's participation in that
meeting motivated Roe to change her informal complaint into a
formal complaint.  Therefore, the court concludes that the
defendants' motion for summary judgment is denied with respect
to count VII(D).

    (v)    <u>Findings Constituting a Violation by a Preponderance</u>
             <u>of Evidence – Count VII(E)</u>

Yale argues that it is entitled to summary judgment with
respect to Montague's claim that the UWC panel failed to make
sufficient findings of sexual assault.  Yale states that the UWC
properly fulfilled its duty to look at the evidence and
determine credibility.  Specifically, Yale points out that Roe

---

[55] However, Post testified that he had received e-mails from Gleason asking
him to by on standby before.

told Montague three times that she did not want to have sexual intercourse and never consented to intercourse, either by word or action.  According to Yale, the UWC panel deliberated and identified specific reasons to credit Roe's version of the events over Montague's version and properly found Roe's account more credible.

Montague argues in opposition that the fact-finder and the UWC II panel were biased in their collection, consideration, and reporting of the evidence.[56]  Specifically, Montague argues that they failed to seek exculpatory evidence, cast Roe's inconsistencies as consistencies, placed unfair weight on a supposed inconsistency in Montague's recollections, failed to probe Roe's motive,[57] and transformed and obliterated undisputed evidence to remove facts[58] which raised questions about whether Roe consented.[59]  Montague also argues that there was pressure on

---

[56] Montague relies on the testimony of Murphy, his expert witness.

[57] He noted that they changed positions during intercourse and he argues that Roe didn't properly explain why she returned to his apartment and stayed the night.

[58] For example, Montague argues that the fact-finder wrote that Roe consented to him "touching her genitals" when, in fact, "she consented, non-verbally, to digital penetration."  Montague further argues that the panel may see this as evidence that Roe "changed her mind."  Yale responds that Roe reported that she said "no" prior to intercourse and Roe had previously consented to "hook up and not have sex."  As such, Yale argues that Roe had previously verbally consented to all sexual acts "short of intercourse."

[59] Montague argues that Yale's Title IX office has a contractual duty of impartiality requiring it to avoid influencing a complainant's decision whether to file a formal or informal complaint.  The court has concluded that there are genuine issues of material fact regarding whether Yale adhered to its UWC procedure in this regard.

Yale to be tough on perpetrators of sexual misconduct and the Title IX office was trying to use his popularity as the captain of the basketball team to show that Yale was being tough on sexual misconduct.[60]

Section 7.3 of the UWC procedures provides that "the UWC Chair will appoint an impartial fact-finder to assist in the investigation of the allegations.  The Secretary will provide the fact-finder with the complaint, the response, and any other information provided by the parties.  The fact-finder will gather documents and conduct interviews as necessary to reach a thorough understanding of the facts and circumstances surrounding the allegations of the complaint."  Section 7.5 of the UWC procedures requires that "the panel . . . consider whether the respondent has violated the University policy, giving an affirmative answer if it satisfied that a violation has been shown by a preponderance of the evidence."

In viewing all inferences and ambiguities "in a light most favorable to the nonmoving party," Fed. R. Civ. P. 56(c), the court concludes that there is a genuine issue of material fact with respect to the impartiality of the hearing, given the disputed evidence presented in the other breach of contract

---

[60] Montague provided e-mails and edits to the fact-finder's report from the UWC chair and others which may raise other issues of fact.  Section 7.3, of the UWC procedures, indicates that "[a]fter reviewing the [fact-finder's] report, the UWC Chair may request clarifications and additional investigations."

claims.  Therefore, the defendants' motion for summary judgment is denied with respect to count VII(D).

> (vi)   <u>Violation of Section 7.4 & 7.5 of the UWC Procedures – Reliance on UWC I – Counts VII(F)[61] and (G)</u>

With respect to count VII(G), Yale argues that it is entitled to summary judgment on Montague's claim that it breached UWC procedures when it considered and relied upon the UWC I discipline, for culpability in UWC II.  Specifically, Yale argues that the UWC procedures "explicitly state that information regarding prior discipline is to be discussed only during the panel's deliberations on culpability, which necessarily occurs outside the presence of the complainant and respondent."  Yale argues that Montague received a copy of UWC procedures prior to the hearing, which informed him that the discipline that he received in UWC I could be considered when assessing culpability.  Yale states that Montague "was not precluded from discussing UWC I during UWC II."

Montague argues in opposition that Section 7.4 of the UWC procedures indicates that consideration of previous formal

---

[61] In count VII(F), Montague argues that Yale breached Section 7.4 of the UWC procedures by taking into consideration the UWC I proceedings for culpability because it "did not in fact involve any 'acts of sexual misconduct.'"  The court has concluded that there are no genuine issues of material fact in counts I and II of Montague's complaint, regarding UWC I.  Therefore, the court concludes that there are no genuine issues of material fact for the jury on count VII(F), for the reasons previously articulated, and Yale is entitled to judgment as a matter of law.

discipline occurs at the hearing phase of the proceedings.
Montague also responds that the UWC procedures indicate that the
parties have the right to be present for the hearing, with the
only limitation that the complainant and the respondent will not
jointly appear before the panel.  Montague points out that he is
entitled to hear and to respond to all evidence against him,
considered by the panel, in determining his culpability and only
the deliberations should be conducted following the hearing.

Section 7.4 of the UWC procedures, entitled "Hearing,"
discusses the hearing procedure and indicates, in relevant part,
that, "the complainant and the respondent will not appear
jointly before the panel at any stage of the hearing.  The party
who is not before the panel will be in a private room with audio
access to the proceedings. . . .  In determining culpability,
the panel may also take into account a respondent's previous
formal discipline for other acts of sexual misconduct, including
written reprimands, and the respondent's criminal conviction
arising out of the events complained of."

Section 7.5 of the UWC procedures, entitled "Findings,
Conclusions, and Recommendations," provides, in relevant part,
that, "[f]ollowing the hearing, the panel will consider whether
the respondent has violated University policy giving an
affirmative answer if it is satisfied that a violation has been
shown by a preponderance of the evidence. . . .  If a party is

44

found to have violated University policy, the panel will recommend a penalty.  The Secretary will inform the panel about the nature of previous penalties assessed for similar violations.  The Secretary will also describe any formal Yale discipline previously imposed on the respondent, and the panel may consider this prior discipline in its recommendations regarding a penalty."

The parties do not dispute that Menon, UWC secretary, disclosed to the panel Montague's UWC I discipline for sexual harassment, outside of Montague's presence.  The parties do not dispute that the UWC I was not contained in the fact-finder's report.  The February 1, 2016 panel report clearly indicates that the panel considered Montague's previous formal disciplinary history with the UWC when it concluded that he sexually assaulted Roe in violation of Yale's misconduct policy.[62]  In addition, the panel took into consideration the UWC I hearing and the written reprimand from the Executive Committee for "Defiance of Authority" in determining the penalty.[63]

---

[62]  The panel report indicates: "**Conclusion:**  In accordance with Section 7.4 of the UWC's Procedures, the panel takes into account Mr. Montague's previous formal disciplinary history with the UWC for violating Yale's sexual misconduct policy when reaching its conclusion.  The panel concludes by a preponderance of evidence that Mr. Montague sexually assaulted Ms. [Roe] in violation of Yale's sexual misconduct policy."

[63]  The panel report indicates: "**Recommendation:** In accordance with section 7.5 of the UWC's Procedures, the panel takes into account its conclusion in this case and the two previous formal disciplinary findings against Mr. Montague when making its recommendation."

Post testified that, when providing information on a prior complaint, the "practice of the secretary is to give a couple sentence description of the case without identifying details, but . . . with enough detail that the panel can understand the previous violation and then the penalty."  He further testified that the panel does not receive the fact-finder's report from the prior complaint.  Post testified that the disclosure of the prior discipline happens at the hearing, but not in the presence of the complainant or the respondent because the "respondent's disciplinary history is confidential, and we would not share that with the complainant."

Montague has failed to demonstrate any genuine issues of material fact with respect to whether Yale violated the UWC procedures regarding this issue.  No provision in the UWC specifically provides that evidence and/or information regarding prior discipline is to be presented during the hearing and in the presence of the respondent.  Therefore, the defendants' motion for summary judgment is granted with regard to count VII(G).

(vii) <u>Violation of Section 7.5 – Reliance on the Executive Committee's Reprimand – Count VII(H)</u>

Yale argues that it is entitled to summary judgment with respect to Montague's claim that Yale violated the UWC procedures when it relied on the Executive Committee's

46

reprimand.  Specifically, Yale argues that the Executive
Committee's letter to Montague does not state that only the
Executive Committee would consider the reprimand if Montague
subsequently violated the undergraduate regulations.

Montague argues in opposition that the letter specifically
refers to an infraction under the undergraduate regulations
found by the "Executive Committee."  He states that it does not
indicate that the UWC could, or would, take the reprimand into
consideration in adjudicating a complaint alleging a violation
of Yale's sexual misconduct policies.

Section 7.5 of the UWC procedures provides that "[t]he
Secretary will also describe any formal Yale discipline
previously imposed on the respondent, and the panel may consider
this prior discipline in its recommendations regarding a
penalty."

On September 24, 2015, the Executive Committee informed
Montague, by letter, that he violated Yale's undergraduate
regulations governing "Defiance of Authority" due to his conduct
on September 6, 2015.  The letter states that the reprimand was
a "matter of internal record only" and that Montague was free to
deny its existence if ever asked if he had been subject to
disciplinary sanctions at Yale.  The letter further states that
"the reprimand will be taken into consideration in determining a
penalty if you should ever again be found by the Executive

47

Committee to have committed an infraction of the [u]ndergraduate [r]egulations."

The UWC procedures allow the panel to consider any formal Yale discipline previously imposed on the respondent, in determining a penalty.  Ultimately, Montague admitted that the Executive Committee's decision is a formal disciplinary matter which could be considered by the UWC.

Therefore, the defendants' motion for summary judgment is granted with regard to count VII(H).

(viii)  Duty of Fairness – Count VIII

Yale argues that with respect to Montague's claim that they breached a duty to ensure that the UWC II proceedings were conducted with basic fairness, "most of the allegations under count VIII are included in the breach of contract claims."  As such, they stand with their arguments in those sections.  With regard to Montague's additional arguments, Yale argues that they provided Montague with a fair, thorough, and impartial hearing, and did not act arbitrarily or capriciously in their decision to expel Montague.[64]

---

[64] Yale argues that "courts have recognized the need to give a university broad discretion to decide students disciplinary sanctions and the jury in this case should not be allowed to substitute its judgment for that of the UWC Panel and the Dean. . . ."  Yale further argues that "an intervention in Yale's processes would be particularly inappropriate given the absence of any evidence to support [Montague's] claim that, in similar cases, the penalty has been limited to a reprimand."

Montague argues in his opposition that Yale's conduct with respect to the UWC II proceedings, considered as a whole, deprived him of basic fairness.  Specifically, Montague argues that "Yale promises a sexual misconduct adjudicatory process which is fair, thorough, and impartial."  Montague also argues that Yale breached its duty of fairness by breaching the UWC procedures and argues that Yale failed to provide him with adequate notice of the complaint, failed to provide him with an opportunity to respond to the recommended penalty in advance, and arbitrarily and capriciously decided on an expulsion rather than a reprimand as a penalty.  Montague argues that, as captain of the basketball team, "his fate was virtually guaranteed."

Since the court concludes that there are genuine issues of material fact regarding the previously articulated breaches of contract claims based on the UWC procedures and Montague bases this claim and argument on those claims,[65] summary judgment is not warranted with regard to count VIII.

## III.  Title IX Gender Based Discrimination - Counts III and IX

Yale argues that it is entitled to judgment on Montague's gender discrimination claims because he failed to provide sufficient evidence of gender discrimination.

---

[65] Since the court is not granting summary judgment on this count based on his breach of contract claims, the court need not address Montague's additional arguments regarding inadequate notice and penalty at this time.

Montague argues in his opposition that he has established a *prima facie* case of gender discrimination and "his expulsion was motivated, at least in part, by his gender."

Title IX of the Civil Rights Act of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."  20 U.S.C. § 1681.

"Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline."  Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994).  Allegations of gender bias with respect to university disciplinary proceedings generally fall into two categories: 1) erroneous outcome cases and 2) selective enforcement cases.  Id. "[I]n neither case do wholly conclusory allegations suffice. . . ."  Id.

    (a)  UWC I – Count III

Yale argues that Montague failed to exhaust his administrative remedies with respect to UWC I by not contesting the panel report and not electing to appeal and, therefore, the Title IX discrimination claim based on UWC I should be dismissed.  Yale further argues that, even if he did not fail to exhaust his administrative remedies, there is no evidence that

gender was a motivating factor in this decision and Montague has not provided any evidence of intentional discrimination based on gender.[66]

While the complaint alleges that "Yale would not have considered the matter a UWC matter" nor found sexual harassment had the perpetrator been a woman, Montague has failed to provide any evidentiary support for his allegation. "Conclusory allegations will not suffice to create a genuine issue." Del. & Hudson Ry. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990). Montague has not provided any evidence that Yale's decision to treat Smith's UWC I complaint as sexual misconduct was due to gender bias, nor has he provided evidence that a similarly situated female was treated differently under similar circumstances. In addition, for purposes of this motion, Montague does not contest that Menon, Della Rocca, and Post "did not discriminate against Montague based on his gender." Montague admits that the UWC I panel members and Dean Miller did not discriminate against him based on gender. Therefore, Montague has failed to show that "gender [was] a motivating factor in the

---

[66] Yale argues in its reply that summary judgment should enter with regard to count III since Montague did not challenge the motion for summary judgment in his response. The court notes that Montague subsequently filed a sur-reply, which also did not specifically address count III. "[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned." Jackson v. Federal Exp., 766 F.3d 189, 198 (2d Cir. 2014). However, in his opposition and his sur-reply, Montague did address Title IX generally. Therefore, in an abundance of caution, the court will address the merits of count III.

decision to discipline,"[67] <u>Yusuf</u>, 35 F.3d 709 at 715, with respect to UWC I.

The defendants' motion for summary judgment is granted with respect to count III.

(b) <u>UWC II – Count IX</u>

Yale argues that Montague failed to produce any evidence demonstrating that the defendants intentionally discriminated against him based on his gender with respect to UWC II. Specifically, Yale argues that since Montague failed to provide any evidence of gender bias, summary judgment should enter in count IX. Yale points out that under the burden shifting framework established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), even assuming that Montague could establish a *prima facie* case of gender discrimination under Title IX, he cannot demonstrate that Yale's proffered reason, a violation of the misconduct policies, was a pretext for discrimination.

Montague argues in opposition that, under the <u>McDonnell Douglas</u> framework, a "prima facie case, combined with sufficient evidence to find that the [defendant's] justification is false,

---

[67] In so far as Montague is arguing that the sexual misconduct policies have a disparate impact on males, the court notes that "[w]hile a private plaintiff may bring a claim under Title IX for intentional discrimination, courts have held that a private right of action based on the alleged disparate impact of a policy is not cognizable under Title IX." <u>Nungesser v. Columbia University</u>, 244 F. Supp. 3d 345, 362 (S.D.N.Y Mar. 24, 2017) (citations omitted); <u>see also</u> <u>Xiaolu Peter Yu v. Vassar College</u>, 97 F. Supp. 3d. 448, 461 and note 6 (S.D.N.Y. Mar. 31, 2015).

may permit the trier of fact to conclude that the [defendant] unlawfully discriminated." Montague relies on Doe v. Columbia University, 831 F.3d 46 (2d Cir. 2016), to support his argument that he has established a prima facie case of gender discrimination under Title IX.[68]  Montague cites to the fact that "Yale faced immense pressure to crack down on the perceived epidemic of sexual misconduct."[69]  He argues that he "need not produce additional, independent evidence of discrimination where he has satisfied a prima facie case and produced sufficient evidence from which a jury could reject the defendant's proffered explanation for its conduct."

Yale replies that Montague's reliance on Doe v. Columbia University, 831 F.3d 46 (2d Cir. 2016), is misplaced because the standard of proof articulated by the second circuit in Doe "was limited to the specificity of pleading necessary to survive a motion to dismiss" and not summary judgment.  Yale argues that Montague's burden at the summary judgment stage is significantly higher; he must "demonstrate a genuine issue of material fact,

---

[68] In Doe v. Columbia University, the second circuit remanded the case for further proceedings, concluding that the plaintiff adequately pled facts that could plausibly support at least the needed minimal inference of gender bias to withstand a 12(b)(6) motion to dismiss, due to the temporary presumption under McDonnell Douglas, where the plaintiff pled allegations similar to the allegations pled by Montague in this case. Doe v. Columbia University, 831 F.3d at 57.

[69] Montague points out that the AAU survey and Salovey's call to redouble efforts happened on the same day that Gleason met with Roe to discuss a formal complaint.

not merely allegations of a plausible inference of gender bias." Yale states that "none of Montague's arguments demonstrate that the defendants were under pressure to target male students in an effort to address the issue of sexual misconduct on campus."

Montague makes two arguments in his sur-reply to show that he provided sufficient evidence to show gender bias. First, in support of his argument that Yale was under immense pressure to crack down on sexual misconduct, he provides evidence that Yale was pressured due to the Office of Civil Rights complaint, alleging that a sexually hostile environment existed at Yale, and the statement that Yale had not responded in a prompt and adequate manner.[70] Next, Montague argues that statements made by members of the disciplinary tribunal and statements by other university officials during Yale's Fall 2015 training for Title IX and UWC personnel, "show[] that the outcome of the disciplinary action against him was motivated at least in part by his male gender."[71]

---

[70] Montague also provided evidence of a hostile campus climate through reference to an open letter written by alumni to Salovey and Spangler, the AAU campus climate survey results, Salovey's call to redouble its efforts, and media articles on Yale's campus climate. He states that he was a high-profile student because he was the captain of the basketball team and the team was on its way to qualifying for the NCAA Tournament, which it had not accomplished since 1962. He points out that there were articles in the press on the basketball team and on him. Montague states that this is enough to show an inference of discriminatory intent based on gender bias.

[71] The court notes that Montague first made this argument in his sur-reply, after receiving, in discovery, video recordings from Yale's Fall 2005 two-day annual refresher training, which he provided to the court.

In this case, both parties make arguments regarding the impact of the McDonnell Douglas burden shifting framework.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). "Under McDonnell Douglas, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  If the plaintiff does so, the burden shifts to the defendant to articulate 'some legitimate, nondiscriminatory reason' for its action.  Once such a reason is provided, the plaintiff can no longer rely on the prima facie case, but may still prevail if [he or] she can show that the . . . determination was in fact the result of discrimination." Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010) (quoting McDonnell Douglas, 411 U.S. at 802 and citing Holcomb v. Iona College, 521 F.3d 130, 138 (2d Cir. 2008)).

In the context of Title IX gender discrimination claims, erroneous outcome cases refer to cases in which the plaintiff claims that "[he] was innocent and wrongfully found to have committed an offense." Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994).  "To establish an erroneous outcome, a plaintiff must first provide evidence indicating that the outcome of the proceeding was flawed." Doe v. Colgate University, 5:15-CV-1069 (LEK/DEP), 2017 WL 4990629 at *11 (N.D.N.Y Oct. 31, 2017), aff'd, No 17-3594-cv, 2019 WL 190515 (2d Cir. Jan. 15, 2019)(summary order)(citing Yusuf, 35 F.3d 709 at 716).  The

plaintiff can provide evidence that "cast[s] some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" or evidence of "particular procedural flaws affecting the proof." Yusuf, 35 F.3d 709 at 715.  Next, the plaintiff must provide evidence of a "causal connection between the flawed outcome and gender bias." Id.  The plaintiff must show that "gender bias was a motivating factor behind the erroneous finding," id.,[72] and "not merely allegations of a plausible inference of gender bias." Doe v. Colgate University, 5:15-CV-1069 (LEK/DEP), 2017 WL 4990629 at *12 (N.D.N.Y Oct. 31, 2017), aff'd, No. 17-3594-cv, 2019 WL 190515 (summary order)(2d Cir. Jan. 15, 2019).

The second circuit recently upheld a case where the district court granted summary judgment, concluding that the same types of external pressures articulated by Montague in this case,[73] without something more, did not create a genuine issue of fact for the jury. Doe, 2019 WL 190515.  Montague must show

---

[72] See also, Doe v. Colgate University, 5:15-CV-1069 (LEK/DEP), 2017 WL 4990629 at *11 (N.D.N.Y Oct. 31, 2017), aff'd, No 17-3594-cv, 2019 WL 190515 (summary order)(2d Cir. Jan. 15, 2019)("Because Title IX prohibits (under covered circumstances) subjecting a person to discrimination on account of sex, it is understood to 'bar[ ] the imposition of university discipline where gender is a motivating factor in the decision to discipline.'")(citation omitted).

[73] The allegations in Doe v. Columbia University, 5:15-CV-1069 (LEK/DEP), 2017 WL 4990629 at *12 (N.D.N.Y Oct. 31, 2017), include the fact that the university was under pressure to punish male students accused of sexual misconduct.  These pressures included the "Dear Colleague Letter," the Sexual Climate Forum, anti-sexual assault advocacy, the president's message, student activism, and allegations that the training was biased against men.

evidence, such as, "statements made by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender."  Yusuf, 35 F.3d 709 at 715.

In this case, Montague relies on his breach of contract allegations and his allegation of tortious interference with a contractual relationship to provide evidence of procedural flaws and to cast doubt on the accuracy of the outcome of the proceeding.  However, even assuming that Montague can prove that the proceedings were flawed due to Yale's failure to follow its own procedures, Montague must provide evidence to support the conclusion that Yale's actions were motivated by gender bias.[74]

For support that he provided sufficient evidence to show gender bias, Montague relies on evidence supporting his claim that Yale was under extreme pressure to prosecute sexual misconduct cases and relies on examples of statements and actions from Yale's Fall 2015 training for Title IX and UWC personnel.  While Montague may have shown that Yale was under pressure to be tough on complaints of sexual misconduct, he has

---

[74] Even if a plaintiff's "insistence that the sexual encounters were consensual was sufficient to raise a disputed issue of material fact on the question of misconduct, to resist summary judgment [the plaintiff] must demonstrate a genuine dispute of material fact as to whether [the University's] actions were motivated by gender bias." Doe v. Colgate University, No. 17-3594-cv, 2019 WL 190515 (summary order)(2d Cir. Jan. 15, 2019).

not shown that this pressure created a bias toward males, over females.[75] See Doe, 2019 WL 190515.

In addition, Montague has failed to show evidence of "statements made by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." Yusuf, 35 F.3d 709 at 715.  The statements and actions that Montague cites in his sur-reply, with respect to Yale's 2015 training, were taken out of context and do not create a genuine issue of material fact regarding gender bias.  For example, Montague points to a comment made by Spangler that "we don't have enough complaints."  However, Spangler was discussing how Yale had to reach out and change the culture, climate, and behavior and that the survey showed that people effected by sexual misconduct were not reporting those incidents at a high rate.  This comment does not show gender bias.

Another example that Montague points to is that Ms. Boyd, assistant dean of student affairs, acknowledged at the training that "'[a]lmost always, [there is] a presumption of female victims, male perpetrator.'"  However, Boyd did not make that

---

[75] Regarding Montague's argument that the evidence shows that the problem "Yale was called upon to solve was overwhelmingly a problem of sexual assaults committed by males against females," a private right of action for disparate impact is not cognizable under Title IX.  See, Xiaolu Peter Yu v. Vassar College, 97 F. Supp. 3d. 448, 461 and note 6 (S.D.N.Y. Mar. 31, 2015).

alleged comment.  Instead, it was a bullet point on a slide to which she was referring.  Boyd was commenting about prior studies from other campuses and she was pointing out that some past outside studies gave women victim surveys, and males perpetrator surveys, but noted that Yale did not do that in its survey.  Montague also cites to the fact that, at the training, Boyd presented outside research studies concerning sexual assault by college males, but then commented that: "We know that women commit acts of sexual violence – it turns up a little bit on our survey as well- but nobody, has done any significant research on that so I don't have much of anything to present on that."  The fact that no outside research studies were available on sexual violence committed by women is not sufficient to show that Yale is biased against males.[76]

The court concludes that Montague failed to provide evidence[77] that his gender was a motivating factor in Yale's decision to discipline him.  Therefore, the court concludes that there are no genuine issues of material fact for the jury and Yale is entitled to judgment as a matter of law on count IX.

---

[76] While Montague points to several other comments, these comments were also taken out of context and, after reviewing the content of the video recordings presented as evidence, the court concludes that the other comments do not create a genuine issue of material fact regarding gender bias.

[77] While Montague argues that he does not need to provide direct evidence of discrimination, he has failed to provide any indirect evidence that he was disciplined because he was male.  Although, Montague argues that he was a popular male athlete, Title IX does not provide protection for athletes.

## IV.   Other Common Law Claims arising from UWC II

### (a)   Defamation against Yale University and Gleason - Count IV

Yale argues that Montague has not challenged its motion for summary judgment with regard to count IV.  Therefore, Yale argues that summary judgment should be granted.

The court agrees.  Montague failed to address count IV in his opposition to Yale's motion for summary judgment and in his sur-reply.  "[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."  Jackson v. Federal Exp., 766 F.3d 189, 198 (2d Cir. 2014).  In addition, a party cannot defeat a motion for summary judgment "by relying on the allegations in his pleading . . . or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible."  Gottlieb v. County of Orange, 84 F.3d 511, 51 (2d Cir. 1996).  Therefore, the defendants' motion for summary judgment is granted with regard to count IV.[78]

---

[78] Even assuming *arguendo* that the Montague did not abandon his claim in count IV, he did not allege a cognizable claim for defamation.  Montague's allegations relate solely to statements made by Gleason to Roe regarding UWC I.  It is well settled that "for a claim of defamation to be actionable, the statement must be false . . . and under the common law, truth is an affirmative defense to defamation . . . the determination of the truthfulness of a statement is a question of fact for the jury." Cweklinsky v. Mobil Chemical Co., 267 Conn. 210, 228-229, 837 A.2d 759 (2004)(citations omitted). Montague failed to provide evidence of the falsity of the statement by Gleason to Roe, sufficient to withstand a motion for summary judgment based on substantial truth.

(b)  <u>Violation of Confidentiality and False Light against
     Yale University and Gleason - Count V</u>

Yale argues that Montague has not challenged its motion for
summary judgment with regard to count V and, therefore, summary
judgment should be granted.

The court agrees.  Montague failed to address count V in
his opposition to Yale's motion for summary judgment and in his
sur-reply.  Therefore, the court concludes that Montague
abandoned his claim.[79]  The defendants' motion for summary
judgment is granted with respect to count V.[80]

(c)  <u>Tortious Interference with a Contract – against
     Gleason, Killheffer, and others unknown - Count VI</u>

Yale argues, with respect to Montague's claim that Gleason
and Killheffer intentionally interfered with his contractual
relationship with Yale, that Montague failed to provide evidence
supporting his claim.[81]  With regard to Gleason, Yale argues that

---

[79]  <u>See</u> <u>Jackson v. Federal Exp.</u>, 766 F.3d 189, 198 (2d Cir. 2014).

[80]  Assuming *arguendo* that the Montague did not abandon his claim in count V,
he did not allege a cognizable claim for invasion of privacy.  Since
Montague's allegations relate solely to statements made by Gleason to Roe,
Montague has failed to meet the requirement of publication for a false light
invasion of privacy claim.  "Unlike the limited publication required to state
a claim for defamation, the publicity element of a false light invasion of
privacy claim requires publication of the allegedly false matter to the
public at large or to so many persons as to make it substantially certain
that the matter will become public knowledge." <u>Grigorenko v. Pauls</u>, 297 F.
Supp. 2d 446, 448 (D. Conn. Dec. 31, 2003).

[81]  Montague's claim alleges that the defendants violated Yale's strict
confidentiality requirements; falsely informed Roe that the informal
complaint process was not available; falsely informed or implied to Roe that

Gleason and Roe testified that Gleason did not inform Roe of a previous complaint against Montague, that he had been found responsible of misconduct, or that he had to participate in training because of that finding.  Yale further argues that both Gleason and Roe testified that Gleason informed Roe of all of the options, including offering Montague sensitivity training again in an informal complaint, abandoning the informal complaint, or proceeding with a formal complaint as either the complainant or a witness.  Yale states that, since Gleason and Roe "were the only witnesses to the conversations between them, there is no contrary evidence."

Montague argues in opposition that Berkman's initial draft report and email to the UWC indicate that "Gleason explained to Roe that Montague had already been given a recommendation for training after a previous complaint" and that "[t]his is an accurate statement of what [Roe] told me about her motivation. . . ."[82]

"A claim for tortious interference with contractual relations requires the plaintiff to establish (1) the existence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relationship, (3) the defendants' intent to

---

Montague was the subject of a previous complaint; and manipulated Roe into agreeing to participate in a formal complaint against Montague.

[82] Montague further argues that Roe's statement to Gleason falls within an exception to the rule against hearsay.

interfere with the relationship, (4) the interference was tortious, and (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct." Appleton v. Board of Ed., 254 Conn. 205, 212-13 (Aug. 15, 2000)(citation omitted).

"[F]or a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously . . . . [A]n action for intentional interference with business relations . . . requires the plaintiff to plead and prove at least some improper motive or improper means . . . . The plaintiff in a tortious interference claim must demonstrate malice on the part of the defendant, not in the sense of ill will, but intentional interference without justification . . . . In other words, [the plaintiff] bears the burden of alleging and proving lack of justification on the part of the actor." Daley v. Aetna Life and Cas. Co., 249 Conn. 766, 805-806 (1999)(citations and quotation marks omitted).

The court has denied summary judgment on count VII(A), which is related to Montague's allegation that Gleason breached the UWC's confidentiality requirement, based on disputed evidence suggesting that this alleged disclosure may have motivated Roe to pursue a formal complaint. Therefore, with

respect to Gleason, the court concludes that a genuine issue of material fact also exists with regard to count VI.

With regard to Killheffer, Yale argues that he did not meet or communicate with Jane Roe until February 23, 2016, after Dean Holloway had already accepted the recommendation of the UWC II panel to expel Montague.  Yale further argues that, at his depositions, Montague could not identify how Killheffer coerced Roe into filing a formal complaint.

Montague responds that Killheffer "admitted to participating in the decision to pursue a formal complaint against Montague, contrary to the established policy of the Title IX office," in his deposition.  Specifically, Montague responds that Killheffer "joined in the decision, made at the November 4, 2015 meeting of Yale's Title IX [l]eadership, that the Title IX [o]ffice would independently pursue a formal complaint against Montague (including by convincing Roe to participate in that complaint) in deliberate violation of the contractual obligation of impartiality."

The parties do not dispute that Killheffer had no contact with Roe until after the UWC II hearing.  However, Killheffer testified that he attended the November meetings and he agreed that "the group had made the decision to bring a formal complaint against [Montague] if [Roe] said she would participate in it."  He also testified that it was his understanding that

Gleason would meet again with Roe "to discuss the fact that these allegations were very serious" and see if Roe would be willing to speak to a fact-finder.

In viewing all inferences and ambiguities "in a light most favorable to the nonmoving party," Fed. R. Civ. P. 56(c), the court concludes that Montague provided some evidence to demonstrate a genuine issue of material fact with respect improper motive behind the November meetings, which Killheffer and Gleason attended. Therefore, as to both Gleason and Killheffer, the court denies the defendants' motion for summary judgment with respect to count VI.

<u>**CONCLUSION**</u>

Based upon the foregoing, the defendants' motion for summary judgment (document no. 142) is GRANTED in part and DENIED in part.

It is so ordered, this 29th day of March 2019, at Hartford, Connecticut.

/s/
_____
Alfred V. Covello
United States District Judge